# United States District Court

| NORTHERN | DISTRICT OF | CALIFORNIA |

**FILED**
2009 JAN 26 P 2: 11

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

UNITED STATES OF AMERICA

V.

ALBERT KE-JENG HU,
a/k/a Ke-Jeng Hu

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

SEALED BY ORDER OF THE COURT

09-70057 PVT

CASE NUMBER:

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about, __2/2005 to 6/2007__, in __Santa Clara County__ in the __Northern__ District of __California__ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally cause money to be wired in foreign commerce in furtherance of an investment fraud scheme

in violation of Title __18__ United States Code, Section(s) __1343__
I further state that I am a(n) __FBI Special Agent__ and that this complaint is based on the following
_Official Title_
facts:

See attached affidavit.

Maximum Penalties: 20 years imprisonment, $250,000 fine, 3 years supervised release, $100 special assessment fee.

No bail arrest warrant requested

APPROVED AS TO
FORM: _____
ASSISTANT UNITED STATES ATTORNEY JOSEPH A. FAZIOLI  —1/26/09

Continued on the attached sheet and made a part hereof: ☒ Yes  ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__1/26/09__  at  __San Jose, California__
Date                              City and State

DOCUMENT NO.  CSA's INITIALS
1

Patricia V. Trumbull
United States Magistrate Judge
_____
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT OF FBI SPECIAL AGENT GREGORY FINE
# IN SUPPORT OF CRIMINAL COMPLAINT

I, Gregory S. Fine, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed as a Special Agent since September 2006, and am presently assigned to the white collar crime squad in the San Jose Resident Agency Office of the San Francisco Division of the FBI. As a Special Agent, I am authorized to investigate crimes involving wire fraud, money laundering, mail fraud, securities fraud, and other complex crimes. I have successfully completed 18 weeks of criminal investigative training at the FBI Academy in Quantico, Virginia, which included training on investigating financial crime. Through my training and experience, as well as discussions with other agents, I have become knowledgeable in the methods employed to commit fraudulent crimes. The information set forth in this affidavit is based on my personal knowledge and that which has been provided to me by other agents with whom I have been working on this ongoing investigation.

2. This affidavit contains information necessary to establish probable cause in support of this Complaint. It is not intended to include every fact known to me or the Government. The information is based on my personal knowledge and observations during the investigation, information conveyed to me by other law enforcement and government officials, and my review of records, documents and other physical evidence obtained during this investigation. Except where specifically indicated, I have personally reviewed all of the records and the reports of interviews referred to in this affidavit.

3. As set forth below, there is probable cause to believe Albert Ke-Jeng Hu caused money to be wired in furtherance of a fraudulent high-yield investment scheme in violation of Title 18, United States Code, Sections 1343 (Wire Fraud).

//
//

## OVERVIEW

4.  My investigation has revealed that the defendant, Albert Ke-Jeng Hu, has been involved in an investment fraud scheme involving hedge funds he administered from 2002 to 2008. Hu and others told potential investors that they were operating hedge funds under the names Asenqua Beta Fund and Fireside LS Fund out of locations in Sunnyvale, San Francisco and elsewhere in the Northern District of California. Hu's company was located in Sunnyvale, California. Hu enticed victims to invest by promising them rates of returns as high as 20-30% a year. Additionally, Hu and others made several false representations regarding entities that were supposedly affiliated with these hedge funds, such as a prominent law firm, a fund administrator, an independent auditing firm, and a chief financial officer (CFO). In reality, neither the law firm, the fund administrator, nor the CFO ever had any connection with Hu's hedge funds. Furthermore, the so-called "independent" auditing firm was a facade Hu fabricated to lure victim-investors to invest in his funds. Hu used the names of these entities to legitimize the hedge fund and give the perception that the hedge fund was secure.

5.  Hu's materially false statements regarding his hedge funds and their affiliated entities caused victim-investors to wire substantial amounts to entities under his control. Documents obtained in the course of the investigation revealed that Hu caused the wiring of millions of dollars from victim-investors' bank accounts in the United States to bank accounts Hu held abroad.

## FACTS SUPPORTING PROBABLE CAUSE

Details of the Scheme

Victim-Investor "F.L."

