Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable, Magistrate Judge

```
                                    )
United States of America,           )
                                    )   No. CR09-00487 RMW
            Plaintiff,              )
       vs.                          )
                                    )
Albert Ke-Jeng Hu.                  )
                                    )
            Defendant.              )
                                    )
_____     )
```

San Jose, California
Thursday, July 30, 2009

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES:**

For Plaintiff:

        JOSEPH P. RUSSONIELLO
        United States Attorney
        450 Golden Gate Avenue, 11th Floor
        San Francisco, California  94102
    **BY:  JOSEPH FAZIOLI**
         **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:

        Federal Public Defender
        Suite 575
        160 W. Santa Clara St.
        San Jose, CA 95113
    **BY:  CYNTHIA CHIN YOUNG LIE**
         **ASSISTANT FEDERAL PUBLIC DEFENDER**

Transcribed By:    Stacy Wegner
           Transcriber
           smwtyping@yahoo.com
           (859) 539-2802

1    Thursday, July 30, 2009                        9:35 a.m.

2

3           **THE COURT:**  United States versus Albert Ke-Jeng Hu,

4    CR09-00487 JW.

5           Counsel?

6           **MR. FAZIOLI:**  Good morning, Your Honor.  I'm Joseph

7    Fazioli on behalf of the United States.

8           **THE COURT:**  Mr. Fazioli.

9           **MS. LIE:**  Good morning, Your Honor.  Cynthia Lie

10   for Mr. Hu.  He's probably being brought up presently in

11   custody.

12          **THE COURT:**  The record should reflect that Mr. Hu

13   is present.  And I have -- he's here for a detention hearing,

14   and I have received a Pretrial Services report.

15          Has everybody else had an opportunity to receive

16   and review that?

17          **MR. FAZIOLI:**  We have, Your Honor.

18          **MS. LIE:**  Yes, Your Honor.

19          **THE COURT:**  The Government's position?

20          **MR. FAZIOLI:**  Your Honor, the Government agrees

21   with Pretrial Services that the Defendant should remain

22   detained pending trial.

23          The charges in this case are very serious involving

24   the Defendant -- Defendant's alleged involvement in hedge

25   fund fraud.  The -- the Defendant submits that he is a

1  serious risk of flight.  He left the United States in June of

2  2008 and did not return prior to his March 2009 arrest in

3  Hong Kong.  He's made statements --

4          **THE COURT**:  So he was extradited?

5          **MR. FAZIOLI**:  He was extradited.  He fought his

6  extradition from Hong Kong, but after extradition -- yes, we

7  were able to successfully obtain his extradition from Hong

8  Kong to the United States.

9          Prior to his arrest, the Defendant made statements

10  to victim-investors, which is -- which were consistent with

11  his understanding that -- that he was a fugitive.  He has --

12  he's indicated that he has access to sub -- substantial funds

13  abroad.  He's -- he's told other investors he has controls of

14  funds -- over a hundred million dollars.

15          As -- as the Court eluded to, we were required to

16  extradite him from -- from Hong Kong.  He opposed his

17  extradition.  He is a Taiwanese citizen.  If he -- my

18  understanding is -- is that if he were to flee to Taiwan for

19  -- for whatever reason, then it would be very difficult, if

20  not impossible, for the Government to get him back through

21  extradition.

22          He also has an extensive history of international

23  travel, including traveling to Mainland China.  And again, if

24  the Defendant were to make access to some resources and flee

25  to Mainland China, it would also be very difficult for us to

1    get him back in that case by extradition as well.

2         There's no indication that there are any kind of

3    sureties or substantial ties to the community that would keep

4    the Defendant here.

5         And he has a strong incentive to flee, given the

6    very substantial charges that he's facing in this case, and

7    the fact that he apparently had shifted a substantial amount

8    of money abroad.

9         Regarding economic danger, we would submit -- I --

10   I will concede that's not as strong a basis for detention as

11   for the risk of flight, which I think is -- frankly, this is

12   one of the clearest cases of a serious risk of flight that

13   I've dealt with as an AUSA.  But in regard to the economic

14   danger prong --

15        **THE COURT**:  I'll remind you when you say that every

16   time the next time.

17        **MR. FAZIOLI**:  Well --

18        **THE COURT**:  Go ahead.

