1

2                    IN THE UNITED STATES DISTRICT COURT

3               FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                           SAN JOSE DIVISION

5

    UNITED STATES,                )  CR-09-00487-RMW
6                                  )
                   PLAINTIFF,      )
7                                  )  JUNE 5, 2012
              VS.                  )
8                                  )  VOLUME 2
    ALBERT KE-JENG HU,            )
9                                  )
                   DEFENDANT.      )  PAGES 1-195
10   _____       )

11

12                    TRANSCRIPT OF PROCEEDINGS

13            BEFORE THE HONORABLE RONALD M. WHYTE

14               UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S:

17

18   FOR THE PLAINTIFF:  U.S. ATTORNEY'S OFFICE
                         BY:  JOSEPH FAZIOLI
19                       150 S. ALMADEN BLVD, STE 900
                         SAN JOSE, CA  95113
20

21   FOR THE DEFENDANT:  ATTORNEY AT LAW
                         BY:  JERRY FONG
22                       PO BOX 1040
                         PALO ALTO, CA  94302-1040
23

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185

                                                            1

1

2      OPENING STATEMENT BY MR. FAZIOLI        P.  19

3      OPENING STATEMENT BY MR. FONG           P.  33

4

5


6                    INDEX OF WITNESSES

7


8      PLAINTIFF'S

9      **FUYUAN BOB LIN**
            DIRECT EXAM BY MR. LUCEY           P.  60
10           CROSS-EXAM BY MR. FONG            P. 139

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                           2

1                    INDEX OF EXHIBITS

2                              MARKED          ADMITTED

3      PLAINTIFF'S

4      220-252, 257, 276, 278                  P. 57
       1                                       P. 71
5      2                                       P. 88
       26                                      P. 93
6      27                                      P. 94
       3, 4                                    P. 95
7      29, 30                                  P. 108
       5                                       P. 113
8      31, 6-11                                P. 121
       36                                      P. 130

9

10

11

12     DEFENDANT'S

13     16                                      P. 161
       1                                       P. 182

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

1    SAN JOSE, CALIFORNIA          JUNE 5, 2012

2                    P R O C E E D I N G S

3    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT

4    OF THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING, EVERYBODY.

6              MR. FONG:  GOOD MORNING, YOUR HONOR.

7              MR. FAZIOLI:  GOOD MORNING, YOUR HONOR.

8              THE COURT:  I JUST WANTED TO CHECK TO SEE

9    IF YOU HAD ANY PROBLEM WITH THE PREINSTRUCTIONS.

10             MR. LUCEY:  WELL, YOUR HONOR, AT LEAST

11   FOR THE GOVERNMENT'S PART WE CONFERRED LAST NIGHT

12   AND ALSO TALKED WITH OUR SUPERVISOR IN THE OFFICE

13   AND WE WERE ALL IN AGREEMENT THAT WE WOULD PREFER

14   AND RECOMMEND AND PROPOSE WE KEEP THE SPECIFIC

15   UNANIMITY LANGUAGE IN REGARD TO THE WIRE FRAUD

16   CHARGES.  I THINK MR. FONG IS IN AGREEMENT WITH

17   THAT.

18             THE COURT:  THAT'S FINE.  I HAVE NO

19   PROBLEM WITH THAT.  LET'S SEE WHERE WE NEED TO

20   STICK IT IN.

21             MR. FAZIOLI:  YOUR HONOR, I THINK IF THIS

22   IS THE PREINSTRUCTIONS, THE PRELIMINARY JURY

23   INSTRUCTIONS IT MIGHT BE APPROPRIATE TO PUT IT

24   AFTER UNDER THE CHARGE PRESUMPTION OF INNOCENCE

25   UNDER SUBSECTION ONE, THE DEFENDANT KNOWINGLY

                                                        4

1    DEVISED THE SCHEME OR PLAN TO DEFRAUD.

2            I ALSO WANT TO BE CLEAR IT'S OUR

3    UNDERSTANDING AND MY UNDERSTANDING FROM OTHER CASES

4    IN THIS DISTRICT THAT IF THE JURY IS INSTRUCTED ON

5    A SPECIFIC UNANIMITY INSTRUCTION, THAT DOES NOT

6    NECESSARILY MEAN THAT ULTIMATELY WHEN THEY FILL OUT

7    THE VERDICT FORM THAT THEY ARE REQUIRED TO

8    SPECIFICALLY LIST THE SPECIFIC FALSE STATEMENT.

9    IT'S SIMPLY THAT THEY ARE INSTRUCTED AS TO THEY

10   HAVE TO AGREE TO A FALSE STATEMENT AS PART OF THEIR

11   DELIBERATIONS.

12           THE COURT:  THAT'S CERTAINLY THE WAY IT'S

13   OFTEN DONE BUT WE CAN DEAL WITH THAT AT THE TIME.

14           MR. LUCEY:  CERTAINLY.

15           MAYBE FOLLOWING THAT THEN.

16           THE COURT:  I'M HAPPY WITH THE WAY -- I

17   THINK WE SHOULD IN THE FIRST PART, THE FALSE AND

18   FRAUDULENT PRETENSES, PROMISES, CHANGE THAT TO

19   CONSISTENT WITH THE UNANIMITY PORTION.

20           MR. FAZIOLI:  YOU WANT TO TAKE OUT THE

21   WORD FRAUDULENT AND ADD FALSE OR FALSE AND

22   FRAUDULENT PROMISES?

23           THE COURT:  FALSE AND FRAUDULENT PROMISE

24   OR STATEMENT.

25           MR. FONG:  YOUR HONOR, I'M SORRY, I

1    DIDN'T MEAN TO INTERRUPT. I JUST NOTICED THAT THE

2    INSTRUCTION ON THE SECOND ELEMENT AS TO

3    MATERIALITY, I KNOW THAT CAME OUT OF THE MODEL

4    INSTRUCTION AND I CERTAINLY DON'T HAVE A PROBLEM

5    WITH THAT IN THE ABSTRACT.

6          HOWEVER, I DID SUBMIT A MORE SPECIFIC

7    INSTRUCTION THAT'S BASED ON THE CASE OF U.S. V.

8    NEDER, N-E-D-E-R, WHICH HAS EXCEPT IT ADDS CAPABLE

9    OF INFLUENCING.

10          IN ESSENCE, THE PERSON TO WHOM THE

11    ALLEGED MISREPRESENTATION WAS DIRECTED.

12         I HAVE A COPY OF THAT PROPOSED JURY

13    INSTRUCTION IF THE COURT WISHES TO SEE IT.

14         MR. FAZIOLI: YOUR HONOR, I THINK THE

15    COURT'S PROPOSED PRELIMINARY INSTRUCTION TRACKS THE

16    MODEL INSTRUCTION. OUR POSITION WOULD BE IT SHOULD

17    TRACK THE MODEL INSTRUCTION IN TERMS OF PRELIMINARY

18    INSTRUCTIONS.

19         THE COURT: I'M SATISFIED WITH THE WAY I

20    HAVE IT NOW, BUT WE CAN TALK ABOUT A MORE SPECIFIC

21    INSTRUCTION AT THE TIME AT THE CLOSE OF EVIDENCE IF

22    YOU THINK IT'S APPROPRIATE.

23         IT STRIKES ME THAT IT BASICALLY SAYS THE

24    SAME THING.

25         SO THE FIRST ELEMENT IS GOING TO READ,

1    FIRST, THE DEFENDANT KNOWINGLY DEVISED A SCHEME OR

2    PLAN TO DEFRAUD OR A SCHEME OR PLAN FOR OBTAINING

3    MONEY OR PROPERTY BY MEANS OF FALSE OR FRAUDULENT

4    PROMISES OR STATEMENTS WITH ALL OF YOU AGREEING ON

5    AT LEAST ONE PARTICULAR FALSE PROMISE OR STATEMENT

6    THAT WAS MADE.

7              MR. FAZIOLI:  YOUR HONOR, CAN I JUST

8    INQUIRE SO THE COURT IS CONCERNED, WHY ARE YOU

9    DELETING THE TERM PRETENSES?

10             THE COURT:  BECAUSE ONE, IT WASN'T IN

11   YOUR PROPOSED STATEMENT IS ONE REASON.  AND THE

12   OTHER DOES JUST SEEMED TO ME TO BE KIND OF FUNNY TO

13   SAY -- I MEAN, I'M HAPPY TO PUT PRETENSES IN; WITH

14   ALL OF YOU AGREEING ON AT ONE PARTICULAR FALSE

15   PROMISE OR STATEMENT THAT WAS MADE.

16             DO YOU WANT TO ADD FALSE PRETENSE IN

17   THERE TOO?

18             MR. FONG:  IT'S FOR A PRELIMINARY

19   INSTRUCTION, YOUR HONOR.

20             IT APPEARS TO ME TO BE SOMEWHAT

21   REDUNDANT.  WE CAN MAYBE HASH THAT OUT BEFORE THE

22   FINAL INSTRUCTION.

23             MR. FAZIOLI:  YOU'VE EXPLAINED YOUR

24   REASONING AND IT'S PERSUASIVE.  SO WE ARE ALL RIGHT

25   WITH THE WAY YOU PROPOSED IT.

7

1          THE COURT:  OKAY.  ARE WE READY TO GO?

2          MR. FAZIOLI:  YES, YOUR HONOR.

3          MR. FONG:  YES, YOUR HONOR.

4          MR. FAZIOLI:  YOUR HONOR, WITH THE

5    AGREEMENT OF THE DEFENSE AFTER THE OPENING

6    STATEMENTS THE UNITED STATES WAS GOING TO READ A

7    STIPULATION INTO THE RECORD.

8          THE COURT:  THAT'S FINE.

9          MR. FAZIOLI:  I THINK IT WOULD SAVE TIME.

10   WE WILL DO THAT BEFORE WE CALL OUR FIRST WITNESS.

11         (WHEREUPON, THE FOLLOWING PROCEEDINGS

12   WERE HELD IN THE PRESENCE OF THE JURY:)

13         THE COURT:  ALL RIGHT, GOOD MORNING,

14   EVERYBODY.

15         WHAT I INDICATED TO YOU YESTERDAY WAS

16   THAT THE FIRST THING THIS MORNING WOULD BE THAT I

17   WOULD GIVE YOU SOME FURTHER INSTRUCTIONS WITH

18   RESPECT TO YOUR DUTIES IN THIS CASE, SO THAT'S WHAT

19   I'M GOING TO DO.

20         YOU ARE NOW THE JURY IN THIS CASE AND I'M

21   GOING TO TAKE A FEW MINUTES TO TELL YOU SOMETHING

22   ABOUT YOUR DUTIES AS JURORS AND TO GIVE YOU SOME

23   PRELIMINARY INSTRUCTIONS.

24         AT THE END OF THE TRIAL I WILL GIVE YOU

25   MORE DETAILED WRITTEN INSTRUCTIONS THAT WILL

1     ACTUALLY CONTROL YOUR DELIBERATIONS.

2               WHEN YOU DELIBERATE IT WILL BE YOUR DUTY

3     TO WEIGH AND TO EVALUATE ALL THE EVIDENCE RECEIVED

4     IN THE CASE AND IN THAT PROCESS, DECIDE THE FACTS.

5               TO THE FACTS AS YOU FIND THEM, YOU WILL

6     APPLY THE LAW AS I GIVE IT TO YOU WHETHER YOU AGREE

7     WITH THE LAW OR NOT.

8               YOU MUST DECIDE THE CASE SOLELY ON THE

9     EVIDENCE AND THE LAW BEFORE YOU AND MUST NOT BE

10    INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES,

11    OPINIONS, PREJUDICES OR SYMPATHY.

12              PLEASE DO NOT TAKE ANYTHING I MAY SAY OR

13    DO DURING THE TRIAL AS INDICATING WHAT I THINK OF

14    THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE, THAT

15    IS ENTIRELY UP TO YOU.

16              THIS IS A CRIMINAL CASE BROUGHT BY THE

17    UNITED STATES GOVERNMENT.  THE GOVERNMENT CHARGES

18    ALBERT HU WITH SEVEN COUNTS OF WIRE FRAUD.

19              THE CHARGES AGAINST MR. HU ARE CONTAINED

20    IS WHAT IS CALLED THE INDICTMENT.  THE INDICTMENT

21    SIMPLY DESCRIBES THE CHARGES THE GOVERNMENT BRINGS

22    AGAINST THE DEFENDANT.  THE INDICTMENT IS NOT

23    EVIDENCE AND DOES NOT PROVE ANYTHING.

24              MR. HU HAS PLEADED NOT GUILTY TO THE

25    CHARGES AND IS PRESUMED INNOCENT UNLESS AND UNTIL

1    THE GOVERNMENT PROVES HIM GUILTY BEYOND A

2    REASONABLE DOUBT.  IN ADDITION, THE DEFENDANT HAS

3    THE RIGHT TO REMAIN SILENT AND NEVER HAS TO PROVE

4    INNOCENCE OR PRESENT ANY EVIDENCE.

5              IN ORDER TO HELP YOU FOLLOW THE EVIDENCE,

6    I WILL NOW GIVE YOU A BRIEF SUMMARY OF THE ELEMENTS

7    OF THE CRIME OF WIRE FRAUD WHICH THE GOVERNMENT

8    MUST PROVE TO TAKE ITS CASE ON EACH OF THE COUNTS

9    ALLEGED.

10             IN ORDER FOR MR. HU TO BE FOUND GUILTY OF

11   THE OFFENSE OF WIRE FRAUD, THE GOVERNMENT MUST

12   PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

13   REASONABLE DOUBT.

14             FIRST, THE DEFENDANT KNOWINGLY DEVISED A

15   SCHEME OR PLAN TO DEFRAUD OR A SCHEME OR PLAN FOR

16   OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR

17   FRAUDULENT PROMISES OR STATEMENTS WITH ALL OF YOU

18   AGREEING ON AT LEAST ONE PARTICULAR FALSE PROMISE

19   OR STATEMENT THAT WAS MADE.

20             SECOND, THE STATEMENTS MADE AS PART OF

21   THE SCHEME WERE MATERIAL, THAT IS THEY HAD A

22   NATURAL TENDENCY TO INFLUENCE OR WERE CAPABLE OF

23   INFLUENCING A PERSON TO PART WITH MONEY OR

24   PROPERTY.

25             THIRD, THE DEFENDANT ACTED WITH THE

                                                    10

1    INTENT TO DEFRAUD, THAT IS THE INTENT TO DECEIVE OR

2    CHEAT.

3         AND FOURTH, THE DEFENDANT USED OR CAUSED

4    TO BE USED INTERSTATE OR INTERNATIONAL WIRES TO

5    CARRY OUT AN ESSENTIAL PART OF THE SCHEME.

6         IN DETERMINING WHETHER A SCHEME TO

7    DEFRAUD EXISTS YOU MAY CONSIDER NOT ONLY THE

8    DEFENDANT'S WORDS AND STATEMENTS BUT ALSO THE

9    CIRCUMSTANCES IN WHICH THEY WERE USED AS A WHOLE.

10        A DEFENDANT USES OR CAUSES SOMEONE TO USE

11   INTERSTATE WIRES WHEN HE KNOWS OR REASONABLY FOR

12   SEES IN THE ORDINARY COURSE OF BUSINESS, THAT ANY

13   WRITING SIGNAL OR SOUND WILL BE TRANSMITTED BY

14   MEANS OF WIRE, RADIO OR TELEVISION COMMUNICATION

15   FROM ONE STATE TO ANOTHER.

16        SIMILARLY, A DEFENDANT USES OR CAUSES

17   SOMEONE TO USE INTERNATIONAL WIRES WHEN HE KNOWS OR

18   REASONABLY FORESEES IN THE ORDINARY COURSE OF

19   BUSINESS, THAT ANY WRITING, SIGNAL OR SOUND WILL BE

20   TRANSMITTED BY MEANS OF WIRE, RADIO OR TELEVISION

21   COMMUNICATION FROM ONE COUNTRY TO ANOTHER.

22        IT DOES NOT MATTER WHETHER THE MATERIAL

23   WIRE WAS ITSELF FALSE OR DECEPTIVE, SO LONG AS THE

24   WIRES WERE USED AS PART OF THE SCHEME.  NOR DOES IT

25   MATTER WHETHER THE SCHEME OR PLAN WAS SUCCESSFUL OR

1     THAT ANY MONEY OR PROPERTY WAS OBTAINED.

2              IT IS EVIDENCE YOU ARE TO CONSIDER IN

3     DECIDING WHAT THE FACTS ARE CONSISTS OF ONE, THE

4     SWORN TESTIMONY OF ANY WITNESS.  TWO, THE EXHIBITS

5     WHICH ARE RECEIVED IN EVIDENCE.

6              AND THREE, ANY FACTS TO WHICH THE PARTIES

7     AGREE.

8              THE FOLLOWING THINGS ARE NOT EVIDENCE AND

9     YOU MUST NOT CONSIDER THEM AS EVIDENCE IN DECIDING

10    THE FACTS OF THE CASE:

11             ONE, STATEMENTS AND ARGUMENTS OF THE

12    ATTORNEYS.

13             TWO, QUESTIONS AND OBJECTIONS OF THE

14    ATTORNEYS.  YOU MUST CONSIDER A LAWYER'S QUESTIONS

15    TO UNDERSTAND THE ANSWERS OF A WITNESS, THE

16    LAWYER'S QUESTIONS ARE NOT EVIDENCE.

17             THREE, TESTIMONY THAT I INSTRUCT YOU TO

18    DISREGARD.

19             AND FOUR, ANYTHING YOU MAY SEE OR HEAR

20    WHEN THE COURT IS NOT IN SESSION EVEN IF WHAT YOU

21    SEE OR HEAR IS DONE OR SAID BY ONE OF THE PARTIES

22    OR BY ONE OF THE WITNESSES.

23             QUESTIONS MAY BE DIRECT OR

24    CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF

25    A FACT SUCH AS A TESTIMONY BY A WITNESS ABOUT WHAT

12

1    THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

2           CIRCUMSTANTIAL EVIDENCE IS INDIRECT

3    EVIDENCE, THAT IS, IT IS PROOF OF ONE OR MORE FACTS

4    FROM WHICH ONE CAN FIND ANOTHER FACT.

5           YOU ARE TO CONSIDER BOTH DIRECT AND

6    CIRCUMSTANTIAL EVIDENCE.  EITHER CAN BE USED TO

7    PROVE ANY FACT.  THE LAW MAKES NO DISTINCTION

8    BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR

9    CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE

10   HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

11          TO EXPLAIN CIRCUMSTANTIAL EVIDENCE A

12   LITTLE MORE, LET ME GIVE YOU AN EXAMPLE.  IF YOU

13   WAKE UP IN THE MORNING AND SEE THAT THE SIDEWALK IS

14   WET, YOU MAY FIND FROM THAT FACT THAT IT RAINED

15   DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE SUCH AS

16   A TURNED ON GARDEN HOSE MAY PROVIDE AN EXPLANATION

17   FOR THE WATER ON THE SIDEWALK.

18          THEREFORE, BEFORE YOU DECIDE THAT A FACT

19   HAS BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU

20   MUST CONSIDER ALL THE EVIDENCE IN LIGHT OF REASON,

21   EXPERIENCE AND COMMON SENSE.

22          THERE ARE RULES OF EVIDENCE THAT CONTROL

23   WHAT CAN BE RECEIVED INTO EVIDENCE.  WHEN A LAWYER

24   ASKS A QUESTION OR OFFERS AN EXHIBIT IN EVIDENCE

25   AND A LAWYER ON THE OTHER SIDE THINKS IT IS NOT

1   PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY

2   OBJECT.

3           IF I OVERRULE THE OBJECTION, THE QUESTION

4   MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I

5   SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

6   ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.

7           WHENEVER I SUSTAIN AN OBJECTION TO A

8   QUESTION, YOU MUST IGNORE THE QUESTION AND MUST NOT

9   GUESS WHAT THE ANSWER WOULD HAVE BEEN.

10          SOMETIMES I MAY ORDER THAT EVIDENCE BE

11  STRICKEN FROM THE RECORD AND THAT YOU DISREGARD OR

12  IGNORE THE EVIDENCE.  THAT MEANS THAT WHEN YOU ARE

13  DECIDING THE CASE YOU MUST NOT CONSIDER IT IS

14  EVIDENCE THAT I TOLD YOU TO DISREGARD.

15          IN DECIDING THE FACTS IN THIS CASE YOU

16  MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND

17  WHICH TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE

18  EVERYTHING A WITNESS SAYS, OR PART OF IT OR NONE OF

19  IT.

20          IN CONSIDERING THE TESTIMONY OF ANY

21  WITNESS, YOU MAY TAKE INTO ACCOUNT ONE, THE

22  WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

23  KNOW THE THINGS TESTIFIED TO.

24          TWO, THE WITNESS'S MEMORY.

25          THREE, THE WITNESS'S MANNER WHILE

                                                      14

1    TESTIFYING.

2              FOUR, THE WITNESS'S INTEREST IN THE

3    OUTCOME OF THE CASE, IF ANY.

4              FIVE, THE WITNESS'S BIAS OR PREJUDICE, IF

5    ANY.

6              SIX, WHETHER OTHER EVIDENCE CONTRADICTED

7    THE WITNESS'S TESTIMONY.

8              SEVEN, THE REASONABLENESS OF THE

9    WITNESS'S TESTIMONY;

10             AND EIGHT, ANY OTHER FACTORS THAT BEAR ON

11   BELIEVABILITY.

12             THE WEIGHT OF THE EVIDENCE AS TO A FACT

13   DOES NOT NECESSARILY DEPEND ON THE NUMBER OF

14   WITNESSES WHO TESTIFY ABOUT IT.

15             I WILL TALK NOW BRIEFLY ABOUT YOUR

16   CONDUCT AS JURORS WE DISCUSSED THIS A LITTLE BIT

17   YESTERDAY.

18             FIRST, KEEP AN OPEN MIND THROUGHOUT THE

19   TRIAL AND DO NOT DECIDE WHAT THE VERDICT SHOULD BE

20   UNTIL YOU AND YOUR FELLOW JURORS HAVE COMPLETED

21   YOUR DELIBERATIONS AT THE END OF THE CASE.

22             SECOND, BECAUSE YOU MUST DECIDE THIS CASE

23   BASED ONLY ON THE EVIDENCE RECEIVED IN THE CASE,

24   AND ON MY INSTRUCTIONS ON THE LAW THAT APPLIES, YOU

25   MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT

1    THE CASE OR TO THE ISSUES IT INVOLVES DURING THE

2    COURSE OF YOUR JURY DUTY.

3                 THUS, UNTIL THE END OF THE CASE OR UNLESS

4    I TELL YOU OTHERWISE, DO NOT COMMUNICATE WITH

5    ANYONE IN ANY WAY AND DO NOT LET ANYONE ELSE

6    COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

7    THE CASE OR ANYTHING TO DO WITH IT.

8                 THIS INCLUDES DISCUSSING THE CASE IN

9    PERSON, WRITING BY PHONE OR ELECTRONIC MEANS,

10   E-MAIL, TEXT MESSAGES, MESSAGING OR ANY INTERNET

11   CHAT ROOM, BLOG WEBSITE OR OTHER FEATURE.

12                THIS APPLIES TO COMMUNICATING WITH YOUR

13   FELLOW JURORS UNTIL I GIVE YOU THE CASE FOR

14   DELIBERATION AND IT APPLIES TO COMMUNICATING WITH

15   EVERYONE ELSE INCLUDING YOUR FAMILY MEMBERS, YOUR

16   EMPLOYER, THE MEDIA OR PRESS AND THE PEOPLE

17   INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR

18   FAMILY AND YOUR EMPLOYER THAT YOU HAVE BEEN SEATED

19   AS A JUROR IN THE CASE.

20                BUT IF YOU ARE ASKED OR APPROACHED IN ANY

21   WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS

22   CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED

23   NOT TO DISCUSS THE MATTER AND TO REPORT THE CONTACT

24   TO THE COURT.

25                BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE

                                                    16

1    AND LEGAL INSTRUCTIONS YOU MAY PROPERLY CONSIDER TO

2    RETURN A VERDICT, DO NOT READ, WATCH OR LISTEN TO

3    ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE

4    CASE OR ANYTHING TO DO WITH IT.  DO NOT DO ANY

5    RESEARCH SUCH AS CONSULTING DICTIONARIES SEARCHING

6    THE INTERNET OR USING OTHER REFERENCE MATERIALS AND

7    DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY

8    TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

9          THE LAW REQUIRES THESE RESTRICTIONS TO

10   ENSURE THAT THE PARTIES HAVE A FAIR TRIAL AND THE

11   SAME EVIDENCE THAT EACH PARTY HAS HAD AN

12   OPPORTUNITY TO ADDRESS.

13         A JUROR WHO VIOLATES THESE RESTRICTIONS

14   JEOPARDIZES THE FAIRNESS OF THE PROCEEDINGS.

15         IN ANY JUROR IS EXPOSED TO ANY OUTSIDE

16   INFORMATION, PLEASE NOTIFY ME IMMEDIATELY.

17         AT THE END OF THE TRIAL YOU WILL HAVE TO

18   MAKE YOUR DECISION BASED UPON WHAT YOU RECALL OF

19   THE EVIDENCE.

20         YOU WILL NOT HAVE A WRITTEN TRANSCRIPT OF

21   THE TRIAL THEREFORE IT'S IMPORTANT YOU PAY CLOSE

22   ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

23         IF YOU WISH YOU MAY TAKE NOTES TO HELP

24   YOU REMEMBER THE EVIDENCE.  IF YOU DO TAKE NOTES

25   PLEASE KEEP THEM TO YOURSELF UNTIL YOU AND YOUR

1    FELLOW JURORS GO TO THE JURY ROOM TO DECIDE THE

2    CASE.

3              DO NOT LET NOTE TAKING DISTRACT YOU FROM

4    BEING ATTENTIVE.  WHEN YOU LEAVE THE COURT FOR

5    RECESSES YOUR NOTES SHOULD BE LEFT IN THE COURTROOM

6    OR THE JURY ROOM.  NO ONE WILL READ YOUR NOTES.

7              WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD

8    RELY ON YOUR OWN MEMORY OF THE EVIDENCE.  NOTES ARE

9    ONLY TO ASSIST YOUR MEMORY.  YOU SHOULDN'T BE

10   OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR

11   FELLOW JURORS.

12             FROM TIME TO TIME DURING THE TRIAL IT MAY

13   BECOME NECESSARY FOR ME TO TAKE UP LEGAL MATTERS

14   WITH THE ATTORNEYS PRIVATELY EITHER BY HAVING A

15   CONFERENCE AT THE BENCH OR WHEN NECESSARY BY

16   CALLING A RECESS.  WE WILL DO WHAT WE CAN TO KEEP

17   THE NUMBER AND LENGTH OF THESE CONFERENCES TO A

18   MINIMUM.  I MAY NOT ALWAYS GRANT AN ATTORNEY'S

19   REQUEST FOR A CONFERENCE.

20             THE NEXT PHASE OF THE TRIAL WILL NOW

21   BEGIN.  FIRST EACH SIDE MAY MAKE AN OPENING

22   STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE,

23   IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT

24   THAT PARTY EXPECTS THE EVIDENCE WILL SHOW.

25             A PARTY IS NOT REQUIRED TO MAKE AN

1    OPENING STATEMENT.  THE GOVERNMENT WILL THEN

2    PRESENT EVIDENCE AND COUNSEL FOR THE DEFENDANT MAY

3    CROSS-EXAMINE.  THEN IF THE DEFENDANT CHOOSES TO

4    OFFER EVIDENCE, COUNSEL FOR THE GOVERNMENT MAY

5    CROSS-EXAMINE.

6              AFTER THE EVIDENCE HAS BEEN PRESENTED,

7    THE ATTORNEYS WILL MAKE CLOSING ARGUMENTS AND I

8    WILL INSTRUCT YOU ON THE LAW THAT APPLIES TO THE

9    CASE.

10             AFTER THAT YOU WILL GO TO THE JURY ROOM

11   TO DELIBERATE ON YOUR VERDICT.

12             ALL RIGHT.  SO THE DOES THE GOVERNMENT

13   WISH TO MAKE AN OPENING STATEMENT?

14             MR. FAZIOLI:  YES, YOUR HONOR.

15             THE COURT:  ALL RIGHT.

16

17        **OPENING STATEMENT BY MR. FAZIOLI**

18

19             MR. FAZIOLI:  GOOD MORNING.

20             BEFORE I BEGIN MY OPENING STATEMENT I

21   WANTED TO THANK YOU IN ADVANCE FOR YOUR SERVICE AND

22   THANK YOU FOR TAKING THE TIME TO SERVE AS JURORS ON

23   THIS CASE.

24             I ALSO WANTED TO BRIEFLY REINTRODUCE WHO

25   IS GOING TO BE AT GOVERNMENT TABLE DURING THE

1    COURSE OF THIS CASE.

2            MY NAME IS ASSISTANT UNITED STATES

3    ATTORNEY JOSEPH FAZIOLI.  AND I'M AN ASSISTANT

4    UNITED STATES ATTORNEY HERE IN THE NORTHERN

5    DISTRICT OF CALIFORNIA.

6            I'M WORKING ON THIS CASE WITH MY

7    COLLEAGUE TIM LUCEY WHO IS ALSO AN ASSISTANT

8    UNITED STATES ATTORNEY HERE IN THE NORTHERN

9    DISTRICT OF CALIFORNIA.

10           ALSO SITTING AT TABLE IS THE F.B.I. CASE

11   AGENT FOR THIS CASE GREG FINE.  ALSO SITTING AT

12   TABLE WHO IS WHO WAS NOT HERE YESTERDAY IS NINA

13   BURNEY.  SHE IS A LEGAL TECHNICIAN IN OUR OFFICE.

14   SHE WILL BE HELPING TO KEEP THE PRESENTATION MOVING

15   AND WILL ALSO WE WILL BE PROJECTING CERTAIN

16   DOCUMENTS ON THAT SCREEN THAT ARE RELEVANT TO THE

17   CASE.

18           "I WILL INVEST YOUR MONEY IN HIGH-TECH

19   STOCKS AND CAN GET YOU A 20 PERCENT RETURN."

20           "I HAVE A PHD FROM MIT WITH A GREAT TRACK

21   RECORD OF INVESTMENT SUCCESS.  AND MY INVESTMENT

22   FUNDS HAVE ASSETS TOTALLING OVER $200 MILLION.  BUT

23   MY INVESTMENT FUNDS REQUIRE A MINIMUM INVESTMENT OF

24   $1 MILLION."

25           "YOU CAN TRUST ME BECAUSE MY INVESTMENT

1    FUNDS ARE NOT A ONE-MAN SHOW.  BUT ARE AFFILIATED

2    WITH A LOT OF REPUTABLE ENTITIES, INCLUDING

3    PROMINENT LAW FIRMS, A HEDGE FUND ADMINISTRATION

4    FIRM, AN ACCOUNTING FIRM, AND AN INDEPENDENT

5    AUDITING FIRM THAT HAS REVIEWED OUR BOOKS.

6           AND THE CFO OF MY INVESTMENT FUNDS IS AN

7    INDIVIDUAL NAMED TONY POLLACK."

8           THE EVIDENCE AT THIS TRIAL WILL SHOW THAT

9    THESE ARE SOME OF THE PROMISES THAT THE DEFENDANT,

10   ALBERT HU, MADE TO INVESTORS TO GET THEM TO GIVE

11   HIM MONEY FOR THE INVESTMENT FUNDS THAT HE FOUND TO

12   BE CONTROLLED IN THE TIME PERIOD FROM 2002 TO 2008.

13          THE UNITED STATES WILL PRESENT EVIDENCE

14   AT THIS TRIAL THAT DURING THAT TIME PERIOD THE

15   DEFENDANT FOUNDED AND RAN A NUMBER OF INVESTMENT

16   FOUNDS AND OTHER COMPANIES.

17          THE MOST PROMINENT OF WHICH YOU WILL HEAR

18   ABOUT WERE CALLED THE ASENQUA BETA FUND, THE

19   FIRESIDE LS FUND, AND YOU WILL ALSO HEAR ABOUT

20   OTHER COMPANIES WITH THE NAME ASENQUA AND ABOUT

21   ANOTHER ONE OF THE DEFENDANT'S INVESTMENT FUNDS

22   WHICH WAS CALLED THE ASENQUA MULTI STRATEGY FUND.

23          THE DEFENDANT ALBERT HU RAN THOSE

24   INVESTMENT ACTIVITIES THROUGH A COMPANY HE WAS IN

25   CONTROL OF CALLED ASENQUA CAPITOL.

1           YOU MAY HEAR EVIDENCE THAT THE DEFENDANT

2    HIRED SOME PEOPLE TO WORK FOR HIM INCLUDING AN

3    OFFICE MANAGER NAMED LINDA DANESH.

4           BUT THE EVIDENCE WILL SHOW THAT THE

5    DEFENDANT WAS THE PERSON IN CHARGE, THE DRIVING

6    FORCE BEHIND HIS INVESTMENT FUNDS, THE PERSON WHO

7    CONTROLLED THOSE FUNDS AND CONTROLLED WHAT HAPPENED

8    TO THE MONEY.

9           YOU WILL HEAR EVIDENCE THAT THE DEFENDANT

10   MADE VARIOUS PROMISES TO GET PEOPLE TO INVEST THEIR

11   MONEY AND THAT HE MADE THOSE PROMISES TO MANY

12   DIFFERENT PEOPLE, MANY DIFFERENT TIMES AND IN MANY

13   DIFFERENT WAYS, BOTH VERBALLY BUT ALSO IN WRITING.

14          FIRST, THE DEFENDANT PROMISED INVESTORS

15   THAT THEIR MONEY WOULD ACTUALLY BE INVESTED.  AND

16   THAT IT WOULD BE INVESTED IN HIGH-TECH STOCKS.  THE

17   DEFENDANT PROMISED THAT THEIR MONEY WOULD BE

18   INVESTED -- THAT PEOPLE WERE INVESTING IN A HEDGE

19   FUND.

20          AND YOU WILL SEE CERTAIN INVESTMENT

21   RELATED DOCUMENTS THAT THE DEFENDANT PROVIDED TO

22   INVESTORS TO GET THEM TO INVEST AND IN CONNECTION

23   WITH THEIR INVESTMENTS.

24          YOU WILL SEE A DOCUMENT CALLED A PPM THAT

25   SEVERAL INVESTORS WERE PROVIDED.  THIS IS A

1    DOCUMENT RELATED TO A POTENTIAL INVESTMENT THEN YOU

2    WILL SEE A DOCUMENT CALLED A SUBSCRIPTION BOOKLET

3    WHICH RELATES TO WHEN PEOPLE DECIDED TO INVEST AND

4    THE DOCUMENTS WERE SIGNED OFF BY BOTH THE DEFENDANT

5    AND THE INVESTOR.

6         THE DEFENDANT ALSO TOLD INVESTORS THAT

7    THEY COULD TRUST HIM BECAUSE HE HAD RETAINED

8    SEVERAL REPUTABLE COMPANIES THAT WERE ASSOCIATED

9    WITH HIS INVESTMENT FUNDS.

10        AND THE DEFENDANT TOLD INVESTORS IN

11   WRITING THAT HE HAD RETAINED THE PROMINENT NATIONAL

12   LAW FIRM OF PROSKAUER ROSE.  THE DEFENDANT ALSO

13   TOLD INVESTORS IN WRITING THAT THE ACCOUNTING FIRM

14   SYLAR WERE THE ACCOUNTANTS FOR THE FUND.

15        THE DEFENDANT ALSO TOLD INVESTORS IN

16   WRITING THAT THE HEDGE FUND ADMINISTRATIVE FIRM

17   GLOBEOP WAS HAD BEEN RETAINED BY THE FUND AND WAS

18   GOING TO BE PROVIDING ADMINISTRATIVE SERVICES FOR

19   HIS INVESTMENT FUNDS.

20        THE DEFENDANT ALSO TOLD INVESTORS THAT

21   THIS SUPPOSEDLY INDEPENDENT AUDITING FIRM OF

22   CASTILLO, LYN, COHEN & VIJAY HAD SIGNED OFF ON THE

23   BOOKS RELATED TO HIS INVESTMENT FUNDS.

24        THE DEFENDANT PROVIDED DOCUMENTS TO

25   INVESTORS WHICH PURPORTEDLY HAD BEEN WRITTEN BY

23

1    THIS SO CALLED INDEPENDENT ACCOUNTING FIRM,

2    CASTILLO, LYN, COHEN & VIJAY AND BY A CPA WITH THAT

3    FIRM NAMED JUNE CASTILLO.

4           BASED ON THOSE PROMISES AND OTHER ONES

5    THAT YOU WILL HEAR OVER THE COURSE OF THIS TRIAL,

6    THE DEFENDANT WAS ABLE TO RAISE MILLIONS OF DOLLARS

7    FROM INVESTORS AROUND THE WORLD, LIVING IN BOTH THE

8    UNITED STATES AND IN TAIWAN.

9           AND DURING THIS TRIAL YOU WILL BE HEARING

10   TESTIMONY FROM A NUMBER OF THOSE INVESTORS WHO ARE

11   GOING TO COME IN AND PRESENTS EVIDENCE.  THEY WILL

12   TESTIFY WHAT THEY WERE TOLD BY THE DEFENDANT AND

13   TESTIFY TO SOME OF THE DOCUMENTS PROVIDED BY HIM.

14          SOME OF THE INVESTORS WILL INCLUDE FUYUAN

15   LIN, ALSO KNOWN AS BOB LIN.  JOHN MARK VERDIELL,

16   GRACE DOONG, ANDY YAN.

17          THOSE INVESTORS WILL TESTIFY THAT THE

18   PROMISES THAT THE DEFENDANT MADE TO THEM INFLUENCED

19   THEM TO INVEST MONEY WITH THE DEFENDANT.

20          THEY WILL TESTIFY IF THEY HAD KNOWN THAT

21   THOSE PROMISES WERE FALSE, THEY WOULDN'T HAVE

22   INVESTED MONEY WITH THE DEFENDANT.  THEY WOULDN'T

23   HAVE WIRED HIM MONEY.

24          THE EVIDENCE WILL SHOW THAT AFTER THE

25   DEFENDANT RECEIVED THESE INVESTORS MONEY AFTER HE

1    RECEIVED MILLIONS OF DOLLARS FROM THEM, THAT HE

2    SUBMITTED TO THEM FINANCIAL DOCUMENTS CLAIMING THAT

3    THEIR INVESTMENTS WERE DOING GREAT, THAT THEIR

4    INVESTMENTS WERE GETTING GREAT RETURNS THAT, IN

5    SOME INSTANCES THEIR MONEY HAD MORE THAN DOUBLED.

6         HE ALSO REPRESENTED TO INVESTORS THAT

7    THEIR MONEY HAD ACTUALLY BEEN INVESTED.  YOU WILL

8    SEE EVIDENCE THAT THE DEFENDANT SIGNS ALL THESE

9    DOCUMENTS.  THESE UPDATES ABOUT PEOPLE'S

10   INVESTMENTS, AND THAT THESE DOCUMENTS THESE

11   INVESTMENT UPDATES ARE SUPPOSEDLY CO-SIGNED BY THE

12   CFO OF HUES INVESTMENT FUNDS, AN INDIVIDUAL NAMED

13   TONY POLLACE.

14        SO THE DEFENDANT WAS ABLE TO RAISE

15   MILLIONS OF DOLLARS FROM INVESTORS BUT THE EVIDENCE

16   WILL SHOW THAT UNFORTUNATELY FOR THE PEOPLE WHO

17   TRUSTED THE DEFENDANT, AND TRUSTED HIM WITH THEIR

18   MONEY, THE REALITY WAS QUITE DIFFERENT FROM WHAT

19   ALBERT HU HAD TOLD THEM.

20        THE EVIDENCE WILL SHOW THAT THE

21   DEFENDANT, ALBERT HU, LIED TO INVESTORS TO GET

22   THEIR MONEY.  YOU WILL HEAR FROM REPRESENTATIVES OF

23   THE VARIOUS COMPANIES THAT THE DEFENDANT TOLD

24   INVESTORS WERE CONNECTED WITH HIS INVESTMENT FUNDS.

25   THESE WITNESSES WILL ALL TESTIFY IN ESSENCE THAT

1    THEIR ORGANIZATIONS NEVER HAD ANYTHING TO DO WITH

2    THE DEFENDANT AND HIS INVESTMENT FUNDS.

3              THE EVIDENCE WILL SHOW THAT THE DEFENDANT

4    LIED TO INVESTORS ABOUT PROSKAUER ROSE BEING ONE OF

5    THE LAW FIRMS FOR HIS INVESTMENT FUNDS.  PROSKAUER

6    ROSE IS A PROMINENT NATIONAL LAW FIRM.  BUT YOU

7    WILL HEAR FROM A REPRESENTATIVE OF THAT FIRM THAT

8    THE DEFENDANT AND HIS INVESTMENT FUNDS WERE NEVER

9    ONE OF THEIR CLIENTS.  AND THAT THEY LOOKED AND

10   THERE WAS NO EVIDENCE THAT THE DEFENDANT WAS EVER A

11   CLIENT OR THAT PROSKAUER ROSE DID ANY WORK FOR THE

12   DEFENDANT OR HIS INVESTMENT FUNDS.

13             THE EVIDENCE WILL SHOW THAT THE DEFENDANT

14   LIED ABOUT THE ACCOUNTING FIRM, SYLAR BEING THE

15   ACCOUNTANTS FOR HIS FUNDS.  SYLAR IS AN ACCOUNTING

16   FIRM IN THE BAY AREA, BUT YOU WILL ALSO HEAR FROM A

17   REPRESENTATIVE OF THE SYLAR FIRM THAT NEITHER THE

18   DEFENDANT NOR HIS FUNDS WERE EVER A CLIENT OF THE

19   FIRM.  AND THAT THERE'S NO INDICATION THAT THEIR

20   FIRM DID ANY WORK FOR THE DEFENDANT AND HIS

21   INVESTMENT FUNDS.

22             YOU WILL ALSO HEAR EVIDENCE THAT THE

23   DEFENDANT LIED WHEN HE REPRESENTED THAT THE HEDGE

24   FUND ADMINISTRATIVE FIRM GLOBEOP HAD BEEN RETAINED

25   BY HIS FUND.  GLOBEOP IS A HEDGE FUND

1    ADMINISTRATIVE FIRM, BUT AGAIN YOU WILL HEAR

2    EVIDENCE FROM A REPRESENTATIVE OF THAT COMPANY THAT

3    ALBERT HU AND HIS FUNDS WERE NOT A CLIENT OF THE

4    FIRM.

5            THE EVIDENCE WILL ALSO SHOW THAT

6    CASTILLO, LYN, COHEN & VIJAY, THE SO CALLED

7    INDEPENDENT ACCOUNTING FIRM WHEN HU TOLD INVESTORS

8    HAD LOOKED OVER HIS BOOKS INDEPENDENTLY IN

9    CONNECTION WITH THE ESTABLISHED STANDARDS, THAT THE

10   EVIDENCE WILL SHOW THAT CASTILLO, LYN, COHEN &

11   VIJAY NEVER ACTUALLY EXISTED.  RATHER, THE EVIDENCE

12   WILL SHOW THAT CASTILLO, LYN, COHEN & VIJAY WAS A

13   SHAM THAT HU CREATED TO CITY HAS FRAUD SCHEME.

14           THE EVIDENCE WILL SHOW THAT CASTILLO,

15   LYN, COHEN & VIJAY OTHER CERTAINLY NOT INDEPENDENT

16   IN ANY WAY.  THE DEFENDANT HIMSELF PAID FOR THE

17   OFFICE SPACE FOR THE CASTILLO, LYN, COHEN & VIJAY

18   FIRM.  THE DEFENDANT PAID FOR THIS OFFICE SPACE,

19   PUT DOWN A DEPOSIT FOR IT WITH HIS OWN CREDIT CARD,

20   AND HE DIRECTED HIS OFFICE ASSISTANT LINDA DANESH

21   TO SUBMIT AN APPLICATION FOR THIS OFFICE SPACE, AN

22   APPLICATION WHICH CONTAINS THE DEFENDANT'S CREDIT

23   CARD.

24           YOU WILL ALSO HEAR THAT THERE IS NO

25   EVIDENCE THAT CASTILLO, LYN, COHEN & VIJAY HAS EVER

27

1    EXISTED AS AN AUDITING FIRM.  YOU WILL HEAR

2    TESTIMONY FROM A REPRESENTATIVE OF THE CALIFORNIA

3    BOARD OF ACCOUNTANCY.  THIS IS A REGULATORY ENTITY

4    THAT AMONG OTHER ROLES IS TASKED TO PROTECT

5    CONSUMERS BY ENSURING ONLY QUALIFIED LICENSEES AND

6    OTHER FIRMS PRACTICE ACCOUNTANCY IN ACCORDANCE WITH

7    ESTABLISHED PROFESSIONAL STANDARDS.

8            THIS IS AN ENTITY THAT TRACKS AUDIT AND

9    ACCOUNTING FIRMS IN CALIFORNIA.

10           YOU WILL HEAR THIS WITNESS FROM THE

11   CALIFORNIA BOARD OF ACCOUNTANCY TESTIFY THAT THEY

12   HAVE NO RECORD OF A CASTILLO, LYN, COHEN & VIJAY

13   EVER EXISTING AS AN AUDITING FIRM IN CALIFORNIA NOR

14   DO THEY HAVE ANY RECORD OF A JUNE CASTILLO AS A CPA

15   IN CALIFORNIA.

16           YOU WILL ALSO HEAR EVIDENCE FROM A

17   WITNESS WITH THE CALIFORNIA EMPLOYMENT DEVELOPMENT

18   DEPARTMENT WHICH IS ALSO KNOWN AS CALIFORNIA EDD.

19           AND WE ANTICIPATE THIS WITNESS WILL

20   TESTIFY THAT THEY HAVE DONE A SEARCH OF THEIR

21   RECORDS TO SEE WHETHER THERE'S ANY RECORDS OF A

22   CASTILLO, LYN, COHEN & VIJAY THAT PAID MONEY TO EDD

23   FOR ITS EMPLOYEES AND THAT THERE'S NO INDICATION

24   THAT A CASTILLO, LYN, COHEN & VIJAY EVEN EXISTS.

25           WE WILL ALSO INTRODUCE A FINANCIAL

28

1    ANALYSIS OF WHAT THE DEFENDANT ALBERT HU DID WITH

2    THE MONEY THAT INVESTORS ENTRUSTED WITH HIM.  WE

3    WILL INTRODUCE INTO EVIDENCE A SERIES OF EXHIBITS

4    WHICH ARE FINANCIAL RECORDS THAT THE INVESTIGATION

5    HAS OBTAINED OVER THE, ABOUT THE DEFENDANT'S

6    ACTIVITIES AND HIS FINANCIAL AFFAIRS BOTH RELATED

7    TO HIS INVESTMENT FUNDS AND SOME OF HIS PERSONAL

8    FINANCES.

9            WE WILL INTRODUCE, THE PARTIES HAVE

10   STIPULATED TO THAT, AND WE WILL INTRODUCE THOSE

11   RECORDS INTO EVIDENCE.

12           DURING THE GOVERNMENT'S CASE WE WILL

13   PRESENT EVIDENCE FROM THE F.B.I., CASE AGENT IN

14   THIS CASE, GREG FINE WHO WILL PROVIDE SUMMARY

15   TESTIMONY REGARDING THOSE FINANCIAL RECORDS.  HE'S

16   REVIEWED THOSE RECORDS AND WILL SUMMARIZE THEM.

17           THE EVIDENCE WILL SHOW THAT THERE IS NO

18   QUESTION THAT DEFENDANT CONTROLLED WHAT HAPPENED

19   WITH THE MONEY HIS INVESTORS GAVE HIM.

20           YOU WILL HEAR TESTIMONY FROM INVESTORS

21   THAT MR. HU DIRECTED THEM REGARDING WHERE TO WIRE

22   THE MONEY.  YOU WILL ALSO HEAR EVIDENCE THAT FROM

23   THE DEFENDANT'S FORMER EMPLOYEES THAT HE TIGHTLY

24   CONTROLLED THE PURSE STRINGS FOR HIS INVESTMENT

25   FUNDS, IN FACT HE WAS ESSENTIALLY A MICRO MANAGER,

1    AT SOME POINT EVEN DEMANDING A TIGHT INFORMATION

2    AND FREQUENT INFORMATION ABOUT WHAT WAS HAPPENING

3    WITH THE MONEY WITH HIS FUNDS.

4         THE EVIDENCE WILL SHOW THAT AFTER

5    INDUCING INVESTORS TO GIVE HIM MONEY THROUGH FALSE

6    STATEMENTS, THE DEFENDANT TURNED AROUND AND STOLE

7    THEIR MONEY.  THE DEFENDANT DID NOT INVEST THE

8    MONEY IN HIGH-TECH FUNDS AS HE PROMISED.

9         THE EVIDENCE WILL SHOW ONLY A SMALL

10   PORTION OF INVESTOR MONEY IS USED TO PURCHASE

11   STOCKS.  AND IT'S NOT CLEAR THAT ALL THE MONEY USED

12   TO PURCHASE STOCKS EVER ACTUALLY GOES TO THE

13   BENEFIT OF THE INVESTORS WHO HAD ENTRUSTED THEIR

14   MONEY WITH MR. HU.  INSTEAD, THE DEFENDANT STOLE

15   MONEY, INVESTORS MONEY FOR THEIR PERSONAL USE AND

16   OTHER NON INVESTMENT PURPOSES.

17        YOU WILL SEE EVIDENCE OF INVESTOR MONEY

18   COMING IN AND THEN GOING OUT TO ACCOUNTS THAT

19   BELONG TO THE DEFENDANT.  YOU WILL SEE EVIDENCE

20   THAT THE DEFENDANT ALBERT HU DIVERTED LARGE SUMS OF

21   INVESTOR MONEY ON CASH, DISSIPATED LARGE AMOUNTS OF

22   MONEY ON CHECK CARD PURCHASES.  SPENT MONEY ON GOLF

23   AND RETAIL BUSINESSES SUCH AS FRY'S AND COSTCO AND

24   STARBUCKS, THAT THIS IS INVESTOR MONEY THAT'S TAKEN

25   AND USED FOR A PURPOSE OTHER THAN WHAT THE

1    INVESTORS HAD AGREED TO AND WHAT THE DEFENDANT HAD

2    PROMISED THEM HE WOULD DO WITH THEIR MONEY.

3           THE EVIDENCE WILL ALSO SHOW THAT THE

4    DEFENDANT, ALBERT HU, TOOK ONE INVESTOR'S MONEY TO

5    PAY ANOTHER WITHOUT ANYONE'S KNOWLEDGE OR

6    PERMISSION OF THE INVESTORS.

7           AFTER HAVING LOST OR SPENT ALL OF THE

8    INVESTOR'S MONEY, THE EVIDENCE WILL SHOW THAT THE

9    DEFENDANT CONTINUES TO PAINT A ROSY PICTURE TO

10   INVESTORS.  HE'S SENDING THEM QUARTERLY STATEMENTS

11   AND OTHER INFORMATION INDICATE BEING THAT THEIR

12   INVESTMENTS ARE DOING GREAT, THAT THEIR INVESTMENTS

13   IN THE ASENQUA BETA AND THE FIRESIDE LS FUND HAVE

14   GROWN.

15          AND THESE STATEMENTS ARE CO-SIGNED BY AN

16   INDIVIDUAL NAMED TONY POLLACE, ALTHOUGH SOMETIMES

17   THE NAME IS ALSO SPELLED TONY POLLACK, WHO IS

18   PURPORTEDLY WHO HU SAID WAS THE CFO OF HIS FUNDS.

19          THE EVIDENCE WILL SHOW THAT THE REALITY

20   IS A LITTLE DIFFERENT REGARDING MR. POLLACE.  WE

21   ANTICIPATE MR. POLLACE WILL TESTIFY THAT IT'S HE

22   WAS AT ONE POINT A PART TIME CFO FOR ONE OF

23   MR. HU'S BUSINESSES, THAT AT THE TIME FRAME IN

24   WHICH IS ISSUE IN THIS CASE, THAT HE WAS NOT A CFO

25   FOR ANY OF MR. HU'S COMPANIES.  THAT HE WAS NEVER

1    THE CFO FOR THE ASENQUA BETA FUND OR THE FIRESIDE

2    LS FUND.

3         AND THE EVIDENCE WILL ALSO SHOW THAT

4    TONY POLLACE NEVER SIGNED THOSE QUARTERLY

5    STATEMENTS AND THOSE FINANCIAL DOCUMENTS THAT

6    PURPORTEDLY CONTAINED HIS SIGNATURE AS CFO NEXT TO

7    THE SIGNATURE OF DEFENDANT ALBERT HU.

8         WE ANTICIPATE MR. POLLACE WILL TESTIFY

9    THAT HE NEVER SIGNED ANY OF THOSE DOCUMENTS.  AND

10   YOU WILL ALSO SEE EVIDENCE FROM THE CALIFORNIA

11   DEPARTMENT OF MOTOR VEHICLES SHOWING THE SIGNATURE

12   THAT MR. POLLACE PROVIDED TO THE CALIFORNIA DMV.

13   AND IT WILL SHOW THAT SIGNATURE THAT MR. POLLACE

14   PROVIDED TO THE DMV IS VERY DIFFERENT FROM HIS

15   SIGNATURE THAT'S SUPPOSED TO BE ON THESE FINANCIAL

16   DOCUMENTS THAT MR. HU PROVIDED TO INVESTORS.

17        THE EVIDENCE WILL SHOW THAT THE

18   DEFENDANT'S INVESTMENT ACTIVITIES ULTIMATELY FALL

19   APART.  IN THE END, MANY INVESTORS TRY TO GET THEIR

20   MONEY BACK.  THEY ASK THE DEFENDANT WHAT THEY NEED

21   TO DO TO GET THEIR MONEY BACK.  THEY DO WHAT HE

22   TELLS THEM TO DO.  BUT MOST OF THEM LOSE

23   EVERYTHING.

24        THE FALSE PROMISES THAT THE DEFENDANT

25   MADE TO INVESTORS, THE LIES HE TOLD THEM THAT HE

32

1    KNEW THEY WERE LIES AT THE TIME CAUSED THEM TO WIRE

2    MOAN AND SEND WIRES.  AND BECAUSE THE DEFENDANT'S

3    SCHEME OF FRAUD LEAD TO THOSE LIES HE COMMITTED

4    WIRE FRAUD.

5            AFTER ALL THE EVIDENCE HAS BEEN SUBMITTED

6    WE WILL COME BACK AND WE WILL MAKE A CLOSING

7    STATEMENT WHERE WE ANTICIPATE THAT THE EVIDENCE

8    WILL SHOW THAT THE DEFENDANT IS GUILTY ON ALL

9    COUNTS OF WIRE FRAUD.

10           THANK YOU.

11           THE COURT:  MR. FONG, DO YOU WISH TO MAKE

12   AN OPENING STATEMENT?

13           MR. FONG:  YES, YOUR HONOR, THANK YOU.

14

15           **OPENING STATEMENT BY MR. FONG**

16

17           MR. FONG:  YOUR HONOR, JUDGE WHYTE,

18   MR. LUCEY, MR. FAZIOLI, MEMBERS OF THE PROSECUTION

19   TEAM, LADIES AND GENTLEMEN OF THE JURY, GOOD

20   MORNING.  MY NAME IS JERRY FONG AND I REPRESENT

21   DEFENDANT ALBERT HU.

22           I LIKE A CLICHE AS MUCH AS THE NEXT

23   PERSON AND I THINK EVEN THOSE OF US WHO ARE NON

24   LAWYERS HAVE HEARD THAT AN OPENING STATEMENT IS

25   SUPPOSED TO BE A ROAD MAP.

33

1          YOU WILL FIND THAT IN SORT OF A LAWYER

2     101 THAT A LAWYER STATEMENT IS SUPPOSED TO BE A

3     ROAD MAP.  IT'S SUPPOSED TO HELP YOU, THE JURORS,

4     TO FOLLOW THE EVIDENCE.

5          NOW, AS WE ALL KNOW, THOUGH, WHICH ROAD

6     MAP ON WHAT ROAD?  NOW, THE PROSECUTOR HAS SAID IN

7     HIS OPENING STATEMENT A LOT OF THINGS.  WHAT I WANT

8     YOU TO FOCUS ON IS WHAT IS ACTUALLY CHARGED IN THIS

9     CASE.

10          THE EVIDENCE IN THIS CASE WILL MAKE SENSE

11     ONLY IF WE FOCUS ON WHAT IS ACTUALLY CHARGED.  WHAT

12     IS ACTUALLY CHARGED IS THAT MR. HU SUPPOSEDLY

13     ALLEGEDLY DEFRAUDED TWO INDIVIDUALS.  BOB LIN OR

14     ROBERT LIN, AND ANOTHER GENTLEMAN BY THE NAME OF

15     JEAN MARK VERDIELL.

16          MR. HU IS NOT CHARGED WITH DEFRAUDING

17     ANYBODY ELSE.  SO WE ARE GOING TO LOOK AT THE ROAD

18     MAP OF EVIDENCE IN THIS CASE.  I WOULD ASK YOU TO

19     LOOK AT THE EVIDENCE AS THEY RELATE BACK TO THESE

20     TWO INDIVIDUALS, WERE THEY DEFRAUDED BY MR. HU, BOB

21     LIN AND MR. JEAN MARK VERDIELL.

22          NOW, JUDGE WHYTE READ TO YOU EARLIER THIS

23     MORNING THE ELEMENTS, IF YOU WILL, THE REQUIREMENTS

24     OF WHAT IS NECESSARY, THE LEGAL REQUIREMENTS THAT

25     ARE NECESSARY FOR SOMEBODY TO BE CONVICTED OF WIRE

                                                      34

1    FRAUD.

2            I WANT TO FOCUS ON ONE OF THE ELEMENTS

3    AND THAT IS THE MATERIALITY.  NOW, IN ORDER FOR A

4    PERSON TO BE CONVICTED OF WIRE FRAUD, IT DOESN'T

5    MATTER IF THERE WAS A FALSE STATEMENT, IT DOESN'T

6    MATTER IF THERE WERE A MILLION FALSE STATEMENTS, IT

7    DOESN'T MATTER WHAT THE INTENT WAS IF THE ALLEGED

8    FALSE STATEMENTS WERE NOT MATERIAL.

9            WHAT IS MATERIAL?  THE INSTRUCTION IS

10   VERY CLEAR THAT IN ORDER FOR A FALSE STATEMENT TO

11   BE LEGALLY RELEVANT IN A WIRE FRAUD OR MAIL FRAUD

12   CASE, IT HAS TO BE SOMETHING THAT HAS A NATURAL

13   TENDENCY TO INFLUENCE OR IS CAPABLE OF INFLUENCING

14   THE PERSON WHO TO MAKE THE DECISION BASED ON WHAT

15   HE OR SHE HAD BEEN TOLD, OKAY.

16           SO WHAT IS IMPORTANT ABOUT THIS CASE IN

17   TERMS OF LOOKING AT THE EVIDENCE IS NOT JUST

18   WHETHER OR NOT THERE WAS A FALSE STATEMENT OR THERE

19   WERE A MILLION FALSE STATEMENTS, BUT WAS ANY OF

20   THESE ALLEGED FALSE STATEMENTS MATERIAL?  DID ANY

21   OF THE FALSE STATEMENTS INFLUENCE ONE OF THE TWO

22   INVESTORS, MR. LIN OR MR. VERDIELL INTO DOING

23   SOMETHING THAT HE OTHERWISE WOULD NOT HAVE DONE,

24   THAT IS TO SAY MAKE THE INVESTMENT WITH MR. HU.

25           LET'S LOOK AT MR. LIN FIRST.  LET ME

35

1   BACKTRACK HERE A LITTLE BIT.  I DO AGREE WITH THE

2   PROSECUTOR ON CERTAIN ASPECTS OF THE CASE IN TERMS

3   OF WHAT THE EVIDENCE WILL SHOW.  THERE WERE SOME

4   FALSE STATEMENTS.  NOW, THERE WILL BE A DISPUTE

5   OVER WHAT WAS THE EXTENT OR WHICH ONES WERE FALSE.

6   BUT THERE WERE SOME FALSE STATEMENTS.

7           BUT THE EVIDENCE WILL SHOW THAT EVEN IF

8   THERE WERE SOME FALSE STATEMENTS, THEY WERE

9   IMMATERIAL.  THAT IS TO SAY THEY DO NOT INFLUENCE

10  THE TWO PEOPLE WHO MATTER IN THIS CASE, MR. LIN AND

11  MR. VERDIELL, INTO DOING WHAT THEY DID WHICH IS TO

12  INVEST WITH MR. HU.

13          NOW, WHY IS THAT?  THE EVIDENCE WILL SHOW

14  THAT MR. LIN WAS NOT JUST YOUR TYPICAL DAY TRADER,

15  INVESTOR, HE MIGHT HAVE GONE TO CHARLES SCHWABB AND

16  SAID LOOK, JUST PUT MY MONEY IN SOMETHING SAFE OR I

17  WANT TO BE A LITTLE BIT RISKY.

18          THE EVIDENCE WILL SHOW MR. LIN, ACCORDING

19  TO HIS OWN BIOGRAPHY, IS A PROFESSIONAL INVESTOR.

20  HE TOUTS HIMSELF AS THE VENTURE CAPITOL KING OF THE

21  CHINESE-AMERICAN COMMUNITY, NOT JUST IN THE BAY

22  AREA BUT THROUGHOUT ASIA.

23          MR. LIN IS AN EXPERT AND ALWAYS HAS BEEN

24  AN EXPERT IN INVESTMENT.  HE, IN HIS BIOGRAPHY, THE

25  EVIDENCE WILL SHOW THAT HE BRAGS ABOUT THE FACT

1    THAT HE HAD TAKEN MANY START UP COMPANIES TAKING

2    THEM INTO IPL PUBLIC OFFERING AND THAT HE HAD MADE

3    PROUDLY, JUSTIFIABLY HE HAD MADE A LOT OF MONEY

4    INCLUDING INVESTING IN THE SECOND GENTLEMAN START

5    UP COMPANY -- MR. VERDIELL IS THE OTHER GENTLEMAN.

6    HE HAD A START UP COMPANY.

7          THE EVIDENCE WILL SHOW THAT MR. LIN

8    INVESTED IN MR. VERDIELL'S STARTUP COMPANY.  THE

9    NAME IS LIGHT LOGIC.

10          AND THEY WERE BOTH VERY FORTUNATE AND

11    PROBABLY DID A LOT OF HARD WORK BUT ULTIMATELY

12    MR. VERDIELL'S STARTUP COMPANY LIGHT LOGIC WAS

13    ACQUIRED BY INTEL FOR APPROXIMATELY $400 MILLION.

14    AND THAT THE PEOPLE WHO LIKE MR. LIN WHO INVESTED

15    EARLY, THE ANGEL INVESTORS TO THE STARTUP COMPANY

16    MADE ABOUT A HUNDRED TIMES OF WHAT HE PUT IN

17    INITIALLY.

18          AGAIN, THIS IS ALL ACCORDING TO MR. LIN'S

19    OWN BIOGRAPHY.  MR. LIN LECTURES, GIVES SEMINARS,

20    TEACHES INVESTMENT TO NOT JUST TO NOVICE INVESTORS,

21    PEOPLE WHO ARE TRYING TO INVEST A THOUSAND DOLLARS.

22    MR. LIN GIVES THESE SEMINARS THESE COURSES, HE

23    LECTURES TO CFO'S CEO'S PEOPLE FROM ALL OVER THE

24    WORLD.

25          MR. LIN IS AND ALWAYS HAS BEEN AN

1    INVESTMENT EXPERT.

2            NOW, MR. LIN KNEW WHAT WAS IMPORTANT AND

3    HE KNEW WHAT WAS NOT IMPORTANT.  IN FACT, THE

4    EVIDENCE WILL SHOW THAT MR. LIN MADE A LIVING

5    TEACHING PEOPLE, LECTURING TO PEOPLE AS TO WHAT IS

6    IMPORTANT AND WHAT IS NOT IMPORTANT.

7            AND THE EVIDENCE WILL SHOW THAT ANY OF

8    THE ALLEGED MISSTATEMENTS OR FALSE STATEMENTS WERE

9    NOT IMPORTANT TO MR. LIN.  THE EVIDENCE WILL SHOW

10   THAT SOMETHING ELSE WAS GOING ON, THAT MR. LIN

11   COULD HAVE CARED LESS ABOUT, FOR EXAMPLE, WHETHER

12   OR NOT THERE WAS THE CPA FIRM, THE AUDITING FIRM OF

13   CASTILLO, LYN, COHEN & VIJAY, FOUR NAMES TOUGH TO

14   REMEMBER.  MR. LIN WOULDN'T CARE LESS.

15           CONTRARY TO WHAT MR. LIN SAID REPEATEDLY

16   TO THE GOVERNMENT INCLUDING PUTTING A SWORN

17   STATEMENT IN WRITING THAT, HE RELIED ON THE FACT

18   THAT THERE WAS THIS AUDITING FIRM OF CASTILLO, LYN,

19   COHEN & VIJAY THAT HAD DONE THE AUDITING STATEMENT

20   OR HAD PREPARED THE AUDIT STATEMENTS FOR THE

21   ASENQUA BETA FUND.

22           MR. LIN NEVER BOTHERED TO CHECK TO SEE IF

23   THAT WAS INDEED A REAL FIRM.  AND THE EVIDENCE WILL

24   SHOW THAT BACK IN 2005 WHEN MR. LIN FIRST MADE HIS

25   INITIAL INVESTMENT, OF COURSE THE BOARD OF

1       ACCOUNTANCY THAT COUNSEL REFERRED TO IN HIS OPENING

2       STATEMENT HAD A WEBSITE UP, ANYBODY COULD HAVE

3       LOOKED AND SEEN WHO WAS AND WHO WAS NOT LICENSED BY

4       THE STATE OF CALIFORNIA.

5               IF MR. LIN HAD CARED ABOUT WHETHER OR NOT

6       THIS CASTILLO, LYN, COHEN & VIJAY AUDITING FIRM WAS

7       ON THE UP AND UP AND LEGITIMATE, HE COULD HAVE

8       CHECKED THAT WEBSITE.

9               THE EVIDENCE WILL SHOW THAT WAS NOT A

10      MATERIAL REPRESENTATION OR STATEMENT TO MR. LIN.

11      SOMETHING ELSE WAS GOING ON.

12              REMEMBER, THIS WAS A MAN WHO WAS A

13      PROFESSIONAL INVESTOR WHO TAUGHT PEOPLE NOT JUST

14      ANY PEOPLE BUT CFO'S, CEO'S HOW TO INVEST.

15              WHAT WAS GOING ON?  THE EVIDENCE WILL

16      SHOW THAT MR. LIN WAS NOT THIS NAIVE OUTSIDER WHO

17      JUST HAPPENED TO COME ACROSS MR. HU, WELL, HE LOOKS

18      LIKE A NICE GUY, I WILL INVEST IN HIM.

19              EVIDENCE WILL SHOW MR. LIN WAS A TRUE

20      INSIDER IN THE ASENQUA FAMILY TREE.  THE EVIDENCE

21      WILL SHOW THIS CASE IS NOT ABOUT JUST THE ASENQUA

22      BETA, OR THIS FUND THAT IT BECAME SUBSEQUENTLY IN

23      2005, THE FIRESIDE LS FUND.

24              THE EVIDENCE WILL SHOW THAT THIS CASE IS

25      ABOUT A FAMILY TREE OF ASENQUA ENTITIES.  AND THE

1   EVIDENCE WILL SHOW THAT NOT ONLY WAS MR. LIN AN

2   INVESTOR BUT HE WAS ALSO AGAIN, IN HIS OWN WORDS HE

3   WAS A MANAGING PARTNER OF ASENQUA VENTURES

4   MANAGEMENT.  ONE PART OF THE ASENQUA FAMILY TREE.

5           MR. LIN HIMSELF SAID I PROVIDE ADVICE TO

6   THE ASENQUA ENTITIES AND I AM A MANAGING PARTNER OF

7   THE ONE OF THE ASENQUA ENTITIES.

8           MR. LIN ALSO TRAVELLED NOT JUST AROUND

9   THE BAY AREA, HE TRAVELLED THROUGHOUT ASIA, TOUTING

10  THE VIRTUES OF INVESTING IN THE ASENQUA ENTITIES

11  INCLUDING THE TWO FUNDS WE WERE TALKING ABOUT, THE

12  ASENQUA BETA FUND AND THE FUND IT TURNED INTO THE

13  FIRESIDE LS FUND.

14          MR. LIN NOT ONLY WENT AROUND ASIA TO TOUT

15  THE VIRTUES OF THE ASENQUA FUNDS, HE TRAVELLED WITH

16  THE ASENQUA BETA FUNDS PORTFOLIO MANAGER STEVEN

17  BOND.  AND MR. LIN DIDN'T JUST DO THIS HE WAS

18  REIMBURSED FOR HIS TRAVEL EXPENSES TO THE TUNE OF

19  TENS OF THOUSANDS OF DOLLARS THROUGH THE YEARS.

20          IN FACT, MR. LIN EVEN GOT A $3,000

21  INSURANCE COPAYMENT CHECK FROM THE ASENQUA VENTURES

22  MANAGEMENT COMPANY.  MR. LIN WAS THE ULTIMATE

23  INSIDER IN ASENQUA.

24          AGAIN, THE EVIDENCE WILL SHOW THAT

25  WHATEVER WAS GOING ON, MR. LIN WAS NOT INFLUENCED

1    BY WHETHER OR NOT THERE WAS IN ACCOUNTING FIRM

2    CASTILLO, LYN, COHEN & VIJAY -- I'M GETTING BETTER

3    AT THOSE NAMES.

4            AND THERE WAS SOME REFERENCE IN COUNSEL'S

5    OPENING STATEMENT ABOUT MISLEADING RETURNS.

6            THE EVIDENCE WILL SHOW THAT MR. LIN WILL

7    NOW BE SAYING THAT, LOOK, BEFORE I INVESTED I WAS

8    SHOWN CERTAIN FANTASTIC RETURN NUMBERS ON THE

9    ASENQUA BETA.  30 PERCENT, 25 PERCENT, 40 PERCENT,

10   WHATEVER.  YOU KNOW, THEY LOOKED GREAT, AND I WAS

11   MISLEAD.

12           THE EVIDENCE WILL SHOW THAT WHILE MR. LIN

13   MIGHT, BEFORE HE INVESTED, MIGHT HAVE BEEN SHOWN

14   SOME NUMBERS IN NOVEMBER OF 2004, HE MADE HIS

15   INITIAL INVESTMENT IN EARLY PART OF 2005.  AND HE

16   WAS GIVEN CERTAIN NUMBERS OF VERY HIGH RETURNS BY

17   THE ASENQUA BETA FUND.

18           THE EVIDENCE WILL SHOW THAT LESS THAN TWO

19   YEARS LATER IN FEBRUARY OF 2006, MR. LIN PUT HIS

20   NAME, BOB LIN, ON AN ASENQUA POWER POINT

21   PRESENTATION TO PROMOTE THEIR HEDGE FUNDS AND TO

22   BRING IN NEW INVESTORS.

23           AND IN THAT POWER POINT PRESENTATION,

24   WHICH IS GOVERNMENT EXHIBIT -- THAT'S A GOVERNMENT

25   EXHIBIT THAT I ANTICIPATE WILL BE COMING INTO

1    EVIDENCE, THAT POWER POINT PRESENTATION LAYS OUT

2    THE ASENQUA FAMILY TREE.

3              AND IT ALSO LAYS OUT THE FACT THAT BOB

4    LIN WAS ONE OF THE KEY PARTNERS OF ONE OF THE

5    ASENQUA BRANCHES, THE ASENQUA VENTURE MANAGEMENT

6    GROUP.

7              WHAT'S MORE IMPORTANT IS THAT IN THAT

8    SAME POWER POINT PRESENTATION THERE WAS A PAGE

9    DEVOTED TO THE ANNUAL RETURNS OF THE ASENQUA BETA

10   FUND FOR THE YEARS FROM 2000 THROUGH 2005.

11             WHAT MR. LIN HAS SEEN BEFORE HE INVESTED

12   WERE THE SAME NUMBERS FROM 2000 TO 2003.  SO

13   MR. LIN, THIS WORLDWIDE EXPERT IN INVESTMENT WHO

14   TEACHES, WHO IS AN INVESTMENT GURU WHO TEACHES

15   LECTURES AND GIVES SEMINARS ON HOW TO INVEST, HE

16   PUT HIS NAME ON THE VERY SAME NUMBERS THAT HE WILL

17   NOW TRY TO CLAIM THAT HE HAD BEEN MISLEAD BY.

18             THE EVIDENCE WILL NOT SHOW THAT THESE

19   NUMBERS WERE FALSE OR INCORRECT.  WHAT THE EVIDENCE

20   WILL SHOW IS THAT BOB LIN MORE THAN A YEAR OR

21   ALMOST TWO YEARS AFTER HE BECAME A MEMBER OF THE

22   ASENQUA FAMILY, HE PUT HIS NAME ON TO THOSE SAME

23   NUMBERS.  AND THE EVIDENCE WILL SHOW THAT HE HAD

24   NOT BEEN MISLEAD OR HE WOULD NOT HAVE BEEN INDUCED

25   BY ANYTHING THAT MR. HU HAD SAID.

1           AS TO THE SECOND GENTLEMAN, THE SECOND

2     GENTLEMAN WHOSE INVESTMENT IS THE BASIS FOR THE

3     SECOND SET OF CHARGES AGAINST MR. HU, HIS NAME IS

4     JEAN MARK VERDIELL.  MR. VERDIELL IS AND HAS BEEN A

5     VERY, VERY, SUCCESSFUL ENTREPRENEUR.  HIS COMPANY

6     LIGHT LOGIC LIKE I SAID, WAS A COMPANY THAT MR. LIN

7     HAD INVESTED IN WAY BACK NEAR THE TURN OF THE

8     MILLENNIUM AND THEY BOTH DID INCREDIBLY WELL.

9           LIGHT LOGIC WAS ACQUIRED BY INTEL AS I

10    SAID BEFORE AND MADE A HUNDRED OF MILLIONS OF

11    DOLLARS AND THE INITIAL INVESTORS LIKE MR. LIN MADE

12    HUNDRED TIMES THEIR INITIAL INVESTMENT.

13          MR. VERDIELL WAS NOT AND IS NOT AN

14    INVESTMENT GURU LIKE MR. LIN.  THE EVIDENCE WILL

15    SHOW THAT MR. VERDIELL IS A BUSINESS PERSON, IS A

16    VERY, VERY GOOD BUSINESS PERSON.  BUT THE EVIDENCE

17    WILL SHOW THAT MR. LIN AND MR. VERDIELL HAD A

18    WORKING RELATIONSHIP.

19          AND THE EVIDENCE WILL SHOW THAT

20    MR. VERDIELL WAS INTRODUCED TO THE ASENQUA FAMILY

21    BY MR. LIN.  MR. LIN BROUGHT IN THE MR. VERDIELL

22    ABOUT TWO AND A HALF YEARS AFTER MR. LIN HAD MADE

23    HIS INITIAL INVESTMENT IN THE ASENQUA FAMILY AND

24    AFTER MR. LIN HAD BEEN GOING AROUND THE WORLD

25    TOUTING THE VIRTUES OF ASENQUA, PUTTING HIS NAME

1    INTO A POWER POINT PRESENTATION THAT HAD THE SAME

2    NUMBERS FOR THE YEARS 2000 TO 2003 THAT HE NOW IS

3    ALLEGING THAT HE WILL BE MISLEAD BY.

4         MR. VERDIELL WILL TESTIFY THAT IN LARGE

5    PART, NOT THE ONLY PART, BUT IN LARGE PART HE MADE

6    THE INVESTMENT, HE MADE A ONE TIME INVESTMENT, A

7    LOT OF MONEY, $2 MILLION, A LOT OF MONEY.  HE MADE

8    A ONE TIME INVESTMENT INTO THE FIRESIDE LS FUND

9    WHICH IS THE SECOND GENERATION, IF YOU WILL OF WHAT

10   THE ASENQUA BETA FUND HAD BECOME.

11        MR. VERDIELL MADE HIS ONE TIME INVESTMENT

12   OF A LOT OF MONEY, NO MATTER HOW RICH SOMEBODY IS

13   THAT'S A LOT OF MONEY.  MR. VERDIELL MADE THAT

14   INVESTMENT IN LARGE PART, NOT THE ONLY PART,

15   BECAUSE HIS INVESTMENT GURU, THE GUY HE CONSIDERS

16   TO BE A PROFESSIONAL INVESTOR AND A GUY THAT HE

17   SAID HE TRUSTED AND VALUED HIS OPINIONS ON

18   INVESTMENTS, BOB LIN, BOB LIN MADE THE

19   RECOMMENDATION TO MR. VERDIELL AND MR. VERDIELL

20   INVESTED.

21        AGAIN, WILL EVIDENCE WILL SHOW THEY WERE

22   FALSE STATEMENTS.  AND THE EVIDENCE MIGHT NOT SHOW

23   IF A PARTICULAR STATEMENT WAS FALSE OR NOT.  THERE

24   MIGHT BE A TUG OF WAR.  BUT THE EVIDENCE WILL

25   CLEARLY SHOW THAT AS TO THE TWO INDIVIDUALS WHO ARE

1    INVOLVED IN THIS PARTICULAR CASE, NEVER MIND

2    ANYBODY ELSE, MR. LIN AND MR. VERDIELL THEY WERE

3    NOT MATERIAL IN THEIR DECISION MAKING IN TERMS OF

4    WHY THEY MADE THE INVESTMENTS THEY DID.

5         THE GOVERNMENT IS LIKELY TO PRESENT A

6    THIRD INVESTOR, A MR. YAN, ANDY YAN WHO ALSO MADE

7    INVESTMENTS.  WHAT'S INTERESTING ABOUT MR. YAN IS

8    THAT, EVIDENCE WILL SHOW THAT HE MADE A STATEMENT

9    TO MR. VERDIELL THAT KIND OF SUMS UP WHAT THIS CASE

10   IS REALLY ABOUT.

11        MR. YAN TOLD MR. VERDIELL, YEAH, I HAD

12   INVESTED WITH MR. HU AND BUT BEFORE I INVESTED WITH

13   MR. HU I HAD KNOWN THAT HE WASN'T TRUSTWORTHY, THAT

14   HE MIGHT HAVE LIED ON OCCASIONS, I DIDN'T TRUST

15   HIM, BUT GUESS WHAT, KNOWING ALL OF THAT, I STILL

16   INVESTED WITH MR. HU OR HIS COMPANY, THE ASENQUA

17   FAMILY.

18        THAT STATEMENT KIND OF SUMS UP WHAT THE

19   EVIDENCE WILL POINT TO AT THE END OF THIS CASE.

20   THAT YES, THERE MIGHT HAVE BEEN FALSE STATEMENTS,

21   THERE MIGHT HAVE BEEN MISREPRESENTATIONS BUT

22   HOWEVER NONE OF THEM WAS MATERIAL IN TERMS OF

23   INFLUENCING THE TWO PEOPLE BOB LIN AND JEAN MARK

24   VERDIELL IN TERMS OF INVESTING THE ASENQUA AND

25   FIRESIDE FUNDS.

1        THANK YOU VERY MUCH FOR YOUR ATTENTION, I

2    REALLY APPRECIATE IT.

3        THE COURT:  ALL RIGHT.

4        MR. FAZIOLI, DO YOU WANT TO CALL YOUR

5    FIRST WITNESS?

6        MR. FAZIOLI:  YOUR HONOR, BEFORE WE CALL

7    OUR FIRST WITNESS, WITH LEAVE OF THE COURT, I WOULD

8    LIKE TO READ A STIPULATION INTO THE RECORD.

9        THE COURT:  ALL RIGHT.

10        MR. FAZIOLI:  THIS IS A TRIAL

11    STIPULATION, NUMBER 1, FINANCIAL RECORDS.

12        THE UNITED STATES OF AMERICA AND

13    DEFENDANT ALBERT -- I WILL JUST PREFACE BY SAYING

14    THIS WILL TAKE A LITTLE WHILE BUT I THINK IT WILL

15    ULTIMATELY SAVE TIME.

16        THE DEFENDANT THE UNITED STATES OF

17    AMERICA TRIAL STIPULATION 1 OF FINANCIAL RECORDS:

18        THE UNITED STATES OF AMERICA AND

19    DEFENDANT ALBERT KE-JENG HU HEREBY STIPULATE FOR

20    PURPOSES OF THIS TRIAL ACTION THAT THE FOLLOWING

21    FACTS ARE CONCLUSIVELY ESTABLISHED BEYOND A

22    REASONABLE DOUBT AND THEREFORE ARE NOT IN DISPUTE:

23        ONE, THE DOCUMENTS MARKED FOR

24    IDENTIFICATION AS EXHIBIT 220 HU101901(A) TO

25    HU1964(A), AND THERE'S OTHER BATES NUMBERS LISTED

46

1   THERE, ARE TRUE AND ACCURATE BUSINESS RECORDS OF

2   CREDIT SWISS SINGAPORE THAT ARE MAINTAINED BY

3   CREDIT SWISS SINGAPORE IN THE NORMAL COURSE OF ITS

4   BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER RULE

5   FEDERAL RULE OF EVIDENCE 8036.

6          TWO, DOCUMENTS MARKED FOR IDENTIFICATION

7   AS EXHIBIT 221 ARE TRUE AND ACCURATE BUSINESS

8   RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

9   MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

10  COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

11  UNDER FEDERAL RULE OF EVIDENCE 8036.

12         THREE, THE DOCUMENTS MARKED FOR

13  IDENTIFICATION AS EXHIBIT 222 ARE TRUE AND ACCURATE

14  BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT WAS

15  MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

16  COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

17  UNDER FEDERAL RULE OF EVIDENCE 8036.

18         FOUR, THE DOCUMENTS MODIFICATION AS

19  EXHIBIT 223 ARE TRUE AND ACCURATE BUSINESS RECORDS

20  OF CREDIT SWISS SINGAPORE THAT ARE MAINTAINED BY

21  CREDIT SWISS SINGAPORE IN THE NORMAL COURSE OF ITS

22  BUSINESS ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE

23  OF EVIDENCE 8036.

24         FIVE, THE DOCUMENTS MARKED FOR

25  IDENTIFICATION AS EXHIBIT 224, ARE TRUE AND

1   ACCURATE BUSINESS RECORDS OF CREDIT SWISS SINGAPORE

2   THAT ARE MAINTAINED BY CREDIT SWISS SINGAPORE IN

3   THE NORMAL COURSE OF ITS BUSINESS AND ARE

4   ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 8036.

5          SIX, THE DOCUMENTS MARKED FOR

6   IDENTIFICATION AS EXHIBIT 225 ARE TRUE AND ACCURATE

7   BUSINESS RECORDS OF CREDIT SWISS SINGAPORE AND ARE

8   MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

9   COURSE OF BUSINESS AND ARE ADMISSIBLE UNDER FEDERAL

10  RULE OF EVIDENCE 8036.

11         SEVEN, THE DOCUMENTS MARKED FOR

12  IDENTIFICATION AS EXHIBIT 226 ARE TRUE AND ACCURATE

13  BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

14  MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

15  COURSE OF ITS BUSINESS ARE ADMISSIBLE AS MUCH UNDER

16  FEDERAL RULE OF EVIDENCE 8036.

17         EIGHT, THE DOCUMENTS MARKED FOR

18  IDENTIFICATION AS EXHIBIT 227, ARE TRUE AND

19  ACCURATE BUSINESS RECORDS OF CREDIT SWISS SINGAPORE

20  THAT ARE MAINTAINED BY CREDIT SWISS SINGAPORE IN

21  THE NORMAL COURSE OF HIS BUSINESS AND ARE

22  ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE

23  8036.

24         NINE, THE DOCUMENTS MARKED FOR

25  IDENTIFICATION AS EXHIBIT 228 ARE TRUE AND ACCURATE

1    BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

2    MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

3    COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

4    UNDER FEDERAL RULE OF EVIDENCE 8036.

5            10, THE DOCUMENTS MARKED FOR

6    IDENTIFICATION AS EXHIBIT 229 ARE TRUE AND ACCURATE

7    BUSINESS RECORDS OF CREDIT SWISS SINGAPORE AND ARE

8    MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

9    COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

10   UNDER FEDERAL RULE OF EVIDENCE 8036.

11           11, DOCUMENTS MARKED FOR IDENTIFICATION

12   AS EXHIBIT 230 ARE TRUE AND ACCURATE BUSINESS

13   RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

14   MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

15   COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

16   UNDER FEDERAL RULE OF EVIDENCE 8036.

17           12, THE DOCUMENTS MARKED FOR

18   IDENTIFICATION AS EXHIBIT 231 ARE TRUE AND ACCURATE

19   BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

20   MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

21   COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

22   UNDER FEDERAL RULE OF EVIDENCE 8036.

23           13, THE DOCUMENTS MARKED FOR

24   IDENTIFICATION AS EXHIBIT 23 ARE TRUE AND ACCURATE

25   BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

1    MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

2    COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

3    UNDER FEDERAL RULE OF EVIDENCE 8036.

4         14, THE DOCUMENTS MARKED FOR

5    IDENTIFICATION AS EXHIBIT 233 ARE TRUE AND ACCURATE

6    BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

7    MAINTAINED BY CREDIT SWISS SINGAPORE IN THE NORMAL

8    COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

9    UNDER FEDERAL RULE OF EVIDENCE 8036.

10        15, THE DOCUMENTS MARKED FOR

11   IDENTIFICATION AS EXHIBIT 234 ARE TRUE AND ACCURATE

12   BUSINESS RECORDS OF CREDIT SWISS SINGAPORE THAT ARE

13   MAINTAINED BY CREDIT SWISS SINGAPORE IN ITS NORMAL

14   COURSE OF BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

15   FEDERAL RULE OF EVIDENCE 836.

16        16, DOCUMENTS MARKED FOR IDENTIFICATION

17   AS EXHIBIT 235 ARE TRUE AND ACCURATE RECORDS OF

18   BANK OF SARASIN-RABO, THAT ARE MAINTAINED BY BANK

19   OF SARASIN-RABO AND ARE IN THE NORMAL COURSE OF ITS

20   BUSINESS ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE

21   OF EVIDENCE 8036.

22        17, THE DOCUMENTS MARKED FOR

23   IDENTIFICATION AS EXHIBIT 236 ARE TRUE AND ACCURATE

24   BUSINESS RECORDS OF WELLS FARGO BANK THAT ARE

25   MAINTAINED BY WELLS FARGO BANK IN THE NORMAL COURSE

1    OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

2    FEDERAL RULE OF EVIDENCE 8036.

3              18, THE DOCUMENTS MARKED FOR

4    IDENTIFICATION AS EXHIBIT 237 ARE TRUE AND ACCURATE

5    BUSINESS RECORDS OF WELLS FARGO BANK THAT ARE

6    MAINTAINED BY WELLS FARGO BANK IN THE NORMAL COURSE

7    OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

8    FEDERAL RULE OF EVIDENCE 8036.

9              19, THE DOCUMENTS MARKED FOR

10   IDENTIFICATION AS EXHIBIT 238 ARE TRUE AND ACCURATE

11   BUSINESS RECORDS OF WELLS FARGO BANK THAT ARE

12   MAINTAINED BY WELLS FARGO IN THE NORMAL COURSE OF

13   ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

14   FEDERAL RULE OF EVIDENCE 8036.

15             20, THE DOCUMENTS MARKED FOR

16   IDENTIFICATION AS EXHIBIT 239 ARE TRUE AND ACCURATE

17   BUSINESS RECORDS OF CHINA TRUST BANK AS MAINTAINED

18   BY CHINA TRUST BANK IN THE NORMAL COURSE OF ITS

19   BUSINESS ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE

20   OF EVIDENCE 8036.

21             21, THE DOCUMENTS MARKED FOR

22   IDENTIFICATION AS EXHIBIT 240 ARE TRUE AND ACCURATE

23   BUSINESS RECORDS OF HSBC BANK THAT ARE MAINTAINED

24   BY HSBC BANK IN THE NORMAL COURSE OF ITS BUSINESS

25   AND ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

1    EVIDENCE 8036.

2              22, THE DOCUMENTS MARKED FOR

3    IDENTIFICATION AS EXHIBIT 241 ARE TRUE AND ACCURATE

4    BUSINESS RECORDS OF WASHINGTON MUTUAL AND ITS

5    SUCCESSOR, CHASE BANK, THAT ARE MAINTAINED BY CHASE

6    BANK IN THE NORMAL COURSE OF ITS BUSINESS AND ARE

7    ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE

8    8036.

9              23, THE DOCUMENTS MARKED FOR

10   IDENTIFICATION AS EXHIBIT 242 ARE TRUE AND ACCURATE

11   BUSINESS RECORDS OF U.S. BANK THAT ARE MAINTAINED

12   BY U.S. BANK IN THE NORMAL COURSE OF ITS BUSINESS

13   AND ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

14   EVIDENCE 8036.

15             24, THE DOCUMENTS MARKED FOR

16   IDENTIFICATION AS EXHIBIT 243 ARE TRUE AND ACCURATE

17   BUSINESS RECORDS OF U.S. BANK THAT ARE MAINTAINED

18   BY U.S. BANK IN THE NORMAL COURSE OF ITS BUSINESS

19   ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

20   EVIDENCE 8036.

21             25, THE DOCUMENTS MARKED FOR

22   IDENTIFICATION AS EXHIBIT 244 ARE TRUE AND ACCURATE

23   BUSINESS RECORDS OF U.S. BANK THAT ARE MAINTAINED

24   BY U.S. BANK IN THE NORMAL COURSE OF ITS BUSINESS

25   ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

1    EVIDENCE 8036.

2              AND THERE ARE 37 OF THESE ENTRIES, AND WE

3    ARE NOW ON NUMBER 26.

4              26, THE DOCUMENT MARKED FOR

5    IDENTIFICATION AS EXHIBIT 245 ARE TRUE AND ACCURATE

6    BUSINESS RECORDS OF BANK OF AMERICA THAT ARE

7    MAINTAINED BY BANK OF AMERICA IN THE NORMAL COURSE

8    OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

9    FEDERAL RULE OF EVIDENCE 8036.

10             27, DOCUMENTS MARKED FOR IDENTIFICATION

11   AS EXHIBIT 246 ARE TRUE AND ACCURATE BUSINESS

12   RECORDS OF THE BANK OF AMERICA THAT ARE MAINTAINED

13   BY BANK OF AMERICA IN THE NORMAL COURSE OF ITS

14   BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER FEDERAL

15   RULE OF EVIDENCE 8036.

16             28, DOCUMENTS MARKED FOR IDENTIFICATION

17   AS EXHIBIT 247 ARE TRUE AND ACCURATE BUSINESS

18   RECORDS OF FIRST REPUBLIC BANK THAT ARE MAINTAINED

19   BY FIRST REPUBLIC BANK IN THE NORMAL COURSE OF ITS

20   BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER FEDERAL

21   RULE OF EVIDENCE 8036.

22             29, THE DOCUMENTS MARKED FOR

23   IDENTIFICATION AS EXHIBIT 248 ARE TRUE AND ACCURATE

24   BUSINESS RECORDS OF FIRST REPUBLIC BANK THAT ARE

25   MAINTAINED BY FIRST REPUBLIC BANK IN THE NORMAL

1   COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

2   UNDER FEDERAL RULE OF EVIDENCE 8036.

3           30, THE DOCUMENTS MARKED FOR

4   IDENTIFICATION AS EXHIBIT 249 ARE TRUE AND ACCURATE

5   BUSINESS RECORDS OF FIRST REPUBLIC BANK THAT ARE

6   MAINTAINED BY FIRST REPUBLIC BANK IN THE NORMAL

7   COURSE OF BUSINESS ARE ADMISSIBLE AS SUCH UNDER

8   FEDERAL RULE OF EVIDENCE 8036.

9           31, THE DOCUMENTS MARKED FOR

10  IDENTIFICATION AS EXHIBIT 250 ARE TRUE AND ACCURATE

11  BUSINESS RECORDS OF FIRST REPUBLIC BANK THAT ARE

12  MAINTAINED BY FIRST REPUBLIC BANK IN THE NORMAL

13  COURSE OF BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

14  FEDERAL RULE OF EVIDENCE 8036.

15          32, THE DOCUMENTS MARKED FOR

16  IDENTIFICATION AS EXHIBIT 251 ARE TRUE AND ACCURATE

17  BUSINESS RECORDS OF FIRST REPUBLIC BANK THAT ARE

18  MAINTAINED BY FIRST REPUBLIC BANK IN THE NORMAL

19  COURSE OF ITS BUSINESSES ARE ADMISSIBLE AS SUCH

20  UNDER FEDERAL RULE OF EVIDENCE 8036.

21          33, THE DOCUMENT MARKED FOR

22  IDENTIFICATION AS -- DOCUMENTS MARKED FOR

23  IDENTIFICATION AS EXHIBIT 252, ARE TRUE AND

24  ACCURATE BUSINESS RECORDS OF U.S. BANK THAT ARE

25  MAINTAINED BY U.S. BANK IN THE NORMAL COURSE OF ITS

1    BUSINESS ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE

2    OF EVIDENCE 8036.

3         34, THE DOCUMENTS MARKED FOR

4    IDENTIFICATION AS EXHIBIT 257 ARE TRUE AND ACCURATE

5    BUSINESSES OF WASHINGTON MUTUAL THAT ARE MAINTAINED

6    BY JP MORGAN CHASE IN THE NORMAL COURSE OF BUSINESS

7    AND ARE ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

8    EVIDENCE 8036.

9         35, THE DOCUMENTS MARKED FOR

10   IDENTIFICATION AS EXHIBIT 276 ARE TRUE AND ACCURATE

11   BUSINESS RECORDS OF SINOPAC BANK THAT ARE

12   MAINTAINED BY SINOPAC BANK IN THE NORMAL COURSE OF

13   ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

14   FEDERAL RULE OF EVIDENCE 8036.

15        36, THE DOCUMENTS MARKED FOR

16   IDENTIFICATION AS EXHIBIT 277 ARE THE TRUE AND

17   ACCURATE BUSINESS RECORDS OF AMERICAN BANK THAT ARE

18   MAINTAINED BY AMERICAN BANK AS IN THE NORMAL COURSE

19   OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH UNDER

20   FEDERAL RULE OF EVIDENCE 8036.

21        AND LASTLY 37, THE DOCUMENTS MARKED FOR

22   IDENTIFICATION AS EXHIBIT 278 ARE TRUE AND ACCURATE

23   BUSINESS RECORDS OF WASHINGTON MUTUAL THAT ARE

24   MAINTAINED BY WASHINGTON MUTUAL IN THE NORMAL

25   COURSE OF ITS BUSINESS AND ARE ADMISSIBLE AS SUCH

1    UNDER FEDERAL RULE OF EVIDENCE 8036.

2             THE STIPULATION ALSO INCLUDES SPECIFIC

3    BATES NUMBERS WHICH ARE REFERENCES TO THE PAGES

4    WITHIN THE VARIOUS EXHIBITS, AND THOSE -- I HAVEN'T

5    READ THOSE NUMBERS BUT THEY ARE IN THE STIPULATION.

6             IT IS SO STIPULATED.  DATED YESTERDAY,

7    SIGNED BY MYSELF, COUNSEL FOR DEFENDANT JERRY FONG,

8    AND THE DEFENDANT HIMSELF.

9             THE COURT:  ALL RIGHT.

10            BASICALLY I THINK IT'S CLEAR THE EVIDENCE

11   CODE PROVIDES THAT RECORDS OF A REGULARLY CONDUCTED

12   BUSINESS ACTIVITY ARE ADMISSIBLE IN EVIDENCE AND

13   THE PARTIES HAVE AGREED THAT THE RECORDS OF THESE

14   INSTITUTIONS ARE ADMISSIBLE AND ARE THE RECORDS OF

15   THE INSTITUTIONS AND CAN BE CONSIDERED BY YOU.

16            MR. FAZIOLI:  AND YOUR HONOR, AT THIS

17   POINT, AND I THINK WITHOUT OBJECTION FROM THE

18   DEFENSE, WE WOULD MOVE INTO EVIDENCE THE EXHIBITS,

19   THE FINANCIAL EXHIBITS THAT ARE REFERENCED IN THAT

20   STIPULATION NAMELY EXHIBITS 220, THROUGH 252,

21   EXHIBIT 257 AND EXHIBIT 276 THROUGH 278.

22            THE COURT:  ALL RIGHT.

23            THOSE ARE ADMITTED.

24

25

1    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS 220 THROUGH

2    252, 257, 276 AND 278 HAVING BEEN PREVIOUSLY MARKED

3    FOR IDENTIFICATION, WERE ADMITTED INTO EVIDENCE.)

4          MR. FAZIOLI:  THANK YOU, YOUR HONOR.

5          MR. FAZIOLI:  AND YOUR HONOR, WE ARE

6    GOING TO READ THE TWO OTHER STIPULATIONS BRIEFLY.

7          THE COURT:  ALL RIGHT.

8          MR. FAZIOLI:  THERE ARE TWO MORE

9    STIPULATIONS.

10          FIRST IS TRIAL STIPULATION NUMBER TWO.

11    WIRE TRANSFERS AND COMMUNICATIONS.

12          THE UNITED STATES OF AMERICA AND

13    DEFENDANT ALBERT KE-JENG HU HEREBY STIPULATE FOR

14    PURPOSES OF THE TRIAL OF THIS ACTION THAT THE

15    FOLLOWING FACTS ARE CONCLUSIVELY ESTABLISHED BEYOND

16    A REASONABLE DOUBT AND THEREFORE ARE NOT IN

17    DISPUTE:

18          THE FOLLOWING WIRE TRANSFERS OR WIRE

19    COMMUNICATIONS OCCURRED ON OR ABOUT THE DATES SET

20    FORTH BELOW.  EACH WIRE TRANSMITTED OR CAUSED TO BE

21    TRANSMITTED, SIGNALS IN AND AFFECTING INTERSTATE

22    FOREIGN COMMERCE OR COMMUNICATION.

23          FIRST, ON FEBRUARY 8TH, 2005 AN

24    INTERSTATE WIRE TRANSFER OF A HUNDRED THOUSAND

25    DOLLARS SENT BY OR ON THE BEHALF OF MR. LIN TO A

1    BANK OF AMERICA ACCOUNT ENDING IN 6581.

2              NEXT, FEBRUARY 23RD, 2005 AN INTERSTATE

3    WIRE TRANSFER OF A HUNDRED THOUSAND DOLLARS SENT BY

4    OR ON THE BEHALF OF MR. LIN TO A BANK OF AMERICA

5    ACCOUNT ENDING IN 6581.

6              NEXT, ON 7-6-05, AN INTERSTATE WIRE

7    TRANSFER OF $250,000 SENT BY OR ON THE BEHALF OF

8    MR. LIN TO A BANK OF AMERICA ACCOUNT ENDING IN

9    6581.

10             NEXT, ON 4-27-07 AN INTERSTATE WIRE

11   TRANSFER DIRECTING THAT A $2 MILLION WIRE TRANSFER

12   BE SENT BY OR ON THE BEHALF OF MR. VERDIELL TO A

13   CREDIT SWISS ACCOUNT ENDING IN 1780.

14             4-30-07, AN INTERSTATE WIRE TRANSFER OF

15   $2 MILLION SENT BY OR ON THE BEHALF OF MR. VERDIELL

16   TO A CREDIT SWISS ACCOUNT ENDING IN 1780.

17             6-19-07, AN INTERSTATE WIRE COMMUNICATION

18   DIRECTING THAT A $250,000 WIRE TRANSFER BE SENT BY

19   OR ON THE BEHALF OF MR. LIN TO A CREDIT SWISS

20   ACCOUNT ENDING IN 1780.

21             AND LASTLY, 6-19-07, AN INTERNATIONAL

22   WIRE TRANSFER OF $250,000 WIRE TRANSFER SENT BY OR

23   ON THE BEHALF OF MR. LIN TO A CREDIT SWISS ACCOUNT

24   ENDING IN 1780.

25             IT IS SO STIPULATED, SIGNED YESTERDAY BY

1    ASSISTANT UNITED STATES ATTORNEY JOSEPH FAZIOLI,

2    JERRY FONG COUNSEL FOR THE DEFENDANT, AND THE

3    DEFENDANT HIMSELF.

4             LASTLY, TRIAL STIPULATION NUMBER THREE,

5    CAPITOL ONE VISA ACCOUNT.

6             THE UNITED STATES OF AMERICA AND

7    DEFENDANT ALBERT KE-JENG HU HEREBY STIPULATE FOR

8    PURPOSES OF THE TRIAL OF THIS ACTION THAT THE

9    FOLLOWING FACTS ARE CONCLUSIVELY ESTABLISHED BEYOND

10   A REASONABLE DOUBT AND THEREFORE ARE NOT IN

11   DISPUTE:

12            BETWEEN 2000 AND 2009, THE DEFENDANT

13   ALBERT KE-JENG HU WAS THE ACCOUNT HOLDER FOR THE

14   CAPITOL ONE VISA ACCOUNT WITH THE NUMBER OF

15   4121742619993085.

16            IT IS SO STIPULATED.  SIGNED YESTERDAY BY

17   MYSELF, ASSISTANT UNITED STATES ATTORNEY JOSEPH

18   FAZIOLI, JERRY FONG COUNSEL FOR THE DEFENDANT, AND

19   THE DEFENDANT HIMSELF.

20            THANK YOU.

21            THE COURT:  DO YOU WANT TO CALL YOUR

22   FIRST WITNESS?

23            MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

24   CALLS FUYUAN BOB LIN TO THE STAND.

25            THE COURT:  ALL RIGHT.

59

1          MR. LUCEY:  YOUR HONOR, I UNDERSTAND IT

2     MIGHT BE JUST A MOMENT FOR MR. LIN TO ARRIVE:

3          THE CLERK:  COME FORWARD AND I WILL SWEAR

4     YOU IN.

5

6                    **FUYUAN BOB LIN,**

7     BEING CALLED AS A WITNESS ON BEHALF OF THE

8     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

9     EXAMINED AND TESTIFIED AS FOLLOWS:

10         THE WITNESS:  I DO.

11         THE CLERK:  THANK YOU.

12         TAKE THE STAND THERE, PLEASE.  FOR THE

13    RECORD PLEASE STATE YOUR FULL NAME AND SPELL YOUR

14    FIRST AND LAST NAME.

15         THE WITNESS:  FUYUAN LIN, L-I-N.

16         THE CLERK:  THANK YOU.

17

18              **DIRECT-EXAMINATION BY MR. LUCEY**

19

20    BY MR. LUCEY:

21    Q.   GOOD MORNING.

22    A.   GOOD MORNING.

23    Q.   MR. LIN, DO YOU GO BY ANY OTHER NAME BESIDES

24    FUYUAN?

25    A.   YES.  I'M ALSO KNOWN AS BOB LIN, BOB.

1    Q.   AND MR. LIN, WHERE DO YOU CURRENTLY RESIDE?

2    A.   I RESIDE IN SARATOGA.

3    Q.   AND BEFORE THAT WHERE DID YOU RESIDE?

4    A.   CUPERTINO.

5    Q.   AND YOU LIVED IN THE BAY AREA FOR HOW LONG?

6    A.   SINCE 1978.  30-SOMETHING YEARS.

7    Q.   MR. LIN, HOW ARE YOU FEELING TODAY?

8    A.   I'M OKAY.  JUST CHRONIC -- SOME BREATHING

9    PROBLEM.

10   Q.   SO DO YOU HAVE ANY SORT OF A HEALTH CONDITION

11   THAT MAY AFFECT DURING THE COURSE OF YOUR TESTIMONY

12   TODAY YOUR SPEAKING PATTERN?

13   A.   NO, SOMETIMES I MAY BREATHE THROUGH MY MOUTH

14   BUT I'M GENERALLY HEALTHY, BUT THIS IS MANY YEARS

15   OF BREATHING PROBLEM.

16   Q.   BUT YOU ARE DOING FINE?

17   A.   YEAH, I'M FINE.

18   Q.   MR. LIN ARE YOU CURRENTLY EMPLOYED?

19   A.   I'M SEMI-RETIRED.  I WORK ON THE TWO BOARDS OF

20   A START UP HELPING ENTREPRENEURS START UP BUSINESS.

21   AND THE OTHER HALF OF THE TIME I WORK AS AN ON THE

22   BOARD OF AN EDUCATIONAL FOUNDATION WHICH IS

23   NONPROFIT HELPING YOUNG PEOPLE FROM TWO SIDES OF

24   THE PACIFIC OCEAN TO LEARN ABOUT EACH OTHER.

25   Q.   AND MR. LIN, DO YOU KNOW AN INDIVIDUAL NAMED

1    ALBERT HU?

2    A.   YES.

3    Q.   HOW DID YOU COME TO KNOW HIM?

4    A.   INITIALLY, BACK IN LATE 90'S I WAS A MEMBER OR

5    CHAIRMAN -- HAD AN ASSOCIATION CALLED CHINESE

6    ASSOCIATION OF INTERNATIONAL TRADE.  AND THIS IS

7    ONE OF THOSE NONPROFIT COMMUNITY SERVICES

8    ASSOCIATION, AND WE HAVE ACTIVITIES.

9         AND I BELIEVE ONE TIME MR. HU CAME TO OUR

10   ACTIVITY AS A DEDICATION TO VISIT TAIWAN.  THAT WAS

11   ONE TIME, BRIEF.  ALSO, ANOTHER TIME I WAS INVITED

12   BY MR. HU TO LISTEN TO HIS PROPOSAL, THIS IS IN THE

13   LATE NINETIES, I BELIEVE AT THAT TIME HE WAS TRYING

14   TO RAISE FUNDS FOR HIS SEMICONDUCTOR EQUIPMENT

15   COMPANY.  THAT WAS ALSO ONE TIME I LISTENED TO

16   PROPOSAL QUITE OFTEN.

17   Q.   SO YOU'VE KNOWN HIM FOR SOME TIME NOW?

18   A.   IN THE -- AND THEN SINCE THOSE TWO ENCOUNTERS

19   THERE WAS NO MORE CONTACT OR ENGAGEMENT, NOTHING,

20   UNTIL ENCOUNTER AROUND 2004, YES.

21        MAY I HELP MYSELF TO THE WATER?

22   Q.   YES, MR. LIN THERE MAY BE A GLASS OF WATER IN

23   FRONT OF YOU THAT'S ALREADY BEEN POURED.

24        MR. LIN DO YOU SEE MR. HU SITTING IN THE

25   COURTROOM TODAY?

62

1    A.   YES.

2    Q.   CAN YOU DESCRIBE WHERE HE'S SITTING?

3    A.   HE'S SITTING AT THE TABLE.

4    Q.   AND WHAT IS HE WEARING?

5    A.   A PINK SHIRT.

6         MR. LUCEY:  YOUR HONOR, I WOULD ASK THE

7    RECORD REFLECT THE DEFENDANT IDENTIFIED MR. HU.

8         THE COURT:  OKAY.

9    BY MR. LUCEY:

10   Q.   SO MR. LIN, AT SOME POINT AFTER THE INITIAL

11   MEETINGS YOU DISCUSSED A MOMENT AGO THAT OCCURRED

12   IN THE LATE 90'S YOU HAD ANOTHER CHANCE ENCOUNTER

13   WITH HIM SOMETIME AFTER THAT?

14   A.   2004.

15   Q.   AND WHAT WAS THE CIRCUMSTANCES OF THAT MEETING

16   IN OR AROUND 2004?

17   A.   I BELIEVE IT WAS IN THE JAPANESE RESTAURANT IN

18   CUPERTINO.  HE WAS WITH SOMEONE ELSE I WAS WITH

19   SOMEONE ELSE AND WE SAY HELLO, THEN THAT WAS IT.

20   Q.   DID YOU MAKE ANY MANS TO HAVE ANY FURTHER

21   MEETING AFTER THAT?

22   A.   NO HE CONTACTED ME AFTERWARDS.

23   Q.   DO YOU RECALL WHAT HE CONTACTED YOU IN REGARD

24   TO?

25   A.   HE CAME TO MY OFFICE AT THE TIME TO PRESENT

63

1    HIS HEDGE FUND AND SO I SAY, YEAH, PLEASE COME IN.

2    BECAUSE AGAIN, IN MY BUSINESS DURING THOSE DAYS I

3    RECEIVED PROPOSALS VERY OFTEN AND I REVIEWED MANY,

4    MANY PROPOSAL PEOPLE SEEKING HELP, SEEKING START

5    UP, LAUNCHING BUSINESS.

6    Q.   AND DO YOU RECALL WHAT KIND OF PROPOSAL MR. HU

7    WAS MAKING ON THIS OCCASION?

8    A.   YEAH.  HE CAME TO SEE ME JOINTLY WITH A

9    GENTLEMAN CALLED MR. STEVE BOND.

10   Q.   LET ME STOP YOU THERE, DID YOU UNDERSTAND WHAT

11   MR. BOND'S ROLE WAS AT THAT MEETING?

12   A.   I BELIEVE MR. BOND WORKED FOR MR. HU.

13   Q.   AND AGAIN, WHAT WAS THE NATURE OF MR. HU'S

14   PROPOSAL ON THAT OCCASION?

15   A.   YES, PARDON ME.  HE CAME TO PRESENT HIS HEDGE

16   FUND, I BELIEVE IT WAS CALLED ASENQUA BETA FUND,

17   THAT ACCORDING TO HIM HE HAS BEEN -- HE FOUND IT,

18   CREATED IT AND HAS BEEN MANAGING IT VERY

19   SUCCESSFULLY IN THE PAST FEW YEARS.

20   Q.   AND MR. LIN, AT THAT TIME IN 2004, WHAT WAS

21   YOUR UNDERSTANDING ABOUT WHAT A HEDGE FUND DID?

22   A.   ALLOW ME, MY PROFESSION HAS BEEN MOSTLY

23   VENTURE CAPITOL AND MY EXPERTISE IS MOSTLY IN

24   HELPING ENTREPRENEUR, LIKE IN THE SILICON VALLEY

25   SPIRIT, HELPING YOUNG PEOPLE START BUSINESS.  AND

1    IN FACT I WAS NOT VERY GOOD AT INVESTING IN THE

2    MARKET WHICH IS MY --

3              THE COURT:  OKAY, THE QUESTION WAS WHAT

4    WAS YOUR UNDERSTANDING OF A HEDGE FUND.

5              THE WITNESS:  VERY LITTLE, VERY LITTLE.

6    BY MR. LUCEY:

7    Q.   JUST SO I'M CLEAR AND THE JURY IS CLEAR, ARE

8    YOU TELLING US THAT A VENTURE CAPITOL AND A HEDGE

9    FUND IS?

10   A.   YES.

11   Q.   WHAT'S THE DIFFERENCE?

12   A.   OKAY.  IF I MAY, VENTURE CAPITOL WE JUST HELP

13   PEOPLE WHO HAVE A DREAM WHO WANT TO START BUSINESS

14   LAUNCH BUSINESS.  SO IT'S NONPUBLIC.

15             MY UNDERSTANDING AT THE TIME IS A HEDGE

16   FUND IS MOSTLY INVESTING AND PLAYING WITH THE

17   MARKET BY MAKING PROFIT.

18   Q.   JUST SO WE ARE CLEAR ABOUT YOUR TERMS HERE,

19   WHAT DO YOU MEAN BY THE MARKET?

20   A.   MARKET, STOCK MARKET.

21   Q.   SO INVESTING IN PUBLIC COMPANIES?

22   A.   YES, ALREADY LISTED.

23   Q.   AND WHAT WAS YOUR BACKGROUND IN INVESTING IN

24   PUBLIC COMPANIES AT THAT TIME?

25   A.   VERY LITTLE, VERY POORLY.

1    Q.   WHEN YOU PREVIOUSLY INVESTED IN A HEDGE FUND?

2    A.   AT THAT TIME IN PARALLEL I WAS REVIEWING A

3    FEW, YES.

4    Q.   BUT YOU HAD NOT YET MADE ANY FINAL INVESTMENT

5    DECISIONS?

6    A.   NO, AFTER PRESENTATION FROM HIM, I HAVE NOT

7    MADE DECISION.

8    Q.   OKAY.  SO DO YOU RECALL SOME OF THE

9    INFORMATION THAT MR. HU PROVIDED YOU REGARDING THIS

10   PARTICULAR HEDGE FUND INVESTMENT THE ASENQUA BETA

11   AS YOU DESCRIBED IT?

12   A.   I RECALL HE HAD A POWER POINT PRESENTATION

13   WHICH WAS QUITE WELL MADE WITH A SHOWING ALL SORTS

14   OF HISTORY GRAPH AND HIS SUCCESSES WITH SOME CASES

15   AND DEMONSTRATING LIKE THE PAST FEW YEARS HE HAS

16   THIS HIGH PERCENTAGE GAIN.  PLUS, I BELIEVE A

17   BROCHURE.

18   Q.   AND WHAT DID MR. HU TELL YOU ABOUT HIS

19   BACKGROUND IN TERMS OF HIS WORK WITH HEDGE FUNDS?

20   A.   YEAH, HE TOLD ME HE'S PHD AT MIT.  AND I AND I

21   THINK HE'S A TECHNICAL PERSON SO IN FACT I THINK I

22   COMMENTED OH, YOU LEARN ABOUT THE MARKET HEDGE

23   FUND.

24   Q.   WHAT DID HE SAY IN RESPONSE TO THE QUESTION

25   FROM YOU?

1    A.   THAT'S WHAT HE WANTED TO DO.

2    Q.   WHAT ABOUT -- DID MR. HU ADDRESS WHAT

3    MR. BOND'S ROLE WAS IF ANY WOULD BE IN THE ASENQUA

4    BETA FUND?

5    A.   ONE MORE TIME.

6    Q.   I'M SORRY.  DID MR. HU ON THAT OCCASION WHEN

7    YOU MET HIM IN 2004 TO DISCUSS POTENTIALLY

8    INVESTING IN HIS ASENQUA BETA FUND, DID HE MAKE ANY

9    REFERENCE TO WHAT MR. BOND'S ROLE WOULD BE IF ANY?

10   A.   OH, OKAY.

11        MR. BOND WAS INTRODUCED TO ME THROUGH

12   MR. HU.  MR. STEVE BOND WAS THE PERSON TO HELP HIM

13   PICK STOCKS SORTS OF LIKE ANALYST AND HELP HIM RUN

14   THE EVERYTHING ELSE IS CONTROLLED AND MANAGED BY

15   MR. HU.  ESSENTIALLY MR. BOND WORKS FOR MR. HU.

16   Q.   SO WHO DID, I'M SORRY -- DID MR. HU INDICATE

17   WHO WOULD BE THE ULTIMATE DECISION MAKER WITHIN THE

18   ASENQUA BETA FUND?

19   A.   THAT WOULD BE HIM.

20   Q.   MR. HU?

21   A.   UH-HUH.

22   Q.   NOW DURING THE COURSE OF THIS MEETING DID

23   MR. HU MENTION THE NAMES OF ANY OTHER INDIVIDUALS

24   WHO HAD ALREADY INVESTED IN THE ASENQUA BETA?

25   A.   I DON'T RECALL HE HAD MENTIONED ANY SPECIFIC

1    NAME BUT IT WAS A BIG THING THAT HE MENTIONED MANY

2    OTHER PROMINENT HIGH-TECH SUCCESSFUL PEOPLE WERE

3    ALREADY HIS CLIENTS, WERE ALREADY HIS INVESTORS.

4    TO ME THAT WAS ALSO IMPORTANT, YEAH.

5    Q.   AND WHY IS THAT IMPORTANT TO YOU?  WHY WAS

6    THAT IMPORTANT TO YOU AT THAT TIME?

7    A.   WELL, I THINK, YOU KNOW, HE BE AN MIT, PHD AND

8    HE MUST KNOW WHAT HE'S DOING.  AND IF THERE ARE

9    MANY OTHER SUCCESSFUL ENTREPRENEUR ALSO SELECTING

10   HIM TO TRUST HIM, GIVE HIM THE FUND, THEN I FEEL

11   MUCH MORE COMFORTABLE.  THERE'S A TRUST BELIEVE UP,

12   YEAH.

13   Q.   AND ESSENTIALLY SOMEWHAT OF A CORROBORATION OF

14   HIS EFFORTS ESSENTIALLY?

15   A.   YES.  BECAUSE TO ME FOR ANY KIND OF INVESTMENT

16   WHETHER IT'S FOR START UP OR FOR THE PUBLIC MARKET

17   I RELY ON TRUST, THAT'S VERY IMPORTANT.

18   Q.   SO MR. LIN, DO YOU RECALL IF AT THIS MEETING

19   MR. HU MENTIONED THE NAME OF LONG LIEU AS ONE OF

20   HIS EXISTING INVESTORS THAT HE WAS WORKING WITH?

21   A.   I DON'T REMEMBER IF HE SPECIFICALLY MENTIONED

22   BUT HONG LU THERE WAS ONE BROCHURE, THERE WAS ONE

23   BROCHURE OF ASENQUA BROCHURE.  HONG LU'S PHOTO WAS

24   INCLUDED IN THE BOOKLET PROMINENTLY.

25   Q.   AND YOU WERE AWARE WHEN YOU WERE REVIEWING

1    THIS BROCHURE AS TO WHO LONG LIEU WAS?

2    A.   OH, YES, YES, HE'S VERY FAMOUS AND A VERY

3    SUCCESSFUL GENTLEMAN.

4    Q.   AND YOU KNEW WHO HE WAS AT THAT TIME IN OR

5    ABOUT 2004, CORRECT?

6    A.   YES.

7    Q.   AND WHAT WAS MR. HONG LU'S PROFESSION AT THAT

8    TIME?

9    A.   HE WAS A FOUNDER OF A PUBLIC COMPANY CALLED

10   UTSTARCOM.  ACTUALLY, I KNEW HIM WHEN WE BOTH WERE

11   GIVING TALKS AT THE STANFORD UNIVERSITY.  WE BOTH

12   WERE ON THE SAME PANEL TEACHING, TALKING TO THE

13   YOUNG STUDENTS.

14   Q.   AND THE FACT THAT MR. LIN YOU SAW A BROCHURE

15   WHERE MR. HONG LU'S NAME WAS MENTIONED AND HIS

16   PICTURE LISTED DID THAT MAKE YOU MORE OR LESS

17   LIKELY TO INVEST WITH MR. HU?

18   A.   MUCH MORE LIKELY.

19   Q.   WHY SO?

20   A.   I RESPECT HONG LU GREATLY.  IT HAS BEEN WELL

21   PUBLICIZED I EVEN WROTE ARTICLE ABOUT HONG LU AND

22   TALK ABOUT HONG LU HE HIS PARTICULAR STYLE AND

23   TRUSTWORTHINESS IN MANY OF MY BOOKS.

24   Q.   OVER THE YEARS?

25   A.   YES.

1    Q.   SO MR. LIN, DID YOU RECEIVE ANY DOCUMENTS

2    BEYOND THE POWERPOINT PRESENTATION DOCUMENTS THE

3    INVESTMENT DOCUMENTS IN CONNECTION WITH CONSIDERING

4    MAKING AN INVESTMENT IN THE ASENQUA BETA FUND?

5    A.   YES, I DON'T KNOW, I DON'T REMEMBER THE EXACT

6    SEQUENCE BUT SEQUENTIALLY EVENTUALLY HE BROUGHT ME

7    SOME SUPPORTING DOCUMENTS LIKE LATER A FEW MONTHS

8    LATER, MAYBE LIKE HE'S A FINANCIAL STATEMENT,

9    AUDITED FINANCIAL STATEMENT AND THE LP AGREEMENT

10   THINGS LIKE THAT, OVER THE COURSE OF A FEW MONTH.

11             MR. LUCEY:  YOUR HONOR, IF I MAY APPROACH

12   THE WITNESS.

13             THE COURT:  ALL RIGHT.

14   Q.   MR. LIN, I'M HANDING YOU NOW WHAT'S BEEN

15   PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT NUMBER 1.

16   IT'S BATES STAMPED FOR COUNSEL'S BENEFIT HU37

17   THROUGH HU43?

18   A.   UH-HUH.

19   Q.   MR. LIN FIRST, TAKE A MOMENT TO LOOK THROUGH

20   THOSE SEQUENCE OF PAGES IT'S A MULTI PAGE DOCUMENT.

21   A.   YEAH ALL TOGETHER SEVEN PAGE.

22   Q.   DO YOU RECOGNIZE THAT DOCUMENT, SIR?

23   A.   YES.

24   Q.   WHAT IS THIS DOCUMENT?

25   A.   IT WAS A DOCUMENT PROVIDED TO ME BY MR. HU AS

70

1    AN OUGHT AUDITED FINANCIAL STATEMENT FOR HIS

2    ASENQUA BETA FUND AT THAT TIME.

3    Q.   DID HE PROVIDE THIS DOCUMENT TO YOU BEFORE OR

4    AFTER YOU MADE ANY INVESTMENT WITH MR. HU?

5    A.   BEFORE, BEFORE.

6             MR. LUCEY:  YOUR HONOR, I MOVE EXHIBIT 1

7    INTO EVIDENCE.

8             MR. FONG:  NO OBJECTION.

9             THE COURT:  OKAY.  IT'S RECEIVED.

10   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 1 HAVING

11   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

12   ADMITTED INTO EVIDENCE.)

13            MR. LUCEY:  YOUR HONOR, I ASK IF IT COULD

14   BE PUBLISHED ON OUR SCREEN FOR THE BENEFIT OF THE

15   JURY STARTING WITH PAGE 1, 37.

16   Q.   SO MR. LIN, THIS IS THE FIRST PAGE OF THE

17   DOCUMENT, CORRECT?

18   A.   YES.

19   Q.   WHAT IS THE NAME OF THE FIRM AT THE TOP OF

20   THIS PAGE?

21   A.   CASTILLO, LYN, COHEN & VIJAY.

22   Q.   IF YOU COULD READ THE BALANCE OF THE PORTION

23   OF THE DOCUMENT BEGINNING WITH "AUDITED"?

24   A.   AUDIT THE FINANCIAL STATEMENTS ASENQUA BETA

25   FUND LP.  A DELAWARE LIMITED PARTNERSHIP.

1    DECEMBER 31ST, 2004.

2    Q.   MR. LIN, IF YOU COULD TURN TO THE THIRD PAGE

3    OF THE DOCUMENT BATES STAMP NUMBER 39.

4            AND AGAIN, IF I COULD ASK MS. BURNEY TO

5    ENLARGE THE WRITTEN PORTION OF THIS DOCUMENT.

6            AGAIN MR. LIN, HAS THAT SAME HEADING AT

7    THE TOP OF THE DOCUMENT?

8    A.   YES.

9    Q.   WHAT IS THE TEXT IMMEDIATELY BELOW THE HEADING

10   OF THE FIRM?

11   A.   I'M SORRY.

12   Q.   WHAT'S THE FIRST LINE OF TEXT IN THIS DOCUMENT

13   IF YOU COULD READ IT OUT LOUD?

14   A.   REPORT OF THE INDEPENDENT AUDITORS.

15   Q.   AND AT THE VERY BOTTOM OF THE DOCUMENT BELOW

16   THE TEXT THERE APPEARS TO BE A NAME AND A SIGNATURE

17   AND A DATE?

18   A.   YES.  JUAN CASTILLO, CPA.

19   Q.   WHAT'S THE DATE?

20   A.   JANUARY 10, 2005.

21   Q.   SO WE WILL LOOK AT THE TEXT OF THE DOCUMENT IN

22   A MOMENT, BUT WHAT DID YOU TAKE TO MEAN BY THE FACT

23   THAT THE DOCUMENT HAD A SIGNATURE NAME AND DATE AT

24   THE BOTTOM AT THE TIME?

25            MR. FONG:  OBJECTION.  AMBIGUOUS.

72

1        MR. LUCEY:  I CAN CLARIFY THE QUESTION,

2   YOUR HONOR.

3        THE COURT:  ALL RIGHT.

4   BY MR. LUCEY:

5   Q.   MR. LIN, WHAT WAS YOUR UNDERSTANDING WAS THE

6   NATURE OF THE SIGNATURE THAT APPEARED IN THE DATE.

7   WHAT DID YOU UNDERSTAND THAT MEAN WHEN YOU READ

8   THIS DOCUMENT BACK IN OR AROUND 2004?

9   A.   YEAH.  THIS DOCUMENT TO ME MEANT THAT ASENQUA

10  BETA FUND HAS BEEN, THE FINANCIAL STATEMENT HAS

11  BEEN EITHER PREPARED OR REVIEWED AND CERTIFIED BY

12  THIS PARTICULAR CPA.  SO IT'S LEGITIMATE.

13  Q.   AND MR. LIN, IS IT -- WAS IT IMPORTANT AT THE

14  TIME YOU READ THIS DOCUMENT THAT THE INDIVIDUAL'S

15  NAME WAS FOLLOWED BY CFA?

16  A.   OH, YES.

17  Q.   WHY IS THAT?

18  A.   IT'S A CERTIFIED PUBLIC ACCOUNTANT IT MEANS.

19  Q.   LET ME STOP YOU THERE, WHAT DID THAT MEAN TO

20  YOU AT THAT TIME?

21  A.   IT MEANS THIS IS A PERSON THAT HAS BEEN

22  CERTIFIED BY THE GOVERNMENT AND HE'S ACCOUNTABLE

23  AND RESPONSIBLE AND VERIFY EVERYTHING IN THE

24  FINANCIAL STATEMENT IS TRUE.

25  Q.   ASK AGAIN I ASK, WHY IS THAT IMPORTANT TO YOU

1    IN REVIEWING THIS DOCUMENT?

2    A.   YES.  ONCE AGAIN, IT IS -- IT CERTIFIES THAT

3    THE FINANCIAL STATEMENT IS TRUE AND IT'S NOT JUST

4    SOMEONE WHO MADE IT UP.

5    Q.   NOW I ASK MS. BURNEY IF SHE COULD ENLARGE THE

6    FIRST FULL PARAGRAPH OF THIS DOCUMENT.

7            MR. LIN, I WILL READ THE TEXT OUT LOUD

8    FOR THE RECORD THEN ASK YOU A QUESTION.

9            WE HAVE AUDITED THE FINANCIAL STATEMENTS

10   OF ASENQUA BETA FUND, THE FUND FOR THE YEAR ENDED

11   DECEMBER 31ST, 2004, WHICH COMPRISE THE BALANCE

12   SHEET, STATEMENT OF CAPITAL ACCOUNTS, AND THE

13   RELATED NOTES 1 TO 4.  IT IS OUR RESPONSIBILITY TO

14   FORM AN INDEPENDENT OPINION BASED ON OUR AUDIT ON

15   THOSE FINANCIAL STATEMENTS AND TO REPORT OUR

16   OPINION SOLELY TO YOU, AS A BODY, AND FOR NO OTHER

17   PURPOSE.  WE DO NOT ASSUME RESPONSIBILITY TOWARDS

18   OR ACCEPT LIABILITY TO ANY OTHER PERSON FOR THE

19   CONTENTS OF THIS REPORT.

20           NOW MR. LIN, MY QUESTION IS:  WHAT'S THE

21   IMPORTANCE OF THIS FIRST PARAGRAPH OF THE -- OF

22   THIS REPORT OF THE INDEPENDENT AUDITORS SIGNED BY

23   MR. CASTILLO?

24   A.   YES, TO ME THE MOST IMPORTANT ONE ACTUALLY IS

25   THE FIRST TWO SENTENCE.  WE HAVE AUDITED THE

1    FINANCIAL STATEMENT.

2    Q.   WHY IS THAT IMPORTANT?

3    A.   THAT MEANS THERE'S AN INDEPENDENT CPA FIRM

4    HAVE ACTUALLY PHYSICALLY REVIEWED THE FINANCIAL

5    STATEMENT FOR THE UNDERSTANDING OF THIS DOCUMENT.

6    Q.   WHEN YOU SAY -- LET ME STOP YOU THERE, WHAT DO

7    YOU MEAN BY "PHYSICALLY REVIEW" WHAT DOES THAT

8    MEAN?

9    A.   MEANING THIS CPA FIRM HAS BEEN CONTRACTED BY

10   THIS COMPANY.

11   Q.   ASENQUA BETA FUND?

12   A.   TO GO IN AND REVIEW THEIR FINANCIAL STATEMENT.

13   IN ORDER FOR THEM TO PRODUCE SUCH AN AUDITED

14   FINANCIAL REPORT.

15   Q.   SO WHAT KIND OF THINGS ARE YOU TALKING ABOUT

16   THAT THEY WOULD HAVE HAD TO REVIEW TO WRITE THAT

17   PARAGRAPH AND WRITE THAT SENTENCE WHAT DOES THAT

18   MEAN?

19   A.   YES, IT MEANS THE CPA NEEDS TO ACCESS THEIR

20   FINANCIAL RECORD TO REVIEW AND LOOK AT THE REVENUE

21   LOOK AT INCOME, LOOK AT TURN OVER LOOK AT THE

22   EXPENSE AND ALL THOSE THINGS AND FOR IT TO BE A

23   REAL AUDITED REPORT.

24   Q.   MAYBE SOMETIME IT IS YOU HEAR THE PHRASE THEY

25   LOOKED AT THE BOOKS; IS THAT RIGHT?

1    A.   YES.

2    Q.   LOOKED AT ALL THE MONEY COMING IN THE MONEY

3    GOING OUT ALL THE BANK RECORDS?

4    A.   YES.

5    Q.   ALL THE ASSETS OF THE FIRM?

6    A.   RIGHT.

7    Q.   THE LIABILITIES OF THE FUND, CORRECT?

8    A.   UH-HUH.

9    Q.   MS. BURNEY, I NOW ASK IF YOU COULD BLOW UP THE

10   SECOND PARAGRAPH OF THIS PAGE 39.

11            AGAIN, I WILL READ A PORTION OF THIS TO

12   THE JURY AND THE COURT.  THE SECOND SENTENCE OF

13   THIS PARAGRAPH BEGINS, AN AUDIT INCLUDES EXAMINING

14   ON A TEST BASIS EVIDENCE SUPPORTING THE AMOUNTS AND

15   DISCLOSURES IN THE FINANCIAL STATEMENTS.  AN AUDIT

16   ALSO INCLUDES ASSESSING THE ACCOUNTING PRINCIPLES

17   USED AS SIGNIFICANT ESTIMATES MADE BY MANAGEMENT AS

18   WELL AS IN EVALUATING THE OVER ALL FINANCIAL

19   STATEMENT'S PRESENTATION.

20            WE BELIEVE THAT OUR AUDIT PROVIDES A

21   REASONABLE BASIS FOR OUR OPINION.

22            SO MR. LIN, WHAT DID YOU TAKE THAT, THOSE

23   LINES I JUST READ INTO THE RECORD, TO MEAN AT THE

24   TIME YOU READ THEM BACK YEARS AGO PRIOR TO

25   INVESTING?

1    A.   THE TIME WHEN I READ IT, THIS PARAGRAPH TOLD

2    ME THAT THIS FIRM, LIKE I SAID EARLIER, HAVE

3    ACTUALLY CONDUCTED THE TRUE AUDITING AND FOLLOWING

4    THE STANDARD REQUIREMENT.  LIKE YOU SAY, EXAM THE

5    BOOKS TO THEIR SATISFACTION, PLUS THEIR ASSESSMENT.

6    Q.   AND MR. LIN, I WANT TO READ ONE MORE SENTENCE

7    INTO THE RECORD AND ASK YOU AGAIN TO HAVE A

8    QUESTION FOR YOU.

9         THE SENTENCE BEGINS, THOSE STANDARDS

10   REQUIRE THAT WE PLAN AND PERFORM THE AUDIT TO

11   OBTAIN REASONABLE ASSURANCE ABOUT WHETHER THE

12   FINANCIAL STATEMENTS ARE FREE OF MATERIAL

13   MISSTATEMENT.

14        MR. LIN, WHAT DID YOU UNDERSTAND THAT

15   STATEMENT TO MEAN BACK WHEN YOU READ THIS REPORT

16   YEARS AGO?

17   A.   THAT MEANS THE CPA WHEN THEY CONDUCTED THE

18   AUDITING, THEY HAVE REVIEWED ALL THE IMPORTANT

19   DOCUMENTS WHICH IS A COMPANY RECORD, INCOME RECORD,

20   FINANCIAL RECORD, EXPENSE RECORD.  THAT'S -- AND TO

21   MAKE SURE THERE WERE NO FALSE STATEMENT OR

22   DISCREPANCY OR INCONSISTENCY AND THEY HAVE DONE

23   THAT.

24   Q.   AND MR. LIN, PRIOR TO INVESTING WITH MR. HU

25   WAS IT IMPORTANT FOR YOU TO KNOW THAT THE FINANCIAL

1    STATEMENTS WOULD BE FREE OF MATERIAL MISSTATEMENT?

2    A.   YES.

3    Q.   WHY SO?

4    A.   BECAUSE IF -- WITHOUT AUDITING THE REPORT,

5    WITHOUT ACTUAL REVIEW AND EXAM, PEOPLE CAN BLOW UP

6    THE AMOUNT OF EXPENSES OR BLOW UP THE REVENUE

7    MEANING FALSIFY IT.

8    Q.   AND NOW I ASK MS. BURNEY IF SHE COULD ENLARGE

9    THE LAST PARAGRAPH OF THIS DOCUMENT.

10         NOW AGAIN I WILL READ THE SENTENCE INTO

11   THE RECORD AND ASK YOU A QUESTION MR. LIN

12   BEGINNING, IN OUR OPINION, THE FINANCIAL STATEMENTS

13   REFERRED TO ABOVE WERE SENT FAIRLY IN ALL MATERIAL

14   RESPECTS THE FINANCIAL POSITION OF THE FUND AS OF

15   DECEMBER 31ST, 2004, AND THE RESULTS OF ITS

16   OPERATIONS ITS CASH FLOWS AND IT IS CHANGES IN ITS

17   EQUITY FOR THE YEAR THEN ENDED UNTIL ACCORDANCE

18   WITH THE INTERNATIONAL FINANCIAL REPORTING

19   STANDARDS.

20         SO MR. LIN, WHAT DID YOU UNDERSTAND THAT

21   LAST SENTENCE TO MEAN IMMEDIATELY ABOVE MR.

22   CASTILLO'S SIGNATURE?

23   A.   YES, MY UNDERSTANDING IS AFTER HE REVIEWED AN

24   EXAM EVENTUALLY HE CAME TO THIS CONCLUSION

25   THEREFORE OFFERED HIS OPINION OF THE FINANCIAL

1   STATEMENTS TO HIS SATISFACTION, THEREFORE HE CAN

2   SIGN.

3   Q.   YOU UNDERSTOOD HIM TO BE GIVING HIS

4   PROFESSIONAL OPINION?

5   A.   YES.

6   Q.   NOW I ASK MR. LIN, IF YOU COULD TURN YOUR

7   ATTENTION NOW TO THE NEXT PAGE, PAGE 40.

8            AND MS. BURNEY, IF YOU COULD PUBLISH THAT

9   TO THE JURY, AND SLIGHTLY ENLARGE THE NUMBER

10  PORTION OF THE DOCUMENT.

11           MR. LIN, WHAT ARE YOU LOOKING AT HERE AS

12  YOU UNDERSTOOD IT WHEN YOU RECEIVED THIS DOCUMENT

13  BACK YEARS AGO.

14  A.   I AM NOT A CPA.  I'M NOT A FINANCIAL EXPERT

15  BUT WHEN I READ THIS I WAS VERY IMPRESSED BY THIS

16  VERY PROFESSIONALLY PREPARED DOCUMENT.

17  Q.   AND WHAT ABOUT IT SO IMPRESSED YOU?

18  A.   WELL, I LOOK AT TWO LINES ESPECIALLY.

19  Q.   WHICH TWO LINES ARE YOU THINKING?

20  A.   THE ONE THAT SAYS NET ASSET VALUE.

21  Q.   LET ME STOP YOU THERE MR. LIN.

22           MS. BURNEY, IF YOU COULD ENLARGE THAT FOR

23  THE JURY.

24           THIS IS THE LINE YOU ARE REFERRING TO

25  MR. LIN?

1    A.   YES.

2    Q.   WHY IS THAT IMPORTANT TO YOU WHEN YOU READ IT

3    BACK?

4    A.   THIS PERSON WHO I LIKED AT THAT TIME, AT THAT

5    TIME I LIKED HIM VERY MUCH.

6    Q.   MR. WHO?

7    A.   MR. HU.  AND HE HAD ALREADY MORE THAN A

8    HUNDRED 40 MILLION HELPING HIS CLIENTS, BUT THIS

9    YOU NEED TO READ THIS ALONG WITH THE SECOND LINE

10   FOLLOWING IT WHICH IS EVEN MORE IMPRESSIVE IS THE

11   YEAR TO YEAR GAIN.

12   Q.   YOU ARE REFERRING TO THIS LINE NAV,

13   YEAR-OVER-YEAR PERCENT?

14   A.   YES.

15   Q.   WHY WAS THAT SIGNIFICANT TO YOU?

16   A.   THIS IS A VERY, VERY SIGNIFICANTLY GOOD

17   PERFORMANCE, HE'S HELPING HIS CLIENTS, CERTAINLY

18   BETTER THAN MY OWN PERFORMANCE.

19   Q.   SO MR. LIN, HAVING READ AND REVIEWED THIS

20   ENTIRE REPORT, AFTER BEING PROVIDED IT TO YOU BY

21   MR. HU, THESE PAGES AND THE ENTIRETY OF THIS

22   DOCUMENT YOU READ IT BACK YEARS AGO.

23   A.   UH-HUH.

24   Q.   WERE YOU MORE OR LESS LIKELY TO INVEST WITH

25   MR. HU IN HIS ASENQUA BETA FUND?

1    A.   I'M MORE LIKELY BECAUSE IT'S A WONDERFUL

2    PERFORMANCE, IT'S A WONDERFUL PERFORMANCE.

3    Q.   AND WHY IS IT SO IMPORTANT FOR YOU TO SEE THAT

4    THE NET ASSET VALUE, HAD IT GONE UP OR DOWN YEAR

5    OVER YEAR BETWEEN 2003 AND 2004?

6    A.   IT MEANS THAT HE'S IMPROVING HIS PERFORMANCE

7    AND HIS CLIENTS ARE GAINING THROUGH HIS INVESTMENT.

8    Q.   AND THE OVER ALL VALUE OF THE FUND IS

9    INCREASING, CORRECT?

10   A.   YES, YES.

11   Q.   BASED ON THIS DOCUMENT?

12   A.   YES.

13   Q.   AND MR. LIN DID YOU UNDERSTAND THE ACCOUNTANTS

14   AND THE ACCOUNTING FIRM WHO PREPARED THESE

15   DOCUMENTS TO BE CERTIFIED PUBLIC ACCOUNTANTS IN THE

16   STATE OF CALIFORNIA WHEN YOU REVIEWED IT BACK YEARS

17   AGO?

18   A.   I WAS TOLD, YEAH.

19   Q.   WHO WERE YOU TOLD BY?

20   A.   BY MR. HU.

21   Q.   AT THAT TIME?

22   A.   UH-HUH.

23   Q.   IF YOU HAD KNOWN HIS FIRM AT THAT TIME DID NOT

24   ACTUALLY EXIST, WOULD YOU HAVE REVIEWED THIS

25   DOCUMENT DIFFERENTLY?

1    A.    DEFINITELY.

2    Q.    WHY?

3    A.    I WOULD THINK THEN IF THIS WAS MADE UP IF I

4    KNEW THIS WHOLE THING WAS MADE UP I WOULD THINK THE

5    WHOLE SCENARIO WAS FALSE.

6              THE COURT:  IT'S A GOOD TIME FOR A BREAK.

7              MR. LUCEY:  CERTAINLY, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  WE WILL TAKE A

9    15-MINUTE RECESS.

10             (WHEREUPON, THE FOLLOWING PROCEEDINGS

11   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

12             COULD I TALK TO COUNSEL FOR JUST A

13   SECOND.

14             (OFF-THE-RECORD DISCUSSION.)

15             (WHEREUPON, THE FOLLOWING PROCEEDINGS

16   WERE HELD IN THE PRESENCE OF THE JURY:)

17             THE CLERK:  DO WE HAVE THE WITNESS?

18             MR. LUCEY:  OH.

19             THE COURT:  YOU MAY CONTINUE.

20   BY MR. LUCEY:

21   Q.    BACK ON THE RECORD.

22             SO MR. LIN, I HAVE A FEW MORE QUESTIONS

23   TO ASK YOU REGARDING EXHIBIT 1.

24             SO I ASK NOW THAT MS. BURNEY, TURN AND

25   PUBLISH FOR THE JURY'S BENEFIT AND THE COURT PAGE

1    THREE, BATES NUMBER 41.

2              SO MR. LIN, IT'S THE PAGE IMMEDIATELY

3    FOLLOWING THE NUMBER SECTION WE WERE JUST LOOKING

4    AT.  DO YOU SEE THAT DOCUMENT, MR. LIN?

5    A.   YES.

6    Q.   I WOULD ASK MS. BURNEY BLOW UP THE FIRST FULL

7    PARAGRAPH, PARAGRAPH ONE WITH THE HEADING OF

8    GENERAL.

9              AND I'M GOING TO READ THE SECOND

10   PARAGRAPH OF THIS SECTION 1 HEADING INTO THE RECORD

11   FOR THE BENEFIT OF YOU, MR. LIN AND THE JURY AND

12   COURT THEN I HAVE A QUESTION TO ASK YOU ABOUT IT.

13             THE PARAGRAPH READS:  THE INVESTMENT

14   OBJECTIVE OF THE FUND IS TO SEEK LONG-TERM CAPITAL

15   APPRECIATION, IN ALL MARKET ENVIRONMENTS, WITHOUT

16   EXPOSING INVESTORS TO SIGNIFICANT LEVELS OF

17   SYSTEMIC MARKET RISK.  THE MANAGER OF THE FUND,

18   ASENQUA INC., WILL SEEK TO ACHIEVE THE INVESTMENT

19   OBJECTIVE OF THE COMPANY PRINCIPALLY BY TAKING BOTH

20   LONG AND SHORT POSITIONS PRIMARILY IN A TECHNOLOGY,

21   MEDIA, TELECOMMUNICATION CORPORATIONS TRADED ON THE

22   NEW YORK STOCK EXCHANGE, NASDAQ, AND AMERICAN STOCK

23   EXCHANGE.  THROUGH THIS PROPRIETARY INVESTMENT

24   MODELS THE MANAGER WILL EVALUATE THESE COMPANIES

25   AND TAKE LONG POSITIONS IN UNDER VALUED COMPANIES

1    WITH IMPROVING FUNDAMENTALS AND TAKE SHORT

2    POSITIONS IN OVER VALUED COMPANIES WITH

3    DETERIORATING FUNDAMENTALS.

4         MR. LIN, WHAT DO YOU UNDERSTAND THAT

5    PARAGRAPH I JUST READ BACK AT THE TIME YOU READ IT

6    PRIOR TO INVESTING WITH MR. HU?

7    A.   YES, IT BASICALLY DESCRIBED ASENQUA BETA FUNDS

8    OBJECTIVE TO ACHIEVE GOOD RETURN NO MATTER HOW THE

9    STOCK MARKET WENT UP OR DOWN.

10   Q.   WAS IT TALKING ABOUT INVESTING IN PRIVATE

11   COMPANIES LIKE VENTURE CAPITAL?

12   A.   NO.

13   Q.   WHAT DID YOU UNDERSTAND THE FUND TO BE

14   INVESTING IN BASED ON THIS PARAGRAPH AND THE

15   INFORMATION MR. HU PROVIDED YOU?

16   A.   YEAH, TO BE NEW YORK STOCK EXCHANGE, NASDAQ

17   AND AMERICAN STOCK EXCHANGE.  THESE ARE THE LISTED

18   PUBLIC COMPANIES.

19   Q.   PUBLIC COMPANIES?

20   A.   YEAH, THIS IS NOT FOR THE VENTURE FUND.

21   Q.   OKAY.  AND THEN NOW I WOULD ASK MS. BURNEY IF

22   YOU COULD BLOW UP FOR THE BENEFIT OF ALL IN THE

23   COURTROOM, PARAGRAPH TWO, SIGNIFICANT ACCOUNTING

24   POLICIES.  THE FIRST PARAGRAPH WHICH HAS THE

25   HEADING BASIS OF PREPARATION.

1          AND NOW AGAIN I WILL READ THIS OUT LOUD

2     AND THEN I HAVE A QUESTION TO FOLLOW UP FOR YOU

3     MR. LIN.

4          SIGNIFICANT ACCOUNTING POLICIES:  BASIS

5     OF PREPARATION.

6          THE FINANCIAL STATEMENTS HAVE BEEN

7     PREPARED IN ACCORDANCE WITH INTERNATIONAL FINANCIAL

8     REPORTING STANDARDS, IFRS, WHICH COMPLIES STANDARDS

9     AND INTERPRETATIONS APPROVED BY THE INTERNATIONAL

10    ACCOUNTING STANDARDS BOARD, IASB, AND INTERNATIONAL

11    ACCOUNTING STANDARDS, IAS, AND STANDING

12    INTERPRETATIONS COMMITTEE INTERPRETATIONS APPROVED

13    BY THE INTERNATIONAL ACCOUNTING STANDARDS COMMITTEE

14    IASC THAT REMAIN IN EFFECT.

15         NOW MR. LIN, YOU ALREADY TOLD US EARLIER

16    YOU ARE NOT A CPA, CORRECT?

17    A.   CORRECT.

18    Q.   YOU ARE NOT AN ACCOUNTANT?

19    A.   CORRECT.

20    Q.   BUT DID YOU HAVE ANY UNDERSTANDING OF WHAT THE

21    PARAGRAPH MEANT WHEN YOU READ IT YEARS AGO?

22    A.   YES.  I DO NOT KNOW WHAT THESE ORGANIZATIONS

23    ARE OR WERE BUT I UNDERSTAND THESE ARE THE

24    GOVERNING BODY WHICH WERE -- OVERSEES THE OPERATION

25    OF THE CPA FIRM AND THEIR PRACTICE OR THE FINANCIAL

1    INDUSTRY.

2    Q.   AND WAS IT IMPORTANT TO YOU WHEN YOU WERE

3    REVIEWING THIS REPORT FROM CASTILLO, LYN, COHEN &

4    VIJAY THAT YOU RECEIVED FROM MR. HU THAT THE REPORT

5    WAS BEING PREPARED IN ACCORDANCE WITH THESE

6    STANDARDS?

7    A.   YES, VERY IMPORTANT.

8    Q.   WHY SO?

9    A.   WITHOUT FOLLOWING THE GUIDELINE OF THE

10   GOVERNANCE THEN ANYBODY CAN FORMULATE THEIR OWN

11   BOOKS HOWEVER WAY THEY WISH SO THEY MUST FOLLOW

12   CERTAIN GUIDELINES.  AND TO ME THAT'S IMPORTANT,

13   MEANS IT'S LEGIT.

14   Q.   WHEN YOU SAY LEGIT WHAT DO YOU MEAN?

15   A.   IT MEANS IT'S A LEGITIMATE DOCUMENT,

16   LEGITIMATE PRACTICE AND PREPARATION FOLLOWING THE

17   GUIDELINE WITHIN THE BOUNDARY OF THE GUIDELINE.

18   Q.   DOES THAT MEAN IT WOULD CAUSE YOU TO RELY ON

19   THE INFORMATION CONTAINED IN THE REPORT?

20   A.   YES.

21   Q.   I WILL ASK MS. BURNEY IF I COULD HAVE YOU BLOW

22   UP THE VERY BOTTOM PORTION OF THIS DOCUMENT WITH A

23   FOOTER OF THE DOCUMENT BELOW THE NUMBERS.

24        MR. LIN, I'M GOING TO READ THIS ADDRESS

25   OUT TO YOU THAT'S LISTED HERE AT THE BOTTOM OF THE

86

1    PAGE. ONE EMBARCADERO CENTER SUITE 500

2    SAN FRANCISCO, CALIFORNIA, 94111. PHONE NUMBER IS

3    (415)623-2055. FAX IS (415)623-2056.

4              MR. LIN, WHAT WAS YOUR UNDERSTANDING OF

5    WHAT THAT REFERENCE WAS AT THE BOTTOM OF THIS PAGE

6    OF THE DOCUMENT AT THE TIME YOU READ IT YEARS AGO?

7    A.   I TOOK IT AS THE LOCATION OF THE OFFICE OF

8    THIS ACCOUNTING FIRM, CASTILLO, LYN, COHEN & VIJAY.

9    Q.   SO YOU UNDERSTOOD THIS ACCOUNTING FIRM THAT

10   PREPARED THIS REPORT HAD THEIR OFFICE AT ONE

11   EMBARCADERO CENTER IN SAN FRANCISCO, CALIFORNIA?

12   A.   YES.

13   Q.   I WILL SHOW YOU ANOTHER EXHIBIT NOW MR. LIN,

14             MR. LUCEY:  YOUR HONOR, MAY I APPROACH

15   THE WITNESS?

16             THE COURT:  YES.

17             MR. LUCEY:  THANK YOU.

18   Q.   MR. LIN, SHOWING YOU WHAT'S BEEN PREVIOUSLY

19   MARKED AS GOVERNMENT'S EXHIBIT NUMBER 2.

20             TAKE A MOMENT IT'S A MULTI-PAGE DOCUMENT

21   LONGER THAN THE LAST ONE WE JUST LOOKED AT.

22   UPWARDS OF 30 PAGES SO TAKE A MOMENT TO REVIEW THE

23   PAGES, SIR.

24             SO MR. LIN, DID YOU SIGN ANY

25   AGREEMENTS -- BACK UP, SORRY.  ULTIMATELY, MR. LIN,

1    YOU MOVED FORWARD WITH YOUR INVESTMENT PROCESS WITH

2    MR. HU, CORRECT?

3    A.   YES.

4    Q.   AND WHAT IS THIS DOCUMENT WE ARE LOOKING AT

5    NOW, EXHIBIT NUMBER 2?

6    A.   THIS IS A SUBSCRIPTION AGREEMENT FOR ASENQUA

7    BETA FUND.

8    Q.   OR SUBSCRIPTION BOOKLET?

9    A.   YES, SUBSCRIPTION BOOKLET.

10   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT, SIR?

11   A.   YES.

12   Q.   AND HOW DID YOU COME TO HAVE IT?

13   A.   IT WAS PROVIDED TO ME BY MR. HU.

14         MR. LUCEY:  AND YOUR HONOR, AT THIS POINT

15   I MOVE TO HAVE EXHIBIT 2 MOVED INTO EVIDENCE.

16         MR. FONG:  NO OBJECTION, YOUR HONOR.

17         THE COURT:  TWO IS ADMITTED.

18   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 2 HAVING

19   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

20   ADMITTED INTO EVIDENCE.)

21   BY MR. LUCEY:

22   Q.   I WOULD ASK MS. BURNEY TO PUBLISH ONE

23   PARTICULAR PAGE TO LOOK AT FIRST.  IT'S BATES

24   NUMBER 62.  PAGE 18.

25         IF SHE COULD BLOW UP THE BOTTOM PORTION

1    OF THE DOCUMENT WHERE IT SAYS AGREED AND SIGNED.

2    ACCEPTED AND AGREED AS OF JANUARY 25TH OF 2005.

3    THE ASENQUA BETA FUND LP.

4          MR. LIN, WHO DO YOU RECOGNIZE THAT

5    SIGNATURE TO BE DIRECTLY UNDERNEATH ASENQUA BETA

6    FUND?

7    A.   IT'S ALBERT HU.

8    Q.   AND HOW ARE YOU ABLE TO MAKE THAT STATEMENT?

9    A.   IT WAS PROVIDED TO HIM AND HE SIGNED IT.

10   Q.   DID HE SIGN IN YOUR PRESENCE?

11   A.   I BELIEVE SO.

12   Q.   OKAY.  AND THE DATE ON THIS DOCUMENT ACCEPTED

13   AND AGREED AS OF JANUARY 25, 2005, DOES THAT HAVE

14   ANY HELP, DOES THAT HELP YOU FIX WHEN APPROXIMATELY

15   YOU RECEIVED THIS DOCUMENT FROM MR. HU?

16   A.   IT SHOULD BE AROUND THAT TIME.  I CANNOT

17   RECALL THE EXACT DATE.

18   Q.   OKAY.  NOW I ASK MS. BURNEY IF SHE COULD MOVE

19   UP TO THE SAME PAGE OF THE DOCUMENT AND ENLARGE THE

20   PORTION READING THE UNDERSIGNED COMMITMENT IS.

21          AND YOU SEE THAT PHRASE THERE MR. LIN ON

22   THE SCREEN ON THE DOCUMENT PAGE 64?  THE

23   UNDERSIGNED COMMITMENT IS $200,000?

24   A.   YES.

25   Q.   DOES THAT RELATE TO YOUR INITIAL INVESTMENT

1    WITH MR. HU?

2    A.   YES THAT WAS MY INITIAL INVESTMENT IN TWO

3    WIRING.

4    Q.   OKAY.  SO WE WILL GET TO THE DETAILS IN A

5    MOMENT BUT I UNDERSTAND YOU DIDN'T SEND THE MONEY

6    IN ONE LUMP SUM?

7    A.   NOT THIS ONE.

8    Q.   IN CAME IN TWO PORTIONS?

9    A.   YES.

10   Q.   SO MR. LIN, JUST SO WE ARE CLEAR FOR THE

11   RECORD NOW, YOU HAD THE INITIAL MEETING WITH MR. HU

12   IN REGARD TO INVESTING NOW AND HE SHOWED YOU A

13   POWER POINT.  AND HE ALSO PROVIDED YOU WITH A

14   CASTILLO REPORT?

15   A.   YES.

16   Q.   HE ALSO PROVIDED YOU THE SUBSCRIPTION BOOKLET

17   OF ASENQUA BETA FUND.  AND HE DISCUSSED WITH YOU

18   HIS PRIOR RECORD IN TERMS OF HIS INVESTING RECORD?

19   A.   YES.

20   Q.   WHAT HE WAS PLANNING ON INVESTING IN A HEDGE

21   FUND?

22   A.   CORRECT.

23   Q.   AND IT WAS ON THE BASIS OF THE REPRESENTATIONS

24   AND THE DOCUMENTS THAT YOU MADE THE DECISION TO

25   INVEST $200,000 WITH MR. HU?

1    A.   YES.

2    Q.   OKAY.  NOW $200,000 DID YOU AND MR. HU TALK

3    ABOUT THAT BEING THE ULTIMATE NUMBER MR. HU WAS

4    LOOKING TO HAVE YOU INVEST WITH HIM?

5    A.   NOT REALLY.  MR. HU INFORMED ME MOST OF THE

6    CLIENTS ARE VERY HIGH NET WORTH.  THEY ALL INVESTED

7    A LOT MORE MONEY THAN SEVEN FIGURE.  SO 200,000

8    INITIAL AMOUNT IS SMALL.

9    Q.   SO DID YOU HAVE -- DID MR. HU HAVE DISCUSSIONS

10   WITH YOU ABOUT INCREASING THAT AMOUNT OR WAS HE

11   GOING TO MAKE AN EXCEPTION FOR YOU?

12   A.   YEAH.  IN FACT, ONE OF THE MEETING HE TOLD ME

13   ASENQUA BETA FUND WAS CLOSE BECAUSE AT THE TIME I

14   HAD PUBLISHED SOME BOOKS ABOUT TEACHING PEOPLE HOW

15   TO BE HAPPY TEACHING PEOPLE HOW TO SUCCEED.  AND AS

16   YOU SAY, IT'S BECAUSE OF YOUR SPECIAL, SO HE WAS TO

17   OPEN IT FOR ME TO PARTICIPATE.  SO THAT WAS AN

18   HONOR FOR ME.

19   Q.   HOW DID YOU ULTIMATELY TRANSMIT THE FUNDS THAT

20   YOU COMMITTED TO INVEST IN THIS ASENQUA BETA FUND

21   THE $200,000 COMMITMENT WE JUST DISCUSSED?

22   A.   I BELIEVE I INSTRUCT MY BANK AND BASED ON THE

23   DESTINATION ACCOUNT DETAIL PROVIDED BY MR. HU AND

24   MY BANK DID THAT ACCORDINGLY.

25   Q.   OKAY.  AND THAT WAS DONE IN TWO ALLOTMENTS?

1    A.   I BELIEVE SHORTLY AFTER THE AGREEMENT TWO

2    ALLOTMENTS, YEAH, 100,000 EACH TIME.

3    Q.   AND THE FIRST ONE WAS DONE IN OR AROUND

4    FEBRUARY 8TH, 2005?

5    A.   I BELIEVE SO, YES.

6    Q.   AND THAT WAS FOR $100,000?

7    A.   $100,000 FIRST.

8    Q.   HOW DID YOU KNOW WHAT BANK ACCOUNT TO WIRE IT

9    TO?

10   A.   THE BANK ACCOUNT DETAILS WAS PROVIDED BY

11   MR. HU.

12   Q.   AND THAT WAS THE SAME FOR THE SECOND WIRE?

13   A.   I BELIEVE SO.

14   Q.   AND THAT ONE OCCURRED ON OR AROUND FEBRUARY --

15   A.   SHORTLY AFTER THE FIRST ALLOTMENT.

16   Q.   A COUPLE WEEKS AFTER THAT?

17   A.   I THINK SO.

18   Q.   IN OUR AROUND FEBRUARY 23RD, 2005?

19   A.   IT SOUNDS RIGHT.

20   Q.   AND AGAIN YOU DIRECTED IT TO THE BANK ACCOUNT

21   THAT -- HOW DID YOU KNOW TO DIRECT IT TO THE

22   ACCOUNT FOR THE SECOND ONE?

23   A.   YES.  I BELIEVE IT WAS THE SAME ACCOUNT WITH

24   THE WIRING INSTRUCTION PROVIDED BY MR. HU.

25   Q.   SO MR. LIN, I'M GOING TO SHOW YOU A SERIES OF

1   DOCUMENTS.

2           MR. LUCEY:  YOUR HONOR, IF I MAY APPROACH

3   MR. LIN.

4           THE COURT:  SURE.

5   Q.   MR. LIN, I'M NOW SHOWING YOU A SERIES OF

6   DOCUMENTS MARKED AS GOVERNMENT'S EXHIBIT 26, 27, 3

7   AND 4.  SO ACTUALLY TAKE A MOMENT TO LOOK AT ALL

8   THE PAGES OF THOSE FOUR EXHIBITS.

9           SO MR. LIN, DO YOU RECOGNIZE THESE FOUR

10  EXHIBITS, THE DOCUMENTS THAT ARE MARKED WITH THESE

11  FOUR EXHIBIT NUMBERS, 26, 27, 3 AND 4?

12  A.   YES.

13  Q.   AND WHAT IS FIRST, WHAT IS EXHIBIT 26?

14  A.   EXHIBIT 26 IS A RECEIPT ISSUED BY MR. ALBERT

15  HU TO ME TO CONFIRM THAT HE HAS RECEIVED FROM ME

16  THE $100,000.

17          MR. LUCEY:  AND YOUR HONOR, I MOVE THAT

18  GOVERNMENT EXHIBIT 26 BE ADMITTED INTO EVIDENCE.

19          MR. FONG:  NO OBJECTION, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

21  (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 26 HAVING

22  BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

23  ADMITTED INTO EVIDENCE.)

24  BY MR. LUCEY:

25  Q.   MR. LIN I WANT TO TURN YOUR ATTENTION TO

1    EXHIBIT 27.  WHAT IS THIS DOCUMENT WE ARE NOW

2    LOOKING AT.

3    A.    THIS IS THE ASENQUA BETA FUND STATEMENT

4    QUARTERLY STATEMENT AND SUMMARY OF ACCOUNT

5    INFORMING ME --

6    Q.   HOLD ON, IT HASN'T COME INTO EVIDENCE YET SO I

7    HAVE TO STOP YOU THERE.

8              HOW DID YOU COME TO HAVE THIS DOCUMENT?

9    A.    IT WAS PROVIDED TO ME BY MR. ALBERT HU.

10             MR. LUCEY:  AGAIN YOUR HONOR, THE

11   GOVERNMENT MOVES TO HAVE 26 INTO EVIDENCE.

12             THE COURT:  ISN'T THIS 27?

13             MR. LUCEY:  27, I'M SORRY.

14             MR. FONG:  NO OBJECTION.

15             THE COURT:  27 IS ADMITTED.

16   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 27 HAVING

17   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

18   ADMITTED INTO EVIDENCE.)

19   BY MR. LUCEY:

20   Q.   MR. LIN, IF YOU COULD TURN YOUR ATTENTION TO

21   EXHIBIT 3.  THIS IS A TWO PAGE DOCUMENT; DO YOU

22   RECOGNIZE THIS DOCUMENT, SIR?

23   A.   YES.

24   Q.   WHAT IS THIS DOCUMENT?

25   A.    THIS IS ANOTHER QUARTERLY STATEMENT FROM

94

1    ASENQUA BETA FUND FOR MY DEPOSIT AND FOR THE

2    PERFORMANCE OF THE FUND FOR ME.

3             MR. LUCEY:  YOUR HONOR, AGAIN, THE

4    GOVERNMENT WOULD MOVE EXHIBIT 3 INTO EVIDENCE.

5             MR. FONG:  NO OBJECTION.

6             THE COURT:  ALL RIGHT.  IT'S RECEIVED.

7    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 3 HAVING

8    BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

9    ADMITTED INTO EVIDENCE.)

10   BY MR. LUCEY:

11   Q.   NOW MR. LIN, IF YOU COULD TURN YOUR ATTENTION

12   TO GOVERNMENT EXHIBIT 4; WHAT IS THIS DOCUMENT SIR?

13   A.   THIS IS AGAIN A SIMILAR THING, THE ASENQUA

14   BETA FUND QUARTERLY STATEMENT SUMMARY OF MY ACCOUNT

15   Q2, 2005.  PREVIOUS ONE WAS Q1.

16   Q.   AND AGAIN, IT WAS SHOWING YOU PERFORMANCE AS

17   TO THE INVESTMENT?

18   A.   YES.

19             MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

20   MOVES EXHIBIT 4 INTO EVIDENCE.

21             MR. FONG:  NO OBJECTION.

22             THE COURT:  ALL RIGHT IT'S RECEIVED.

23   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 4 HAVING

24   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

25   ADMITTED INTO EVIDENCE.)

1    BY MR. LUCEY:

2    Q.   SO NOW MR. LIN, LET'S TURN BACK TO 26.

3              I WOULD ASK MS. BURNEY TO PUBLISH 26 TO

4    THE COURT.  IF YOU COULD BLOW UP THE TEXT PORTION

5    OF THE DOCUMENT.

6              SO MR. LIN, I WANT TO CALL YOUR ATTENTION

7    TO THE SENTENCE IMMEDIATELY BELOW THE DATE

8    FEBRUARY 8TH, 2005.

9              IF YOU COULD READ THAT SENTENCE INTO THE

10   RECORD, SIR, THE AFOREMENTIONED AMOUNT.

11   A.   THIS IS TO CONFIRM --

12   Q.   JUST BELOW THE DATE OF FEBRUARY 8TH, 2005,

13   WHERE IT SAYS THE AFOREMENTIONED AMOUNT.  THE

14   AFOREMENTIONED --

15   A.   THE AFOREMENTIONED AMOUNT IS THE FIRST WIRING

16   FOR THE PURPOSE OF INVESTMENT INTO THE ASENQUA BETA

17   FUND.

18   Q.   WAS IT IMPORTANT TO YOU THAT DOCUMENT THE

19   RECEIPT YOU RECEIVED FROM MR. HU SAID FOR THE

20   PURPOSE OF INVESTMENT INTO ASENQUA BETA FUND?

21   A.   YES.

22   Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN IN THE

23   RECEIPT THAT YOU GOT FROM MR. HU?

24   A.   THAT MEANS I DEPOSITED THE FIRST $100,000 INTO

25   HIS COMPANY FOR THE SOLE PURPOSE OF INVESTMENT

96

1    BASED ON HIS PROPOSAL.

2    Q.   AND DID YOU UNDERSTAND THAT THE INVESTMENT WAS

3    GOING TO BE CONSISTENT OR INCONSISTENT WITH THE

4    OBJECTIVES THAT WE LOOKED AT IN THE EXHIBIT 1

5    CASTILLO, LYN, COHEN & VIJAY?

6    A.   IT WAS TO BE CONSISTENT WITH THE OBJECTIVE.

7    Q.   THAT WAS LAID OUT IN THE REPORT FROM THE

8    AUDITING FIRM?

9    A.   YES.

10   Q.   OKAY.  AND DO YOU RECOGNIZE THAT SIGNATURE

11   THAT FOLLOWS UNDERNEATH THE TEXT OF THIS DOCUMENT?

12   A.   YES.

13   Q.   WHOSE SIGNATURE IS THAT?

14   A.   ALBERT K. HU.

15   Q.   NOW SIR, I ASK WE TURN OUR ATTENTION TO

16   EXHIBIT 27.

17        MS. BURNEY, IF YOU COULD TURN TO THAT

18   DOCUMENT FOR THE COURT AND FOR THE JURY.

19        IF YOU COULD BLOW UP THE TOP PORTION.

20   YES, THANK YOU.

21        SO MR. LIN, WE'VE ALREADY BRIEFLY

22   DISCUSSED THIS DOCUMENT BUT LET'S LOOK AT IT AGAIN

23   NOW THAT IT'S IN EVIDENCE.  THE ADDRESS LISTED ON

24   THIS ACCOUNT STATEMENT, FU-YUAN LIN 1996 TRUST, IS

25   THAT YOUR ADDRESS AT THAT TIME?

1    A.    THAT WAS MY OFFICE ADDRESS AT THAT TIME.

2    Q.    AND MR. LIN, DID YOU RECEIVE THIS DOCUMENT IN

3    THE MAIL?

4    A.    I DON'T RECALL WHETHER IT WAS IN PERSON OR IN

5    MAIL.

6    Q.    BUT YOU RECALL AT SOME POINT RECEIVING THIS

7    DOCUMENT IN OR AROUND THE STATEMENT DATE

8    FEBRUARY 23RD, 2005, LISTED ON THE DOCUMENT?

9    A.    CORRECT.

10   Q.    MR. LIN THERE'S INDICATIONS HERE OF THE

11   RECORDS OF WHAT'S GOING ON IN YOUR ACCOUNT.  A

12   MONEY TRANSFER OF $100,000 ON 2-8-2005?

13   A.    YES.

14   Q.    WHAT'S THE REFERENCE HERE ON 2-23-2005 ANOTHER

15   MONEY TRANSFER?

16   A.    THAT'S MY SECOND WIRING.

17   Q.    WHAT DID YOU UNDERSTAND YOUR BALANCE TO BE AS

18   OF THE DATE OF THIS DOCUMENT?

19   A.    200,000 AS OF THIS STATEMENT.

20   Q.    OKAY.  AND THIS IS SHORTLY AFTER YOU'VE WIRED

21   THE MONEY IN, CORRECT?

22   A.    CORRECT.

23   Q.    SO NOW I WOULD ASK MS. BURNEY TO BLOW UP THE

24   BOTTOM PORTION OF THE DOCUMENT WITH THE TWO

25   SIGNATURES.

1          MR. LIN, DO YOU RECOGNIZE -- DO YOU

2     RECALL SEEING THOSE SIGNATURES AT THE TIME YOU

3     REVIEWED THE DOCUMENT?

4     A.   YES.

5     Q.   WHAT DID YOU UNDERSTAND THOSE SIGNATURES TO

6     REPRESENT?

7     A.   IT MEANS THIS UPDATED THE STATEMENT OF MY

8     ACCOUNT OF MY DEPOSIT, THEY WERE VERIFIED, RECEIVED

9     AND VERIFIED AND SIGNED BY THESE TWO-PERSON.

10    Q.   AND THERE'S TWO -- THERE APPEARS TO BE TWO

11    SIGNATURES HERE CORRECT?

12    A.   YES.

13    Q.   THE ONE ON THE BOTTOM IS?

14    A.   THAT'S ALBERT HU.

15    Q.   WHAT PERSON IS SIGNING THE BOTTOM PORTION OF

16    THE DOCUMENT?

17    A.   THE PRESIDENT, ALBERT HU.

18    Q.   AND WHOSE SIGNATURE -- WHAT SIGNATURE IS

19    IMMEDIATELY ABOVE THAT?

20    A.   THE CHIEF FINANCIAL OFFICER.  ANTHONY POLLACK.

21    Q.   WHAT ROLE DID YOU UNDERSTAND MR. POLLACK TO

22    HAVE IN THE COMPANY?

23    A.   SUPPOSED TO BE THE FUNDS CFO.

24    Q.   DID YOU EVER MEET THIS CFO?

25    A.   NEVER.

1    Q.   IN ALL OF YEARS OF INVESTMENT?

2    A.   NEVER.

3    Q.   WAS IT IMPORTANT TO YOU MR. LIN THAT THE

4    STATEMENT AND THE ONES WE ARE GOING TO LOOK AT

5    FOLLOWING HAVE BEEN REVIEWED BY AND SIGNED OFF ON

6    BY MR. POLLACK THE FUNDS REPORTED CFO?

7    A.   YES, IT WAS IMPORTANT.

8    Q.   WHY SO?

9    A.   CFO -- IN ANY FINANCIAL STATEMENT CFO IS KEY.

10   Q.   WHY IS THE CFO IMPORTANT?

11   A.   HE'S RESPONSIBLE FOR ALL THE FINANCIAL RELATED

12   ISSUE, HE'S RESPONSIBLE TO VERIFY ALL THE FINANCIAL

13   STATEMENTS ARE CORRECT.

14   Q.   AND HOW DID YOU UNDERSTAND YOUR INVESTMENT TO

15   BE DOING IF WE CAN NOW LOOK AT THE ENTIRETY OF THE

16   DOCUMENT AGAIN, MS. BURNEY.

17        HOW DID YOU UNDERSTAND YOUR INVESTMENT TO

18   BE DOING AS OF THE TIME OF YOUR SECOND WIRE?

19   A.   THIS WAS THE BEGINNING, YEAH, THIS WAS THE

20   BEGINNING, JUST STARTED.

21   Q.   OKAY.  SO YOU UNDERSTAND THERE WAS $200,000

22   HELD IN YOUR BENEFIT?

23   A.   YES.

24   Q.   IN THE ASENQUA BETA FUND?

25   A.   CORRECT.

1    Q.   SO MR. LIN, WHAT DID IT MEAN THE FACT THAT

2    THERE WAS TWO SIGNATURES AT THE BOTTOM OF THIS

3    DOCUMENT, MR. POLLACK AND MR. HU?

4    A.   WHAT DID YOU TAKE THAT TO MEAN?

5    A.   IT MADE ME FEEL MUCH MORE COMFORTABLE.

6    Q.   WHY?

7    A.   IT MADE THIS STATEMENT MUCH MORE TRUSTWORTHY.

8    Q.   WHY SO?

9    A.   IT'S A WELL STRUCTURED ORGANIZATION AND

10   THERE'S A GOVERNANCE THERE'S A TRUE GOVERNANCE OF

11   THE FUND SUPERVISING THE FUND FOR THE INVESTORS.

12   Q.   AND DID THE SIGNATURE MEAN ANYTHING ABOUT THE

13   INFORMATION CONTAINED ON THE DOCUMENT, IS THERE ANY

14   CONNECTION IN THE SIGNATURES WE SEE AT THE BOTTOM

15   AND THE NUMBERS PROVIDED ABOVE?

16   A.   I'M SORRY THE QUESTION ONE MORE TIME.

17   Q.   I'M SORRY, MR. LIN.

18        MY QUESTION IS:  IS THERE ANY CONNECTION

19   IN YOUR MIND IN YOUR REVIEWING THE DOCUMENT AT THE

20   TIME, BETWEEN THE FACT THAT THE NUMBERS LISTED

21   ABOVE THE $200,000 TOTAL VALUE WE LOOKED AT EARLIER

22   AND THE TWO SIGNATURES BELOW?

23   A.   IT MEANS THESE TWO PERSONS CONFIRMED THEY

24   RECEIVED BY 200,000 IN THE ACCOUNT.  AND IT'S BEING

25   HELD BY THEM.

1    Q.   YOU WERE UNDERSTANDING THEY WERE ATTESTING TO

2    THE VALUE IN THE ACCOUNT?

3    A.   YES, THEY CONFIRM.

4    Q.   MR. LIN, I WANT YOU TO TURN YOUR ATTENTION TO

5    EXHIBIT 3.

6         NOW MS. BURNEY, IF YOU COULD PUBLISH THE

7    ENTIRETY OF THE DOCUMENT BLOWING UP THE TOP

8    PORTION.

9         TO YOU, MR. LIN, THIS IS THE ACCOUNT

10   STATEMENT YOU RECEIVED IN APRIL 2005?

11   A.   YES.

12   Q.   AND AGAIN SHOWING THE TOTAL VALUE OF THE

13   ACCOUNT $203,842?

14   A.   YES.

15   Q.   MS. BURNEY IF YOU COULD TURN TO THE SECOND

16   PAGE OF THE DOCUMENT BLOWING UP THE TOP PORTION.

17        YOU RECOGNIZE THOSE SIGNATURES?

18   A.   YES.

19   Q.   THOSE ARE MR. POLLACK AND MR. HU?

20   A.   YES.

21   Q.   MS. BURNEY, IF YOU COULD TURN TO EXHIBIT 4.

22        AND MS. BURNEY IF YOU COULD BLOW UP THE

23   SECOND HALF OF THAT BOX BEGINNING AT THE 6-30-05.

24        SO MR. LIN, THIS IS A STATEMENT YOU

25   RECEIVED IN OR AROUND JULY 28TH, 2005, EXHIBIT 4?

1    A.    YES.

2    Q.    AND LOOKING NOW AT THE BOTTOM PORTION OF THE

3    TOTAL VALUE BOX, IT APPEARS THERE'S ANOTHER

4    TRANSACTION GOING ON AS OF JULY 6, 2005?

5    A.    YES.

6    Q.    WHAT'S HAPPENING THERE?

7    A.    THAT SHOULD BE MY THIRD WIRING INTO THE

8    ACCOUNT.

9    Q.    SO NOW YOU ARE MAKING ANOTHER INVESTMENT; IS

10   THAT CORRECT?

11   A.    YES.

12   Q.    AND WHY DID YOU DECIDE TO MAKE ANOTHER

13   INVESTMENT AFTER YOU HAD ALREADY MADE A $200,000

14   INVESTMENT IN FEBRUARY 2005?

15   A.    YES, BECAUSE IF YOU LOOK AT HIS STATEMENT IN

16   MARCH AND APRIL, HE HAS ALREADY, IN A FEW SHORT

17   MONTHS HE HAS ALREADY MADE A VERY GOOD GAIN.

18   THERE'S A FOUR PERCENT OF A GAIN JUST WITHIN A

19   LITTLE MORE THAN 2 OR 3 MONTHS.

20   Q.    SO MR. LIN YOU ARE LOOKING HERE YOU ARE

21   REFERRING IN YOUR TESTIMONY AS OF 6-30-05 YOUR

22   INVESTMENT HAD GONE UP TO $213,000?

23   A.    RIGHT.

24   Q.    DID THAT CAUSE YOU TO BE MORE OR LESS LIKELY

25   HAVING READ AND REVIEWED IT MORE OR LESS LIKELY TO

1    MAKE AN INVESTMENT WITH MR. HU?

2    A.    MORE LIKELY.

3    Q.    HOW SO?

4    A.    BECAUSE HE AT LEAST OUT PERFORM MY BANK.

5    Q.    AND YOU UNDERSTOOD THAT TO BE A TRUE AND

6    ACCURATE STATEMENT OF YOUR INVESTMENT AT THAT TIME

7    AS OF JUNE 30TH?

8    A.    BASED ON THIS STATEMENT, YES.

9    Q.    AND SO ARE YOU TELLING US YOU THEN MADE A

10   DECISION TO MAKE ANOTHER INVESTMENT WITH MR. HU?

11   A.    MR. HU ALSO ALONG THE TIME THOSE MONTHS, HE

12   HAS ON NUMEROUS OCCASIONS INFORMED ME THAT ALL

13   OTHER CLIENTS OF HIS HAVE A MUCH LARGER AMOUNT IN

14   THE FUND AND I WAS ONE OF THE SMALLER.  SO BEING A

15   VERY GULLIBLE PERSON I DECIDED I SHOULD ALSO

16   INCREASE THE AMOUNT.

17   Q.    SO IN ADDITION TO THE RETURN YOU WERE

18   RECEIVING IN TERMS OF WHAT MR. HU WAS PROVIDING YOU

19   WITH IN TERMS OF THE STATEMENT OF THE ACCOUNT AS OF

20   JUNE 30TH, 2005, AND THE CHANGE OF VALUE, MR. HU

21   WAS ALSO INDICATED YOUR INVESTMENT WAS SMALL

22   RELATIVE TO OTHER INVESTORS?

23   A.    YES.

24   Q.    AND WHY WAS THAT IMPORTANT TO YOU WHEN HE TOLD

25   YOU THAT?

1    A.   WELL, I DID NOT WISH TO DRAG HIS AVERAGE DOWN.

2    I DON'T WANT TO BE THE PERSON WHO IS THE SMALLEST

3    BECAUSE TO ME BEING ABLE TO PARTICIPATE IN HIS

4    FUND, AT THAT TIME IT'S ALMOST A PRIVILEGE.

5    Q.   SO, AND DURING THIS PERIOD OF TIME NOW, THE

6    STATEMENT WAS IN EXHIBIT 4, JULY 28TH, 2005, WHAT

7    PERSON IS YOUR PRIMARY POINT OF CONTACT AT THE

8    ASENQUA BETA FUND?

9    A.   ALWAYS ALBERT HU.  ALWAYS ALBERT HU.

10   Q.   DID MR. HU TELL YOU ABOUT HOW HE WAS INVESTING

11   YOUR MONEY, THE PARTICULAR WAY HE WAS INVESTING

12   YOUR MONEY AT THIS TIME AS OF JUNE-JULY, 2005?

13   A.   WELL, IN GENERAL TERMS, HE HAS, LIKE HE WILL

14   BUT NEVER SPECIFICS.

15   Q.   DID HE MENTION ANY TRADERS OR PORTFOLIO

16   MANAGERS HE WAS WORKING WITH?

17   A.   NO, HE DID NOT MENTION ANY INVESTMENT BANK

18   TRADER OTHER THAN STEVE BOND, HIS STAFF.

19   Q.   WHAT DID HE TELL YOU WAS MR. BOND'S ROLE AT

20   THIS TIME?

21   A.   MR. BOND, HE WAS THE ASSISTANT, MY

22   UNDERSTANDING.

23   Q.   BUT MR. BOND WAS WORKING UNDERNEATH MR. HU?

24   A.   YES.

25   Q.   NOW MR. LIN AT SOME POINT WAS THERE EVER ANY

1   DISCUSSION ABOUT CHANGING THE NATURE OF THE

2   INVESTMENT, THE NAME OF THE FUND OR THE LOCATION OF

3   THE FUND WITH MR. HU?

4   A.   YES.  I THINK --

5   Q.   TELL US ABOUT THAT IF YOU COULD?

6   A.   I THINK -- AGAIN, I DON'T RECALL THE EXACT

7   TIME BUT IT CAME AFTER I WIRED IN 2 OR 3 TIMES ALL

8   TOGETHER THE $450,000 INVEST.  AND MR. HU

9   APPROACHED ME INFORMING ME THAT HE WANTED TO, HE

10  PROPOSED TO CHANGE THE STRUCTURE OF THE FUND.

11  Q.   WHAT DID HE TELL YOU ABOUT WHAT HE WAS

12  ENVISIONING IN TERMS OF CHANGING THE STRUCTURE OF

13  THE FUND?

14  A.   SURE.  THIS I REMEMBER CLEARLY.

15         HE CAME OVER AND STATED THAT IN THE PAST

16  THE SO CALLED HEDGE FUNDS WERE NOT HEAVILY

17  REGULATED.  I DID NOT UNDERSTAND WHETHER THERE WAS

18  OR NOT.  BUT THE GOVERNMENT DECIDED TO REGULATE

19  U.S. HEDGE FUND MORE AND MORE.

20         SO HE TOLD ME BECAUSE OF THAT CHANGE IT

21  WOULD BECOME MUCH MORE EXPENSIVE TO MAINTAIN THE

22  U.S. BASED HEDGE FUND, IN THIS CASE THE ASENQUA

23  BETA FUND WHICH I INVESTED IN.  SO HE NEEDS TO

24  CHANGE THE STRUCTURE.

25  Q.   DO YOU HAVE EXPERIENCE WITH THAT LEGAL

1    STRUCTURE HE WAS TALKING ABOUT?

2    A.   I DID NOT HAVE SUCH EXPERIENCE WITH THE HEDGE

3    FUND BUT I HAVE EXPERIENCES WITH STARTUP, YES,

4    STARTUP LIKE COMPANY IN TAIWAN, COMPANY IN CHINA,

5    COMPANY IN SINGAPORE, COMPANY IN U.S., YEAH.

6    Q.   AND WAS ANY OF THAT EXPERIENCE IN CONNECTION

7    WITH HEDGE FUNDS?

8    A.   NO.

9    Q.   AND LAST THING BEFORE WE LEAVE EXHIBIT 4,

10   MS. BURNEY IF YOU COULD BLOW UP THE BOTTOM PORTION

11   OF THE DOCUMENT ON PAGE 82.

12            MR. LIN COULD YOU READ WHAT IT SAYS,

13   BELOW ONE OF TWO --

14   A.   SAFE ALTERNATIVE FOR HIGH RETURN.

15            FOR ME IT'S A WONDERFUL WAY TO INVEST,

16   IT'S A VERY SAFE ALTERNATIVE FOR VERY HIGH RETURN.

17   Q.   MR. LIN, I'M GOING TO APPROACH YOU WITH

18   ANOTHER DOCUMENT NOW, GOVERNMENT EXHIBIT 29.  WOULD

19   YOU TAKE A MOMENT TO LOOK AT THAT DOCUMENT, PLEASE.

20   A.   YES, I HAVE READ IT.

21            MR. LUCEY:  YOUR HONOR, MAY I APPROACH

22   THE WITNESS?

23            THE COURT:  SURE.

24   BY MR. LUCEY:

25   Q.   I'M SHOWING YOU NOW WHAT HAS BEEN MARKED AS

1    GOVERNMENT EXHIBIT 30.  WHAT IS THAT DOCUMENT, SIR?

2    A.   THEY ARE TWO.  WHICH ONE?

3    Q.   I'M SORRY, WHAT IS THE DOCUMENT MARKED AS

4    EXHIBIT 30.

5    A.   THE EXHIBIT 30 SAYS IT'S A FUND WITHDRAWAL

6    AGREEMENT.

7    Q.   HOW DID YOU COME TO HAVE THIS DOCUMENT, SIR?

8    A.   IT WAS PROVIDED BY MR. HU TO ME.

9    Q.   AND TURNING BACK TO EXHIBIT 29, WHAT IS THAT

10   DOCUMENT, SIR?

11   A.   THIS WAS AN ASENQUA BETA FUND, FUND NAME

12   CHANGES AND MANAGEMENT FIRM TRANSFER AGREEMENT.

13   Q.   HOW DID YOU COME TO HAVE THIS DOCUMENT SIR?

14   A.   ALSO PROVIDED BY MR. HU TO ME.

15        MR. LUCEY:  YOUR HONOR, AT THIS POINT THE

16   GOVERNMENT WOULD MOVE 29 AND 30 INTO EVIDENCE.

17        MR. FONG:  NO OBJECTION AS TO EITHER,

18   YOUR HONOR.

19        THE COURT:  ALL RIGHT.  THEY ARE

20   RECEIVED.

21   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 29 AND 30

22   HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

23   WERE ADMITTED INTO EVIDENCE.)

24        MR. LUCEY:  MS. BURNEY, IF YOU COULD

25   PUBLISH FIRST EXHIBIT 29 FOR THE COURT AND JURY'S

1    BENEFIT, AND IF YOU COULD ENLARGE THE TOP PORTION

2    WHERE THE DATE IS SHOWN.

3    Q.   MR. LIN THIS SAYS, ASENQUA BETA FUND, FUND

4    NAME CHANGE AND MANAGEMENT FIRM TRANSFER AGREEMENT

5    OCTOBER 25TH, 2005.

6         DOES THAT REFRESH YOUR RECOLLECTION AS TO

7    WHEN THIS DISCUSSION WAS GOING ON REGARDING THE

8    NAME CHANGE?

9    A.   YES, IT WAS AROUND THAT TIME.

10   Q.   AND THEN NOW, MS. BURNEY IF YOU COULD NOW BLOW

11   UP THE PORTION READING I, BOB LIN, DOWN TO ON

12   OCTOBER 25TH.

13        I WILL READ THE PORTION INTO THE RECORD.

14        THE NAME BE CHANGED FROM ASENQUA BETA

15   FUND TO FIRESIDE LS FUND.  THAT THE MANAGEMENT FIRM

16   BE CHANGED FROM ASENQUA CAPITAL MANAGEMENT LLC TO

17   FIRESIDE CAPITAL MANAGEMENT LIMITED A SINGAPORE

18   COMPANY ON OCTOBER 25TH, 2005.

19        MR. LIN, WHEN YOU RECEIVED THIS DOCUMENT

20   FROM MR. HU WHAT DID YOU UNDERSTAND THIS DOCUMENT

21   WAS PROVIDING FOR?

22   A.   SURE.  MR. HU INFORMED ME TO REDUCE THE COST

23   OF MANAGING HIS FUND HE WISHES TO TRANSFER

24   EVERYTHING IN ASENQUA BETA FUND TO SOME PLACE ELSE.

25   SO IT MEANS FIRST OF ALL THE ORIGINAL ASENQUA BETA

1    FUND TRANSFERRED TO A NEW NAME CALLED FIRESIDE LS

2    FUND.  AND THE ASENQUA BETA FUND CHANGED TO

3    FIRESIDE CAPITAL MANAGEMENT A SINGAPORE COMPANY.

4    Q.   NOW DID YOU HAVE A DISCUSSION AT THIS TIME

5    WITH MR. HU OF HOW THIS WOULD AFFECT YOUR

6    INVESTMENT WITH ASENQUA BETA FUND IN THE SENSE OF

7    WAS THE MONEY IN THERE AT THAT TIME GOING TO

8    TRANSFER WERE YOU GOING TO LOSE VALUE; DO YOU HAVE

9    A DISCUSSION ABOUT THAT?

10   A.   YES, OF COURSE, THAT WAS VERY IMPORTANT.  AT

11   THAT TIME BASED ON MY LAST STATEMENT OF THE

12   BALANCE, I HAVE A CERTAIN AMOUNT IN ASENQUA BETA

13   FUND.  AND THEY TOLD ME THEY WOULD TRANSFER

14   EVERYTHING INTO THIS NEW FUND, NOTHING HAS CHANGED.

15   AND ALBERT HU HIMSELF WILL STILL BE THE PRIMARY

16   MANAGEMENT.

17   Q.   DID YOU UNDERSTAND THEN YOUR INVESTMENT WAS

18   STILL SECURE WITH MR. HU AT THAT TIME?

19   A.   YES.

20   Q.   SO NOW I ASK IF MS. BURNEY COULD PUBLISH

21   EXHIBIT 30 TO THE JURY.  AND IN PARTICULAR THE TOP

22   PORTION OF THE DOCUMENT ENDING IN "ONLY."

23        SO MR. LIN, CALLING YOUR ATTENTION TO

24   EXHIBIT 30.  I WILL READ THE DOCUMENT INTO THE

25   RECORD AND ASK YOU A QUESTION ABOUT IT.

1              I, FU-YUAN LIN REPRESENTING FU-YUAN LIN

2    1996 TRUST, WITHDRAW FROM ASENQUA BETA FUND THE

3    AMOUNT OF IF I HAVE HUNDRED $562,331.82.  THEN IT

4    READS $562,331.82 ONLY.

5              WHAT WAS THE SIGNIFICANCE, AS YOU

6    UNDERSTOOD IT, OF THAT NUMBER?  WHAT WAS THAT

7    NUMBER REPRESENTING?

8    A.   THIS NUMBER REPRESENTED BY BALANCE BEFORE MY

9    ORIGINAL DEPOSIT PLUS THE GAINS OF MY INVESTMENT

10   PERFORMANCE.

11   Q.   SO IF I'M UNDERSTANDING YOU, YOU INVESTED

12   ROUGHLY THE FIRST 200,000 YOU INVESTED IN

13   FEBRUARY 2005?

14   A.   YES.

15   Q.   THEN YOU INVESTED A FURTHER $250,000?

16   A.   YES.

17   Q.   IN JULY '05?

18   A.   YES.

19   Q.   I'M NOT THAT GREAT AT MATH BUT I THINK THAT'S

20   $450,000 YOU HAD INVESTED AT THAT POINT?

21   A.   YES.

22   Q.   BUT THE TOTAL VALUE OF YOUR INVESTMENT WAS NOW

23   ACCORDING TO MR. HU AND THE DOCUMENTS 562,000 PLUS?

24   A.   YES, $562,331.82.

25   Q.   SO WERE YOU SATISFIED OUT OF THE MONEY OUT OF

1    THE ASENQUA BETA FUND SATISFIED WITH THE

2    PERFORMANCE THUS FAR BY MR. HU?

3    A.   I WAS VERY, VERY SATISFIED BECAUSE THAT'S A

4    GAIN OF VERY LARGE PERCENTAGE.

5    Q.   NOW I WILL SHOW YOU A SERIES OF ADDITIONAL

6    DOCUMENTS, MR. LIN.  AS PART OF THE PROCESS FOR

7    THIS TRANSFER TO FIRESIDE WERE YOU PROVIDED ANOTHER

8    SUBSCRIPTION BOOKLET, SIR?

9    A.   YES.

10   Q.   FOR FIRESIDE?

11   A.   YES.

12         MR. LUCEY:  YOUR HONOR, MAY I APPROACH?

13         THE COURT:  SURE.

14   Q.   MR. LIN, I'M SHOWING YOU NOW WHAT HAS BEEN

15   MARKED PREVIOUSLY GOVERNMENT'S EXHIBIT 5.

16         AGAIN SIR, THIS IS A MULTI PAGE DOCUMENT

17   UPWARDS OF 30 PAGES.  I WILL ASK YOU TO REVIEW IT

18   BEFORE I ASK YOU ANY QUESTIONS ABOUT IT.

19   A.   YES.

20   Q.   SO MR. LIN, DO YOU RECOGNIZE WHAT'S BEEN

21   MARKED AS GOVERNMENT EXHIBIT NUMBER 5?

22   A.   YES.

23   Q.   WHAT IS THIS DOCUMENT?

24   A.   IT'S A FIRESIDE LS FUND, LTD, SUBSCRIPTION

25   BOOKLET.

1   Q.   AND SIR, HOW DO YOU RECOGNIZE THIS DOCUMENT?

2   A.   IT'S A DOCUMENT PROVIDED BY MR. HU TO ME TO

3   SET UP AN ACCOUNT WITH HIS FIRESIDE LS FUND.

4   Q.   AND THIS WAS AROUND THE TIME YOU WERE

5   TRANSITIONING MONEY, CORRECT?

6   A.   CORRECT.

7   Q.   I CALL YOUR ATTENTION TO PAGE 18 OF THIS

8   DOCUMENT.  IT'S BATES 101.  AND BEFORE I DO THAT I

9   HAVE TO MOVE IT INTO EVIDENCE.

10          YOUR HONOR, I MOVE EXHIBIT 5 INTO

11  EVIDENCE.

12          MR. FONG:  NO OBJECTION.

13          THE COURT:  5 IS RECEIVED.

14  (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 5 HAVING

15  BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

16  ADMITTED INTO EVIDENCE.)

17          MR. LUCEY:  MS. BURNEY, IF YOU COULD TURN

18  TO THAT PAGE.

19  Q.   FIRST I CALL YOUR ATTENTION, MR. LIN, TO THE

20  BOTTOM PORTION OF THE DOCUMENT ACCEPTED AND AGREED

21  AS OF NOVEMBER 25TH, 2005?

22  A.   YES.

23  Q.   AND WHOSE SIGNATURE DO YOU RECOGNIZE THAT TO

24  BE UNDER THE FIRESIDE?

25  A.   MR. ALBERT HU, THE PRESIDENT.

1    Q.   THE DATE ON THIS DOCUMENT, NOVEMBER 25TH OF

2    2005?

3    A.   YES.

4    Q.   IS THAT CONSISTENT WITH YOUR MEMORY OF THE

5    TIMING OF THIS?

6    A.   I THINK SO.

7    Q.   YES, SIR.  OKAY.

8         THEN I CALL YOUR ATTENTION NOW TO THE TOP

9    PORTION OF THE DOCUMENT.

10        MS. BURNEY, IF YOU COULD BLOW UP THE

11   UNDERSIGNED COMMITMENT IS.  THIRD LINE DOWN.  IT

12   SAYS, "THE UNDERSIGN'S COMMITMENT IS $300,000."

13        IT GOES ON TO SAY, IN WITNESS WHEREOF,

14   THE UNDERSIGNED HAS EXECUTED THIS SIGNATURE PAGE

15   NOVEMBER 25, 2005.

16        WHAT DO YOU UNDERSTAND THIS TO MEAN,

17   MR. LIN?

18   A.   THIS MEANS MR. HU REQUESTS IN ORDER TO SET UP

19   THE -- MY ACCOUNT IN FIRESIDE, IT WAS NOT

20   SUFFICIENT TO JUST TRANSFER ORIGINAL MONEY FROM

21   ASENQUA BETA FUND INTO IT.  I NEED TO OPEN IT WITH

22   ADDITIONAL FUND.  WHICH IS CONSISTENT WITH WHAT HE,

23   SEVERAL TIMES INFORMED ME THAT ALL HIS CLIENTS ARE

24   AT THE MILLION DOLLAR LEVEL.

25   Q.   AND HOW MUCH BASED ON THIS DOCUMENT HOW MUCH

114

1    WERE YOU COMMITTING NOW IN TOTAL TO GIVE TO MR. HU?

2    A.   $300,000 MORE.

3    Q.   SO THAT WOULD BE HOW MUCH TOTAL ALL TOGETHER?

4    A.   PLUS THE PREVIOUS 450, IT WAS MAKE IT 450.

5    BUT PLUS THE GAIN IT WOULD BE 800 SOMETHING.

6    Q.   I'M PROBABLY NOT ASKING THE QUESTION

7    CORRECTLY.

8         SO PRIOR TO THIS TIME WE JUST COVERED A

9    MOMENT AGO YOU INDICATED THAT YOU UNDERSTOOD AS OF

10   THE TIME YOU WERE TRANSITIONING OUT OF THE ASENQUA

11   BETA FUND YOU HAD INVESTED A TOTAL OF $450,000

12   CORRECT?

13   A.   CORRECT.

14   Q.   NOW UNDER THIS NEW COMMITMENT OF $300,000

15   ADDING TO THAT THE TOTAL COMMITMENT WILL BE ONCE

16   YOU COMPLETE YOUR WIRE TRANSACTIONS OR GETTING THE

17   MONEY TO MR. HU WAS GOING TO BE $750,000; IS THAT

18   CORRECT?

19   A.   CORRECT.

20   Q.   NOW MR. LIN, IF YOU COULD TURN YOUR ATTENTION

21   TO PAGE 15 OF THIS DOCUMENT WHICH IS BATES STAMPED

22   NUMBER 98.

23         MS. BURNEY, IF YOU COULD BLOW UP FOR THE

24   BENEFIT OF THE COURT AND THE JURY PARAGRAPH NUMBER

25   12.

1          MR. LIN ARE YOU ON THAT PAGE NOW?

2     A.   YES.

3     Q.   MR. LIN, DO YOU RECALL READING AMONG THE OTHER

4     PORTIONS OF THE BOOKLET ON FIRESIDE, THIS PAGE ON

5     THIS PARAGRAPH, SIR.  DO YOU RECALL READING THIS

6     PARAGRAPH AT THE TIME OF YOUR INVESTMENT?

7     A.   YES.

8     Q.   WHAT DOES THIS PARAGRAPH REFER YOU IN GENERAL

9     TERMS WHAT'S THE TITLE OF THE PARAGRAPH, SIR?

10    A.   LEGAL REPRESENTATION, WAIVER OF CONFLICTS.

11    Q.   I'M GOING TO READ A PORTION NOW INTO THE

12    RECORD AND ASK YOU A QUESTION, MR. LIN.

13          THE INVESTOR UNDERSTANDS THAT PROSKAUER

14    ROSE LLP, PROSKAUER, HAS BEEN ENGAGED TO ACT AS

15    LEGAL COUNSEL TO THE FUND, THE INVESTMENT MANAGER,

16    THE ORDINARY SHAREHOLDER AND THE MASTER FUND,

17    CORRECTIVELY THE FUND AFFILIATED GROUP.  PROSKAUER

18    HAS NOT BEEN ENGAGED TO PROTECT OR REPRESENT THE

19    PARTICIPATING SHARES OF ANY SHAREHOLDER WITH REGARD

20    TO THE FUND AFFILIATED GROUP OR THE PREPARATION OF

21    THIS SUBSCRIPTION AGREEMENT.  AND NO OTHER LEGAL

22    COUNSEL HAS BEEN ENGAGED BY THE FUND AFFILIATED

23    GROUP TO ACT IN SUCH CAPACITY.

24          MR. LIN, WHAT DID YOU UNDERSTAND THIS

25    SENTENCE TO MEAN AT THE TIME YOU REVIEWED THE

1  DOCUMENT BACK PRIOR TO MAKING YOUR ADDITIONAL

2  $300,000 COMMITMENT?

3  A.   TO ME THE MOST IMPORTANT THING IS THIS

4  AGREEMENT AND THIS NEW FUND HAS BEEN EITHER SET UP

5  OR HELP US SET UP BY THIS PROSKAUER ROSE, LLP.

6  Q.   WHAT DID YOU TAKE IT TO MEAN WHERE IT SAYS IN

7  THE FIRST SENTENCE PROSKAUER ROSE, LLP HAS BEEN

8  ENGAGED TO ACT AS LEGAL COUNSEL TO THE FUND.  DOES

9  THAT MEAN IT'S STILL -- THEY MIGHT BE RETAINED?

10  A.   I READ IT AS THEY HAD BEEN RETAINED.

11  Q.   SO IT'S ALREADY BEEN DONE IT'S ALREADY

12  HAPPENED?

13  A.   YES.

14  Q.   AND MR. LIN, DID THE REFERENCE TO THIS LAW

15  FIRM IN THAT SENTENCE IN THE REMAINDER OF THE

16  PARAGRAPH MAKE YOU MORE OR LESS LIKELY TO INVEST

17  INTO THE FUND?

18  A.   MORE LIKELY.

19  Q.   WHY SO?

20  A.   IT MEANS THEY ESTABLISHED A NEW STRUCTURE

21  THROUGH A PROPER LEGAL PROCESS.  SO EVERYTHING

22  LEGIT.

23  Q.   WHAT DO YOU MEAN BY LEGIT?

24  A.   LEGIT MEANS ALL THE ESTABLISHMENTS SET UP

25  FOLLOW THE GUIDELINE RULES OF THE GOVERNANCE.

1    Q.   AND MR. LIN, IF YOU HAD KNOWN AT THE TIME YOU

2    RECEIVED THIS DOCUMENT FROM MR. HU THAT THIS FIRM

3    PROSKAUER ROSE HAD IN FACT NOT BEEN RETAINED BY THE

4    TIME YOU RECEIVED THIS DOCUMENT FROM MR. HU, WOULD

5    YOU HAVE STILL HAVE INVESTED IN THE FIRESIDE LS

6    FUND?

7    A.   NO, I WOULD NOT.

8    Q.   WHY NOT?

9    A.   THAT WOULD MEAN THIS DOCUMENT WAS FALSE IT WAS

10   A FABRICATION, NOT REAL.

11   Q.   AND WHY IS THAT SIGNIFICANT TO YOU?

12   A.   WELL AGAIN, ALL THE STRUCTURE NEEDS TO BE

13   COMPLIANT WITH THE RULES AND GOVERNANCE AND

14   REGULATIONS.  THEY NEED TO BE SET UP BY A LEGAL

15   COUNSEL.

16   Q.   AND WOULD THAT ISSUE ABOUT THE TRUTH OR LACK

17   OF TRUTH OF THIS STATEMENT SIR IN PARAGRAPH 12,

18   WOULD THAT HAVE HAD AN AFFECT ON YOUR TRUST

19   RELATIONSHIP WITH MR. HU AT THE TIME?

20   A.   OH, YEAH.  I TRUST.  I TRUST THIS DOCUMENT

21   BECAUSE HIS PERFORMANCE HAS BEEN VERY GOOD AND HE

22   HAS.

23   Q.   UP TO THIS POINT?

24   A.   UP TO THIS POINT, YEAH.

25   Q.   AND NOW, MR. LIN GOING ON FURTHER, IF YOU KNEW

1    AT THE TIME YOU RECEIVED THIS DOCUMENT, EXHIBIT 5,

2    AND THIS PARAGRAPH IN PARTICULAR IN YOUR REVIEWING

3    OF IT, THAT THIS FIRM PROSKAUER ROSE HAD NEVER EVEN

4    HEARD OF MR. HU, OR THIS FUND AT THIS TIME, WOULD

5    YOU STILL HAVE INVESTED IN THE FIRESIDE LS FUND?

6    A.   NO, I WOULD BE IN SHOCK.

7    Q.   WHY SO?

8    A.   THAT MEANS THIS -- IF THIS DOCUMENT WAS

9    FALSELY CREATED, IT COULD ALSO MEAN OTHER DOCUMENTS

10   HAVE ALSO BEEN FALSELY CREATED.

11   Q.   WOULD IT HAVE CREATED DOUBTS ABOUT THE

12   REMAINDER OF THE INFORMATION YOU HAD GOTTEN TO THAT

13   POINT?

14   A.   YES, YES.

15   Q.   MR. LIN, I'M NOW GOING TO SHOW YOU A SERIES OF

16   DOCUMENTS GOVERNMENT'S 31, AND 6 THROUGH 11.

17           MR. LUCEY:  YOUR HONOR, IF I MAY APPROACH

18   THE WITNESS.

19           THE COURT:  YES.

20           IF YOU ARE JUST DELIVERING A DOCUMENT TO

21   THE WITNESS YOU DON'T NEED TO ASK TO APPROACH.

22           MR. LUCEY:  CERTAINLY, YOUR HONOR.

23   UNDERSTOOD.

24   Q.   MR. LIN, I'M NOW PLACING IN FRONT OF YOU A

25   SERIES OF DOCUMENTS THAT HAVE BEEN MARKED

1    PREVIOUSLY AS GOVERNMENT'S EXHIBIT 31 THEN

2    GOVERNMENT'S EXHIBIT 6 THROUGH 11 CONSECUTIVELY.

3           IF YOU COULD TAKE A MOMENT TO LOOK AT

4    EACH OF THOSE PAGES THEN I WILL HAVE SOME QUESTIONS

5    FOR YOU.

6    A.   YES.

7    Q.   SO MR. LIN, THE FIRST FEW DOCUMENTS I WANT

8    TO -- LET'S LOOK AT THEM ALL FIRST TO MAKE SURE WE

9    HAVE THEM IN FRONT OF US IN EVIDENCE THEN WE WILL

10   LOOK AT THEM MORE CAREFULLY AFTER THAT ONCE THEY

11   ARE IN.

12          ASSUMING THEY ARE BY THE COURT.  MR. LIN

13   LOOKING FIRST AT EXHIBIT 31, WHAT IS THIS DOCUMENT,

14   SIR?

15   A.   THIS IS THE QUARTERLY STATEMENT OF THE

16   FIRESIDE LS FUND AFTER I WIRED IN THE 300,000

17   ADDITIONAL FUND.

18   Q.   AND THE STATEMENT --

19   A.   TO OPEN THE ACCOUNT AT FIRESIDE.

20   Q.   AND THE STATEMENT DATE JANUARY 27, 2006; IS

21   THAT CORRECT?

22   A.   YEAH, ABOUT RIGHT.

23   Q.   AND MR. LIN, HOW DID YOU COME TO HAVE THIS

24   DOCUMENT?

25   A.   IT WAS PROVIDED TO ME BY MR. HU.

1          MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

2     MOVES EXHIBIT 31 INTO EVIDENCE.

3          MR. FONG:  NO OBJECTION, YOUR HONOR.

4          THE COURT:  IT'S RECEIVED.

5     (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 31 HAVING

6     BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

7     ADMITTED INTO EVIDENCE.)

8     BY MR. LUCEY:

9     Q.   NOW MR. LIN IF YOU COULD TURN YOUR ATTENTION

10    TO 6, 7, 8, 9, 10 AND 11, SIR.

11    A.   YES.

12    Q.   ARE ALL THESE DOCUMENTS SIMILAR?

13    A.   THEY WERE ALL QUARTERLY STATEMENTS FROM

14    FIRESIDE LS FUND TO ME.  EACH QUARTER THROUGH 2006.

15    ALL THE WAY TO 2007.

16    Q.   HOW DO YOU RECOGNIZE THESE DOCUMENTS, SIR?

17    A.   THESE WERE PROVIDED TO ME BY MR. HU.

18         MR. LUCEY:  YOUR HONOR THE GOVERNMENT

19    MOVES GOVERNMENT'S EXHIBIT 6, 7, 8, 9, 10 AND 11

20    INTO EVIDENCE.

21         MR. FONG:  NO OBJECTION.

22         THE COURT:  THEY ARE RECEIVED.

23    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS 6 THROUGH

24    11, HAVING BEEN PREVIOUSLY MARKED FOR

25    IDENTIFICATION, WERE ADMITTED INTO EVIDENCE.)

1   BY MR. LUCEY:

2   Q.   MR. LIN, LET'S LOOK AT NUMBER 6 FIRST.

3           I'M NOW PUBLISHING TO THE COURT AND JURY

4   TWO EXHIBITS, 31 WHICH IS ON THE LEFT AND 6 ON THE

5   RIGHT SIDE OF THE SCREEN.

6           MS. BURNEY IF YOU COULD BLOW UP ON THE

7   LEFT-HAND SIDE THE BOX, AND THE SAME ON THE

8   RIGHT-HAND SIDE DOCUMENT.

9           IS IT POSSIBLE TO MAKE IT ANY LARGER?

10  FOR THE BENEFIT OF THE JURY I THINK IT WOULD BE

11  DIFFICULT TO READ THOSE TWO SO WHY DON'T WE GO WITH

12  ONE AT A TIME.  LET'S START WITH 31, MS. BURNEY.

13  IF YOU COULD BLOW UP THE BOX NOW.

14          SO NOW, MR. LIN, THIS DOCUMENT INDICATES

15  WHAT AS YOU UNDERSTOOD IT AT THE TIME YOU RECEIVED

16  IT?

17  A.   IT INDICATED MY LAST WIRING OF $300,000 HAS

18  BEEN RECEIVED BY THE NEWLY CREATED FIRESIDE LS

19  FUND.

20  Q.   BUT IT DOESN'T APPEAR TO REFLECT ANYTHING

21  ABOUT YOUR MONEY MOVING OVER FROM ASENQUA BETA

22  FUND, CORRECT?

23  A.   YES.

24  Q.   THE $500,000 WE LOOKED AT EARLIER?

25  A.   YES.

1    Q.   SO NOW LET'S TURN TO EXHIBIT 6.   THEN

2    MS. BURNEY IF YOU COULD BLOW UP THAT PORTION OF THE

3    BOX.

4         WHAT IS THIS BOX REFLECT, MR. LIN, AS YOU

5    UNDERSTOOD IT?

6    A.   IT MEANS THAT MY TRANSFER FROM THE ORIGINAL

7    ASENQUA BETA FUND HAS ALSO BEEN TRANSFERRED AND

8    RECEIVED BY THE NEWLY CREATED FIRESIDE LS FUND.

9    Q.   NOW I CALL YOUR ATTENTION TO EXHIBIT NUMBER 8.

10   AND MS. BURNEY IF YOU COULD DO A BLOW UP OF THE BOX

11   ON PAGE 123.

12        MR. LIN, CALLING YOUR ATTENTION TO THE

13   ITEMIZED LISTING, IF I'M FOLLOWING THIS DOCUMENT

14   CORRECTLY, CORRECT ME IF I'M WRONG, IT SAYS

15   12-20-05 THERE'S A MONEY TRANSFER OF 300,000,

16   CORRECT

17   A.   CORRECT.

18   Q.   AND THEN THERE'S A FURTHER TRANSFER ON

19   1-1-2006 OF 562,000?  SO WHAT DO THOSE TWO NUMBERS

20   REPRESENT?  ARE THE TWO NUMBERS NOW BEING PUT

21   TOGETHER?

22   A.   YES.

23   Q.   SO WHAT WAS YOUR TOTAL VALUE IN THE FIRESIDE

24   FUND, IN THIS NEW FIRESIDE FUND, BASED ON YOUR NEW

25   PRIOR COMMITMENT AS OF 1-1-06?

1    A.   THE TOTAL AMOUNT AT THE BOTTOM SHOWED

2    $1,123,404.26.

3    Q.   AND THAT'S THE BALANCE AS OF 3-31-07, CORRECT?

4    A.   END OF Q1.

5    Q.   BUT THE BALANCE AS OF 1-1-06 WAS HOW MUCH IN

6    THE MIDDLE OF THE PAGE THERE, MR. LIN, IT SAYS

7    JANUARY 1, 2006, TRANSFER?

8    A.   $863,403.03.

9    Q.   AND BETWEEN THAT TIME JANUARY 1, 2006, ON OR

10   ABOUT MARCH 31ST, 2007, BASED ON THE STATEMENT WHAT

11   DID YOU UNDERSTAND YOUR VALUE OF YOUR INVESTMENT

12   WAS DOING WAS IT GOING UP OR DOWN?

13   A.   IT'S DOING FANTASTIC IT'S UP.  THERE WAS ONE

14   SMALL PERIOD OF ONE MONTH DOWN.  BUT ALL OTHER

15   MONTHS WERE UP AND UP QUITE SIGNIFICANTLY.

16   Q.   OKAY.  AGAIN TURNING TO THE SECOND PAGE OF

17   THIS EXHIBIT 8, WHOSE SIGNATURES ARE ON THE BOTTOM

18   OF THE DOCUMENT?

19   A.   MR. ALBERT HU AND ANTHONY POLLACE.

20   Q.   AND AGAIN YOU TOOK THE SIGNATURES TO MEAN THE

21   SAME THING YOU TESTIFIED TO EARLIER.  THEY ATTESTED

22   TO THE TRUTH AND ACCURACY OF THESE STATEMENTS?

23   A.   YES.

24   Q.   TURNING NOW MR. LIN TO EXHIBIT 10.  GOING

25   AHEAD SIX MONTHS IN TIME.

1    A.    OKAY.

2    Q.    AND MS. BURNEY, IF YOU COULD TURN TO PAGE TWO

3    OF THIS DOCUMENT AND ENLARGE THE BOX PORTION AT THE

4    TOP OF THE PAGE.

5             SO MR. LIN THERE APPEARS TO BE MORE

6    ACTIVITY GOING ON IN YOUR ACCOUNT IN SPRING OF 2007

7    A.    YES.

8    Q.    THERE'S AN INDICATION OF 5-13-07 A WIRE IN?

9    A.    I WIRED IN $250,000 MORE.

10   Q.    SO YOU ARE MAKING A FURTHER INVESTMENT NOW?

11   A.    YES, THAT WAS MY LAST ONE.

12   Q.    AND HOW MUCH WAS YOUR TOTAL INVESTED WITH

13   MR. HU AT THIS POINT?

14   A.    BY THIS TIME, I FINALLY REACHED HE TOLD ME

15   MOST PEOPLE ARE 1 MILLION.  SO THIS ADDED UP TO MY

16   TOTAL INVESTMENT OF $1 MILLION.

17   Q.    AND WHY WAS IT SO IMPORTANT TO YOU TO REACH

18   THAT $1 MILLION THRESHOLD WITH MR. HU'S FUND?

19   A.    AT LEAST I MEET THE MINIMUM OF HIS AVERAGE

20   CLIENTS.

21   Q.    AND HOW IS THE PERFORMANCE OF THE FUND DOING

22   AS OF SEPTEMBER 30TH, 2007, BASED ON THIS STATEMENT

23   WHEN YOU RECEIVED IT AT THAT TIME?

24   A.    YES IT SAYS THE TOTAL VALUE OF $1,553,245.23.

25   Q.    AND MR. LIN, HAD THE STATEMENTS WE LOOKED AT

1    NOW THAT PRECEDED THE DATE OF YOUR LAST WIRE OF

2    5-13-07 AS RECORDED ON THE STATEMENT, DID THOSE

3    STATEMENTS HAVE ANY AFFECT ON YOUR PROVIDING

4    ADDITIONAL INVESTMENT TO MR. HU?

5    A.   SORRY?

6    Q.   WE LOOKED AT JUST A MOMENT AGO THE LAST

7    EXHIBIT WE LOOKED AT BEFORE NUMBER TEN WAS NUMBER

8    EIGHT.  AND WE SAW AS OF MARCH 31ST, 2007, YOUR

9    BALANCE WAS ROUGHLY OVER A MILLION DOLLARS,

10   CORRECT?

11   A.   MY INVESTMENT WAS 750 BUT TOTAL BALANCE AT

12   THAT TIME WAS MORE THAN THAT.

13   Q.   SO THE FACT OF AS OF MARCH 31ST, 2007, BASED

14   ON EXHIBIT 8 THE VALUE OF YOUR INVESTMENT IN

15   FIRESIDE FUND, DID THAT PLAY ANY ROLE IN YOUR

16   PROVIDING WHAT YOU CALL YOUR LAST INVESTMENT WITH

17   MR. HU THAT OCCURRED ON OR ABOUT MAY 13TH, 2007?

18   A.   IT'S VERY OUT STANDING PERFORMANCE.

19   Q.   AND THAT PLAYED A ROLE IN YOUR MAKING A

20   FURTHER INVESTMENT?

21   A.   YES.

22   Q.   NOW I WANT TO CALL YOUR ATTENTION TO

23   EXHIBIT 11, THE SECOND PAGE, THE TOTAL VALUE NUMBER

24   LISTED THERE.

25          SO MR. LIN, THIS EXHIBIT 11 THIS IS THE

1    STATEMENT DATE OF DECEMBER 31ST, 2007, ON PAGE ONE

2    OF THE DOCUMENT.  WHAT IS THE TOTAL VALUE YOU

3    UNDERSTOOD YOU HAD WITH MR. HU --

4    A.   $1,711,567.52.

5    Q.   AND YOU UNDERSTOOD THAT MONEY WAS ALL

6    MAINTAINED FOR YOUR BENEFIT WITH MR. HU AND

7    FIRESIDE?

8    A.   YES.

9    Q.   THAT WAS BASED ON ALL THESE DOCUMENTS THAT WE

10   HAVE BEEN LOOKING AT NOW PARTICULARLY THE QUARTERLY

11   STATEMENTS?

12   A.   YES.

13   Q.   NOW GIVEN ALL OF THAT, DID THERE EVER COME A

14   TIME AFTER THIS DOCUMENT WE ARE LOOKING AT,

15   EXHIBIT 11, THAT YOU CAME TO HAVE SOME CONCERNS

16   ABOUT THE SECURITY OF YOUR INVESTMENT IN THE

17   FIRESIDE FUND?

18   A.   YES.

19   Q.   AND WHY WAS THAT?

20   A.   OVER THE COURSE OF THOSE MORE THAN TWO YEARS,

21   '05, '06, '07, THROUGH NUMEROUS DISCUSSIONS I HAVE

22   STARTED WITH ASKING MR. HU, ALL WE HAVE, ALL WE

23   EVER GOT IS THIS DOCUMENT PROVIDED BY YOU.

24        AND TYPICALLY MY OTHER THINGS, MY OTHER

25   INVESTMENTS YOU HAVE A CUSTODIAN MAYBE A BANK A

1    THIRD-PARTY BANK TO VALIDATE THIS IS TRUE.  THAT'S

2    ONE.

3          AND TWO, THEY WILL GIVE YOU QUARTERLY

4    STATEMENTS OR MONTHLY STATEMENTS.  THIS BANK OR THE

5    FUND WILL PROVIDE THE MUTUAL FUND WILL TELL YOU

6    THAT THESE ARE THE PORTFOLIO, WHEN WE BOUGHT HOW

7    MUCH OF THIS AND WHEN WE SOLD, THEN A LONG LIST OF

8    THEM.  SO YOU KNOW EXACTLY WHAT WENT ON.

9          BUT THAT TO US HERE, WE NEVER GOT THOSE.

10   Q.   SO IF I CAN, MAYBE I CAN CLARIFY YOUR ANSWER

11   OR EXPOUND ON IT, MR. LIN.  ARE YOU TELLING US THAT

12   YOU WERE LOOKING FOR THE BACK UP FOR THE

13   INFORMATION CONTAINED IN THESE QUARTERLY

14   STATEMENTS?

15   A.   YES.  I WAS VERY HAPPY WITH THE PERFORMANCE

16   NUMBER.  I GRADUALLY FOUND IT AS UNSUPPORTED.

17   Q.   WHY WAS THAT?

18   A.   LIKE I SAID EARLIER, I REQUESTED TO SEE THE

19   DETAIL OF YOUR TRANSACTION.  THESE ARE VERY BASIC

20   DOCUMENTS.  ANY FUND MANAGER WOULD NEED TO PROVIDE.

21   Q.   MR. LIN, DID YOU SPEAK TO MR. HU ABOUT YOUR

22   CONCERNS?

23   A.   YES, I REQUEST MORE INFORMATION OR INVESTMENT

24   BANK CONTACT.

25   Q.   AND JUST SO WE CAN FIX OURSELVES IN TIME HERE,

1    WHAT'S THE TIME FRAME WE ARE TALKING ABOUT WHEN

2    THESE CONCERNS STARTED TO COME ABOUT FOR YOU?

3    A.   YEAH.   AFTER ALL THESE INVESTMENTS WERE DONE

4    AND THERE WAS ANOTHER GENTLEMAN FRIEND OF MINE WHO

5    ALSO INVESTED, JEAN VERDIELL WHO ALSO INVESTED IN

6    THE FUND.   AND HE AND I WERE TALKING ABOUT THE

7    GREAT PERFORMANCE.   WE WERE TALKING ABOUT HOW IT

8    WAS ALL OPAQUE THERE WAS NO TRANSPARENCY.   IT'S

9    LIKE WE HAD BEEN IN THE DARK FOR QUITE SOME TIME.

10   Q.   AFTER THAT CONVERSATION WITH MR. VERDIELL,

11   WHAT COURSE OF ACTION DID YOU DECIDE TO TAKE IN

12   REGARD TO YOUR INVESTMENT WITH MR. HU?

13   A.   I DON'T RECALL THE EXACT TIME BUT AFTER THAT I

14   BEGAN TO REQUEST TO WITHDRAW OR REDEMPTION.

15   Q.   MR. LIN, I'M GOING TO SHOW YOU ANOTHER

16   DOCUMENT NOW IT'S PREVIOUSLY MARKED AS GOVERNMENT'S

17   EXHIBIT 36.

18        DO YOU RECOGNIZE THAT DOCUMENT

19   A.   YES, THIS WAS A WITHDRAWAL FORM.

20   Q.   AND HOW DO YOU RECOGNIZE THIS DOCUMENT?

21   A.   YEAH.   THIS DOCUMENT DIDN'T COME EASY BECAUSE

22   PRIOR TO THIS --

23   Q.   WAIT A MINUTE, WE ARE GETTING A LITTLE BIT

24   AHEAD OF OURSELVES MR. LIN.   BEFORE WE GET TO THAT,

25   BUT IN TERMS OF THIS DOCUMENT, HOW DID YOU COME TO

1    HAVE THIS DOCUMENT?

2    A.   THIS DOCUMENT WAS PROVIDED BY ME TO ME, WAS

3    PROVIDED TO ME BY MR. ALBERT HU.

4         MR. LUCEY:  YOUR HONOR, AT THIS POINT THE

5    GOVERNMENT WOULD MOVE EXHIBIT 36 INTO EVIDENCE.

6         MR. FONG:  NO OBJECTION.

7         THE COURT:  ALL RIGHT.  36 IS RECEIVED.

8    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 36 HAVING

9    BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

10   ADMITTED INTO EVIDENCE.)

11   BY MR. LUCEY:

12   Q.   SO MR. LIN, YOU WERE TELLING US THERE'S A

13   STORY ASSOCIATED WITH THIS DOCUMENT AND I WOULD ASK

14   MS. BURNEY TO PUBLISH IT TO THE COURT AND JURY.  IF

15   YOU COULD BLOW UP THE TEXT.

16        WHAT'S THE STORY BEHIND THIS DOCUMENT,

17   MR. LIN?

18   A.   BEFORE THIS WITHDRAWAL FORM CAME ABOUT OVER

19   THE PERIOD OF SEVERAL MONTHS I HAVE CALLED AND

20   WRITTEN E-MAIL, I COMMUNICATED WITH MR. HU

21   REQUESTING REDEMPTION.  AND BECAUSE THE PERFORMANCE

22   WAS THERE AND I HAVE GOOD GAIN SO IT WAS TIME FOR

23   ME TO REDEEM.  PLUS, I FELT THAT THERE WAS NOT

24   SUFFICIENT TRANSPARENCY AS I SAID EARLIER SO I

25   REQUEST --

1    Q.   LET ME ASK YOU A QUESTION THERE MR. LIN.  WHAT

2    DO YOU MEAN BY IT WAS TIME TO REDEEM; WHAT DO YOU

3    MEAN BY THAT?

4    A.   WELL, I DEPOSITED $1 MILLION AND THE LAST

5    STATEMENT SHOWING 1.7 MILLION.  SO TO ME THAT'S A

6    GOOD ENOUGH, AND IN FACT IT'S VERY OUTSTANDING

7    PERFORMANCE AND AT THAT TIME I WANT TO PURCHASE

8    ANOTHER HOUSE BECAUSE MY MOTHER IS IN TAIWAN, SHE'S

9    89.  AT THAT TIME SHE'S 80-SOMETHING AND I WANT HER

10   TO HAVE A NICER HOME AND I'M THINKING USING THOSE

11   FUNDS TO -- AND IT WOULD ALSO SERVE AS MY RETIRE

12   HOME EVENTUALLY.  SO I WANTED THE FUND.

13   Q.   SO YOU WANTED TO CASH OUT?

14   A.   YES.

15   Q.   OKAY.  SO WHAT HAPPENED NEXT YOU MADE THE

16   DECISIONS BASED ON BOTH THE LACK OF TRANSPARENCY

17   THAT WAS CAUSING YOU CONCERN AND SINCE YOUR RETURN

18   HAD BEEN SO GOOD YOU WANTED TO TAKE THAT MONEY OUT?

19   A.   YES.  SO I COMMUNICATED WITH MR. HU AND

20   COMMUNICATED BY WISH TO REDEEM.

21   Q.   SO DID HE PROVIDE YOU WITH THE WITHDRAWAL?

22   A.   NO, NO.  INITIALLY HE SAID THERE WERE VARIOUS

23   REASONS.  FIRST FEW TIMES WAS IT WOULD TAKE TIME TO

24   LIQUIDATE THE POSITIONS, MEANING HE HAS ALL THE

25   MONEY IN THE STOCKS THAT HE PLAYED.  AND IT WILL

1    TAKE TIME.

2    Q.   JUST SO WE ARE CLEAR THAT'S YOUR

3    INTERPRETATION OF WHAT HE MEANT BY LIQUIDATION

4    ISSUES?

5    A.   RIGHT.  MEANING IT WOULD TAKE TIME FOR HIM TO

6    TURN IT INTO CASH TO RETURN TO ME.

7    Q.   OKAY.

8    A.   LATER HE GAVE ME DIFFERENT REASONS SAYING --

9    Q.   WHAT DID HE SAY THE NEXT TIME?

10   A.   YES, I CONTINUED TO REQUEST BECAUSE I LIKE THE

11   GUY I LIKED MR. HU SO INITIALLY HE WAS QUITE

12   FRIENDLY.  THEN HE EXPLAINED TO ME BECAUSE MANY

13   OTHER CLIENTS WERE STILL STAYING IN THE FUND, IF

14   JUST ME REDEEM EVERYTHING, THEN IT'S GOING TO HURT

15   OTHER PEOPLE BECAUSE LIKE IF YOU SELL RAPIDLY IT

16   WILL HURT THE POSITION HURT THE PRICE.  THESE ARE

17   AMONG THE REASONS THAT HE GAVE ME.

18   Q.   AFTER HE GAVE YOU THOSE REASONS DID MR. HU

19   THEN GIVE YOU THE WITHDRAWAL FORM OR DID SOMETHING

20   ELSE HAPPEN AFTER THAT?

21   A.   EVENTUALLY I GOT UPSET AND I TOLD HIM THAT I

22   NEED TO TAKE THE DUE COURSE ACTION INCLUDING LEGAL

23   ACTION TO PRESS HIM FOR I REDEEM MY FUND.

24   Q.   WAS IT AT THAT POINT YOU WERE PROVIDED WITH

25   THE WITHDRAWAL FORM?

1   A.   YEAH.  THEN HE INVITED ME, IN FACT IT WAS DONE

2   IN A RESTAURANT IN CUPERTINO.

3   Q.   DO YOU RECALL WHAT KIND OF RESTAURANT IT WAS?

4   A.   IT WAS A JAPANESE RESTAURANT.

5   Q.   AND MR. LIN, CAN YOU GIVE US AN ESTIMATE ABOUT

6   HOW LONG IT TOOK BETWEEN THE TIME YOU FIRST RAISED

7   THE ISSUE OF WITHDRAWING YOUR FUNDS AND THE TIME

8   YOU FINALLY HAD THIS MEETING AT THE RESTAURANT IN

9   CUPERTINO?

10  A.   I DON'T RECALL EXACT TIME BUT IT'S SEVERAL

11  MONTHS, SEVERAL MONTHS.  NUMEROUS EXCHANGES.

12  Q.   SO THIS -- DID MR. HU BRING THIS WITHDRAWAL

13  FORM EXHIBIT 36 TO THE MEETING AT THE RESTAURANT?

14  A.   YES.

15  Q.   AND IT WAS ALREADY COMPLETE WHEN HE PRESENTED

16  IT TO YOU?

17  A.   I BELIEVE SO, YES.

18  Q.   BUT YOU HAD TO SIGN IT OBVIOUSLY?

19  A.   YES.

20  Q.   IS THAT YOUR SIGNATURE THERE BELOW CLOSING?

21  A.   YES.

22  Q.   IS THAT YOUR WRITING ON THE DATE LINE ABOVE

23  YOUR NAME?

24  A.   YES.

25  Q.   HOW ABOUT THE SIGNATURES BELOW?

1    A.   SIGNATURE BELOW CAME TO ME HE BROUGHT IT TO

2    ME.

3    Q.   SO IT WAS ALREADY SIGNED?

4    A.   UH-HUH.

5    Q.   AND DID IT ALSO CONTAIN THE SIGNATURE WE SEE

6    HERE TONY POLLACE?

7    A.   YES THE BOTTOM ONE ANTHONY POL LUCK.

8    Q.   AND WAS MR. POLLACE AT THIS MEETING?

9    A.   NO.

10   Q.   JUST YOU AND MR. HU?

11   A.   YES.

12   Q.   AND TURNING YOUR ATTENTION TO ONE PART OF THE

13   DOCUMENT.  YOU RECALL EARLIER WE HAD BEEN LOOKING

14   AT A REFERENCE TO ANTHONY AND TONY.  AND ALL THE

15   PRIOR ACCOUNT DOCUMENTS STATEMENTS HAVE SAID

16   ANTHONY POLLACE.  NOW IT SAYS ANTHONY POLLACE

17   ENDING IN CE RATHER THAN CK.  DID YOU NOTICE THAT

18   AT THE TIME?

19   A.   NO, I DIDN'T.

20   Q.   AFTER THE WITHDRAWAL FORM WERE YOU PROVIDED

21   WITH THE $1.7 MILLION?

22   A.   NO.

23   Q.   HOW MUCH WERE YOU PROVIDED WITH?

24   A.   ZERO.

25   Q.   YOU NEVER RECEIVED ANY MONEY BACK AFTER

1    FILLING OUT THIS WITHDRAWAL FORM?

2    A.   NO.

3    Q.   DID YOU FOLLOW UP WITH MR. HU TO MAKE SURE

4    THAT HE HAD THE WITHDRAWAL FORM AND HADN'T

5    MISPLACED IT?

6    A.   YES.

7    Q.   HOW LONG AFTER THIS DID YOUR COMMUNICATION

8    CONTINUE AFTER NOVEMBER 26, 2007?

9    A.   QUITE A FEW MONTHS.  I WOULD CALL HIM.  HE'S

10   IN U.S. OR HE'S IN HONG KONG SO HE HAS SEVERAL

11   NUMBERS, PHONE NUMBER IN TAIWAN, PHONE NUMBER IN

12   HONG KONG, SO I HAD TO TRY ALL THE NUMBERS.

13        MOST THE TIME I DID NOT KNOW WHERE HE WAS

14   AT THAT TIME.

15   Q.   AND JUST SO WE ARE CLEAR AGAIN, JUST ONE POINT

16   I NEGLECTED TO ASK YOU EARLIER MR. LIN, THE DATE ON

17   THIS WITHDRAWAL FORM EXHIBIT 36, NOVEMBER 262007,

18   IS THAT THE DATE ON THIS WHICH MEETING OCCURRED TO

19   THE BEST OF YOUR RECOLLECTION?

20   A.   YES, TO MY BEST RECOLLECTION.

21   Q.   OKAY.  AND SO HOW MANY INTERACTIONS DO YOU

22   HAVE WITH MR. HU OTHER THAN YOUR FAILED EFFORTS TO

23   CONTACT HIM AFTER NOVEMBER 26, 2007 IN AN ATTEMPT

24   TO RETRIEVE YOUR MONEY?

25   A.   QUITE A FEW TIMES BUT MOSTLY BY PHONE OR BY

1    E-MAIL.  AND EVENTUALLY HE DID REPLY -- INITIALLY,

2    HE DID NOT REPLY BECAUSE MY E-MAIL GOT MORE AND

3    MORE HEATED.

4    Q.   NOW FROM THIS, YOU KNOW, WHEN YOU FIRST BEGAN

5    ASKING FOR YOUR MONEY BACK SOME TIME PRIOR TO

6    NOVEMBER 26, 2007 LOOKING TO CASH OUT YOUR

7    INVESTMENT YOU MADE WITH MR. HU AND RETRIEVE YOUR

8    GAINS ACCORDING TO HIS QUARTERLY STATEMENTS TO YOU,

9    MR. LIN, AND IN THE WEEKS AND MONTHS THAT FOLLOWED,

10   DID MR. HU EVER TELL YOU YOUR MONEY WAS GONE?

11   A.   NO.

12   Q.   WHAT IMPRESSION DID YOU HAVE BASED ON YOUR

13   INTERACTIONS WITH HIM?

14   A.   IT WAS STILL DOING VERY WELL.

15   Q.   THAT IT WAS STILL THERE?

16   A.   STILL THERE STILL DOING VERY WELL.

17   Q.   IT WAS STILL BEING HELD IN AN ACCOUNT FOR YOUR

18   BENEFIT?

19   A.   YES.

20   Q.   DID MR. HU EVER TELL YOU THAT HE USED A

21   PORTION OF YOUR INVESTMENT MONEY TO PAY OTHER

22   INVESTORS IN THE FUND?

23   A.   NO, HE HAS NEVER TOLD ME THAT.

24   Q.   IF YOU KNEW THAT THAT WAS HOW SOME OF YOUR

25   MONEY WAS GOING TO BE INVESTED AND USED WOULD YOU

1    STILL HAVE INVESTED WITH MR. HU?

2    A.   NO, I WOULD NOT.

3    Q.   DID HE EVER, MR. HU EVER TELL YOU THAT HE WAS

4    GOING TO USE YOUR MONEYS TO FUND HIS OPERATIONS OF

5    HIS FUND BEYOND THE PERCENTAGES PROVIDED FOR IN THE

6    SUBSCRIPTION DOCUMENTS?

7    A.   NO, HE NEVER TOLD ME THAT.

8    Q.   IF YOU HAD KNOWN THAT WAS GOING TO HAPPEN WITH

9    YOUR INVESTMENT MONEY WOULD YOU STILL HAVE INVESTED

10   IN THE FIRESIDE FUND AND THE ASENQUA BETA FUND?

11   A.   NO, I WOULD NOT.

12   Q.   AND MR. LIN, DID MR. HU EVER TELL YOU THAT HE

13   USED YOUR INVESTMENT MONEYS THE $1 MILLION YOU

14   PROVIDED HIM WITH TO FUND HIS LIVING EXPENSES AND

15   PERSONNEL EXPENSES?

16   A.   THE AGREEMENT CALLS FOR MANAGEMENT FEE, ONLY

17   WITHIN THAT, THAT'S HIS DISCRETION.  OTHER THAN THE

18   MANAGEMENT FEE, NO, HE HAS NEVER TOLD ME THAT.

19   Q.   AND IF YOU HAD KNOWN HE WAS GOING TO USE YOUR

20   MONEYS BEYOND THE MANAGEMENT FEES PROVIDED FOR IN

21   THE INVESTMENT DOCUMENTS WOULD YOU HAVE STILL

22   INVESTED YOUR MONEY?

23   A.   NO.

24   Q.   AND FOR ALL THOSE QUESTIONS I JUST ASKED YOU

25   ABOUT USING MONEYS TO PAY OTHER INVESTORS AND TO

1    USE MONEYS, USE YOUR INVESTMENT MONEYS TO FUND THE

2    OPERATIONS OF ASENQUA AND FIRESIDE AND TO FUNDS AND

3    LIVING EXPENSES BEYOND THE MANAGEMENT FEES PROVIDED

4    IN THE INVESTMENT DOCUMENTS, YOU SAID NO TO ALL

5    THOSE QUESTIONS?

6    A.   CORRECT.

7    Q.   YOU WOULD NOT HAVE INVESTED?

8    A.   CORRECT.

9    Q.   WHY NOT?

10   A.   BECAUSE IT WOULD NOT BE FAIR OOZE ME AS AN

11   INVESTOR.

12   Q.   WHAT DO YOU MEAN FAIR?

13   A.   MEANING IF I DEPOSITED $1 MILLION, HE WAS

14   SUPPOSED TO USE THE $1 MILLION TO MAKE THE BEST

15   EFFORT TO CREATE, TO HONESTLY INVEST IN THE MARKET.

16   Q.   AND MR. LIN, WOULD YOU HAVE KEPT INVESTING IF

17   YOU HAD KNOWN THAT THOSE QUARTERLY STATEMENTS WE

18   LOOKED AT THIS MORNING BOTH FOR ASENQUA BETA FUND

19   THEN FOR FIRESIDE FUND.  IF YOU HAD KNOWN THOSE

20   RETURNS WERE NOT TRUE AND ACCURATE WOULD YOU HAVE

21   KEPT INVESTING MONEY?

22   A.   NO, I WOULD HAVE RUN AS FAST AS I COULD.

23   Q.   WOULD YOU HAVE KEPT YOUR ORIGINAL VESTMENT

24   THERE TOO JUST NOT INVESTED NEW MONEY?

25   A.   NO.

1    Q.   YOU WOULD HAVE TAKEN ALL THE MONEY OUT AS SOON

2    AS HAD LEARNED THAT?

3    A.   YES.

4    Q.   WHY IS THAT?

5    A.   BECAUSE THAT MEANS THAT THE IF THE STATEMENTS

6    WERE FALSE THEN THE WHOLE, THE ENTIRE FUND WAS SOME

7    KIND OF A SCHEME.

8              MR. LUCEY:  JUST A MOMENT, YOUR HONOR,

9    I'M GOING TO CONFER WITH MY COUNSEL.

10             THE COURT:  OKAY.

11             MR. LUCEY:  NO FURTHER QUESTIONS,

12   YOUR HONOR.

13             THE COURT:  ALL RIGHT.  MR. FONG?

14             DO YOU NEED A BREAK?

15             THE WITNESS:  NO, I'M FINE, JUST -- IT'S

16   TIME.  I'M SORRY.

17

18        **CROSS-EXAMINATION BY MR. FONG**

19

20   BY MR. FONG:

21   Q.   GOOD MORNING, MR. LIN.  MY NAME IS JERRY FONG

22   AND I REPRESENT ALBERT HU.

23             I JUST WANTED TO ASK YOU SOME QUESTIONS,

24   IF I MAY.

25             NOW MR. LIN, FOR THE LAST 25 YEARS YOUR

1    OCCUPATION HAS BEEN INVESTING IN STARTUP COMPANIES;

2    IS THAT CORRECT?

3    A.   STARTING 2000 UNTIL NOW, AS A PROFESSION

4    STARTING 2000 AS ANGEL STARTING MID-90'S.

5    Q.   SO THAT WOULD BE ABOUT 15, 20 YEARS?

6    A.   ONLY AS ENTREPRENEUR STARTUP.

7    Q.   NOW YOU ALSO HAVE EXTENSIVE EXPERIENCE IN

8    TERMS OF LECTURING TO PEOPLE ABOUT ANGEL INVESTING

9    OR VENTURE CAPITAL INVESTING; IS THAT CORRECT?

10   A.   I WOULD NOT SELF INFLATE TO SAY LECTURE.  I

11   SHARE WITH MY EXPERIENCE BOTH IN LOSING AND

12   SUCCESS, AND FAILURE.

13   Q.   BUT YOU HAVE SPOKEN AS A FEATURED SPEAKER AT

14   SEMINARS AND TALKS, RIGHT?

15   A.   ON VENTURE INVESTMENT, YES.

16   Q.   AND YOU ALSO WROTE VARIOUS COLUMNS FOR TWO

17   TAIWAN NEWSPAPERS; IS THAT CORRECT?

18   A.   CORRECT.

19   Q.   OKAY.  WHAT ARE THE NAMES OF THESE TWO

20   NEWSPAPERS?

21   A.   ONE IS ECONOMICAL DAILY NEWS.  THE OTHER IS

22   COMMERCIAL TIME.

23   Q.   WOULD IT BE FAIR TO SAY THAT THESE ARE THE

24   CHIEF FINANCIAL NEWSPAPERS FOR TAIWAN?

25   A.   YES.

1   Q.   THEY ARE KIND OF, IF YOU WILL, THE EQUIVALENT

2   OF THE TAIWAN VERSION OF *THE WALL STREET JOURNAL*,

3   IS THAT A FAIR STATEMENT?

4   A.   I CANNOT ANSWER THAT.

5   Q.   BUT THEY ARE THE TWO MAJOR NEWSPAPERS IN WHICH

6   PEOPLE OF TAIWAN GET THEIR FINANCIAL NEWS, IS THAT

7   YOUR UNDERSTANDING?

8   A.   THERE ARE OTHER, BUT THESE ARE TWO OF THE

9   MANY.

10  Q.   I'M SORRY I APOLOGIZE I INTERRUPTED YOU.

11  PLEASE FINISH?

12  A.   THESE ARE TWO OF THE MANY OTHER THINGS.

13  Q.   BUT THESE ARE THE TWO MAJOR NEWSPAPERS

14  ACCORDING TO YOUR UNDERSTANDING; IS THAT CORRECT?

15  A.   YES.

16  Q.   OKAY.  AND YOU WROTE COLUMNS FOR THEM?

17  A.   STARTING 2003, ONLY FOR ECONOMICAL DAILY NEWS

18  AND STARTING 2005 I THINK FOR COMMERCIAL TIME OR

19  SOMEWHERE AROUND THAT TIME, YEAH.

20  Q.   OKAY.  AND THESE ARE COLUMNS ABOUT HOW TO

21  INVEST AND FINANCES, RIGHT?

22  A.   NO.  HOW TO INVEST, HOW TO FINANCE IS JUST ONE

23  PART OF IT.  I HAVE FOUR CATEGORIES THAT I DEVOTE

24  MY LIFE TO.  ONE IS TEACH PEOPLE HOW TO BE HAPPY,

25  MOTIVATIONAL TALK.  I WROTE A LOT MORE ON THAT.

1          AND THEN HOW TO BUILD AND RETAIN POSITIVE

2     THINKING.  AND THEN HOW TO START UP WHICH IS REALLY

3     MY MAIN FOCUS.  SO TO ENCOURAGE ENTREPRENEUR WITH

4     DREAMS TO PURSUE THEIR DREAM.

5          THEN ALONG THE WAY THERE'S SOME

6     INVESTMENTS.  AGAIN, I'M NOT EXPERT IN MARKET

7     INVESTMENT BUT ONLY INVESTMENT FOCUS IN VENTURE

8     STARTUP.

9     Q.   MR. LIN, AT ONE POINT IS IT TRUE YOU WROTE A

10    COLUMN ABOUT HEDGE FUND INVESTMENT FOR ONE OF THOSE

11    TWO NEWSPAPERS YOU MENTIONED, I FORGET IT IF IT WAS

12    TAIWAN DAILY NEWS OR ECONOMIC TIMES?

13    A.   IT'S FINE.

14          I WROTE THREE COLUMNS IN SEQUENCE.  FIRST

15    ABOUT VENTURE FUND.  I HAVE MORE EXPERIENCE IN

16    THAT.

17          TWO IS ON PRIVATE EQUITY.  BASICALLY JUST

18    EXPLAIN WHAT IT IS.

19          AND THE THIRD ONE IS ON HEDGE FUND

20    BECAUSE I LEARNED OVER THE PAST FEW MONTHS DURING

21    THAT TIME BY READING A LOT OF BOOKS ON HEDGE FUND.

22    Q.   OKAY.  SO YOU FELT COMFORTABLE TO WRITE A

23    COLUMN IN ONE OF THE LEADING FINANCIAL NEWSPAPERS

24    IN TAIWAN ON THE ISSUE OF HEDGE FUNDS; IS THAT

25    CORRECT?

1    A.   THE CONTENT OF THAT SPECIFIC COLUMN EXPLAINS

2    WHAT HEDGE FUND IS WHICH PROBABLY YOU CAN ALSO

3    WRITE AFTER READING AND SUMMARIZING.

4    Q.   YOU OBVIOUSLY HAVE NEVER SEEN MY WRITING.  BUT

5    LEAVING THAT ASIDE, BUT YOU WROTE THE COLUMN FOR A

6    MAJOR, ONE OF THE TWO MAJOR FINANCIAL NEWSPAPERS IN

7    TAIWAN.

8    A.   YES, UH-HUH.

9    Q.   ON THE SUBJECT OF WHAT IS A HEDGE FUND?

10   A.   YES.

11   Q.   IN FACT YOUR COLUMN WENT BEYOND DESCRIBING

12   WHAT IS A HEDGE FUND; IS THAT TRUE?

13   A.   I DON'T RECALL THE EXACT DATA BUT THE DOCUMENT

14   IS THERE.  I HAVE A WEBSITE WHICH HAS ALL MY

15   ARTICLES ALSO.  ANYBODY CAN READ.

16   Q.   AND THAT WEBSITE IS IN CHINESE, CORRECT?

17   A.   CORRECT.

18   Q.   NOW IN THAT ARTICLE YOU MENTIONED ABOUT THE

19   HEDGE FUND YOU ALSO TALKED ABOUT SORT OF, IF YOU

20   WILL, HOW A HEDGE FUND CAN BE A VERY GOOD

21   INVESTMENT VEHICLE; IS THAT CORRECT?

22   A.   HEDGE FUND CAN BE A VERY GOOD VEHICLE, YES, IT

23   CAN BE.

24   Q.   OKAY.  AND YOU WERE GIVING ADVICE ON THAT,

25   RIGHT?

1    A.    I WROTE AN ARTICLE, YES.

2    Q.    OKAY.  WITH ADVICE?

3    A.    I DO NOT KNOW WHAT YOU MEAN.

4    Q.    OKAY.  LET ME WITHDRAW THAT QUESTION.  LET ME

5    TRY THIS.  NOW, IN THAT ARTICLE YOU MENTIONED THAT

6    THERE WAS, IF YOU WILL, A SYNERGY BETWEEN VENTURE

7    CAPITAL VENTURE CAPITAL FUNDS AND HEDGE FUNDS; IS

8    THAT CORRECT?

9    A.    OKAY.  THE COLUMN OR SEQUENCE OF THREE, FIRST

10   ONE WAS ON VENTURE CAPITAL BECAUSE IT'S BEFORE

11   PUBLIC.  THE SECOND ONE WAS ON PRIVATE EQUITY FUND

12   THAT'S WHEN THE COMPANY GROW.  THE THIRD ONE IS

13   HEDGE FUND AFTER IT WENT PUBLIC BECOME A PUBLIC

14   LISTING COMPANY.  THESE NATURALLY HAVE THEIR

15   SYNERGY.

16   Q.    AND THESE TALK ABOUT COMBINED INVESTING IN THE

17   COMPANIES FROM THE VERY BEGINNING STARTUP UNTIL

18   THEY ARE ACTUALLY TAKEN PUBLIC, RIGHT?

19   A.    IDEALLY, YES.

20   Q.    IN THAT ARTICLE YOU MENTIONED THAT A TYPICAL

21   HEDGE FUND MANAGER OR A TYPICAL HEDGE FUND MANAGER

22   WOULD ONLY DO CERTAIN THINGS THAT YOU THOUGHT WERE

23   GOOD THINGS BUT NOT ENOUGH; IS THAT CORRECT?

24   A.    CAN YOU BE MORE CLEAR?  I DON'T UNDERSTAND

25   THAT.

1    Q.   SURE.  IN YOUR ARTICLE DID YOU MENTION THAT A

2    TYPICAL HEDGE FUND MANAGER WOULD DO CERTAIN TYPES

3    OF DUE DILIGENCE BEFORE HE OR SHE WOULD MAKE AN

4    INVESTMENT INTO A PARTICULAR STOCK?

5    A.   YEAH.  TYPICAL HEDGE FUND MANAGER, YES.  THEY

6    WILL STUDY AND UNDERSTAND THE COMPANY BEFORE THEY

7    DECIDE TO PURCHASE AND SELL, OR SELL.

8    Q.   AND YOUR ARTICLE TALKED ABOUT THE FACT THAT IN

9    YOUR OPINION THAT WAS NOT GOOD ENOUGH; IS THAT

10   CORRECT?

11   A.   SOMETIMES IT CAN BE NOT GOOD ENOUGH.  YOU CAN

12   STUDY FACEBOOK BUT THE MARKET WILL REACT VERY

13   STRANGELY.

14   Q.   IN FACT, IN YOUR ARTICLE YOU WERE TALKING

15   ABOUT THE FACT THAT FROM YOUR PERSPECTIVE THE

16   BETTER WAY TO DO IT IS TO INTEGRATE THE KNOWLEDGE

17   ABOUT VENTURE CAPITAL INTO YOUR HEDGE FUND

18   MANAGEMENT SO THAT YOU CAN SEE WHETHER OR NOT THE

19   ONE PART WOULD PROVIDE INFORMATION THAT WOULD HELP

20   YOU IN TERMS OF INVESTING IN THE OTHER PART; IS

21   THAT CORRECT?

22   A.   NOT IN DEGRADING THE FUNDS.  BUT IN DEGRADING

23   THE CAPABILITY.

24        IN VENTURE FUND, WHAT I SPEND MY LIFE

25   DOING IS I STUDY A STARTUP DREAM PROPOSAL.  THEN WE

145

1    ANALYZE THE START UP, WHETHER IT'S POSSIBLE OR

2    FEASIBLE, IS IT GOOD, IS THE MANAGEMENT TEAM GOOD,

3    OR THOSE ARE THE VENTURE FUND.

4         AND MY COMMENT, IF I RECALL CORRECTLY,

5    WAS DISCIPLINE CAN BE APPLIED AS A BENEFIT TO A

6    HEDGE FUND.

7    Q.   AND THAT'S WHERE YOU WERE TALKING ABOUT KIND

8    OF INTEGRATING THE KNOWLEDGE FROM ONE TO THE OTHER;

9    IS THAT CORRECT?

10   A.   KNOWLEDGE, YES.

11   Q.   AND THAT'S FROM YOUR PERSPECTIVE THAT'S WHAT

12   ASENQUA WAS DOING, RIGHT?  I DON'T MEAN JUST THE

13   ASENQUA BETA FUND BUT THE ASENQUA FAMILY TREE, IF

14   YOU WILL?

15   A.   I DON'T KNOW IF THERE'S A FAMILY TREE.  MR. HU

16   HAS INVITED ME TO HELP HIM START A FUND CALLED

17   ASENQUA VENTURE FUND WHICH MY UNDERSTANDING WAS

18   REALLY JUST A SORT OF CO-INVEST TYPE OF IDEA.

19   Q.   NOW YOU -- BUT YOU DO UNDERSTAND THAT FROM IN

20   TERMS OF YOUR PROFESSION YOU DO UNDERSTAND THE NEED

21   TO BE VERY CAREFUL BEFORE MAKING A PARTICULAR

22   INVESTMENT DECISION; IS THAT CORRECT?

23   A.   YES, THE MOST CAREFUL PERSON WITH THE LEADERS.

24   Q.   AND YOU HAVE HAD OF COURSE A LOT OF SUCCESS IN

25   TERMS OF INVESTING IN STARTUP COMPANIES; IS THAT

1    CORRECT?

2    A.   I HAVE SOME SUCCESSES BUT I HAVE EQUALLY MANY

3    FAILURES, YES.  IT'S ALL PART OF IT.

4    Q.   AND WHAT YOU DO TRY TO DO WHEN YOU GIVE TALKS

5    IS TO IMPART YOUR EXPERIENCE TO OTHERS, RIGHT?

6    A.   YES.

7    Q.   AND YOU ALSO TRY TO LET THEM KNOW, IF YOU

8    WILL, THE PITFALLS OR HOW NOT TO DO THINGS THAT

9    WOULD BE HURTFUL, RIGHT?

10   A.   YES, VERY HURTFUL.

11   Q.   AND ONE OF THOSE THINGS IS NOT CONDUCTING

12   WHAT -- WELL, DO YOU UNDERSTAND THE TERM "DUE

13   DILIGENCE"?

14   A.   YES.

15   Q.   AND WHAT IS YOUR UNDERSTANDING OF THE TERM DUE

16   DILIGENCE AS IT APPLIES TO WHAT YOU DO IN TERMS OF

17   ASSESSING WHETHER OR NOT TO MAKE AN INVESTMENT IN A

18   PARTICULAR COMPANY?

19   A.   I, INCLUDING MEETING AND UNDERSTANDING WHAT

20   THEY TRY TO DO.  MY LINE OF WORK DUE DILIGENCE

21   MOSTLY ARE BASED ON DREAMS.

22        REMEMBER, MY 20 YEARS OF INVESTMENT AS AN

23   ANGEL IN THE VENTURE FUND ARE PEOPLE LIKE

24   ZUCKERBERG OF A FEW YEARS BACK, GOOGLE A FEW YEARS

25   BACK, THEY ONLY HAVE A DREAM.

147

1          SO WHEN WE DO DUE DILIGENCE WE REVIEW

2     THEIR BUSINESS PLAN THEY REVIEW THESE PEOPLE WE

3     REVIEW THEIR CAPE ABILITY.  THOSE ARE MY KIND OF

4     DUE DILIGENCE.

5     Q.   IS IT FAIR TO SAY WHEN YOU DO YOUR DUE

6     DILIGENCE, WHATEVER COMPANY WHO WANTS YOU TO INVEST

7     IN THAT COMPANY WHATEVER INFORMATION THEY GIVE YOU,

8     YOU WANT TO MAKE SURE THAT IS ACCURATE AND

9     TRUTHFUL; IS THAT CORRECT?

10    A.   YOU CANNOT BE ACCURATE FOR A START UP DREAM.

11    YOU CAN ONLY TO YOUR BEST IN UNDERSTANDING THE

12    MARKET -- IN FACT, MY SECOND BOOK IF YOU ALSO HAVE

13    READ WHICH WON THE NATIONAL AWARD TALKS ABOUT HOW

14    TO HELP A START UP.  IN FACT, I EMPHASIZE TWO

15    THINGS.  YOU CAN ONLY UNDERSTAND WHAT THE DREAM

16    MARKET IS AND WHAT THE CAPABILITY IS

17    TRUSTWORTHINESS OF THE STARTUP FOUNDER.

18    Q.   OKAY.  BUT IF SOMEBODY IF A STARTUP COMPANY

19    PROVIDED YOU WITH CERTAIN INFORMATION ABOUT THE

20    COMPANY YOU WOULD WANT TO CHECK THAT OUT BEFORE YOU

21    MAKE A DECISION TO INVEST OR NOT TO INVEST; IS THAT

22    CORRECT?

23    A.   CHECK WHAT OUT.

24    Q.   CHECK OUT INFORMATION YOU DEEM TO BE IMPORTANT

25    BEFORE MAKING A DECISION TO INVEST IN THE COMPANY?

1    A.   FOR A STARTUP ALL, I CAN CHECK IS TO VERIFY

2    THE MARKET AND YOU CAN ONLY READ THE MARKET.  THEN

3    THE PEOPLE.  BECAUSE NOTHING ELSE HAS HAPPENED

4    THESE ARE STARTUPS THAT I SPEND MY LIFE READING.

5    Q.   YOU HAVE, BUT IN TERMS OF YOUR VERSION OF WHAT

6    IS DUE DILIGENCE YOU DO CONSIDER CHECKING

7    STATEMENTS OR REPRESENTATIONS MADE BY THE COMPANY

8    THAT YOU ARE INVESTIGATING, YOU WANT TO MAKE SURE

9    THOSE ARE TRUTHFUL AND ACCURATE; IS THAT CORRECT?

10   A.   IF I MAY, I DO NOT WISH TO BE UNDER VALUED

11   WITH MY WORK.  MY PASSION IS HELPING ENTREPRENEUR

12   IN THEIR STARTUP.  SO I ALWAYS APPROACH A YOUNG

13   PERSON OR YOUNG TEAM WHO APPROACH ME.  I ALWAYS

14   APPROACH THEM WITH SYMPATHY AND APPRECIATION IT'S

15   THE BETTER WAY TO LIVE A LIFE.

16          SO WHEN THESE YOUNG FOLKS COME IN CAME TO

17   ME WITH THEIR DREAM.  THE MAJORITY OF THEM IS THEIR

18   PLAN, THAT'S WHY IT'S CALLED BUSINESS PLAN.  AND

19   YOU CAN ONLY VERIFY THESE PEOPLE'S CAPABILITY AND

20   YOU READ THE MARKET.

21          IF FIVE YEARS AGO, TEN YEARS AGO PEOPLE

22   ASK YOU TO STUDY GOOGLE.  TEN YEARS AGO PEOPLE ASK

23   YOU TO REVIEW FACEBOOK OR SOCIAL NETWORK YOU HAVE

24   NO IDEA SOCIAL NETWORK WOULD BE THIS BIG.  THAT'S

25   MY LINE OF BUSINESS.

1      SO MY TIME IS SPENT DEVOTED TO THE

2   CONTENT OF THE THEIR IDEAS.  AND THE PEOPLE, THAT'S

3   WHAT I DO.

4   Q.   NOW, BUT IF THEY -- IF THE COMPANY IS MAKING A

5   REPRESENTATION, SO FOR EXAMPLE IT'S TAKE FACE BOOK.

6   FACEBOOK BEFORE IT BECAME AS BIG AS IT IS NOW, IF

7   FACEBOOK WAS TELLING YOU INVEST IN US WE HAVE

8   500,000 USERS IN THE BAY AREA, THAT NUMBER OF USERS

9   WOULD BE AN IMPORTANT FACTOR IN DETERMINING WHETHER

10  OR NOT TO INVEST OR NOT INVEST IN FACEBOOK; IS THAT

11  CORRECT?

12  A.   YES.

13  Q.   AND YOU WOULD WANT TO MAKE SURE THAT NUMBER IS

14  ACCURATE AND TRUTHFUL; IS THAT CORRECT?

15  A.   IN REALITY, THESE ARE ACTUAL CASES.  REMEMBER

16  THE DOT COM BUBBLE.  THE DOT COM BUBBLE WERE

17  FIGHTING INVESTORS TO GET THE DOT COM DEALS.  THEY

18  WERE ALL WRONG AND I WAS STUPID ENOUGH TO HAVE MADE

19  THE SIMILAR MISTAKES AS WELL.

20      THERE ARE TIMES YOU RECEIVE AN OFFER AN

21  ENTREPRENEUR WILL TELL YOU HEY EITHER IT'S CALLED

22  COME TO PLAY.  COME AND JOIN.  AND YES, THEY GIVE

23  YOU SOME DOCUMENT THAT THERE'S ALWAYS TIME.

24      SO MOST CASES WE TRY TO DO DUE DILIGENCE

25  THE BEST OF OUR ABILITY.  BUT A LOT OF TIMES WE

1    CANNOT BECAUSE OF COMPETITION.  IT'S NOT LIKE I SIT

2    HERE I CAN PICK AND CHOOSE I SAY YOU ARE NO GOOD,

3    YOU ARE NO GOOD.  I'M JUST A VERY SMALL INVESTOR.

4    Q.   SO WHAT YOU ARE SAYING IF I HEARD YOU

5    CORRECTLY IS THAT WHAT YOU WANT TO DO IS TO WEIGH

6    THE HOW CAREFUL YOU ARE WITH THE RISK, THAT IS TO

7    SAY WITH THE POSSIBLE REWARD.

8         IF IT'S A VERY, VERY, VERY HIGH REWARD

9    YOU'RE WILLING TO TAKE A LOT MORE RISK; IS THAT

10   CORRECT?

11   A.   YEAH, THAT'S WHAT VENTURE INVESTMENT IS, YES.

12   Q.   SO THAT IF YOU FEEL FOR EXAMPLE LIKE WITH

13   FACEBOOK IF YOU FEEL THERE ARE SEVERAL THOUSAND

14   OTHER VENTURE CAPITAL COMPANIES WANTING TO INVEST

15   IN THAT YOU MIGHT NOT CARE AS MUCH ABOUT WHETHER OR

16   NOT THE NUMBERS THAT YOU ARE GETTING FROM FACEBOOK

17   WERE ACCURATE.  YOU MIGHT WANT TO JUST SIMPLY BEAT

18   YOUR COMPETITION IN TERMS OF BEING FIRST THROUGH

19   THE DOOR?

20   A.   I BEG TO DIFFER.  WE ARE TALKING ABOUT REAL

21   INVESTMENT, WE ARE NOT DEALING WITH A SWINDLING

22   THEM.

23   Q.   I'M TALKING ABOUT WHAT YOU DO IN TERMS OF DUE

24   DILIGENCE, THAT'S ALL I'M TALKING ABOUT.

25   A.   WHEN I HAVE BEEN GIVEN GOOD OPPORTUNITIES SO

1    FAR, I HAVE BEEN CORRECT AS YOU ALLUDED TO.  SO FAR

2    I HAVE BEEN FORTUNATE ENOUGH TO HAVE SOME CORRECT

3    INVESTMENT.  AT THE SAME TIME I HAVE A LOST FAILURE

4    AS WELL ALL BASICALLY ALONG THAT LINE, YES.

5    Q.    OKAY.  BUT IT IS A RISK AND REWARD KIND OF

6    BALANCING; IS THAT CORRECT?

7    A.    RISK AND REWARD, YES.

8    Q.    AT THE TIME YOU INVESTED WITH THE ASENQUA BETA

9    FUND, THERE WERE A LOT OF OTHER HEDGE FUNDS OUT

10   THERE IN 2004, 2005 PERIOD?

11   A.    I THINK SO, YEAH.

12   Q.    WELL, IN FACT YOU YOURSELF HAD INVESTED IN

13   HEDGE FUNDS BEFORE, RIGHT?

14   A.    AROUND THE SAME TIME, YEAH.

15   Q.    BUT YOU DID SOME SHOPPING AROUND BEFORE YOU

16   MADE YOUR INVESTMENT?

17   A.    THAT'S A SPECULATION, NO, I DID NOT SHOP

18   AROUND.  MR. HU APPROACHED ME.

19   Q.    BUT YOU WERE AWARE THERE WERE OTHER HEDGE

20   FUNDS OUT THERE?

21   A.    IT'S CALLED ALTERNATIVE, YES.

22   Q.    SO YOU KNEW MR. HU DID NOT HAVE THE ONLY HEDGE

23   FUND IN THE UNITED STATES AT THAT TIME; IS THAT

24   CORRECT?

25   A.    CORRECT.

1          THE COURT:  IS THIS A GOOD TIME FOR A

2     BREAK?

3          MR. FONG:  SURE.

4          THE COURT:  IS THIS ALL RIGHT?

5          MR. FONG:  SURE.

6          THE COURT:  WE WILL BE IN RECESS FOR

7     15 MINUTES.

8          (WHEREUPON A RECESS WAS TAKEN.)

9          (WHEREUPON, THE FOLLOWING PROCEEDINGS

10    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

11         MR. LUCEY:  YOUR HONOR, JUST BEFORE WE

12    CONTINUE WITH MR. FONG'S CROSS-EXAMINATION OF

13    MR. LIN OUTSIDE THE PRESENCE OF THE JURY, I WANTED

14    TO RAISE AN ISSUE, TWO ISSUES REALLY.

15         ONE IS THAT MR. FONG HAS SPENT A GOOD BIT

16    OF TIME ON HIS CROSS SO FAR TALKING ABOUT THE

17    VENTURE CAPITAL OF MR. LIN.

18         THERE WAS A BASIS TO ASK THE QUESTIONS,

19    BUT I THINK MR. LIN HAS NOW ANSWERED THEM IN A WAY

20    THAT I THINK FURTHER QUESTIONING ON THE TOPIC IS

21    PROBATIVE TO THE HEDGE FUND HE INVESTED IN.  SO WE

22    RAISE THAT AS A CONCERN ON OUR PART.

23         MR. FAZIOLI:  AND BASED ON OUR INITIAL

24    REVIEW OF THE DEFENDANT'S EXHIBITS IS THAT A LOT OF

25    THEM REFER TO VENTURE CAPITAL DEALS THAT MR. LIN

153

1    WAS INVOLVED IN WHICH MAKE IT APPEAR AS IF THE

2    FIRMS HE WAS WITH NETTED A GREAT DEAL OF MONEY, AT

3    LEAST WHAT WE CAN TELL FROM THE DOCUMENTS.

4             OUR CONCERN IS, AND THIS IS SOMEWHAT

5    RELATED TO THE MOTION IN LIMINE WE FILED REGARDING

6    REFERENCES TO THE NET WORTH OF THE VICTIMS, IS THAT

7    IF WE ARE HAVING DISCUSSIONS ABOUT THE VENTURE

8    CAPITAL WE VIEW IS SOMEWHAT DISTINCT FROM INVESTING

9    IN A HEDGE FUND, WHETHER THE ADDITIONAL QUESTIONING

10   OR DISCUSSIONS ABOUT PARTICULAR VENTURE CAPITAL

11   DEALS THAT THE DEFENDANT, THAT THIS VICTIM MR. LIN

12   WAS INVOLVED IN WOULD EFFECTIVELY SERVE AS A PROXY

13   FOR SIGNALLING TO THE JURY THAT HE IS A PERSON OF

14   HIGH NET WORTH WHICH COULD BE PREJUDICIAL IN TERMS

15   OF MAKING HIM SEEM SOMEWHAT UNSYMPATHETIC IF

16   SOMEONE FELT THAT WAY ON THE JURY, AND IT WOULDN'T

17   BE PARTICULARLY PROBATIVE IN TERMS OF HIS NET

18   WORTH.

19            MR. FAZIOLI:  THE QUESTIONS MAY BE NOT

20   PROBATIVE TO THE NET WORTH AND IT MAY NOT BE

21   TERRIBLY PROBATIVE TO THE QUESTION OF NET WORTH.

22            THE COURT:  I SORT OF GATHERED THE

23   CROSS-EXAMINATION TO BE DIRECTED PRIMARILY AT WHAT

24   ONE LOOKS AT WHEN ONE DECIDES TO MAKE AN

25   INVESTMENT.  AND WHETHER IF THE COMPANY IN WHICH

1    YOU ARE TO MAKE AN INVESTMENT WHETHER IT BE A STOCK

2    OR STARTUP OR HEDGE FUND, DO YOU INVESTIGATE THE

3    FACTS SUPPORTING WHATEVER STATEMENT MAY HAVE BEEN

4    MADE TO YOU IN THE DOCUMENTS.

5              I WOULD AGREE THE AMOUNT OF MONEY MR. LIN

6    MADE OR DIDN'T MAKE REALLY ISN'T RELEVANT TO THAT

7    INQIRY BUT THAT'S NOT WHAT I WAS THINKING THE

8    CROSS WAS SO FAR.

9              MR. FONG:  YOUR HONOR, I HAVE NO

10   INTENTION OF ASKING MR. LIN ABOUT HIS NET WORTH.

11   BUT IN TERMS OF WHETHER OR NOT HE'S TESTIFIED THAT

12   HE'S HAD SUCCESS AND SOME FAILURES, I WANT TO

13   INQUIRE ABOUT SORT OF WHICH ONES WERE SUCCESSFUL,

14   YOU KNOW, TO GET TO FLESH OUT THE STORY.  BUT I'M

15   NOT GOING TO ASK HIM HOW MUCH HE MADE.

16             THE COURT:  WHAT'S THE POINTS YOU WANT TO

17   MAKE?

18             MR. FONG:  MY POINT, YOUR HONOR, IS THAT

19   HE IS -- HE IS A VERY SUCCESSFUL AND REPUTABLE

20   INVESTMENT GURU.  AND TO OBVIOUSLY, TO HIS SUCCESS,

21   NOT IN TERMS OF HOW MUCH HE EARNED BUT IN TERMS OF

22   HIM HAVING SUCCESSFULLY INVESTED IN A PARTICULAR

23   COMPANY IS RELEVANT IN TERMS OF HIS REPUTATION OF

24   WHAT HE HAS DONE.

25             THE COURT:  I'M JUST NOT SURE WHERE --

1    WHAT YOU ARE GOING TO GO INTO BEYOND WHAT YOU HAVE

2    COVERED.

3              I MEAN, IF YOU ARE ASKING HIM DID HE LOOK

4    AT OR CHECK OUT THE ACCURACY OF CERTAIN

5    REPRESENTATIONS THAT WERE MADE TO HIM OR CERTAIN

6    STATEMENTS THAT WERE MADE IN LITERATURE PERTAINING

7    TO AN INVESTMENT HE MADE, THAT'S ONE THING.  IF YOU

8    ARE ASKING HIM SOMETHING ELSE, THAT'S A DIFFERENT

9    QUESTION.

10             MR. FONG:  WELL, YOUR HONOR, I THINK IT

11   HAS TO DO WITH WHAT IS MATERIAL TO MR. LIN AND HIS

12   EXPERTISE OR THE LACK OF IS IMPORTANT IN TERMS OF

13   FLESHING OUT WHAT IS MATERIAL AND WHAT IS NOT, WHAT

14   HE CONSIDERS --

15             THE COURT:  MATERIAL IS SUBJECTIVE OR

16   OBJECTIVE?

17             MR. FONG:  IN TERMS OF THE TARGET

18   AUDIENCE FOR THIS PARTICULAR INVESTMENT AND THAT'S

19   WHERE THE NEDER CASE COMES IN YOUR HONOR, IT'S NOT

20   JUST AN OBJECTIVE STANDARD, HOWEVER IT IS OBJECTIVE

21   AS TO YOUR TARGET IN TERMS OF TO WHOM YOU ARE

22   MAKING THESE REPRESENTATIONS IN TERMS OF WHAT IS

23   MATERIAL TO ONE PERSON MAY NOT BE MATERIAL TO

24   ANOTHER PERSON.

25             THE COURT:  WHAT I'M GETTING AT IS --

1    LET'S TAKE A BANK.  IS THE QUESTION AS TO WHETHER

2    IT'S MATERIAL, WHETHER IT WOULD BE REPORTED TO

3    SOMEONE IN THE BANKING INDUSTRY OR WOULD THE

4    QUESTION BE MATERIAL TO THIS PARTICULAR BANK?

5            MR. FONG:  OR TO THE BANKING INDUSTRY

6    BECAUSE WHICH IN THIS CASE WOULD BE VERY, VERY HIGH

7    POWER, HIGH NET WORTH INDIVIDUALS WHO ARE

8    SOPHISTICATED, SOPHISTICATED INVESTORS.

9            BECAUSE OBVIOUSLY SOMETHING THAT'S

10   IMPORTANT TO A BANK MAY HAVE NO RELEVANCE

11   WHATSOEVER TO A PERSON ON THE STREET.

12           THE COURT:  YOU'RE NOT GETTING MY POINT,

13   I DON'T THINK.

14           IS THE QUESTION AS TO WHETHER SOMETHING

15   IS A MATERIAL OBJECTIVE STANDARD THAT APPLIES TO

16   THE CLASS OF THE AUDIENCE, THE CLASS OF PEOPLE TO

17   WHOM THE INVESTMENT OR THE REPRESENTATION IS BEING

18   MADE OR IS THE SUBJECTIVE MATERIALITY TO THAT

19   PARTICULAR PERSON.

20           MR. FONG:  I BELIEVE IT'S OBJECTIVE

21   WITHIN THAT GROUP OF TARGETED INVESTORS.

22           THE COURT:  IF THAT'S THE CASE, THEN HOW

23   MUCH RELEVANCE IS MATERIAL TO MR. LIN HIMSELF?

24           MR. FONG:  WELL, MR. LIN WOULD -- MR. LIN

25   CAN DECIDE FOR HIMSELF WHAT IS MATERIAL AND WHAT IS

1    NOT.  AND WHAT HE RELIED ON.

2              THE COURT:  RIGHT.

3              MR. FONG:  AND IT IS -- IT IS AN

4    OBJECTIVE STANDARD BUT IT'S OBJECTIVE STANDARD

5    INFLUENCED BY THE PERSON HE IS.  SO THAT AN

6    OBJECTIVE PERSON LOOKING AT THIS IS WHAT MR. LIN

7    HEARD, WOULD MR. LIN BE INFLUENCED BY THIS.

8              THE COURT:  IT WOULD BE AN OBJECTIVE

9    STANDARD FOR THOSE PEOPLE THAT WERE CONSIDERING

10   INVESTMENTS IN A FUND LIKE THE FUND HERE EITHER

11   THAT FIRESIDE OR -- I DON'T KNOW HOW YOU PRONOUNCE

12   IT.

13             MR. FONG:  ASENQUA.

14             THE COURT:  THE CLASS OF PERSONS WHO

15   WOULD INVEST IN SUCH A FUND, RIGHT?

16             MR. FONG:  RIGHT.  AND YOUR HONOR, WE ARE

17   TALKING ABOUT TWO THINGS.

18             THE COURT:  LET'S GET TO THE POINT.

19   BECAUSE I DON'T WANT TO HOLD UP THE JURY.

20             MR. FONG:  SURE.

21             THE COURT:  WHAT IS IT THAT YOU WANT TO

22   TRY TO ESTABLISH WITH MR. LIN THAT YOU HAVEN'T

23   ESTABLISHED?

24             MR. FONG:  WELL, I DO WANT TO FLESH OUT A

25   LITTLE BIT MORE IN TERMS OF HIS BACKGROUND BECAUSE

1   I DON'T BELIEVE THAT HE HAS BEEN COMPLETELY

2   FORTHCOMING IN TERMS OF WHAT HE HAS DONE.

3          THE COURT:  I DON'T HAVE A PROBLEM WITH

4   HIS BACKGROUND.  WHAT ELSE?

5          MR. FONG:  WELL, AND THEN I WILL GET INTO

6   THE SPECIFIC MISREPRESENTATIONS.

7          THE COURT:  THAT'S FINE.  I MEAN IN THE

8   AREA THAT THE GOVERNMENT IS CONCERNED ABOUT.

9          MR. FONG:  I'M NOT SURE THERE'S A

10  SIGNIFICANT DISAGREEMENT.  I'M NOT GOING TO GET

11  INTO HIS NET FORTH.

12         THE COURT:  WE WILL GO AND I WILL STEP IN

13  IF I THINK YOU ARE GETTING TOO FAR AFIELD.

14         MR. FONG:  ALL RIGHT.

15         MR. FAZIOLI:  THANK YOU, YOUR HONOR.

16         MR. LUCEY:  THANK YOU, YOUR HONOR.

17         THE COURT:  OKAY.

18         (WHEREUPON, THE FOLLOWING PROCEEDINGS

19  WERE HELD IN THE PRESENCE OF THE JURY:)

20         THE CLERK:  PLEASE BE SEATED.

21         THE COURT:  ALL RIGHT.

22         MR. FONG, YOU MAY CONTINUE.

23         MR. FONG:  THANK YOU.

24

25         **CROSS-EXAMINATION BY MR. FONG (CONT.)**

1

2     BY MR. FONG:

3     Q.   GOOD MORNING AGAIN MR. LIN, OR ALMOST NOON.

4     A.   GOOD MORNING, AGAIN.

5              THE COURT:  IT'S AFTERNOON, BUT THAT'S

6     ALL RIGHT.

7     Q.   LET ME SHOW YOU A DOCUMENT THAT'S BEEN

8     PREMARKED AS DEFENDANT'S EXHIBIT 16, MR. LIN.  IT'S

9     A TWO-PAGE DOCUMENT AND I WILL JUST LET YOU HAVE AN

10    OPPORTUNITY TAKE A LOOK AT IT, SIR?

11    A.   YES.

12    Q.   HAVE YOU SEEN THIS DOCUMENT BEFORE?

13    A.   YES, I HAVE.

14    Q.   OKAY.  AND I'M SORRY, IF I INTERRUPT YOU

15    PLEASE JUST LET ME KNOW, I APOLOGIZE.

16              NOW, WHAT IS YOUR UNDERSTANDING OF WHAT

17    THIS DOCUMENT IS?

18    A.   THIS IS AN ANNUAL CONFERENCE BOOKLET FROM

19    MONTE JADE.

20    Q.   CAN YOU TELL US WHAT'S MONTE JADE?

21    A.   MONTE JADE IS A CHINESE AMERICAN HIGH-TECH

22    BUSINESS ASSOCIATION.

23    Q.   HAVE YOU EVER BEEN AFFILIATED WITH MONTE JADE?

24    A.   YES, I WAS A MEMBER AND BOARD MEMBER AND

25    CHAIRMAN.

1    Q.   OKAY.  AND LET ME DIRECT YOUR ATTENTION TO THE

2    SECOND PAGE OF EXHIBIT 16; DO YOU SEE THAT, SIR?

3    A.   YES.

4    Q.   AND CAN YOU TELL US AGAIN IN GENERAL WHAT THAT

5    IS?

6    A.   IT IS AN OPENING STATEMENT FROM THE CHAIRMAN

7    AT THE TIME I SERVED AS A CHAIRMAN.

8    Q.   SO THE SECOND PAGE IS A STATEMENT BY YOU AS

9    THE CHAIRMAN OF THIS ORGANIZATION MONTE JADE; IS

10   THAT CORRECT?

11   A.   YES.

12   Q.   AS PART OF THE 2000 ANNUAL CONFERENCE FOR THAT

13   ORGANIZATION; IS THAT CORRECT?

14   A.   CORRECT.

15   Q.   OKAY.

16           MR. FONG:  YOUR HONOR, I WOULD MOVE --

17   MOVE INTO EVIDENCE EXHIBIT 16 PLEASE.

18           MR. LUCEY:  NO OBJECTION, YOUR HONOR.

19           THE COURT:  OKAY.  IT WILL BE RECEIVED.

20   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 16 HAVING

21   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

22   ADMITTED INTO EVIDENCE.)

23           MR. FONG:  I APOLOGIZE, HERE'S YOUR COPY.

24           THE WITNESS:  THANK YOU.

25   Q.   AND MR. LIN, FIRST OF ALL, DO YOU SEE PAGE TWO

1     OF EXHIBIT 16?

2     A.   YES.

3     Q.   OKAY.  AND THIS IS A PHOTOGRAPH OF YOU IN THE

4     UPPER LEFT-HAND CORNER ON PAGE TWO; IS THAT

5     CORRECT?

6     A.   CORRECT.

7     Q.   OKAY.  AND YOU'RE IDENTIFIED BY THE NAME BOB

8     FU-YUAN LIN; IS THAT CORRECT?

9     A.   YES.

10    Q.   AND THEN BELOW THAT THERE ARE THREE LINES,

11    WHAT I GATHER TO BE YOUR PROFESSIONAL

12    QUALIFICATIONS; IS THAT CORRECT?

13    A.   AT THAT TIME THOSE WERE SOME OF THE TITLES I

14    USED, YES.

15    Q.   COULD YOU READ THE FIRST ONE FOR US?

16    A.   FOUNDER MULTI-DIMENSIONAL VENTURE PARTNERS.

17    Q.   CAN YOU TELL US WHAT THE MULTI DIMENSIONAL

18    VENTURES ARE?

19    A.   IT'S IT IS ANGEL GROUP JUST A PARTNERSHIP, ME

20    AND SOME FRIENDS WE HELP ENTREPRENEUR.

21    Q.   OKAY.  WHEN WAS THAT STARTED?

22    A.   THIS WAS STARTED AROUND MID-2000, I THINK.

23    MID-2000, YEAH.

24    Q.   THE NEXT LINE, CAN YOU READ THAT?

25    A.   MANAGING PARTNER ASENQUA VENTURES.

1    Q.   OKAY.  THIS WOULD BE ASENQUA VENTURES THAT IS

2    AN ENTITY AFFILIATED WITH MR. ALBERT HU, CORRECT?

3    A.   SUPPOSEDLY, YES.

4    Q.   YOU SAID SUPPOSEDLY.  YOU KNOW THAT, RIGHT?

5    A.   YEAH.  I KNEW IT IS, YEAH.

6    Q.   NOW, BY THE WAY, HOW MANY PEOPLE WAS THIS

7    DISTRIBUTED TO, THIS CHAIRMAN'S MESSAGE THAT YOU

8    KNOW?

9    A.   IT'S TO THE MEMBERS.  I DON'T KNOW HOW MANY.

10   Q.   HOW MANY MEMBERS DO YOU RECALL APPROXIMATELY

11   HOW MANY MEMBERS WERE PART OF THE MONTE JADE

12   ASSOCIATION?

13   A.   SEVERAL THOUSAND.

14   Q.   OKAY.  SO THIS WAS SENT TO SEVERAL THOUSAND

15   INDIVIDUALS, RIGHT?

16   A.   YES.

17   Q.   AND THESE WERE ALL -- THESE WERE ALL

18   PROFESSIONAL PEOPLE WHO ARE IN THE HIGH-TECH

19   INDUSTRY, RIGHT?

20   A.   CORRECT.

21   Q.   OKAY.  AND SO YOU WERE IDENTIFYING YOURSELF AS

22   THE MANAGING PARTNER OF ASENQUA AS FAR AS FOUNDER

23   OF MULTI DIMENSIONAL VENTURE PARTNERS; IS THAT

24   CORRECT?

25   A.   CORRECT.

1    Q.   THEN YOU ALSO IDENTIFIED YOURSELF AS THE

2    CO-FOUNDER OF ACORN CAMPUS; IS THAT CORRECT?

3    A.   CORRECT.

4    Q.   AND TELL US WHAT IS ACORN CAMPUS?

5    A.   ACORN CAMPUS IS AN INCUBATOR VENTURE FUND

6    FOUNDED BY ME AND THREE OTHER PARTNERS.

7    Q.   AND WHEN DID ACORN VENTURE CAMPUS, WHEN DID

8    THAT START?

9    A.   2000.

10   Q.   THEN THE MESSAGE YOU HAD FOR THE MEMBERS OF

11   THE MONTE JADE WAS WELCOME TO THE CONFERENCE, THE

12   ANNUAL CONFERENCE KIND OF MESSAGE?

13   A.   I BELIEVE IT'S TO ENCOURAGE THEM FOR LOOK

14   FORWARD TO A MORE PROSPEROUS AND HAPPIER WORLD.

15   Q.   AND THAT WOULD BE IN LINE WITH YOUR

16   PHILOSOPHY?

17   A.   I WOULDN'T CALL IT PHILOSOPHY, JUST SOMETHING

18   I WROTE.

19   Q.   BUT THAT WAS YOUR BELIEF?

20   A.   YES.

21   Q.   NOW, THEN DO YOU SEE THAT LINE OVER HERE

22   TOWARD THE BOTTOM OF THE PAGE TWO OF EXHIBIT 16,

23   MR. LIN?

24   A.   UH-HUH.

25   Q.   I'M SORRY IS THAT A YES?

1    A.   I'M SORRY, PLEASE.  ASK THE QUESTION AGAIN.

2    Q.   DO YOU SEE THIS LINE HERE ABOVE THE LOWER

3    THIRD OR LOWER FOURTH OF PAGE 2?

4    A.   OKAY, YES.

5    Q.   OKAY.  NOW, CAN YOU READ THE FIRST SENTENCE

6    FOR ME?

7    A.   UNDER THE LINE?

8    Q.   YES.

9    A.   BOB LIN IS THE FOUNDER OF MULTI DIMENSIONAL

10   VENTURE PARTNERS, AN ANGEL VENTURE GROUP IN SILICON

11   VALLEY AND ASIA AND THE COFOUNDER OF CAPITAL

12   MULTIPLIER INTERNATIONAL, AN AUTOMATED FOREX

13   INVESTMENT FLAT FORM COMPANY, HE SERVES AS THE

14   MANAGING PARTNER OF ASENQUA VENTURE.  HE ALSO

15   COFOUNDED AND SERVED AS THE GENERAL PARTNER OF IT'S

16   CORN CAMPUS FUND 1 AND 2 AND ACORN ANGELS.

17        BOB HAS MORE THAN 25 YEARS OF ANGELS AND

18   VENTURE INVESTMENT EXPERTISE WITH MULTIPLE IPO'S

19   AND A LONG HISTORY OF ENTREPRENEURIAL STARTUP

20   INTERNATIONAL BUSINESS MARKETING AND MANAGEMENT

21   EXPERIENCES.

22   Q.   THANK YOU.

23        NOW LET ME JUST FOCUS ON SOME OF THE

24   PARTICULARS THERE.  FIRST OF ALL, IPO IS INITIAL

25   PUBLIC OFFERING; IS THAT CORRECT?

1    A.   CORRECT.

2    Q.   AND WHAT IS INITIAL PUBLIC OFFERING WITH THOSE

3    OF US WHO ARE NOT SOPHISTICATED IN FINANCES?

4    A.   A RECENT EXAMPLE WOULD BE A FACEBOOK.

5    Q.   I'M SORRY?

6    A.   WHICH BECOME LISTED ON THE PUBLIC MARKET.

7    Q.   SO THAT'S WHEN A PRIVATE STARTUP COMPANY

8    BECOMES A PUBLIC TRADING COMPANY; IS THAT CORRECT?

9    A.   YES, YES.

10   Q.   SO NOW?

11   Q.   BY THE WAY THIS SECTION ON BELOW THE LINE ON

12   PAGE TWO, NOW THAT'S INFORMATION YOU WROTE TO

13   ACCOMPANY YOUR MESSAGE; IS THAT CORRECT?

14   A.   CORRECT.

15   Q.   OKAY.  SO EVERYTHING THERE IS ACCURATE AND

16   TRUTHFUL TO THE BEST OF YOUR UNDERSTANDING CORRECT?

17   A.   YES.

18   Q.   SECOND PARAGRAPH WHY DON'T YOU READ IT FOR US?

19   A.   CAN YOU MOVE A LITTLE BIT?

20   Q.   I'M SORRY YOU COULD READ IT IF YOU WANT --

21   A.   ACTUALLY IT'S LARGER.

22   Q.   BOB SERVE ON THE BOARD, PRESENTLY AND IN THE

23   PAST OF PINE PHOTONICS, MONTE JADE TECHNOLOGIES,

24   GREATLAND ELECTRONICS, SANTRUM NETWORKS AND LUXNET

25   OF TAIWAN AND EPIN TECHNOLOGIES AND HENBANG OF

1    CHINA. THEY ARE SOME OF THIGH PORTFOLIOS.

2    Q.   THEN THE THIRD PARAGRAPH?

3    A.   BOB IS THE AUTHOR OF THREE TOP SELLING BOOKS

4    IN ASIA, FIND YOUR WAY TO SUCCESS AND HAPPINESS,

5    CREATING VALUE TO DIFFERENTIATE, AND BUILD YOUR

6    CAREER FROM WHERE YOU ARE. HE IS WORKING ON THE

7    FOURTH BOOK, IT IS EASY TO BE SUPER HAPPY.

8    Q.   AND I GATHER THIS WAS WRITTEN AROUND THE TIME

9    OF THE 2007 CONFERENCE SO THAT IT WOULD HAVE BEEN

10   AROUND 2007, RIGHT.

11   A.   YES.

12   Q.   DID YOU EVER PUBLISH THE FOURTH BOOK?

13   A.   YES, I DID.

14   Q.   GOOD.

15   Q.   THE LAST LINE, PLEASE READ.

16   A.   BOB HOLDING MSEE FROM UNIVERSITY OF CAL AT

17   SANTA BARBARA. HE HAS BEEN VERY ACTIVE IN

18   COMMUNITY SERVICES.

19   Q.   I'M GOING TO SHOW MR. LIN WHAT'S PREMARKED AS

20   DEFENDANT'S EXHIBIT 18.

21        FIRST OF ALL MR. LIN, AND I WANT TO GIVE

22   YOU AN OPPORTUNITY OF COURSE TO READ THAT. BUT

23   FIRST OF ALL DO YOU SEE THAT ONE-PAGE DOCUMENT HAS

24   BEEN MARKED AS DEFENDANT'S EXHIBIT NUMBER 18?

25   A.   YES.

1   Q.   OKAY.  AND THAT'S A ONE PAGE DOCUMENT; IS THAT

2   RIGHT?

3   A.   YES.

4   Q.   NOW DO YOU RECOGNIZE THAT DOCUMENT?

5   A.   IT IS FOR A CONFERENCE HELD BY NUS NATIONAL

6   UNIVERSITY OF SINGAPORE, I WAS INVITED TO GIVE

7   TALKS.

8   Q.   ALL RIGHT.  AND WHEN WAS THIS CONFERENCE, IF

9   YOU REMEMBER?

10  A.   SOMETIME IN 2006 I BELIEVE.

11  Q.   ALL RIGHT.  WHAT IS THE NATIONAL UNIVERSITY OF

12  SINGAPORE TO THE BEST OF YOUR UNDERSTANDING AND

13  KNOWLEDGE?

14  A.   IT WAS ONE OF THE LARGEST UNIVERSITY IN

15  SINGAPORE.

16  Q.   ALL RIGHT.  AND WHAT IS THE TOPIC OF THIS TALK

17  THAT YOU WERE SUPPOSED TO GIVE?

18  A.   ENTREPRENEURSHIP.

19  Q.   AND IT WAS GLOBAL ENTREPRENEURSHIP; IS THAT

20  CORRECT?

21  A.   YES.

22  Q.   OKAY.

23          MR. FONG:  YOUR HONOR, I WOULD MOVE INTO

24  EVIDENCE DEFENSE'S EXHIBIT NUMBER 18.

25          MR. LUCEY:  YOUR HONOR, WE WOULD OBJECT

1    AT THIS POINT.

2              THE COURT:  I'M NOT SURE THAT I SEE THE

3    RELEVANCE OF THE STATEMENTS IN THE DOCUMENT.

4              MR. FONG:  MAY I --

5              THE COURT:  WE WILL TAKE IT UP --

6              MR. FONG:  I'M SORRY.

7              THE COURT:  WE WILL TAKE IT UP LATER SO

8    WE DON'T TAKE JURY TIME TO DISCUSS IT.

9              MR. FONG:  ALL RIGHT.

10   Q.   NOW, MR. LIN, IN THIS DOCUMENT, THERE'S A

11   BIOGRAPHY SECTION FOR YOU RIGHT?

12   A.   YES.

13   Q.   AND IN THAT BIOGRAPHY SECTION IT SAYS THAT

14   PART OF WHAT YOU WERE DOING IN 2006 WAS ADVISING

15   ASENQUA VENTURE FUND IN SILICON VALLEY; IS THAT

16   CORRECT?

17   A.   VENTURE, YES.

18   Q.   OKAY.  SO IN 2006 YOU WERE INVOLVED WITH AN

19   ASENQUA VENTURE FUND?

20   A.   YES.

21   Q.   OKAY.  AND YOU FELT THAT IT WAS IMPORTANT

22   ENOUGH TO PUT THAT IN YOUR BIOGRAPHY OF THIS TALK

23   THAT YOU WERE GIVING TO ONE OF THE BIGGEST

24   UNIVERSITIES IN SINGAPORE?

25   A.    IN FACT, AT THAT TIME I WAS VERY PROUD TO BE

1    ASSOCIATED WITH ALBERT HU I TRUST HIM VERY MUCH.

2    Q.   OKAY.  DO YOU REMEMBER WHEN IN 2006 THIS

3    SUMMIT TOOK PLACE?

4    A.   I DON'T REMEMBER THE EXACT TIME.

5    Q.   OKAY.  BUT YOU MADE YOUR FIRST INVESTMENT WITH

6    MR. HU'S ASENQUA BETA FUND IN EARLY 2005?

7    A.   YES.

8    Q.   SO THIS WOULD HAVE BEEN ABOUT AT THE VERY LEFT

9    A YEAR LATER; IS THAT CORRECT?

10   A.   CORRECT.

11   Q.   NOW, MR. LIN YOU HAD INVESTED IN A COMPANY

12   THAT JEAN MARK VERDIELL STARTED?

13   A.   1998.  LIGHT LOGIC.

14   Q.   WHAT WAS YOUR ROLE IN TERMS OF YOUR INVESTMENT

15   IN LIGHT LOGIC?

16   A.   I WAS ONE OF THE FIRST ANGEL INVESTOR.

17   Q.   OKAY.  IF YOU COULD SHARE WITH US YOUR

18   UNDERSTANDING OF THE TERM ANGEL INVESTOR?

19   A.   THE COMPANY WAS ACQUIRED I'M SORRY YOUR

20   QUESTION AGAIN.

21   Q.   IF YOU COULD SHARE WITH US YOUR UNDERSTANDING

22   OF WHAT THE TERM ANGEL INVESTOR MEANS?

23   A.   ANGEL INVESTOR MEANS AN INDIVIDUAL NOT THE

24   FUND, AN INDIVIDUAL WHO PERSONALLY INVESTS HIS OWN

25   PERSONAL MONEY INTO A COMPANY TO HELP THE COMPANY

1    LAUNCH.

2    Q.   AND THAT INVESTMENT TURNED OUT TO BE VERY

3    SUCCESSFUL; IS THAT CORRECT?

4    A.   CORRECT.

5    Q.   AND THE COMPANY WAS ACQUIRED SUBSEQUENTLY BY

6    INTEL; IS THAT CORRECT?

7    A.   CORRECT.

8    Q.   AND THE COMPANY, NOT YOU, BUT THE COMPANY WAS

9    ACQUIRED BY INTEL FOR ABOUT $400 MILLION?

10   A.   YES, CORRECT, PUBLIC RECORD.

11   Q.   AND THE PEOPLE WHO INVESTED ORIGINALLY UPON

12   WHEN INTEL ACQUIRED LIGHT LOGIC, THE PEOPLE WHO

13   INVESTED ORIGINALLY MADE ABOUT HUNDRED TIMES THEIR

14   ORIGINAL INVESTMENT?

15            THE COURT:  WE ARE GETTING OFF WHAT'S

16   REALLY RELEVANT TO THIS CASE.

17            MR. FONG:  OKAY.

18   Q.   BUT YOU WERE ONE OF THE SUCCESSFUL ORIGINAL

19   INVESTORS?

20   A.   YES.

21   Q.   OKAY.  AND YOU HAVE -- AND YOU ALSO INVESTED

22   IN ANOTHER COMPANY THAT MR. VERDIELL STARTED THAT

23   IS CORRECT?

24   A.   APERUS.

25   Q.   AND WHAT IS APERUS?

1    A.   OPTICAL SUBSYSTEM.  FIBER OPTICAL SYSTEM.

2    Q.   AND WHEN DID YOU INVEST IN THE APERUS COMPANY.

3    THAT WAS MUCH LATER, MUCH LATER?

4    Q.   WAS THAT BEFORE OR AFTER YOU MADE YOUR FIRST

5    INVESTMENT IN ASENQUA BETA?

6    A.   I BELIEVE AFTER, YES.

7    Q.   SO YOU AND MR. VERDIELL HAVE HAD A WORKING

8    RELATIONSHIP IN TERMS OF YOUR INVESTMENT FOR A GOOD

9    PART OF 10, 12 YEARS?

10   A.   HE CAME TO ME, 1998, SO THAT WAS THE FIRST

11   TIME I MET HIM.  HE WAS TRYING TO START HIS DREAM

12   AND I WAS ONE OF THE FIRST FEW WHO HELPED HIM.  SO

13   SINCE THEN, MANY YEARS.

14   Q.   AND OF COURSE YOU HAVE THROUGHOUT THE YEARS

15   YOU HAVE MAINTAINED CONTACT WITH MR. VERDIELL; IS

16   THAT CORRECT?

17   A.   CORRECT.

18   Q.   AND THE TWO OF YOU WOULD OFTEN TALK ABOUT

19   INVESTMENT STRATEGIES; IS THAT CORRECT?

20   A.   NO.  WE WOULD TALK ABOUT HIS BUSINESS, TALK

21   ABOUT EXPERIENCE OF LIGHT LOGIC, TALK ABOUT

22   EXPERIENCE OF APERUS.  NOT NECESSARILY ABOUT

23   INVESTMENT.  WE ARE PERSONAL FRIENDS.

24   Q.   I'M SORRY YOU ARE PERSONAL FRIENDS?

25   A.   PERSONAL FRIENDS, YEAH, AFTER INVESTMENT

1    BECAME PERSONNEL FRIENDS.

2    Q.   BUT THE TWO OF YOU AMONG OTHER TOPICS, YOU DID

3    TALK ABOUT INVESTMENTS, RIGHT?

4    A.   WHAT INVESTMENT, EXCUSE ME.

5    Q.   WELL JUST INVESTMENTS IN GENERAL?

6    A.   YEAH, MOSTLY VENTURE INVESTMENT BECAUSE HE'S

7    AN ENTREPRENEUR I'M ALSO AN ENTREPRENEUR, THAT'S

8    WHAT WE LIKE.

9    Q.   YOU FIRST, IT WAS YOU WHO TOLD MR. VERDIELL

10   THE ASENQUA BETA FUND; IS THAT CORRECT?

11   A.   YES.

12   Q.   IN FACT YOU INTRODUCED MR. VERDIELL TO

13   MR. ALBERT HU; IS THAT CORRECT?

14   A.   YES.  MAY I EXPLAIN?

15   Q.   SURE.

16   A.   OKAY.  MR. ALBERT HU RENTED AN OFFICE CUBICLE

17   IN A SUNNYVALE BUILDING CALLED PLUG AND PLAY.  SO

18   HE INVITE ME THERE TO MEET HIM TO REVIEW SO CALLED

19   ASENQUA VENTURE DEAL.  SO WE REVIEWED.

20        AFTER MEETING I RAN INTO JEAN MARK

21   VERDIELL WHO HAPPENS TO BUILD HIS NEW COMPANY IN

22   THE SAME BUILDING JUST A FEW CUBICS AWAY.  WE RAN

23   INTO EACH OTHER.

24        NATURALLY, I INTRODUCED TWO OF THEM TO

25   MEET EACH OTHER.  JUST HEY, I'M WORKING WITH THIS

1    GUY, HE'S PRETTY GOOD, GIVE ME GOOD RETURN, YES

2    Q.   NOW WHEN WAS IT THAT YOU INTRODUCED

3    MR. VERDIELL TO MR. HU?

4    A.   I DON'T REMEMBER WHEN THE EXACT TIME WAS.

5    THAT'S THE TIME THEY, MR. HU RENTED A SPACE IN PLUG

6    AND PLAY.

7    Q.   BUT YOU HAD ALREADY, AT THE TIME YOU HAD

8    INTRODUCED MR. VERDIELL TO MR. HU, YOU HAD ALREADY

9    INVESTED IN THE ASENQUA BETA FUND; IS THAT CORRECT?

10   A.   YES.

11   Q.   AND FOR MORE THAN A YEAR?

12   A.   I DON'T KNOW.  I DON'T REMEMBER IF IT'S MORE

13   THAN A YEAR, BUT AFTER I INVESTED, YES.

14   Q.   AND YOU KNEW THAT MR. VERDIELL TRUSTED YOUR

15   JUDGMENT AND OPINIONS AND ADVICE; IS THAT CORRECT?

16        MR. LUCEY:  OBJECTION, YOUR HONOR.  CALLS

17   FOR SPECULATION.

18        THE COURT:  I WILL ALLOW HIM TO STATE

19   HIS -- IF HE UNDERSTOOD OR FELT THAT MR. VERDIELL

20   TRUSTED HIM.  AND WHETHER HE DID OR NOT IS A

21   DIFFERENT QUESTION.

22        DID YOU THINK HE TRUSTED YOU?

23        THE WITNESS:  I THINK SO.

24   BY MR. FONG:

25   Q.   OKAY.  AND YOUR UNDERSTANDING, YOUR BELIEF IS

1    THAT MR. VERDIELL TRUSTED AND VALUED YOUR OPINIONS

2    AND JUDGMENT AND ADVICE ON INVESTMENTS; IS THAT

3    CORRECT?

4    A.   I INTRODUCED THEM AS FRIENDS JUST LIKE YOU RUN

5    INTO EACH OTHER ON THE STREET.  IF YOU DON'T WANT

6    TO AVOID THE FRIEND YOU JUST SHAKE HANDS.  THIS GUY

7    IS THAT GUY.

8    Q.   OKAY.  I UNDERSTAND THAT.  BUT MY QUESTION IS

9    A LITTLE BIT MORE GENERAL.  LET ME ASK IT AGAIN IF

10   I MAY.

11   A.   PLEASE.

12   Q.   I WILL LET YOU TAKE A DRINK OF WATER, FIRST.

13            NOW, I'M NOT REFERRING TO JUST THE

14   INTRODUCTION OF MR. HU AND MR. VERDIELL'S ADVICE

15   FIRST.

16            IN GENERAL, YOUR BELIEF IS THAT

17   MR. VERDIELL TRUSTED AND VALUED YOUR JUDGMENT AND

18   ADVICE AND I BELIEVE YOU SAID YES TO THAT, RIGHT?

19   A.   IF I MAY REPHRASE.  I SHOULD SAY WE LIKE EACH

20   OTHER AS FRIENDS.

21   Q.   I COULD ACTUALLY UNDERSTAND THAT.  BUT MY

22   QUESTION IS --

23   A.   BECAUSE I CANNOT SPEAK FOR HIM.

24   Q.   I'M JUST ASKING YOUR BELIEF?

25   A.   THAT WE LIKE EACH OTHER AS FRIENDS, YES.

1    Q.   BUT YOUR BELIEF AS TO WHETHER OR NOT YOU FELT

2    THAT HE TRUSTED AND VALUED YOUR ADVICE AND

3    JUDGMENT?

4    A.   YES.

5    Q.   OKAY.  AS TO INVESTMENTS?

6    A.   THAT I DON'T KNOW.

7    Q.   OKAY.  NOW I WANT TO SHOW YOU A DOCUMENT

8    THAT'S BEEN MARKED AS GOVERNMENT'S EXHIBIT 12.

9         IT'S A 40 PAGE DOCUMENT SO JUST TAKE A

10   MOMENT SIR AND TAKE A LOOK AT IT, IF YOU DON'T

11   MIND.

12        WHENEVER YOU ARE READY MR. LIN LET ME

13   KNOW WHEN YOU HAVE HAD A CHANCE TO LOOK AT THE

14   DOCUMENT TO SEE IF YOU RECOGNIZE THAT DOCUMENT.

15        THE COURT:  I THINK ALL HE WANTS TO TELL

16   US AT THIS POINT IS GENERALLY DO YOU RECOGNIZE THAT

17   DOCUMENT?

18        THE WITNESS:  YES.

19   BY MR. FONG:

20   Q.   OKAY.  WHAT DO YOU RECOGNIZE THAT DOCUMENT AS?

21   A.   IT'S IT IS FIRESIDE LS FUND, LLP CONFIDENTIAL

22   PRIVATE PLACEMENT MEMORANDUM.

23   Q.   NOW THIS WAS A DOCUMENT THAT WAS GIVEN TO YOU

24   AT ANY POINT?

25   A.   I DON'T RECALL.  I RECALL THE FIRESIDE

1    SUBSCRIPTION BOOKLET BUT I DON'T RECALL THIS

2    FIRESIDE LS FUND, LLP.

3    Q.   ALL RIGHT.

4         NOW DO YOU -- DID YOU GET A PRIVATE

5    PLACEMENT MEMORANDUM WHEN YOU WERE INVESTING IN THE

6    ASENQUA BETA FUND?

7    A.   I REMEMBER RECEIVING THE POWERPOINT, THE

8    BROCHURE AND THE SUBSCRIPTION BOOKLET.  I DON'T

9    REMEMBER THE PLACEMENT.

10   Q.   OKAY.  DO YOU RECALL -- SO DO YOU KNOW IF YOU

11   RECEIVED A PRIVATE PLACEMENT MEMORANDUM.

12   A.   I DO NOT REMEMBER, IT'S BEEN QUITE A FEW

13   YEARS.

14   Q.   OKAY.  NOW YOU OF COURSE KEPT DOCUMENTS THAT

15   YOU CONSIDERED TO BE IMPORTANT; IS THAT CORRECT?

16   A.   AS MUCH AS I CAN, YES.

17   Q.   OKAY.  SO YOU DON'T RECALL IF YOU HAVE SEEN

18   GOVERNMENT'S EXHIBIT 12, RIGHT?

19   A.   NO, I CANNOT REMEMBER THAT.

20   Q.   NOW YOU MENTION THAT YOU SAW A POWER POINT

21   PRESENTATION; IS THAT CORRECT?

22   A.   YES.

23   Q.   OKAY.  AND APPROXIMATELY WHEN -- THIS WAS IN

24   CONNECTION WITH MR. HU AND YOU DISCUSSING YOUR

25   DECISION TO INVEST OR NOT TO INVEST IN THE ASENQUA

1    BETA FUND; IS THAT CORRECT?

2    A.   DURING THE FIRST MEETING, YEAH, HE PRESENTED

3    THE FUNDS THROUGH A POWERPOINT, PREPRINTED THEM.

4    Q.   OKAY.  AND WAS THAT AROUND NOVEMBER 2004?

5    A.   NO, THERE WAS AN EARLIER VERSION OF ASENQUA

6    BETA FUND IN THE FIRST MEETING.  WHENEVER THE FIRST

7    MEETING TOOK PLACE, YEAH, IN MY OFFICE.

8    Q.   OKAY.  AND IN THE POWERPOINT DID YOU SEE --

9    WELL, LET ME ASK YOU, WERE THERE ANY STATEMENTS

10   ABOUT THE RETURN HISTORY, THE HISTORY OF THE

11   PERFORMANCE OF THE ASENQUA BETA FUND?

12   A.   YES, I REMEMBER THERE WERE.

13   Q.   OKAY.  AND DID YOU LOOK AT THAT, YOU SAW THAT,

14   RIGHT?

15   A.   YES.

16   Q.   OKAY.

17   A.   IT WAS PRESENTED TO ME PAGE BY PAGE.

18   Q.   OKAY.  HOW MUCH TIME DID YOU SPEND

19   APPROXIMATELY IN GOING OVER THE POWERPOINT WITH

20   MR. HU?

21   A.   A FEW HOURS IN MY OFFICE, I REMEMBER THAT.

22   Q.   AND ALSO PRESENT WAS A GENTLEMAN BY THE NAME

23   OF STEVEN BOND; IS THAT CORRECT?

24   A.   CORRECT.

25   Q.   AND YOUR UNDERSTANDING IS THAT MR. BOND WAS

1    THE ASENQUA BETA FUND MANAGER; IS THAT CORRECT?

2    A.   I DON'T KNOW IF THE WORD MANAGER WAS USED BUT

3    HE WORKS FOR ALBERT.  I DON'T KNOW IF MANAGER WAS

4    THE TITLE.

5    Q.   OKAY.  AND IN FACT, YOU GOT TO KNOW MR. BOND A

6    LITTLE BIT SUBSEQUENTLY; IS THAT CORRECT?

7    A.   YES.  THROUGH MR. HU, YES.

8    Q.   AND YOU AND MR. BOND TRAVELLED THROUGHOUT ASIA

9    ON OCCASIONS, RIGHT?

10   A.   A FEW TIMES AT THE REQUEST OF ASENQUA VENTURE,

11   YES.

12   Q.   AND YOU WERE DOING SO AS PART OF THE ASENQUA

13   VENTURE MANAGEMENT TEAM; IS THAT CORRECT?

14   A.   YES, YES, UH-HUH.

15   Q.   AND YOU AND MR. BOND WERE IN ESSENCE, TOUTING

16   THE ASENQUA VENTURE MANAGEMENT FUND WAS A GOOD

17   INVESTMENT; IS THAT CORRECT?

18   A.   ASENQUA VENTURE IS NOT AN INVESTMENT IT'S

19   ANGEL GROUP CO-INVEST:  ASENQUA IS THE

20   CO-INVESTMENT VEHICLE.

21   Q.   BUT YOU WERE TRAVELLING WITH MR. BOND TO TALK

22   ABOUT THE VIRTUES OF ASENQUA?

23   A.   I DON'T THINK I DID THAT.  I HAVE SEVERAL

24   VENTURE FUND.  MY FOCUS IS TO LOCATE GOOD STARTUP

25   AND INTRODUCE THEM TO ASENQUA VENTURE SEE IF WE CAN

1    HELP THOSE START UP, SEE IF WE CAN HELP THOSE

2    ENTREPRENEURS.

3    Q.   NOW, YOU WERE REIMBURSED BY ASENQUA FOR YOUR

4    TRAVEL FUNDS, RIGHT?

5    A.   YES.  TWO TIMES OR THREE TIMES, YES.

6    Q.   AND IN FACT ON ONE OCCASION ASENQUA PAY FOR

7    YOUR INSURANCE COPAYMENT; IS THAT CORRECT?

8    A.   I DON'T REMEMBER WHEN, THERE'S A SMALL SHORT

9    PERIOD OF TIME.  BY THE WAY, THE REIMBURSEMENT IS I

10   PAY FOR THE AIR TICKET AND THE HOTEL FIRST.  THEN

11   THEY BASED ON THE REIMBURSEMENT BECAUSE I TRAVEL TO

12   HELP THEM, YES.

13   Q.   BUT YOU DID -- YOU DO REMEMBER HAVING ASENQUA

14   PAY YOU FOR YOUR INSURANCE COPAYMENT?

15   A.   I DON'T REMEMBER FOR HOW LONG OR WHEN.

16   Q.   BUT THEY DID?

17   A.   I DON'T REMEMBER.

18   Q.   YOU DON'T REMEMBER THEY DID THAT AT ALL?

19   A.   I DON'T.  I DON'T.  AT THAT TIME I WAS ALSO

20   INSURED BY ACORN CAMPUS.

21   Q.   I'M GOING TO HAND YOU A SET OF DOCUMENTS

22   THAT'S BEEN MARKED AS DEFENDANT'S EXHIBIT 1.  THERE

23   ARE SEVEN PAGES TO EXHIBIT 1.

24   A.   OKAY.

25   Q.   HAVE YOU HAD A CHANCE TO LOOK THROUGH

1    EXHIBIT 1?

2    A.   OKAY.  I'M LOOKING AT IT NOW.

3    Q.   DO YOU RECOGNIZE THE DOCUMENTS THAT ARE, THAT

4    MAKE UP EXHIBIT 1 -- I SHOULD SAY DEFENDANT'S

5    EXHIBIT 1, I APOLOGIZE.

6    A.   OKAY.

7    Q.   DO YOU RECOGNIZE IT?

8    A.   I RECOGNIZE IT, IT'S A CHECK FOR REIMBURSEMENT

9    OR --

10   Q.   OKAY.  AND THESE ARE -- I GATHER YOU ARE

11   REFERRING TO CHECK SINGULAR BECAUSE YOU ARE LOOKING

12   AT THE FIRST PAGE, RIGHT?

13   A.   I'M LOOKING AT THE FIRST PAGE, YES.

14   Q.   I GUESS WHAT I'M ASKING YOU IS THE OTHER PAGES

15   NOW THEY CONTAIN COPIES OF CHECKS THAT WERE WRITTEN

16   DO YOU; IS THAT CORRECT?

17   A.   YEAH, REIMBURSEMENT.

18   Q.   FROM ASENQUA VENTURE MANAGEMENT; IS THAT

19   CORRECT?

20   A.   YES, YES.

21        MR. FONG:  YOUR HONOR, I WOULD MOVE

22   DEFENDANT'S EXHIBIT 1 WHICH IS SEVEN PAGES INTO

23   EVIDENCE.

24        MR. LUCEY:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  ALL RIGHT.

1           EXHIBIT 1 IS ADMITTED.  DEFENDANT'S

2     EXHIBIT 1.

3     (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 1 HAVING

4     BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

5     ADMITTED INTO EVIDENCE.)

6               MR. FONG:  YES.

7               THE COURT:  DO YOU BOTH HAVE EXHIBIT 1?

8               MR. FAZIOLI:  I THINK WE DO, YOUR HONOR.

9               THE COURT:  OKAY.  ALL RIGHT.

10    BY MR. FONG:

11    Q.   NOW MR. LIN, THE FIRST PAGE OF EXHIBIT 1, LET

12    ME PUBLISH THAT, OKAY, WE WILL GIVE IT A TRY.

13              ARE YOU ABLE TO READ YOUR COPY?

14    A.   SOMEWHAT, YES.

15    Q.   THE FIRST PAGE OF EXHIBIT 1?

16    A.   YES.

17    Q.   IS THAT A $4,306.50 CHECK?

18    A.   YES.

19    Q.   AND THAT'S PAYABLE TO YOU, RIGHT?

20    A.   YES.

21    Q.   AND THAT'S FROM ASENQUA VENTURES MANAGEMENT

22    LLC; IS THAT CORRECT?

23    A.   UH-HUH.

24    Q.   I'M SORRY IS THAT -- THAT'S FROM THE CHECK IS

25    MADE BY ASENQUA VENTURES MANAGEMENT; IS THAT

1    CORRECT?

2    A.   YES.

3    Q.   IT APPEARS TO BE DATED DECEMBER 2006, IS THAT

4    WHAT YOU SEE?

5    A.   YES, IT SAYS DECEMBER 2006.

6    Q.   OKAY.  AND THE SECOND PART OF THAT CHECK, THE

7    LOWER PART, DO YOU SEE THAT, SIR?

8    A.   YES.

9    Q.   IS THAT -- I'M POINTING TO A SIGNATURE THAT'S

10    ON THE RIGHT-HAND EDGE OF THAT THE PARTICULAR, THE

11    LOWER CHECK ON PAGE ONE OF EXHIBIT 1, DEFENDANT'S

12    EXHIBIT 1.  DO YOU SEE THAT, SIR?

13    A.   YES.

14    Q.   IS THAT YOUR SIGNATURE?

15    A.   IT IS.

16    Q.   DIRECTING YOUR ATTENTION TO A MUCH CLEARER

17    PAGE TWO OF THE DEFENDANT'S EXHIBIT 1, DO YOU SEE

18    THAT, SIR?

19    A.   YES.

20    Q.   AND THAT IS A $6,381.50 REIMBURSEMENT CHECK

21    FROM YOU TO ASENQUA MANAGEMENT?

22    A.   UH-HUH.

23    Q.   I'M SORRY IS THAT A YES?

24    A.   YES.

25          MR. LUCEY:  YOUR HONOR, I'M SORRY I THINK

1    IT SAYS ASENQUA ACORN, LLC.

2            MR. FONG:  I'M SORRY.  YES.  IT'S ASENQUA

3    ACORN LLC.

4    Q.   MR. LIN, IF I COULD DIRECT YOUR ATTENTION, THE

5    CHECK IS FROM ASENQUA ACORN LLC; IS THAT CORRECT?

6    A.   YES, IT SAYS SO, YES.

7    Q.   OKAY.  AND ASENQUA ACORN IS NOT YOUR COMPANY,

8    ACORN CAMPUS, RIGHT?

9    A.   NO, NO.  TOTALLY UNRELATED.

10   Q.   DIRECTING YOUR ATTENTION TO -- DIRECTING YOUR

11   ATTENTION TO PAGE THREE OF DEFENDANT'S EXHIBIT 1,

12   DO YOU SEE THAT SIR?

13   A.   YES.

14   Q.   AND THERE ARE TWO CHECKS ON THAT PAGE; IS THAT

15   CORRECT?

16   A.   YES, YES.

17   Q.   AND THE FIRST ONE APPEARS TO BE A $7,050.01

18   CHECK MADE PAYABLE TO YOU, BOB LIN; IS THAT

19   CORRECT?

20   A.   YES.

21   Q.   AND THAT'S DATED NOVEMBER 25TH, 2005; IS THAT

22   CORRECT?

23   A.   CORRECT.

24   Q.   AND THAT CAME FROM ASENQUA VENTURES MANAGEMENT

25   LLC; IS THAT CORRECT?

1    A.   CORRECT.

2    Q.   AND THERE'S ANOTHER CHECK DATED APPEARS TO BE

3    JUST BUT LOW THAT, NOVEMBER 24TH, 2005?

4    A.   YES.

5    Q.   AND THAT APPEARS TO BE FOR $1,775?

6    A.   YES.

7    Q.   OKAY.  AND THAT'S ALSO PAYABLE TO YOU FROM

8    ASENQUA VENTURES MANAGEMENT; IS THAT CORRECT?

9    A.   YES, UH-HUH.

10   Q.   DIRECTING YOUR ATTENTION TO PAGE FOUR OF

11   DEFENDANT'S EXHIBIT 1, DO YOU SEE THAT, SIR?

12   A.   YES.

13   Q.   AND THAT'S THE FRONT AND BACK OF A CHECK; IS

14   THAT CORRECT?

15   A.   YES.

16   Q.   AND -- IT APPEARS TO BE A BLURRY ONE, I

17   APOLOGIZE.  DIRECTING YOUR ATTENTION TO PAGE SEVEN

18   OF DEFENDANT'S EXHIBIT 1; DO YOU SEE THAT, SIR?

19   A.   WHICH PAGE?

20   Q.   SEVEN, PLEASE.

21   A.   THE LAST ONE?

22   Q.   YES.

23   A.   YES.

24   Q.   OKAY.  AND DOES THAT APPEAR TO BE A CHECK IN

25   THE AMOUNT OF $3,000 PAYABLE TO YOU?

1    A.    YES.

2    Q.    AND THAT, EVEN THOUGH IT'S HARD TO READ ON THE

3    SCREEN, IT IS COMING FROM ASENQUA VENTURE

4    MANAGEMENT LLC; IS THAT CORRECT?

5    A.    YES.

6    Q.    AND THE DATE APPEARS TO BE SOME TIME IN 2007;

7    IS THAT CORRECT?

8    A.    YES.

9    Q.    AND THEN ON THE MEMO PART, DO YOU SEE THE MEMO

10   PART?  THE MEMO LINE ON THE LOWER LEFT-HAND CORNER

11   OF THE CHECK?

12   A.    IT'S NOT CLEAR.  NOT CLEAR.

13   Q.    YOU CANNOT READ THAT?

14   A.    NO.  CAN TRY.

15   Q.    CAN YOU READ THAT IT SAYS INSURANCE COPAY,

16   DOES THAT --

17   A.    WELL, I DON'T KNOW IF YOU CAN READ IT.

18   Q.    OKAY.  IN YOU CANNOT READ IT, YOU CANNOT READ

19   IT.

20          MR. LIN, YOU TALKED A LITTLE BIT ABOUT

21   THE FACT THAT YOU WANTED TO IN YOUR WORDS REDEEM

22   YOUR INVESTMENT IN THE FIRESIDE AND ASENQUA FUNDS;

23   IS THAT CORRECT?

24   A.    CORRECT.

25   Q.    WHAT IS YOUR UNDERSTANDING OF THE WORD WHEN

1    YOU USE THE WORD REDEEM WHAT ARE YOU TALKING ABOUT?

2    A.   TO GET MY INVESTMENT BACK.

3    Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT WAS

4    THE AGREEMENT THAT YOU ENTERED INTO WITH -- LET'S

5    START WITH ASENQUA BETA FUND IN TERMS OF YOU AS AN

6    INVESTOR YOUR RIGHT TO -- TO REDEEM YOUR

7    INVESTMENT?

8    A.   MY UNDERSTANDING IS SO LONG I REQUEST TO

9    REDEEM THEN THE FUND MANAGER WILL PROVIDE THE FUNDS

10   BACK.  AND USUALLY THERE'S A DELAY OF 1 OR 2 MONTHS

11   BUT THAT'S --

12   Q.   AND THAT WAS YOUR UNDERSTANDING AS TO THE

13   EVERYTHING THAT WAS OR THAT WAS THE AGREEMENT --

14   THAT WAS YOUR UNDERSTANDING OF ALL THERE WAS TO THE

15   AGREEMENT IN TERMS OF YOUR RIGHT TO REDEEM YOUR

16   INVESTMENT IN, SAY ASENQUA BETA FUND, RIGHT?

17   A.   YES.

18   Q.   OKAY.  DID YOU HAVE THE SAME UNDERSTANDING AS

19   TO THE FIRESIDE LS FUND?

20   A.   IT SHOULD BE THE SAME.

21   Q.   OKAY.  AND DO YOU HAVE ANY UNDERSTANDING OF

22   WHETHER OR NOT THAT AS LONG AS -- MY BAD.

23        DID YOU HAVE ANY UNDERSTANDING THERE WERE

24   CERTAIN CONDITIONS UNDER WHICH THE FUND WOULD NOT

25   HAVE TO REDEEM YOUR MONEY AT THE TIME -- YOUR

1    INVESTMENT, AT THE TIME YOU ASKED FOR IT?

2    A.   I DON'T REMEMBER THAT.

3    Q.   OKAY.  LET ME HAVE YOU LOOK AT GOVERNMENT'S

4    EXHIBIT 12 AGAIN.

5              AND I KNOW THIS IS A DOCUMENT THAT YOU

6    DON'T NECESSARILY RECALL SEEING.  I JUST WANTED YOU

7    TO USE THAT TO SEE IF IT REFRESHES YOUR

8    RECOLLECTION.

9              OKAY.  DIRECTING YOUR ATTENTION TO PAGE

10   12 OF GOVERNMENT'S EXHIBIT 12.  AND BECAUSE THIS

11   DOCUMENT HAS NOT YET BEEN PUBLISHED, I WILL NOT ASK

12   YOU TO READ THAT OUT LOUD YET.

13             MR. FONG:  EXCUSE ME, ONE SECOND.

14   Q.   OKAY. DO YOU SEE THAT, SIR?

15   A.   I LOOKED AT PAGE 12, YES.

16   Q.   OKAY.

17   A.   WHAT DO YOU WANT ME TO SEE?

18   Q.   I JUST WANTED YOU TO READ TO YOURSELF THE PART

19   WHERE I PUT A YELLOW POST-IT ON THE PARAGRAPH.

20             AGAIN, PLEASE DO NOT READ IT OUT LOUD

21   BECAUSE THIS HAS NOT BEEN ADMITTED INTO EVIDENCE.

22   I JUST WANT TO SEE IF READING THAT WILL REFRESH

23   YOUR RECOLLECTION.

24   A.   OKAY.

25   Q.   OKAY.  WELL, FIRST OF ALL, READING THAT

1    PARAGRAPH TO YOURSELF AS YOU JUST DID, DOES THAT

2    REFRESH YOUR RECOLLECTION AS TO YOUR UNDERSTANDING

3    OF THE AGREEMENT THAT YOU REACHED WHEN YOU MADE THE

4    INVESTMENT WITH FIRESIDE LS FUND?

5    A.   I READ IT NOW BUT IT DID NOT REFRESH MY

6    RECOLLECTION.

7            THE COURT:  THE QUESTION WAS WHETHER IT

8    REFRESHED YOUR RECOLLECTION WITH ANY AGREEMENTS YOU

9    HAD WITH RESPECT TO REDEMPTION.

10           THE WITNESS:  NO.

11   BY MR. FONG:

12   Q.   YOU SAID YOU WERE GIVEN CERTAIN DOCUMENTS

13   BEFORE YOU MADE YOUR INVESTMENT IN ASENQUA BETA

14   FUND; IS THAT CORRECT?

15   A.   YES.

16   Q.   OKAY.  AND YOU WOULD HAVE OF COURSE READ

17   EVERYTHING IN EVERY DOCUMENT THAT WAS GIVEN TO YOU

18   BEFORE YOU MADE YOUR INVESTMENT, RIGHT?

19   A.   YES.

20   Q.   OKAY.  AND YOU WOULD HAVE DONE THAT CAREFULLY?

21   A.   YES.

22   Q.   OKAY.  AND THAT WOULD BE TRUE AS TO ANY

23   DOCUMENTS THAT YOU RECEIVED THAT RELATED TO THE

24   FIRESIDE LS FUND; IS THAT CORRECT?

25   A.   YES.

1    Q.   THEN LET ME DIRECT YOUR ATTENTION TO PAGE 17

2    OF GOVERNMENT'S EXHIBIT 12 IF I MAY, SIR.  AND

3    ACTUALLY THERE'S A POST IT BY IT SO IT MIGHT BE A

4    LITTLE EASIER.

5              I WOULD LIKE TO DIRECT YOUR ATTENTION

6    AGAIN, READ TO YOURSELF BECAUSE THIS DOCUMENT HAS

7    NOT BEEN ADMITTED INTO EVIDENCE YET.  THE SECOND

8    FULL PARAGRAPH OF PAGE 17 OF GOVERNMENT'S

9    EXHIBIT 12.

10   A.   I HAVE READ THAT.  IT'S THE SAME AS THE

11   PREVIOUS ONE.

12   Q.   AGAIN, I'M NOT ENTITLED TO ASK YOU NOR DO I

13   WANT TO ASK YOU THE SUBSTANTIVE WHAT THE WORDS ARE,

14   I JUST WANT TO ASK YOU DOES THAT REFRESH YOUR

15   RECOLLECTION ONE WAY OR THE OTHER WHETHER OR NOT

16   YOU HAD AN UNDERSTANDING AS TO ANY CONDITIONS THAT

17   WERE -- THAT WOULD BE APPLICABLE TO WHETHER OR NOT

18   YOU CAN GET YOUR REDEMPTION AT THE TIME THAT YOU

19   ASKED FOR IT?

20   A.   NO, IT DID NOT REFRESH MY MEMORY.

21   Q.   OKAY.  THEN DIRECTING YOUR ATTENTION TO PAGE

22   28 OF EXHIBIT, GOVERNMENT'S EXHIBIT 12; DO YOU SEE

23   THAT, SIR?

24   A.   YES.

25   Q.   DIRECTING YOUR ATTENTION TO, I THINK IT'S THE

1    THIRD PARAGRAPH FROM THE BOTTOM.  AGAIN, JUST READ

2    THAT TO YOURSELF.  DO YOU SEE THE THIRD PARAGRAPH

3    ON THE BOTTOM?

4            MR. LUCEY:  YOUR HONOR, I THINK JUST TO

5    CLARIFICATION/OBJECTION.  I THINK MR. FONG NEEDS TO

6    POSE A QUESTION TO THE WITNESS FIRST THEN SEE IF IT

7    REFRESHES HIS RECOLLECTION.  I'M NOT CLEAR WHAT THE

8    QUESTION THAT'S POSED RIGHT NOW IS PENDING.

9            THE COURT:  I DON'T KNOW WHAT HE'S

10   LOOKING AT SPECIFICALLY SO IT'S KIND OF HARD TO

11   ANSWER THAT BUT I THINK THAT'S A VALID POINT.

12            IF YOU WANT TO ASK HIM ABOUT IT --

13            MR. FONG:  I'M SORRY, YOUR HONOR.

14            IF I DIDN'T MAKE IT CLEAR, ALL THESE

15   QUESTIONS ARE TO SEE IF THE DOCUMENT AND THE

16   VARIOUS PROVISIONS WILL REFRESH MR. LIN'S

17   RECOLLECTION AS TO WHETHER OR NOT THERE ARE ANY

18   CONDITIONS OR TERMS AS TO HIS RIGHT OF REDEMPTION

19   AND I'M SORRY IF I DIDN'T MAKE THAT CLEAR.

20            THE COURT:  OKAY.  THAT'S FINE.

21            MR. FONG:  I'M SORRY, MR. LIN.

22   Q.  IF I COULD DIRECT YOUR ATTENTION TO PAGE 28 OF

23   GOVERNMENT'S EXHIBIT 12, THE THIRD PARAGRAPH FROM

24   THE BOTTOM; DO YOU SEE THAT FIRST, SIR?

25   A.  YES.

1    Q.   HAVE YOU HAD A CHANCE TO LOOK, TO READ THAT

2    PARAGRAPH TO YOURSELF?

3    A.   YES, I'M READING IT, JUST READ IT NOW.

4    Q.   PLEASE LET ME KNOW AT YOUR CONVENIENCE WHEN

5    YOU ARE DONE.

6           THE COURT:  WHEN YOU ARE FINISHED WITH

7    THIS WE WILL TAKE A BREAK.

8           THE WITNESS:  I'M DONE.

9    BY MR. FONG:

10   Q.   AND I WILL ASK YOU THE SAME QUESTION I ASKED

11   YOU WITH THE OTHER PREVIOUS PAGES.

12           READING THAT TO YOURSELF, DOES THAT

13   PARAGRAPH, THE THIRD PARAGRAPH FROM THE BOTTOM ON

14   PAGE 28 OF GOVERNMENT'S EXHIBIT 12, DOES THAT

15   REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT

16   THERE WERE CONDITIONS CONCERNING WHEN YOU CAN

17   REDEEM YOUR INVESTMENT FROM YOUR -- FROM THE

18   FIRESIDE LS FUND?

19   A.   NO.

20           THE COURT:  OKAY.  WE WILL BE IN RECESS

21   UNTIL TOMORROW MORNING AT 8:30.  HAVE A GOOD REST

22   OF THE DAY.  AND PLEASE REMEMBER THE INSTRUCTION

23   NOT TO TALK ABOUT THE CASE WITH ANYBODY AND SEE YOU

24   TOMORROW.

25           LEAVE THE NOTEBOOKS IN THE JURY ROOM IF

1    YOU WOULD, PLEASE.  THEY WILL BE SAFE THERE AND NOT

2    LOOKED AT BY ANYONE.

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5              THE COURT:  MR. LIN, YOU MAY STEP DOWN.

6              THE WITNESS:  OKAY.

7              THE COURT:  WOULD YOU GET THAT DOOR.

8              I JUST WANTED TO CHECK, THERE WAS ONE

9    ISSUE ABOUT A DOCUMENT THAT I SAID I WOULD TAKE UP

10   OUTSIDE THE PRESENCE OF THE JURY.  I DON'T FINISH

11   IT'S SOMETHING THAT CONCERNS YOU OR NOT MR. FONG

12             MR. FONG:  I APOLOGIZE, YOUR HONOR.

13             MR. LUCEY:  18.

14             MR. FONG:  18.

15             MR. FAZIOLI:  IT'S THE NATIONAL

16   UNIVERSITY OF SINGAPORE.

17             MR. FONG:  IT DOESN'T CONCERN ME.  I'M

18   NOT CONCERNED ABOUT IT, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  SEE YOU TOMORROW.

20             MR. FONG:  THANK YOU, YOUR HONOR.

21             MR. LUCEY:  THANK YOU, YOUR HONOR.

22             THE COURT:  WHAT'S YOUR TIME ESTIMATE

23   WITH MR. LIN?

24             MR. FONG:  IT WILL BE MORE THAN AN HOUR.

25   I DON'T KNOW IF IT'S GOING TO BE MORE THAN TWO

1    HOURS.

2              THE COURT:  OKAY.  THEN WHO IS NEXT?

3              MR. LUCEY:  WE HAVE TO CHECK.  WE HAD

4    THOUGHT MS. DOONG WOULD GO NEXT BUT THERE MAY BE

5    SCHEDULING ISSUES WITH OTHER PEOPLE COMING OUT OF

6    TOWN NOW, SO WE WILL NEED TO LOOK AT OUR ROSTER OF

7    FOLKS.

8              WE CAN GET BACK TO MR. FONG TONIGHT.  IT

9    WILL STILL BE MS. DOONG BUT WE HAVE PEOPLE COMING

10   FROM THE EAST COAST WHO WE NOW HAVE TO FIT IN

11   TOMORROW AS WELL.

12             THE COURT:  ALL RIGHT.

13             MR. FONG:  THANK YOU.

14             (WHEREUPON, THE PROCEEDINGS IN THIS

15   MATTER WERE CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          **CERTIFICATE OF REPORTER**

5

6

7

8               I, THE UNDERSIGNED OFFICIAL COURT

9       REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10      THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11      FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12      CERTIFY:

13               THAT THE FOREGOING TRANSCRIPT,

14      CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15      CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16      SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17      HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18      TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23
        /S/_____
24      SUMMER A. FISHER, CSR, CRR
        CERTIFICATE NUMBER 13185          DATED: 6/11/12
25

                                                      195