1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

   UNITED STATES,              )  CR-09-00487-RMW
5                              )
               PLAINTIFF,      )
6                              )  JUNE 6, 2012
          VS.                  )
7                              )  VOLUME 3
   ALBERT KE-JENG HU,          )
8                              )  PAGES 196-404
               DEFENDANT.      )
9   _____)

10

11              TRANSCRIPT OF PROCEEDINGS

12       BEFORE THE HONORABLE RONALD M. WHYTE

13            UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE PLAINTIFF:  U.S. ATTORNEY'S OFFICE
                        BY:  JOSEPH FAZIOLI
18                      150 S. ALMADEN BLVD, STE 900
                        SAN JOSE, CA  95113
19

20

21   FOR THE DEFENDANT:  ATTORNEY AT LAW
                        BY:  JERRY FONG
22                      PO BOX 1040
                        PALO ALTO, CA  94302-1040
23

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                           CERTIFICATE NUMBER 13185

1

2                    INDEX OF WITNESSES

3

4       PLAINTIFF'S

5       **FUYUAN BOB LIN**
             CROSS-EXAM BY MR. FONG              P. 199
6            REDIRECT EXAM BY MR. LUCEY          P. 300
             RECROSS-EXAM BY MR. FONG            P. 314
7

8       **DERICK ARTHUR**
             DIRECT EXAM BY MR. FAZIOLI         P. 320
9

10      **LARY RAPPAPORT**
             DIRECT EXAM BY MR. FAZIOLI         P. 328
11

12      **DOMINIC FRANZELLA**
             DIRECT EXAM BY MR. LUCEY           P. 347
13           CROSS-EXAM BY MR. FONG             P. 362

14

15      **LYNETTE DWORKIN**
             DIRECT EXAM BY MR. LUCEY           P. 364
16

17      **GRACE DOONG**
             DIRECT EXAM BY MR. LUCEY           P. 373
18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2                              MARKED          ADMITTED

3      PLAINTIFF'S

4      3, 63                                   P. 386

5

6

7      DEFENDANT'S

8      501                                     P. 203

9      503                                     P. 209

10     502                                     P. 247

11     504, 506                                P. 252

12     505                                     P. 256

13     525                                     P. 283

14

15

16

17

18

19

20

21

22

23

24

25

                                                    198

1    SAN JOSE, CALIFORNIA           JUNE 6, 2012

2                  P R O C E E D I N G S

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4    WERE HELD IN THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING, EVERYBODY.

6              MR. FONG:  GOOD MORNING, YOUR HONOR.

7

8        **CROSS-EXAMINATION BY MR. FONG (CONT.)**

9

10   BY MR. FONG:

11   Q.   GOOD MORNING AGAIN, MR. LIN.

12   A.   GOOD MORNING.

13   Q.   JUST I WANTED TO START TODAY, IF I MAY, YOU

14   WERE SERVED WITH A SUBPOENA BY MY OFFICE RECENTLY,

15   WERE YOU NOT?

16   A.   YES.

17   Q.   AND THAT SUBPOENA ASKED YOU TO PRODUCE CERTAIN

18   DOCUMENTS IN RESPONSE TO THAT SUBPOENA; IS THAT

19   CORRECT?

20   A.   CORRECT.

21   Q.   OKAY.  AND IN RESPONSE TO THAT SUBPOENA, YOU

22   LOOK THROUGH DOCUMENTS RELATING TO YOUR DEALINGS

23   WITH ASENQUA, FIRESIDE, MR. HU; IS THAT CORRECT?

24              MR. LUCEY:  OBJECTION, YOUR HONOR.

25              FACTS NOT IN EVIDENCE.  HE'S ASSUMING

1    FACTS THAT HAVEN'T BEEN ASKED YET, THAT QUESTION

2    HAS NOT BEEN POSED.

3              THE COURT:  MAYBE I MISSED THE --

4              IS YOUR PROBLEM THAT IT HASN'T LAID A

5    FOUNDATION

6              MR. LUCEY:  CORRECT, YOUR HONOR.  LACK OF

7    FOUNDATION.

8              THE COURT:  THE SUBPOENA CALLED FOR THOSE

9    DOCUMENTS?

10             MR. LUCEY:  I THINK HE'S ASKING IF

11   MR. LIN -- I WOULD ASSUME, YOUR HONOR, HE WOULD

12   HAVE TO ASK WHAT MR. LIN DID WITH REGARD TO THE

13   SUBPOENA FIRST WHAT STEPS HE TOOK TO RESPOND TO IT.

14             THE COURT:  WELL, RESTATE YOUR QUESTION.

15   BECAUSE I THOUGHT THAT'S WHAT YOU ASKED.

16             MR. FONG:  I THOUGHT SO TOO BUT LET ME

17   TRY AGAIN.

18   Q.   MR. LIN, ONCE YOU GOT THE SUBPOENA, I STARTED

19   SEARCHING FOR DOCUMENTS; IS THAT CORRECT?

20   A.   FIRST I TURNED TO MY ATTORNEY FOR HIM TO HELP

21   ME.

22   Q.   AND I'M NOT ENTITLED TON NOR DO I WANT TO GET

23   INTO WHAT YOU AND YOUR ATTORNEY DISCUSSED.

24             SO YOU GAVE THE COPY OF THE SUBPOENA TO

25   YOUR ATTORNEY AND AFTER THAT DID YOU THEN START TO

1    LOOK FOR DOCUMENTS THAT ARE RESPONSIVE TO THE

2    SUBPOENA?

3    A.   YES.

4    Q.   OKAY.  AND THESE ARE DOCUMENTS THAT YOU HAD IN

5    YOUR POSSESSION; IS THAT CORRECT?

6    A.   YES.

7    Q.   AND THESE ARE DOCUMENTS RELATING TO YOUR

8    DEALINGS WITH ASENQUA, FIRESIDE, OR MR. HU; IS THAT

9    CORRECT?

10   A.   CORRECT.

11   Q.   AND THROUGH YOUR ATTORNEY YOU PRODUCED

12   THOSE -- THE DOCUMENTS THAT YOU HAD IN YOUR

13   POSSESSION THAT YOU THOUGHT WERE RESPONSIVE TO THE

14   SUBPOENA, YOU PRODUCED THOSE TO MY OFFICE THROUGH

15   YOUR ATTORNEY; IS THAT CORRECT?

16   A.   YES.  UNDER THE ATTORNEY'S ADVICE.

17   Q.   YES.  OKAY.  AND AGAIN, I DO NOT WANT TO

18   INVADE ANY CONVERSATIONS THAT YOU HAD WITH YOUR

19   ATTORNEY.  BUT I APPRECIATE YOU CLARIFYING THAT.

20        OKAY.  NOW, LET ME SHOW YOU WHAT I HAVE

21   MARKED AS EXHIBIT -- DEFENDANT'S EXHIBIT 501.  IT'S

22   ABOUT A 22 PAGE -- 23 PAGE DOCUMENT.  DO YOU SEE

23   THAT IN FRONT OF YOU, SIR?  AND PLEASE TAKE YOUR

24   TIME.

25   A.   YES.

1    Q.   OKAY.  NOW, DO YOU RECOGNIZE THIS DOCUMENT AS

2    ONE OF THE DOCUMENTS THAT YOU FOUND IN YOUR

3    POSSESSION --

4    A.   YES.

5    Q.   AND PRODUCED -- I'M SORRY, I APOLOGIZE.  I

6    PAUSE SO I DO THAT SOMETIMES SO BEAR WITH ME.  I

7    WILL CERTAINLY TRY NOT TO INTERRUPT YOU.

8         LET ME START AGAIN.  IS THIS A DOCUMENT

9    THAT YOU FOUND AND PRODUCED IN RESPONSE TO THE

10   SUBPOENA?

11   A.   YES.

12   Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THIS

13   DOCUMENT IS?

14   A.   I BELIEVE THIS IS AN ANGEL GROUP INVESTMENT

15   INTO A COMPANY PROPOSED BY MR. ALBERT HU.

16   Q.   ALL RIGHT.  AND WHAT IS THE TITLE OF THAT

17   DOCUMENT?

18   A.   IT'S CALLED ASENQUA VENTURE MEMBER SHIP FUND.

19   Q.   AND IT JUST HAS THE LETTERS LP BEHIND IT,

20   RIGHT?

21   A.   YEAH, YEAH, LP.

22   Q.   SO IT'S A LIMITED PARTNERSHIP AGREEMENT IS

23   THAT TRUE?

24   A.   CORRECT.

25         MR. FONG:  YOUR HONOR, AT THIS TIME I

1   WOULD MOVE EXHIBIT -- DEFENDANT'S EXHIBIT 501 INTO

2   EVIDENCE.

3             MR. LUCEY:  NO OBJECTION, YOUR HONOR.

4             THE COURT:  ALL RIGHT.  IT'S RECEIVED.

5   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 501 HAVING

6   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

7   ADMITTED INTO EVIDENCE.)

8   BY MR. FONG:

9   Q.   NOW DIRECTING YOUR ATTENTION, MR. LIN, TO THE

10  FIRST PAGE OF EXHIBIT 501; DO YOU SEE THAT, SIR?

11  A.   YES.

12  Q.   ACTUALLY, LET ME BACK UP.  OKAY.  NOW, DO YOU

13  SEE WHERE IT READS PARAGRAPH 1.2?

14  A.   YES.

15  Q.   OKAY.  AND CAN YOU PLEASE READ THE FIRST --

16  LET ME PUBLISH THIS.

17             IF YOU COULD READ THE SCREEN, THAT'S FINE

18  OR IF YOU PREFER TO READ THE DOCUMENT IN FRONT OF

19  YOU.  CAN YOU PLEASE READ THE FIRST SENTENCE OF

20  PARAGRAPH 1.2, PLEASE

21  A.   THE PRIMARY PURPOSE OF THE PARTNERSHIP IS TO

22  MAKE VENTURE CAPITAL TYPE INVESTMENTS IN EQUITY OR

23  EQUITY-ORIENTED SECURITIES OF PRIVATELY HELD

24  CORPORATIONS.

25  Q.   OKAY.  AND CAN YOU PLEASE READ THE SECOND

1    SENTENCE FOR ME, PLEASE?

2    A.   THE GENERAL PURPOSE OF THE PARTNERSHIP ARE TO

3    BUY, SELL, HOLD AND OTHERWISE INVEST IN SECURITIES

4    OF EVERY KIND AND NATURE AND RIGHTS AND OPTIONS

5    WITH RESPECT THERE TO, INCLUDING WITHOUT

6    LIMITATION, STOCK, NOTES, BONDS AND DEBENTURES TO

7    EXERCISE ALL RIGHTS, POWERS, PRIVILEGES AND OTHER

8    INCIDENTS OF OWNERSHIP OR POSSESSION WITH RESPECT

9    TO SECURITIES HELD OR OWNED BY THE PARTNERSHIP, TO

10   INTO, MAKE AND PERFORM ALL CONTRACTS AND OTHER

11   UNDERTAKINGS, AND TO ENGAGE IN ALL ACTIVITIES AND

12   TRANSACTIONS AS MAY BE NECESSARY, ADVISABLE OR

13   DESIRABLE TO CARRY OUT THE FOREGOING.

14   Q.   SO WHAT YOU JUST READ IN PARAGRAPH 1.2, IS

15   THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

16   THIS AGREEMENT IS ABOUT --

17   A.   YES.

18   Q.   THAT YOU WERE --

19   A.   SORRY.

20   Q.   NO, AGAIN, I APOLOGIZE.  I WILL TRY NOT TO

21   PAUSE.

22        BUT IT'S YOUR UNDERSTANDING THAT THIS

23   AGREEMENT WAS A LIMITED PARTNERSHIP, THAT YOU WERE

24   BUYING INTO AND THE LIMITED PARTNERSHIP WOULD BE

25   LAKING INVESTMENTS IN CLOSELY HELD CORPORATIONS?

1    A.   NO.  THIS AGREEMENT IS WHAT YOU DESCRIBE, BUT

2    FOR A SPECIFICALLY, ONE COMPANY CALLED ANOXIS, THAT

3    NEEDS TO BE VERY CLEAR.

4    Q.   SO IT WAS FOR ONE PARTICULAR COMPANY?

5    A.   YES, CALLED ANOXIS.

6    Q.   AND YOU HAD A CHANCE TO READ THIS AGREEMENT

7    CAREFULLY BEFORE YOU SIGNED IT; IS THAT CORRECT?

8    A.   YES.

9    Q.   YOU INVESTED $75,000 IN THE ASENQUA VENTURES

10   MEMBER'S FUND; IS THAT CORRECT?

11   A.   CORRECT.

12   Q.   LET ME SHOW YOU, PUBLISH, LET ME DIRECT YOUR

13   ATTENTION TO PARAGRAPH 7.2 ON PAGE 8 OF DEFENDANT'S

14   EXHIBIT 501.  FIRST OF ALL, DO YOU SEE THAT, SIR?

15   A.   YES.

16   Q.   ALL RIGHT.  CAN YOU PLEASE READ 7.2 FOR ME?

17   A.   DISTRIBUTION AND WITHDRAWAL POLICIES, SUBJECT

18   TO COMPLIANCE WITH APPLICABLE LAW, THE GENERAL

19   PARTNER SHALL BE AUTHORIZED TO MAKE DISTRIBUTIONS

20   AS SET FORTH IN THIS ARTICLE 7.  NO PARTNER MAY

21   WITHDRAW ANY AMOUNT FROM ITS CAPITAL ACCOUNT UNLESS

22   SUCH WITHDRAWAL IS MADE PURSUANT TO THE ARTICLE 7

23   OR ARTICLE 10.

24   Q.   OKAY.  NOW, IS IT YOUR UNDERSTANDING THAT THE

25   $75,000 THAT YOU INVESTED IN THAT ENTITY, ASENQUA

1    VENTURES MEMBER'S FUND LIMITED MEMBER PARTNERSHIP,

2    WOULD STAY WITHIN THE PARTNERSHIP UNTIL A CERTAIN

3    DATE?

4    A.   MY UNDERSTANDING AT THAT TIME WAS MY 75,000

5    WAS TO BE DEPOSITED INTO THIS PARTNERSHIP FOR THE

6    SOLE PURPOSE TO GO INTO PURCHASE ANOXIS THIS START

7    UP WHICH WAS PROVIDED FOR MR. ALBERT HU.

8    Q.   ALL RIGHT.  BUT THAT'S NOT MY QUESTION.

9         MY QUESTION IS:  DID YOU UNDERSTAND THAT

10   YOUR $75,000 THAT YOU HAD NO RIGHT TO WITHDRAW THAT

11   $75,000 WITHOUT THE GENERAL PARTNER'S CONSENT?

12   A.   I MADE INVESTMENT AND HAVE NO RIGHT TO

13   WITHDRAW?

14   Q.   I'M JUST UNDERSTANDING YOUR UNDERSTANDING OR

15   RECOLLECTION, SIR?

16   A.   THAT'S NOT MY RECOLLECTION.

17   Q.   THAT'S FINE, THAT'S FINE.  NOW, LET ME DIRECT

18   YOUR ATTENTION TO PAGE -- ACTUALLY, IT'S NOT

19   NUMBERED BUT IT'S THE SECOND TO THE LAST PAGE OF

20   THE DOCUMENT IN FRONT OF YOU; DO YOU SEE THAT, SIR.

21   LET ME KNOW WHEN YOU DO?

22   A.   SECOND TO THE LAST.

23   Q.   YES.

24   Q.   UNFORTUNATELY IT WAS NOT NUMBERED.  THE LAST

25   PAGE IS PAGE -- THE LAST NUMBERED PAGE IS PAGE 21

1    AND THIS WOULD BE THE PAGE AFTER THAT?

2    A.   OKAY.  YES.

3    Q.   OKAY.  AND DO YOU SEE SOME SIGNATURES?

4    A.   YES.

5    Q.   OKAY.  LET ME DIRECT YOUR ATTENTION TO PAGE --

6    IS THAT YOUR SIGNATURE HERE ON THE RIGHT-HAND SIDE

7    OF THE PAPER?

8    A.   YES.

9    Q.   OKAY.

10   Q.   AND YOU WERE INVESTING THIS IN YOUR CAPACITY

11   AS TRUSTEE FOR THE YEW UNION LYNN 1996 TRUST; IS

12   THAT CORRECT?

13   A.   CORRECT.

14   Q.   AND THEN LET ME DIRECT YOUR ATTENTION TO THE

15   LAST PAGE, IF I MAY.  DO YOU SEE THAT?  THAT'S ALSO

16   UNNUMBERED.

17   A.   WHICH ONE.

18   Q.   THE LAST PAGE OF THE DOCUMENT.

19   A.   THE ONE THAT SAYS EXHIBIT 8?

20   Q.   YOU IDENTIFIED IT MUCH BETTER THAN I DID.  DO

21   YOU SEE THAT PAGE, SIR?

22   A.   YES.

23   Q.   ABOUT TWO THIRDS OF THE WAY DOWN THERE'S A

24   LINE HERE, DO YOU SEE THAT, FEW UNION LYNN 1996

25   TRUST, $75,000?

1    A.    YES.

2    Q.    AND THAT ACCURATELY REPRESENTS THE AMOUNT OF

3    MONEY THAT YOU INVESTED IN THIS PARTICULAR LIMITED

4    PARTNERSHIP, CORRECT?

5    A.    IN THIS PARTICULAR LIMITED PARTNERSHIP WHICH

6    WAS SPECIFICALLY CREATED TO INVEST INTO ANOXIS A

7    START UP.

8    Q.    ALL RIGHT.  OKAY.  THANK YOU.

9          LET ME SHOW YOU NOW A DOCUMENT THAT'S

10   BEEN MARKED AS PLAINTIFF'S EXHIBIT 503 -- EXCUSE

11   ME, DEFENDANT'S EXHIBIT 503.  I APOLOGIZE.

12          FIRST OF ALL, DO YOU SEE THAT 40 PAGE

13   DOCUMENT IN FRONT OF YOU, SIR?

14   A.    YES.

15   Q.    AND DO YOU RECOGNIZE THAT DOCUMENT?

16   A.    THIS ONE I RECOGNIZE.  THIS ONE IS ASENQUA

17   BETA FUND LP.

18   Q.    OKAY.  AND IS THIS ONE OF THE DOCUMENTS THAT

19   YOU PRODUCED THROUGH YOUR ATTORNEY TO MY OFFICE IN

20   RESPONSE TO THE SUBPOENA?

21   A.    YES.

22   Q.    OKAY.  AND CAN YOU PLEASE READ THE TITLE OF

23   THE DOCUMENT FOR US.

24   A.    THE ASENQUA BETA FUND LP.

25   Q.    AND DOES IT SAY CONFIDENTIAL PRIVATE --

1   A.   OH, YEAH, CONFIDENTIAL PRIVATE PLACEMENT

2   MEMORANDUM, YES.

3   Q.   NOW DID YOU RECEIVE THIS PARTICULAR DOCUMENT

4   DEFENDANT'S EXHIBIT 503 BEFORE YOU MADE YOUR

5   INITIAL FIRST INVESTMENT INTO THE ASENQUA BETA FUND

6   WHICH I THINK WAS AROUND JANUARY 2005?

7   A.   I DON'T RECALL THE EXACT TIME BUT I MUST HAVE.

8   Q.   I DON'T WANT YOU TO GUESS, I'M ONLY ENTITLED

9   TO YOUR BEST RECOLLECTION?

10   A.   EXACT TIME, I DON'T REMEMBER.

11   Q.   BUT DO YOU RECALL IF YOU RECEIVED THIS

12   DOCUMENT BEFORE YOU MADE THE FIRST INVESTMENT?

13   A.   I DON'T RECALL.

14   Q.   ALL RIGHT.  BUT YOU DID SEE THIS DOCUMENT?

15   A.   YES.

16        MR. FONG:  YOUR HONOR, I WOULD MOVE INTO

17   EVIDENCE DEFENDANT'S EXHIBIT 503.

18        MR. LUCEY:  NO OBJECTION, YOUR HONOR.

19        THE COURT:  ALL RIGHT.  IT'S RECEIVED.

20   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 503 HAVING

21   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

22   ADMITTED INTO EVIDENCE.)

23        MR. FONG:  OKAY.

24   Q.   NOW, MR. LIN LET ME DIRECT YOUR ATTENTION TO

25   THE FIRST, PAGE 3 IF I MAY, DO YOU SEE THAT PAGE?

1    A.   YES.

2    Q.   BY THE WAY, AT THE TIME -- I APOLOGIZE BUT LET

3    ME START OVER.  WHEN YOU RECEIVED THIS DOCUMENT DID

4    YOU READ IT CAREFULLY?

5    A.   I DON'T REMEMBER WHEN I RECEIVED IT, BUT I

6    HAVE READ IT.

7    Q.   OKAY.  AND DID YOU READ IT CAREFULLY?

8    A.   TO THE BEST OF MY ABILITY, YES.

9    Q.   YES.  SO DIRECTING YOUR ATTENTION TO PAGE

10   THREE, DO YOU SEE THAT PAGE IN FRONT OF YOU, SIR?

11   A.   YES.

12   Q.   OKAY.  LET ME PUBLISH THAT TO THE JURORS.

13   OKAY.  DO YOU SEE THE THIRD PARAGRAPH ON THAT PAGE?

14   A.   YES.

15   Q.   OKAY.  AND CAN YOU READ THAT FOR US, PLEASE?

16   A.   THE ASENQUA BETA FUND LP, THE FUND, WILL

17   INVEST SUBSTANTIALLY ALL OF ITS ASSETS IN A MASTER

18   FUND UTILIZING A MASTER FUND/FEEDER FUND STRUCTURE.

19   Q.   ALL RIGHT.  NOW AT THE TIME YOU READ THIS

20   DOCUMENT WHEN YOU FIRST READ THIS DOCUMENT,

21   WHENEVER THAT MIGHT BE, DID YOU HAVE ANY

22   UNDERSTANDING AS TO WHAT THE TERM MASTER FUND AND

23   FEEDER FUND MEANT?

24   A.   I HAVE A LIMITED UNDERSTANDING.

25   Q.   OKAY.  AND AT THE TIME WHAT WAS YOUR

1    UNDERSTANDING OF THE MASTER FUND/FEED FUND TERM?

2    A.   MY TAKE WAS MASTER FUND WAS ALBERT HU'S FUND.

3    THEN FEEDER FUND WAS FEEDING INTO THE ASENQUA BETA

4    FUND.

5    Q.   ALL RIGHT.  DID YOU KNOW --

6    A.   I DON'T UNDERSTAND, BUT THAT'S MY

7    UNDERSTANDING.

8    Q.   AGAIN, I'M NOT ENTITLED TO -- I'M ONLY

9    ENTITLED TO YOUR BEST UNDERSTANDING.  I'M SORRY FOR

10   INTERRUPTING YOU.

11        NOW AT THE TIME YOU READ THIS DOCUMENT

12   DID YOU UNDERSTAND THAT THE ASENQUA BETA FUND WOULD

13   BE A FEEDER FUND AS OPPOSED TO A MASTER FUND?

14        DID YOU HAVE THAT UNDERSTANDING?

15   A.   NOT CLEAR.

16   Q.   OKAY.

17   A.   NOT CLEAR.

18   Q.   AT THE TIME DID YOU HAVE AN UNDERSTANDING THAT

19   THE ASENQUA BETA FUND WOULD NOT BE THE MASTER FUND

20   THAT'S REFERRED TO IN THAT THIRD PARAGRAPH ON PAGE

21   THREE OF DEFENDANT'S EXHIBIT 503?

22   A.   I DID NOT UNDERSTAND THIS TERMINOLOGY IN SUCH

23   DETAILS.

24   Q.   ALL RIGHT.  AT THE TIME THAT YOU READ THIS

25   DOCUMENT, DID YOU ASK ANYBODY ABOUT THE DISTINCTION

1    BETWEEN MASTER FUND AND A FEEDER FUND?

2    A.   I DON'T REMEMBER.

3    Q.   OKAY.

4    A.   I WAS INVITED.  I JUST WANTED TO ANXIOUSLY

5    WANTED TO GET IN.

6    Q.   OKAY.  I CAN UNDERSTAND THAT.  BUT YOUR

7    TESTIMONY IS THAT YOU DO NOT RECALL ASKING ANYBODY,

8    INCLUDING MR. HU, HEY, WHAT IS THE MASTER FUND,

9    WHAT IS THE FEEDER FUND?

10   A.   NO, I DO NOT RECALL.  I DO NOT RECALL.

11   Q.   AND AS YOU SIT HERE TODAY, YOU DO NOT KNOW IF

12   THE ASENQUA BETA FUND WAS INTENDED TO BE THE FEEDER

13   FUND OR THE MASTER FUND, DO YOU?

14   A.   NO.

15   Q.   OKAY.  LET ME THEN DIRECT YOUR ATTENTION TO

16   THE PARAGRAPH BELOW THE PARAGRAPH THAT YOU JUST

17   READ, IF I MAY, IT'S THE FOURTH PARAGRAPH.  LET ME

18   JUST PULL THIS UP JUST A LITTLE.  AND HOPEFULLY

19   BEFORE THE END OF THIS TRIAL I WILL LEARN HOW TO

20   USE THE ELMO.  SO BEAR WITH ME.

21        DO YOU SEE THE FOURTH PARAGRAPH, SIR?

22   A.   WHICH ONE IS THAT?

23   Q.   OKAY.  AND AGAIN, SIR, ANY TIME THAT I'M

24   SHOWING YOU A DOCUMENT THAT YOU ALSO HAVE IN FRONT

25   OF YOU, PLEASE FEEL FREE IF YOU ARE MORE

1   COMFORTABLE OR IF IT'S EASIER FOR YOU, TO LOOK AT

2   THE DOCUMENT RATHER THAN WHAT'S ON THE SCREEN.  I

3   CAN CERTAINLY ENLARGE THAT IF THAT'S NECESSARY.

4   BUT IT'S THIS PARAGRAPH; DO YOU SEE THAT, SIR?

5   A.   YES.

6   Q.   OKAY.  CAN YOU PLEASE READ THE FIRST SENTENCE

7   OF THAT PARAGRAPH FOR ME?

8   A.   INTERESTS ARE SPECULATIVE AND INVOLVE

9   SUBSTANTIAL RISK OF LOSS, INCLUDING THE POSSIBILITY

10  OF THE TOTAL LOSS OF AN INVESTMENT THEREIN,

11  CONSEQUENTIALLY THEY ARE AVAILABLE ONLY TO PERSONS

12  WILLING AND ABLE TO BEAR SUCH RISK.  SEE RISK

13  FACTORS AND OTHER CONSIDERATIONS.

14  Q.   OKAY.  AND PLEASE GO ON TO THE NEXT SENTENCE,

15  IF YOU DON'T MIND?

16  A.   A PROSPECTIVE INVESTOR SHOULD CAREFULLY READ

17  THIS MEMORANDUM TO EVALUATE THE RISKS INVOLVED IN

18  LIGHT OF ITS INVESTMENT, OBJECTIVES AND FINANCIAL

19  RESOURCES.

20  Q.   ALL RIGHT.

21       NOW, DO YOU RECALL -- AT THE TIME THAT

22  YOU READ THIS DOCUMENT, WHENEVER THAT MIGHT BE, DO

23  YOU RECALL SEEING THAT PARTICULAR PARAGRAPH THAT

24  YOU JUST READ, THE FOURTH PARAGRAPH, ON PAGE THREE

25  OF DEFENDANT'S EXHIBIT 503?

1    A.   DO I RECALL READING IT?

2    Q.   YES.

3    A.   NO, I DO NOT RECALL WHAT I HAVE READ 7 OR

4    8 YEARS AGO, NO.  I CANNOT QUALIFY THAT STATEMENT.

5    Q.   ALL RIGHT.  THEN LET ME BROADEN THE QUESTION A

6    LITTLE BIT.  DO YOU RECALL WHEN YOU FIRST READ THIS

7    OR ANY TIME THAT YOU READ THIS DOCUMENT,

8    DEFENDANT'S EXHIBIT 503, THE PRIVATE PLACEMENT

9    MEMORANDUM FOR THE ASENQUA BETA FUND.

10          DO YOU RECALL SEEING ANYTHING IN THIS

11   DOCUMENT THAT WARNED YOU THAT THE INVESTMENT THAT

12   YOU WERE THINKING ABOUT MAKING WOULD BE SPECULATIVE

13   AND INVOLVE SUBSTANTIAL RISK OF LOSS?  DO YOU

14   RECALL READING ANYTHING LIKE THAT?

15   A.   I DON'T REMEMBER THAT.

16   Q.   ALL RIGHT.

17          OKAY.  AND NOW, IF YOU HAD COME ACROSS --

18   CERTAINLY, IN YOUR EXPERIENCE YOU HAVE SEEN THIS

19   KIND OF WARNINGS BEFORE, RIGHT?

20   A.   RISK OF REAL INVESTMENT IS ACCEPTED.  RISK OF

21   NOT REAL INVESTMENT CANNOT BE ACCEPTED.

22   Q.   I FULLY UNDERSTAND THAT.  BUT THAT'S NOT MY

23   QUESTION.

24          AND YOUR HONOR, I WOULD MOVE TO STRIKE

25   THE LAST ANSWER.

214

1           THE COURT:  I WILL STRIKE THAT BECAUSE IT
2    WAS NOT RESPONSIVE.
3    Q.   AND AGAIN, MR. LIN, I'M SURE I WILL HAVE
4    PLENTY OF OPPORTUNITY TO CLARIFY ANY ANSWERS THAT
5    YOU WANT THROUGH THE GOVERNMENT'S REDIRECT.  LET ME
6    JUST, IF I MAY, ASK YOU THE QUESTION THAT I
7    INTENDED TO ASK, BEAR WITH ME.
8           NOW, IN YOUR EXPERIENCE, PROFESSIONAL
9    EXPERIENCE, HAVE YOU EVER RUN ACROSS THIS
10   PARTICULAR KIND OF WARNING IN TERMS OF, HEY, IF YOU
11   ARE MAKING AN INVESTMENT, IT'S RISKY, IT'S
12   INHERENTLY RISKY.
13   A.   YES.
14   Q.   AND OF COURSE, YOU WOULD REMEMBER READING
15   SOMETHING LIKE THAT BECAUSE THAT'S MEANT, YOU KNOW
16   THAT IS MEANT TO PUT THE READER ON ALERT AS TO WHAT
17   HE OR SHE IS DOING, RIGHT?
18   A.   CORRECT.  BUT YOUR PREVIOUS QUESTION WAS ON
19   THIS SPECIFIC DOCUMENT WHICH I DON'T RECALL
20   READING.
21   Q.   AND I FULLY UNDERSTAND THAT AND THAT'S WHY I
22   BROADENED THE QUESTION TO, DO YOU RECALL READING
23   SOMETHING LIKE THAT, OKAY, BUT I THINK YOU'VE
24   ANSWERED, THANK YOU SO MUCH.
25           OKAY.  NOW, LET ME DIRECT YOUR ATTENTION

1    TO THE NEXT PAGE IN THIS SAME EXHIBIT, PAGE 4.

2              FIRST OF ALL, SIR, DO YOU SEE THAT PAGE?

3    A.   YES.

4    Q.   OKAY.  AND LET ME DIRECT YOUR ATTENTION TO THE

5    1, 2 -- THE THIRD PARAGRAPH ON PAGE 4 OF THIS

6    EXHIBIT WHICH I BELIEVE IS DEFENDANT'S EXHIBIT 503.

7    DO YOU SEE THAT, SIR?

8    A.   YES.

9    Q.   OKAY.  AND BY THE WAY MR. LIN, IF YOU CAN KNOW

10   NOT HEAR ME BECAUSE MY BACK IS TURNED TOWARDS YOU,

11   I APOLOGIZE.  JUST LET ME KNOW I WILL BE GLAD TO

12   TURN AROUND IT'S JUST OPERATING THAT MACHINE.

13   A.   THANK YOU VERY MUCH.

14   Q.   OKAY.  CAN YOU PLEASE READ THE FIRST SENTENCE

15   OF THE THIRD PARAGRAPH ON PAGE 4?

16   A.   NO REPRESENTATION OR WARRANTIES OF ANY KIND

17   ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO

18   THE ECONOMIC RETURN OR TAX CONSEQUENCES FROM AN

19   INVESTMENT IN THE FUND.

20   Q.   OKAY.  AND COULD YOU PLEASE READ THE NEXT

21   SENTENCE.

22   A.   PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE

23   CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT,

24   TAX OR OTHER ADVICE.

25   Q.   ALL RIGHT.  AND THEN THE NEXT SENTENCE,

1    PLEASE.

2    A.   EACH PROSPECTIVE INVESTOR MUST RELY UPON ITS

3    OWN REPRESENTATIVES INCLUDING ITS OWN INVESTMENT

4    ADVISORS, LEGAL COUNSEL AND ACCOUNTANTS AT TO

5    ECONOMIC, LEGAL, TAX AND RELATED ASPECTS OF THE

6    INVESTMENT DESCRIBED HEREIN AND AS TO ITS

7    SUITABILITY FOR SUCH INVESTMENT.

8    Q.   OKAY.  THANK YOU, SIR.

9         NOW, AS TO THAT PARTICULAR PARAGRAPH, DO

10   YOU RECALL SEEING -- READING THAT PARAGRAPH WHEN

11   YOU RECEIVED THIS PARTICULAR DOCUMENT?

12   A.   NO, I DON'T RECALL.

13   Q.   OKAY.  DO YOU -- AND NOW I WANT TO BROADEN THE

14   QUESTION TO BEYOND JUST THIS PARAGRAPH.

15        DO YOU RECALL READING SOMETHING LIKE THAT

16   WITH THESE KIND OF WORDS OR IDEAS IN THE PARAGRAPH

17   YOU JUST READ, DO YOU RECALL SEEING SOMETHING LIKE

18   THAT IN THE -- IN ANY DOCUMENTS THAT YOU SAW WHEN

19   YOU WERE CONTEMPLATING, WHEN YOU WERE THINKING

20   ABOUT INVESTING IN ASENQUA BETA FUND?

21   A.   YES, THERE WERE DIFFERENT TYPE OF DISCLAIMER,

22   THIS DISCLAIMER.

23   Q.   RIGHT.  OKAY.  AND LET ME ASK YOU, AT ANY TIME

24   BEFORE YOU MADE YOUR INITIAL INVESTMENT IN ASENQUA

25   BETA FUND IN I THINK JANUARY 2005, DID YOU CONSULT

217

1    WITH ANY LEGAL COUNSEL OR ACCOUNTANTS OR ECONOMIC

2    OR LEGAL ADVISORS?

3    A.    NO, I HAVE NOT.

4    Q.    OKAY.  THAT'S TO SAY YOU DID NOT, RIGHT?

5    A.    CORRECT.

6    Q.    OKAY.  NOW, DIRECTING YOUR ATTENTION TO TWO

7    PARAGRAPHS DOWN FROM THE PARAGRAPH THAT YOU JUST

8    READ, SO THAT SHOULD MAKE IT ABOUT PARAGRAPH

9    NUMBERS 1, 2, 3, 4, 5 IF I'M NOT MISTAKEN.

10              DO YOU SEE THE PARAGRAPH THAT BEGINS WITH

11   THE WORD "PROSPECTIVE INVESTORS?"

12   A.    YES.

13   Q.    CAN YOU PLEASE READ THE FIRST SENTENCE TO ME.

14   A.    PROSPECTIVE INVESTORS SHOULD NOTE THAT IT'S

15   CERTAIN REDEMPTION RIGHTS EXIST UNDER THE LIMITED

16   PARTNERSHIP AGREEMENT, REDEMPTION MAY OCCUR ONLY

17   AFTER 12 MONTHS INTERVAL FOLLOWING THE INITIAL

18   INVESTMENT AND ARE FURTHER LIMITED AS OUT LINED IN

19   THAT AGREEMENT.

20              THE WHOLE PARAGRAPH?

21   Q.    PLEASE CONTINUE WITH THE NEXT SENTENCE IF YOU

22   DON'T MIND?

23   A.    FURTHERMORE, THE AMOUNT ACTUALLY RECEIVED UPON

24   REDEMPTION OF AN INTEREST MAY NOT CORRESPOND TO THE

25   VALUE OF SUCH INTEREST AT THE TIME THE REDEMPTION

1    REQUEST IS RECEIVED BECAUSE OF FLUCTUATIONS IN THE

2    MASTER FUND'S ASSETS BETWEEN THE DATE OF RECEIPT

3    AND THE DATE OF VALUATION.  INVESTORS IN THE FUND

4    SHOULD BE AWARE OF THE LIMITED LIQUIDITY OF THE

5    INVESTMENT IN INTERESTS.

6    Q.   THANK YOU, SIR.

7         NOW DO YOU RECALL READING THIS PARTICULAR

8    PARAGRAPH THAT YOU JUST READ INTO THE RECORD ON

9    PAGE 4 OF EXHIBIT 503.  DO YOU RECALL READING THAT

10   AT THE TIME, AFTER YOU RECEIVED THIS PARTICULAR

11   DOCUMENT?

12   A.   NO, I DON'T RECALL.

13   Q.   OKAY.  DID YOU HAVE ANY UNDERSTANDING BEFORE

14   YOU MADE YOUR INITIAL INVESTMENT IN ASENQUA BETA

15   FUND IN ABOUT JANUARY 2005 THAT YOUR RIGHT TO

16   REDEEM, THAT IS TO SAY GET BACK YOUR INVESTMENT,

17   WOULD BE CONTROLLED BY CERTAIN CONDITIONS?

18   A.   CAN YOU REPHRASE THE QUESTION ONE MORE TIME?

19   Q.   SURE.

20   A.   THANK YOU.

21   Q.   I APOLOGIZE.  LET ME TRY AGAIN.  AT THE TIME

22   THAT -- BEFORE YOU MADE YOUR FIRST INVESTMENT IN

23   THE ASENQUA BETA FUND, DID YOU HAVE ANY

24   UNDERSTANDING THAT THERE ARE LIMITATIONS IMPOSED BY

25   CONTRACT AS TO, UNDER WHAT CONDITIONS YOU CAN

1    REDEEM YOUR INVESTMENT?

2    A.   I DON'T REMEMBER WHEN I BEGIN TO LEARN ABOUT

3    THE LIMITATION, BUT OVER THE COURSE OF THE

4    INVESTMENT YEARS, IN THE CONVERSATION MR. ALBERT HU

5    HAS TOLD ME YOU HAVE TO WAIT, YOU HAVE TO WAIT.

6         LIKE IN THE VERY LAST WHEN I REQUEST

7    REDEMPTION HE SAYS HE'S WORKING ON TRYING TO

8    LIQUIDATE AND THESE ARE ACCUMULATIVE PROCESSES THAT

9    I LEARNED.  IT'S NOT AT THE TIME THAT I EITHER READ

10   OR NOT READ THIS.

11   Q.   OKAY.  SO JUST SO THAT I'M CLEAR, YOUR ANSWER

12   IS THAT BEFORE YOU MADE YOUR INVESTMENT YOUR FIRST

13   INVESTMENT IN ASENQUA BETA FUND IN JANUARY 2005,

14   YOU HAD NOT HAVE THIS UNDERSTANDING OF WHETHER OR

15   NOT THERE WERE LIMITATIONS ON YOUR RIGHT TO

16   REDEMPTION OF YOUR INVESTMENT?

17   A.   AGAIN, I DON'T RECALL WHEN I BEGIN TO LEARN,

18   THERE IS A DELAY AND WAIT.

19   Q.   OKAY.

20   A.   WHAT TIME I DON'T REMEMBER, YES.

21   Q.   DID YOU HAVE ANY UNDERSTANDING -- LET ME ASK

22   YOU THIS.  WHEN YOU FIRST LEARNED THAT THERE MIGHT

23   BE SOME CONDITIONS OR LIMITATIONS ON YOUR RIGHT TO

24   REDEEM YOUR INVESTMENT, DID YOU GO BACK AND TAKE

25   OUT THIS AGREEMENT OR LOOK AT ANY OTHER AGREEMENT

1    AND SAY, HEY, LET ME FIND OUT WHAT THESE

2    LIMITATIONS OR CONDITIONS ARE SO THAT I CAN

3    DETERMINE FOR MYSELF IF WHAT PEOPLE ARE TELLING ME

4    IS ACCURATE.  DID YOU DO THAT?

5    A.    NO, I DIDN'T BECAUSE I TRUST ALBERT HU.

6    Q.    OKAY.  I FULLY UNDERSTAND THAT.  BUT THE

7    ANSWER IS YOU DID NOT, RIGHT?

8    A.    I DID NOT.

9    Q.    ALL RIGHT.  AND YOU DIDN'T SEEK ANY KIND OF

10   LEGAL COUNSEL TO DETERMINE WHAT YOUR RIGHTS ARE AND

11   TO REDEEM YOUR INVESTMENT IN THE ASENQUA BETA FUND

12   OR THE FIRESIDE FUND; IS THAT CORRECT?

13   A.    CORRECT.

14   Q.    OKAY.  LET ME THEN DIRECT YOUR ATTENTION TO

15   THE NEXT PARAGRAPH, WHICH IS THE LAST PARAGRAPH OF

16   THIS PAGE WHICH IS PAGE 4; DO YOU SEE THAT, SIR?

17   A.    YES.

18   Q.    LET ME PULL THIS UP A LITTLE BIT.  AND MAY I

19   TROUBLE YOU TO READ THE FIRST SENTENCE OF THAT LAST

20   PARAGRAPH ON PAGE 4.

21   A.    IN SUBSCRIBING FOR AN INTEREST, EACH INVESTOR

22   MUST REPRESENT AND WARRANT, AMONG OTHER THINGS,

23   THAT IT AND/OR ITS PURCHASER REPRESENTATIVE HAS

24   REVIEWED THIS MEMORANDUM AND IT HAS, OR THEY

25   TOGETHER HAVE SUCH SOPHISTICATION, KNOWLEDGE AND

1    EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT

2    IT IS, OR THEY ARE, CAPABLE OF EVALUATING THE

3    MERITS AND RISKS OF AN INVESTMENT IN THE FUND.

4    Q.   OKAY.  MAY I TROUBLE YOU THEN TO READ THE

5    SECOND AND THE LAST SENTENCE OF THAT PARAGRAPH?

6    A.   EACH INVESTOR FURTHER ACKNOWLEDGES THAT AN

7    INVESTMENT IN THE FUND INVOLVES A HIGH DEGREE OF

8    RISK.  NO ASSURANCE CAN BE GIVEN THAT THE --

9    Q.   AND IT HAPPENS ON TO THE FOLLOWING PAGE, I

10   APOLOGIZE.  MAY I TROUBLE YOU TO READ THAT.

11   A.   READ WHAT?

12   Q.   PAGE 5.

13   A.   THE FUND, DON'T YOU WANT TO SHOW THAT?

14   Q.   I'M ACTUALLY LOOKING FOR THAT RIGHT NOW.  MY

15   FAULT FOR NOT BEING MORE ON THE BALL.

16   A.   WANT MY HELP?  I CAN GIVE YOU THIS PAGE.

17   Q.   THAT'S VERY KIND OF YOU BUT I THINK I MIGHT BE

18   ABLE TO FIX IT BUT I DO APPRECIATE YOUR

19   COOPERATION.

20        SO HERE IS THE LONG AWAITED FIRST LINE OF

21   PAGE 5.

22   A.   THAT THE FUND'S INVESTMENT OBJECTIVE WILL BE

23   ACHIEVED AND INVESTMENT RESULTS MAY VARY

24   SUBSTANTIALLY ON A QUARTERLY OR ANNUAL BASIS.

25   Q.   OKAY.  THANK YOU.

1          NOW, BEFORE YOU MADE YOUR INITIAL

2     INVESTMENT, THE FIRST INVESTMENT IN THE ASENQUA

3     BETA FUND, DID YOU RECALL READING THE PARAGRAPH

4     THAT YOU JUST READ ON THE RECORD?

5     A.   NO, I DON'T RECALL SPECIFICALLY ON THIS

6     DOCUMENT, NO.

7     Q.   OKAY.  LET ME DIRECT YOUR ATTENTION TO PAGE 8,

8     IF I MAY.  DO YOU SEE THAT PAGE IN FRONT OF YOU,

9     SIR?

10    A.   WHICH ONE?

11    Q.   PAGE 8, I APOLOGIZE.

12    A.   YES, I HAVE SEEN IT.

13    Q.   OKAY.  NOW, DIRECTING YOUR ATTENTION TO THE

14    VERY LAST PARAGRAPH OF PAGE 8 AND IT HAS THE

15    HEADING TO THE LEFT OF IT.  THE HEADING IS

16    INVESTMENT STRUCTURE, DO YOU SEE THAT, SIR?

17    A.   YES.  INVESTMENT STRUCTURE.

18    Q.   LET ME THEN ASK YOU TO, MAY I ASK YOU TO READ

19    THAT PARAGRAPH FOR ME.

20    A.   THE FUND WILL INVEST SUBSTANTIALLY ALL OF ITS

21    ASSETS THROUGH A MASTER FUND/FEED FUND STRUCTURE IN

22    THE ASENQUA MASTER FUND LP, THE MASTER FUND.

23    ASSETS NOT INVESTED IN THE MASTER FUND WILL PROVIDE

24    FOR FUND OPERATING EXPENSES.

25    Q.   OKAY.  THAT'S FINE, SIR.  LET ME THEN IF I MAY

1    ASK YOU AS TO THOSE TWO SENTENCES THAT YOU JUST

2    READ, DO YOU RECALL READING EITHER THOSE PARTICULAR

3    SENTENCES OR SOMETHING LIKE THAT IN THIS DOCUMENT

4    AT THE TIME THAT YOU RECEIVED THIS DOCUMENT?

5    A.   NO, I DON'T RECALL.

6    Q.   OKAY.  DO THESE TWO SENTENCES REFRESH YOUR

7    RECOLLECTION AS TO WHETHER OR NOT YOU HAD AN

8    UNDERSTANDING OF THE MASTER FUND/FEEDER FUND

9    STRUCTURE THAT THE ASENQUA BETA FUND WOULD BE

10   INVOLVED IN BEFORE YOU MADE YOUR FIRST INVESTMENT?

11   A.   NO, IT DID NOT REFRESH MY MEMORY.

12   Q.   OKAY.  THAT'S FINE.  LET ME DIRECT YOUR

13   ATTENTION NOW TO PAGE 9 EXHIBIT 503 THE PRIVATE

14   PLACEMENT MEMORANDUM OF ASENQUA BETA FUND.  DO YOU

15   HAVE THAT IN FRONT OF YOU, SIR?

16   A.   PAGE 9, YES.

17   Q.   OKAY.  DO YOU SEE THAT VERY LAST PARAGRAPH

18   WHICH IS ACTUALLY THE BIGGEST PARAGRAPH OF THAT

19   PAGE SIR WITH THE TITLE RISK OF PARTICIPATION?

20   A.   YES.

21   Q.   OKAY.  LET ME DIRECT YOUR ATTENTION TO ABOUT

22   HALFWAY DOWN BEGINNING WITH THE WORD NATURALLY OF

23   THE FIRST OF ALL DO YOU SEE WHERE I'M POINTING SIR?

24   A.   I SAW THE WORD NATURALLY.

25   Q.   I WILL PUT AN ARROW HERE, VERY HIGH-TECH.  CAN

1    I ASK YOU TO READ THAT PARTICULAR SENTENCE FOR ME.

2    A.   NATURALLY, THERE CAN BE NO ASSURANCE THAT THE

3    FUND WILL ALWAYS OPERATE UNDER NORMAL MARKET

4    CONDITIONS EVEN IN THE UNLIKELY EVENT THAT IT DOES

5    THERE CAN BE NO ASSURANCE THAT THE INVESTMENT

6    MANAGER WILL ADEQUATELY IDENTIFY THE RISKS TO WHICH

7    THE FUND IS SUBJECT UNDER THOSE CONDITIONS OR BE

8    SUCCESSFUL --

9    Q.   OKAY.  CAN YOU PLEASE GO ON TO THE NEXT

10   SENTENCE FOR ME.

11   A.   IN EMPLOYING MEASURES TO REDUCE SUCH A RISK IN

12   THIS REGARD, THE MARKETS IN WHICH THE FUND WILL

13   INVEST ARE FREQUENTLY VOLATILE.  FURTHERMORE, THE

14   FUND'S POSITIONS IN SOME CASES WILL BE LEVERAGED

15   WHICH INCREASE THE RISK.

16   Q.   OKAY.  THANK YOU, SIR.

17        NOW, BEFORE YOU MADE YOUR FIRST

18   INVESTMENT IN THE ASENQUA BETA FUND IN

19   JANUARY 2005, DO YOU RECALL SEEING, FIRST OF ALL,

20   THIS PARTICULAR PARAGRAPH?

21   A.   I DON'T RECALL, SPECIFICALLY SEEING THIS

22   PARAGRAPH.

23   Q.   DO YOU RECALL IF YOU SAW ANYTHING IN WRITING

24   THAT HAD THE SAME IDEAS, IF YOU WILL, AS THE

25   SENTENCES YOU JUST READ ON THE RECORD THAT -- DID

225

1    YOU RECALL SEEING ANYTHING THAT HAD THE SAME IDEAS
2    AS WHAT YOU JUST READ ON TO THE RECORD BEFORE YOU
3    MADE YOUR FIRST INVESTMENT IN THE ASENQUA BETA
4    FUND?
5    A.   I'M SORRY, THAT QUESTION WAS VERY LONG.  I'M
6    LOST.
7    Q.   WELL, ALSO VERY POOR, SO LET ME TRY AGAIN.
8         YOU MAY NOT REMEMBER SPECIFICALLY READING
9    THIS PARAGRAPH.  BUT WHAT ABOUT THE IDEA BEHIND
10   THIS PARAGRAPH.  DO YOU RECALL SEEING ANYTHING WITH
11   THIS TYPE OF INFORMATION BEFORE YOU MADE YOUR FIRST
12   INVESTMENT IN ASENQUA BETA FUND?
13   A.   WERE YOU BROADENING THE SCOPE AGAIN?  NOT JUST
14   RELATED TO THIS DOCUMENT?
15   Q.   ANYTHING.  ANYTHING.  AND I APPRECIATE YOUR
16   CLARIFYING THIS.  YES, ANYTHING?
17   A.   OKAY.  YEAH.  IN OTHER CIRCUMSTANCES, YEAH,
18   SOMETHING SIMILAR IN DIFFERENT WAY, YES.
19   Q.   BUT AS TO ASENQUA BETA FUND, IT MIGHT BE
20   ANOTHER DOCUMENT RELATING TO ASENQUA BETA FUND, DID
21   YOU RECALL SEEING ANYTHING THAT HAD THIS TYPE OF
22   WARNING OR INFORMATION IN ANY DOCUMENTS RELATING TO
23   ASENQUA BETA FUND BEFORE YOU MADE YOUR FIRST
24   INVESTMENT IN ASENQUA BETA FUND?
25   A.   I DON'T RECALL, BUT I HAVE PROVIDED YOU ALL

1    THE POWERPOINT WHICH YOU HAVE IN THE POSSESSION AS

2    WELL.

3    Q.   OKAY.  AND I'M SURE WE WILL GET TO THAT.  BUT

4    AS I UNDERSTAND YOUR TESTIMONY IS THAT YOU DO NOT

5    RECALL?

6    A.   CORRECT.

7    Q.   OKAY.  NOW, LET ME ASK YOU, YOU KEEP TRACK OF

8    THE MARKET, JUST GENERAL ECONOMIC NEWS, BOTH IN THE

9    UNITED STATES AND IN ASIA, DO YOU NOT?

10   A.   I DON'T UNDERSTAND THE MEANING OF THIS

11   QUESTION.

12   Q.   SURE.  OKAY.  DO YOU KEEP TRACK OF WHAT'S

13   HAPPENING WITH THE MARKET?

14   A.   I WATCH NEWS AND I WATCH CNBC ONCE IN A WHILE.

15   Q.   OKAY.  A VERY FINE STATION.  BESIDES THAT, DO

16   YOU DO ANY READING EITHER ONLINE OR NEWSPAPER OR

17   MAGAZINE FORMAT REGARDING NEWS OF WHAT THE STOCK

18   MARKET IS DOING?

19   A.   ONLY OCCASIONALLY.  AGAIN, MOSTLY CNN.  YEAH.

20   Q.   IN THE YEAR 2008, WERE YOU AWARE THAT THERE

21   WAS SOMETHING HAPPENING WITH THE MARKET, STOCK

22   MARKET GLOBALLY?

23   A.   2008 YOU MUST BE REFERRING TO THE SUBPRIME.

24   Q.   OKAY.  SO YOU ARE AWARE THAT THERE WAS A

25   CONDITION THAT YOU JUST TERMED A SUBPRIME, RIGHT?

1    A.   YES.

2    Q.   WHAT WAS YOUR UNDERSTANDING?

3              MR. LUCEY:  YOUR HONOR, I WOULD LIKE TO

4    PLACE AN OBJECTION AT THIS POINT AS TO VAGUENESS OF

5    THE QUESTION IN TERMS OF MARKET IN 2008.

6              THE COURT:  I WILL LET IT GO SO FAR

7    BECAUSE THERE'S NO OBJECTION.  BUT YOU MIGHT MAKE

8    YOUR QUESTIONS A LITTLE MORE SPECIFIC.  IF YOU ARE

9    ASKING HIM ABOUT A SPECIFIC TYPE OF CONDITION OR A

10   SPECIFIC MARKET, WHEN YOU SAY MARKET I DON'T KNOW

11   IF YOU ARE REFERRING TO ALL U.S. MARKET AND FOREIGN

12   MARKETS OR A PARTICULAR ONE.

13             MR. FONG:  CERTAINLY, YOUR HONOR.

14             I WILL TRY TO MAKE TO COME UP WITH A

15   BETTER QUESTION.

16   Q.   LET ME TRY AGAIN, MR. LIN, AND THANK YOU FOR

17   BEARING WITH ME.

18             WERE YOU AWARE IN 2008 THAT THERE WAS

19   SOME CHANGES IN THE STOCK MARKET, SAY, IN THE

20   UNITED STATES FOR PUBLICLY TRADED COMPANIES?

21   A.   YES.

22   Q.   OKAY.  AND WHAT WAS YOUR UNDERSTANDING OF THAT

23   CHANGE?

24   A.   THERE WERE FINANCIAL CRISIS CREATED TRIGGERED

25   BY SUBPRIME.

1    Q.   ALL RIGHT.  AND DID YOU HAVE ANY UNDERSTANDING

2    THAT, AGAIN, I'M ONLY FOCUSSING ON THE U.S. MARKET

3    RIGHT NOW, THE U.S. PUBLICLY TRADED MARKET, STOCK

4    MARKET, THAT THERE WAS -- THERE WERE CHANGES IN HOW

5    BANKS WERE DOING BUSINESS IN THE UNITED STATES

6    BECAUSE OF THIS SUBPRIME CONDITION THAT YOU JUST

7    DESCRIBED?

8    A.   I'M ONLY A VERY ORDINARY PERSON IN THAT

9    REGARD.  SO MY UNDERSTANDING IS WHATEVER I HEARD OR

10   READ FROM THE NEWSPAPER OR THE BANK.

11   Q.   I UNDERSTAND.

12   A.   THE TV STATIONS, YES.

13   Q.   I UNDERSTAND THAT.  BUT MY QUESTION IS,

14   REGARDLESS OF THE SOURCE, DID YOU HAVE ANY

15   UNDERSTANDING ONE WAY OR THE OTHER IF THERE WERE

16   CHANGES IN WHAT WAS HAPPENING WITH THE BANKS AS A

17   RESULT WITH THE -- WHAT YOU TERM THE SUBPRIME

18   CONDITION IN 2008 FROM THE U.S. MARKET?

19        MR. LUCEY:  YOUR HONOR, IT WOULD BE A NEW

20   OBJECTION AS TO VAGUENESS AS TO TIME.  RELEVANCE AS

21   TO THE NATURE OF MR. LIN'S TESTIMONY.

22        THE COURT:  HE SAID 2008.  DO YOU WANT A

23   MORE SPECIFIC DATE.

24        MR. LUCEY:  THERE ARE MANY MONTHS IN

25   2008, YOUR HONOR.

1          THE COURT:  OKAY.  COULD YOU BREAK IT

2     DOWN.

3          MR. FONG:  SURE.

4     Q.   ANY TIME IN 2008, DID YOU KNOW -- WERE YOU

5     AWARE THERE WERE CHANGES AS A RESULT OF THE

6     SUBPRIME CONDITION THAT YOU JUST DESCRIBED, CHANGES

7     IN WHAT THE BANKS WERE DOING IN THE U.S. MARKET?

8     ANY TIME IN 2008?

9     A.   I HEARD AND KNEW ABOUT SUBPRIME.  I AM NOT

10    CLEAR.  WHAT DO YOU MEAN BY CHANGES IN THE BANK

11    OPERATION?  I AM NOT A BANKER.

12    Q.   OKAY.  I UNDERSTAND THAT.

13         DID YOU -- WERE YOU AWARE THAT CERTAIN

14    BANKS WERE EITHER COLLAPSING OR WERE ON THE VERGE

15    OF COLLAPSING IN 2008 AS A RESULT OF THE SUBPRIME

16    CONDITION THAT YOU JUST MENTIONED?

17    A.   IT'S WHATEVER I READ FROM NEWSPAPER LIKE BAYER

18    STERN, FOR EXAMPLE.

19    Q.   SO YOUR ANSWER IS YES, YOU WERE AWARE FROM

20    WHATEVER SOURCE YOU WERE GETTING YOUR INFORMATION;

21    IS THAT CORRECT?

22    A.   ONE MORE TIME, WHAT'S THIS QUESTION?

23    Q.   SURE.  WERE YOU AWARE IN ANY TIME IN 2008 THAT

24    BANKS WERE HAVING PROBLEMS AS A RESULT OF THE

25    SUBPRIME CONDITION THAT YOU JUST DESCRIBED EARLIER?

1    A.   BANKS ARE HAVING PROBLEM AND YOU WANT ME TO

2    SAY IF BANKS HAVE -- I'M NOT AN ECONOMIST.

3              THE COURT:  HIS QUESTION, BASICALLY, IS

4    IN 2008 WERE YOU AWARE THAT SOME BANKS WERE HAVING

5    DIFFICULTIES BECAUSE OF THE SUBPRIME MARKET?

6              THE WITNESS:  I READ ABOUT BAYER STERN.

7    I DON'T KNOW IF EVERY BANK HAD THE PROBLEM.  THEY

8    WERE ALL BIG NEWS, YES.

9              MR. FONG:  AGAIN, I WILL CONTINUE

10   APOLOGIZING FOR INTERRUPTING YOU.

11             THE WITNESS:  I ALSO APOLOGIZE FOR NOT

12   UNDERSTANDING YOUR QUESTION, I'M SORRY.

13             MR. FONG:  IT'S PROBABLY BECAUSE MY

14   QUESTIONS ARE POOR, SO LET ME TRY AGAIN.

15   Q.   SO YOU HEARD THAT BAYER STERN WAS HAVING

16   PROBLEMS AS A RESULT OF SUBPRIME CONDITION SOMETIME

17   IN 2008, IS THAT TRUE?

18   A.   TRUE.

19   Q.   NOW, LET ME CHANGE THE GEOGRAPHICAL LOCATION.

20   IN ANY TYPE IN 2008, WERE YOU AWARE THAT THE STOCK

21   MARKET IN ASIA WAS HAVING PROBLEMS?

22   A.   I'M SORRY, WHAT DOES THAT HAVING PROBLEMS

23   MEAN?

24   Q.   THERE WERE CHANGES, THERE WERE SUBSTANTIAL

25   CHANGES IN THE MARKET, MARKET GOING UP AND DOWN.

1    WERE YOU AWARE OF THAT?

2    A.   MY UNDERSTANDING OF THE MARKET GOES UP AND

3    DOWN IS THE FACTS OF LIFE.  THAT'S WHAT I'M AWARE

4    OF.

5    Q.   ALL RIGHT.  WERE YOU AWARE IF THE SUBPRIME

6    CONDITION THAT YOU TESTIFIED TO EARLIER WAS HAVING

7    ANY EFFECT ON THE ASIAN STOCK MARKET ANY TIME IN

8    2008?

9    A.   I BELIEVE I'M NOT QUALIFIED TO ANSWER THAT

10   QUESTION.  I'M NOT KNOWLEDGEABLE IN THOSE STOCK

11   MARKETS.

12   Q.   AND I CERTAINLY DON'T WANT YOU TO TESTIFY AS

13   AN EXPERT.  WHAT I AM ASKING YOU IS WERE YOU, BOB

14   LIN, PERSONALLY AWARE FROM ANY SOURCE THAT AS A

15   RESULT OF THE SUBPRIME CONDITION THAT YOU TESTIFIED

16   TO EARLIER, THAT WAS AFFECTING THE ASIAN STOCK

17   MARKET IN 2008?

18   A.   AS I SAY, I KNEW ABOUT U.S. THROUGH READING

19   THE NEWS.  I AM NOT QUALIFIED TO ANSWER WHETHER I

20   KNEW ABOUT ASIA HAS CHANGE OR NOT, NO, NO I DON'T.

21   Q.   MAYBE MY QUESTION IS POOR.  LET ME TRY THIS.

22   AT ANY TIME IN 2008 DID YOU HEAR FROM ANY NEWS

23   SOURCE THAT THE SUBPRIME CONDITION WAS HAVING AN

24   EFFECT ON THE ASIAN STOCK MARKET?

25   A.   AGAIN, FROM THE NEWS IN GENERAL, IT WAS

1    GLOBAL, YEAH.

2    Q.   SO THAT WOULD -- AND WHEN YOU USE THE TERM

3    GLOBAL OF COURSE, YOU WOULD INCLUDE THE ASIAN STOCK

4    MARKET AS WELL, IS THAT TRUE?

5    A.   YES.

6    Q.   THANK YOU.  NOW LET ME DIRECT YOUR ATTENTION

7    IF I MAY, TO PAGE 12.  FIRST OF ALL, DO YOU SEE

8    PAGE 12?

9    A.   YES.

10   Q.   DIRECTING YOUR ATTENTION TO -- WELL, FIRST OF

11   ALL, THE HEADING OF PAGE 12 IS LIQUIDITY, RIGHT?

12   A.   YES.

13   Q.   AND THEN THERE'S WITHDRAWALS, RIGHT?

14   A.   YES.

15   Q.   OKAY.  GOING DOWN TO 1, 2, 3, THE THIRD FULL

16   PARAGRAPH; DO YOU SEE THAT, SIR?

17   A.   YES.

18   Q.   OKAY.  LET ME JUST MAGNIFY THIS JUST A LITTLE.

19   MAY I TROUBLE YOU TO READ THE FIRST SENTENCE,

20   COMPLETE SENTENCE OF THE THIRD PARAGRAPH OF PAGE 12

21   OF THE DEFENDANT'S EXHIBIT 503.

22   A.   THE FUND MAY SUSPEND THE VALUATION OF ITS

23   ASSETS AND ANY REDEMPTIONS OF INTERESTS FOR THE

24   WHOLE OR ANY PART OF ANYTIME PERIOD DURING THE

25   EXISTENCE OF ANY STATE OF AFFAIRS INCLUDING THE

1    RESTRICTION OF TRADING IN ANY ONE OR MORE MARKETS

2    WHICH IN THE OPINION OF THE INVESTMENT MANAGER

3    MAKES THE DETERMINATION OF THE PRICE, VALUE OR

4    DISPOSITION OF THE MASTER FUND'S INVESTMENTS

5    IMPRACTICAL OR PREJUDICIAL TO ITS INVESTORS; OR

6    TWO, IN WHICH REDEMPTION WOULD IN THE OPINION OF

7    THE GENERAL PARTNER, RESULT IN THE VIOLATION OF

8    APPLICABLE LAW.

9    Q.   OKAY.  THANK YOU.  YOU CAN STOP THERE.  I

10   WOULD LIKE TO ASK YOU A COUPLE FOLLOWUP QUESTIONS.

11        WELL, FIRST OF ALL, AND PLEASE IF YOU

12   NEED A MOMENT, JUST LET ME KNOW AND I WILL PAUSE.

13   I DON'T WANT TO --

14   A.   THANK YOU VERY MUCH.  PLEASE CONTINUE.

15   Q.   OKAY.  THANK YOU.

16        OKAY.  NOW, DID YOU RECALL READING THIS

17   PARTICULAR PARAGRAPH IN THIS PRIVATE PLACEMENT

18   MEMORANDUM FOR THE ASENQUA BETA FUND --

19   A.   NO, I DON'T KNOW.  I'M SORRY, I MADE A MISTAKE

20   AGAIN, SORRY.

21   Q.   DO YOU RECALL READING THIS PARAGRAPH IN THE

22   ASENQUA BETA FUND PRIVATE PLACEMENT MEMORANDUM

23   BEFORE YOU MADE YOUR FIRST INVESTMENT IN ASENQUA

24   BETA FUND?

25   A.   NO, I DO NOT RECALL.

1    Q.   OKAY.  DO YOU RECALL -- BEFORE TODAY DO YOU

2    RECALL EVER SEEING THIS PARTICULAR PARAGRAPH?

3    A.   NO.

4    Q.   ALL RIGHT.  NOW I'M GOING TO BROADEN THE

5    QUESTION.

6         DO YOU RECALL AT ANY TIME, AT ANY TIME,

7    READING OR SEEING SOMETHING ABOUT THE IDEA OF

8    REDEMPTION AND HOW THE REDEMPTION CAN BE SUSPENDED

9    BY THE INVESTMENT MANAGER; DO YOU EVER RECALL

10   SEEING ANYTHING IN WRITING?

11   A.   NO, I DON'T RECALL.

12   Q.   ALL RIGHT.  AND OF COURSE, IF YOU HAD SEEN

13   THIS, THAT WOULD HAVE OF COURSE BEEN VERY IMPORTANT

14   TO YOU, RIGHT?

15   A.   CAN YOU REPHRASE YOUR QUESTION AGAIN?

16   Q.   SURE.  HAVING JUST SEEN THIS, WOULD THIS

17   HAVE -- THIS INFORMATION THAT'S CONTAINED IN THE

18   PARAGRAPH THAT YOU JUST READ, WOULD THIS HAVE BEEN

19   IMPORTANT INFORMATION FOR YOU TO KNOW BEFORE YOU

20   MADE YOUR FIRST INVESTMENT IN ASENQUA BETA FUND?

21   A.   IT WOULD BE IMPORTANT.  BUT EVEN MORE

22   IMPORTANT IS WHO IS THE MANAGER.

23   Q.   I FULLY APPRECIATE THAT.  BUT THIS WOULD BE --

24   BUT THIS PARAGRAPH, THE RIGHT OF REDEMPTION AND HOW

25   THE REDEMPTION CAN BE SUSPENDED BY THE INVESTMENT

1    MANAGER, THAT WOULD HAVE BEEN IMPORTANT, RIGHT?

2    A.   YES.

3    Q.   OKAY.  NOW, WHO DID YOU UNDERSTAND WHO THE

4    INVESTMENT MANAGER WOULD BE IN THE ASENQUA BETA

5    FUND?

6    A.   IT'S MR. ALBERT HU.

7    Q.   OKAY.  SO THE INVESTMENT MANAGER WOULD BE

8    MR. ALBERT HU.  NOW, YOU ALSO DO NOT KNOW EACH AS

9    YOU SIT HERE, IF THE ASENQUA BETA FUND WAS SUPPOSED

10   TO BE A FEEDER FUND OR THE MASTER FUND THAT YOU

11   HAVE SEEN NOW IN THIS DOCUMENT, RIGHT?

12   A.   CORRECT.  I DO NOT RECALL THAT.

13   Q.   SO AS YOU SIT HERE, YOU DO NOT KNOW IF WHEN --

14   IF THE TERM MASTER FUND AS USED IN THIS DOCUMENT

15   WAS REFERRING TO SOMETHING OTHER THAN THE ASENQUA

16   BETA FUND; IS THAT CORRECT?

17   A.   ONE MORE TIME, PLEASE.

18   Q.   SURE.  AS YOU SIT HERE YOU DO NOT KNOW IF THE

19   TERM MASTER FUND, AS USED IN THIS DOCUMENT THAT WE

20   HAVE SEEN, WAS REFERRING TO THE ASENQUA BETA FUND

21   OR SOME OTHER FUND?

22   A.   NO, NOT THAT SPECIFICITY.  ALL I KNOW IS I

23   DEPOSIT THE MONEY TO ALBERT HU'S ACCOUNT THAT HE

24   PROVIDED.  THAT'S ALL I KNEW.

25   Q.   OKAY.  NOW, DO YOU HAVE ANY UNDERSTANDING AS

1  YOU SIT HERE IF YOU HEAR THE TERMS MASTER FUND AND

2  FEEDER FUND, DOES THAT IMPLY TO YOU THAT THE MASTER

3  FUND IS BIGGER THAN THE FEEDER FUND?

4  A.   THE WORD, YES.

5  Q.   I UNDERSTAND THE WORD MASTER WOULD BRING UP

6  CERTAIN IMAGES, BUT IN YOUR MIND WOULD THE TERM

7  MASTER FUND AND FEEDER FUND, WOULD THAT IMPLY TO

8  YOU THAT MASTER FUND WOULD BE A BIGGER FUND THAN

9  THE FEEDER FUND?

10  A.   YES, AGAIN, READING THE WORD, YES.

11  Q.   NOW, LET ME DIRECT YOUR ATTENTION NOW TO PAGE

12  13, DEFENDANT'S EXHIBIT 503.

13          DO YOU SEE THAT PAGE IN FRONT OF YOU,

14  SIR?

15  A.   YES.

16  Q.   AND IT HAS THE HEADING OF SUMMARY ON TOP,

17  RIGHT?

18  A.   RIGHT.

19  Q.   OKAY.  DIRECTING YOUR ATTENTION TO THE SECOND

20  PARAGRAPH WHICH HAS THE HEADING MINIMUM

21  SUBSCRIPTION?

22  A.   MINIMUM SUBSCRIPTION.

23  Q.   DO YOU SEE THAT PARAGRAPH, SIR?

24  A.   YES, I SEE IT.

25  Q.   OKAY.  MAY I TROUBLE YOU TO PLEASE READ THE

1    FIRST SENTENCE OF THAT PARAGRAPH.

2    A.    INTEREST IN THE FUND WILL BE SOLD AT A MINIMUM

3    SUBSCRIPTION PER INVESTOR OF 1 MILLION, THE GENERAL

4    PARTNER MAY IN ITS DISCRETION ADJUST THIS MINIMUM.

5    Q.    OKAY.  IF YOU COULD STOP THERE.

6          FIRST OF ALL, DO YOU HAVE ANY

7    UNDERSTANDING AS TO WHO WAS THE GENERAL PARTNER

8    REFERRED TO IN THIS PARTICULAR SENTENCE?

9    A.    ALBERT HU.

10   Q.    ALL RIGHT.  SO DOES THIS PARAGRAPH TO YOU MEAN

11   THAT THE STATED MINIMUM FOR THE SUBSCRIPTION IN THE

12   ASENQUA BETA FUND WAS A MILLION DOLLARS, BUT MR. HU

13   IN HIS DISCRETION COULD MAKE ADJUSTMENTS TO IT,

14   RIGHT?

15   A.    THAT'S WHAT THE PARAGRAPH SAID.

16   Q.    ALL RIGHT.  NOW, YOU -- DID YOU EVER READ THIS

17   PARTICULAR PARAGRAPH BEFORE YOU MADE YOUR FIRST

18   INVESTMENT IN ASENQUA BETA FUND IN JANUARY 2005?

19   A.    I DON'T RECALL.  VERBALLY MR. HU HAS TOLD ME

20   MANY TIMES ALL HIS INVESTORS ARE EITHER 1 MILLION

21   OR 2 MILLION.  I WAS THE SMALLER, SMALLEST OR THE

22   SMALLER ONE.

23   Q.    ALL RIGHT.  NOW, DURING THESE DISCUSSIONS WITH

24   MR. HU, DID YOU EVER LOOK AT THE DOCUMENTS THAT YOU

25   HAD BEEN PROVIDED WITH TO FIND OUT IF INDEED WHAT

1    THE MINIMUM -- WHAT THE RULES WERE IN TERMS OF A

2    MINIMUM AMOUNT OF INVESTMENT?

3    A.   I DON'T RECALL.  BUT AGAIN, HE HAS VERBALLY

4    TOLD ME, YEAH.

5    Q.   THAT'S FINE.  OKAY.

6         THEN DIRECTING YOUR ATTENTION, MOVING

7    DOWNWARD TO THE LAST PARAGRAPH OF THAT PAGE, PAGE

8    13, DO YOU SEE THAT, SIR?

9    A.   THE LAST PARAGRAPH.

10   Q.   IT HAS THE HEADING OF COUNSEL, DO YOU SEE

11   THAT?

12   A.   COUNSEL.

13   Q.   DO YOU SEE THAT, SIR?

14   A.   YES, I SEE IT.

15   Q.   CAN YOU PLEASE READ THAT SHORT PARAGRAPH FOR

16   US.

17   A.   NOBLE LAW GROUP THAT HAS BEEN RETAINED AS

18   COUNSEL FOR THE FUND, THE MASTER FUND AND THE

19   INVESTMENT MANAGER.  MAPLES AND CALDER HAS BEEN

20   RETAINED AS CAYMAN ISLAND COUNSEL TO THE MASTER

21   FUND.

22   Q.   OKAY.  DO YOU RECALL READING THIS PARAGRAPH

23   BEFORE YOU MADE YOUR INVESTMENT IN THE ASENQUA BETA

24   FUND?

25   A.   I DON'T RECALL.

1    Q.   DO YOU RECALL HEARING OR SEEING FROM ANY

2    SOURCE THAT THE NOBLE LAW GROUP WOULD BE OR HAS

3    BEEN RETAINED AS THE ATTORNEY FOR THE ASENQUA BETA

4    FUND AND THE MASTER FUND FOR THE MANAGER?

5    A.   NO, I DON'T RECALL.  FURTHERMORE, I HAVE NOT

6    MET ANY OF THESE PEOPLE.

7    Q.   NOW, LET ME ASK YOU, DO YOU KNOW A PERSON BY

8    THE NAME OF SEAN VERAH?

9    A.   YES.

10    Q.   AND WHAT IS YOUR UNDERSTANDING OF MR. VERAH'S

11    RELATIONSHIP, IF ANY, TO MR. HU?

12    A.   WHEN I FIRST MET WITH ALBERT HU, HE INVITED ME

13    TO HIS PALO ALTO OFFICE FOR THE FIRST TIME.  AND

14    MR. SEAN VERAH WAS THERE, WAS INTRODUCED TO ME AS

15    SOMEONE TO HELP EVALUATE A START UP.

16    Q.   DO YOU KNOW IF THERE'S ANY REASON BETWEEN SEAN

17    VERAH AND THE NOBLE LAW GROUP?

18    A.   NO, I DON'T.

19    Q.   DO YOU KNOW IF THE PRINCIPAL ATTORNEY FOR THE

20    NOBLE LAW GROUP WAS A GENTLEMAN BY THE NAME OF

21    JONATHAN NOBLE, DO YOU KNOW THAT?

22    A.   I DON'T.

23    Q.   ALL RIGHT.  AND DO YOU KNOW AS YOU SIT HERE

24    TODAY IF MR. JONATHAN NOBLE HAD EVER DONE ANY LEGAL

25    WORK FOR ASENQUA BETA FUND?

1    A.   I DON'T KNOW.

2    Q.   WOULD IT -- DO YOU KNOW IF JONATHAN NOBLE WAS

3    A CHILDHOOD FRIEND OF SEAN VERAH'S DO YOU KNOW

4    THAT?

5    A.   I DON'T.

6    Q.   DIRECTING YOUR ATTENTION TO PAGE 17, FIRST OF

7    ALL DO YOU SEE THAT, SIR?

8    A.   YES, I SEE PAGE 17.

9    Q.   OKAY.

10   Q.   AND THE HEADING FOR THIS PAGE IS MASTER FUND

11   VALUATION, DO YOU SEE THAT, SIR?

12   A.   YES.

13   Q.   DIRECTING YOUR ATTENTION TO THE SHORTER

14   PARAGRAPH ON PAGE 17, DO YOU SEE THAT, SIR?

15   A.   YES.

16   Q.   JUST TAKE A MOMENT.  YOU DON'T NEED TO READ IT

17   OUT LOUD, JUST READ IT TO YOURSELF, IF I MAY ASK

18   YOU TO.

19   A.   I HAVE, YES.

20   Q.   OKAY.  NOW, THE PARAGRAPH THAT YOU JUST READ,

21   THAT IN ESSENCE IT SAYS THE SAME THING AS THE

22   PARAGRAPH THAT WE SAW EARLIER, RIGHT, ABOUT THE

23   RIGHT OF REDEMPTION AND HOW THAT RIGHT OF

24   REDEMPTION IS LIMITED, RIGHT?

25   A.   RIGHT.

1    Q.   OKAY.  NOW DO YOU RECALL SEEING THIS

2    PARTICULAR PARAGRAPH?  I UNDERSTAND YOU TESTIFIED

3    TO THE OTHER PARAGRAPH, BUT DO YOU RECALL SEEING

4    THIS PARTICULAR PARAGRAPH IN THIS DOCUMENT BEFORE

5    YOU MADE YOUR INVESTMENT, YOUR FIRST INVESTMENT IN

6    ASENQUA BETA FUND?

7    A.   NO, I DON'T RECALL.

8    Q.   OKAY. LET ME DIRECT YOUR ATTENTION TO PAGE 28

9    OF THE DOCUMENT.  SO THIS IS PAGE 28.  AND IF YOU

10   COULD READ TO YOURSELF THE THIRD PARAGRAPH FROM THE

11   BOTTOM, STARTING WITH THE WORDS, THE FUND MAY

12   SUSPEND.  DO YOU SEE THAT, SIR?

13   A.   YES.

14   Q.   OKAY. AND JUST TAKE A MOMENT, IF YOU DON'T

15   MIND, SIR, AND JUST READ TO YOURSELF THAT

16   PARTICULAR PARAGRAPH.

17   A.   OKAY.

18   Q.   NOW, THAT PARAGRAPH PROVIDES THE SAME

19   INFORMATION THAT WE JUST SAW IN THE LAST PAGE THAT

20   WE LOOKED AT, I THINK THAT WAS PAGE 17, THEN

21   PREVIOUSLY BEFORE THAT, RIGHT, ABOUT THE

22   REDEMPTION, THE RIGHT OF REDEMPTION AND HOW THE

23   RIGHT OF REDEMPTION CAN BE SUSPENDED UNDER CERTAIN

24   CIRCUMSTANCES?

25   A.   RIGHT.

1    Q.   NOW, DO YOU RECALL BEFORE YOU EVER MADE AN

2    INVESTMENT IN ASENQUA BETA FUND, THAT SEEING A

3    BUNCH OF PARAGRAPHS ABOUT REDEMPTION REGARDLESS OF

4    WHAT THE CONTENTS MIGHT BE JUST THINGS, IF YOU

5    WILL, ABOUT REDEMPTION?

6    A.   I DON'T RECALL.  AS I SAID EARLIER.  IN THE

7    CONVERSATION MR. HU HAD TOLD ME A FEW TIMES BUT I

8    DON'T RECALL READING THE PARAGRAPH.

9    Q.   BUT YOU DID TESTIFY EARLIER TODAY THAT YOU HAD

10   READ THIS DOCUMENT, THE PRIVATE PLACEMENT

11   MEMORANDUM --

12   A.   NO, SORRY, YOU ASKED ME IF I RECOGNIZED THIS

13   DOCUMENT, YES.  I RECOGNIZE IT.

14   Q.   OKAY.  AND DID YOU EVER READ IT?  IF I FORGOT

15   THAT QUESTION, I APOLOGIZE.

16        DO YOU EVER READ THIS PARTICULAR

17   DOCUMENT, EXHIBIT 503, THE PRIVATE PLACEMENT

18   MEMORANDUM FOR ASENQUA BETA FUND BEFORE YOU MADE

19   YOUR FIRST INVESTMENT IN ASENQUA BETA FUND?

20   A.   FIRST OF ALL, I DON'T RECALL WHEN I RECEIVED

21   THIS DOCUMENT.

22        AND SECONDLY, IF I HAD READ IT THAT WAS

23   QUITE A FEW YEARS AGO.  SO IF I HAVE, I MIGHT HAVE

24   JUST SCANNED THROUGH IT.

25   Q.   I IS CERTAINLY UNDERSTAND THAT?

1    A.   I APOLOGIZE FOR MY LOUSY MEMORY, IT'S GETTING

2    OLD.

3    Q.   MR. LIN THERE'S ABSOLUTELY NO NEED TO

4    APOLOGIZE.  ALL I'M ENTITLED TO IS ASK YOU

5    QUESTIONS AND HAVE YOU ANSWER TO THE BEST OF YOUR

6    RECOLLECTION, THAT'S ALL I'M ENTITLED TO.

7         I CERTAINLY DON'T MEAN TO IMPLY THROUGH

8    MY QUESTIONS THAT THIS IS A TEST, IT ISN'T.  I JUST

9    WANT TO KNOW WHAT YOUR BEST RECOLLECTION IS AND YOU

10   ARE PROVIDING ME WITH THAT.

11        DIRECTING YOUR ATTENTION TO PAGE 24.  OF

12   THE PRIVATE PLACEMENT MEMORANDUM; DO YOU SEE THAT,

13   SIR?

14   A.   PAGE 24?

15   Q.   YES.

16   A.   YES.

17   Q.   NOW DIRECTING YOUR ATTENTION TO THE THIRD FULL

18   PARAGRAPH ON PAGE 24 OF DEFENDANT'S EXHIBIT 503, DO

19   YOU SEE -- FIRST OF ALL, DO YOU SEE THAT PARTICULAR

20   PARAGRAPH?  IT BEGINS WITH THE TERM, THE INVESTMENT

21   MANAGER'S TRADING STRATEGIES MAY NOT BE SUCCESSFUL.

22   A.   YES, I HAVE SEEN IT.

23   Q.   OKAY.  NOW, CAN YOU PLEASE READ THE FIRST

24   SENTENCE OF THAT PARAGRAPH?

25   A.   THERE CAN BE NO ASSURANCE THAT ANY TRADING

1   METHOD EMPLOYED ON BEHALF OF THE MASTER FUND WILL

2   PRODUCE PROFITABLE RESULTS OR AVOID LOSSES.

3   Q.   OKAY.  THANK YOU.  AND CAN YOU PLEASE READ THE

4   NEXT SENTENCE WHICH, YES, NEXT SENTENCE, PLEASE?

5   A.   FOR EXAMPLE THE PROPRIETARY MODELS USED BY THE

6   INVESTMENT MANAGER MAY NOT FUNCTION AS ANTICIPATED

7   DURING UNUSUAL MARKET CONDITIONS.  WHILE THE

8   PRINCIPALS OF THE INVESTMENT MANAGER HAVE A PRIOR

9   EXPERIENCE IN USING THE STRATEGIES THAT WILL BE

10  APPLIED TO TRADING FOR THE MASTER FUND, THIS CANNOT

11  BE USED TO PREDICT FUTURE PROFITABILITY.

12  Q.   OKAY.  THANK YOU.

13       NOW, DO YOU RECALL READING THIS

14  PARTICULAR PARAGRAPH ON PAGE 24, THE THIRD

15  PARAGRAPH OF PAGE 24, BEFORE YOU MADE YOUR FIRST

16  INVESTMENT IN ASENQUA BETA FUND?

17  A.   NO, I DON'T RECALL READING THIS SPECIFIC

18  PARAGRAPH.

19  Q.   OKAY.  DO YOU RECALL READING SOMETHING THAT

20  HAS THE SAME KIND OF INFORMATION AS THIS PARAGRAPH

21  HAS IN ANY OF THE DOCUMENTS THAT YOU READ BEFORE

22  YOU MADE YOUR FIRST INVESTMENT IN THE ASENQUA BETA

23  FUND?

24  A.   NO, I DON'T RECALL.

25  Q.   OKAY.  THANK YOU VERY MUCH AS TO THIS

1    PARTICULAR DOCUMENT.  I THINK WE ARE DONE WITH THIS

2    DOCUMENT.

3              LET ME ASK YOU A FOLLOWUP QUESTION,

4    THOUGH, IF I MAY.  YOU DO CONSIDER THE SUBPRIME

5    CONDITION THAT HAPPENED IN THE YEAR, AROUND THE

6    YEAR 2008 TO BE AN UNUSUAL CONDITION FOR THE

7    MARKET, RIGHT?

8    A.   IT WAS.

9    Q.   OKAY.  THANK YOU.  LET ME THEN, IF I COULD

10   RETRIEVE THAT FROM YOU, THANK YOU.

11             IF I COULD DIRECT YOUR ATTENTION NOW TO

12   WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 502.

13   DO YOU SEE THAT, SIR?

14   A.   YES.

15   Q.   AND FIRST OF ALL, JUST TAKE A MOMENT TO LOOK

16   AT THE DOCUMENT.

17   A.   YES.  I HAVE LOOKED AT THE DOCUMENT.

18   Q.   DO YOU RECOGNIZE THAT DOCUMENT?

19   A.   YES, I HAVE -- I RECOGNIZE THIS DOCUMENT.

20   Q.   AND IS THIS A DOCUMENT THAT YOU PRODUCED TO MY

21   OFFICE THROUGH YOUR ATTORNEY IN RESPONSE TO THE

22   SUBPOENA?

23   A.   YES.  ORIGINALLY PROVIDED BY MR. HU.

24   Q.   YES.  I APPRECIATE THAT CLARIFICATION.  BUT

25   THIS IS A DOCUMENT THAT YOU HAD IN YOUR POSSESSION,

1    RIGHT?

2    A.   CORRECT.

3    Q.   OKAY.  NOW, CAN YOU TELL ME WHAT THIS DOCUMENT

4    IS?

5    A.   IT'S A BROCHURE INTRODUCING THE MANAGEMENT

6    TEAM OF ASENQUA CAPITAL MANAGEMENT.

7    Q.   AND DO YOU RECALL IF YOU RECEIVED THIS

8    DOCUMENT FROM MR. HU BEFORE YOU MADE YOUR FIRST

9    INVESTMENT IN ASENQUA BETA FUND?

10   A.   YES, THIS ONE BEFORE?  YES.

11             MR. FONG:  YOUR HONOR, AT THIS TIME I

12   WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 502.

13             MR. LUCEY:  NO OBJECTION, YOUR HONOR.

14             THE COURT:  502 IS ADMITTED.

15   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 502 HAVING

16   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

17   ADMITTED INTO EVIDENCE.)

18   BY MR. FONG:

19   Q.   IF I COULD DIRECT YOUR ATTENTION MR. LIN TO

20   PAGE 2, NOT NECESSARILY THE SECOND PAGE BUT PAGE 2

21   ON THE BOTTOM THERE OF THIS EXHIBIT.  DO YOU SEE

22   THAT, SIR?

23   A.   PAGE 2, YES.

24   Q.   AND IT HAS A PICTURE OF A GENTLEMAN, THEN IT'S

25   ENTITLED STEVEN C. BOND; DO YOU SEE THAT?

1    A.    YES.  I SEE THAT.

2    Q.    OKAY.  NOW, DO YOU RECOGNIZE THIS GENTLEMAN,

3    STEVEN BOND?

4    A.    YES.  I MET HIM THROUGH MR. HU.

5    Q.    AND WAS HE WITH MR. HU WHEN YOU AND MR. HU THE

6    FIRST TIME THAT THE TWO OF YOU DISCUSSED THE

7    POSSIBILITY OF YOU INVESTING IN ASENQUA BETA FUND?

8    A.    YES.  FIRST, VERY FIRST MEETING HE WAS WITH

9    MR. HU.

10   Q.    OKAY.  AND NOW, YOU READ THIS DOCUMENT BEFORE

11   YOU, DEFENDANT'S EXHIBIT 502, BEFORE YOU MADE YOUR

12   FIRST INVESTMENT IN ASENQUA BETA FUND, RIGHT?

13   A.    YES.

14   Q.    SO LET ME DIRECT YOUR ATTENTION TO THE FIRST

15   SENTENCE UNDER STEVEN C. BOND, CFA, DO YOU SEE THAT

16   SIR?

17   A.    YES.

18   Q.    CAN YOU READ THE FIRST SENTENCE FOR ME?

19   A.    STEVE HAS SERVED AS FUND MANAGER AND ANALYST

20   FOR ASENQUA CAPITAL MANAGEMENT SINCE MAY 2000.

21   Q.    ALL RIGHT.  NOW, DID YOU HAVE ANY

22   UNDERSTANDING BEFORE YOU MADE YOUR FIRST INVESTMENT

23   IN THE ASENQUA BETA FUND THAT ASENQUA, WHAT THE

24   ROLE IF ANY THAT ASENQUA CAPITAL MANAGEMENT WOULD

25   HAVE INSOFAR AS THE ASENQUA BETA FUND WOULD BE

1    CONCERNED?

2    A.   PLEASE REPHRASE YOUR QUESTION, I'M SOMEWHAT

3    LOST.

4    Q.   SURE.  OKAY.  THE COMPANY ASENQUA CAPITAL

5    MANAGEMENT THAT'S IN THE SENTENCE YOU JUST READ, DO

6    YOU KNOW WHAT -- FIRST OF ALL, DO YOU KNOW WHAT

7    THAT IS?

8    A.   ASENQUA CAPITAL MANAGEMENT IS THE MANAGEMENT

9    ENTITY HEADED BY ALBERT HU.

10    Q.   ALL RIGHT.  AND THIS BROCHURE SAYS THAT STEVEN

11    BOND HAS SERVED AS THE FUND MANAGER FOR ASENQUA

12    CAPITAL MANAGEMENT SINCE MAY 2000, RIGHT?

13    A.   THAT'S WHAT IT SAYS.  I ONLY MET HIM IN 2004.

14    Q.   OKAY.  THAT'S FINE.  NOW, DO YOU KNOW A

15    DR. ANDY YAN, Y-A-N?

16    A.   YES.

17    Q.   OKAY.  HE'S ALSO PART OF THE ASENQUA CAPITAL

18    MANAGEMENT GROUP, IS THAT TRUE.

19    A.   I DON'T KNOW.  I ALSO MET HIM THROUGH

20    MR. ALBERT HU.  INTRODUCED BY MR. ALBERT HU.

21    Q.   OKAY.  DO YOU KNOW WHAT DR. YAN'S ROLE IS IN

22    THE ASENQUA UNIVERSE?

23    A.   IT'S NOT CLEAR TO ME.

24          THE COURT:  TIME FRAME?

25          MR. FONG:  SURE.  ANY TIME.

1              THE COURT:  UP UNTIL TODAY?

2              MR. FONG:  YEAH.

3              THE COURT:  DO YOU KNOW WHAT DR. YAN'S

4    ROLE, IF ANY, WAS IN ANY ASENQUA ENTITIES UP UNTIL

5    TODAY?

6              THE WITNESS:  YEAH, I ONLY MET HIM

7    THROUGH MR. HU AFTER THE -- SEVERAL MEETING.

8    BY MR. FONG:

9    Q.   OKAY.  SO YOU DID NOT KNOW, FOR EXAMPLE, IF HE

10   WAS A MANAGER WITH ANY OF THE ASENQUA ENTITIES, DO

11   YOU?

12   A.   I DON'T KNOW.

13   Q.   THAT'S FINE.

14             LET ME DIRECT YOUR ATTENTION TO TWO

15   DOCUMENTS ONLY BECAUSE I'M NOT SURE WHICH ONE IS

16   THE ONE YOU SAW.  DIRECTING YOUR ATTENTION TO TWO

17   DOCUMENTS THAT I PUT IN FRONT OF YOU, MR. LIN, THEY

18   ARE MARKED AS DEFENDANT'S EXHIBIT 504 AND

19   DEFENDANT'S EXHIBIT 506.  THE -- FIRST OF ALL, DO

20   YOU RECOGNIZE 504?

21   A.   I RECOGNIZE.

22   Q.   DO YOU RECOGNIZE EXHIBIT 506?

23   A.   I RECOGNIZE.

24   Q.   ARE THESE DOCUMENTS THAT YOU PRODUCED THROUGH

25   YOUR ATTORNEY TO MY OFFICE IN RESPONSE TO THE

1    SUBPOENA?

2    A.   YES.  ORIGINALLY PROVIDED BY MR. HU.

3    Q.   YES.  OKAY.  AND CAN YOU PLEASE HELP US

4    IDENTIFY WHAT IS EXHIBIT 504?

5    A.   504 IS A PROMOTIONAL POWERPOINT PROVIDED BY

6    DOCTOR -- MR. ALBERT HU ON ASENQUA CAPITAL.

7    Q.   IT'S A POWERPOINT UNDER THE HEADING OF ASENQUA

8    CAPITAL MANAGEMENT, CORRECT?

9    A.   CORRECT.

10   Q.   EXHIBIT 504 HAS A DATE ON THE LEFT-HAND CORNER

11   THERE, LOWER LEFT-HAND CORNER, ACTUALLY THE

12   RIGHT-HAND CORNER DEPENDING HOW YOU LOOK AT IT,

13   SEPTEMBER 2004.  DO YOU SEE THAT DATE?

14   A.   YES, I SAW THAT.

15   Q.   THEN, 506 HAS THE DATE OF NOVEMBER 2004, DO

16   YOU SEE THAT?

17   A.   YES, I SAW THAT.

18   Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT

19   EXHIBIT 506 IS?

20   A.   I'M SORRY, 504 OR 506.

21   Q.   506.

22   A.   506 IS THE PROMOTIONAL POWERPOINT PROVIDED BY

23   MR. ALBERT HU INTRODUCING ASENQUA CAPITAL.

24   Q.   OKAY.  NOW, BEFORE YOU INVESTED IN ASENQUA

25   BETA FUND, DID YOU LOOK AT DEFENDANT'S EXHIBIT 504?

1    A.    YES, THIS ONE, YEAH.

2    Q.    OKAY.  SO THEN DID YOU ALSO LOOK AT THE

3    EXHIBIT 506, THE NOVEMBER 2004 VERSION?

4    A.    AREN'T THEY VERY SIMILAR OR THE SAME?

5    Q.    WELL, MY ONLY QUESTION REALLY IS, YOUR

6    TESTIMONY IS THAT YES, YOU DID SEE A POWERPOINT

7    PRESENTATION AND YOU BELIEVE THE ONE THAT YOU SAW

8    IS EXHIBIT 504; IS THAT CORRECT?

9    A.    YES.

10   Q.    OKAY.  AND SO THAT WOULD HAVE BEEN CLOSER IN

11   TIME, SEPTEMBER 2004 TO THE TIME THAT YOU ADMIT

12   WITH MR. HU AND MR. BOND, RIGHT?

13   A.    YES.

14   Q.    OKAY.

15            MR. FONG:  YOUR HONOR, I WOULD MOVE INTO

16   EVIDENCE BOTH EXHIBITS 504 AND 506.

17            MR. LUCEY:  NO OBJECTION, YOUR HONOR.

18            THE COURT:  ALL RIGHT.  THEY ARE

19   ADMITTED.

20   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 504 AND 506

21   HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

22   WERE ADMITTED INTO EVIDENCE.)

23   Q.    DIRECTING YOUR ATTENTION, MR. LIN, TO

24   EXHIBIT 504, CAN I TROUBLE YOU TO TAKE A LOOK AT

25   PAGE 5 OF EXHIBIT 504.

1    A.    YES.

2    Q.    DIRECTING YOUR ATTENTION TO PAGE FIVE WHICH

3    HAS THE HEADING OF PERFORMANCES.  DO YOU SEE THAT,

4    SIR?

5    A.    YES.

6    Q.    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT

7    THE PAGE 5 NUMBERS REPRESENT?

8    A.    IT WAS MY FIRST -- ALBERT HU FIRST INTRODUCED

9    HIS FUND TO ME SHOWING HIS TERRIFIC PERFORMANCE

10   THROUGHOUT 2001, 2002 AND 2003.

11   Q.    ALL RIGHT.  SO IT'S FOR THE PERFORMANCE OF THE

12   ASENQUA HEDGE FUND FROM 2000 TO 2003; IS THAT

13   CORRECT?

14   A.    YES.

15   Q.    THEN THERE'S A COMPARISON TO THE RIGHT OF THE

16   ACM NUMBERS OF S&P THEN CSFB TREMONT AND NASDAQ.

17   DO YOU SEE THAT?

18   A.    YES.

19   Q.    AND YOU UNDERSTOOD THAT THE PURPOSE WAS TO

20   COMPARE THE ASENQUA HEDGE FUND'S PERFORMANCE WITH

21   THE OTHER INDEXES, RIGHT?

22   A.    YES.

23   Q.    AND IS THIS -- THE NUMBERS YOU SEE THERE IN

24   THE ACM COLUMN FROM 2000 TO 2002, FIRST OF ALL YOU

25   SAW THE NUMBERS WHEN THIS POWERPOINT PRESENTATION

1    WAS PRESENTED TO YOU RIGHT?

2    A.   YES.  AND I WAS IMPRESSED.

3    Q.   AND YOU WERE IMPRESSED.  AND IN FACT YOU

4    TESTIFIED EARLIER I KNOW THAT IN PART YOU RELIED ON

5    THESE NUMBERS IN MAKING YOUR DECISION, RIGHT?

6    A.   I WAS ATTRACTED BY IT.

7    Q.   OKAY.  DIRECTING YOUR ATTENTION NOW TO A

8    DOCUMENT THAT'S BEEN MARKED AS DEFENDANT'S

9    EXHIBIT 505.

10          IF YOU COULD JUST TAKE A MOMENT TO LOOK

11   AT THAT, SIR.

12   A.   YES.

13   Q.   OKAY.  FIRST OF ALL, HAVE YOU EVER SEEN THIS

14   DOCUMENT BEFORE?

15   A.   I HAVE.

16   Q.   OKAY.  AND DO YOU KNOW WHAT THIS DOCUMENT IS?

17   A.   IT IS AN ALBERT HU'S CREATION INTRODUCING

18   ASENQUA CAPITAL GROUP.

19   Q.   OKAY.  AND IS IT A POWERPOINT PRESENTATION?

20   A.   IT IS A POWER POINT PRESENTATION.

21   Q.   AND IS IT -- I'M SORRY I WILL WAIT.  OKAY.

22   AND IS IT SIMILAR KIND OF POWERPOINT PRESENTATION

23   THAT WE JUST SAW IN EXHIBIT, DEFENDANT'S

24   EXHIBIT 504?

25   A.   NO, IT'S NOT SIMILAR.  THIS IS -- THIS TALKS

1    ABOUT HIS GROUP.

2    Q.   I APOLOGIZE.  WHAT I MEANT IS, I MEAN IN TERMS

3    OF FORMAT, IT'S A POWERPOINT PRESENTATION?

4    A.   YES, IT IS.

5    Q.   OKAY.  IT'S PHOTOCOPIES OF A POWERPOINT

6    PRESENTATION, RIGHT?

7    A.   YES.

8    Q.   NOW IT CARRIES A DATE OF AUGUST 2006; IS THAT

9    CORRECT?

10   A.   YES, UH-HUH.

11            MR. FONG:  NOW, YOUR HONOR, AT THIS TIME

12   I WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 505.

13            MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

14   WOULD OBJECT BASED ON THE QUESTIONS ASKED SO FAR.

15   LACK OF FOUNDATION.

16            THE COURT:  ALL RIGHT.  WHY DON'T YOU ASK

17   A COUPLE MORE.

18            MR. FONG:  SURE.

19   Q.   YOU'VE SEEN THIS DOCUMENT BEFORE TODAY, RIGHT?

20   A.   RIGHT.

21   Q.   AND THIS IS A DOCUMENT THAT WAS GIVEN TO YOU

22   BY ALBERT HU, CORRECT?

23   A.   CORRECT.

24            MR. FONG:  YOUR HONOR, I WOULD MOVE THAT

25   INTO EVIDENCE.

1       THE COURT:  IT WILL BE RECEIVED.

2       MR. LUCEY:  NO OBJECTION, YOUR HONOR.

3  (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 505 HAVING

4  BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

5  ADMITTED INTO EVIDENCE.)

6  BY MR. FONG:

7  Q.   NOW LET ME DIRECT YOUR ATTENTION TO PAGE 2 OF

8  505.  FIRST OF ALL, DO YOU SEE THAT PAGE, SIR?

9  A.   YES.

10 Q.   WELL, THE CONTRAST IS NOT THE GREATEST IN THE

11 WORLD, BUT LET ME SEE -- OKAY.

12      FIRST OF ALL, DO YOU SEE THAT PAGE, SIR

13 A.   YES, I SEE IT.

14 Q.   AND THIS IS A, IF YOU WILL, A CORPORATE

15 ORGANIZATIONAL CHART FOR THE ASENQUA GROUP, RIGHT?

16 A.   YES.

17 Q.   OKAY.  AND THIS WOULD INCLUDE THE VARIOUS

18 ASENQUA ENTITIES, RIGHT?

19 A.   YES.

20 Q.   AND ON THE TOP THERE IS THE ASENQUA CAPITAL

21 GROUP, DO YOU SEE THAT, SIR?

22 A.   YES.

23 Q.   AND UNDERNEATH THAT NAME THERE'S THE NAME

24 ALBERT HU, RIGHT?

25 A.   YES.

1   Q.   AND DOWN AND TO THE RIGHT OF IT IS THE

2   OPERATIONS BRANCH, RIGHT?

3   A.   YES.

4   Q.   AND THAT HAS IN IT THE NAMES OR THE WORDS

5   COMPLIANCE, AUDIT, OPERATION, TONY POLLACE, MICHAEL

6   SCHRADLE AND LINDA DANESH, YOU SEE THAT, RIGHT?

7   A.   YES.

8   Q.   THEN BELOW THAT AT THE FAR RIGHT THERE IS THE

9   NAME AQC, FIA THEN PARENTHESES FIXED INCOME ARB,

10  FUND.  YOU SEE THAT, RIGHT?

11  A.   YES.

12  Q.   THAT HAS THE NAME CHRIS DANIELIAN.

13  D-A-N-I-E-L-I-A-N AND CHRIS YOUNG.  YUAN, USA,

14  RIGHT?

15  A.   YES.

16  Q.   AND SOT CENTER WE SEE THE NAME ASENQUA

17  VENTURES, MANAGEMENT, RIGHT?

18  A.   YES.

19  Q.   IT HAS THE NAMES SEAN VERAH THE GENTLEMAN YOU

20  TESTIFIED EARLIER ABOUT RIGHT?

21  A.   YES.

22  Q.   BOB LIN, THAT WOULD BE YOU?

23  A.   YES.

24  Q.   AND FRANK FRANZILLI, F-R-A-N-Z-I-L-L-I.  YOU

25  SEE THAT, RIGHT?

257

1    A.    YES, I SEE THAT.

2    Q.    OKAY.  THEN PALO ALTO, CALIFORNIA, RIGHT?

3    A.    YES.

4    Q.    THEN TO THE OTHER SIDE OF IT IS FIRESIDE

5    CAPITAL MANAGEMENT DO YOU SEE THAT?

6    A.    YES.

7    Q.    THEN IN PARENTHESES, FORMER ASENQUA CAPITAL,

8    RIGHT?

9    A.    YES.

10   Q.    THAT HAS NAMES ANDY YAN, CHRIS YUAN, AND STEVE

11   BOND; DO YOU SEE THAT?

12   A.    YES.

13   Q.    SINGAPORE, RIGHT?

14   A.    YES.

15   Q.    YOU HAVE SEEN -- THIS CHART ACCURATELY DEPICTS

16   OR ACCURATELY SHOWS THE ORGANIZATIONAL STRUCTURE OF

17   THE ASENQUA GROUP IN ABOUT 2006, RIGHT?

18   A.    WHAT DO YOU MEAN ACCURATELY.

19   Q.    I MEAN, IS IT YOUR UNDERSTANDING THAT THIS WAS

20   A -- THIS WAS WHAT THE -- HOW THE ASENQUA GROUP'S,

21   THE ASENQUA ENTITIES WERE STRUCTURED?

22   A.    YEAH.  THESE WERE -- MAY I EXPLAIN?

23   Q.    NO, I JUST SIMPLY WANT TO ASK IF YOU KNOW.  IF

24   YOU DON'T KNOW, THAT'S FINE?

25   A.    CAN YOU REPHRASE, CAN YOU GIVE ME THE QUESTION

1    ONE MORE TIME?

2    Q.   SURE.  SURE.  DID YOU KNOW THAT IN 2006 THIS

3    WAS THE STRICTURE OF THE ORGANIZATIONAL STRUCTURE

4    OF THE ASENQUA ENTITIES?

5    A.   AS CREATED BY MR. HU, YES.

6    Q.   OKAY.  THAT'S FINE.  OKAY, NOW, LET ME DIRECT

7    YOUR ATTENTION TO PAGE 8?

8    A.   PAGE 8, YES.

9    Q.   OF THIS SAME DOCUMENT EXHIBIT 505.  NOW THE

10   COLUMNS TO THE RIGHT ARE NOT LEGIBLE ON THIS SCREEN

11   BUT I'M NOT GOING TO ASK YOU QUESTIONS ABOUT THAT.

12            BUT DO YOU SEE THE COLUMN ON THE

13   LEFT-HAND SIDE OF THAT PAGE?

14   A.   YES.

15   Q.   AND THIS PAGE IS ENTITLED FIRESIDE LS FUND

16   PERFORMANCES?

17   A.   YES.

18   Q.   BASICALLY IS IT YOUR UNDERSTANDING THAT THE

19   COLUMN UNDER FIRESIDE LS AND THANK GOODNESS THE

20   WHITE COLUMN SO WE CAN SEE THE CONTRAST, YOU

21   UNDERSTAND THAT COLUMN FIRESIDE LS AS PROVIDING THE

22   PERFORMANCE RETURN RATE OF THE FIRESIDE LS FUND FOR

23   THE YEARS 2000 THROUGH 2005; IS THAT CORRECT?

24   A.   AGAIN, THE QUESTION WAS VERY LENGTHY.  CAN YOU

25   PLEASE, ONE MORE TIME.

1    Q.    MY LAW SCHOOL PROFFER WARNED ME THERE WOULD BE

2    DAYS LIKE THIS BUT I WILL TRY?

3    A.    MY APOLOGY.

4    Q.    IT'S MY FAULT?

5          THE COURT:  LET'S JUST ASK THE QUESTION.

6    BY MR. FONG:

7    Q.    OKAY.  NOW, IS -- DID YOU UNDERSTAND THE

8    COLUMN UNDER FIRESIDE LS, THAT REPRESENTS THE

9    ANNUAL RETURN RATE OF THE FIRESIDE FUND?

10   A.    YES.

11   Q.    OKAY.  AND BEFORE 2005 THE FIRESIDE FUND HAD

12   BEEN OF COURSE THE ASENQUA BETA FUND, RIGHT?

13   A.    CORRECT.

14   Q.    AND THE ASENQUA BETA FUND AND THE FIRESIDE LS

15   FUND WERE THE TWO FUNDS YOU INVESTED IN, RIGHT?

16   A.    I INVESTED ORIGINALLY IN ASENQUA BETA FUND

17   WHICH WAS TRANSFERRED INTO FIRESIDE.  THEY -- I DO

18   NOT BELIEVE THEY COEXISTED AT THE SAME TIME, NO.

19   Q.    YOU ARE ABSOLUTELY RIGHT.

20   Q.    OKAY -- SO?

21   A.    SO I DID NOT INVEST IN TWO FUNDS.

22   Q.    YOU INVESTED IN ONE AND THEN THE OTHER, RIGHT?

23   A.    YES.

24   Q.    OKAY.  SO NOW, DIRECTING YOUR ATTENTION TO THE

25   NUMBERS FOR 2000 SHOWING A MINUS .58 PERCENT RETURN

1    FOR WHAT WAS THEN THE ASENQUA BETA FUND.  EXCUSE

2    ME, MINUS .68 PERCENT FOR THE YEAR 2000.  DO YOU

3    SEE THAT, SIR?

4    A.   I SEE THAT.

5    Q.   THEN IT SHOWS FOR 2001, 41.65 PERCENT RETURN

6    FOR WHAT WAS THEN THE ASENQUA BETA FUND; IS THAT

7    CORRECT?

8    A.   I'M READING IT, YES.

9    Q.   THEN IN 2002, 30.45 PERCENT ANNUAL RETURN FOR

10   WHAT WAS THEN THE ASENQUA BETA FUND, RIGHT?

11   A.   YES.

12   Q.   THEN 2003, 34.12 PERCENT AS THE ANNUAL RETURN

13   FOR WHAT WAS STILL AT THAT TIME 2003 THE ASENQUA

14   BETA FUND; IS THAT CORRECT?

15   A.   CORRECT.

16   Q.   NOW, THE NUMBERS IN THIS PARTICULAR

17   EXHIBIT 505 WHICH IS DATED AUGUST 2006, THESE

18   NUMBERS ARE IDENTICAL TO THE NUMBERS THAT YOU SAW

19   AND YOU TESTIFIED TO IN THE POWERPOINT PRESENTATION

20   IN EXHIBIT 504, THE ONE IN SEPTEMBER 2004; DO YOU

21   RECALL THAT?

22   A.   I ONLY GOT INVOLVED I ONLY START INVESTMENT IN

23   2004.  SO YOU ASKED ME COMPARING THE TWO

24   POWERPOINT?  MAYBE YOU CAN SHOW ME THE PREVIOUS ONE

25   WHICH YOU TOOK AWAY.  I CANNOT MEMORIZE BY READING

1     IT LIKE THAT.

2     Q.   I FULLY UNDERSTAND AND THAT'S MY FAULT.  WELL,

3     YOU HAVE 505, RIGHT?

4     A.   YEAH.

5     Q.   HERE IS 504, PAGE 5.  OKAY.  SO NOW YOU HAVE

6     504 AND 506 SIDE BY SIDE OR EXCUSE ME 504 AND 505

7     SIDE-BY-SIDE, RIGHT?

8     A.   YES.

9     Q.   AND THE NUMBERS FOR THE ANNUAL RETURN FOR THE

10    ASENQUA BETA FUND FOR THE YEARS 2001, 2002 AND 2003

11    ARE IDENTICAL IN 505 AND 504; IS THAT CORRECT?

12    A.   CORRECT.

13    Q.   OKAY.  THE ONLY DIFFERENCE IS THAT IN 505 WAS,

14    HAS THE DATE OF AUGUST 2006, RIGHT?

15    A.   YES.

16    Q.   AND THEN 504 HAD THE DATE OF SEPTEMBER 2004?

17    A.   NO, THAT'S NOT JUST THE DATE ALSO, ADDING ONE

18    MORE YEAR.  504 ONLY WENT UP TO 2003.

19    Q.   YOU ARE ABSOLUTELY RIGHT.  WHAT I MEANT IS IN

20    TERMS OF THE NUMBERS FROM 2000 TO 2003, I'M JUST

21    TRYING TO COMPARE THE NUMBERS FOR THOSE YEARS?

22    A.   YES.

23    Q.   THEY ARE IDENTICAL EXCEPT ONE OF THEM, ONE WAS

24    IN THE SEPTEMBER 2004 POWERPOINT PRESENTATION WHICH

25    IS EXHIBIT 504, RIGHT?

1     A.    YES.

2     Q.    AND THEN THE OTHER ONE, THE IDENTICAL NUMBERS

3     APPEAR IN THE AUGUST 2006 POWERPOINT PRESENTATION

4     THAT'S IN EXHIBIT 505; IS THAT CORRECT?

5     A.    CORRECT.

6     Q.    OKAY.  FOR THOSE 4 YEARS 2000, 2001, 2002,

7     2003 THE NUMBERS ARE THE SAME?

8     A.    YES.

9     Q.    OKAY.  AND IN AUGUST OF 2006, YOU WERE ALREADY

10    AN INVESTOR IN BOTH IN ASENQUA BETA FUND AND THEN

11    LATER TO THE FIRESIDE LS FUND, RIGHT?

12    A.    CORRECT, STARTING EARLY 2005.

13    Q.    OKAY.  AND BY AUGUST OF 2006, YOU WERE PART OF

14    THE ASENQUA VENTURES MANAGEMENT TEAM, RIGHT?

15    A.    YES.  I WAS INVITED TO BE AN ADVISOR, YES.

16    Q.    AND YOU DID ADVISE, RIGHT?

17    A.    YES, I WAS VERY HAPPY INTRODUCING STARTUP TO

18    THEM.

19    Q.    OKAY.  THANK YOU.

20          THE COURT:  LET'S TAKE A 15-MINUTE BREAK.

21          MR. FONG:  OKAY.

22          THE COURT:  WE WILL BE IN RECESS FOR

23    15 MINUTES.

24          (WHEREUPON, THE FOLLOWING PROCEEDINGS

25    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

263

1          MR. FAZIOLI:  YOUR HONOR, JUST BRIEFLY,

2     THE COURT, THE GOVERNMENT WOULD LIKE TO EXPRESS ITS

3     CONCERN ABOUT THE TIMING AND THE PACE IN THIS CASE

4     IN TERMS OF THE CROSS-EXAMINATION.

5          NO NEGATIVE COMMENT DIRECTED TOWARD

6     DEFENSE COUNSEL BUT THE DIRECT-EXAMINATION IS NOW

7     AT ABOUT TWO HOURS WE ARE NOW AT THE THREE AND A

8     HALF-HOUR OF THE CROSS-EXAMINATION.

9          I SEE THAT WE HAVE BEEN GIVEN SEVEN MORE

10     DOCUMENTS SOME OF WHICH ARE IN FOREIGN LANGUAGE AND

11     THAT'S AN ISSUE IN TERMS OF THE GOVERNMENT.

12          AND THERE HAVE BEEN A SERIES OF QUESTIONS

13     ABOUT AREAS SUCH AS THE 2008 FINANCIAL CRISIS WHICH

14     TOOK PLACE AFTER THE INVESTMENTS IN THIS CASE OR A

15     SERIES OF QUESTIONS ABOUT DOCUMENTS WHICH APPEAR TO

16     SPEAK FOR THEMSELVES AND WERE NOT PREPARED BY THE

17     WITNESS.

18          WE HAVE SOME CONCERNS ABOUT TIMING BOTH

19     AS TO THIS PARTICULAR WITNESS AND JUST IN GENERAL

20     IF ABOUT THE OVERALL TIMING OF THE CASE FRANKLY.

21     IF THIS IS GOING TO BE OUR UNDERSTANDING IN TERMS

22     OF OUR TIMING FOR THE CASE IN CHIEF AND STUFF WAS

23     BASED ON CERTAIN ASSUMPTIONS ABOUT TIMING AND

24     THINGS AND I JUST WANT TO RAISE THAT CONCERN TO THE

25     COURT.

1          THE COURT:  HOW MUCH MORE DO YOU HAVE

2     WITH MR. LIN?

3               MR. FONG:  I SUSPECT ABOUT AN HOUR OR SO.

4               THE COURT:  OKAY.

5               MR. FONG:  YES.  AND I DON'T WANT --

6     OBVIOUSLY I WOULD PREFER NOT TO CALL MR. LIN BACK

7     AS MY WITNESS, BUT IF THE GOVERNMENT IS CONCERNED

8     ABOUT HIS SCHEDULING, I WILL DO EVERYTHING I CAN,

9     YOUR HONOR.

10              THE COURT:  MY ONLY -- I GUESS A COUPLE

11    OF COMMENTS.

12              ONE IS I UNDERSTAND YOUR CONCERN ABOUT

13    THE TWO AREAS YOU MENTIONED.  I THINK TO SOME

14    DEGREE YOU ARE CORRECT.  BUT THERE WAS NO

15    OBJECTION.

16              THE OTHER IS THAT I DO THINK THAT SOME OF

17    THE QUESTIONING AS TO SOME OF THE DOCUMENTS CAN BE

18    SPED UP BECAUSE WE ARE JUST REPEATING SOME OF THE

19    THINGS OVER AND OVER AGAIN.

20              SO I WOULD JUST ASK YOU TO TRY AND MAKE

21    IT A LITTLE MORE CONCISE AND CRISP IF YOU COULD.  I

22    THINK IT WOULD BE MORE EFFECTIVE, AT LEAST AT THIS

23    POINT FOR THE JURY TO SPEED IT UP RATHER THAN

24    CONTINUE AT THE PACE WE ARE GOING.

25              WHAT'S YOUR SCHEDULE FOR WITNESSES TODAY

1    WHEN HE FINISHES?

2              MR. FAZIOLI:  WELL, WE HAVE TWO WITNESSES

3    FROM THE LAW FIRM PROS COWER ROSE WHO HAVE BEEN

4    FLOWN IN FROM LOS ANGELES AND NEW YORK TO TESTIFY.

5    WE WOULD PUT THEM ON AFTER THE REDIRECT OF MR. LIN.

6              THE COURT:  ARE THEY GOING TO SAY

7    ANYTHING OTHER THAN THEY DIDN'T PARTICIPATE OR.

8              MR. FAZIOLI:  YES AND SOME OTHER RELATED

9    INFORMATION BUT THAT'S GENERALLY THEIR TESTIMONY.

10   AND I THINK THAT WILL BE QUICK TESTIMONY.

11             THEN THERE WOULD BE AN INDIVIDUAL NAMED

12   DOMINIC FRANCELLO WHO IS WITH THE CALIFORNIA BOARD

13   OF ACCOUNTANCY HE'S FROM SACRAMENTO AND THAT'S OUR

14   ANTICIPATED NEXT WITNESS.

15             THEN AFTER THAT THERE'S A VICTIM INVESTOR

16   NAMED LINDA DOONG -- GRACE DOONG WHO WE HAVE FLOWN

17   IN FROM TAIWAN AND SHIELD BE THE NEXT WITNESS IN

18   THE CASE.

19             THERE'S ALSO A WITNESS NAMED ANDREA

20   DULBERG WHO IS THE GENERAL COUNSEL OF GLOBE OP

21   WHICH IS ANOTHER ONE OF THE ENTITIES LISTED IN THE

22   DEFENDANT'S INVESTMENT DOCUMENTS.  SHE IS FLYING

23   OUT FROM NEW YORK TODAY AND WE ARE HOPING TO TRY TO

24   PUT HER ON THE STAND TOMORROW IN PART BECAUSE SHE'S

25   FLYING IN FROM NEW YORK AND BECAUSE HER COMPANY IS

1    GOING THROUGH A FINANCIAL TRANSACTION

2              THE COURT:  ALL I CAN DO IS URGE THAT WE

3    FORGE FORWARD AS QUICKLY AS WE CAN.

4              IF I THINK IT'S DRAGGING I WILL SPEAK UP.

5    I WILL SEE YOU AT 10:30.

6              MR. FONG:  THANK YOU, YOUR HONOR.

7              MR. FAZIOLI:  OKAY.

8              (WHEREUPON A RECESS WAS TAKEN.)

9              (WHEREUPON, THE FOLLOWING PROCEEDINGS

10   WERE HELD IN THE PRESENCE OF THE JURY:)

11   BY MR. FONG:

12   Q.   GOOD MORNING AGAIN, MR. LIN.

13   A.   GOOD MORNING TO YOU.

14   Q.   I'M GOING TO SHOW YOU A DOCUMENT THAT'S BEEN

15   MARKED AS DEFENDANT'S EXHIBIT 512.  FIRST OF ALL --

16   I'M SORRY.  TAKE A LOOK AT IT IF YOU DON'T MIND.

17             HAVE YOU HAD A CHANCE TO LOOK AT

18   EXHIBIT 512?

19   A.   YES.

20   Q.   HAVE YOU EVER SEEN EXHIBIT 512 BEFORE TODAY?

21   A.   YES, I HAVE.

22   Q.   WHAT DO YOU RECOGNIZE IT TO BE?

23   A.   IT WAS A POWERPOINT PROMOTION CREATED BY

24   MR. ALBERT HU, HE'S ATTEMPTING TO START HIS VENTURE

25   FUND, ASENQUA VENTURES.

1    Q.   IT'S DATED FEBRUARY 2006?

2    A.   YES.

3    Q.   AND YOU, MR. HU GAVE YOU A COPY OF THIS

4    POWERPOINT?

5    A.   I DON'T RECALL RECEIVING IT IN PHYSICAL COPY

6    AND I DID NOT HAVE ANY ELECTRONIC COPIES IN MY

7    POSSESSION.

8    Q.   OKAY.  BUT YOU HAVE SEEN THIS BEFORE?

9    A.   YES, I HAVE.

10   Q.   AROUND 2006?

11   A.   DON'T KNOW EXACT TIME.

12   Q.   HAVE YOU EVER USED THIS POWERPOINT

13   PRESENTATION IN ANY OF YOUR TRIPS TO ASIA?

14   A.   ME USING IT?

15   Q.   YES.

16   A.   NO.

17   Q.   HAVE YOU EVER BEEN PRESENT WHEN THIS

18   POWERPOINT PRESENTATION WAS SHOWN TO ANYBODY?

19   A.   YES.

20          MR. FONG:  YOUR HONOR, I WOULD MOVE INTO

21   EVIDENCE DEFENDANT'S EXHIBIT 512.

22          MR. LUCEY:  OBJECTION, YOUR HONOR.  WE

23   WOULD MOVE THIS AS BEYOND THE SCOPE AND LACK OF

24   RELEVANCE.

25          THE COURT:  WHAT IS THE RELEVANCE SINCE

1    IT'S WELL BEYOND THE DATE OF THE INVESTMENTS WE ARE

2    CONCERNED WITH.

3              MR. FONG:  IT SHOWS MR. LIN'S CONNECTION

4    TO THE ASENQUA ENTITIES.

5              THE COURT:  ALL RIGHT.  I WILL LET YOU GO

6    INTO THAT BRIEFLY.

7    BY MR. FONG:

8    Q.   AND THIS PARTICULAR DOCUMENT CONTAINS YOUR

9    NAME, DOES IT NOT?

10   A.   YES, IT DOES.

11   Q.   AND IT CONTAINS A PROFILE OF YOUR BACKGROUND

12   IN TERMS OF YOUR BUSINESS AND INVESTMENT

13   EXPERIENCE, RIGHT?

14   A.   YES.

15   Q.   OKAY.

16             MR. FONG:  YOUR HONOR, I WOULD MOVE TO

17   HAVE IT ADMITTED INTO EVIDENCE.

18             MR. LUCEY:  SAME OBJECTION, YOUR HONOR.

19             THE COURT:  IS THERE A PARTICULAR PAGE

20   YOU ARE GOING TO BE REFERRING TO?

21             MR. FONG:  YES.  YOUR HONOR, PAGE 2 AND

22   28.

23             MR. LUCEY:  YOUR HONOR, AGAIN LOOKING AT

24   THE PAGES REFERENCED, IT'S STILL INVESTMENTS OTHER

25   THAN THE MATTERS AT ISSUE HERE.

1        THE COURT: YEAH, BUT IT IS THE ASENQUA

2    VENTURES. I WILL HOLD MY RULING ON THE EXHIBIT BUT

3    YOU CAN GO AHEAD AND ASK ABOUT PAGES 2 AND 28.

4        MR. FONG: OKAY.

5    Q.   MR. LIN, ON PAGE 2 OF THIS POWERPOINT FOR

6    ASENQUA VENTURES DATED FEBRUARY 2006, IT MENTIONS

7    THAT ASENQUA HAS AN EDGE IN ITS EXISTING HEDGE FUND

8    NETWORK OF PACIFIC RIM AND IT IDENTIFIED IN THAT

9    NETWORK TWO INDIVIDUALS AND YOU WERE ONE OF THE

10   INDIVIDUALS, RIGHT?

11   A.   YES.

12   Q.   OKAY. AND THEN IN -- ON PAGE 28 THERE'S A

13   BIOGRAPHY OF YOURSELF, RIGHT?

14   A.   YES.

15   Q.   AND IN WHICH YOU WERE IDENTIFIED AS PART OF

16   THE ASENQUA VENTURES TEAM, RIGHT?

17   A.   YES. ALBERT HU USES MY NAME, YES?

18   Q.   YOU'VE SEEN THIS BEFORE HAVEN'T YOU?

19   A.   YES.

20        MR. FONG: THAT'S ALL I HAVE FOR THIS

21   DOCUMENT, YOUR HONOR.

22        THE COURT: I DON'T SEE THE RELEVANCE

23   UNLESS IT'S INFORMATION HE PROVIDED OR APPROVED OF.

24   THE FACT IT'S IN A DOCUMENT THAT MR. HU PREPARED

25   DOESN'T MAKE IT ADMISSIBLE.

1           MR. FONG:  OKAY.

2    Q.   MR. LIN YOU TESTIFIED THAT YOU HAD BEEN

3    PRESENT WHEN THIS PARTICULAR POWERPOINT

4    PRESENTATION HAD BEEN SHOWN TO OTHERS, RIGHT?

5    A.   YES.

6    Q.   AND YOU SAW YOUR NAME IN CONNECTION OR YOU SAW

7    YOUR NAME IN CONNECTION WITH THOSE PASSAGES THAT

8    YOU JUST TESTIFIED ABOUT, RIGHT?

9    A.   REGARDING THE VENTURE FUND HE WAS TRYING TO

10   RAISE, RIGHT, NOT RELATED TO HEDGE FUND.

11   Q.   I FULLY UNDERSTAND THAT.  I FULLY UNDERSTAND

12   THAT.  BUT SO FAR AS BEING PART OF THE ASENQUA

13   VENTURES, YOU WILLINGLY ALLOW YOUR NAME AND

14   BIOGRAPHY TO BE USED IN THE POWERPOINT; IS THAT

15   CORRECT?

16   A.   YES, I TRUSTED ALBERT HU AT THAT TIME.

17           THE COURT:  GO, GO AHEAD.

18           MR. FONG:  I WOULD MOVE TO HAVE IT

19   ADMITTED INTO EVIDENCE, YOUR HONOR.

20           MR. LUCEY:  YOUR HONOR, WE WOULD AGAIN

21   OBJECT.  WE WOULD ALSO RAISE IN REGARD TO PAGE 28

22   THAT MR. FONG HAS BEEN REFERRING TO, A 403

23   OBJECTION, PARTICULARLY IN PARAGRAPH TWO OF THAT

24   PAGE, WE RAISED YESTERDAY.

25           THE COURT:  ALL RIGHT.  WHY DON'T YOU GO

1    AHEAD, QUESTION, ASK WHATEVER QUESTIONS YOU HAVE ON

2    THE DOCUMENTS AND I WILL TAKE THIS UP WITH YOU AT A

3    BREAK.

4              MR. FONG:  THAT'S FINE.

5              I HAVE NO FURTHER QUESTIONS ON THAT,

6    YOUR HONOR.

7              THE COURT:  OKAY.

8    Q.   LET ME SHOW YOU A DOCUMENT THAT'S BEEN MARKED

9    AS DEFENSE EXHIBIT 524.

10             FIRST OF ALL, SIR, DO YOU SEE THAT

11   DOCUMENT?

12   A.   YES.

13   Q.   IS THIS -- ARE THESE DOCUMENTS THAT YOU HAVE

14   PRODUCED IN RESPONSE TO MY SUBPOENA?

15   A.   YES.

16   Q.   OKAY.

17   A.   I PROVIDE THEM TO YOU.

18   Q.   THROUGH YOUR ATTORNEY?

19   A.   THREE MY ATTORNEY, YES.

20   Q.   AND THESE WERE DOCUMENTS IN YOUR POSSESSION,

21   RIGHT?

22   A.   YES.

23   Q.   AND CAN YOU DESCRIBE FOR US IN GENERAL WHAT

24   EXHIBIT 524 IS?

25   A.   YEAH.  EXHIBIT 524 ARE MEETING MINUTES THAT

1    WHEN PEOPLE INTRODUCE A STARTUP TO MYSELF I WOULD

2    INTRODUCE THEM TO ALBERT HU OR SOMEBODY ELSE HAVE A

3    STARTUP AND WE REVIEW THE START UP.

4    Q.   SO THIS WAS, EXHIBIT 524 ARE THE MINUTES FROM

5    THE VARIOUS MEETINGS OF ASENQUA VENTURES THAT YOU

6    ATTENDED, RIGHT?

7    A.   YES.

8    Q.   OKAY.

9         MR. FONG:  YOUR HONOR, AT THIS POINT I

10   WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 524.

11        MR. LUCEY:  YOUR HONOR, AGAIN THE

12   GOVERNMENT --

13        THE COURT:  I WILL HOLD IT FOR NOW.

14        MR. FONG:  OKAY.

15   Q.   LET ME ASK YOU, MR. LIN, IF YOU COULD TAKE A

16   LOOK AT PAGE THREE.

17   A.   YES.

18   Q.   THAT SHOWS A MEETING ON JULY 5TH, 2005; IS

19   THAT CORRECT?

20   A.   YES.

21   Q.   AND IT SHOWS THAT YOU ARE ONE OF THE ATTENDEES

22   OF THAT MEETING, RIGHT?

23   A.   YES.

24   Q.   AND THIS WAS AN ASENQUA VENTURES MEETING

25   MINUTES, RIGHT?

1    A.   YES.

2    Q.   AND THERE ARE SOME HANDWRITTEN NOTATIONS TO,

3    ON THAT PAGE, DO YOU SEE THOSE HANDWRITTEN

4    NOTATIONS?

5    A.   YES.

6    Q.   ARE THEY YOUR HANDWRITING?

7    A.   YEAH, THOSE WERE MY NOTATIONS, YEAH.

8    Q.   AND ONE OF THE HANDWRITING ON THE UPPER

9    RIGHT-HAND CORNER READS FIRESIDE USA DIVISION; IS

10   THAT CORRECT?

11   A.   YES.

12   Q.   OKAY.  THEN ON THE LEFT-HAND COLUMN, IT READS

13   CHARLES SHAO S-H-A-O; IS THAT CORRECT?

14   A.   YES.

15   Q.   THEN PARAGRAPH 1A OF PAGE 3 OF EXHIBIT 524

16   MENTIONS THAT BOB LIN MENTIONED THAT THE

17   CHAIRMAN --

18        MR. LUCEY:  OBJECTION.  HE'S NOT READING

19   THE DOCUMENT, YOUR HONOR.

20        MR. FONG:  OKAY.

21        THE COURT:  JUST A SECOND.  YEAH, I DON'T

22   WANT YOU TO READ FROM THE DOCUMENT BUT YOU CAN ASK

23   A QUESTION.

24   BY MR. FONG:

25   Q.   MR. LIN, FIRST OF ALL, DO YOU REMEMBER IF YOU

1    PARTICIPATED VERBALLY AT THIS MEETING?

2    A.   YES.

3    Q.   OKAY.  AND DO YOU REMEMBER WHAT IT IS THAT YOU

4    SAID?

5    A.   OKAY.  ALBERT HU HAD PROPOSED A VERY GRAND

6    IDEA.  HE WANTS TO HAVE MANY PEOPLE INTRODUCE MORE

7    AND MORE FRIENDS INTO HIS NETWORK.  YEAH.

8    Q.   OKAY.  AND WHAT WAS YOUR -- WHAT DID YOU DO AT

9    THE MEETING, IF ANYTHING?

10   A.   I MENTIONED THERE WERE OTHER PEOPLE THAT I

11   MIGHT BE ABLE TO INTRODUCE HIM FOR THE VENTURE AND

12   BECAUSE ALL THE STARTUP REQUIRES A FOREMEMBER,

13   EXPERIENCED FOREMEMBER, AND IF A STARTUP NEEDS

14   THAT, YES, I WAS VERY READY TO HELP HIM, YES.

15   Q.   AND DID YOU RECOMMEND ANY PARTICULAR

16   INDIVIDUALS?

17   A.   I DON'T REMEMBER IN THIS CASE IT'S A CHAIRMAN

18   BUT I DON'T REMEMBER WHO THAT WAS.

19   Q.   WHAT IS THE NAME CHARLES SHAO, DOES THAT HAVE

20   ANY MEANS TO YOU?

21   A.   I HAVE ANOTHER FRIEND CALLED CHARLES SHAO IN

22   BEIJING.  THIS, I KNOW, SOMETIMES I MAY EVEN DRAW A

23   FACE.

24   Q.   OKAY.  DO YOU REMEMBER LOOKING AT PAGE 3, DO

25   YOU REMEMBER IF YOU MENTIONED CHARLES SHAO AS A

1    CANDIDATE FOR ONE OF THE BOARDS THAT WERE BEING

2    DISCUSSED AT THIS MEETING?

3    A.   QUITE POSSIBLY, YEAH, I DON'T REMEMBER THAT.

4    Q.   LET ME DIRECT YOUR ATTENTION TO PAGE 6 OF 524.

5    DO YOU SEE THAT PAGE, SIR?

6    A.   YES.

7    Q.   AND THAT PAGE IS, LET ME ASK YOU, DID YOU

8    ATTEND A MEETING ASSOCIATED WITH ASENQUA VENTURES

9    INTERNATIONAL OPERATIONS ON OR ABOUT JULY 5TH,

10   2005?

11   A.   YES.

12   Q.   OKAY.  YOU WERE AT THE MEETING AND ALSO AT THE

13   MEETING WERE ALBERT HU AND SEAN VERAH; IS THAT

14   CORRECT?

15   A.   I DON'T REMEMBER, YES.

16   Q.   AGAIN THERE'S SOME HANDWRITTEN NOTATIONS ON

17   PAGE 6.  ARE THOSE YOUR HANDWRITING NOTATIONS?

18   A.   YEAH.

19   Q.   DO YOU RECALL WHAT IS IT YOU SAID HOW DID YOU

20   PARTICIPATE AT THE MEETING ON JULY 5TH, 2005?

21   A.   WELL, I BELIEVE ALBERT HU INVITED ME TO BE A

22   VENTURE PARTNER.  VENTURE PARTNER BY DEFINITION IS

23   PEOPLE WHO BRING OPPORTUNITY LIKE A START UP

24   ENTREPRENEUR INTRODUCED TO THEM, YEAH.

25   Q.   AND YOU PARTICIPATED IN THIS MEETING TALKING

1    ABOUT START UP VENTURES, RIGHT?

2    A.   OH, YES, I WAS VERY HAPPY.

3              MR. LUCEY:  YOUR HONOR, WE WOULD OBJECT

4    TO THIS WHOLE LINE OF QUESTIONING WITH REGARD TO

5    ASENQUA VENTURES AS TO THE RELEVANCE TO OUR MATTERS

6    AT HAND.

7              THE COURT:  LET ME SEE SIDEBAR QUICKLY.

8              (SIDE-BAR DISCUSSION.)

9              THE COURT:  THE CONCERN I HAVE AND I WILL

10   LET MR. FONG EXPLAIN, BUT THESE MEETINGS ARE ALL

11   DURING THE TIME THAT INVESTMENTS WERE BEING MADE IN

12   THE ASENQUA --

13             MR. LUCEY:  ASENQUA BETA FUND.

14             THE COURT:  YEAH.  AND THERE'S NOTES LIKE

15   INTEGRATE OPERATIONS, THE EVIDENCE IS -- ISN'T HE

16   ENTITLED TO GET INTO THE RELATIONSHIP OF WHAT HIS

17   ROLE IN ASENQUA ENTITIES WAS DURING THE TIME --

18             MR. LUCEY:  I THINK IT IS FAIR.  IF

19   THAT'S WHERE IT'S GOING, THAT'S FINE BUT I'M NOT

20   CLEAR THAT'S WHERE IT'S HEADED.

21             MR. FONG:  YOUR HONOR, EVERYBODY MIGHT

22   RECALL WE HAVE SEEN THE ORGANIZATIONAL CHART WHERE

23   THE ASENQUA VENTURES IS AN ARM OF --

24             THE COURT:  I GUESS MY QUESTION IS, WHAT

25   IS IT THAT YOU'RE SORT OF DRIVING AT IN YOUR

277

1    OBJECTION?

2         MR. LUCEY:  I'M JUST TRYING TO UNDERSTAND

3    IF THE QUESTIONING IS GOING TOWARD, I MEAN, I DON'T

4    NEED A PREVIEW BUT IF IT'S GOING TOWARDS LINKING

5    THEM UP, THAT MAKES SENSE, BUT IF IT'S A SEPARATE

6    LINE OF QUESTIONING THEN I'M NOT SURE IT'S

7    RELEVANT.

8         THE COURT:  WELL, I WOULD SAY -- I

9    ASSUME, YOU ARE LINKING IT UP.

10         MR. FONG:  YES.  BUT ALSO, YOUR HONOR,

11    BUT IN ADDITION TO THAT THERE'S ALSO THE ARGUMENT

12    THAT THE -- THEY ARE INHERENTLY LINKED TOGETHER,

13    THAT IT'S THE SAME PEOPLE HE FELT COMFORTABLE -- HE

14    HAD INSIDER INFORMATION.

15         IT'S REALLY KIND OF LIKE IF YOU LIVE WITH

16    SOMEBODY, LET'S SAY HYPOTHETICALLY YOU ARE GOING TO

17    BE MORE LIKELY TO BE PRIVY TO INSIDER INFORMATION.

18         MR. LUCEY:  THAT'S MORE DIFFERENT --

19         MR. FONG:  I'M JUST TRYING TO LAY A

20    FOUNDATION AND FORM AN ARGUMENT FOR THE STRONG LINK

21    AND HOW IT IS THAT HE WAS NOT WORRIED ABOUT

22    PARTICULAR TYPES OF REPRESENTATIONS BECAUSE HE HAD

23    INSIDER INFORMATION.

24         THE COURT:  SO, HIS RELIANCE IS NOT AN

25    ELEMENT OF THE OFFENSE.

1          MR. FONG:  BUT IT GOES TO THE ISSUE OF

2    MATERIALITY OF WHAT HE CONSIDERS TO BE SOMEBODY WHO

3    IS ON THE INSIDE, WOULD BE SEEN AS WHETHER OR NOT

4    SOMETHING IS MATERIAL.  THAT IS TO SAY INFLUENCING

5    THAT PERSON'S DECISION.

6          THE COURT:  BUT IT DOESN'T HAVE TO

7    INFLUENCE THAT PERSON'S DECISION, IT JUST HAS TO BE

8    CAPABLE OF INFLUENCING SOMEONE WHO IS IN THE GROUP

9    OF POTENTIAL INVESTORS IN THIS TYPE OF --

10          MR. FAZIOLI:  TO PART WITH THEIR MONEY.

11          MR. FONG:  BUT YOUR HONOR, THE

12    GOVERNMENT'S INDICTMENT ALSO SPECIFICALLY SAID THAT

13    THE VICTIMS WERE INDUCED BY THESE

14    MISREPRESENTATIONS AS WELL AS THAT THEY RELIED ON

15    THEM.

16          MR. LUCEY:  I WILL BE CLEAR THOUGH, IT'S

17    NOT JUST TWO VICTIMS.  THE COURT'S EARLIER RULING

18    IS NOT LIMITED TO THE TWO VICTIMS.

19          THE COURT:  I THINK IT'S -- I THINK IT'S

20    LEGITIMATE TO SHOW -- WELL, I GUESS I DON'T KNOW

21    WHAT THE REST OF THE PROOF IS GOING TO BE, IS THE

22    PROOF GOING TO BE THESE REPRESENTATIONS AS TO

23    PROFITS AND RETURNS WERE ACCURATE?

24          MR. FONG:  WELL, OR HE CERTAINLY -- IT

25    WAS NOT SOMETHING THAT HE WAS WORRIED ABOUT BECAUSE

1    THERE WERE --

2              THE COURT:  ANSWER MY QUESTION.

3              ARE YOU GOING TO --

4              MR. FONG:  YEAH, BECAUSE YOUR HONOR,

5    QUITE FRANKLY THERE IS ACTUALLY NO EVIDENCE THAT

6    I'M AWARE OF THAT THE RETURNS ARE FALSE OR

7    INACCURATE, QUITE FRANKLY.

8              THE COURT:  WELL, I WILL LET YOU GET INTO

9    THE RELATIONSHIP OF MR. LIN TO THE ASENQUA ENTITIES

10   AND WHAT HE KNEW OR DIDN'T KNOW ABOUT THE

11   ASPIRATIONS.

12             MR. FONG:  OKAY.

13             THE COURT:  I'M NOT SURE I SEE ANYTHING

14   ELSE.

15             MR. FONG:  WELL, YOUR HONOR, THE FACT HE

16   WAS SITTING IN ON MEETINGS --

17             THE COURT:  THAT'S WITHIN THE SCOPE OF

18   WHAT I JUST SAID.

19             MR. FONG:  YEAH.  THAT'S ALL I --

20             MR. LUCEY:  USING ASENQUA, WE WOULD NEED

21   TO BE CLEAR WHAT TERMS WE ARE TALKING ABOUT.  I

22   DON'T WANT TO HAVE A MISLEADING CONFUSING THE JURY

23   ABOUT ASENQUA VENTURE VERSUS ASENQUA BETA --

24             MR. FONG:  I THINK I WAS VERY CAREFUL TO

25   SAY THIS IS ASENQUA VENTURES OR --

1        THE COURT:  RIGHT.

2        MR. FONG:  IF I COULD PROCEED,

3    YOUR HONOR.

4        THE COURT:  YES.

5        MR. FONG:  THANK YOU.

6    (WHEREUPON THE FOLLOWING PROCEEDINGS WERE HELD IN

7    THE PRESENCE OF THE JURY:)

8    Q.   LOOKING ON THE TOP OF THE RIGHT-HAND CORNER OF

9    PAGE 6 OF EXHIBIT 524, DO YOU SEE THE TWO WORDS IN

10   HANDWRITING?

11   A.   YES.

12   Q.   AND WHAT DO THOSE WORDS SAY?

13   A.   THEY SAY INTEGRATED OPERATIONS.

14   Q.   AND OF COURSE THESE ARE YOUR WORDS, RIGHT?

15   A.   YEAH.

16   Q.   WHAT DID YOU MEAN BY INTEGRATED OPERATIONS IN

17   CONNECTION WITH THIS PARTICULAR MEETING?

18   A.   I DON'T REMEMBER BECAUSE I WROTE LIKE I SAY

19   SOMETIME IT IS A DRAW A FACE OR CARTOON.  THESE ARE

20   MY OWN PERSONAL NOTES.

21   Q.   OKAY.

22   A.   I DON'T REMEMBER.

23   Q.   DO YOU REMEMBER IF YOU WROTE THE NOTATIONS

24   DURING THE MEETING?

25   A.   I THINK SO, YES.

1    Q.   DIRECTING YOUR ATTENTION NOW TO WHAT'S BEEN

2    MARKED AS DEFENDANT'S EXHIBIT 525.

3             MR. FONG:  EXCUSE ME, YOUR HONOR, I

4    APOLOGIZE, BUT THE COURT IS STILL RESERVING THE

5    RULING ON THE ADMISSIBILITY OF 522; IS THAT

6    CORRECT?

7             THE COURT:  YES.

8             MR. FONG:  OKAY.  THANK YOU.

9    Q.   DO YOU SEE THE DOCUMENT MARKED 525 IN FRONT OF

10   YOU, SIR?

11   A.   YES.

12   Q.   IT'S APPROXIMATELY SEVEN PAGES, RIGHT?

13   A.   YES.

14   Q.   HAVE YOU SEEN THIS PARTICULAR DOCUMENT BEFORE?

15   A.   YES.

16   Q.   OKAY.  AND THIS WAS PART OF THE DOCUMENTS THAT

17   YOU PRODUCED TO MY OFFICE THROUGH YOUR ATTORNEY IN

18   RESPONSE TO MY SUBPOENA; IS THAT CORRECT?

19   A.   YES.

20   Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT 525 IS?

21   A.   YES, ALBERT HU INVITED ME TO TRAVEL WITH HIM

22   TO SEVERAL TRIP TO ASIA.  AND I HAVE TO PAY FOR THE

23   TRIP MYSELF.  AND THEN REIMBURSE.  AND I ALSO DID

24   NOT HAVE A CHANCE TO INFORM YOU, THOSE

25   REIMBURSEMENT CHECKS YOU SHOW YESTERDAY, TWO OF

1    THEM ACTUALLY BOUNCED.  I KEPT THE BOUNCED CHECK.

2    I HAD TO PURSUE HIM TO GET MY REIMBURSEMENT BACK.

3    Q.   AND YOU ULTIMATELY GOT YOUR MONEY, RIGHT?

4    A.   YES.

5    Q.   SO THESE ARE FORMS, IF YOU WILL, THAT YOU

6    SUBMITTED TO ASENQUA FOR REIMBURSEMENT?

7    A.   YES, AS AN ADVISOR OR SOMEONE HELPING HIM,

8    YES.

9    Q.   OKAY.

10   A.   I FIRST PAY FOR IT MYSELF THEN GET THEM BACK.

11   Q.   SO THE INFORMATION THAT'S CONTAINED IN THESE

12   ON THESE PAGES IN EXHIBIT 525 THEY CAME FROM YOU,

13   RIGHT?

14   A.   YES, ALONG WITH THE RECEIPTS.

15   Q.   RIGHT.  BECAUSE YOU WERE MAKING CLAIMS FOR

16   EXPENSES REIMBURSEMENT, RIGHT?

17   A.   YES.

18   Q.   OKAY.

19           MR. FONG:  YOUR HONOR, AT THIS TIME I

20   WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 525.

21           MR. LUCEY:  NO OBJECTION, YOUR HONOR.

22           THE COURT:  IT'S RECEIVED.

23   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 525 HAVING

24   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

25   ADMITTED INTO EVIDENCE.)

1    BY MR. FONG:

2    Q.   OKAY, MR. LIN, LET ME DIRECT YOUR ATTENTION TO

3    THE FIRST PAGE OF EXHIBIT 525.  FIRST OF ALL, DO

4    YOU SEE THAT PAGE?

5    A.   YES.

6    Q.   AND ALL SEVEN PAGES ARE BASICALLY DIFFERENT

7    PAGES OF THE SAME FORM; IS THAT CORRECT?

8    A.   YES.

9    Q.   AND IN HERE, IT SAYS ASENQUA, INC.?

10   A.   YES, THAT'S WHAT IT SAYS, YES.

11   Q.   AND IT'S AN EXPENSE STATEMENT, RIGHT?

12   A.   YES.

13   Q.   AND UNDERNEATH HERE IT HAS THE WORD

14   "EMPLOYEE", RIGHT?

15   A.   YES.

16   Q.   AND BELOW HAS YOUR NAME, BOB LIN, RIGHT?

17   A.   YES.

18   Q.   AND THIS IS -- THIS IS WHAT YOU DID TO SUBMIT

19   FOR REIMBURSEMENT FOR YOUR EXPERIENCES?

20   A.   BASED ON THE FORM PROVIDED BY MR. HU.

21   Q.   I FULLY UNDERSTAND.

22   A.   I HAVE NEVER BEEN THE EMPLOYEE BUT THIS FORM

23   WAS GIVEN TO ME AS A WAY TO REIMBURSE.

24   Q.   OKAY.  AND YOU FILLED OUT THE FORM YOURSELF,

25   RIGHT?

1    A.    YES.

2    Q.    OKAY.  AND IN EXHIBIT 525, YOU NEVER CROSS THE

3    OUT THE WORD EMPLOYEE ON ANY OF THE PAGES, DID YOU?

4    A.    NO.

5    Q.    LET ME DIRECT YOUR ATTENTION THEN TO -- LET ME

6    ASK YOU, DID YOU HAVE RECEIVE A WIRE TRANSFER OF

7    FUNDS FROM ASENQUA VENTURES MANAGEMENT COMPANY?

8    A.    I DON'T RECALL.

9    Q.    OKAY.  LET ME DIRECT YOUR ATTENTION TO WHAT

10   HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 526.  FIRST

11   OF ALL, SIR, DO YOU SEE THAT DOCUMENT?

12   A.    YES.

13   Q.    NOW, HAVE YOU SEEN THIS DOCUMENT BEFORE TODAY?

14   A.    ON THE FIRST PAGE, NO.

15   Q.    THAT'S FINE?

16   A.    THE LAST TWO, I PROVIDE THEM TO YOU, THE

17   BOUNCED CHECK.

18   Q.    OKAY.  LET ME DIRECT YOUR ATTENTION TO THE

19   ENTRY AGAIN BECAUSE THIS HEADS NOT BEEN ADMITTED

20   INTO EVIDENCE.

21           LET ME HAVE YOU LOOK AT IT WITHOUT

22   READING IT AT THIS POINT.  DO YOU SEE AN ENTRY

23   MARKED 227 AT THE VERY BOTTOM?

24   A.    OKAY.

25   Q.    OKAY.  NOW CAN YOU PLEASE READ TO YOURSELF

1    THAT ENTRY.

2    A.   YES.

3    Q.   READING THAT ENTRY DATED 2006 ON THE BOTTOM OF

4    EXHIBIT 526, DOES THAT REFRESH YOUR RECOLLECTION AS

5    TO WHETHER OR NOT ASENQUA VENTURES MANAGEMENT EVER

6    SENT YOU WIRED DO YOU MONEY?

7    A.   YEAH, I DON'T RECALL.  I DON'T RECALL.  THIS

8    IS QUITE A FEW YEARS AGO, I GUESS.

9    Q.   LOOKING AT THE ENTRY THAT I JUST POINTED TO

10   YOU, THAT DOES NOT REFRESH YOUR RECOLLECTION; IS

11   THAT CORRECT?

12   A.   NO, IT DOESN'T.

13   Q.   THAT'S FINE.  LET ME NOW DIRECT YOUR ATTENTION

14   TO A DOCUMENT THAT'S BEEN PREVIOUSLY MARKED AS

15   DEFENDANT'S EXHIBIT 531.  IT'S A TWO-PAGE DOCUMENT?

16   A.   YES.

17   Q.   OKAY.  FIRST OF ALL, HAVE YOU EVER SEEN THIS

18   DOCUMENT BEFORE?

19   A.   I DON'T REMEMBER.

20   Q.   OKAY.  DO YOU -- LET ME ASK THE QUESTION

21   SLIGHTLY DIFFERENTLY.  INSTEAD OF THE DOCUMENT,

22   HAVE YOU EVER SEEN ON THE INTERNET OR ON YOUR

23   COMPUTER OR ON A COMPUTER THE CONTENTS OF

24   EXHIBIT 531?

25            MR. LUCEY:  OBJECTION, YOUR HONOR.

1          VOID FOR VAGUENESS.  I'M NOT EXACTLY

2     CLEAR WHAT MR. FONG IS REFERRING TO.

3          THE COURT:  CAN YOU DIRECT HIM TO A

4     PARTICULAR PORTION.

5          MR. FONG:  OF COURSE.

6     Q.   DIRECTING YOUR ATTENTION TO -- ON THE UPPER

7     LEFT-HAND CORNER OF PAGE ONE OF EXHIBIT 531 THERE'S

8     A PICTURE OF AN INDIVIDUAL.  FIRST OF ALL, DO YOU

9     SEE THAT?

10    A.   THAT'S ME.  THIS LOOKS LIKE A PRINT OF THE WEB

11    PAGE, YES.

12    Q.   OKAY.  NOW, HAVE YOU EVER SEEN THE CONTENTS OF

13    THIS WEB PAGE BEFORE?

14    A.   I DON'T REMEMBER SEEING THIS SPECIFIC ONE.

15    Q.   ALL RIGHT.

16         MR. LUCEY:  YOUR HONOR, MAY WE APPROACH?

17         THE COURT:  NO, LET'S KEEP MOVING.

18    BY MR. FONG:

19    Q.   DO YOU REMEMBER IF YOU EVER POSTED THE

20    CONTENTS OF THE UPPER LEFT-HAND CORNER WITH YOUR

21    PICTURE ON IT AND SOME WORDS, THAT'S ON THE FIRST

22    PAGE OF DEFENDANT'S EXHIBIT 531?

23    A.   NO, I PERSONALLY DID NOT EVEN KNOW HOW TO POST

24    A PHOTO OR NOTHING OF MYSELF INTO A WEB PAGE.

25    Q.   DID YOU EVER ASK OR AUTHORIZE ANYBODY TO?

1     A.   NO.

2     Q.   OKAY.  LET ME THEN NOW ASK YOU TO TAKE A LOOK

3     AT DEFENDANT'S EXHIBIT 532.  IT'S A ONE-PAGE

4     DOCUMENT.  I WILL LET YOU HAVE A MOMENT TO TAKE A

5     LOOK AT IT?

6     A.   YES.

7     Q.   NOW THE DOCUMENT IS ALMOST ENTIRELY IN

8     CHINESE, CORRECT?

9     A.   IT IS.

10    Q.   AND YOU ARE FLUENT IN CHINESE; IS THAT RIGHT?

11    A.   YES.

12    Q.   NOW FIRST OF ALL, DO YOU RECOGNIZE THE

13    CONTENTS OF THE SINGLE PAGE OF EXHIBIT 532?

14          THE COURT:  WHAT DO YOU MEAN BY RECOGNIZE

15    THE CONTENTS?

16    BY MR. FONG:

17    Q.   DO YOU REMEMBER SEEING THE CONTENTS OF THIS

18    PAGE BEFORE?

19    A.   YES.

20    Q.   AND IS THIS AN ARTICLE THAT YOU PREPARED?

21    A.   I WROTE, YES, AT THE REQUEST OF THE PUBLISHER

22    OR THE NEWSPAPER, YEAH.

23    Q.   SO JUST SO THAT WE ARE CLEAR, THIS IS AN

24    ARTICLE THAT YOU WROTE FOR A PARTICULAR

25    PUBLICATION; IS THAT CORRECT?

1    A.   YES.

2    Q.   OKAY.  DO YOU REMEMBER WHO WAS THE PUBLISHER?

3    A.   THIS ONE ORIGINALLY COULD BE ECONOMICAL DAILY

4    NEWS.

5    Q.   OKAY.  THAT WOULD BE ONE OF THE FINANCIAL

6    NEWSPAPERS IN TAIWAN, RIGHT?

7    A.   YES.

8    Q.   AND YOU HAVE BEEN OR WERE A REGULAR COLUMNIST

9    FOR THEM, RIGHT?

10   A.   FOR 6 TO 7 YEARS.

11   Q.   OKAY.  NOW, LOOKING AT THIS PAGE, IS THE

12   ARTICLE THAT'S CONTAINED IN DEFENDANT'S

13   EXHIBIT 532, DOES THAT RELATE TO THE HEDGE FUND

14   ARTICLE THAT YOU TESTIFIED ABOUT YESTERDAY?

15   A.   MAY I READ THROUGH IT A LITTLE BIT?

16   Q.   OF COURSE, OF COURSE?

17   A.   MY LIFETIME I PUBLISHED ABOUT 500 ARTICLES SO

18   I DON'T REMEMBER A SPECIFIC ONE.

19   Q.   I CAN CERTAINLY UNDERSTAND.  PLEASE TAKE A

20   LOOK.

21   A.   YES.

22   Q.   OKAY.  IS THIS ARTICLE THE ARTICLE ABOUT HEDGE

23   FUND THAT YOU TESTIFIED ABOUT YESTERDAY?

24   A.   IT IS NOT SPECIFICALLY ABOUT HEDGE FUND, I

25   TALKED ABOUT, I WROTE ABOUT THE INTERESTING

289

1    EMERGENCE OF INTERESTING COMBINATION OF THERE'S A

2    VENTURE FUND WHICH I'M FAMILIAR WITH, THERE'S A

3    PRIVATE EQUITY FUND THEN HEDGE FUND.

4    Q.   SO HEDGE FUND WAS ONE OF THE TOPICS OF THIS

5    ARTICLE?

6    A.   YES, I MENTIONED IT, YES.

7    Q.   DIRECTING YOUR ATTENTION TO -- BY THE WAY,

8    THERE ARE A COUPLE OF ENGLISH WORDS SPRINKLED

9    THROUGHOUT THE ARTICLE?

10   A.   YES.

11   Q.   THOSE WERE PART OF YOUR ARTICLE?

12   A.   YES.

13   Q.   AT THE VERY FIRST LINE, SENTENCE, THERE IS THE

14   ENGLISH WORD HEDGE FUND IN PARENTHESES; IS THAT

15   CORRECT?

16   A.   YES.  FOLLOWED BY VENTURE CAPITAL THEN

17   FOLLOWED BY HEDGE FUND.

18   Q.   ABSOLUTELY.  THEN FOLLOWED BY PRIVATE EQUITY

19   FUND?

20   A.   YES, I TALK ABOUT THEM IT'S JUST MY

21   UNDERSTANDING.

22   Q.   AND YOUR UNDERSTANDING OF THE KIND OF IF YOU

23   WILL THE INTEGRATION OF THESE THREE TYPES OF FUNDS,

24   RIGHT?

25   A.   I JUST FIND IT INTERESTING.  THAT'S WHAT I

1    WROTE AS THE TITLE, INTERESTING.

2    Q.   OKAY.  DO YOU TALK ABOUT THE RELATIONSHIP

3    AMONG THESE THREE TYPES OF FUNDS?

4    A.   I DON'T KNOW IF RELATIONSHIP IS THE RIGHT

5    WORD.  THERE WAS SOME EXAMPLE.

6    Q.   DO YOU TALK ABOUT THE DIFFERENCE OF EACH OF

7    THE FUNDS?

8    A.   IN THIS ARTICLE.

9    Q.   YES.

10   A.   LET ME READ AGAIN.

11   Q.   PLEASE.

12   A.   ONE SHORT PARAGRAPH, YES.

13   Q.   OKAY.

14   A.   I TALK ABOUT EACH TYPE OF FUND HAS ITS EXPERT

15   EASY.

16   Q.   ALL RIGHT.  LET ME DIRECT YOUR ATTENTION TO

17   THE FOURTH PARAGRAPH IN THE EXHIBIT 532.  DO YOU

18   SEE THAT, SIR?

19   A.   PARAGRAPH FOUR?

20   Q.   YES.

21   A.   YES.

22   Q.   OKAY.  AND CAN YOU TELL -- CAN YOU READ FOR US

23   YOUR UNDERSTANDING OF WHAT PARAGRAPH FOUR SAYS?  GO

24   AHEAD, PLEASE?

25   A.   IF A VENTURE.

1          MR. LUCEY:  OBJECTION, YOUR HONOR.

2          WE ARE NOT READING THE DOCUMENT NOW, ARE

3    WE?  OR IS HE ASKING THE WITNESS TO READ IT TO

4    HIMSELF?

5          MR. FONG:  I'M ASKING THE WITNESS TO READ

6    ON THE RECORD.

7          I APOLOGIZE.  I SHOULD HAVE MOVED TO

8    ADMIT INTO EVIDENCE DEFENDANT'S EXHIBIT 532.

9          THE COURT:  WITHOUT A TRANSLATION IT'S

10   KIND OF MEANINGLESS, ISN'T IT?

11         MR. FONG:  NO, YOUR HONOR.  IT REALLY HAS

12   TO DO WITH WHAT THE WITNESS IS GOING TO BE

13   TESTIFYING TO AS TO THE CONTENT IT'S JUST LIKE A

14   DRAWING OR SYMBOL.

15         THE COURT:  WELL, YOU CAN ASK HIM WHAT HE

16   WROTE ABOUT HEDGE FUNDS, IF THAT'S WHAT YOUR

17   QUESTION IS, OR WHAT HE WROTE ABOUT INTEGRATING

18   FUNDS IF THAT HAS RELEVANCE TO YOUR CASE.

19         MR. FONG:  OKAY.  THAT'S WHY I WANT HIM

20   TO READ TWO SPECIFIC PARAGRAPHS.

21         THE COURT:  WHY DON'T YOU FIRST LAY A

22   FOUNDATION FOR THOSE PARAGRAPHS.

23         MR. FONG:  SURE, SURE.

24   Q.   LOOK THINK AT PARAGRAPH FOUR, DO YOU SEE THAT,

25   SIR?

1    A.    YES.

2    Q.    WHAT IS PARAGRAPH FOUR, WHAT DOES IT SAY IN

3    ESSENCE?

4    A.    IT SAYS THAT WHEN THE --

5            MR. LUCEY:  YOUR HONOR, I WANT TO MAKE

6    SURE THE WITNESS IS ACTUALLY PROVIDING TESTIMONY AS

7    OPPOSED TO READING THE DOCUMENT.

8            THE COURT:  I'M GOING TO LET HIM ANSWER

9    THE QUESTION.

10           THE WITNESS:  IF -- OKAY.  IT SAYS WHEN A

11   VC SELECT A STARTUP AND THEY TRY TO DO DUE

12   DILIGENCE AND SOMETIMES IT MAY OR MAY NOT BE

13   SUFFICIENT.

14           MR. FONG:  ALL RIGHT.

15   Q.    DOES IT SAY ANYTHING ELSE IN THAT PARAGRAPH?

16   A.    YES, IT SAYS IF THIS VC HAS A COMBINATION WITH

17   ANOTHER LIKE A HEDGE FUND, THEY CAN COMPARE THE

18   MARKET, STUDY THE MARKET THROUGH THE PUBLIC COMPANY

19   AND MAYBE COMPARE AND FURTHER IMPROVE.  ESSENTIALLY

20   THAT'S WHAT IT IS.

21   Q.    SO WHAT YOU WERE SAYING IN THAT PARAGRAPH, IF

22   I HEARD YOU CORRECTLY, IS THAT YOU SEE A BENEFIT OF

23   USING -- COMBINING THE INFORMATION FROM A HEDGE

24   FUND WITH THE INFORMATION FROM THE INFORMATION FROM

25   THE VENTURE FUND, RIGHT?

1    A.   YES.

2    Q.   GOING TO THE NEXT PARAGRAPH, JUST THE FIRST

3    SENTENCE TAKE A LOOK AT IT AND READ IT TO YOURSELF?

4    A.   YES.

5    Q.   OKAY.  AND WHAT DOES THAT PARAGRAPH SAY, IN

6    ESSENCE?

7    A.   IN ESSENCE, SIMILARLY, A VENTURE CAPITAL FUND

8    CAN RECEIVE BENEFITS BY WORKING WITH A PRIVATE

9    EQUITY FUNDS BECAUSE EACH FUND HAS A DIFFERENT

10   LAYERS.

11   Q.   ALL RIGHT.  WHEN DID YOU PUBLISH THIS ARTICLE?

12   A.   I DON'T REMEMBER IT SHOULD BE EASY TO FIND IN

13   THE FILE.

14   Q.   DO YOU REMEMBER IF IT WAS DURING THE TIME YOU

15   HAD MONEY INVESTED IN THE ASENQUA BETA FUND OR THE

16   FIRESIDE FUND?

17   A.   I BELIEVE SO, YEAH.  AS I WAS LEARNING ABOUT

18   HEDGE FUND, YES.

19   Q.   OKAY.  THANK YOU.

20        MR. LIN, YOU TESTIFIED ABOUT THE AUDITING

21   FIRM THE CPA FIRM, CASTILLO, LYN, COHEN & VIJAY

22   YESTERDAY IN YOUR DIRECT EXAMINATION; IS THAT

23   CORRECT?

24   A.   YES.

25   Q.   AND THAT'S THE FIRM THAT SUPPOSEDLY HAD

1    PROVIDED THE AUDITED STATEMENTS, FINANCIAL

2    STATEMENTS FOR THE ASENQUA FUND, RIGHT?

3    A.   YES, PROVIDED BY ALBERT HU TO ME.

4    Q.   YES.  OKAY.  NOW, BEFORE YOU INVESTED IN --

5    BEFORE YOU MADE YOUR FIRST INVESTMENT IN THE

6    ASENQUA BETA FUND IN JANUARY 2005, DID YOU EVER DO

7    ANY TYPE OF CHECKING TO SEE IF, WHAT WAS THE

8    REPUTATION OF THE FIRM OF CASTILLO, LYN, COHEN &

9    VIJAY?

10   A.   NO, BECAUSE I TRUST ALBERT HU.  AND I WAS MORE

11   THAN HAPPY, HE OPENED THE DOOR TO LET ME IN.

12   Q.   AND THIS WAS IN THE YEAR RIGHT TOWARD THE END

13   OF 2004 AND BEGINNING 2005, WERE YOU AWARE IF THERE

14   WAS A STATE GOVERNMENT ENTITY THAT REGULATED AND

15   LICENSED CPA'S CERTIFIED PUBLIC ACCOUNTANTS?

16   A.   I'M NOT CPA I'M NOT QUALIFIED TO EVEN ANSWER

17   THAT.

18   Q.   I'M SIMPLY ASKING YOU AS A CONSUMER IF YOU

19   KNEW IN 2004, LET'S JUST SAY TAKE THE END OF 2004,

20   TO THE BEGINNING OF 2005, DID YOU KNOW AT THAT TIME

21   THAT THERE WAS A CALIFORNIA BOARD GOVERNMENT AGENCY

22   THAT ISSUED, LICENSED TO CERTIFIED PUBLIC

23   ACCOUNTANTS AND ACCOUNTING FIRMS.

24   A.   NO, I DON'T.

25   Q.   DID YOU KNOW THAT THEY HAD A WEBSITE?

1    A.   NO, I DON'T.

2    Q.   OKAY.  SO I GATHER YOU DID NOT, BEFORE YOU

3    MADE THE INVESTMENT YOU DID NOT CHECK ON ANY

4    WEBSITE OR WITH ANY STATE AGENCIES REGARDING

5    WHETHER OR NOT THE FIRM OF CASTILLO, LYN, COHEN &

6    VIJAY WERE INDEED A LICENSED CPA FIRM IN

7    CALIFORNIA?

8    A.   NEVER IN MY LIFE HAD I EVER IMAGINED IT CAN BE

9    FABRICATED CPA FIRM.

10   Q.   OKAY.  BUT THE ANSWER IS YOU DID NOT?

11   A.   I DID NOT.

12   Q.   OKAY NOW, IN THE PAST YOU TRAVELLED WITH

13   MR. STEVE BOND, RIGHT?

14   A.   I DON'T REMEMBER HOW MANY TIMES, THERE WERE A

15   FEW TIMES BUT IT'S NOT TRAVEL TOGETHER.  HE TRAVEL,

16   I TRAVEL, AND WE SWING BY AND MET AT THE HOTEL,

17   YES.

18   Q.   AND THE TWO OF YOU THOUGH DID MEET WITH CEO'S

19   AND MANAGERS OF VARIOUS COMPANIES IN ASIA; IS THAT

20   CORRECT?

21   A.   A FEW TIMES, YES.

22   Q.   OKAY.  AND THAT WAS -- THE PURPOSE OF THESE

23   MEETINGS WERE TO TALK ABOUT ASENQUA VENTURES,

24   RIGHT?

25   A.   THERE WERE MANY TIMES I INTRODUCED A STARTUP

1    OR YOUNG ENTREPRENEURS.  THEY ARE NOT REALLY THE

2    LARGEST CEO, NO THEY ARE NOT.

3    Q.    OKAY.

4    A.    MY CONNECTION MOSTLY IS WITH ENTREPRENEURS?

5    Q.    IN THE COURSE OF THESE MEETINGS MR. BOND WOULD

6    TALK ABOUT THE VARIOUS ASENQUA HEDGE FUND, RIGHT?

7    A.    I DON'T UNDERSTAND THIS QUESTION.

8    Q.    MR. BOND TALKED ABOUT A HEDGE FUND AT THESE

9    MEETINGS, RIGHT?

10   A.    MR. BOND TALKS ABOUT A HEDGE FUND, YOU HAVE TO

11   ASK HIM.  I DO NOT REMEMBER.

12   Q.    I'M SORRY, THESE MEETINGS THAT YOU WERE AT.  I

13   APOLOGIZE IF I DIDN'T MAKE THAT CLEAR.

14   A.    I DON'T REMEMBER.

15   Q.    OKAY.  NOW, YOU MADE A FINAL INVESTMENT OF

16   ABOUT $250,000; IS THAT CORRECT?

17   A.    YES.

18   Q.    OKAY.  AND THAT WOULD HAVE BEEN AROUND MAY OF

19   2007, RIGHT?

20   A.    YES.

21   Q.    AND BEFORE THAT IT HAD BEEN A LITTLE WHILE

22   SINCE YOU MADE AN INVESTMENT BEFORE THAT, RIGHT?

23   A.    CORRECT.

24   Q.    NOW, AND YOUR REASON FOR MAKING THE LAST

25   INVESTMENT IN MAY OF 2007, THE $250,000 IS THAT YOU

1    HAD A CONVERSATION WITH ALBERT HU, RIGHT?

2    A.   YES.

3    Q.   AND IN THE CONVERSATION HE MENTIONED, MR. HU

4    MENTIONED THAT YOU WERE THE ONLY INVESTOR WHO HAD

5    NOT INVESTED A MILLION DOLLARS IN THE HEDGE FUND?

6    A.   ESSENTIALLY, YES.

7    Q.   OKAY.  AND THAT YOU KNEW A LOT OF THESE OTHER

8    INVESTORS WERE PROMINENT BUSINESS PEOPLE IN THE

9    CHINESE AMERICAN COMMUNITY OR IN CHINA; IS THAT

10   CORRECT?

11   A.   THIS IS A VERY GRAND QUESTION.  I DON'T KNOW

12   WHAT YOU MEAN.

13   Q.   YOU KNEW THAT --

14   A.   I KNEW WHAT?

15   Q.   DID YOU KNOW THAT THE OTHER INVESTORS THAT

16   MR. HU WAS REFERRING TO WHO MADE -- WHO MADE AN

17   INVESTMENT OF AT LEAST A MILLION DOLLARS, THAT

18   THESE INDIVIDUALS, YOU KNEW THESE INDIVIDUALS WERE

19   PROMINENT BUSINESS PEOPLE IN THE CHINESE-AMERICAN

20   COMMUNITY IN THE BAY AREA?

21   A.   ALL ACCORDING TO MR. HU.  HE HAS ALWAYS BEEN

22   VERY SECRETIVE.  HE WOULD NEVER TELL YOU WHO OTHER

23   PEOPLE ARE OTHER THAN PEOPLE I KNEW AND MET LIKE

24   DR. MICHAEL CHOUNG.

25             BUT OTHER THAN THAT IT'S ALL VERY

1    SECRETIVE. I DON'T KNOW WHO HE HAS BUT HE TOLD ME

2    HE HAS VERY PROMINENT SUCCESSFUL PEOPLE IN HIS

3    FUND.

4    Q.  OKAY. SO THE REASON YOU MADE THAT LAST

5    INVESTMENT WAS BECAUSE MR. HU HAD MENTIONED TO YOU

6    HEY LOOK OTHER INVESTORS WERE MAKING AT LEAST A

7    MILLION DOLLARS IN INVESTMENT, BUT MR. LIN YOU ARE

8    NOT UP TO A MILLION YET?

9            MR. LUCEY: OBJECTION, YOUR HONOR. THAT

10   MISSTATES TESTIMONY.

11           THE COURT: I THINK HE'S ASKING HIM

12   WHETHER THAT WAS WHAT WAS SAID. BUT JUST TO MAKE

13   CLEAR, WHAT DID MR. HU SAY TO YOU, IF ANYTHING,

14   THAT PROMPTED YOU TO PAY THE LAST 250.

15           THE WITNESS: YES, ESSENTIALLY THAT OTHER

16   INVESTORS WERE AROUND 1 MILLION. AND I DID NOT

17   WANT TO BE THE ONE THAT WAS DRAGGING THE AVERAGE

18   DOWN. I WAS VERY STUPID, YES.

19           MR. FONG: OKAY.

20   Q.  BUT THE REASON YOU MADE THAT INVESTMENT WAS

21   BECAUSE YOU DID NOT WANT TO BE SEEN AS THE LAST

22   PERSON TO BE INVESTING LESS THAN A MILLION DOLLARS?

23   A.  YES.

24   Q.  OKAY.

25           MR. FONG: THANK YOU, MR. LIN. THANK YOU

1    SO MUCH FOR YOUR TIME.  I APPRECIATE IT.

2              THAT'S ALL I HAVE, YOUR HONOR

3              THE COURT:  OKAY.  THE GOVERNMENT HAS THE

4    RIGHT TO ASK A FEW FOLLOWUP QUESTIONS IF IT WANTS

5    TO.

6              MR. LUCEY:  THANK YOU, YOUR HONOR.  IF WE

7    COULD JUST HAVE A MOMENT TO COLLECT OUR --

8

9              **REDIRECT EXAMINATION BY MR. LUCEY**

10

11   BY MR. LUCEY:

12   Q.   GOOD MORNING, MR. LIN.  I HAVE A FEW FOLLOWUP

13   QUESTIONS FOR YOU.

14             MR. LIN, FIRST I WANT TO SHOW YOU A

15   DOCUMENT THAT MR. FONG SPENT SOME TIME GOING OVER

16   WITH YOU THIS MORNING?

17   A.   YES.

18   Q.   IT IS DEFENDANT'S EXHIBIT 503.  AND YOU MIGHT

19   RECALL THAT MR. -- RECALL LOOKING AT THAT DOCUMENT

20   THIS MORNING, 503?

21   A.   YES.

22   Q.   THIS IS NOW PAGE 9 OF THIS DOCUMENT, MR. LIN?

23   A.   YES.

24   Q.   AND MR. LIN, FIRST, TO COVER THE RISK OF

25   PARTICIPATION, DO YOU SEE THE PARAGRAPH AT THE

1    BOTTOM IN ALL CAPS?

2    A.   YES.

3    Q.   AND DO YOU RECALL IF YOU RECOVERED THAT

4    PARAGRAPH THIS MORNING WITH MR. FONG?

5    A.   YES, HE ASKED ME TO READ A PORTION OF IT.

6    Q.   YOU WERE AWARE GENERALLY BEFORE YOU MADE YOUR

7    FIRST INVESTMENT WITH MR. HU ON OR ABOUT JANUARY,

8    FEBRUARY 2005 AND THERE AFTER, WERE YOU AWARE THERE

9    WAS A RISK INVOLVED IN INVESTING YOUR MONEY WITH

10   MR. HU?

11   A.   SPECIFICALLY TO THIS DOCUMENT.

12   Q.   I'M NOT ASKING THAT QUESTION THOUGH I'M ASKING

13   MORE GENERALLY NOW, JUST IN CONNECTION WITH YOUR

14   INVESTMENT DID YOU UNDERSTAND THERE WAS A RISK IN

15   INVESTING IN A HEDGE FUND?

16   A.   THERE'S A RISK IN EVERYTHING.

17   Q.   THAT WAS PERFECTLY CLEAR TO YOU?

18   A.   YES.

19   Q.   YOU WERE NEVER UNDER AN IMPRESSION THERE WAS

20   NOT AN INVESTMENT RISK IN INVESTING IN A HEDGE

21   FUND?

22   A.   CORRECT, YEAH.

23   Q.   NOW MR. FONG DIDN'T COVER THE OTHER PART OF

24   THE DOCUMENT WITH YOU -- DO YOU SEE THE REFERENCE

25   THERE THE SECOND LINE DOWN IN BOLD ON THE LEFT-HAND

1    SIDE IT SAYS AUDITORS?

2    A.   IT SAYS RISK OF --

3    Q.   I'M SORRY.  I WILL POINT IT OUT TO YOU.

4    WALKING DOWN APPROACHING THE SCREEN DO YOU SEE THE

5    REFERENCE HERE?

6    A.   STARTING WITH AUDITING, YES.

7    Q.   WHAT DOES IT SAY TO THE RIGHT-HAND SIDE THERE,

8    SIR?

9    A.   THAT'S THE CASTILLO, LYN, COHEN & VIJAY, LLC.

10   Q.   IS THAT NAME FAMILIAR TO YOU?

11   A.   YES.

12   Q.   WHAT IS THIS A REFERENCE TO?

13   A.   IT'S ON THE FINANCIAL STATEMENT PROVIDED TO ME

14   BY ALBERT HU THAT'S HE SAYS CPA.

15   Q.   THAT'S A DOCUMENT YOU LOOKED AT YESTERDAY,

16   EXHIBIT 1?

17   A.   CORRECT, CORRECT.

18   Q.   WHAT'S THE REFERENCE THERE, MR. LIN, POINTING

19   NOW TO THE LINE HERE READING WHERE IT SAYS -- WHAT

20   DOES THAT SAY THERE IN BOLD?

21   A.   LOOKS LIKE ADMINISTRATOR.

22   Q.   I'M SORRY, MR. FONG CAN I HAVE A COPY.  I WILL

23   PROVIDE YOU WITH A WITNESS COPY, MR. LIN?

24   A.   WHEN I WAS YOUNG IT WAS 2020.

25   Q.   I UNDERSTAND.  SO NOW THAT YOU HAVE A COPY IN

1    FRONT OF YOU MR. LIN, THIS PAGE 9, WHAT DOES IT SAY

2    IN BOLD THERE BELOW AUDITORS?

3    A.   ADMINISTRATOR.

4    Q.   WHAT DOES IT SAY TO THE RIGHT OF THAT?

5    A.   GLOBAL OP FINANCIAL SERVICES, LLC, THE

6    ADMINISTRATOR HAS BEEN RETAINED BY THE FUND AND THE

7    MASTER FUND TO PERFORM DAY-TO-DAY ADMINISTRATIVE

8    AND BOOKKEEPING SERVICES AND TO SERVE AS A

9    REGISTRAR AND TRANSFERRER AGENT.

10   Q.   MR. LIN, REFERRING AGAIN TO THE NATURE OF RISK

11   INVESTING IN THE ASENQUA FUND AND THE FIRESIDE LS

12   FUND?

13   A.   YES.

14   Q.   DID YOU UNDERSTAND THAT RISK OF YOU INVESTING

15   INVOLVED THE RISK THAT YOUR MONEY WOULD NOT BE

16   INVESTED ACCORDING TO THE SUBSCRIPTION BOOKLET WE

17   LOOKED AT YESTERDAY AND THE PPM YOU LOOKED AT AT

18   THIS TIME IN THE CENTS YOUR MONEY WOULD BE INVESTED

19   IN STOCKS AND OTHER EQUITIES?

20           MR. FONG:  OBJECTION.  LEADING.

21           MR. LUCEY:  I CAN RESTATE.

22           THE WITNESS:  PLEASE.

23   Q.   DID YOU UNDERSTAND THE RISK OF THE MONEY WOULD

24   BE SPENT ON OTHER PURPOSES BEYOND INVESTMENTS?

25   A.   NO.

1    Q.   YOU NEVER UNDERSTOOD THAT, DID YOU, SIR?

2    A.   NO.

3    Q.   NOW, MR. LIN DO YOU RECALL DURING YOUR

4    TESTIMONY WITH MR. FONG COVERING VARIOUS PORTIONS

5    OF THE PPM DEFENDANT'S EXHIBIT 503 IN REGARD TO

6    PROCEDURES REGARDING REDEMPTION?

7    A.   YES, I RECALL THAT.

8    Q.   OKAY.  AND YOU RECALL TESTIFY WHEN YOU

9    TESTIFIED YOU COMPLETED A WITHDRAWAL FORM WITH

10   MR. HU, CORRECT?

11   A.   YES.

12   Q.   IN ORDER TO HAVE YOUR MONEY WITHDRAWN HAVE IT

13   REDEEMED?

14   A.   YES, HE AGREED AND SIGNED.

15   Q.   DID HE AT THAT POINT MAKE REFERENCE IN ANY

16   POINT DURING THOSE CONVERSATIONS TO THE PROCEDURES

17   THAT MR. FONG HAD LAID OUT TODAY IN THE PPM?

18   A.   NO.  I THOUGHT AFTER HE SIGNED THAT ALL I NEED

19   TO DO IS TO WAIT FOR THE REDEMPTION.

20   Q.   SO DID HE EVER TELL YOU YOUR MONEY WOULD NOT

21   BE COMING TO YOU AFTER YOU COMPLETED THAT FORM?

22   A.   NO.

23   Q.   DID HE TELL YOU, DID MR. HU TELL YOU IF THAT

24   WAS THE LAST STEP YOU NEEDED TO COMPLETE OR NOT?

25   A.   YEAH, THAT WAS AFTER I ARGUED WITH HIM SEVERAL

1    MONTHS AND PURSUE HIM, EVENTUALLY GOT THAT.

2    Q.   MS. BURNEY, IF YOU COULD FLASH UP THE SCREEN

3    FOR US THE DOCUMENT ALREADY IN EVIDENCE EXHIBIT 37.

4         AND MS. BURNEY IF YOU COULD BLOW UP THE

5    DATE ON THE TEXT PART OF THE DOCUMENT.

6         MR. LIN WHAT IS THE DATE OF THIS DOCUMENT

7    IMMEDIATELY BELOW YOUR NAME AND ACCOUNT NUMBER?

8    A.   NOVEMBER 26, 2007.

9    Q.   AND SO THIS REDEMPTION FORM, WITHDRAWAL FORM

10   THAT YOU TALKED ABOUT YESTERDAY, YOU COMPLETED THIS

11   DOCUMENT IN 2007, CORRECT?

12   A.   CORRECT.

13   Q.   IT WAS NOT DONE IN 2008?

14   A.   NO, IT WAS IN 2007.

15   Q.   AND HOW MANY MONTHS WOULD YOU ESTIMATE IT TOOK

16   BETWEEN THE TIME YOU FIRST RAISED THE ISSUE WITH

17   MR. HU ABOUT WITHDRAWING YOUR MONEY FROM THE

18   FIRESIDE FUND?

19   A.   I DON'T REMEMBER EXACTLY --

20   Q.   AND LET ME FINISH MY QUESTION.  AND THE TIME

21   YOU SIGNED THIS DOCUMENT HERE, EXHIBIT 36, HOW LONG

22   DO YOU THINK IT TOOK?

23   A.   I'M SORRY, ONE MORE TIME, PLEASE.

24   Q.   SURE.  SURE.  HOW LONG DO YOU THINK IT TOOK

25   BETWEEN THE TIME YOU FIRST RAISED THE ISSUE WITH

1    MR. HU ABOUT REDEEMING YOUR MONEY, WITHDRAWING YOUR

2    MONEY FROM THE FUND AT THE TIME YOU FINALLY MET

3    WITH MR. HU AND EXECUTED THIS DOCUMENT?

4    A.   SEVERAL MONTHS.

5    Q.   SEVERAL MONTHS.  ALL IN 2007?

6    A.   YES.

7    Q.   AND HOW MANY YEARS NOW HAS IT BEEN SINCE YOU

8    FILLED OUT THIS FORM?

9    A.   A LITTLE -- ABOUT FOUR AND A HALF, NOW.

10   Q.   AND HAVE YOU RECEIVED ANY MONEY SINCE

11   COMPLETING THIS FORM?

12   A.   NO.

13   Q.   NO, NEVER?

14   A.   ABSOLUTELY NOTHING.

15   Q.   ZERO?

16   A.   UH-HUH.

17   Q.   MR. LIN, YOU RECALL DURING YOUR TESTIMONY WITH

18   MR. LIN, COVERING TWO POWERPOINTS IN REGARD TO

19   VARIOUS PERFORMANCE MARKS FOR THE ASENQUA BETA FUND

20   AND THE FIRESIDE FUND?

21   A.   YES.

22   Q.   AND JUST SO WE ARE CLEAR, DID YOU PLAY ANY

23   ROLE IN CREATING THOSE POWERPOINTS?

24   A.   NO.

25   Q.   SO WHAT IS YOUR BASIS OF UNDERSTANDING WHAT

1    THE NUMBERS THAT ARE IN THOSE POWERPOINTS ARE AS TO

2    THE PERFORMANCE?

3    A.   THOSE WERE PROVIDED BY MR. HU AND PRESENTED TO

4    ME.

5    Q.   BY MR. HU?

6    A.   MR. HU, INVITING ME TO INVEST IN HIS FUND.

7          MR. LUCEY:  I THINK WE ARE JUST ABOUT

8    DONE, YOUR HONOR.

9    Q.   SO MR. LIN, I WANT TO ASK YOU SOME FINAL

10   QUESTIONS HERE.  JUST SO WE ARE CLEAR.

11          WOULD YOU HAVE MADE THIS INVESTMENT,

12   SIR -- BEFORE I GET TO THAT YOU HAD TALKED WITH

13   MR. FONG JUST A MOMENT AGO IN REGARD TO YOUR LAST

14   INVESTMENT IN FIRESIDE, THE $250,000?

15   A.   YES.

16   Q.   IN REGARD TO AT THAT POINT YOU HAD COME UP TO

17   THE $1 MILLION THRESHOLD?

18   A.   YES.

19   Q.   THAT MR. HU WAS VERY INTERESTED IN?

20   A.   YES.

21   Q.   WAS THAT THE ONLY FACTOR THAT INFLUENCED YOUR

22   DECISION TO MAKE THAT FINAL INVESTMENT WITH

23   FIRESIDE?

24   A.   ALSO -- ALSO OVER THE COURSE OF THE PAST FEW

25   QUARTERS I RECEIVED, CONTINUING TO RECEIVE

1    FINANCIAL STATEMENT UPDATE FROM MR. HU PERSONALLY

2    AND THEY DEMONSTRATED SUCH TERRIFIC PERFORMANCE,

3    YEAH.

4              I WOULD HAVE BEEN HAPPY WITH JUST 750,

5    SUCH A HIGH PERFORMANCE, BUT HE ASKED ME TO MEET

6    THE MINIMUM LIKE EVERYBODY ELSE SO I DID.

7    Q.   AND THOSE WERE THE QUARTERLY STATEMENTS WE

8    REVIEWED YESTERDAY, CORRECT?

9    A.   CORRECT.

10   Q.   AND SO IS IT FAIR TO SAY THAT THOSE QUARTERLY

11   STATEMENTS WERE IMPORTANT TO YOU IN CONSIDERING

12   MAKING YOUR FINAL INVESTMENT IN THE FIRESIDE FUND?

13   A.   YES.

14   Q.   AND IF YOU HAD KNOWN THOSE QUARTERLY RETURNS

15   WERE NOT IN FACT TRUE AND ACCURATE WOULD YOU HAVE

16   STILL MADE YOUR LAST INVESTMENT IN THE FIRESIDE

17   FUND?

18   A.   I WOULD NOT.

19   Q.   AND WHAT ABOUT THE ALL THE INVESTMENTS WE'VE

20   TALKED ABOUT YOU MADE A SERIES OF INVESTMENTS

21   OBVIOUSLY WE TALKED ABOUT YESTERDAY LEADING UP TO

22   ULTIMATELY A MILLION DOLLARS?

23   A.   YES.

24   Q.   ONCE YOU MADE YOUR FIRST INVESTMENT OF

25   $100,000 IN OR ABOUT FEBRUARY 28TH, 2005, YOU BEGAN

1    RECEIVING QUARTERLY STATEMENTS CORRECT?

2    A.   YES.

3    Q.   AND FROM THAT TIME ON WOULD YOU HAVE CONTINUED

4    TO MAKE ANY FURTHER INVESTMENTS IF YOU HAD KNOWN

5    THAT THOSE QUARTERLY STATEMENTS YOU WERE RECEIVING

6    WERE NOT IN FACT TRUE AND ACCURATE?

7    A.   I WOULD RUN AWAY AS FAST AS I COULD.

8    Q.   AND WOULD YOU HAVE MADE ANY INVESTMENTS AT ALL

9    IF YOU HAD KNOWN THAT THE ACCOUNTING FIRM OF

10   CASTILLO, LYN, COHEN & VIJAY DID NOT ACTUALLY EXIST

11   AT THE TIME THAT YOU REVIEWED THOSE AUDIT -- THE

12   FINANCIALS IN OR ABOUT LATE '04 AND EARLY 2005

13   PRIOR TO MAKING YOUR FIRST INVESTMENT?

14   A.   NO, I WOULD NOT.

15   Q.   AND WOULD YOU HAVE MADE YOUR INVESTMENT IF YOU

16   HAD KNOWN THAT THE LAW FIRM LISTED IN THE FIRESIDE

17   DOCUMENTS WE LOOKED AT YESTERDAY PROSKAUER ROSE HAD

18   NOT ACTUALLY BEEN RETAINED BY THE FIRESIDE FUND?

19   A.   I WOULD NOT INVEST.

20   Q.   AND WOULD YOU HAVE INVESTED YOUR MONEY WITH

21   MR. HU AT ABOUT ANY TIME IF YOU HAD KNOWN YOUR

22   MONEY WOULD NOT BEEN INVESTED IF THE SECURITIES AND

23   PURSUANT TO THE INVESTMENT OBJECTIVE WE LOOKED AT

24   YESTERDAY?

25   A.   I WOULD NOT.

1     Q.   WOULD YOU HAVE INVESTED YOUR FUNDS, AND WOULD

2     IT HAVE BEEN IMPORTANT TO YOU TO KNOW THAT YOUR

3     MONEY WAS NOT ACTUALLY BEING INVESTED ACCORDING TO

4     THOSE INVESTMENT OBJECTIVES?

5     A.   YEAH, I WOULD BE VERY ANGRY.

6     Q.   AND IT WAS IMPORTANT TO YOU?

7     A.   YES, IT WAS IMPORTANT.

8     Q.   YOU WOULD NOT HAVE INVESTED?

9     A.   I WOULD NOT HAVE INVESTED.

10    Q.   AND IF YOU HAD KNOWN THAT YOUR INVESTMENT

11    MONEY YOU PROVIDED TO MR. HU WERE ACTUALLY INTENT

12    ON HIS OWN PERSONAL EXPERIENCES ABOVE AND WELL

13    BEYOND THE SCOPE OF THE MANAGEMENT FEES PROVIDED

14    FOR THE INVESTMENT DOCUMENTS, WOULD YOU STILL HAVE

15    INVESTED ANY OF YOUR FUNDS?

16    A.   I WOULD NOT INVEST ANY OF MY FUNDS.

17    Q.   AT ANY TIME?

18    A.   AT ANY TIME.

19    Q.   NOW MR. FONG HAD DISCUSSIONS WITH YOU ABOUT

20    THE ASENQUA VENTURES PARTNERS, CORRECT?

21    A.   YES.

22    Q.   AND HOW MUCH, AGAIN, DID YOU RECALL INVESTING

23    SEPARATELY IN THE ASENQUA VENTURES PARTNERSHIP?

24    A.   THIS IS AN IMPORTANT QUESTION.  THERE IS NO

25    MONEY IN THE SO CALLED ASENQUA VENTURE.  THERE WERE

1     TWO STARTUPS SPECIFICALLY PROVIDED BY MR. HU.

2              ONE FOR ANOXIS.  SECOND ONE FOR KONARKA.

3     FIRST ONE WAS 75,000, SECOND ONE WAS 50,000.  SO

4     THESE ARE ALL FROM DIFFERENT ENTITIES CREATED BY

5     MR. ALBERT HU.  ASENQUA VENTURE ITSELF IS JUST A

6     CONCEPT HE CONJURED UP.

7     Q.   NOW IN TERMS OF THOSE TWO SETS OF MONEY YOU

8     JUST TALKED ABOUT, AND AGAIN THOSE FIGURES ARE

9     WHAT, JUST SO WE ARE CLEAR?

10    A.   $75,000 INTO ANOXIS.  AND 50,000 INTO KONARKA

11    TECHNOLOGY.

12    Q.   NOW AS TO THOSE TWO SETS OF MONEYS, WERE THOSE

13    MONEYS TO BE DIRECTED TO THE ASENQUA BETA FUND?

14    A.   NO, THEY WERE SUPPOSED TO GO INTO THE COMPANY

15    THAT WE REVIEW AND INVESTED.

16    Q.   WERE THEY INVESTED INTO THE FIRESIDE FUND AS

17    YOU UNDERSTOOD IT?

18    A.   IT SHOULDN'T.

19    Q.   AND IN REGARD TO THOSE TWO INVESTMENTS DID YOU

20    EVER RECEIVE ANY OF THOSE MONEYS BACK FROM MR. HU?

21    A.   NO, 0.

22    Q.   AND AT ANY TIME DID YOU PLAY A ROLE IN THE

23    MANAGEMENT OR OPERATIONS OF ASENQUA BETA FUND?

24    A.   NO.

25    Q.   DID YOU PLAY ANY ROLE IN THE MANAGEMENT OR

1    DIRECTION OF FIRESIDE LS FUND?

2    A.   NO.

3    Q.   WERE YOU -- DID YOU EVER HAVE ACCESS TO THE

4    BOOKS AND RECORDS AND FINANCIAL DOCUMENTS OF, HOLD

5    ON, FOR THE ASENQUA BETA FUND?

6    A.   NO.

7    Q.   WHAT ABOUT THE FINANCIAL DOCUMENTS, BOOKS AND

8    RECORDS RELATING TO THE FIRESIDE FUND?

9    A.   NO, OTHER THAN THE STATEMENT HE PROVIDED.

10   Q.   AND DID YOU EVER ASK OF MR. HU TO BE PROVIDED

11   WITH THOSE DOCUMENTS?

12   A.   YES.  I HAVE REQUESTED FOR EXAMPLE IF THERE

13   IS, WAS A CUSTODIAN BANK, INVESTMENT BANK OR AT A

14   MINIMUM HE SHOULD PROVIDE A LIST OF PORTFOLIO LIKE

15   WHICH COMPANY HE BOUGHT STOCK, HE BOUGHT WHICH

16   COMPANY STOCK HE SOLD.  THESE WERE MINIMUM, YES.

17   Q.   AND ULTIMATELY MR. HU, WHEN YOU FILLED OUT

18   THAT WITHDRAWAL FORM YOU LOOKED AT A MOMENT AGO,

19   EXHIBIT 36, IN OR ABOUT NOVEMBER 2007, DID MR. HU

20   INDICATE THAT YOUR MONEY WAS STILL AVAILABLE AND

21   HELD IN TRUST FOR YOUR BENEFIT?

22   A.   YES.

23   Q.   HE NEVER INDICATED YOUR MONEY WAS ALREADY

24   DISSIPATED?

25   A.   NO.  HE ALWAYS TOLD ME EVERYTHING IS DOING

1    WELL.

2    Q.    AND SO IF I'M DOING THE MATH CORRECTLY HERE

3    BASED ON YOUR TESTIMONY HERE TODAY, MR. LIN, AND

4    THEN YOUR TESTIMONY YESTERDAY, THROUGH YOUR

5    INVESTMENTS WITH MR. HU YOU HAVE, YOU ARE NOW OUT

6    OVER A MILLION DOLLARS; IS THAT CORRECT?

7    A.    1.25 MILLION.  1 MILLION INTO ALBERT HU'S

8    HEDGE FUND AND 125,000 INTO THE TWO STARTUP HE TOLD

9    ME HE WANTED TO INVEST.

10   Q.    MR. LIN, HOW IS THE LOSS OF THOSE MONEYS THAT

11   OVER A MILLION DOLLARS AFFECTED YOU?

12            MR. FONG:  OBJECTION.  RELEVANCE.

13            THE COURT:  SUSTAINED.

14   BY MR. LUCEY:

15   Q.    LET ME ASK IT THIS WAY:  MR. LIN, NO LONGER

16   HAVING THE MONEY IN EXCESS OF $1 MILLION, HAVE YOU

17   HAD TO MAKE DIFFERENT ARRANGEMENTS FOR YOUR

18   WORKING, WORK LIFE AND YOUR INVESTMENT PORTFOLIO?

19            MR. FONG:  OBJECTION.  SAME OBJECTION.

20   RELEVANCE AS WELL AS 302.

21            THE COURT:  SUSTAINED.

22            YOU DIDN'T WANT TO GET INTO THIS EITHER.

23            MR. LUCEY:  LET ME CHECK WITH MY COUNSEL,

24   YOUR HONOR.

25            THE COURT:  OKAY.

1             MR. LUCEY:  NO FURTHER QUESTIONS,

2    YOUR HONOR.

3             THE COURT:  ALL RIGHT.

4             MR. FONG:  TWO QUESTIONS, YOUR HONOR.

5             THE COURT:  WE CAN'T KEEP GOING BACK AND

6    FORTH.  I MEAN, DIRECT, CROSS --

7             MR. FONG:  IT'S DIRECTLY RELATED TO A

8    QUESTION THAT MR. LUCY ASKED.

9             THE COURT:  I WILL LET YOU ASK ONE OR TWO

10   BUT I'M -- NORMALLY I'M NOT GOING TO ALLOW RECROSS.

11            MR. FONG:  THAT'S FINE, YOUR HONOR.

12

13        **RE-CROSS EXAMINATION BY MR. FONG**

14

15   BY MR. FONG:

16   Q.   MR. LIN, YOU SPOKE TO F.B.I. AGENT GREGORY

17   FINE IN DECEMBER 2008; IS THAT CORRECT?

18   A.   CORRECT.

19   Q.   OKAY.  AND DURING THAT CONVERSATION YOU TOLD

20   AGENT FINE ABOUT THE LAST $250,000 INVESTMENT THAT

21   YOU MADE WITH MR. HU, DID YOU NOT?

22   A.   YES, I REVIEW EVERYTHING.

23   Q.   AND DURING THAT CONVERSATION, DURING THE

24   ENTIRE CONVERSATION WITH AGENT FINE, YOU DID NOT

25   TELL HIM THERE WAS ANY OTHER REASON FOR YOU TO MAKE

314

1    THAT LAST INVESTMENT OTHER THAN THE FACT THAT

2    MR. HU HAD MENTIONED TO YOU THAT YOU WERE THE ONLY

3    INVESTOR WHO HAD NOT PUT IN AT LEAST A MILLION

4    DOLLARS.

5    A.   CAN YOU REPHRASE THAT QUESTION AGAIN BECAUSE

6    THAT'S LIKE PUTTING WORDS IN MY MOUTH.

7    Q.   SURE.  LET ME TRY THIS.  WHEN YOU WERE TALKING

8    TO AGENT FINE ABOUT THE REASONS WHY YOU -- WHEN YOU

9    WERE TELLING AGENT FINE WHY YOU MADE THAT LAST

10   INVESTMENT IN MAY OF 2007 OF $250,000, YOU TOLD HIM

11   THAT THE ONLY THING THAT YOU TOLD HIM WAS THAT YOU

12   MADE THAT INVESTMENT BECAUSE MR. HU HAD MENTIONED

13   THAT YOU WERE THE ONLY INVESTOR UNDER A MILLION

14   DOLLARS; IS THAT CORRECT?

15   A.   THAT'S PARTIALLY CORRECT ONLY.

16   Q.   BUT --

17   A.   MAY I EXPLAIN?

18   Q.   NO.  I JUST WANT TO KNOW IS THAT A TRUE

19   STATEMENT?  IS THAT THE ONLY REASON THAT YOU TOLD

20   AGENT FINE?

21   A.   BECAUSE THROUGHOUT THE DISCUSSION HIS

22   WONDERFUL STATEMENT HAS ALWAYS BEEN THE MOTIVATION

23   AS WELL.  THAT'S UNDERSTOOD.

24   Q.   IT MAY BE UNDERSTOOD BUT AGAIN I'M ONLY

25   INTERESTED IN WHAT YOU TOLD AGENT GREGORY FINE.

1    DID YOU TELL IN DECEMBER 2008 WHEN YOU WERE

2    INTERVIEWED BY AGENT FINE WHEN YOU WERE TALKING

3    ABOUT WHY YOU MADE THAT LAST $250,000 INVESTMENT,

4    YOU TOLD AGENT FINE, THE ONLY THING YOU TOLD AGENT

5    FINE WAS BECAUSE MR. HU HAD MENTIONED THAT YOU WERE

6    THE ONLY INVESTOR WHO HAD NOT PUT IN A MILLION

7    DOLLARS; IS THAT A CORRECT STATEMENT?

8    A.   I CANNOT RECALL HUNDRED PERCENT BUT THERE'S A

9    DOCUMENT THAT YOU CAN, WHATEVER THE --

10   Q.   OKAY.  HAVE YOU SEEN THE REPORT WHAT THEY

11   CALL -- WHAT WE CALL THE F.B.I. 302 REPORT THAT

12   AGENT FINE PREPARED IN CONNECTION WITH YOUR --

13   CONNECTION WITH HIS INTERVIEW OF YOU ON

14   DECEMBER 2ND, 2008?

15   A.   I DON'T RECALL.  I REMEMBER THE CONVERSATION

16   WITH MR. FINE WAS BASICALLY I TALK ABOUT THE WHOLE

17   HISTORY.

18           AND YOU ARE ASKING ME SPECIFICALLY THE

19   REASON.  IT'S NEVER THAT CLEAN CUT, IT'S ALWAYS,

20   THE BASIS IS HE SENT ME, OVER THE YEARS, THE

21   STATEMENT, PLUS THE PRESSURE OF MEETING THE

22   MINIMUM.

23   Q.   I'M GOING TO HAND YOU A DOCUMENT THAT'S BEEN

24   MARKED AS DEFENDANT'S EXHIBIT 508.  NOW I KNOW THAT

25   YOU DID NOT PREPARE THIS DOCUMENT.  I SIMPLY WANT

1    TO ASK YOU TO LOOK AT THIS DOCUMENT AND SEE IF IT

2    REFRESHES YOUR RECOLLECTION.  DIRECTING YOUR

3    ATTENTION TO PAGE 4 OF EXHIBIT 508.

4         DO YOU SEE -- I'M SORRY, I WILL WAIT

5    UNTIL YOU --

6    A.   THIS IS NOT MY DOCUMENT.

7    Q.   I FULLY UNDERSTAND THAT, SIR.

8    A.   I DID NOT WRITE THIS, YEAH.

9    Q.   I FULLY UNDERSTAND THAT AND I APPRECIATE THAT.

10   IF YOU WILL ALLOW ME I SIMPLY WANT TO ASK YOU A

11   QUESTION TO SEE IF A PARTICULAR PARAGRAPH,

12   PARAGRAPH, THE THIRD FULL PARAGRAPH ON PAGE 4, IF

13   THAT REFRESHES YOUR RECOLLECTION AS TO THE QUESTION

14   THAT I HAVE BEEN POSING.  I WILL BE GLAD --

15   A.   I'M NOT SURE WHICH PARAGRAPH.  WHAT'S THE

16   LEADING WORD?

17   Q.   I WOULD CONSIDER THIS THE THIRD.

18   A.   THIS ONE?

19   Q.   IN MAY 2007, JUST FOR IDENTIFICATION PURPOSES.

20   YOU SEE THE PARAGRAPH THAT BEGINS WITH THE WORDS IN

21   MAY 2007, RIGHT?

22   A.   YES, YES, I SEE THAT.

23   Q.   CAN YOU PLEASE READ THAT PARAGRAPH TO

24   YOURSELF, THAT'S ALL I'M ASKING?

25   A.   YES, I READ.

1    Q.   OKAY.  NOW, THIS IS THE THIRD FULL PARAGRAPH

2    ON PAGE 4 OF EXHIBIT 508.  HAVING READ THAT

3    PARTICULAR PARAGRAPH, DOES THAT REFRESH YOUR

4    RECOLLECTION AS TO DID YOU TELL AGENT FINE THAT THE

5    ONLY REASON WHY YOU MADE THAT LAST INVESTMENT

6    $250,000 WAS BECAUSE MR. HU MENTIONED TO YOU THAT

7    YOU WERE THE ONLY INVESTOR WHO HAD NOT PUT IN A

8    MILLION DOLLARS?

9    A.   THIS DOCUMENT DOES NOT SAY FOR THIS ONLY

10   REASON.

11           THE COURT:  WAIT A MINUTE.  THE QUESTION

12   IS NOT WHAT THAT DOCUMENT SAYS.  THE QUESTION IS

13   WHETHER THIS DOCUMENT REFRESHES YOUR RECOLLECTION

14   NOW THAT YOU'VE READ THE PARAGRAPH, DOES THAT

15   REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT YOU

16   TOLD AGENT FINE THAT THE SOLE REASON THAT YOU MADE

17   THE LAST INVESTMENT --

18           THE WITNESS:  THANK YOU, YOUR HONOR.

19           THE COURT:  BECAUSE YOU WERE AT THE

20   MINIMUM.

21           THE WITNESS:  NO, I DON'T RECALL THE

22   EXACT EVERY WORD, NO.

23   BY MR. FONG:

24   Q.   HAD YOU BEFORE TODAY, HAD A CHANCE TO LOOK AT

25   THE DOCUMENT EXHIBIT 508?

1    A.   YES, BRIEFLY.

2    Q.   OKAY.  AND WHEN WAS THAT?

3    A.   IT WAS A FEW DAYS AGO.

4    Q.   DID YOU TELL ANYBODY THAT THERE WAS ANYTHING

5    THAT WAS INACCURATE ABOUT WHAT YOU READ IN

6    EXHIBIT 508?

7    A.   AGAIN, THIS IS NOT SOMETHING THAT I WROTE,

8    RIGHT, IT'S A SUMMARY BASED ON A LENGTHY

9    CONVERSATION.

10   Q.   AND MY QUESTION TO YOU IS, HAVING READ, LET

11   SOMEBODY ELSE SUMMARIZE YOUR CONVERSATIONS WITH

12   AGENT FINE, HAVING READ EXHIBIT 508, DID YOU TELL

13   ANYBODY THAT THERE WAS ANYTHING INACCURATE ABOUT

14   EXHIBIT 508?

15   A.   NO.

16           MR. FONG:  THANK YOU.  THAT'S ALL I HAVE.

17           THANK YOU VERY MUCH.

18           MR. LUCEY:  NOTHING FURTHER, YOUR HONOR.

19           THE COURT:  YOU MAY STEP DOWN.

20           THE WITNESS:  THANK YOU VERY MUCH,

21   YOUR HONOR.

22           THE COURT:  OKAY.  DO YOU WANT TO CALL

23   YOUR NEXT WITNESS, PLEASE.

24           MR. FAZIOLI:  YES, YOUR HONOR.

25           THE UNITED STATES CALLS DERICK ARTHUR.

1          THE COURT:  WILL YOU COME FORWARD AND WE

2    WILL SWEAR YOU IN AS A WITNESS.

3

4                    **DERICK ARTHUR,**

5    BEING CALLED AS A WITNESS ON BEHALF OF THE

6    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

7    EXAMINED AND TESTIFIED AS FOLLOWS:

8          THE WITNESS:  YES, I SWEAR.

9          THE CLERK:  PLEASE STATE YOUR FULL NAME

10   AND SPELL YOUR LAST NAME.

11         THE WITNESS:  DERICK JOHN ARTHUR.

12   A-R-T-H-U-R.

13

14             **DIRECT-EXAMINATION BY MR. FAZIOLI**

15

16   BY MR. FAZIOLI:

17   Q.   GOOD MORNING, MR. ARTHUR.  CAN YOU PLEASE TELL

18   THE JURY WHERE YOU LIVE?

19   A.   HILLSDALE, NEW JERSEY.

20   Q.   ARE YOU CURRENTLY EMPLOYED?

21   A.   YES, I AM.

22   Q.   AND WITH WHOM ARE YOU EMPLOYED?

23   A.   LAW FIRM OF PROSKAUER ROSE.

24   Q.   IS THAT ALSO KNOWN AS PROSKAUER ROSE LLP?

25   A.   THAT'S CORRECT.

1    Q.   SO PROSKAUER ROSE IS A LAW FIRM?

2    A.   THAT IS CORRECT.

3    Q.   DOES IT HAVE OFFICES THROUGHOUT THE WORLD.  WE

4    ARE A GLOBAL LAW FIRM, 12 OR 13 OFFICES.

5    HEADQUARTERED IN NEW YORK?

6    Q.   WHICH PROSPECTIVE INVESTORS OFFICE ARE YOU

7    BASED OUT OF?

8    A.   NEW YORK.

9    Q.   WHAT IS YOUR JOB TITLE WITH PROSKAUER ROSE?

10   A.   I'M DIRECTOR OF RECORDS AND FACILITIES I OVER

11   SEE RECORDS MANAGEMENT, BUSINESS INTAKE CONFLICTS

12   AND OTHERS STUFF.

13   Q.   ARE YOU DIRECTORS OF RECORDS MANAGEMENT FOR

14   THE ENTIRE FIRM?

15   A.   YES, I AM.

16   Q.   IF YOU DON'T MIND FOR THE COURT REPORTER IF

17   YOU DON'T MIND LETTING ME FINISH MY QUESTION?

18   A.   YES.

19   Q.   SO YOU ARE THE DIRECTOR OF RECORDS FOR THE

20   ENTIRE PROSKAUER FIRM?

21   A.   YES.

22   Q.   AND HOW LONG HAVE YOU BEEN IN THIS POSITION?

23   A.   EIGHT YEARS.

24   Q.   CAN YOU DESCRIBE FOR THE JURY WHAT SOME OF

25   YOUR DUTIES ARE AS DIRECTOR OF RECORDS FOR

1  PROSKAUER ROSE?

2  A.   WE OVERSEE THE GOVERNANCE OF RECORDS IN THE

3  FIRM.  MY GROUP IS ALSO RESPONSIBLE AGAIN FOR

4  HANDLING BUSINESS INTAKE AND CONFLICTS SO WE OPEN

5  UP NEW CLIENT MATTER NUMBERS, WE RUN COPIES OF

6  INTEREST CHECKS, WE MAINTAIN HARD COPY STORAGE, IN

7  OUR RECORD SYSTEM.

8  Q.   YOU MADE REFERENCE TO YOUR GROUP, DO YOU HAVE

9  A TEAM THAT WORKS FOR YOU AT PROSKAUER ROSE?

10  A.   YES, THERE ARE 25 PEOPLE -- 24 PEOPLE IN NEW

11  YORK AND 40 OR SO THROUGHOUT THE U.S.

12  Q.   HOW LONG HAVE YOU WORKED IN THE FIELD OF

13  RECORDKEEPING IN THE CONTEXT OF LAW FIRMS?

14  A.   SINCE 1981.

15  Q.   HAVE YOU I ASSUME YOU'VE SEEN LEGAL

16  RECORDKEEPING TECHNOLOGY CHANGE OVER THOSE YEARS?

17  A.   YES, YES.

18  Q.   AND ARE YOU FAMILIAR WITH THE RECORDKEEPING

19  SYSTEM FOR THE LAW FIRM PROSKAUER ROSE?

20  A.   YES, I AM.

21  Q.   AND DOES THE FIRM PROSKAUER ROSE MAINTAIN

22  RECORDS FOR EVERY ONE OF ITS CLIENTS?

23  A.   YES, IT DOES.

24  Q.   IS THIS MAINTENANCE OF RECORDS OF EVERYONE OF

25  ITS CLIENTS A REGULAR BUSINESS PRACTICE OF THE FIRM

1    PROSKAUER ROSE?

2    A.   YES.

3    Q.   AND DOES THE PROSKAUER ROSE CLIENT RECORD

4    DATABASE INCLUDE CLIENTS FROM OFFICES THROUGHOUT

5    THE WORLD?

6    A.   YES, IT DOES.

7    Q.   INCLUDING CLIENTS IN ASIA, FOR EXAMPLE?

8    A.   YES, IT DOES.

9    Q.   HOW ARE PROSPECTIVE INVESTORS CLIENT RECORDS

10   STORES?

11   A.   THEY ARE STORED IN A SYSTEM CALLED LEGAL KEY

12   IT'S A DATABASE WHERE WE MAINTAIN ALL OF OUR

13   INFORMATION.

14   Q.   AND HOW ARE THOSE RECORDS AMENDED OR UPDATED?

15   A.   BY MY GROUP.  IF THERE'S A REQUEST TO CHANGE A

16   CLIENT NAME CHANGE A MATTER NAME WE WOULD GET THE

17   NOTIFICATION FROM THE PARTNER OR LAWYER INVOLVED,

18   WE WOULD MAKE THOSE CHANGES WE WOULD ALL KEEP A

19   HISTORY OF THE CHANGE THAT WE CHANGED THE ORIGINAL

20   RECORD FROM.

21   Q.   AND WHO IN YOUR GROUP MAINTAINS THE CLIENT

22   RECORD DATABASES?

23   A.   YES.

24   Q.   AND PROSKAUER ROSE HAS A LONG HISTORY AS A

25   FIRM, CORRECT?

1    A.   YES.  WE WERE OPENED IN I BELIEVE 1975 OR SO.

2    Q.   AND HOW FAR BACK DOES PROSKAUER ROSE -- HOW

3    FAR BACK DO ITS CLIENT RECORDS?

4    A.   PROBABLY 1930'S OR SO.

5    Q.   AND IF PROSKAUER ROSE NO LONGER HAS A

6    PARTICULAR CLIENT, THEY ARE NO LONGER ENGAGED BY

7    THE FIRM, WOULD THAT CLIENT DISAPPEAR FROM

8    PROSKAUER ROSE'S DATABASES?

9    A.   NO, WE DON'T DELETE THE RECORD WE JUST MARK IT

10   AS INACTIVE OR CLOSED.  WE NEED THAT INFORMATION

11   FOR, AGAIN, CONFLICTS CHECKING.  WE WOULDN'T WANT

12   TO MISS A NAME OR SOMETHING.

13   Q.   IS THERE EVER -- IN YOUR UNDERSTANDING BEEN A

14   CIRCUMSTANCE WHERE PROSKAUER ROSE HAS ASKED TO

15   REMOVE ITS NAME FROM PROSKAUER ROSE'S CLIENT

16   RECORDS AND YOU'VE AGREED TO DO THAT?

17   A.   NO.

18   Q.   OKAY.  AND HOW OFTEN DO YOU -- DO YOU

19   PERSONALLY CONDUCT SEARCHES OF PROSKAUER ROSE

20   CLIENT DATABASES?

21   A.   UNFORTUNATELY, YES, I DO.

22   Q.   AND WHAT IS YOUR IMPRESSION OF THE ACCURACY

23   AND COMPREHENSIVENESS OF THE PROSKAUER ROSE LLP

24   CLIENT DATABASE?

25   A.   I WILL SAY IT'S A HUNDRED PERCENT.  THE SYSTEM

1    IS USED BY MANY LAW FIRMS THROUGHOUT THE WORLD,

2    ACTUALLY.

3    Q.   THE SYSTEM THAT PROSKAUER ROSE USES?

4    A.   YES.

5    Q.   THAT TYPE OF INFORMATION TECHNOLOGY IS USED BY

6    MANY OTHER LAW FIRMS?

7    A.   YES.  IN PARTICULAR THERE'S ONE SYSTEM AS WELL

8    WHICH IS USED BY MANY LAW FIRMS.

9    Q.   HAVE YOU EVER SEARCHED FOR A KNOWN CLIENT OF

10   PROSKAUER ROSE LLP AND FAILED TO FIND IT IN YOUR

11   DATABASE?

12   A.   NO.

13   Q.   HAVE YOU EVER CONDUCTED A SEARCH OF THE

14   PROSKAUER ROSE CLIENT DATABASES TO SEE WHETHER THE

15   DEFENDANT ALBERT HU AND ANY OF THE FUNDS AFFILIATED

16   WITH HIM HAD EVER ENGAGED THE LAW FIRM PROSKAUER

17   ROSE LLP?

18   A.   YES.

19   Q.   AND WHEN DID YOU CONDUCT THIS SEARCH?

20   A.   MAY OF 2009 OR SO.

21   Q.   AND WHAT WAS THE TIME FRAME FOR WHICH YOU

22   CONDUCTED THE SEARCH TO SEE WHETHER THE DEFENDANT

23   OR HIS FUNDS HAD EVER BEEN A CLIENT OF PROSKAUER

24   ROSE?

25   A.   WHEN WE SEARCHED -- EVERYTHING IS SEARCHED, SO

1    EVERY RECORD IN THE DATABASE WAS SEARCHED.  SO FROM

2    WHATEVER RECORDS WERE IN THE SYSTEM UP UNTIL THAT

3    DAY.

4    Q.   SO THAT WOULD HAVE BEEN ANY RECORD OF

5    PROSKAUER ROSE RELATED TO CLIENTS AS FOR BACK TO

6    THE 19 FORTS TO 2009?

7    A.   CORRECT.  CLIENT NAMES, MATTER NAMES, ANY

8    RELATED PARTY INVOLVED IN ANY TRANSACTION THAT WE

9    HAVE.

10   Q.   DO YOU RECALL WHAT WERE SOME OF THE TERMS FOR

11   WHICH YOU SEARCHED?

12   A.   EVERYTHING IS SEARCHED WITH WILD CARDS.  SO HU

13   WAS SEARCHED, ASENQUA OR FIRESIDE, AQC.  AND AGAIN

14   SO WE ARE SEARCHING FIRESIDE WITH AN ASTERISK,

15   FIRESIDE SPELLED WITH FY, SO WE WILL COME ACROSS

16   ANYTHING THAT'S SEARCHED.  HU WOULD BE H-U.

17   Q.   DID YOU FIND ANY RECORDS FOR ALBERT HU, ALBERT

18   K. HU, ASENQUA, FIRESIDE LS FUND, AQC, OR ANY OTHER

19   ENTITY ASSOCIATED WITH THE DEFENDANT THAT YOU WERE

20   ASKED TO SEARCH FOR?

21   A.   NO.

22   Q.   WOULD YOU HAVE FOUND SUCH RECORDS IF SUCH A

23   PERSON OR ENTITY HAD EVER BEEN A CLIENT OF

24   PROSKAUER ROSE LLP?

25   A.   YES.

326

1    Q.   SITTING HERE TODAY AS DIRECTOR OF RECORDS FOR

2    THE PROSKAUER FIRM DO YOU EVER ANY REASON

3    WHATSOEVER TO THINK THAT ALBERT HU, THE FIRESIDE LS

4    FUND THE ASENQUA BETA FUND THE AQC FUND OR ANY

5    OTHER AT BETTER HU AFFILIATED ENTITY HAS EVER

6    ENGAGED PROSKAUER ROSE?

7    A.   NO.

8            MR. FAZIOLI:  NOTHING FURTHER FROM THIS

9    WITNESS, YOUR HONOR.

10           THE COURT:  ANY QUESTIONS, MR. FONG?

11           MR. FONG:  NO QUESTIONS, YOUR HONOR.

12           THE COURT:  YOU ARE EXCUSED.  THANK YOU.

13           THE WITNESS:  THANK YOU.

14           THE COURT:  OKAY.  ARE YOU PREPARED TO

15   CALL YOUR NEXT WITNESS.

16           MR. FAZIOLI:  YES.  THE UNITED STATES

17   CALLS LARRY RAP PORT.

18

19                       **LARRY RAPPAPORT,**

20   BEING CALLED AS A WITNESS ON BEHALF OF THE

21   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

22   EXAMINED AND TESTIFIED AS FOLLOWS:

23           THE WITNESS:  I WILL.

24           THE CLERK:  FOR THE RECORD, PLEASE STATE

25   YOUR FULL NAME AND SPELL YOUR LAST NAME.

1           THE WITNESS:  CERTAINLY.  LARY.  I WILL

2    ACTUALLY SPELL LARY.  IT ONLY HAS ONE R.  ALAN,

3    A-L-A-N, RAPPAPORT.

4

5           **DIRECT-EXAMINATION BY MR. FAZIOLI**

6

7    BY MR. FAZIOLI:

8    Q.   STILL THE MORNING, SO GOOD MORNING

9    MR. RAPPAPORT.

10   A.   GOOD MORNING.

11   Q.   WHY DO YOU LIVE?

12   A.   LOS ANGELES, CALIFORNIA.

13   Q.   ARE YOU CURRENTLY EMPLOYED?

14   A.   YES, I AM.

15   Q.   WHO ARE YOU EMPLOYED BY?

16   A.   I'M AN ATTORNEY.  I'M A PARTNER WITH THE LAW

17   FIRM OF PROSKAUER ROSE.

18   Q.   IT'S ALSO KNOWN AS PROSKAUER ROSE LLP?

19   A.   YES, IT IS.  IT'S A LIMITED LIABILITY

20   PARTNERSHIP.

21   Q.   AND HOW LONG HAVE YOU BEEN IN THIS POSITION OF

22   EQUITY PARTNER?

23   A.   I HAVE BEEN WITH PROSPECTIVE INVESTORS SINCE

24   APRIL 1ST OF 2000.

25   Q.   ARE YOU A MEMBER IN GOOD STANDING OF ANY STATE

1    BAR?

2    A.   YES, THE CALIFORNIA STATE BAR.

3    Q.   DO YOU HAVE PRIOR EMPLOYMENT IN THE FIELD OF

4    CRIMINAL LAW?

5    A.   IN CRIMINAL LAW YES, I DO.  WHEN I GRADUATED

6    LAW SCHOOL IN 1979 I WORKED AT THE SOLANO COUNTY

7    PUBLIC DEFENDERS OFFICE AS A PUBLIC DEFENDER FOR A

8    FIRST JOB AND I SWITCHED TO LOS ANGELES AND

9    SWITCHED OVER TO CIVIL PRACTICE.

10   Q.   GETTING BACK TO YOUR CURRENT EMPLOYMENT, CAN

11   YOU BRIEFLY DESCRIBE FOR THE JURY WHAT IT MEANS TO

12   BE AN EQUITY PARTNER OF YOUR FIRM?

13   A.   SURE.  AS AN EQUITY PARTNER THAT MEANS THAT

14   I'M AN OWNER OF THE FIRM.  WE HAVE ABOUT 750

15   LAWYERS WORLDWIDE AND WE HAVE OVER 200 OF US ARE

16   PARTNERS OR OWNERS.

17   Q.   AND PROSKAUER ROSE IS A GLOBAL LAW FIRM

18   CORRECT?

19   A.   YES, IT IS.

20   Q.   AS AN EQUITY PARTNER DO YOU KNOW APPROXIMATELY

21   HOW MANY LAWYERS WORK FOR PROSKAUER ROSE WORLDWIDE?

22   A.   WE HAVE ABOUT 750 CURRENT IT'S NOT AN EXACT

23   AMOUNT BUT IT'S AN APPROXIMATION.

24   Q.   AND YOU HAVE OFFICES THROUGHOUT THE WORLD?

25   A.   WE DO, WE HAVE EIGHT OFFICES, I BELIEVE IN THE

1    UNITED STATES.  THE MAIN OFFICE IS IN NEW YORK AND

2    WE ALSO HAVE OFFICES IN PARIS, LONDON, AND HONG

3    KONG.

4    Q.   AND AS AN EQUITY PARTNER DO YOU SERVE ON

5    CERTAIN COMMITTEES ON PROSKAUER ROSE?

6    A.   YES, I DO.  I'M A MEMBER OF A TECHNOLOGY

7    COMMITTEE WHICH IS IN CHARGE OF OVERSEEING THE

8    FIRM'S COMPUTER SYSTEMS AND TECHNOLOGY.

9          I'M COCHAIR OF THE KNOWLEDGE MANAGEMENT

10    COMMITTEE WITH CHRISTINE MATTHEWS WHO IS ONE OF MY

11    PARTNERS IN NEW YORK.  WE ARE CHARGED WITH -- IT'S

12    BASICALLY, KNOWLEDGE MANAGEMENT IS WHAT INFORMATION

13    DO WE HAVE AT THE FIRM, HOW DO YOU FIND IT.  THEN

14    IF YOU WANT TO FIND IT, AGAIN, HOW DO YOU FIND IT

15    AGAIN.

16          AND I'M ALSO A MEMBER OF THE NEW BUSINESS

17    COMMITTEE WHERE WE REVIEWED THE FORMS WHERE PEOPLE

18    TURN THEM IN TO OPEN NEW MATTERS WITHIN THE FIRM

19    AND WE LOOK AT THOSE AND MAKE SURE THOSE ARE

20    PROPERLY FILLED OUT.

21    Q.   LET'S TALK BRIEFLY ABOUT ONE OF THE NEW

22    COMMITTEES.  THE NEW BUSINESS COMMITTEE WHO IS THE

23    PURPOSE OF THAT COMMITTEE THE PROSPECTIVE INVESTORS

24    COMMIT I?

25    A.   WELL, IT HAS A VARIETY OF PURPOSES.  EVERY

1    TIME YOU WANT TO BRING A NEW CLIENT INTO THE FIRM

2    YOU HAVE TO FILL OUT CERTAIN INFORMATION ABOUT WHO

3    THE PERSON IS WHO THE CONTACTS ARE WHAT THE BILLING

4    INFORMATION WILL BE, WHAT INFORMATION WE KNOW ABOUT

5    THAT PERSON OR COMPANY HOW THEY CAME TO THE FIRM IF

6    THEY WERE REFERRED OR NOT, WHO THE CONTACT PEOPLE

7    WOULD BE.

8         THERE'S SOME FINANCIAL INFORMATION THAT'S

9    DONE -- I HONESTLY DON'T KNOW WHO IT'S DONE BY BUT

10   IT'S COMPLETED AS PART OF THE CHECK THEN IT'S

11   CERTIFIED THAT THEY DID THAT.

12        I THINK THERE'S -- I'M NOT FAMILIAR WITH

13   THE PATRIOT ACT I THINK THEY DID PATRIOT ACT

14   CERTIFICATION FOR IT.  THEN IF THERE'S AN ISSUE

15   ABOUT THE NATURE OF THE BUSINESS IT MAY REQUIRE ALL

16   THE MEMBERS OF THE COMMUNITY TO TALK ABOUT IT.

17        FOR EXAMPLE, WE REPRESENT MAJOR LEAGUE

18   BASEBALL.  IF THERE WAS AN ISSUE WHICH IS SOMETHING

19   WHERE EVEN THOUGH IT TECHNICALLY WOULDN'T BE A

20   CONFLICT OF INTEREST IN REPRESENTING MAJOR LEAGUE

21   BASEBALL, WE MAY NOT WANT TO NOT TAKE IT BECAUSE

22   MAJOR LEAGUE BASEBALL WOULD RATHER WE DON'T DO

23   THAT.  WE WOULD HAVE TO TALK ABOUT THAT.

24        THEN ONE OF THE LARGEST PURPOSES OF GOING

25   THROUGH THESE THINGS ARE THE CONFLICT CHECK LISTS

331

1    WHICH ARE DONE BY THE RECORDS DEPARTMENT.  AND AS A

2    MEMBER OF THE NEW BUSINESS COMMITTEE I CHECK TO

3    ENSURE THAT THAT'S DONE BUT I DON'T GET INVOLVED IN

4    DOING THE CONFLICT CHECK MYSELF UNLESS I'M THE

5    PERSON TURNING IN THE FORM.

6    Q.   NOW WE HEARD TESTIMONY FROM DERICK ARTHUR.

7    A.   CORRECT.

8    Q.   AND IS IT FAIR TO SAY PROSKAUER ROSE HAS VERY

9    COMPREHENSIVE RECORDS OF ITS CLIENTS?

10   A.   YES.

11   Q.   AND IS IT YOUR EXPERIENCE THAT PROSKAUER ROSE

12   RETAINS THE CLIENTS -- OR LET ME REPHRASE THAT.

13          IS IT YOUR EXPERIENCE THAT PROSKAUER ROSE

14   IS ENGAGED AS LEGAL COUNSEL FOR CLIENTS WITHOUT

15   CREATING ANY RECORDS OF THOSE CLIENTS?

16   A.   NO.  YOU HAVE TO CREATE THE RECORDS IN ORDER

17   TO BE ENGAGED.

18   Q.   OKAY.  AND ARE THERE IMPORTANT BUSINESS

19   REASONS FOR PROSKAUER ROSE LLP TO HAVE TO MAINTAIN

20   SUCH COMPREHENSIVE CLIENT RECORDS?

21   A.   SURE.  I MEAN, ONE OF THE THINGS WE HAVE TO DO

22   FROM AN ETHICAL STANDPOINT WHICH TO ME IS PART OF

23   THE BUSINESS STANDPOINT.  BUT FROM AN ETHICAL

24   STANDPOINT THERE'S RULES OF PROFESSIONAL

25   RESPONSIBILITY IN CALIFORNIA.

1               AND IN EVERY OTHER STATE IN WHICH YOU ARE

2     GOING TO PRACTICE LAW.  ONE OF THE THINGS IS YOU

3     CAN'T REPRESENT ONE CLIENT WHOSE GOT AN ADVERSE

4     INTEREST TO ANOTHER CLIENT UNLESS THERE'S SPECIFIED

5     EXCEPTIONS AND YOU'VE GOT WRITTEN WAIVERS AND

6     CONSENTS FROM BOTH SIDES TO DO THAT.

7               SO ONE OF THE THINGS WE DO IS YOU HAVE TO

8     MAINTAIN THE RECORDS TO MAKE SURE THAT YOU ARE NOT

9     TAKING A NEW CLIENT OR TAKING A NEW MATTER GOING TO

10    BE ADVERSE TO AN EXISTING ONE.

11              WE ALSO INTERNALLY -- AGAIN, IT'S MORE OF

12    A BUSINESS SITUATION.  WE LOOK TO MAKE SURE WE ARE

13    NOT GOING TO BE INVOLVED IN AN INDUSTRY OR INVOLVED

14    IN A TYPE OF CASE WHICH WE AS A FIRM HAVE DECIDED

15    WE DON'T WANT TO DO.  AND WE CAN ONLY DO THAT BY

16    HAVING THE RECORDS AND HAVING THOSE MAINTAINED.

17              FROM A BUSINESS STANDPOINT ALSO, I MEAN

18    IT'S PART OF WHAT WE HAVE TO DO TO OPERATE AS A

19    BUSINESS.  WE ARE REQUIRED BY OUR INSURANCE CARRIER

20    TO MAINTAIN A CONFLICT DATABASE SO WE CAN GO

21    THROUGH AND DO THAT.

22    Q.   AND IN ADDITION TO THE CLIENT RECORD DATABASES

23    DOES PROSKAUER ALSO REQUIRE EMPLOYEES TO PUT CLIENT

24    INFORMATION IN ORDER TO PERFORM FUNCTIONS LIKE

25    COPYING AND OTHER THINGS SUCH AS THAT?

1    A.   SURE.  WHAT WE DO IS -- THERE'S TWO DIFFERENT

2    FUNCTIONS.

3            ONE FUNCTION IS WE HAVE A DOCUMENT

4    MANAGEMENT SYSTEM WHICH IS IN ORDER TO SAVE THINGS

5    TO THE FILE SERVER SO THAT WE CAN RETRIEVE THEM AS

6    PART OF THE KNOWLEDGE MANAGE.

7            YOU HAVE TO HAVE A CLIENT AND MATTER

8    NUMBER.  THE CLIENT NUMBERS ARE UNIQUE FOR EACH

9    CLIENT THEN MATTERS WILL START WITH ONE AND GO FOR

10   HOWEVER MANY YOU HAVE.  BUT YOU HAVE TO HAVE BOTH

11   THE CLIENT AND MATTER NUMBER.

12           IF I WANT TO MAKE A PHONE CALL FOR

13   BILLING PURPOSES I HAVE TO HAVE A CLIENT NUMBER AND

14   A MATTER NUMBER IF IT'S A LONG DISTANCE PHONE CALL

15   OTHERWISE IT GETS CHARGED TO ME.

16           IF I WANT TO GO MAKE A COPY I ACTUALLY

17   CAN'T ACCESS THE COPIER MACHINE WITHOUT HAVING THE

18   NUMBER.  AND THEY NOW RECENTLY CHANGED THAT SO EVEN

19   FOR THE PRINTER, IF YOU WANT TO PRINT SOMETHING OUT

20   AT THE PRINTER IN THE LIBRARY, I HAVE TO HAVE A

21   CLIENT AND MATTER NUMBER SO IT GETS BILLED.

22           IT'S FOR EVERYTHING WE DO BECAUSE THAT'S

23   HOW WE MAKE OUR MONEY IS WE BILL ACCORDING TO OUR

24   COSTS.

25   Q.   AND FOR THOSE REASONS PROSKAUER HAS SUCH

1    COMPREHENSIVE RECORDS OF WHO ACTUALLY HAD ARE AND

2    HAVE BEEN THEIR CLIENTS CORRECT?

3    A.   YES.

4    Q.   AND YOU MENTIONED ABOUT A TECHNOLOGY

5    COMMITTEE.  DOES -- AND I THINK YOU MENTIONED

6    DOCUMENT MANAGEMENT SYSTEM DOES PROSKAUER ROSE HAVE

7    A DOCUMENT MANAGEMENT SYSTEM IN WHICH INFORMATION

8    WITHIN THE FIRM IS INDEXED?

9    A.   YES.  IT'S -- IT'S CALLED FILE SITE.  I KNOW

10   IT'S AN INTERWOVEN SOFTWARE PROGRAM BUT IT'S CALLED

11   FILE SITE.

12            AND IT'S BASICALLY A DATABASE INTO WHICH

13   ALL THE EXCEL DOCUMENTS, THE WORD DOCUMENTS,

14   E-MAILS, THE PDF FILES, EVERYTHING GOES INTO THAT,

15   THEN IT'S A SEARCHABLE DATABASE.

16            IT'S LIKE IF I WENT ON THE INTERNET AND

17   I'M SEARCHING GOOGLE TO FIND A WORD OR SOMETHING, I

18   CAN DO THE SAME WAY WITHIN OUR OWN DATABASE.

19   Q.   WHAT ARE SOME OF THE UNIVERSE OF DOCUMENTS

20   THAT'S CONTAINED WITHIN THIS PROSKAUER ROSE

21   DOCUMENT MANAGEMENT SYSTEM?

22   A.   OH, I MEAN, IT'S SUPPOSED TO BE ALL THE

23   DOCUMENTS THAT WE WORK ON.  I MEAN, FOR EXAMPLE

24   EVERY TIME I GET AN E-MAIL RELATED TO ONE OF THE

25   CASES THAT I'M WORKING ON, YOU SAVE THAT TO FILE

1    SITE BY USING THE CLIENT AND THE MATTER NUMBER.

2            EVERY TIME -- WHAT I HAVE BEEN DOING

3    WHILE I HAVE BEEN WAITING TO TESTIFY TODAY AND I'M

4    WORKING ON A BRIEF I HAVE TO FILE THIS WEEK, IS IN

5    ORDER TO SAVE THAT TO FILE SITE WHICH I'M DOING

6    REMOTELY, I HAVE TO HAVE A CLIENT AND MATTER NUMBER

7    SO I PUT IT IN THERE.

8            SO I'VE GOT THAT.  IF I'M WORKING ON A

9    SPREAD SHEET IN A CASE OR SOMEBODY ELSE IS WORKING

10   ON ONE IT GETS SAVED IN THE SYSTEM.

11   Q.   SO LET'S SAY A PROSKAUER ROSE IS WORKING ON A

12   MEMORANDUM, TYPES IS OUT AND SAVES IT.  THE TERMS

13   IN THAT MEMORANDUM WOULD MAKE IT INTO THE FILE SITE

14   SYSTEM?

15   A.   THAT'S CORRECT.  THE MEMORANDUM ITSELF WOULD

16   BE IN, THEN IT'S FULL TEXT SEARCHABLE SO EVERY WORD

17   IS SEARCHABLE.

18   Q.   OR FOR EXAMPLE A COVER LETTER BILLING INVOICE

19   TO A CLIENT INDICATING THAT PROSKAUER ROSE WAS

20   CHARGING THEM FOR SERVICES, THE INFORMATION WITHIN

21   THAT LETTER WOULD MAKE IT INTO THE SYSTEM AS WELL?

22   A.   CORRECT.  CORRESPONDS TO IN THE SYSTEM.

23   Q.   LET'S SAY THERE WAS A TRANSACTIONABLE ATTORNEY

24   AT PROSKAUER ROSE THAT WAS PREPARING A DOCUMENT FOR

25   A HEDGE FUND WOULD THE INFORMATION THAT THAT

1    DOCUMENT MAKE IT INTO THE FILE SITE SYSTEM?

2    A.   THE DOCUMENT IS PREPARED BY THE CORPORATE

3    DEPARTMENT BY THE CORPORATE ATTORNEYS.  I'M IN

4    LITIGATION BUT IT'S THE SAME THROUGHOUT THE FIRM

5    FOR ALL THE DEPARTMENTS ALL THE DOCUMENTS THAT ARE

6    CREATED GET SAVED INTO FILE SITE.

7    Q.   YOU KNOW THAT IN PART BASED ON YOUR ROLES IN

8    THE TECHNOLOGY COMMITTEE AND THE MANAGEMENT

9    COMMITTEE?

10   A.   CORRECT.  THAT'S ONE OF THE THINGS WE DO.

11   IT'S KNOWLEDGE MANAGEMENT BECAUSE WE DON'T WANT TO

12   REINVENT THE WHEEL ALL THE TIME.

13            SO IT'S A BIG POINT TO MAKE SURE

14   EVERYTHING IS INTO THE SYSTEM SO THAT IF SOMEBODY

15   HAS SOMEONE SOMETHING PREVIOUSLY YOU CAN PULL IT UP

16   AND USE THE NEXT TIME.

17   Q.   HAVE YOU EVER CONDUCTED A SEARCH OF THE

18   PROSKAUER ROSE FILE SITE DOCUMENT SYSTEM TO SEE

19   WHETHER THE DEFENDANT ALBERT HU OF ANY OF HIS

20   AFFILIATED FUNDS HAD EVER BEEN CLIENTS OF PROSKAUER

21   ROSE LLP?

22   A.   YES, I DID.

23   Q.   WHEN DID YOU CONDUCT THIS SEARCH?

24   A.   I ACTUALLY DID TWO DIFFERENT SEARCHES AND I --

25   THEY MAY HAVE BEEN ON TWO DIFFERENT DAYS BUT WHAT I

1    DID LAST WEEK WAS I WENT INTO FILE SITE AND I DID A

2    SEARCH FOR HIS NAME FOR, I DON'T WANT TO TRY TO

3    MISPRONOUNCE THE MIDDLE NAME BUT IT'S KE-JENG OR

4    SOMETHING.  I DID IT FOR THE FULL NAME.  I DID IT

5    FOR ALBERT HU, I DID IT FOR HU, I DID IT FOR THE

6    DIFFERENT ENTITIES THAT HAD BEEN LISTED IN THE

7    AFFIDAVIT THAT I HAD SEEN PREVIOUSLY.  I CUT AND

8    PASTED THOSE.  I PUT THOSE INTO THE SYSTEM AND YES,

9    I DID THAT SEARCH.

10         THEN I ALSO DID IT IN THE CLIENT DATABASE

11   WHICH I DID AS A SEPARATE SEARCH.  I CAN'T REMEMBER

12   IF THEY WERE ON THE SAME DAY.

13   Q.   OKAY.  BUT YOU SEARCHED BOTH THE CLIENT

14   DATABASE AND THE DOCUMENT MANAGEMENT SYSTEM FOR THE

15   TERM ALBERT HU AND ASENQUA, FIRESIDE LS FUND, AQC,

16   THOSE THINGS?

17   A.   THAT IS CORRECT.

18   Q.   OKAY.  DID YOU FIND ANY RECORDS AT ALL THAT

19   INDICATED THAT PROSKAUER ROSE LLP HAD EVER BEEN

20   ENGAGED AS LEGAL COUNSEL FOR ALBERT HU, ALBERT KHU,

21   ASENQUA, FIRESIDE LS FUND, AQC OR ANY OTHER ENTITY

22   ASSOCIATED WITH THE DEFENDANT?

23   A.   NO, I DIDN'T.

24   Q.   DO YOU THINK YOU WOULD HAVE FOUND SUCH RECORDS

25   IF ALBERT HU OR HIS INVESTMENT FUNDS HAD EVER

338

1    ENGAGED PROSKAUER ROSE AS LEGAL COUNSEL?

2    A.   YES.

3    Q.   DID YOU RECENTLY TAKE ANOTHER STEP INTERNALLY

4    WITHIN PROSKAUER ROSE TO INQUIRE AS TO WHETHER

5    PROSKAUER ROSE LLP HAD EVER BEEN ENGAGED TO DO

6    LEGAL WORK FOR ALBERT HU, THE FIRESIDE LS FUND OR

7    ANY ASENQUA REPORTED ENTITIES?

8    A.   YES, I DID.

9    Q.   WHAT STEP DID YOU TAKE?

10   A.   THIS WOULD HAVE BEEN LAST WEDNESDAY.  WHAT I

11   DID WAS I DRAFTED AN E-MAIL AND I TOOK ALL OF HIS

12   NAME AND I TOOK ALL THE NAMES OF THE ENTITIES AND I

13   SENT IT TO ALL THE LAWYERS IN THE PROSKAUER OFFICES

14   WHETHER THEY WERE PARTNERS OR ASSOCIATES OR

15   WHATEVER.  BUT IT BASICALLY SAID, PLEASE LET ME

16   KNOW IMMEDIATELY IF YOU HAVE ANY KNOWLEDGE OF OUR

17   HAVING REPRESENTED ANY OF THE FOLLOWING.

18   Q.   WAS THERE ANY, WHAT WAS THE RESPONSE?

19   A.   I GOT NO RESPONSE FROM ANY OF THE ATTORNEYS.

20   Q.   SITTING HERE TODAY AS AN EQUITY PARTNER OF

21   PROSKAUER ROSE, LLP AND AS A MEMBER OF THE VARIOUS

22   COMMITTEES OF THE FIRM, DO YOU HAVE ANY REASON

23   WHATSOEVER TO THINK THAT PROSKAUER ROSE HAS EVER

24   BEEN ENGAGED TO ACT AS LEGAL COUNSEL TO ALBERT HU,

25   THE FIRESIDE LS FUND, THE ASENQUA BETA FUND, THE

1    AQC FUNDS OR ANY OTHER ASENQUA ENTITY?

2    A.   NO.

3    Q.   NOW PROSKAUER ROSE, YOU WERE A PROMINENT

4    GLOBAL LAW FIRM, CORRECT?

5    A.   THAT IS CORRECT.

6    Q.   WITH A WELL KNOWN REPUTATION IN BOTH

7    LITIGATION AND TRANSACTIONAL WORK?

8    A.   THAT IS CORRECT.

9    Q.   IS THE LAW FIRM A PUBLIC REPUTATION IMPORTANT

10   TO ITS BUSINESS?

11   A.   OH, ABSOLUTELY.

12   Q.   WHY IS THE LAW FIRM'S PUBLIC REPUTATION

13   IMPORTANT TO ITS BUSINESS?

14   A.   WELL THAT'S HOW WE GET BUSINESS THAT'S HOW WE

15   DO BUSINESS.  PEOPLE KNOW THE FIRM.  IT'S BOTH FROM

16   THE STANDPOINT OF ACQUIRING CLIENTS, HAVING

17   CONTINUED CLIENTS, AND THEN ALSO ATTRACTING TALENT,

18   ATTRACTING ATTORNEYS TO COME TO THE LAW FIRM TO

19   WANT TO WORK THERE.

20   Q.   LET ME SHOW YOU WHAT'S BEEN MARKED AS

21   GOVERNMENT'S EXHIBIT 5.  PROSKAUER HAVE YOU EVER

22   SEEN GOVERNMENT EXHIBIT 5?

23   A.   YES, I HAVE.

24   Q.   WHEN DID YOU FIRST SEE GOVERNMENT EXHIBIT 5?

25   A.   THE FIRST AND ONLY TIME I'VE SEEN IT BEFORE

1  WAS LAST NIGHT.

2  Q.   IS THAT WHEN YOU MET WITH GOVERNMENT COUNSEL

3  AND THE F.B.I.?

4  A.   THAT IS CORRECT.

5  Q.   AND MS. BURNEY, COULD YOU PUBLISH GOVERNMENT

6  EXHIBIT 5, THE FIRST PAGE.  CAN YOU PLEASE READ

7  WHAT IS ON THE FIRST PAGE OF GOVERNMENT EXHIBIT 5

8  THE TEXT?

9  A.   ALOUD OR TO MYSELF?

10  Q.   ALOUD?

11  A.   THE FIRESIDE LS FUND LIMITED SUBSCRIPTION

12  BOOKLET FOR NON U.S. INVESTORS AND U.S. TAX EXEMPT

13  INVESTORS.

14  Q.   OKAY.  AND THEN DRAWING YOUR ATTENTION TO THE

15  PAGE AND IT'S BATES NUMBERED ON THE BOTTOM RIGHT.

16  A.   YES.

17  Q.   I THINK THE BATES NUMBER IS HU115.  IT MIGHT

18  BE THE 31ST PAGE OF THE DOCUMENT.

19  A.   OKAY.

20  Q.   MS. BURNEY, CAN YOU PLEASE BLOW UP THE SECTION

21  AT THE BOTTOM THAT SAYS DATED AND THE SIGNATURE

22  BLOCK AT THE BEGINNING.

23         DO YOU SEE THERE'S A DATE AT THE BOTTOM

24  OF THIS PAGE ON EXHIBIT 5?

25  A.   YES.

1     Q.    WHAT'S THE DATE THERE?

2     A.    NOVEMBER 25, 2005.

3     Q.    OKAY YOU SEE THERE'S ALSO A SIGNATURE ON THE

4     BOTTOM OF THAT PAGE, CORRECT?

5     A.    YES.

6     Q.    NOW DRAWING YOUR ATTENTION TO PAGE, I THINK

7     IT'S IT IS SIXTH PAGE OF THIS DOCUMENT, IT'S HU90.

8     A.    OKAY.  YES.

9     Q.    AND MS. BURNEY, CAN YOU PLEASE PULL UP THE TOP

10    WHERE IT SAYS SUBSCRIPTION AGREEMENT THEN DOWN

11    THROUGH THE FIRST PARAGRAPH THAT SAYS APPLICATION.

12    CAN YOU WIDEN IT TO GET THE WHOLE FIRST PARAGRAPH.

13            ALL RIGHT.  CAN YOU PLEASE READ THE FIRST

14    SENTENCE AFTER THE WORD APPLICATION HERE IN THIS

15    PARAGRAPH.

16    A.    SURE.

17            THE UNDERSIGNED INDIVIDUAL OR ENTITY THE

18    INVESTOR, HEREBY APPLIES TO BECOME A SHAREHOLDER OF

19    THE FIRESIDE LS FUND LIMITED A CAYMAN COMPANY, THE

20    FUND OR THE FUND, ON THE TERMS -- I'M SORRY IT SAYS

21    THE FUND TWICE.  THE FUND OR THE FUND.  ON THE

22    TERMS AND CONDITIONS SET FORTH IN THIS SUBSCRIPTION

23    AGREEMENT, THIS SUBSCRIPTION AGREEMENT, AND IN THE

24    PRIVATE PLACEMENT MEMORANDUM OF THE FUND, THE PPM,

25    A COPY OF WHICH HAS BEEN FURNISHED TO THE INVESTOR.

1              DO YOU WANT ME TO STOP?  THAT'S THE END

2       OF THE FIRST SENTENCE.

3       Q.   YES.

4              SO YOU SEE THIS IS A SUBSCRIPTION

5       AGREEMENT REPORTED TO AN ENTITY CALLED THE FIRESIDE

6       LS FUND?

7       A.   YES, SIR.

8       Q.   AND IN THIS DOCUMENT THIS DOCUMENT IS MAKING

9       REFERENCE TO THE FIRESIDE LS FUND AS THE QUOTE

10      "FUND," CORRECT?

11      A.   THAT IS CORRECT.

12      Q.   SO THIS DOCUMENT WHEN IT WAS REFERRING TO THE

13      FUND IS IN FACT REFERRING TO THE FIRESIDE LS FUND?

14      A.   CORRECT.  IT IS A DEFINED TERM.

15      Q.   OKAY.  SO THEN LASTLY, DRAWING YOUR ATTENTION

16      TO THE PAGE HU98.

17      A.   OKAY.

18      Q.   AND MS. BURNEY, WOULD YOU BLOW UP THE

19      PARAGRAPH THAT SAYS LEGAL REPRESENTATION WAIVER OF

20      CONFLICTS.

21              AND CAN YOU PLEASE READ -- DO YOU SEE

22      THAT THERE'S THIS FIRST, THE PARAGRAPH HERE LEGAL

23      REPRESENTATION WAIVER OF CONFLICTS

24      A.   YES, I DO.

25      Q.   CAN YOU PLEASE READ THE FIRST THREE SENTENCES

                                                        343

1    OF THIS PARAGRAPH, PLEASE?

2    A.   SURE.

3              THE INVESTOR, UNDERSTANDING THAT

4    PROSKAUER ROSE LLP (PROSKAUER), HAS BEEN ENGAGED TO

5    ACT AS LEGAL COUNSEL TO THE FUND, THE INVESTMENT

6    MASTER, THE ORDINARY SHAREHOLDER AND THE MASTER

7    FUND, COLLECTIVELY THE FUND AFFILIATED GROUP.

8    PROSKAUER HAS NOT BEEN ENGAGED TO PROTECT OR

9    REPRESENT THE PARTICIPATING SHARES OF ANY

10   SHAREHOLDER WITH REGARD TO THE FUND AFFILIATED

11   GROUP OR THE PREPARATION OF THIS SUBSCRIPTION

12   AGREEMENT, AND NO OTHER LEGAL COUNSEL HAS BEEN

13   ENGAGED BY THE FUND AFFILIATED GROUP TO ACT IN SUCH

14   CAPACITY.  IN ITS CAPACITY AS LEGAL COUNSEL TO THE

15   FUND AFFILIATED GROUP, PROSKAUER MAY BE SUBJECT TO

16   ACTUAL OR POTENTIAL CONFLICTS ARISING FROM, AMONG

17   OTHER THINGS, ITS REPRESENTATION OF ONE OR MORE

18   SHAREHOLDERS IN CONNECTION WITH MATTERS OTHER THAN

19   PREPARATION OF THIS SUBSCRIPTION AGREEMENT OR THE

20   OPERATIONS OF THE FUND.

21   Q.   ALL RIGHT.

22             DO YOU SEE IN THAT FIRST SENTENCE WHERE

23   IT SAYS PROSKAUER ROSE, PROSKAUER HAS BEEN ENGAGED

24   TO ACT AS LEGAL COUNSEL OF THE FUND, THE INVESTMENT

25   MANAGER, THE ORDINARY SHARE SHOULDER AND THE MASTER

1    FUND, COLLECTIVELY THE FUND AFFILIATED GROUP; DO

2    YOU SEE THAT?

3    A.   YES, I DO.

4    Q.   IS THAT STATEMENT FALSE?

5    A.   IT CERTAINLY IS WITH RESPECT TO THE FUND.  AS

6    I'M SITTING HERE I DO NOT KNOW WHAT THE INVESTMENT

7    MANAGER IS THE ORDINARY SHAREHOLDER OR THE MASTER

8    FUND IS.  BUT THE FUND AS IT WAS DEFINED EARLIER

9    THAT'S ABSOLUTELY WRONG.

10   Q.   AND JUST ONE FINAL QUESTION.

11   A.   CERTAINLY.

12   Q.   YOU DID A SEARCH, I THINK YOU PREVIOUSLY

13   MENTIONED YOU DID A SEARCH THROUGH PROSKAUER'S

14   LEGAL DOCUMENT DATABASE FOR INFORMATION RELATED TO

15   ALBERT HU, ASENQUA, FIRESIDE AND OTHER TOPICS,

16   CORRECT?

17   A.   CORRECT.  THAT WAS IN FILE SITE AS WELL AS A

18   CLIENT DATABASE AND I GOT NO -- WE DID NOT

19   REPRESENT ANY OF THOSE ENTITIES.

20   Q.   SO AND THIS DOCUMENT DID NOT APPEAR DURING

21   THAT SEARCH?

22   A.   CORRECT.

23   Q.   BECAUSE NOTHING CAME UP -- WELL I'M SORRY

24   NOTHING CAME UP THAT INDICATED, THIS DOCUMENT DID

25   NOT COME UP DURING THE SEARCH?

1    A.    THAT IS CORRECT.

2              MR. FAZIOLI:  NOTHING FURTHER,

3    YOUR HONOR.

4              MR. FONG:  NO QUESTIONS, YOUR HONOR.

5              THE COURT:  ALL RIGHT.

6              YOU ARE EXCUSED.  THANK YOU.

7              MR. LUCEY:  YOUR HONOR, IS YOUR

8    PREFERENCE TO CONTINUE FORWARD OR A SECOND BREAK,

9    WHATEVER YOUR PREFERENCE WOULD BE.

10             THE COURT:  LET'S -- HOW LONG IS THE NEXT

11   WITNESS GOING TO BE.

12             MR. LUCEY:  ROUGHLY THE SAME TIME AS

13   MR. RAPPAPORT, 10, 15 MINUTES.

14             THE COURT:  WHY DON'T WE TAKE A RECESS

15   RIGHT NOW.

16             WE WILL BE IN RECESS FOR 15 MINUTES.

17             (WHEREUPON A RECESS WAS TAKEN.)

18             THE COURT:  ALL RIGHT.

19             MR. LUCEY, DO YOU HAVE YOUR NEXT WITNESS.

20             MR. LUCEY:  YES, YOUR HONOR.

21             THE GOVERNMENT CALLS DOMINIC FRANZELLA TO

22   THE WITNESS STAND.

23             THE CLERK:  COME FORWARD AND I WILL SWEAR

24   YOU IN.

25

346

1                    **DOMINIC FRANZELLA,**

2       BEING CALLED AS A WITNESS ON BEHALF OF THE

3       PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

4       EXAMINED AND TESTIFIED AS FOLLOWS:

5                    THE WITNESS:  YES.

6                    THE CLERK:  THANK YOU.  TAKE THE STAND,

7       PLEASE.

8                    FOR THE RECORD PLEASE STATE YOUR FULL

9       NAME AND SPELL YOUR LAST NAME.

10                   THE WITNESS:  DOMINIC THOMAS FRANZELLA.

11      F-R-A-N-Z-E-L-L-A.

12                   THE CLERK:  THANK YOU.

13

14                  **DIRECT-EXAMINATION BY MR. LUCEY**

15

16      BY MR. LUCEY:

17      Q.   SIR, WHERE DO YOU RESIDE?

18      A.   WEST SACRAMENTO, CALIFORNIA.

19      Q.   HOW LONG HAVE YOU LIVED THERE?

20      A.   I'VE LIVED IN WEST SAC FOR JUST OVER FIVE

21      YEARS NOW.

22      Q.   AND MR. FRANZELLA, ARE YOU CURRENTLY EMPLOYED?

23      A.   YES.

24      Q.   HOW ARE YOU EMPLOYED?

25      A.   BY THE STATE OF CALIFORNIA.

1    Q.   IN WHAT PARTICULAR PART OF THE STATE

2    GOVERNMENT?

3    A.   I WORK WITHIN THE DEPARTMENT OF CONSUMER

4    AFFAIRS SPECIFICALLY THE BOARD OF ACCOUNTANCY.

5    Q.   AND HOW LONG -- WHAT IS YOUR JOB TITLE AT THE

6    CALIFORNIA BOARD OF ACCOUNTANCY?

7    A.   I AM THE LICENSING DIVISION CHIEF.

8    Q.   AND HOW LONG HAVE YOU HELD THAT PARTICULAR

9    TITLE?

10   A.   I'VE BEEN THE DIVISION CHIEF SINCE APRIL.

11   Q.   APRIL OF?

12   A.   THIS YEAR.

13   Q.   AND HOW ABOUT PRIOR TO THAT TIME?

14   A.   I HAVE BEEN WITH THE BOARD OF ACCOUNTANCY FOR

15   MY ENTIRE, THE TIME I HAVE BEEN EMPLOYED BY THE

16   STATE FOR JUST OVER SIX AND A HALF YEARS.

17   Q.   AND MR. FRANZELLA, WHAT IS YOUR EDUCATIONAL

18   BACKGROUND?

19   A.   I HAVE A BA IN HISTORY FROM SACRAMENTO STATE

20   UNIVERSITY AND I ALSO COMPLETED THE COURSE WORK FOR

21   THE MASTER'S DEGREE BUT I HAVEN'T COMPLETED THE

22   THESIS.

23   Q.   WHAT WAS THE WORK IN REGARD TO YOUR MASTER'S

24   DEGREE?

25   A.   PUBLIC HISTORY.

1    Q.   MR. FRANZELLA, CAN YOU TELL US THE MISSION OF

2    THE BOARD OF ACCOUNTANCY?

3    A.   YES.  THE BOARD'S JOB IS TO PROVIDE LICENSING

4    AND PRACTICING PUBLIC ACCOUNTANCY TO ESTABLISH

5    PROFESSIONAL STANDARDS.

6    Q.   IN TERMS OF IN YOUR ROLE AS DIVISION CHIEF,

7    WHAT IS YOUR RESPONSIBILITY?

8    A.   I OVERSEE THE BOARDS OF LICENSING DIVISION

9    WHICH IS COMPRISED OF FOUR SEPARATE UNITS, THE

10   EXAMINATION UNIT, THE INITIAL LICENSING UNIT WHICH

11   ARE BOTH PART OF THE PROCESS TO GET THE CPA LICENSE

12   AND LICENSE INDIVIDUALS AND FIRMS.

13          I ALSO OVERSEE THE RENEWAL UNIT WHICH IS

14   THE UNIT RESPONSIBLE FOR THE CONTINUED COMPETENCY

15   AND THE RENEWAL OF CPA AND ALSO THE PRACTICE

16   PRIVILEGE UNIT WHICH DEALS WITH OUT OF STATE

17   LICENSES.

18   Q.   AND IN TERMS OF YOUR ROLE AS THE DIVISION

19   CHIEF FOR LICENSING, DO YOU HAVE ANYONE WORKING

20   UNDERNEATH YOU?

21   A.   I HAVE THREE DIRECT MANAGERS, STAFF SERVICES

22   MANAGERS WHO REPORT DIRECTLY TO ME AND THEY OVERSEE

23   A STAFF, I OVERSEE THAT UNIT OR THAT DIVISION WHICH

24   HAS A STAFF OF ROUGHLY 40 STAFF MEMBERS.

25   Q.   AND AS PART OF YOUR ROLE AS A LICENSING CHIEF

1    FOR THE CALIFORNIA BOARD OF ACCOUNTANCY ARE YOU

2    CHARGED WITH ANY ROLE IN REGARD TO RECORDKEEPING?

3    A.   YES.  I AM ONE OF THE DESIGNATED RECORD

4    KEEPERS, YES.

5    Q.   AND COULD YOU DESCRIBE FOR THE COURT AND THE

6    JURY THE NATURE OF THE RECORDS KEPT BY THE

7    CALIFORNIA BOARD OF ACCOUNTANCY?

8    A.   THE BOARD KEEPS BOTH PAPER COPY RECORDS, PAPER

9    FILES, AS WELL AS AN ELECTRONIC DATABASE WHICH IS

10   CALLED CONSUMER AFFAIRS SYSTEM WHICH IS A

11   CENTRALIZED SYSTEM KIND OF RUN BY THE DEPARTMENT OF

12   CONSUMER AFFAIRS WHERE MOST THE BOARDS AND BUREAUS

13   WITHIN THAT DEPARTMENT RETAIN THEIR ELECTRONIC

14   FILES FOR LICENSEES.

15   Q.   SO ARE THERE TWO TYPES OF RECORD DATABASES?

16   A.   NOT NECESSARILY TWO TYPES IT'S JUST WE KEEP

17   THE PAPER FILES FOR, WE DON'T HAVE ANY ELECTRONIC

18   SUBMISSIONS OF APPLICATIONS RENEWAL APPLICATIONS,

19   INITIAL APPLICATIONS SO WE MAINTAIN THE PAPER

20   COPIES IN HOUSE FOR A SELECT GROUP OF LICENSEES

21   THOSE WHO ARE CURRENTLY PRACTICING, THOSE WHO HAVE

22   EXAMINATION APPLICATIONS ON FILE.

23         THE REMAINING OF THE ACTUAL LICENSEES ARE

24   ALSO IN THE CONSUMER AFFAIRS SYSTEM THAT DATES BACK

25   TO THE 1989 AND RECORDS THAT WERE BROUGHT IN PRIOR

350

1    TO THAT.

2    Q.   SO JUST SO I'M UNDERSTANDING YOUR TESTIMONY,

3    SO THE CALIFORNIA BOARD OF ACCOUNTANCY MAINTAINS

4    ITS RECORDS IN PAPER FORM?

5    A.   CORRECT.

6    Q.   HOW FAR BACK DO THOSE RECORDS GO?

7    A.   I'VE SEEN RECORDS GO AS FAR AS THE 30'S 40'S,

8    MAYBE '50S.

9    Q.   1930'S AND 40'S?

10   A.   YEAH.  THE ONES WE MAINTAIN IN HOUSE THAT ARE

11   LICENSEE FILES ARE ONES THAT CURRENTLY MAINTAIN

12   ACTIVE LICENSE OR EVEN INACTIVE LICENSE BUT

13   CONTINUE TO RENEW THEIR LICENSE.

14        THOSE THAT HAVE SINCE CANCELLED MAYBE

15   HAVE BEEN DECEASED SURRENDERED A LICENSE IN SOME

16   CAPACITY.  THOSE WILL POSSIBLY BE TAKEN OFF THE

17   SHELF AND FILED AT THE STATE RECORDS CENTER

18   ARCHIVED AS SUCH.

19   Q.   SO IF I'M UNDERSTANDING YOU, THE CALIFORNIA

20   BOARD OF ACCOUNTANCY MAINTAINS RECORDS FOR BOTH

21   CURRENT ACTIVE ACCOUNTING PERSONS WITH LICENSES OR

22   ENTITIES WITH LICENSES OR PRIOR AND PAST?

23   A.   YEAH.  THEY TO HAVE RECORD RETENTION BUT I

24   BELIEVE IT'S SOMEWHERE IN THE NEIGHBORHOOD OF

25   50 YEARS IF I RECALL RIGHT.

1    Q.   NOW IN THE TERMS OF THE CALIFORNIA CONSUMER

2    AFFAIRS, DEPARTMENT OF CONSUMER AFFAIRS, THAT'S THE

3    ELECTRONIC SIDE OF THE RECORDKEEPING FUNCTION?

4    A.   YEAH.   THAT ALLOWS US TO PERFORM ELECTRONIC

5    LOOK UP OF CERTAIN FILES AS WELL AS IT PRETTY MUCH

6    THE PRIMARY INTERFACE FOR THE WEB LICENSE LOOK UP

7    THAT ALLOWS CONSUMERS TO ACCESS LICENSEE RECORD

8    INFORMATION VIA THE WEB.

9    Q.   SO MR. FRANZELLA, CAN YOU SPEAK TO WHAT TYPE

10   OF LICENSE RECORDS THE CALIFORNIA BOARD OF

11   ACCOUNTANCY KEEPS IN ITS PAPER FILES?

12   A.   YEAH, THE BOARD FOR THE LICENSEES THE BOARD

13   HAS FIVE LICENSE TYPES, CERTIFIED PUBLIC

14   ACCOUNTANTS, PUBLIC ACCOUNTANTS, CORPORATIONS,

15   PARTNERSHIPS AND WHAT ARE DEEMED FICTITIOUS NAME

16   PERMITS.

17   Q.   CAN YOU WALK US THROUGH THOSE TO UNDERSTAND

18   WHAT WE ARE TALKING ABOUT?

19   A.   CPA AND PA ARE THE INDIVIDUAL LICENSEES.   THE

20   PUBLIC ACCOUNTANT DESIGNATION WAS SUSPENDED OR

21   TERMINATED SOMETIME BACK IN THE 1960'S, MAYBE '65.

22   AND NOBODY HAS BEEN ISSUED A LICENSE UNDER PUBLIC

23   ACCOUNTING SINCE 1965 BUT THERE ARE SOME OF THEM

24   WHO HAVE LICENSES RENEWED.

25           CPA'S ARE THE INDIVIDUAL LICENSES.

1    CORPORATIONS, PARTNERSHIPS OR FIRMS, THE ACCOUNTING

2    FIRMS.  THEN THE FICTITIOUS NAME PERMITS ARE

3    RECORDS WE KEEP FOR BASICALLY DBA'S OR DOING

4    BUSINESS AS FOR OUR SOLE PRACTITIONERS WHO CHOOSE

5    NOT TO NECESSARILY INCORPORATE OR HAVE A FIRM BUT

6    CHOOSE TO OPERATE A BUSINESS UNDER A NAME STYLE

7    OTHER THAN THE ONE DISPLAYED ON THEIR LICENSE.

8    Q.   UNDER WHAT SITUATIONS WOULD THE CALIFORNIA

9    BOARD OF ACCOUNTANCY MAINTAIN LICENSING RECORDS FOR

10   A PARTICULAR ACCOUNTING FIRM?  WOULD IT BE A SERIES

11   OF POTENTIAL LICENSING WITH THE CALIFORNIA BOARD OF

12   ACCOUNTANCY?

13   A.   FOR AN ACCOUNTING FIRM THE LICENSE FILE WOULD

14   BE MADE UP OF THE INITIAL APPLICATION.  AND AS WELL

15   AS DEPENDING ON IF THEY'RE A CORPORATION OR LIMITED

16   LIABILITY PARTNERSHIP, THE ARTICLES OF

17   INCORPORATION ISSUED BY THE SECRETARY OF STATE AS

18   WELL AS I BELIEVE MOST OF THE FILES ALSO MAINTAIN

19   THE VARIOUS RENEWAL FORMS, RENEWAL APPLICATIONS

20   THAT WERE SUBMITTED, AND IF THEY ARE NOT HOUSED IN

21   THE PARTICULAR FILE THEY ARE BATCHED TOGETHER IN

22   VARIOUS FILES MAINTAINED IN THE OFFICE.

23   Q.   SO BREAKING IT DOWN A LITTLE BIT FURTHER.  IF

24   A PARTICULAR INDIVIDUAL IS ALREADY LICENSED BY THE,

25   HAS ALREADY PASSED ALL THE LICENSING REQUIREMENTS

1   AND IS NOW A CPA FOR CALIFORNIA AND THEY WANTED TO

2   GO OUT TO WORK TO DO CPA IN CALIFORNIA WOULD THEY

3   HAVE TO FILE ADDITIONAL FILINGS BECAUSE THEY ARE

4   NOW WORKING AS AN ACCOUNTANT HOLDING THEMSELVES OUT

5   AS AN ACCOUNTANT TO THE PUBLIC?

6   A.   IF THEY'RE NOT DOING SO USING THE NAME STYLE

7   IN WHICH THEY WERE ISSUED THEIR LICENSE LIKE JOHN

8   SMITH CPA, THAT PARTICULAR INDIVIDUAL WOULD HAVE NO

9   OTHER REPORTING REQUIREMENTS TO US.

10          BUT IF THEY EITHER FORMED A CORPORATION,

11  FORMED A PARTNERSHIP OR STARTED DOING BUSINESS AS A

12  NAME OTHER THAN THAT ON THEIR LICENSE THEY WOULD BE

13  REQUIRED TO FILE AN APPLICATION WITH THE BOARD AND

14  GET APPROVED PRIOR TO USING THAT NAME STYLE.

15  Q.   SO DEPENDING ON HOW MANY PEOPLE, IF ONE

16  INDIVIDUAL DECIDED TO GO INTO BUSINESS WITH ANOTHER

17  ACCOUNTANT OR ANOTHER INDIVIDUAL, DEPENDING ON HOW

18  THEY STRUCTURED THEIR PARTICULAR ENTITY THEY MAY

19  NOT HAVE TO DO ADDITIONAL FILINGS WITH THE

20  CALIFORNIA BOARD OF ACCOUNTANCY?

21  A.   WHEN TWO INDIVIDUALS COME TOGETHER THEY

22  GENERALLY FORM A PARTNERSHIP OR CORPORATION.  THEY

23  WILL COMBINE THEIR NAME STALES OR COME UP WITH A

24  NAME, GENERALLY THE LAST NAMES AND IN THAT

25  PARTICULAR INSTANCE THAT FIRM WOULD HAVE TO APPLY

1   FOR LICENSE AND BE APPROVED PRIOR TO BEING ABLE TO

2   HOLD OUT AND PROVIDE SERVICES.

3   Q.   AND MR. FRANZELLA, IS THERE ANY DIFFERENCE IN

4   YOUR EXPERIENCE BETWEEN THE TERM AUDITORS AND

5   ACCOUNTANTS?

6   A.   I PROBABLY CAN'T REALLY SPEAK TO THAT TOO

7   MUCH.  I DO KNOW THAT THERE ARE AUDITORS, STATE

8   AUDITORS AND SUCH WHO AREN'T NECESSARILY CPA'S BUT

9   IF YOU ARE PERFORMING AUDITED FINANCIAL STATEMENTS

10  AND PERFORMING THOSE TYPES OF AUDITS THOSE ARE

11  PERFORMED BY CPA'S.

12  Q.   SO IS IT FAIR TO SAY THAT IS A FUNCTION UNIQUE

13  TO CPA'S?

14  A.   YEAH CPA'S CAN PERFORM MANY SERVICES -- MANY

15  INDIVIDUALS CAN PERFORM SERVICES THAT CPA'S PERFORM

16  DEPENDING ON THE NATURE AND TYPE OF SERVICES BEING

17  PERFORMED.

18          TAXES MANAGING, CONSULTING SERVICES AND

19  THE LIKE.  BUT THE TEST FUNCTIONS WHAT'S TERMED AS

20  A TEST STATION FUNCTIONS WHICH ARE COMPRISED OF

21  AUDITS REVIEWS AND SERVICES IN THAT PARTICULAR

22  CATEGORY ARE EXCLUSIVELY PERFORMED OR SHOULD BE

23  EXCLUSIVELY PERFORMED BY CPA'S.

24  Q.   I WANT TO SHOW YOU A DOCUMENT NOW

25  MR. FRANZELLA, IT'S GOVERNMENT'S EXHIBIT 1.

1            I WOULD ASK MS. BURNEY PUBLISH IT TO THE

2    JURY, IT'S ALREADY BEEN ADMITTED INTO EVIDENCE.

3            THIS IS, FOR CLARITY, GOVERNMENT'S

4    EXHIBIT 1.

5            AND MR. FRANZELLA I'M NOW HANDING A

6    DOCUMENT THAT WAS PREVIOUSLY MARKED AS GOVERNMENT'S

7    EXHIBIT 1.  IT'S ALSO ON THE SCREEN DIRECTLY IN

8    FRONT OF YOU, SIR.  HAVE YOU SEEN THIS DOCUMENT

9    BEFORE?

10   A.   YES.

11   Q.   WHAT DID YOU FIRST SEE IT?

12   A.   YESTERDAY.

13   Q.   AND WAS THAT IN CONNECTION WITH YOUR MEETING

14   WITH THE GOVERNMENT COUNSEL AND THE F.B.I.?

15   A.   YES.

16   Q.   HAVE YOU HAD A CHANCE TO REVIEW THIS DOCUMENT?

17   A.   BRIEFLY YESTERDAY.

18   Q.   AND YOU WILL SEE THE NAME AT THE TOP OF THE

19   DOCUMENT CASTILLO, LYN, COHEN & VIJAY?

20   A.   YES.

21   Q.   THEN I COULD ASK YOU NOW TO TURN TO THE PAGES

22   THAT FOLLOW.  THIRD PAGE, I BELIEVE MS. BURNEY.

23   A.   YES.

24   Q.   IF YOU COULD BLOW UP THE TEXT PORTION OF THAT

25   DOCUMENT, MS. BURNEY.

1          AND FIRST CAN I DIRECT YOUR ATTENTION TO

2     THE TOP LETTER HEAD, CASTILLO, LYN, COHEN & VIJAY.

3     THEN THE SIGNATURE AT THE BOTTOM OF JUN CASTILLO

4     CPA DATED JANUARY 10, 2005; DO YOU SEE THAT

5     REFERENCE THERE?

6     A.   YES, SIR.

7     Q.   PRIOR TO COMING TO COURT TODAY, MR. FRANZELLA,

8     WERE YOU ASKED BY THE GOVERNMENT TO CONDUCT A

9     SEARCH OF THE RECORDS OF THE CALIFORNIA BOARD OF

10    ACCOUNTANCY AS TO THE FIRM OF CASTILLO, LYN, COHEN

11    & VIJAY?

12    A.   YES.

13    Q.   WERE YOU ABLE TO DETERMINE WHETHER RECORDS TO

14    THAT AFFECT IN THE RECORDS OF YOUR DEPARTMENT?

15    A.   WE WERE UNABLE TO FIND ANY RECORDS.

16    Q.   CAN YOU DESCRIBE THE EFFORTS YOU MADE TO

17    SEARCH FOR RECORDS WITH REGARD TO THE FIRM NAME?

18    A.   YEAH, THE PRIMARY DATABASE WE QUERIED WAS THE

19    CONSUMER AFFAIRS SYSTEM WHICH HOUSES THE ELECTRONIC

20    INFORMATION OF THE PARTICULAR LICENSES OR

21    LICENSEES, LICENSES THE BOARD HAS ISSUED AND WE

22    FOUND NO REFERENCE TO A CASTILLO, LYN, COHEN &

23    VIJAY.

24          AS WELL AS I CHECKED THE BOARD'S OUT OF

25    STATE LICENSE DATABASE TO SEE IF THIS FIRM WAS

1    SOMEHOW PRACTICING THROUGH WHAT'S TERM SAID AS A

2    PRACTICE PRIVILEGE HOLDER AND FOUND NO REFERENCE TO

3    THIS FIRM.

4    Q.   SO AS FAR AS THE CALIFORNIA BOARD OF

5    ACCOUNTANCY VIEW, WHAT IS THE UNDERSTANDING OF THIS

6    FIRM AS LEAST AS OPERATING IN THE STATE OF

7    CALIFORNIA?

8    A.   THAT IT IS NOT LICENSED.

9    Q.   PRACTICE ACCOUNTANCY?

10   A.   PRACTICE PUBLIC ACCOUNTANCY.

11   Q.   THAT WOULD INCLUDE THE AUDITING FUNCTIONS?

12   A.   THAT WOULD INCLUDE THE AUDITING FUNCTIONS.

13   Q.   NOW THE NAME AT THE BOTTOM JUAN CASTILLO, CPA,

14   DID YOU RUN THAT PARTICULAR NAMED INDIVIDUAL

15   THROUGH YOUR DATABASE?

16   A.   YES.

17   Q.   DID YOU RECEIVE ANY RESPONSES AS TO THAT NAME?

18   A.   NO.

19   Q.   DID YOU RUN -- AND THAT WOULD BE FIRST AS TO

20   THE DOMESTIC OR CALIFORNIA BASED ACCOUNTANTS?

21   A.   CORRECT.

22   Q.   WHAT ABOUT THE OUT OF STATE DATABASE?

23   A.   NO.  WE RAN CASTILLO AND HAD ONE HIT FOR

24   SOMEBODY NAMED CASTILLO AND IT WAS FOR, I BELIEVE A

25   DEBBIE OR DEBRA, IF I RECALL.

1    Q.   IT WAS NOT JUAN?

2    A.   NO.

3    Q.   TO THE BEST OF --

4         WHAT'S THE OPINION AS TO THE CALIFORNIA

5    BOARD OF ACCOUNTANCY BASED ON YOUR RECORD REVIEW AS

6    TO THE INDIVIDUAL WHO APPEARS TO BE SIGNING THIS

7    DOCUMENT, JUAN CASTILLO?

8    A.   THAT HE OR SHE IS NOT LICENSED BY THE

9    CALIFORNIA BOARD OF ACCOUNTANCY AS A CPA.

10   Q.   AND IS THE USE OF THE INITIALS CPA AFTER A

11   NAME IN CONNECTION WITH A DOCUMENT THAT SAYS REPORT

12   OF THE INDEPENDENT AUDITORS, IS THAT SIGNIFICANT TO

13   THE CALIFORNIA BOARD OF ACCOUNTANCY?

14   A.   YEAH.

15   Q.   WHY SO?

16   A.   SORRY.  ANY TIME SOMEBODY USES THE NAME OR THE

17   ACRONYM CPA, IT'S A SIGNAL AS HOLDING OUT, AND AS

18   SUCH THEY SHOULD BE LICENSED TO PERFORM SERVICES.

19   AND THIS PARTICULAR CASE THEY ARE HOLDING OUT AS

20   THEY WERE A CPA PERFORMING AN INDEPENDENT AUDIT OF

21   THE FINANCIAL STATEMENTS AND THAT WOULD BE WITHIN

22   THE DEFINITION OF THE PRACTICE OF PUBLIC

23   ACCOUNTANCY.

24   Q.   AND NOW HAVING LOOKED AT THE ENTIRETY OF THIS

25   DOCUMENT YESTERDAY, MR. FRANZELLA, YOU WILL SEE ON

1    THE PAGE THAT FOLLOWS THERE'S A SET OF FINANCIALS

2    THAT FOLLOW?

3    A.    UH-HUH.

4    Q.    I WILL ASK MS. BURNEY TO PUBLISH THE NEXT

5    PAGE.  AND THEN WHAT FOLLOWS THERE AFTER,

6    INDICATIONS REGARDING THE NATURE IN WHICH THIS

7    DOCUMENT WAS PUT TOGETHER.

8            DOES THIS FACT THAT YOU DID NOT DETERMINE

9    TO LOCATE ANY RECORDS IN REGARD TO CASTILLO, LYN,

10   COHEN & VIJAY THE NAME OF THE FIRM AND DID NOT

11   LOCATE ANY RECORDS IN REGARD TO THE PERSON SIGNING

12   IT, JUAN CASTILLO, DOES THIS DOCUMENT RAISE ANY

13   CONCERNS IN REGARD TO THE CALIFORNIA BOARD OF

14   ACCOUNTANCY AND IT'S ENFORCEMENT ARM?

15           MR. FONG:  OBJECTION.  RELEVANCE,

16   YOUR HONOR.

17           THE COURT:  I WILL ALLOW THE QUESTION.

18           THE WITNESS:  I REALLY COULDN'T SPEAK TOO

19   DIRECTLY FOR THE BOARD'S ENFORCEMENT UNIT,

20   NECESSARILY.

21           THAT SAID, THE FACT THAT THE INDIVIDUAL

22   HELD OUT AS A CPA, THE FACT THAT THE FIRM IS

23   PERFORMING PUBLIC ACCOUNTING SERVICE, IF THIS WERE

24   TO COME ACROSS MY DESK AND I WERE TO PERFORM THIS

25   SEARCH OF THIS NATURE I WOULD FORWARD IT ON TO THE

1   BOARD'S ENFORCEMENT DIVISION FOR PURPOSES OF

2   DETERMINING UNLICENSED ACTIVITY

3   BY MR. LUCEY:

4   Q.   AND MR. FRANZELLA, LAST SERIES OF QUESTIONS

5   HERE.  WHY IS IT IMPORTANT FOR THE CALIFORNIA BOARD

6   OF ACCOUNTANCY TO MAINTAIN ITS RECORD DATABASE AND

7   TO HAVE LICENSING REQUIREMENTS IN TERMS OF CPA AND

8   AUDITS FUNCTIONS?

9   A.   IT GETS BACK TO THE CORE RESPONSIBILITY OF THE

10  BOARD BUSINESS AND PROFESSIONS CODE SECTION 5000.1

11  PLACES A PRIMARY FIDUCIARY RESPONSIBILITY ON THE

12  BOARD TO PROTECT CONSUMERS.

13         AS SUCH WE MAINTAIN RECORDS TO PROVIDE

14  INDIVIDUALS THE OPPORTUNITY TO LOG ON TO OUR

15  WEBSITE LOOK THAT SOMEONE HAS MET MINIMUM

16  COMPETENCY IS MAINTAINING A LEVEL OF COMPETENCY TO

17  MAINTAIN A LICENSE, THAT THE FIRM IS LICENSED TO

18  PRACTICE PUBLIC ACCOUNTING.

19         ALL OF THESE MEASURES AS A WAY TO ENSURE

20  THAT THE PUBLIC CAN SOMEHOW RELY UPON THE SERVICES

21  BEING PROVIDED BY THE LICENSEE.

22         WITHOUT THAT LEVEL OF ASSURANCE THEN THE

23  BOARD IS NOT REALLY MEETING ITS MISSION.

24  Q.   AND IS THAT IMPORTANT TO THE MAINTENANCE OF

25  THE USE OF THE INITIAL CPA IN A DOCUMENT?

1    A.   YES.

2    Q.   SO THE PUBLIC CAN -- THE TRUST THAT THE PUBLIC

3    HAVE IN THOSE INITIALS?

4    A.   THERE'S AN INHERENT PUBLIC TRUST WITH THE

5    DESIGNATION CPA.

6            MR. LUCEY:  JUST CHECKING IF THERE'S ANY

7    REMAINING QUESTIONS, YOUR HONOR.

8    Q.   MR. FRANZELLA, JUST TO CLARIFY AS WELL, CAN

9    YOU SPEAK TO THE NATURE OF THE PROBLEMS RAISED FOR

10   THE CALIFORNIA BOARD OF ACCOUNTANCY FOR ITS POINT

11   OF VIEW IN HAVING AN INDIVIDUAL PRACTICING AUDITING

12   FUNCTIONS WHO ARE NOT LICENSED BY THE STATE?

13           MR. FONG:  OBJECTION RELEVANCE.  302.

14           THE COURT:  I DON'T THINK WE NEED THIS.

15           MR. LUCEY:  NO FURTHER QUESTIONS,

16   YOUR HONOR.

17           THE COURT:  MR. FONG, ANY QUESTIONS?

18           MR. FONG:  YES JUST A COUPLE.

19

20           **CROSS-EXAMINATION BY MR. FONG**

21

22   BY MR. FONG:

23   Q.   GOOD AFTERNOON, SIR.  MY NAME IS JERRY FONG

24   AND I REPRESENT ALBERT HU.

25           WHAT YOU TESTIFIED TO IN TERMS OF THE

1    SEARCHING FOR THIS INDIVIDUAL JUAN CASTILLO OR THE

2    FIRM OF CASTILLO, LYN, COHEN & VIJAY, ANY MEMBER OF

3    THE PUBLIC COULD HAVE DONE THAT, RIGHT?

4    A.   CORRECT.

5    Q.   BECAUSE -- THE BOARD MAINTAINS A VERY GOOD

6    WEBSITE THAT ALLOWS MEMBERS OF THE PUBLIC WITH

7    ACCESS TO THE INTERNET TO DO THIS SEARCH, RIGHT?

8    A.   CORRECT.

9    Q.   AND THIS HAS BEEN UP FOR WHAT, SINCE LAST TEN

10   YEARS?

11   A.   YOU KNOW, I CAN'T SAY, BUT IT'S BEEN THERE

12   SINCE I HAVE BEEN AT THE BOARD SINCE 2005, I

13   BELIEVE IT'S BEEN THERE LONGER THAN THAT THOUGH.

14            MR. FONG:  OKAY.  THAT'S ALL I HAVE.

15            THANK YOU VERY MUCH.

16            MR. LUCEY:  THANK YOU, YOUR HONOR.

17            THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

18            THANK YOU.

19            THE WITNESS:  THANK YOU.

20            THE COURT:  DO YOU WANT TO CALL YOUR NEXT

21   WITNESS, PLEASE.

22            MR. LUCEY:  YES, YOUR HONOR.

23            WE ARE CALLING LYNETTE DWORKIN TO THE

24   STAND.

25            THE CLERK:  COME FORWARD AND I'M GOING TO

1    SWEAR YOU IN.

2

3                    **LYNETTE DWORKIN,**

4    BEING CALLED AS A WITNESS ON BEHALF OF THE

5    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

6    EXAMINED AND TESTIFIED AS FOLLOWS:

7             THE WITNESS:  YES.

8             THE CLERK:  FOR THE RECORD PLEASE STATE

9    YOUR FULL NAME AND SPELL YOUR LAST NAME.

10            THE WITNESS:  LYNETTE DWORKIN.

11   D-W-O-R-K-I-N.

12

13               **DIRECT-EXAMINATION BY MR. LUCEY**

14

15   BY MR. LUCEY:

16   Q.   GOOD AFTERNOON, MA'AM.  WHERE DO YOU LIVE?

17   A.   IN MORGAN HILL.

18   Q.   HOW LONG HAVE YOU RESIDED THERE?

19   A.   NINE YEARS.

20   Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

21   A.   BY THE EMPLOYMENT DEVELOPMENT DEPARTMENT.

22   Q.   FOR WHAT ENTITY IS IT FOR THE STATE OF

23   CALIFORNIA?

24   A.   I'M SORRY, STATE OF CALIFORNIA, EMPLOYMENT

25   DEVELOPMENT DEPARTMENT.

1    Q.   HOW LONG HAVE YOU BEEN SO EMPLOYED BY THE

2    CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT?

3    A.   11 YEARS.

4    Q.   AND DOES THE CALIFORNIA EMPLOYMENT DEVELOPMENT

5    DEPARTMENT GO BY ANY ACRONYM OR SHORTENED NAME?

6    A.   IT GOES BY EDD.

7    Q.   WHAT IS YOUR JOB TITLE THERE?

8    A.   I'M THE STAFF TAX AUDITOR.

9    Q.   WHAT DOES THAT MEAN IN PRACTICAL TERMS?

10   A.   I'M A SENIOR AUDITOR.

11   Q.   HOW LONG HAVE YOU HELD THAT POSITION?

12   A.   SINCE 2008.

13   Q.   AND PRIOR TO THAT TIME WERE YOU ALSO EMPLOYED

14   BY THE EDD?

15   A.   YES, I WAS.

16   Q.   IN WHAT CAPACITY?

17   A.   TAX AUDITOR.  I WAS PROMOTED IN 2008.

18   Q.   HOW LONG IN TOTAL HAVE YOU BEEN EMPLOYED BY

19   THE EDD, THE 11-YEAR TIME FRAME YOU TALKED ABOUT?

20   A.   THAT'S CORRECT.

21   Q.   WHERE ARE YOU BASED WHAT OFFICE ARE YOU BASED

22   OUT OF?

23   A.   SAN JOSE.

24   Q.   CAN YOU DESCRIBE THE DUTIES OF YOUR POSITION

25   IN GENERAL TERMS?

365

1    A.   YES, I'M RESPONSIBLE FOR THE MORE COMPLEX

2    AUDITS FOR OUR DEPARTMENT, LARGE EMPLOYER'S

3    INVESTIGATIVE DIVISION AUDITS.

4         I'M ALSO RESPONSIBLE FOR THE PETITION

5    PROCESS FOR APPEALED TAX ASSESSMENTS.  I HANDLE THE

6    PETITION PROCESS AND I ALSO MENTOR THE JUNIOR

7    AUDITORS.

8    Q.   WHEN YOU SAY AUDITING, WHAT ARE YOU TALKING

9    ABOUT IN TERMS OF SENIOR STAFF AUDITOR?

10   A.   WELL, SENIOR AUDITORS GO OUT AND AUDIT THE

11   LARGER EMPLOYERS FOR PAYROLL TAX ISSUES.

12   Q.   SO, THE FUNCTION IS WHAT, I GUESS DESCRIBE

13   WHAT AN AUDIT WOULD ENTAIL IN GENERAL TERMS?

14   A.   LOOKING AT THE BOOKS AND RECORDS OF THE

15   ENTITY, VERIFYING THE ENTITY, LOOKING TO SEE IF

16   THEY ARE REPORTING THEIR PAYROLL TAXES

17   APPROPRIATELY.  LOOKING TO SEE IF THEY CLASSIFIED

18   WORKERS AS INDEPENDENT CONTRACTORS AS OPPOSED TO

19   EMPLOYEES.

20   Q.   SO THIS IS ENFORCEMENT OF SOME PART OF STATE

21   LAW?

22   A.   THIS IS EDD HAS THREE BRANCHES.  THERE'S THE

23   TAX BRANCH WHICH IS THE BRANCH THAT I WORK FOR.

24   THERE'S THE UNEMPLOYMENT INSURANCE BRANCH WHICH IS

25   RESPONSIBLE FOR UNEMPLOYMENT BENEFITS, AND THE

366

1    DISABILITY BRANCH.

2              SO THE TAX BRANCH IS RESPONSIBLE FOR

3    ENFORCING THE PAYROLL LAWS OF THE STATE OF

4    CALIFORNIA.

5    Q.   AND ENSURES THERE'S COMPLIANCE BY EMPLOYERS?

6    A.   THAT'S CORRECT.

7    Q.   AND DOES THE EDD IN ITS TAX CAPACITY, DOES IT

8    MAINTAIN RECORDS RELATIVE TO EMPLOYER COMPLIANCE

9    WITH THE LAWS THAT EDD IS CHARGED TO ENFORCE?

10   A.   YES, IT DOES.

11   Q.   WHAT SORT OF RECORDS DOES IT MAINTAIN?

12   A.   WE MAINTAIN THE RETURNS THAT THE EMPLOYERS

13   FILE WITH US REPORTING THEIR PAYROLL AND THE

14   WORKERS THAT THEY EMPLOY.  IT CONSISTS OF QUARTERLY

15   RETURNS, ANNUAL RETURNS, REGISTRATION FORMS AND

16   ALSO ANY MISCELLANEOUS CORRESPONDENCE AN EMPLOYER

17   MAY SEND IN.

18   Q.   COULD YOU GIVE US A SENSE OF WHAT POINT MUST A

19   COMPANY REGISTER WITH EDD?

20   A.   AN ENTITY NEEDS TO REGISTER WITH EDD AFTER

21   THEY HAVE THE FIRST HUNDRED DOLLARS OF PAYROLL IN A

22   CALENDAR QUARTER.

23   Q.   THAT WOULD BE FOR ANY ENTITY AT ALL,

24   ESSENTIALLY, ANYONE WHO HAS HAD WAGE EARNING

25   EMPLOYEES?

367

1    A.   ANY ENTITY THAT HAS EMPLOYEES THAT EARN OVER A

2    HUNDRED DOLLARS IN A QUARTER NEEDS TO REGISTER AND

3    START REPORTING TO EDD.

4    Q.   SO WHAT HAPPENS ONCE AN EMPLOYER REGISTERS,

5    COMPLETES THE REGISTRATION PROCESS?

6    A.   THEN THAT EMPLOYER IS REQUIRED TO START

7    REPORTING TO US ON A QUARTERLY BASIS AND MAKE

8    PAYMENTS FOR THE QUARTERLY TAXES DUE FOR THE

9    WORKERS THEY HIRE.

10   Q.   AND WOULD THERE BE, I GUESS THE INITIAL

11   PROCESS IS COMPLETING THE REGISTRATION FORM YOU

12   TALKED ABOUT EARLIER?

13   A.   YES.

14   Q.   ONCE THAT'S RECEIVED BY EDD DOES THAT MAINTAIN

15   RECORD DATABASE?

16   A.   YES, IT IS.

17   Q.   IS THERE ANY SORT OF UNIQUE IDENTIFIER CREATED

18   IN THE EDD TO IDENTIFY THAT PARTICULAR EMPLOYER WHO

19   HAS FILED A REGISTRATION FORM?

20   A.   EACH EMPLOYER IS ASSIGNED AN ACCOUNT ID.

21   Q.   WHAT'S THE FUNCTION OF THAT ACCOUNT ID?

22   A.   TO IDENTIFY THAT EMPLOYER.

23   Q.   DOES THAT HELP TO KEEP TRACK OF THE RECORDS

24   WITHIN THE DATABASE?

25   A.   YES, EMPLOYERS SUBMIT THEIR RETURNS WITH THE

1    ACCOUNT NUMBER ON IT.

2    Q.   AND CAN YOU SPEAK TO HOW FAR BACK THE RECORDS

3    GO WITHIN THE STATE OF CALIFORNIA AND EDD?

4    A.   I DON'T KNOW THE EXACT YEAR.

5    Q.   DO THEY GO BACK ONE YEAR, 5 YEARS, 10 YEARS?

6    A.   OH, IT GOES BACK TO THE '70S, '60S AND

7    PROBABLY PRIOR.

8    Q.   OKAY.  SO SEVERAL DECADES ANY WAY?

9    A.   YES.

10   Q.   NOW WHAT IF A COMPANY GOES OUT OF BUSINESS DO

11   THE RECORDS GET DESTROYED AT THAT POINT?

12   A.   NO WE RETAIN THE RECORDS.

13   Q.   HOW LONG ARE THE RECORDS RETAINED?  THAT SAME

14   1970 TIME FRAME?

15   A.   I BELIEVE WE RETAIN RECORDS IN OUR COMPUTER

16   SYSTEM -- I'VE SEEN REGISTRATIONS GO ALL THE WAY

17   BACK TO 1996, SO I'M NOT SURE ON THE DEFINITE TIME

18   PERIOD.

19   Q.   SO AS FAR AS YOUR RECOLLECTION WOULD GO AND

20   YOUR UNDERSTANDING, IT WOULD GO BACK AT LEAST PAST

21   TEN YEARS?

22   A.   YES.

23   Q.   AND YOU JUST MENTIONED A MOMENT AGO THE

24   COMPUTER DATABASE.  SO ARE THESE RECORDS KEPT

25   ELECTRONICALLY, PAPER, BOTH?

1    A.   ELECTRONICALLY, RIGHT NOW AND I BELIEVE THE

2    EXTREMELY OLD, I BELIEVE WE HAVE A PAPER OR

3    WAREHOUSE.

4    Q.   FOR PAPER RECORDS?

5    A.   FOR PAPER RECORDS.

6    Q.   AND THOSE ARE BOTH SEARCHABLE?

7    A.   YES.

8    Q.   AND ONE WOULD ASSUME THE ELECTRONIC DATABASE

9    MIGHT BE MORE READILY SEARCHABLE?

10   A.   YES.

11   Q.   SO MORE PARTICULARLY NOW MS. DWORKIN, WERE YOU

12   AT SOME POINT CONTACTED BY THE F.B.I. IN CONNECTION

13   WITH AN INQUIRY WITH REGARD TO A PARTICULAR ENTITY?

14   A.   YES.

15   Q.   I WILL ACTUALLY FLASH UP ON THE SCREEN NOW A

16   DOCUMENT PREVIOUSLY PUT INTO EVIDENCE.  EXHIBIT 1.

17        SHOWING YOU THE DOCUMENT ALREADY IN

18   EVIDENCE A DOCUMENT RELATED TO CASTILLO, LYN, COHEN

19   & VIJAY.

20        WERE YOU ASKED TO CONDUCT A SEARCH OF THE

21   EDD'S RECORDS IN CONNECTION WITH THAT PARTICULAR

22   NAMED ENTITY?

23   A.   YES, I WAS.

24   Q.   AND WHAT IS IN GENERAL TERMS WERE YOU ASKED,

25   WHAT KIND OF SEARCH WERE YOU ASKED TO PERFORM?

1    A.   I WAS ASKED TO PERFORM IF EDD HAD ANY RECORDS

2    OF THIS ENTITY IN ITS DATABASE.

3    Q.   AND DID YOU COMPLY WITH THAT REQUEST?

4    A.   YES, I DID.

5    Q.   HOW DID YOU GO ABOUT CONDUCTING A SEARCH AT

6    THAT POINT?

7    A.   I ENTERED -- I DID MULTIPLE SEARCHES BASED ON

8    NAME, REVERSE NAME.  I DID A SEARCH BASED ON

9    ADDRESS.  I DID A SEARCH BASED ON PHONE NUMBER.

10   AND THEN I BELIEVE THERE WAS ONE NAME THAT WAS

11   GIVEN TO ME THAT I DID A SEARCH FOR.

12   Q.   WHAT NAME WAS THAT?

13   A.   JUAN CASTILLO.

14   Q.   IF MS. BURNEY, YOU COULD TURN TO THE THIRD

15   PAGE OF THIS DOCUMENT.

16        DOES THAT COINCIDE WITH YOUR MEMORY THE

17   NAME YOU SEARCHED FOR?

18   A.   YES.

19   Q.   DID YOU FIND, HAVING CONDUCTED THAT SEARCH,

20   ANY RECORDS RELATIVE TO THE NAME OF THE FIRM

21   CASTILLO, LYN, COHEN & VIJAY?

22   A.   NO, I DID NOT.

23   Q.   DID YOU FIND RECORDS RELATIVE TO JUAN

24   CASTILLO?

25   A.   NO, I DID NOT.

1    Q.   IF IN FACT THAT FIRM HAD REGISTERED THAT

2    ENTITY WITH THE STATE OF CALIFORNIA, EDD, WOULD YOU

3    HAD FOUND RECORDS RELATIVE TO THE FIRM?

4    A.   YES.

5    Q.   WOULD IT MATTER IF THE FIRM WAS ACTUALLY BASED

6    OUT OF STATE?

7    A.   IF THEY HAD WORKERS IN CALIFORNIA THEY ARE

8    REQUIRED TO REGISTER WITH EDD.

9    Q.   IN ORDER TO BE IN COMPLIANCE?

10   A.   THAT'S CORRECT.

11              MR. LUCEY:  JUST A MOMENT, YOUR HONOR.

12              NO FURTHER QUESTIONS, YOUR HONOR.

13              MR. FONG:  NO QUESTIONS, YOUR HONOR.

14              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

15              THANK YOU.

16              MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

17   WILL NEXT CALL TO THE NEXT GRACE DOONG.

18              THE COURT:  OKAY.

19              MR. LUCEY:  AND YOUR HONOR, JUST SO WE

20   ARE CLEAR, WE DON'T EXPECT TO COMPLETE WITH THIS

21   WITNESS TODAY HER DIRECT-EXAMINATION.

22              THE CLERK:  COME FORWARD AND I WILL SWEAR

23   YOU IN.

24

25

1                        **GRACE DOONG,**

2     BEING CALLED AS A WITNESS ON BEHALF OF THE

3     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

4     EXAMINED AND TESTIFIED AS FOLLOWS:

5                  THE WITNESS:  YES.

6                  THE CLERK:  THANK YOU.  TAKE THE STAND

7     OVER THERE, PLEASE.  THANK YOU.

8                  FOR THE RECORD PLEASE STATE YOUR FULL

9     NAME AND SPELL YOUR LAST NAME.

10                 THE WITNESS:  NAI FEN DOONG.  LAST NAME

11    D-O-O-N-G.

12                 THE CLERK:  GO AHEAD AND SPELL THAT FIRST

13    NAME.

14                 THE WITNESS:  N-A-I F-E-N.

15                 THE CLERK:  DO YOU NORMALLY GO BY GRACE?

16                 THE WITNESS:  YES.

17                 THE CLERK:  OKAY.  THANK YOU.

18

19              **DIRECT-EXAMINATION BY MR. LUCEY**

20

21    BY MR. LUCEY:

22    Q.   GOOD AFTERNOON, MA'AM.

23    A.   GOOD AFTERNOON.

24    Q.   MA'AM, FIRST, AS THE COURTROOM DEPUTY JUST

25    ASKED YOU, ASIDE FROM YOUR GIVE NAME YOU GO BY

                                                      373

1    ANOTHER NAME AS WELL FOR A FIRST NAME?  WHAT OTHER

2    NAME -- YOU GO BY GRACE AS WELL FOR YOUR FIRST

3    NAME?

4    A.   YES.

5    Q.   YOUR LAST NAME IS PRONOUNCED DOONG?

6    A.   DOONG.

7    Q.   WHERE DO YOU CURRENTLY RESIDE, MA'AM?

8    A.   IN TAIWAN.

9    Q.   WHERE IN TAIWAN?

10   A.   TAIAPI CITY.

11   Q.   HOW LONG HAVE YOU LIVED THERE?

12   A.   SINCE 1999.

13   Q.   WHAT IS YOUR EDUCATIONAL BACKGROUND?

14   A.   I RECEIVED A PHD FROM UC DAVIS IN AGRICULTURAL

15   CHEMISTRY AND A BA FROM NYU STERN UNIVERSITY.

16   Q.   ASIDE FROM YOUR BA, IN AGRICULTURAL CHEMISTRY

17   AND YOUR BA FROM NYU DO YOU HAVE ANY OTHER DEGREES

18   AS WELL?

19   A.   A BACHELOR DEGREE FROM TAIWAN UNIVERSITY.

20   Q.   SO I'M SORRY, SO YOUR PHD IS FROM UC DAVIS,

21   CORRECT?

22   A.   CORRECT.

23   Q.   NOW, MS. DOONG ARE YOU CURRENTLY EMPLOYED?

24   A.   NO.

25   Q.   IN THE PAST WERE YOU AT SOME POINT EMPLOYED

1    AFTER YOU COMPLETED YOUR PHD AT UC DAVIS?

2    A.   YES, I WORK AT GENTRY FOOD IN GILROY.

3    Q.   COULD I STOP YOU THERE.  COULD YOU SPELL THE

4    NAME OF YOUR FIRST EMPLOYER YOU MENTIONED FOR THE

5    COURT REPORTER?

6    A.   G-E-N-T-R-Y.

7    Q.   THAT WAS IN GILROY CALIFORNIA?

8    A.   YES.

9    Q.   HOW LONG WERE YOU SO EMPLOYED THERE, ROUGHLY?

10   A.   PROBABLY ABOUT AROUND TWO YEARS, A BIT OVER

11   TWO YEARS.

12   Q.   THEN AFTER THAT YOU WENT ON TO WHAT JOB?

13   A.   DOLE, DOLE PACK FOODS.

14   Q.   WHERE WAS THAT LOCATED?

15   A.   IN CALIFORNIA.

16   Q.   AND HOW LONG DID YOU WORK THERE?

17   A.   PROBABLY LONGER THAN A YEAR.  AROUND A YEAR.

18   Q.   WHAT ABOUT AFTER THAT?

19   A.   THEN I MOVED TO EAST COAST WITH PEPSI COLA.

20   Q.   AND WHERE IN PARTICULAR ON THE EAST COAST?

21   A.   IN WESTCHESTER COUNTY.

22   Q.   THAT WAS IN NEW YORK STATE?

23   A.   IT'S IN NEW YORK STATE.

24   Q.   WHAT WAS YOUR POSITION WITHIN PEPSI

25   CORPORATION?

1    A.    RESEARCH AND DEVELOPMENT MANAGER.

2    Q.    HOW LONG WERE YOU SO EMPLOYED THERE ROUGHLY?

3    A.    ALMOST FIVE YEARS.

4    Q.    WHAT WAS YOUR JOB DUTIES AT PEPSI IN TERMS OF

5    RESEARCH AND DEVELOPMENT?

6    A.    IT'S A PRODUCT DEVELOPER, LAUNCH NEW PRODUCT.

7    Q.    WHAT KIND OF PRODUCTS WERE YOU INVOLVED IN

8    DEVELOPING AND LAUNCHING WHILE YOU WERE AT PEPSI?

9    A.    THE LAST ONE I MANAGING IS THE BRAND NAME

10   CALLED ALL SPORT.

11   Q.    WHAT WAS YOUR ROLE IN CONNECTION WITH ALL

12   SPORT?

13   A.    I'M THE PROJECT MANAGER.

14   Q.    WHAT DOES THAT MEAN IN REAL TERMS?

15   A.    IT MEANS THE RESEARCH AND PRODUCT, I PLAY A

16   MAJOR ROLE TO BRING THE PRODUCT FROM THE RESEARCH

17   LAB INTO THE MARKET.

18   Q.    IS THAT DRAWING MORE ON YOUR SCIENCE

19   BACKGROUND OR YOUR MBA BUSINESS BACKGROUND?

20   A.    MORE ON MY SCIENCE BACKGROUND AND OPERATION

21   RATHER THAN BUSINESS.

22   Q.    SO YOU ARE TALKING ABOUT DEVELOPING THE ACTUAL

23   DRINK?

24   A.    YES, FROM SCRATCH, RIGHT.

25   Q.    NOW, THEN AT SOME POINT, MS. DOONG, YOU

1    STOPPED THAT EMPLOYMENT AT PEPSI?

2    A.   YES.

3    Q.   AND WHAT HAPPENED AFTER THAT, YOU MOVED BACK

4    TO TAIWAN?

5    A.   I MOVED TO -- NO, I WORKED IN CHINA.

6    Q.   HOW LONG DID YOU WORK IN CHINA?

7    A.   FIVE YEARS.

8    Q.   WHAT WAS YOUR WORK AT THAT POINT?

9    A.   I WORK AS AN OPERATION MANAGER FOR A BRITISH

10   BISCUIT COMPANY.

11   Q.   WAS THAT A SIMILAR JOB TO WHAT YOU HELD IN

12   PEPSI COMPANY IN NEW YORK?

13   A.   NOT QUITE.  MORE ON THE MANUFACTURING SIDE.

14   Q.   AND WHAT PART OF CHINA WAS THAT JOB LOCATED

15   IN?

16   A.   I HAVE FIRST THREE AND A HALF YEARS IN

17   SHENZEN, THEN THE LAST YEAR IN HANGCHOU.

18   Q.   COULD YOU JUST FOR THE BENEFIT OF THE COURT

19   REPORTER IF YOU COULD SPELL EACH OF THOSE CITIES

20   FOR US?

21   A.   S-H-E-N-Z-E-N.  H-A-N-G-C-H-O-U.

22   Q.   THANK YOU.  AND WHEN YOU FINISHED THOSE

23   FIVE --

24   A.   SORRY, HANG CHOU.

25   Q.   AND AFTER YOU FINISHED YOUR FIVE-YEAR TENURE

1   AT THIS BRITISH COMPANY, DID YOU MOVE ON TO ANOTHER

2   JOB AT THAT POINT?

3   A.   YES, I RETURNED TAIWAN AND WORK FOR AMBIT

4   COMPANY.

5   Q.   COULD YOU SPELL THAT?

6   A.   A-M-B-I-T.

7   Q.   WHAT KIND OF WORK DID YOU DO AT THE AMBIT

8   COMPANY?

9   A.   I WORK AS A SPECIAL ASSISTANT.  ON THE SIDE OF

10   THE GENERAL MANAGER.

11   Q.   AND CAN YOU GIVE US A SENSE ABOUT WHAT YOUR

12   JOB DUTIES WERE THERE?

13   A.   THE JOB IS TEARING THE TASK BY THE GENERAL

14   MANAGER FOR COLLABORATION WORK AMONG MULTIPLE

15   FUNCTION IN THE WHOLE COMPANY.

16   Q.   WOULD IT BE FAIR TO SAY YOU WERE DRAWING MORE

17   ON YOUR SCIENCE BACKGROUND OR --

18   A.   THIS WAS MORE ON MY BUSINESS BACKGROUND.

19   Q.   HOW LONG DID THAT PARTICULAR JOB LAST?

20   A.   FIVE YEARS.

21   Q.   OKAY.  SO AT WHAT POINT, WHAT YEAR DID THAT

22   JOB END NOW, ROUGHLY?

23   A.   2006.

24   Q.   OKAY.  AND HAVE YOU BEEN EMPLOYED SINCE THAT

25   TIME?

1   A.   NO.

2   Q.   OKAY.  BUT YOU'VE CONTINUED TO LIVE AND RESIDE

3   IN TAIWAN?

4   A.   YES.

5   Q.   NOW, MISS MS. DOONG DO YOU HAVE ANY FAMILY IN

6   THE UNITED STATES?

7   A.   MY OWN FAMILY, YES.

8   Q.   SO DID THAT ON OCCASION REQUIRE YOU TO FLY AND

9   TRAVEL TO THE UNITED STATES TO VISIT WITH FAMILY?

10  A.   YES, AND MY FRIENDS HERE.

11  Q.   AND WHERE DOES YOUR FAMILY RESIDE THAT'S BASED

12  IN THE UNITED STATES?

13  A.   IN SAN JOSE AREA, CALIFORNIA.

14  Q.   MS. DOONG, NOW, GOING MORE TO THE PARTICULARS

15  OF THE MATTER HERE IN FRONT OF THE COURT, DO YOU

16  RECALL WHEN YOU FIRST HEARD THE NAME ALBERT HU?

17  A.   YES.

18  Q.   WHEN APPROXIMATELY DID YOU FIRST HEAR IT?

19  A.   THE YEAR 2004.

20  Q.   AND AFTER YOU FIRST HEARD HIS NAME, DID YOU AT

21  SOME POINT MEET PERSONALLY WITH MR. HU?

22  A.   YES.

23  Q.   AND WHERE DID YOU -- WHERE DO YOU RECALL

24  MEETING HIM ON THE FIRST OCCASION, APPROXIMATELY?

25  A.   USUALLY ALWAYS I MET HIM IN TAIPAI CITY IN THE

1    PLAZA HOTEL.

2    Q.   SO IT WAS ALWAYS THE SAME LOCATION AS YOU BEST

3    RECALL IT?

4    A.   YES.  MY MEETING WITH MR. HU.

5    Q.   AND THIS IS A HOTEL IN TAIPAI CITY?

6    A.   YES.

7    Q.   AND APPROXIMATELY HOW MANY OCCASIONS DO YOU

8    THINK YOU MET WITH HIM PERSONALLY WOULD YOU

9    ESTIMATE?

10   A.   AT LEAST THREE TIMES.

11   Q.   AND DO YOU RECOGNIZE MR. HU IN THE COURTROOM

12   HERE TODAY?

13   A.   YES.

14   Q.   WHERE DO YOU RECOGNIZE SEEING HIM?

15   A.   HE'S SITTING THERE.

16        MR. LUCEY:  YOUR HONOR, THAT WOULD BE --

17   Q.   AND THAT WOULD BE THE GENTLEMAN IN THE PINK

18   SHIRT?

19        THE WITNESS:  YES.

20        MR. LUCEY:  YOUR HONOR, IF THE RECORD

21   COULD REFLECT MS. DOONG HAS IDENTIFIED THE

22   DEFENDANT.

23        THE COURT:  YES.

24   Q.   NOW YOU INDICATED TO US JUST A MOMENT AGO THAT

25   YOU FIRST HEARD ABOUT MR. HU, OF HIM, IN OR ABOUT

1    2004?

2    A.   CORRECT.

3    Q.   WHAT DID YOU LEARN ABOUT HIM IN TERMS OF, YOU

4    HEARD HIS NAME WHAT ELSE DID YOU LEARN ABOUT HIM AT

5    THAT POINT?

6    A.   I LEARNED HE'S VERY GOOD IN MANAGING

7    INVESTMENT FUND AND HE HAS GOOD CREDENTIAL

8    ACADEMICALLY AND INDUSTRIAL-WISE.

9    Q.   AND DID YOU HEAR HE WAS ASSOCIATED WITH

10   ANYTHING IN CONNECTION WITH THE FINANCIAL INDUSTRY?

11   A.   ASENQUA CAPITAL.

12   Q.   AND WHAT ABOUT ANY PARTICULAR INVESTMENT FUND?

13   A.   WHEN I HEARD ABOUT THE FIRST FUND IS ASENQUA

14   BETA FUND.

15   Q.   NOW, AT SOME POINT WERE THERE ANY DISCUSSIONS

16   BETWEEN MR. HU AND YOURSELF ABOUT INVESTMENTS IN

17   ASENQUA BETA FUND?

18   A.   YES.

19   Q.   COULD YOU TELL US ABOUT THOSE INITIAL

20   DISCUSSIONS?

21   A.   THE INITIAL DISCUSSION MORE IS FROM MY HUSBAND

22   INTRODUCE HIM TO ME.  AND THEN WHEN WE ASKED OR I

23   CONSULT WITH MY SISTER, SHE MADE THE FIRST INITIAL

24   INVESTMENT.

25   Q.   JUST SO WE ARE CLEAR THE INITIAL INVESTMENT IN

1    TERMS THAT YOU HAVE AWARENESS AND KNOWLEDGE OF IN

2    REGARD TO THE ASENQUA BETA FUND IS IN CONNECTION

3    WITH YOUR SISTER?

4    A.   YES.

5    Q.   WHAT IS YOUR SISTER'S NAME?

6    A.   YU MEI DOONG.

7    Q.   COULD YOU PLEASE SPELL THAT FOR THE COURT

8    REPORTER.

9    A.   FIRST NAME Y-U M-E-I.  SAME LAST NAME

10   D-O-O-N-G.

11   Q.   AND HOW MUCH DO YOU KNOW ABOUT YOUR SISTER'S

12   INVESTMENT, DIDN'T YOUR SISTER DO IT DIRECTLY WITH

13   MR. HU?

14   A.   TOTAL?

15   Q.   NO, LET ME ASK THE QUESTION AGAIN.  LET ME ASK

16   THE QUESTION AGAIN.

17        SO YOU'VE JUST TOLD US THAT AS FAR AS UN

18   THE INITIAL INVESTMENT YOU BECAME AWARE OF WITH

19   MR. HU THAT YOU HAD ANY SORT OF RELATIONSHIP WITH

20   WAS IN REGARD TO YOUR SISTER

21   A.   YES.

22   Q.   YU MEI DOONG?

23   A.   YES.

24   Q.   NOW DID YOU PLAY IN ROLE IN THAT INVESTMENT

25   PROCESS?

1    A.   I PLAYED A MAJOR ROLE.

2    Q.   HOW SO?

3    A.   WE ARE VERY CLOSE WE TALK TO EACH OTHER OFTEN

4    THEN WE TALK ABOUT THIS FUND SO MY SISTER IS

5    INTERESTED IN SO THAT'S HOW SHE PUT IN HER FIRST

6    AMOUNT.

7    Q.   SO YOUR ROLE WAS TO INTRODUCE HER TO THE FUND

8    AND SHE GOT ALL THE DOCUMENTS AND READ THROUGH THEM

9    AND INVESTED?

10             MR. FONG:  OBJECTION LEADING.

11             THE COURT:  SUSTAINED.

12             THE WITNESS:  WELL MY ROLE WAS MORE THAN

13   THAT.

14             THE COURT:  WAIT, WAIT.

15             ASK ANOTHER QUESTION.

16   BY MR. LUCEY:

17   Q.   LET ME ASK A DIFFERENT WAY, MS. DOONG.

18             DID YOU HAVE ANY FURTHER ROLE IN THE

19   INVESTMENT PROCESS IN REGARD TO YOUR SISTER AFTER

20   YOU FIRST MENTIONED THE NAME OF THE FUND TO HER?

21   A.   YES.

22   Q.   WHAT WAS THAT ROLE?

23   A.   FOR MY FAMILY, MOST INVESTMENT I WOULD SAY ALL

24   INVESTMENT IT IS FOR THE INVESTMENT.  USUALLY I

25   MENTION THAT FOR THEM.

1    Q.   AND DID YOU HAVE ANY ROLE IN SEEING OR

2    REVIEWING ANY OF THE DOCUMENTS IN CONNECTION WITH

3    YOUR SISTER'S INVESTMENT IN THE ASENQUA BETA FUND?

4    A.   YES.

5    Q.   WHAT WAS THAT ROLE?

6    A.   I REVIEW EVERY DOCUMENT ABOUT THE INVESTMENT.

7    Q.   SO I'M GOING TO SHOW YOU A DOCUMENT,

8    MS. DOONG.  I'M NOW SHOWING YOU A MULTI PAGE

9    DOCUMENT, EXHIBIT 63.

10        AND MS. DOONG, YOU WILL NOTICE AT THE

11   BOTTOM MIDDLE OF THE DOCUMENT AND I WILL JUST WALK

12   UP SO I WILL MAKE IT AS CLEAR AS POSSIBLE FOR YOU,

13   THERE'S A SERIES OF VERY SMALL NUMBERS AT THE

14   BOTTOM HERE.

15        I WILL REFER TO THE MIDDLE NUMBERS FOR

16   YOUR CONVENIENCE AND THE COURT AND THE JURY'S

17   CONVENIENCE AS WE GO THROUGH THESE DOCUMENTS.

18        SO MS. DOONG, IF YOU COULD TURN YOUR

19   ATTENTION IN PARTICULAR IN REGARD TO GOVERNMENT'S

20   EXHIBIT 63 TO THE PAGE NUMBER BEGINNING 59.

21   A.   YES.

22   Q.   LET ME DOUBLE CHECK ON THE PAGE YOU ARE ON.

23   YES.  IT'S THE SUBSCRIPTION BOOKLET.

24        MR. LUCEY:  JUST A MOMENT, YOUR HONOR.  I

25   WANT TO MAKE SURE MR. FONG IS ON THE RIGHT DOCUMENT

1     HERE.

2              SO MS. DOONG, YOU RECOGNIZE THIS IS A

3     MULTI-PAGE DOCUMENT WHICH HAS BATES NUMBER ON THE

4     BOTTOM 1075 AND CONTINUES ON TO 1107 ON THE

5     RIGHT-HAND SIDE OF THE PAGE, IT GOES ON FOR MANY

6     PAGES.

7     A.   YES.

8     Q.   DO YOU RECOGNIZE THIS DOCUMENT?

9     A.   YES.

10    Q.   WHAT IS THIS DOCUMENT?

11    A.   THIS IS THE SUBSCRIPTION BOOKLET FOR THE

12    ASENQUA BETA FUND YU MEI DOONG INVESTMENT.

13    Q.   TURNING YOUR ATTENTION MA'AM IF YOU COULD LOOK

14    FURTHER ON IN THE DOCUMENT THERE'S A REFERENCE ON

15    BATES NUMBER 1100?

16    A.   UH-HUH.

17    Q.   AND DO YOU SEE THAT DOCUMENT IT'S PAGE 26 OF

18    33 OF THIS PARTICULAR DOCUMENT?

19    A.   YES.

20    Q.   AND DO YOU SEE THAT REFERENCE AT THE BOTTOM

21    LEFT CORNER OF THE DOCUMENT?

22    A.   YES.

23    Q.   TO A NAME AND ADDRESS?

24    A.   YES.

25    Q.   WHOSE ADDRESS IS LISTED THERE?

1    A.   IT'S MY ADDRESS.

2              MR. LUCEY:  YOUR HONOR, AT THIS POINT WE

3    MOVE BOTH THIS PARTICULAR PORTION OF THE EXHIBIT 3

4    AND THE ENTIRETY OF EXHIBIT 63 INTO EVIDENCE.

5              MR. FONG:  NO OBJECTION, YOUR HONOR.

6              THE COURT:  IT'S RECEIVED.

7    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 3 AND 63

8    HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

9    WERE ADMITTED INTO EVIDENCE.)

10             MR. LUCEY:  AND MS. BURNEY, IF I COULD

11   ASK YOU TO PUBLISH THAT PAGE NOW WE ARE LOOKING AT

12   PAGE 26 OF 33 BATES NUMBER 1100.

13   Q.   JUST SO WE ARE CLEAR NOW, MS. DOONG, THE NAME

14   HERE IS NOT YOURS, CORRECT?  YU MEI DOONG, THAT'S

15   NOT YOUR NAME?

16   A.   NO.

17   Q.   HOW ABOUT IT IS ADDRESS LISTED THERE?

18   A.   THE ADDRESS IS MY DISTRESS.

19   Q.   HOW ABOUT THE TELEPHONE NUMBER?

20   A.   IT'S MY TELEPHONE NUMBER.

21   Q.   I GUESS THE OBVIOUS QUESTION IS WHY IF THIS IS

22   YOUR SISTER'S INVESTMENT WITH THE ASENQUA BETA FUND

23   BOOKLET IS YOUR ADDRESS AND TELEPHONE NUMBER LISTED

24   ON THIS DOCUMENT?

25   A.   YES.  AS I MENTION THAT ALL, MY DOONG SIDE

1    FAMILY INVESTMENT, THE MEMBERS IN TAIWAN IF THEY

2    HAVE AN INVESTMENT USUALLY I MANAGE ALL THEIR

3    INVESTMENT.  AND WHENEVER THE DOCUMENT IS IN

4    ENGLISH, THEY COULDN'T READ IT.  SO USUALLY IT'S UP

5    TO ME TO DO THE TRANSLATION FOR THEM.

6            IT'S THE SAME WITH OTHER INVESTMENTS

7    OTHER THAN THIS.

8    Q.   SO ARE YOU TELLING THIS, THIS IS NOT THE FIRST

9    OCCASION WHEN YOU PROVIDED ASSISTANCE TO YOUR

10   SISTER?

11   A.   NO.

12   Q.   SO THIS HAPPENED BEFORE?

13   A.   YES.

14   Q.   AND SO AGAIN, WHAT WAS YOUR ROLE IN REGARD TO

15   THIS SUBSCRIPTION DOCUMENT THIS MULTI PAGE DOCUMENT

16   IN REGARD TO YOUR SISTER CONSIDERING AN INVESTMENT

17   IN THE ASENQUA BETA FUND?

18   A.   I'M FULLY AUTHORIZED BY MY SISTER AND DOONG

19   FAMILY TO MANAGE THEIR INVESTMENT OVERSEAS.

20   Q.   SO -- GOING ON NOW FURTHER, IF YOU COULD TURN

21   TO THE BOTTOM MIDDLE OF THE PAGE IT SHOULD BE

22   NUMBER 76, BATES NUMBER 1092.

23   A.   YES.

24   Q.   AND FIRST IF YOU COULD ASK MS. BURNEY TO

25   HIGHLIGHT THE PORTION READING UNDERSIGNED

COMMITMENT SECTION.

MR. FONG:  I'M SORRY, MR. LUCEY WHAT IS
THE BATES NUMBER ON THAT?

MR. LUCEY:  IT SHOULD BE 1092.

MR. FONG:  1092, THANK YOU.

MR. LUCEY:  SURE.

Q.   SO DO YOU SEE THAT PAGE IN FRONT OF YOU
MS. DOONG?

A.   YES, I DO.

Q.   WHAT IS THAT IN REFERENCE TO, WHAT DOES THAT
MEAN UNDER SIGNED COMMITMENT IS $200,000?

A.   IT'S THE FIRST WIRING MY SISTER MADE TO INVEST
INTO THE ASENQUA BETA FUND.

Q.   NOW, WHAT DO YOU MEAN BY WIRING, DO YOU
MEAN --

A.   SENDING MONEY TO THE SPECIFIED ACCOUNT.

Q.   AND I DON'T WANT TO PUT WORDS INTO YOUR MOUTH
IN OTHER WORDS YOU ARE TELLING US THIS IS THE
INITIAL PORTION OF MONEY SHE INVESTED?

A.   THIS IS THE INITIAL PORTION.  THE FIRST -- THE
FIRST MONEY PUT INTO THIS INVESTMENT.

Q.   INVESTMENT FUND?

A.   YES.

Q.   NOW I WANT TO SHOW YOU ANOTHER DOCUMENT,
MA'AM.  IT'S BAT THE BOTTOM MIDDLE OF THE PAGE IT'S

1    NUMBER 35 IT'S BATES NUMBER 1027.

2              AND MS. BURNEY I WOULD ASK IF YOU COULD

3    ENLARGE THE TEXT PORTION OF THIS DOCUMENT.  THANK

4    YOU.

5              AND SO MS. DOONG, DO YOU RECOGNIZE THIS

6    DOCUMENT WITHIN EXHIBIT 63?

7    A.   YES, I DO.

8    Q.   WHAT IS THIS DOCUMENT?

9    A.   THIS IS THE RECEIPT TO CONFIRM THE FIRST

10   PORTION OF THE INVESTMENT TO HUNDRED THOUSAND USD

11   FROM YU MEI DOONG, ON JULY 2ND, YEAR 2004.

12   Q.   DOES THAT DATE SAY JULY 2, 2004?  IS THAT THE

13   FIRST INVESTMENT FROM YOUR SISTER?

14   A.   YES, IT IS.

15   Q.   AND WHY ARE YOU SO CERTAIN ABOUT THIS

16   DOCUMENT?  DID IT COME DIRECTLY TO YOUR SISTER?

17   A.   ALL THE DOCUMENT CAME DIRECTLY TO ME.

18   Q.   AND WHY IS THAT?

19   A.   AS I DESCRIBED BEFORE, I MANAGE ALL THE

20   INVESTMENT OVERSEAS FOR MY DOONG FAMILY AND I FIRST

21   RECEIVE THAT THEN REFER THAT TO DOONG'S FAMILY.

22   Q.   AND MS. DOONG, WHAT'S YOUR UNDERSTANDING ABOUT

23   THE SIGNATURES THAT APPEAR UNDERNEATH THIS RECEIPT,

24   TWO SIGNATURES THERE; DO YOU SEE THAT THERE?

25   A.   YES.

1    Q.   THE TOP SIGNATURE WHAT DO YOU RECOGNIZE THAT

2    TO BE?

3    A.   IT'S THE SIGNATURE OF THE CHIEF FINANCIAL

4    OFFICER FOR ASENQUA BETA FUNDS.

5    Q.   WHAT'S THE NAME LISTED DIRECTLY ABOVE CHIEF

6    FINANCIAL OFFICER?

7    A.   ANTHONY POLLACE.

8    Q.   DID YOU, SINCE YOU RECEIVED THIS DOCUMENT BACK

9    IN OR AROUND JULY 2ND, 2004, HAVE YOU EVER MET

10   ANTHONY POLLACE?

11   A.   NO.

12   Q.   NOW ON THIS DOCUMENT HERE WHOSE SIGNATURE IS

13   THAT, MS. DOONG?

14   A.   AT BETTER HU.

15   Q.   AND THAT'S THE SAME ALBERT HU YOU REFERRED TO

16   EARLIER TODAY?

17   A.   YES.

18   Q.   AND THE SENTENCE SAYS, THIS IS TO CONFIRM THE

19   RECEIPT, IT GOES ON TO SAY FOR THE INVESTMENT IN

20   ASENQUA BETA FUND.  WHAT DID YOU UNDERSTAND THAT TO

21   MEAN WHEN YOU RECEIVED THIS DOCUMENT BACK IN

22   JULY 2004 FOR THE INVESTMENT IN ASENQUA BETA?

23   A.   MEANS ASENQUA BETA FUND HAD RECEIVED THE

24   INVESTMENT AND THE INVESTMENT IS FOR ASENQUA BETA

25   FUND.

1    Q.    THE MONEY WAS GOING TO BE INVESTED?

2    A.    YES.

3    Q.    PURSUANT TO THE TERMS OF THE SUBSCRIPTION

4    BOOKLET WE LOOKED AT A MOMENT AGO, CORRECT?

5    A.    YES.

6              THE COURT:  IT'S A GOOD TIME FOR A BREAK,

7    I THINK.

8              MR. LUCEY:  CERTAINLY, YOUR HONOR.

9              THE COURT:  ALL RIGHT.

10             WE WILL BE IN RECESS FOR THE DAY.  WE

11   WILL SEE YOU AT 8:30 TOMORROW MORNING AND HAVE A

12   GOOD REST OF THE DAY.

13             (WHEREUPON, THE FOLLOWING PROCEEDINGS

14   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

15             THE COURT:  ALL RIGHT.

16             DO WE HAVE ANY LOOSE ENDS?  THE ONLY

17   THING I CAN THINK OF WAS A COUPLE OF EXHIBITS YOU

18   HAD MARKED.

19             MR. FONG:  YES, YOUR HONOR.

20             YOUR HONOR, IT ACTUALLY JUST OCCURRED TO

21   ME THAT WHEN A COURT PERMITS THE 404(B) OR

22   INEXTRICABLY INTERTWINED EVIDENCE, WE EXPERIENCE OR

23   WE THE ATTORNEYS UNDERSTAND THE LIMITATION OF THE

24   USE OF THE EVIDENCE, BUT I'M NOT SURE THE JURORS

25   UNDERSTAND THAT.

1           SO MY CONCERN IS THAT I'M WONDERING AND

2      I'M MORE THINKING OUT LOUD THAN ANYTHING ELSE AT

3      THIS POINT, YOUR HONOR, IT MIGHT NOT BE A GOOD IDEA

4      FOR ME TO ASK THE COURT TO INSTRUCT THE JURORS ON

5      THE LIMITATIONS OF THE USE OF THE EITHER UNDER THE

6      INEXTRICABLY INTERTWINED THEORY OR THE 404(B)

7      THEORY SO THAT THEY UNDERSTAND THAT MR. HU IS NOT

8      CHARGED WITH DEFRAUDING --

9           THE COURT:  BEFORE WE GET TO THAT I WANT

10     TO TIE UP ANY LOOSE ENDS WE HAVE FROM WHAT'S

11     ALREADY OCCURRED.

12          MR. FONG:  OH, I'M SORRY, AS TO THE

13     TWO --

14          THE COURT:  I THINK THE ONLY THING I CAN

15     THINK OF ARE THE TWO EXHIBITS THAT YOU HAD MARKED.

16          MR. FONG:  YES.

17          THE COURT:  DO YOU WANT TO OFFER THEM OR

18     NOT --

19          MR. FONG:  YES, I DO YOUR HONOR, I'M

20     SORRY I APOLOGIZE.

21          THE COURT:  AND THOSE SPECIFICALLY ARE --

22          MR. FONG:  I BELIEVE -- YOU KNOW, I

23     DON'T -- 512 IS ONE OF THEM, AND 524.  524 IS THE

24     MINUTES OF THE ASENQUA VENTURES MEETINGS.

25          THE COURT:  WHAT IS IT THAT YOU FEEL IS

1    RELEVANT ABOUT 403?

2         MR. FONG:  IT SHOWS THE EXTENT OF

3    MR. LIN'S PARTICIPATION IN THE ASENQUA VENTURES

4    MEETINGS AND IN PARTICULAR ON THIS PARTICULAR

5    OCCASION, THAT PARTICULAR MEETING INCLUDING HIS

6    HAND NOTATION ABOUT FIRESIDE USA DIVISION.

7         FIRESIDE, OF COURSE YOUR HONOR, HAS ONLY

8    A HEDGE FUND COMPONENT BASED ON THE EVIDENCE THAT

9    WE HAVE HEARD.

10        SO THAT AGAIN THIS GOES TO THE ISSUE OF

11   TYING IN TOGETHER WHAT ASENQUA VENTURES WAS DOING

12   TO HOW IT HAS BROADER IMPLICATIONS IN TERMS OF

13   TOUCHING ON FIRESIDE.

14        WE SEE MR. LIN'S HANDWRITTEN NOTATION ON

15   THAT.  AND ALSO WE HEARD MR. LIN ACTUALLY HAD

16   WRITTEN AN ARTICLE IN WHICH HE TALKS ABOUT THE

17   VIRTUES OF HOW ONE TYPE OF FUND CAN HELP -- THE

18   INFORMATION OF ONE TYPE OF FUND CAN HELP ANOTHER

19   TYPE OF FUND.

20        THE COURT:  WELL, THE ONLY TWO PAGES YOU

21   REFERRED TWO WERE 4-3 AND 4-6.

22        MR. FONG:  YES.

23        AND THESE WERE ALL PRODUCED TOGETHER BY

24   MR. LIN, I JUST GROUPED THEM TOGETHER IN TERMS OF

25   THE MINUTES.  CERTAINLY, FOR EXAMPLE, I BELIEVE THE

1    FIRST PAGE PROBABLY THAT MR. LIN WAS NOT AT THAT

2    PARTICULAR MEETING.  SO I DON'T KNOW WHY HE HAS A

3    COPY OF THAT MEETING, THE MINUTES OF THAT MEETING,

4    BUT CERTAINLY I CAN REDACT THAT PAGE.  THE FIRST

5    PAGE OR THE FIRST TWO PAGES, I THINK.

6              THE COURT:  WHAT DOES THAT DOCUMENT SHOW

7    THAT YOU DIDN'T COVER WITH HIM IN YOUR QUESTIONS?

8              MR. FONG:  WELL, IT ACTUALLY SHOWS THE

9    EXTENT OF THE CONVERSATIONS OR DISCUSSIONS THAT

10   WERE HAD NOT BY MR. LIN BUT A LOT OF THE KEY

11   PLAYERS IN THIS CASE MR. HU, MR. BOND AND I'M SURE

12   WE WILL HERE FROM LIZ DANESH.  IT SHOWS THAT

13   MR. LIN WAS DEFINITELY ON THE INSIDE AS EARLY AS

14   JULY 2005.

15             THE COURT:  TO THE EXTENT IT OFFERS

16   COMMENTS BY OTHERS AND I DON'T REALLY SEE ANY,

17   WOULDN'T THAT BE HEARSAY?

18             MR. FONG:  WELL, YOUR HONOR, IT ACTUALLY

19   GOES TO SHOW, IT'S NOT SO MUCH WHAT WAS SAID, I'M

20   NOT REALLY OFFERING IT NECESSARILY FOR THE TRUTH OF

21   THE MATTER ASSERTED BUT JUST SIMPLY THAT THESE

22   INDIVIDUALS WERE HAVING OBVIOUSLY EXTENSIVE

23   DISCUSSIONS ABOUT STRATEGY.

24             WHO CARES IF WHAT THEY WERE DISCUSSING

25   MIGHT TURN OUT TO BE TRUE OR NOT, IF SOMEBODY SAYS

1    JOE WOULD MAKE A GREAT CEO.  I DON'T CARE IF JOE

2    WOULD MAKE A GREAT CEO, THE POINT IS THAT WAS

3    RAISED IN THIS MEETING.

4              THE COURT:  OKAY.  AND THE OTHER EXHIBIT

5    IS --

6              MR. LUCEY:  I THINK IT'S NUMBER 512,

7    YOUR HONOR.  DEFENDANT'S 512.  ASENQUA VENTURES

8    POWERPOINT FEBRUARY 2006.

9              MR. FONG:  AND AGAIN, THAT PARTICULAR

10   DOCUMENT IS RELEVANT YOUR HONOR FROM MY PERSPECTIVE

11   BECAUSE IT TIES AGAIN, IT STRENGTHENS THE TIE THAT

12   MR. LIN HAD WITH THE ASENQUA GROUP OF ENTITIES.  HE

13   MIGHT -- I KNOW HE WAS TRYING TO SINGLE, ISOLATE

14   HIMSELF INTO THE ASENQUA VENTURES FUND, BUT ON PAGE

15   2 OF EXHIBIT 512, THE POWERPOINT PRESENTATION

16   ACTUALLY TALKS ABOUT HOW MR. LIN COULD PLUG INTO

17   THE HEDGE FUND SIDE OF THE ASENQUA, OPERATIONS.

18             AND WE HAVE SEEN IN AN EARLIER

19   PRESENTATION THAT THESE ARE NOT ISOLATED ENTITIES,

20   THESE ARE ALL KIND OF, IF YOU WILL, INTEGRATED INTO

21   THAT ORGANIZATIONAL CHART THAT WE SAW IN AN EARLIER

22   POWERPOINT PRESENTATION IN WHICH MR. LIN WAS NAMED

23   AS ONE OF THE THREE INDIVIDUALS FOR ONE OF THE FOUR

24   SUBDIVISIONS, IF YOU WILL, OF THE ASENQUA CAPITAL

25   GROUP.

1          THE COURT:  DO YOU HAVE ANY COMMENT?

2          MR. FAZIOLI:  WELL, WE DO HAVE A COUPLE

3    OF CONCERNS.  ONE IS THAT BOTH DOCUMENTS, THE

4    DOCUMENT DOES NOT APPEAR TO HAVE BEEN AUTHORED OR

5    ADOPTED BY MR. LIN.

6          THERE'S COMMENTS OR NOTES ON THE

7    DOCUMENTS BUT THAT DOESN'T MEAN HE'S AGREEING TO

8    ITS CONDUCT.

9          SO WE HAVE A FOUNDATIONAL ISSUE TO THE

10   TWO DOCUMENTS BEING INTRODUCED IN THEIR ENTIRETY.

11         THERE'S ALSO THE POSSIBLE HEARSAY ISSUE.

12   AND AT LEAST FOR THE POWERPOINT I WOULD DISPUTE THE

13   NOTION THAT THE NOTES IN THE POWERPOINT ARE NOT

14   BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED

15   BECAUSE SOME OF THE SLIDES IN THE POWERPOINT ARE

16   TALKING ABOUT THE ASENQUA HEDGE FUND NETWORK AND

17   MR. LIN IS UNDERNEATH THAT AND THERE'S A PRETTY

18   CLEAR IMPLICATION I THINK THAT SHOWS MR. LIN'S

19   KNOWLEDGE AND CONNECTION TO THE HEDGE FUND

20   BUSINESS.  THAT WOULD BE TRUTH OF THE MATTER

21   ASSERTED IN THE POWERPOINTS AND HEARSAY.

22         THERE'S ALSO, TO SOME EXTENT, A RELEVANCE

23   CONCERN WHICH IS SOMETHING WE APPROACHED EARLIER

24   ABOUT THE RELEVANCE OF MR. LIN'S ROLE IN THE

25   ASENQUA VENTURES WITH HIS INVESTMENTS IN ASENQUA

1    HEDGE FUND ESPECIALLY THE ROLE OF THIS, THE

2    RELEVANCE OF THIS PARTICULAR DOCUMENT GIVEN THAT

3    TOPIC, MR. LIN'S RELATIONSHIP WITH ASENQUA VENTURES

4    WAS SOMETHING HE WAS ASKED ABOUT EXTENSIVELY OVER

5    THE COURSE OF CROSS-EXAMINATION.

6            SO IT'S UNCLEAR TO US WHAT THE PROBATIVE

7    VALUE IS OF THIS DOCUMENT AS TO A TOPIC RELATED TO

8    ASENQUA VENTURES WHICH WE THINK IS A LITTLE BIT FAR

9    AFIELD FROM THE INVESTMENTS AT ISSUE.

10           MR. LUCEY:  AND IF YOU RECOLLECT,

11   YOUR HONOR, ON PAGE 28 THAT MR. FONG DID ASK I

12   THINK SOME QUESTIONS ABOUT, THERE'S ALSO A

13   REFERENCE IN THE MIDDLE PARAGRAPH TO AGAIN SOME OF

14   THE DEALS THAT MR. LIN MAY HAVE HAD SOME

15   INVOLVEMENT IN WITH REGARD TO THE VENTURE CAPITAL

16   SIDE OF HIS WORK AND THE VALUE OF THOSE WHICH WE'VE

17   TALKED ABOUT BEFORE IN REGARD TO 403 ISSUES WITH

18   REGARD TO PREJUDICIAL VERSUS PROBATIVE IN REGARD TO

19   THE WEALTH OF MR. LIN AND HIS PRIOR DEALINGS IN

20   VENTURE CAPITAL.

21           MR. FONG:  YOUR HONOR, IF I COULD ADDRESS

22   THAT ISSUE QUICKLY.

23           THE COURT:  I THINK WE ARE SPENDING A LOT

24   OF TIME OF SOMETHING THAT'S OF MARGINAL IMPORTANCE

25   TO EITHER SIDE.

1          MR. FONG:  IN THAT CASE, YOUR HONOR --

2          THE COURT:  MY FEELING AT THIS POINT IS

3     THAT THOSE TWO EXHIBITS WERE, THE RELEVANT

4     INFORMATION WAS DISCUSSED IN A WAY THAT WAS

5     UNDERSTANDABLE TO THE JURY.  SO THERE'S NOTHING

6     THAT'S REALLY ADDED BY THE DOCUMENTS.

7          AND I REALLY THINK IT'S A CASE WHERE THE

8     MINIMAL RELEVANCE THEY HAVE IS OUTWEIGHED BY THE

9     POTENTIAL OF CONFUSING THE JURY IN THE SENSE OF

10    HAVING THE DOCUMENTS AND SAYING WHAT ARE THESE FOR,

11    HOW DO THESE RELATE TO THE CASE.

12         AND I THINK AT THIS POINT AT LEAST I'M

13    GOING TO NOT ADMIT THEM.  AS THE CASE DEVELOPS, I

14    CAN BE ASKED TO CHANGE MY MIND BUT THAT'S MY

15    FEELING AT THIS POINT.

16         MR. FONG:  THANK YOU, YOUR HONOR.

17         THE COURT:  ANYTHING ELSE?  YOU STARTED

18    TO TALK ABOUT --

19         MR. FONG:  YEAH.  THE ISSUE OF THE COURT

20    INSTRUCTION.

21         THE COURT:  LET ME STOP YOU THERE.  IT

22    SEEMS TO ME THAT IF THE EVIDENCE IS OFFERED UNDER

23    404(B) THERE PROBABLY DOES NEED TO BE A LIMITING

24    INSTRUCTION ON THE PURPOSE FOR WHICH THEY ARE

25    CONSIDERED.

1        I'M NOT SURE THAT IF IT'S EVIDENCE THAT'S

2   ADMISSIBLE BECAUSE IT'S SO INTERTWINED THAT A

3   LIMITING INSTRUCTION MAKES SENSE, BUT IF YOU WANT

4   TO DRAFT ONE AND OFFER IT TO ME TO LOOK AT A WILL

5   CONSIDER IT.

6        MR. FONG:  OKAY.  AND OF COURSE I WILL

7   CIRCULATE IT.

8        YES, YOUR HONOR.  MY MAJOR CONCERN REALLY

9   IS THAT THE -- I JUST WANT TO AVOID A SITUATION

10  WHERE THE JURY MIGHT END UP CONVICTING A DEFENDANT

11  BASED ON THE DEFENDANT'S ALLEGED CRIMINAL ACTS

12  AGAINST A PERSON AND THAT PARTICULAR ACT HAD NOT

13  BEEN CHARGED AT ALL

14       THE COURT:  THE CONCERN I HAD THOUGH

15  ISN'T THE TESTIMONY AT LEAST AS I UNDERSTAND IS

16  WHAT IT'S GOING TO BE IS IT'S RELEVANT TO PROVING

17  THE GOVERNMENT'S SCHEME OR THE SCHEME THE

18  GOVERNMENT CONTENDS EXISTS.

19       AND THE FRAUD, SPECIFIC FRAUDULENT ACTS

20  THE GOVERNMENT'S CHARGED IN EACH OF THE SEVEN

21  COUNTS DO NOT INVOLVE AN INVESTMENT BY MS. DOONG OR

22  HER FAMILY BUT ISN'T IT RELEVANT TO THE SCHEME THAT

23  THE GOVERNMENT'S SEEKING TO PROVE?

24       MR. FONG:  YOUR HONOR, IT COULD BE BUT

25  AGAIN, MY CONCERN IS THAT JURORS MAY NOT DRAW THAT

1    DISTINCTION.  BUT AS THE COURT SUGGESTED I WILL

2    WRITE SOMETHING UP, PROPOSE, CIRCULATE AND PROPOSE

3    IT TO THE COURT.

4              THE COURT:  OKAY.

5              MR. FONG:  THANK YOU.

6              THE COURT:  ANY COMMENT?

7              MR. FAZIOLI:  I THINK THE COURT IN ITS

8    RULING, ADMITTED IT ON THE NOTION IT WAS

9    INEXTRICABLY INTERTWINED AND ALSO ON THE 404(B)

10   LEVEL.  BUT I THINK IT'S FULLY THE SAME SCHEME

11   INEXTRICABLY INTERTWINED.

12             AND WE ARE NOT GOING TO ARGUE THAT GRACE

13   DOONG'S WIRE OF MONEY, FOR EXAMPLE, IS A

14   SUBSTANTIVE COUNT AND THAT THAT'S GOING TO BE ONE

15   OF THE COUNTS THAT, ONE OF THE COUNTS THE JURY IS

16   GOING TO BE ASKED ABOUT.

17             HOWEVER, THEY DO HAVE TO FIND AN ELEMENT

18   OF THERE BEING A SCHEME TO DEFRAUD.

19             AND MR. HU'S CONDUCT IN REACTION TO

20   MS. DOONG OR SOME OF THE OTHER INVESTORS IS PLAINLY

21   RELEVANT AS TO THAT.

22             THE COURT:  MR. FONG ISN'T OBJECTING TO

23   ADMISSIBILITY, HE KNOWS HE'S MADE THAT AND LOST.  I

24   THINK HIS QUESTION IS WHETHER SHOULD BE A LIMITING

25   INSTRUCTION.

1          MR. FAZIOLI:  WE CAN TAKE A LOOK AT IT.

2          I THINK TO THE EXTENT IT'S INEXTRICABLY

3    INTERTWINED, MY INITIAL THOUGHT IS THERE SHOULD NOT

4    BE A LIMITED INSTRUCTION AT THIS TIME.

5          NOW THAT WOULD BE MY INITIAL IMPRESSION.

6    I THINK THE ULTIMATE INSTRUCTIONS IN THE VERDICT

7    FORM WILL MAKE CLEAR THAT THE JURY IS SUPPOSED TO

8    BE CONSIDERING WIRES AND TO IDENTIFY THOSE WIRES

9    THE PARTIES WILL STIPULATE TO THEM THAT THE

10   JURISDICTIONAL HOOK ARE THE WIRES THAT ARE BETWEEN

11   RELATED TO MR. VERDIELL AND MR. LIN.

12         AND I THINK THAT SHOULD BE CLEAR FROM MY

13   UNDERSTANDING WHAT THE INSTRUCTIONS, THE

14   INSTRUCTIONS AND THE VERDICT FORM WILL BE.

15         SO AT THIS POINT I WILL SAY WE DO NOT

16   NEED A SPECIFIC INSTRUCTION AND JUST THINKING OFF

17   THE TOP OF MY HEAD, SUCH AN INSTRUCTION MIGHT

18   INDICATE THAT IT'S INEXTRICABLY INTERTWINED AND

19   RELEVANT.

20         SO AT THIS POINT I WOULD SAY NO, WE DO

21   NOT THINK THERE HAS TO BE A LIMITING INSTRUCTION AS

22   TO THAT TESTIMONY.  BUT WE ARE OPEN TO OBVIOUSLY

23   TAKING EYE LOCK AT WHATEVER THE DEFENSE HAS

24         THE COURT:  OKAY.  WHY DON'T YOU DISCUSS

25   IT BETWEEN YOURSELVES AND IF YOU AGREE I WILL

1      PROBABLY GO ALONG WITH IT AND IF YOU DON'T AGREE I

2      WILL RESOLVE IT.

3                  MR. FONG:  THANKS, YOUR HONOR.

4                  MR. FAZIOLI:  THANK YOU VERY MUCH,

5      YOUR HONOR.

6                  (WHEREUPON, THE PROCEEDINGS IN THIS

7      MATTER WERE CONCLUDED.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13           THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   /S/
     _____
25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 6/11/12