1

2                IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

UNITED STATES,                    )   CR-09-00487-RMW
6                                  )
                  PLAINTIFF,       )
7                                  )   JUNE 7, 2012
            VS.                    )
8                                  )   VOLUME 4
  ALBERT KE-JENG HU,               )
9                                  )
                  DEFENDANT.       )   PAGES 405-591
10   _____ )

11

12                TRANSCRIPT OF PROCEEDINGS

13         BEFORE THE HONORABLE RONALD M. WHYTE

14             UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S:

17

18   FOR THE PLAINTIFF:   U.S. ATTORNEY'S OFFICE
                          BY:  JOSEPH FAZIOLI
19                             TIM LUCEY
                          150 S. ALMADEN BLVD, STE 900
20                        SAN JOSE, CA  95113

21

22   FOR THE DEFENDANT:   ATTORNEY AT LAW
                          BY:  JERRY FONG
23                        PO BOX 1040
                          PALO ALTO, CA  94302-1040

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                             CERTIFICATE NUMBER 13185

1

2                        INDEX OF WITNESSES

3

4      PLAINTIFF'S

5      WENDY ESPINOZA
            DIRECT EXAM BY MR. FAZIOLI        P. 409
6

7      NAI FEN GRACE DOONG (CONT.)
            DIRECT EXAM BY MR. LUCEY          P. 421
8           CROSS-EXAM BY MR. FONG            P. 491
            REDIRECT EXAM BY MR. LUCEY        P. 551
9

10     ANDREA DULBERG
            DIRECT EXAM BY MR. FAZIOLI        P. 558
11

12     MARK SZTO
            DIRECT EXAM BY MR. LUCEY          P. 570
13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              406

INDEX OF EXHIBITS

                                    MARKED          ADMITTED

PLAINTIFF'S

260                                                 P. 415

19                                                  P. 576

20, 21                                              P. 577


DEFENDANT'S

541                                                 P. 506

407

1    SAN JOSE, CALIFORNIA          JUNE 7, 2012

2                  P R O C E E D I N G S

3              (WHEREUPON, COURT CONVENED AND THE

4    FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF

5    THE JURY:)

6              MR. FAZIOLI:  YOUR HONOR, WITH THE NO

7    OBJECTION OF THE DEFENSE, THERE WAS A BRIEF WITNESS

8    THAT THE GOVERNMENT HAD FROM THE CALIFORNIA DMV WHO

9    HAD A FAMILY REASON SCHEDULING-WISE THAT IT WOULD

10   BE BETTER FOR HER TO TESTIFY FIRST THING IN THE

11   MORNING.

12             SO IF IT WAS ACCEPTABLE TO THE COURT, OUR

13   PLAN WAS TO PUT HER TESTIMONY ON QUICKLY THEN

14   RESUME THE TESTIMONY OF MRS. DOONG.

15             MR. FONG:  I HAVE NO OBJECTION.

16             THE COURT:  ALL RIGHT.  THAT'S FINE.

17             MR. FAZIOLI:  ALL RIGHT.

18             WITH THAT, THE GOVERNMENT CALLS

19   WENDY ESPINOZA.

20

21                  **WENDY ESPINOZA,**

22   BEING CALLED AS A WITNESS ON BEHALF OF THE

23   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

24   EXAMINED AND TESTIFIED AS FOLLOWS:

25             THE WITNESS:  I DO.

1          THE CLERK:  THANK YOU.  PLEASE TAKE THE

2     STAND.

3          FOR THE RECORD, PLEASE STATE YOUR FULL

4     NAME AND SPELL YOUR LAST NAME.

5          THE WITNESS:  WENDY DANIELLE

6     FARRELL-ESPINOZA.  LAST NAME E-S-P-I-N-O-Z-A.

7

8          **DIRECT-EXAMINATION BY MR. FAZIOLI**

9

10    BY MR. FAZIOLI:

11    Q.   GOOD MORNING, MS. ESPINOZA, WHERE DO YOU LIVE

12    A.   IN SAN JOSE, CALIFORNIA.

13    Q.   AND ARE YOU CURRENTLY EMPLOYED?

14    A.   YES, I AM.

15    Q.   WHERE ARE YOU EMPLOYED?

16    A.   BY THE DEPARTMENT OF MOTOR VEHICLES IN THE

17    STATE OF CALIFORNIA.

18    Q.   AND WHAT IS YOUR POSITION WITH THE CALIFORNIA

19    DEPARTMENT OF MOTOR VEHICLES?

20    A.   I'M AN INVESTIGATOR.

21    Q.   AND THE CALIFORNIA DEPARTMENT OF MOTOR

22    VEHICLES IS ALSO KNOWN AS THE DMV, CORRECT?

23    A.   YES.

24    Q.   HOW LONG HOW ABOUT AN INVESTIGATOR WITH THE

25    CALIFORNIA DMV?

1   A.   ABOUT FIVE YEARS.

2   Q.   CAN YOU DESCRIBE YOUR DUTIES AS A DMV

3   INVESTIGATOR?

4   A.   I INVESTIGATE IDENTIFY THEFT, FORGED

5   SIGNATURES ON DOCUMENTS, CAR DEALERS, CAR SALESMAN.

6   ANY SORT OF FRAUD THAT HAPPENS AT THE DMV.

7   Q.   AND WHAT SORT OF RECORDS DOES THE CALIFORNIA

8   DMV KEEP?

9   A.   WE KEEP RECORDS RELATED TO VEHICLE TITLES AND

10   REGISTRATIONS WE KEEP RECORDS RELEVANT TO DRIVER'S

11   LICENSES, APPLICATIONS ANY SORT OF COMMUNICATION

12   THAT'S SENT.

13   Q.   SO I'M GOING TO ASK YOU A COUPLE OF QUESTIONS

14   ABOUT RECORDS RELATED TO DRIVER'S LICENSES.  DOES

15   THE CALIFORNIA DMV KEEP RECORDS OF PEOPLE'S

16   SIGNATURES?

17   A.   YES.

18   Q.   AND DOES THE COLLECT SIGNATURES OF PERSONS WHO

19   APPLY FOR A DRIVER'S LICENSE IN THE STATE OF

20   CALIFORNIA?

21   A.   YES THEY DO.

22   Q.   AND WHY DOES THE DMV COLLECT SIGNATURES OF

23   PEOPLE APPLYING FOR A DRIVER'S LICENSE.

24   A.   SIGNATURES ARE KEPT AND ASSOCIATED WITH A

25   PERSON'S DRIVER'S LICENSE SO THAT THERE'S AN

1    OFFICIAL, LEGAL DOCUMENT WITH A SIGNATURE ON IT.

2    AND IT'S MAINTAINED THROUGHOUT THE LIFETIME OF THE

3    RECORD.

4    Q.   DOES THE DMV HAVE STANDARDIZED PROCEDURES OF

5    COLLECTING SIGNATURES FOR PEOPLE APPLYING FOR

6    DRIVER'S LICENSES?

7    A.   YES, WE DO.

8    Q.   CAN YOU PLEASE DESCRIBE TO THE JURY THE

9    PROCESS BY WHICH SIGNATURES ARE OBTAINED?

10   A.   YES.  AN INDIVIDUAL GOES INTO THE DMV TO START

11   A NEW RECORD, A NEW DRIVER'S LICENSE OR TO COMPLETE

12   ONE THAT IS NOT YET FINISHED.

13          THEY CHECK IN AT A "START HERE" COUNTER

14   THEN THEY GO TO THE NEXT COUNTER AND SHOW SOME FORM

15   OF IDENTIFICATION WHETHER IT BE A BIRTH

16   CERTIFICATE, PASSPORT, AND THEY CHECK EVERYTHING ON

17   A PERSON'S RECORD, THEIR ADDRESS, BIRTH DATE, TO

18   MAKE SURE THIS IS THE INDIVIDUAL THEY ARE LOOKING

19   AT.

20          THEN THE INDIVIDUAL IS DIRECTED TO A

21   CAMERA WINDOW AND AT THE CAMERA WINDOW THEY PULL UP

22   THE PERSON'S PHOTO, AGAIN TO VERIFY THE LAST PHOTO

23   ON RECORD TO THE PERSON STANDING IN FRONT OF THEM.

24          THEN THE INDIVIDUAL WILL GIVE ANOTHER

25   RIGHT THUMBPRINT AND SIGN THEIR NAME.

411

1    Q.   AND THAT'S A SIGNATURE ON A SIGNATURE PAD?

2    A.   YES, IT IS.

3    Q.   AND THEN AFTER THE PERSON APPLYING FOR A

4    LICENSE APPLIES FOR THE SIGNATURE, THAT SIGNATURE

5    IS ATTACHED TO THE INDIVIDUAL FILE; IS THAT

6    CORRECT?

7    A.   YES.

8    Q.   HOW DOES DMV ATTACH THE SIGNATURES THAT THE

9    INDIVIDUAL PROVIDES TO THEIR INDIVIDUAL FILES?

10   A.   IT'S STORED ELECTRONICALLY TO THE RECORD.

11   Q.   DURING THE PROCESS, IS THE PROCEDURE THAT THE

12   INDIVIDUAL OBTAINING THE LICENSE VERIFIES THAT HIS

13   OR HER SIGNATURE PICTURE AND INFORMATION ARE

14   CORRECT?

15   A.   YES.

16   Q.   THEN DOES A DMV PROCESSOR DO A CHECK ON THE

17   SIGNATURE TO SEE THAT IT MATCHES IN REALTIME?

18   A.   THEY LOOK AT THE APPLICATION THAT THAT PERSON

19   HAS FILLED OUT TO MAKE SURE THAT IT RESEMBLES THE

20   SIGNATURE JUST GIVEN ELECTRONICALLY.

21   Q.   DOES DMV IN ANY WAY LIMIT THE MANNER IN WHICH

22   AN INDIVIDUAL CAN SIGN THEIR NAME, FOR EXAMPLE BY

23   REQUIRING THEM ONLY TO USE A FIRST INITIAL?

24   A.   NO.

25   Q.   DO ALL DMV'S ACROSS THE STATE FOLLOW THE SAME

412

1    PROCEDURE REGARDING OBTAINING AND STORING

2    INDIVIDUAL SIGNATURES?

3    A.   YES.

4    Q.   HOW ARE THESE SIGNATURES STORED?

5    A.   THEY ARE STORED AT A NETWORK IN SACRAMENTO.

6    Q.   AND IT'S A REGULAR PRACTICE OF THE DMV TO

7    STORE SIGNATURES ELECTRONICALLY IN SUCH A MANNER?

8    A.   YES.

9    Q.   YOU WERE CONTACTED BY THE FEDERAL GOVERNMENT

10   TO CONDUCT A SEARCH OF DMV RECORDS IN CONNECTION

11   WITH THIS CASE; IS THAT CORRECT?

12   A.   YES, I WAS.

13   Q.   AND WAS THERE A PARTICULAR PERSON WHO YOU WERE

14   TASKED TO SEARCH DMV RECORDS FOR?

15   A.   YES.

16   Q.   AND WHO WAS THAT INDIVIDUAL?

17   A.   MR. ANTHONY POLLACE.

18   Q.   DID YOU CONDUCT A SEARCH FOR MR. POLLACE?

19   A.   YES, I DID.

20   Q.   CAN YOU EXPLAIN HOW YOU DID A SEARCH FOR

21   MR. POLLACE'S RECORDS?

22   A.   I DID A SEARCH BY NAME.  I ENTERED THE

23   INDIVIDUAL'S FIRST NAME AND LAST NAME AND THEN

24   SEARCHED THROUGHOUT THE STATE.

25        WE CAN ALSO LIMIT IT BY CITIES AND OTHER

413

1    THINGS, BUT IN THIS CASE I DID A SEARCH FOR HIS

2    NAME.

3    Q.   HOW OFTEN DO YOU HAVE TO SEARCH DMV RECORDS AS

4    PART OF YOU'RE PROFESSIONAL DUTIES?

5    A.   SEVERAL TIMES A DAY.

6    Q.   DID YOU FIND ANY RECORDS FOR AN ANTHONY

7    POLLACE?

8    A.   YES, I DID.

9    Q.   LET ME SHOW YOU WHAT'S BEEN MARKED AS

10   GOVERNMENT'S EXHIBIT 260.  PLEASE TAKE A LOOK AS

11   GOVERNMENT EXHIBIT 260.

12            DO YOU RECOGNIZE GOVERNMENT EXHIBIT 260?

13   A.   YES, I DO.

14   Q.   WHAT IS GOVERNMENT EXHIBIT 260?

15   A.   THIS IS A SCANNED COPY OF WHAT WE WOULD REFER

16   TO AS A SOUNDEX WHICH IS A CERTIFIED DOCUMENT

17   PRODUCED BY THE DEPARTMENT OF MOTOR VEHICLES.

18   Q.   AND GOVERNMENT EXHIBIT 260 RELATES TO

19   DOCUMENTS FOR A PARTICULAR INDIVIDUAL, CORRECT?

20   A.   YES.

21   Q.   WHO IS THAT INDIVIDUAL?

22   A.   ANTHONY POLLACE.

23            MR. FAZIOLI:  YOUR HONOR, AT THIS TIME

24   UNITED STATES MOVES GOVERNMENT EXHIBIT 260 INTO

25   EVIDENCE.

```
1              MR. FONG:  NO OBJECTION.

2              THE COURT:  ALL RIGHT.  260 IS RECEIVED.

3       (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 260 HAVING

4       BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

5       ADMITTED INTO EVIDENCE.)

6       Q.   CAN YOU EXPLAIN TO THE JURY SOME OF THE

7       INFORMATION THAT'S ON THE FIRST PAGE OF GOVERNMENT

8       EXHIBIT 260?

9       A.   YES.

10      Q.   A SOUNDEX PHOTO IS MEANT TO RESEMBLE A

11      CALIFORNIA DRIVER'S LICENSE.  IT INCLUDES PHOTO,

12      SIGNATURE, A FINGERPRINT WHICH IS NOT VISIBLE ON A

13      DRIVER'S LICENSE BUT ACCEPTABLE VIA A MAG STRIPE.

14              IT ALSO HAS AN INDIVIDUAL'S FIRST, LAST

15      NAME, THE CLASS OF THE VEHICLE THEY ARE ELIGIBLE TO

16      DRIVE, CLASS OF THE LICENSE, DRIVER'S LICENSE

17      NUMBER, ADDRESS ON RECORD, DATE OF BIRTH, GENDER,

18      PHYSICAL DESCRIPTORS AS WELL AS THE INFORMATION

19      WITH RESPECT TO WHEN THE APPLICATION WAS COMPLETED

20      AND THE PHOTO DATE AND WHEN THAT WAS DONE.

21      Q.   SO LET'S ASK -- I WANT TO ASK YOU A COUPLE

22      QUESTIONS ABOUT THE FIRST PAGE OF GOVERNMENT

23      EXHIBIT 260.

24              AND I WILL NOTE FOR THE RECORD THAT THE

25      BOTTOM RIGHT, THE BATES NUMBER IS HU14801.
```

1              NOW IS THERE -- WHAT IS THE NAME THAT'S

2    ON THIS FIRST PAGE OF IN TERMS OF THE INDIVIDUAL

3    WHO IS BEING PICTURED HERE?

4    A.   ANTHONY VINCENT POLLACE.

5    Q.   AND THERE'S A NOTE THERE THAT SAYS APP DATE,

6    ISSUE DATE AND PHOTO DATE; DO YOU SEE THAT?

7    A.   YES, I DO.

8    Q.   AND THERE'S ONE DATE THAT'S AFTER EACH OF

9    THOSE, CORRECT?

10   A.   YES.

11   Q.   AND WHAT IS THE DATE THAT'S AFTER EACH OF

12   THOSE INDICATIONS?

13   A.   IT IS APRIL 29TH, 2011.

14   Q.   AND IN YOUR EXPERIENCE WORKING FOR THE DMV IS

15   THERE ANY SIGNIFICANCE TO WHAT THOSE DATES MEAN,

16   APP DATE ISSUE DATE AND PHOTO DATE?

17   A.   YES.

18   Q.   WHAT DO THOSE TERMS MEAN?

19   A.   WELL, THE APPLICATION DATE INDICATES THE DATE

20   THE INDIVIDUAL WENT INTO THE DMV AND FILLED OUT THE

21   APPLICATION.

22        THE PHOTO DATE ALSO INDICATES THE DAY THE

23   PHOTO WAS TAKEN WHICH MAY NOT BE THE SAME AS THE

24   APPLICATION DATE.

25             AND FINALLY, THE ISSUE DATE IS ACTUALLY

1    THE DATE THAT THE RECORD WAS CLOSED AND ISSUED BY

2    THE DEPARTMENT.

3    Q.   ALL RIGHT.

4         AND THE APPLICATION DATE, THAT'S THE DATE

5    ON WHICH INDIVIDUALS ARE REQUIRED TO PRESENT THEIR

6    SIGNATURE TO THE DMV, CORRECT?

7    A.   YES.

8    Q.   THAT'S THE SIGNATURE THAT'S CONFIRMED BY DMV

9    PERSONNEL?

10   A.   YES.

11   Q.   AND THEN YOU ALSO SEE IT SAYS APP OFFICE,

12   ISSUE OFFICE AND PHOTO OFFICE; DO YOU SEE THAT?

13   A.   YES.

14   Q.   WHAT'S THE SIGNIFICANCE OF THOSE LABELS?

15   A.   THAT'S A UNIQUE IDENTIFIER.  EACH DMV HAS A

16   SPECIFIC NUMBER, 516 HAPPENS TO BE THE SAN JOSE

17   DMV.

18   Q.   AND YOU SEE THERE'S A PICTURE ON THIS FIRST

19   PAGE OF EXHIBIT 260?

20   A.   YES.

21   Q.   AND TO THE BEST OF YOUR KNOWLEDGE THAT'S A

22   PICTURE OF ANTHONY PALACE?

23   A.   YES.

24   Q.   DID YOU FIND ANY OTHER ANTHONY POLLACE IN YOUR

25   CALIFORNIA DMV DATABASE OTHER THAN THE INDIVIDUAL

417

1    WHOSE RECORDS ARE HERE IN EXHIBIT 260?

2    A.   NO.

3    Q.   SO TO THE BEST OF YOUR KNOWLEDGE, THE

4    SIGNATURE THAT'S ON THE FIRST PAGE OF EXHIBIT 2

5    SIGNATURE IS THE SIGNATURE THAT ANTHONY PALACE

6    PROVIDED THE DMV ON APRIL 29TH, 2011, CORRECT?

7    A.   YES.

8    Q.   NOW WERE YOU PRESENT WITH ANTHONY POLLACE

9    SIGNED AT THE DMV AT APRIL 2011?

10   A.   I WAS NOT.

11   Q.   SO HOW DO YOU KNOW THE SIGNATURE HERE ON THE

12   FIRST PAGE OF EXHIBIT 260 IS THE ACTUAL SIGNATURE

13   MR. POLLACE PROVIDED TO THE DMV?

14   A.   THE DEPARTMENT HAS DEVELOPED CERTAIN

15   PROCEDURES THAT ARE FOLLOWED, AND WITHOUT THAT

16   BEING FOLLOWED, THESE LICENSES DON'T COMPLETED.

17         IF THERE HAD BEEN A PROBLEM, IF THERE HAD

18   BEEN A QUESTION ABOUT THE INDIVIDUAL PICTURE VERSUS

19   THE SIGNATURE, IT WOULD HAVE BEEN REFERRED TO

20   INVESTIGATION FOR FURTHER ANALYSIS.

21   Q.   AND THERE'S NO INDICATION THAT THAT THAT

22   HAPPENED WITH MR. POLLACE?

23   A.   THERE WAS NOT.

24   Q.   THERE ARE A COUPLE OTHER PAGES OF THIS

25   DOCUMENT WE ARE GOING TO GO THROUGH QUICKLY.

1           CAN YOU PLEASE GO TO THE NEXT PAGE OF

2     THAT DOCUMENT, MS. BURNEY.

3           AND IS THIS NEXT PAGE IS THIS ANOTHER

4     EXAMPLE OF MR. POLLACE GIVING HIS SIGNATURE TO THE

5     DMV?

6     A.   YES.

7     Q.   AND WHAT'S THE DATE FOR THE SIGNATURE, OR

8     WHAT'S THE APP DATE ON THE SECOND PAGE OF THE

9     EXHIBIT?

10    A.   IT'S APRIL 11, 2006.

11    Q.   SO TO THE BEST OF YOUR KNOWLEDGE THAT

12    SIGNATURE ON THE SECOND PAGE IS A SIGNATURE FOR THE

13    APP -- OF MR. POLLACE OF APRIL 6, 2011?

14    A.   YES.

15    Q.   CAN YOU PLEASE GO TO THE NEXT PAGE OF

16    EXHIBIT 260.

17          NOW, THE NEXT PAGE ALSO HAS ANOTHER

18    SIGNATURE ON IT, CORRECT?

19    A.   YES.

20    Q.   WHAT'S THE APP DATE FOR THIS SIGNATURE?

21    A.   APRIL 11, 2001.

22    Q.   SO TO THE BEST OF YOUR KNOWLEDGE THIS IS THE

23    SIGNATURE THAT MR. POLLACE HAD PROVIDED TO THE DMV

24    FOR PURPOSES OF THIS APP DATE WHICH IS APRIL 2001?

25    A.   YES.

1    Q.   AND MS. BURNEY, DO YOU MIND MOVING TO THE NEXT

2    PAGE OF EXHIBIT 260.

3            NOW THIS IS AN ISSUE DATE OF 4-10-97.

4    THERE'S A SIGNATURE THERE AS WELL, CORRECT?

5    A.   YES.

6    Q.   NOW THERE'S NO APP DATE FOR THIS 4-10-97

7    ENTRY; IS THAT CORRECT?

8    A.   YES.

9    Q.   SO WHAT'S THE SIGNIFICANCE OF THERE NOT BEING

10   AN APP DATE HERE ON 4-10-97?

11   A.   IT'S POSSIBLE AN APPLICATION WAS NOT NEEDED.

12   MAYBE IF HE HAD GONE IN BEFORE AND THE CAMERA HAD

13   BEEN DOWN, HE WOULD HAVE BEEN INSTRUCTED TO GIVE A

14   NEW PHOTO.

15           SO ON THIS PARTICULAR DATE, APRIL 10TH

16   1997, HE WOULD HAVE TAKEN A PICTURE AND GIVEN A

17   SIGNATURE AND THUMBPRINT.

18   Q.   SO MOVING ON TO THE NEXT PAGE, AGAIN,

19   THERE'S -- THE NEXT PAGE OF THE DOCUMENT THERE'S

20   ANOTHER SIGNATURE FOR MR. POLLACE, THEN WHAT'S THE

21   ISSUE DATE ON THIS?

22   A.   SEPTEMBER 13, 1995.

23   Q.   THERE'S ANOTHER SIGNATURE FOR MR. POLLACE,

24   CORRECT?

25   A.   YES.

1    Q.   SO THE SIGNATURES THAT ARE HERE IN GOVERNMENT

2    EXHIBIT 260 WOULD BE FAIR TO SAY THAT THESE ARE THE

3    SIGNATURES THAT MR. POLLACE HAD PROVIDED THE DMV

4    FROM THE PERIOD, FROM THIS ISSUE DATE OF 1993 ALL

5    THE WAY THROUGH 2011; IS THAT CORRECT?

6    A.   YES.

7              MR. FAZIOLI:  I HAVE NO FURTHER QUESTIONS

8    OF THIS WITNESS.

9              MR. FONG:  I HAVE NO QUESTIONS,

10   YOUR HONOR.

11             THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

12             THANK YOU.

13             MR. LUCEY:  YOUR HONOR, AT THIS TIME THE

14   GOVERNMENT WOULD LIKE TO RECALL GRACE DOONG TO THE

15   STAND.

16

17                       **GRACE DOONG,**

18   BEING CALLED AS A WITNESS ON BEHALF OF THE

19   PLAINTIFF, HAVING BEEN PREVIOUSLY SWORN, WAS

20   EXAMINED AND TESTIFIED AS FOLLOWS:

21             THE COURT:  OKAY.  COME BACK AND RESUME

22   YOUR SEAT AS THE WITNESS, PLEASE.

23             THE CLERK:  YOU ARE STILL UNDER OATH.

24             THE WITNESS:  YES.

25

1        **DIRECT-EXAMINATION BY MR. LUCEY (RESUMED)**

2

3    BY MR. LUCEY:

4    Q.   GOOD MORNING, MA'AM.

5    A.   GOOD MORNING.

6    Q.   WHEN WE LEFT YESTERDAY I BELIEVE WE WERE

7    DISCUSSING EXHIBIT 63 WHICH WAS ALREADY IN EVIDENCE

8    AND WE WERE ON HU1027.

9            AND IF MS. BURNEY -- THANK YOU FOR

10   REPUBLISHING THAT.  IF YOU COULD AGAIN BLOW UP THE

11   TEXT PORTION OF THE DOCUMENT, BEGINNING JULY 2ND,

12   '04.

13           JUST TO MAKE SURE I UNDERSTAND YOUR

14   TESTIMONY IN REGARD TO THIS DOCUMENT, MS. DOONG,

15   YOU DID IN FACT RECEIVE THIS DOCUMENT IN OR AROUND

16   JULY 2004?

17   A.   CORRECT.

18   Q.   AND YOU AT THAT TIME DID YOU OBSERVE THE TWO

19   SIGNATURES ON THE DOCUMENT?

20   A.   YES, I DID.

21   Q.   FOR MR. HU AND MR. POLLACE?

22   A.   CORRECT.

23   Q.   NOW AT SOME TIME AFTER -- MS. BURNEY IF YOU

24   COULD LEAVE THIS DOCUMENT, GO BACK TO THE ENTIRE

25   DOCUMENT.  THEN GO TO THE VERY BOTTOM OF THE

1    DOCUMENT WHERE IT HAS TEXT AT THE BOTTOM.  IF YOU

2    COULD BLOW THAT UP FOR ALL OF THE COURTROOM,

3    INCLUDING THE WITNESS.

4              THANK YOU.

5              MS. DOONG, WHAT DOES THE TEXT SAY AT THE

6    BOTTOM OF THE DOCUMENT?

7    A.   SAFE ALTERNATIVE FOR HIGH RETURN.

8    Q.   WHAT DID YOU TAKE THAT TO MEAN WHEN YOU

9    RECEIVED THIS DOCUMENT BACK IN 2004?

10   A.   IT MEANS MY INVESTMENT IS SAFE.

11   Q.   WHEN YOU SAY YOUR INVESTMENT, WHAT DO YOU MEAN

12   BY THAT IN TERMS OF THIS PARTICULAR INVESTMENT IN

13   ASENQUA?

14   A.   YU-MEI DOONG'S INVESTMENT INTO ASENQUA BETA

15   FUND 200,000 USD AT THAT TIME.

16   Q.   NOW, MS. DOONG, AFTER YOU WORKED WITH YOUR

17   SISTER, ON BEHALF OF YOUR SISTER AS YOU EXPLAINED

18   TO US, TO HAVE THIS FIRST INVESTMENT IN ASENQUA

19   BETA FUND, DID YOU EVER RECEIVE ANY UPDATES FROM

20   MR. HU REGARDING THE STATUS OF YOUR SISTER'S

21   INVESTMENT IN THE ASENQUA BETA FUND?

22   A.   YES.  RECEIVED THE QUARTERLY ACCOUNT STATEMENT

23   FROM ASENQUA BETA FUND.

24   Q.   OKAY.  I'M NOW GOING TO SHOW YOU A SERIES OF

25   DOCUMENTS, THEY ARE BATES NUMBERS 1026, 1025, 1024,

1    1023, AND 1022.

2              SO MS. DOONG, IF I COULD ASK YOU TO TURN

3    YOUR ATTENTION TO THE PAGE I JUST MENTIONED,

4    STARTING WITH 1026.

5              MS. BURNEY, IF YOU WOULD BE SO KIND TO

6    FLASH UP ON THE SCREEN PAGE 1026.  AND MS. BURNEY,

7    IF YOU COULD BLOW UP THE TOP HALF OF THE DOCUMENT

8    FROM THE ASENQUA BETA FUND DOWN TO THE BOX.

9              THANK YOU.

10              MS. DOONG, ARE YOU ABLE TO READ THE

11    DOCUMENT FROM YOUR WITNESS STAND OR DO YOU PREFER

12    TO LOOK AT THE DOCUMENT IN FRONT OF YOU?

13    A.   I PREFER TO LOOK AT THE DOCUMENT.

14    Q.   OKAY.  VERY GOOD.

15              SO I CALL YOUR ATTENTION TO FIRST THE

16    LEFT-HAND TEXT RIGHT ABOVE THE BOX.  WHOSE NAME IS

17    LISTED THERE?

18    A.   AT THE BOTTOM?  TOP?

19    Q.   I'M SORRY, I WILL WALK OVER TO THE SCREEN,

20    IT'S MUCH EASIER THAT WAY.

21              FIRST, TO CONFIRM AGAIN, THE NAME LISTED

22    HERE.

23    A.   YU-MAI DOONG, MY YOUNGER SISTER.

24    Q.   WHOSE ADDRESS IS LISTED HERE ON THIS DOCUMENT?

25    A.   MY ADDRESS.

1    Q.   THAT WAS YOUR ADDRESS AT THE TIME IN OUR ABOUT

2    JULY 2004?

3    A.   CORRECT.

4    Q.   NOW, MY QUESTION IS NOW MS. DOONG ARE, THIS

5    INDICATION ON THIS DOCUMENT THAT THERE'S A WIRE IN

6    OF $200,000; DO YOU SEE THAT INDICATION THERE?

7    A.   YES.

8    Q.   DO YOU KNOW WHAT THAT'S IN REFERENCE TO?

9    A.   IT'S REFERENCE TO YU-MAI DOONG'S MONEY HAS

10   BEEN INTO THE ASENQUA BETA FUND AND BEING

11   CONFIRMED.

12   Q.   NOW, MS. BURNEY, I WOULD ASK YOU TO BLOW UP

13   THE BOTTOM HALF OF THE DOCUMENT WHERE THE SIGNATURE

14   IS LOCATED.

15        MS. DOONG, I NOW CALL YOUR ATTENTION TO

16   THIS PORTION OF THE DOCUMENT ON THE BOTTOM HALF.

17   DO YOU SEE THOSE TWO SECRETARIES THERE?

18   A.   YES, I DO.

19   Q.   WHO DID YOU UNDERSTAND THOSE SIGNATURES TO BE?

20   A.   SIGNATURE TO BE THE SIGN OFF ON THE DOCUMENT

21   IT WAS FOR CHIEF FINANCIAL OFFICER AND ALSO BY THE

22   PRESIDENT OF THE ASENQUA BETA FUND.

23   Q.   WHEN YOU SAY "SIGN OFF" WHAT DO YOU MEAN BY

24   THAT?

25   A.   IT MEANS IT'S BEEN APPROVED THE ACCURACY OF

1    THIS STATEMENT AND AUTHORIZED IT ON BEHALF OF THE

2    ASENQUA BETA FUND.

3    Q.    PRIOR TO IT BEING SENT TO YOU?

4    A.    YES.

5    Q.    NOW DO YOU RECALL HOW YOU RECEIVED THIS

6    DOCUMENT?

7    A.    ALL THE DOCUMENT I RECEIVED FROM ASENQUA BETA

8    FUND MAINLY IT'S THROUGH HAND DELIVER.

9    Q.    AND THAT WOULD BE HAND DELIVERED WHERE?  DO

10   YOU RECALL WHERE?

11   A.    IN TAIPEI.

12   Q.    BY WHOM?

13   A.    FOR THIS ONE IS BY ALBERT.

14   Q.    ALBERT HU?

15   A.    RIGHT.

16   Q.    NOW MS. BURNEY, IF YOU COULD GO ON AND GO TO

17   EXHIBIT, PAGE 35 OF THIS DOCUMENT, 1025-A.

18            THE COURT:  HAVE THESE BEEN ADMITTED?

19            MR. LUCEY:  THEY HAVE ALL BEEN ADMITTED,

20   YOUR HONOR.  THESE ARE ALL EXHIBIT 63.

21   Q.    SO WE ARE LOOKING AGAIN, MS. DOONG, AT THE TOP

22   HALF OF THIS DOCUMENT, IT APPEARS -- WHAT STATEMENT

23   IS LISTED THERE AS YOU LOOK AT THE DOCUMENT?

24   A.    IT'S ON SEPTEMBER 30TH IN THE YEAR 2004.

25   Q.    AND FOR WHAT QUARTER DID THIS STATEMENT OF

1    ACCOUNT FOR YOUR SISTER'S VESTMENT IN ASENQUA BETA

2    FOR?

3    A.   IT'S THE THIRD QUARTER YEAR 2004.

4    Q.   AT THIS POINT HOW LONG APPROXIMATELY HAD YOUR

5    SISTER BEEN INVESTED IN THE ASENQUA BETA FUND WOULD

6    YOU SAY?

7    A.   CLOSE TO THREE MONTHS -- OVER TWO MONTHS.

8    Q.   AND HOW WAS YOUR SISTER'S INVESTMENT DOING

9    BASED ON THIS STATEMENT YOU RECEIVED?

10   A.   IT GAINS 2.2 PERCENT, BY $4,426.

11   Q.   AND HAVING REVIEWED THAT STATEMENT IN OR ABOUT

12   SEPTEMBER 2004, AND AGAIN HOW DID YOU RECEIVE THIS

13   STATEMENT?

14   A.   RECEIVE IT THROUGH HAND DELIVERY BY ALBERT HU.

15   Q.   WHERE?

16   A.   IN TAIPEI.

17   Q.   HOW WAS YOUR SISTER'S INVESTMENT DOING BASED

18   ON YOUR REVIEW OF THE DOCUMENT IN SEPTEMBER 2004?

19   A.   IT'S DOING GOOD.

20   Q.   ARE YOU FEELING MORE OR LESS LIKELY TO RETAIN

21   YOUR SISTER'S INVESTMENT IN ASENQUA BETA FUND?

22   A.   MORE.

23   Q.   MORE LIKELY?

24   A.   YES.

25   Q.   OKAY.  AND AGAIN, IF YOU COULD, MS. BURNEY, IF

1    YOU COULD FLASH TO THE BOTTOM PART OF THE DOCUMENT

2    AND BLOW UP THAT FOR THE JURY AND THE COURTROOM.

3              AGAIN, WHOSE SIGNATURES ARE AT THE BOTTOM

4    OF THE DOCUMENT?

5    A.   A GENTLEMAN, ANTHONY POLLACE AND ALBERT HU.

6    Q.   AND AGAIN, DID YOU HAVE ANYTIME UNDERSTANDING

7    AS TO WHAT THEIR SIGNATURES MEANT ON THE DOCUMENT

8    AS YOU HAD WITH WHEN WE LOOKED AT THE FIRST

9    DOCUMENT THIS MORNING, SAME UNDERSTANDING?

10   A.   YES.

11   Q.   NOW MS. BURNEY, IF YOU COULD TURN TO THE NEXT

12   DOCUMENT IN SEQUENCE MIDDLE NUMBER 34, BATES NUMBER

13   1024-A.

