1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

   UNITED STATES,                    )   CR-09-00487-RMW
5                                     )
                    PLAINTIFF,        )
6                                     )   JUNE 14, 2012
             VS.                      )
7                                     )   VOLUME 5
   ALBERT KE-JENG HU,                 )
8                                     )
                    DEFENDANT.        )   PAGES 592-765
9   _____  )

10

11              TRANSCRIPT OF PROCEEDINGS

12       BEFORE THE HONORABLE RONALD M. WHYTE

13             UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16

17  FOR THE PLAINTIFF:  U.S. ATTORNEY'S OFFICE
                        BY:  JOSEPH FAZIOLI
18                           TIM LUCEY
                        150 S. ALMADEN BLVD, STE 900
19                      SAN JOSE, CA  95113

20

21  FOR THE DEFENDANT:  ATTORNEY AT LAW
                        BY:  JERRY FONG
22                      PO BOX 1040
                        PALO ALTO, CA  94302-1040

23

24

25  OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                             CERTIFICATE NUMBER 13185

592

1

2                    INDEX OF WITNESSES

3   PLAINTIFF'S

4   **MARK SZTO (RECALLED)**
         DIRECT EXAM BY MR. LUCEY          P. 596

5

6   **JEANIQUE COOK**
         DIRECT EXAM BY MR. LUCEY          P. 599
7        CROSS-EXAM BY MR. FONG            P. 608

8   **MARK VERDIELL**
         DIRECT EXAM BY MR. FAZIOLI        P. 610
9        CROSS-EXAM BY MR. FONG            P. 676
         REDIRECT EXAM BY MR. FAZIOLI      P. 738
10

11  **LYNN BORN**
         DIRECT EXAM BY MR. LUCEY          P. 746
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    593

1                    INDEX OF EXHIBITS

2                              MARKED        ADMITTED

3    PLAINTIFF'S

4    280, 281                               P. 604

5    12, 13                                 P. 618

6    14 THROUGH 18                          P. 636

7    66                                     P. 653

8    290, 291                               P. 659

9

10

11

12

     DEFENDANT'S
13
     560                                    P. 727
14

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA        JUNE 14, 2012

2              P R O C E E D I N G S

3    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT

4    OF THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING.

6              MR. LUCEY:  YOUR HONOR, VERY BRIEF A

7    HOUSEKEEPING MATTER.  AT THE CLOSE OF LAST WEEK'S

8    SESSION ON THURSDAY, THE GOVERNMENT HAD CALLED A

9    WITNESS FROM THE REGIS HQ GLOBAL COMPANY IN REGARD

10   TO THE LEASE DOCUMENT EXHIBIT 19, 20 AND 21.

11             PERHAPS BECAUSE OF JUST THE LATENESS OF

12   THE DAY OR WHATEVER, THE GOVERNMENT ACTUALLY

13   MISREAD UNFORTUNATELY THE NUMBERS CONTAINED IN

14   TRIAL STIPULATION 3.  I SKIPPED THREE DIGITS INTO

15   THE RECORD.

16             WE CONFERRED WITH MR. FONG ABOUT THIS

17   AFTER TRIAL CONCLUDED LAST, THURSDAY.  HE'S

18   AGREEABLE TO HAVING US RECALL THE WITNESS AND KIND

19   OF DO A MULLIGAN ON REREADING THE STIPULATION INTO

20   THE RECORD

21             MR. FONG:  I HAVE NO OBJECTION TO THAT

22   YOUR HONOR.

23             THE COURT:  ALL RIGHT.

24             MR. LUCEY:  I ALSO ADVISED MR. FONG THAT

25   THE FBI DID HAVE A CONVERSATION WITH MR. GOLDBERG

1 THE ATTORNEY FOR THE UNDERLYING COMPANY ABOUT WHAT

2 WE WOULD BE DOING HERE TODAY. THE WITNESS WILL BE

3 ASKED TO AGAIN REFER TO EXHIBIT 19 BATES 229. AND

4 ASKED ABOUT THE CARD NUMBER LISTED THERE.

5 MR. FONG: AGAIN. I HAVE NO OBJECTION,

6 YOUR HONOR.

7 THE COURT: OKAY.

8 (WHEREUPON, THE FOLLOWING PROCEEDINGS

9 WERE HELD IN THE PRESENCE OF THE JURY:)

10 THE COURT: ALL RIGHT. PLEASE BE SEATED.

11 MR. LUCEY DOES THE GOVERNMENT WISH TO

12 PROCEED

13 MR. LUCEY: YES, YOUR HONOR. THE

14 GOVERNMENT WILL BE CALLING MARK SZTO TO THE STAND.

15 THE CLERK: GO AHEAD AND TAKE THE STAND.

16 YOU ARE STILL UNDER OATH.

17 THE WITNESS: OKAY.

18

19 **DIRECT-EXAMINATION BY MR. LUCEY**

20

21 BY MR. LUCEY:

22 Q. GOOD MORNING, SIR.

23 A. GOOD MORNING.

24 Q. FIRST I WOULD ASK MS. BURNEY IF SHE COULD

25 REPUBLISH TO THE JURY A PORTION ALREADY IN EVIDENCE

596

1    GOVERNMENT EXHIBIT 19 PAGE TWO.  IF YOU COULD BLEW

2    UP THE CARD NUMBER SECTION.

3              SIR, DO YOU SEE THE NUMBER THERE IN FRONT

4    OF YOU?

5    A.   YES.

6    Q.   DOES THAT NUMBER -- I'M GOING TO READ THE

7    NUMBER AND SEE IF YOU AGREE WITH THE READING OF THE

8    NUMBER THERE.  4121742619993085?

9    A.   YES.

10             MR. LUCEY:  AND YOUR HONOR NOW READING

11   INTO THE RECORD THE STIPULATION THE PARTIES

12   PREVIOUSLY AGREED TO.  TRIAL STIPULATION NUMBER

13   THREE.

14             THE UNITED STATES OF AMERICA AND

15   DEFENDANT ALBERT KE-JENG HU HEREBY STIPULATE FOR

16   PURPOSES OF THIS TRIAL ACTION THAT THE FOLLOWING

17   FACTS ARE CONCLUSIVELY ESTABLISHED BEYOND A

18   REASONABLE DOUBT AND THEREFORE ARE NOT IN DISPUTE.

19             BETWEEN 2000 AND 2009, DEFENDANT ALBERT

20   KE-JENG WAS THE ACCOUNT HOLDER FOR THE CAPITAL ONE

21   VISA ACCOUNT WITH THE NUMBER 4121742619993085.

22             IT IS SO STIPULATED.  SIGNED BY COUNSEL

23   AND THE DEFENDANT.

24             THE COURT:  ALL RIGHT.  AND MY

25   UNDERSTANDING IS THAT YOU MISREAD THAT LAST WEEK.

1          MR. LUCEY:  I DID, YOUR HONOR.

2          THE COURT:  OKAY.

3          MR. LUCEY:  AND I APOLOGIZE TO YOU.

4          THE COURT:  SO THAT'S READING AGAIN THE

5     CORRECT --

6          MR. LUCEY:  CORRECT YOUR HONOR.

7          NO FURTHER QUESTIONS FROM THE GOVERNMENT,

8     YOUR HONOR.

9          THE COURT:  MR. FONG ANYTHING FURTHER?

10         MR. FONG:  NO, YOUR HONOR.

11         THE COURT:  ALL RIGHT.  THANK YOU.

12         MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

13    NOW CALLS /SKWRE /TPHAOEPB COOK TO THE STAND.

14         THE COURT:  WHY DON'T YOU COME FORWARD,

15    MA'AM AND THE CLERK WILL SWEAR YOU IN AND WE WILL

16    HAVE YOU TAKE THE WITNESS STAND.

17         THE CLERK:  COME FORWARD PLEASE.  I WILL

18    SWEAR YOU IN.

19         THE WITNESS:

20                   NAME,

21    BEING CALLED AS A WITNESS ON BEHALF OF THE

22    ^ PLAINTIFF ^ DEFENDANT, HAVING BEEN FIRST DULY

23    SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

24         THE WITNESS:  I DO.

25         THE CLERK:  FOR THE RECORD, PLEASE STATE

598

1    YOUR FULL NAME AND I'M GOING TO ASK YOU TO SPELL

2    YOUR FIRST AND LAST NAME.

3            THE WITNESS:  JEANIQUE, COOK.  C-O-O-K.

4

5            **DIRECT-EXAMINATION BY MR. LUCEY**

6

7    BY MR. LUCEY:

8    Q.   GOOD MORNING, MA'AM.

9    A.   HI.

10   Q.   WHERE DO YOU RESIDE, MA'AM?

11   A.   RICHMOND, CALIFORNIA.

12   Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

13   A.   REGIS IN SAN FRANCISCO.

14   Q.   AND HOW LONG HAVE YOU BEEN EMPLOYED WITH

15   REGIS?

16   A.   EIGHT YEARS.

17   Q.   AND SO WHAT YEAR APPROXIMATELY DID YOU BEGIN

18   WORKING FOR REGIS?

19   A.   MAY 2004.

20   Q.   AND IS REGIS AFFILIATED IN ANY WAY WITH A

21   COMPANY KNOWN AS HQ GLOBAL?

22   A.   YES.

23   Q.   WHAT'S THE AFFILIATION?

24   A.   REGIS IS LIKE THE PARENT COMPANY.

25   Q.   OKAY.  AND WHAT IS YOUR CURRENT JOB TITLE?

```
1    A.   CENTER MANAGER.

2    Q.   WHAT DOES THE CENTER MANAGER DO?

3    A.   RESPONSIBLE FOR THE DAY-TO-DAY OPERATIONS OF

4    THE CENTER OR LOCATION.

5    Q.   AND WHAT -- CAN YOU TELL US GENERALLY WHAT

6    THOSE DUTIES ENTAIL?

7    A.   WE RUN OFFICE SPACE.  SO I MANAGE THE TEAM AND

8    THE CLIENTS AND MAKE SURE EVERYTHING IS RUNNING

9    PROPERLY.

10   Q.   AND WHERE IS YOUR OFFICE LOCATED?

11   A.   795 FULL SOME IN SAN FRANCISCO.

12   Q.   AND PRIOR -- HOW LONG HAVE YOU HELD YOUR

13   CURRENT POSITION?

14   A.   ABOUT FOUR YEARS.

15   Q.   FOUR YEARS?

16   A.   UH-HUH.

17          THE COURT:  COULD YOU PULL THE MICROPHONE

18   JUST A LITTLE CLOSER TO YOU.  THANK YOU.

19   Q.   AND MA'AM, PRIOR TO YOUR CURRENT POSITION WHAT

20   WAS YOUR TITLE?

21   A.   OPERATIONS MANAGER.

22   Q.   AND WHAT DID THAT JOB ENTAIL?

23   A.   BASICALLY THE SAME THING AS A CENTER MANAGER,

24   NOT RESPONSIBLE FOR EVERYTHING BUT MANAGING THE

25   DUTIES FOR THE DAY.
```

1    Q.   MS. COOK I'M NOW GOING TO SHOW YOU A DOCUMENT,

2    IT'S ALREADY IN EVIDENCE.  WE WILL SHOW IT UP ON

3    THE SCREEN.

4            NOW, MS. COOK DO YOU SEE THAT BLOW UP OF

5    WHAT IS GOVERNMENT'S EXHIBIT 19, PAGE TWO AT 229?

6    A.   UH-HUH, YES.

7    Q.   THE INDICATION ON THE DOCUMENT OF HQ USE ONLY,

8    DO YOU SEE THAT PORTION THERE ON THE SCREEN?

9    A.   YES.

10   Q.   WHAT IS THAT A REFERENCE TO, IF YOU KNOW?

11   A.   IT'S SAYING WHO, ME, THE PERSON WHO EXECUTED

12   THE AGREEMENT.

13   Q.   IS THAT YOUR WRITING IN THE NAME SECTION?

14   A.   YES.

15   Q.   AND THE LOCATION?

16   A.   YES.

17   Q.   AND THE ROLE?

18   A.   YES.

19   Q.   AND THE DATE RIGHT ABOVE THIS DOCUMENT,

20   8-7-06, WHICH WOULD HAVE BEEN AUGUST 7, 2006,

21   MS. COOK WAS THAT YOUR TITLE AT THAT TIME?

22   A.   YES.

23   Q.   NOW, THERE'S A SIGNATURE DIRECTLY ABOVE THAT,

24   IS THAT YOUR SIGNATURE?

25   A.   NO.

1    Q.   MS. COOK, DO YOU SEE THE HANDWRITING ON THIS

2    PORTION OF THE DOCUMENT?

3    A.   NO.

4    Q.   IS ANY OF THAT HANDWRITING YOURS?

5    A.   NO.

6    Q.   NOR IS THE DATE?

7    A.   NO.

8    Q.   MS. BURNEY IF YOU COULD NOW PUBLISH FOR THE

9    JURY THE FIRST PAGE OF THIS DOCUMENT.

10        AND IF YOU COULD NOW ENHANCE OR BLOW UP

11   THE TOP PORTION OF THE DOCUMENT RIGHT ABOVE THE

12   TELEPHONE CALL SECTION.  MS. COOK YOU SEE THERE'S

13   SOME WRITING ON THIS PAGE OF THE DOCUMENT AS WELL

14   A.   YES.

15   Q.   THE HANDWRITING AT THE VERY TOP RIGHT CORNER,

16   SIX 50-SEVEN 93-8857.  LINDA DANESH, DO YOU

17   RECOGNIZE THAT WRITING?

18   A.   IT LOOKS LIKE IT COULD BE MY WRITING.

19   Q.   NOW THERE'S ADDITIONAL WRITING IN THE BOXES

20   IMMEDIATELY BELOW IN THE CLIENT DETAIL SECTION.  IS

21   THAT WRITING IN THE CONTACT NAME IS THAT YOURS?

22   A.   NO.

23   Q.   HOW ABOUT IN THE TELEPHONE SECTION THERE'S A

24   HANDWRITTEN NUMBER?

25   A.   NO.

1    Q.   WHO IS THE CLIENT THAT'S RENTING THE SPACE OUT

2    BASED ON THIS DOCUMENT YOU ARE LOOKING AT?

3    A.   CASTILLO, LYN, COHEN & VIJAY.

4    Q.   AND DO YOU RECOGNIZE THIS DOCUMENT AS A

5    DOCUMENT THAT WAS USED BY HQ GLOBAL FOR ITS CLIENT

6    SERVICES IN 2006?

7    A.   YES.

8    Q.   NOW I WANT TO SHOW YOU TWO NEW DOCUMENTS, THEY

9    HAVE BEEN MARKED AS GOVERNMENT EXHIBIT 280 AND 281.

10   DO YOU SEE THOSE DOCUMENTS IN FRONT OF YOU?

11   A.   YES.

12   Q.   WHAT ARE THEY?

13   A.   INVOICES.

14   Q.   AND INVOICES THAT WERE GENERATED BY YOUR

15   COMPANY?

16   A.   YES.

17   Q.   AND IT WAS GOING TO A PARTICULAR CLIENT?

18   A.   CASTILLO, LYN, COHEN & VIJAY.

19   Q.   WE WILL TALK ABOUT THE TEXT OF IT IN A MOMENT.

20   THESE WERE GOING FOR A PARTICULAR SPACE THAT WAS

21   BEING LEASED?

22   A.   YES.

23   Q.   AND YOU RECOGNIZE THESE DOCUMENTS AS DOCUMENTS

24   OF THE TYPE THAT WERE GENERATED BY YOUR COMPANY

25   DURING YOUR TENURE THERE?

1    A.   YES.

2              MR. LUCEY:  YOUR HONOR, THE GOVERNMENT AT

3    THIS POINT WOULD MOVE GOVERNMENT EXHIBIT 280 AND

4    281 INTO EVIDENCE.

5              MR. FONG:  NO OBJECTION, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THEY ARE

7    RECEIVED.

8    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 280 AND 281

9    HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

10   WERE ADMITTED INTO EVIDENCE.)

11   BY MR. LUCEY:

12   Q.   AND MS. BURNEY I WOULD ASK IF YOU COULD

13   PUBLISH FOR THE JURY THE EXHIBIT 280.  AND IF YOU

14   COULD BLOW UP THE TOP HALF OR TOP THIRD OF THE

15   DOCUMENT.

16             MS. COOK THIS APPEARS TO BE AN INVOICE;

17   IS THAT CORRECT?

18   A.   YES.

19   Q.   THERE'S A LINE LISTED THERE BELOW IT SAYS

20   CENTER, DO YOU SEE THAT THERE?

21   A.   YES.

22   Q.   WHAT IS THAT A REFERENCE TO?

23   A.   IT'S OUR CENTER NUMBER AND THE NAME OF THE

24   LOCATION.

25   Q.   THE LOCATION THAT'S WHAT, BEING LEASED?

1    A.   YES.

2    Q.   AND THERE'S WRITING ON THE BELOW TO THE LEFT

3    OF THE BAR CODE DO YOU SEE THAT?

4    A.   YES.

5    Q.   AND THERE'S A NAME CASTILLO, LYN, COHEN &

6    VIJAY THEN AN ADDRESS IMMEDIATELY BELOW THAT,

7    WHAT'S THAT A REFERENCE TO?

8    A.   THE CLIENT, OUR CLIENT.  THAT RECEIVED

9    SERVICES.

10   Q.   FOR THIS PARTICULAR SPACE?

11   A.   UH-HUH.

12   Q.   WHAT'S THE NAME OF THE COMPANY LISTED THERE OR

13   CLIENT?

14   A.   CASTILLO, LYN, COHEN & VIJAY.

15   Q.   AND WHAT'S THE ADDRESS IMMEDIATELY BELOW THAT

16   COULD YOU READ THAT OUT LOUD?

17   A.   788 LOYOLA DRIVE, LOS ALTOS, CALIFORNIA 94024.

18   Q.   WHAT IS THE INVOICE DATE OF THIS PARTICULAR

19   INVOICE CAN YOU TELL US?

20   A.   11-17-2004.

21   Q.   NOW, MS. COOK IF YOU COULD TURN YOUR ATTENTION

22   TO 281.

23        NOW MOOSE COOK LOOKING AT THIS DOCUMENT

24   WHAT'S THE INVOICE DATE OF THIS DOCUMENT?

25   A.   JUNE 14, 2007.

1    Q.   NOW IN THIS DOCUMENT THERE APPEARS TO BE AN

2    ADDITIONAL EMBLEM OR LETTERHEAD AT THE TOP RIGHT

3    CORNER?

4    A.

5    Q.   IS THAT YOUR CURRENT EMPLOYER?

6    A.   YES.

7    Q.   SO IS IT FAIR FOR US TO UNDERSTAND THAT

8    BETWEEN '04 AND '07 THAT'S WHEN REGIS HAD ACQUIRED

9    HQ GLOBAL?

10   A.   YES.

11   Q.   AND IT BEGAN TO PUT THAT EMBLEM ON ITS

12   INVOICES?

13   A.   YES.

14   Q.   NOW, AGAIN IS THERE A -- THE SAME SPACE IS

15   BEING LEASED HERE?

16   A.   YES.

17   Q.   ON THIS INVOICE.  AND IS THIS THE SAME CLIENT

18   AS THE EXHIBIT 280?

19   A.   YES.

20   Q.   WHAT ADDRESS IS LISTED THERE BELOW CASTILLO

21   LYNN?

22   A.   788 LOYOLA DRIVE, LOS ALTOS, CALIFORNIA,

23   94024.