6.  In September 2004, Hu approached victim "F.L.", a resident of Cupertino, California, regarding Hu's Asenqua Beta Fund. F.L. believed that Hu approached him because F.L. was a successful entrepreneur and venture capitalist in the Silicon Valley area of California, and because F.L. was well-known in the local Chinese-American community. Hu told F.L. that the Asenqua Beta Fund was closed to new investors, but that Hu was willing to make an exception for F.L. because of his status in the community. Hu showed F.L. purported historical

AFFIDAVIT OF GREGORY FINE
IN SUPPORT OF COMPLAINT                 2

data regarding the returns achieved by the Asenqua Beta Fund. F.L. was very impressed that the hedge fund had earned almost 50% returns for the first full year of its existence (2001) and continued to earn annual returns over 30% from 2002 to 2003.

7. F.L. met with Hu several times before deciding to invest. During one of these meetings in early 2005, Hu presented F.L. with the "audited" financial statements of the Asenqua Beta Fund. Hu represented that these financial statements had been prepared by an independent auditing firm called Castillo, Lyn, Cohen & Vijay, whose principal place of business was in San Francisco, California. These audited financial statements contained a balance sheet, which detailed the assets and liabilities of the Asenqua Beta Fund. According to the balance sheet, the net assets for the hedge fund totaled $140,870,552 as of December 31, 2004.

8. F.L. ultimately decided to invest with Hu in reliance upon his statements that his hedge funds: (1) had a history of high returns; and (2) were affiliated with an established and independent auditing firm which had conducted an audit of the fund. F.L. invested $100,000 in the Asenqua Beta Fund on or about February 8, 2005. F.L. later invested an additional $100,000 on or about February 23, 2005; $250,000 on or about July 6, 2005; $300,000 on or about December 20, 2005; and $250,000 on or about May 13, 2007. As a result of Hu's false representations, F.L. ultimately invested a total of $1,000,000 in the Asenqua Beta Fund. In each instance F.L. wired money from one of his accounts to a bank account Hu controlled. Specifically, the December 20, 2005 wire of $300,000 and the May 13, 2007 wire of $250,000 were wired from F.L.'s bank account in the United States to a bank account in the name of Fireside Capital Management at Credit Suisse Bank in Singapore.

9. To memorialize F.L.'s investment, Hu provided F.L. with a subscription booklet detailing the agreement between parties and, on two occasions, receipts. Hu signed these subscription booklet and receipts.

10. Subsequent to F.L.'s initial investment, F.L. began to receive what Hu claimed were accurate quarterly statements from the Asenqua Beta Fund. Hu or his assistant, Linda Danesh, usually hand-delivered the statements to F.L. The quarterly statements purported to confirm F.L.'s investments and showed the returns he was earning. The final statement that F.L.

AFFIDAVIT OF GREGORY FINE
IN SUPPORT OF COMPLAINT                3

received sometime around December 31, 2007 reported that F.L.'s principal investment of $1,000,000 had grown to $1,711,567.52. The quarterly statements contained what Hu represented was both his signature (as the fund's chief investment officer) and the signature of an individual named Tony Pollace (as the fund's chief financial officer.)

11. On October 25, 2005, Hu contacted F.L. to tell him that the Asenqua Beta Fund was changing its name to the Fireside LS Fund and would now be managed under the company name Fireside Capital Management. Hu explained that the Securities and Exchange Commission (SEC) had changed its regulations, which would now make it more expensive for the hedge fund to be managed in the United States. This additional cost would reduce the performance of the hedge fund. For this reason, Hu had started Fireside Capital Management, which was located in Singapore.

12. Shortly after this conversation, F.L. signed a fund withdrawal agreement with Hu, related to a potential transfer of $562,331.82 from the Asenqua Beta Fund to the Fireside LS Fund. The $562,331.82 represented F.L.'s $450,000 principal investment at the time, plus $112,331.82 in supposed earnings reflected on the quarterly statements Hu had provided F.L.

13. Around this time, Hu represented to F.L. that Hu could not simply transfer F.L.'s investment from one hedge fund to another. Hu stated that in order to perform the transfer, as an administrative matter F.L. needed first to open an account with the Fireside LS Fund. Hu told F.L. that he would have to invest an additional amount directly into the Fireside LS Fund in order to open this new account. In part as a result of Hu's representations regarding this supposed administrative requirement of additional funding, F.L. wired an additional $300,000 to the Fireside LS Fund on December 20, 2005.

14. In May 2007, Hu contacted F.L. regarding his investment in the Fireside LS Fund. During the course of the conversation, Hu falsely stated that F.L. was the only investor who had not invested $1,000,000 in the hedge fund. In fact, many investors had invested amounts less than $1,000,000 in Fireside LS hedge fund. In part due to this false statement, F.L. wired Hu an additional $250,000 on May 13, 2007.