19        **MR. FAZIOLI**:  -- like I said, this I think, is

20   actually near the top of the -- the top of the heap in that

21   regard.

22        Regarding economic danger, we do have concerns that

23   the Defendant, if -- if released, could continue to engage in

24   fraudulent conduct.

25        There is some indication that he is -- was engaging

1    in -- in additional hedge fund activities abroad.  I -- I

2    think it would be kind of a -- a legal question we'd have to

3    look into, whether it was -- poses a danger to the community,

4    but we do think that there is a serious risk that he could

5    pose an economic danger if released, given a pattern of

6    engaging in hedge fund fraud.

7              I just want to one point clear.  I raised an issue

8    about a website on Monday.  That the Defendant had a website.

9    Just to be clear about the facts on that, when we were pro --

10   when we were proceeding with trying to file papers related to

11   the extradition of the -- of the Defendant, it was my

12   recollection that we were able to see a website that was

13   active with the Defendant related to his funds.  And that

14   gave us concern that -- notwithstanding the fact that he may

15   have been arrested.  That he was still touting himself as --

16   as a -- as a hedge fund professional, which we think would

17   speak to there being a future economic danger to the

18   community.

19             Subsequent of Monday's hearing, we checked.  Those

20   -- those websites appear to have been taken down, some of

21   which may have been taken down very recently.  So we will no

22   longer proffer that fact in support of him being an economic

23   danger to the community, but given the -- the very serious

24   allegations in this case, we think that economic danger is

25   also something the Court could consider.

1          Lastly, I -- I -- I want to wish the -- to inform

2   the Court that one of the Defendant's victims is present at -

3   - in -- in the court today.  Other victims have asked the

4   Government to prevent -- present very brief statements to the

5   Court in furtherance of their right to be reasonably heard at

6   any public proceeding in the District Court regarding

7   release, pursuant to the Criminal Victims' Rights Act.  And I

8   don't know if I -- if -- if with the Court's permission, I

9   could -- I could present these very brief statements of some

10  of the victims?

11          **THE COURT:**  Why don't you go ahead and do that.

12          **MR. FAZIOLI:**  Mr. Verdiel (phonetic), who is in the

13  courtroom, is one of the victims of the Defendant.  The

14  Defendant is alleged to have stolen two million dollars from

15  Mr. Verdiel.

16          He has asked me to communicate that he thinks that

17  the Defendant should not be released, has concerns about --

18  that it would be very difficult to apprehend him if he were

19  to -- to flee, and -- and that he might use some of the money

20  that -- that he stole from Mr. Verdiel to facilitate his

21  flight.

22          **THE COURT:**  And is he the one that wanted to

23  actually make a statement to the Court?

24          **MR. FAZIOLI:**  No.  He's indicated that -- that it's

25  okay --

1          **THE COURT:**  If you make a statement, that's

2   sufficient.

3          **MR. FAZIOLI:**  I think that is sufficient.

4          **THE COURT:**  If there are victims here and you

5   actually wish to stand up and make a statement, you would be

6   allowed to do that.  The United States Attorney, I think, is

7   trying to represent your situation, so if that's adequate,

8   then that's okay.  But let me know if you want to -- and you

9   are, sir?

10         **MR. VERDIEL:**  I am Mr. Mark Verdiel (phonetic).

11         **THE COURT:**  Okay.  And -- and we've just been --

12  you've -- the United States Attorney has just been talking

13  about you.  So would you like to make a statement?

14         What -- what -- this is a prehearing Pretrial

15  release hearing.  What we're trying to decide is whether he

16  will be released on bail.  The only issue for bail, really,

17  is whether he will make his court appearances, so that's the

18  only issue we're dealing with.

19         So you may go ahead and tell me what you -- how you

20  feel about that.

21         **MR. VERDIEL:**  All right, Your Honor.  I truly

22  believe that Mr. Hu is a flight risk.  He fled once when we

23  were trying to get our funds back.  He disappeared it was

24  hard enough to find out where (inaudible).  We found him in

25  Hong Kong (inaudible).  He's a man of considerable --

1 considerable means.  He travels around the world in the most

2 expensive (inaudible) and conditions possible.  And I believe

3 that if he was released, he would probably -- would leave

4 again and it would be very hard to catch him.

5          **THE COURT:**  Thank you, sir.