14              WHAT IS THIS DOCUMENT WE ARE LOOKING AT

15   NOW, MS. DOONG?

16   A.   THIS IS THE Q4, THE LAST QUARTER OF 2004 FOR

17   THE YU-MEI DOONG'S STATEMENT.

18   Q.   IS THIS SOMETIMES CALLED THE YEAR END

19   STATEMENT?

20   A.   YES.

21   Q.   AND AGAIN, THIS DOCUMENT HAS YOUR ADDRESS ON

22   IT?

23   A.   YES.

24   Q.   DID YOU RECEIVE THIS DOCUMENT IN OR AROUND

25   DECEMBER THIRST 2004 OR THEREABOUTS?

1    A.   COULD BE LATER BECAUSE QUITE OFTEN THE

2    STATEMENT WOULD BE DELIVERED LATE.

3    Q.   OKAY.   HOW MUCH AFTER THAT WOULD YOU

4    ESTIMATE -- YOU DO RECALL RECEIVING THIS DOCUMENT?

5    A.   YES.

6    Q.   WHEN APPROXIMATELY AFTER THIS DO YOU THINK YOU

7    WOULD HAVE RECEIVED THIS DOCUMENT EARLY 2005?

8    A.   MOST LIKELY.

9    Q.   WHAT'S THE BALANCE AS THE STATEMENT REFLECTS

10   OF YOUR SISTER'S ACCOUNT AS OF THIS YEAR END DATE

11   DECEMBER 31ST, 2004?

12   A.   $221,417 -- $221,417.18.

13   Q.   SO BASED ON YOUR REVIEW OF THE DOCUMENT WHAT

14   WAS YOUR UNDERSTANDING OF HOW MUCH HAD YOUR SISTER

15   GAINED TO DATE IN THE ASENQUA BETA FUND?

16   A.   A BIT MORE THAN 10 PERCENT, AROUND 21,000.

17   Q.   MS. DOONG WHOSE SIGNATURE IS ON THE BOTTOM OF

18   THIS DOCUMENT?

19   A.   TWO FINANCIAL OFFICERS AND THEIR PRESIDENT.

20   ANTHONY POLLACE AND ALBERT HU AGAIN.

21   Q.   THOSE ARE THE SAME INDIVIDUALS WHO WERE ON THE

22   SAME STATEMENTS THIS MORNING?

23   A.   YES.

24   Q.   AND YOU HAD THE SAME UNDERSTANDING AS YOU

25   DISCUSSED EARLIER?

429

1    A.   CORRECT.

2    Q.   AS TO THE IMPACT OF THESE TWO SIGNATURES FOR

3    YOU?

4    A.   YES.

5    Q.   OKAY.  MS. BURNEY, IF YOU COULD TURN TO PAGE

6    1023 OF THE DOCUMENT.  MS. DOONG, DO YOU RECOGNIZE

7    THIS PAGE?

8    A.   YES.

9    Q.   WHAT IS THIS DOCUMENT HERE?

10   A.   THIS IS FOR Q1 2005 ACCOUNT STATEMENT.

11   Q.   AND DO YOU RECALL RECEIVING THIS DOCUMENT?

12   A.   YES.

13   Q.   SOME TIME ON OR ABOUT NEAR -- AFTER

14   MARCH 31ST, 2005?

15   A.   YES.

16   Q.   WHERE DID YOU RECEIVE THIS DOCUMENT?

17   A.   FROM ALBERT HU.

18   Q.   WHERE?

19   A.   IN TAIPEI.

20   Q.   HOW MUCH WAS YOUR SISTER'S BALANCE AS OF THIS

21   TIME FRAME?

22   A.   $225,661.33.

23   Q.   AGAIN, MS. BURNEY, IF YOU COULD BLOW UP THE

24   TOP AND BOTTOM PORTION OF THE PAGE OF THE DOCUMENT,

25   OF THE EXHIBIT.

1          ARE THERE TWO SIGNATURES ON THE BOTTOM OF

2     THIS DOCUMENT AS WELL MS. DOONG?

3     A.    YES.

4     Q.    WHOSE SIGNATURES DID YOU UNDERSTAND THEM TO BE

5     AT THE TIME?

6     A.    ANTHONY POLLACE AND ALBERT HU, THE FINANCIAL

7     CHIEF OFFICER AND PRESIDENT OF THE ASENQUA BETA

8     FUND.

9     Q.    AND IS IT FAIR TO SAY YOU KNEW THE SIGNATURES

10    TO MEAN THE SAME THINGS AS YOU DISCUSSED EARLIER AS

11    TO WHY THEY ARE ON THE DOCUMENT?

12    A.    YES.

13    Q.    NOW, MS. BURNEY COULD YOU PLEASE TURN TO THE

14    NEXT DOCUMENT IN SEQUENCE IT'S NUMBER 32.  NOW IF

15    YOU COULD HIGHLIGHT THE TOP PORTION, BLOW UP THE

16    TOP PORTION OF THE DOCUMENT.

17          DO YOU RECOGNIZE THIS PAGE OF THE

18    EXHIBIT, MS. DOONG?

19    A.    YES, I DO.

20    Q.    WHAT IS IT?

21    A.    IT'S THE Q2 STATEMENT OF YEAR 2005.

22    Q.    THE STATEMENT DATE WAS ENDING WHEN?

23    A.    JUNE 30TH.

24    Q.    AND BASED ON YOUR VIEW OF THIS DOCUMENT WHAT

25    DID YOU UNDERSTAND YOUR SISTER'S VALUE OF HER

1    INVESTMENT TO BE AS OF ON OR ABOUT JUNE 30TH, 2005?

2    A.   234, 447.83.

3    Q.   HOW DID YOU COME TO HAVE THIS PARTICULAR PAGE

4    OF THE EXHIBIT?

5    A.   IT WAS HAND DELIVERED BY MR. ALBERT HU IN

6    TAIPEI.

7    Q.   TO YOU?

8    A.   YES.

9    Q.   AND AGAIN, MS. BURNEY, IF YOU COULD BLOW UP

10   THE BOTTOM PORTION OF THE DOCUMENT.

11          ARE THERE TWO SIGNATURES ON THE BOTTOM OF

12   THIS DOCUMENT?

13   A.   YES.

14   Q.   AND WHOSE SIGNATURES DO YOU RECOGNIZE THEM TO

15   BE?

16   A.   ANTHONY POLLACE AND ALBERT HU.

17   Q.   AND AGAIN THESE ARE THE SAME TWO SIGNATURES WE

18   LOOKED AT FOR THE SEQUENCE OF STATEMENTS?

19   A.   YES, IT IS.

20   Q.   AND YOU HAD THE SAME UNDERSTANDING AS TO THE

21   MEANING AND IMPORT OF HAVING THEIR SIGNATURES ON

22   THE BOTTOM OF THE ACCOUNT STATEMENT?

23   A.   YES.

24   Q.   THAT YOU TESTIFIED TO EARLIER?

25   A.   YES.

1    Q.   MS. BURNEY IF YOU COULD NOW TURN TO THE NEXT

2    DOCUMENT IN SEQUENCE NUMBER 31.

3              ACTUALLY, BEFORE WE GET TO THIS DOCUMENT

4    MS. DOONG I WANT TO ASK YOU ABOUT A DIFFERENT

5    PORTION OF THE DOCUMENT.  NOW WE'VE LOOKED AT A

6    SERIES OF STATEMENTS THIS MORNING, MS. DOONG --

7              AND ACTUALLY MS. BURNEY, IF YOU COULD

8    TURN BACK TO THE DOCUMENT WE WERE JUST LOOKING AT A

9    MOMENT AGO, THE NUMBER 32.  THE ONE FOR

10   SEPTEMBER 30TH, 2005, -- JUNE 30TH.  32, SORRY, MY

11   APOLOGIES.

12             SO, MS. DOONG WE NOW LOOKED AT A SERIES

13   OF STATEMENTS FOR '05, HOW LONG AT THIS POINT HAD

14   YOUR SISTER HAD HER INVESTMENT IN ASENQUA BETA

15   FUND?

16   A.   A LITTLE BIT OVER A YEAR.

17   Q.   OVER A YEAR?

18   A.   YES.

19   Q.   BECAUSE SHE INVESTED IN JULY 2ND, '04 AND THIS

20   IS FOR JUNE 30TH, '05, SO JUST ABOUT A YEAR?

21   A.   OH, SORRY.  YES, JUST APPROXIMATELY A YEAR.

22   Q.   AND AT THIS POINT HOW WERE YOU -- WHAT WAS

23   YOUR FEELING IN REGARD TO HOW THE INVESTMENT WAS

24   DOING IN GENERAL TERMS?

25   A.   MY SISTER WAS VERY HAPPY.

433

1    Q.   NOW, AROUND THIS TIME IN THE SUMMER OF 2005,

2    DID YOU EVER HAVE OCCASION TO ASK MR. HU FOR ANY

3    ADDITIONAL INFORMATION RELATIVE TO THE PERFORMANCE

4    OF THE ASENQUA BETA FUND?

5    A.   YES, BECAUSE THE RETURN IS HEALTHY AND GOOD

6    AND MY SISTER WAS THINKING ABOUT INVESTING MORE

7    MONEY.

8         AND BEFORE, WE JUST ADVISE HER THAT WAIT,

9    SEE HOW THE RETURN FOR THIS FUND, EVEN THOUGH THE

10   PAST RECORD SHOWED THE FUND PERFORMED CONSISTENTLY

11   VERY GOOD.

12   Q.   SO --

13   A.   SO WE ASKED FOR SOME ANNUAL REPORT FROM

14   ASENQUA BETA FUND.

15   Q.   WHAT DO YOU MEAN BY ANNUAL REPORT?

16   A.   USUALLY FOR A FUND THEY HAVE THEIR ANNUAL

17   REPORT THAT INCLUDING THE BALANCE SHEET OR THE

18   ANNUAL IF ANY SITUATION.

19   Q.   SO WERE YOU LOOKING FOR MORE INFORMATION

20   REGARDING THE PERFORMANCE OF THE FUND?

21   A.   YES.

22   Q.   AND YOU WERE LOOKING FOR -- WELL, OKAY.  SO IN

23   RESPONSE TO THAT, DID YOU RECEIVE ANY DOCUMENTS

24   FROM ANYONE?

25   A.   YES.

1    Q.   WHAT KIND OF DOCUMENTS DID YOU RECEIVE?

2    A.   WE RECEIVE AUDIT REPORT.

3    Q.   AND IF I COULD ASK --

4    A.   FOR YEAR 2004.

5    Q.   IF I COULD ASK MS. BURNEY NOW TO MOVE TO PAGE

6    1 THROUGH PAGE 7 OF THIS EXHIBIT.

7         AND I WOULD ASK MS. DOONG IF YOU COULD

8    TURN YOUR ATTENTION TO BATES NUMBER 993A AT THE

9    BOTTOM RIGHT-HAND CORNER?

10   A.   YES.

11   Q.   DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU,

12   MA'AM.  IT'S UP ON THE SCREEN NOW AS WELL.

13        DO YOU RECOGNIZE THIS PAGE OF EXHIBIT 63?

14   A.   I DO.

15   Q.   WHAT IS IT?

16   A.   IT'S AUDIT REPORT SENT TO US ABOUT ASENQUA

17   BETA FUND.

18   Q.   IS THIS THE DOCUMENT YOU WERE REFERRING TO A

19   MOMENT AGO THAT YOU RECEIVED IN RESPONSE TO YOUR

20   QUESTIONS REGARDING AN ANNUAL REPORT?

21   A.   YES, THAT'S THE DOCUMENT.

22   Q.   YOU SAID IT WAS SENT TO YOU, WHAT DO YOU MEAN

23   BY THAT SENT TO YOU?

24   A.   I DON'T REMEMBER HOW IT WAS DELIVERED TO ME.

25   Q.   BUT YOU -- DO YOU RECALL RECEIVING THE

1      DOCUMENT?

2      A.   YES.

3      Q.   SOMETIME AFTER DECEMBER 31ST, 2004?

4      A.   CORRECT.

5      Q.   AND MORE PUTTING A MORE PRECISE DATE ON IT,

6      SOMETIME IN THAT SUMMERTIME OF 2005?

7      A.   MAYBE EARLIER.

8      Q.   MAYBE EARLIER THAN THAT?

9      A.   YES.

10     Q.   ONCE YOU RECEIVED THIS DOCUMENT, DID YOU

11     REVIEW IT?

12     A.   YES, OF COURSE.

13     Q.   WHY DID YOU REVIEW IT?

14     A.   READ THROUGH THE WHOLE DOCUMENT AND ESPECIALLY

15     THE FIGURES THERE.

16     Q.   AND WHY WAS IT IMPORTANT TO YOU TO REVIEW THIS

17     DOCUMENT?

18     A.   BECAUSE THE ACCOUNT STATEMENT IS MAINLY YU-MEI

19     DOONG OWN ACCOUNT AND THIS IS, I COULD LOOK AT OVER

20     ALL FINANCIAL SITUATION FOR THE FUND ITSELF AS A

21     WHOLE.

22     Q.   MS. BURNEY, IF YOU COULD TURN TO THE THIRD

23     PAGE IN ON THE DOCUMENT.  PAGE 5, BATES STAMP

24     NUMBER 995.

25          DO YOU SEE THAT PAGE IN FRONT OF YOU,

1    MS. DOONG?

2    A.   YES, I SEE IT.

3    Q.   FIRST MS. BURNEY IF YOU COULD HIGHLIGHT THE

4    FIRST PART OF THE DOCUMENT FROM CASTILLO, LYN,

5    COHEN & VIJAY DOWN TO ASENQUA BETA FUND.

6          AND MS. BURNEY, IF YOU COULD ACTUALLY

7    HIGHLIGHT THE TEXT THAT READS REPORT OF THE

8    INDEPENDENT AUDITORS.

9          DO YOU SEE THE PORTION HIGHLIGHTED THERE,

10   MS. DOONG?

11   A.   YES.

12   Q.   WHAT DID THAT LINE MEAN TO YOU, THE REPORT OF

13   THE INDEPENDENT AUDITORS?

14   A.   IT MEANS THE REPORT HAS BEEN ADVISED AND

15   OBJECTIVE.

16   Q.   SO DOES THE WORD INDEPENDENT HAVE SIGNIFICANCE

17   TO YOU?

18   A.   DEFINITELY.

19   Q.   WHY?

20   A.   IT MEANS I HAVE A CERTIFIED INDIVIDUAL OR

21   COMPANY TO PROVE THE CONTENT AND CHECK THE CONTENT

22   OF THIS REPORT.

23   Q.   DOES THAT -- DID YOU UNDERSTAND THAT THIS --

24   WHAT WAS YOUR UNDERSTANDING OF THE RELATIONSHIP

25   BETWEEN THIS CASTILLO, LYN, COHEN & VIJAY FIRM AS

1    LISTED HERE ON THIS DOCUMENT AND THE ASENQUA BETA

2    FUND?

3    A.   THAT'S AN AUDIT FIRM THAT'S BEING ASKED TO

4    CONDUCT AUDIT.

5    Q.   AND WHAT TYPE OF AUDIT?

6    A.   FINANCIAL AUDIT.

7    Q.   NOW, MS. BURNEY, IF YOU COULD GO BACK TO THE

8    MAIN PORTION OF THE TEXT.  AND IF YOU COULD BLOW UP

9    THE PORTION, THE FIRST PARAGRAPH OF THE DOCUMENT.

10        MS. DOONG DO YOU SEE THE HIGHLIGHTED

11   PORTION OF THE DOCUMENT?

12   A.   YES.

13   Q.   THE ENLARGED PORTION OF THE DOCUMENT.  COULD

14   YOU READ THE PARAGRAPH SAYING, WE HAVE AUDITED, OUT

15   LOUD.

16   A.   WE HAVE AUDITED THE FINANCIAL STATEMENT OF

17   ASENQUA BETA FUND, THE FUND, FOR THE YEAR ENDED

18   DECEMBER 31ST, 2004 WHICH COMPRISE THE BALANCE

19   SHEET STATEMENT OF CAPITAL ACCOUNTS AND THE RELATED

20   NOTES 1 TO 4.

21        IT IS OUR RESPONSIBILITY TO FORM AN

22   INDEPENDENT OPINION BASED ON OUR AUDIT ON THOSE

23   FINANCIAL STATEMENTS AND TO REPORT OUR OPINION

24   SOLELY TO YOU AS A BODY AND FOR NO OTHER PURPOSE.

25        WE DO NOT ASSUME RESPONSIBILITY TOWARDS

438

1    OR ACCEPT LIABILITY TO ANY OTHER PERSON FOR THE

2    CONTENTS OF THIS REPORT.

3    Q.   MS. DOONG, DID YOU READ THIS, THE FIRST TWO

4    SENTENCES YOU JUST READ INTO THE RECORD NOW, DID

5    YOU READ THESE SENTENCES BACK WHEN YOU RECEIVED

6    THIS DOCUMENT BACK IN 2005?

7    A.   YES.

8    Q.   WHAT DID YOU TAKE THIS PARAGRAPH TO MEAN WHEN

9    YOU READ IT BACK THEN?

10   A.   THAT MEANS IT'S AN INDEPENDENT OPINION ABOUT

11   THE ACCURACY AND CREDIBILITY FOR THE BALANCE SHEET

12   AND STATEMENT OF CAPITAL ACCOUNTS AND EVERY

13   CONTENTS IN THIS AUDIT REPORT.

14   Q.   AND WHAT DID YOU UNDERSTAND THE TERM "BALANCE

15   SHEET" TO MEAN WHEN YOU READ IT BACK IN 2005, IN

16   GENERAL TERMS?

17   A.   IT'S STANDARD ANNUAL REPORT FROM THE COMPANY

18   FOR THE FUND.

19   Q.   AND WAS IT SIGNIFICANT TO YOU THAT THE

20   PARAGRAPH SAID THAT IT IS OUR RESPONSIBILITY TO

21   FORM AN INDEPENDENT OPINION BASED ON OUR AUDIT?

22   A.   YES.

23   Q.   WHY?

24   A.   IT MEANS I HAVE AN ACCOUNTABLE PARTY TO TELL

25   ME THE ASENQUA BETA FUND'S FINANCIAL SITUATION IN

1    YEAR 2004.

2    Q.   AND DID YOU UNDERSTAND THAT THE TERM

3    "INDEPENDENT" MEANT THAT THIS FIRM WAS WORKING AT

4    THE DIRECTION OF THE ASENQUA BETA FUND?

5    A.   NO.

6    Q.   WHY NOT?

7    A.   THEN THAT WOULD NOT BE INDEPENDENT.

8    Q.   NOW, MS. BURNEY, IF YOU COULD NOW ENLARGE THE

9    SECOND PARAGRAPH OF THIS PAGE OF PAGE 5, BATES

10   NUMBER 995.

11         AND IF YOU COULD HIGHLIGHT MS. BURNEY THE

12   SENTENCE THAT BEGINS, AN AUDIT INCLUDES.

13         MS. DOONG, DO YOU SEE THE PORTION THAT'S

14   HIGHLIGHTED NOW?

15   A.   YES, I SEE.

16   Q.   COULD YOU READ THAT PORTION INTO THE RECORD

17   PLEASE?

18   A.   AN AUDIT INCLUDES EXAMINING ON A TEST BASIS,

19   EVIDENCE SUPPORTING THE AMOUNT AND DISCLOSURE IN

20   THE FINANCIAL STATEMENTS.

21         AN AUDIT ALSO INCLUDES ASSESSING THE

22   ACCOUNTING PRINCIPLES USED AND SIGNIFICANT

23   ESTIMATES MADE BY MANAGEMENT AS WELL AS EVALUATING

24   THE OVER ALL FINANCIAL STATEMENT PRESENTATION.

25         WE BELIEVE THAT OUR AUDIT PROVIDES A

1    REASONABLE BASIS FOR OUR OPINION.

2    Q.   MS. DOONG, DID YOU READ THOSE SENTENCES

3    BACK --

4    A.   YES, I DID.

5    Q.   BACK IN 2005?

6    A.   YES.

7    Q.   WHAT DID YOU TAKE THEM TO MEAN?

8    A.   IT MEANS THE DATA THERE HAS BEEN TESTIFIED AND

9    SUPPORTED BY SUFFICIENT EVIDENCE TO PROVE ITS

10   TRUTHFULNESS.

11   Q.   WHAT DOES "TESTING" MEAN, WHAT DID YOU

12   UNDERSTAND THAT TO MEAN ON A TEST BASIS?

13   A.   PASS A TEST.  I THINK THERE MUST BE A STANDARD

14   ACCOUNTING PRACTICE TO DEFINE A TEST BASIS.

15   Q.   AND THAT WAS THE TESTING BEING DONE BY WHOM,

16   WHO WAS DOING THE TESTING?

17   A.   BY THE AUDITOR.

18   Q.   CASTILLO, LYN, COHEN & VIJAY?

19   A.   YES.

20   Q.   NOW, MS. BURNEY, IF YOU COULD NOW ENLARGE THE

21   LAST PARAGRAPH OF THIS PAGE BEGINNING, IN OUR

22   OPINION.

23        MS. DOONG, DO YOU SEE THE LANGUAGE NOW ON

24   THE SCREEN?

25   A.   YES.

1    Q.   COULD YOU READ THAT INTO THE RECORD PLEASE?

2    A.   IN OUR OPINION, THE FINANCIAL STATEMENTS

3    REFERRED TO ABOVE PRESENT FAIRLY IN ALL MATERIAL

4    RESPECTS THE FINANCIAL POSITION OF THE FUND AS OF

5    DECEMBER 31ST, 2004, AND THE RESULTS OF ITS

6    OPERATIONS, ITS CASH FLOWS AND CHANGES IN ITS

7    EQUITY FOR THE YEAR THAT ENDED IN ACCORDANCE WITH

8    INTERNATIONAL FINANCIAL REPORTING STANDARDS.

9    Q.   DID YOU READ THAT PARAGRAPH BACK?

10   A.   YES, I DID.

11   Q.   IN 2005?

12   A.   YES.

13   Q.   WHAT DID YOU TAKE THAT TO MEAN WHEN YOU READ

14   IT BACK THEN?

15   A.   I THINK THE MOST IMPORTANT IS IT'S IN

16   ACCORDANCE WITH INTERNATIONAL FINANCIAL REPORTING

17   STANDARDS.

18   Q.   AND WHY DO YOU THINK -- WHY DO YOU SEE THAT'S

19   SO IMPORTANT?

20   A.   BECAUSE THE INTERNATIONAL FINANCIAL REPORTING

21   STANDARDS HAVE DEFINED ALL THE NECESSARY ELEMENTS

22   TO PROVE THE ACCURACY AND RELIABILITY AND ALSO THE

23   WHOLENESS OF THE FINANCIAL STATEMENT.

24   Q.   MS. BURNEY, IF YOU COULD ENLARGE THE SIGNATURE

25   PORTION OF THE DOCUMENT.

1          MS. DOONG, DO YOU SEE THE ENLARGED

2     PORTION OF EXHIBIT 63 ON THE SCREEN?

3     A.   YES.

4     Q.   WHAT DID YOU UNDERSTAND THAT SIGNATURE BLOCK

5     DATE AND OTHER LANGUAGE THERE TO MEAN?  FIRST OF

6     ALL, LET ME BREAK THIS QUESTION DOWN.

7          DID IT HAVE ANY SIGNIFICANCE TO YOU THAT

8     THIS PAGE WAS SIGNED?

9     A.   YES.

10    Q.   WHAT WAS THE SIGNIFICANCE OF IT BEING SIGNED

11    TO YOU WHEN YOU READ THIS DOCUMENT BACK IN 2005?

12    A.   IT WAS SIGNED AFTER 2005 AND BY A CPA.

13    Q.   WHAT DOES THE INITIAL CPA, WHAT DID THAT MEAN

14    TO YOU BACK WHEN YOU RECEIVED THIS DOCUMENT?

15    A.   IT MEANS IT'S A CERTIFIED ACCOUNTING

16    INDIVIDUAL WHO IS QUALIFIED TO PERFORM AN AUDIT.

17    Q.   AND WAS THAT IMPORTANT TO YOU?

18    A.   YES.

19    Q.   WHY?

20    A.   BECAUSE THAT'S WHAT MAKE THE AUDIT REPORT

21    BEING LEGITIMATE OR BEING COMPLYING TO THE

22    PREREQUISITE AS AN AUDIT REPORT.

23    Q.   NOW MS. BURNEY, IF YOU COULD TURN TO THE NEXT

24    PAGE OF THIS EXHIBIT WITH MIDDLE NUMBER 006, BATES

25    NUMBER 996.

1          AND IF YOU COULD ENLARGE THE PORTION OF

2     THE DOCUMENT WHERE THE THIRD OF THE WAY DOWN ON THE

3     TOP OF THE PAGE, INVESTMENTS SECTION.  YES, THAT'S

4     IT.  AND IF WE COULD GRAB THE YEARS AS WELL, RIGHT

5     ABOVE.  PERFECT.

6          MS. DOONG, DO YOU SEE THE PORTION THAT'S

7     NOW BEEN ENLARGED ON OUR VIDEO SCREEN HERE?

8     A.   YES.

9     Q.   DO YOU RECALL READING THIS ALONG WITH THE REST

10    OF PAGE TWO OF THIS AUDIT REPORT BACK IN 2005?

11    A.   YES.

12    Q.   WHAT DID YOU TAKE THIS SECTION OF THE PAGE TO

13    MEAN WHERE IT LISTS INVESTMENTS?

14    A.   IT MEANS 2004 THEY HAVE GAINED $33 MILLION AND

15    SAME AS 2003, IT'S DOING PRETTY WELL.

16    Q.   WHAT DID YOU UNDERSTAND THE NUMBER OF

17    120,946,307 TO MEAN, UNDERNEATH THE COLUMN LISTING

18    2004 USD SIGN?

19    A.   THAT MEANS THE VALUE OF THE SECURITY.

20    Q.   THE VALUE OF THE SECURITY?

21    A.   RIGHT.

22    Q.   AT THAT TIME, IN OR ABOUT THE DATE OF THE

23    REPORT JANUARY 10TH, 2005?

24    A.   DECEMBER 31ST, 2004.

25    Q.   MS. BURNEY, IF YOU COULD ENLARGE THE PORTION

                                              444

1    OF THE SCREEN WHERE IT SAYS NET CURRENT ASSETS AND

2    NET ASSET VALUE.

3              MS. DOONG DO YOU SEE THE PORTION OF THE

4    DOCUMENT ENLARGED ON THE SCREEN, THE LISTINGS FOR

5    NET CURRENT ASSETS AND NET ASSETS VALUE?

6    A.   NET CURRENT ASSET, YES.

7    Q.   SO MS. DOONG, ACCORDING TO THIS REPORT, WHAT

8    DID YOU UNDERSTAND THE NET ASSET VALUE AS OF 2004

9    TO BE FOR THE ASENQUA BETA FUND?

10   A.   19 -- OVER $19 MILLION.

11   Q.   AND HOW ABOUT THE NET ASSET VALUE OF THE

12   ASENQUA BETA FUND?

13   A.   OVER $140,000,000.

14   Q.   AND IS THAT NUMBER SIGNIFICANT TO YOU?

15   A.   YES.

16   Q.   WHY?

17   A.   IT MEANS THE FUND HAS SUFFICIENT ASSET THERE

18   SO I DON'T HAVE TO WORRY ABOUT OUR MONEY ON THE

19   ASENQUA BETA FUND, YU-MEI DOONG'S MONEY.

20   Q.   AND NOW ARE YOU TELLING US THAT YOUR SISTER'S

21   INVESTMENT IS NOW WORTH 140 MILLION?

22   A.   NO.  THE TOTAL ASENQUA BETA FUND WORTH

23   $140 MILLION.

24   Q.   WHY WAS IT SIGNIFICANT TO YOU THAT YOUR

25   SISTER'S INVESTMENT WAS PART OF AN OVERALL

1   INVESTMENT THAT NOW HAD NET ASSET VALUE OF 140

2   MILLION?

3   A.   HER INVESTMENT IS LESS THAN ONE PERCENT

4   FRACTION OF THE ASSET AND THIS IS THE FUND WITH

5   THIS SIZE, THAT MEANS IT'S ATTRACTIVE FOR INVESTOR.

6   SO IT'S NOT ONLY YU-MEI DOONG.  IT'S ONE OF THEM.

7   Q.   THEN COMPARING THE TWO NUMBERS LISTED HERE ON

8   THIS PORTION OF THE SCREEN, MS. DOONG, THIS NUMBER

9   LISTED HERE, 110 MILLION?

10  A.   YES.

11  Q.   AND THE NUMBER LISTED HERE IN 2004 OF 140

12  MILLION?

13  A.   YES.

14  Q.   WHAT DID YOU TAKE THAT DIFFERENCE TO MEAN

15  BETWEEN 2003 AND 2004?

16  A.   IT MEANS THE FUND IS DOING WELL TO INCREASE BY

17  27 PERCENT IN A YEAR.

18  Q.   AND WAS THAT SIGNIFICANT TO YOU?

19  A.   YES.

20  Q.   THAT AND -- AND HAVING SEEN NOW THE AUDITED

21  FINANCIAL STATEMENTS, THIS REPORT FROM THE FIRM OF

22  CASTILLO, LYN, COHEN & VIJAY, DID YOUR REVIEW OF

23  THIS DOCUMENT CAUSE YOU TO BE MORE OR LESS LIKELY

24  TO CONTINUE YOUR SISTER'S INVESTMENT IN THE ASENQUA

25  BETA FUND?

1    A.    DEFINITELY MORE.

2    Q.    WHY SO?

3    A.    BECAUSE A FUND WHO GROW WITH PROFIT AT 27 IS

4    SIGNIFICANT.  AND FROM THE REPORT IT'S DOING WELL

5    IN 2003 AS WELL.  NET GAIN OF 34 PERCENT FOR A FUND

6    THAT CONSISTENTLY, GIVE THE INVESTOR SUCH A GOOD

7    RETURN, IT'S VERY ENCOURAGING FOR ME AND TO TELL MY

8    SISTER, YES, IF YOU WANTED, YOU CAN INVEST IN MORE.

9    Q.    INVEST MORE?

10   A.    YES.

11   Q.    AND DID THAT IN FACT HAPPEN?

12   A.    YES.

13   Q.    NOW, DURING THE SAME PERIOD THIS 2005 PERIOD

14   AND IN PARTICULAR THE PERIOD WE LOOKED AT FOR THE

15   ASENQUA BETA FUND ENDING IN JUNE 30TH, '05, DID

16   MR. HU ADVISE YOU AS TO CHANGES TAKES PLACE IN THE

17   ASENQUA BETA FUND?

18   A.    AT SOME POINT HE TOLD US HE'S GOING TO MOVE

19   THE FUND TO SINGAPORE TO ASIA.

20   Q.    DID HE, AS PART OF THAT ADVISING YOU ABOUT

21   THAT, DID HE EXPLAIN WHY?

22   A.    HE DID, BUT I DON'T RECALL BECAUSE I DON'T

23   THINK THAT'S RELEVANT TO YU-MEI DOONG'S ACCOUNT.

24   Q.    YOU DIDN'T THINK IT WAS RELEVANT AT THAT TIME?

25   A.    I THINK -- I KNOW HE HAS A REASON BUT IT SEEMS

1    IT'S RELEVANT TO OTHER INVESTORS.

2             SO AS THE FUND MANAGEMENT THEY WANT TO

3    TAKE INTO CONSIDERATION EVERYONE'S INTEREST, MAY

4    MAKE THIS MOVEMENT BUT IT DOESN'T MAKE ANY

5    DIFFERENCE TO YU-MEI DOONG.  THAT WAS WHAT I

6    REMEMBER.

7    Q.   OKAY.  SO NOW MS. BURNEY, IF YOU COULD TURN

8    OUR ATTENTION TO BATES NUMBER 1021-A, PAGE NUMBER

9    31.

10            SO MS. BURNEY, IF YOU COULD ACTUALLY TURN

11   TO 29, I'M SORRY, 1021-A.

12            MS. DOONG, DO YOU RECOGNIZE THIS DOCUMENT

13   NOW?

14   A.   YES, I DO.

15   Q.   WHAT IS THIS DOCUMENT?

16   A.   IT'S THE STATEMENT OF ACCOUNT IN Q3 2005.

17   Q.   AND NOW, THIS DOCUMENT, WHAT'S -- MS. BURNEY

18   IF YOU COULD HIGHLIGHT THE TOP LEFT CORNER

19   LETTERHEAD PORTION.  WHAT ADDRESS IS LISTED THERE,

20   MS. DOONG?

21   A.   IT SAYS ADDRESS FOR FIRESIDE CAPITAL

22   MANAGEMENT LIMITED IN SINGAPORE.

23   Q.   IS THIS THE SAME OR DIFFERENT ADDRESS?

24   A.   IT'S DIFFERENT.

25   Q.   HOW ABOUT ON THE LEFT-HAND SIDE OF THE PAGE,

1   MS. BURNEY IF YOU COULD BLOW UP THAT PORTION.  WHAT

2   DOES THAT SAY, MS. DOONG?

3   A.   THE FIRESIDE.

4   Q.   DOES THIS REFERENCE TO FIRESIDE IN SINGAPORE

5   HAVE ANY CONNECTION WITH THE INFORMATION YOU JUST

6   TESTIFIED TO IN REGARD TO SINGAPORE?

7   A.   YES, BECAUSE JUST FOLLOWING WHAT WE TALK

8   EARLIER THAT ALBERT HU WANTED TO MOVE THE FUND FROM

9   THE STATE TO SINGAPORE.  AND HE CHANGED THE NAME

10  FROM ASENQUA BETA FUND TO FIRESIDE.

11  Q.   NOW, MS. BURNEY, IF YOU COULD ENLARGE THE

12  PORTION OF THE DOCUMENT REGARDING THE BOX.

13         MS. DOONG, THERE APPEARS TO BE A

14  REFERENCE IN THIS DOCUMENT OF A TRANSACTION

15  OCCURRING ON 8-25-05?

16  A.   YES.

17  Q.   WHAT'S GOING ON AS YOU UNDERSTOOD AT THAT

18  POINT?

19  A.   THAT WAS AFTER WE RECEIVED THE AUDIT REPORT

20  AND MY SISTER YU-MEI WANTED TO INVEST IN MORE

21  EARLIER THAN THAT.  SO AFTER REVIEWING THE REPORT I

22  JUST ADVISE HER IF YOU WANTED YOU CAN PUT IN MORE

23  MONEY.  THEREFORE THE SECOND INVESTMENT COMES IN

24  AUGUST 2005.

25  Q.   AND DO YOU RECALL RECEIVING THIS DOCUMENT IN

449

1    OR AROUND SEPTEMBER 30TH OF '05?

2    A.   YES.

3    Q.   HOW DID YOU COME TO RECEIVE IT?

4    A.   HAND DELIVER.

5    Q.   BY WHOM?

6    A.   AT THAT POINT I BELIEVE IT'S STILL ALBERT HU.

7    Q.   AND WHERE DID YOU RECEIVE IT?

8    A.   IN TAIPEI.

9    Q.   AND MS. BURNEY, IF YOU COULD NOW TURN TO THE

10   DOCUMENT BATES NUMBER 1019.

11        MS. DOONG DO YOU RECOGNIZE THIS PAGE OF

12   EXHIBIT 63?

13   A.   YES, I DO.

14   Q.   WHAT IS THIS DOCUMENT WE ARE LOOKING AT?

15   A.   YU-MEI DOONG'S STATEMENT OF ACCOUNT FOR Q4,

16   2005.

17   Q.   IF YOU COULD TURN TO THE NEXT PAGE OF THE

18   DOCUMENT, MS. BURNEY.  IF YOU COULD ENLARGE THE TOP

19   PORTION OF THE DOCUMENT.

20        WHAT DID YOU UNDERSTAND YOUR SISTER'S

21   BALANCE TO BE AS OF THIS TIME FRAME MS. DOONG?

22   A.   396,336.07.

23   Q.   AND AGAIN, WHOSE SIGNATURES DO YOU SEE ON THIS

24   PAGE OF THE DOCUMENT?

25   A.   ANTHONY POLLACE AND ALBERT HU.

1    Q.   NOW MS. BURNEY IF YOU COULD TURN TO 1017-A.

2    AND TO THE SECOND PAGE OF THAT DOCUMENT NOW AS

3    WELL.

4              MS. DOONG IS THIS ANOTHER ACCOUNT

5    STATEMENT?

6    A.   YES.

7    Q.   WHAT'S THE TIME FRAME FOR THIS ACCOUNT

8    STATEMENT?

9    A.   FROM Q1, 2006.

10   Q.   DID YOU RECEIVE THIS DOCUMENT?

11   A.   YES.

12   Q.   AND HOW DID YOU COME TO HAVE IT?

13   A.   MOST LIKELY FROM ALBERT HU.

14   Q.   AND WHERE, DO YOU RECALL WHERE YOU WERE?

15   A.   IN TAIPEI.

16   Q.   AND LOOKING AT THE SECOND PAGE OF THIS ACCOUNT

17   STATEMENT, WHAT WAS THE VALUE LISTED IN THIS

18   STATEMENT AS OF THE DATE TIME FRAME MARCH 31ST --

19   A.   $420,948.54.

20   Q.   SO HOW DID YOU TAKE YOUR SISTER'S INVESTMENT

21   TO BE DOING AT THIS POINT AS OF MARCH 31ST, 2006?

22   A.   IT'S GROWING EVEN BETTER THAN THE YEAR BEFORE.

23   Q.   AND WHOSE SIGNATURES DO YOU SEE BELOW THE

24   ACCOUNT VALUE?

25   A.   ANTHONY POLLACE AND MR. ALBERT HU.

1  Q.   OKAY.  AND NOW MS. BURNEY, IF YOU COULD TURN

2  TO THE NEXT SEQUENCE 1015 AND 1016-A.

3          MS. DOONG, DO YOU RECOGNIZE THESE PAGES?

4  A.   YES, I DO.

5  Q.   WHAT ARE THESE PAGES?

6  A.   THOSE TWO PAGES ARE Q2, 2006 OF YU-MEI DOONG'S

7  STATEMENTS OF ACCOUNT.

8  Q.   AND MS. BURNEY, IF YOU COULD NOW BLOW UP THE

9  BOX THAT'S ON 1016-A AT THE TOP.  AND PERHAPS IF

10  YOU COULD MAKE IT ANY LARGER FOR THE JURY.

11          SO MS. DOONG, NOW DO YOU SEE THE

12  REFERENCE THERE OF THE TRANSACTION OCCURRING ON

13  3-14-2006?

14  A.   YES.

15  Q.   IT SAYS $200,000?

16  A.   YES.

17  Q.   WHAT'S GOING ON THERE AS YOU RECALL?

18  A.   WELL, BECAUSE THE PROFIT IS GOOD MY SISTER

19  WANTED TO PUT IN MOST OF HER MONEY IN.  SO SHE

20  INVESTED ANOTHER 200,000 AT THAT TIME.

21  Q.   AND YOU WERE INVOLVED IN ARRANGING THAT

22  INVESTMENT AS WELL?

23  A.   BASICALLY SHE ASKED ME THAT SHE WANTED TO

24  INVEST IT AND I SAY YES.  AND THEN SHE WIRED THE

25  MONEY TO THE ACCOUNT.

1    Q.   OKAY.  AND WHAT WAS THE VALUE AT THAT POINT AS

2    OF THE STATEMENT DATE OF JUNE 30TH, 2006?

3    A.   618,437.00.

4    Q.   OKAY.  NOW, MS. BURNEY, IF YOU COULD TURN TO

5    NEXT IN SEQUENCE, 1013-A AND 1014-A.  IF YOU COULD

6    PLACE BOTH PAGES -- THANK YOU.

7         WHAT ARE THESE TWO PAGES OF EXHIBIT 63,

8    MS. DOONG?

9    A.   THE Q2, 2006 STATEMENT OF ACCOUNT FOR YU-MEI

10   DOONG'S FIRESIDE.

11   Q.   AND WHAT'S THE VALUE AT THE END OF THE

12   DOCUMENT -- AND MS. BURNEY, IF YOU COULD JUST SHOW

13   1014-A, NOW.

14   A.   $671,702.98.

15   Q.   AND WHOSE SIGNATURES ARE IMMEDIATELY BELOW

16   THAT?

17   A.   ANTHONY POLLACE AND ALBERT HU AT THE END.

18   Q.   NOW MS. BURNEY IF YOU COULD TURN TO 1011 AND

19   1012-A.