24   Q.   NOW IF -- MS. COOK DO SEAT NUMBER LISTED THERE

25   NEXT TO THE CARD NUMBER SECTION OF THE DOCUMENT?

606

1    A.   YES.

2    Q.   I WANT TO READ THIS NUMBER OUT LOUD AND ASK

3    YOU IF YOU AGREE WITH THE -- MY READING OF THE

4    DOCUMENT.

5         CARD NUMBER 4121742619993085?

6    A.   YES, I AGREE.

7    Q.   AND YOUR HONOR AT THIS POINT WE WOULD LIKE TO

8    REFER AGAIN TO TRIAL STIPULATION NUMBER THREE

9    ALREADY IN EVIDENCE THAT PROVIDES, THE

10   UNITED STATES OF AMERICA AND DEFENDANT ALBERT

11   KE-JENG HU STIPULATE FOR PURPOSES OF THE TRIAL IN

12   THIS ACTION THAT THE FOLLOWING FACTS ARE

13   CONCLUSIVELY ESTABLISHED BEYOND A REASONABLE DOUBT

14   AND THEREFORE ARE NOT IN DISPUTE.

15        BETWEEN 2000 AND 2009 DEFENDANT ALBERT

16   KE-JENG HU WAS THE ACCOUNT HOLDER FOR THE CAPITAL

17   ONE VISA ACCOUNT WITH THE NUMBER OF

18   4121742619993085.  IT IS SO STIPULATED SIGNED AND

19   DATED BY COUNSEL FOR BOTH PARTIES AND THE

20   DEFENDANT.

21        NO FURTHER QUESTIONS, YOUR HONOR

22        THE COURT:  MR. FONG, ANY QUESTIONS?

23        MR. FONG:  JUST A COUPLE, YOUR HONOR.

24

25   ///

1          **CROSS-EXAMINATION BY MR. FONG**

2

3    BY MR. FONG:

4    Q.   GOOD MORNING, MS. COOK.  MY NAME IS JERRY FONG

5    I'M THE ATTORNEY FOR ALBERT HU.  I JUST HAVE A

6    COUPLE OF QUESTIONS.

7              THE COMPANY YOU WORKED FOR REGIS, IT

8    MAINTAINS OFFICE SPACES THROUGHOUT THE WORLD; IS

9    THAT CORRECT?

10   A.   YES.

11   Q.   AND IT HAS FOR EXAMPLE, OFFICE SPACES IN

12   SINGAPORE?

13   A.   I WOULD ASSUME SO.

14   Q.   OKAY.  I'M ONLY ENTITLED TO WHAT YOU KNOW.  IF

15   YOU DON'T KNOW THAT'S FINE?

16   A.   I DON'T KNOW.

17   Q.   AND YOU HAVE HAD CONTACT WITH THE

18   UNITED STATES GOVERNMENT BEFORE DATE IS THAT TRUE,

19   IN TERMS OF THE SUBJECT MATTER OF THIS CASE?

20   A.   YES.

21   Q.   OKAY.  NOW, AT ANY TIME -- LET ME ASK YOU, DO

22   YOU KNOW IF A COMPANY BY THE NAME OF FIRESIDE

23   CAPITAL MANAGEMENT LEASED AN OFFICE IN SINGAPORE

24   WITH REGIS?

25   A.   I DON'T KNOW.

1    Q.   OKAY.  DO YOU KNOW OF A COMPANY BY THE NAME OF

2    FIRESIDE USA LEASED AN OFFICE IN SAN FRANCISCO FROM

3    REGIS?

4    A.   I DON'T KNOW.

5    Q.   NOW, DID THE GOVERNMENT EVER ASK YOU TO CHECK

6    TO SEE IF ANY COMPANIES BY THE NAME OF FIRESIDE OR

7    ASENQUA RENTED OTHER OFFICES WITH REGIS?

8    A.   NO.

9    Q.   THANK YOU.

10            MR. FONG:  THAT'S ALL I HAVE.

11            MR. LUCEY:  NO FURTHER QUESTIONS,

12   YOUR HONOR.

13            THE COURT:  ALL RIGHT.  YOU MAY BE

14   EXCUSED.  THANK YOU.

15            MR. FAZIOLI:  THE UNITED STATES CALLS

16   MARK VERDIELL.

17            THE COURT:  I'M SORRY?

18            MR. FAZIOLI:  THE UNITED STATES CALLS

19   MARK VERDIELL.

20            THE CLERK:  COME FORWARD AND I WILL SWEAR

21   YOU IN.

22

23                   **MARK VERDIELL,**

24   BEING CALLED AS A WITNESS ON BEHALF OF THE

25   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

1    EXAMINED AND TESTIFIED AS FOLLOWS:

2         THE WITNESS:

3         THE CLERK:  FOR THE RECORD PLEASE STATE

4    YOUR FULL NAME AND SPELL YOUR LAST NAME.

5         THE WITNESS:  MY NAME IS JUAN MARK

6    VERDIELL.  JEAN, VERDIELL.  V-E-R-D-I-E-L-L.

7

8         **DIRECT-EXAMINATION BY MR. FAZIOLI**

9

10   BY MR. FAZIOLI:

11   Q.   GOOD MORNING, MR. VERDIELL.

12   A.   GOOD MORNING.

13   Q.   COULD YOU PLEASE TELL THE JURY WHERE YOU

14   CURRENTLY LIVE?

15   A.   I LIVE IN PALO ALTO.

16   Q.   HOW LONG HAVE YOU LIVED IN CALIFORNIA?

17   A.   CALIFORNIA SINCE 94, SO 18 YEARS.

18   Q.   WHERE DID YOU LIVE BEFORE THAT?

19   A.   I LIVED IN, ON THE EAST COAST.  IN NEW JERSEY

20   ACTUALLY.

21   Q.   WHERE DID YOU LIVE BEFORE THAT?

22   A.   IN FRANCE.

23   Q.   ARE YOU FROM FRANCE?

24   A.   I AM FROM FRANCE, YES.

25   Q.   PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND

1    FOR THE JURY?

2    A.   I HAVE A PHD IN OPT ON ELECTRONICS FROM

3    UNIVERSITY OF PARIS.

4    Q.   AND ANY OTHER -- DO YOU HAVE ANY OTHER

5    DEGREES?

6    A.   YES, I HAVE A MASTER'S DEGREE FROM A PLACE IN

7    FRANCE WHICH IS ONE OF THE TOP ENGINEERING SCHOOLS.

8    Q.   AND ARE YOU CURRENTLY EMPLOYED?

9    A.   YES, I AM.

10   Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

11   A.   I'M EMPLOYED BY A COMPANY CALLED SAMTEC,

12   S-A-M-T-E-C.

13   Q.   WHAT'S YOUR POSITION WITH SAMTEC?

14   A.   I DO THE BUSINESS DEVELOPMENT FOR THEIR

15   OPTICAL DIVISION.

16   Q.   AND CAN YOU SUMMARIZE SOME OF YOUR

17   PROFESSIONAL EXPERIENCE BEFORE WORKING AT SAMTEC?

18   A.   SO I HAVE -- I HAVE BEEN IN FIBER OPTIC

19   TECHNOLOGY FOR MY WHOLE CAREER.  I STARTED AT ATT

20   BELL LABS FROM RESEARCH AND SCIENTIFIC SIDE OF IT.

21   THEN STARTED A FEW COMPANIES START UPS IN THE

22   VALLEY, ONE OF THEM WAS CALLED LIGHT LOGIC, GOT

23   ACQUIRED BY INTEL.  THE LATEST ONE JUST GOT

24   ACQUIRED RECENTLY BEING ACQUIRED BY SAMTEC.  AND

25   ALL IN THE SAME FIELD IN THE HIGH SPEED FIBER

1    OPTICS.  BASICALLY WE MAKE DEVICES ON WHICH THE

2    INTERNET CONNECTION RUN.

3    Q.   DO YOU KNOW SOMEONE NAMED ALBERT HU?

4    A.   I DO.

5    Q.   DO YOU SEE HIM IN COURT TODAY?

6    A.   HE'S OVER THERE, YES, I SEE HIM.

7    Q.   CAN YOU PLEASE DESCRIBE WHAT HE IS WEARING?

8    A.   HE'S WEARING A DARK JACKET AND A PINK SHIRT.

9         MR. FAZIOLI:  AND LET THE RECORD REPORT

10   THAT MR. VERDIELL HAS IDENTIFIED THE DEFENDANT,

11   ALBERT HU.

12        THE COURT:  ALL RIGHT.

13   Q.   AT SOME POINT DID YOU MAKE AN INVESTMENT WITH

14   MR. HU?

15   A.   YES, I DID.

16   Q.   WHAT WAS THE AMOUNT OF THE INVESTMENT THAT YOU

17   MADE WITH MR. HU?

18   A.   $2 MILLION.

19   Q.   HOW DID YOU FIRST HEAR ABOUT ALBERT HU?

20   A.   I HEARD ABOUT ALBERT HU THROUGH A FRIEND

21   CALLED BOB LIN.

22   Q.   WHO IS BOB LIN?

23   A.   BOB LIN IS A FRIEND OF MINE WHO I FIRST MET

24   THROUGH ANOTHER FRIEND WHEN WE DISCUSSED INVESTMENT

25   IN ONE OF MY COMPANIES.

1    Q.   OKAY.  WHAT DID YOU KNOW ABOUT ALBERT HU'S

2    BACKGROUND BEFORE YOU DECIDED TO INVEST WITH HIM?

3    A.   THAT HE VERY MUCH LIKE ME, HE WAS AN

4    ENTREPRENEUR, ALSO HAD A PHD AND HAD HAD A

5    SUCCESSFUL COMPANY WORKING IN THE TECH SECTOR.

6    Q.   DID YOU MEET WITH ALBERT HU BEFORE DECIDING TO

7    INVEST MONEY WITH HIM?

8    A.   I MET WITH HIM SEVERAL TIMES, YES.

9    Q.   WHERE DID YOU FIRST MEET WITH ALBERT HU?

10   A.   I MET WITH HIM AT A PLACE CALLED PLUG AND PLAY

11   TECH CENTER.  WHICH IS ACTUALLY WHERE MY COMPANY

12   WAS LOCATED AT THE TIME.

13   Q.   WHAT WAS THE PLUG AND PLAY TECH CENT NOTER?

14   A.   IT'S A FUN PLACE ACTUALLY.  VERY CLOSE TO HERE

15   IN SUNNYVALE.  A LARGE BUILDING THAT HOUSES MANY

16   START UPS SO IT'S PLUG AND PLAY IN THE SENSE WHERE

17   YOU RENT A SUITE OF CUBICLE CUBICLES AND YOU ARE

18   READY TO START YOUR COMPANY.

19   Q.   AND THE COMPANY YOU ARE WITH HAD AN OFFICE IN

20   THE PLUG AND PLAY CENTER?

21   A.   YES.  AND BY COINCIDENCE THE OFFICES OF ALBERT

22   HU WERE IN THE SAME BELIEVE.

23   Q.   SO WHO WAS AT THAT FIRST MEETING BETWEEN YOU

24   AND MR. HU?

25   A.   WHO, SORRY?

1    Q.   WHO WAS AT THAT MEETING?

2    A.   JUST MR. HU AND ME.

3    Q.   WHAT HAPPENS AT THAT FIRST MEETING BETWEEN

4    YOURSELF AND MR. HU?

5    A.   IT WAS TO GET TO KNOW YOU MEETING FROM THE

6    DESTRUCTION OF MY FRIEND, BOB LIN, AND I EXPECTED

7    THE SUBJECT TO BE ABOUT A VENTURE FUND THAT MR. HU

8    HAD STARTED AND I'M ASKED FREQUENTLY TO ADVISE

9    VENTURE FUND OR TO PARTICIPATE IN THEM.

10   Q.   WHAT WAS THE NAME OF THAT VENTURE FUND THAT

11   YOU HAD THOUGHT IT WAS GOING TO BE ABOUT?

12   A.   IT WAS CALLED ASENQUA.

13   Q.   AND WHERE DID THE DISCUSSIONS LEAD IN THAT

14   FIRST MEETING?

15   A.   WE AT LEAST STARTED AND TALKED ABOUT ASENQUA

16   AND THERE MR. HU TOLD ME THAT HE HAD ALSO OTHER

17   ACTIVITIES, OTHER FUNDS.  IN PARTICULAR WE TALKED

18   ABOUT A HEDGE FUND CALLED FIRESIDE.

19   Q.   WHAT DID ALBERT HU TELL YOU ABOUT THE FIRESIDE

20   FUND?

21   A.   HE TOLD ME THAT WAS A HEDGE FUND INVESTING IN

22   HIGH TECHNOLOGY COMPANIES AND IT HAD A SPECIFIC WAY

23   TO GO ABOUT IT.

24   Q.   AND WHAT DID HE TELL YOU WAS THE WAY IN WHICH

25   IT WAS INVESTING IN HIGH TECHNOLOGY COMPANIES?

1       A.    WELL, LIKE MOST HEDGE FUNDS, IT'S SET UP TO

2       MINIMIZE VOLATILITY AND RISK.  AND THE WAY HE DID

3       IT IS TO BUY PAIRS OF TECHNOLOGY COMPANIES AND 1, 1

4       MEMBER OF THE PAIR BEING SUPPOSEDLY THE LEADER OR

5       SOMEBODY HE BELIEVE WILL DO WELL.  ANOTHER COMPANY

6       THAT YOU BELIEVE WILL NOT DO AS WELL, BUT IN THE

7       SAME PRODUCT LINE OR AREA OR TECHNOLOGY LINE.

8             SO THE IDEA IS THAT YOU WILL DO THE ONE

9       THAT YOU BELIEVE WILL BE SUCCESSFUL IN THE

10      LONG-TERM.  YOU WILL TAKE A LONG POSITION ON IT SO

11      YOU MAKE MONEY.  THE STOCK GOES UP.  THE ONE THAT

12      YOU BELIEVE IS NOT GOING TO DO AS WELL YOU WILL

13      TAKE A SHORT POSITION ON IT SO YOU MAKE MONEY AT

14      IT, THE STOCK GOES DOWN.

15      Q.    AND WHAT DID ALBERT HU REPRESENT TO BE THE

16      VALUE OF HIS HEDGE FUNDS?

17      A.    $200 MILLION.

18      Q.    AND DID THE DEFENDANT PROVIDE YOU WITH ANY

19      INVESTMENT DOCUMENTS REGARDING THE FIRESIDE LS FUND

20      BEFORE YOU INVESTED WITH HIM?

21      A.    YES, BUT AT A LATER TIME.

22      Q.    WHAT HAPPENS AFTER THIS INITIAL MEETING

23      BETWEEN YOU AND MR. HU?  SO THE DIRECTION OF THE?

24      A.    CONVERSATION CHANGES.  IT TURNS OUT THAT THAT

25      BY COINCIDENCE I WAS LOOKING FOR A HEDGE FUNDS IN

1  TECHNOLOGY SO I BECAME INTERESTED TO KNOW ABOUT HIS

2  FUND AND POTENTIALLY INVEST IN IT?

3  Q.   SO WHAT HAPPENS AFTER THAT?

4  A.   SO I BELIEVE THE NEXT MEETING I MET ANOTHER

5  PRINCIPAL IN THE FUND WHICH WAS MR. STEVE BOND WHO

6  WAS REPRESENTED TO ME AS THE ONE DOING THE

7  TRANSACTION AND THE STOCK PURCHASES AND ANALYZING

8  WHICH PAIRS TO BUY.

9  Q.   WHO REPRESENTED THAT TO YOU?

10  A.   MR. HU.

11  Q.   SO IS MR. HU AT THE SECOND MEETING AS WELL?

12  A.   YES HE IS.

13  Q.   WHAT HAPPENS AT THE SECOND MEETING.

14  A.   WELL, WE GO INTO MORE DETAILS ABOUT THE FUNDS.

15  I GET TO KNOW MR. BOND AND CHECK HIS CREDENTIALS.

16  HE'S REPRESENTED AS HAVING BEEN AN ANALYST FOR A

17  LARGE HEDGE FUND.  I ASK HIM QUESTIONS ABOUT THE

18  TECHNOLOGY COMPANIES.  SOME OF THEM I KNOW BECAUSE

19  WE TALK ABOUT INTEL IN PARTICULAR.  AND HE LOOKS

20  LIKE HE'S QUITE KNOWLEDGEABLE ABOUT STOCKS AND

21  STOCK COMPANY.

22  Q.   WHAT HAPPENS AFTER THE SECOND MEETING THAT YOU

23  HAVE?

24  A.   I BELIEVE AT THAT POINT I AM INTERESTED IN

25  GOING TO THE NEXT STEP AND I INVEST, AND I RECEIVE

1    INVESTMENT DOCUMENTS ABOUT THE FUND.

2    Q.   SO AFTER THE SECOND MEETING YOU HAVE AN IS

3    INTEREST IN INVESTING AND YOU WERE PROVIDED

4    INVESTMENT DOCUMENTS?

5    A.   I BELIEVE THAT'S LITTLE CHRONOLOGY, YES.

6    Q.   WHO PROVIDES YOU THOSE INVESTMENT DOCUMENTS?

7    A.   I BELIEVE IT'S MR. HU.

8    Q.   OKAY.

9         MR. FAZIOLI:  YOUR HONOR, MAY I APPROACH?

10        THE COURT:  SURE.

11   Q.   LET ME SHOW YOU WHAT'S BEEN MARKED AS

12   GOVERNMENT EXHIBIT 12 AND GOVERNMENT EXHIBIT 13.

13        DO YOU RECOGNIZE GOVERNMENT EXHIBIT 12?

14   A.   YES IT'S THE MEMORANDUM FOR THE FIRESIDE.

15   Q.   AND THIS IS FOR THE DEFENDANT?

16   A.   YES.

17   Q.   AND YOU RECOGNIZE GOVERNMENT EXHIBIT 13?

18   A.   YES IT'S THE FIRESIDE FUND AND SUBSCRIPTION

19   BOOKLET.

20   Q.   ALSO PROVIDED TO YOU BY THE DEFENDANT?

21   A.   YES.

22        MR. FAZIOLI:  YOUR HONOR AT THIS POINT

23   THE GOVERNMENT WOULD MOVE EXHIBIT 12 AND 13 INTO

24   EVIDENCE.

25        MR. FONG:  NO OBJECTION, YOUR HONOR.

617

1          THE COURT:  ALL RIGHT.  THEY ARE

2    RECEIVED.

3          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 12

4    AND 13 HAVING BEEN PREVIOUSLY MARKED FOR

5    IDENTIFICATION, WERE ADMITTED INTO EVIDENCE.)

6    BY MR. FAZIOLI:

7    Q.   I'M NOW GOING TO ASK YOU A SERIES OF QUESTIONS

8    ABOUT THE INVESTMENT DOCUMENTS.  SO COULD YOU

9    PLEASE INDICATE WHAT IS AT THE TOP OF THIS PAGE,

10   GOVERNMENT EXHIBIT 12?

11   A.   IT'S IT IS FIRESIDE LS FUND, LP.

12   Q.   WHAT'S THE DATE AT THE BOTTOM?

13   A.   JUNE 30TH, 2000, FIRE.

14   Q.   WHAT PORTION DID YOU READ?

15   A.   THE ENTIRE DOCUMENT.

16   Q.   DID YOU READ ALL THE INVESTMENT DOCUMENTS THAT

17   THE DEFENDANT PROVIDED YOU?

18   A.   I BELIEVE SO.

19   Q.   AGAIN WITH GOVERNMENT EXHIBIT 13 DID YOU READ

20   THROUGH ALL OF GOVERNMENT EXHIBIT 13 AS WELL?

21   A.   YES, I DID.

22   Q.   WHY DID YOU TAKE THE TIME TO READ THROUGH THE

23   INVESTMENT DOCUMENTS THAT ALBERT HU PROVIDED YOU?

24   A.   WELL, I THINK THAT'S A STEP THAT I DON'T

25   USUALLY DO IF THE INVESTMENT IS PRESENTED BY ONE OF

618

1    MY BROKER, IF IT'S A PUBLIC INVESTMENT.  BUT THIS

2    ONE WAS A PRIVATE INVESTMENT AND I WANTED TO REVIEW

3    IT MORE CLOSELY THAN MY, THAN A PUBLIC INVESTMENT.

4    Q.   SO EXPLAIN WHAT YOU UNDERSTOOD TO BE THE

5    DIFFERENCE BETWEEN A PUBLIC INVESTMENT WITH A

6    BROKER AND A BRIEF ATE INVESTMENT WITH A HEDGE

7    FUND?

8    A.   WELL, FOR ME ONE OF THE MAJOR DIFFERENCES IS

9    THE PUBLIC INVESTMENT IS PUBLIC.  SO THEY ARE NOT

10   CHECKING IT ASKING THE QUESTION.  THEY DO THIS

11   REVIEW WORK ALL THE TIME.  SO MANY EYES ARE LOOKING

12   ON IT.

13        ON THE PRIVATE INVESTMENT IT'S NOT PUBLIC

14   SO IT'S UP TO YOU TO DIG A LITTLE BIT DEEPER.

15   Q.   SO IF YOUR BROKER CAME TO YOU AND SAID THAT,

16   ASKED YOU TO INVEST IN A PUBLIC COMPANY LIKE APPLE,

17   YOU WOULD UNDERSTAND THERE WOULD BE ANALYSTS

18   LOOKING AT APPLE, CORRECT?

19   A.   YES, WE WOULD STILL DISCUSS WHY APPLE IS A

20   GOOD INVESTMENT AND WE WILL LOOK AT THE NUMBERS.

21   BUT MOST OF THE FACTS ARE WELL KNOWN BECAUSE IT'S A

22   PUBLIC COMPANY.

23   Q.   BUT HERE WITH THE POSSIBLE INVESTMENT IN THE

24   FIRESIDE FUND BECAUSE IT WAS A PRIVATE INVESTMENT

25   YOU FELT IT REQUIRED ADDITIONAL ATTENTION, CORRECT?

1    A.    YES.   PLUS IT WASN'T PRESENTED TO ME BY ONE OF

2    MY INVESTMENT MANAGERS, WHOSE USUAL ROLE WOULD BE

3    TO REVIEW THOSE.

4    Q.    THIS DOCUMENT EXHIBIT 12, THE PRIVATE

5    PLACEMENT MEMORANDUM.   DID IT INFLUENCE YOUR

6    DECISION TO INVEST IN THE FIRESIDE LS FUND?

7    A.    YES, IT DID.

8    Q.    PLEASE TURN TO PAGE EIGHT OF GOVERNMENT

9    EXHIBIT 12.   THIS IS THE PAGE THAT'S MARKED HU147

10   AT THE BOTTOM.

11   A.    YES.

12   Q.    SO YOU READ THIS PAGE BEFORE YOU INVESTED WITH

13   ALBERT HU, CORRECT?

14   A.    YES.

15   Q.    AND CAN YOU TELL ME WHAT'S THE TITLE AT THE

16   TOP OF THAT PAGE?

17   A.    IT'S A SUMMARY OF PRINCIPAL TERMS.

18   Q.    MS. BURNEY CAN YOU PLEASE HIGHLIGHT THE

19   SECTION OF THIS PAGE THAT SAYS, THE FUND AND

20   INVESTMENT OBJECTIVE, PLEASE.

21          WHAT'S THE FUND THAT'S IDENTIFIED THERE?

22   A.    FIRESIDE LS FUND, LP.

23   Q.    OKAY.   AND DO YOU SEE THERE'S A NEXT PARAGRAPH

24   THAT SAYS INVESTMENT OBJECTIVE.

25   A.    YES.

1    Q.   CAN YOU READ THE SECOND PARAGRAPH THAT SAYS

2    INVESTMENT OBJECTIVE?

3    A.   IT SAYS THE INVESTMENT OBJECTIVE OF THE FUND

4    AS IMPLEMENTED THROUGH THE MASTER FUND AS DEFINED

5    BELOW WILL BE TO GENERATE HIGH ABSOLUTE RETURNS

6    WHICH ARE UN CORRELATED WITH MAJOR MARKET INDICES

7    AND WHICH EXHIBIT LOW VOLATILITY.  THE FUND WILL

8    SEEK TO ACHIEVE THIS OBJECTIVE BY

9    INVESTING-INVESTMENT PRINCIPALLY IN THE SECURITIES

10   OF HIGH TECHNOLOGY COMPANIES AND THEIR DERIVATIVES

11   SUCH AS OPTIONS.

12        THE FUND WILL IDENTIFY INFORMATION

13   ADVANTAGE FROM ACADEMIA VENTURE CAPITAL COMMUNITY,

14   GOVERNMENT AND EXTRACT RETURN FROM THE PUBLIC

15   EQUITY MARKET.  THE FUND WILL ATTEMPT TO HEDGE ALL

16   DIRECTIONAL RISK THROUGH THE DEPLOYMENT OF A LONG

17   SHORT NEAR MARKET NEUTRAL PORTFOLIO CONSISTS OF

18   MANY PAIR TRADES AND HEDGING DERIVATIVES.  THERE

19   CAN BE NO ASSURANCE THAT THE FUND WILL ACHIEVE ITS

20   OBJECTIVES OR AVOID LOSS.

21   Q.   WAS THIS PARAGRAPH, DID THIS SUMMARIZE YOUR

22   UNDERSTANDING OF THE INVESTMENT OBJECTIVES OF THE

23   FIRESIDE LS FUND?

24   A.   YES, THAT WAS ENTIRELY CONSISTENT WITH WHAT WE

25   DISCUSSED WITH MR. HU.

1    Q.   SO THIS IS PARAGRAPH IS CONSISTENT WITH WHAT

2    MR. HU HAD ALSO TOLD YOU, CORRECT?

3    A.   YES.

4    Q.   DID THESE INVESTMENT OBJECTIVES PUT FORWARD

5    HERE IN THIS PAGE, AND ALSO COMMUNICATED TO YOU BY

6    MR. HU HIMSELF, DID THEY INFLUENCE YOUR DECISION TO

7    INVEST WITH HIM?

8    A.   ABSOLUTELY.

9    Q.   HOW DID THEY -- HOW?

10   A.   FOR SIMPLE REASON.  IT TURNS OUT THAT I WAS

11   LOOKING FOR A HEDGE FUND FOR THE USUAL ADVANTAGE

12   THAT IS A HEDGE FUND PROVIDES WHICH IS UN

13   CORRELATED INVESTMENT WITH THE MARKET AND I HAD ONE

14   BEFORE ACTUALLY BUT IT WAS VERY BROAD AND I DIDN'T

15   LIKE THIS.  I WANTED ONE THAT WAS INVESTED IN

16   TECHNOLOGY FOR THE SIMPLE REASON THAT I'M MORE

17   FAMILIAR WITH TECHNOLOGY.  AND THIS FUND DID

18   ACHIEVE EXACTLY THAT.  SO THE LOW CORRELATION OR

19   THE LOW VOLATILITY IS BECAUSE YOU TAKE PAIRS.

20        SO IF SOMETHING HITS A PARTICULAR

21   TECHNOLOGY SECTOR YOUR PAIR WILL MOVE THE SAME WAY.

22   THE WINNER OR THE ANTICIPATED LOSER, THEY WILL BOTH

23   MOVE UP OR DOWN.  SO THEY WILL CANCEL EACH OTHER.

24        THEN ON THE LONG-TERM TECHNOLOGY,

25   HOPEFULLY YOU CHOSE THE RIGHT PAIR AND YOU WILL GET

1    A RETURN OUT OF THAT

2    Q.    IF AT THIS TIME YOU HAD KNOWN THAT CONTRARY TO

3    THESE INVESTMENT OBJECTIVES THAT YOUR FUNDS WERE

4    NOT GOING TO BE INVESTED PRINCIPALLY IN THE

5    SECURITIES OF HIGH TECHNOLOGY COMPANIES AND THEIR

6    DERIVATIVE SUCH AS OPTIONS, IF YOU HAD KNOWN THAT

7    WOULD IT HAVE INFLUENCED YOUR DECISION TO INVEST

8    WITH ALBERT HU?

9    A.    ABSOLUTELY.  I WOULD NOT HAVE INVESTED.

10   Q.    WHY NOT?

11   A.    BECAUSE I INVESTED FOR THE VERY PURPOSE OF

12   DOING THIS KIND OF INVESTMENT IN PAIR CUBICLES AND

13   HIGH TECHNOLOGY AND LOW VOLATILITY, HOW DO YOU CALL

14   THAT, STRATEGY.

15   Q.    DRAWING YOUR ATTENTION TO THE SECOND OF THE

16   BOTTOM OF THIS PAGE, IT SAYS INVESTMENT STRUCTURE.

17   YOU COULD READ THE FIRST SENTENCE AFTER, INVESTMENT

18   STRUCTURE?

19   A.    THE FUND WILL INVEST SUBSTANTIALLY ALL OF ITS

20   ASSET IT IS THROUGH A MASTER FUND FEEDER FUND

21   STRUCTURE IN THE FIRESIDE MASTER FUND LP, THE

22   MASTER FUND.  ASSETS NOT INVESTED IN THE MASTER

23   FUND WILL PROVIDE FOR FUND OPERATING EXPENSES.

24   OTHER INVESTMENT FUNDS STRUCTURED TO MEET THE NEEDS

25   OF VARIOUS U.S. TAX EXEMPT AND NON U.S. INVESTORS

1    TOGETHER WITH THE FUND, THE INVESTMENT VEHICLES,

2    MAY ALSO INVEST IN THE MASTER FUND AND WILL BEAR A

3    PROPORTIONATE SHARE OF THE MASTER FUND'S EXPENSES.

4    Q.   NOW, WAS IT YOUR UNDERSTANDING THAT IF YOU

5    INVESTED WITH ALBERT HU THAT HE WOULD INVEST

6    SUBSTANTIALLY ALL OF THE FUNDS YOU PROVIDED HIM?

7    A.   YES THAT WAS MY UNDERSTANDING.

8    Q.   IF YOU HAD KNOWN AT THE TIME THAT ALBERT HU

9    WAS NOT GOING TO INVEST SUBSTANTIALLY ALL OF THE

10   MONEY THAT YOU WERE GOING TO PROVIDE HIM, WOULD IT

11   HAVE INFLUENCED YOUR DECISION TO INVEST?

12   A.   YES.

13   Q.   AND HOW OLD IT HAVE INFLUENCED THAT?

14   A.   I WOULD NOT HAVE INVESTED.

15   Q.   PLEASE TURN TO PAGE NINE OF THE DOCUMENT.

16        MR. VERDIELL, COULD YOU PLEASE READ THE

17   SECTION LISTED ADMINISTRATOR ON PAGE 9 EXHIBIT 12

18   A.   IT SAYS GLOBEOP FINANCIAL SERVICES LLC, THE

19   ADMINISTRATOR HAS BEEN RETAINED BY THE FUND AND THE

20   MASTER FUND TO PERFORM DAY TO DAY ADMINISTRATIVE

21   AND BOOKKEEPING SERVICES AND TO SERVE AS REGISTRAR

22   AND TRANSFER AGENT.

23   Q.   AT THE TIME THAT YOU WERE CONSIDERING

24   INVESTING WITH MR. HU, WHAT DID YOU UNDERSTAND TO

25   BE THE ROLE OF A HEDGE FUND ADMINISTRATOR?

1    A.   BASICALLY WHAT'S WRITTEN HERE IS TO KEEP THE

2    BOOKS AND DO THE ADMINISTRATIVE TASKS TO RUN THE

3    FUND.

4    Q.   AT THE TIME WAS IT IMPORTANT TO YOU THAT

5    SOMEONE INDEPENDENT BE THE BOOKKEEPER OR DO THE

6    ADMINISTRATIVE TASKS FOR THE FIRESIDE LS FUND?

7    A.   YES.

8    Q.   WHY WAS IT IMPORTANT FOR YOU THERE BE SOME

9    INDEPENDENT BOOKKEEPER AND ADMINISTRATIVE?

10   A.   F CHECK CUBICLES AND BALANCES ACCIDENT

11   PROTECTION AGAINST FRAUD FOR EXAMPLE.  SO DIFFERENT

12   PEOPLE CHECK THE BOOKS AND IT'S NOT JUST VESTED IN

13   ONE PERSON.

14   Q.   YOU FELT THAT HAVING AN INDEPENDENT BOOK

15   COOPER ADMINISTRATIVE MIGHT HELP CREATE THAT CHECK

16   AND BALANCE?

17   A.   YEAH, THAT'S THE FIRST STEP YOU WOULD LAKE.

18   YOU HAVE AN INDEPENDENT BOOKKEEPER.

19   Q.   OKAY.  IF YOU HAD KNOWN AT THIS TIME THAT YOU

20   RECEIVED THIS DOCUMENT THAT THE HEDGE FUND

21   ADMINISTRATIVE FIRM GLOBEOP FINANCIAL SERVICES LLC

22   HAD NOT ACTUALLY BEEN RETAINED BY THE FIRESIDE

23   FUND, WOULD IT HAVE INFLUENCED YOUR DECISION TO

24   INVEST WITH ALBERT HU?

25   A.   OBVIOUSLY, YES, I WOULD HAVE NOT INVESTED.

1    THAT WOULD HAVE BEEN A GROSS MISREPRESENTATION.

2    Q.   THAT WOULD HAVE RAISED A RED FLAG FOR YOU?

3    A.   YEAH.  THAT WOULD HAVE RAISED THE POSSIBILITY

4    OF FRAUD ACTUALLY.

5    Q.   CAN YOU PLEASE TURN TO PAGE 29 OF EXHIBIT 12.

6    THIS IS -- THE BATES NUMBER AT THE BOTTOM IS HU168.

7             AND CAN YOU PLEASE READ THE PARAGRAPH

8    THAT AFTER REPORT TO PARTNERS.

9    A.   SEALER AND CPA CO, THE FUND'S ACCOUNTANTS WILL

10   AUDIT THE FUND'S BOOKS AND RECORDS AT THE END OF

11   EACH FISCAL YEAR COMMENCING WITH THE FUNDS FIRST

12   FISCAL YEAR.  AS SOON AS PRACTICABLE AFTER EACH

13   SUCH FISCAL YEAR THE FUND WILL PREPARE AND MAIL TO

14   EACH LIMITED PARTNER TOGETHER WITH THE REPORT

15   PREPARED BY THE FUND'S INDEPENDENT ACCOUNTANTS, A

16   CERTIFIED FINANCIAL REPORT SETTING FORTH CERTAIN

17   FINANCIAL INFORMATION RELATING TO THE FUND AND SUCH

18   LIMITED PARTNERS CAPITAL ACCOUNT.  WITHIN A

19   REASONABLE PERIOD AFTER EACH CALENDAR YEAR EACH

20   PARTNER WILL BE FURNISHED SIMILAR INFORMATION FOR

21   PREPARATION OF THEIR RESPECTIVE TAX RETURNS.  IN

22   ADDITION, FOLLOWING THE END OF EACH MONTH, THE FUND

23   WILL DELIVER TO EACH LIMITED PARTNER AN ESTIMATE OF

24   SUCH LIMITED PARTNER'S CAPITAL ACCOUNT BALANCE AS

25   OF THE END OF SUCH MONTH, NET OF ANY ACCRUED

1    INCENTIVE ALLOCATION.

2    Q.   OKAY.  YOU SEE WHO IS IDENTIFIED AS IT IS

3    FUND'S ACCOUNTANTS IN THAT PARAGRAPH?

4    A.   CORRECT.

5    A.   SEALER AND CPA.

6    Q.   WAS IT IMPORTANT TO YOU THAT THE FIRESIDE LS

7    FUND HAVE SEPARATE ACCOUNTS?

8    A.   YES, IT'S IMPORTANT.

9    Q.   WHY?

10   A.   AS I EXPLAINED BEFORE THAT'S THE SECOND LEVEL

11   OF CHECK AND BALANCES THAT YOU HAVE INDEPENDENT

12   ACCOUNTANT CHECKING THE BOOKKEEPING.

13   Q.   SO THE FIRST LEVEL IS THE BOOKKEEPERS AND

14   ADMINISTRATORS?

15   A.   INDEPENDENT.

16   Q.   AND THE SECOND LEVEL ARE THE INDEPENDENT

17   ACCOUNTANTS, CORRECT?

18   A.   RIGHT.

19   Q.   ALL RIGHT.  IF YOU HAD KNOWN AT THE TIME THAT

20   YOU RECEIVED THIS DOCUMENT THAT SIELOR AND CPA

21   COMPANY, THE SIELOR ACCOUNTING FIRM HAD NOT

22   ACTUALLY BEEN RETAINED BY THE FIRESIDE LS FUND

23   WOULD IT HAVE INFLUENCED YOUR DECISION TO INVEST

24   WITH ALBERT HU?

25   A.   YES OF COURSE I WOULD NOT HAVE INVESTED.

1    Q.   AGAIN, WHY NOT?

2    A.   BECAUSE THAT WOULD POINT THAT SOMETHING

3    POTENTIALLY FRAUDULENT IN THE SET UP.  IT WOULD BE

4    A GROSS MISREPRESENTATION OF ONE OF THE MOST

5    IMPORTANT GUARDS AGAINST FRAUD.

6    Q.   OKAY.  NOW DRAWING YOUR ATTENTION BACK, LET'S

7    GO BACK TO PAGE EIGHT, SORRY, PAGE NINE OF

8    EXHIBIT 12.  THIS WOULD BE THE PAGE WITH THE NUMBER

9    AT THE BOTTOM, HU148?

10   A.   I HAVE IT.

11   Q.   OKAY.  WHOSE IDENTIFIED HERE AS THE AUDITORS

12   OF THE FIRESIDE LS FUND?

13   A.   CASTILLO, LYN, COHEN & VIJAY.

14   Q.   AND AT THE TIME THAT YOU WERE CONSIDERING

15   INVESTING WITH MR. HU, WAS IT IMPORTANT TO YOU THAT

16   THE FIRESIDE LS FUND HAD INDEPENDENT AUDITORS?

17   A.   YES OF COURSE.

18   Q.   WHAT WAS YOUR UNDERSTANDING OF WHAT THE ROLE

19   OF WHAT INDEPENDENT AUDITORS WOULD DO?

20   A.   THAT'S THE ULTIMATE PROTECTION AGAINST FRAUD

21   OR BOOKKEEPING.  THOSE PEOPLE SPECIALIZE IN

22   REVIEWING BOOKS AND ASKING FOR ALL THE

23   DOCUMENTATION AND MAKING SURE, CERTIFYING THE

24   ACCOUNTING IS DONE PROPERLY AND THEY ARE VERY TOUGH

25   ACTUALLY.  THAT'S THEIR JOB?

1    Q.   YOU DON'T NECESSARILY HAVE ANY PERSONAL

2    KNOWLEDGE ABOUT AN AUDITING FIRM CALLED CASTILLO,

3    LYN, COHEN & VIJAY, CORRECT?

4    A.   NO, I SPEAK IN GENERAL.  THE JOB OF AN AUDITOR

5    IS.

6    Q.   SO IN ADDITION TO HAVING INDEPENDENT

7    BOOKKEEPERS AND ACCOUNTANTS IT WAS ALSO IMPORTANT

8    TO YOU THAT THE FIRESIDE FUND HAVE INDEPENDENT

9    AUDITORS AS WELL?

10   A.   RIGHT.  THAT'S THE THIRD LEVEL OF PROTECTION.

11   Q.   WHY WAS IT IMPORTANT FOR YOU TO HAVE ALL THREE

12   LEVELS OF PROTECTION, THE BOOKKEEPERS, THE

13   ACCOUNTANTS AND THE AUDITORS ALL BEING INDEPENDENT?

14   A.   OBVIOUSLY IT'S A FAIRLY LARGE SUM OF MONEY

15   THAT YOU PUT IN THE HANDS OF A VERY FEW PEOPLE SO

16   YOU WANT TO MAKE SURE THERE ARE MANY INDEPENDENT

17   EYES THAT WATCH THAT MONEY IS SPENT PROPERLY

18   ACCORDING TO THE INVESTMENT DOCUMENT.

19   Q.   NOW IF YOU HAD KNOWN AT THE TIME BEFORE YOU

20   INVESTED WITH MR. HU THAT THE CASTILLO, LYN, COHEN

21   & VIJAY WERE NOT INDEPENDENT AUDITORS FOR THE

22   FIRESIDE LS FUND WOULD IT HAVE INFLUENCED YOUR

23   DECISION TO INVEST WITH ALBERT HU?

24   A.   YES, I WOULD NOT HAVE INVESTED.  AT THAT POINT

25   THAT ONE IS AN ENORMOUS MISREPRESENTATION I WOULD

1    HAVE PROBABLY CALLED AUTHORITIES AT THAT POINT.

2              MR. FONG:  OBJECTION.  MOVE TO STRIKE.

3              THE COURT:  WHAT'S THE OBJECTION?

4              MR. FONG:  WENT BEYOND THE SCOPE OF THE

5    QUESTION.

6              THE COURT:  I'M GOING TO LET IT STAY IN.

7    GO AHEAD.

8    BY MR. FAZIOLI:

9    Q.   IF YOU HAD KNOWN AT THE TIME THAT CASTILLO,

10   LYN, COHEN & VIJAY WOULD NOT HAVE EXISTED, WOULD

11   THAT HAVE INFLUENCED YOUR DECISION TO INVEST WITH

12   ALBERT HU?

13   A.   YES, I WOULD NOT HAVE INVESTED.

14   Q.   NOW AFTER YOU RECEIVED AND REVIEWED EXHIBITS

15   12 AND 13, DID YOU INVEST RIGHT AWAY?

16   A.   NO.

17   Q.   SO WHAT HAPPENED THEN?

18   A.   THERE WERE FURTHER MEETINGS.  ACTUALLY I HAD

19   SEVERAL QUESTIONS DETAILED QUESTIONS ABOUT THE

20   DOCUMENTS THAT I WANTED MR. HU TO CLARIFY.

21   Q.   DID MR. HU SUBSEQUENTLY CLARIFY SOME OF THOSE

22   QUESTIONS?

23   A.   YES.  WE HAD A MEETING ABOUT THOSE QUESTIONS.

24   Q.   WHAT HAPPENED AT THAT MEETING?

25   A.   WE DISCUSSED THE CONCERNS THAT I HAD.  HE

1    PROVIDED ANSWERS THAT MADE ME COMFORTABLE THAT I

2    SHOULD NOT BE CONCERNED.

3    Q.   OKAY.  SO AFTER HE GAVE YOU ANSWERS THAT MADE

4    YOU COMFORTABLE WHAT HAPPENED AFTER THAT?

5    A.   THEN I GUESS SHORTLY AFTER THAT I DECIDED TO

6    INVEST IN THE FUND AND I TRANSFERRED SOME MONEY TO

7    THE FUND.

8    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO

9    GOVERNMENT EXHIBIT 13.

10        MS. BURNEY CAN YOU PLEASE HIGHLIGHT THE

11   FIRST PAGE OF GOVERNMENT EXHIBIT 13.

12        CAN YOU PLEASE READ, MR. VERDIELL, WHAT'S

13   ON THE COVER OF GOVERNMENT EXHIBIT 13.

14   A.   IT SAYS THE FIRESIDE LS FUND, LTD,

15   SUBSCRIPTION BOOKLET FOR U.S. INVESTORS.

16   Q.   OKAY.  AND DRAWING YOUR ATTENTION TO PAGE 18

17   OF GOVERNMENT EXHIBIT 13.  IT SAYS AT THE BOTTOM

18   HU198.

19   A.   PAGE -- PAGE 19?

20   Q.   PAGE 19.  YES.  HU198.

21        AND MS. BURNEY CAN YOU PLEASE HIGHLIGHT

22   THE TOP, THE TEXT AT THE TOP OF THAT PAGE.

23        CAN YOU PLEASE READ WHAT IT SAYS THERE

24   UNDER SIGNATURE PAGE, MR. VERDIELL.

25   A.   THIS PAGE CONSTITUTES THE SIGNIFICANT PAGE FOR

1    THE SUBSCRIPTION AGREEMENT.  THE EXECUTION OF THIS

2    PAGE CONSTITUTES EXECUTION OF AND THE UNDER SIGNED

3    HEREBY AUTHORIZES THIS PAGE TO BE ATTACH TO A

4    COUNTERPART TO THE SUBSCRIPTION AGREEMENT.

5             THE UNDERSIGN'S COMMITMENT IS $2 MILLION,

6    IN WITNESS WHERE OF, THE UNDER SIGNED HAS EXECUTED

7    THIS SIGNATURE PAGE THIS DATE 4-24-2007

8    Q.   IT SAYS THE UNDERSIGNED'S COMMITMENT IS

9    $2 MILLION ONLY WHAT'S THE SIGNIFICANCE OF THAT

10   NUMBER?

11   A.   THAT'S AMOUNT I INVESTED IN THE FUND.

12   Q.   DO YOU SEE WHERE IT SAYS FOR ENTITIES?

13   A.   YES.

14   Q.   WHAT ARE THOSE SIGNATURES THERE UNDER FOR

15   ENTITIES?

16   A.   IT'S MY OWN SIGNATURE AND MY WIFE'S SIGNATURE.

17   Q.   AND IT SAYS ACCEPTED AND AGREED AS OF THEN

18   THERE'S A DATE THERE?

19   A.   YES.

20   Q.   WHOSE SIGNATURE IS AT THE BOTTOM OF THE PAGE?

21   A.   IT'S ALBERT HU'S SIGNATURE.

22   Q.   SO AFTER SIGNING THE DOCUMENT YOU MADE

23   ARRANGEMENTS TO HAVE $2 MILLION WIRED TO THE

24   DEFENDANT, CORRECT?

25   A.   THAT'S CORRECT.

1   Q.   THAT MONEY EVENTUALLY WENT TO THE FIRESIDE LS

2   FUND IN SINGAPORE?

3   A.   THAT'S CORRECT.

4   Q.   YOU CONTACTED YOUR BROKERS AT FIDELITY IN

5   CONNECTION WITH THAT WIRE?

6   A.   YES.

7   Q.   WHAT WAS YOUR UNDERSTANDING ABOUT THE FIRESIDE

8   LS'S CONNECTION TO SINGAPORE?

9   A.   SO THAT'S SOMETHING I DISCUSSED WITH MR. HU

10  AND HE SAYS THE FUND HAD PREVIOUSLY BEEN IN THE

11  U.S., BUT THAT HE RECENTLY MOVED IT TO SINGAPORE

12  AND THE REASON THAT WAS GIVEN WAS HE HAD LOTS OF

13  ASIAN INVESTORS AND MAY WERE MORE COMFORTABLE WITH

14  THE FUND BEING IN SINGAPORE.

15  Q.   WHAT DID ALBERT HU LEAD YOU TO BELIEVE HE WAS

16  GOING TO DO WITH THE MONEY, THE $2 MILLION YOU HAD

17  INVESTED IN THE FIRESIDE LS FUND?

18  A.   CAN YOU REPEAT THAT?

19  Q.   WHAT DID ALBERT HU LEAD YOU TO UNDERSTAND THAT

20  HE WAS GOING TO DO WITH THE $2 MILLION YOU HAD

21  ENTRUSTED WITH HIM?

22  A.   SO WHAT WE DISCUSSED THAT IT WAS GOING TO BE

23  INVESTED IN THE PORTFOLIO OF PAIRS OF STOCKS OF

24  TECHNOLOGY COMPANY.

25  Q.   DID YOU EVER EXPECT THAT YOUR FUNDS WOULD BE

633

1    USED TO PAY OFF OTHER INVESTORS?

2    A.   NO.

3    Q.   WOULD YOU HAVE -- WOULD IT HAVE INFLUENCED

4    YOUR DECISION TO INVEST WITH ALBERT HU IF YOU HAD

5    KNOWN THAT YOU'RE A PORTION OF YOUR INVESTMENT WAS

6    GOING TO BE USED TO PAY OFF OTHER INVESTORS?

7    A.   ABSOLUTELY.  I WOULD NEVER HAVE INVESTED IN I

8    HAD KNOWN THAT.

9    Q.   AND WHY NOT?

10   A.   WELL, THAT'S CALLED A PONZI SCHEME WHERE YOU

11   PAY SOMEBODY ELSE WITH YOUR OWN MONEY, SO THAT'S A

12   FRAUDULENT ACT.

13   Q.   DID YOU EXPECT -- WOULD IT HAVE INFLUENCED

14   YOUR DECISION TO INVEST WITH ALBERT HU IF A

15   SIGNIFICANT PORTION OF YOUR FUNDS WAS GOING TO BE

16   USED TO PAY FOR ALBERT HU'S LIVING EXPENSES?

17   A.   ABSOLUTELY.  I WOULDN'T HAVE INVESTED.

18   Q.   AND AGAIN, WHY NOT?

19   A.   BECAUSE THE MONEY WAS FOR THE PURPOSE OF THE

20   INVESTMENT IT WAS NOT FOR MR. HU TO PUT IN HIS

21   POCKET.

22   Q.   AFTER YOU INVESTED THE $2 MILLION WITH ALBERT

23   HU, DID YOU EVER RECEIVE ANY UPDATES FROM HIM ABOUT

24   HOW YOUR INVESTMENT WAS SUPPOSEDLY PERFORMING?

25   A.   YES, I DID.

634

1    Q.   LET ME SHOW YOU WHAT'S BEEN MARKED GOVERNMENT

2    EXHIBIT 14 THROUGH 18.  PLEASE TAKE A QUICK LOOK AT

3    EXHIBITS 14 THROUGH 18?

4    A.   I ONLY LOOKED AT 14.

5    Q.   PLEASE LOOK AT 14 THROUGH 18.  YES, I WILL BE

6    ASKING YOU A COUPLE QUESTIONS ABOUT THESE

7    DOCUMENTS.

8    A.   YES, I'VE SEEN THEM.

9    Q.   DO YOU RECOGNIZE GOVERNMENT EXHIBIT'S EXHIBITS

10   14 THROUGH 18?

11   A.   YES THOSE ARE MY QUARTERLY STATEMENT.

12   Q.   FOR THE FIRESIDE LS FUND?

13   A.   FOR THE FIRESIDE LS FUND.

14   Q.   DO YOU RECALL HOW YOU RECEIVED THOSE

15   DOCUMENTS?

16   A.   MOST, IF NOT ALL WERE HAND DELIVERED TO ME.

17   Q.   WERE THEY HAND DELIVERED IN LOOSE FORM IN

18   ENVELOPE?

19   A.   AS I RECALL USUALLY IN AN ENVELOPE.

20   Q.   WHERE WERE THEY HAND DELIVERED TO YOU?

21   A.   AT MY OFFICE IN THE PLUG AND PLAY TECH CENTER.

22   Q.   ALL RIGHT.

23          MR. FAZIOLI:  YOUR HONOR, AT THIS TIME

24   THE GOVERNMENT WOULD MOVE 14 THROUGH 18 INTO

25   EVIDENCE.

1           MR. FONG:  NO OBJECTION.

2           THE COURT:  14 THROUGH 18 ARE RECEIVED.

3    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS 14 THROUGH

4    18 HAVING BEEN PREVIOUSLY MARKED FOR

5    IDENTIFICATION, WERE ADMITTED INTO EVIDENCE.)

6    BY MR. FAZIOLI:

7    Q.   AND IS THIS THE FIRST ACCOUNT OPEN STATEMENT

8    THAT YOU RECEIVED?

9    A.   YES.  THIS IS THE OPENING STATEMENT.

10   Q.   OKAY.  IS THERE A NOTATION ON THIS GOVERNMENT

11   EXHIBIT 14 ABOUT REFLECTING THE, YOUR INITIAL

12   INVESTMENT IN THE FUND?

13   A.   YES, RIGHT IN THE MIDDLE IT SAYS 4-30-2007,

14   WIRED IN THE AMOUNT OF $2 MILLION.

15   Q.   THAT WAS AROUND THE TIME YOU ACTUALLY DID WIRE

16   MONEY?

17   A.   YES, THIS IS THE ORIGINAL INVESTMENT.

18   Q.   OKAY.  AND DO YOU SEE THERE'S A NAME AT THE

19   TOP LEFT OF THIS DOCUMENT?

20   A.   YES.

21   Q.   WHAT'S THE NAME THERE?

22   A.   FIRESIDE.

23   Q.   THEN THERE'S A NAME OF THE FUND AT THE TOP OF

24   THE DOCUMENT?

25   A.   RIGHT, FIRESIDE LS FUND.

1    Q.   THEN LET'S TAKE A QUICK LOOK AT EXHIBIT 15.

2    THIS IS A DOCUMENT STATEMENT DATED JUNE 30, 2007,

3    CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   AND MOVING ON TO DOCUMENT 16, PLEASE.  AGAIN

6    THIS IS ANOTHER ACCOUNT STATEMENT, CORRECT?

7    A.   YES.

8    Q.   OKAY.  AND COULD I QUICKLY, NUMBER 17, PLEASE.

9    AND THIS IS AN ACCOUNT OPEN STATEMENT DATED

10   DECEMBER 31ST, 2007?

11   A.   CORRECT.

12   Q.   AND THESE ACCOUNT STATEMENTS LOOK TO BE

13   CUMULATIVE, CORRECT THEY SHOW YOUR ORIGINAL

14   $2 MILLION WIRE, CORRECT?

15   A.   YES.

16   Q.   WHAT'S SOME OF THE INFORMATION THAT'S

17   SUMMARIZED BELOW THE ENTRY FOR THE WIRE?

18   A.   SO THAT'S IT SHOWS HOW THE INVESTMENT HAS

19   PERFORMED AT DIFFERENT POINT IN TIME AND THE AMOUNT

20   HAD GROWN TO IN JUNE, SEPTEMBER AND DECEMBER OF

21   2007.

22   Q.   OKAY.  THEN LET'S PLEASE MOVE TO GOVERNMENT

23   EXHIBIT 18.  THIS IS THE ONE I'M GOING TO ASK YOU A

24   COUPLE MORE QUESTIONS ABOUT.  WHAT'S THE STATEMENT

25   DATE ON THIS DOCUMENT?

1     A.   THE STATEMENT DATE IS MARCH 31ST, 2008.

2     Q.   OKAY.  SO LET ME ASK YOU ABOUT GOVERNMENT

3     EXHIBIT 18.

4          SO THIS IS AN ACCOUNT IT SHOWS THE

5     STATEMENT DATE, THE MONEY BEING WIRED IN APRIL 30,

6     2007, CORRECT?