15. In July 2007, F.L. requested that his investment in the Fireside LS Fund be

redeemed because he was planning on retiring and wanted to purchase a retirement house. Hu informed F.L. that it would take some time to liquidate F.L.'s investment in the hedge fund. Hu explained that it was important to liquidate F.L.'s investment at the proper time or it could affect other investors' money. After several months of asking Hu for his money, F.L. met Hu and both signed a withdrawal form dated November 26, 2007. Hu promised F.L. that his money would be returned soon based upon the signed withdrawal form, but never gave F.L. a specific time frame. Eventually, Hu stopped answering F.L.'s phone calls and emails and has to date failed to return any of F.L.'s money.

<u>Victim-Investor "J.V."</u>

16. Sometime during the course of F.L.'s investment, F.L. introduced victim "J.V." to Hu. J.V. was a resident of Palo Alto, California, a successful entrepreneur in Silicon Valley, and is currently the chief executive officer of a technology company in Sunnyvale, California. J.V. considered F.L. to be a professional investor and trusted his opinion.

17. On more than one occasion, J.V. met with Hu in at his conference room at Hu's Sunnyvale, California business location. In these meetings, Hu presented the Fireside LS Fund to J.V. as a potential vehicle for investment. According to Hu, the hedge fund: (1) had historically provided investors with a 20 to 30% annual return; and (2) was affiliated with an established and independent auditing firm, law firm, and fund administrator

18. Based upon a combination of Hu's representations regarding his hedge fund's high rates of return, their connection with reputable entities, and J.V.'s trust in F.L., on or about April 30, 2007, J.V. wired $2,000,000 from his bank account in the United States to a bank account held by Fireside Capital Management in Singapore. To memorialize his $2,000,000 investment in the Fireside LS Fund, J.V. and Hu signed a subscription agreement and Hu provided J.V. with a private placement memorandum (PPM).

19. The PPM Hu provided J.V. referenced Castillo, Lyn, Cohen & Vijay as the auditors for the Fireside LS Fund and GlobeOp Financial Services as the fund administrator. Additionally, both the PPM and subscription agreement referenced the law firm Pillsbury, Winthrop, Shaw, and Pittman as legal counsel to the Fireside LS Fund.

20. Subsequent to J.V.'s initial investment, J.V. began to receive what Hu claimed were accurate quarterly statements from the Fireside LS Fund. Hu or his assistant, Linda Danesh, usually hand-delivered these statements to J.V. Hu represented that these quarterly statements contained both his signature (as the fund's chief investment officer) and the signature of Tony Pollace (as the fund's chief financial officer.)

21. Immediately after receiving his first quarterly statement, J.V. began to have some suspicions about the hedge fund. The quarterly statements did not seem as professional as J.V. was expecting. A short while after J.V.'s suspicions began, J.V. met F.L. at a retreat for Credit Suisse clients at the Ritz Carlton in Half Moon Bay, California. F.L. informed J.V. that he was also becoming concerned about his investment and planned to ask for his money to be returned. In the months following, J.V. learned that F.L. was having difficulty withdrawing his money.

22. Based on his own suspicions and those of F.L., in March 2008, J.V. decided to request a full withdrawal of his investment. J.V. requested this withdrawal through emails to Hu. Ultimately both Hu and J.V. signed a withdrawal form detailing that J.V's money would be returned to him. In addition, J.V. requested a K-1 statement for tax purposes. Despite J.V.'s requests and these signed documents, J.V. has never received any money from Hu nor has Hu provided him with a K-1 statement.

Fraudulent Nature of the Scheme

23. There is probable cause to believe that Hu fabricated the existence of a so-called independent auditing firm – "Castillo, Lyn, Cohen & Vijay" to lure victim-investors to invest in his Asenqua Beta Fund and Fireside LS Fund. Hu manufactured and supplied to J.V. and F.L. investment documents which falsely reported that Castillo, Lyn, Cohen & Vijay was an independent auditor for the Asenqua Beta Fund and the Fireside LS Fund. Several of the documents Hu provided J.V. and F.L. also listed the address for the auditing firm as One Embarcadero Center, Suite 500, San Francisco, California. This property is leased from a company by the name of Regus.