6          **MR. FAZIOLI:**  Thank you, Mr. Verdiel.

7          **THE COURT:**  Is there anybody else who wants to say

8 anything about this?

9          **MR. FAZIOLI:**  I -- I don't think there's anyone

10 present in the courtroom.  I was --

11          **THE COURT:**  Okay.

12          **MR. FAZIOLI:**  -- just sent certain statements that

13 I've been asked to present to the Court.  They're fairly

14 brief.  I don't know if I can do that at this time?

15          **THE COURT:**  Okay.  Go ahead.

16          **MR. FAZIOLI:**  Another victim-investor Fu Yon Lin

17 (phonetic), who is one of the victim-investors that is

18 charged in the indictment.  It's alleged in the indictment

19 that he stole approximately a million dollars from Mr. Lin.

20          He has asked to communicate to the Court, "As a

21 victim who knew how clever this Elder Ke Hu is and how he

22 could lie his way out of anything, I go with other victims to

23 urge you to continue the detention of Mr. Albert Ke Hu.  He

24 is definitely a flight risk because he has stolen our money

25 and hide them overseas, and next time he may not be located

1  or found again.  Warmest regards Bob Fu Yon Lin."

2       The second statement is from a victim-investor

3  named Grace Jun (phonetic).  This is a victim-investor in

4  Taiwan who lost a significant amount of money that was

5  invested on behalf of her sister who was suffering from

6  cancer.

7       Ms. Jun has asked the Government to communicate to

8  the Court that, "We Nay Fay Grace Jun (phonetic), my husband,

9  Michael Chweng (phonetic) and my sister Yu May Dong

10  (phonetic) are in favor of further retaining Hu.

11       "Hu staying in Hong Kong was an attempt to escape

12  from the judgment for his misconduct.  He also arrogantly

13  announced that he was not afraid that we brought up a lawsuit

14  against him when Joe met him in Hong Kong.  There is no

15  reason to believe that he is going to abide from the law from

16  now on.

17       "His further retention would prevent him from

18  communicating with other documents, if there is any, to cloud

19  the facts, from destroying evidence, or from making false

20  statements, as he demonstrated to be good at before."

21       And I just want to be clear, the Joe they're

22  referring to is not me.  It is another individual named Joe

23  Yee (phonetic), who apparently spoke with the -- the

24  Defendant abroad.

25       Victim-investor three is Andy Yan (phonetic) who

1   resides in the Northern District of California.  He's asked

2   to communicate to the Court that, "I vote to detain him

3   further because I believe that he is certainly a flight risk,

4   and that will prevent him from making further false

5   documents.  And that is the most effective way to make him

6   cooperate with the Government in a timely manner."

7           I just want to be clear, the Government does not

8   proffer that -- that any kind of cooperation with the

9   Government is a basis for detention, notwithstanding what Mr.

10  Yan said, but I'm communicating his statement to the Court.

11          **THE COURT**:  That's fine.  It's -- I'm not --

12  understanding that you are reading that which was

13  communicated to you to be communicated to me.

14          **MR. FAZIOLI**:  Yes.  I just want to make it

15  unequivocally clear we're not arguing he should be detained

16  in order to facilitate any type of cooperation with the

17  Government.

18          Lastly, victim-investor four.  This is May Shang

19  Shwang (phonetic), a victim-investor in Taiwan who has asked

20  the Government to communicate to the Court that, "I also

21  agree to the -- the continuous detention of Albert Ke-Jeng Hu

22  is necessary, so that he will not destroy or alter evidence.

23  It will also prevent him from discussing with the case with

24  his former employees."

25          **THE COURT**:  All right.

1    **MR. FAZIOLI:**  So those are the victims' statements.

2  I think this is an extraordinarily strong case for detention,

3  particularly on the serious risk of flight, and we would

4  submit, unless the Court has any additional concerns.

5    **THE COURT:**  Ms. Lee?

6    **MS. LIE:**  Your Honor, as a threshold matter, I

7  would remind Counsel and the Court that detention as a danger

8  to the community is not available as an option to this court

9  when, in fact, the crime charged is for one (Inaudible - -

10  due to simultaneous colloquy.)

11    **THE COURT:**  And I'm actually not concerned about

12  that part, as much I -- as I am the flight.