20   Q.   MS. DOONG, WHAT ARE THESE PAGES OF EXHIBIT 63?

21   A.   THOSE ARE THE Q2 -- Q4 STATEMENT OF ACCOUNT

22   FOR YU-MEI DOONG IN FIRESIDE FUND.

23   Q.   WHAT'S THE STATEMENT DATE?

24   A.   DECEMBER 31ST, 2006.

25   Q.   HOW DID YOU COME TO HAVE THIS DOCUMENT?

453

1    A.   IT WAS HAND DELIVERED.  I BELIEVE THAT TIME,

2    PROBABLY WAS DONE BY AMY CHAN.

3    Q.   SHE DELIVERED IT TO YOU?

4    A.   YES ALL THE STATEMENTS ARE HAND DELIVERED.

5    Q.   WHO IS AMY CHEN?

6    A.   AMY CHEN IS AN ASSISTANT FOR ALBERT HU

7    STATIONED IN TAIWAN.

8    Q.   I TAKE IT YOU RECEIVED THIS DOCUMENT IN

9    TAIWAN?

10   A.   YES.

11   Q.   MS. BURNEY, IF WE COULD TURN TO 1012-A.

12           MS. DOONG, DO YOU SEE THE TRANSACTIONS OF

13   11606?

14   A.   YES.

15   Q.   WHAT IS THAT IN REFERENCE TO?

16   A.   ANOTHER FUND INJECTED INTO FIRESIDE FUND BY

17   YU-MEI DOONG.

18   Q.   COULD YOU TELL US ABOUT HOW THAT CAME TO PASS

19   HOW THERE WAS ANOTHER INVESTMENT?

20   A.   IT WAS JUST MY YOUNGER SISTER WAS PULLING THE

21   MONEY TOGETHER.  AND IF YOU LOOK AT THE GAIN FROM

22   THE FUND AND HE WANTED TO PUT IN MORE.

23   Q.   SO DID THE QUARTERLY STATEMENTS WE JUST LOOKED

24   AT FOR 2006, WE HAVING GOING THROUGH?

25   A.   YES.

1    Q.    DID THAT PLAY ANY ROLE IN THE INVESTMENT THAT

2    TOOK PLACE ON 11-3-06 AND 11-6-06?

3    A.    YES.

4    Q.    HOW SO?

5    A.    BECAUSE IT'S CONSISTENTLY DOING WELL EXCEPT A

6    SMALL LOSS AT Q2, BUT Q3 BOUNCED BACK.  SO SHE FELT

7    OKAY, IT'S BACK TO THE TRACK, SO SHE WAS WILLING TO

8    PUT IN THE REST OF THE MONEY.

9    Q.    AND YOU WERE PART OF THE PROCESS IN ADVISING

10   YOUR SISTER ABOUT, IN TERMS OF REVIEWING THE

11   STATEMENTS?

12   A.    YES.

13   Q.    AND WHAT INFORMATION WERE YOU SHARING WITH HER

14   REGARDING YOUR REVIEW OF THE STATEMENTS?

15   A.    I SHARE WITH HER ALL THE STATEMENT OF ACCOUNTS

16   I RECEIVED AND IF SHE WANTED TO PUT IN MORE MONEY

17   SHE WOULD CONSULT ME AND THEN SHE WILL WIRE THE

18   MONEY.

19   Q.    NOW MS. DOONG IN CONNECTION WITH THIS

20   INVESTMENT IN OR AROUND NOVEMBER 2006 THESE TWO

21   WIRES OF 73,000 AND 257,000, DID YOU RECEIVE ANY

22   ADDITIONAL DOCUMENTS IN FIRESIDE IN OR AROUND THE

23   TIME OF NOVEMBER 2006?

24   A.    NO.

25   Q.    LET ME SHOW YOU A DOCUMENT THAT MIGHT REFRESH

1    YOUR RECOLLECTION.  IF YOU COULD TURN --

2    A.   YOU TALK ABOUT SUBSCRIPTION BOOKS.  OKAY.

3    YES.

4    Q.   SO YOU RECALL RECEIVING A SUBSCRIPTION

5    BOOKLET?

6    A.   YES, BUT THAT'S FOR FIRESIDE FUND.

7    Q.   OKAY.  SO LET'S TURN TO PAGE 1108 OF

8    EXHIBIT 63.  MS. DOONG DO YOU RECOGNIZE THIS FIRST

9    PAGE OF EXHIBIT 63?

10   A.   YES, I DO.

11   Q.   AND YOU SEE IN FRONT OF YOU THERE'S -- THIS

12   GOES ON FOR SEVERAL PAGES IN FACT 33 PAGES?

13   A.   YES.

14   Q.   IF YOU COULD TAKE A MOMENT BEFORE WE ASK

15   FURTHER QUESTIONS JUST TO MAKE SURE YOU ARE

16   SATISFIED THAT'S ALL THE PAGES OF THIS PARTICULAR

17   DOCUMENT THE FIRESIDE LS FUND SUBSCRIPTION BOOKLET.

18   UP THROUGH BATES 1141.  I'M SORRY, NOT 1141 -- YES,

19   1141.  DO YOU RECOGNIZE THIS DOCUMENT IN ITS

20   ENTIRETY?

21   A.   YES.

22   Q.   SO WHAT IS THIS DOCUMENT WE ARE LOOKING AT

23   NOW?

24   A.   IT'S A FUND SUBSCRIPTION BOOKLET YOU RECEIVE

25   WHEN YOU PARTICIPATE IN A FUND.  AND THIS IS COMPLY

1    TO THAT FORMAT.

2              AND THIS IS FOR THE FIRESIDE FUND OF

3    YU-MEI DOONG.  SEEMS THEY CHANGED FROM ASENQUA BETA

4    FUND AND THEY ISSUE THIS TO THE INVESTOR.

5    Q.   AND I WOULD ASK FIRST, MS. BURNEY, IF YOU

6    COULD TURN TO BATES NUMBER 1137.  DO YOU SEE THAT

7    SIGNATURE ON -- ACTUALLY MS. BURNEY, IF YOU COULD

8    ENLARGE THAT DOCUMENT.

9              DO YOU SEE THE DATE LISTED THERE,

10   MS. DOONG?

11   A.   YES.

12   Q.   WHAT DATE IS THAT?

13   A.   NOVEMBER 7, 2006.

14   Q.   DO YOU SEE THE SIGNATURE JUST TO THE RIGHT OF

15   IT?

16   A.   YES.

17   Q.   ABOVE INVESTORS SIGNATURE?

18   A.   YES.

19   Q.   WHOSE SIGNATURE DO YOU RECOGNIZE THAT TO BE?

20   A.   IT'S MY SISTER'S SIGNATURE AND I SIGNED FOR

21   HER.

22   Q.   YOU SIGNED FOR HER?

23   A.   YES.

24   Q.   NOW I WOULD ASK, MS. BURNEY, IF YOU COULD TURN

25   TO BATES NUMBER 1127.  FIRST, IF YOU COULD ENLARGE

1    THE DOCUMENT WHERE IT SAYS, UNDERSIGNED'S

2    COMMITMENT IS, ALL THE WAY DOWN THROUGH THE DATE

3    LINE AS WELL.  THANK YOU.

4            MS. DOONG, DO YOU RECOGNIZE AGAIN THE

5    SIGNATURES LISTED BELOW INDIVIDUALS?

6    A.   YES.

7    Q.   WHOSE SIGNATURE IS THAT?

8    A.   YU-MEI DOONG'S SIGNATURE SIGNED BY ME.

9    Q.   AND BELOW LISTED FIRESIDE LS FUND?

10   A.   IT'S ALBERT HU'S SIGNATURE.

11   Q.   AND AGAIN, HOW DID YOU COME TO HAVE THIS

12   DOCUMENT, THIS SUBSCRIPTION BOOKLET WE ARE LOOKING

13   THROUGH NOW?

14   A.   I DON'T REMEMBER.  IT COULD BE THROUGH MAIL.

15   Q.   OKAY.  BUT YOU HAVE A MEMORY THOUGH OF

16   RECEIVING IT IN OR AROUND THIS TIME FRAME NOVEMBER

17   OF '06?

18   A.   YES.

19   Q.   NOW MS. BURNEY, IF YOU COULD TURN TO BATES

20   NUMBER 1123 OF THE SUBSCRIPTION BOOKLET.  IF YOU

21   COULD ENLARGE PARAGRAPH 12, PLEASE.

22           THANK YOU.

23           MS. DOONG DO YOU SEE IS THE ENLARGED

24   PORTION ON THE SCREEN IN FRONT OF YOU?

25   A.   YES.

458

1   Q.   WHAT IS THE TITLE AS YOU UNDERSTAND IT OF THIS

2   SECTION OF THE SUBSCRIPTION BOOKLET IN BOLD?

3   A.   LEGAL REPRESENTATION, WAIVER OF CONFLICTS.

4   Q.   COULD YOU READ THE FIRST SENTENCE OF THE

5   PARAGRAPH, PLEASE.

6   A.   THE INVESTOR UNDERSTANDS THAT PROSKAUER ROSE

7   HAS BEEN ENGAGED TO ACT AS LEGAL COUNSEL TO THE

8   FUND, THE INVESTMENT MANAGER, THE ORDINARY

9   SHAREHOLDER AND THE MASTER FUND COLLECTIVELY, THE

10   FUND AFFILIATED GROUP.

11   Q.   AND MA'AM, BY QUESTION NOW IS, DO YOU RECALL

12   AMONG OTHER PORTIONS OF THE SUBSCRIPTION BOOKLET

13   REVIEWING THIS PORTION OF THE BOOKLET PRIOR TO

14   MAKING ANY FURTHER INVESTMENT?

15   A.   YES.

16   Q.   WHAT DID YOU UNDERSTAND THIS REFERENCE TO

17   PROSKAUER ROSE LLP TO MEAN AT THE TIME?

18   A.   IT MEANS THE FUND HAS BEEN MONITORED BY

19   PROSKAUER ROSE AS A LEGAL COUNSEL.

20   Q.   AND WAS THAT SIGNIFICANT TO YOU AT THE TIME?

21   A.   YES.

22   Q.   WHY?

23   A.   IT MEANS THE FUND WAS MONITORED.

24   Q.   AND WHAT DO YOU MEAN BY MONITORED?

25   A.   IT MEANS IT'S MONITORED TO MAKE SURE IT COMPLY

1    TO ALL THE LEGAL OR FINANCIAL REGULATION

2    REQUIREMENTS.

3    Q.    AND MS. DOONG WHERE IT SAYS IN THIS FIRST

4    SENTENCE THE INVESTOR UNDERSTANDS THAT PROSKAUER

5    ROSE LLP, HAS BEEN ENGAGED TO ACT AS LEGAL COUNSEL

6    TO THE FUND, DOES THAT MEAN -- DID YOU UNDERSTAND

7    IT TO MEAN THAT THE FUND MIGHT BE IN THE PROCESS OF

8    TRYING TO GET PROSKAUER ROSE TO BE RETAINED OR HAD

9    IT ALREADY BEEN DONE?

10   A.    IT'S ALREADY DONE.  HAS BEEN ENGAGED.

11   Q.    IT WAS IN THE PAST TENSE?

12   A.    YES.

13   Q.    I WANT TO SHOW YOU SEVERAL MORE ACCOUNT

14   STATEMENTS, MS. DOONG.  I WANT TO TRY TO LOOK AT

15   THESE AS A SERIES.  BEGINNING ON BATES NUMBER 1009

16   AND 1010.

17   A.    OKAY.

18   Q.    MS. DOONG, DO YOU RECOGNIZE THE DOCUMENTS THAT

19   ARE NOW UP ON THE VIDEO SCREEN?

20   A.    YES.

21   Q.    WHAT ARE THESE DOCUMENTS?

22   A.    Q12007 STATEMENT OF ACCOUNT FOR YU-MEI DOONG

23   UNDER FIRESIDE FUND.

24   Q.    DID YOU RECEIVE THE STATEMENT SOMETIME CLOSE

25   TO MARCH 31ST, 2007?

1    A.    YES, A BIT LATER.

2    Q.    HOW DID YOU RECEIVE IT?

3    A.    THROUGH HAND DELIVERY BY AMY CHEN.

4    Q.    AND WHERE DID YOU RECEIVE IT?

5    A.    IN TAIPEI.

6    Q.    TURNING NOW MS. BURNEY, IF YOU COULD SHOW THE

7    SECOND PAGE OF THIS TWO-PAGE STATEMENT.  IF YOU

8    COULD ENLARGE THE LISTING OF TOTAL VALUE.

9          HOW HAD YOUR, IN READING THIS STATEMENT

10   MS. DOONG AT THE TIME YOU RECEIVED IT, WHAT DID YOU

11   UNDERSTAND YOUR SISTER'S TOTAL VALUE TO BE?

12   A.    1,122,181.05.

13   Q.    WHOSE SIGNATURES WERE ON THE BOTTOM OF THIS

14   PAGE?

15   A.    THE SAME ANTHONY POLLACE AND ALBERT HU.

16   Q.    NOW MS. BURNEY, IF YOU COULD TURN TO THE NEXT

17   IN SEQUENCE.  1006 AND 1007.

18          THIS IS A LITTLE BIT MORE DIFFICULT TO

19   READ, BUT IF YOU COULD HIGHLIGHT, MS. BURNEY, THE

20   DATE LISTED ON THE FIRST PAGE AT BATES 006.

21          MS. DOONG, DO YOU RECOGNIZE THESE TWO

22   PAGES OF EXHIBIT 63?

23   A.    YES.

24   Q.    WHAT IS IT?

25   A.    IT'S A STATEMENT OF ACCOUNT Q4, 2004 FOR

1    YU-MEI DOONG'S FIRESIDE LS FUND.

2    Q.   AS OF WHAT YEAR?

3    A.   YEAR OF 2007.

4    Q.   SO THE END OF THE YEAR?

5    A.   YES.

6    Q.   SO IF WE COULD TURN NOW TO 1007 AND THE TOTAL

7    VALUE LISTING THERE, MS. BURNEY.

8            AND AGAIN, JUST TO REMIND US, HOW DID YOU

9    COME TO HAVE THIS DOCUMENT?

10   A.   IT WAS HAND DELIVERY BY AMY CHEN IN TAIPEI.

11   Q.   AND WHAT DID YOU UNDERSTAND THE TOTAL VALUE TO

12   BE NOW AS OF THE END OF 2007 FOR INJURY SISTER'S

13   INVESTMENT IN FIRESIDE?

14   A.   $1,395,421.00

15   Q.   WHOSE SIGNATURE IS IMMEDIATELY BELOW THAT?

16   A.   ANTHONY POLLACE AND ALBERT HU.

17   Q.   MS. BURNEY, NOW IF YOU COULD TURN TO 003 AND

18   004 AND 5.  THREE-PAGE DOCUMENT AS PART OF

19   EXHIBIT 63.

20           SO BEGINNING ON THE FIRST TWO PAGES,

21   MS. DOONG WHAT YOU'RE LOOKING AT HERE ON THE VIDEO

22   SCREEN?

23   A.   IT'S Q1, 2008, STATEMENT OF ACCOUNT FOR YU-MEI

24   DOONG IN FIRESIDE FUND.

25   Q.   AND AGAIN, HOW DID YOU COME TO HAVE THIS

1    PARTICULAR STATEMENT?

2    A.   HAND DELIVERED BY AMY CHEN IN TAIPEI.

3    Q.   AND TURNING NOW TO THE LAST PAGE OF THIS

4    DOCUMENT 1005, WHAT WAS THE TOTAL VALUE LISTED AT

5    THAT POINT?

6    A.   $1,401,472.61.

7    Q.   AND WHOSE SIGNATURE IS IMMEDIATELY BELOW THAT?

8    A.   ANTHONY POLLACE AND ALBERT HU.

9    Q.   NOW MS. BURNEY IF YOU COULD TURN TO DOCUMENTS

10   1000 AND 1001.

11           AGAIN, THIS IS THREE PAGES OF RELATED

12   DOCUMENTS.

13           MS. DOONG, DO YOU RECOGNIZE THIS PAGE

14   BEGINNING ON 1,000?

15   A.   YES, I DO.

16   Q.   WHAT IS IT?

17   A.   Q2 2002 STATEMENT OF ACCOUNT FOR YU-MEI DOONG

18   AT FIRESIDE FUND.

19   Q.   HOW DID YOU COME TO HAVE THIS STATEMENT?

20   A.   IT'S AGAIN HAND DELIVERED BY AMY CHEN IN

21   TAIPEI.

22   Q.   TURNING TO BATES, MS. BURNEY IF YOU COULD

23   HIGHLIGHT THE TOTAL VALUE SECTION.  WHAT'S THE

24   TOTAL VALUE LISTED THERE?

25   A.   $1,437,774.56.

1    Q.   AND THAT'S YOUR SISTER'S INVESTMENT TOTAL

2    VALUE AS OF WHAT DATE?

3    A.   JUNE 30TH, 2008.

4    Q.   WHOSE SIGNATURE IS IMMEDIATELY BELOW THAT?

5    A.   ANTHONY POLLACE AND ALBERT HU.

6    Q.   MS. DOONG TO 2007 DID YOU HAVE ANY OCCASION TO

7    BE INVOLVED IN ANY ADDITIONAL INVESTMENT INVOLVING

8    ALBERT HU ASIDE FROM YOUR SISTER?

9    A.   YES.

10   Q.   COULD YOU TALK TO US ABOUT THAT?

11   A.   MY HUSBAND AND I -- MY HUSBAND BROUGHT UP THAT

12   ALBERT IS RAISING ANOTHER FUND CALLED AQC.

13   Q.   SO YOU LEARNED OF ANOTHER FUND INVOLVING

14   MR. HU?

15   A.   YES.

16   Q.   AND WHAT WAS THE NATURE OF AQC, WAS IT GOING

17   TO BE MORE OR LESS CONSERVATIVE INVESTING STYLE?

18   A.   MORE CONSERVATIVE THAT WAS HOW THE FUND WAS

19   REPRESENTED AT THE BEGINNING.

20   Q.   DID YOU PROCEED TO FOLLOW THROUGH MAKING AN

21   INVESTMENT IN AQC?

22   A.   YES.

23   Q.   AND I WOULD LIKE TO, MS. BURNEY IF YOU COULD

24   FLASH UP ON THE SCREEN BEGINNING AT BATES 1032,

25   PAGE 40.

1          MS. BURNEY IF YOU COULD ENLARGE THE

2     PORTION OF THE DOCUMENT WHERE IT SAYS AQC VALUE.

3               DO YOU RECOGNIZE THIS DOCUMENT,

4     MS. DOONG?

5     A.   YES, I DO.

6     Q.   WHAT'S THE TRANSACTION REFERENCE THERE

7     2/1-9/2007?

8     A.   YES.

9     Q.   WHAT'S THAT IN REFERENCE TO?

10    A.   I WIRE IN 300,000 TO AQC FUND.

11    Q.   WHAT IF ANYTHING HAD MR. HU EXPLAINED TO YOU

12    ABOUT THE AQC FUND PRIOR TO MAKING THAT INVESTMENT?

13    A.   IT WAS LIKE OTHER FUND WILL MANAGE.

14    Q.   HOW DID YOU COME TO HAVE THE STATEMENT WE ARE

15    LOOKING AT NOW FOR MARCH 31ST, 2007?

16    A.   IT'S AGAIN HAND DELIVERED BY AMY CHEN TO ME IN

17    TAIPEI.

18    Q.   WHOSE SIGNATURES ARE LISTED BELOW THAT

19    SECTION?

20    A.   SAME ANTHONY POLLACE AND ALBERT HU.

21    Q.   MS. BURNEY IF YOU COULD TURN TO 1031 PAGE 39.

22    Q.   WHAT IS THIS?

23    A.   IT'S MY Q2, 2007 SUMMARY ACCOUNT FOR AQC FUND.

24    Q.   HOW DID YOU COME TO HAVE THIS DOCUMENT?

25    A.   HAND DELIVERED BY AMY CHEN IN TAIPEI TO ME.

                                                    465

1    Q.   WHOSE SIGNATURE IS IMMEDIATELY BELOW THE TOTAL

2    VALUE?

3    A.   ANTHONY POLLACE AND ALBERT HU.

4    Q.   WHAT'S THE VALUE LISTED THERE AS OF JUNE 30TH,

5    2007?

6    A.   $323,037.50.

7    Q.   HOW HAD, BASED ON THE STATEMENT HOW DID YOU

8    UNDERSTAND YOUR INVESTMENT TO HAVE DONE SINCE YOU

9    MADE THE INVESTMENT?

10   A.   THE INVESTMENT IS DOING PRETTY GOOD, BETTER

11   THAN I EXPECTED.

12   Q.   IF YOU COULD TURN TO BATES NUMBER 1038 IN THE

13   MIDDLE OF THE DOCUMENT.  WHAT IS THIS DOCUMENT NOW

14   MS. DOONG?

15   A.   IT'S MY Q42007 SUMMARY OF ACCOUNT FOR AQC

16   FUND.

17   Q.   WHAT'S THE STATEMENT DATE?

18   A.   DECEMBER 31ST, 2007.

19   Q.   WHAT WAS THE TOTAL VALUE BASED ON THIS

20   DOCUMENT?

21   A.   $351,580.83.

22   Q.   HOW DID YOU COME TO HAVE THIS DOCUMENT?

23   A.   HAND DELIVERED BY AMY CHEN TO ME IN TAIPEI.

24   Q.   WHOSE SIGNATURES ARE DIRECTLY BELOW THE TOTAL

25   VALUE?

1     A.    ANTHONY POLLACE AND ALBERT HU AND ALBERT HU.

2     Q.    MS. BURNEY IF YOU COULD TURN TO 1029, PAGE 37.

3           MS. DOONG DO YOU RECOGNIZE THIS PAGE OF

4     EXHIBIT 63?

5     A.    YES, I DO.

6     Q.    WHAT IS IT?

7     A.    IT'S MY Q1, 2008 AQC FUNDS SUMMARY OF ACCOUNT.

8     Q.    HOW DID YOU COME TO HAVE THIS DOCUMENT?

9     A.    HAND DELIVERED BY AMY CHEN IN TAIPEI.

10    Q.    TO YOU?

11    A.    YES, TO ME IN PERSON.

12    Q.    AND WHAT IS THE TOTAL VALUE AS YOU UNDERSTOOD

13    IT WHEN YOU RECEIVED IT BACK IN 2008?

14    A.    $359,903.46.

15    Q.    DID YOU UNDERSTAND YOUR INVESTMENT WAS GOING

16    UP OR DOWN IN VALUE AT THIS POINT IN 2008?

17    A.    IT'S UP, NOT AS GOOD AS FIRESIDE BUT I WAS

18    VERY PLEASED.

19    Q.    AND WHOSE SIGNATURE IS DIRECTLY BELOW THE

20    TOTAL VALUE BOX?

21    A.    ANTHONY POLLACE AND ALBERT HU.

22    Q.    NOW TURNING TO BATES 1028, DO YOU RECOGNIZE

23    THIS PAGE?

24    A.    YES.

25    Q.    WHAT IS IT?

1    A.    IT'S MY Q2, 2008 AQC SUMMARY OF ACCOUNT.

2    Q.    WHAT'S THE TOTAL VALUE LISTED THERE?

3    A.    368,026.47.

4    Q.    HOW DID YOU COME TO HAVE THIS DOCUMENT?

5    A.    FROM AMY CHEN HAND DELIVER.

6    Q.    WHOSE SIGNATURES ARE BELOW?

7    A.    ANTHONY POLLACE AND ALBERT HU.

8    Q.    ANTHONY POLLACE AND ALBERT HU?

9    A.    YES.

10   Q.    I'M SORRY WHAT WERE YOU GOING TO SAY?

11   A.    THIS IS AFTER WE REQUEST THE REDEMPTION.

12   Q.    WE WERE JUST GOING TO GET TO THAT HERE.  YOU

13   ARE ANTICIPATING MY NEXT QUESTION?

14   A.    OH, SORRY.

15   Q.    NOW AT SOME POINT IN 2008, MS. DOONG, DID YOU

16   COME TO A DECISION ABOUT RETAINING YOUR FUNDS IN

17   AQC AND YOUR SISTER'S FUNDS IN THE FIRESIDE FUND?

18   A.    NO, WE WANTED TO PULL OUT ALL THE FUNDS.

19   Q.    AND WHEN DID THAT APPROXIMATELY OCCUR?

20   A.    EARLY YEAR OF 2008.

21   Q.    OKAY.  I'M GOING TO SHOW YOU SOME DOCUMENTS

22   NOW.

23           IF YOU COULD TURN TO PAGE 1041 AND 1042

24   OF THE DOCUMENTS IN FRONT OF YOU.

25           MS. BURNEY, IF YOU COULD PUT THOSE TWO

1    DOCUMENTS ON THE SCREEN, PLEASE.

2         WHAT ARE THESE TWO PAGES WE ARE LOOKING

3    AT NOW, MS. DOONG?

4    A.   THOSE ARE THE REQUESTS TO WITHDRAW MY AQC FUND

5    AND MY SISTER'S ASENQUA BETA FUND.

6    Q.   AND THERE APPEARS TO BE A DATE LISTED ON

7    THERE?

8    A.   YES.

9    Q.   WHAT DATE --

10   A.   FEBRUARY 19, 2008.

11   Q.   THERE APPEARS TO BE A SERIES OF SIGNATURES ON

12   THE FIRST DOCUMENT BATES 1041-A.  WHOSE NAME IS

13   LISTED THERE?

14   A.   NAI FEN DOONG.

15   Q.   THAT'S YOU?

16   A.   YES.

17   Q.   WHO WROTE THAT DATE FEBRUARY 19, 2008, IS THAT

18   YOUR WRITING?

19   A.   IT LOOKS LIKE MY WRITING.

20   Q.   NOW THERE APPEARS TO BE TWO SIGNATURES HERE?

21   A.   YES.

22   Q.   ON THE DOCUMENT?

23   A.   YES.

24   Q.   COULD YOU EXPLAIN WHY THERE'S TWO SIGNATURES

25   ON THIS DOCUMENT?

1    A.   I REMEMBER WE REQUEST TO WITHDRAW ALL THE

2    MONEY.

3    Q.   FROM WHOM?

4    A.   FROM ALBERT HU FOR MY SISTER'S FIRESIDE FUND

5    AND MY AQC FUND.  ALBERT TOLD US WE NEED TO FILL

6    OUT THIS STANDARD FORM.  THEN WE MET IN TAIPEI IN

7    THE FAR EASTERN PLAZA HOTEL AGAIN.  HE HAND

8    DELIVERED THE FORM TO ME.  BUT AT THAT POINT IT

9    DAWNED ON ME I WANT --

10   Q.   WHAT DO YOU MEAN DOUBLE CHECK?

11   A.   IT'S JUST A BAD FEELING WITH THE WHOLE

12   PROCESS.  IT DIDN'T GO AS SMOOTHLY AS WE

13   EXPERIENCED WITH OTHER FUND.

14        SO IT JUST DAWNED ON ME OR I ASKED HIM TO

15   SIGN AND FIND ME.  SO THERE'S DOUBLE SIGNATURE FOR

16   ALBERT HU AS WELL AS FOR ME, NAI FEN DOONG.

17   Q.   SO LOOKING UP AT THE SCREEN HERE?

18   A.   IT'S JUST I WANT TO MAKE SURE THAT'S ALBERT

19   HU'S SIGNATURE.

20   Q.   SO YOU ARE TELLING US THE SIGNATURE ON THE

21   LEFT-HAND SIDE OF THE PAGE ABOVE MR. HU, WAS THIS

22   SIGNATURE ALREADY ON THE PAGE WHEN YOU ARRIVED?

23   A.   WHEN WE ADMIT, YES, YES.

24   Q.   AND THIS SIGNATURE WAS HERE SIGNED BY HIM?

25   A.   IN FRONT OF ME.

1    Q.    AT THE HOTEL?

2    A.    YES.

3    Q.    HOW ABOUT THIS SIGNATURE HERE WAS THAT ALREADY

4    ON THE DOCUMENT?

5    A.    IT'S ALREADY ON THE DOCUMENT.

6    Q.    BUT THIS YOU SIGNED IN FRONT OF HIM?

7    A.    YES.

8    Q.    AT THAT SAME TIME?

9    A.    YES.

10   Q.    NOW HOW ABOUT MR. POLLACE, WAS HE THERE TOO?

11   A.    NO, I HAVE NEVER MET HIM.

12   Q.    NOW, MS. BURNEY, IF YOU COULD SHOW THE OTHER

13   DOCUMENT ON THE SCREEN AS WELL.

14        BEFORE WE GET TO THIS NEXT DOCUMENT YOU

15   MENTIONED A MOMENT AGO SOMETHING ALONG THE LINES OF

16   A BAD FEELING.  WHAT ARE YOU TALKING ABOUT THERE, A

17   BAD FEELING?

18   A.    THE ONE REASON WE WANT TO WITHDRAW ALL THE

19   FUND IS BECAUSE WE HEARD --

20        MR. FONG:  OBJECTION.  HEARSAY.

21        THE COURT:  IT'S NOT OFFERED FOR THE

22   TRUTH, IT'S OFFERED TO EXPLAIN WHY SHE ASKED FOR A

23   WITHDRAWAL.  SO IT CAN BE CONSIDERED FOR THAT

24   PURPOSE ONLY.

25        MR. LUCEY:  THANK YOU, YOUR HONOR.

1           THE COURT:  OKAY.

2           THE WITNESS:  THE REASON WE WANT TO

3    WITHDRAW THE FUND BECAUSE WE HEARD OTHER INVESTORS,

4    ONE INVESTOR WE KNOW OF, HE HAS TROUBLE TO GET

5    MONEY BACK IN THE SHORT PERIOD OF TIME.

6           THEREFORE WE DECIDED WE ARE GOING TO TAKE

7    ALL THE MONEY OUT.  AND ADVISE MY SISTER, OF

8    COURSE, ACCORDINGLY TO DO THE SAME.

9    BY MR. LUCEY:

10   Q.   SO NOW LOOKING AT EXHIBIT 1042, SORRY,

11   EXHIBIT 63, PAGE 1042-A.

12          THERE APPEARS TO BE ONLY ONE SET OF

13   DOUBLE SIGNATURES HERE, RIGHT

14   A.   BECAUSE THIS IS YU-MEI DOONG'S FUND.  SO I

15   JUST ASK HIM TO SIGN FOR THE REASON THAT HE IS

16   RESPONSIBLE FOR THE SIGNATURE OF OUR WITHDRAWAL

17   FORM.

18          I DON'T REALLY CONCERN ABOUT OUR PART OF

19   SIGNATURE I'M MORE CONCERNED OF HIS PART OF

20   SIGNATURE.

21   Q.   AND WHICH ONE OF THESE TWO SIGNATURES HERE

22   NEAR TO MR. HU'S NAME WAS THE ONE HE SIGNED IN

23   FRONT OF YOU?

24   A.   ON THE RIGHT-HAND SIDE.

25   Q.   THIS ONE HERE ON THE RIGHT-HAND SIDE?

1    A.   YES, ON MY RIGHT-HAND SIDE, YES.

2    Q.   AND AGAIN, IT APPEARS TO BE ANOTHER SIGNATURE

3    AT THE BOTTOM?

4    A.   YES.

5    Q.   WHOSE SIGNATURE DO YOU RECOGNIZE THAT TO BE?

6    A.   ANTHONY POLLACE.

7    Q.   WAS HE PRESENT FOR THIS MEETING?

8    A.   NO.  IT WAS THE SAME MEETING.

9    Q.   OKAY.  SO THESE TWO DOCUMENTS WE LOOKED AT, 41

10   AND 42 OF EXHIBIT 63, THEY WERE BOTH SIGNED BY

11   MR. HU AT THE SAME TIME?

12   A.   YES.

13   Q.   IN FRONT OF YOU?

14   A.   YES.

15   Q.   NOW WE LOOKED AT THOSE SERIES OF STATEMENTS

16   FOR AQC AND FOR FIRESIDE FUND IN 2008?

17   A.   YES.

18   Q.   NOW, MAYBE I MISSED IT BUT I DIDN'T SEE ANY

19   REFERENCE ON THOSE TO ANY MONEY BEING WITHDRAWN OR

20   REIMBURSED TO YOU?

21   A.   NO.

22   Q.   THEY GO ALL THE WAY UP THROUGH JUNE, 08?

23   A.   CORRECT.  WE DIDN'T GET ANY BACK, ANY MONEY

24   BACK.

25   Q.   IN FEBRUARY 2008?

1    A.    UNTIL NOW.

2    Q.    MARCH, 08?

3    A.    NO.

4    Q.    APRIL, MAY, JUNE?

5    A.    NO.

6          THE COURT:  SHE SAID SHE DIDN'T GET ANY

7    MONEY TO TODAY.

8          THE WITNESS:  TO TODAY.

9    Q.    NOW GOING ON FROM MR., MS. DOONG, AFTER

10   FEBRUARY '08, DID YOU EVER REACH OUT AND TRY TO

11   TALK TO MR. HU ABOUT GETTING YOUR MONEY BACK?

12   A.    YES, I CALL HIM PRACTICALLY EVERY DAY

13   DESPERATELY.

14   Q.    EVERY DAY AFTER THIS DAY FEBRUARY 19TH.  AND

15   HOW DID MR. HU RESPOND, DO YOU RECALL?

16   A.    HE KEPT GIVING US THE REASON, AT FIRST THE

17   REASON I REMEMBER, HE HAS TO MOVE THE FUND TO

18   SOMEWHERE ELSE, SO HE HAS TO DO ALL THE ARRANGEMENT

19   AND IT TAKES TIME.

20         AND THEN THE OTHER REASON I REMEMBER HE

21   TOLD US HE CANNOT ISSUE THE MONEY OUT TO INDIVIDUAL

22   BECAUSE WE EVEN THOUGHT ABOUT IF THERE ANY WAY WE

23   CAN GO THROUGH A COMPANY OR THIS, IT JUST, AND WHEN

24   HE TALK ABOUT HE WANT TO MAKE ARRANGEMENT IN

25   SINGAPORE, I VOLUNTEER I WILL GO AND WORK OUT WITH

1    HIM, IT'S ALL BEING TURNED DOWN.  BUT CONSISTENTLY,

2    HE PROMISED US HE WILL GIVE US THE MONEY BACK.

3    Q.   NOW, DID YOU EVER HAVE ANY SORT OF CONFERENCE

4    CALL WITH MR. HU ABOUT THIS?

5    A.   YES.

6    Q.   WHEN DID THAT CONFERENCE CALL TAKE PLACE?

7    A.   MY LAST ENCOUNTER WITH ALBERT HU WAS IN

8    SEPTEMBER 5TH OF YEAR 2008.

9    Q.   WHAT HAPPENED ON THAT OCCASION?

10   A.   HIS ASSISTANT SET UP WEBEX, A CONFERENCE CALL

11   WITH THE TV SCREEN TO SHOW A PRESENTATION.

12   Q.   IS THAT A VIDEO CONFERENCE CALL?

13   A.   YES.

14   Q.   AND DID THAT TAKE PLACE THAT WEBEX CALL?

15   A.   YES.

16   Q.   AND WHAT HAPPENED DURING THE COURSE OF THAT

17   CALL?

18   A.   I WAS IN TAIWAN MY HUSBAND WAS TRAVELLING

19   ABROAD.  AND ALBERT HU, I DON'T KNOW HE PROBABLY

20   WAS IN HONG KONG AT THAT TIME.  THEN HIS ASSISTANT

21   FRANK LIANG, FOUR OF US HAD A CONFERENCE CALL.

22   Q.   WHAT WAS DISCUSSED AT THAT CONFERENCE CALL?

23   A.   WHAT WE WANTED TO DISCUSS IS WHEN IS HOW HE

24   CAN PAY US THE MONEY BACK BUT HE GAVE US ANOTHER

25   FINANCIAL STATEMENT OF HOW HEALTHY THE AQC FUND AND

1    ASENQUA BETA FUND WAS.

2    Q.   AS OF THAT TIME SEPTEMBER 2008?

3    A.   YES.

4    Q.   WAS IT GIVEN TO YOU IN PAPER FORM?

5    A.   NO IT WAS SHOWN ON THE SCREEN.  WE DID REQUEST

6    REQUEST IS IT IN PRINT BUT WE HAVE NEVER SEEN IT.

7    Q.   IF YOU COULD ASK MS. BURNEY TO ASSIST US HERE

8    IN PUTTING UP ON THE SCREEN ANOTHER PART OF

9    EXHIBIT 63, IN PARTICULAR BATES NUMBER 1034.

10          AND MS. DOONG THIS DOCUMENT IS SOMEWHAT

11   DARK.  DO YOU RECOGNIZE THIS DOCUMENT?

12   A.   YES.

13   Q.   WHAT IS IT?

14   A.   IT WAS THE PHOTOCOPY OF A PICTURE I TOOK ON

15   THE COMPUTER SCENE WHEN WE HAD THAT VIDEO

16   CONFERENCE.

17   Q.   SO LET ME UNDERSTAND WHAT YOU ARE TELLING US.

18   YOU ARE TELLING US YOU TOOK A PICTURE OF THE

19   SCREEN?

20   A.   YES.

21   Q.   WHY DID YOU DO THAT?

22   A.   I THINK SINCE WE HAD SOME DIFFICULTY IN

23   GETTING THE MONEY BACK, I WAS EXTREMELY NERVOUS AND

24   I THOUGHT I WANTED TO MAKE A RECORD OF WHATEVER

25   ALBERT HU SHOWED TO US.

1           AND AT THAT MOMENT, I WAS NOT SURE THAT I

2     CAN GET THAT PRINT FROM THEM, I MEAN ALBERT HU AND

3     FRANK LIANG THOUGH WE WOULD REQUEST.

4           SO JUST AS A PRECAUTION I USED A CAMERA

5     TO TAKE THE SCREEN DOWN.

6     Q.   AND MS. DOONG, WHAT DID YOU RECOGNIZE, WHAT DO

7     YOU UNDERSTAND THIS TO SAY, THIS LINE RIGHT HERE TO

8     SAY?

9           MR. FONG:  OBJECTION, YOUR HONOR.

10    FOUNDATION.  I THINK THAT'S ILLEGIBLE.

11          MS. DOONG CAN CERTAINLY TESTIFY AS TO HER

12    WHAT SHE HEARD OR WHAT SHE SAW.  BUT IN TERMS OF,

13    AT LEAST MY COPY IS ALMOST TOTALLY ILLEGIBLE.

14          THE COURT:  SHE CAN CERTAINLY TESTIFY AS

15    TO WHAT SHE HEARD OR SAW.

16          MR. LUCEY:  AND MS. DOONG, IF YOU WANT TO

17    REFER TO THE PAPER COPY IN FRONT OF YOU?

18          THE COURT:  THAT'S FINE.

19          THE WITNESS:  PAGE 1034?

20          MR. LUCEY:  YES.

21          THE WITNESS:  OKAY.

22    BY MR. LUCEY:

23    Q.   I'M LOOKING NOW AT THE, THERE'S A SERIES OF

24    LINES OF TEXT.  AND I'M ASKING, WHAT DO YOU

25    UNDERSTAND BASED ON YOUR REVIEW OF THIS DOCUMENT,

1    THE PICTURE YOU TOOK OF THE SCREEN, WHAT DOES THIS

2    LINE SAY HERE?

3              MR. FONG:  SAME OBJECTION, YOUR HONOR.

4              THE COURT:  I WILL ALLOW HER TO TESTIFY.

5    IF SHE CAN OR CAN'T READ IT, TELL US.

6              THE WITNESS:  I CAN READ IT.

7              THE COURT:  OKAY.

8              THE WITNESS:  THE NET CURRENT ASSET IS

9    OVER 29,000 AND NET ASSET VALUE IS OVER

10   $239 MILLION.