7     A.   YES.

8     Q.   IT'S KIND OF HARD TO READ BUT CAN YOU

9     SUMMARIZE WHAT ARE THE QUARTERLY CHANGES THAT ARE

10    INDICATED HERE ON GOVERNMENT EXHIBIT 18.

11    A.   YES, ON MY COPY IT'S EASILY LEGIBLE.  SO START

12    WITH THE $2 MILLION.  THEN JUNE 30TH IT REPORTS

13    THAT IT HAD GONE UP BY 4.327 PERCENT.

14    Q.   IN THE SECOND QUARTER OF 2007?

15    A.   THAT'S CORRECT.

16    Q.   SO ACCORDING TO THAT 4.327 PERCENT FIGURE,

17    YOUR $2 MILLION HAD GROWN TO WHAT, ACCORDING TO

18    THIS ACCOUNT STATEMENT?

19    A.   SO IT SAYS 2,086,540.

20    Q.   ALL RIGHT.  THE NEXT ENTRY 9-30-2007?

21    A.   THAT'S THE RETURN FOR Q3, 2007.  IT SHOWS IT

22    HAS GROWN BY ANOTHER 6.113 PERCENT.  THE TOTAL OF

23    THE INVESTMENT IS NOW 2, 214, 090.19.

24    Q.   SO IN THAT PERIOD THAT'S A LITTLE OVER SIX

25    MONTHS AFTER YOU INVESTED BY 9-30-2007?

1    A.   CORRECT.

2    Q.   BUT ACCORDING TO THIS ACCOUNT STATEMENT, YOUR

3    INVESTMENT HAD GROWN BY A LITTLE OVER TEN PERCENT?

4    A.   CORRECT.

5    A.   CORRECT.

6    Q.   DID YOU CONSIDER THAT TO BE A PRETTY GOOD

7    RETURN AT THAT POINT?

8    A.   YES, THAT'S A VERY GOOD RETURN.

9    Q.   ALL RIGHT.  EXHIBIT AGAIN WHAT DOES IS IT

10   INDICATE WAS THE CHANGE FOR Q4?

11   A.   Q4 STATED IT HAS GROWN BY 10.193 PERCENT.  THE

12   ACCOUNT HAS GROWN TO $2,439,772.40.

13   Q.   WHAT WAS THE RETURN TO Q1?

14   A.   THE RETURN IN Q1 IS NEGATIVE 0.324 PERCENT AND

15   THE ACCOUNT IS AT THE BOTTOM SAYS, $2,431,867.54.

16   Q.   OKAY.  THEN DRAWING YOUR ATTENTION TO THE TOP

17   OF EXHIBIT 18 DO YOU SEE THERE'S AN ADDRESS SAYS

18   VERDIELL FAMILY TRUST.  DO YOU RECOGNIZE THAT

19   ADDRESS?

20   A.   THIS IS MY ADDRESS.

21   Q.   OKAY.  AND THE FAMILY TRUST WAS THAT THE MONEY

22   WHICH YOU INVESTED IT IS MONEY IN THE FIRESIDE

23   FUND?

24   A.   YES, ALL THE ASSETS ARE IN THE TRUST.

25   Q.   WE ARE NOT GOING TO PUBLISH EACH ONE OF THOSE

1    PRIOR ACCOUNT STATEMENTS BUT THEY SIMILARLY HAVE

2    YOUR ADDRESS AT THE TOP, CORRECT?

3    A.   YES.

4    Q.   OKAY.  AND CAN YOU PLEASE BLOW UP THE

5    SIGNATURES THAT ARE AT THE BOTTOM OF EXHIBIT 18.

6    OKAY.  NOW, WE ARE NOT GOING TO WALK THROUGH EVERY

7    SINGLE ONE OF THE EXHIBITS, 14 THROUGH 18, BUT

8    THESE TWO SIGNATURES ARE ON EACH OF THOSE EXHIBITS,

9    CORRECT?

10   A.   YES, THEY ARE.

11   Q.   ALL RIGHT.  SO WHOSE SIGNATURES ARE THOSE

12   PURPORTED TO BE AT THE BOTTOM OF THESE DOCUMENTS?

13   A.   IT SAYS CHIEF FINANCIAL OFFICER ANTHONY

14   POLLACE AND CHIEF INVESTMENT OFFICER ALBERT HU.

15   Q.   WHAT DID YOU UNDERSTAND THOSE SIGNATURES AT

16   THE BOTTOM OF THE ACCOUNT STATEMENTS WHAT DID YOU

17   UNDERSTAND THOSE SIGNATURES TO REPRESENT?

18   A.   I UNDERSTOOD THEM TO BE THE SIGNATURE OF THE

19   CHIEF FINANCIAL OFFICER AND ALSO OF THE ALBERT HU,

20   THE CHIEF INVESTMENT OFFICER.

21   Q.   DID YOU UNDERSTAND THAT AN INDIVIDUAL NAMED AN

22   ANTHONY POLLACE AND ALBERT HU HAD ACTUALLY PLACED

23   THEIR SIGNIFICANT ON THOSE DOCUMENTS?

24   A.   YES.

25   Q.   AND THE FACT THAT IT WAS REPRESENTED TO YOU

640

1  THAT MR. POLLACK AND MR. HU HAD SIGNED THOSE

2  DOCUMENTS, WHAT DID THAT MEAN TO YOU WHEN YOU

3  RECEIVED THOSE DOCUMENTS?

4  A.   IT HASN'T THAT MAY WERE CERTIFYING THAT THE

5  NUMBERS ON THAT PAGE WERE ACCURATE.

6  Q.   WAS IT IMPORTANT TO YOU THAT THE NUMBERS ON

7  THESE ACCOUNT STATEMENTS HAD BEEN REVIEWED BY AND

8  SIGNED OFF ON BY ANTHONY POL, THE CHIEF FINANCIAL

9  OFFICER FOR THE FIRESIDE LS FUND?

10  A.   YES.

11  Q.   WHY WAS IT IMPORTANT TO YOU?

12  A.   BECAUSE IT REPRESENTED THAT A FINANCIAL

13  OFFICER HAD REVIEWED AND CERTIFIED THE DOCUMENT AND

14  THE AMOUNTS.

15  Q.   WHY WAS IT IMPORTANT TO YOU THAT THE FINANCIAL

16  OFFICER CERTIFIED THE AMOUNTS?

17  A.   SO IT WOULD IMPLY HE WAS CERTIFYING AND THE

18  BOOKS WERE MAINTAINED CORRECTLY OR ACCURATELY.

19  Q.   DID YOU EVER MEET AN ANTHONY POL?

20  A.   ACTUALLY NO, I DID NOT.

21  Q.   DID YOU EVER COMMUNICATE DIRECTLY WITH MR.

22  POLLACK?

23  A.   NOT DIRECTLY.

24  Q.   AFTER YOU -- YOU REVIEWED THESE ACCOUNT

25  STATEMENTS AFTER YOU RECEIVED THEM, CORRECT?

1    A.   YES.

2    Q.   DID THESE DOCUMENTS CAUSE YOU TO DECIDE TO

3    KEEP YOUR MONEY IN THE FIRESIDE LS FUND?

4    A.   YES.

5    Q.   AT SOME POINT DID YOU START TO HAVE CONCERNS

6    ABOUT YOUR INVESTMENT WITH ALBERT HU?

7    A.   YES, I DID.

8    Q.   WHY DID YOU START TO HAVE CONCERNS?

9    A.   IT CAME BY LITTLE BITS PROGRESSIVELY.  IT

10   WASN'T UNTIL LATER ON THAT I HAD BIG CONCERNS.

11           THE FIRST CONCERN CAME WITH THE FIRST OF

12   THESE REPORTS AND, MAYBE THE SECOND ONE WHEN I

13   RECEIVED THE QUARTERLY STATEMENT.

14   Q.   SO EXHIBIT 15?

15   A.   LET ME CHECK TO MAKE SURE.  YES, THAT WOULD BE

16   EXHIBIT 15.

17   Q.   MS. BURNEY, IF YOU COULD BRING UP EXHIBIT 15,

18   PLEASE.

19           SO THIS IS EXHIBIT -- WE ARE PUBLISHING

20   EXHIBIT 15 TO THE JURY, WHAT CONCERNS DO YOU HAVE

21   AFTER YOU RECEIVED EXHIBIT 15

22   A.   I WOULD SAY IT WAS A RELATIVELY MILD CONCERN

23   BUT IT'S RELATIVELY LARGE INVESTMENT AND I WOULD

24   HAVE EXPECTED A LITTLE BIT MORE THAN A NUMBER AND

25   PERCENTAGE.  SO FOR EXAMPLE YOU WOULD HAVE -- THERE

1    WOULD BE A LETTER WITH IT SAYING USUALLY WHAT

2    HAPPENED DURING THE QUARTER IN THAT FIELD.  THEN

3    YOU WOULD HAVE PROBABLY EXPECTED A MORE DETAILED

4    SAME DURING THAT PERIOD WE MADE SUCH AND SUCH

5    INVESTMENT AND WE HAD SUCH AND SUCH INVESTMENT.

6    THIS ONE PERFORMED A LITTLE BETTER THAN THIS ONE.

7    A LITTLE MORE DETAIL.

8              MR. FAZIOLI:  SO IT LOOKED A LITTLE BIT

9    OPAQUE TO ME.

10   Q.   WHAT DID YOU DO AFTER THAT?

11   A.   I TALKED TO ALBERT HU AND ASKED HIM THOSE

12   QUESTIONS.  WHAT WAS, I KIND OF GOT ORALLY, WHAT

13   WAS THE PAPER.

14   Q.   WHAT OTHER CONCERNS DID YOU HAVE ABOUT YOUR

15   INVESTMENT WITH ALBERT HU OR HOW MONEY WAS BEING

16   SPENT?

17   A.   SO I THINK THE NEXT INCIDENT WAS WHEN MR. HU

18   AT ONE POINT MENTIONED HE WAS SPONSORING HIS

19   GIRLFRIEND TO DO SOME EQUESTRIAN EVENTS,

20   COMPETITION.

21   Q.   WHY WAS THAT TROUBLING TO YOU?

22   A.   I THOUGHT IT WAS VERY IMPROPER, THAT HE DOES

23   THAT ON HIS OWN MONEY, I HAVE NO PROBLEM WITH IT.

24   BUT THAT HE SAID THE FUND WAS SPONSORING HIS

25   GIRLFRIEND, I FIND THAT IMPROPER.

1    Q.   DID YOU CONFRONT MR. HU ABOUT THAT?

2    A.   NO.  IT'S A MINOR INFRACTION CATEGORY.  I WAS

3    NOT HAPPY ABOUT IT.  IT CERTAINLY RAISED MY

4    CONCERN.

5    Q.   WERE THERE OTHER THINGS THAT CAME UP THAT

6    RAISED YOUR CONCERN ABOUT WHAT WAS GOING ON WITH

7    THE FIRESIDE FUND?

8    A.   THE NEXT ONE THAT I REMEMBER WAS A

9    CONVERSATION WITH MR. LIN LATER ON.

10   Q.   WHAT WAS THE NATURE OF THAT CONVERSATION?

11   A.   WE RAN INTO EACH OTHER AT AN EVENT ORGANIZED

12   BY MY INVESTMENT MANAGER AT THE TIME.  AND HE HAD

13   THE SAME ONE.  AND HE TOOK ME APART DURING ONE OF

14   THE BREAKS IN THE SESSIONS AND HE STARTED TO

15   EXPRESS CONCERNS ABOUT MR. HU.

16   Q.   WHAT WERE SOME OF THOSE CONCERNS?

17   A.   WELL, HE TOLD ME THAT HE HAD WORKED RECENTLY A

18   BIT CLOSER WITH MR. HU.  IN PARTICULAR HE WENT TO

19   ASIA AND INTRODUCED HIM TO NEW POTENTIAL INVESTORS

20   AND FIRM HIS WORDS CORRECTLY, HE SAID THE MORE I

21   WORK WITH THAT PERSON THE LESS I'M TRUSTING HIM.

22        THEN HE WENT ON TO DESCRIBE A FEW OF THE

23   THINGS THAT REALLY BOTHERED HIM

24   Q.   WHAT WERE SOME OF THOSE THINGS?

25        MR. FONG:  YOUR HONOR, AT THIS POINT I'M

644

1     GOING TO OBJECT ON THE GROUNDS OF HEARSAY.

2             THE COURT:  IT CAN ONLY BE CONSIDERED FOR

3     WHAT RAISED CONCERNS IN THE WITNESS'S MIND.  IT

4     CANNOT BE CONSIDERED FOR WHETHER OR NOT WHAT

5     MR. LIN WAS TELLING HIM WAS TRUE.

6             THE WITNESS:  SO, CAN I GO ON?

7             THE COURT:  YES.

8             THE WITNESS:  SO FOR EXAMPLE, HE

9     MENTIONED THAT WHAT MR. HU WAS SAYING TO INVESTORS

10    WAS HIGHLY INCONSISTENT AND IN PARTICULAR, THAT

11    MR. HU REPRESENTED THE SIZE OF THE FUND TO BE

12    DIFFERENT NUMBERS.  ONE DAY HE WOULD SAY IT'S 200

13    MILLION AND THE OTHER DAY, AS I HEARD IT FROM

14    MR. LIN ONCE AGAIN, THAT MR. HU HAD REPRESENTED IT

15    WAS A $500 MILLION FUND.

16    BY MR. FAZIOLI:

17    Q.   AND THIS RAISED CONCERNS WITH YOU?

18    A.   IT RAISED CONCERNS WITH MR. LIN, RIGHT, IT WAS

19    SO INCONSISTENT.  THOSE NUMBERS ARE VERY IMPORTANT

20    NUMBERS.  SO WHICH ONE IS IT, RIGHT?  WHEN YOU HAVE

21    TWO SUCH DIFFERENT NUMBERS.

22            HE ALSO RAISED CONCERNS ABOUT ETHICAL

23    BEHAVIOR OF MR. HU.  AND THE EXAMPLE HE BROUGHT UP

24    IS THAT HE WOULD INTRODUCE MR. HU TO A NEW INVESTOR

25    ONE DAY, THEN THE NEXT DAY ALSO MR. HU HAD MET THAT

                                                    645

1    INVESTOR FOR PROBABLY ONLY A FEW MINUTES, HE WOULD

2    REPRESENT TO THE NEXT INVESTOR THAT HE KNEW THAT

3    PERSON THAT HE ONLY MET A FEW MINUTES A FEW DAYS

4    AGO, HE KNEW HIM VERY WELL.

5          SO, WHICH WAS OBVIOUSLY A

6    MISREPRESENTATION.  AS SEEN MY MR. LIN.  SHOULD I

7    GO ON?  THERE WERE SOME MORE.

8    Q.   WHAT WERE OTHER THINGS YOU HEARD THAT CAUSED

9    YOU CONCERN?

10   A.   THE ONE I REMEMBER WAS -- AGAIN BECAUSE HE

11   TOLD ME THAT BECAUSE HE STARTED TO TRUST MR. HU

12   LESS AND LESS, HE SUBMITTED AN EXPENSE REPORT FOR

13   THE TRIP AND HE GOT REIMBURSEMENT CHECK FOR IT AND

14   THE CHECK BOUNCED.

15   Q.   NOW, YOU HAD THIS CONVERSATION WHERE MR. LIN

16   WAS ADD A CREDIT SWISS REPORTED EVENT?

17   A.   THAT'S CORRECT.

18   Q.   NOW WHEN YOU ORIGINALLY WIRED $2 MILLION TO

19   MR. HU, IT ULTIMATELY WENT TO A CREDIT SWISS

20   ACCOUNT SINGAPORE?

21   A.   CORRECT.

22   Q.   BUT THIS CREDIT SWISS EVENT WHERE YOU WERE AT

23   WHEN YOU HAD COMMUNICATION WITH MR. LIN DID IT HAVE

24   ANYTHING TO DO WITH THE FIRESIDE LS FUND?

25   A.   NO IT WAS A PURE COINCIDENCE.

1    Q.   SO YOU HEARD THIS INFORMATION AND YOU HAVE

2    ADDITIONAL CONCERNS WHAT DO YOU DO ABOUT THOSE

3    CONCERNS IF ANYTHING AT THIS POINT?

4    A.   I THINK THAT THE NEXT ONE, SO AN NOTICED BY

5    THE LACK OF INFORMATION OR HOW OPAQUE I THOUGHT THE

6    FUND WAS SO I INSISTED TO HAVE A PORTFOLIO REVIEW

7    WHERE THEY WOULD GO INTO DETAILS AND THEIR HOLDINGS

8    OF WHAT WOULD HAPPEN.

9    Q.   WITH WHOM?

10   A.   WITH MR. HU AND MR. BOND.

11   Q.   SO YOU DON'T RECALL WHEN THAT WAS THE

12   PORTFOLIO REVIEW?

13   A.   I THINK IT WAS DECEMBER 2007, SOMETIME.

14   Q.   SO YOU HAVE A PORTFOLIO REVIEW WITH MR. HU AND

15   MR. BOND IN DECEMBER 2007 AND WHERE DID THIS

16   PORTFOLIO REVIEW TAKE PLACE?

17   A.   IT HAPPENED ONCE AGAIN IN ONE OF THE

18   CONFERENCE ROOMS AT THE PLUG AND PLAY TECH CENTER.

19   Q.   AND YOU, MR. HU AND MR. BOND ARE PRESENT,

20   CORRECT?

21   A.   CORRECT.

22   Q.   WHAT'S GENERALLY OF THE SUBSTANCE OF THE

23   DISCUSSION AT THE PORTFOLIO REVIEW?

24   A.   WELL, THIS TIME WE GO INTO MORE DETAILS ABOUT

25   THE FUND HOLDINGS.  HE HAD TALKED PREVIOUSLY ABOUT

1    SOME IN PARTICULAR THE INTEL PAIR, PARTICULARLY

2    BECAUSE I WORKED AT INTEL AND I KNOW THAT INDUSTRY

3    SO THAT WAS INTERESTING TO ME.

4            SO A LOT OF DETAILS WERE REPRESENTED.  DO

5    YOU KNOW HOW MANY PAIRS WAS IN THE FUNDS AND HE WAS

6    MUCH LESS EXPECTED.  I WOULD SAY ABOUT TEN.  WHICH

7    TECH SECTORS THERE WERE.  IT WAS FAIRLY DETAIL,

8    SOME IN COMPUTER, SOME IN -- THERE WAS SOME IN

9    SOLAR ENERGY AND THE OTHER I DON'T REMEMBER

10   EXACTLY.

11           SOME PARTICULAR PAIRS WERE DISCUSSED.

12   THE INTEL AMD WAS MENTIONED.  I THINK IT WAS EVEN A

13   QUESTION FROM MR. HU TO MR. BOND WHETHER THEY

14   SHOULD KEEP THAT PAIR LONGER MR. BOND SAID YES, IT

15   WASN'T PLAYED OUT COMPLETELY YET.

16           THERE WERE SPECIFIC PAIRS ABOUT THE SOLAR

17   COMPANY WAS DISCUSSED.

18   Q.  WHEN YOU ARE TALKING ABOUT PAIRS IN THIS

19   CONTEXT IN THIS INVESTMENT CONTEXT WHAT DO YOU MEAN

20   BY THAT?

21   A.  YES, SORRY AGAIN, THAT WAS THE INVESTMENT

22   STRATEGY OF THIS FUND WAS TO BUY STOCK OF TWO

23   COMPANIES IN THE SAME FIELD THAT HAVE APPROXIMATELY

24   THE SAME PRODUCT AS CLOSE AS YOU K. ONE THAT YOU

25   BELIEVE WILL DO BETTER THAN THE OTHER AND ONE WILL

1    DO BETTER.

2    Q.   AND IN CASE SOMEONE ON THE JURY DOESN'T

3    UNDERSTAND IT, EXPLAIN WHAT IT MEANS TO LONG A

4    STOCK AND TO SHORT A STOCK FROM EXPERIENCE?

5    A.   SO IT'S BUYING OPTIONS AND ESSENTIALLY IT

6    ALLOWS YOU TO, WHEN YOU BUY A STOCK LONG, IT'S A

7    REGULAR BUY WHEN YOU DO THAT IS YOU MAKE MONEY IF

8    THE STOCK APPRECIATES AND YOU SELL IT AFTERWARDS.

9    THAT'S THE USUAL WAY.

10            ON THE SHORT YOU HAVE TO BUY AN OPTION,

11   IT ALLOWS YOU TO MAKE A PROFIT IF THE STOCK GOES

12   DOWN.

13            SO ONCE AGAIN THE IDEA IS THAT IF THERE'S

14   SOMETHING THAT HAPPENS WITH THE INDUSTRY, IT

15   DOESN'T MATTER BECAUSE YOU LOSE SOME ON THE SHORT

16   BUT YOU WILL MAKE IT ON THE LONG OR VICE VERSA.

17   WHAT'S CALLED MARKET NEUTRAL.  BUT IF YOU PICKED

18   YOUR WINNERS AND LOSER CORRECTLY THEN THEY WILL

19   DIVERGE AND YOU WILL MAKE MONEY.  YOU WANT TO MAKE

20   MONEY BOTH ON THE LONG AND SHORT

21   Q.   AND THIS PAIRING OF STOCKS AND THE LONGING AND

22   SHORTING THIS WAS SOMETHING ALBERT HU SAID HE WAS

23   GOING TO DO WITH YOUR MONEY?

24   A.   YES, IT'S SOMETHING I INVESTED SPECIFICALLY

25   FOR HIM TO PERFORM THAT STRATEGY.

1    Q.   SO WHEN YOU SAID FOR EXAMPLE THE INTEL AMD

2    PAIR, CAN YOU EXPLAIN A LITTLE BIT ABOUT HOW THAT

3    PAIRING WOULD WORK IN THAT CONTEXT?

4    A.   SO THAT'S A GOOD EXAMPLE BECAUSE THEY REALLY

5    COMPETE WITH THE SAME PRODUCT.  THEY DO PROCESSOR

6    CHIPS.  AMD HAD A GOOD RUN AT THAT TIME.  IT WAS

7    BELIEVED THAT LONG-TERM WINNER OR THE COMPANY THAT

8    HAD THE BETTER PROSPECT WAS BE INTEL AND AMD WOULD

9    BE THE ONE THAT WOULD HAVE MORE DIFFICULTIES.  IT

10   TURNED OUT TO BE THAT WAY.

11         SO YOU WOULD BUY AN EQUAL AMOUNT OF INTEL

12   AND AMD.  IF SOMETHING HAPPENS TO THE COMPUTER

13   MARKET THEY SELL LESS COMPUTERS THEY BUY MORE

14   COMPUTERS THOSE STOCKS WITH MOVE A LOT.  BUT

15   BECAUSE THEY MOVE AT THE SAME TIME IT DOESN'T DO

16   ANYTHING.  THEN OVER THE TIME ACTUALLY THIS ONE

17   THEY SHOWED ME THE GRAPH AND YOU PROBABLY KNOW

18   INTEL DID MUCH BETTER THAN AMD, THEREFORE THE PAIR

19   GREW IN VALUE

20   Q.   WHEN YOU SAY THEY SHOWED YOU THE GRAPH IS THAT

21   THE PORTFOLIO REVIEW MR. HU AND MR. BOND WERE

22   SHOWING YOU GRAPHS?

23   A.   YES I WAS SHOWN GRAPHS.

24   Q.   DID YOU RECEIVE ANY WRITTEN REPORT IN

25   CONNECTION WITH THAT PORTFOLIO REVIEW?

1    A.   NO.

2    Q.   LET'S JUMP BACK TO GOVERNMENT EXHIBIT 17

3    PLEASE.  THIS PORTFOLIO REVIEW TOOK PLACE IN

4    DECEMBER 2007, CORRECT?

5    A.   YES.

6    Q.   MS. BURNEY COULD YOU PLEASE HIGHLIGHT WHAT THE

7    STATEMENT DATE IS ON THIS GOVERNMENT EXHIBIT

8    EXHIBIT 17.  WHAT'S THE STATEMENT DATE HERE?

9    A.   DECEMBER 31ST, 2007.

10   Q.   OKAY.  AND MR. HU PROVIDED YOU THIS DOCUMENT,

11   CORRECT?

12   A.   YES.

13   Q.   AND YOU RECEIVED THIS DOCUMENT WITHIN WEEKS OF

14   THE PORTFOLIO REVIEW, CORRECT?

15   A.   YES.

16   Q.   THEN THE PORTFOLIO REVIEW HAD BEEN A RESULT OF

17   YOU EXPRESSING CONCERNS ABOUT YOUR INVESTMENT,

18   CORRECT?

19   A.   YES.  IT WAS TO MAKE MYSELF COMFORTABLE THAT

20   THE INVESTMENTS WERE WELL DONE AND WELL MANAGED TO

21   GET MORE UNDERSTANDING AND CLARITY OF THE

22   UNDERLYING INVESTMENTS.

23   Q.   SO MS. BURNEY COULD YOU PLEASE BLOW UP FOR THE

24   JURY THE INCREASES IN THE PERFORMANCE THAT'S IN THE

25   GRAY SECTION OF THAT DOCUMENT.

1           SO THIS DOCUMENT AT THE BOTTOM, THIS IS

2     INDICATING ABOUT A NET CHANGE IN WHAT TIME PERIOD?

3     A.    IN A QUARTER.

4     Q.    WHICH QUARTER IS IT INDICATING?

5     A.    SO THE ONE AT THE VERY BOTTOM IS THE CHANGE IN

6     QUARTER, Q4, 2007.

7     Q.    THIS DOCUMENT YOU RECEIVED A COUPLE WEEKS

8     AFTER THE PORTFOLIO REVIEW, WHAT DOES IT SHOW TO BE

9     THE NET GAIN IN THE LAST QUARTER OF 2007?

10    A.    10.193 PERCENT.

11    Q.    HOW DOES THAT 10.193 NUMBER IN 2007 COMPARE TO

12    THE OTHER NET GAINS ON THAT SHEET?

13    A.    IT'S THE HIGHEST TURN, ACTUALLY.

14    Q.    OKAY.  SO WHAT HAPPENS AFTER THAT?  YOU HAVE

15    THE PORTFOLIO REVIEW IN DECEMBER 2007 AND WHAT

16    HAPPENS AFTER THAT?

17    A.    SO FIRST THEY PASS THE PORTFOLIO REVIEW WITH

18    FLYING COLORS.  SO I'M LESS WORRIED FOR A WHILE AND

19    MAYBE MR. LIN IS OVERREACTING.  BUT MR. LIN TOLD ME

20    HE'S CONCERNED ENOUGH HE'S DECIDE TO WITHDRAW HIS

21    MONEY.  AND I THINK I, SO EITHER I PROD HIM OR HE

22    VOLUNTEERS THAT HE HAS TROUBLE GETTING THE MONEY

23    WIRED BACK TO HIM.

24    Q.    OKAY.  SO AT SOME POINT DO YOU ASK FOR YOUR

25    MONEY BACK FROM ALBERT HU?

1    A.   YES.  AND I ALSO HEAR FROM MR. LIN THAT HE'S

2    NOT THE ONLY ONE THAT HASN'T RECEIVED HIS MONEY

3    BACK.

4    Q.   LET ME APPROACH AND SHOW YOU WHAT HAS BEEN

5    MARKED AS GOVERNMENT EXHIBIT 66.  DO YOU RECOGNIZE

6    GOVERNMENT EXHIBIT 66?

7    A.   YES, I DO.

8    Q.   WHAT DO YOU RECOGNIZE IT TO BE?

9    A.   THIS IS THE WITHDRAWAL FORM THAT I FILLED IN,

10   IN MARCH 2008.

11        MR. FAZIOLI:  YOUR HONOR, UTILITY THE

12   GOVERNMENT MOVES GOVERNMENT EXHIBIT 66 INTO

13   EVIDENCE.

14        MR. FONG:  NO OBJECTION, YOUR HONOR.

15        THE COURT:  66 IS RECEIVED.

16   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 66 HAVING

17   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

18   ADMITTED INTO EVIDENCE.)

19   BY MR. FAZIOLI:

20   Q.   MS. BURNEY COULD YOU PLEASE PUBLISH GOVERNMENT

21   EXHIBIT 66 AND HIGHLIGHT THE TEXT THERE.

22        YOU COULD PLEASE INDICATE WHAT IT SAYS AT

23   THE TOP OF THAT PAGE.

24   A.   WITHDRAWAL FORM.  DO YOU WANT ME TO GO ON

25   READING?

1    Q.   YES, PLEASE.

2    A.   THEN IT HAS MY COULD NUMBER, MY NAME, VERDIELL

3    FAMILY TRUST.  THE DATE, MARCH 14, 2008.  THE

4    AMOUNT WERE YOU, THE REASON CLOSING THE ACCOUNT.

5    AND MY SIGNATURE.

6    Q.   ALL RIGHT.  AND DID YOU SUBMIT THIS FORM TO

7    MR. HU?

8    A.   YES, I DID.

9    Q.   HOW DID YOU DO THAT?

10   A.   I MUST HAVE FAXED IT OVER E-MAILED A COPY.  I

11   DON'T REMEMBER.

12   Q.   NOW, THAT'S YOUR SIGNATURE ON THIS FORM.  DID

13   YOU EVER RECEIVE A COPY BACK THAT WAS SIGNED BY

14   MR. HU?

15   A.   I BELIEVE I DID.

16   Q.   OKAY.  NOW, LET'S JUMP BACK -- WHAT'S THE DATE

17   ON THIS DOCUMENT?

18   A.   MARCH 14, 2008.

19   Q.   ALL RIGHT.  THEN LET'S JUMP BACK TO GOVERNMENT

20   EXHIBIT 18.  THIS IS THE LAST ACCOUNT STATEMENT.

21         AND CAN YOU PLEASE, MS. BURNEY, HIGHLIGHT

22   THE STATEMENT DATE HERE.

23         WHAT'S THE DATE ON THE STATEMENT HERE,

24   EXHIBIT 18?

25   A.   MARCH 31ST, 2008.

1    Q.   SO YOU RECEIVED THIS ACCOUNT STATEMENT A

2    COUPLE OF WEEKS AFTER YOU SUBMITTED YOUR WITHDRAWAL

3    FORM, CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   OTHER THAN THIS EXHIBIT 18, AFTER THAT DID YOU

6    RECEIVE ANY ACCOUNT STATEMENTS FROM MR. HU AFTER

7    YOU SUBMITTED THE WITHDRAWAL FORM?

8    A.   NO, THAT WOULD BE THE LAST STATEMENT.

9    Q.   OKAY.  NOW SO YOU SUBMITTED YOUR WITHDRAWAL

10   FORM TO MR. HU IN MARCH 2008, CORRECT?

11   A.   CORRECT.

12   Q.   AND HE ACKNOWLEDGED HE HAD RECEIVED THE FORM,

13   CORRECT?

14   A.   YES.  HE DOES.  HE GOES ACTUALLY FURTHER, HE

15   TELLS ME THAT ANY HOW, HE HAD PLANNED TO

16   RESTRUCTURE THE FUND AND REFUND ALL THE, ALL THE

17   FUND HOLDERS AND REOPEN IT AFTERWARDS.

18   Q.   AND WHEN DOES HE TELL YOU THAT?

19   A.   I DON'T REMEMBER THE EXACT DATE.  SOME TIME

20   AFTER DECEMBER.  I DON'T KNOW, AROUND THAT TIME.  I

21   DON'T EXACTLY KNOW.

22   Q.   DID YOU GET YOUR MONEY BACK IN MARCH 2008?

23   A.   NO, I DID NOT.

24   Q.   HOW ABOUT APRIL 2008?

25   A.   I DID NOT.

1    Q.   MAY OR JUNE OF 2008?

2    A.   I NEVER GOT THE MONEY BACK.

3    Q.   SO YOU NEVER RECEIVED YOUR $2 MILLION BACK?

4    A.   NO.

5    Q.   DID MR. HU PROVIDE ANY EXPLANATIONS TO YOU

6    ABOUT WHY HE HAD NOT RETURNED YOUR MONEY?

7    A.   HE, DURING THE TIME WHERE I WAS -- THE ANSWER

8    IS NO, HE DID NOT PROVIDE AN EXPLANATION.

9    Q.   AT THAT TIME IN MARCH.  YOU ASKED FOR IT YOU

10   DON'T GET IT BACK.  ALL RIGHT.

11            WHAT IS A K-1 FORM?

12   A.   THE K-1 FORM IS A TAX DOCUMENT THAT YOU NEED

13   TO FILE AT TAX TIME.  THAT REPRESENTS WHAT THE

14   DEFENDANT HAS GOTTEN AND THEREFORE THE IRS LOOKS AT

15   IT AND TAXES YOU ON IT.

16   Q.   SO IF YOU INVEST MONEY IN A HEDGE FUND YOU

17   TYPICALLY RECEIVE A K-1 FORM?

18   A.   CORRECT.  A PRIVATE INVESTMENT INSTEAD OF

19   GETTING A 1099 IT'S A K-1 FORM.

20   Q.   AT SOME POINT DID YOU EXPECT TO RECEIVE A K-1

21   FORM FROM ALBERT HU?

22   A.   YES, ABSOLUTELY.

23   Q.   WHY DID YOU EXPECT TO RECEIVE A K-1 FORM?

24   A.   WELL, HE'S OBLIGATED TO GIVE ONE.  THEY ARE

25   OBLIGATED TO SEND YOU THE 1099.  -- I THINK BECAUSE

656

1    IT'S A LIMITED PARTNERSHIP SO IT'S NOT A 1099 IT'S

2    A K-1.

3    Q.   CAN YOU PLEASE BRING UP GOVERNMENT EXHIBIT 18,

4    PLEASE.

5            MS. BURNEY CAN YOU PLEASE HIGHLIGHT THE

6    SECTION WHERE IT SAYS TAX REPORTING.  DOWN TO CHIEF

7    INVESTMENT OFFICER.

8            CAN YOU READ WHAT IT SAYS FOR TAX

9    REPORTING HERE ON THE DOCUMENT YOU RECEIVED FROM

10   THE DEFENDANT.

11   A.   FOR TAX REPORTING FIRESIDE LS FUND IS A

12   NONPUBLIC TRADED LIMITED PARTNERSHIP.

13           I WILL READ IT OFF MY DOCUMENT IT'S

14   EASIER.

15           FIRESIDE WILL PROVIDE AND ASSIST

16   INVESTOR'S TAX AGENT OR ADVISOR IN THE PREPARATION

17   OF DOCUMENTS FOR REPORTING AND COMPLIANCE WITH

18   ERISA AND INTERNAL REVENUE CODE, INCLUDING BUT NOT

19   LIMITED TO --

20   Q.   THEN THERE'S A NUMBER OF OTHER CODE SECTIONS,

21   CORRECT?

22   A.   RIGHT.

23   Q.   CONSISTENT WITH THIS PARAGRAPH IT WAS YOUR

24   UNDERSTANDING YOU WERE GOING TO RECEIVE TAX

25   DOCUMENTS FROM ALBERT HU?

1    A.   CORRECT.

2    Q.   AT SOME POINT DID YOU COMMUNICATE YOUR REQUEST

3    TO MR. HU TO GET A K-1 FORM?

4    A.   YES, I DID.

5    Q.   DID YOU EVER RECEIVE A K-1 FORM FROM MR. HU?

6    A.   NO, I DID NOT.

7    Q.   LET ME SHOW YOU WHAT'S BEEN MARKED AS

8    GOVERNMENT EXHIBIT 290 AND 291.  PLEASE TAKE A LOOK

9    AT GOVERNMENT EXHIBITS 290 AND 291.

10           DO YOU RECOGNIZE EXHIBITS 290 AND 291?

11   A.   CAN I JUST READ THEM?

12   Q.   YES.

13   A.   SO THOSE ARE E-MAIL EXCHANGES BETWEEN MYSELF

14   AND MR. HU.  I DIDN'T HAVE TIME TO READ THEM

15   COMPLETELY.

16   Q.   TAKE A QUICK LOOK THROUGH THEM, PLEASE.

17   A.   OKAY.

18   Q.   SO YOU'VE REVIEWED GOVERNMENT EXHIBIT 290 AND

19   291 IN ENTIRETY?