24. According to representatives from Regus, as well as corresponding Regus documents, an entity named Castillo, Lyn, Cohen & Vijay leased this One Embarcadero Center

AFFIDAVIT OF GREGORY FINE
IN SUPPORT OF COMPLAINT                 6

property from October 2004 to June 2007. However, this entity has never been physically located at this address. Instead, "Castillo, Lyn, Cohen & Vijay" purchased a virtual office from Regus. The virtual office product enabled the company to have telephone answering in the company's name, fax and mail handling, and 16 hours of office usage. Hu personally signed the agreement between Regus and Castillo, Lyn, Cohen & Vijay for the virtual office product and paid for this product with his personal credit card. Additionally, the contact person on this agreement was Danesh, referenced above as Hu's assistant. Finally, the physical address of the firm Castillo, Lyn, Cohen & Vijay used on the Regus invoices was Danesh's home address in Los Altos, California.

25. There is also probable cause to conclude that Hu falsely claimed that a prominent hedge fund administrator, a law firm, and a CFO were affiliated with his hedge funds when in fact no such connection existed. Hu provided victim-investors with a PPM investment document listing GlobeOp Financial Services as the fund administrator for the Fireside LS Fund. GlobeOp Financial Services was a popular and well-known fund administrator for several other hedge funds at the time. Representatives from GlobeOp Financial Services have confirmed that they have never been the fund administrator for the Fireside LS Fund or the Asenqua Beta Fund.

26. The PPM and subscription agreement for the Fireside LS Fund listed the law firm Pillsbury, Winthrop, Shaw, and Pittman as the legal representation for the fund. Representatives from this law firm have confirmed that they never represented Hu, Fireside LS Fund, or the Asenqua Beta Fund. At one point, J.V.'s personal attorney contacted Pillsbury, Winthrop, Shaw, and Pittman to arrange a settlement for her client, but was surprised to find out that the law firm did not represent Hu or the Fireside LS Fund.

27. As discussed above, Hu provided to F.L. and J.V. quarterly financial statements of his hedge funds that were purportedly signed off by a chief financial officer of those funds named Tony Pollace. There is probable cause to believe that this signature was forged. An individual named Tony Pollace was in fact at one time chief financial officer for a semi-conductor company Hu once owned called Aplex. However, Aplex was shut down in the early 2000's and Pollace and Hu parted ways at that time. The signed quarterly statements for the Asenqua Beta Fund and

Fireside LS Fund that Hu provided F.L. and J.V. contained the signature "Tony Pollace." Pollace's full name is actually Anthony Pollace, and a check of California Department of Motor Vehicles records confirmed that Pollace signature contains his full first name. In an interview with the FBI, Pollace emphatically stated that he had not worked for Hu since his employment at Aplex, that he was not affiliated with the Asenqua Beta or Fireside LS Funds, and that the "Tony Pollace" signature on the quarterly statements Hu provided to F.L. and J.V. was a forgery.

28. F.L.'s May 13, 2007 investment of $250,000 by F.L. in the Fireside LS Fund was caused in part by Hu's false statement that F.L. was the only investor in the fund who had not invested at least $1,000,000. In fact, my investigation has determined that at the time Hu made this statement to F.L. several other victim-investors of the Fireside LS Fund had invested less than $1,000,000.

29. My investigation has confirmed that the false statements Hu made to F.L. and J.V. caused them to wire money from the United States to Hu in Singapore as detailed above.

30. Hu left the United States in June of 2008 and has not returned, which corresponds to the time period that investors began having difficultly contacting him. Law enforcement authorities in Singapore have confirmed that Hu closed his bank accounts in Singapore around December 2008 and transferred some of the money to Hong Kong and some of the money to Taiwan. A victim, residing in Taiwan, was able to arrange a meeting with Hu in December 2008 in Hong Kong. During the meeting, the victim asked Hu what he would do if the victim went through legal means to obtain the reimbursement of his lost investment. Hu replied that the victim could try and catch him. The victim believed this meant that Hu would hide if the victim started a legal proceeding. There is probable cause to believe that Hu has no intention of returning investors' money despite the quarterly statements he supplied victims showing that the money had earned significant returns and despite the signed agreements that Hu supplied victims stating that the money would be returned.

## CONCLUSION

31. Based on the above information contained in this affidavit, I believe there is probable cause to believe that defendant Albert Ke-Jeng Hu executed a scheme to defraud victim

AFFIDAVIT OF GREGORY FINE
IN SUPPORT OF COMPLAINT                    8

investors and that, in furtherance of the scheme, Hu caused money to be wired from the United States to Singapore, in violation of Title 18, United States Code, Section 1343.

_____
Gregory S. Fine
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

on this  26  day of January, 2009

_____
PATRICIA V. TRUMBULL
United States Magistrate Judge

AFFIDAVIT OF GREGORY FINE
IN SUPPORT OF COMPLAINT                9