13    **MS. LIE:**  I think, furthermore, that with all due

14  respect to the victims' statements and the sense of loss that

15  they had experienced, their votes, as they've been styled by

16  the Government, for detention tends to muddle those two

17  grounds, the economic harm, which the Government has

18  proffered as a completely invalid basis for detention, as

19  would the otherwise legitimate ground of risk of flight.

20    As far as the risk of flight is concerned, I think

21  that there were a number of things that need to be clarified

22  for the record regarding the Government's proffer.

23    Mr. Hu is, in fact, Taiwanese -- Taiwanese citizen.

24  He was born in Taiwan, as he indicated to Pretrial Services.

25  He is also a United States citizen, having naturalized over a

1   decade ago and -- and I believe that the Government may have

2   omitted that particular fact from its proffer.  I'm sure it

3   didn't mean to mislead the Court.

4          Mr. Hu reside -- entered the United States in 1986.

5   He obtained his doctoral degree from the Massachusetts

6   Institute of Technology in mechanical engineering.  He has

7   taught on the faculty at San Jose State University in their

8   mechanical engineering department.

9          He has a former wife, Mrs. Hu, who is referenced in

10  the Pretrial Services report, as well as two minor children,

11  aged four and -- and 11.  Although, Mrs. Hu was not willing

12  to speak extensively with me or to speak with Pretrial

13  Services -- and she did indicate that she would not be able

14  to provide Mr. Hu with a residence in the event that the

15  Court were to release him -- she did verify his employment at

16  -- or confirm to me his employment at San Jose State and also

17  confirmed their -- their -- their higher education,

18  specifically with Mr. Hu in Boston at MIT, and she also

19  confirmed the details of the -- the -- the family history.

20         I think the Government's characterization of Mr. Hu

21  having fought his extradition is somewhat incomplete and

22  inaccurate.  This was a circumstance in which Mr. Hu was

23  arrested in Hong Kong on March 17th of 2009.

24         Notably, Mr. Hu did not go to Taiwan where the

25  Government maintains that he would be nearly impossible to

1   extradite.  He did not go Taiwan.  He did not go to Mainland

2   China, despite connections in Mainland China.  He went to

3   Hong Kong.  Principality, which does, in fact, have an

4   Extradition Treaty with the United States.

5           He did, while he was in Hong Kong on what has been

6   routine quarterly business trip for him albeit, extended in

7   this particular instance -- while he was in Hong Kong, as the

8   Court has heard from the statements that were read by the

9   Government, he did meet with one of the victim-investors.

10          I, in fact, have been contacted by another of the

11  apparent victim-investors who volunteered to find a place to

12  stay for Mr. Hu.  This would be Eugene Quo (phonetic).

13          What I would also indicate is that having been

14  arrested on March 17th of 2009, this was not a situation

15  where the Government had yet indicted, and under the

16  Extradition Treaty between the United States and Hong Kong,

17  the Rule of Specialty, which limits the cause of action in

18  the charging country, based upon what information is provided

19  to the extraditing nation or entity is defined in large part

20  by the formal request, if any, that is provided by the

21  Government through the Secretary of State to their diplomatic

22  counterpart for Hong Kong, in this instance.

23          That package was not prepared until May.  So Mr.

24  Hu's electing to wait until that package was prepared and the

25  prompt issuance of a surrender order, without any contesting

1    of the applicability of the Treaty, without any contesting of

2    the specifics of this particular offense and whether they

3    meet the requirements of the Treaty, without any issue as to

4    jurisdiction or Hong Kong's authority to do this, Mr. Hu then

5    submitted to extradition.

6            Now, for the Government to characterize this as his

7    having fought his extradition, it's -- it's analogous to the

8    -- the -- the -- the Rule 5 and Rule 20 circumstance that we

9    often find here in this district when we have charging

10   districts within the United States.

11           As the Court is well aware, it is the practice of

12   the defense bar in almost every circumstance when a person is

13   charged in a complaint in the charging district, but arrested

14   here in this district, we will typically wait to waive

15   removal until we have an indictment.  That is not fighting

16   removal.  That is not contesting extradition, and that is, in

17   sum and substance, what Mr. Hu did in this particular

18   instance.

19           I agree.  He has international travel.  He has

20   routine international travel, and his travel in this

21   particular instance did not take him out of what his routine

22   international travel was.