11   BY MR. LUCEY:

12   Q.   AND DID YOU HAVE ANY DISCUSSION DURING THIS

13   WEBEX CALL REGARDING NET ASSET VALUE IN THE FUND

14   WITH ALBERT HU?

15   A.   YES, I THINK THAT'S WHAT HE WANTED TO TELL US

16   THERE'S PLENTY MONEY IN THE FUND YOU DO NOT HAVE TO

17   WORRY ABOUT IT.

18             THE COURT:  LET'S TAKE A MORNING RECESS

19   FOR 15 MINUTES.

20             MR. LUCEY:  CERTAINLY, YOUR HONOR.

21             THANK YOU.

22             (WHEREUPON A RECESS WAS TAKEN.)

23             THE COURT:  ALL RIGHT.  YOU MAY CONTINUE.

24             MR. LUCEY:  THANK YOU, YOUR HONOR.

25   Q.   MS. DOONG, PICKING UP WHERE WE LEFT OFF.

1    DURING THE COURSE OF THIS WEBEX CALL YOU HAD WITH

2    ALBERT HU AMONG OTHERS IN SEPTEMBER 5TH, 2008, YOU

3    TOLD US, DID YOU UNDERSTAND THAT THERE WAS STILL

4    YOUR SISTER'S MONEY AND YOUR MONEY WAS STILL HELD

5    IN TRUST BY MR. HU FOR YOU?

6    A.   IT'S WHAT MR. HU SAID.

7    Q.   YOU UNDERSTOOD YOUR MONEY WAS STILL THERE?

8    A.   YES.

9    Q.   DID HE EVER TELL YOU DURING THAT CALL AT ANY

10   POINT THAT THE MONEY HAD ALREADY DISSIPATED OR WAS

11   GONE?

12   A.   NEVER.  HE KEPT RAISING FUND.

13   Q.   HE KEPT RAISING THE FUND?

14   A.   YES, DURING THAT PERIOD.

15   Q.   I'M JUST GOING TO APPROACH TO HELP WITH THE

16   MICROPHONE HERE.

17        MS. BURNEY, IF YOU COULD NOW SHOW UP ON

18   THE VIDEO SCREEN BEGINNING AT BATES 1045, I BELIEVE

19   IT'S PAGE NUMBER 55 OF EXHIBIT 63.  AND IF YOU

20   COULD ALSO SHOW THE SECOND PAGE AS WELL, PAGE 1046.

21   55 AND 56, I BELIEVE.  IT SHOULD BE BATES NUMBERS

22   1045 AND 1046.

23        SO MS. DOONG, DO YOU SEE THAT DOCUMENT

24   THERE IN FRONT OF YOU WHERE AT THE TOP IT SAYS

25   ALBERT HU'S VERSION?

1    A.   YES.

2    Q.   THIS DOCUMENT APPEARS TO BE IN A FOREIGN

3    LANGUAGE?

4    A.   IN CHINESE, YES.

5    Q.   FOR THE MOST PART.  SO WITHOUT GETTING INTO

6    THE TEXT OF THE FOREIGN LANGUAGE, WHAT GENERALLY IS

7    THIS DOCUMENT?

8    A.   THIS DOCUMENT IS A PROMISE NOTE TO PAY BACK

9    MONEY.

10   Q.   AND HOW DID YOU COME TO HAVE THIS DOCUMENT?

11   A.   IT WAS AT THE END -- IT WAS DURING THAT WEBEX

12   MEETING WE HAD BACK IN SEPTEMBER 2008.  HE WAS

13   EAGER TO SHOW US THERE ARE PLENTY OF MONEY.  AND WE

14   WANTED HIM TO TELL US HOW ARE YOU GOING TO PAY BACK

15   OUR MONEY.

16          AND DURING THAT SESSION, WE REACH A

17   CONCLUSION, HE'S GOING TO WRITE US A PROMISE NOTE

18   TO PAY BACK.  AND THIS WAS -- THIS WAS WHAT CAME

19   OUT FROM THAT MEETING.

20   Q.   OKAY.

21   A.   I BELIEVE I RECEIVED THAT SEVERAL DAYS RIGHT

22   AFTER THE MEETING.

23   Q.   AND THIS IS THE SEPTEMBER, '08 MEETING?

24   A.   SEPTEMBER, '05.

25   Q.   OKAY.  SEPTEMBER OF 2008, THOUGH?

1    A.   YES, 2008, SORRY.  SEPTEMBER 5TH OF 2008.

2    Q.   UNDERSTOOD.

3         SO NOW SOMEBODY IF YOU COULD SHOW BATES

4    1047 AND 1048, THE NEXT TWO PAGES.

5         SO MS. DOONG, WHAT ARE WE LOOKING AT HERE

6    ON THESE TWO PAGES?

7    A.   THIS IS MY REVISION FOR THE PROMISE NOTE,

8    BECAUSE THERE WERE POINTS WE DISCUSSED ON THE WEBEX

9    WAS NOT CAPTURED.  SO I MADE A FEW MODIFICATIONS

10   THERE AND SEND IT BACK AND REQUEST ALBERT HU TO

11   SIGN BACK.

12   Q.   SO ARE YOU TELLING US THERE'S CHANGES FROM THE

13   DOCUMENT WE JUST LOOKED AT A MOMENT AGO?

14   A.   YES.

15   Q.   AND THERE APPEARS TO BE NOW SOME ADDITIONAL

16   WORDS OF ENGLISH SCATTERED THROUGHOUT THE TEXT OF

17   THE DOCUMENT; IS THAT FAIR TO SAY?

18   A.   YES.

19   Q.   WHO INSERTED THOSE ENGLISH WORDS INTO THE

20   DOCUMENT?

21   A.   I DID.

22   Q.   AND AT THE VERY TOP OF THE DOCUMENT,

23   MS. BURNEY, IF YOU COULD ENLARGE THE TOP HALF OF

24   THE DOCUMENT ON THE LEFT-HAND SIDE.  AND ACTUALLY,

25   IF YOU COULD PLEASE GO DOWN TO THROUGH NUMBER ONE.

1           SO THERE'S A REFERENCE THERE TO AQC FUND;

2    IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND IS THAT IN CONNECTION WITH YOUR

5    INVESTMENT?

6    A.   MY OWN INVESTMENT.

7    Q.   AND THERE'S SOME NUMBERS THAT APPEAR TO BE

8    INSERTED -- MS. BURNEY, IF YOU COULD ENLARGE THE

9    TEXT AT NUMBER ONE AND NUMBER TWO, THAT PORTION OF

10   THE DOCUMENT.

11           MS. DOONG, DO YOU SEE THE TEXT NUMBERS

12   HERE OF 368,027, WHAT IS THAT IN REFERENCE TO?

13   A.   THAT WAS AT THE TIME MY ACCOUNT BALANCE OF THE

14   AQC FUND.

15   Q.   AND IS THAT, JUST SO WE ARE CLEAR ABOUT

16   CONVENTION HERE, THAT'S THE 2-17-08 THAT'S THE

17   DATE?

18   A.   WHY IS.

19   Q.   THERE'S A SERIES OF NUMBERS.  THERE'S 2008,

20   SCATTERED AMONG THE CHINESE CHARACTERS, WHAT'S THAT

21   IN REFERENCE TO?

22   A.   THAT WAS THE QUARTERLY END OF 2008.

23   Q.   FOR THE AQC FUND?

24   A.   FOR THE AQC FUND.

25   Q.   AND WHAT IS THE 368,027.47 REPRESENT?

                                                    482

1    A.   IT REPRESENTS THE ACCOUNT BALANCE AT THAT

2    MOMENT.

3    Q.   THEN PARAGRAPH TWO HAS 208,217.  THEN BELOW

4    THAT IN THE SAME PARAGRAPH SCATTERED AMONG THE

5    CHINESE CHARACTERS 368,027.47 IN PARAGRAPH TWO?

6    A.   SORRY, WHERE?

7    Q.   I WILL SHOW YOU HERE ON THE SCREEN.

8              SO THERE'S A REFERENCE HERE IN PARAGRAPH

9    2 -- 2008, 217.  THEN THE NUMBERS HERE 368,027.47

10   A.   YES.

11   Q.   CAN YOU SPEAK TO WHAT THAT IS IN REFERENCE TO

12   IN TERMS OF THE CHANGES YOU ARE MAKING TO THE

13   DOCUMENT?

14   A.   THAT JUST REFERRED -- MAY I -- THE FIRST

15   PARAGRAPH MEANS HE PROMISED ME THAT THE $368,000.

16   AND THE SECOND PARAGRAPH MEANS HE PROMISED TO PAY

17   ME THAT AMOUNT OF MONEY.

18   Q.   OKAY.  NOW IF WE COULD TURN TO 1049 AND 1050.

19             AND MS. DOONG, WHAT ARE THESE TWO PAGES

20   NOW WE ARE LOOKING AT?

21   A.   THOSE ARE THE PROMISE NOTE I REVISED, YU-MEI

22   DOONG'S ASENQUA BETA FUND.

23   Q.   OKAY.  WHAT DID YOU DO WITH THE DOCUMENTS,

24   WHAT DID YOU DO TO THEM, DID YOU SEND THEM TO

25   ANYONE?

1    A.   I MAILED IT TO ALBERT HU AND HIS ASSISTANT AT

2    THAT MOMENT, FRANK LIANG.

3    Q.   DID YOU EVER RECEIVE ANY VERSIONS OF THIS

4    DOCUMENT BACK FROM ALBERT HU?

5    A.   NO, MR. HU JUST DISAPPEARED AND VANISHED,

6    UNREACHABLE AFTERWARDS.

7    Q.   SO WHEN WAS THE LAST TIME YOU HAD CONTACT TO

8    MR. HU PRIOR TO COMING TO COURT YESTERDAY EITHER IN

9    VIDEO FORM OR IN LIVE FORM?

10   A.   NONE.

11   Q.   NONE?  SO DID YOU EVER RECEIVE ANY MONEYS BACK

12   IN CONNECTION WITH YOUR SISTER'S INVESTMENT IN THE

13   FIRESIDE FUND WHICH ORIGINALLY HAD BEEN THE ASENQUA

14   BETA FUND?

15   A.   I NEVER RECEIVED ANY MONEY.

16   Q.   AND HOW MUCH WAS THE TOTAL AMOUNT OF MONEY

17   THAT SHE HAD INVESTED IN THE -- YOU INVESTED WITH

18   HER OR ON HER BEHALF IN WHAT WAS ULTIMATELY THE

19   FIRESIDE LS FUND?

20   A.   MY YOUNGER SISTER HAD INVESTED TOTAL,

21   $830,000.

22   Q.   WHAT ABOUT YOURSELF?

23   A.   300,000.

24   Q.   HOW MUCH IN THE AQC FUND?

25   A.   300,000.

1    Q.   SO IF I'M DOING MY MATH CORRECT THAT'S OVER A

2    MILLION DOLLARS OF YOU AND YOUR SISTER?

3    A.   CORRECT.

4    Q.   MS. DOONG, DID YOU EVER HAVE OCCASION TO MEET

5    ANY OTHER INVESTORS AND COMPARE ACCOUNT STATEMENTS

6    WITH EACH OTHER?

7    A.   ONCE, YES.

8    Q.   AND WHEN DID THAT OCCUR, APPROXIMATELY?

9    A.   I DON'T REMEMBER THE EXACT MONTHS OR DATE BUT

10   IT HAPPENED AFTER SEPTEMBER 8TH PROBABLY WHEN WE

11   COULDN'T REACH ALBERT HU.

12   Q.   SOME TIME AFTER THE WEBEX CALL?

13   A.   YES, I BELIEVE SO.

14   Q.   AND WHAT INVESTOR DID YOU HAVE THE OPPORTUNITY

15   TO MEET WITH AND COMPARE ACCOUNT STATEMENTS?

16   A.   I MET -- I DIDN'T COMPARE ALL THE ACCOUNT

17   STATEMENTS BUT I MET JOE YEN, ANDY YAN, CHEN WU-FUE

18   IN TAIWAN.

19   Q.   AND IN TERMS OF MR. YAN, DID YOU HAVE AN

20   OPPORTUNITY TO REVIEW AND COMPARE ACCOUNT

21   STATEMENTS WITH MR. YAN?

22   A.   YES.

23   Q.   AND --

24   A.   HE BROUGHT HIS STATEMENT AND I HAD A CHANCE TO

25   TAKE A LOOK.

1    Q.   DID YOU REVIEW THEM?

2    A.   YES.

3    Q.   AFTER REVIEWING THE DOCUMENTS THAT MR. YAN HAD

4    SHOWED YOU ON THAT OCCASION, WHAT IMPRESSION DID

5    YOU COME AWAY WITH AFTER REVIEWING THOSE

6    STATEMENTS?

7    A.   RIGHT ON THE SPOT I RAISED THE QUESTION THAT

8    WHEN WE COMPARE NOTES TO EACH OTHER, HIS RETURN,

9    IT'S SLIGHTLY HIGHER THAN YU-MEI DOONG'S FIRESIDE

10   FUND.

11   Q.   AND WHAT FUND WAS MR. YAN IN, DO YOU KNOW?

12   A.   I THOUGHT IT WAS EITHER FIRESIDE FUND OR

13   ASENQUA FUND.

14   Q.   OKAY.

15   A.   WE THOUGHT WE ARE COMPARING THE FUND OR AT

16   LEAST THE SIMILAR FUNDS.

17   A.   WE DIDN'T TALK ABOUT THE --

18           MR. FONG:  OBJECTION.  HEARSAY.

19           MR. LUCEY:  NO QUESTION PENDING AT THIS

20   POINT.

21           THE WITNESS:  SORRY.

22   BY MR. LUCEY:

23   Q.   JUST A MOMENT, MS. DOONG, I HAVE A FEW MORE

24   QUESTIONS TO ASK YOU.

25           SO MS. DOONG, WOULD YOU HAVE INVESTED

1    YOUR MONEY IF YOU KNEW THE AUDITED FINANCIAL REPORT

2    WE LOOKED AT EARLIER TODAY FROM THE CASTILLO, LYN,

3    COHEN & VIJAY FIRM WAS NOT IN FACT A TRUE AND

4    ACCURATE REPORT WHEN YOU RECEIVED IT?

5    A.   ABSOLUTELY, NO.

6    Q.   WHY NOT?

7    A.   YOU WILL NOT DEFINITELY INVEST IT INTO A FUND

8    WHICH DIDN'T GIVE YOU THE CORRECT INFORMATION.  AND

9    IF THEY HAVE TO FORGE THAT DATA --

10             MR. FONG:  OBJECTION.  MOVE TO STRIKE.

11             THE WITNESS:  THAT'S UNDER ASSUMPTION, I

12   WAS ASKED --

13             MR. LUCEY:  HOLD ON.

14             THE COURT:  WAIT A MINUTE.  WHAT'S YOUR

15   OBJECTION?

16             MR. FONG:  MOVE TO STRIKE.  SPECULATION.

17             MR. LUCEY:  WELL, THE QUESTION IS, IT'S

18   ASKING WOULD SHE HAVE INVESTED IF SHE HAD KNOWN.

19             THE COURT:  AND SHE SAID NO SHE WOULDN'T

20   HAVE BECAUSE.

21             MR. LUCEY:  THEN SHE SAID NO, THEN SHE

22   WAS GIVING HER EXPLANATION AS TO WHY.

23             THE COURT:  I WILL -- GO AHEAD.

24             THE WITNESS:  BASED ON YOUR REASON

25   ACTUALLY, NO.

487

1          IF YOU ASK WHY THEN THAT WAS YOUR

2     QUESTION ALREADY TELL ME THAT ASSUMPTION.

3          MR. LUCEY:  I WOULD LIKE TO HAVE HER

4     COMPLETE HER ANSWER.

5          THE COURT:  YOU CAN EXPLAIN YOU WOULDN'T

6     HAVE INVESTED.

7          THE WITNESS:  I INVESTED BECAUSE I THINK

8     IT'S A PROFITABLE MONEY.  I THINK IT'S THE FUND IS

9     MANAGED WITH PROFESSIONALISM AND HONESTY.

10         IF THE REPORT OR ANY DATA IS NOT TRUE, I

11    DEFINITELY WOULD NOT INVEST IN IT.  I WOULD NOT

12    EVEN BRING UP THIS FUND TO MY SISTER.  IT WASN'T

13    THE CORRECT MINDSET.

14    BY MR. LUCEY:

15    Q.  NOW AT THE POINT YOU RECEIVED THESE CASTILLO,

16    LYN STATEMENTS, THERE HAD ALREADY BEEN MONEY

17    INVESTED CORRECT IN REGARD TO YOUR SISTER?

18    A.   YES.

19    Q.  SHE HAD ALREADY MADE HER INITIAL INVESTMENT,

20    THAT'S WHAT YOU TESTIFIED TO?

21    A.   YES.

22    Q.  IF YOU HAD KNOWN AT THAT TIME THAT THE

23    CASTILLO LYN STATEMENTS WERE NOT IN FACT A TRUE AND

24    ACCURATE REPRESENTATION OF THE STATUS OF THE

25    ASENQUA BETA FUND, WOULD YOU HAVE ADVISED YOUR

                                                      488

1   SISTER TO MAKE FURTHER INVESTMENTS?

2              MR. FONG:  OBJECTION.  FOUNDATION,

3   SPECULATION.

4              THE WITNESS:  ABSOLUTELY NO.

5              THE COURT:  I WILL ALLOW THE QUESTION.

6   BY MR. LUCEY:

7   Q.   WOULD YOU ADVISE YOUR SISTER TO DO ANYTHING IN

8   REGARD TO HER THEN CURRENT INVESTMENT IN THE

9   ASENQUA BETA FUND WOULD YOU HAVE LEFT IT THERE?

10  A.   ABSOLUTELY I WOULD NOT ADVISE HER TO PUT IN

11  MORE MONEY AND WE WILL TRY TO PULL ALL THE MONEY

12  BACK.

13  Q.   NOW, MS. DOONG, WOULD YOU HAVE INVESTED YOUR

14  MONEY YOU AND YOUR SISTER IN THE TWO FUNDS WE

15  DISCUSSED THE ASENQUA BETA FUND THAT BECAME

16  FIRESIDE AND AQC IF YOU HAD KNOWN YOU WOULD BE

17  PROVIDED WITH A QUARTERLY STATEMENTS THAT WERE NOT

18  TRUE AND ACCURATE?

19  A.   ABSOLUTELY NO.

20  Q.   WHY NOT?

21  A.   I FELT THAT IF I ANSWER YOUR PREVIOUS

22  QUESTION, IF I KNOW THE OTHER REPORT WASN'T TRUE, I

23  WOULD ADVISE -- I WOULD REQUEST, I WOULD REQUEST MY

24  SISTER TO PULL OUT THE MONEY ALREADY, THEN NOW

25  UNDER THE ASSUMPTION IF ALL THE STATEMENT WERE NOT

1    TRUE, I WOULD NOT PUT IN ANY DIME, MINE OR MY

2    SISTER OR ANY PEOPLE I KNOW TO PUT INTO THIS FUND.

3    Q.   AND MS. DOONG, IF YOU HAD KNOWN THAT ALL THOSE

4    QUARTERLY STATEMENTS WE LOOKED AT YESTERDAY AND

5    TODAY THAT HAD THE TWO SIGNATURES ON THEM,

6    MR. POLLACE AND MR. HU, DO YOU RECALL THOSE?

7    A.   YES.

8    Q.   IF YOU HAD KNOWN AT ANY POINT IN THAT PROCESS

9    THAT MR. POLLACE HAD NOT IN FACT SIGNED THOSE

10   DOCUMENTS HIMSELF, WOULD THAT HAVE CAUSED YOU TO

11   ACT DIFFERENTLY?

12   A.   OF COURSE.

13   Q.   WHY?

14   A.   EVERY DOCUMENT NEED TO BE TRUE.  AND IF

15   ANYTHING ON THE FUND THAT WASN'T TRUE, TO ME I

16   SHOULDN'T MAKE ANY INVESTMENT IN THOSE FUNDS.

17   Q.   AND MS. DOONG, IF YOU HAD KNOWN AT ANY POINT

18   EITHER BEFORE YOU INVESTED OR THERE AFTER WITH

19   MR. HU THAT THE REFERENCE TO THE PROSKAUER ROSE

20   FIRM IN THE SUBSCRIPTION BOOK WE LOOKED AT TODAY

21   FOR FIRESIDE HAD NOT IN FACT BEEN RETAINED BY THAT

22   FUND, THE FIRESIDE FUND, WOULD YOU HAVE STILL HAVE

23   INVESTED IN THAT FUND?

24   A.   NO, ABSOLUTELY, NO.

25   Q.   AND MS. DOONG, IF FOR THE INVESTMENTS THAT

490

1    YOUR SISTER MADE IN THE ASENQUA BETA FUND THAT

2    BECAME FIRESIDE AND YOUR OWN INVESTMENT IN AQC, IF

3    YOU HAD KNOWN AT ANY POINT EITHER PRIOR TO THE

4    START OF INVESTING OR THERE AFTER THAT THE MONEY

5    WAS NOT BEING INVESTED AS IT HAD BEEN PROMISED TO

6    YOU BUT WAS ACTUALLY BEING SPENT ON OTHER PURPOSES

7    BY MR. HU, WOULD YOU HAVE STILL INVESTED?

8    A.   ABSOLUTELY NO.

9    Q.   WHY NOT?

10   A.   AS I SAID, IF THE INVESTMENT WASN'T DONE AS

11   IT'S SUPPOSED TO BE HANDLED, IT WOULD BE STUPID TO

12   PUT IN ANY OF MY MONEY OR OTHER'S MONEY.

13              MR. LUCEY:  JUST A MOMENT, YOUR HONOR.

14              THE COURT:  OKAY.

15              MR. LUCEY:  NO FURTHER QUESTIONS,

16   YOUR HONOR.

17              THE COURT:  ALL RIGHT.

18              MR. FONG?

19              MR. FONG:  THANK YOU, YOUR HONOR.

20

21           **CROSS-EXAMINATION BY MR. FONG**

22

23   BY MR. FONG:

24   Q.   GOOD MORNING, MS. DOONG.

25   A.   GOOD MORNING.

1    Q.   MY NAME IS JERRY FONG AND I'M THE ATTORNEY FOR

2    ALBERT HU?

3    A.   I WOULD LIKE TO ASK YOU SOME FOLLOW UP

4    QUESTIONS.  FIRST OF ALL, YOU HAVE A, AN MBA DEGREE

5    FROM NEW YORK UNIVERSITY; IS THAT CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   AND JUST SO THAT WE ARE ALL CLEAR, AN MBA

8    DEGREE STANDS FOR MASTER OF BUSINESS

9    ADMINISTRATION; IS THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   AND IN YOUR CAREER, EVEN THOUGH OF COURSE YOU

12   ALSO HOLD A PHD IN, I BELIEVE, AGRICULTURAL

13   CHEMISTRY AS WELL, RIGHT?

14   A.   YES.

15   Q.   OKAY.  AND IN YOUR PROFESSION, YOU HAVE HAD

16   THE OPPORTUNITY TO USE BOTH OF THOSE DEGREES IN

17   YOUR JOBS, RIGHT?

18   A.   CORRECT.

19   Q.   INCLUDING, SORT OF, IF YOU WILL THE BUSINESS

20   OR FINANCIAL SIDE OF THE COMPANIES THAT YOU ARE

21   WORKING FOR; IS THAT CORRECT?

22   A.   THAT'S NOT CORRECT.  IT'S ON THE MANAGEMENT

23   SIDE, NOT ON THE FINANCE SECTION.

24   Q.   OKAY.  THE MANAGEMENT SIDE.

25   A.   YES, OPERATION SIDE.

1    Q.   OPERATION SIDE.

2             OKAY, NOW, AND YOU ARE MARRIED, RIGHT

3    A.   THAT'S CORRECT.

4    Q.   AND YOUR HUSBAND'S NAME IS MICHAEL, AND IF I

5    MISPRONOUNCE IT PLEASE CORRECT ME, CHUANG?

6    A.   C-H-U-A-N-G.

7    Q.   SO C-H-U-A-N-G?

8    A.   THAT'S CORRECT.

9    Q.   HOW DO YOU PRONOUNCE THAT LAST NAME?

10   A.   CHUANG.

11   Q.   CHUANG.  OKAY.  AND DOES HE GO BY ANY OTHER

12   NAME?

13   A.   MEI CHEN CHUANG.

14   Q.   AND THAT IS THE -- HIS CHINESE NAME.  AND IT

15   SOUNDS A LITTLE BIT LIKE MICHAEL BUT IT'S A -- IT

16   REALLY IS A SLIGHTLY DIFFERENT NAME, RIGHT?

17   A.   IT'S A DIFFERENT WORD.

18   Q.   I FULLY UNDERSTAND.  SO, HOW DO YOU SPELL MEI

19   CHEN CHUANG, THE FIRST TWO WORDS FOR ME?

20   A.   MEI CHEN.   M-E-I, C-H-E-N.

21   Q.   IF I REFER TO YOUR HUSBAND AS MICHAEL CHUANG

22   YOU WOULD KNOW WHO I'M TALKING ABOUT, RIGHT?

23   A.   CORRECT.

24   Q.   NOW, YOUR HUSBAND WHAT KIND OF EDUCATIONAL

25   BACKGROUND DOES HE HAVE?

1    A.   HE HAS A PHD.

2    Q.   IN WHAT?

3    A.   IN CHEMISTRY.

4    Q.   FROM AN AMERICAN UNIVERSITY OR?

5    A.   STANFORD.

6    Q.   OKAY.  AND YOUR HUSBAND AT ONE POINT -- HE

7    WORKED FOR A VENTURE CAPITAL COMPANY IN TAIWAN; IS

8    THAT CORRECT?

9    A.   THAT'S CORRECT.

10   Q.   OKAY.  AND WHAT IS THE NAME OF THAT VENTURE

11   CAPITAL COMPANY THAT YOUR HUSBAND WORKED FOR?

12   A.   SORRY, I DON'T REMEMBER.

13   Q.   OKAY.  DOES -- WAS THE NAME WK TECHNOLOGIES?

14   A.   SOUNDS FAMILIAR.

15   Q.   I'M SORRY, DOES THAT SOUND FAMILIAR OR NOT?

16   A.   IT SOUNDS FAMILIAR.

17   Q.   BUT YOU ARE NOT SURE?

18   A.   I'M NOT SURE.

19   Q.   ALL RIGHT.  AND HOW LONG, WHATEVER THE NAME OF

20   THAT VENTURE COMPANY -- VENTURE CAPITAL COMPANY

21   YOUR HUSBAND WORKED FOR, IT MIGHT OR MIGHT NOT BE

22   WK TECHNOLOGIES, HOW LONG DID HE WORK THERE?

23   A.   FOR A SHORT PERIOD OF TIME.  IT'S A SHORT.

24   Q.   DID HE ALSO WORK FOR OTHER VENTURE CAPITAL

25   COMPANIES?

1    A.    MOST ARE TAIWAN HIGH-TECH INDUSTRY.

2    Q.    ALL RIGHT.  SO YOUR HUSBAND'S BUSINESS CAREER

3    HAS BEEN WORKING IN TAIWAN HIGH-TECH INDUSTRY,

4    RIGHT?

5    A.    YES.

6    Q.    OKAY.  AND ON THE BUSINESS SIDE?

7    A.    YES, MANAGEMENT SIDE.

8    Q.    ALL RIGHT.  AND YOUR HUSBAND HAS BEEN INVOLVED

9    WITH VENTURE CAPITAL INVESTMENTS IN HIS CAREER; IS

10   THAT CORRECT?

11   A.    HAS BEEN, YES.

12   Q.    AND IT WAS THROUGH YOUR HUSBAND THAT YOU MET

13   ALBERT HU; IS THAT CORRECT?

14   A.    MORE PRECISELY SPEAKING, I MET ALBERT HU

15   BECAUSE YU-MEI DOONG INVESTED IN THE MONEY.  BUT

16   ALBERT HU'S NAME WAS BROUGHT UP TO MY ATTENTION

17   BECAUSE MY HUSBAND MENTIONED THAT ALBERT HU HAS A

18   FUND.

19   Q.    I'M SORRY IF I DIDN'T MAKE MYSELF CLEAR.  YOU

20   ARE ABSOLUTELY RIGHT.  LET ME START OVER.

21          WHEN DID YOU -- HOW DID YOU FIRST HEAR

22   ABOUT THE NAME ALBERT HU?

23   A.    WHEN MY HUSBAND TOLD ME THAT THERE'S A FUND

24   CALLED ASENQUA, OR THERE'S A COMPANY CALLED ASENQUA

25   CAPITAL, AND RUN BY ALBERT HU, THAT WAS THE FIRST

1    TIME I HEARD OF ALBERT HU.

2    Q.   SO -- I APOLOGIZE I DIDN'T MEAN TO INTERRUPT

3    YOU, I THOUGHT YOU HAD FINISHED YOUR ANSWER, I

4    APOLOGIZE.

5           SO IF I HAVE IT RIGHT YOU FIRST HEARD OR

6    LEARNED ABOUT ALBERT HU AND ASENQUA THROUGH YOUR

7    HUSBAND; IS THAT CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   AND APPROXIMATELY WHEN WOULD THAT HAVE BEEN?

10   A.   PRIOR TO YU-MEI DOONG'S INVESTMENT.

11   Q.   ALL RIGHT.  AND WOULD THAT HAVE BEEN A YEAR

12   BEFORE THE INVESTMENT OR SIX MONTHS, IF YOU

13   REMEMBER, YOUR BEST RECOLLECTION?

14   A.   A BIT EARLY -- NO, I THINK, JUST SHORT, RIGHT

15   BEFORE I MIGHT SAY.  NO LESS THAN -- NO MORE THAN A

16   FEW MONTHS.

17   Q.   OF COURSE THE FIRST INVESTMENT WAS JULY 2004;

18   IS THAT CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   SO IT WOULD HAVE BEEN AT THE EARLIEST THAT YOU

21   HAVE HEARD ABOUT ALBERT HU AND OR ASENQUA MAYBE

22   JUNE OR AT THE EARLIEST MAY OF 2004; IS THAT

23   CORRECT?

24   A.   IT COULD HAVE BEEN APRIL.

25   Q.   ALL RIGHT.  IT COULD HAVE BEEN AS FAR BACK AS

1    APRIL BUT IT WOULD HAVE BEEN IN THE EARLY PART OF

2    2004; IS THAT CORRECT?

3    A.   YES.

4    Q.   ALL RIGHT.  NOW, YOUR HUSBAND KNEW ALBERT HU

5    FOR A LITTLE WHILE BEFORE THAT IS THAT TRUE?

6              MR. LUCEY:  OBJECTION.  CALLS FOR

7    SPECULATION.

8              THE COURT:  IF SHE KNOWS.

9              MR. FONG:  IF YOU KNOW.

10             THE WITNESS:  I THINK SO.

11   BY MR. FONG:

12   Q.   OKAY.  AND YOUR HUSBAND, YOU KNOW IF YOUR

13   HUSBAND METAL BETTER HU AS FAR BACK AS, SAY, 2001?

14   A.   I DON'T KNOW EXACT, I KNEW HE MUST NOT KNOW

15   BEFORE ME.

16   Q.   ALL RIGHT.  OKAY.  BUT DO YOU KNOW THAT YOUR

17   HUSBAND HAD KNOWN MR. HU FOR A COUPLE OF YEARS FOR

18   EXAMPLE, BEFORE HE TOLD YOU ABOUT ALBERT HU AND THE

19   ASENQUA FUND?

20   A.   NO, I SHOULDN'T.  HE TOLD ME HE KNEW ALBERT HU

21   AND INTRODUCED ME TO THE FUND AND HE DIDN'T TELL ME

22   EXACT OR HOW LONG HE HAS KNOWN ALBERT HU.

23   Q.   OKAY.  AND DO YOU KNOW WHAT RELATIONSHIP IF

24   ANY YOUR HUSBAND HAD WITH ALBERT HU?

25   A.   THEY DISCUSSED SOME INVESTMENT, I GUESS.

497

1    Q.   ALL RIGHT.  DO YOU KNOW IF YOUR HUSBAND AT ONE

2    POINT WAS THINKING ABOUT INVESTING IN ONE OF ALBERT

3    HU'S COMPANIES?

4    A.   CAN YOU NAME THE COMPANY, THAT MAY RING A

5    BELL.

6    Q.   OH, SURE.  OKAY.  WE WILL GET TO THAT LATER

7    THEN.  I DO HAVE IT SOMEWHERE.  BUT, OKAY.

8         BUT YOUR HUSBAND -- BUT YOU KNEW YOUR

9    HUSBAND AND MR. HU HAD TALKED ABOUT BUSINESS

10   MATTERS BEFORE YOUR HUSBAND INTRODUCED YOU TO

11   MR. HU, RIGHT

12   A.   I DIDN'T KNOW BEFORE, MAYBE AFTER, YES.  BUT I

13   DIDN'T KNOW WHAT HAPPENED BETWEEN MY HUSBAND AND

14   ALBERT HU BEFORE HE BROUGHT UP THE OTHER FUND TO MY

15   ATTENTION.

16   Q.   AND I GUESS LET ME TRY A BETTER QUESTION THEN.

17   DID YOU LEARN AT SOME POINT THAT YOUR HUSBAND AND

18   ALBERT HU HAD BEEN TALKING ABOUT BUSINESS DEALS AND

19   BUSINESS MATTERS AT A TIME THAT WAS BEFORE HE

20   INTRODUCED YOU TO ALBERT HU?

21   A.   NO.  I KNEW AFTER BUT NOT BEFORE.

22   Q.   RIGHT.  I'M JUST TALKING ABOUT -- I UNDERSTAND

23   THAT YOU LEARNED OF THIS INFORMATION AFTER YOUR

24   HUSBAND OBVIOUSLY THE FIRST TIME HE MENTIONED

25   ALBERT HU TO YOU.

1           WHAT I'M ASKING IS DID YOU LEARN AT ANY

2    TIME THAT AT SOME POINT BEFORE YOUR HUSBAND

3    INTRODUCED YOU TO MR. HU, HE AND MR. HU HAD ALREADY

4    BEEN TALKING ABOUT BUSINESS MATTERS?

5    A.   NO.

6    Q.   OKAY.

7    A.   I KNEW HE KNEW BEFORE HE MENTIONED THE FUND TO

8    ME BUT I DON'T KNOW WHAT THEY TALK ABOUT ON THE

9    BUSINESS SIDE.

10   Q.   SURE.  ALL RIGHT.  OKAY.  NOW, IN THE

11   INVESTMENTS RELATING TO YOUR SISTER, YU-MEI?

12   A.   YU-MEI.

13   Q.   IF I SAY MEI, WOULD THAT IDENTIFY HER

14   SUFFICIENTLY.  OKAY.  THANK YOU, I APPRECIATE IT.

15   I KNOW THAT'S NOT HER FULL NAME BUT I'M TRYING TO

16   MAKE SURE I KEEP TRACK OF WHAT'S GOING ON.

17           OR I COULD REFER TO HER AS YOUR SISTER,

18   DO YOU HAVE MORE THAN ONE SISTER?

19   A.   MORE THAN ONE.

20   Q.   IN THAT CASE I WILL REFER TO HER AS MEI?

21   A.   MY YOUNGER SISTER.

22   Q.   AS FAR AS THE INVESTMENTS THAT YOU MADE IN

23   ASENQUA BETA FUND ON BEHALF OF YOUR SISTER, MEI

24   DOONG, YOU WERE ACTING ON YOUR SISTER'S BEHALF; IS

25   THAT CORRECT?

1   A.   THAT'S CORRECT.

2   Q.   AND YOU WERE DOING THAT BECAUSE AMONG OTHER

3   THINGS YOUR SISTER, MEI, WAS NOT FLUENT IN ENGLISH;

4   IS THAT CORRECT?

5   A.   THAT'S CORRECT.

6   Q.   AND OF COURSE ALSO BECAUSE YOU HAD -- YOU HAVE

7   AND HAD AN MBA, RIGHT?

8           THE COURT:  IS THE QUESTION WHETHER SHE

9   HAD AN MBA, OR OR IS THAT THE REASON --

10          MR. FONG:  THE REASON, SORRY.

11          THE WITNESS:  NOT BECAUSE I HAVE A REASON

12   OR MBA OR WHAT.  I AM THE HIGHEST EDUCATED PERSON

13   IN MY FAMILY.  THEY COUNT A LOT ON MY ADVICE,

14   ESPECIALLY IF IT'S SOMETHING DEALING WITH THE

15   ASPECT OUTSIDE OF TAIWAN.

16   Q.   OKAY.  ALL RIGHT.  YOUR SISTER IN THE YEAR

17   2004, WHERE WAS SHE LIVING, YOUR SISTER MEI?