20   A.   RIGHT.

21   Q.   THOSE ARE E-MAILS BETWEEN AND YOU MR. HU?

22   A.   THEY ARE.

23           MR. FAZIOLI:  YOUR HONOR AT THIS TIME THE

24   GOVERNMENT WOULD MOVE EXHIBIT 290 AND 291 INTO

25   EVIDENCE.

1        MR. FONG:  NO OBJECTION, YOUR HONOR.

2        THE COURT:  ALL RIGHT THEY ARE RECEIVED.

3   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 290 AND 291

4   HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

5   WERE ADMITTED INTO EVIDENCE.)

6   BY MR. FAZIOLI:

7   Q.   DRAWING YOUR ATTENTION TO PAGE 290.  THE

8   SUBSTANCE OF THIS E-MAIL THIS IS THE PAGE AT THE

9   BOTTOM THAT SAYS -- MS. BURNEY COULD YOU PLEASE

10  PULL UP THE MESSAGE AT THE TOP WHERE IT SAYS

11  MESSAGE TO MARK VERDIELL AND ENDS WHERE IT SAYS

12  MARK.  THAT'S GOOD.

13       WHAT'S THE ADDRESS -- DID YOU SEND THIS

14  E-MAIL?

15  A.   YES, I DID.

16  Q.   WHAT'S THE DATE AND TIME OF THE E-MAIL?

17  A.   WEDNESDAY MAY 28TH, 2008, AT 4:19.

18  Q.   AND THIS IS ABOUT, YOU ASKED FOR YOUR MONEY

19  BACK IN MARCH 2008 ABOUT TWO MONTHS AFTERWARDS?

20  A.   CORRECT.

21  Q.   AND WHO IS THE E-MAIL ADDRESSED TO?

22  A.   TO ALBERT HU AND LINDA DANESH.

23  Q.   YOU COULD PLEASE INDICATE WHAT THE MESSAGE OF

24  THE E-MAIL WAS?

25  A.   IT SAYS STILL DIDN'T GET THE K-1, CAN YOU

1     RESCIND.

2     Q.   WHAT DOES MR. HU RESPOND?

3     A.   HE SAYS DEAR MARK, WE WILL CHECK AND REVERT.

4     THANKS, ALBERT.

5     Q.   WHAT'S THE DATE ON THAT E-MAIL?

6     A.   THE NEXT DAY, MAY 29TH.

7     Q.   MS. BURNEY, COULD YOU PLEASE GO TO THE SECOND

8     PAGE OF GOVERNMENT EXHIBIT 290 AND HIGHLIGHT THE

9     E-MAIL AT THE BOTTOM.

10         SO WHAT'S THE NEXT E-MAIL ON THIS THREAD.

11    WHAT'S THE DATE OF THE E-MAIL?

12    A.   JUNE 7TH, 2008.

13    Q.   ABOUT A WEEK OR SO LATER?

14    A.   RIGHT.

15    Q.   WHO SENT THIS E-MAIL?

16    A.   ALBERT HU.

17    Q.   TO YOU?

18    A.   TO ME.

19    Q.   AND WHAT DID MR. HU SAY IN THIS E-MAIL?

20    A.   IT SAYS DEAR MARK WE HAVE RECEIVED YOUR K-ONE

21    FORM IN PDF FORMAT.  LINDA WILL FORWARD TO YOU

22    EASTERLY NEXT WEEK, THANKS.

23    Q.   MS. BURNEY COULD YOU BACK UP AND HIGHLIGHT THE

24    TWO E-MAILS IN THE MIDDLE OF THIS DOCUMENT.

25         SO MR. HU SENDS HIS E-MAIL JUNE 7TH.

1    WHEN DO YOU REPLY TO HIS JUNE 7TH E-MAIL?  THE ONE

2    THAT SAYS THURSDAY JUNE 12TH, 1:17 P.M.

3    A.    YES, I SEE.  SO I REPLIED JUNE 12TH.  STILL

4    NOT RECEIVED THE K-ONE CAN YOU RESCIND.  DO YOU

5    HAVE ANY CONFIRMATION ON THE WITHDRAWAL DATE.

6    Q.    WHEN YOU'RE TALKING ABOUT WITHDRAWAL DATE WHAT

7    DO YOU MEAN BY THAT?

8    A.    THE DATE I WOULD GET MY MONEY BACK ON THE

9    WITHDRAWAL.

10   Q.    OKAY.  WHAT'S MR. HU'S RESPONSE?

11   A.    DEAR MARK I HAPPEN TO BE ON MY WAY TO LONDON

12   AND THE PAST TWO DAYS IN DAY-LONG REVIEW OF OUR

13   LONDON OPERATIONS.  SORRY FOR THE LATE RESPONSE.  I

14   WILL FINISH TAKING A LOOK AT YOUR K-ONE AND ASK

15   LINDA TO FORWARD TO YOU.  WILL CONFIRM WITH THE

16   PRIME BROKER ON THE WIRING DATE THANK IT IS ALBERT.

17   Q.    WHAT'S THE DATE?

18   A.    JUNE 14TH ABOUT A WEEK LATER.

19   Q.    MS. BURNEY COULD YOU PLEASE HIGHLIGHT THE NEXT

20   E-MAIL UP IN THE CHAIN.

21          SO MR. HU SENDS THE E-MAIL TO YOU ABOUT

22   THE ONE YOU JUST READ THAT WAS DATED JUNE 14TH.

23   WHAT'S THE NEXT DATE OF THE E-MAIL IN THE NEXT

24   THREAD?

25   A.    JUNE 26TH.

1    Q.   WHO SENT THAT E-MAIL?

2    A.   I DID.

3    Q.   WHO DID YOU SEND IT TO?

4    A.   TO MR. HU AND I COPIED DANESH ON IT.

5    Q.   WHAT DID YOU SAY IN YOUR E-MAIL?

6    A.   STILL HAVEN'T RECEIVED THE K1 NOR THE DATE.  I

7    NEED THIS BY FRIDAY.

8    Q.   WHY WAS IT IMPORTANT YOU NEEDED BOTH THE K1

9    AND THE DATE OF WHEN YOU WERE GOING TO GET YOUR

10   MONEY BACK?

11   A.   WELL, THE FIRST ONE IS BECAUSE I HAVE TO FILE

12   MY TAXES AND THE SECOND ONE IS BECAUSE I'M GETTING

13   WORRIED I STILL HAVE NO DATE FOR WHEN THE MONEY

14   WILL BE WIRED.

15   Q.   THEN CAN YOU, MS. BURNEY CAN YOU SHOW THE

16   BOTTOM OF THE FIRST PAGE THEN THE NEXT PAGE.

17         IF YOU COULD HIGHLIGHT THE TEXT AT THE

18   BOTTOM OF THE FIRST PAGE.  IT SAYS DEAR MARK.

19         COULD YOU READ FOR THE JURY WHAT THE TEXT

20   IS ON THE NEXT PAGE.

21   A.   IT SAYS, SORRY ABOUT THE INCONVENIENCE WE WILL

22   MAKE IT UP FOR YOU.  I AM ON A GLOBAL BUSINESS TRIP

23   I WILL ARRANGE FOR LINDA TO MEET WITH YOU IN THE

24   NEXT COMING WEEK.  THANKS, ALBERT.

25   Q.   ALL RIGHT.  SO THAT'S AN E-MAIL THAT MR. HU

1    SENT JUNE 27TH. YOU REPLY AT THE BOTTOM HERE

2    JUNE 28TH. WHAT DO YOU SAY?

3    A.   I SAY, I DON'T REALLY NEED TO MEET WITH LINDA,

4    I NEED THE K1 AND THE WITHDRAWAL DATE. WHEN CAN I

5    GET THESE, MARK.

6    Q.   WHEN DOES MR. HU RESPOND TO YOU?

7    A.   ON JUNE 30TH.

8    Q.   MS. BURNEY, CAN YOU PLEASE BLOW UP THAT

9    RESPONSE.

10              WHAT'S MR. HU'S RESPONSE TO YOU?

11   A.   IT SAYS DEAREST MARK, MY APOLOGIES FOR CAUSING

12   YOUR DISPLEASURE. THIS IS A REALLY VERY, VERY

13   UNIQUE YEAR AND SPECIAL SITUATION. THEREFORE

14   DESPITE OUR OPERATIONS BEST EFFORT WE ARE

15   DEVELOPING WAYS TO SERVE OUR CUSTOMERS BEST. IF

16   YOU PERMIT ME I WILL ALLOW LINDA TO CALL YOU,

17   PLEASE.

18   Q.   MS. BURNEY IF YOU COULD HIGHLIGHT THE LAST TWO

19   E-MAILS IN THIS EXCHANGE. SO.

20              SO YOU REPLY JULY 15TH CORRECT

21   A.   CORRECT.

22   Q.   THIS IS A FEW MONTHS AFTER YOU SUBMITTED YOUR

23   WITHDRAWAL FORM?

24   A.   CORRECT.

25   Q.   WHAT'S YOUR RESPONSE?

1    A.   THIS IS A VERY SERIOUS SITUATION I WANT TO

2    TALK TO YOU DIRECTLY.  ONCE AGAIN, ONLY TWO TOPICS,

3    DATE OF THE K1 AND NOW OVERDUE WITHDRAWAL.

4    Q.   AND MR. HU RESPONDS JULY 16TH, CORRECT?

5    A.   CORRECT.

6    Q.   AND HOW DOES HE RESPOND?

7    A.   HE SAYS, CERTAINLY MARK, ABSOLUTELY.  I AM

8    CURRENTLY IN ASIA WORKING TO RESOLVE THE UNEXPECTED

9    BUT SLOWLY WORKED OUT SILTATION HERE.  WHEN WILL BE

10   A GOOD TIME FOR YOU, THIS IS A PRIORITY FOR ME.

11   FRIDAY OR SATURDAY, YOUR TIME.  I AM ON HONG KONG

12   TIME ZONE.

13   Q.   MS. BURNEY IF YOU COULD PLEASE PUBLISH

14   GOVERNMENT EXHIBIT 291.

15           THIS IS ANOTHER E-MAIL EXCHANGE BETWEEN

16   YOU AND MR. HU, CORRECT?

17   A.   CORRECT.

18   Q.   THIS IS ACTUALLY TAKING PLACE IN AUGUST 2008?

19   A.   YES.

20   Q.   SHORTLY AFTER THE E-MAIL EXCHANGE SUMMARIZED

21   IN THE PRIOR EXHIBIT?

22   A.   YES.

23   Q.   SO DO YOU SEE AT THE BOTTOM -- CAN YOU PLEASE

24   BLOW UP WHAT IT SAYS ON THE BOTTOM OF THE FIRST

25   PAGE OF GOVERNMENT EXHIBIT 291.

1          AND IT SAYS FROM DEE DEE FERNANDEZ

2    A.   YES.

3    Q.   DO YOU KNOW WHO DEE DEE FERNANDEZ IS?

4    A.   MY ASSISTANT.

5    Q.   AND YOU SEE THE SUBJECT SAYS CANCELLED?

6    A.   YES.  CANCELLED MEETING WITH ALBERT HU

7    REGARDING K1.

8    Q.   DO YOU KNOW WHAT THAT SUBJECT CANCELLED

9    REFERRED TO?

10   A.   SO FINALLY MR. HU HAD AGREED TO A MEETING AND

11   HE JUST CANCELLED IT.

12   Q.   AND IS THAT WHEN YOU LEARNED IT HAD BEEN

13   CANCELLED?

14   A.   YES.

15   Q.   MONDAY AT 7:00 A.M.?

16   A.   YES.  CORRECTION.  I LEARNED IT WHEN I READ

17   THIS E-MAIL SO I MUST HAVE READ IT AFTER IT WAS

18   SENT.

19   Q.   SO YOU LEARNED FOR THE FIRST TIME LATE IN THE

20   MORNING OF MONDAY AUGUST 4TH, 2008, THAT THIS

21   MEETING HAD BEEN CANCELLED, CORRECT?

22   A.   SOME TIME IN THE MORNING.

23   Q.   AND WHEN WAS THE MEETING SCHEDULED FOR?

24   A.   OH, WHAT TIME?  2 TO 3:00 P.M.

25   Q.   OKAY.  AND MS. BURNEY CAN YOU PLEASE HIGHLIGHT

1    THE NEXT -- WHERE WAS THE MEETING GOING TO BE?

2    A.   SO PNP THAT'S THE SHORTHAND FOR PLUG AND PLAY

3    CONFERENCE ROOM.

4    Q.   SO YOU WERE SCHEDULED TO HAVE A MEETING WITH

5    ALBERT HU THAT MORNING, CORRECT?

6    A.   CORRECT.

7    Q.   THAT AFTERNOON.

8         MS. BURNEY COULD YOU PLEASE HIGHLIGHT THE

9    NEXT TEXT OF THAT E-MAIL.

10        AND IS THAT AN E-MAIL YOU SENT LATER THAT

11   DAY?

12   A.   YES IT IS.

13   Q.   CAN YOU READ THE TEXT OF THAT E-MAIL?

14   A.   ALBERT, WHY ARE YOU CANCELLING THIS MEETING AT

15   THE LAST MINUTE?  I STILL HAVEN'T SEEN MY K9, I WAS

16   MEANING K1 OBVIOUSLY, NOR GOTTEN A DATE FOR THE

17   WITHDRAWAL.  AT LONG LAST WILL YOU ANSWER THE

18   QUESTION IS WHEN I'M GOING TO GET BOTH.

19   Q.   NOW THAT K9 WAS A TYPO, CORRECT?

20   A.   I THINK I WAS STARTING TO GET AN NOTICED AT

21   THIS POINT SO IT WAS A TYPO.

22   Q.   MR. HU DID NOT HAVE YOUR DOG?

23   A.   I MEANT K1.  IT WAS REGARDING K1.

24   Q.   AND CAN YOU PLEASE, MS. BURNEY, CAN YOU PLEASE

25   HIGHLIGHT THE TOP PORTION OF THIS E-MAIL.

1     ACTUALLY, HIGHLIGHT THE NEXT E-MAIL.

2              SO MR. HU RESPONDS TO YOUR E-MAIL.  WHEN

3     DOES HE RESPOND?

4     A.   ON AUGUST SIXTH, TWO DAYS AFTERWARD.

5     Q.   AND WHO DOES HE SEND THE E-MAIL TO?

6     A.   TO MYSELF.

7     Q.   DOES HE CC ANYONE IN THE E-MAIL?

8     A.   I DO NOT SEE IT.

9     Q.   OKAY.  CAN YOU PLEASE READ WHAT MR. HU'S

10    RESPONSE TO YOU IS?

11    A.   DEAR MARK IT TURNED OUT I NEED TO BE IN THIS

12    PART OF THE WORLD LONGER FOR MORE MEETINGS TO HELP

13    SPEEDUP THE PROCESS IN CLEANLY RESOLVING ALL

14    MATTERS.  THINGS ARE MOVING SLOWLY SINCE THE BANKS

15    THEMSELVES ARE SORTING OUT THINGS STEP BY STEP

16    THEMSELVES BUT IN THE RIGHT DIRECTION.

17             I LOOK FORWARD VERY MUCH TO CATCHING UP

18    WITH YOU AS I RETURN TO BAY AREA IN MID-AUGUST.

19    Q.   MS. BURNEY CAN YOU PLEASE BLOW UP FROM THE TOP

20    OF THE PAGE THROUGH THE SECTION WE JUST READ.

21             SO MR. HU SENDS THE E-MAIL AUGUST 6TH AND

22    YOU RESPOND THE NEXT DAY, CORRECT?

23    A.   CORRECT.

24    Q.   WHAT'S YOUR RESPONSE?

25    A.   IT SAYS, AND ARE YOU STILL -- AND YOU ARE

                                                            667

1    STILL NOT ANSWERING MY QUESTIONS.  I'M GETTING A

2    DIFFERENT STORY EVERY TIME.  WHAT ARE THESE MATTERS

3    YOU ARE REFERRING TO NOW?

4    Q.   AND HOW DOES MR. HU RESPOND?

5    A.   HE SAYS DEAR MARK I WILL BE IN CONTACT WITH

6    YOU IN A DAY OR TWO TO GO OVER THE DETAILS.

7    THANKS.

8    Q.   WERE YOU GETTING FAIRLY FRUSTRATED AT THIS

9    POINT?

10   A.   OBVIOUSLY, YES.

11   Q.   YOU MAKE REFERENCE IN THIS E-MAIL TO I'M

12   GETTING A DIFFERENT STORY EVERY TIME?

13   A.   YES.

14   Q.   IS THAT SOMETHING YOU FOUND TO BE A PATTERN

15   FROM ALBERT HU?

16   A.   YES.  WE SKIPPED A FEW OTHER EVENTS WHERE I

17   ASKED HIM QUESTIONS AND I GET DIFFERENT STORIES AND

18   SOMETIMES COMPLETELY DIFFERENT STORIES BECAUSE WE

19   HAD FORGOTTEN WHAT HE SAID BEFORE.

20        MR. FONG:  OBJECTION.  MOVE TO STRIKE.

21   SPECULATION.

22        THE COURT:  I WILL SUSTAIN THE OBJECTION

23   TO THE LAST PART, HIS SPECULATION AS TO THAT HE HAD

24   FORGOTTEN WHAT HE SAID BEFORE.

25        MR. FAZIOLI:  OKAY.  I UNDERSTAND.

1          THE COURT:  I WANT TO TAKE A BREAK NOW.

2     IT'S ABOUT THAT TIME.  WE WILL BE IN RECESS FOR

3     15 MINUTES.

4          (WHEREUPON A RECESS WAS TAKEN.)

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS

6     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

7          MR. FAZIOLI:  YOUR HONOR, A QUICK POINT

8     AND TO REITERATE SOMETHING WE RAISED BEFORE WHICH

9     IS WE UNDERSTAND THAT THERE MIGHT BE QUESTIONING ON

10    CROSS-EXAMINATION BY THE DEFENDANT OF THE FACT THAT

11    SHE'S A SUCCESSFUL BUSINESSMAN.  BUT HE --

12    PREVIOUSLY WE OBJECTED TO THE INTRODUCTION OF THE

13    AMOUNT OF MONEY FOR WHICH FOR EXAMPLE HIS COMPANY

14    WAS PURCHASED.  I THINK IT WAS A $400.0 FIGURE WAS

15    US AUDIO AND PREVIOUSLY IN OUR MOTIONS IN LIMINE WE

16    EXPRESSED CONCERNS THAT REPEATED REFERENCES TO THE

17    NET WORTH OF THIS VICTIM WOULD BE INFLAMMATORY AND

18    NOT PARTICULARLY SERVE A PROBATIVE PURPOSE ONCE

19    IT'S KNOW ESTABLISHED THAT PERHAPS HE HAD BEEN A

20    SUCCESSFUL BUSINESSMAN.

21          HAVING LOOKED AT SOME OF THE POTENTIAL

22    DEFENSE EXHIBITS MAKE REFERENCE TO THE $400 MILLION

23    FIGURE AND WE WANT TO REITERATE THAT AS A GENERAL

24    CONCERN THAT WE DON'T NECESSARILY THINK THE

25    SPECIFIC AMOUNT OF HIS NET WORTH IS PROBATIVE AND

```
1    IT COULD BE PREJUDICIAL AND INFLAMMATORY.

2         MR. FONG:  YOUR HONOR, I HAVE NO DESIRE

3    TO GET INTO MR. VERDIELL'S PRESENT NET WORTH OR NET

4    WORTH OF ANY PARTICULAR POINT.  I DO THINK THE

5    AMOUNT OF MONEY THAT HIS COMPANY WAS ACQUIRED FOR

6    BY INTEL IS RELEVANT BECAUSE BOB LIN WAS A

7    SUCCESSFUL INVESTOR.  IT GOES TO SHOW BOTH THE

8    LEVELS OF SOPHISTICATION AS WELL AS THE TIGHT BOND

9    AND THE TRUST THAT HE WOULD HAVE IN SOMEBODY -- HE

10   AND MR. LIN MADE A LOT OF MONEY FROM THAT

11   INVESTMENT, AND IT JUST MAKES PERFECT SENSE THAT

12   THEY WOULD HAVE A VERY STRONG TRUSTING RELATIONSHIP

13   BECAUSE OF THAT.

14        BUT I HAVE NO DESIRE TO GET INTO HIS NET

15   WORTH OR QUITE FRANKLY, EVEN HOW MUCH HE PERSONALLY

16   GOT OUT OF THE DEAL.  I JUST WANT TO SHOW THIS WAS

17   A VERY SUCCESSFUL DEAL FOR THE PEOPLE WHO INVESTED

18   OR WHO WERE PART OF LIGHT LOGIC IN THE BEGINNING.

19        THE COURT:  IS THERE ANY REASON WHY YOU

20   CAN'T JUST REFER TO IT AS VERY SUCCESSFUL?

21        MR. FONG:  I THINK THERE'S -- I THINK IT

22   IS IMPORTANT THAT THE JURORS GET A SENSE OF THE,

23   HOW SUCCESSFUL IN TERMS, AGAIN, FOR THOSE TWO

24   REASONS THAT -- VERY SUCCESSFUL COULD BE THAT MEANT

25   $50,000.
```

1        THE COURT:  WHAT -- THIS IS WITH RESPECT

2    TO WHAT INVESTMENT?

3        MR. FONG:  THIS IS, BOB LIN INITIALLY

4    INVESTED IN LIGHT LOGIC ON KIND OF A VENTURE

5    CAPITAL ANGEL BASIS ALMOST FROM THE VERY EARLY

6    STAGES --

7        THE COURT:  LIGHT LOGIC, HOW IS THAT

8    ASSOCIATED WITH --

9        MR. FONG:  THAT'S MR. VERDIELL'S SECOND

10   STARTUP COMPANY.  SO SUBSEQUENTLY, LIGHT LOGIC WAS

11   ACQUIRED BY INTEL FOR $400 MILLION IN TOTAL.

12   THAT'S THE ONLY NUMBER I'M INTERESTED IN.  I DON'T

13   CARE WHO GOT WHAT.

14       MR. FAZIOLI:  OUR CONCERN IS THAT I

15   MENTIONED TO THE JURY THAT THIS VICTIM HAD A

16   COMPANY THAT WAS PURCHASED FOR $400 MILLION THAT

17   NUMBER HAS NO PROBATIVE VALUE AND MAY SIGNAL TO THE

18   JURY THAT THIS IS AN INDIVIDUAL OF HIGH NET WORTH.

19       THE COURT:  IT'S PRETTY OBVIOUS ALREADY.

20       MR. FAZIOLI:  IT IS.  BUT WE DO CONSIDER

21   GETTING INTO THE WEEDS OF HOW MUCH THE COMPANY WAS

22   PURCHASED FOR TO BE SOMEWHAT INFLAMMATORY AND IT'S

23   UNCLEAR WHAT THE PROBATIVE PURPOSE IS OF THAT

24   NUMBER BEYOND THE FACT THAT HE HAD A COMPANY THAT

25   WAS PURCHASED BY INTEL.

1    THE COURT: I THINK THE RELATIONSHIP

2    BETWEEN BOB LIN AND THE WITNESS IS DEFINITELY

3    RELEVANT AND IF YOU LIMIT IT TO JUST THAT AND DON'T

4    DWELL ON IT I'M NOT GOING TO PRECLUDE YOU FROM

5    THAT.

6    BUT I DO THINK THAT ANY FOCUS ON THE

7    WITNESS'S NET WORTH OR SUCCESS, NOT SUCCESS BUT ON

8    HIS NET WORTH WHICH YOU SAID YOU WERE NOT GOING TO

9    GET INTO, I WOULD HAVE A PROBLEM WITH.

10   SO YOU CAN ASK WHAT YOU SAID BUT BEAR IN

11   MIND THE CONCERN AND I THINK IT'S A LEGITIMATE

12   CONCERN.

13   MR. FONG: OKAY. I UNDERSTAND THE

14   COURT'S RULING AND AGAIN, I HAVE NO DESIRE I'M NOT

15   GOING TO ASK MR. VERDIELL EVEN HOW MUCH HE

16   PERSONALLY GOT OUT OF THE DEAL.

17   THE COURT: OKAY. ALL RIGHT.

18   MR. FAZIOLI: THANK YOU, YOUR HONOR.

19   THE COURT: HOW MUCH LONGER DO YOU THINK

20   YOU HAVE WITH THIS WITNESS?

21   MR. FAZIOLI: LESS THAN FIVE MINUTES.

22   (WHEREUPON, THE FOLLOWING PROCEEDINGS

23   WERE HELD IN THE PRESENCE OF THE JURY:)

24   THE COURT: ALL RIGHT. YOU MAY CONTINUE.

25   MR. FAZIOLI: MS. BURNEY, COULD YOU

1    PLEASE PUBLISH EXHIBIT 291, PLEASE.  AND COULD YOU

2    PLEASE HIGHLIGHT THE TOP HALF OF THIS E-MAIL ENDING

3    WITH -- KEEP GOING DOWN, PLEASE.

4    Q.   DO YOU SEE HOW -- CAN YOU READ WHAT YOU WROTE

5    IN YOUR E-MAIL AT THAT AUGUST 7, 2008, AT

6    8:46 P.M.?

7    A.   THE ONE AT -- WHICH ONE?

8    Q.   THE ONE THAT SAYS, AND YOU ARE STILL NOT

9    ANSWERING MY QUESTIONS.

10   A.   AND YOU ARE STILL NOT ANSWERING MY QUESTIONS

11   I'M GETTING A DIFFERENT STORY EVERY TIME.  WHAT ARE

12   THESE MATTERS YOU ARE REFERRING TO NOW.

13   Q.   ALL RIGHT.  MR. VERDIELL IN THIS TIME PERIOD

14   WHEN YOU WERE HAVING COMMUNICATIONS WITH THE

15   DEFENDANT ABOUT WANTING TO GET YOUR MONEY BACK, DID

16   YOU FIND THE DEFENDANT WOULD GIVE YOU DIFFERENT

17   STORIES ABOUT THINGS?

18   A.   YES.

19   Q.   WHAT WERE SOME OF THE DIFFERENT STORIES THAT

20   ALBERT HU WAS TELLING YOU AT THE TIME REGARDING

21   YOUR INVESTMENT?

22   A.   THERE WERE QUITE A FEW ABOUT WHY MR. LIN

23   WOULDN'T RECEIVE HIS MONEY AND THERE WERE OBVIOUSLY

24   QUITE A FEW ABOUT THE K1 THAT I REMEMBER.

25   Q.   WHAT WERE SOME OF THESE DIFFERENT STORIES YOU

1    WERE HEARING FROM THE DEFENDANT?

2    A.   THE K1 IS THE EASIEST AND PROBABLY FUNNIEST

3    ONE BECAUSE AT ONE POINT.

4              MR. FONG:  OBJECTION.  MOVE TO STRIKE AS

5    TO THE COMMENT.

6              THE COURT:  I WILL STRIKE THE COMMENT,

7    THE FUNNIEST ONE.  GO AHEAD.

8              THE WITNESS:  OKAY.  SORRY.  IT'S NOT

9    FUNNY.

10             BUT I ASKED FOR MY K1 AND I RECEIVED AN

11   E-MAIL OH, WE JUST FAXED IT TO YOU OR SOMETHING OF

12   THAT SORT.

13             AND I OF COURSE DON'T RECEIVE A FAX, SO

14   MAYBE HE HASN'T SENT IT PROPERLY AND I ASK HIM TO

15   SEND THE K1.

16             AND I DON'T REMEMBER IF IT WAS WEEKS OR

17   MONTHS LATER I HAVE ANOTHER ONE OH, WE JUST

18   RECEIVED YOUR K1 HE E-MAILED HE HAD SEEN IT.

19   OBVIOUSLY YOU CANNOT FAX A K1 THAT YOU RECEIVED A

20   MONTH AFTER.  SO THAT WAS ONE THAT WAS REALLY EASY

21   TO POINT OUT THAT ONE OF THE STATEMENTS WASN'T

22   TRUE.  I DON'T KNOW WHICH ONE BUT THEY COULDN'T BE

23   TRUE AT THE SAME TIME

24   Q.   ANY KIND OF STORIES ABOUT A TRADER?

25   A.   WE GOT THE TRADER STORY, YES.  HE GOES INTO

1    WHY BOB LIN IS NOT RECEIVING HIS WIRE BECAUSE BOB

2    TRIED TO WITHDRAW HIS MONEY BEFORE ME AND I WAS

3    WATCHING THE PROCESS.

4            SO I GOT, WHICH ONE, I GOT FIRST.  THE

5    ONE I GOT FIRST WAS, WE HAVE RECEIVED AN INQUIRY

6    FROM THE U.S. GOVERNMENT.  I DO NOT WANT TO MAKE

7    ANY FUND WHILE THIS INQUIRY IS ON GOING.  OKAY.

8            THEN THE NEXT ONE WAS A TRADER HAS GOTTEN

9    IN TROUBLE IN SINGAPORE.  WE ARE RESOLVING IT WITH

10   THE SINGAPORE GOVERNMENT AND DURING THAT TIME I

11   CANNOT MOVE ANY MONEY.

12           AND THEN THE NEXT ONE AFTER THAT IS OH, I

13   CANNOT RETURN MR. LIN A MONEY BECAUSE HE'S WELL

14   KNOWN IN ASIA.

15           THEN THE LAST ONE I DIDN'T BELIEVE A BIT

16   OF IT.

17   Q.   SO AFTER THIS EXCHANGE THAT YOU HAD IN

18   AUGUST 2008, WHAT HAPPENS THEN?

19   A.   SO I NEVER GOT THE K1, I NEVER GOT MY MONEY.

20   Q.   DID IT BECOME HARDER TO -- WHAT WAS THE NATURE

21   OF YOUR COMMUNICATIONS AFTER THIS?

22   A.   SO IN THE MEANTIME THEN AT ONE POINT MR. HU

23   DISAPPEARS AND SO DOES LINDA AND SO DOES THEIR

24   OFFICES SO THERE'S NOBODY TO CONTACT ANYMORE.

25   Q.   DID ALBERT HU EVER TELL YOU THE INVESTMENT IN

1    THE FIRESIDE FUND HAD BEEN LOST?

2    A.   NO ACTUALLY, ON THE CONTRARY.  SEVERAL TIMES

3    HE MENTIONED THAT I WOULD GET MY MONEY BACK, I

4    SHOULDN'T WORRY.  AGAIN, EVERY INVESTOR IS IN THE

5    FUND HAS GOTTEN THEIR MONEY SO THERE DOESN'T SEEM

6    TO BE ANY ISSUE WITH THE AMOUNT JUST THE TIMING.

7    Q.   HAVE YOU EVER GOTTEN BACK ANY OF YOUR

8    $2 MILLION?

9    A.   NO.

10            MR. FAZIOLI:  NO FURTHER QUESTIONS,

11   YOUR HONOR.

12            THE COURT:  MR. FONG, ANY QUESTIONS?

13            MR. FONG:  YES, YOUR HONOR.

14            IF I COULD JUST HAVE A MOMENT,

15   YOUR HONOR, TO GET MY PAPERS SQUARED AWAY.

16

17            **CROSS-EXAMINATION BY MR. FONG**

18

19   BY MR. FONG:

20   Q.   IF I COULD JUST HAVE A MOMENT, YOUR HONOR, TO

21   GET MY PAPER SQUARED AWAY.

22   Q.   GOOD MORNING MR. VERDIELL.  MY NAME IS JERRY

23   FONG AND I REPRESENT MR. ALBERT HU.  YOU TESTIFIED

24   EARLIER YOU WERE INTRODUCED TO MR. HU THROUGH YOUR

25   FRIEND BOB LIN; IS THAT CORRECT?

1    A.   THAT'S RIGHT.

2    Q.   YOU AND MR. LIN AT THE TIME THAT MR. LIN

3    INTRODUCED YOU TO MR. HU, YOU AND MR. LIN HAD

4    ALREADY HAD A BUSINESS RELATIONSHIP; IS THAT

5    CORRECT?

6    A.   YES.

7    Q.   AND IN FACT MR. LIN WAS ONE OF THE EARLY

8    INVESTORS IN YOUR COMPANY, LIGHT LOGIC; IS THAT

9    CORRECT?

10   A.   YES.

11   Q.   AND MR. LIN INVESTED IN LIGHT LOGIC THEN

12   EVENTUALLY THAT COMPANY YOUR COMPANY WAS ACQUIRED

13   BY INTEL; IS THAT CORRECT?

14   A.   YES.

15   Q.   AND THE AMOUNT OF MONEY THAT INTEL PAID FOR

16   THE COMPANY LIGHT LOGIC WAS APPROXIMATELY

17   $400 MILLION; IS THAT CORRECT?