23           The Marshals have custody of his travel documents,

24   both his Taiwanese and his United States citizen passport.

25   This is absolutely a situation where the Court can fashion

1   conditions that will address the issue of flight.

2          He has contacts here.  He has his children here.

3   His life has been here, notwithstanding the routine annual,

4   or rather quarterly business travel in which he is engaged,

5   and where, again, I would point out he did not flee to any

6   jurisdiction where he could not be reached.  And he did, in

7   fact, meet with victim-investors, or at least to the one that

8   is referenced in the Government's proffer.

9          I appreciate that Mr. Hu's conduct appears to have

10  upset deeply and hurt deeply a number of people, but that is

11  not the issue for this Court.

12         And I would also submit that the Government's

13  references to the evidence in this particular case, to the

14  factual allegations in this particular case -- as the Court

15  is aware, that is the least important element to be

16  considered by this Court in determining whether a person is a

17  flight risk.

18         And moreover, I think that it's inappropriate when

19  the Government, despite my request at the initial appearance,

20  has not provided any discovery regarding that -- the -- the -

21  - the material underlying those particular allegations.

22         What I would suggest is that the Court consider

23  releasing Mr. Hu to reside in a halfway house where he would

24  be adequately supervised, not only by Pretrial Services, by -

25  - but by the -- the -- the staff at CCC.

1              If the Court believes that more in the way of -- of

2    -- of actual financial sureties is necessary, which Mr. Hu is

3    certainly anticipating, that is still something that we can

4    still try and work on.  I believe that there are people

5    abroad who may be in a position to assist Mr. Hu in that

6    particular regard, although, local sureties are in short, if

7    nonexistent, supply.

8         THE COURT:  Your position concerning a halfway

9    house and perhaps electronic monitoring on top of that, how

10   do you feel about that?

11        MR. FAZIOLI:  We would oppose that.  We think --

12        THE COURT:  Why?

13        MR. FAZIOLI:  -- he should be detained as --

14   because we think that he's a -- a very significant risk of

15   flight.  We -- he's indicated to investors that he has access

16   to over a hundred million dollars.  He has shifted

17   substantial amounts of money abroad.

18             He is a Taiwanese citizen.  What's relevant about

19   that is the fact that he's a Taiwanese citizen means that if

20   he was for whatever reason able to get to Taiwan, he would be

21   virtually -- it would be extremely difficult for us to get

22   him back by extra --

23        THE COURT:  Because we don't have an Extradition

24   Treaty with Taiwan, and because he's a citizen they wouldn't

25   extradite him anyway?

1

2          **MR. FAZIOLI:**  It's my understanding that they would

3   not extradite him.  If oppose -- if he went to Taiwan and

4   opposed extradition, that it is -- it is virtually impossible

5   for me to be able to extradite him back to the United States.

6          **MS. LIE:**  And I would ask what the sources of that

7   representation are.  I do think that --

8          **MR. FAZIOLI:**  That's based on communications I've

9   had with -- with --

10          **THE COURT:**  Well, and --

11          **MR. FAZIOLI:**  -- law enforcement --

12          **THE COURT:**  And if --

13          **MR. FAZIOLI:**  -- and the department -- and the

14   Department of Justice.  And I -- I think that the -- the

15   allegation that he didn't go to Taiwan or China -- he has

16   traveled to Taiwan.  He has traveled to China.  He was

17   engaged in investment activities that relate to Taiwan.

18          The charges in this case were under seal, and

19   partially in the fact that there was concern that if they

20   were -- if they were unsealed, the Defendant would flee to

21   Taiwan or China where we couldn't reach him.

22          There's a mention about ties to the community.  The

23   fact that there's a complete lack of surety in this case, I

24   think, speaks volumes to being a risk of flight.  The fact

25   that he may have children or have had some contacts as a

1   professor here at -- in -- in this district did not prevent

2   him from essentially fleeing to -- to -- to Asia when the

3   investment scheme started to fall apart.

4          If he was prepared to leave the country and tell

5   investors that they could come and find him based on

6   financial problems, there's no reason to think he wouldn't

7   flee the country based on potential criminal liability, which

8   he is facing in this case.