18   A.   MEI LIVED IN TAIWAN.

19   Q.   HAS SHE ALWAYS LIVED THERE?

20   A.   YES.

21   Q.   AND SHE STILL LIVES THERE NOW?

22   A.   YES.

23   Q.   AND OF COURSE AS THE SISTER WHO IS FLUENT IN

24   ENGLISH AND AS WELL AS LIKE YOU SAID THE HIGHEST

25   EDUCATED MEMBER OF YOUR FAMILY, YOU WANT OF COURSE

1    TO MAKE SURE WHATEVER YOU DO FOR YOUR SISTER YOU

2    WOULD LOOK OUT FOR HER INTEREST; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND YOU WANT TO MAKE SURE YOU GOT ALL THE

5    NECESSARY INFORMATION SO THAT SHE COULD MAKE GOOD

6    CHOICES; IS THAT CORRECT?

7    A.   AS IF IT WERE MY INVESTMENT.

8    Q.   AS IF LIKE YOU SAID AS IF IT WAS YOUR

9    INVESTMENT.  SO YOU WANTED TO MAKE SURE YOU PROTECT

10   YOUR SISTER AND GET ALL THE NECESSARY INFORMATION

11   TO MAKE SURE YOU DO AS GOOD OF A JOB PROTECTING HER

12   AS YOU WOULD FOR YOURSELF; IS THAT CORRECT?

13   A.   THAT'S CORRECT.

14   Q.   NOW, YOU HAVE IN FRONT OF YOU GOVERNMENT

15   EXHIBIT OR PLAINTIFF'S EXHIBIT 63, RIGHT JUDGES?

16   Q.   AND NOW, EXHIBIT 63 YOU HAVE IN FRONT OF YOU

17   YOU RECOGNIZE THEM AS DOCUMENTS THAT YOU HAD KEPT

18   FROM YOUR DEALINGS WITH ASENQUA, FIRESIDE AND

19   ALBERT HU; IS THAT CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   OKAY.  AND YOU, IF YOU WILL, YOU KEPT A FILE

22   ON YOUR DEALINGS WITH FIRESIDE, ASENQUA, AQC AND

23   ALBERT HU; IS THAT CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   OKAY.  AND YOU TURNED OVER TO THE GOVERNMENT

1    WHEN THEY ASKED, EVERYTHING THAT YOU HAD, RIGHT?

2    A.   YES.

3    Q.   OKAY.  AND OF COURSE YOU DID NOT HOLD BACK ANY

4    DOCUMENTS FROM THE GOVERNMENT, RIGHT?

5    A.   I DON'T KNOW.  I HAVE WHAT I HAVE ON HAND.

6    AND THERE MAY BE LOSING SOME PLACE.  I WAS TRYING

7    TO PULL ALL THE FILES TOGETHER.  SO CANNOT

8    GUARANTEE HUNDRED PERCENT OF THE FILE THERE.  BUT

9    IF THEY ASK IF I HAVE SOMETHING ELSE THEN I WILL

10   LOOK FOR IT.

11   Q.   OKAY.  BUT BEFORE YOU HANDED WHATEVER

12   DOCUMENTS YOU HANDED OVER TO THE GOVERNMENT, YOU OF

13   COURSE DID A SEARCH WITHIN YOUR HOME OR YOUR OFFICE

14   OR ON YOUR COMPUTER OF WHATEVER DOCUMENTS YOU HAD

15   RELATING TO ASENQUA, AQC, FIRESIDE AND ALBERT HU;

16   IS THAT CORRECT?

17   A.   WHAT I THINK IS RELEVANT.

18   Q.   WAIT, OKAY, I JUST WANT TO BE CLEAR.  DID YOU

19   SEPARATE OUT SOME DOCUMENTS RELATING TO ASENQUA,

20   AQC, FIRESIDE AND/OR ALBERT HU THAT YOU CONSIDERED

21   NOT TO BE RELEVANT AND YOU DID NOT TURN THOSE

22   DOCUMENTS OVER TO THE GOVERNMENT LIKE THE DOCUMENTS

23   WE SEE IN EXHIBIT 63?

24   A.   LET ME PUT IT THIS WAY; EVERYTHING THAT HAVE

25   CONNECTION WITH ASENQUA FUND AND AQC FUND, I DOES

1   MY MOST EFFORT TO BRING OUT WHATEVER I HAVE IN MY

2   POSSESSION.

3           BUT THERE ARE, FOR EXAMPLE, THE E-MAIL

4   NOTES BETWEEN OTHER INVESTOR AFTER I PRESENTED MY

5   FILE TO GOVERNMENT.  I DID NOT FOLLOW UPKEEP

6   SENDING THEM EVERY MAIL I RECEIVED RELEVANT TO THIS

7   MATTER.

8   Q.   OKAY.  BUT AS TO DOCUMENTS THAT YOU HAD AT THE

9   TIME THAT YOU TURNED OVER THE DOCUMENTS TO THE

10  GOVERNMENT WHICH BECAME EXHIBIT 63, THOSE

11  DOCUMENTS, EVERYTHING AT THAT TIME, EVERYTHING THAT

12  YOU HAD THAT YOU COULD FIND THAT RELATED TO

13  ASENQUA, FIRESIDE, AQC, AND ALBERT HU YOU TURNED

14  OVER TO THE GOVERNMENT; IS THAT CORRECT?

15  A.   TO MY BEST KNOWLEDGE, YES.

16  Q.   OKAY.  AND ALSO, WHATEVER YOU TURNED OVER,

17  THAT WAS ALL THE DOCUMENTS THAT YOU HAD THAT YOU

18  HAD RECEIVED FROM EITHER ALBERT HU OR ANYBODY

19  AFFILIATED WITH ALBERT HU; IS THAT CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   OKAY.  LET ME SHOW YOU A DOCUMENT -- AND BY

22  THE WAY, BEFORE I DO THAT I'M SORRY, AND OF COURSE

23  YOU WERE EVEN BEFORE THE GOVERNMENT CONTACTED YOU,

24  THROUGHOUT YOUR ACTING AS YOUR SISTER'S

25  REPRESENTATIVE IN INVESTING MONEY IN ASENQUA FUND

1     YOU KEPT GOOD RECORDS RIGHT BECAUSE YOU WANT TO

2     MAKE SURE YOU HAVE GOOD RECORDS SO THAT YOUR SISTER

3     WOULD HAVE THESE RECORDS, RIGHT?

4     A.   I KEPT GOOD RECORD FROM ASENQUA CAPITAL, YES.

5     Q.   AND YOU WANTED TO DO A VERY GOOD JOB BECAUSE

6     LIKE YOU SAID YOU WANT TO DO AS GOOD OF A JOB TO

7     PROTECT YOUR SISTER AS YOU WOULD FOR YOURSELF?

8     A.   AS I WOULD FOR MYSELF, YES.

9     Q.   I WANT TO SHOW YOU A DOCUMENT THAT I HAVE

10    MARKED AS DEFENDANT'S EXHIBIT 541.  IT'S A

11    SINGLE-PAGED DOCUMENT.

12              AND I CAN REPRESENT TO YOU, MS. DOONG,

13    THAT THAT'S PART OF DOCUMENTS THAT YOU TURNED OVER

14    TO THE GOVERNMENT.  BUT I WANT TO MAKE SURE YOU

15    HAVE A CHANCE TO LOOK AT THAT AND IF MY ASSUMPTION

16    IS WRONG I WILL ASK YOU SOME QUESTIONS BUT I WANT

17    TO LET YOU KNOW SORT OF WHERE THAT CAME FROM.

18              HAVE YOU HAD A CHANCE TO TAKE A LOOK AT

19    DEFENDANT'S EXHIBIT 541?

20    A.   PARDON?  OH, THIS ONE, YES.

21    Q.   THE ONE PAGE DOCUMENT IN FRONT OF YOU.  YOU'VE

22    HAD A CHANCE TO LOOK AT IT, RIGHT?

23    A.   YES.

24    Q.   DO YOU RECOGNIZE THE DOCUMENT?

25    A.   YES.

1    Q.   OKAY.  DID YOU PREPARE THAT DOCUMENT?

2    A.   YES.

3    Q.   OKAY.  WHAT WAS THE PURPOSE OF YOU

4    PREPARING -- FIRST OF ALL, WHAT DOES THAT DOCUMENT

5    SHOW IN YOUR MIND?

6    A.   THE DOCUMENT IS A SUMMARY LIST FOR EVERYTHING

7    I PRESENTED TO THE GOVERNMENT.  THIS IS JUST FOR

8    THEIR CONVENIENCE.  I PUT DOWN THE TITLE FROM A TO

9    L.

10   Q.   OKAY.  SO IF YOU WILL, THIS IS A LIST OR AN

11   INDEX OF THE DOCUMENTS THAT YOU TURNED OVER TO THE

12   GOVERNMENT, RIGHT?

13   A.   YES.

14   Q.   OKAY.  AND SOME OF WHICH APPEAR AS EXHIBIT 63;

15   IS THAT CORRECT?

16   A.   I DON'T KNOW BECAUSE I DIDN'T PREPARE

17   EXHIBIT 63.  BUT THOSE ARE DOCUMENTS I SEND IT TO

18   THEM.

19   Q.   ALL RIGHT.  OKAY.  THEN LET ME STRIKE THE PART

20   ABOUT EXHIBIT 63.  BUT THIS REPRESENTS A LIST OR

21   INDEX OF DOCUMENTS THAT YOU TURNED OVER TO THE

22   GOVERNMENT; IS THAT CORRECT?

23   A.   THAT'S CORRECT.

24        MR. FONG:  YOUR HONOR, AT THIS TIME I

25   WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 541.

1          MR. LUCEY:  NO OBJECTION, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  IT'S RECEIVED.

3    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 541 HAVING

4    BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

5    ADMITTED INTO EVIDENCE.)

6          MR. FONG:  OKAY.

7    Q.   AND THIS LIST OF DOCUMENTS INCLUDED EVERYTHING

8    YOU RECEIVED FROM ALBERT HU EAR SOMEBODY RELATED TO

9    OR SOMEBODY WORKING FOR ALBERT HU IN TERMS OF

10   DOCUMENTS THAT WERE GIVEN AT ANY TIME RELATING TO

11   THE ASENQUA FUND OR AQC OR ANYTHING ELSE, RELATES

12   TO ALBERT HU, RIGHT?

13   A.   WHAT I HAVE IN MY POSSESSION.

14   Q.   RIGHT.

15   A.   I MAY HAVE LOST SOME FILES BUT THOSE ARE WHAT

16   I HAD IN MY POSSESSION.

17   Q.   BUT YOU DON'T REMEMBER AS YOU SIT HERE THAT

18   WHEN YOU INITIALLY RECEIVED DOCUMENTS FROM ALBERT

19   HU, WHEN YOU FIRST GOT THEM YOU DIDN'T THROW THEM

20   AWARE OR ANYTHING.  YOU TRIED TO, YOUR PRACTICE WAS

21   YOU TRIED TO KEEP THEM IN SOME KIND OF FILE OR

22   FOLDER, RIGHT?

23   A.   YES.

24   Q.   OKAY.  YOU TRIED TO PRESERVE EVERYTHING THAT

25   YOU WERE GIVEN BECAUSE THEY COULD TURN OUT TO BE

1    IMPORTANT LATER ON; IS THAT CORRECT?

2    A.   IF IT'S IMPORTANT.  BUT I DON'T KEEP

3    EVERYTHING LIKE I DID WITH ANY OTHER INVESTMENT.

4    IF THAT'S TO MY JUDGMENT IT'S NOT IMPORTANT I MAY

5    JUST THROW IT AWAY.

6    Q.   ALL RIGHT.  WOULD YOU CONSIDER A PRIVATE

7    PLACEMENT MEMORANDUM ASSOCIATED WITH THE ASENQUA

8    FUND TO BE IMPORTANT?

9    A.   IF YOU SHOW ME THE DOCUMENT, I MAY REMEMBER

10   THAT.

11   Q.   YOU KNOW WHAT A PLACEMENT MEMORANDUM IS,

12   RIGHT?

13   A.   YES.

14   Q.   AND THE PLACEMENT MEMORANDUM IS SUPPOSED TO

15   TELL YOU A LOT OF INFORMATION ABOUT THE PARTICULAR

16   FUND OR WHATEVER BUSINESS OPPORTUNITY IF YOU WILL

17   THAT A PERSON WHO IS THINKING OF INVESTING WOULD

18   LOOK AT, RIGHT?

19   A.   YES.

20   Q.   AND SO TO YOU, YOU WOULD HAVE FORMALLY KEPT A

21   COPY OF THE PLACEMENT MEMORANDUM IF SOMEBODY GAVE

22   IT TO YOU IN CONNECTION WITH AN INVESTMENT

23   OPPORTUNITY, RIGHT?

24   A.   I SHOULD HAVE.

25   Q.   OKAY.  NOW, DOES THIS LIST, EXHIBIT 541 WHICH

1    I WILL PUBLISH -- IF I COULD TROUBLE YOU, IF YOU

2    COULD HELP ME WITH THIS, THANK YOU.

3              THIS LIST, THE DOCUMENT YOU HAVE IN FRONT

4    OF YOU OR THE BLOW UP ON THE SCREEN, THIS LIST DOES

5    NOT CONTAIN THE -- ANY PRIVATE PLACEMENT MEMORANDUM

6    ASSOCIATED WITH THE ASENQUA BETA FUND; IS THAT

7    CORRECT?

8    A.   NO.

9    Q.   OKAY.  NOW, DURING --

10             THE COURT:  LET'S CLEAR THAT UP.  SHE

11   SAID NO.  YOU MEAN --

12             THE WITNESS:  IT DIDN'T HAVE A NAME

13   REPLACEMENT THERE.  SO IT WASN'T THERE.

14             MR. FONG:  OKAY.

15   Q.   SO IT DOES NOT INCLUDE THAT -- THAT'S A POOR

16   QUESTION, LET ME TRY AGAIN.

17             DOES THIS LIST INCLUDE ANY PLACEMENT

18   MEMORANDUM ASSOCIATED WITH THE ASENQUA BETA FUND?

19   A.   NO.

20   Q.   OKAY.  NOW, DO YOU SEE THE ITEM THAT'S NEXT TO

21   THE LETTER I, AS INCOME, OR WHATEVER; DO YOU SEE

22   THAT?

23   A.   YES.

24   Q.   AND THAT DOCUMENT IS THE ASENQUA VENTURES FUND

25   LIMITED PARTNERSHIP AGREEMENT, CORRECT?

1    A.   THAT'S CORRECT.

2    Q.   NOW, THAT WAS PART OF THE DOCUMENTS YOU GAVE

3    TO THE GOVERNMENT, RIGHT, BECAUSE IT'S ON THE LIST?

4    A.   YES.

5    Q.   OKAY.  IF YOU COULD LOOK AT EXHIBIT 63 IN

6    FRONT OF YOU, OKAY, DO YOU SEE THE ASENQUA VENTURES

7    MEMBER'S FUND LIMITED PARTNERSHIP AGREEMENT AMONG

8    THE DOCUMENTS IN EXHIBIT 63?

9         AND I DO RECOGNIZE EXHIBIT 63 DOES

10   CONTAIN A NUMBER OF PAGES BUT IF YOU WILL BEAR WITH

11   ME AND GO THROUGH THAT.

12   A.   NOT IN THIS EXHIBIT.

13   Q.   OKAY.  SO IT'S NOT PART OF WHAT WE HAVE MARKED

14   AND ADMITTED INTO EVIDENCE AS THE GOVERNMENT'S

15   EXHIBIT 63; IS THAT CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   NOW LET ME SHOW YOU A DOCUMENT THAT I'VE JUST

18   MARKED AS DEFENDANT'S EXHIBIT 542.  DO YOU SEE THAT

19   DOCUMENT IN FRONT OF YOU?

20   A.   YES.

21   Q.   DO YOU RECOGNIZE THAT DOCUMENT?

22   A.   YES.

23   Q.   AND HAVE YOU SEEN THAT DOCUMENT BEFORE?

24   A.   YES.

25   Q.   AND --

1    A.   IT'S THE EXHIBIT I.

2    Q.   OKAY.  SO THE DOCUMENT I HANDED YOU,

3    DEFENDANT'S EXHIBIT 542 IS ITEM I AS IN INCOME, ON

4    THE LIST THAT YOU PREPARED IN TERMS OF THE

5    DOCUMENTS THAT YOU TURNED OVER TO THE GOVERNMENT;

6    IS THAT CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   AND CAN YOU -- DO YOU KNOW WHAT ASENQUA

9    VENTURES MEMBER'S FUND IS?

10   A.   I THINK SO.

11   Q.   ALL RIGHT.  AND WHAT IS YOUR UNDERSTANDING OF

12   WHAT IS ASENQUA VENTURES MEMBERSHIP FUND THAT

13   THAT'S REFERENCED IN THE DOCUMENT THAT YOU HAVE IN

14   FRONT OF YOU, DEFENDANT'S EXHIBIT NUMBER 542?

15   A.   I CONSIDER THAT JUST AS ANOTHER INVESTMENT

16   FUND.

17   Q.   ALL RIGHT.  SO IT'S AN INVESTMENT FUND THAT

18   YOUR SISTER YU-MEI DOONG HAD MADE WITH MR. HU,

19   RIGHT?

20   A.   YES.

21   Q.   OKAY.  AND THAT WAS DONE THROUGH YOU, OF

22   COURSE, BECAUSE LIKE YOU SAID BEFORE YOU HANDLE

23   INVESTMENTS ON BEHALF OF YOUR YOUNGER SISTER; IS

24   THAT CORRECT?

25   A.   THAT'S CORRECT.

1   Q.   AND THIS WAS A SEPARATE INVESTMENT FROM THE

2   ASENQUA BETA FUND; IS THAT CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   AND WAS IT -- DO YOU KNOW IF YOUR SISTER'S

5   INVESTMENT IN THE ASENQUA VENTURES MEMBER'S FUND

6   WAS ABOUT LOOKS LIKE, $80,000?

7   A.   YES.

8   Q.   SO THAT WAS AN INVESTMENT THAT YOU HANDLED ON

9   BEHALF OF YOUR SISTER, RIGHT?

10  A.   YES.

11  Q.   NOW DO YOU, AS YOU SITS HERE, DO YOU KNOW WHAT

12  WAS THE PURPOSE HAVING A SEPARATE FUND, ASENQUA

13  FUND, THIS VENTURES MEMBER'S FUND THAT'S DIFFERENT

14  FROM THE ASENQUA BETA FUND?

15  A.   I'M SORRY, I DON'T THINK I KNEW THAT.

16  Q.   ALL RIGHT.  AND NOW, YOU WERE OF COURSE GIVEN

17  A COPY OF THIS PARTICULAR DOCUMENT BEFORE OR AT OR

18  AROUND THE TIME THAT YOUR SISTER, THAT YOU MADE THE

19  INVESTMENT ON BEHALF OF YOUR SISTER, RIGHT?

20  A.   YES.

21  Q.   OKAY.  AND NOW OF THE $80,000 THAT YOU

22  INVESTED ON BEHALF OF YOUR SISTER INTO THE ASENQUA

23  VENTURES MEMBER'S FUND, HAS THAT EVER BEEN RETURNED

24  TO YOUR SISTER OR YOU?

25  A.   NO.  IT WAS MONEY, WE NEVER RECEIVED ANY

511

1    STATEMENTS.

2    Q.   SO YOU NEVER GOT IT, RIGHT?

3    A.   NEVER GOT ANY MONEY BACK.

4    Q.   NOW, DID YOU EXPECT THAT YOU WOULD BE ABLE TO

5    GET BACK THAT MONEY, THE $80,000 THAT YOU INVESTED

6    ON BEHALF OF YOUR SISTER INTO THE ASENQUA VENTURES

7    MEMBER'S FUND?

8    A.   YES.

9    Q.   OKAY.  YOU ASKED FOR IT BACK, RIGHT?

10   A.   I DIDN'T.  WHEN WE DID THE WITHDRAWING I

11   DIDN'T TOUCH ON THIS FUND YET.

12   Q.   OKAY.  DO YOU MEAN WITH THE WITHDRAWAL YOU

13   MEAN THE FORM THAT YOU SIGN?

14   A.   YES.

15   Q.   BUT YOU DID ASK MR. HU TO GIVE YOU BACK THAT

16   $80,000 IN ADDITION TO THE OTHER DEMANDS THAT YOU

17   MADE, RIGHT?

18   A.   I FORGOT, MAYBE.  BECAUSE ALL MY BALANCE I

19   ALWAYS INCLUDE THIS 80,000.

20   Q.   OKAY.  SO EVEN THOUGH YOU MAY NOT HAVE ASKED

21   FOR THIS SPECIFICALLY YOU INCLUDED THIS AMOUNT IN

22   WHATEVER YOU WERE DEMANDING THAT MR. HU RETURN TO

23   YOU, RIGHT?

24   A.   I DON'T REMEMBER.  I THOUGHT OUR PURPOSE IS

25   FOR ASENQUA AND AQC FOR THIS MONEY IF HE DIDN'T

1    ANSWER I'M OKAY.  I WANT TO GET MY SISTER BIG CHUNK

2    OF MONEY AND IT WAS 300,000 INVEST.  SO I PROBABLY

3    LIKELY MENTIONED ABOUT THIS FUND.  BUT WE DIDN'T

4    PUT ANYTHING IN WRITING TO REQUEST RETURN OF THIS

5    FUND.

6    Q.   BUT DO YOU KNOW IF YOU ASKED MR. HU TO RETURN

7    THIS PARTICULAR FUND, THE $80,000?

8    A.   I DON'T REMEMBER, AIM SORRY.

9    Q.   THAT'S OKAY.  AND DO YOU KNOW AS YOU SIT HERE

10   UNDER THIS LIMITED PARTNERSHIP AGREEMENT, WAS YOUR

11   SISTER ENTITLED TO GET BACK THE $80,000 WHEN, IF

12   SHE WANTED TO BY ASKING MR. HU TO RETURN THAT

13   MONEY?

14   A.   I'M SORRY I PROBABLY HAVE TO READ THROUGH THE

15   WHOLE THING TO SEE IF SHE'S ENTITLED TO GET THIS

16   MONEY BECAUSE THIS IS A PARTNERSHIP, MEANS NOT

17   MAYBE 80,000 DEPENDING HOW THE FUND IS DOING.  AND

18   NEVER RECEIVE AN ANSWER OR FEEDBACK OR ANY

19   STATEMENT ABOUT THE PERFORMANCE OF THIS FUND.

20   Q.   SO AS YOU SIT HERE YOU DON'T KNOW IF THIS

21   PARTICULAR AGREEMENT HAS LIMITATIONS AS TO WHEN

22   YOUR SISTER CAN WITHDRAW HER MONEY, RIGHT?

23   A.   NO BECAUSE ALBERT DID NOT SAY THAT TO US AT

24   ALL AND HE NEVER TOLD US THERE IS A LIMITATION AND

25   HE DIDN'T SAY THERE'S A TERMINOLOGY OR WHATEVER IN

1    THIS THAT WOULD RESTRICT US WITHDRAW MONEY BACK.

2    Q.   OKAY?

3    A.   AND ALSO, IN THAT SENSE, IF THAT'S ALL MY

4    SISTER'S SIDE, AT LEAST THIS SHOULDN'T APPLY ON MY

5    AQC SIDE.  AND WHATEVER HE TOLD ME ON THE

6    RESTRICTION ON FUND WITHDRAWING IS NEW TO ME.  I

7    HAVE NEVER HEARD ABOUT IT OTHERWISE I WOULD GO BACK

8    AND SORT OUT AND READ THIS DOCUMENT.

9    Q.   MY QUESTION IS FOCUSED ONLY, IF I DIDN'T MAKE

10   THAT CLEAR THAT'S MY FAULT AND I APOLOGIZE.

11        MY QUESTION TO YOU NOW IS AS TO THE

12   $80,000 YOU INVESTED ON BEHALF OF YOUR SISTER INTO

13   THE ASENQUA VENTURES MEMBER'S FUND, DID YOU KNOW

14   BEFORE TODAY IF THERE WAS ANY RESTRICTION ON YOUR

15   SISTER'S ABILITY TO GET THAT MONEY BACK IF SHE

16   WANTED TO?

17   A.   NO.

18   Q.   YOU DO NOT KNOW?

19   A.   NO.

20   Q.   YOU DO NOT KNOW -- THAT WAS A BAD QUESTION?

21   A.   I DO NOT KNOW.  NO, I DO NOT KNOW.

22   Q.   LET ME DIRECT YOUR ATTENTION THEN TO PAGE TWO

23   OF -- PARAGRAPH 2.1, PAGE TWO OF DEFENDANT'S

24   EXHIBIT 542, DO YOU HAVE THAT IN FRONT OF YOU,

25   MA'AM?

1           MR. LUCEY:  YOUR HONOR, MY WE APPROACH?

2           THE COURT:  WHAT'S YOUR OBJECTION?

3           MR. LUCEY:  WELL, THERE'S ALREADY BEEN

4    SOME QUESTIONING ON THIS MATTER.

5           THE COURT:  WELL, I AGREE IT'S A

6    DIFFERENT MATTER BUT I THINK IT'S RELATED AND I

7    WILL LET YOU GET INTO IT A LITTLE BIT.

8           MR. FONG:  OKAY.  THANK YOU, YOUR HONOR.

9    Q.   AND MS. DOONG, LET ME START MY QUESTION AGAIN.

10          FIRST OF ALL, MAY I TROUBLE YOU TO LOOK

11   AT ON PAGE 2, PARAGRAPH 2.1.  AND JUST LET ME KNOW

12   WHEN YOU HAVE READ THAT PARAGRAPH.

13   A.   YES.

14   Q.   OKAY.  NOW THAT PARAGRAPH IS ENTITLED TERM,

15   T-E-R-M; IS THAT RIGHT?

16   A.   YES.

17   Q.   AND THAT PARAGRAPH SAYS THAT THE LIMITED

18   PARTNERS INVESTMENT IN THIS PARTICULAR FUND WOULD

19   STAY IN THERE UNTIL THE PARTNERSHIP STOPPED IN TEN

20   YEARS FROM 2005; IS THAT CORRECT?

21          THE COURT:  WELL, LET ME STOP YOU.

22          ONE, I DON'T THINK THAT'S A FAIR READING

23   OF THAT PARAGRAPH.

24          BUT WHAT DOES THIS INVESTMENT HAVE TO DO

25   WITH THE ISSUES IN THIS CASE?  I THOUGHT YOU WERE

1    GOING TO A DIFFERENT DIRECTION I'M CONCERNED WE ARE

2    GETTING OFF TO SOMETHING THAT'S NOT RELEVANT.

3            MR. FONG:  MAY WE APPROACH?

4            THE COURT:  ALL RIGHT.  BUT I WOULD LIKE

5    TO AVOID THIS AS MUCH AS POSSIBLE.

6            (SIDE-BAR DISCUSSION ON THE RECORD.)

7            MR. FONG:  YOUR HONOR, IT HAS TO DO WITH

8    HER REPRESENTATION BECAUSE SHE TESTIFIED REPEATEDLY

9    IF I HAD KNOWN.

10           AND I'M WILLING TO SHOW THAT THAT WAS,

11   THAT MIGHT NOT BE TRUE, I WANT TO TEST THE

12   TRUTHFULNESS OF THAT ASSERTION BECAUSE THIS IS

13   SOMETHING THAT IS A RELATED -- IT IS NOT THE SAME

14   INVESTMENT BUT IT'S BASICALLY WHAT SHE WAS DOING

15   FOR HER SISTER ON BEHALF OF, IN RELATION TO THE

16   ASENQUA INVESTMENTS.

17           I MEAN, THERE'S NO DIFFERENCE BETWEEN

18   THIS FUND AND THE BETA FUND.

19           THE COURT:  WHY DOESN'T THAT SATISFY --

20   THAT'S WHERE I THOUGHT YOU WERE GOING WITH THE

21   QUESTION OF, DID YOU EVER -- DID YOU EVER INVEST

22   80,000 ON BEHALF OF YOUR SISTER AND THIS FUND,

23   YOU'VE NEVER ASKED FOR THAT BACK.

24           MR. LUCEY:  HE ALREADY ASKED THAT

25   QUESTION.

516

1            MR. FONG:  I DID.

2            BUT SHE HAS NOT, SHE SAID -- WHAT SHE HAS

3    SAID IS THAT SHE DOESN'T KNOW IF SHE COULD, SHE

4    DOESN'T KNOW ONE WAY OR THE OTHER.

5            MR. LUCEY:  BUT SHE ALSO SAID SHE

6    UNDERSTOOD SHE HAD DIFFERENT RIGHTS AND OBLIGATIONS

7    AS A PARTNERSHIP AS OPPOSED TO AN INVESTMENT FUND.

8            MR. FONG:  MY POINT IS SHE DIDN'T READ

9    THE DOCUMENT.  THAT'S MY POINT, YOUR HONOR.  SHE

10   DIDN'T READ THE DOCUMENT AND SHE PROBABLY DIDN'T.

11   AND I UNDERSTAND FOR ARGUMENT THE INFERENCE IS THAT

12   SHE DIDN'T READ CERTAIN DOCUMENTS.

13           THE COURT:  BUT IF SHE DIDN'T READ THIS

14   DOCUMENT, I'M STILL MISSING YOUR POINT THAT YOU ARE

15   SAYING SHE WOULDN'T HAVE ENTERED INTO ANOTHER

16   INVESTMENT ON BEHALF OF HER SISTER WHICH HAD A

17   PROVISION THAT SAID WHAT?

18           MR. FONG:  WELL, A VERY CRITICAL

19   PROVISION THAT SAYS THE PARTNERS CANNOT WITHDRAW

20   THEIR MONEY UNTIL THE END OF THE PARTNERSHIP AND

21   THE END OF THE PARTNERSHIP IS SUPPOSED TO BE IN

22   MARCH OF 2015.

23           NOW, IF SHE DIDN'T KNOW THAT, IF SHE

24   DIDN'T KNOW THAT, THEN THAT RAISES THE QUESTION OF

25   HER TRUTHFULNESS OR THE ACCURACY OF HER REPEATED

1    STATEMENTS UNDER OATH WITH THAT, YEAH, IF I HAD

2    KNOWN THIS, THIS WAS HIDDEN FROM ME IF I HAD KNOWN

3    THIS, I WOULD NOT HAVE DONE THIS.

4         MR. LUCEY:  I THINK THAT MISSTATEMENTS

5    TESTIMONY SHE SAID EARLIER THAT SHE UNDERSTOOD SHE

6    WAS INVOLVED IN A PARTNERSHIP DIFFERENT FROM THE

7    INVESTMENT FUNDS A DISTINCT RELATIONSHIP.

8         THE COURT:  THAT'S, I'M NOT SURE, A

9    CRITICAL POINT.  BUT SHE -- IS THERE A PROVISION

10   THAT SAYS THAT SHE CAN'T GET MONEY BACK.

11        MR. FONG:  ACTUALLY, BECAUSE ON THE FIRST

12   PARAGRAPH IT SAYS THAT THE PARTNERSHIP DOESN'T END

13   UNTIL 2015.

14        THE COURT:  THEN IT'S JUST THE TERM OF

15   PARTNERSHIP.

16        MR. FONG:  THEN THERE'S ANOTHER PARAGRAPH

17   THAT SAYS THE PARTNERS CANNOT WITHDRAW THEIR MONEY.

18   I MEAN IT'S -- YOU KNOW.

19        THE COURT:  WHAT DOES THAT HAVE TO DO

20   WITH THE INVESTMENT AND IS THERE A SIMILAR

21   PROVISION IN THERE?

22        MR. FONG:  NO, THERE IS NOT.  THERE IS

23   NOT.

24        BUT WHAT IT GOES TO SHOW IS THAT WHAT

25   THE -- THE GOVERNMENT HAS MADE THIS CASE ABOUT HOW

1    THESE INDIVIDUALS HAD RELIED ON THESE STATEMENTS

2    AND ON OTHER REPRESENTATIONS.

3           MY POINT IS, WAIT A MINUTE, AS A MATTER

4    OF FACT CONTRARY TO THE GOVERNMENT'S OF A

5    PARTICULAR FACT, THAT MIGHT NOT BE ENTIRELY TRUE.

6    AND I'M ENTITLED TO EXPLORE I BELIEVE WHETHER OR

7    NOT IF SHE SAW SOMETHING SHE WOULD HAVE ACTED

8    DIFFERENTLY.

9           I GUESS THAT'S REALLY MY ARGUMENT,

10   YOUR HONOR, THAT THE GOVERNMENT HAS SET FORTH A LOT

11   OF EVIDENCE THAT IF SHE HAD KNOWN THE TRUE FACTS

12   SHE WOULD HAVE ACTED DIFFERENTLY.

13          THE COURT:  IF YOU WANT TO ASK SOME VERY

14   POINTED QUESTIONS AS TO, DID YOU ASK FOR A REFUND

15   OF THIS OTHER FUND AND YOU'VE ALREADY ESTABLISHED

16   THAT YOU DIDN'T KNOW, I THINK THAT'S FINE, FOR THAT

17   VERY LIMITED PURPOSE.

18          BUT I WANT TO AVOID GETTING OFF ON OTHER

19   THINGS.  I JUST THINK THAT --

20          MR. FONG:  OKAY.

21          THE COURT:  -- THE WHOLE IDEA AS TO

22   WHETHER SHE WOULD HAVE INVESTED ANYWAY IS REALLY

23   NOT THE ISSUE IN THIS CASE.

24          MR. FONG:  WELL, YOUR HONOR, THAT MAY BE

25   TRUE AS A MATTER OF LAW BUT THE GOVERNMENT HAS

519

1    MADE --

2              THE COURT:  I AGREE THE GOVERNMENT HAS

3    MADE IT AN ISSUE.

4              MR. FONG:  BUT ANYWAY, ALL RIGHT.  OKAY.

5              THANK YOU.

6    (WHEREUPON THE SIDEBAR DISCUSSION WAS CONCLUDED.)