18   A.   YES.

19   Q.   OKAY.  NOW, MR. LIN BEING ONE OF THE EARLY

20   INVESTORS, THAT WAS A VERY SUCCESSFUL INVESTMENT

21   FOR HIM; IS THAT CORRECT?

22   A.   I DON'T KNOW IF HIS OTHER INVESTMENTS BUT IT

23   WAS A GOOD INVESTMENT, YES.

24   Q.   OKAY.  SO YOU AND MR. LIN HAD A VERY

25   SUCCESSFUL WORKING EXPERIENCE IN TERMS OF THE LIGHT

1    LOGIC INVESTMENT AND SUBSEQUENT PURCHASE BY INTEL;

2    IS THAT CORRECT?

3    A.   WE DID NOT WORK TOGETHER WE JUST MADE AN

4    INVESTMENT AND THE INVESTMENT WAS SUCCESSFUL.

5    Q.   BUT IT WAS SUCCESSFUL FOR BOTH OF YOU, RIGHT?

6    A.   YES.

7    Q.   AND LATER ON YOU STARTED ANOTHER COMPANY, I

8    BELIEVE THAT COMPANY IS CALLED APRIUS?

9    A.   CORRECT.

10   Q.   AND THAT'S APRIUS, IS THAT ABOUT RIGHT?

11   A.   RIGHT.

12   Q.   AND AGAIN, YOU STARTED THE COMPANY APRIUS YOU

13   STARTED THAT COMPANY WELL BEFORE YOU EVER INVESTED

14   ANY MONEY WITH MR. HU; IS THAT CORRECT?

15   A.   I STARTED IT IN 2006, SO A LITTLE LESS THAN A

16   YEAR BEFORE I INVESTED WITH MR. HU.

17   Q.   SO IT'S ABOUT A YEAR, MORE OR LESS, BEFORE YOU

18   INVESTED YOUR MONEY WITH MR. HU?

19   A.   APPROXIMATELY.

20   Q.   OKAY.  AND YOUR FRIEND, BOB LIN, HE ALSO

21   INVESTED IN THAT COMPANY APRIUS; IS THAT CORRECT?

22   A.   YES.

23   Q.   AND NOW, YOU TRUST BOB LIN; IS THAT CORRECT?

24   A.   THAT'S A VERY GENERAL QUESTION HERE.  I HAVE

25   TROUBLE ANSWERING THAT WITH YES OR NO.  TRUST FOR,

1    TRUST IN?

2    Q.   WELL, FIRST OF ALL, DO YOU TRUST BOB LIN'S

3    BUSINESS REPUTATION?

4    A.   I DON'T KNOW OF HIS REPUTATION.  DO I TRUST

5    HIM -- SO IT'S HARD FOR ME TO ANSWER.

6    Q.   SURE.

7    A.   CAN YOU REPHRASE?

8    Q.   SURE.  OF COURSE.  FIRST OF ALL, DO YOU THINK

9    HIGHLY OF MR. BOB LIN IN TERMS OF HIS BUSINESS

10   EXPERIENCE?

11   A.   THAT'S HARD TO ANSWER.  DO I HIGHLY -- DO I

12   HIGHLY REGARD HIM OR IS THAT THE IMPORTANT I TRUST

13   THE MOST?

14   Q.   WELL, LET ME ASK YOU THIS, MR. VERDIELL, IF

15   SOMEONE WERE TO ASK YOU, HEY, DO YOU THINK HIGHLY

16   OF THIS PERSON, YOU USUALLY WOULD HAVE AN OPINION

17   IF YOU KNOW THAT PERSON; IS THAT CORRECT?

18   A.   IF I REGARD HIM WELL, YES.

19   Q.   THEN PERHAPS THOSE ARE THE WORDS I'M LOOKING

20   FOR, THANK YOU FOR THAT.  DO YOU REGARD MR. BOB LIN

21   WELL?

22   A.   YES.

23   Q.   OKAY.  AND NOT JUST AS YOUR FRIEND BUT AS A

24   BUSINESS PERSON?

25   A.   YES.

1    Q.   AND YOU TRUST HIS BUSINESS JUDGMENT; IS THAT

2    CORRECT?

3    A.   IF I TRUST HIS BUSINESS JUDGMENT -- WE HAVEN'T

4    HAD MANY SITUATIONS WHERE I RELIED ON HIS JUDGMENT

5    FOR BUSINESS, IF THAT'S WHAT YOU ARE AFTER.

6    Q.   WELL, MY QUESTION IS DID YOU TRUST BOB LIN'S

7    BUSINESS JUDGMENT?

8    A.   ABOUT -- I'M HAVING -- I DON'T MEAN TO BE

9    DIFFICULT HERE I'M HAVING TROUBLE ANSWERING THE

10   GENERAL QUESTIONS.

11           THE COURT:  I THINK THE PROBLEM IS YOU

12   NEED TO LAY A FOUNDATION AS TO WHETHER OR NOT HE

13   HAD BUSINESS DEALINGS WHICH REQUIRED TRUST OR

14   SITUATIONS LIKE THAT.

15           MR. FONG:  SURE.

16           MR. FAZIOLI:  YOUR HONOR, I'M ALSO NOT

17   CLEAR WHAT DEALINGS THEY ARE TALKING ABOUT.

18   BY MR. FONG:

19   Q.   NOW, YOU AND MR. LIN WOULD TALK ABOUT BUSINESS

20   VENTURES OR PROJECTS TOGETHER; IS THAT CORRECT?

21   A.   A FEW.  MOSTLY LIGHT LOGIC INVESTMENT WAS MY

22   MAIN INVOLVEMENT WITH MR. LIN.

23   Q.   NOW YOU WERE INTERVIEWED BY THE FBI AGENTS IN

24   THIS CASE ON SEVERAL OCCASIONS; IS THAT CORRECT?

25   A.   YES.

1      Q.   AND DURING THE COURSE OF THAT INTERVIEW YOU

2      TOLD THE FBI GENTLEMAN THAT YOU TRUSTED BOB LIN; IS

3      THAT CORRECT?

4      A.   I MIGHT HAVE TOLD THAT, YES.

5      Q.   NOW, BEFORE YOU EVER MET ALBERT HU, YOU HAD

6      KNOWN THAT BOB LIN WAS INVESTING WITH ALBERT HU; IS

7      THAT CORRECT?

8      A.   I KNEW THAT MR. BOB LIN WAS INVESTING IN

9      VENTURE CAPITAL COMPANY BECAUSE THAT'S HOW WE MET.

10     HE PITCHED BY COMPANY TO HIS FUND.  I DIDN'T KNOW

11     IF HE HAD INVESTED IN MR. HU'S VENTURE AT THAT

12     POINT.

13     Q.   OKAY.  SO BEFORE YOU EVER MET MR. HU, DID YOU

14     KNOW WHETHER OR NOT -- HAD YOU KNOWN WHETHER OR NOT

15     MR. LIN HAD INVESTED WITH MR. HU?

16     A.   NO.

17     Q.   OKAY.  AND DID YOU KNOW BEFORE YOU EVER MET

18     MR. HU, YOU KNEW THAT MR. LIN WAS RAISING MONEY ON

19     BEHALF OF MR. HU; IS THAT CORRECT?

20     A.   I DON'T THINK SO.  I DON'T THINK THAT IS

21     CORRECT.  IF I RECALL CORRECTLY AT THAT TIME MY

22     ONLY CONNECTION BETWEEN MR. LIN, MR. HU, WAS HIS

23     INVOLVEMENT WITH ASENQUA.

24     Q.   OKAY.  BUT YOU KNEW THAT BOB LIN WAS INVOLVED

25     WITH ASENQUA; IS THAT CORRECT?

1    A.   YES.  ALTHOUGH I DIDN'T -- YES.

2    Q.   AND YOU ALSO KNEW THAT PART OF WHAT BOB LIN

3    WAS DOING IN TERMS OF HIS CONNECTION WITH ASENQUA

4    WAS THAT HE WAS HELPING ALBERT HU TO RAISE MONEY;

5    IS THAT CORRECT?

6    A.   NO.  THIS I DIDN'T KNOW.

7    Q.   OKAY.  DO YOU RECALL BEING INTERVIEWED BY AN

8    ATTORNEY FROM THE SECURITY EXCHANGE COMMISSION

9    AROUND DECEMBER 2008?

10   A.   I WAS INTERVIEWED BY SEVERAL GOVERNMENT

11   PEOPLE.  I'M NOT SURE WHICH ONE THEY WERE REPORTING

12   TO.

13   Q.   BUT OF COURSE YOU DID SAY YOU HAD BEEN

14   INTERVIEWED BY THE FBI AGENTS IN THIS CASE; IS THAT

15   CORRECT?

16   A.   YES, THE FBI I REMEMBER.

17   Q.   DO YOU RECALL IF YOU EVER TOLD ANY OF THE

18   GOVERNMENT AGENTS WHO INTERVIEWED YOU REGARDLESS IF

19   THEY ARE FBI AGENTS OR SECURITIES EXCHANGE

20   COMMISSION AGENTS OR ATTORNEYS, THAT YOU KNEW THAT

21   BOB LIN WAS HELPING ALBERT HU TO RAISE MONEY FOR

22   ASENQUA?

23   A.   I DO NOT RECALL THAT AND ALSO YOUR QUESTION

24   WAS THE FIRST TIME I MET, ALBERT, RIGHT.  I LEARNED

25   THAT MR. LIN ACTUALLY HAD INVESTED AND WAS HELPING

1    RAISE MONEY FOR FIRESIDE, I'M NOT SURE ABOUT

2    ASENQUA.

3    Q.   AND YOU UNDERSTAND THE ASENQUA BETA FUND

4    EVENTUALLY BECAME THE FIRESIDE LS FUND; IS THAT

5    CORRECT?

6    A.   I'M NOT SURE I UNDERSTAND THAT, NO.

7    Q.   OKAY.  THAT'S OKAY.

8         NOW, AT THE TIME BEFORE YOU EVER MET

9    MR. HU, YOU HAD ALREADY BEEN INVESTED IN AT LEAST

10   ONE HEDGE FUND; IS THAT CORRECT?

11   A.   YES.

12   Q.   OKAY.  AND AT THE TIME, AT THE TIME BEFORE YOU

13   EVER MET MR. HU, YOU WERE NOT HAPPY WITH THE

14   PERFORMANCE OF THE HEAD THAT YOU WERE IN; IS THAT

15   CORRECT?

16   A.   YES.

17   Q.   ALL RIGHT.  AND YOU WERE LOOKING, AT THAT TIME

18   YOU WERE LOOKING FOR ANOTHER HEDGE FUND TO MOVE

19   YOUR MONEY?

20   A.   YES.

21   Q.   OKAY.  NOW, PART OF THE REASON THAT YOU

22   INVESTED WITH MR. HU WAS THAT YOU TRUSTED MR. LIN

23   AND THROUGH HIS AFFILIATION AND INVESTMENT IN, WITH

24   MR. HU, YOU THOUGHT THAT WOULD MAKE, THAT WOULD BE

25   A GOOD IDEA FOR YOU TO INVEST WITH MR. HU TOO; IS

683

1    THAT CORRECT?

2    A.   NO.  WELL, NOT AS THE MAIN REASON.  NO, THAT

3    IS INCORRECT.  THE MAIN REASON I INVESTED IN THE

4    FUND WAS DIFFERENT.

5    Q.   ALL RIGHT.  OKAY.

6         BUT THE FACT THAT BOB LIN WAS INVOLVED

7    WITH MR. HU, THAT PLAYED A ROLE IN YOUR

8    DECISION-MAKING PROCESS OF WHETHER OR NOT TO INVEST

9    IN THE FIRESIDE LS FUND; IS THAT CORRECT?

10   A.   A SMALL ROLE, YES.

11   Q.   I'M SORRY, I COULDN'T HEAR YOU?

12   A.   A SMALL ROLE, YES.

13   Q.   IN FACT, ANOTHER REASON -- ANOTHER FACTOR THAT

14   AFFECTED YOUR DECISION TO INVEST WITH MR. HU WAS

15   THE FACT THAT YOU HAD HEARD SEVERAL OTHER PROMINENT

16   BUSINESS PEOPLE HAD ALSO BEEN -- WERE, OR WERE

17   FIRESIDE INVESTORS; IS THAT CORRECT?

18   A.   MR. HU REPRESENTED THAT SOME OTHER WELL KNOWN

19   INDIVIDUAL HAD INVESTED IN HIS FUND.  AND IT GAVE

20   LEGITIMACY TO HIS FUND.  AND THIS IMPRESSION OF

21   LEGITIMACY CERTAINLY INFLUENCED ME.

22   Q.   SO THAT PLAYED A ROLE IN INFLUENCING YOU TO

23   MAKE THE DECISION OF INVESTING WITH MR. HU; IS THAT

24   CORRECT?

25   A.   YES.

1    Q.   AND ONE OF THOSE INDIVIDUALS WAS A PERSON BY

2    THE NAME OF HONG, H-O-N-G, LU, L-U; IS THAT

3    CORRECT?

4    A.   I DON'T REMEMBER THE NAME.

5    Q.   OKAY.  DO YOU RECALL A PARTICULAR INDIVIDUAL

6    THAT YOU HEARD WAS AN INVESTOR IN FIRESIDE THAT YOU

7    SORT OF UNDERSTOOD THAT INDIVIDUAL TO BE A

8    PROMINENT BUSINESS PERSON IN THE CHINESE-AMERICAN

9    COMMUNITY?

10   A.   THE ONE I REMEMBER WAS THE CEO OF UT STARCOM.

11   I THINK HE'S IN TAIWAN, NOT HERE.

12   Q.   YOU DID NOT KNOW THAT PARTICULAR GENTLEMAN

13   PERSONALLY, DID YOU?

14   A.   I KNEW OF BUT I DIDN'T KNOW HIM PERSONALLY,

15   YES.

16   Q.   THE FACT THAT THIS PERSON BUSINESS I THINK YOU

17   SAID HE'S THE HEAD OF STAR COM?

18   A.   UT STARCOM.

19   Q.   UT OR C?

20   A.   UT AS IN TOM.

21   Q.   UT -- HEAD OF THE UT STARCOM.  THE FACT THAT

22   THIS GENTLEMAN WHOM YOU NEVER MET IN PERSON WAS

23   INVESTING IN THAT INFLUENCED YOUR DECISION IN TERMS

24   OF WHETHER OR NOT TO INVEST WITH MR. HU; IS THAT

25   CORRECT?

1    A.    AS I SAID BEFORE MR. HU REPRESENTED TO ME AND

2    I NEVER CHECKED, THAT THESE INDIVIDUALS WERE GIVING

3    LEGITIMACY TO THE FUND.  AND SO THE FACT THAT THIS

4    PERSON REPRESENTED TO ME AS INVESTORS MAKE ME THINK

5    THE FUND WAS LEGITIMATE.

6    Q.    OKAY.  NOW, YOUR FRIEND BOB LIN, HE KNEW OF

7    THIS GENTLEMAN WHO WAS THE HEAD OF UT STARCOM, I

8    THINK -- IF I HAVE THAT WRONG PLEASE CORRECT ME.

9    A.    I DON'T KNOW.

10   Q.    OKAY.  AND YOU ALSO HEARD THAT OTHER PROMINENT

11   BUSINESS PEOPLE WERE INVESTORS IN THE FIRESIDE

12   FUND; IS THAT CORRECT?

13   A.    MR. HU MENTIONED A FEW OTHER NAMES WHICH I

14   DON'T REMEMBER.

15   Q.    OKAY.  AND AGAIN, THE FACT THAT THESE

16   PROMINENT INDIVIDUALS WERE INVESTORS IN FIRESIDE

17   THAT, HELPED INFLUENCE YOUR DECISION MAKING PROCESS

18   OF WHETHER OR NOT TO INVEST IN THE FIRESIDE FUND;

19   IS THAT CORRECT?

20   A.    IT MADE THE FUND LOOK LEGITIMATE.

21   Q.    SO THE ANSWER IS YES?

22   A.    YES.

23   Q.    NOW YOU ALSO -- WHEN YOU WERE INTERVIEWED BY

24   THE FBI AGENTS IN THIS CASE, WHAT YOU TOLD THEM WAS

25   THAT AFTER MEETING WITH MR. HU AND MR. BOND AND ON

1    THE BASIS OF YOUR KNOWLEDGE OF WHO WERE INVOLVED

2    WITH MR. HU AND MR. BOND, INCLUDING MR. LIN AND THE

3    GENTLEMAN OF THE UT STARCOM THAT YOU MENTIONED AND

4    OTHER INVESTORS, THAT IT WAS FOR THESE REASONS THAT

5    YOU INVESTED IN FIRESIDE; IS THAT CORRECT?

6    A.    SO THERE WERE SEVERAL QUESTIONS IN THERE.

7    Q.    THAT WAS PROBABLY A POOR QUESTION, I BEG YOUR

8    PARDON, SO LET ME TRY AGAIN.

9              WHEN YOU INTERVIEWED -- WHEN YOU WERE

10   INTERVIEWED BY THE FBI AGENTS IN THIS CASE YOU TOLD

11   THEM THE REASONS YOU INVESTED IN THE FIRESIDE FUND

12   WAS BECAUSE AMONG OTHER REASONS THE OTHER INVESTORS

13   YOU KNEW OF INCLUDING BOB LIN AND THIS GENTLEMAN AT

14   THE HEAD OF UT STARCOM; IS THAT CORRECT?

15   A.    I DON'T REMEMBER EXACTLY THE PARTICULAR DETAIL

16   THAT YOU MENTION, BUT ONE OF THE REASONS WAS SINCE

17   THESE OTHER PEOPLE HAD INVESTED GAVE LEGITIMACY TO

18   THE FUND AND THAT HELPED MY DECISION, YES.

19   Q.    AND ANOTHER REASON THAT YOU TOLD THE AGENTS

20   ABOUT AS TO WHY YOU DECIDED TO INVEST IN THE

21   FIRESIDE FUND WAS THAT YOU LIKED THE MEETINGS YOU

22   HAD WITH MR. HU AND MR. BOND; IS THAT CORRECT?

23   A.    THAT IS CORRECT.

24   Q.    OKAY.  AND YOU DID NOT TELL THE AGENTS THAT

25   YOU WERE -- THAT IT WAS IMPORTANT TO YOU THAT THE

1      AUDITOR, THAT THERE WAS AN INDEPENDENT AUDITOR SET

2      FORTH IN THE FIRESIDE PPM, THE PRIVATE PLACEMENT

3      MEMO.  YOU DID NOT TELL THEM THAT WAS AN IMPORTANT

4      FACTOR IN TERMS OF YOUR DECISION TO INVEST IN

5      FIRESIDE; IS THAT CORRECT?

6      A.   I DO NOT REMEMBER IF I -- THEY MIGHT NOT HAVE

7      ASKED ME.

8      Q.   OKAY.  BUT THEY DID ASK YOU WHAT WERE THE

9      IMPORTANT FACTORS INFLUENCING YOUR DECISION, RIGHT?

10     IN TERMS OF INVESTING IN FIRESIDE?

11     A.   I DO NOT RECALL THAT THEY ASKED ME THAT

12     PARTICULAR QUESTION.

13     Q.   DO YOU RECALL TELLING THE AGENTS REGARDLESS IF

14     THEY ASKED YOU, WHY YOU FELT COMFORTABLE WITH

15     INVESTING IN FIRESIDE?

16     A.   NO, I DON'T THINK THEY ASK ANY SPECIFIC

17     QUESTION LIKE THIS.

18     Q.   OKAY.  BUT DO YOU RECALL TELLING THEM WHY?

19     A.   ONCE AGAIN, I'M NOT SURE THE QUESTION WAS

20     ASKED THAT WAY, SO SOME ELEMENTS OF THAT I'M SURE

21     WERE PART OF THE INTERVIEW BUT I DON'T THINK I

22     ANSWERED THAT PARTICULAR QUESTION DIRECTLY.

23     Q.   WELL, AGAIN, I'M NOT REFERENCING A PARTICULAR

24     QUESTION.  MY QUESTION TO YOU IS, DURING YOUR

25     INTERVIEWS WITH THE GOVERNMENT AGENTS, BE THEY FROM

1     THE FBI OR THE SECURITIES AND EXCHANGE COMMISSION,

2     DID YOU TALK ABOUT WHY YOU CHOSE TO INVEST IN

3     FIRESIDE?

4     A.    YEAH, I'M SURE THAT CAME UP.

5     Q.    OKAY.  AND IN THE COURSE OF THAT PARTICULAR

6     CONVERSATION OR THAT PART OF THE CONVERSATION, YOU

7     NEVER MENTIONED TO THE GOVERNMENT AGENTS THAT, FOR

8     EXAMPLE, THAT THERE WAS, THE FACT THAT THERE WAS AN

9     INDEPENDENT AUDITOR, THE CASTILLO, LYN, COHEN &

10    VIJAY ACCOUNTING FIRM.  YOU NEVER MENTIONED THAT AS

11    PART OF YOUR REASON FOR INVESTING, DID YOU?

12    A.    I DO NOT KNOW.  I DO NOT RECALL THAT.

13    Q.    OKAY.  AND YOU ALSO DID NOT TELL THE AGENTS

14    THAT IT WAS IMPORTANT TO YOU THAT THERE WAS AN

15    INDEPENDENT ACCOUNTING FIRM THE SIELOR AND CPA

16    FIRM, I BELIEVE.  YOU DID NOT TELL THE AGENT THAT

17    WAS AN IMPORTANT FACTOR TO YOU IN TERMS OF YOUR

18    DECISION TO INVEST IN FIRESIDE; IS THAT CORRECT?

19    A.    I CANNOT ANSWER THAT QUESTION.  I DON'T RECALL

20    ONE WAY OR THE OTHER.

21    Q.    BUT AS YOU SAT HERE EARLIER TODAY, YOU WERE

22    CERTAIN THOSE FACTORS, THE SIELOR ACCOUNTING FIRM,

23    THE CASTILLO CPA FIRM WERE VERY IMPORTANT TO YOU IN

24    TERMS OF YOUR DECISION MAKING PROCESS OF WHETHER OR

25    NOT TO INVEST IN FIRESIDE; IS THAT CORRECT?

1    A.   NO, THE QUESTION WAS DIFFERENT.  THE QUESTION

2    WAS WOULD I HAVE INVESTED IF I HAD KNOWN THOSE

3    REPRESENTATIONS WERE FALSE.  AND THE ANSWER IS NO.

4    Q.   OKAY.  BUT YOU DON'T RECALL TESTIFYING EARLIER

5    TODAY THAT IT WAS IMPORTANT TO YOU TO HAVE, TO SEE

6    THE CASTILLO CPA FIRM IN THE PRIVATE PLACEMENT

7    MEMO.

8    A.   YES.  THAT WAS IMPORTANT TO ME.

9    Q.   BUT YOU DID NOT MENTION THAT FACT TO THE

10   AGENTS, DO YOU?

11   A.   I MIGHT HAVE.  I DO NOT RECALL.

12   Q.   AND THE SAME WOULD BE TRUE FOR THE SIELOR

13   ACCOUNTING FIRM.  IS THAT TRUE?

14   A.   ONCE AGAIN I MIGHT HAVE MENTIONED IT.  I DON'T

15   RECALL.  I DON'T REMEMBER ONE WAY OR THE OTHER.

16   Q.   NOW, RECENTLY I THINK AS RECENTLY AS A COUPLE

17   DAYS AGO YOU WERE RE INTERVIEWED BY THE AGENTS IN

18   THIS CASE ALONG WITH MR. FAZIOLI AND MR. LUCEY; IS

19   THAT CORRECT?

20   A.   I WAS RE INTERVIEWED?

21   Q.   THAT WAS A POOR QUESTION, LET ME JUST TRY

22   AGAIN.

23        A COUPLE OF DAYS AGO, WITHIN THE LAST

24   WEEK, YOU WERE INTERVIEWED BY THE CASE AGENTS IN

25   THIS CASE; IS THAT CORRECT?

1    A.   I MET WITH THEM, YES.

2    Q.   AND FOR THE PURPOSE OF PREPARING FOR YOUR

3    TRIAL TESTIMONY TODAY; IS THAT CORRECT?

4    A.   YES.

5    Q.   AND MR. FAZIOLI AND MR. LUCEY, THE PROSECUTORS

6    IN THIS CASE, WERE PRESENT DURING THAT MEETING; IS

7    THAT CORRECT?

8    A.   YES.

9    Q.   OKAY.  AND AS PART OF THAT MEETING YOU WENT

10   OVER A REPORT THAT THE AGENTS HAD PREPARED FROM

11   YOUR EARLIER INTERVIEW WITH THEM; IS THAT CORRECT?

12   A.   YES.

13   Q.   OKAY.  AND THAT'S I THINK IT'S REFERRED TO --

14   IS IT YOUR UNDERSTANDING THAT THE REPORT IS

15   REFERRED TO AS THE FBI 302 REPORT?

16   A.   I DON'T KNOW THE NUMBER OF THE DOCUMENT.

17   Q.   THAT'S OKAY.  BUT YOU KNOW WHAT I'M TALKING

18   ABOUT IN TERMS OF YOU SAW A REPORT THAT THE AGENTS

19   HAD PREPARED FROM THEIR EARLIER INTERVIEW OF YOU;

20   IS THAT CORRECT?

21   A.   I DON'T KNOW UNTIL YOU SHOW ME THE DOCUMENTS.

22   Q.   OKAY.  I'M GOING TO SHOW YOU A DOCUMENT THAT'S

23   BEEN PREMARKED AS DEFENSE EXHIBIT 541.

24        AND I WILL LET YOU HAVE A MOMENT, SIR, TO

25   TAKE A LOOK AT IT.  I THINK IT'S ABOUT FIVE PAGES.

1    YEAH.

2              MR. FONG:  AND YOUR HONOR, IF I MAY

3    CORRECT THE RECORD.  MR. FAZIOLI JUST POINTED OUT

4    TO ME THAT THERE ALREADY IS ANOTHER 541.

5              SO IF I MAY REFER TO THE DOCUMENT THAT I

6    JUST HANDED TO MR. VERDIELL AS DEFENDANT'S

7    EXHIBIT 541-A, AS IN APPLE, I WOULD APPRECIATE IT.

8              THE COURT:  ALL RIGHT.  IT'S 541-A.

9    Q.   AND MR. VERDIELL I GATHER YOU HAVE HAD THE

10   OPPORTUNITY TO LOOK AT DEFENSE EXHIBIT 541-A; IS

11   THAT CORRECT?

12   A.   YES.

13   Q.   AND THAT'S A FIVE-PAGE DOCUMENT; IS THAT

14   CORRECT?

15   A.   YES.

16   Q.   AND DO YOU RECOGNIZE THAT DOCUMENT?

17   A.   YES, THAT'S THE DOCUMENT YOU WERE TALKING

18   ABOUT.

19   Q.   AND THAT WAS THE DOCUMENT YOU REVIEWED WHEN

20   YOU WERE INTERVIEWED RECENTLY WITHIN THE LAST WEEK

21   OR SO BY THE GOVERNMENT AGENTS IN THIS CASE; IS

22   THAT CORRECT?

23   A.   YES.

24   Q.   OKAY.  AND YOU WERE ASKED TO MAKE ANY

25   CORRECTIONS OR CHANGES THAT YOU DEEMED NECESSARY TO

1      THIS PARTICULAR REPORT; IS THAT CORRECT?

2      A.   I WAS -- SORRY, ASKED TO MAKE CORRECTIONS?

3      Q.   YES.  YOU WERE ASKED BY THE AGENTS AND THE

4      GOVERNMENT'S PROSECUTORS TO -- WHETHER OR NOT YOU

5      CONSIDERED THIS REPORT, 541-A, TO BE ACCURATE; IS

6      THAT CORRECT?

7      A.   YES.

8      Q.   OKAY.  AND YOU TOLD THEM WHATEVER CHANGES THAT

9      YOU FELT WERE NECESSARY TO MAKE IT AS ACCURATE AS

10     YOU COULD; IS THAT CORRECT?

11     A.   I SO THIS IS A DOCUMENT THAT I JUST BECAME

12     AWARE OF IT VERY RECENTLY AS YOU SAID.  AND I

13     POINTED OUT SOME INACCURACIES THAT I THOUGHT WERE

14     IN THE DOCUMENT.

15     Q.   NOW AFTER LOOKING AT THIS DOCUMENT, 541-A, YOU

16     DID NOT, AFTER LOOKING AT THAT DOCUMENT, YOU STILL

17     DID NOT TELL THE AGENTS THAT IT WAS IMPORTANT TO

18     YOU THAT THE CASTILLO CPA FIRM WAS AN INDEPENDENT

19     AUDITOR FOR THE FIRESIDE FUND, DID YOU?

20     A.   NO, ON THE CONTRARY.

21     Q.   AND YOU ALSO DID NOT, AFTER READING THIS

22     REPORT, THE 541-A, AT THAT MEETING YOU ALSO DID NOT

23     TELL THE AGENTS THAT IT WAS IMPORTANT TO YOU THAT

24     THIS COMPANY GLOBEOP WAS THE FUND ADMINISTRATOR; IS

25     THAT CORRECT?

1    A.   NO, THAT'S NOT CORRECT.

2    Q.   YOU DID TELL THEM?

3    A.   YES.  ACTUALLY, ONE OF THE THINGS I POINTED

4    OUT IS THAT I DIDN'T LIKE THE WAY IT WAS REDACTED.

5    IT SOUNDED LIKE IT MISSED MOST OF THE REASONS OF

6    WHY I INVESTED IN THE FUND.  OR SOME OF THE

7    REASONS.

8    Q.   OKAY.  AND OF COURSE, SO YOU TOLD THE AGENTS

9    SPECIFICALLY THAT HEY, ONE OF THE REASONS WHY OR

10   ONE OF THE FACTORS THAT WAS IMPORTANT TO ME WAS, IN

11   TERMS OF MY DECISION TO INVEST IN THE FUND WAS THE

12   EXISTENCE OF, SAY, THE FUND ADMINISTRATOR GLOBEOP;

13   IS THAT CORRECT?

14   A.   I MIGHT NOT HAVE USED THIS PARTICULAR WORDING,

15   BUT I POINTED OUT THAT UNLIKE MOST OF MY

16   INVESTMENTS I REALLY LOOKED AT THE DOCUMENT AND

17   MARKED IT OUT AND LOOKED AT SPECIFIC PLACES WHICH

18   INCLUDED THE EXISTENCE OF INDEPENDENT AUDITORS,

19   INDEPENDENT ACCOUNTANT, INDEPENDENT BOOKKEEPERS,

20   AMONG OTHER THINGS.

21   Q.   AND YOU SAID THESE THINGS TO THE AGENTS AT

22   THAT RECENT MEETING; IS THAT CORRECT?

23   A.   YES, I THINK IT CAME OUT AT THE MEETING.

24   Q.   OKAY.  NOW, I WANTED TO DIRECT YOUR ATTENTION

25   TO YOUR MEETINGS WITH, AND YOU TESTIFIED THERE WERE

694

1    SEVERAL DIFFERENT MEETINGS THAT YOU HAD WITH MR. HU

2    AND THEN LATER ON A MR. STEVEN BOND, BEFORE YOU

3    MADE YOUR INVESTMENT; IS THAT CORRECT?

4    A.   YES.

5    Q.   OKAY.  AND YOU -- THIS MEETING, YOU HAD A

6    CHANCE TO TALK WITH MR. HU AND MR. BOND ABOUT WHAT

7    SORT OF, IF YOU WILL, THEIR STRATEGY FOR THE

8    INVESTMENT STRATEGY FOR THE FIRESIDE FUND; IS THAT

9    CORRECT?

10   A.   YES.

11   Q.   AND YOU LIKE WHAT THEY HAD TO SAY; IS THAT

12   CORRECT?

13   A.   YES.  THAT IS CORRECT.

14   Q.   OKAY.  AND ONE OF THE REASONS YOU LIKE WHAT

15   THEY HAD TO SAY WAS THAT YOU LIKE THE FACT THAT

16   MR. HU WAS A HIGH-TECH ENTREPRENEUR LIKE YOURSELF;

17   IS THAT CORRECT?

18   A.   YES.  I THOUGHT HE HAD THE CORRECT BACKGROUND

19   TO DO INVESTMENTS IN HIGH TECHNOLOGY.

20   Q.   NOW, YOU SAID THAT MR. BOND, STEVEN BOND WAS

21   NOT AT THE FIRST MEETING; IS THAT CORRECT?

22   A.   THAT'S RIGHT.

23   Q.   BUT MR. BOND APPEARED AT THE SECOND MEETING;

24   IS THAT CORRECT?

25   A.   THAT'S RIGHT.

1    Q.   AND YOU UNDERSTOOD MR. BOND TO BE THE FIRESIDE

2    FUND PORTFOLIO MANAGER; IS THAT CORRECT?

3    A.   YES.

4    Q.   AND WHAT YOU UNDERSTOOD FROM YOUR MEETING WITH

5    MR. BOND AND MR. HU WAS THAT MR. BOND WAS THE FUND

6    MANAGER AND MR. HU WAS KIND OF, IF YOU WILL,

7    RESPONSIBLE FOR RAISING MONEY FROM THE INVESTORS;

8    IS THAT CORRECT?

9    A.   SOMEWHAT.  SO I THINK THAT WAS THEIR MAIN

10   ROLES BUT IT BECAME VERY OBVIOUS OR I WAS MADE TO

11   BELIEVE OR I BELIEVED LATER ON THROUGH THE

12   PORTFOLIO REVIEW AND WITH MY CONVERSATION WITH

13   MR. HU THAT MR. HU WAS ALSO VERY ACTIVE IN

14   SELECTING STOCKS AND STRATEGY.

15   Q.   BUT AT THE INITIAL MEETING, YOUR UNDERSTANDING

16   WAS MR. HU WAS RESPONSIBLE FOR RAISING FUNDS AMONG

17   THE INVESTORS AND MR. BOND WAS RESPONSIBLE FOR

18   FIGURING THE PORTFOLIO ITSELF; IS THAT CORRECT?

19   A.   NO, I DIDN'T VIEW IT AS SUCH A SEPARATION.  I

20   THINK I VIEWED MR. BOND AS ULTIMATELY BEING THE ONE

21   DOING THE TRADES OR THAT'S WHAT I UNDERSTOOD.  BUT

22   MY UNDERSTANDING THAT BOTH MR. BOND AND MR. HU

23   WOULD DISCUSS THE INVESTMENTS AND SELECT THEM.

24   Q.   OKAY.  NOW, YOU HAD EVEN AFTER YOU MADE YOUR

25   INVESTMENTS YOU CONTINUED TO HAVE COMMUNICATIONS

1    WITH MR. BOND THE PORTFOLIO MANAGER; IS THAT

2    CORRECT?

3    A.   YES.

4    Q.   AND IN FACT ON OCCASIONS YOU WOULD ASK

5    MR. BOND FOR HIS ANALYSIS OR OPINION ABOUT CERTAIN

6    STOCK MARKET ISSUES; IS THAT CORRECT?

7    A.   I RECALL IT THE OTHER WAY AROUND, BUT I MIGHT

8    BE WRONG.  AS MR. BOND FORWARDING ME PRESS CLIPS OR

9    AN ANNOUNCEMENT ABOUT INTEL AND AMD IN PARTICULAR.

10   Q.   AND IT WAS KIND OF, IF YOU WILL, KIND OF A

11   TWO-WAY STREET BETWEEN YOU AND MR. BOND.  MR. BOND

12   WANTED YOUR OPINION AND ANALYSIS ON CERTAIN PARTS

13   OF THE STOCK MARKET THAT YOU HAD FAMILIARITY WITH

14   THAT PARTICULAR INDUSTRY; IS THAT CORRECT?

15   A.   I CAN ONLY REMEMBER ONE INSTANCE OF THAT WHICH

16   WAS A QUESTION ABOUT INTEL AND AMD.  I DON'T THINK

17   WE BROACHED ANY OTHER SUBJECT.  WE MIGHT HAVE BUT I

18   DON'T REMEMBER.

19   Q.   AND ON YOUR SIDE YOU ALSO ON OCCASION DID ASK

20   MR. BOND OF HIS OPINION AND ANALYSIS ABOUT THE

21   STOCK MARKET; IS THAT CORRECT?

22   A.   YES, I MUST HAVE.

23   Q.   OKAY.  ALL RIGHT.  NOW, BEFORE MADE YOUR

24   INVESTMENT WHICH WOULD HAVE BEEN I THINK IN

25   APRIL 2007; IS THAT CORRECT?

1    A.    YES.

2    Q.    OKAY.  BEFORE YOU MADE YOUR INVESTMENT WITH

3    MR. HU, AND THE FIRESIDE FUND, YOU WERE NOT GIVEN

4    ANY KIND OF AN AUDIT FINANCIAL STATEMENT BY THE CPA

5    FIRM OF CASTILLO, LYN, COHEN & VIJAY; IS THAT

6    CORRECT?

7    A.    YES, I WASN'T GIVEN THAT DOCUMENT.

8    Q.    OKAY.  NOW, LET ME DIRECT YOUR ATTENTION -- BY

9    THE WAY, LET ME BACK UP TO THE LAST QUESTION.

10        BEFORE YOU INVESTED YOUR MONEY IN THE

11   FIRESIDE FUND, FIRESIDE, I SHOULD SAY THE FIRESIDE

12   LS FUND, DID YOU EVER CHECK WITH THE CALIFORNIA

13   BOARD OF ACCOUNTANCY TO SEE IF THERE WAS A CPA FIRM

14   BY THE NAME OF CASTILLO, LYN, COHEN & VIJAY

15   A.    NO, I DIDN'T CHECK.

16   Q.    OKAY.  DID YOU CHECK WITH THE BOARD OF

17   ACCOUNTANCY WHETHER OR NOT THERE WAS A CPA BY THE

18   NAME OF JUN OR JUAN CASTILLO?

19   A.    NO.

20   Q.    LET ME DIRECT YOUR ATTENTION TO WHAT HAS

21   ALREADY BEEN ADMITTED INTO EVIDENCE GOVERNMENT

22   EXHIBIT 12, THE FIRESIDE LS FUND PRIVATE PLACEMENT

23   MEMORANDUM.

24        I DON'T KNOW, SIR, IF YOU STILL HAVE A

25   COPY OF THAT IN FRONT OF YOU.

1    A.   I DO.

2    Q.   OH, THANK YOU.  THAT'S GREAT.