9          And regards to -- there was some discussion about

10  the Rule of Specialty as it regards to -- in regards to him

11  fighting his extradition, and -- and I -- we -- without

12  getting too far into the weeds on that, I -- I disagree with

13  the argument that we were -- I -- I don't think that we were

14  required to, by the way, get an indictment in order to

15  extradite the Defendant from the United States -- from Hong

16  Kong to the United States.

17         He did not agree to waive his extradition and come

18  to the United States.  It was -- it required a great deal of

19  effort on the part of the Government to prepare the

20  extradition papers, which demonstrated, I think, in great

21  detail the almost overwhelming amount of proof against the

22  Defendant in this case.  If at the end of that process he

23  sort of decided to come to the United States, that he -- that

24  doesn't speak to the fact that he didn't resist his

25  extradition.

1          So no, we would -- we would certainly oppose any

2    kind of halfway house, electronic surveillance -- electronic

3    monitoring type situation -- situation.  He -- we believe he

4    did, in fact, flee to Asia before he was arrested, and he

5    communicated that to certain -- to victim-investors.

6          The statements of the victims, I think, are

7    relevant and something the Court should take into account

8    about him being a risk of flight.  These are people who

9    interacted with the Defendant.  They, frankly, know the

10   Defendant better than -- than I -- than -- as well as -- as

11   anyone in this courtroom today.

12         And I think that given his practice or his -- his

13   practice of international travel, his apparent flight once

14   this investment scheme started to go south, the statements

15   he's made to investors, his representations that he is worth

16   a substantial amount of money, and he has -- there's

17   indications he has substantial money abroad, and the complete

18   lack of sureties and -- and -- and meaningful ties to this

19   community, vis-a-vis his come -- the community is in Asia, I

20   think that it's -- it's -- it's clear that he should remain

21   detained pending trial due to serious risk of flight.

22         **MS. LIE:**  Your Honor, I'd like to respond briefly -

23   -

24         **THE COURT:**  Okay.

25         **MS. LIE:**  -- regarding the Government's argument

1   regarding the extradition.  I agree, no indictment was

2   necessary; however, a formal demand from the United States

3   was necessary through the regular diplomatic channels that

4   are set up for this purpose under the Treaty.

5          And that demand, which did include the indictment -

6   - that demand was not actually signed, frankly, by -- Mr.

7   Fazioli's aspect of that wasn't even signed until after the

8   month of May had begun.

9          The entire package -- I -- I can't determine from

10  the package itself when it was actually provided to Mr. Hu or

11  his counsel over there, but the simple fact remains that is

12  the demand -- it is the formal demand, the package with all

13  of the, you know, bells, whistles and ribbons, quite frankly,

14  that this Court has seen that delimits what the nature of the

15  prosecution can be in the -- the -- the requesting country.

16         And so much as in the removal context, it is -- it

17  is simply a matter of prudence and competent representation

18  to wait until that is provided.

19         **THE COURT:**  And I don't usually hold it against

20  anyone who -- who waits until all of the pieces are put

21  together to make sure that it is appropriate, so I -- I

22  understand your argument there.

23         **MR. FAZIOLI:**  The only point I have to make on that

24  is the -- the sort of preparation of the materials related to

25  the formal request is -- is so substantial as, I think, to be

1   different in kind from the typical issues related to Rule 5

2   proceedings, but I think that's kind of beside the point of

3   the main issues of why we think he's a serious risk of

4   flight.

5         I -- I will also say that, although I understand

6   the Court is not necessarily inclined to go with us on this

7   point, we do not think that it is somehow invalid for us to

8   argue that he's an economic danger to the community.  There

9   is case law that indicates that that is a potential basis --

10         **THE COURT:**  And I haven't --

11       **MR. FAZIOLI:**  -- for detention.

12         **THE COURT:**  I haven't said anything about that one

13   way or the other --

14       **MR. FAZIOLI:**  And we have --

15         **THE COURT:**  -- your argument concerning that.

16       **MR. FAZIOLI:**  We did submit to the Court and to

17   Defense Counsel a copy of the complaint in this case that, I

18   think, lays out in some more detail some of the allegations

19   regarding the Defendant's -- Defendant's conduct, and we will

20   work with -- to provide discovery to the defense.

21         **THE COURT:**  Okay.

22       **MR. FAZIOLI:**  So with that mind, we submit and

23   think he should be detained pending trial.