7    BY MR. FONG:

8    Q.   LET ME THEN JUST ASK YOU A NEW QUESTION,

9    MS. DOONG.

10             HAVING READ PARAGRAPH 2.1, DO YOU HAVE AN

11   UNDERSTANDING OF WHETHER OR NOT THE PARTNERSHIP IS

12   SUPPOSED TO END IN 2015?

13   A.   READING THIS, YES.

14   Q.   OKAY.  BUT YOU DID NOT KNOW THAT BEFORE YOU

15   READ IT IN COURT TODAY; IS THAT CORRECT?

16   A.   I KNEW THAT BUT I DID NOT THINK IT'S RELEVANT

17   BECAUSE I DIDN'T ASK FOR THIS MONEY BACK FROM

18   ALBERT HU.

19   Q.   OKAY.  BUT I THOUGHT YOU TESTIFIED A LITTLE

20   BIT EARLIER THAT YOU DID ASK FOR THIS MONEY BACK

21   NOT IN WRITING BUT AS PART OF WHAT YOU WERE ASKING?

22   A.   I CONSIDERED THAT AS PART OF THE INVESTMENT IN

23   THE WHOLE LUMP SUM.

24             SO IN MY RECORD, IT'S ALWAYS THERE.  BUT

25   IN ASKING THE MONEY TO GET BACK, I DIDN'T TOUCH ON

1    THIS SUBJECT AT ALL.

2    Q.   YOU DIDN'T TOUCH ON THIS SUBJECT --

3    A.   BUT I DIDN'T FORGET THIS $80,000 INVESTMENT.

4    Q.   SO EVEN THOUGH YOU DIDN'T ASK FOR YOU DIDN'T

5    ASK FOR IT BY THE TITLE OF THE $80,000 INVESTMENT

6    IN THE ASENQUA VENTURES FUND, YOU DIDN'T ASK FOR

7    THE 80,000 AS PART OF YOUR OVER ALL NUMBER THAT YOU

8    DEMANDED TO ALBERT HU; IS THAT CORRECT?

9    A.   NO, I DON'T THINK IT'S CORRECT BECAUSE ALL THE

10   RECORD I DID ASK ON THE WITHDRAWAL FORM IN ALL

11   COMMUNICATION, IT'S ALL RELATED TO MY SISTER, THE

12   ASENQUA BETA FUND.  AND ALSO MY AQC.

13        IF I ASK FOR THAT MONEY THEN WE SHOULD

14   HAVE A SEPARATE AGREEMENT ON THAT SUBJECT.

15   Q.   BUT I'M NOT TALKING ABOUT WHAT YOU ASKED FOR

16   IN WRITING I'M SIMPLY ASKING YOU IF YOU ASKED

17   MR. HU EVER FOR RETURN OF A LUMP SUM THAT WOULD

18   HAVE INCLUDED THE $80,000 THAT -- THAT WAS INVESTED

19   IN THE ASENQUA VENTURES MEMBER'S FUND?

20   A.   I DO NOT REMEMBER BECAUSE AFTER WE ASKED TO

21   WITHDRAW I CHASE AFTER, IS THIS AQC AND ASENQUA

22   BETA.

23   Q.   OKAY.  THANK YOU.

24        OKAY.  NOW, YOU TESTIFIED A LITTLE BIT

25   EARLIER THAT THE VERY FIRST INVESTMENT THAT YOU

1    MADE ON BEHALF OF YOUR SISTER MEI, YU-MEI DOONG WAS

2    IN JULY OF 2004; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND YOU TESTIFIED A LITTLE BIT EARLIER THAT

5    WAS ABOUT HALF A YEAR BEFORE YOU EVER SAW THE

6    CASTILLO, LYN, COHEN & VIJAY AUDITED STATEMENT,

7    RIGHT?

8    A.   I BELIEVE SO.

9    Q.   OKAY.  SO AT THE TIME THAT YOU MADE THE

10   INITIAL $200,000 INVESTMENT, YOU OF COURSE DID NOT

11   RELY ON THE CASTILLO, LYN, COHEN & VIJAY AUDITED

12   STATEMENT, RIGHT?

13   A.   NO.

14   Q.   AND IN FACT, YOU MADE THE INITIAL

15   INVESTMENT --

16          THE COURT:  MR. FONG, JUST TO WARN YOU,

17   YOU'RE ASKING SOME QUESTIONS WHERE THE YES OR NO

18   ANSWER MAY BE DIFFERENT THAN IF YOU JUST READ THE

19   HARD RECORD.

20          MR. FONG:  I CERTAINLY APPRECIATE THE

21   COURT POINTING THAT OUT.  I WILL TRY MY BEST TO

22   MAKE MY QUESTIONS CLEARER.  BUT THANK YOU SO MUCH,

23   YOUR HONOR

24   Q.   JUST SO I HAVE A CLEAR RECORD I WILL TRY TO

25   ASK A BETTER QUESTION.

1           WHEN YOU MADE THE FIRST INVESTMENT ON

2     BEHALF OF YOUR SISTER IN JULY 2004, DID YOU RELY ON

3     THE CASTILLO, LYN, COHEN & VIJAY AUDITED

4     STATEMENTS?

5     A.    NO, I RELIED ON OTHERS.

6     Q.    OKAY.  AND WERE YOU GIVEN ANY WRITTEN

7     FINANCIAL STATEMENTS BEFORE YOU MADE THE FIRST

8     INVESTMENT ON JULY 2ND, 2004, ON BEHALF OF YOUR

9     SISTER?

10    A.    YES.  IT MAY NOT BE IN MY POSSESSION ANYMORE.

11    I REMEMBER I SAW A RECORD LIKE THREE YEARS

12    CONSECUTIVE PERFORMANCE RECORD COMPARING THE

13    ASENQUA FUND VERSUS NASDAQ AND S&P 500.

14    Q.    BUT THOSE, THE RECORDS THAT YOU SAW, THEY WERE

15    NOT PREPARED BY -- WERE THEY PREPARED BY THE FIRM

16    OF CASTILLO, LYN, COHEN & VIJAY?

17    A.    PROBABLY, NO.

18    Q.    AND NOW, AS YOU SIT HERE TODAY, YOU DO NOT

19    KNOW ONE WAY OR THE OTHER IF THE NUMBERS THAT ARE

20    CONTAINED IN THE CASTILLO AUDITED STATEMENT, YOU

21    HAVE NO IDEA IF THOSE NUMBERS ARE RIGHT OR WRONG,

22    RIGHT?

23    A.    IT SHOULD BE RIGHT.

24    Q.    OKAY.  IT SHOULD BE RIGHT.

25          NOW, WHEN YOU FIRST MADE THE INVESTMENT

523

1    ON BEHALF OF YOUR SISTER IN JULY 2004, YOU DID THAT

2    ON THE RECOMMENDATION OF YOUR HUSBAND MICHAEL

3    CHUANG, RIGHT?

4    A.   THAT'S CORRECT.  I PASSED WHAT I THOUGHT THE

5    INVESTMENT OPPORTUNITY, AND THIS INVESTMENT WAS

6    BROUGHT UP TO MY ATTENTION THROUGH MY HUSBAND.

7    Q.   AND YOUR HUSBAND SPECIFICALLY RECOMMENDED THAT

8    YOU DO SO?

9    A.   NO.

10   Q.   BUT YOUR HUSBAND BROUGHT THIS TO YOUR

11   ATTENTION, RIGHT?

12   A.   YES.

13   Q.   AND OF COURSE, YOU TRUST YOUR HUSBAND?

14   A.   THE INFORMATION HE GAVE ME, I TRUST THE

15   INFORMATION HE GAVE ME, THE CREDENTIAL ON THE

16   BUSINESS SIDE OF ALBERT HU AND THE PAST HISTORY

17   RECORD.

18   Q.   OKAY.  YOUR HUSBAND TOLD YOU THAT HE THOUGHT

19   THIS WAS A GOOD INVESTMENT, AMONG OTHER REASONS,

20   BECAUSE OF MR. HU'S CREDENTIALS AS A PHD FROM MIT;

21   IS THAT CORRECT?

22   A.   YES.

23   Q.   OKAY.  AND YOUR HUSBAND ALSO TOLD YOU THAT

24   BASED ON HIS DEALINGS WITH MR. HU, THAT HE THOUGHT

25   THIS WOULD BE A GOOD INVESTMENT?

1           MR. LUCEY:  OBJECTION.  ASKED AND

2      ANSWERED, YOUR HONOR.

3           THE WITNESS:  HE DIDN'T TELL ME HIS

4      DEALING --

5           THE COURT:  WAIT A MINUTE.  I WILL

6      OVERRULE THE OBJECTION.

7           YOU CAN ANSWER.  GO AHEAD.  YOU CAN

8      ANSWER NOW.

9           THE WITNESS:  HE DIDN'T TELL ME HIS

10     DEALING WITH ALBERT HU.  I DON'T KNOW WHAT KIND OF

11     DEALING THEY HAD IN THE PAST, HE TOLD ME THIS IS A

12     GOOD INVESTMENT OPPORTUNITY.

13          AND IT SEEMS THEY HAVE A VERY GOOD TRACK

14     RECORD.  AND THE STRATEGY THEY USE, HE LISTEN AND

15     HE THINK IT'S A SOUND INVESTMENT STRATEGY.

16     BY MR. FONG:

17     Q.   SO PART OF WHAT HE TOLD YOU IS THAT HEY, I

18     HEARD MR. HU'S INVESTMENT STRATEGY AND I LIKE IT,

19     IS THAT TRUE?

20     A.   IT'S A SOUND STRATEGY.

21     Q.   OKAY.  A SOUND -- OKAY.  SO WHAT HE TOLD YOU

22     WAS SOMETHING TO THE EFFECT OF, I HEARD MR. HU TALK

23     ABOUT HIS INVESTMENT STRATEGY AND TO ME, MICHAEL

24     CHUANG, I THINK THAT'S A SOUND STRATEGY; IS THAT

25     CORRECT?

1    A.   THAT'S CORRECT.

2    Q.   OKAY.  NOW --

3    A.   HE EXPLAINED TO ME IN MORE DETAIL, BUT, MORE

4    THAN THAT ON THE STRATEGY ITSELF.

5    Q.   CERTAINLY.  I DON'T MEAN TO IMPLY THAT'S ALL

6    HE TOLD YOU BUT THAT WAS ONE OF THE STATEMENTS HE

7    MADE TO YOU WHEN HE WAS INTRODUCING YOU TO THE

8    ASENQUA FUND, RIGHT?

9    A.   YES.  LIKE OTHER PEOPLE REFER TO ME FOR AN

10   INVESTMENT OPPORTUNITY, THAT'S HOW I'M REGARDED.

11   Q.   DID YOUR HUSBAND INTRODUCE YOU TO A LOT OF

12   DIFFERENT INVESTMENT OPPORTUNITIES?

13   A.   YES.

14   Q.   OKAY.

15   A.   IF WE WANT TO INVEST IT OURSELVES WE DISCUSS.

16   Q.   OKAY.  DID YOU INVEST IN A LOT OF OF THE

17   INVESTMENT OPPORTUNITIES THAT YOUR HUSBAND BROUGHT

18   TO YOUR ATTENTION?

19   A.   NOT ALL OF THEM.

20   Q.   OKAY.  COULD YOU GIVE ME, SINCE THE YEAR 2000,

21   APPROXIMATELY HOW MANY INVESTMENT OPPORTUNITIES DID

22   YOUR HUSBAND BRING TO YOUR ATTENTION FOR YOU TO

23   LOOK AT?

24   A.   I CAN'T TELL THE NUMBER, FEW.

25   Q.   WOULD IT BE MORE THAN TEN?

1    A.   I CAN'T ANSWER THAT BECAUSE I DON'T KNOW HOW

2    MANY.  SOMETHING JUST, MAY BE JUST BRING IT

3    LIGHTLY, HEARD ABOUT SOMETHING, AND SOME HAD MORE

4    INVESTIGATION AND SOME ASKED FOR DATA SO I CANNOT

5    TELL HOW MANY.  BUT THIS PROBABLY IS BY FAR ON

6    YU-MEI'S SIDE OF HER INVESTMENT, BY FAR THE LARGEST

7    AMOUNT.

8    Q.   THERE WERE OTHER INVESTMENT OPPORTUNITIES THAT

9    YOUR HUSBAND BROUGHT TO YOU THAT YOU MADE

10   INVESTMENT IN, RIGHT?

11   A.   I THINK SO.

12   Q.   OKAY.  CAN YOU GIVE ME YOUR BEST ESTIMATE OF

13   HOW MANY, MORE THAN FIVE?  LESS THAN -- FEWER THAN

14   FIVE?

15   A.   YOU MEAN ACTUAL DOING THE INVESTMENT.

16   Q.   YES.

17   A.   FEWER THAN FIVE.

18   Q.   OKAY.  SO IT'S A VERY LIMITED NUMBER OF

19   INVESTMENT OPPORTUNITIES THAT YOUR HUSBAND BROUGHT

20   TO YOUR ATTENTION THAT YOU ENDED UP INVESTING IN;

21   IS THAT CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  OKAY.  NOW, I GATHER THAT OF COURSE IN

24   2004 YOU HAD ACCESS TO THE INTERNET, RIGHT?

25   A.   2004, YES.

1    Q.   OKAY.  AND YOU CERTAINLY HAVE NO TROUBLE USING

2    THE INTERNET, RIGHT?

3    A.   CORRECT.

4    Q.   OKAY.  AND NOW, YOU ARE AWARE THAT IN 2004 YOU

5    ARE AWARE THAT THAT A CERTIFIED PUBLIC ACCOUNTANT

6    IN CALIFORNIA WOULD HAVE TO HAVE OR SHOULD HAVE A

7    PROFESSIONAL LICENSE GIVEN BY THE STATE OF

8    CALIFORNIA; IS THAT CORRECT?

9    A.   IF YOU ASK IF I CHECK IF HE HAS A CREDENTIAL,

10   I DIDN'T.  I THOUGHT IT'S TRUE.

11              THE COURT:  HIS QUESTION WAS --

12              THE WITNESS:  OKAY.

13              THE COURT:  HIS QUESTION WAS WHETHER OR

14   NOT YOU UNDERSTOOD THAT CPA'S HAD TO HAVE A LICENSE

15   IN CALIFORNIA.

16              THE WITNESS:  I KNEW THEY HAVE A LICENSE

17   IN CALIFORNIA BECAUSE MY FRIEND THEY HAVE TO TAKE A

18   TEST IN ORDER TO GET A QUALIFICATION LICENSE.

19   BY MR. FONG:

20   Q.   AND IN 2004 YOU KNEW THAT WHETHER OR NOT A

21   PARTICULAR PERSON OR COMPANY OR OFFICE, IF YOU

22   WILL, A FIRM, IF YOU WILL, HAD, WAS LICENSED BY THE

23   STATE OF CALIFORNIA FOR ACCOUNTING, OR ACCOUNTANCY

24   I SHOULD SAY, THAT WAS A MATTER OF PUBLIC RECORD.

25   YOU KNEW THAT, RIGHT, IN 2004?

1    A.   I DIDN'T KNOW THAT.

2    Q.   YOU DID NOT THINK THAT YOU COULD, YOU AS A

3    MEMBER OF THE PUBLIC, COULD FIND THAT OUT?

4    A.   NO, I DIDN'T KNOW BECAUSE I DIDN'T THINK OF

5    FINDING IT OUT.

6    Q.   I UNDERSTAND THAT YOU DIDN'T THINK ABOUT DOING

7    THE ACTUAL SEARCH.  I UNDERSTAND THAT.

8         BUT MY QUESTION IS:  IN 2004 DID YOU

9    KNOW -- DID YOU KNOW ONE WAY OR THE OTHER IF THE

10   LICENSING STATUS OF A PARTICULAR PERSON OF AN

11   ACCOUNTANT IN THE STATE OF CALIFORNIA WOULD BE A

12   MATTER OF PUBLIC RECORD?

13   A.   NO, I DIDN'T KNOW.

14   Q.   OKAY.  NOW, DID YOU HOLD -- AT ANY POINT IN

15   YOUR CAREER DID YOU HOLD A PROFESSIONAL LICENSE IN

16   THE STATE OF CALIFORNIA?

17   A.   NO.

18   Q.   DO YOU KNOW ANYBODY WHO HELD A PROFESSIONAL

19   LICENSE IN THE STATE OF CALIFORNIA?

20   A.   I KNEW -- I HAVE A FRIEND WHO HOLD SOME

21   LICENSE THAT INVOLVES SOME ENVIRONMENTAL ISSUES.

22   Q.   OKAY.  NOW, IN 2004, DID YOU KNOW IS THAT THE

23   PUBLIC CAN GET INFORMATION ABOUT WHETHER OR NOT A

24   PARTICULAR CPA HAD EVER BEEN DISCIPLINED BY THE

25   LICENSING AGENCY IN THE STATE OF CALIFORNIA?

529

1    A.   NO, I DIDN'T KNOW.

2    Q.   OKAY.  WOULD THAT HAVE BEEN IMPORTANT

3    INFORMATION TO KNOW?

4    A.   YES.

5    Q.   IF YOU HAD DONE A SEARCH AND FOUND THAT THE

6    CASTILLO OFFICE WAS NOT LICENSED BY THE STATE OF

7    CALIFORNIA WOULD THAT HAVE BEEN IMPORTANT

8    INFORMATION FOR YOU?

9    A.   YES.

10   Q.   NOW LET ME DRAW YOUR ATTENTION, IF I MAY,

11   TO -- I'M GOING TO SHOW YOU A DOCUMENT THAT'S PART

12   OF EXHIBIT 63 WHICH IS ALREADY IN EVIDENCE.

13            FIRST OF ALL, MA'AM, DO YOU SEE THE

14   DOCUMENT I JUST PLACED IN FRONT OF YOU?

15   A.   YES, I DO.

16   Q.   JUST FOR THE RECORD I WILL REPRESENT TO YOU

17   AND YOU CAN TELL ME IF THIS IS ACCURATE OR NOT,

18   IT'S A DOCUMENT THAT HOLDS PAGES OF, WITH THE BATES

19   NUMBER HU-001075-A  AS IN APPLE.  TO HU-001107-A

20   AS IN APPLE.

21            FIRST OF ALL, DO YOU SEE THE BATES

22   NUMBERS ON THE FIRST AND THE LAST PAGE, THAT

23   PARTICULAR DOCUMENT?

24   A.   YES, I SEE IT.

25   Q.   OKAY.  AND AGAIN, THIS IS ALREADY IN EVIDENCE

1    AS PART OF EXHIBIT 63 BUT I JUST WANTED TO MAKE

2    SURE THAT WE ARE TALKING ABOUT THE SAME DOCUMENT,

3    ALL RIGHT.  OKAY.  AND IT'S A 33 PAGE DOCUMENT; IS

4    THAT CORRECT?

5    A.    YES.

6    Q.    OKAY.  AND THIS IS THE ASENQUA BETA FUND

7    SUBSCRIPTION BOOKLET; IS THAT CORRECT?

8    A.    THAT'S CORRECT.

9    Q.    OKAY.  NOW, EXCUSE ME FOR ONE SECOND WHILE

10   I -- NOW, I WANT TO DIRECT YOUR ATTENTION TO PAGE 4

11   OF 33 OF THE DOCUMENT I JUST PUT IN FRONT OF YOU.

12   THAT WOULD OCCUR THE BATES NUMBER HU-001078 A,

13   RIGHT?

14   A.    YES.

15   Q.    THE FIRST PARAGRAPH THERE READS, IF YOU DECIDE

16   AFTER YOU REVIEWED THE CONFIDENTIAL PRIVATE

17   PLACEMENT MEMORANDUM OF THE ASENQUA BETA FUND LP,

18   THE FUND, DATED ON OR ABOUT JUNE 10TH, 2002, AS AN

19   AMENDED OR SUPPLEMENTED FROM TIME IT TIME, THE

20   MEMORANDUM, AND A LIMITED PARTNERSHIP AGREEMENT OF

21   THE FUND PROVIDED THERE WITH TO INVEST IN THE FUND,

22   PLEASE FOLLOW THE INSTRUCTIONS BELOW.

23          DO YOU SEE THAT PARAGRAPH?

24   A.    YES, I SEE IT.

25   Q.    AND DID YOU READ THAT PARAGRAPH BEFORE YOU

531

1    MADE THE INVESTMENT ON BEHALF OF YOUR SISTER, THE

2    VERY FIRST INVESTMENT IN JULY ON OR ABOUT JULY 2ND,

3    2004?

4    A.   YES.

5    Q.   OKAY.  AND --

6    A.   AND I ALSO WHEN I MET ALBERT I ASKED HIM ABOUT

7    THE EXHIBIT A PART.

8    Q.   OKAY.  NEITHER THE MEMO OR -- NOR THE LIMITED

9    PARTNERSHIP AGREEMENT THAT I JUST READ INTO THE

10   RECORD ON THE FIRST PARAGRAPH, NEITHER OF THOSE TWO

11   DOCUMENTS ARE INCLUDED IN THE DOCUMENTS THAT YOU

12   PRODUCED TO THE GOVERNMENT; IS THAT CORRECT?

13   A.   THIS ONE?  YOU MEAN THE ONE ON THE "I" PART?

14   Q.   NO.  WHAT I'M TALKING ABOUT IS THE ASENQUA

15   BETA FUND CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

16   IS NOT AMONG THE DOCUMENTS THAT YOU TURNED OVER TO

17   THE GOVERNMENT; IS THAT CORRECT?

18   A.   IF IT'S NOT THERE, IT'S NOT THERE.

19   Q.   OKAY.  AND THE LIMITED PARTNERSHIP AGREEMENT

20   OF THE ASENQUA BETA FUND IS ALSO NOT THERE; IS THAT

21   CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  AND JUST FOR THE JURORS I WILL PUBLISH

24   THE FIRST PARAGRAPH.  AND WHERE MY FINGER IS

25   POINTING, THIS IS THE PARAGRAPH I READ INTO THE

1    RECORD JUST A COUPLE OF MINUTES AGO; IS THAT

2    CORRECT?

3    A.   YES.

4    Q.   AND THIS IS THE PRIVATE PLACEMENT MEMO THAT I

5    JUST REFERRED TO; IS THAT CORRECT?

6    A.   YES.

7    Q.   AND THIS IS THE LIMITED PARTNERSHIP AGREEMENT,

8    RIGHT?

9    A.   YES.

10   Q.   OKAY.  THANK YOU.

11        NOW, YOU TESTIFIED A LITTLE BIT EARLIER I

12   BELIEVE YOU GOT A BAD FEELING WHEN YOU TRIED TO

13   WITHDRAW YOUR SISTER'S MONEY AND YOUR MONEY OR YOUR

14   INVESTMENT I SHOULD SAY FROM THE FIRESIDE FUND AND

15   THE AQC FUND; IS THAT CORRECT?

16   A.   CORRECT.  I HAD A BAD FEELING.  I WAS SO

17   AFRAID I MAY NOT GET MONEY BACK FOR MY SISTER.

18   Q.   AND THE REASON WHY YOU GOT THE BAD FEELING WAS

19   THAT THE PROCESS OF WITHDRAWING THE MONEY WAS

20   DIFFERENT FROM HOW, WHAT YOU HAD EXPERIENCED DOING

21   WITH OTHER INVESTMENT FUNDS; IS THAT CORRECT?

22   A.   CORRECT.

23   Q.   OKAY.  SO I THINK YOU MENTIONED OTHER FUNDS,

24   SO YOU BESIDES THE ASENQUA BETA FUND, AQC AND THE

25   FIRESIDE FUND, YOU HAD EXPERIENCE WITH OTHER

1    INVESTMENT FUNDS?

2    A.   YES.

3    Q.   OKAY.  APPROXIMATELY HOW MANY?

4    A.   RECENT YEARS?

5    Q.   WELL --

6    A.   LESS THAN FIVE.

7    Q.   I'M SORRY WHAT I MEANT IS AT THE TIME THAT

8    THANK YOU WERE TRYING TO, THAT YOU FIRST MADE A

9    REQUEST TO WITHDRAW YOUR INVESTMENT FROM MR. HU, AT

10   THAT TIME YOU ALREADY HAD SOME EXPERIENCE WITH

11   INVESTMENT FUNDS, RIGHT?

12   A.   YES.

13   Q.   OKAY.  AND WOULD THAT BE -- WOULD YOU SAY IT

14   WAS AROUND FIVE OR FEWER?

15   A.   ABOUT FIVE OR FEWER.

16   Q.   OKAY.  BUT IT WAS MORE THAN, SAY, TWO?  IF YOU

17   REMEMBER.

18   A.   1 OR 2.  I SHOULD SAY I DON'T REMEMBER HOW

19   MANY.

20   Q.   OKAY.  FAIR ENOUGH.

21        NOW, I WANT TO TALK A LITTLE BIT ABOUT

22   THE AQC INVESTMENT THAT YOU MADE, THAT WAS AROUND

23   FEBRUARY 2007; IS THAT CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   OKAY.  AND AQC FUND WAS SOMETHING THAT YOUR

1    HUSBAND BROUGHT TO YOUR ATTENTION?

2    A.   YES.

3    Q.   AND YOU KNEW THAT YOUR HUSBAND WAS ACTUALLY

4    INVOLVED IN THE START OF THE AQC FUND; IS THAT

5    CORRECT?

6    A.   NO.

7    Q.   DID YOU HAVE ANY UNDERSTANDING ONE WAY OR THE

8    OTHER IF YOUR HUSBAND HAD ANYTHING TO DO WITH AQC

9    FUND?

10   A.   NO.  IF IT'S TO DO WITH AQC FUND, HE MAY TALK

11   ABOUT IT.  I DIDN'T KNOW THAT'S RELATED TO AQC

12   FUND.

13   Q.   DID YOU HAVE ANY KNOWLEDGE IF YOUR HUSBAND WAS

14   EVER A PARTNER IN THE AQC FUND?

15   A.   NO.

16   Q.   OKAY.  DO YOU KNOW IF YOUR HUSBAND EVER

17   REPRESENTED HIMSELF AS THE -- AS A PARTNER IN AQC

18   FUND?

19   A.   YOU MEAN AFTER WE INVESTED THE MONEY.

20   Q.   WELL, AT ANY TIME, LET'S START THERE THEN WE

21   CAN WORK BACKWARDS.

22   A.   NO.

23   Q.   OKAY.

24   A.   HE TALKED ABOUT ACTIVITIES BUT I DON'T KNOW

25   WHICH ACTIVITIES LINKED TO AQC OR LINKED TO ANY

1    OTHERS.

2    Q.   WHEN YOU SAY ACTIVITIES WOULD YOU MIND

3    DESCRIBING FOR US WHAT YOU MEAN BY ACTIVITIES?

4    A.   HE MAY TALK TO COMPANIES OR HE MAY INVEST --

5    INVESTIGATE THE COMPANY.  THAT MEANS ACTIVITY.  HE

6    TALKED TO MANY COMPANIES.

7    Q.   OKAY.  DO YOU KNOW IF YOUR HUSBAND, MICHAEL

8    CHUANG, DID HE EVER TRY TO MARKET AQC FUND TO

9    OTHERS?

10   A.   HE PROBABLY DID THAT BECAUSE WE ALSO HAD OUR

11   INVESTMENT SAYING THAT HE WOULD REFER TO THEM, SAME

12   AS HE SHARED INFORMATION WITH ME OR I SHARE

13   INFORMATION WITH OTHERS.

14   Q.   OKAY.  DO YOU KNOW IF YOUR HUSBAND'S NAME EVER

15   APPEARED IN ANY ASENQUA POWER POINT PRESENTATIONS?

16   A.   YES.  HE ASKED TO PULL BACK, TO PULL OUT, AND

17   ASKED FOR MANY TIMES AND ALBERT DIDN'T PULL HIS

18   PICTURE OUT OR NAME, I DON'T KNOW.

19   Q.   BUT HIS -- YOUR HUSBAND'S PICTURE WAS, AS FAR

20   AS YOU KNOW, WAS ON AN ASENQUA POWERPOINT

21   PRESENTATION, RIGHT?

22   A.   I DIDN'T KNOW IF THAT'S A PICTURE OR WHAT.  HE

23   JUST SAID HE REQUESTED ALBERT TO TAKE HIS NAME DOWN

24   SO MANY TIMES OR OVER YEARS.  IT DIDN'T HAPPEN.  SO

25   I DIDN'T KNOW ON WHAT CONTENT HIS NAME WAS LINKED

1    TO ASENQUA.

2    Q.   DID -- AS FAR AS YOU KNOW DID YOUR HUSBAND

3    HAVE GO BUSINESS DEALINGS WITH ALBERT HU BESIDES

4    YOUR INVESTMENTS IN AQC AND ON YOUR SISTER'S BEHALF

5    IN ASENQUA BETA FUNDI YOUR HONOR, I OBJECT TO THE

6    QUESTION.  IT'S CONFUSING.

7              THE WITNESS:  I DON'T KNOW YOU ARE

8    SAYING.  OH, SORRY.

9              THE COURT:  CONFUSING IN WHAT SENSE?

10             MR. LUCEY:  IF I FOLLOW THE QUESTION

11   CORRECTLY HE ASKED IF MR. -- IF MS. DOONG'S HUSBAND

12   HAD DEALINGS WITH MR. HU ASIDE FROM HIS DEALINGS IN

13   ASENQUA AND AQC.

14             I DIDN'T UNDERSTAND THE LANGUAGE.  I

15   THINK I MISHEARD THE QUESTION.

16             MR. FONG:  I WILL BE GLAD TO ASK ANOTHER

17   QUESTION.

18             THE COURT:  ALL RIGHT.

19   BY MR. FONG:

20   Q.   AS FAR AS YOU KNOW, DID YOUR HUSBAND EVER HAVE

21   ANY BUSINESS DEALINGS WITH MR. HU?

22   A.   HE MET MR. HU BEFORE, SO I DON'T KNOW THE

23   CONTENT OF THEIR MEETING, SAME AS -- I HAVE TO PUT

24   IT THIS WAY, I WASN'T PUT ANY ATTENTION TO HIS

25   BUSINESS ACTIVITIES.

1    Q.   ALL RIGHT.  NOW, IN THE -- HAVE YOU EVER ASKED

2    YOUR HUSBAND, WHAT DO YOU KNOW -- WHAT HE KNEW

3    ABOUT MR. HU?

4    A.   YES, WHEN HE BROUGHT UP THE BUSINESS

5    OPPORTUNITY.

6    Q.   ALL RIGHT.  AND BESIDES THAT, DID YOU -- AFTER

7    YOU MADE YOUR FIRST INVESTMENT IN, ON BEHALF OF

8    YOUR SISTER IN ASENQUA BETA FUND, DID YOU EVER ASK

9    YOUR HUSBAND WHAT WAS HIS EXPERIENCE, IF ANY, WITH

10   MR. HU?

11   A.   NO.  I CONSIDERED THAT AN INVESTMENT AND I

12   RECEIVED AN ACCOUNT BALANCE.  UNLESS I WORRY ABOUT

13   THIS INVESTMENT, OTHERWISE WHY WOULD I TALK TO HIM

14   ABOUT MR. HU?

15   Q.   WELL, IN LIGHT OF THE -- BUT YOU KNEW THAT

16   YOUR HUSBAND KNEW MR. HU?

17   A.   YES.

18   Q.   OKAY.  IN LIGHT OF THE FACT THAT ON BEHALF OF

19   YOUR SISTER AND YOU COMBINED, YOU HAD OVER A

20   MILLION DOLLARS INVESTED WITH MR. HU, DID YOU EVER

21   ASK YOUR HUSBAND, HEY, WHAT IS YOUR EXPERIENCE WITH

22   MR. HU?

23   A.   I MET MR. HU MYSELF.

24   Q.   AGAIN, I'M SORRY BUT THAT'S --

25   A.   AS AN INVESTOR.  SO NO, I DIDN'T ASK HIM

1    SPECIFICALLY, WHAT DO YOU KNOW ABOUT MR. HU.  I

2    THOUGHT HE TOLD ME WHAT HE KNEW ABOUT MR. HU WHEN

3    HE INTRODUCED ASENQUA BETA FUND TO ME.

4    Q.   OKAY.  SO AFTER THE INITIAL INTRODUCTION MADE

5    BY YOUR HUSBAND, DID YOU EVER ASK HIM AFTER THAT,

6    DID YOU EVER ASK YOUR HUSBAND ANYTHING ABOUT

7    MR. HU, ABOUT WHAT HU KNEW ABOUT MR. HU, I SHOULD

8    SAY?

9    A.   NO, I DID NOT ASK HIM.

10   Q.   OKAY.  THANK YOU.

11        NOW, DID YOU KNOW WHEN YOU MADE YOUR

12   INVESTMENT IN AQC FUND IN FEBRUARY OF 2007, DID YOU

13   KNOW IF AQC FUND WAS A NEW FUND OR ONE THAT'S BEEN

14   AROUND FOREVER OR SOMEWHERE IN BETWEEN, DID YOU

15   KNOW THAT ONE WAY OR THE OTHER?

16   A.   I THOUGHT IT WAS A BRAND-NEW FUND.

17   Q.   IN FACT IT WAS A BRAND-NEW FUND, YOU

18   UNDERSTOOD THAT, RIGHT?

19   A.   I THINK SO.  BECAUSE THEY WANTED TO RAISE A

20   NEW FUND THAT'S WHAT HE BROUGHT UP.

21   Q.   WHEN YOU SAY THEY, WHO ARE THEY?

22   A.   I MEAN ALBERT HU, THAT'S WHY I SAY THEY.

23   Q.   WAS YOUR HUSBAND ALSO TRYING TO RAISE THIS NEW

24   FUND WITH ALBERT HU?

25   A.   NO, HE PROBABLY INTRODUCED TO OTHERS BUT NOT

539

1    RAISE THE FUND.

2    Q.   BUT YOU KNEW BEFORE YOU MADE YOUR FIRST

3    INVESTMENT IN AQC FUND, THAT IT WAS A BRAND-NEW

4    FUND, RIGHT?

5    A.   THAT WAS, I KNEW.

6    Q.   AND YOU KNEW IT WAS, I THINK YOUR WORD WAS A

7    CONSERVATIVE FUND, RIGHT?

8    A.   THAT'S -- THAT MAY NOT BE AS PROFITABLE AS THE

9    FIRESIDE OR ASENQUA BETA FUND.

10   Q.   OKAY.  YOU'VE ANSWERED MY NEXT QUESTION I WAS

11   GOING TO ASK YOU.

12          SO IN YOUR MIND YOU KNEW BEFORE YOU

13   INVESTED THAT AQC FUND WAS NOT LIKELY TO PRODUCE

14   THE SAME KIND OF RETURNS AS FIRESIDE OR ASENQUA

15   BETA FUND, RIGHT?

16   A.   YES, I KNEW.

17   Q.   AND YOU ALSO KNEW THAT OF COURSE AT THE TIME

18   THAT YOU ARE INVESTING IN THIS BRAND-NEW FUND, AQC

19   FUND AT THAT POINT DID NOT HAVE ANY TRACK RECORD OR

20   HISTORY OF PERFORMANCE; IS THAT CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  BUT -- OKAY.

23          NOW, YOU ALSO TALKED A LITTLE BIT

24   ABOUT --

25   A.   THAT -- SORRY, CAN I SAY IT?

1    Q.   I THINK YOU'VE ANSWERED MY LAST QUESTION, SO

2    I'M PERFECTLY FINE.

3             NOW, JUST ONE MOMENT, LET ME FIND THAT

4    PAGE.  I'M GOING TO DIRECT YOUR ATTENTION TO -- BY

5    THE WAY, I'M SORRY.

6             DO YOU KNOW IF YOUR HUSBAND MET WITH

7    MR. HU ON MORE OCCASIONS THAN YOU HAD?

8    A.   YES, BECAUSE WHEN MR. HU COME TO TAIPEI AND HE

9    WOULD LIKE TO MEET WITH US BUT I DON'T ATTEND EVERY

10   MEETING HE INVITED US.

11   Q.   DO YOU KNOW IF YOUR HUSBAND --

12   A.   AND ALSO --

13   Q.   I'M SORRY.  PLEASE.

14   A.   ALSO, I HAVE OCCASION, I MET MR. HU AND I

15   DON'T THINK MY HUSBAND WAS PRESENT AS WELL.

16   Q.   OKAY.  THANK YOU FOR THAT CLARIFICATION.  NOW,

17   DO YOU KNOW IF YOUR HUSBAND EVER MET WITH MR. HU IN

18   CALIFORNIA IN SUNNYVALE?

19   A.   YES.

20   Q.   DO YOU KNOW IF MR. -- IF YOUR HUSBAND EVER MET

21   WITH MR. HU IN SUNNYVALE WITH PEOPLE WHO WORKED

22   WITH MR. HU?

23   A.   YES.

24   Q.   ALL RIGHT.  DO YOU KNOW IF YOUR HUSBAND EVER

25   MET MR. HU AT A RESTAURANT IN SUNNYVALE WITH STEVE

541

1    BOND?

2    A.   NO.

3    Q.   OKAY.  SO YOU DON'T KNOW WHO WERE PRESENT,

4    RIGHT?

5    A.   NO.

6    Q.   OKAY.  NOW, DIRECTING -- LET ME SHIFT GEARS

7    JUST ONE SECOND.

8         I'M GOING TO ASK YOU TO LOOK AT IN FRONT

9    OF YOU A PARTICULAR PAGE OF DOCUMENT THAT'S ALREADY

10   BEEN ADMITTED INTO EVIDENCE, AND I BELIEVE YOU

11   TESTIFIED ABOUT IS HAS THE BATES NUMBER OF

12   HU-00123A, AS IN APPLE.  AND I WILL LET YOU HAVE A

13   MOMENT TO FIND THAT.

14   A.   0012 --

15   Q.   3A.

16   A.   123A.

17   Q.   I BELIEVE IT'S PAGE 15 OF THE FIRESIDE

18   SUBSCRIPTION BOOKLET.

19   A.   THE FIRESIDE SUBSCRIPTION BOOKLET.

20        THE COURT:  SHOW HER WHAT YOU ARE LOOKING

21   AT.

22        MR. FONG:  I'M SORRY?

23        THE COURT:  WHY DON'T YOU SHOW HER WHAT

24   YOU ARE LOOKING AT.

25   Q.   AND THIS IS THE PAGE THAT HAS -- IS ENTITLED

542

1     PARAGRAPH 12, LEGAL REPRESENTATION; WAIVER OF

2     CONFLICTS.  DO YOU SEE THAT?

3     A.   YES.

4     Q.   NOW YOU TESTIFIED A LITTLE BIT EARLIER THAT

5     THIS PARAGRAPH OR THIS PAGE HAS SIGNIFICANCE TO

6     YOU, RIGHT?

7     A.   WELL, FOR THE PART I READ, THAT I WAS ASKED TO

8     READ.

9     Q.   OKAY.  THE PROSKAUER ROSE LAW FIRM, RIGHT?

10    A.   YES.

11    Q.   AND I BELIEVE YOUR TESTIMONY AND PLEASE

12    CORRECT ME IF I'M WRONG, I BELIEVE YOUR TESTIMONY

13    WAS THAT YES, THIS IS IMPORTANT TO YOU BECAUSE THIS

14    WAY YOU FEEL PROTECTED?

15    A.   YES.

16    Q.   OKAY.  NOW, DID YOU EVER READ THIS PARAGRAPH

17    BEFORE, BEFORE YOU AGREED TO SWITCH THE INVESTMENT,

18    YOUR SISTER'S ASENQUA FUND INTO THE FIRESIDE LS

19    FUND?

20    A.   YES, I DID.  I DON'T KNOW, HOW DOES THAT

21    REGISTER TO ME?  I THOUGHT THAT WAS VERY STANDARD

22    BOOKLET FROM MOST OF THE FUND THEY WOULD INCLUDE

23    PARAGRAPH SUCH AS THIS.

24    Q.   SURE.  BUT YOU DO RECALL THOUGH READING THIS

25    SPECIFIC PARAGRAPH THOUGH, RIGHT?

1    A.   YES, I READ THROUGH THE WHOLE BOOKLET.

2    Q.   OKAY.  I FULLY UNDERSTAND YOUR RECOLLECTION IS

3    YOU READ THROUGH THE WHOLE BOOKLET.  MY QUESTION IS

4    A LITTLE BIT MORE SPECIFIC, IF I MAY.

5              DO YOU HAVE A SPECIFIC RECOLLECTION ONE

6    WAY OR THE OTHER IF YOU READ PARAGRAPH 12?

7    A.   YES.

8    Q.   OKAY.

9              NOW, I WANT TO PUBLISH PARAGRAPH 12, AND

10   PLEASE FEEL FREE TO READ FROM YOUR PAGE.  MAY I

11   TROUBLE YOU WHEN YOU HAVE YOUR ORIENTATION, CAN YOU

12   READ THE FIRST SENTENCE OF PARAGRAPH 12 FOR ME.

13   A.   THE FIRST SENTENCE?

14   Q.   YES, PLEASE.

15   A.   THE INVESTOR UNDERSTANDS THAT PROSKAUER ROSE

16   LLP HAS BEEN ENGAGED TO ACT AS LEGAL COUNSEL TO THE

17   FUND, THE INVESTMENT MANAGER, THE ORDINARY

18   SHAREHOLDER, AND THE MASTER FUND, COLLECTIVELY THE

19   FUND AFFILIATED GROUP.

20   Q.   OKAY.  CAN YOU READ THE NEXT SENTENCE.

21   A.   PROSKAUER HAS NOT BEEN ENGAGED TO PROTECT OR

22   REPRESENT THE PARTICIPATING SHARES OF ANY

23   SHAREHOLDER WITH REGARD TO THE FUND AFFILIATED

24   GROUP OR THE PREPARATION OF THIS SUBSCRIPTION,

25   AGREEMENT AND NO OTHER LEGAL COUNSEL HAS BEEN

1    ENGAGED BY THE FUND AFFILIATED GROUP TO ACT IN SUCH

2    CAPACITY.

3    Q.   OKAY.  IS IT YOUR UNDERSTANDING WHEN YOU READ

4    THIS PARTICULAR PARAGRAPH THAT THE PARAGRAPH WAS

5    INTENDED TO ASK YOU AS AN INDIVIDUAL INVESTOR TO

6    WAIVE ANY POSSIBLE CONFLICT OF INTEREST ABOUT AN

7    ATTORNEY REPRESENTING MORE THAN ONE PARTY?

8    A.   NO.

9    Q.   OKAY.  BUT YOU DID READ IT?

10   A.   I DID READ IT BUT I DIDN'T SEE IT THAT WAY.

11   Q.   LET ME ASK YOU, WHAT IS YOUR UNDERSTANDING

12   ABOUT THE TERM WAIVER OF CONFLICTS, HAVE YOU EVER

13   SEEN THAT PHRASE BEFORE?

14   A.   YES, BUT NOT IN THE LEGAL CONTENT.

15   Q.   OKAY.  WHAT WAS YOUR EXPERIENCE IN TERMS OF

16   ANOTHER CONTEXT?  WHAT WAS YOUR UNDERSTANDING OF

17   THE WAIVER OF CONFLICT?

18   A.   WHEN THERE'S A CONFLICT INTEREST AMONG THE

19   PARTIES, IT DOESN'T INVOLVE WHEN THERE'S CONFLICT

20   AMONG PARTIES.  THAT'S WHAT I UNDERSTAND.

21   Q.   OKAY?

22            THE COURT:  LET'S TAKE A RECESS FOR

23   15 MINUTES.