3         AND YOU TESTIFIED A LITTLE BIT EARLIER

4    THAT YOU HAD, I THINK IN YOUR WORDS YOU HAD READ

5    AND GONE THROUGH THAT DOCUMENT, THE PRIVATE

6    PLACEMENT MEMORANDUM WITH A COMB.

7    A.   YES.  THAT'S THE WORD I USED.  PROBABLY THE

8    BEST WAY TO SAY IT IS THAT I REVIEWED IT MORE

9    CLOSELY THAN I REVIEWED PROBABLY ANY OTHER

10   INVESTMENT.

11   Q.   OKAY.  AND I THINK YOU EXPLAINED A LITTLE BIT

12   EARLIER THE REASON WHY YOU WERE SO CAREFUL WAS THAT

13   THIS WAS A PRIVATE INVESTMENT AND NOT A, IF YOU

14   WILL, A MORE PUBLIC INVEST; IS THAT CORRECT?  LIKE

15   IN APPLE STOCKS?

16   A.   TWO REASONS.  PRIVATE VERSUS PUBLIC.  AND ALSO

17   SOMETIMES I HAVE PRIVATE INVESTMENT BUT IT WILL

18   COME THROUGH MY INVESTMENT MANAGERS AND IT'S THEIR

19   ROLE TO GO THROUGH THAT.  AND IN THIS CASE I HAD TO

20   GO THROUGH IT MYSELF.

21   Q.   AND YOU HAD A PROFESSIONAL YOU CONSULTED WITH

22   DURING THIS PERIOD OF TIME ON AN AS-NEEDED BASIS;

23   IS THAT CORRECT?

24   A.   YES.  I HAVE -- THE ANSWER IS YES.

25   Q.   NOW, DIRECTING YOUR ATTENTION TO EXHIBIT 3,

1    EXCUSE ME, I APOLOGIZE.  EXHIBIT 12 THE PRIVATE

2    PLACEMENT MEMORANDUM.  YOU SEE THAT IN FRONT OF

3    YOU, SIR, RIGHT?

4    A.   YES.

5    Q.   DIRECTING YOUR ATTENTION TO PAGE THREE, THE

6    THIRD PARAGRAPH OF THAT DOCUMENT.  FIRST OF ALL, I

7    WILL GIVE YOU A MOMENT, SIR, TO LOOK AT THAT PAGE.

8            AND I WANT TO DIRECT YOUR ATTENTION TO

9    THE THIRD PARAGRAPH OF PAGE THREE OF EXHIBIT 12; DO

10   YOU SEE THAT, SIR?

11   A.   YES.

12   Q.   AND THAT TALKS ABOUT THE FACT THAT WHAT YOU

13   WERE INVESTING IN WAS WHAT THEY CALL A MASTER

14   FUND/FEEDER FUND STRUCTURE; IS THAT CORRECT?

15   A.   YES.

16   Q.   AT THE TIME THAT YOU WERE READING THIS

17   DOCUMENT CAREFULLY, YOU HAD AN UNDERSTANDING OF

18   WHAT A MASTER FUND/FEED FUND STRUCTURE WAS, RIGHT?

19   A.   MAYBE A LAYMAN UNDERSTANDING.

20   Q.   SURE.  BUT AT THE TIME THAT YOU WERE READING

21   THIS DOCUMENT AND BEFORE YOU MADE YOUR INVESTMENT,

22   YOU UNDERSTOOD THAT THE FIRESIDE LS FUND THAT YOU

23   WERE PUTTING YOUR MONEY INTO WAS GOING TO BE A PART

24   OF A BIGGER FUND, THE MASTER FUND; DID YOU

25   UNDERSTAND THAT?

1    A.    SO THE WAY I READ THAT IS THAT THE MONEY GOES

2    INTO A PORTFOLIO AND THAT PORTFOLIO IS MANAGED IN

3    THE MASTER FUND.

4    Q.    OKAY.  WELL MY QUESTION IS SLIGHTLY DIFFERENT,

5    SO BEAR WITH ME.

6          NOW, DID YOU UNDERSTAND WHEN YOU WERE

7    READING THE EXHIBIT 12 IN PARTICULAR, PAGE THREE,

8    PARAGRAPH THREE WHEN THE DOCUMENT WAS REFERRING TO

9    A MASTER FUND/FEED FUND STRUCTURE, THAT THE

10   FIRESIDE LS FUND ITSELF WOULD BE A PART OF A BIGGER

11   FUND, THE MASTER FUND?

12   A.    NO, I DIDN'T HAVE THAT LEVEL OF UNDERSTANDING.

13   Q.    AND BEFORE YOU MADE YOUR INVESTMENT, YOU DID

14   NOT FIND OUT WHETHER OR NOT THE FIRESIDE LS FUND

15   WOULD BE A PART OF A BIGGER MASTER FUND; IS THAT

16   CORRECT?

17   A.    NO.  MY IMPRESSION WAS THAT -- SO ONCE AGAIN,

18   I'M NOT A SPECIALIST IN HOW THIS IS STRUCTURED, BUT

19   THAT THE INVESTMENT WAS GOING TO BE PART OF -- WAS

20   GOING TO BE IN THE PORTFOLIO THAT WOULD BE, RESIDE

21   IN THE MASTER FUND, IN THAT FUND.

22   Q.    WELL, AT THE TIME THAT YOU WERE MAKING --

23   BEFORE YOU MADE THE INVESTMENT, DID YOU EVER HAVE

24   AN UNDERSTANDING THAT THE FIRESIDE LS FUND WAS NOT,

25   WAS NOT THE MASTER FUND THAT WAS REFERRED TO IN

1    THIS DOCUMENT?

2    A.   NO, I DIDN'T HAVE SUCH AN UNDERSTANDING.

3    Q.   OKAY.  AND OF COURSE, YOU DID NOT ASK THE

4    FINANCIAL ADVISOR OR PROFESSIONALS THAT YOU WORKED

5    WITH TO EXPLAIN THAT TO YOU BEFORE YOU MADE THE

6    INVESTMENT; IS THAT CORRECT?

7    A.   NO, I DON'T USE THAT FOR SUCH PURPOSE.

8    Q.   OKAY.  NOW, DIRECTING YOUR ATTENTION TO THE

9    FOURTH PARAGRAPH ON THAT SAME PAGE; DO YOU SEE

10   THAT, SIR?

11   A.   WHICH PARAGRAPH?

12   Q.   I'M SORRY, IT'S JUST THE ONE THAT'S RIGHT

13   BELOW WHAT WE JUST LOOKED AT.  THE FOURTH FULL

14   PARAGRAPH ON PAGE THREE OF EXHIBIT 12 WHICH IS THE

15   FIRESIDE LS FUND PRIVATE PLACEMENT MEMORANDUM.

16   A.   YES.

17   Q.   BY THE WAY, IF I USE THE SHORT TERM PPM FOR

18   PRIVATE PLACEMENT MEMORANDUM YOU WILL UNDERSTAND

19   THAT I'M REFERRING TO, RIGHT?

20   A.   OKAY.  NOW I KNOW.

21   Q.   JUST MAKE IT A LITTLE BIT EASIER.

22        NOW, LOOKING AT THE FOURTH PARAGRAPH, DO

23   YOU SEE THAT, SIR?

24   A.   YES.

25   Q.   NOW THAT PARAGRAPH TALKS ABOUT THE FACT THAT

1    HEY, THE -- WHAT YOU'RE INVESTING IN, IS IT

2    SPECULATIVE AND IT INVOLVES A SUBSTANTIAL RISK OF

3    LOSS; IS THAT CORRECT?

4    A.   YES.

5    Q.   AND OF COURSE YOU READ THAT CAREFULLY BEFORE

6    YOU MADE THE INVESTMENT?

7    A.   YES.  I HATE TO CALL THAT A DEROGATORY NAME

8    BOILER PLATE.  BUT THE RIGHT NAME WOULD BE STANDARD

9    PROVISION IN ANY INVESTMENT THAT YOU MAKE.  YOU

10   MIGHT LOSE MONEY.  YOU GET THAT INDIVIDUAL FUNDS.

11   Q.   SO BEFORE YOU MADE THE INVESTMENT, BEFORE YOU

12   MADE THE INVESTMENT, YOU KNEW WHEN YOU SAW THIS

13   PARAGRAPH IT WAS WHAT YOU WOULD CALL A STANDARD

14   BOILER PLATE PARAGRAPH MEANING THAT IT IS JUST

15   COMMON KNOWLEDGE THAT OF COURSE AN INVESTMENT WOULD

16   CARRY RISK AND YOU COULD LOSE ALL YOUR MONEY IN THE

17   INVESTMENT.  YOU KNEW THAT?

18   A.   SO PART OF YOUR QUESTION, THE INVESTMENT IS

19   RISKY, RIGHT, IT'S A STANDARD DISCLAIMER AND I

20   COULD LOSE ALL OF MY MONEY.  NO, THAT'S EXTREMELY

21   RARE THAT'S WHY WE INVEST IN FUNDS, RIGHT.

22   PORTFOLIO IS MADE OF MANY THINGS THEY NEVER GO ALL

23   DOWN AT THE SAME TIME.  AND THAT'S EVEN, THE NEXT

24   REPRESENTATION IS YOU DO HEDGE FUNDS THAT HAVE

25   STRATEGIES TO PREVENT YOU FROM LOSING YOUR MONEY.

1    THAT'S WHAT WE TALKED ABOUT THEY ARE IN PAIRS.

2              SO THE FIRST ANSWER WAS YES, THE LAST

3    ANSWER TO THE QUESTION WAS NO

4    Q.   THANK YOU FOR BREAKING THAT DOWN FOR ME.  I

5    APPRECIATE IT.  I APOLOGIZE FOR INTERRUPTING YOU.

6              BUT HAVE YOU NOW HAD A CHANCE TO ANSWER

7    MY QUESTION FULLY?

8    A.   YES.

9    Q.   OKAY.  NOW, THE -- AND IT WAS PRECISELY THE

10   FACT THAT WITH THIS PARTICULAR HEDGE FUND THESE

11   LONG, SHORT STRATEGY, THAT WAS WHAT YOU JUST WERE

12   JUST REFERRING TO IN TERMS OF THE LOWERING THE RISK

13   INVOLVED, RIGHT?

14   A.   THAT WAS THE MAIN STRATEGY TO LOWER THE RISK,

15   CORRECT.  THE OTHER ONE IS TO SIMPLE INVESTING IN

16   LARGE NUMBER OF COMPANIES, WE ARE NOT SENSITIVE TO

17   JUST ONE GOING UNDER.

18   Q.   OKAY.  AND THAT'S WHAT -- AND THAT STRATEGY,

19   THAT WAS IMPORTANT TO YOU IN TERMS OF YOUR DECISION

20   MAKING PROCESS OF WHETHER OR NOT TO INVEST IN THIS

21   FUND; IS THAT CORRECT?

22   A.   YES.  I INVEST -- WELL, AMONG OTHERS, THE

23   STRATEGY OF HAVING PAIRS TO LOWER THE RISK WHEN

24   INVESTING IN TECH, YES.

25   Q.   AND THAT WAS A FACT YOU INTRODUCED TO THE CASE

1    AGENTS WHEN THEY INTERVIEWED YOU, CORRECT?

2    A.   ON WHAT OCCASION, WHAT ARE YOU REFERRING TO.

3    Q.   THE FACT THAT YOU LIKE THE LONG, SHORT

4    INVESTMENT STRATEGY OF THE FIRESIDE LS FUND.  THE

5    FACT THAT YOU LIKE THAT, YOU TOLD THE AGENTS THAT

6    WAS A FACTOR IN YOUR DECISION TO INVEST IN THE

7    FIRESIDE FUND; IS THAT CORRECT?

8    A.   YES.

9    Q.   NOW, DIRECTING YOUR ATTENTION TO PAGE FOUR OF

10   THE SAME DOCUMENT, NEXT PAGE OVER AND I WILL DIRECT

11   YOUR ATTENTION TO THE THIRD PARAGRAPH FROM THE TOP,

12   IF I MAY, SIR.

13        AND AGAIN, JUST LOCATE THAT PARAGRAPH AND

14   I WILL ASK YOU A COUPLE QUESTIONS ABOUT IT BUT I

15   WANT TO FIRST MAKE SURE THAT YOU HAVE FOUND THAT

16   PARTICULAR PARAGRAPH.

17   A.   YES.

18   Q.   OKAY.  IF YOU COULD JUST READ THAT TO YOURSELF

19   JUST FOR A MOMENT, I WOULD APPRECIATE IT.

20   A.   I'VE READ IT.

21   Q.   OKAY.  AND THAT'S YET ANOTHER WARNING, IF YOU

22   WILL, THAT EACH INVESTOR SHOULD MAKE SURE THAT HE

23   OR SHE KNOWS WHAT HE OR SHE IS DOING BEFORE

24   INVESTING; IS THAT CORRECT?

25   A.   THE CORRECT WAY WOULD BE TO READ THE ENTIRE

1    PARAGRAPH, BUT IT'S LONG, LEGAL VERBIAGE TO SAY, TO

2    WARN YOU THAT YOU SHOULD GET AS MUCH OTHER ADVICE

3    AS YOU CAN.

4    Q.   OKAY.  SO THAT'S PART OF WHAT WAS IN THAT

5    PARAGRAPH THAT AN INVESTOR SHOULD GET AS MUCH

6    INFORMATION AND ADVICE, INDEPENDENT ADVICE, BEFORE

7    HE OR SHE MAKE THE DECISION TO INVEST; IS THAT

8    CORRECT?

9    A.   IT'S SAID DIFFERENTLY, BUT IT'S A WARNING THAT

10   THIS DOCUMENT AND YOU SHOULDN'T, I DON'T HAVE TO

11   READ IT IN ITS ENTIRETY.  IT'S COMPLICATED LEGAL

12   LANGUAGE THAT SAYS THAT -- THE ONLY WAY TO DO IT IS

13   READ IT.

14            PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE

15   THE CONTENTS OF THIS MEMORANDUM AS LEGAL

16   INVESTMENT, TAX OR OTHER ADVICE.

17            EACH PROSPECTIVE INVESTOR MUST RELY UPON

18   ITS OWN REPRESENTATIVE INCLUDING ITS OWN INVESTMENT

19   ADVISOR, LEGAL COUNSEL OR ACCOUNTANTS AS TO LEGAL

20   TAX RELATED ASPECTS OF THE INVESTMENT DESIRED

21   HEREIN AND HAS TO BE SUITABLE FOR SUCH INVESTMENT.

22            AND SO THAT'S WHAT IT SAYS.

23   Q.   OKAY.  SO IT DID SAY THAT EACH INVESTOR, EACH

24   PROSPECTIVE INVESTOR MUST RELY ON HIS OR HER OWN

25   REPRESENTATIVE INCLUDING HIS OR HER OWN INVESTMENT

706

1    ADVISOR, LEGAL COUNSEL AND ACCOUNTANTS, AS TO THE

2    ECONOMIC LEGAL AND TAX RELATED ASPECT OF THIS

3    INVESTMENT, RIGHT?

4    A.   RIGHT.

5    Q.   AND NOW, ON THE SAME PAGE TWO PARAGRAPHS BELOW

6    THAT, IT WOULD MAKE IT THE VERY LAST PARAGRAPH ON

7    PAGE FOUR.  DO YOU SEE THAT, SIR?

8    A.   YES.

9    Q.   OKAY.  NOW, THAT PARAGRAPH IS AGAIN ANOTHER

10   WARNING THAT EACH INVESTOR SHOULD MAKE SURE THAT

11   THIS KIND OF INVESTMENT CARRIES A HIGH DEGREE OF

12   RISK.  IT SAYS THAT, RIGHT?

13   A.   I HAVE TO READ IT.  IT SAYS IN SUBSCRIBING FOR

14   AN INTEREST EACH INVESTOR MUST REPRESENT AND

15   WARRANT AMONG OTHER THINGS THAT IT'S AND/OR IT'S

16   PURCHASER REPRESENTATIVE HAS VIEWED THIS MEMORANDUM

17   AND WILL IT HAS OR THEY TOGETHER HAVE SUCH

18   SOPHISTICATION KNOWLEDGE AND EXPERIENCE IN

19   FINANCIAL AND BUSINESS MATTERS THAT IT IS OR THEY

20   ARE CAPABLE OF EVALUATING THE MERITS AND RISKS OF

21   AN INVESTMENT IN THE FUND.

22        EACH INVESTOR FURTHER ACKNOWLEDGES THAT

23   AN INVESTMENT IN THE FUND INVOLVES A HIGH DEGREE OF

24   RISK, ASSURANCE CAN BE GIVEN THAT THE FUNDS

25   INVESTMENT OBJECTIVE WILL BE ACHIEVED AND IS THAT

1  INVESTMENT RESULTS THEY VARY SUBSTANTIALLY ON A

2  QUARTERLY OR ANNUALLY BASIS

3  Q.   AND YOU READ THE PARAGRAPH BEFORE YOU MADE

4  YOUR DECISION TO INVEST IN THE FIRESIDE LS FUND?

5  A.   YES.  THAT'S A VERY STANDARD LEGAL WARNING

6  CLAUSE.

7  Q.   IN FACT IT'S SO COMMON THAT YOU, EACH WITHOUT

8  READING THIS PARAGRAPH, YOU KNEW THAT TO BE THE

9  CASE, WAS THAT CORRECT?

10  A.   IT'S A VERY COMMON ONE FOR, PARTICULARLY FOR

11  INVESTMENT OF LARGE SUM OF MONEY THEY WILL ASK --

12  THERE'S ALWAYS SOME WARNING LANGUAGE, KNOW THAT

13  THERE'S RISK THAT IT FALLS WITHIN THAT CATEGORY.

14  Q.   AND AT THE TIME YOU WERE MAKING THE DECISION

15  TO INVEST IN THE FIRESIDE LS FUND YOU WERE FAMILIAR

16  WITH THE CONCEPT THAT THERE'S STANDARD WARNINGS OF

17  HIGH RISK OF INVESTMENT AND EACH INVESTOR SHOULD DO

18  HIS OR HER OWN DILIGENCE.  YOU WERE FAMILIAR WITH

19  THAT; IS THAT CORRECT?

20  A.   IT'S A STANDARD CLAUSE IN ANY INVESTMENT, YES.

21  Q.   SO YES, YOU WERE FAMILIAR WITH THAT CONCEPT?

22  A.   YES.

23  Q.   NOW, AT THE TIME -- PLEASE TAKE A -- YEAH.

24       NOW, BEFORE YOU MADE YOUR INVESTMENT,

25  BECAUSE LET'S BACK UP JUST ONE SECOND.  YOU ONLY

1    MADE ONE INVESTMENT INTO THE FIRESIDE LS FUND; IS

2    THAT CORRECT?

3    A.   THAT'S RIGHT.

4    Q.   AND THAT WAS FOR $2 MILLION?

5    A.   THAT'S RIGHT.

6    Q.   AND THAT WAS THE ONLY INVESTMENT YOU EVER MADE

7    WITH MR. HU; IS THAT CORRECT?

8    A.   YES.

9    Q.   OKAY.  NOW, BEFORE YOU MADE THAT INVESTMENT

10   DID YOU HAVE AN UNDERSTANDING AS TO UNDER WHAT

11   CONDITIONS YOU CAN GET YOUR MONEY BACK OUT OF THE

12   FUND?

13   A.   YES.  THAT WAS DISCUSSED WITH MR. HU.

14   Q.   OKAY.  BESIDES THE DISCUSSION WITH MR. HU,

15   WHEN YOU WERE READING THIS DOCUMENT, EXHIBIT 12,

16   THE PPM FOR THE FIRESIDE LS FUND, DID YOU SEE

17   ANYTHING -- DID YOU NOTICE ANYTHING IN THERE ABOUT

18   UNDER WHAT CONDITIONS THAT YOU AS AN INVESTOR COULD

19   GET YOUR MONEY BACK OUT OF THE FUND IF YOU WANT TO

20   GET IT BACK?

21   A.   YES.  THE REDEMPTION CONDITIONS ARE ALSO

22   STANDARD PART OF THOSE DOCUMENTS.

23   Q.   DID YOU UNDERSTAND BEFORE YOU MADE THE

24   INVESTMENT, DID YOU UNDERSTAND THAT THE RIGHT TO

25   GET YOUR MONEY OUT, I THINK YOU REFERRED TO IT AS

1    THE RIGHT OF REDEMPTION; IS THAT CORRECT?

2    A.   RIGHT.

3    Q.   IF I USE THE WORD REDEMPTION YOU WILL KNOW I'M

4    TALKING ABOUT THE RIGHT OF THE INVESTOR TO DRAW HIS

5    OR HER MONEY OUT OF THE INVESTMENT FUND?

6    A.   YES.

7    Q.   BEFORE YOU MADE YOUR INVESTMENT DID YOU

8    UNDERSTAND THAT THE PRIVATE PLACEMENT MEMORANDUM

9    HAD CERTAIN RESTRICTIONS AS TO HOW AND WHEN AN

10   INVESTOR CAN REDEEM OR WITHDRAW HIS OR HER

11   INVESTMENT?

12   A.   YES.

13   Q.   OKAY.  AND DID YOU UNDERSTAND THAT THERE WAS A

14   PROCEDURE, IF YOU WILL, THAT YOU CAN ONLY, AN

15   INVESTOR COULD GET HIS OR HER MONEY OUT, FIRST OF

16   ALL, ONLY AFTER A YEAR OF MAKING HIS OR HER

17   INVESTMENT; IS THAT CORRECT?

18   A.   ACTUALLY, THAT ONE IS ONE I DIDN'T REMEMBER.

19   I JUST RECALLED IT WHEN I READ THE DOCUMENT.  MY

20   UNDERSTANDING WHEN I INVESTED WAS IT WAS A

21   QUARTERLY REDEMPTION, 30-DAY NOTICE.  THAT'S WHAT I

22   DISCUSSED WITH MR. HU.

23   Q.   LET ME DIRECT YOUR ATTENTION THEN TO PAGE 12

24   OF EXHIBIT 12, IF I MAY.  IF YOU COULD PLEASE BLOW

25   UP THE FIRST HALF OF THAT DOCUMENT.  AND THE NEXT

1    PARAGRAPH AS WELL.  THANK YOU.

2             AND MR. VERDIELL, PLEASE FEEL FREE TO

3    REFER TO YOUR OWN DOCUMENT YOU HAVE IN FRONT OF YOU

4    IF THAT'S EASIER FOR YOU OR YOU COULD READ THE

5    SCREEN.

6             FIRST OF ALL, DO YOU SEE PAGE 12?

7    A.   YES, I DO.

8    Q.   AND THE READING THERE IS WITHDRAWALS ON THE

9    UPPER LEFT-HAND CORNER; IS THAT CORRECT?

10   A.   YES.

11   Q.   AND CAN YOU PLEASE READ THAT FIRST SENTENCE TO

12   THE RIGHT OF THE HEADING FOR WITHDRAWALS?

13   A.   AFTER THE END OF 12 MONTHS FOLLOWING A LIMITED

14   PARTNER'S INVESTMENT A LIMITED PARTNER MAY REQUEST

15   REDEMPTION OF ALL OR ANY PART OF ITS INVESTMENT AS

16   OF THE END OF EACH SUCCESSIVE FISCAL QUARTER THERE

17   AFTER, UPON 45 DAYS'S WRITTEN NOTICE TO THE FUND,

18   WHICH NOTICE MAY BE GIVEN DURING THE INITIAL

19   12-MONTH INVESTMENT PERIOD WITH REGARD TO THE FIRST

20   FISCAL QUARTER ENDING AFTER, OR IF APPLICABLE

21   COINCIDING WITH THE END OF SUCH 12 MONTHS PERIOD.

22   Q.   OKAY.  SO NOW, DID YOU, BEFORE YOU MADE YOUR

23   INVESTMENT DID YOU READ THAT PARTICULAR SENTENCE?

24   A.   I DID.

25   Q.   OKAY.  AND DID YOU AFTER READING THAT, DID YOU

1    HAVE ANY UNDERSTANDING AS TO THE PROCEDURAL TIME

2    TABLE FOR WHEN AN INVESTOR LIKE YOURSELF CAN ASK TO

3    WITHDRAW OR REDEEM HIS OR HER INVESTMENT?

4    A.   YES.

5    Q.   OKAY.  SO IT -- SO AN INVESTOR WOULD HAVE TO

6    WAIT FOR A PERIOD OF 12 MONTHS AFTER HE OR SHE MADE

7    THE INITIAL INVESTMENT, RIGHT?

8    A.   WELL, WE JUST READ THROUGH IT.  SO THIS ONE

9    HAS CALLED A 12 MONTHS LOCKED IN PERIOD.  BUT IT

10   ALSO SAYS YOU CAN SUBMIT YOUR REDEMPTION BEFORE THE

11   12 MONTHS INVESTMENT PERIOD THE QUARTER BEFORE.  SO

12   IT'S ALL ABOUT THE EXACT TIMING OF THINGS.

13   Q.   YOU KNEW YOU COULD NOT GET YOUR MONEY BACK

14   UNTIL 12 MONTHS HAD PASSED, RIGHT?

15   A.   RIGHT.

16   Q.   OKAY.  AND NOW, DIRECTING YOUR ATTENTION TO

17   THE THIRD PARAGRAPH OF THIS PAGE WHICH IS PAGE 12,

18   BEGINNING WITH THE WORD, THE FUND MAY SUSPEND.  DO

19   YOU SEE THAT?

20   A.   YES.

21   Q.   NOW, DID YOU READ THAT PARTICULAR PARAGRAPH

22   BEFORE YOU MADE YOUR DECISION TO INVEST IN FIRESIDE

23   LS FUND?

24   A.   YES.

25   Q.   OKAY.  AND DID YOU UNDERSTAND THAT IN THAT

1    PARAGRAPH, THE THIRD PARAGRAPH OF PAGE 12, EXHIBIT

2    12, THAT THE FUND MANAGER HAD THE DISCRETION TO

3    SUSPEND THE INVESTOR'S RIGHT TO REDEEM OR WITHDRAW

4    HIS OR HER MONEY UNDER CERTAIN CONDITIONS?

5    A.   YES.

6    Q.   SO YOU KNEW THAT?

7    A.   YES.

8    Q.   OKAY.  AND YOU ACCEPTED THAT CONDITION AS PART

9    OF YOUR ENTERING INTO YOUR INVESTMENT?

10   A.   YES, ONCE AGAIN IT'S A STANDARD PROVISION.  IF

11   SOMETHING PREVENTS YOU FROM EVALUATING YOUR

12   PORTFOLIO YOU MIGHT SUSPEND IT UNDER CERTAIN

13   CIRCUMSTANCES.

14   Q.   AND THE CONDITIONS THAT WOULD JUSTIFY THE

15   SUSPENSION OF REDEMPTION OF WITHDRAWAL RIGHTS WOULD

16   BE IN THE OPINION OF THE INVESTMENT MANAGER; IS

17   THAT CORRECT?

18   A.   YOU WOULD HAVE TO READ THE WHOLE PARAGRAPH TO

19   FIND ALL THE CONDITIONS.  THERE'S A WHOLE BUNCH OF

20   THEM.

21   Q.   WELL, IT SAYS ON THE THIRD LINE OF THAT

22   PARAGRAPH IT SAYS THAT THE FUND MAY SUSPEND THE

23   VALUATION OF ITS ASSETS AND ANY REDEMPTION OF

24   INTEREST FOR THE WHOLE OR ANY PART OF ANY PERIOD,

25   DURING THE EXISTENCE OF ANY STATE OF AFFAIRS

1    INCLUDING THE RESTRICTIONS OF TRADING IN ONE OR

2    MORE MARKETS WHICH IN THE OPINION OF THE INVESTMENT

3    MANAGER MAKES THE DETERMINATION OF THE PRICE, VALUE

4    OR POSITION OF THE MASTER FUND'S INVESTMENT IN

5    PRACTICAL OR PREJUDICIAL TO ITS INVESTORS.

6              YOU SEE THAT SENTENCE, RIGHT

7    A.   YES.

8    Q.   OKAY.  AND YOU HAVE READ THIS DOCUMENT

9    CAREFULLY BEFORE YOU MADE YOUR DECISION TO INVEST

10   IN FIRESIDE?

11   A.   YES.

12   Q.   AND YOU ACCEPTED OF COURSE THAT CONDITION?

13   A.   YES, IT'S STANDARD PROCEDURE THAT WHEN

14   SOMETHING PREVENTS YOU TO VALUATING THE PORTFOLIO,

15   USUALLY IT'S EXTRAORDINARY EVENTS, THE COMPANY IS

16   GOING BANKRUPT OR SOMETHING LIKE THAT, YOU HAVE,

17   IT'S IMPOSSIBLE TO VALUE THE PORTFOLIO.  SO THEY

18   MUST PUT A CLAUSE LIKE THIS.

19   Q.   AND YOU KNEW THAT THAT DETERMINATION WOULD BE

20   MADE BY IN THE OPINION OF THE INVESTMENT MANAGER;

21   IS THAT CORRECT?

22   A.   YES.

23   Q.   SO THE INVESTMENT MANAGER WOULD HAVE THE

24   DISCRETION TO MAKE THAT DETERMINATION; IS THAT

25   CORRECT?

1    A.   IF FIRST YOU WOULD HAVE TO HAVE SOMETHING THAT

2    PREVENTS HIM FROM EVALUATING THE -- AN EXCEPTIONAL

3    EVENT THAT PREVENTS HIM FROM VALUATING THE

4    PORTFOLIO.  IF HE CAN'T VALLATE IT, HE CAN'T DO

5    ANYTHING.  HE HAS TO VALLATE IT.

6    Q.   NOW LET ME DIRECT YOUR ATTENTION TO THE.

7             YOU TESTIFIED TO EARLIER.  IF I COULD

8    DIRECT YOUR ATTENTION TO PAGE 29.

9             IF YOU COULD TROUBLE YOU TO BRING UP THE

10   THIRD FULL PARAGRAPH.  IF YOU COULD ENLARGE THAT

11   FOR ME.  THANK YOU SO MUCH.

12            DIRECTING YOUR ATTENTION TO THE THIRD

13   PARAGRAPH ON PAGE 29 OF EXHIBIT 12.  DO YOU SEE

14   THAT EITHER ON THE SCREEN, SIR, OR IN THE DOCUMENT

15   IN FRONT OF YOU?

16   A.   YES.

17   Q.   AND THAT HAS THE HEADING OF REPORTS TO

18   PARTNERS; IS THAT CORRECT?

19   A.   LET ME READ IT.

20   Q.   SURE.  OF COURSE.

21   A.   YES.

22   Q.   OKAY.  NOW, THAT PARAGRAPH WITH THE HEADING

23   REPORTS TO PARTNERS.  IT SAYS THAT AFTER THE FUNDS

24   STARTS -- AFTER THE FUNDS STARTED, THE FIRESIDE

25   FUND STARTED, THERE WAS SUPPOSED TO BE PREPARED BY

1    THE SIELOR AND CPA COMPANY ANNUAL AUDIT REPORTS OF

2    THE FUND; IS THAT CORRECT?

3    A.   YES.

4    Q.   AND THAT THIS WAS SUPPOSED TO BE DISTRIBUTED

5    TO EACH INVESTOR; IS THAT CORRECT?

6    A.   YES.

7    Q.   NOW, AT THE TIME THAT YOU MADE YOUR DECISION

8    TO INVEST, THAT WOULD HAVE BEEN IN ABOUT LATE

9    MARCH, EARLY APRIL 2007; IS THAT CORRECT?

10   A.   YES.

11   Q.   AND BY THAT TIME THE -- YOU UNDERSTOOD THAT

12   THE FIRESIDE FUND ALREADY HAD A COUPLE YEARS OF

13   PERFORMANCE HISTORY; IS THAT CORRECT?

14   A.   ACTUALLY, I DON'T KNOW THE EXACT STARTING DATE

15   OF THE FUND AS FIRESIDE, BUT A SIMILAR ENTITY HAD

16   SEVERAL YEARS OF -- SO, THE ANSWER IS YES.  IT'S A

17   LITTLE DETAILED BECAUSE IN ONE HAD CHANGED NAMES OR

18   SOMETHING LIKE THAT.

19   Q.   SURE.  I FULLY UNDERSTAND THAT.  LET ME DIRECT

20   YOUR ATTENTION WE DON'T NEED TO BRING UP ON THE

21   SCREEN.  IF WE COULD STAY HERE ON THIS PAGE OF THE

22   SCREEN I APPRECIATE IT.

23        DIRECTING YOUR ATTENTION TO PAGE ONE OF

24   EXHIBIT 12.  DO YOU HAVE THAT IN FRONT OF, SIR?

25   A.   YES.

1    Q.   TOWARD THE MIDDLE OF THE PAGE IT SAYS THAT IN

2    ESSENCE, IT DATES THE CONFIDENTIAL PRIVATE

3    PLACEMENT MEMORANDUM FOR THE FIRESIDE LS FUND AS

4    DATED JUNE 30TH, 2005; IS THAT CORRECT?

5    A.   YES.

6    Q.   SO DOES THAT REFRESH YOUR RECOLLECTION AS TO

7    YOUR UNDERSTANDING AT THE TIME THAT YOU MADE THE

8    INVESTMENT IN APRIL OF 2007 THAT THE FIRESIDE FUND

9    WOULD HAVE HAD COUPLE YEARS OF HISTORY?

10   A.   IF IT WAS STARTED AT THE SAME TIME, THE

11   MEMORANDUM WAS PRINTED, IT WOULD BE 2005, YES.

12   Q.   AND THAT WOULD BE CONSISTENT WITH YOUR

13   UNDERSTANDING THAT EVEN WITHOUT REFERENCING THE

14   DATE THAT WE JUST TALKED ABOUT ON PAGE ONE, THAT

15   WOULD BE CONSISTENT WITH YOUR UNDERSTANDING THAT

16   THE FIRESIDE FUND HAD BEEN AROUND FOR A COUPLE OF

17   YEARS AT THE TIME THAT YOU MADE THE DECISION TO

18   INVEST IN THAT FUND?

19   A.   YES.

20   Q.   NOW, BEFORE YOU MADE YOUR DECISION TO INVEST

21   IN THE FIRESIDE LS FUND IN APRIL OF 2007, YOU DID

22   NOT ASK ANYBODY TO GIVE YOU ANY OF THE AUDITED

23   ANNUAL STATEMENTS, DID YOU?

24   A.   NO.

25   Q.   NOW, LET ME DIRECT YOUR ATTENTION NOW TO SOME

1    OF THE E-MAILS THAT YOU AND MR. HU HAD EXCHANGED

2    WITH EACH OTHER.

3            NOW, YOU TESTIFIED -- LET ME ASK YOU THIS

4    QUESTION.  HOW DID YOU NORMALLY COMMUNICATE WITH

5    MR. HU, IT WAS BY E-MAIL, TELEPHONE, IN PERSON OR

6    COMBINATION OF THE THREE?

7    A.   COMBINATION OF THE THREE.

8    Q.   WOULD E-MAIL BE THE MOST PROMINENT METHOD OF

9    COMMUNICATING WITH MR. HU?

10   A.   NO, I WOULD SAY E-MAIL AND MEETING IN PERSON.

11   Q.   OKAY.  AND WHEN MR. HU WAS OUT OF TOWN, WHAT

12   ABOUT THEN, DID YOU TALK BY TELEPHONE OR E-MAIL OR

13   COMBINATION OF THE TWO?

14   A.   WHEN HE WAS OUT OF TOWN, MOSTLY E-MAIL.

15   Q.   SO WHEN HE WAS OUT OF TOWN THERE WERE NOT THAT

16   MANY TELEPHONE CALLS BUT YOUR PREDOMINANT MODE OF

17   COMMUNICATION WOULD BE THROUGH E-MAILS, RIGHT?

18   A.   YES.

19   Q.   NOW LET ME DIRECT YOUR ATTENTION TO A DOCUMENT

20   THAT'S BEEN MARKED AS DEFENDANT'S EXHIBIT FIVE 62,

21   SIR.

22           FIRST OF ALL, SIR, DO YOU SEE THAT

23   DOCUMENT?

24   A.   YES.

25   Q.   IT APPEARS TO BE A TWO-PAGE DOCUMENT; IS THAT

718

1    CORRECT?

2    A.   YES.

3    Q.   AND IS THIS -- WELL, HAD YOU SEEN THIS

4    DOCUMENT BEFORE TODAY?

5    A.   NO.

6    Q.   OKAY.  AND DO YOU RECALL GETTING AN E-MAIL

7    FROM ALBERT HU?  LET ME ASK YOU, DIRECTING YOUR

8    ATTENTION TO THE TOP OF THE FIRST PAGE OF

9    DEFENDANT'S EXHIBIT 562, DO YOU SEE A NAME AT THE

10   VERY LEFT-HAND UPPER CORNER OF PAGE 1?

11   A.   YES.  DO YOU MIND IF I READ THE DOCUMENT.

12   Q.   PLEASE, OF COURSE, PLEASE.  I APOLOGIZE IF I

13   DIDN'T GIVE YOU THE OPPORTUNITY.  PLEASE.

14        AND MR. VERDIELL, HAVE YOU NOW HAD A

15   CHANCE TO LOOK AT THE TWO-PAGE DOCUMENT THAT IS

16   DEFENDANT'S EXHIBIT 562?

17   A.   YES.

18   Q.   DO YOU RECOGNIZE THAT DOCUMENT HAVING NOW HAD

19   THE OPPORTUNITY TO LOOK AT IT?

20   A.   NO, I DON'T.

21   Q.   OKAY.  AND NOW, THERE IS A NAME IN THE -- DO

22   YOU SEE THE NAME WITHOUT MENTIONING WHAT THAT NAME

23   IS IN THE UPPER LEFT-HAND CORNER OF EXHIBIT 562 ON

24   PAGE ONE, DO YOU SEE THAT?

25   A.   YES.

1    Q.   DO YOU RECOGNIZE THAT NAME AS AN INDICATION OF

2    THE SOURCE OF THE DOCUMENT?

3    A.   IT'S MY NAME.

4    Q.   OKAY.  NOW, WHEN YOU PRODUCE AN E-MAIL FROM

5    YOUR COMPUTER DOES YOUR NAME, MARK VERDIELL, APPEAR

6    IN THE UPPER LEFT-HAND CORNER OF THE FRONT PAGE?

7    A.   IT MIGHT.  IT WOULD SEEM NORMAL.

8    Q.   OKAY.  NOW, OBVIOUSLY YOU JUST ANSWERED YOU DO

9    NOT RECALL SEEING THIS PARTICULAR DOCUMENT,

10   DEFENDANT'S EXHIBIT 562.  NOW HAVING LOOKED AT