24        **MS. LIE:**  Your Honor, the plain terms of the Bail

25   Reform Act require that the Defendant be charged with a crime

1    of violence.  Now, a crime of violence is defined broadly,

2    but nowhere is there case law identifying this as a crime of

3    violence.

4            What I would also indicate is that -- you know, the

5    Government persists in characterizing Mr. Hu's trip to Hong

6    Kong as flight.  Again, given that he's traveling quarterly

7    to Asia, given that he was in Hong Kong.  That he met with

8    victims in Hong Kong.  That he discussed with them the -- the

9    nature of the allegations, apparently -- again, it's -- it's

10   -- it's hard to characterize that as flight when he had not

11   actually been charged.

12           And the Government wants to have it both ways.  On

13   the one hand they want to say, "Well, he knew that there were

14   charges and -- and -- and he was in Hong Kong, so basically

15   (Inaudible - - due to simultaneous colloquy.)

16       THE COURT:  Why don't we clarify it.  Let's really

17   clarify the timing issue.

18       MR. FAZIOLI:  My understanding is he left the

19   United States in June of 2008 and did not return prior to his

20   March 2009 arrest.  So to be clear, there's no indication he

21   was like quarterly --

22       THE COURT:  So the charges --

23       MR. FAZIOLI:  -- returning to the United States.

24       THE COURT:  The -- the indictment here is filed in

25   May of 2009, right?

1    **MR. FAZIOLI:**  Yes.  He was arrested in March of

2    2009.

3          **THE COURT:**  Because I -- I have the indictment in

4    front of me, which has a file of May 6, 2009.

5          **MR. FAZIOLI:**  Correct.  There was a criminal

6    complaint that was filed in this case.

7          **MS. LIE:**  And sealed.

8          **MR. FAZIOLI:**  And sealed.  That's correct.  In

9    January 26, 2009.

10          **THE COURT:**  (Inaudible).

11          **MR. FAZIOLI:**  This is what we submitted to the

12    Court and Defense Counsel in the --

13          **THE COURT:**  Right.  It's -- it --

14          **MR. FAZIOLI:**  -- in the courtroom so --

15          **THE COURT:**  Right.  It's not in -- it's in its own

16    folder?

17          **MR. FAZIOLI:**  Yes.

18          **THE COURT:**  It's not in this folder?

19          **MR. FAZIOLI:**  Yes.  And I -- I'll communicate about

20    merging those two case files --

21          **THE COURT:**  Okay.

22          **MR. FAZIOLI:**  -- in terms of on the PACER

23    electronic record.

24          "He left the United States in June of 2008.  He

25    didn't return prior to being arrested in March 2009.  During

1   the time period between June 2008 and March 2009, victims had

2   difficulty contacting Mr. Hu.  Hu appears at this time to

3   have forwarded money either outside the United States or just

4   started putting money in the name of other individuals.

5              "A victim-investor residing in Taiwan was able to

6   arrange a meeting in Hong Kong with Hu in December 2008.

7   During the meeting, the victim told -- asked Hu what could we

8   do if the victim went through legal means to obtain a

9   reimbursement of his lost investment.  And Hu replied that

10  the victim 'could try and catch him.'"

11             So to say that there were communications between

12  victim-investors and -- and Mr. Hu in Hong Kong, I -- yeah,

13  technically there were communications, but communications in

14  which, by all appearances, Mr. Hu is -- is telling the

15  victims of his fraud, "Well, why don't you try and come and

16  get me in Hong Kong," which -- which from the Government's

17  position is consistent with someone who is seeking to escape

18  responsibility for his actions and is, in fact, a fugitive.

19             This reference about quarterly trips to -- to Hong

20  Kong -- there's no indication that the Defendant was

21  returning to the United States on any kind of quarterly

22  basis, and he -- and he -- and I think the facts in this case

23  support a conclusion that when his investment scheme started

24  to go south, he left -- or fled the United States, and was

25  only caught -- was caught in Hong Kong on sealed charges in

1  March 2009.

2          Given that pattern of behavior, given his

3  representations to victims that he has access to over a

4  hundred million dollars, given the fact that money was not --

5  he -- he either transferred money abroad or transferred money

6  in other people's names than his, I think it's -- it's --

7  undoubtedly he's a serious risk of flight, given the complete

8  lack of sureties in this case and the overwhelming strong

9  incentive that having fled once, potentially to avoid

10  financial problems.  There's even a stronger incentive to

11  flee again to avoid criminal liability to places, which if he

12  were to flee would be very difficult for us to get him back.