24            MR. FONG:  SURE.

25            THE COURT:  COUNSEL IF YOU WOULD HANG ON

1    FOR A MOMENT.

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  HOW MUCH MORE DO YOU HAVE,

5    MR. FONG?

6              MR. FONG:  NOT A LOT MORE, MAYBE ABOUT 3,

7    4, 5 MINUTES.

8              THE COURT:  OH, OKAY.

9              ALSO, WHILE I'M THINKING ABOUT IT, I

10   NOTICED THERE ARE FORFEITURE ALLEGATIONS, WHAT DID

11   YOU INTEND TO DO WITH RESPECT TO THOSE?

12             MR. FAZIOLI:  I DIDN'T THINK -- IT'S NOT

13   OUR INTENTION TO PRESENT THE FORFEITURE IN THIS

14   CASE IN CHIEF.

15             THE COURT:  OKAY.  I JUST -- I DIDN'T

16   KNOW WHETHER YOU HAD SOME AGREEMENT AMONG COUNSEL

17   OR WHAT.  I JUST --

18             MR. FAZIOLI:  I UNDERSTAND.  I APPRECIATE

19   ARE RAISING IT FOR OUR ATTENTION.  WE WILL CONFER

20   WITH DEFENSE COUNSEL ABOUT THE FORFEITURE

21   ALLEGATIONS.

22             MR. FONG:  THANK YOU, YOUR HONOR.

23             THE COURT:  OKAY.

24             (WHEREUPON A RECESS WAS TAKEN.)

25             THE COURT:  ALL RIGHT.

1           MR. FONG?

2           MR. FONG:  JUST A COUPLE MORE QUESTIONS.

3    Q.   DO YOU KNOW IF YOUR HUSBAND EVER RECEIVED ANY

4    KIND OF MONEY FROM THE -- FROM ANY ASENQUA ENTITIES

5    TO REIMBURSE HIM FOR TRAVEL EXPENSES?

6    A.   YES, FOR REIMBURSE FOR TRAVEL.  I THINK HE

7    TRAVELLED WITH WHOEVER THEN GET THE REIMBURSEMENT.

8    Q.   DO YOU UNDERSTAND -- DO YOU KNOW IF YOUR

9    HUSBAND RECEIVED THE REIMBURSEMENT PAYMENTS FROM

10   ASENQUA FOR TRAVELS HE DID ON BEHALF OF ASENQUA?

11   A.   YES, I THINK HE WENT TO KOREA OR SOME PLACE

12   ONCE.  YES, HE DID TRAVEL.

13   Q.   HE DID TRAVEL, BUT MY QUESTION IS, DO YOU KNOW

14   IF THE REASON THAT ASENQUA WAS REIMBURSING YOUR

15   HUSBAND FOR HIS TRAVEL EXPENSES WAS THAT HE WAS

16   TRAVELLING FOR ASENQUA BUSINESS?

17   A.   I KNEW HE TRAVELLED FOR ASENQUA -- WITH ALBERT

18   HU PROBABLY TO KOREA ONCE OR TWICE.  I DON'T KNOW.

19   I DON'T REMEMBER.  AND IF HE TRAVELLED THEN HE GET

20   REIMBURSEMENT.

21           I DIDN'T KNOW EXACTLY WHEN OR HOW HE GOT

22   REIMBURSEMENT, I ASSUME HE TRAVELLED AND HE SHOULD

23   ENTITLED TO GET REIMBURSEMENT.  HE DIDN'T TELL ME

24   OF THAT PARTICULAR ASPECT.

25   Q.   BUT YOU UNDERSTOOD IF YOUR HUSBAND WAS

1    TRAVELLING WITH, SAY, ALBERT HU ON VACATION FOR

2    EXAMPLE, HE PROBABLY WOULD NOT GET REIMBURSED BY

3    ASENQUA FOR TRAVELLING WITH MR. HU, RIGHT?

4    A.   IF IT'S FOR -- I DON'T THINK IT'S FOR HIMSELF.

5    HE TRAVELLED WITH ALL THE OTHER PEOPLE IF THEY ASK

6    FOR HIS HELP, HE TRAVELLED WITH THEM TO HELP OUT.

7    Q.   SO YOUR UNDERSTANDING -- I APOLOGIZE I

8    INTERRUPT YOU, I APOLOGIZE.  PLEASE.

9    A.   NO, I'M JUST SAYING HE DID THAT WITH MANY

10   OTHER ACTIVITIES, NOT ONLY WITH ALBERT HU.  IF

11   THERE'S SOMETHING THAT AN INVESTOR OR FRIENDS OR

12   COMPANY THAT REQUIRED HIS ASSISTANCE AND HE AGREED

13   TO, HE TRAVELLED WITH THEM.

14   Q.   SO YOUR UNDERSTANDING IS THAT WHEN HE WAS

15   TRAVELLING WITH ALBERT HU HE WAS TRAVELLING TO HELP

16   ALBERT; IS THAT CORRECT?

17   A.   YES.

18   Q.   OKAY.  AND THAT'S WHY ASENQUA WAS REIMBURSING

19   YOUR HUSBAND FOR HIS TRAVEL EXPENSES; IS THAT

20   CORRECT?

21   A.   I DIDN'T KNOW ASENQUA REIMBURSE HIM HIS TRAVEL

22   EXPENSES.  BUT I ASSUMED HE'S NOT GOING TO PAY HIS

23   WAY TO THE TRAVEL.

24   Q.   I GUESS MY QUESTION TO YOU IS DO YOU KNOW IF

25   ASENQUA EVER PAID TO YOUR HUSBAND ANY REIMBURSEMENT

548

1    FOR TRAVEL EXPENSES FOR TRAVELLING WITH MR. HU?

2    A.   I DIDN'T KNOW.  I DID NOT KNOW EXACTLY.  I DID

3    NOT KNOW.  I KNEW HE TRAVELLED WITH ALBERT HU.

4    Q.   BUT YOU KNEW THAT HE TRAVELLED WITH MR. HU BUT

5    YOU DO NOT KNOW EVEN AS YOU SIT HERE IF ASENQUA

6    EVER PAID TO YOUR HUSBAND ANY REIMBURSEMENT

7    PAYMENTS FOR TRAVELLING WITH MR. HU; IS THAT

8    CORRECT?

9    A.   IT'S CORRECT.  I DID NOT KNOW.  BUT I THINK HE

10   SHOULD GET TRAVELLING EXPENSE REIMBURSED.

11   Q.   NOW, I'M GOING TO DIRECT YOUR ATTENTION TO

12   GOVERNMENT EXHIBIT -- BATES NUMBER HU001026A, AS IN

13   APPLE.  AND I WILL SHOW THE DOCUMENT SO THAT

14   PERHAPS THAT MIGHT HELP.  IN FACT, I WILL LET YOU

15   JUST WORK OFF OF THAT DOCUMENT IF THAT'S OKAY.

16        NOW, THAT'S THE DOCUMENT, THAT'S A

17   RECEIPT OR ACKNOWLEDGEMENT THAT ON JULY 2ND, 2004,

18   THAT ASENQUA RECEIVED $200,000 OF INVESTMENT, THE

19   FIRST INVESTMENT THAT YOU MADE ON BEHALF OF YOUR

20   SISTER, RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND THAT'S THE DOCUMENT THAT CONTAINS THE TWO

23   SIGNATURES THAT YOU TESTIFIED TO EARLIER, ANTHONY

24   POLLACE AND ALBERT HU, RIGHT?

25   A.   THAT'S CORRECT.

1    Q.   AND THIS IS REGARDING THE -- ACKNOWLEDGING THE

2    RECEIPT OF A WIRE PAYMENT ON JULY 2ND, 2004, RIGHT?

3    A.   RIGHT.

4    Q.   OKAY.  AND THIS STATEMENT IN FACT IS DATED

5    JULY 2ND, 2004, RIGHT?

6    A.   YES.

7    Q.   OKAY.  NOW, BEFORE YOU SENT IN THE MONEY, THE

8    $200,000 ON BEHALF OF YOUR SISTER, HAVE YOU EVER

9    HEARD OF THE NAME ANTHONY POLLACE BEFORE?

10   A.   NO.

11   Q.   AND BEFORE YOU SENT IN THE $200,000 THAT'S

12   REFLECTED IN THE EXHIBIT THAT WE ARE PUBLISHING

13   HERE, BEFORE YOU SENT IN THE MONEY HAD YOU EVEN

14   HEARD OF ANTHONY POLLACE BEFORE?

15   A.   NO.

16   Q.   OKAY.  AT THAT TIME YOU SENT IN THE FIRST

17   $200,000 ON BEHALF OF YOUR SISTER YOU HAD NO IDEA

18   WHO ANTHONY POLLACE WAS, RIGHT?

19   A.   CORRECT.

20   Q.   OKAY.  THANK YOU.  NOW YOU TESTIFIED EARLIER

21   THAT YOU, OF COURSE, HAVE BEEN ACTING ON BEHALF OF

22   YOUR YOUNGER SISTER, YU-MEI DOONG, RIGHT?

23        IS THAT A YES, I'M SORRY.

24   A.   YES.

25   Q.   BUT YOU ARE NOT YU-MEI DOONG'S TRUSTEE, ARE

1    YOU?  LET ME ASK YOU, ARE YOU YU-MEI DOONG'S

2    TRUSTEE?

3    A.    DEFINE TRUSTEE.  I'M NOT SURE I'M --

4    Q.    SURE.  ARE YOU AWARE THERE IS A TRUST DOCUMENT

5    A LEGAL TRUST DOCUMENT APPOINTING YOU AS A TRUSTEE

6    ON BEHALF OF YOUR SISTER YU-MEI DOONG?

7    A.    WELL, WE HAD A NOTARIZED DOCUMENT WITH

8    AMERICAN INSTITUTE IN TAIWAN THAT YU-MAI DOONG

9    ENTRUST ME TO HANDLE ALL HER FINANCIAL INVESTMENTS

10   ABROAD.

11   Q.    OKAY.  AND THIS WAS NOT A DOCUMENT THAT'S

12   INCLUDED IN THE LIST OF DOCUMENTS YOU TURNED OVER

13   TO THE GOVERNMENT; IS THAT CORRECT?

14   A.    THAT'S CORRECT.

15   Q.    OKAY.

16         MR. FONG:  THANK YOU VERY MUCH FOR YOUR

17   PATIENCE.  I APPRECIATE IT.

18         THE COURT:  ANYTHING FURTHER?

19         MR. LUCEY:  VERY BRIEF, YOUR HONOR.

20

21         **REDIRECT EXAMINATION BY MR. LUCEY**

22

23   BY MR. LUCEY:

24   Q.    GOOD AFTERNOON, MS. DOONG.

25   A.    GOOD AFTERNOON.

1    Q.   I JUST HAVE A COUPLE OF QUICK FOLLOW UP

2    QUESTIONS FOR YOU REGARDING THE TOPICS MR. FONG HAD

3    COVERED.

4         FIRST, YOU RECALL MR. FONG DURING HIS

5    QUESTIONING OF YOU HAD ASKED YOU ABOUT WHAT

6    DOCUMENTS YOU HAD REVIEWED AND REFERRED TO AND

7    RELIED ON PRIOR TO MAKING THE FIRST INVESTMENT?

8    A.   YES.

9    Q.   ON BEHALF OF YOUR SISTER IN JULY 2004?

10   A.   YES.

11   Q.   AND YOU HAD MADE A REFERENCE TO, YOU HAD SEEN

12   DOCUMENTS REGARDING A NATURE OF PRIOR PERFORMANCE?

13   A.   YES.

14   Q.   BY THE ASENQUA BETA FUND?

15   A.   YES.

16   Q.   IN COMPARISON TO MARKET RETURNS?

17   A.   YES.

18   Q.   DO YOU HAVE AN UNDERSTANDING OR RECOLLECTION

19   AS TO WHO, WHAT PERSON PREPARED THAT DOCUMENT YOU

20   WERE REFERRING TO IN REGARDS TO RETURNS?

21   A.   WHAT PERSON PREPARED?

22   Q.   YES, IF YOU KNOW.

23   A.   ALBERT HU'S OFFICE.

24   Q.   ALSO, SEPARATELY NOW, MS. DOONG, ANOTHER

25   TOPIC.  DO YOU RECALL EARLIER WHEN MR. FONG WAS

1     QUESTIONING YOU HE WAS ASKING YOU ABOUT SOME OF THE

2     CONVERSATIONS YOU HAD WITH YOUR HUSBAND?

3     A.   YES.

4     Q.   IN REGARD TO THE INITIAL, WHEN YOU INITIALLY

5     LEARNED ABOUT MR. HU?

6     A.   YES.

7     Q.   AND YOU HAD I THINK STARTED TO GIVE AN ANSWER

8     REGARDING WHAT YOU HAD HEARD ABOUT WHAT YOUR

9     HUSBAND TOLD YOU ABOUT MR. HU'S CREDENTIALS?

10    A.   YES.

11    Q.   COULD YOU COMPLETE YOUR ANSWER ON THAT FOR US?

12    A.   HE IS MIT, PHD.  WAS A PROFESSOR AT SAN JOSE

13    UNIVERSITY, AND HAD SOME SUCCESSFUL BUSINESS.  I

14    DON'T REMEMBER THE NAME.

15    Q.   OKAY.

16    A.   QUITE A FEW.  AND HE MAKE LECTURES IN TAIWAN,

17    IN CHINA, ALSO IN SOME UNIVERSITY HERE.

18    Q.   NOW, AGAIN, ANOTHER TOPIC NOW, MS. DOONG.

19          YOU RECALL THERE WERE SOME QUESTIONS THAT

20    MR. FONG WAS ASKING YOU ABOUT YOUR AWARENESS OF THE

21    DATABASES AND WEBSITES REGARDING STATE OF

22    CALIFORNIA THAT, WHETHER OR NOT YOU KNEW ABOUT THE

23    STATE OF CALIFORNIA MAINTAINING ANY WEBSITES OR

24    DATABASES RELATIVE TO ACCOUNTING FIRMS AND

25    ACCOUNTANTS?  DO YOU REMEMBER THOSE QUESTIONS?

1    A.   YES.

2    Q.   I JUST WANT TO CLARIFY YOUR ANSWER IN REGARD

3    TO A QUESTION JUST SO WE ARE CLEAR IN TERMS OF THE

4    QUESTIONS YOU GAVE AND ANSWERS YOU GAVE TO MR. FONG

5    EARLIER IN RESPONSE TO HIS QUESTIONS.

6         WERE YOU AWARE AT THE TIME -- OR DID YOU

7    HAVE ANY PERSONAL KNOWLEDGE AS TO WHETHER OR NOT

8    THE CASTILLO, LYN, COHEN & VIJAY FIRM, THE

9    ACCOUNTING FIRM YOU LOOKED AT IN EXHIBIT 63 EARLIER

10   TODAY, DID YOU HAVE ANY PERSONAL KNOWLEDGE AT THAT

11   TIME YOU REVIEWED THE DOCUMENT AS TO WHETHER OR NOT

12   THEY HAD A LICENSE TO PRACTICE ACCOUNTANCY IN THE

13   STATE OF CALIFORNIA?

14   A.   NO.  I THOUGHT THEY HAD A LICENSE.

15   Q.   OKAY.  AND ALSO IN RESPONSE TO A QUESTION, I

16   JUST WANT TO BE CLEAR FOR THE RECORD, THE ANSWER I

17   HAVE WRITTEN DOWN I WANT TO BE CLEAR OF WHAT YOUR

18   TESTIMONY ON.

19        AGAIN, ON THE CASTILLO, LYN, COHEN &

20   VIJAY TOPIC, MS. DOONG, DO YOU HAVE ANY PERSONAL

21   KNOWLEDGE CONFIRMING THAT THE CASTILLO, LYN NUMBERS

22   WERE CORRECT OR INCORRECT IN THE EXHIBIT 63 WE

23   LOOKED AT TODAY?

24   A.   NO.  CAN YOU REPEAT THE QUESTION?

25   Q.   YES.  I THINK YOU TESTIFIED SEVERAL TIMES

1    TODAY THAT YOU DID REVIEW THAT CASTILLO, LYN, COHEN

2    & VIJAY AUDITING REPORT, CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   DID YOU HAVE ANY PERSONAL KNOWLEDGE CONFIRMING

5    THE ACCURACY OF THE NUMBERS THEMSELVES OTHER THAN

6    YOUR REVIEW OF THEM, DO YOU HAVE ANY PERSONAL

7    KNOWLEDGE REGARDING THEIR ACCURACY?

8    A.   NO, JUST COUNT ON THE DATA I SAW.

9    Q.   JUST BASED ON YOUR REVIEW OF IT?

10   A.   BELIEVING IT'S TRUE.

11   Q.   YOU UNDERSTOOD THOSE NUMBERS TO BE CORRECT?

12   A.   YES.

13   Q.   AGAIN, ANOTHER TOPIC NOW, MS. DOONG.

14        DO YOU RECALL THERE WAS DISCUSSION TODAY

15   REGARDING THE PROCESS OF WITHDRAWING MONEY FROM THE

16   ASENQUA BETA FUND AND THE FIRESIDE FUND AND

17   MR. FONG HAD QUESTIONS REGARDING THAT.

18   A.   YES.

19   Q.   MY QUESTION TO YOU NOW, TO THE BEST OF YOUR

20   RECOLLECTION, DID YOU FOLLOW ALL THE INSTRUCTIONS

21   THAT MR. HU GAVE TO YOU IN REGARD TO WITHDRAWING

22   YOUR MONEY FROM -- YOU AND ON BEHALF OF YOUR SISTER

23   IN THE FIRESIDE FUND AND THE AQC FUND?

24   A.   DILIGENTLY, YES.

25   Q.   TO THE BEST OF YOUR ABILITY?

1    A.   YES.

2    Q.   WERE THERE ANY INSTRUCTIONS THAT MR. HU GAVE

3    TO YOU THAT YOU CHOSE NOT TO FOLLOW?

4    A.   NO.

5    Q.   AGAIN, ANOTHER TOPIC NOW.  YOU RECALL THERE

6    WERE SOME QUESTIONS ASKED BY MR. FONG IN REGARD TO

7    YOUR UNDERSTANDING ABOUT THE BACKGROUND AND TRACK

8    RECORD OF AQC PRIOR TO YOUR INVESTING?

9    A.   YES.

10   Q.   WHAT DID YOU UNDERSTAND WOULD HAPPEN TO YOUR

11   MONEY THE $300,000 YOU INVESTED ONCE IT WAS

12   PROVIDED TO MR. HU IN CONNECTION WITH THE AQC FUND?

13   A.   BASED ON THE PERFORMANCE OF ASENQUA BETA AND

14   ALSO THE FIRESIDE FUND, I ASSUMED AND I FELT THAT

15   IT WOULD OFFER ME A POSITIVE GAIN IN THE FUTURE.

16   Q.   LET ME ASK THE QUESTION A DIFFERENT WAY,

17   MS. DOONG.

18        WHAT DID YOU UNDERSTAND WAS GOING TO BE

19   THE NATURE OF THE INVESTMENT IN TERMS OF THE

20   INVESTMENT PROCESS IN REGARD TO AQC?  HOW WAS IT

21   GOING TO BE INVESTED, WHAT TYPE OF INVESTMENT --

22   WHAT WAS YOUR UNDERSTANDING IT WAS GOING TO BE

23   GOING TOWARD IN REGARD TO AQC?

24   A.   I DON'T UNDERSTAND THE QUESTION.  YOU MEAN

25   INVESTING IN WHAT FIELD, WHAT INDUSTRY?

1    Q.    EXACTLY.

2    A.    IN THE HIGH-TECH INDUSTRY.

3    Q.    OKAY.  AND THAT WAS GOING TO BE IN EQUITIES,

4    STOCKS?

5    A.    YES.

6    Q.    OKAY.

7              MR. LUCEY:  JUST A MOMENT, YOUR HONOR.  I

8    THINK WE ARE JUST ABOUT DONE.

9              NO FURTHER QUESTIONS, YOUR HONOR

10             THE COURT:  ALL RIGHT.

11             YOU MAY STEP DOWN.  THANK YOU.

12             THE WITNESS:  SHOULD I LEAVE THIS HERE?

13             THE COURT:  YES.

14             MR. LUCEY:  I WILL COLLECT THAT,

15   YOUR HONOR.

16             THE COURT:  CALL YOUR NEXT WITNESS,

17   PLEASE.

18             MR. FAZIOLI:  THE UNITED STATES CALLS

19   ANDREA DULBERG.

20

21                    **ANDREA DULBERG,**

22   BEING CALLED AS A WITNESS ON BEHALF OF THE

23   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

24   EXAMINED AND TESTIFIED AS FOLLOWS:

25             THE WITNESS:  YES, I DO.

1          THE CLERK:  THANK YOU.  TAKE THE STAND,

2     PLEASE.  FOR THE RECORD PLEASE STATE YOUR FULL NAME

3     AND SPELL YOUR LAST NAME.

4          THE WITNESS: ANDREA DULBERG.

5     D-U-L-B-E-R-G.

6

7          **DIRECT-EXAMINATION BY MR. FAZIOLI**

8

9     BY MR. FAZIOLI:

10    Q.   GOOD AFTERNOON, MS. DULBERG.

11         WHERE DO YOU CURRENTLY LIVE?

12    A.   IN PURCHASE, NEW YORK.

13    Q.   ARE YOU CURRENTLY EMPLOYED?

14    A.   YES, I AM.

15    Q.   WHERE ARE YOU EMPLOYED?

16    A.   AT GLOBEOP FINANCIAL SERVICES.

17    Q.   WHAT IS YOUR -- IS YOUR ORGANIZATION ALSO

18    KNOWN AS GLOBEOP FINANCIAL SERVICES LLC?

19    A.   YES IT IS.

20    Q.   AND WHAT IS YOUR POSITION AT GLOBEOP?

21    A.   I'M GENERAL COUNSEL.

22    Q.   AND HOW LONG HAVE YOU BEEN IN THIS POSITION?

23    A.   SIX YEARS.

24    Q.   AND CAN YOU PLEASE DESCRIBE FOR THE JURY YOUR

25    DUTIES AS GENERAL COUNSEL OF GLOBEOP?

1    A.   I OVER SEE THE WHOLE LEGAL AND COMPLIANCE

2    FUNCTION AT THE COMPANY.  I HAVE A STAFF OF LAWYERS

3    AND PARALEGALS REPORTING TO ME.  I ADVISE ON ANY

4    SORT OF LEGAL ISSUES RELATES TO GLOBEOP.

5            WE HAVE BEEN A PUBLIC COMPANY SINCE 2007

6    I DEAL WITH PUBLIC COMPANY ISSUES, I ADVISE ON ANY

7    LEGAL ISSUES THAT COME UP WITH CLIENTS AND ON

8    COMPLIANCE MATTERS RELATING TO CLIENTS.

9    Q.   APPROXIMATELY HOW MANY ATTORNEYS AND

10   PARALEGALS REPORT TO YOU?

11   A.   ABOUT TEN.

12   Q.   AND WHAT IS THE GENERAL -- WHAT KIND OF

13   BUSINESS IS GLOBEOP?

14   A.   WE ARE A HEDGE FUND ADMINISTRATOR AND WE ALSO

15   PROVIDE MIDDLE AND BACK OFFICES TO HEDGE FUND --

16   PRIMARILY HEDGE FUNDS.

17   Q.   WHAT SORT OF ADMINISTRATIVE SERVICES DOES

18   GLOBEOP PROVIDE TO HEDGE FUNDS?

19   A.   AS AN ADMINISTRATOR WE WOULD CALCULATE THE

20   FUNDS AND ASSET VALUE AT THE END OF EACH MONTH.  WE

21   WOULD DO, KEEP THE REGISTER OF INVESTORS FOR THE

22   FUND, DO THE ANTI MONEY LAUNDERING CHECKS ON

23   INVESTORS WHO WERE INVESTING INTO THE FUND.

24   Q.   WHAT DOES IT MEAN TO CALCULATE A NET NET ASSET

25   VALUE FOR A HEDGE FUND?

1    A.   YOU TAKE THE HEDGE FUNDS INVESTING IN

2    DIFFERENT ASSETS YOU TAKE THE VALUES OF EACH OF

3    THOSE ASSETS ADD THEM TOGETHER CALCULATE THEN GET A

4    FULL ASSET VALUE FOR THE FUND ITSELF UPON.  THEN DO

5    THE BREAKDOWN OF INVESTOR BASED ON THEIR

6    INVESTMENTS OF THE FUND.

7    Q.   GENERALLY, JUST IN CASE THE JURORS DO NOT

8    KNOW, WHAT IS A HEDGE FUND?

9    A.   A HEDGE FUND IS A POOL OF INVESTORS POOLING

10   MONEY TOGETHER TO MAKE INVESTMENTS, NOT DISSIMILAR

11   FROM REGULAR MUTUAL FUND OTHER THAN BY REGULATION,

12   IT TENDS TO BE LIGHTLY REGULATED.

13   Q.   AND WHERE -- WHAT OFFICE ARE YOU BASED OUT OF?

14   A.   I'M IN HARRISON, NEW YORK.

15   Q.   DOES GLOBEOP HAVE A PROMINENT REPUTATION IN

16   THE HEDGE FUND INDUSTRY?

17   A.   YES, WE DO.

18   Q.   AND IS GLOBEOP'S PUBLIC REPUTATION IMPORTANT

19   TO ITS BUSINESS?

20   A.   YES, IT'S VERY IMPORTANT.

21   Q.   WHY IS GLOBE OP'S PUBLIC REPUTATION IMPORTANT

22   TO ITS BUSINESS?

23   A.   IN ORDER FOR CLIENTS, THE INVESTMENT MANAGERS

24   TO RETAIN US AND HIRE US AND FOR INVESTORS TO BE

25   COMFORTABLE INVESTING INTO FUNDS THAT USE US AS

1    ADMINISTRATOR WE HAVE TO KEEP OUR REPUTATION

2    STELLAR.

3    Q.   AND WHAT IS THE PROCESS BY WHICH A HEDGE FUND

4    WOULD RETAIN THE SERVICES OF GLOBEOP?

5    A.   GENERALLY IT STARTS WITH OUR SALES TEAM WHO

6    WOULD SPEAK WITH DIFFERENT PROSPECTS DEPENDING ON

7    IF IT'S AN EXISTING FUND OR A NEW START UP FUND,

8    THEIR FIRST GENERALLY IS WITH OUR SALES TEAM.

9              ONCE THEY ARE COMFORTABLE WITH THE

10   PRICING WITH THE SERVICES THAT THEY WANT, THERE

11   WILL BE AN OFFER LETTER THAT IS DRAFTED AND GOES

12   OUT TO THE CLIENT.

13             WHEN THE CLIENT SIGNS THAT OFFER LETTER,

14   THAT WILL GET LOADED INTO OUR SYSTEM AND THAT WILL

15   START THE CONTRACT PROCESS, THE LEGAL TEAM TAKE

16   THAT IS OFFER LETTER THEN CREATES A DRAFT OF THE

17   CONTRACT THAT WE WILL ASK THE CLIENT TO SIGN.

18   Q.   AND I THINK YOU MENTIONED SIGNING A CONTRACT.

19             ARE THERE IMPORTANT -- ARE THERE

20   ACCOUNTING REASONS RELATED TO WHY IT'S IMPORTANT TO

21   SIGN A CONTRACT BEFORE YOU START PROVIDING SERVICES

22   TO A CLIENT?

23   A.   YES.  GENERALLY, WE CANNOT RECOGNIZE REVENUES

24   FROM A CLIENT UNLESS WE HAVE A SIGNED CONTRACT IN

25   PLACE.  SO WE HAVE A POLICY REQUIRING THE CONTRACT

1    BE SIGNED.

2              ON OCCASION, AN EXCEPTION WILL BE MADE

3    FOR A SHORT TIME PERIOD.  IF THEY NEED ADDITIONAL

4    TIME TO REVIEW THE TERMS OF THE CONTRACT, SINCE WE

5    CAN'T RECOGNIZE REEF NEWS UNDER THE ACCOUNTING

6    ROLES UNTIL WE HAVE A SIGNED CONTRACT, IT'S

7    CRITICAL AND GETS ESCALATED IN THE FIRM.

8    Q.   WHEN YOU SAY RECOGNIZED REVENUE, WHAT DO YOU

9    MEAN BY THAT?

10   A.   IT MEANS WE CAN'T COUNT ON IT.  IF WE HAVE

11   PROVIDE THE THE SERVICES THAT MONTH HAVE BEEN WE

12   HAVE INVOICED THE CLIENT FOR THE SERVICES THEY HAVE

13   PAID IT, UNLESS WE HAVE A SIGNED CONTRACT THAT

14   SHOWS WE WERE ENTITLED TO THAT INCOME FROM THE

15   CLIENT WE CAN'T RECOGNIZE IT INTO OUR INCOME.

16   Q.   AND IS THAT PART OF THE REASON WHY IT'S

17   IMPORTANT FOR GLOBEOP TO HAVE ACCURATE RECORDS OF

18   ITS CLIENTS?

19   A.   ABSOLUTELY ALL OUR CONTRACTS ARE LOADED IN OUR

20   DATABASE.

21   Q.   DOES YOUR ORGANIZATION AGREE TO PROVIDE

22   SERVICES TO EVERY POTENTIAL HEDGE FUND WHO WANTS TO

23   HIRE GLOBEOP?

24   A.   NO.

25   Q.   WHY NOT?

1     A.   IT COULD VARY IN REASON FROM THE FUND JUST

2     BEING TOO SMALL WE DON'T THINK IT HAS POTENTIAL TO

3     BE PROFITABLE FOR US, THE FUND HAS TO BE OF A

4     CERTAIN SIZE TO ACTUALLY BE PROFITABLE FOR US IT'S

5     A CERTAIN AMOUNT OF SERVICES THAT WE HAVE TO DO

6     REGARDLESS WHEN WE GET PAID BASED ON THE SIZE OF

7     THE FUND.

8              SO WE HAVE TO -- EITHER IT HAS TO BE

9     LAUNCHING WITH SIGNIFICANT ENOUGH ASSETS OR HAVE

10    THE POTENTIAL TO GROW TO BE SIGNIFICANT.  BUT IN

11    ADDITION, WE HAVE -- WE DO DUE DILIGENCE ON ALL ARE

12    OF OUR PROSPECTIVE CLIENTS BEFORE THEY CAN COME ON

13    THE FLAT FORM.

14             WE HAVE REGULATORY REQUIREMENTS THAT'S

15    KNOWN AS KYC, WHICH IS KNOW YOUR CUSTOMER.  SO WE

16    WILL REQUIRE REFERENCES FROM PROCEDURAL CLIENTS FOR

17    BOTH THE ENTITIES IF THEY HAVE A HISTORY, BUT ALSO

18    THE PRINCIPLES OF THE INVESTMENT MANAGER.

19    Q.   SO THERE'S A VETTING PROCESS THAT GLOBEOP DOES

20    WITH ITS PROSPECTIVE CLIENTS?

21    A.   YES.

22    Q.   AND I THINK YOU MENTIONED KYC.  CAN YOU

23    EXPLAIN A LITTLE MORE TO THE JURY WHAT KYC

24    REQUIREMENTS ARE?

25    A.   YES.  IT MEANS YOU HAVE TO KNOW THE CUSTOMERS,

1    KNOW WHAT THEIR BACKGROUND IS.  AND GENERALLY ALSO

2    IT'S A CLIENT IN WHICH YOU ARE TAKING MONEY FROM

3    YOU HAVE TO KNOW THE SOURCE OF THOSE FOUNDS WHERE

4    IT'S COMING FROM.

5    Q.   WHAT COULD BE SOME OF THE RISK TO GLOBEOP IF

6    IT WAS AFFILIATED WITH A DISREPUTABLE HEDGE FUND?

7    A.   REPUTATIONALLY IT WOULD BE POTENTIALLY VERY

8    BAD FOR THE FIRM.  ANY TIME YOU KNOW THERE'S

9    NEGATIVE PUBLICITY INVOLVED WITH A CLIENT OF OURS

10   IT HURTS US TREMENDOUSLY IN TERMS OF BRINGING IN

11   NEW CLIENTS, GETTING INVESTORS TO BE COMFORTABLE

12   INVESTING IN FUNDS OR FOR GLOBEOP AS THE

13   ADMINISTRATOR.

14   Q.   AND THAT IS IN PART OF THE MOTIVATION FOR YOUR

15   PRACTICES REGARDING VETTING CLIENTS?

16   A.   YES.

17   Q.   I THINK YOU PREVIOUSLY MENTIONED THAT AS PART

18   OF REGULAR PRACTICES OF ITS BUSINESS THAT GLOBEOP

19   KEEPS RECORDS ABOUT ITS CLIENTS, CORRECT?

20   A.   THAT'S RIGHT.

21   Q.   AND IS THAT RETAINED CLIENTS OR ALSO

22   PROSPECTIVE CLIENTS?

23   A.   WE KEEP GENERALLY WE HAVE A VERY THOROUGH

24   DOCUMENT SYSTEM FOR THE CLIENTS THAT LAUNCH ON OUR

25   PLATFORM.

1         PROSPECTIVE CLIENTS THAT WE WOULD KEEP A

2    SALES FORCE SYSTEM WHICH IS SOFTWARE THAT THE SALES

3    TEAM USES TOO KEEP TRACK OF ITS PROSPECTS IT TRACKS

4    COMMUNICATIONS WITH ALL PROSPECTS.

5         SO PROSPECTIVE CLIENTS THAT NEVER BECOME

6    CLIENTS WOULD STILL BE ON THAT SYSTEM.

7    Q.   DOES GLOBEOP ENTER THE NAMES OF ACTUAL AND

8    PROSPECTIVE CLIENTS INTO ITS DATABASES AT OR NEAR

9    THE TIME THAT THOSE ACTUAL OR PROSPECTIVE CLIENTS

10   APPROACH THE FIRM?

11   A.   YES, FROM FIRST COMMUNICATION.

12   Q.   AND WHAT HAPPENS IN A HEDGE FUND CLIENT WERE

13   TO NO LONGER BE A CLIENT OF GLOBEOP WOULD YOU STILL

14   MAINTAIN RECORDS INDICATING THAT THERE HAD BEEN A

15   CLIENT RELATIONSHIP INTERNALLY?

16   A.   IF THEY WERE A CLIENT HAD SIGNED A CONTRACT

17   AND THEN TERMINATED WITH US?

18   Q.   YES.

19   A.   ABSOLUTELY.

20   Q.   OKAY.  AND DOES GLOBEOP GENERALLY MAKE

21   AVAILABLE TO THE PUBLIC THE FACT THAT IT HAS

22   CERTAIN HEDGE FUND CLIENTS?

23   A.   NO, NOT GENERALLY.

24   Q.   IS THAT FOR REASONS OF CONFIDENTIALITY AND

25   OTHER THINGS?

1    A.   YES GENERALLY OUR CLIENTS AND OUR CONTRACTS

2    WITH OUR CLIENTS OUR CLIENTS GENERALLY REQUIRE

3    CONFIDENTIALITY INCLUDING THE FACT WE ARE THE

4    ADMINISTRATOR FOR THE FUND.

5    Q.   HAVE YOU EVER DIRECTED A SEARCH EVER GLOBEOP

6    CLIENT RECORDS TO SEE WHETHER THE DEFENDANT ALBERT

7    HU, VARIOUS ASENQUA REPORTED ENTITIES OR VARIOUS

8    FIRESIDE RELATED ENTITIES HAD EVER RETAINED GLOBEOP

9    AS AN ADMINISTRATOR?

10   A.   YES, WE DID.

11   Q.   AND WHEN DID YOU CONDUCT THIS SEARCH?

12   A.   SOMETIME IN 2009.

13   Q.   AND DO YOU RECALL WHAT WERE SOME OF THE SEARCH

14   TERMS FOR WHICH YOU SEARCHED?

15   A.   ALBERT HU, ASENQUA, FIRESIDE, AND ASSORTED

16   OTHER LEGAL ENTITIES THAT WERE NAMES THAT WERE

17   PROVIDED TO ME.

18   Q.   INCLUDING FIRESIDE LS FUND?

19   A.   YES.

20   Q.   DID YOU FIND ANY RECORDS THAT INDICATED THAT

21   GLOBEOP HAD EVER BEEN RETAINED OR APPROACHED TO BE

22   RETAINED TO SERVE AS AN ADMINISTRATOR FOR ALBERT

23   HU, IT IS ASENQUA BETA FUND, FIRESIDE LS FUND, AQC,

24   OR ANY OTHER ENTITY ASSOCIATED WITH THE DEFENDANT?

25   A.   NO.

1    Q.   DO YOU THINK THAT YOU WOULD HAVE FOUND SUCH

2    RECORDS IF ALBERT HU THE FIRESIDE LS FUND OR ANY

3    OTHER ENTITY AFFILIATED WITH HIM HAD EVER ENGAGED

4    GLOBEOP AS AN ADMINISTRATOR?

5    A.   YES.

6              MR. FONG:  OBJECTION.  SPECULATION.

7              THE COURT:  OVERRULED.

8    BY MR. FAZIOLI:

9    Q.   LET ME APPROACH WHAT'S BEEN MARKED AS

10   GOVERNMENT EXHIBIT 12.  IF YOU COULD PLEASE TAKE A

11   LOOK AT GOVERNMENT EXHIBIT 12.

12   A.   IS THERE A SPECIFIC PAGE.

13   Q.   THE FIRST PAGE.  HAVE YOU REVIEWED GOVERNMENT

14   EXHIBIT 12?

15   A.   NOT BEFORE TODAY.  WHILE I WAS WAITING

16   SOMEBODY SHOWED ME THE DOCUMENT OR SIMILAR

17   DOCUMENT, BUT I HADN'T BEFORE TODAY.

18   Q.   CAN YOU PLEASE INDICATE WHAT IT STATES THE

19   FIRST TWO LINES, THE FIRST PAGE OF GOVERNMENT

20   EXHIBIT 12?

21   A.   PURSUANT TO AN EXEMPTION.

22   Q.   THAT'S A TITLE AT THE TOP?

23   A.   FIRESIDE LS FUND CONFIDENTIAL PLACEMENT

24   MEMORANDUM.

25   Q.   CAN PLEASE READ THE TEXT AT THE BOTTOM FOUR

1    LINES OF TEXT NEAR THE MIDDLE?

2    A.   FIRESIDE PARTNERS LLC, GENERAL PARTNER,

3    FIRESIDE CAPITAL MANAGEMENT LIMITED INVESTMENT

4    MANAGER, THE DATE OF THIS MEMORANDUM IS JUNE 30,

5    2005.