11   EXHIBIT 562, DOES THAT REFRESH YOUR RECOLLECTION OF

12   WHETHER OR NOT MR. HU IN APRIL OF 2008 SENT OUT

13   COMMUNICATIONS TO YOU AND OTHERS ABOUT THE PROBLEM

14   WITH THE SUBPRIME GLOBAL CRISIS?

15   A.   I HAVE NO RECOLLECTION OF THIS WHATSOEVER.

16   Q.   OKAY.  SO YOU DO NOT RECALL EVER SEEING ANY

17   COMMUNICATIONS FROM ALBERT HU AROUND APRIL 2008

18   ABOUT THE POSSIBLE PROBLEMS WITH THE SUBPRIME

19   GLOBAL MARKET?

20   A.   I DO NOT RECALL RECEIVING OR READING THIS

21   DOCUMENT.

22   Q.   OKAY.  I UNDERSTAND THAT.  BUT MY QUESTION IS

23   DO YOU RECALL INDEPENDENT OF THIS PARTICULAR

24   DOCUMENT, DO YOU RECALL GETTING ANY KIND OF

25   COMMUNICATION FROM ALBERT HU AROUND APRIL 2008 IN

1    WHICH MR. HU WAS SAYING THAT HEY, THERE IS THIS

2    GLOBAL ECONOMIC CRISIS BROUGHT ON BY THE SUBPRIME

3    SITUATION?

4    A.    I DON'T REMEMBER IT.

5    Q.    OKAY.  NOW, LET ME DIRECT YOUR ATTENTION TO A

6    DOCUMENT THAT'S BEEN PRE-MARKED AS DEFENDANT'S

7    EXHIBIT 567.  I WILL JUST GIVE YOU A MOMENT, SIR,

8    TO LOOK THAT OVER.

9    A.    OKAY.

10   Q.    OKAY.  FIRST OF ALL, DO YOU RECOGNIZE THAT

11   DOCUMENT THAT'S BEEN MARKED AS DEFENDANT'S

12   EXHIBIT 567?

13   A.    YEAH, THOSE ARE PUT TOGETHER BUT THEY WERE TWO

14   DIFFERENT DOCUMENTS.

15   Q.    LET ME DIRECT YOUR ATTENTION THEN TO THE

16   SECOND PAGE OF, AND I APOLOGIZE FOR THE

17   ADMINISTRATIVE SNAFU BUT IT'S REALLY THE SECOND

18   PAGE THAT I WANT TO DIRECT YOUR ATTENTION TO.

19   EXHIBIT 567 DO YOU SEE THAT, SIR.  IT HAS THE --

20   THE BATES NUMBER.  IN THE LOWER RIGHT-HAND CORNER

21   IT HAS THE BATES NUMBER OF SEC 0147.  IS THAT WHAT

22   YOU SEE?

23   A.    YES.

24   Q.    JUST TO MAKE SURE WE ARE ON THE SAME PAGE.

25   NOW, THE TOP HALF OF THE DOCUMENT, DO YOU RECOGNIZE

1    THAT PARTICULAR COMMUNICATION?

2    A.   DO I RECOGNIZE SEEING IT OR DO I REMEMBER IT?

3    Q.   FIRST OF ALL, DO YOU RECALL EVER SEEING THAT

4    BEFORE?

5    A.   NO, I HAD FORGOTTEN ABOUT IT.

6    Q.   OKAY.  LOOKING AT THE TOP HALF OF THE SECOND

7    PAGE OF DEFENDANT'S EXHIBIT 567, DOES THAT REFRESH

8    YOUR RECOLLECTION?

9    A.   YES, IT'S -- AN E-MAIL THAT WAS SENT TO ALBERT

10   HU AND COPIED TO ME.

11   Q.   IT WAS SENT FROM ALBERT HU TO BOB LIN?

12   A.   YES.

13   Q.   YOU DID RECEIVE THAT E-MAIL, RIGHT?

14   A.   I MUST HAVE.  I DON'T KNOW FOR SURE.  I DON'T

15   RECALL IT.

16   Q.   OKAY.  DO YOU -- IT'S DATED AROUND

17   SEPTEMBER 4TH, 2008.  DO YOU SEE THAT?

18   A.   YES.

19   Q.   1:44 A.M., RIGHT?

20   A.   YES.

21   Q.   DO YOU RECALL ALBERT HU AROUND THE TIME OF

22   SEPTEMBER 4TH, 2008, COMMUNICATING WITH BOB LIN AND

23   COMMUNICATING WITH YOURSELF ABOUT CERTAIN

24   SITUATIONS HE WAS INVOLVED IN AT THE TIME?

25   A.   I DO NOT RECALL THIS PARTICULAR EPISODE BUT I

1    RECALL THE MANY, THERE WERE THESE MATTERS THAT

2    HAPPENED WE WERE SORTING THROUGH THINGS.  THAT

3    HAPPENED A NUMBER OF TIMES.  IT'S ANOTHER ONE OF

4    THOSE.  BUT NOT MENTIONING EXACTLY WHAT THAT WAS.

5    Q.   OKAY.  NOW, YOU DON'T RECALL, THOUGH, IF YOU

6    EVER RECEIVED THIS PARTICULAR E-MAIL, RIGHT?

7    A.   I DON'T RECALL IT AT ALL.

8    Q.   OKAY.  DO YOU RECALL MR. HU SAYING,

9    COMMUNICATING TO YOU IN ANY WAY THAT IF HE HAD

10   KNOWN ABOUT THE COMPLEXITY OF THE SITUATION THAT HE

11   NOW KNOWS, HE WOULD HAVE ADOPTED A DIFFERENT

12   APPROACH TO RESOLVE MATTERS IN A SATISFACTORY AND

13   COMPLIANT MANNER?

14            MR. FAZIOLI:  OBJECTION YOUR HONOR.  THIS

15   IS JUST HEARSAY.  PLUS THERE'S A LACK OF FOUNDATION

16   ABOUT THIS DOCUMENT.

17            THE COURT:  IT'S HEARSAY, IS IT NOT?

18            MR. FONG:  IT'S PART OF THE COMPLETENESS.

19            THE COURT:  BUT IT'S NOT COMPLETING

20   ANYTHING THAT I SEE.

21            MR. FONG:  I'M SORRY, YOUR HONOR.

22            THE COURT:  I DON'T SEE WHAT IT'S

23   COMPLETING.

24   BY MR. FONG:

25   Q.   BUT YOU DID HAVE E-MAIL COMMUNICATIONS FROM

1    ALBERT HU AROUND THE FALL OF 2008; IS THAT CORRECT?

2    A.   I DON'T REMEMBER THE EXACT TIME PERIOD, BUT I

3    SUPPOSE I HAD.

4    Q.   OKAY.  AND DO YOU RECALL GETTING

5    COMMUNICATIONS FROM ALBERT HU SAYING THAT HEY, I'M

6    TRYING TO PUT OUT -- I'M TRYING TO SOLVE A LOT OF

7    PROBLEMS HERE?

8    A.   I DO RECALL FACE-TO-FACE COMMUNICATION OF THAT

9    WITH HIM.

10   Q.   ALL RIGHT.  AND DO YOU RECALL HIM SAYING THAT

11   AROUND THAT PERIOD OF TIME, SOME TIME, ANY TIME IN

12   2008 DO YOU RECALL ALBERT HU COMMUNICATING TO YOU

13   BY ANY MEANS WHATSOEVER THAT HE WAS SLOW TO RESPOND

14   TO SOME OF YOUR INQUIRIES BECAUSE HE WAS FACING

15   KIND OF A TURMOIL IN THE FINANCIAL MARKET IN ASIA?

16   A.   NO.  I RECALL SIMILAR ARGUMENTS ABOUT THINGS,

17   MATTERS, PROBLEMS.  THE ONES I RECALL ARE DIFFERENT

18   FROM THIS ONE.

19   Q.   LET ME DIRECT YOUR ATTENTION TO A DOCUMENT

20   THAT'S BEEN PREMARKED AS DEFENDANT'S EXHIBIT 569.

21   IT'S A ONE-PAGE DOCUMENT.

22   A.   UH-HUH.

23   Q.   LET ME ASK YOU, HAVE YOU HAD A CHANCE TO LOOK

24   OVER EXHIBIT 569?

25   A.   NOT YET.

1      Q.   PLEASE DO.  THANK YOU.

2      A.   I'VE READ IT.

3      Q.   OKAY.  FIRST OF ALL, DO YOU RECALL SEEING THE

4      DOCUMENT THAT'S EXHIBIT 569?

5      A.   NOT THAT PARTICULAR ONE, BUT THE GENERAL MANY

6      EXCUSES, I RECALL THAT.

7      Q.   BUT DO YOU RECALL PRINTING THIS PARTICULAR

8      DOCUMENT OUT FROM YOUR COMPUTER?

9      A.   NO.

10     Q.   OKAY.  DO YOU RECALL HANDING THIS DOCUMENT

11     OVER TO THE SEC, THE SECURITIES EXCHANGE COMMISSION

12     AS PART OF YOUR DOCUMENT PRODUCTION IN RESPONSE TO

13     THAT AGENCY'S SUBPOENA?

14     A.   I PRINTED ALL THE DOCUMENTS I HAD IN MY

15     POSSESSION AND IT MIGHT HAVE BEEN IN THERE BUT I

16     DON'T RECALL THIS ONE SPECIFICALLY.

17     Q.   OKAY.  DO YOU RECALL IF -- WELL, DID MR. HU

18     AROUND THE FALL OF 2008 TELL YOU THAT THERE WAS

19     TURMOIL IN THE FINANCIAL MARKET IN ASIA?

20     A.   I DIDN'T, BUT NOW THAT I SEE THAT E-MAIL IT

21     REFRESHES MY MEMORY, THAT'S WHAT HE MUST HAVE TOLD

22     ME.

23     Q.   OKAY.  THANK YOU.

24          NOW, LET ME ASK YOU, DO YOU RECALL

25     COMMUNICATING WITH YOUR FRIEND BOB LIN ABOUT THE

725

1    ASENQUA SITUATION IN TERMS OF WHETHER OR NOT BOB

2    LIN WAS GETTING HIS MONEY BACK FROM ASENQUA?

3    A.   I RECALL THAT, BUT FROM FIRESIDE FOR SOME

4    REASON, NOT ASENQUA.

5    Q.   OKAY.  FIRESIDE, DO YOU RECALL HAVING SOME

6    COMMUNICATIONS WITH BOB LIN REGARDING THE STATUS OF

7    BOB LIN GETTING HIS MONEY BACK FROM FIRESIDE?

8    A.   YES.

9    Q.   OKAY.  DO YOU RECALL TELLING BOB LIN THAT YOU

10   WERE AWARE THAT MANY HEDGE FUNDS HAVE STRUGGLED

11   WITH WITHDRAWAL LIQUIDITY THIS QUARTER?

12   A.   YES.

13   Q.   OKAY.  AND THAT YOU SUPPOSE THAT THE ASENQUA

14   OR FIRESIDE PEOPLE WERE NOT IMMUNE?

15   A.   YES.

16   Q.   OKAY.  AND YOU SAID THIS AROUND MARCH 2008?

17   A.   I DON'T RECALL.

18   Q.   LET ME SHOW YOU A DOCUMENT THAT'S BEEN MARKED

19   AS DEFENDANT'S EXHIBIT 560.  IT'S A ONE-PAGE

20   DOCUMENT.

21   A.   YES.

22   Q.   AND YOU RECOGNIZE THAT DOCUMENT?

23   A.   YES.

24   Q.   AND YOU RECOGNIZE THAT DOCUMENT AS AN E-MAIL

25   EXCHANGE BETWEEN YOU AND MR. BOB LIN?

1    A.    YES.

2    Q.    AND IT WAS AROUND MARCH 5TH, 2008?

3    A.    YES.

4             MR. FONG:  YOUR HONOR, AT THIS TIME I

5    WOULD MOVE DEFENDANT'S EXHIBIT 560 INTO EVIDENCE.

6             MR. FAZIOLI:  NO OBJECTION.

7             THE COURT:  I DIDN'T -- DID YOU SAY

8    SOMETHING, MR. FAZIOLI.

9             MR. FAZIOLI:  NO OBJECTION.

10            THE COURT:  OKAY.  I JUST DIDN'T HEAR

11   YOU.  IT'S ADMITTED.

12            MR. FAZIOLI:  I APOLOGIZE.

13   (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 560 HAVING

14   BEEN PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

15   ADMITTED INTO EVIDENCE.)

16            MR. FONG:  I'M GOING TO PUBLISH 560.

17   Q.    DO YOU SEE THE DOCUMENT IN FRONT OF YOU, SIR?

18   A.    YES.

19   Q.    IT HAS THE NAME MARK VERDIELL AND THEN COLON,

20   DO YOU SEE THAT?

21   A.    YES.

22   Q.    CAN YOU READ THAT PARTICULAR PARAGRAPH FOR US?

23   A.    BELOW MY NAME.

24   Q.    YES.

25   A.    HOW DID IT END UP WITH ASENQUA.  MANY HEDGE

1    FUNDS HAVE STRUGGLED WITH WITHDRAWAL LIQUIDITY THIS

2    QUARTER.  I SUPPOSE THEY WERE NOT IMMUNE.

3    Q.   THEN IT HAS THE NAME MARK?

4    A.   YES, MY NAME.

5    Q.   AND YOU SENT THIS PARTICULAR E-MAIL BOB LIN ON

6    OR ABOUT MARCH 5TH, 2008, RIGHT?

7    A.   YES.

8    Q.   NOW YOU TESTIFIED A LITTLE BIT EARLIER ABOUT

9    BOB LIN EXPRESSING HIS CONCERNS ABOUT HIS

10   INVESTMENT WITH MR. HU, RIGHT?

11   A.   YES.

12   Q.   AND THAT THE KIND OF, IF YOU WILL, WHAT THOSE

13   CONCERNS WERE HAVING IN TERMS OF IMPACT OF WHAT HE

14   WAS GOING TO DO, RIGHT?

15   A.   YES.

16   Q.   OKAY.  NOW, BOB LIN WAS NOT THE ONLY INVESTOR

17   IN FIRESIDE THAT YOU SPOKE TO, RIGHT?

18   A.   YES.

19   Q.   YOU ALSO SPOKE TO A GENTLEMAN BY THE NAME OF

20   ANDY YAN, Y-A-N; IS THAT CORRECT?

21   A.   YES.

22   Q.   AND SPECIFICALLY YOU SPOKE TO MR. YAN ABOUT

23   CONCERNS HE HAD ABOUT HIS INVESTMENT, RIGHT?

24   A.   YES.

25   Q.   OKAY.  AND IN THE COURSE OF THAT CONVERSATION,

728

1     MR. YAN TOLD YOU THAT HE HAD NOT TRUSTED ALBERT HU

2     AND THAT HE HAD THE KNOWN ALBERT HU TO LIE, RIGHT?

3              MR. FAZIOLI:  OBJECTION.  THIS IS

4     HEARSAY, YOUR HONOR.

5              MR. FONG:  YOUR HONOR, THIS IS SIMPLY AN

6     EXTENSION OF WHAT MR. VERDIELL HAD TESTIFIED TO

7     ABOUT BOB LIN'S CONCERNS, IT'S JUST REALLY THE

8     OTHER SIDE OF THE COIN.

9              THE COURT:  WHAT'S IT BEING OFFERED FOR?

10             MR. FONG:  IT'S OFFERED FOR BOTH

11    COMPLETENESS AS WELL AS MR. VERDIELL'S ACTIONS IN

12    TERMS OF WHY HE DID WHAT HE DID.

13             BECAUSE HE TESTIFIED EARLIER THAT MR. LIN

14    TOLD HIM ABOUT HIS CONCERNS AND THAT MOTIVATED HIM

15    TO ULTIMATELY TAKE CERTAIN ACTIONS.

16             MR. FAZIOLI:  I THINK THESE QUESTIONS ARE

17    FOR MR. YAN NOT MR. LIN.

18             MR. FONG:  BUT IT'S THE SAME PRINCIPLE,

19    YOUR HONOR.

20             THE COURT:  WILL YOU COME UP FOR A

21    MINUTE.

22             (SIDE-BAR DISCUSSION OFF THE RECORD.)

23             THE COURT:  WHAT ARE YOU TALKING ABOUT?

24    WHAT, IF IT WERE MR. LIN IT WOULD BE ADMISSIBLE FOR

25    THE PURPOSES OF MAYBE RAISING SOME QUESTION ABOUT

1    WHY HE TOOK THE ACTION HE TOOK BASED ON WHAT

2    MR. LIN SAID.  NOW WE ARE TALKING ABOUT YAN.

3              MR. FONG:  I'M TALKING ABOUT IT'S IT IS

4    THE SAME THING HE TALKED TO A WIDE VARIETY OF

5    INVESTORS, AMONG THEM, LIN AND YAN.  AND ALL THOSE

6    CONVERSATIONS CONTRIBUTED TO HIS DOING WHAT HE WAS

7    GOING TO DO.  THE COURT OVERRULED MY OBJECTION.

8    THE COURT SUSTAINED MY OBJECTION TO HEARSAY GROUNDS

9    BUT ALLOW THE WITNESS TO TESTIFY AS TO WHAT MR. LIN

10   SAID FOR THE PURPOSE OF ENLIGHTENING THE JURY AS TO

11   WHAT MR. LIN SAID ABOUT THE CONCERNS AND WHETHER IT

12   MOTIVATED HIM TO DO OR NOT DO SOMETHING.  IT'S

13   REALLY THE SAME THING COMING FROM ANOTHER INVESTOR.

14             MR. LUCEY:  I GUESS THERE WOULD BE TWO

15   POINTS.  ONE IS I THINK IT WAS OFFERED FOR THE

16   STATE OF MIND OF WHAT PROMPTED HIM TO WITHDRAWAL IN

17   THE FIRST PLACE.

18             THE SECOND THING IS I THINK MR. FONG CAN

19   ASK HIM DID YOU EVER A CONVERSATION WITH MR. YAN OR

20   LYNN YES OR NO.  THEN AS A RESULT OF THAT WHAT

21   ACTION DID YOU TAKE.

22             THE QUESTION IS GETTING SENSITIVE TO WHAT

23   MR. YAN SAID

24             THE COURT:  I DID THINK THAT WAS MR. LIN

25   FOR THE PURPOSE -- WHAT'S YOUR POINT?

1          MR. FONG:  IT'S THE SAME POINT THAT A

2     CO-INVESTOR'S EXPRESSION OF CONCERN MOTIVATED

3     MR. VERDIELL TO TAKE WHATEVER ACTION HE TOOK IS FOR

4     THE SAME --

5          THE COURT:  OKAY.  I UNDERSTAND THAT.

6     WHERE DOES THAT GO?

7          MR. FONG:  WELL, IT SIMPLY GOES TO WHY HE

8     WAS, WHAT WAS IMPORTANT TO MR. VERDIELL IN TERMS OF

9     WHAT HE DID, WHAT HE DIDN'T DO.

10         THE COURT:  SINCE I LET IT IN, I'M GOING

11    TO GIVE THE SAME ALLOWANCE.

12         MR. FONG:  I BELIEVE WE ARE BACK ON THE

13    RECORD.

14    Q.   MR. VERDIELL LET ME THEN ASK YOU A NEW

15    QUESTION.  BEFORE YOU WERE YOU YOUR MONEY FROM OR

16    BEFORE YOU ASKED TO WITHDRAWAL YOUR MONEY YOU HAD A

17    CONVERSATION WITH ANDY YAN, RIGHT?

18    A.   I HAD A CONVERSATION WITH ANDY YAN.  I DON'T

19    REMEMBER IF IT WAS BEFORE OR AFTER.

20    Q.   BUT YOU HAD A CONVERSATION WITH ANDY YAN

21    CONCERNING HIS CONCERNS ABOUT HIS INVESTMENT WITH

22    FIRESIDE, RIGHT?

23    A.   I UNDERSTOOD THAT HE WAS AN INVESTOR THAT

24    ASKED FOR REDEMPTION AND HADN'T GOTTEN HIS MONEY

25    BACK.  I ASKED HIM IF HE HAD GOTTEN HIS MONEY BACK.

1    Q.   AND IN THE COURSE OF THAT CONVERSATION,

2    MR. YAN TOLD YOU THAT HE HAD NOT TRUSTED ALBERT HU,

3    RIGHT?

4    A.   HE FROM WHAT I RECALL HE EXPRESSED SIMILAR

5    CONCERNS TO MR. LIN THAT HE HAD HAD EPISODES THAT

6    LEAD HIM TO BELIEVE THAT SOME OF THE THINGS THAT

7    MR. HU HAD TOLD TO HIM WERE NOT ACCURATE.

8    Q.   OKAY.  AND IN FACT MR. YAN TOLD YOU THAT HE

9    HAD KNOWN MR. HU TO HAVE LIED ON OCCASIONS, RIGHT?

10   A.   I DON'T REMEMBER THAT PARTICULAR HIM TELLING

11   HIM THAT.

12   Q.   BUT YOU DO REMEMBER THAT MR. YAN TOLD YOU THAT

13   EVEN THOUGH HE HAD NOT TRUSTED MR. HU, HE STILL

14   MADE THE DECISION TO INVEST WITH MR. HU; IS THAT

15   CORRECT?

16   A.   HE TOLD ME FROM WHAT I RECALL THAT HE HAD BEEN

17   CLOSE TO MR. HU, AND I HAVEN'T, AND I DON'T

18   REMEMBER WHY.  SO THAT HE KNEW HIM TO BE DIFFERENT,

19   TO THINK DIFFERENTLY FROM OTHERS, THAT'S HOW HE

20   PHRASED IT.  AND THAT SOMETIMES HE COULD NOT RELY

21   ON WHAT HE SAID.  THAT'S WHAT I RECALL.  IT'S A

22   LONG TIME AGO.

23          THE COURT:  LET ME JUST MAKE CLEAR THAT

24   WHAT MR. YAN MAY HAVE SAID ABOUT MR. HU CANNOT BE

25   CONSIDERED FOR WHETHER IT'S TRUE OR NOT.  THE ONLY

1    RELEVANCE IT HAS AT ALL IS WHAT INFLUENCE IT HAD ON

2    MR. VERDIELL AND WHAT ACTIONS HE TOOK.

3              MR. FONG:  THANK YOU, YOUR HONOR.

4    Q.   OKAY.  SO MR. VERDIELL, JUST TO FOLLOW UP ON

5    IT.  BUT MR. YAN TOLD YOU THAT DESPITE HIS

6    RESERVATIONS ABOUT HIS EXPERIENCE DEALING WITH

7    MR. HU, MR. YAN STILL DECIDED TO INVEST WITH

8    MR. HU; IS THAT CORRECT?

9    A.   I DON'T RECALL IT THAT WAY.  HE INVESTED -- HE

10   TOLD ME THAT HE HAD INVESTED IN MR. HU'S FUND.  I

11   DON'T RECALL OR KNOW THAT HE LINKED IT TO WHAT YOU

12   SAID.

13   Q.   LET ME DIRECT YOUR ATTENTION TO A DOCUMENT, I

14   THINK YOU STILL HAVE IT IN FRONT OF YOU.  THAT'S

15   DEFENDANT'S EXHIBIT 541-A AS IN APPLE.  IT'S THE

16   FBI REPORT OF YOUR INTERVIEW THAT WE TALKED ABOUT A

17   LITTLE BIT EARLIER.

18   A.   541 YOU SAID.

19   Q.   541-A.  YOURS WOULD NOT HAVE "A" ON IT.  I

20   APOLOGIZE.  THAT WAS THE SNAFU ON MY PART.  IT'S

21   THE FIVE-PAGE FBI REPORT OF YOUR INTERVIEW?

22   A.   UH-HUH.

23   Q.   YOU SEE THE DOCUMENT IN FRONT OF YOU, SIR,

24   RIGHT?

25   A.   YES, I DO.

1    Q.   AND THAT'S AN INTERVIEW FROM DECEMBER 24TH,

2    2008, RIGHT?

3    A.   YES.

4    Q.   OKAY.  LET ME DIRECT YOUR ATTENTION TO PAGE

5    FOUR OF THAT DOCUMENT.

6    A.   YES.

7    Q.   OKAY.  NOW, DIRECTING YOUR ATTENTION TO THE

8    SECOND PARAGRAPH FROM THE BOTTOM, AND I WILL BE

9    GLAD TO PHYSICALLY POINT THAT OUT BECAUSE I CANNOT

10   ASK YOU TO READ IT OUT LOUD.

11   A.   I THINK I KNOW WERE YOU ARE GOING.

12   Q.   IF YOU COULD READ THAT SECOND TO THE LAST

13   PARAGRAPH ON PAGE FOUR OF DEFENDANT'S

14   EXHIBIT 541-A.  IF YOU COULD READ THAT TO YOURSELF

15   SILENTLY, I WOULD APPRECIATE IT.

16        HAVE YOU HAD A CHANCE TO READ THE

17   PARAGRAPH IN ITS ENTIRETY?

18   A.   YES.

19   Q.   HAVING READ THAT PARAGRAPH, DOES THAT REFRESH

20   YOUR RECOLLECTION OF WHETHER OR NOT ANDY YAN HAD

21   TOLD YOU THAT HE HAD NOT TRUSTED MR. HU BUT HE

22   STILL NEVERTHELESS DECIDED TO INVEST WITH MR. HU?

23   A.   SO MY RECOLLECTION OF IT, AND DEFINITELY I

24   RECALL MR. YAN TELLING ME THAT ON SOME OCCASIONS HE

25   HAD NOT TRUSTED -- HE HAD NOT TRUSTED MR. HU.  THE

1    LINK BETWEEN THE TWO THAT DESPITE THAT HE STILL

2    INVESTED, I DON'T RECALL.

3    Q.   DO YOU RECALL WHEN YOU WERE INTERVIEWED BY THE

4    AGENT, THE FBI AGENTS IN THIS CASE, ON OR ABOUT

5    DECEMBER 24TH, 2008, TALKING ABOUT WITH THE AGENTS

6    DID YOU TALK WITH THE AGENTS ABOUT WHAT YOU AND

7    MR. YAN HAD TALKED ABOUT?

8    A.   IT'S TOO FAR AGO, I DON'T REMEMBER.  BUT I

9    CERTAINLY RECALL THE DISCUSSION WITH MR. YAN AND

10   HIS EXAMPLE OF WHEN HE HAD, HE ALSO HAD THOUGHTS

11   ABOUT TRUSTING MR. HU.  AND I ALSO KNOW THAT HE

12   INVESTED IN THE FUND.  SO HE HAD OBVIOUSLY BOTH.

13            SO THAT ONE CAUSE THE OTHER OR IF THERE'S

14   A LINK, I DON'T RECALL.

15   Q.   OKAY.  THANK YOU.

16            NOW, LET ME DIRECT YOUR ATTENTION TO THE

17   DECEMBER 2007 MEETING YOU HAD WITH MR. BOND, STEVE

18   BOND AND MR. HU.

19            NOW, THE, THAT WAS FOR THE PURPOSE OF

20   GOING OVER, REVIEWING I THINK IN YOUR WORDS,

21   REVIEWING THE FIRESIDE PORTFOLIO, RIGHT

22   A.   RIGHT.

23   Q.   BECAUSE OF COURSE BY THAT TIME YOU HAD

24   CONCERNS ABOUT YOUR INVESTMENT?

25   A.   YES.

1    Q.    AND THOSE CONCERNS CAME ABOUT IN PART BECAUSE

2    BOB LIN HAD SPOKEN TO YOU BEFOREHAND?

3    A.    IN PART, BUT THAT PARTICULAR ONE WAS

4    ADDRESSING THE OPAQUENESS OF THE INVESTMENT.  I

5    TALKED ABOUT IT BEFORE.

6    Q.    OKAY.  SO YOU MET WITH MR. BOND AND MR. HU TO

7    REVIEW THE PORTFOLIO OF FIRESIDE?

8    A.    I KIND OF FORCED THEM TO GO INTO PORTFOLIO

9    REVIEW, TO BE MORE EXACT.

10   Q.    DID YOU HAVE A CHANCE TO FINISH YOUR ANSWER?

11   A.    YES.

12   Q.    NOW DURING THAT MEETING, AND BY THE WAY THAT

13   MEETING WAS DECEMBER 12TH, 2007; IS THAT CORRECT?

14   A.    I BELIEVE THAT'S CORRECT, YES.

15   Q.    OKAY.  AND NOW, DURING, IN FACT YOU TOOK NOTES

16   OF THAT MEETING, DID YOU NOT?

17   A.    YES.

18   Q.    AND DURING THAT MEETING, DID MR. BOND SHOW YOU

19   SPECIFIC LONG, SHORT TRADES THAT FIRESIDE WAS

20   ENGAGING IN, RIGHT?

21   A.    YES.

22   Q.    AND YOU SAID THERE WERE ABOUT TEN PAIRS OF

23   THESE, RIGHT?

24   A.    YES.  IT DIDN'T SHOW ME ALL OF THEM.

25   Q.    OKAY.

1    A.   IT GAVE SEVERAL EXAMPLES.  SO I DIDN'T SEE ALL

2    TEN.  OKAY.

3    Q.   YOU WERE AWARE THERE WERE ABOUT TEN?

4    A.   THAT'S WHAT THEY SAID.

5    Q.   OKAY.  AND THIS WAS, THIS INFORMATION WAS

6    BROUGHT UP ON MR. BOND'S COMPUTER, RIGHT?

7    A.   NO.  I THINK IT WAS OUT OF MR. HU'S COMPUTER,

8    HE HAD A PRESENTATION.  IT'S HARD TO RECALL.  MY

9    RECOLLECTION IS THAT MR. BOND'S COMPUTER ALWAYS HAD

10   THE TRADING THINGS THAT HE WAS ALWAYS SUPPOSEDLY

11   TRADING.

12   Q.   OKAY.  BUT AFTER THAT PARTICULAR MEETING,

13   AFTER SEEING THE FIRESIDE PORTFOLIO YOU WERE

14   SATISFIED AT THAT POINT TO CONTINUE WITH YOUR

15   INVESTMENT; IS THAT CORRECT?

16   A.   YES.  MY CONCERNS WERE ONE NOTCH DOWN.  SO THE

17   BETTER WAY TO SATISFY, NO, I DIDN'T GET A COMPLETE

18   DISCLOSURE BUT I WAS, MY WORRY WENT DOWN.  MY LEVEL

19   OF WORRY WENT DOWN IS A BETTER WAY TO SAY IT.

20   Q.   OKAY.  AGAIN, HAVE YOU FINISHED YOUR ANSWER?

21   A.   YES.

22   Q.   WELL, THANK YOU VERY MUCH.  I APPRECIATE YOUR

23   PATIENCE.

24            MR. FONG:  I HAVE NO MORE QUESTIONS,

25   YOUR HONOR.

1          THE COURT:  LET'S TAKE A RECESS FOR

2     15 MINUTES.

3               (WHEREUPON A RECESS WAS TAKEN.)

4               THE COURT:  ALL RIGHT.

5               MR. FAZIOLI, ANY FURTHER QUESTIONS?

6               MR. FAZIOLI:  YEAH, JUST A SHORT NUMBER

7     OF QUESTIONS.

8               MR. FAZIOLI:  MS. BURNEY, COULD YOU

9     PLEASE PUBLISH TO THE JURY DEFENDANT'S EXHIBIT 560.

10

11          **REDIRECT EXAMINATION BY MR. FAZIOLI**

12

13     BY MR. FAZIOLI:

14     Q.   THIS IS AN E-MAIL EXCHANGE BETWEEN YOU AND

15     MR. LIN, CORRECT?

16     A.   YES.

17     Q.   ALL RIGHT.  AND YOU SEE HOW IN YOUR, YOU MAKE

18     A REFERENCE IN THAT E-MAIL SAYING I SUPPOSE THEY

19     WERE NOT IMMUNE, REFERENCING TO THE ASENQUA FUND?

20     A.   YES.

21     Q.   DID YOU HAVE ANY INDEPENDENT OR VERIFIED

22     KNOWLEDGE THAT THE ASENQUA FUND WAS SOMEHOW NOT

23     IMMUNE OR WERE YOU RELYING ON WHAT MR. LIN HAD TOLD

24     YOU?

25     A.   NO, I DIDN'T KNOW THAT.

1    Q.   THERE'S A RESPONSE AT THE TOP OF THE E-MAIL.

2    CAN YOU READ WHAT THE RESPONSE TO THE E-MAIL IS

3    INTO THE RECORD?

4    A.   ITS SAYS UNFORTUNATELY NOT YET, THE WORST PART

5    IS THE CONTINUING OPAQUENESS OF ALBERT'S NON

6    INFORMATION USING COMPLIANCE ISSUE NOT DISCLOSE

7    ANYTHING GOOD OR BAD.

8    Q.   IN FACT IT WAS A COUPLE WEEKS AFTERWARDS THAT

9    YOU SUBMITTED THE WITHDRAWAL FORM, CORRECT?

10   A.   YES.

11   Q.   I THINK THERE WERE A NUMBER OF QUESTIONS ABOUT

12   GOVERNMENT EXHIBIT 12, RIGHT.  THIS IS THE FIRESIDE

13   PPM?

14   A.   YES.

15   Q.   AND YOU RECALL THIS IS THE DOCUMENT THAT HAS

16   THE REFERENCES TO THE GLOBEOP ADMINISTRATIVE FIRM,

17   CORRECT?

18   A.   YES.

19   Q.   AND ALSO MAKES REFERENCE TO THE CASTILLO, LYN,

20   COHEN & VIJAY FIRM BEING THE AUDITORS FOR THE FUND,

21   CORRECT?

22   A.   YES.

23   Q.   AND ALSO MAKES REFERENCE TO SIELOR BEING THE

24   ACCOUNTANTS FOR THE FUND?

25   A.   YES.

1    Q.   YOU TESTIFIED THESE ARE DOCUMENTS YOU

2    REVIEWED, THIS DOCUMENT EXHIBIT 12 YOU REVIEWED

3    PRIOR TO INVESTING, CORRECT?

4    A.   YES.

5    Q.   AND YOU RELIED ON EXHIBIT 12 BEING CORRECT?

6    A.   YES.

7    Q.   AND THE DEFENSE COUNSEL ASKED YOU A NUMBER OF

8    QUESTIONS ABOUT A MEETING YOU HAD WITH THE FBI IN

9    DECEMBER 2008, CORRECT?

10   A.   YES.

11   Q.   AND YOU'VE HAD SUBSEQUENT MEETINGS WITH THE

12   FBI SINCE THEN, CORRECT?

13   A.   YES.

14   Q.   AND IN THOSE MEETINGS HAVE YOU BEEN ASKED

15   WHETHER, IF FOR EXAMPLE GLOBEOP HAD NOT BEEN

16   RETAINED AS THE HEDGE FUND ADMINISTRATOR FOR THE

17   FIRESIDE FUND, WHETHER THAT WOULD HAVE INFLUENCED

18   YOUR DECISION TO HAVE INVESTED?

19   A.   YES, I'VE BEEN ASKED THAT QUESTION.

20   Q.   AND WHEN ASKED THOSE QUESTIONS, GENERALLY WHAT

21   HAS YOUR RESPONSE BEEN?

22   A.   THAT IF I HAD KNOWN THAT I WOULD NOT HAVE

23   INVESTED.

24   Q.   SO THIS IS NOT SOMETHING YOU ARE ASKING FOR

25   THE FIRST TIME ON THE STAND?

1    A.   ABSOLUTELY NOT.

2    Q.   AGAIN, THE SAME QUESTION FOR CASTILLO, LYN,

3    HAVE YOU BEEN PREVIOUSLY ASKED WHETHER IF CASTILLO

4    DIDN'T EXIST AS AN INDEPENDENT AUDITING FIRM WOULD

5    THAT HAVE INFLUENCED YOUR DECISION TO INVEST?

6    A.   YES.

7    Q.   AND HOW DID YOU RESPOND?

8    A.   I RESPONDED THE SAME.  IF I HAD KNOWN THAT WAS

9    NOT A TRUE STATEMENT, I WOULD HAVE NOT INVESTED OF

10   COURSE.

11   Q.   AND SIMILARLY, YOU HAVE BEEN PREVIOUSLY ASKED

12   QUESTIONS IN A SIMILAR FASHION ABOUT SIELOR,

13   WHETHER OR NOT BEING THE ACCOUNT BEING FIRM FOR THE

14   FIRESIDE FUND?

15   A.   YES.  THOSE WOULD HAVE ALL BEEN MAJOR

16   MISREPRESENTATIONS THAT WOULD HAVE CAUSED ME NOT TO

17   INVEST.

18   Q.   AND THESE ARE QUESTIONS THAT YOU WERE ASKED BY

19   THE GOVERNMENT BEFORE, CORRECT?

20   A.   YES.

21   Q.   DRAWING YOUR ATTENTION AGAIN TO GOVERNMENT

22   EXHIBIT 12.  AND THERE WAS A NUMBER OF QUESTIONS

23   THAT MR. FONG ASKED YOU ABOUT HOW THE LANGUAGE OF

24   THE PPM INDICATED THAT THERE WAS A SUBSTANTIAL RISK

25   OF LOSS, CORRECT?

1    A.   YES.

2    Q.   DID YOU UNDERSTAND BEFORE YOU INVESTED WITH

3    ALBERT HU THAT THERE WAS A SUBSTANTIAL RISK THAT

4    YOU COULD LOSE MONEY IF THE MONEY WAS ACTUALLY

5    INVESTED, CORRECT?

6    A.   YES.

7    Q.   WAS IT YOUR UNDERSTANDING -- WITHDRAW THAT.

8         DID ALBERT HU EVER COMMUNICATE TO YOU

9    THAT THERE WAS A SUBSTANTIAL RISK OF LOSS IN THAT

10   YOUR MONEY COULD BE USED TO PAY OTHER INVESTORS?

11   A.   NO, NEVER MENTIONED THAT.

12   Q.   HE NEVER MENTIONED THAT WAS THE SUBSTANTIAL

13   RISK OF LOSS THAT YOU COULD FACE?

14   A.   YES.  AND HE NEVER MENTIONED THAT THE MONEY

15   COULD BE USED TO GO TO OTHER INVESTORS.

16   Q.   SO DID ALBERT HU EVER TELL YOU HE HAD TAKEN

17   $600,000 OF YOUR MONEY AND PAID ANDY YAN WITH IT?