13          **THE COURT**:  I find he's a flight risk and hold him

14  without bail pending further proceedings.  Do -- and he's

15  been arraigned on this indictment?

16          **MS. LIE**:  He has been arraigned on the indictment,

17  yes.

18          **THE COURT**:  And we've already given him a date

19  before the District Court?

20          **MS. LIE**:  We have not, Your Honor.  It is currently

21  indicated as a Judge Ware case.

22          **THE COURT**:  Right.

23          **MS. LIE**:  The Government has, since our initial

24  appearance, filed a notice of related case requesting that

25  Judge White take -- take responsibility for the criminal

1    case, as well as the companion SEC action, notwithstanding

2    the fact that there's been no appearance by Mr. -- Mr. Hu on

3    that matter.

4            While we're not opposing that at this particular

5    juncture, Judge White has not signed that order.  My

6    suggestion would be that we set this matter for August 17th

7    before Judge Ware as a control date, in the event that Judge

8    White signs the -- the order relating the case to his court.

9    Then I think that's -- the parties can work out a stipulation

10   to -- to put this on Judge White's August 17th calendar.

11           THE COURT:  I think that's a reasonable way to do

12   it so that it doesn't get lost between judges.  We need to --

13   to tie it down to a date.  I mean, the other thing is to put

14   it back in front of me for status, but why don't we just go

15   ahead and set it before Judge Ware on 8/17 at 1:30; is that

16   right?  1:30?

17           MR. FAZIOLI:  I agree.  That's reasonable.  The --

18   the suggestion defense counsel came up with, I agree with it.

19   I -- my only suggestion was that --

20           THE COURT:  We don't want to lose it.

21           MR. FAZIOLI:  I agree.  I only suggest we do it on

22   a date which Judge White was also available.  Since it's also

23   a Monday, my understanding is --

24           THE COURT:  Well, since they don't have their days

25   -- their dates on the same day, I can't do that.

```
1        MR. FAZIOLI:  No, they do, actually.  Judge White's
2    in the morning.
3        MS. LIE:  They do, and I believe that Judge White
4    does have a calendar that Monday morning.
5        THE COURT:  He has -- oh, on -- on 8/17?
6        MS. LIE:  Yes.
7        THE COURT:  Okay.
8        MS. LIE:  It's just in the morning, as opposed to
9    the afternoon --
10       MR. FAZIOLI:  Yeah.
11       MS. LIE:  -- and so it would require --
12       THE COURT:  Okay.
13       MS. LIE:  -- come coordination between the parties
14   and the courts to -- to --
15       THE COURT:  Well, why don't I leave it where it's
16   supposed to be, which is Judge Ware.  And if it gets changed
17   to Judge White before that, then the two of you can agree or
18   come back here, even without the Defendant, for a change if
19   you need my order to do that, to move it from -- from the
20   afternoon to the morning.
21       MR. FAZIOLI:  Thank you, Your Honor.
22       THE COURT:  I just don't want both judges picking
23   up something to see that they both have appearances with the
24   same case on the same day.
25       MR. FAZIOLI:  Understood, Your Honor.
```

1       **MS. LIE:**  That's fine.

2       **THE COURT:**  Okay.

3       **MS. LIE:**  Thank you.

4       **THE COURT:**  Anything further?  Thank you.

5       **MR. FAZIOLI:**  Thank you, Your Honor.

6          (Proceedings adjourned at 10:05 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5          **CERTIFICATE OF TRANSCRIBER**

6

7          I certify that the foregoing is a true and correct

8   transcript, to the best of my ability, of the above pages of

9   the official electronic sound recording provided to me by the

10  U. S. District Court, Northern District of California, of the

11  proceedings taken on the date and time previously stated in

12  the above matter.

13         I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties to the action

15  in which this hearing was taken; and, further, that I am not

16  financially nor otherwise interested in the outcome of the

17  action.

18

19  _____    10/3/11

20      Signature of Transcriber       Date

21

22

23

24

25