6    Q.   LET ME DRAW YOUR ATTENTION TO PAGE, I THINK

7    IT'S -- JUST A MOMENT.  PAGE NINE OF THIS DOCUMENT.

8    IT'S BATES STAMPED AT THE BOTTOM HU00148?

9    A.   YES.

10   Q.   AND DO YOU SEE THAT THERE'S A LINE THERE THAT

11   INDICATES ADMINISTRATOR DO YOU SEE THAT?

12   A.   YES, I DO.

13         MR. FAZIOLI:  YOUR HONOR, AT THIS TIME

14   WITHOUT AN OBJECTION FROM THE DEFENSE, I WOULD LIKE

15   TO PUBLISH THIS PAGE OF EXHIBIT 12 TO THE JURY.

16         MR. FONG:  NO OBJECTION, YOUR HONOR.

17         THE COURT:  ALL RIGHT.

18   Q.   SO THIS DOCUMENT GOVERNMENT EXHIBIT 12 IS

19   ENTITLED A CONFIDENTIAL PRIVATE PLACEMENT

20   MANAGEMENT FOR THE FIRESIDE LS FUND CORRECT?

21   A.   YES.

22   Q.   SO DRAWING YOUR ATTENTION HERE TO PAGE 9 OF 40

23   OF THIS DOCUMENT, CAN YOU SEE THAT THERE'S --

24   MS. BURNEY, WOULD YOU MIND BLOWING UP THE SECTION

25   AUDITORS AND THE TEXT NEXT TO THAT.

1      MS. DULBERG, WHAT DOES THAT TEXT SAY NEXT

2    TO THE WORD AUDITORS

3    A.   CASTILLO, LYN, COHEN & VIJAY LLC.

4    Q.   THEN, MS. BURNEY COULD YOU PLEASE BLOW UP THE

5    NEXT SECTION WHERE IT SAYS ADMINISTRATOR.

6         CAN YOU READ THE HIGHLIGHTED TEXT THAT

7    SAYS ADMINISTRATOR WITHIN GOVERNMENT EXHIBIT 12

8    A.   GLOBEOP FINANCIAL SERVICES LLC, THE

9    ADMINISTRATOR, HAS BEEN RETAINED BY THE FUND AND

10   THE MASTER FUND TO PERFORM DAY-TO-DAY

11   ADMINISTRATIVE AND BOOKKEEPING SERVICES AND TO

12   SERVE AS REGISTRAR AND TRANSFER AGENTS.

13   Q.   THAT STATEMENT THAT'S HIGHLIGHTED THERE IN

14   GOVERNMENT EXHIBIT 12, IS THIS A FALSE STATEMENT?

15   A.   YES, IT'S FALSE.

16   Q.   HOW DO YOU KNOW THAT THAT STATEMENT IN

17   GOVERNMENT EXHIBIT 12 IS A FALSE STATEMENT?

18   A.   BECAUSE I CHECKED OUR SYSTEMS AND WE HAVE NO

19   RECORD OF THE FIRESIDE LS FUND IN ANY OF OUR

20   DATABASES AND WE HAVE NO CONTRACT ON FILE FOR THEM.

21        MR. FAZIOLI:  I HAVE NO FURTHER

22   QUESTIONS, YOUR HONOR.

23        THE COURT:  MR. FONG, ANY QUESTIONS?

24        MR. FONG:  NO QUESTIONS, YOUR HONOR.

25        THE COURT:  ALL RIGHT.

1          YOU MAY BE EXCUSED.

2          YES?

3          MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

4     NEXT CALLS MARK SZTO THE STAND.

5          THE CLERK:  COME FORWARD AND I WILL SWEAR

6     YOU IN.

7                    **MARK SZTO,**

8     BEING CALLED AS A WITNESS ON BEHALF OF THE

9     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

10    EXAMINED AND TESTIFIED AS FOLLOWS:

11         THE WITNESS:  YES.

12         THE CLERK:  TAKE THE STAND OVER THERE,

13    PLEASE.  FOR THE RECORD PLEASE STATE YOUR FULL NAME

14    AND SPELL YOUR LAST NAME.

15         THE WITNESS:  MARK SZTO.  S-Z-T-O.

16

17         **DIRECT-EXAMINATION BY MR. LUCEY**

18

19    BY MR. LUCEY:

20    Q.   GOOD AFTERNOON, SIR.

21    A.   GOOD AFTERNOON.

22    Q.   SIR, WHERE DO YOU CURRENTLY RESIDE?

23    A.   WORK?

24    Q.   WHERE DO YOU LIVE?

25    A.   FREMONT, CALIFORNIA.

1    Q.   HOW LONG HAVE YOU LIVED THERE?

2    A.   OVER 20 YEARS.

3    Q.   AND SIR, WHERE ARE YOU CURRENTLY EMPLOYED?

4    A.   REGIS.

5    Q.   HOW LONG HAVE YOU BEEN EMPLOYED WITH REGIS?

6    A.   FIVE YEARS.

7    Q.   WHAT IS YOUR JOB TITLE AT REGIS?

8    A.   AREA OPERATIONS DIRECTOR.

9    Q.   WHAT ARE YOUR JOB DUTIES IN GENERAL TERMS?

10   A.   I OVER SEE THE SAN FRANCISCO BAY AREA AS FAR

11   AS THE CENTERS WE OPERATE.

12   Q.   AND SO NEXT OBVIOUS QUESTION WOULD BE WHAT IS

13   REGIS?

14   A.   WE OFFER BUSINESS SOLUTIONS, OFFICE SPACE

15   MEETING ROOMS CONFERENCE ROOMS.

16   Q.   AND WHERE DO YOU PROVIDE THOSE SERVICES?

17   A.   ALL OVER THE WORLD.

18   Q.   SO IT'S A WORLDWIDE COMPANY?

19   A.   YES.

20   Q.   AND DID REGIS OVER THE YEARS EVER HAVE ANY

21   CONNECTION TO AN ENTITY CALLED HQ GLOBAL WORK

22   PLACE?

23   A.   YES.

24   Q.   WHAT IS THAT RELATIONSHIP?

25   A.   WE ACQUIRED THEM SO THEY ARE PART OF OUR

1    COMPANY.

2    Q.   SO HOW LONG AGO DID THAT ACQUISITION TAKE

3    PLACE?

4    A.   I DON'T KNOW EXACTLY IT HAPPENED BEFORE I

5    STARTED WITH THE COMPANY.

6    Q.   YOU STARTED THERE APPROXIMATELY WHAT YEAR?

7    A.   2007.

8    Q.   AND WHAT KIND OF SERVICES DOES THE HQ GLOBAL

9    PART OF REGIS PROVIDE TO CLIENTS?

10   A.   IT'S THE SAME.

11   Q.   OKAY.  SO IN GENERAL TERMS YOU SAID IT'S

12   BUSINESS SERVICES, COULD YOU BE MORE SPECIFIC ABOUT

13   THE NATURE OF THE SERVICES THAT REGIS PROVIDES TO

14   ITS CLIENTS?

15   A.   SURE.  WE OFFER FULL TIME OFFICE SPACE.  SO

16   CLIENTS CAN TAKE SPACE OR FULL TIME SPACE.  THEY

17   CAN TAKE A VIRTUAL OFFICE WHICH IS MORE OF A

18   PRESENCE, THEY DON'T HAVE THE OFFICE SPACE BUT THEY

19   HAVE THE ADDRESS THEN THEY HAVE MAILBOX PRODUCTS

20   WHERE THEY HAVE PRODUCTS MAIL THE TO THE CENTERS

21   THEN WE HAVE VIDEO CONFERENCES MEETING ROOMS AND

22   BUSINESS LOUNGES.

23   Q.   SO THERE'S A LEVEL OF SERVICES THAT REGIS CAN

24   PROVIDE TO POTENTIAL AND ACTUAL CLIENTS?

25   A.   CORRECT.

1    Q.   CAN YOU SPEAK MORE TO WHAT YOU MEAN BY VIRTUAL

2    OFFICE?

3    A.   SURE.  WHAT THAT IS IS A CLIENT OR ANYONE

4    PURCHASING THAT PRODUCT CAN HAVE AN ADDRESS WHERE

5    WE CAN ANSWER THEIR PHONES COLLECT THEIR MAIL.

6    THEY DO -- WE PROVIDE THEM WITH OFFICE TIME SO IF

7    THEY WANTED TO USE THE BUSINESS CENTER THEIR

8    ADDRESS IS AT, THEY CAN USE THAT AND THEY HAVE

9    ACCESS TO THE LOUNGES.

10   Q.   AND DOES REGIS MAINTAIN ANY PROPERTIES IN THE

11   CITY OF SAN FRANCISCO?

12   A.   YES.

13   Q.   AND PRIOR TO IT BECOMING PART OF REGIS DID HQ

14   GLOBAL MAINTAIN SUCH OFFICE SERVICES IN THE CITY OF

15   SAN FRANCISCO?

16   A.   YES.

17   Q.   WAS ONE OF THOSE PROPERTIES EMBARCADERO

18   CENTER?

19   A.   YES.

20   Q.   NOW IN REGARD TO THE NATURE OF THE

21   RECORDKEEPING SYSTEM, ARE YOU FAMILIAR WITH THE

22   RECORDKEEPING SYSTEM AND DATABASE FOR REGIS?

23   A.   WHEN YOU SAY RECORDKEEPING, COULD YOU

24   ELABORATE.

25   Q.   SURE.  DOES REGIS MAINTAIN RECORDS REGARDING

1    SERVICES IT PROVIDES TO CLIENTS?

2    A.   YES.

3    Q.   WHO ENTER INTO AGREEMENT?

4    A.   YES.

5    Q.   WHAT SORT OF RECORDS DO THEY MAINTAIN IN

6    GENERAL TERMS?

7    A.   THE AGREEMENTS THEMSELVES WHEN A CLIENT SIGNS.

8    Q.   AND IS THAT PART OF THE REGULAR BUSINESS

9    PRACTICE OF THE FIRM?

10   A.   YES.

11   Q.   DO THEY ALSO MAINTAIN RECORDS OF INVOICES AS

12   WELL?

13   A.   WE DO.

14   Q.   AND HOW ARE THESE CLIENT RECORDS MAINTAINED?

15   A.   WELL, WE HAVE A BILLING DEPARTMENT IN DALLAS

16   SO THEY ARE MOSTLY RETAINED THERE.

17   Q.   SIR, WERE YOU AT SOME POINT CONTACTED BY THE

18   GOVERNMENT TO CONDUCT A RECORDS SEARCH IN REGARD TO

19   RECORDS RELATING TO SPACES FOR CASTILLO, LYN, COHEN

20   & VIJAY?

21   A.   I WASN'T CONTACTED BY THEM DIRECTLY.

22   Q.   WAS YOUR COMPANY REGIS CONTACTED?

23   A.   YES.

24   Q.   DO YOU UNDERSTAND THAT A SEARCH WAS ACTUALLY

25   CONDUCTED?

1    A.    THAT'S MY UNDERSTANDING.

2    Q.    I WANT TO SHOW YOU SOME DOCUMENTS NOW, SIR.

3    THEY HAVE BEEN PREVIOUSLY MARKED AS GOVERNMENT

4    EXHIBIT'S 19, 20 AND 21.

5    Q.    SIR, TAKE A MOMENT TO LOOK AT THE THREE

6    DOCUMENTS 19, 20 AND 21.

7    Q.    SO FIRST TAKING THEM IN NUMERICAL ORDER, WHAT

8    ARE WE LOOKING AT FIRST IN GENERAL TERMS WITHOUT

9    READING THE DOCUMENT, WHAT IS THE DOCUMENT IN

10   EXHIBIT 19?

11   A.    IT'S AN AGREEMENT FOR VIRTUAL OFFICE.

12   Q.    AND HOW ARE YOU ABLE TO RECOGNIZE THIS

13   DOCUMENT?

14   A.    WELL, IT'S TITLED THAT.

15   Q.    OKAY.  WHERE DID THIS DOCUMENT COME FROM, AS

16   YOU UNDERSTAND IT?

17   A.    IT CAME FROM THE CENTER.

18   Q.    AND THE CENTER WHEN YOU SAY CENTER, WHAT DO

19   YOU MEAN BY CENTER?

20   A.    THE LOCATION.

21   Q.    THE LOCATION FOR WHERE THE LEASE IS CONNECTED

22   TO?

23   A.    YES, WHERE THE PERSON SIGNED FOR IT'S

24   LOCATION.

25   Q.    AND THE REFERENCE ON THE SECOND PAGE OF THE

1    DOCUMENT WHICH IS BATES STAMPED 229-A.  DO YOU SEE

2    THE LETTERHEAD AT THE RIGHT-HAND CORNER?

3    A.   YES.

4    Q.   FOR HQ DO YOU RECOGNIZE THAT PART OF THE

5    DOCUMENT?

6    A.   YES.

7         MR. LUCEY:  YOUR HONOR, AT THIS POINT THE

8    GOVERNMENT WOULD MOVE EXHIBIT 19 INTO EVIDENCE.

9         MR. FONG:  NO OBJECTION.

10        THE COURT:  19 IS RECEIVED.

11   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 19 HAVING

12   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

13   ADMITTED INTO EVIDENCE.)

14   BY MR. LUCEY:

15   Q.   NOW SIR, IF YOU COULD PLEASE TURN YOUR

16   ATTENTION TO EXHIBITS 20 AND 21.  HAVE YOU SEEN

17   THESE DOCUMENTS BEFORE?

18   A.   YES.

19   Q.   WHAT ARE THESE DOCUMENTS 19 AND 20, IN GENERAL

20   TERMS?

21   A.   INVOICES FOR SERVICES.

22   Q.   FOR SERVICES RENDERS TO WHOM?

23   A.   TO CASTILLO, LYN, COHEN & VIJAY.

24   Q.   AND WHAT'S ON THE -- THESE ARE RECORDS

25   PRODUCED BY WHAT, BY YOUR COMPANY?

1    A.   YES.

2              MR. LUCEY:  YOUR HONOR, AT THIS POINT THE

3    GOVERNMENT WOULD MOVE EXHIBITS 20 AND 21 INTO

4    EVIDENCE.

5              MR. FONG:  NO OBJECTION.

6              THE COURT:  ALL RIGHT.  THEY ARE

7    RECEIVED.

8    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 20 AND 21

9    HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

10   WERE ADMITTED INTO EVIDENCE.)

11   BY MR. LUCEY:

12   Q.   NOW AT THIS POINT MS. BURNEY, IF YOU COULD

13   PUBLISH EXHIBIT 19 THE FIRST PAGE OF EXHIBIT 19 FOR

14   THE BENEFIT OF THE JURY.

15             I WOULD LIKE TO WALK THROUGH THE DOCUMENT

16   NOW.  I WOULD ASK NOW AT THE VERY TOP PORTION OF

17   THE DOCUMENT FOR THE THE FIRST DARK BLACK LINE IF

18   THAT COULD BE BLOWN UP FOR THE BENEFIT OF ALL.

19             SO SIR, WHAT IS THIS DOCUMENT SAY AT THE

20   TITLE OF THE DOCUMENT, THE VERY TOP IN THE BLACK?

21   A.   IT SAYS HQ AGREEMENT TO THE LEFT THEN VIRTUAL

22   OFFICE, VIRTUAL OFFICE PLUS AND TELEPHONE ANSWERS.

23   Q.   THEN IMMEDIATELY BELOW IF YOU COULD NOW BLOW

24   UP THE PORTION READING PRODUCT OF INTEREST.

25             THERE SEEMS TO BE A SERIES OF DIFFERENT

1    BOXES HERE, WHAT ARE THOSE IN REFERENCE TO?

2    A.   THE DIFFERENT PRODUCTS THAT A PERSON WANTS TO

3    SIGN UP FOR.

4    Q.   THESE WERE THE ONES YOU WERE TALKING ABOUT

5    EARLIER TODAY?

6    A.   CORRECT.

7    Q.   THE LEVELS OF SERVICE AT THAT POINT HQ COULD

8    PROVIDE?

9    A.   RIGHT.

10   Q.   IS THAT A SIMILAR TYPE OF SERVICE THAT REGIS

11   STILL PROVIDES TO ITS CLIENTS?

12   A.   YES.

13   Q.   COULD YOU WALK US THROUGH WHAT THESE MEAN

14   MAILBOX PLUS TELEPHONE ANSWERS VIRTUAL OFFICE

15   VIRTUAL OFFICE PLUS?

16   A.   SURE.

17   Q.   WHAT DOES MAILBOX PLUS MEAN?

18   A.   IT BASICALLY MEANS IT'S AN ADDRESS THAT A

19   PERSON CAN HAVE MAIL DELIVERED TO OR SENT TO.

20   Q.   THEY HAVE NO ACTUAL OFFICE SPACE IN THE

21   KNOWLEDGE?

22   A.   NO.

23   Q.   IS IT FAIR TO CALL IT ALMOST LIKE A P.O. BOX?

24   A.   SIMILAR.

25   Q.   HOW ABOUT NOW TELEPHONE ANSWERS WHAT DOES THAT

1    MEAN?

2    A.   THAT IS WHERE WE PROVIDE A NUMBER A PHONE

3    NUMBER FOR THE CLIENT SO THEY CAN HAVE OR PASS IT

4    OUT LIKE ON A BUSINESS CARD, WE PROVIDE IT TO OUR

5    CLIENTS SO WE CAN CALL IT AND ANSWER THE PHONE FOR

6    THEM.

7    Q.   DOES THAT MEAN THEY HAVE A TELEPHONE DESK THEY

8    CAN GO TO IN THE BUILDING?

9    A.   NO, WE ACTUALLY TRANSFER THE CALLS TO WHEREVER

10   THEY WANT TO, HOME, CELL PHONE.

11   Q.   IT'S A PASS THROUGH IN A WAY?

12   A.   I GUESS SO, YEAH.

13   Q.   NEXT WE HAVE VIRTUAL OFFICE.

14   A.   YES.

15   Q.   WHAT DOES THAT MEAN?

16   A.   SO THAT'S A PRODUCT THAT PROVIDES NOT ONLY THE

17   MAILBOX SERVICE ALONG WITH THE TELEPHONE ANSWERING

18   BUT IT ALSO PROVIDES THE PERSON TIME IN THE OFFICE

19   OR THE LOCATION, THEY HAVE A CERTAIN AMOUNT OF

20   HOURS, ON HERE IT STATES 16 HOURS OF OFFICE USAGE

21   THAT THEY CAN HAVE.  THAT'S PART OF THE ACTUAL

22   PRODUCT.

23   Q.   AND THEN THE LAST ONE, LAST BOX APPEARS TO SAY

24   VIRTUAL OFFICE PLUS?

25   A.   CORRECT.  IT'S THE SAME BUT IT OFFERS

1    ADDITIONAL OFFICE TIME.

2    Q.   THAT WOULD BE THE HIGHEST LEVEL OF SERVICE?

3    A.   IN THIS PRODUCT.

4    Q.   THAT WAS PROVIDED AT THE TIME?

5    A.   CORRECT.

6    Q.   IS THAT STILL THE SAME TODAY?

7    A.   YES, IT IS.

8    Q.   OKAY.

9         NEXT MS. BURNEY, IF YOU COULD BLOW UP THE

10   NEXT PORTION OF THE DOCUMENT.

11        SIR, WHAT ARE WE NOW LOOKING AT HERE ON

12   THIS PART OF THE DOCUMENT?

13   A.   THIS IS THE INFORMATION ABOUT THE CLIENT.

14   Q.   SO THIS IS WHO IS MAKING IT, THE LEASE

15   AGREEMENT WITH HQ?

16   A.   CORRECT.

17   Q.   AND WHAT'S THE COMPANY NAME LISTED THERE?

18   A.   CASTILLO, LYN, COHEN & VIJAY.

19   Q.   NOW, DO YOU HAVE AN UNDERSTANDING OF WHO IS

20   FILLING OUT THE DOCUMENT.  YOU WEREN'T PRESENT WHEN

21   THE DOCUMENT WAS FILLED OUT?

22   A.   NO, I WASN'T.

23   Q.   IN YOUR EXPERIENCE HOW GENERALLY IS THIS TYPE

24   OF AGREEMENT DOCUMENT FILMED OUT?

25        MR. FONG:  OBJECTION.  LACKS FOUNDATION.

1    SPECULATION.

2              THE COURT:  YOU HAVE TO LAY SOME

3    FOUNDATION THAT HE HAS KNOWLEDGE OF IT.

4              MR. LUCEY:  SURE.

5    Q.   WHAT'S YOUR UNDERSTANDING OF HOW THE

6    AGREEMENTS WORK, ARE THE FORMS PROVIDED TO

7    POTENTIAL CLIENTS?

8    A.   YES, THEY ARE.

9    Q.   AND THEN WHAT HAPPENS AT THAT POINT?

10   A.   IT COULD BE ONE OF TWO THINGS.  THE PERSON WHO

11   WORKS FOR REGIS CAN FILL IT OUT FOR THE CLIENT BY

12   ASKING THE QUESTIONS OF THE CLIENT OR THE CLIENT

13   CAN FILL IN THE INFORMATION.

14   Q.   OKAY.  THEN NOW MS. BURNEY, IF YOU COULD

15   ENLARGE THE NEXT PORTION OF THE DOCUMENT WHERE IT

16   SAYS CENTER DETAILS.

17             WHAT'S THIS IN REFERENCE TO NOW, SIR?

18   A.   THIS IS WHERE THE CLIENT WOULD CHOOSE THE

19   LOCATION WHERE THEY WANT TO HAVE THEIR ADDRESS.

20   Q.   OKAY.  AND FAIR TO SAY THERE'S A NUMBER OF

21   ADDRESSES THEY CAN CHOOSE FROM?

22   A.   YES.  THEY CAN HAVE MULTIPLE ADDRESSES IF THEY

23   CHOSE.

24   Q.   THIS PARTICULAR 11 EMBARCADERO CENTER, SUITE

25   500, SAN FRANCISCO CALIFORNIA 94111.  THAT'S THE

1    PARTICULAR LOCATION CHOSEN FOR THIS AGREEMENT?

2    A.   YES.

3    Q.   WHAT'S THE REFERENCE THERE TO MONTHLY FEE AND

4    RETAINER?

5    A.   SO THE MONTHLY FEE IS WHAT IT COSTS FER MONTH

6    THAT WE WOULD CHARGE THE PERSON FOR USE OF THAT.

7    THE RETAINER IS TYPICALLY TWO TIMES THE MONTHLY

8    FEE.

9    Q.   NOW GOING DOWN, MS. BURNEY, IF YOU COULD TURN

10   YOUR ATTENTION NOW TO ENLARGING THE VERY BOTTOM

11   PORTION OF THE DOCUMENT WHERE IT SAYS PROGRAM

12   DETAILS.

13         AND SIR, WHAT IS THIS PART OF THE

14   DOCUMENT IN REGARD TO?

15   A.   SO, THEY CAN CHOOSE THE TERM OF THE AGREEMENT,

16   IN THIS CASE THERE ARE 12 MONTHS AND 3 MONTHS SO

17   THEY CHOSE 12 MONTHS ACCORDING TO THIS.

18   Q.   WHAT'S THAT REFERENCE TO MONTHLY PAYMENT AT

19   THE VERY RIGHT BOTTOM LEFT-HAND CORNER?

20   A.   THAT'S WHAT THEY WOULD PAY EACH MONTH.

21   Q.   THEN THERE'S ALSO INITIAL PAYMENT AS WELL?

22   A.   RIGHT.  THAT INCLUDES THE RETAINER AND THEIR

23   FIRST MONTH.

24   Q.   AND WHAT'S THE TERM OF THIS PARTICULAR

25   AGREEMENT TERMS OF THE START AND END DATE?

1    A.   THE START DATE WOULD BE JUST WHEN IT STARTED,

2    THE ACTUAL DATE.  THEN WHEN IT ENDED -- IS THAT

3    WHAT YOU ARE REFERRING TO THE LENGTH OF THE

4    AGREEMENT.

5    Q.   YES.  WHAT'S THE START DATE BASED ON THIS

6    AGREEMENT?

7    A.   THIS ONE SAYS AUGUST 1ST, 2006.

8    Q.   WHAT'S THE END DATE, SIR?

9    A.   JULY 31ST, 2007.

10   Q.   NOW MS. BURNEY, IF WE COULD TURN TO THE NEXT

11   DOCUMENT EXHIBIT 19, 229.

12        AND MS. BURNEY, IF YOU COULD ENLARGE THE

13   SECTION IN THE MIDDLE THERE WHICH READS PREFERRED

14   METHOD OF PAYMENT.

15        ACTUALLY BEFORE WE GET TO THAT LET ME DO

16   THE BOTTOM PORTION FIRST WHERE IT SAYS HQ USE ONLY.

17        SIR, WHAT'S THIS IN REFERENCE TO HERE,

18   THIS PORTION THAT'S ON THE SCREEN NOW?

19   A.   THE MANAGER OR THE PERSON AT THE TIME THAT WAS

20   REPRESENTING THIS, THEY WOULD FILL OUT THE

21   INFORMATION TO VERIFY WHO FILLED OUT THE FORM.

22   Q.   AND DO YOU KNOW WHO MS. COOK IS?

23   A.   YES.

24   Q.   IS SHE STILL EMPLOYED WITH REGIS?

25   A.   YES, SHE IS.

1    Q.   SO DOES THAT INDICATE THAT SHE WAS INVOLVED IN

2    THE PROCESS OF THIS DOCUMENT?

3    A.   YES.

4    Q.   NOW  CAN I TURN YOUR ATTENTION NOW TO EXHIBITS

5    20 AND 21 AND WE CAN PUBLISH THOSE TO THE JURY.

6              AND SIR, WHAT ARE THESE TWO DOCUMENT IT

7    IS WE ARE LOOKING AT SIDE BY SIDE, EXHIBITS 20 AND

8    21?

9    A.   THESE ARE INVOICES FOR THE CLIENT.

10   Q.   SO LET'S TAKE 20 FIRST, EXHIBIT 20.  IF YOU

11   COULD ENLARGE THE TOP OF THE DOCUMENT.

12             AND ON THE LEFT-HAND CORNER OF THE

13   DOCUMENT, SIR, WHAT'S THAT A REFERENCE TO,

14   CASTILLO, LYN, COHEN & VIJAY?  DO YOU SEE THAT ON

15   THE TOP LEFT CORNER?

16   A.   YES.

17   Q.   WHAT ADDRESS IS LISTED THERE BELOW IS THAT THE

18   ADDRESS?

19   A.   IT'S 788 LAHOYA DRIVE LOS GATOS, CALIFORNIA

20   94024.

21   Q.   COULD YOU READ THAT AGAIN, SIR?

22   A.   SURE.  WHY DON'T YOU REFER TO THE PAPER

23   DOCUMENT IF YOU NEED TO.  788 LAHOYA DRIVE, LOS

24   ALTOS, CALIFORNIA, 94024.

25   Q.   THEN IF YOU COULD ALSO ENLARGE THE DATE

1    PORTION OF THE DOCUMENT, MS. BURNEY, JUST ON THE

2    RIGHT SIDE, THANK YOU.

3              WHAT'S THE DATE OF THIS INVOICE, SIR?

4    A.   ON THE BOTTOM?  THE INVOICE, EXCUSE ME.  IT'S

5    11-17-2004.

6    Q.   OKAY.  THROUGH WHAT PERIOD?

7    A.   12-1-2004.

8    Q.   OKAY.  THEN NOW TURNING TO EXHIBIT 21.

9              SIR, DO YOU SEE THAT ADDRESS THERE LISTED

10   ON THE SCREEN?

11   A.   YES.

12   Q.   THIS IS THE SAME NAME AND ADDRESS YOU LOOKED

13   AT BEFORE, CORRECT?

14   A.   YES.

15   Q.   THEN TURNING IF YOU COULD NOW BLOW UP THE DATE

16   PORTION OF THE DOCUMENT.

17              WHAT'S THE INVOICE DATE OF THIS DOCUMENT?

18   A.   I BELIEVE THAT'S 6-14-2007.

19   Q.   THROUGH I GUESS THE DUE DATE OF 7-1-2007?

20   A.   CORRECT.

21   Q.   NOW TURNING BACK TO EXHIBIT 19?

22              THE COURT:  HOW MUCH MORE DO YOU HAVE?

23              MR. LUCEY:  THREE MINUTES, YOUR HONOR.

24              THE COURT:  IF YOU CAN HOLD IT TO THREE

25   MINUTES.

585

1          YOUR HONOR, TURNING TO YOUR HONOR AND THE

2    COURT 19, MIDDLE PORTION OF SECOND PAGE 228.

3          IF YOU COULD BLOW UP THIS PAGE NOW.  IN

4    REGARD TO THE HANDWRITTEN PORTION OF THE DOCUMENT.

5    THANK YOU.

6    Q.   WHAT IS THE NAME LISTED THERE, SIR?

7    A.   ALBERT HU.

8    Q.   WHAT DOES THAT MEAN IN THIS SECTION OF THE

9    DOCUMENT, CARD ISSUER AND PREFERRED METHOD OF

10   PAYMENT?

11   A.   IT'S THE CARD AND THE FORM OF PAYMENT.  THAT'S

12   THE PERSON'S NAME THAT IT BELONGS TO.

13   Q.   DOES THIS HAVE ANY CONNECTION TO THE PAYMENT

14   OF THE SPACE THAT'S BEING RESERVED?

15   A.   YES.

16   Q.   AND THIS IS THE PAYMENT -- FORM AND PAYMENT

17   FOR THE SERVICES AT HQ GLOBAL WAS GOING TO BE

18   PROVIDING TO THIS PARTICULAR SPACE, CORRECT?

19   A.   YES.

20   Q.   AND NOW IF YOU COULD READ THE CARD NUMBER

21   LISTED ON THE RIGHT-HAND SIDE OF THE DOCUMENT OUT

22   LOUD BEGINNING AT 4121?

23   A.   4121 7426 1999 3085.

24          MR. LUCEY:  YOUR HONOR, AT THIS POINT I

25   WOULD LIKE TO READ INTO THE RECORD THE PREVIOUSLY

1    AGREED TO STIPULATION NUMBER 3.

2          THE UNITED STATES OF AMERICA AND

3    DEFENDANT ALBERT KE-JENG HU HEREBY STIPULATE FOR

4    PURPOSES OF THE TRIAL OF THIS ACTION THAT THE

5    FOLLOWING FACTS ARE CONCLUSIVELY ESTABLISHED BEYOND

6    A REASONABLE DOUBT AND THEREFORE ARE NOT IN

7    DISPUTE.

8          BETWEEN 2000 AND 2009, DEFENDANT ALBERT

9    KE-JENG HU WAS GUILTY ACCOUNT HOLDER FOR THE

10   CAPITAL ONE VISA ACCOUNT WITH THE NUMBER OF 421 726

11   199 385.

12         IT IS SO STIPULATED.  SIGNED AND DATED BY

13   MR. FAZIOLI, MR. FONG AND THE DEFENDANT ON OR ABOUT

14   JUNE 4TH, 2012.

15         NO FURTHER QUESTIONS, YOUR HONOR

16         MR. FONG:  NO CROSS, YOUR HONOR.

17         THE COURT:  OKAY.

18         ALL RIGHT.  THAT WILL CONCLUDE US FOR

19   TODAY.

20         REMEMBER, NEXT WEEK WE DON'T MEET UNTIL

21   THURSDAY.  I WILL SEE YOU THURSDAY.  IT'S 8:30 IN

22   THE MORNING.

23         PLEASE REMEMBER MY INSTRUCTION NOT TALK

24   ABOUT THE CASE PARTICULARLY ON THE TIME OFF AND THE

25   WEEKEND THERE MAY BE TEMPTATION TO DO SO, PLEASE

                                                    587

1    RESIST IT AND WE WILL SEE YOU NEXT WEEK.

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  HOW ARE WE RUNNING

5    SCHEDULE-WISE?

6              MR. FAZIOLI:  I THINK WE ARE DOING OKAY,

7    YOUR HONOR.  WE ARE PICKING UP SPEED.

8              I THINK THAT WE HAD SAID THAT OUR

9    ANTICIPATED TRIAL SCHEDULE WOULD BE SIX DAYS.  WE

10   ARE THREE --

11             THE COURT:  4 TO 6, I THINK.

12             MR. FAZIOLI:  4 TO 6.

13             ANY WAY, I THINK THAT WE WOULD HAVE A

14   FULL DAY NEXT THURSDAY AND THEN I WOULD ANTICIPATE

15   PROBABLY THE TWO DAYS AFTER THAT, THE MONDAY AND

16   TUESDAY.

17             SO I THINK WE ARE STILL WITHIN THAT

18   SIX-DAY SCHEDULE.  WE ARE GOING TO STREAMLINE OUR

19   CASE AND PROBABLY TAKE SOME WITNESSES OUT THAT ARE

20   ON OUR WITNESS LIST.

21             BUT IN LIGHT OF SOME TENTATIVE

22   DISCUSSIONS I HAD WITH DEFENSE COUNSEL ON

23   ANTICIPATED CROSS-EXAMINATION, I THINK WE ARE

24   PROBABLY AT -- I WOULD SEE THE GOVERNMENT RESTING

25   ON NEXT TUESDAY, THE WEEK AFTER.

1           MR. LUCEY:  THE SECOND WEEK.

2           MR. FAZIOLI:  WE DO ALSO HAVE A WITNESS

3    WE ARE TRYING TO ARRANGE TO FLY OUT FROM TAIWAN AND

4    WE HAVE REASON TO THINK HE MAY BE COMING OUT, SO IF

5    HE DOES NOT COME OUT THAT WOULD SHORT US BY A DAY

6    PROBABLY.

7           THE COURT:  MR. FONG HOW MUCH TIME ARE

8    YOU ANTICIPATING FOR YOUR CASE, IF ANYTHING?

9           MR. FONG:  YOUR HONOR, IF THE DEFENDANT

10   DOES NOT TESTIFY, I WOULD ANTICIPATE IT WOULD BE A

11   VERY, VERY SHORT DEFENSE CASE.

12          THERE MIGHT BE SOME MATTERS I'M GOING TO

13   ASK THE COURT TO TAKE JUDICIAL NOTICES OF, THINGS

14   LIKE THAT.

15          I THINK IT'S GOING TO BE SHORT.  LET ME

16   BE VERY, VERY SAFE AND SAY HALF A DAY.

17          THE COURT:  OKAY.  ALL RIGHT.

18          I JUST LET BOTH SIDES KNOW THAT I THINK

19   SOME OF THIS CASE HAS PROCEEDED VERY EXPEDITIOUSLY

20   BUT ALSO THOUGHT THAT AT TIMES IT GOT PRETTY

21   REPETITIVE AND I WOULD URGE YOU TO THINK ABOUT

22   BEING EFFICIENT BECAUSE I THINK IT KEEPS THE JURY'S

23   ATTENTION A LOT BETTER WHEN YOU ARE.

24          OKAY.

25          MR. LUCEY:  THANK YOU, YOUR HONOR.

1          MR. FAZIOLI:  THANK YOU, YOUR HONOR.

2          (WHEREUPON, THE PROCEEDINGS IN THIS

3     MATTER WERE CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23   /S/
     _____
24   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 6/11/12
25

591