18   A.   NO.

19   Q.   OKAY.  DID ALBERT HU EVER INDICATE TO YOU THAT

20   PART OF THE SUBSTANTIAL RISK OF LOSS THAT YOU FACED

21   INVESTING IN THE FIRESIDE FUND WAS THAT HE MIGHT

22   TAKE A SUBSTANTIAL PORTION OF YOUR MONEY AND USE IT

23   FOR PERSONAL EXPENSES?

24   A.   NO, I WAS NEVER TOLD THAT.

25   Q.   AND THERE WERE ALSO SOME QUESTIONS ABOUT THE

1    RISK OF LOSS IN THE MARKET.  DID ALBERT HU EVER

2    COMMUNICATE TO YOU THAT ALL OF YOUR MONEY HAD BEEN

3    LOST IN THE MARKET?

4    A.   NO.  QUITE THE CONTRARY.  HE INDICATED SEVERAL

5    TIMES I WOULD GET MY MONEY BACK.

6    Q.   THERE WERE A SERIES OF QUESTIONS ABOUT THE

7    LANGUAGE OF THE WITHDRAWAL PERIOD AND ABOUT A

8    12-MONTH PERIOD, DO YOU RECALL THOSE QUESTIONS?

9    A.   YES.

10   Q.   NOW YOU INVESTED YOUR MONEY WITH MR. HU NEAR

11   THE END OF APRIL 2007, CORRECT?

12   A.   YES.

13   Q.   AND YOU SUBMITTED YOUR WITHDRAWAL FORM, WHICH

14   IS EXHIBIT 66, THAT WAS IN THE MIDDLE OF

15   MARCH 2008, CORRECT?

16   A.   YES.

17   Q.   AND WHEN YOU SUBMITTED THAT WITHDRAWAL FORM,

18   THAT WAS WITHIN A YEAR, IT WAS LESS THAN 12 MONTHS

19   AFTER YOU INVESTED YOUR MONEY, CORRECT?

20   A.   SLIGHTLY LESS, YES.

21   Q.   WHEN YOU DID THAT, WHEN YOU SUBMITTED THAT

22   WITHDRAWAL FORM, DID ALBERT HU EXPRESS CONCERNS TO

23   YOU THAT YOU SUBMITTED IT LESS THAN 12 MONTHS AFTER

24   YOU INVESTED IT?

25   A.   NO, NOT AT ALL.

1    Q.   AND I THINK YOU SAID SOMETHING TO THE EFFECT

2    THAT MR. HU HAD INDICATED THERE WAS ALREADY A

3    PROCESS GOING ON BY WHICH YOUR MONEY WOULD BE

4    RETURNED, CORRECT?

5    A.   YES.  HE SAID HE WOULD HAVE RETURNED MY MOAN

6    ANY HOW BECAUSE HE WAS CHANGING THE STRUCTURE OF

7    THE FUND.

8    Q.   NOW EVENTUALLY A YEAR TIME PASSES BETWEEN THE

9    TIME YOU INVESTED YOUR MONEY IN LATE APRIL AND

10   THE -- EVENTUALLY A YEAR PASSES, CORRECT?

11   A.   YES.

12   Q.   SO MOVE TO THE TIME FRAME OF LATE APRIL 2008.

13   AT THIS POINT YOU'VE EXPRESSED -- HAD YOU EXPRESSED

14   TO ALBERT HU YOUR DESIRE TO GET YOUR MONEY BACK?

15   A.   YES AND I SUBMITTED MY REDEMPTION FORM

16   ALREADY.

17   Q.   AND YOU -- NOW AT THAT POINT AFTER A YEAR HAS

18   PASSED, DID YOU GET YOUR MONEY BACK?

19   A.   NO.

20   Q.   AND THERE WAS SOME LANGUAGE THAT MR. FONG

21   TALKED ABOUT THE DISCRETION OF THE GENERAL PARTNER,

22   DID YOU SEE THAT?

23   A.   YES.

24   Q.   DID MR. HU EVER COMMUNICATE TO YOU THAT HE WAS

25   EXERCISING HIS DISCRETION AS A GENERAL PARTNER AND

1    NOT GOING TO PAY BACK ANY OF YOUR MONEY?

2    A.   NO, HE NEVER SAID ANYTHING ABOUT THAT.

3            MR. FAZIOLI:  NO FURTHER QUESTIONS,

4    YOUR HONOR.

5            MR. FONG:  NOTHING FURTHER.

6            THE COURT:  ALL RIGHT.  YOU MAY BE

7    EXCUSED.  THANK YOU.

8            MR. LUCEY:  YOUR HONOR, THE GOVERNMENT

9    NOW CALLS LYNN BORN TO THE STAND.

10           THE COURT:  ALL RIGHT.  WOULD YOU COME

11   FORWARD, PLEASE, MA'AM.

12           THE CLERK:  I WILL SWEAR YOU IN.

13

14                           **LYNN BORN,**

15   BEING CALLED AS A WITNESS ON BEHALF OF THE

16   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

17   EXAMINED AND TESTIFIED AS FOLLOWS:

18

19           THE WITNESS:  I DO.

20           THE CLERK:  PLEASE STATE YOUR FULL NAME

21   AND SPELL YOUR LAST NAME FOR THE RECORD.

22           THE WITNESS:  LYNN PATRICIA BORN.

23   B-O-R-N.

24           **DIRECT EXAMINATION BY MR. LUCEY**

25

1    BY MR. LUCEY:

2    Q.   GOOD AFTERNOON, MS. BORN.

3    A.   GOOD AFTERNOON.

4    Q.   WHERE DO YOU CURRENTLY RESIDE?

5    A.   IN SAN CARLOS.

6    Q.   AND HOW LONG HAVE YOU LIVED THERE?

7    A.   3, 4 YEARS NOW.

8    Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

9    A.   AT SIELOR, LLP.

10   Q.   AND WHAT IS SIELOR, LLP?

11   A.   SIELOR IS A REGIONAL ACCOUNTING FIRM WITH TWO

12   OFFICES, ONE IN SAN FRANCISCO AND ONE IN SILICON

13   VALLEY.

14   Q.   APPROXIMATELY HOW MANY EMPLOYEES DOES --

15   A.   140.

16   Q.   ALL TOGETHER?

17   A.   UH-HUH.

18   Q.   WHAT IS YOUR POSITION THERE?

19   A.   I'M THE CHIEF OPERATING OFFICER.

20   Q.   WHAT DOES THAT MEAN IN PRACTICAL TERMS?

21   A.   IT MEANS THAT I OVERSEE THE BUSINESS

22   OPERATIONS OF THE FIRM AND WORK DIRECTLY WITH THE

23   MANAGING PARTNER, WORK WITH THE PARTNERS AND

24   OVERSEE THE ADMINISTRATION STAFF.

25   Q.   DOES YOUR JOB DUTIES INCLUDE INVOLVEMENT WITH

1    THE CLIENT DATABASE OF THE FIRM?

2    A.   YES.

3    Q.   HOW ARE THE CLIENT RECORDS MAINTAINED AT

4    SIELOR IN GENERAL TERMS?

5    A.   WE HAVE A LARGE DATABASE THAT HAS ALL THE DATA

6    ABOUT THE CLIENT STORED IN THAT DATABASE.

7    Q.   AND IS THAT DATABASE ELECTRONIC OR PAPER?

8    A.   ELECTRONIC.

9    Q.   HOW FAR BACK, IF YOU KNOW, DO THOSE RECORDS

10   GO?

11   A.   2000 FORWARD.

12   Q.   THE YEAR 2000?

13   A.   CORRECT.

14   Q.   GOING FORWARD?

15   A.   CORRECT.

16   Q.   AND IS THAT A SEARCHABLE DATABASE?

17   A.   YES.

18   Q.   COULD YOU DESCRIBE HOW THAT DATABASE IS

19   SEARCHABLE?

20   A.   IT'S YOUR CLASSIC DATABASE.  YOU OPEN IT UP

21   TYPE ANY WORD YOU WANT TO SEARCH AND YOU SEARCH IT

22   THROUGH THE DATABASE AND IT WILL PULL UP THE WORD

23   IN ANY OF THE ENTRIES.

24   Q.   WHY IS IT IMPORTANT FOR YOUR FIRM TO HAVE

25   RECORDS AS TO ITS CLIENTS, THE CLIENTS IT CURRENTLY

1    MAINTAINS?

2    A.   IT'S THE LIFE AND BLOOD OF OUR FIRM AND IT

3    TRACKS ALL OF THE INFORMATION ABOUT THE CLIENTS

4    ALSO TRACKS THE TIME AND THE BILLING FOR THE CLIENT

5    AS WELL, SO HOW MUCH YOU ARE GOING TO BILL YOUR

6    CLIENT.

7    Q.   AND IS THAT ALSO IMPORTANT FOR THE POINT OF

8    VIEW OF THE EMPLOYEES OF SIELOR FOR BILLING

9    CLIENTS?

10   A.   ABSOLUTELY.

11   Q.   COULD YOU EXPLAIN THAT?

12   A.   IF YOU ARE GOING TO WORK ON A CLIENT YOU DO

13   THE WORK ON THE CLIENT, YOU CALL UP THE DATABASE,

14   YOU ENTER THE TIME THAT YOU PUT IN, YOU ENTER THE

15   JOB THAT YOU DID, YOU CLOSE THE TIME, WE CLOSE IT

16   EVERY MONTH, THEN THAT FLOWS INTO CREATING THE

17   INVOICES AND BILLS SENT TO THE CLIENTS.

18   Q.   SO FAIR TO SAY THE CLIENT DATABASE IS USED TO

19   ASSIST THE ACCOUNTANTS IN THEIR WORK IN THE SENSE

20   OF GENERATING BILLING RECORDS?

21   A.   CORRECT.

22   Q.   AND IN TERMS OF THE RECORD DATABASES IS THE

23   CLIENT DATABASE KEPT UPDATED?

24   A.   YES.

25   Q.   AND YOU ALREADY MENTIONED HOW FAR BACK THE

1    RECORDS GO.  WHAT HAPPENS IF SIELOR IF A CLIENT NO

2    LONGER WISHES TO DO WORK WITH THE SIELOR FORM FOR

3    WHATEVER REASON?

4    A.   IT STAYS IN THE DATABASE SO THAT IT'S

5    SEARCHABLE BUT WE WOULD MARK IT AS A TERMINATED

6    CLIENT.

7    Q.   BUT IT WOULD NOT BE DELETED FROM THE DATABASE?

8    A.   CORRECT.  NO.

9    Q.   NOW WHAT HAPPENS IF A CLIENT OF SIELOR WERE TO

10   CONTACT SIELOR AND ASK THAT ITS NAME BE REMOVED

11   FROM YOUR RECORD DATABASE AS A FORMER CLIENT?

12   A.   WE WOULD NEVER DO SUCH A THING.

13   Q.   WHY NOT?

14   A.   IT'S DISTURBING THE RECORDS OF OUR FIRM.  IT'S

15   AN INAPPROPRIATE REQUEST.

16   Q.   SO IS THE MAINTAIN THE INTEGRITY OF THE

17   RECORDS SOMETHING THAT'S IMPORTANT TO THE SIELOR

18   FIRM?

19   A.   ABSOLUTELY.

20   Q.   AGAIN, WHY IS THAT IMPORTANT?

21   A.   IT'S THE LIFE BLOOD OF THE FIRM.  IT'S

22   EVERYTHING TO THE FIRM.  IT'S OUR CLIENTS, IT'S HOW

23   WE RUN OUR BUSINESS.

24   Q.   NOW, MS. BORN, WERE YOU AT SOME POINT

25   CONTACTED, PRIOR TO TODAY, CONTACTED BY THE

1    GOVERNMENT AND ASKED TO DO A SEARCH OF YOUR CLIENT

2    DATABASE IN REGARD TO MR. ALBERT HU AND RELATED

3    ENTITIES?

4    A.   YES.

5    Q.   WERE YOU INVOLVED IN THAT SEARCH?

6    A.   YES, I WAS.

7    Q.   WHAT WAS THE TIME FRAME WHEN YOU CONDUCTED

8    THIS SEARCH OF YOUR RECORDS?

9    A.   IT WAS JANUARY 2009.

10   Q.   AND HOW FAR BACK IN TIME DID THAT SEARCH GO,

11   WHERE WAS IT LOOKING FOR RECORDS?

12   A.   2000 FORWARD.

13   Q.   SO FROM THE YEAR 2000 UP TO THE DATE OF THE

14   SEARCH?

15   A.   CORRECT.

16   Q.   DO YOU RECALL GENERALLY WHAT TERMS WERE

17   SEARCHED FOR?

18   A.   WE RECEIVED A LIST OF NAMES AND WE BROKE IT

19   DOWN WORD BY WORD AND SEARCHED FOR EVERY WORD IN

20   THE EVENT THAT THERE WAS A MISSPELLING OR IT HAD

21   BEEN ENTERED INCORRECTLY.  SO WE WENT WORD BY WORD.

22   Q.   THAT WOULD BE WHAT, IT WOULD BE A SEARCH THAT

23   WOULD INCLUDE VARIATIONS OF A GIVEN PERSON'S NAME

24   OR ENTITY'S NAME?

25   A.   CORRECT.

1    Q.   SO IT WOULDN'T HAVE TO BE SPELLED EXACTLY

2    RIGHT TO POTENTIALLY TURN UP IN THE RECORD?

3    A.   YOU WOULD SPELL THE WORD RIGHT BUT WE

4    SEGREGATED EACH WORD.

5    Q.   UNDERSTOOD.  DID THE NAME ALBERT HU EVER

6    APPEAR IN YOUR RECORD DATABASE?

7    A.   IT DID NOT.

8    Q.   WHAT ABOUT ASENQUA?

9    A.   IT DID NOT.

10   Q.   HOW ABOUT FIRESIDE?

11   A.   NO.

12   Q.   FIRESIDE LS?

13   A.   NO.

14   Q.   SO JUST SO WE ARE CLEAR, DID YOU FIND ANY

15   RECORDS IN SIELOR'S DATABASE GOING BACK TO THE YEAR

16   2000 FOR ALBERT HU, ALBERT K. HU, ASENQUA, FIRESIDE

17   LS FUND, AQC OR ANY OTHER ENTITY ASSOCIATED WITH

18   THE DEFENDANT?

19   A.   NONE.

20   Q.   AND MS. BORN, WOULD YOU HAVE FOUND SUCH RECORD

21   FIST A PERSON OR ENTITY NAMELY MR. HU OR THE

22   ASSOCIATE ENTITIES THAT I MENTIONED HAD EVER BEEN A

23   CLIENT OF THE SIELOR FIRM?

24   A.   YES.

25   Q.   HOW CAN YOU BE SO SURE?

1    A.   YOU WOULD EVERY TIME YOU GET A NEW CLIENT THE

2    FIRST THING YOU DO IS ASSIGN A CLIENT NUMBER AND

3    PUT THEM IN THE DATABASE.

4         SO IN ORDER TO HAVE A CLIENT AND SEND

5    INVOICES FOR THE WORK YOU'VE DONE, THEY HAVE TO BE

6    IN YOUR DATABASE.

7    Q.   AND MS. BORN, SO SITTING HERE TODAY, AND AGAIN

8    YOU ARE STILL THE CHIEF OPERATING OFFICER THEN AND

9    NOW OF THE SIELOR FIRM?

10   A.   CORRECT.

11   Q.   BOTH WHEN YOU DID THE SEARCH IN 2009 AND

12   CURRENTLY?

13   A.   CORRECT.

14   Q.   BASED ON YOUR SEARCH OF THE SIELOR RECORDS AND

15   THE EFFORTS YOU MADE DO YOU HAVE ANY REASON TO

16   BELIEVE THAT MR. HU, FIRESIDE OR THE ASENQUA

17   ENTITIES WERE EVER A PART OF OR ASSOCIATED AS A

18   CLIENT WITH THE SIELOR FIRM?

19   A.   I HAVE NO REASON TO BELIEVE SO.

20   Q.   NOW PUTTING ASIDE THE RECORD DATABASE, DID YOU

21   TAKE ANY FURTHER STEPS TO DETERMINE IF MR. HU OR

22   THOSE ENTITIES I MENTIONED, ASENQUA AND FIRESIDE,

23   AND OTHERS HAD EVER BEEN ASSOCIATED WITH THE SIELOR

24   FIRM?

25   A.   YES, I DID.

1    Q.    WHAT WAS THAT ADDITIONAL STEP YOU TOOK?

2    A.    WE PULLED THE PARTNERS WHICH IS A PRETTY

3    STANDARD THING TO DO IN AN ACCOUNTING FIRM WHERE WE

4    E-MAILED THE ENTIRE LIST OF NAMES TO THE PARTNERS

5    AND SAID ARE YOU AWARE OF ANY OF THOSE NAME.

6    Q.    WHAT WAS THE TIME FRAME IN THE POLLING WAS

7    CONDUCTED?

8    A.    JANUARY OR FEBRUARY 2009.

9    Q.    AROUND THE SAME TIME?

10   A.    YES.

11   Q.    WHAT WERE THE RESULTS OF THAT SEARCH, THE

12   POLLING EFFORT?

13   A.    NONE OF THE PARTNERS MUCH AWARE OF THOSE NAME.

14   Q.    DID THE FACT YOU DID THIS POLLING ON TOP OF

15   THE DATABASE SEARCH, DID THAT MAKE YOU MORE OR LESS

16   CERTAIN OF THE RESULTS OF THE DATABASE SEARCH?

17   A.    YES, IT MADE ME MORE CERTAIN.

18   Q.    WE HAVEN'T TALKED ABOUT THIS BUT I WANT TO ASK

19   YOU BRIEF QUESTIONS ON THIS.

20         WHAT KIND OF WORK DOES SIELOR DO?  YOU

21   MENTIONED IT'S AN ACCOUNTING FIRM.  CAN YOU

22   DESCRIBE FOR THE JURY WHAT KIND OF WORK YOU DO AS A

23   REGIONAL ACCOUNTING FIRM?

24   A.    SURE.  WE SPECIALIZE IN HIGH NET WORTH CLIENT

25   CUBICLES AND THEY OFTEN OWN BUSINESSES SO WE ALSO

1    DO WORK FOR THEIR BUSINESSES AS WELL.

2              SO WE DO INDIVIDUAL TAX WORK OR TAX WORK

3    FOR THEIR FIRMS AS WELL.  WE DO A SMALL AMOUNT OF

4    AUDITS.  WE HAVE A FAMILY OFFICE WHERE WE SERVE THE

5    VERY HIGH NET WORTH ON THEIR DAY TO DAY NEED

6    CUBICLES AND WE HAVE A SMALL LITIGATION SUPPORT

7    GROUP AS WELL.

8    Q.   AND IS THE IS IT FAIR TO SAY THAT SIELOR LOS

9    ANGELES A SIGNIFICANT REPUTATION ON A REGIONAL

10   BASIS FOR ITS ACCOUNTS WORK FOR ITS CLIENTS?

11   A.   YES.

12   Q.   HOW CAN YOU SAY THAT?

13   A.   OUR CLIENTS ARE, MANY OF THEM ARE OF THE UPPER

14   ECHELON IN SILICON VALLEY, THE ULTRAHIGH NET WORTH

15   THEY ARE VERY WELL NETWORKED THEY SERVE ON BOARDS

16   IN THE VALLEY AND CALIFORNIA IN THE UNITED STATES.

17             WE HAVE BEEN RATED ONE OF THE TOP 25 BEST

18   OF THE BEST FIRMS FOR EIGHT YEARS IN A ROW, WE'RE

19   THE LEADING ONE THAT DOES THE AMOUNTS OF

20   INFORMATION, SO WE HAVE A REPUTATION.

21   Q.   IS ONE OF THE FOCUSES OF BOTH YOUR CURRENT AND

22   POTENTIAL CLIENTS INDIVIDUALS WORK NOTHING AND

23   AROUND SILICON VALLEY?

24   A.   YES.

25   Q.   AND IS YOUR FIRM'S REPUTATION TO YOUR BUSINESS

```
1    IS THAT IMPORTANT TO YOU?

2    A.   YES.

3            MR. FONG:  OBJECTION.  RELEVANCE.

4            THE COURT:  I THINK YOU HAVE MADE YOUR

5    POINT.

6            MR. LUCEY:  FAIR ENOUGH, YOUR HONOR.

7    Q.   I WANT TO NOW SHOW YOU EXHIBIT 12 PREVIOUSLY

8    INTRODUCED INTO EVIDENCE.

9            MS. BORN, I'M SHOWING YOU A DOCUMENT OF

10   EXHIBIT 12.  PREVIOUSLY MARKED AND ALSO ALREADY IN

11   EVIDENCE.

12           HAVE YOU SEEN THIS DOCUMENT BEFORE?

13   A.   YES.

14   Q.   I WANTED TO TURN YOUR ATTENTION NOW TO PAGE 29

15   AND, OF THIS DOCUMENT?

16   A.   TO BE CLEAR, I SAW A PRIVATE PLACEMENT

17   MEMORANDUM BUT IT MIGHT HAVE BEEN ASENQUA, NOT THIS

18   PARTICULAR ONE.  TO WHICH PAGE?

19   Q.   LET ME SHOW YOU THE FIRST PAGE AGAIN.  SO

20   LOOKING AT THE FIRST PAGE NOW.

21   A.   OKAY.

22   Q.   OF EXHIBIT 12 JUST SO WE ARE CLEAR.

23           WHAT IS THE FIRST LINE OF THAT DOCUMENT

24   READ, MS. BORN?

25   A.   THE FIRESIDE LS FUND LP.
```

1    Q.   WHAT IS THE DATE OF THE DOCUMENT DOWN BELOW?

2    A.   JUNE 30TH, 2005.

3    Q.   NOW IF YOU COULD CALL YOUR ATTENTION TO PAGE

4    29 OF THIS DOCUMENT.  I CALL YOUR ATTENTION TO THE

5    NEXT TO LAST PARAGRAPH.  WE ARE GOING TO BLOW UP

6    THAT PORTION ON THE SCREEN.

7             IF YOU COULD READ THE FIRST SENTENCE,

8    MS. BORN AFTER THE BOLDED TEXT THAT READS, REPORTS

9    TO PARTNERS.

10   A.   IT SAYS SIELOR AND CPA COMPANY, THE FUND'S

11   ACCOUNTANTS WILL AUDIT THE FUND'S BOOKS AND RECORDS

12   AS OF THE END OF EACH FISCAL YEAR, COMMENCING WITH

13   THE FUND'S FIRST FIT CAL YEAR.

14   Q.   OKAY.  THANK YOU.  MS. BORN, BASED ON YOUR

15   TESTIMONY EARLIER TODAY, THERE'S NO REASON TO THINK

16   THAT SIELOR, YOUR SIELOR FIRM WHERE YOU ARE THE

17   COO, ACTED AS THE ACCOUNTANTS IN CONNECTION WITH

18   THIS DOCUMENT, IS THERE?

19   A.   THERE'S NO REASON TO THINK SO.

20   Q.   AND IN FACT THERE'S NO REASON TO THINK THE

21   SIELOR FIRM HAD ANYTHING TO DO WITH THIS DOCUMENT?

22   A.   CORRECT.

23   Q.   OR THE FIRESIDE LS FUND?

24   A.   CORRECT.

25   Q.   SO WHERE THAT DOCUMENT NOW SAYS SIELOR AND CPA

1    CO, THE FUND'S ACCOUNTANTS, WHERE YOU JUST READ?

2    A.   YES.

3    Q.   IS THAT FIRST SENTENCE IS THAT TRUE?

4         MR. FONG:  OBJECTION.  OBJECTION.

5    ARGUMENTATIVE.

6         THE COURT:  I WILL ALLOW THE QUESTION.

7         THE WITNESS:  IT IS NOT TRUE THAT WE WERE

8    THE FUND'S ACCOUNTANTS.

9    BY MR. LUCEY:

10   Q.   AND WHY DO YOU SAY THAT?

11   A.   BECAUSE OF THE DATABASE.  AND BECAUSE OF THE

12   POLLING OF THE PARTNERS.

13   Q.   OKAY.

14        MR. LUCEY:  NO FURTHER QUESTIONS,

15   YOUR HONOR.

16        MR. FONG:  NO QUESTIONS, YOUR HONOR.

17        THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

18        THANK YOU.

19        MR. FAZIOLI:  YOUR HONOR, MAY WE APPROACH

20   BRIEFLY ABOUT SCHEDULING?

21        (SIDEBAR DISCUSSION.)

22        MR. FAZIOLI:  YOUR HONOR, WE ARE MOVING A

23   LOT QUICKER THAN WE THOUGHT IN LIGHT OF THE LENGTH

24   OF THE CROSS-EXAMINATION OF THE OTHER VICTIM, WE

25   HAVE ALSO BEEN WORKING TO STREAMLINE OUR CASE.

1          I WOULD ANTICIPATE THAT WE WOULD HAVE

2     PERHAPS THREE MORE WITNESSES THAT WE -- WE MAY BE,

3     WE THINK WE COULD SUBMIT THE WITNESSES ON MONDAY

4     AND WOULD SUGGEST, IF POSSIBLE, IF IT'S NOT TOO

5     INCONVENIENT, THAT WE PERHAPS ADJOURN FOR THE DAY.

6     AND WE HAVE TWO SHORTER CIVILIAN WITNESSES POSSIBLY

7     A THIRD BUT PROBABLY NOT AND THEN THE CASE AGENT.

8          MR. LUCEY:  THEY ARE BOTH UNAVAILABLE

9     TODAY.

10          MR. FAZIOLI:  THERE WERE ISSUES OF THEIR

11     AVAILABILITY.

12          SO I THINK IF IT'S ACCEPTABLE WE COULD

13     ADJOURN A LITTLE EARLY.  I DON'T THINK I WOULD

14     BE --

15          THE COURT:  WE DON'T HAVE A CHOICE, DO

16     WE.

17          MR. FAZIOLI:  I THINK WE ARE CERTAINLY

18     WITHIN THE SIX-DAY TIME FRAME.  WE WILL CERTAINLY

19     FINISH ON MONDAY.

20          THE COURT:  TODAY WENT A LITTLE MORE

21     QUICKLY THAN COUNSEL ANTICIPATED.  SO YOU ARE FREE

22     TO GO FOR TODAY AND WE WILL SEE YOU MONDAY AT 1:00.

23     REMEMBER NOT TO TALK ABOUT THE CASE AND HAVE A GOOD

24     WEEKEND.

25          (WHEREUPON, THE FOLLOWING PROCEEDINGS

758

1    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

2           THE COURT:  WHO ARE THE WITNESSES YOU

3    HAVE LEFT?

4           MR. FAZIOLI:  WE HAVE MS. LINDA DANESH

5    WHO TESTIFIED.  ANTHONY POLLACE AND GREG FINE, WHO

6    WAS THE CASE AGENT.  THERE WAS SOME CONSIDERATION,

7    MR. JOE YE WHO WAS ON OUR LIST IS NOT GOING TO BE

8    TESTIFYING.  AND WE CAN CONFER, BUT I THINK IT'S

9    UNLIKELY MR. ANDY YAN WILL TESTIFY.

10          SO I THINK IT'S DANESH, POLLACE AND AGENT

11   FINE, WHICH WE ANTICIPATE DEPENDING ON THE

12   CROSS-EXAMINATION WE WILL FINISH ON MONDAY.

13          THE COURT:  AND ONE OF THE NAMES DOESN'T

14   RING A BELL WITH ME.

15          MR. FAZIOLI:  MS. DANESH IS SOMEONE THAT

16   WORKED FOR MR. HU.  AND SHE'S ON THE LIST.  I

17   EXPECT HER EXAMINATION WILL NOT BE PARTICULARLY

18   LONG.

19          MR. POLLACE IS THE PERSON WHOSE NAME IS

20   ON THE DOCUMENTS THEN AGENT FINE IS THE CASE AGENT

21   PROVIDING POSSIBLY TESTIMONY ABOUT THE

22   INVESTIGATION BUT MORE LIKELY KIND OF SUMMARY

23   TESTIMONY ABOUT THE FINANCIAL ANALYSIS.

24          THE COURT:  FINANCIAL ANALYSIS OF WHAT?

25          MR. FAZIOLI:  THE FINANCIAL RECORDS THAT

1    HAVE BEEN ADMITTED INTO EVIDENCE AND WILL PROVIDE

2    SUMMARY TESTIMONY ABOUT WHAT HAPPENED TO THE MONEY.

3            MR. LUCEY:  AS TO THE WIRES THAT ARE AT

4    ISSUE, YOUR HONOR.  THE FOLLOW-THE-MONEY AS TO

5    WHERE IT WENT.

6            MR. FAZIOLI:  AND YOUR HONOR, WE HAD, WE

7    WANTED TO REVISIT THE ISSUE OF CHARTS.  WE HAD A

8    COUPLE OF CHARTS, COLOR CHARTS THAT WE PREPARED

9    WITH AGENT FINE AND WHEN WE FINALIZE DRAFTS OF THEM

10   WE HAVE BEEN SUBMITTING THEM TO THE DEFENSE.  AND

11   IN A PRIOR INSTANCE, WE DID PREPARE COLOR COPIES

12   FOR THE JURY HARD COPIES OF THE CHARTS JUST FOR

13   THEIR REVIEW.

14           AND I JUST WANTED TO REVISIT THAT ISSUE

15   AGAIN AND SEE WHETHER THE COURT THINKS THAT WOULD

16   BE PRODUCTIVE OR NOT.  WE FOUND IT PRODUCTIVE IN

17   THE LAST CASE BUT I CAN UNDERSTAND THE CONCERNS IF

18   THE COURT HAS CONCERNS

19           THE COURT:  ARE YOU TALKING ABOUT HARD

20   COPIES THEY COULD TAKE WITH THEM TO THE

21   DELIBERATIONS OR JUST FOR HAVING.

22           MR. FAZIOLI:  THESE ARE EXHIBITS.

23           MR. LUCEY:  I THINK WE ARE ANTICIPATING

24   OFFERING THEM AS EXHIBITS AS WELL, YOUR HONOR.  BUT

25   I THINK THE PRIMARY PURPOSE IS DURING THE COURSE OF

1    AGENT FINE'S TESTIMONY TO THE EXTENT WHICH THE

2    SCREEN MAY NOT, WE THINK IT WILL BE READILY

3    VIEWABLE ON THE SCREEN.  BUT TO THE EXTENT ONE OR

4    MORE OF THE JURORS OR THE COURT MIND FIND IT HELP

5    TO FEEL HAVE A HARD COPY IN FRONT OF THEM JUST

6    MIGHT HELP WITH CONVEYING THE INFORMATION ON THE

7    CHARTS.

8            THE COURT:  WELL, I'M ASSUMING THE CHARTS

9    CAN BE USED AS DEMONSTRATIVE EXHIBITS.  IF BASED ON

10   WHAT YOU TELL ME, IF IN FACT IT WOULD BE HELPFUL TO

11   THE COURT AND THE JURY TO HAVE INDIVIDUAL COPIES, I

12   WOULD BE INCLINED TO ALLOW THAT BUT, THIS MAY BE

13   DIFFERENT THAN WHAT I SAID BEFORE, AS FAR AS

14   WHETHER THEY WOULD BE ADMISSIBLE OR NOT IS A

15   DIFFERENT QUESTION AND WE WOULD HAVE TO SEE WHETHER

16   MR. FONG HAD AN OBJECTION AND SEE WHAT THE FORM OF

17   THE EXHIBITS IS BEFORE WE MAKE A DECISION.

18           MR. LUCEY:  I THINK THAT'S VERY FAIR,

19   YOUR HONOR.

20           I THINK CERTAINLY, EVEN IF WE WEREN'T

21   GOING TO BE OFFERING THEM AS EXHIBITS I THINK IT

22   WOULD STILL BE HELPFUL TO HAVE THE HARD COPIES TO

23   VIEW AS WELL JUST FOR THE PURPOSES OF THE

24   DEMONSTRATIVE NATURE OF THEM.  OBVIOUSLY WE HAVE TO

25   HEAR WHAT MR. FONG HAS TO SAY ABOUT THEM

1              THE COURT:  WAIT AND SEE WHAT YOU -- HOW

2       YOU FEEL ABOUT IT, MR. FONG.

3              MR. FONG:  SURE.

4              THE COURT:  YOU MIGHT HAVE AN OBJECTION

5       OR YOU MIGHT NOT.

6              MR. FONG:  SURE.  I WILL LOOK AT IT,

7       THANK YOU, YOUR HONOR.

8              MR. FAZIOLI:  ONE OTHER QUICK POINT ABOUT

9       SCHEDULING.

10             I ANTICIPATE THERE'S A GOOD PROBABILITY

11      WE WOULD COMPLETE OUR CASE ON MONDAY AND I WANT TO

12      APPRISE THE DEFENSE OF THAT.  AND THEN I GUESS THAT

13      MIGHT RAISE THE QUESTION IF THERE'S A NOT A DEFENSE

14      CASE WHEN CLOSING ARGUMENTS WOULD BE.

15             THE COURT:  DO YOU ANTICIPATE TO THE

16      EXTENT YOU CAN ADVISE, DO YOU ANTICIPATE SOME

17      WITNESSES OR NOT?

18             MR. FONG:  YOUR HONOR, I DON'T, AT THIS

19      POINT I DO NOT THINK SO.  I NEED TO CONFER WITH PIE

20      CLIENT OBVIOUSLY.  AND I CERTAINLY WILL ADVISE

21      COUNSEL OF THAT AS WELL AS THE COURT, IN TERMS OF

22      THE AMOUNT OF TIME THAT I CAN ESTIMATE FOR A

23      DEFENSE CASE.

24             BUT LIKE I SAID TO THE COURT BEFORE, I

25      JUST DO NOT SEE A DEFENSE CASE THAT WOULD EXCEED

1    HALF A DAY, IF AT ALL.

2            THE COURT:  WELL, PROBABLY WHAT WE WILL

3    DO, AND LET'S TENTATIVELY PLAN ON THIS.  IF WE

4    FINISH MONDAY OR EVEN SPILL A LITTLE BIT INTO

5    TUESDAY, BUT ARE THEN FINISHED, WE WILL DO JURY

6    INSTRUCTIONS ON TUESDAY AND THEN DO ARGUMENT ON

7    WEDNESDAY.

8            THE COURT:  THAT'S FINE, YOUR HONOR.

9            MR. FAZIOLI:  YOUR HONOR, JUST FOR POINT

10   OF CLARIFICATION, YOU MEAN DO JURY INSTRUCTIONS,

11   THE JURY WILL BE INSTRUCTED AT THAT POINT OR WE

12   WILL HAVE A CONFERENCE ABOUT THE JURY INSTRUCTIONS?

13           THE COURT:  I THINK YOU KNOW FROM PAST

14   EXPERIENCE I WILL HAND OUT TO YOU BASED ON WHAT I

15   HAVE BEEN SUPPLIED, MY SUGGESTION IS WHAT THE JURY

16   INSTRUCTIONS SHOULD BE AND THEN GIVE YOU AN

17   OPPORTUNITY TO OBJECT TO SOME I'M GIVING OR ADD

18   ADDITIONAL ONES IF YOU FEEL THAT'S APPROPRIATE.

19   AND WE WILL FINALIZE THOSE AND THEN YOU WILL HAVE

20   THEM FOR YOUR ARGUMENT.

21           MR. LUCEY:  YOUR HONOR --

22           THE COURT:  ON WEDNESDAY.

23           MR. FAZIOLI:  WITH THAT SCHEDULE IF IT

24   WRAPS UP MONDAY THEN CHARGING CONFERENCE ON TUESDAY

25   AND THE ARGUMENT ON WEDNESDAY.

1          THE COURT:  RIGHT.  AND WE WOULD HAVE

2     TO -- I THINK ALMOST NO MATTER WHAT WE WILL BE

3     DOING THE JURY INSTRUCTIONS ON TUESDAY.

4          MR. FONG:  THAT'S FINE, YOUR HONOR.

5          MR. LUCEY:  YOUR HONOR, IS YOUR PRACTICE

6     TO INSTRUCT THE JURY PRIOR TO CLOSING OR AFTER?

7          THE COURT:  MY RULE IS THAT IF YOU CAN

8     AGREE, I WILL DO IT THE WAY YOU AGREE.  IF YOU WILL

9     NOT AGREE, I WILL DO IT AFTER ARGUMENT.

10          MR. FAZIOLI:  THANK YOU, YOUR HONOR.

11          MR. FONG:  THANK YOU, YOUR HONOR.

12          THE COURT:  IF BUT YOU COULD RESOLVE THAT

13     NOW, THAT WOULD BE HELPFUL.

14          MR. FONG:  WE WILL CERTAINLY TALK.

15          MR. FAZIOLI:  WE WILL TALK ABOUT THAT.

16          THE COURT:  TELL ME MONDAY, IF YOU CAN.

17          MR. LUCEY:  THANK YOU, YOUR HONOR.

18          (WHEREUPON, THE PROCEEDINGS IN THIS

19     MATTER WERE CONCLUDED.)

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22   _____

23   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 6/18/2012

24

25