1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4
     UNITED STATES,                ) CR-09-00487-RMW
5                                  )
                     PLAINTIFF,    )
6                                  ) JUNE 18, 2012
             VS.                   )
7                                  ) VOLUME 6
     ALBERT KE-JENG HU,            )
8                                  )
                     DEFENDANT.    ) PAGES 766-917
9    _____)

10

11               TRANSCRIPT OF PROCEEDINGS

12         BEFORE THE HONORABLE RONALD M. WHYTE

13             UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE PLAINTIFF:  U.S. ATTORNEY'S OFFICE
                         BY:  JOSEPH FAZIOLI
18                            TIM LUCEY
                         150 S. ALMADEN BLVD, STE 900
19                       SAN JOSE, CA  95113

20

21   FOR THE DEFENDANT:  ATTORNEY AT LAW
                         BY:  JERRY FONG
22                       PO BOX 1040
                         PALO ALTO, CA  94302-1040

23

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                         CERTIFICATE NUMBER 13185

1

2                        <u>INDEX OF WITNESSES</u>

3

4       <u>PLAINTIFF'S</u>

5       **GREGORY FINE**
              DIRECT EXAM BY MR. LUCEY          P. 776
6             CROSS-EXAM BY MR. FONG            P. 835
              REDIRECT EXAM BY MR. LUCEY        P. 862, 876
7

8       **ANTHONY POLLACE**
              DIRECT EXAM BY MR. FAZIOLI        P. 880
9             CROSS-EXAM BY MR. FONG            P. 904

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              767

1                        INDEX OF EXHIBITS

2                                 MARKED        ADMITTED

3     PLAINTIFF'S

4     263-272                                   P. 780

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA          JUNE 18, 2012

 2                  P R O C E E D I N G S

 3    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT

 4    OF THE PRESENCE OF THE JURY:)

 5              MR. FONG:  GOOD AFTERNOON, YOUR HONOR.

 6              JERRY FONG ON BEHALF OF DEFENDANT ALBERT

 7    HU WHO IS PRESENT IN COURT.

 8              MR. LUCEY:  GOOD AFTERNOON, YOUR HONOR.

 9              TIM LUCEY AND JOSEPH FAZIOLI ON BEHALF OF

10    THE UNITED STATES.

11              MR. FONG:  YOUR HONOR, WE HAVE ONE MINOR

12    MATTER.  I'M GOING TO HAND YOUR CLERK A SERIES OF

13    DOCUMENT THAT IS HAVE BEEN PREMARKED AS DEFENSE

14    EXHIBITS.  THEY ARE IN ESSENCE A SERIES OF CHECKS

15    MADE PAYABLE TO THE NOBLE LAW GROUP AND THE LAW

16    FIRM OF PILSBURY WINTHROP.

17              THE GOVERNMENT AND I HAVE AGREED ON

18    CERTAINLY FOUNDATIONAL STIPULATIONS.  I THINK WE

19    ARE IN AGREEMENT AS TO AUTHENTICITY AND BUSINESS

20    RECORD EXCEPTION, THOSE TWO FOUNDATIONAL

21    REQUIREMENTS ARE MET.

22              NOW I THINK THERE'S A DISPUTE OVER

23    WHETHER OR NOT GIVEN A FACT THAT THE AUTHENTICITY

24    AND BUSINESS RECORD EXCEPTION FOUNDATION

25    REQUIREMENTS HAVE BEEN MET, CAN THEY STILL NEVER
```

1    THE LESS COME IN ON, I BELIEVE IT'S A RELEVANCE

2    OBJECTION, RIGHT?

3          MR. FAZIOLI:  YES, YOUR HONOR.  THE

4    DOCUMENTS THAT THE DEFENSE WISHES TO INTRODUCE INTO

5    EVIDENCE ARE CHECKS THAT ARE APPARENTLY PAID TO THE

6    NOBLE LAW GROUP AND TO AN INDIVIDUAL NAMED JAY

7    GOULD WHO WAS A PARTNER AT PILLS BURY.  AND THERE

8    MAY BE CHECKS DIRECTLY TO PILLS BURY.

9          WE DO NOT HAVE ANY -- WE DON'T HAVE ANY

10   ISSUE IN TERMS OF THE AUTHENTICITY OR BUSINESS

11   RECORDS OF THE CHECKS.  WE WOULD NOT REQUIRE THE

12   DEFENSE TO CALL IN A WITNESS FROM THE BANK TO

13   ESTABLISH THEM AS BUSINESS RECORDS AND WE ARE

14   WILLING TO AGREE TO THE AUTHENTICITY OF THE CHECKS.

15         HOWEVER OUR UNDERSTAND SUGGEST THE

16   DEFENSE WOULD LIKE TO INTRODUCE THE CHECKS INTO

17   EVIDENCE THEN SIMPLY BASED ON THE CHECKS THEMSELVES

18   AND NOT ANY TESTIMONY EITHER BY MR. NOBLE OR

19   MR. GOULD AT PILSBURY OR BY THE DEFENDANT TO MAKE

20   AN ARGUMENT THAT THOSE CHECKS ARE SOMEHOW PROBATIVE

21   OF THE DEFENDANT'S STATE OF MIND IN REGARDS TO

22   LEGAL ADVICE THAT HE RECEIVED.

23         AND ALTHOUGH WE DON'T HAVE ANY ISSUES

24   WITH THE AUTHENTICITY OF THEM, WE HAVE SOME

25   CONCERNS THAT JUST A FREE FLOATING CHECK TO THE

1    NOBLE LAW GROUP STANDING BY ITSELF, IF THAT'S THE

2    ONLY PIECE OF EVIDENCE, MAY NOT QUALIFY, MAY NOT BE

3    APPROPRIATE -- MAY COME INTO EVIDENCE ABSENCE SOME

4    TESTIMONY REPORTED TO THE CHECK.

5           MR. LUCEY:  AND YOUR HONOR, SO WE ARE

6    CLEAR FOR THE RECORD, ONE OF THE CHECKS IS ONE OF

7    THE GOVERNMENT'S COMPENDIUM EXHIBITS OF BANK

8    RECORDS.

9           SO IT IS IN FACT ALREADY IN EVIDENCE.

10   BUT I THINK THE GOVERNMENT WOULD SUBMIT THAT

11   CERTAINLY THERE'S EVIDENCE OF A PAYMENT BEING MADE,

12   BUT BEYOND THAT AS MR. FAZIOLI SAID, WE WOULD BE

13   CONCERNED ABOUT THE RELEVANCE AND AS WELL AS THE

14   ISSUES OF 403 RELATED TO ARGUMENT ABOUT THE INTENT

15   OF THE DRAFT OF THE CHECK OR RECEIPT OF THE CHECK

16   OR LEGAL ADVICE BEING CONVEYED BY THE CHECK

17          MR. FAZIOLI:  AND ALSO TO ADD BRIEFLY TO

18   THAT.  IT'S OUR UNDERSTANDING FROM HAVING

19   COMMUNICATED WITH PILSBURY THAT THEY WERE NOT IN

20   FACT THE ATTORNEYS FOR THE ASENQUA BETA THEY WERE

21   NOT THE ATTORNEYS FOR THE FIRESIDE LS FUND AND THAT

22   MR. NOBLE WAS NOT NECESSARILY AN EXPERT IN HEDGE

23   FUNDS.

24          SO WE HAVE CONCERNS THAT A FREE FLOATING

25   CHECK TO THE ENTITIES ABSENT SOME TESTIMONY THAT

1    GIVES SOME CONTEXT MAY NOT BE PARTICULARLY

2    PROBATIVE OR RELEVANT AS TO THE DEFENDANT'S STATE

3    OF MIND.

4                THE COURT:  WHO IS THE NOBLE LAW GROUP?

5                MR. FONG:  YOUR HONOR, THE NOBLE LAW

6    GROUP IS A LAW FIRM HEADED BY A GENTLEMAN BY THE

7    NAME OF JONATHAN NOBLE.  HE'S A PRACTITIONER IN PEN

8    ANYONE SUE LA, CURRENTLY WITH THE LAW FIRM IN MENLO

9    PARK.

10               YOUR HONOR, THE NOBLE'S LAW FIRM'S NAME

11   APPEARED IN THE ASENQUA BETA PRIVATE PLACEMENT

12   MEMORANDUM.  AND THE PILSBURY LAW GROUP OR LAW FIRM

13   I SHOULD SAY, THAT NAME APPEARED IN THE FIRESIDE

14   PRIVATE PLACEMENT MEMORANDUM.

15               YOUR HONOR, I CERTAINLY WILL NOT BE

16   ARGUING THAT SPECIFIC TYPE WAS WORK WERE DONE JUST

17   BECAUSE PAYMENTS WERE MADE.

18               I JUST MERELY WANTED TO SHOW TO THE JURY

19   THAT TWO OF THE LAW FIRMS MENTIONED DID HAVE A

20   CONNECTION TO MR. HU.  THAT'S ALL I'M GOING TO

21   ARGUE.

22               THE COURT:  ONE OF THE MISREPRESENTATIONS

23   THAT'S ALLEGED IS NOT WITH RESPECT TO THE NOBLE LAW

24   GROUP, I DON'T THINK.

25               MR. FONG:  NO, YOUR HONOR.  I UNDERSTAND

1    THAT. BUT --

2            THE COURT: IS THAT CORRECT?

3            MR. FONG: I DON'T BELIEVE ANYBODY HAS

4    TESTIFIED AS TO THE NOBLE LAW GROUP. BUT

5    YOUR HONOR OBVIOUSLY THE IDEA IS THAT THE

6    GOVERNMENT HAS BEEN TRYING TO CONVEY THAT MR. HU

7    HAS PRETTY MUCH -- HAD PRETTY MUCH LIED ABOUT

8    EVERYTHING IN THE PPM'S AND I WANT TO SHOW THAT HEY

9    WAIT A MINUTE, THERE IS ACTUALLY ANOTHER SIDE OF

10   THE COIN. THAT'S ALL I WOULD BE DOING WITH THAT.

11           AND AGAIN, I'M NOT GOING TO BE ARGUING

12   THAT THIS SHOWS A PARTICULAR TYPE OF WORK WAS DONE

13   FOR A PARTICULAR ENTITY OR DOCUMENT. I JUST SIMPLY

14   WANT TO SHOW THAT YES --

15           THE COURT: I UNDERSTAND WHAT YOU WANT TO

16   DO.

17           MR. FONG: I'M SORRY TO BE LONG WINDED,

18   YOUR HONOR.

19           AND ALSO GIVEN THE FACT THAT THE FIRST

20   CHECK THE COURT IS LOOKING AT 602, IT'S ALREADY

21   PART -- IT'S ALREADY BEEN ADMITTED INTO EVIDENCE.

22   THIS WAS SIMPLY --

23           THE COURT: I WILL LET YOU OFFER THEM BUT

24   I STRESS YOU'VE GOT TO BE VERY CAREFUL ABOUT

25   ARGUMENT.

1          MR. FONG:  THAT'S FINE, YOUR HONOR.

2          THE COURT:  OKAY.  I'M READY TO GO.

3          MR. FONG:  YES.

4          MR. LUCEY:  CAN THE COURT GIVE A LITTLE

5    GUIDANCE AS TO THE POSSIBLE LIMITS ON ARGUMENT.

6    PARTICULARLY WITH THE PILLS BURGEE INFORMATION --

7          THE COURT:  HE CAN ARGUE THAT A CHECK ON

8    THE ASENQUA ACORN LLC, CHECK WAS WRITTEN TO THE

9    NOBLE LAW GROUP FOR THE AMOUNT AND THE DATE.  SO HE

10   CAN BASICALLY TAKE WHAT'S ON THE FACE OF THE CHECK.

11   BUT THAT'S ABOUT IT.

12         MR. FAZIOLI:  ALL RIGHT.  THANK YOU,

13   YOUR HONOR.

14         MR. FONG:  THANK YOU, YOUR HONOR.

15         MR. LUCEY:  YOUR HONOR, ONE OTHER

16   HOUSEKEEPING MATTER BEFORE WE GET STARTED.

17         THE GOVERNMENT EXPECTS TO CALL AGENT FINE

18   AS OUR FIRST WITNESS THIS AFTERNOON.  THIS IS THE

19   ISSUE OF CHARGES WE DISCUSSED PREVIOUSLY.  I TALKED

20   TO MR. FONG BEFORE COURT TODAY.  HE HAS NO

21   OBJECTION TO US SUPERVISING THE CHARTS INTO

22   EVIDENCE.  EXHIBITS 263 TO 272.  AND THERE'S NO

23   ISSUE WITH REGARD TO THE EVIDENCE.  THE ONLY OTHER

24   ISSUE WE HAVE TO COVER WITH YOU YOUR HONOR, AS YOU

25   KNOW, WE HAD PROPOSED HAVING BOTH ON THE SCREEN

1    THEN HARD COPIES FOR EVERYONE IN THE COURTROOM.  WE

2    HAVE THOSE AVAILABLE IF THE COURT IS SO INCLINED

3              THE COURT:  THAT'S FINE.

4              MR. FAZIOLI:  THANK YOU, YOUR HONOR.

5              MR. FONG:  I HAVE NO OBJECTIONS.

6              (WHEREUPON, THE FOLLOWING PROCEEDINGS

7    WERE HELD IN THE PRESENCE OF THE JURY:)

8              THE COURT:  PLEASE BE SEATED.

9              WELCOME BACK, EVERYBODY, AND I THINK WE

10   ARE READY TO GO.

11             MR. LUCEY:  YES, YOUR HONOR.  THE

12   GOVERNMENT NOW CALLS SPECIAL AGENT GREG FINE TO THE

13   STAND.

14

15                        **GREGORY FINE,**

16   BEING CALLED AS A WITNESS ON BEHALF OF THE

17   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

18   EXAMINED AND TESTIFIED AS FOLLOWS:

19

20             THE WITNESS:  I DO.

21             THE CLERK:  FOR THE RECORD PLEASE STATE

22   YOUR FULL NAME AND SPELL YOUR LAST NAME.

23             THE WITNESS:  MY NAME IS GREGORY FINE.

24             LAST NAME IS SPELLED F-I-N-E.

25

1          **DIRECT-EXAMINATION BY MR. LUCEY**

2

3      BY MR. LUCEY:

4      Q.    GOOD AFTERNOON, SIR.

5      A.    GOOD AFTERNOON.

6      Q.    WHERE DO YOU CURRENTLY WORK?

7      A.    AT THE FEDERAL BUREAU OF INVESTIGATION.

8      Q.    HOW LONG HAVE YOU WORKED WITH THE FEDERAL

9      BUREAU OF INVESTIGATION?

10     A.    FIVE AND A HALF YEARS.

11     Q.    WHAT IS YOUR TITLE?

12     A.    SPECIAL AGENT.

13     Q.    WHAT OFFICE ARE YOU BASED?

14     A.    THE SAN JOSE OFFICE.

15     Q.    AND SPECIAL AGENT FINE, BEFORE WE GO FURTHER

16     INTO YOUR WORK, BACKGROUND COULD YOU TELL US

17     BRIEFLY WHAT IS YOUR EDUCATIONAL BACKGROUND?

18     A.    I HAVE A BACHELOR'S DEGREE OF COMPUTER SCIENCE

19     FROM THE UNIVERSITY OF MARYLAND.

20     Q.    GOING BACK TO YOUR WORK EXPERIENCE AT THE FBI,

21     AGENT FINE, ARE YOU ASSIGNED TO A PARTICULAR GROUP

22     WITHIN THE SAN JOSE OFFICE?

23     A.    I AM.

24     Q.    WHAT GROUP IS THAT?

25     A.    THE WHITE COLLAR CRIME SQUAD.

1    Q.   HOW LONG HAVE YOU BEEN BASE INDEED THAT

2    PARTICULAR SQUAD?

3    A.   FIVE AND A HALF YEARS.

4    Q.   GENERALLY THE LENGTH OF YOUR TENURE WITH THE

5    FBI?

6    A.   YES.

7    Q.   WHAT ARE YOUR RESPONSIBILITIES GENERALLY AS A

8    SPECIAL AGENT WITH THE FBI?

9    A.   TO INVESTIGATE FEDERAL CRIMES.

10   Q.   HAVE YOU HAD ANY EXPERIENCE PREVIOUSLY TO THIS

11   MATTER BEFORE THE COURT IN INVESTIGATING INVESTMENT

12   FRAUD?

13   A.   YES.

14   Q.   COULD YOU SPEAK GENERALLY ABOUT THAT

15   EXPERIENCE, WHAT KIND OF MATTERS HAVE YOU HANDLED?

16   A.   REGARDING INVESTMENT FRAUD SPECIFICALLY.

17   Q.   YES, SIR.

18   A.   I PROBABLY WORKED TEN TYPES OF CASES RELATED

19   TO VARIOUS TYPES OF FRAUD RELATED TO INVESTMENT.

20   Q.   NOW SPECIAL AGENT FINE, I WANT TO TALK TO YOU

21   ABOUT SOME FINANCIAL DATA IN THIS CASE IN

22   CONNECTION WITH THE DEFENDANT.  HAVE YOU REVIEWED

23   DOCUMENTS IN CONNECTION WITH YOUR TESTIMONY HERE

24   TODAY?

25   A.   YES.

1    Q.   DID THERE COME A TIME WHEN YOU WERE ASKED TO

2    PREPARE CHARTS DEMONSTRATIVES IN CONNECTION WITH

3    YOUR TESTIMONY TODAY?

4    A.   YES.

5    Q.   AND DID YOU IN FACT REVIEW DOCUMENTS IN

6    CONNECTION WITH THE PREPARATION OF THOSE CHARTS?

7    A.   YES.

8    Q.   GENERALLY SPECIAL AGENT FINE WHAT KIND OF

9    DOCUMENTS DID YOU REVIEW IN CONNECTION WITH THE

10   PREPARATION OF THOSE CHARTS?

11   A.   I REVIEWED BANK RECORDS WHICH WOULD INCLUDE

12   THE ACCOUNT STATEMENTS, WIRE TRANSFERS, CANCELLED

13   CHECKS.  ADDITIONALLY, I REVIEWED INVESTOR RECORDS

14   WHICH WOULD INCLUDE THE DOCUMENTS I RECEIVED FROM

15   INVESTORS.  SO THEY ARE INVESTMENT STATEMENTS AS

16   WELL AS THE PRIVATE PLACEMENT MEMORANDUMS AND

17   SUBSCRIPTION BOOK LETS.

18   Q.   AND THAT GENERALLY SUMMARIZES THE GENERAL TYPE

19   OF DOCUMENTS YOU REVIEWED?

20   A.   YES.

21   Q.   NOW AGENT FINE, DO YOU RECALL THAT REALLY LONG

22   STIPULATION THAT MY COLLEAGUE MR. FAZIOLI READ AT

23   THE OUT SET OF THE TRIAL BACK A COUPLE WEEKS AGO?

24   A.   I DO.

25   Q.   AND DO YOU RECALL THAT IT REFERENCED EXHIBITS

1    220 THROUGH 252, 257, AS WELL AS 276 THROUGH 278?

2    A.   YES.

3    Q.   AND DO YOU RECALL THAT THOSE, ALL THOSE

4    EXHIBITS WERE THERE AFTER MOVED INTO EVIDENCE?

5    A.   YES.

6    Q.   NOW, AGENT FINE, DID YOU RELY ON A PORTION OF

7    THOSE EXHIBITS IN PREPARATION FINISH YOUR TESTIMONY

8    HERE TODAY AS WELL AS THE CHARTS BEING REFERENCED

9    YOU ASKED TO PREPARE?

10   A.   I DID.

11   Q.   AND SPECIAL AGENT FINE, DID YOU IN FACT CREATE

12   CHARTS AND TABLES THAT SUMMARIZED THE INFORMATION

13   IN THE PORTION OF THE EXHIBITS YOU DID REFER TO AND

14   REVIEW?

15   A.   YES.

16   Q.   NOW I'M GOING TO SHOW YOU A DOCUMENT, AGENT

17   FINE MARKED PREVIOUSLY AS 263 THROUGH 272.  DO YOU

18   RECOGNIZE THOSE DOCUMENTS, AGENT FINE?

19   A.   YES.

20   Q.   AND AGENT FINE, DO THOSE EXHIBITS ACCURACY

21   LITE SUMMARIZE THE INFORMATION CONTAINED IN THE

22   FINANCIAL DOCUMENTS THAT YOU REVIEWED IN CONNECTION

23   WITH YOUR PREPARATION OF THOSE CHARTS THAT ARE

24   CONTAINED IN EXHIBITS 263 THROUGH 272?

25   A.   YES.

1        MR. LUCEY:  YOUR HONOR, AT THIS POINT THE

2   GOVERNMENT OFFERS EXHIBITS 263 UP TO INCLUDING 272

3   INTO EVIDENCE.

4        MR. FONG:  NO OBJECTION, YOUR HONOR.

5        THE COURT:  THOSE ARE RECEIVED.

6   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 263-272

7   HAVING BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

8   WERE ADMITTED INTO EVIDENCE.)

9        MR. LUCEY:  YOUR HONOR, FOR THE BENEFIT

10  OF ALL CONCERNED BEING AS CAREFUL AS WE CAN IN

11  REVIEWING THE DOCUMENTS WE HAVE HARD COPIES TO

12  PROVIDE TO THE COURT.

13        WE ALREADY PROVIDED COPIES TO DEFENSE

14  COUNSEL AND WE ALSO INTEND TO PUBLISH A HARD COPY

15  TO EACH JUROR IN TODAY'S SESSION.

16        THANK YOU, YOUR HONOR.

17        AND YOUR HONOR JUST GIVING THE JURORS A

18  CHANCE TO DISTRIBUTE THOSE INDIVIDUAL HARD COPIES

19  OF EXHIBIT 263 THROUGH 272.  I WOULD ASK THE JURORS

20  REMAIN ON THE FIRST PAGE OF THEIR HAND OUT, 263.

21        AND NOW MS. BURNEY I WOULD ASK IF YOU

22  COULD PUT THAT ON THE GENE FOR OUR BENEFIT AS WELL.

23  THANK YOU.

24  Q.   AGENT FINE, DO YOU SEE EXHIBIT 263?

25  A.   YES.

1    Q.   AND YOU HAVE A HARD COPY IN FRONT OF YOU?

2    A.   I DO.

3    Q.   SO AGENT FINE, TAKE A LOOK AT EXHIBIT 263.

4    WHAT DOES -- WHAT INFORMATION DOES EXHIBIT 263

5    SUMMARIZE?

6    A.   IT SUMMARIZES THAT DISTRIBUTION OF BOB LIN'S

7    FIRST $100,000 INVESTMENT WHICH HE WIRED

8    TRANSFERRED TO A BANK OF AMERICA ACCOUNT TO ALBERT

9    HU ON FEBRUARY 8TH, 2005.

10   Q.   AND YOU CREATED A CHART IN CONNECTION WITH

11   THAT FIRST WIRE?

12   A.   I DID.

13   Q.   AND HOW MUCH MONEY, SPECIAL AGENT FINE, WAS

14   USED TO PURCHASE STOCKS AND OTHER SECURITIES AFTER

15   THIS WIRE ARRIVED IN THE ACCOUNT ON OR ABOUT

16   FEBRUARY 8TH, 2005?

17   A.   NO MONEY WAS.

18   Q.   HOW WAS THE MONEY ACTUALLY SPENT?

19   A.   WELL, THIS CHART DETAILS HOW.  BUT IN GENERAL,

20   I PUT IT IN THREE CATEGORIES.  $77,274.06 WAS SPENT

21   ON CHECK AND CHECK CARD PURCHASES.  ANOTHER

22   $12,557.16 WAS TRANSFERRED TO ASENQUA EMPLOYEES.

23        AND FINALLY 10,000 WAS TRANSFERRED TO

24   DIFFERENT BANK ACCOUNT IN THE SAME OF ASENQUA AT

25   WELLS FARGO.

1    Q.   SO ESSENTIALLY IT WAS DISTRIBUTED THREE WAYS,

2    ROUGHLY?

3    A.   ROUGHLY.

4    Q.   AND AGENT FINE, CAN WE NOW PROCEED TO TAKE

5    EACH CATEGORY IN SEQUENCE.  I WILL START WITH THE

6    TOP ONE ON THE RIGHT-HAND SIDE, CHECK AND CHECK

7    CARD PURCHASES WHICH AMOUNT TO APPROXIMATELY

8    $17,274.06?

9    A.   OKAY.

10   Q.   IT SAYS CHECK CARD PURCHASES WHAT DO YOU MEAN

11   BY THAT IN YOUR CHART HERE?

12   A.   THIS IS A TYPICAL ACCOUNT AT BANK OF AMERICA

13   THAT HAD CHECKS ASSOCIATED WITH IT AND A CHECK CARD

14   ASSOCIATED WITH IT.  SO THE MONEY CAME OUT USING

15   CHECKS OR CHECK CARD.

16   Q.   AND JUST ESSENTIALLY, USES OF THE MONEY BASED

17   ON CHECK AND CHECK CARDS?

18   A.   THAT'S CORRECT.

19   Q.   BASED ON YOUR REVIEW OF THOSE ACCOUNT

20   DOCUMENTS DID IT GIVE YOU ANY INDICATION THAT THE

21   MONEY WAS BEING USED TO PURCHASE SECURITIES?

22   A.   I FOUND NO EVIDENCE OF THAT.

23   Q.   SO I WOULD LIKE TO NOW HAVE MS. BURNEY CHANGE

24   THE DOCUMENT ON THE SCREEN TO THE BANK OF AMERICA

25   CARD STATEMENT FOR THE ACCOUNT ENDING IN 6581.  IF

1    YOU COULD CALL YOUR ATTENTION TO EXHIBIT 245.  IT'S

2    IN PARTICULAR BATES NUMBER 8627 WHICH SHOULD BE

3    PAGE 23.

4              SO AGENT FINE YOU NOW SEE EXHIBIT 245 IN

5    FRONT OF YOU ON THE SCREEN

6    A.   I SEE IT, NOT VERY WELL.

7    Q.   PERHAPS IF I GET YOU A HARD COPY, AGENT FINE.

8              SHOWING YOU A PORTION OF EXHIBIT 245,

9    GOVERNMENT EXHIBIT 245 IN EVIDENCE.

10             JUST FOR ALL, WHAT IS EXHIBIT 245 HERE

11   THE DOCUMENT I JUST SHOWED YOU BEGINNING AT BATES

12   NUMBER 8626.

13             THIS IS THE BANK OF AMERICA ACCOUNT

14   STATEMENT FOR 8561.  ASENQUA CAPITAL LLC.  IT'S FOR

15   THE TIME PERIOD OF FEBRUARY 5TH, 2005, THROUGH

16   MARCH 10TH, 2005.

17   Q.   AND AGENT FINE I NOW CALL YOUR ATTENTION TO

18   THE ENTRIES BEGINNING AT 214 WHICH ARE ON SCREEN IN

19   FRONT OF US.

20             AS A REFERENCE HERE TO A PURCHASE AT 2-14

21   ON 2-13, THAT'S WHAT A REFERENCE TO?

22   A.   THAT WAS A PURCHASE OF $254.83 AT COSTCO.

23   Q.   DOES THAT APPEAR TO BE FROM YOUR VIEW OF THE

24   RECORD A PURCHASE OF SOME KIND OF STOCK OR SECURITY

25   IN COSTCO?

1    A.   NO.   THIS IS A PURCHASE OF MERCHANDISE AT

2    COSTCO, MOUNTAIN VIEW.

3    Q.   NEXT I CALL YOUR ATTENTION AGENT FINE TO THE

4    ENTRY ON 216.   DO YOU SEE A REFERENCE HERE FOR

5    CHECK CARD PURCHASE ON 2-15 FOR AN AMOUNT OF OVER

6    $4,000?

7    A.   YES.

8    Q.   WHAT IS THAT A REFERENCE TO?

9    A.   BASED ON THE RECORD IT'S A REFERENCE TO

10   $4,760.78 AT FRY'S ELECTRONICS IN PALO ALTO.

11   Q.   I CALL YOUR ATTENTION NOW AGENT FINE TO THE

12   BOTTOM OF THIS DOCUMENT, THE LAST ENTRY OF THE PAGE

13   ON OR ABOUT 2-22.

14   A.   YES.

15   Q.   A CHECK CARD PURCHASE ON 2-17?

16   A.   YES.

17   Q.   APPARENTLY IN THE AMOUNT OF HUNDRED $8.50?

18   A.   THAT'S RIGHT.

19   Q.   WHAT'S THAT A PURCHASE TO?

20   A.   STAR BUCKS.

21   Q.   BASED ON YOUR VIEW OF THE RECORD DOES THAT

22   APPEAR TO BE A PURCHASE OF SECURITIES IN STARBUCKS?

23            MR. FONG:   OBJECTION.   ARGUMENTATIVE.

24            THE COURT:   OVERRULED.

25            THE WITNESS:   NO, THAT'S A PURCHASE AT A

                                                          784

1     STARBUCKS IN PALO ALTO.

2     BY MR. LUCEY:

3     Q.   SO AGENT FINE, WE LOOKED AT A COUPLE OF

4     ENTRIES FOR CHECKS AND CHECK CARD PURCHASES HERE ON

5     THIS PAGE OF THE DOCUMENT 8627.

6          IN GENERAL TERMS, ARE THESE ITEMS

7     REPRESENTATIVE OF THE SPENDING GOING ON IN THE

8     ACCOUNT AT THAT TIME AFTER MR. LIN'S WIRE HIT THE

9     ACCOUNT ON FEBRUARY 8TH?

10    A.   YES.

11    Q.   MR. FINE GOING FORWARD NOW, THE NEXT REFERENCE

12    ON YOUR PIE CHART IN GREEN IS TO ASENQUA EMPLOYEES?

13    A.   YES.

14    Q.   TURNING BACK TO EXHIBIT 263?

15    A.   OKAY.

16    Q.   MS. BURNEY, THANK YOU.  WHAT'S THIS A

17    REFERENCE TO.  THIS CATEGORY?

18    A.   THIS IS A REFERENCE TO MONEY TRANSFERRED TO

19    PERSONS WORKING FOR ALBERT HU.

20    Q.   SO WHO IN FACT RECEIVED THOSE FUNDS BASED ON

21    YOUR REVIEW OF THE BANK STATEMENTS?

22    A.   STEVE BOND.

23    Q.   AND THE LAST CATEGORY ON THIS CHART IS FOR

24    $10,000, WHAT'S THAT A REFERENCE TO?

25    A.   THAT WAS $10,000 THAT WAS TRANSFERRED TO A

1    DIFFERENT ASENQUA ACCOUNT.  THIS ONE AT WELLS

2    FARGO.

3    Q.   AND HAVE YOU HAD AN OPPORTUNITY TO LOOK AT

4    THAT, THE TRANSFER REFERENCED ON THE BANK STATEMENT

5    AS WELL?

6    A.   YES.

7    Q.   AND THAT IS ALSO CONTAINED ON THE EXHIBIT WE

8    JUST LOOKED AT, EXHIBIT 245?

9    A.   IT IS.

10   Q.   DID YOU ALSO HAVE A CHANCE TO LOOK AT THE END

11   RESULT OF THAT TRANSFER TO THE WELLS FARGO ACCOUNT?

12   A.   I DID.

13   Q.   AND THAT'S CONTAINED IN EXHIBIT 237.  PAGE 73

14   OF THAT EXHIBIT.

15         AGENT FINE, WHILE WE ARE TRYING TO GET

16   THAT DOCUMENT PULLED UP ON THE SCREEN, LET ME ASK

17   YOU A QUESTION OF THE BANK OF AMERICA ACCOUNT WE

18   HAVE BEEN REFERRING TO.

19         DID THE DEFENDANT HAVE ACCESS TO AND

20   CONTROL THIS ACCOUNT?

21   A.   YES.

22   Q.   AND WE WILL COME BACK TO THAT EXHIBIT.

23   MS. BURNEY, IF YOU COULD NOW TURN TO EXHIBIT 238 AT

24   PAGE 423.

25         SO AGENT FINE, ARE YOU ABLE TO VIEW THE

1   DOCUMENT ON THE SCREEN?

2   A.   YES.

3   Q.   SO, ARE YOU FAMILIAR WITH THIS DOCUMENT,

4   EXHIBIT 237 BATES NUMBER 5551, NUMBER 73 OF THE

5   EXHIBIT.  DO YOU SEE THE ENTRY HERE, I WILL POINT

6   OUT WITH MY PEN, AGENT FINE, FOR $10,000; IS THAT

7   CORRECT?

8   A.   YES.

9   Q.   WHAT'S THAT A REFERENCE TO, BASED ON YOUR

10  ANALYSIS?

11  A.   IT'S ON THE PIE CHART IT'S THE 10,000 THAT'S

12  BEING TRANSFERRED FROM THE BANK OF AMERICA ACCOUNT

13  TO WELLS FARGO.

14  Q.   THANK YOU.

15          NOW SHOWING YOU EXHIBIT 238, BATES NUMBER

16  6196, PAGE 423 OF THE EXHIBIT.  DO YOU SEE THAT

17  DOCUMENT NOW ON THE SCREEN THERE, AGENT FINE?

18  A.   YES.

19  Q.   I CALL YOUR ATTENTION TO THE ENTRY ON 2-10,

20  THE SECOND TO LAST ENTRY.  COULD YOU READ THAT

21  ENTRY -- THIS IS NOW THE WELLS FARGO BANK ACCOUNT.

22  WHO CONTROLS THIS BANK ACCOUNT BASED ON YOUR REVIEW

23  OF THE DOCUMENTS?

24  A.   SO I THINK WE'VE -- THIS IS ALBERT HU AGAIN.

25  I NEED TO SEE THE FULL BANK STATEMENT BECAUSE I'M

1    NOT SURE THIS IS THE SAME BANK ACCOUNT YOU JUST --

2    Q.   CERTAINLY.  I'M PROVIDING YOU NOW A COPY OF

3    GOVERNMENT EXHIBIT 237.  I'M SORRY, 238?

4    A.   THAT'S RIGHT.  THIS IS EXHIBIT 238.  SO THE

5    10,000 WENT FROM THE BANK OF AMERICA ACCOUNT WHERE

6    BOB LIN ORIGINALLY WIRED HIS MONEY TO AN ASENQUA

7    WELLS FARGO ACCOUNT.  AFTER THAT, WHICH IS WHAT WE

8    WERE STARTING TO JUST SEE, THERE'S A SEPARATE

9    ACCOUNT IN THE NAME OF JUST ALBERT HU, A PERSONAL

10   ACCOUNT.

11          AND 7,000 OUT OF THAT 10,000 WENT TO

12   ALBERT HU'S PERSONAL ACCOUNT.  THEN WE WERE SEEING

13   THE END RESULT OF IT ON THE SAME DAY, 5,000,

14   THERE'S A $5,000 TRANSACTION YOU WERE JUST SHOWING.

15   Q.   AND AGENT FINE, LET ME FLASH THAT BACK UP ON

16   THE SCREEN.

17          SO CALLING YOUR ATTENTION NOW TO THE

18   ENTRY, SECOND TO THE LAST ENTRY ABOVE THE LINE,

19   TOTAL OTHER WITHDRAWALS.

20   A.   YES.

21   Q.   THERE'S AN ENTRY ON 2-10?

22   A.   THAT'S RIGHT.

23   Q.   FOR $5,000?

24   A.   CORRECT.

25   Q.   AND WHAT DOES THE BANK RECORD REFLECT IS THAT

1    TRANSACTION?

2    A.   IT SAYS LOAN PAY BACK TO JESSE.

3    Q.   NOW MS. BURNEY IF YOU COULD FLASH BACK ON THE

4    SCREEN GOVERNMENT EXHIBIT 263, THE COLORED CHART

5    FOR MR. LIN'S FIRST $100,000 INVESTMENT AND WIRE ON

6    FEBRUARY 8TH, 2005.

7            SO MR. FINE, JUST SO WE ARE CLEAR, BASED

8    ON YOUR REVIEW OF THIS BANK ACCOUNT STATEMENT, THE

9    6581 BANK ACCOUNT THAT WAS THE RECIPIENT ACCOUNT

10   FOR MR. LIN'S FIRST WIRE, HOW MUCH OF THAT MONEY

11   WENT TOWARDS INVESTMENTS

12   A.   NONE.

13   Q.   AND LOOKING BACK AT YOUR CHART AGAIN, AGENT

14   FINE, THERE'S TWO ENTRIES AT THE BOTTOM OF THE

15   CHART, ONE HIS ONE ASTERISK AND THE SECOND ONE HAS

16   TWO.  CAN YOU EXPLAIN TO THE JURY WHAT THAT IS A

17   REFERENCE TO BEGINNING AT $98.78?

18   A.   YES.  SO BEFORE BOB LIN WIRED THE HUNDRED

19   THOUSAND DOLLARS THE BANK OF AMERICA ACCOUNT HAD A

20   NEGATIVE BALANCE.  IT WAS $98.78.  SO THE FIRST

21   ASTERISK REFERS TO THE MONEY TO REPLENISH THE

22   ACCOUNT TO BRING IT BACK TO INJURY.

23           THE SECOND ASTERISK IS A SMALL AMOUNT

24   SPENT IN BANK FEE

25   Q.   AND AGENT FINE, AS YOU'VE NOW SUMMARIZED ON

1    THIS CHART, WAS THERE ANY OTHER SOURCE OF FUNDS

2    INTO THE ACCOUNT OTHER THAN THE WIRE THAT BOB LIN

3    DIRECTED BE SENT TO THE ACCOUNT ON FEBRUARY 8TH,

4    2005?

5    A.   NO, THERE WERE NOT.

6    Q.   IT'S --

7    A.   I SHOULD CLARIFY.  THERE'S -- IT'S THE

8    STATEMENT UP ON THE SCREEN.  THERE WAS A CREDIT

9    THAT WAS A REFUND OF A PRIOR CHECK CARD PURCHASE SO

10   REALLY IT'S BOB LIN'S MONEY COMING BACK IN.

11   Q.   BEING RECYCLED INTO THE ACCOUNT?

12   A.   RIGHT.  BUT IT'S ALL BOB LIN'S MONEY.

13   Q.   IF WE COULD TURN OUR ATTENTION TO GOVERNMENT

14   EXHIBIT 264.

15           AGENT FINE YOU ALSO PREPARED THIS EXHIBIT

16   AS WELL, CORRECT

17   A.   YES.

18   Q.   WHAT IS THIS EXHIBIT 264 SUMMARIZE?

19   A.   THIS SHOWS FOR THAT SAME BANK OF AMERICA

20   ACCOUNT SHOWS THE DAILY BALANCE JUST BEFORE BOB

21   LIN'S WIRE AND THE PERIOD AFTER RECEIVING BOB LIN'S

22   WIRE ON FEBRUARY 8TH, 2005.

23   Q.   NOW AGENT FINE I WANT TO BE CLEAR ABOUT

24   SOMETHING.  YOUR CHART HERE SHOWS -- IT STARTS ON

25   2-7, THERE'S OBVIOUSLY A LARGE SPIKE UP HERE ON

1    2-8, RIGHT?

2    A.   YES.

3    Q.   BUT IT NEVER QUITE REACHES $100,000?

4    A.   THAT'S RIGHT.

5    Q.   BUT MR. LIN DID WIRE $100,000?

6    A.   YES.

7    Q.   WHAT IS THIS CHART SHOWING?

8    A.   THERE'S TWO REASONS WHY IT HIT $100,000.  ONE

9    IS THAT THE ACCOUNT WAS ALREADY NEGATIVE BEFORE HE

10   PUT THE MONEY IN.  AND THE SECOND IS BANK OF

11   AMERICA DOES THEIR DAILY BALANCES AT THE END OF THE

12   DAY.  SO THE SAME DAY BOB LIN WIRED IN MONEY, SOME

13   OF IT WAS SPENT.

14   Q.   THEN FURTHER ON, AGENT FINE THERE'S AN ENTRY

15   HERE ON THE RIGHT SIDE OF THE CHART SHOWING 2-2-05?

16   A.   YES.

17   Q.   WHAT DOES THAT REFLECT ON THAT DATE?

18   A.   THE BALANCE ON THAT DATE IS ACTUALLY BACK TO

19   NEGATIVE.  NEGATIVE 207.02.

20   Q.   HOW MUCH TIME ELAPSED BETWEEN THE TIME OF THE

21   WIRE HITTING AND THE TIME OF IT HITTING A NEGATIVE

22   BALANCE?

23   A.   ABOUT TWO WEEKS.

24   Q.   NOW MR. FINE I WANT TO DRAW YOUR ATTENTION TO

25   GOVERNMENT EXHIBIT 265.  MS. BURNEY IF YOU COULD BE

1    SO KIND TO TURN TO THE NEXT EXHIBIT IN ORDER.

2            AGENT FINE, WHAT INFORMATION DOES

3    GOVERNMENT EXHIBIT 265 SUMMARIZE?

4    A.   SIMILAR TO THE FIRST PIE CHART WE LOOKED AT.

5    DISTRIBUTION OF BOB LIN'S SECOND $100,000 THAT HE

6    INVESTED, SPECIFICALLY HIS WIRE TRANSFER WAS

7    FEBRUARY 23RD, 2005.

8    Q.   AND HOW MUCH OF THE MONEY FROM THIS SECOND BOB

9    LIN WIRE THAT OCCURRED ON OR ABOUT FEBRUARY 23RD,

10   2005, HOW MUCH OF THAT WAS USED TO PURCHASE STOCKS

11   AND OTHER SECURITIES, BASED ON YOUR REVIEW OF THE

12   DOCUMENTS?

13   A.   I FOUND NO EVIDENCE THAT ANY OF IT WAS USED TO

14   PURCHASE SECURITY.

15   Q.   SO YOUR EXHIBIT HERE YOU PREPARED, 265, THIS

16   SUMMARIZES HOW THE MONEY WAS ACTUALLY SPENT?

17   A.   YES.

18   Q.   SO AGAIN, WHAT IS THE RED COLOR ON THE CHART,

19   THE SINGLE LARGEST CATEGORY OF SPENDING?

20   A.   CHECK AND CHECK CARD PURCHASES IN THE AMOUNT

21   OF 76,590.18.

22   Q.   MS. BURNEY IF YOU COULD CALL UP THE BANK OF

23   AMERICA ACCOUNT, EXHIBIT 245, AND MR. FINE YOU

24   STILL HAVE A HARD COPY IN FRONT OF YOU?

25   A.   I DO.

1    Q.   MS. BURNEY, IF YOU COULD BLOW UP THE TEXT

2    BEGINNING AT THE DATE OF 2-25-05?

3              MR. FINE, THERE APPEARS TO BE AN ENTRY OF

4    $10,000.  WHAT WAS THE CHECK FOR $10,000, WERE YOU

5    ABLE TO EXAMINE THE CHECK?

6    A.   I BELIEVE SO.

7    Q.   AGENT FINE DO YOU RECOGNIZE THIS PORTION OF

8    EXHIBIT 245?

9    A.   YES.

10   Q.   WHAT IS THIS DOCUMENT?

11   A.   THIS IS THAT CHECK THAT WE WERE JUST LOOKING

12   AT ON THE ACCOUNT STATEMENT.

13   Q.   DID YOU HAVE AN UNDERSTANDING IF THIS WAS IN

14   CONNECTION OF ANY KIND OF SECURITIES?

15   A.   NO.

16   Q.   MS. BURNEY, IF YOU COULD TURN BACK TO THE MAIN

17   ACCOUNT STATEMENT PAGE.  AND AGAIN, IF YOU COULD

18   ENLARGE THE BOTTOM HALF BEGINNING AT 225 OF THE

19   DOCUMENT.

20             AND AGAIN, AGENT FINE YOU MAY WANT TO

21   REFER TO THE HARD COPY IN FRONT OF YOU.  THERE

22   APPEARS TO BE AN ENTRY ON 2-28-05 FOR REFERENCE OF

23   $9.68

24   A.   YES.  THERE'S A PURCHASE AT PALO ALTO

25   HARDWARE.

1    Q.   THERE APPEARS TO BE A DEBIT FOR $1,700 PLUS ON

2    228?

3    A.   YES.  IT WAS A PURCHASE TO AIR CHINA.

4    Q.   AND HOW MUCH WAS THAT EXACT PURCHASE FOR?

5    A.   I'M SORRY, $1,760.95.

6    Q.   IF WE COULD TURN TO THE NEXT PAGE, MS. BURNEY,

7    IN ORDER OR SEQUENCE.  STILL ON EXHIBIT 245.  IF WE

8    COULD HIGHLIGHT THE ENTRIES IN OR AROUND MARCH 2ND,

9    2005.

10            AND THEN I CALL YOUR ATTENTION, AGENT

11   FINE TO THE ENTRY ON THE BANK RECORD DATED

12   MARCH 2ND, 2005.  THERE'S AN ENTRY FOR 1,479.89

13   A.   YES.

14   Q.   WHO IS THE PAYEE ON THAT PARTICULAR ENTRY?

15   A.   HQ GLOBAL WORK PLACE.

16   Q.   AGENT FINE, DID YOU HAVE AN UNDERSTANDING

17   BASED ON YOUR INVOLVEMENT AND REVIEW OF DOCUMENTS

18   IN THIS MATTER OF ANY CONNECTION BETWEEN THE

19   DEFENDANT AND HQ GLOBAL PRIOR TO MARCH 2005?

20   A.   YES.

21   Q.   WHAT IS THE CONNECTION?

22   A.   HE PURCHASED VIRTUAL OFFICE SPACE FROM THAT

23   COMPANY.

24   Q.   PREVIOUS TO MARCH 2005?

25   A.   YES.

1    Q.   AGENT FINE WHAT'S THE GREEN WHICH ARE ON THIS

2    CHART NOW FOR $10,000?

3    A.   THAT'S 10,000 TRANSFERRED TO AN ASENQUA

4    EMPLOYEE.

5    Q.   WHAT ASENQUA EMPLOYEE RECEIVED THAT SUM OF

6    MONEY?

7    A.   IT WAS STEVE BOND.

8    Q.   AND THAT'S AGAIN BASED ON YOUR REVIEW OF THE

9    BANK STATEMENT?

10   A.   YES.

11   Q.   EXHIBIT 245?

12   A.   THAT'S CORRECT.

13   Q.   NOW THE NEXT ENTRY ON YOUR CHART AGENT FINE IS

14   FOR ANOTHER $10,000 SUM IN YELLOW, WHAT'S THAT IN

15   REFERENCE TO?

16   A.   THE SAME ASENQUA, WELLS FARGO ACCOUNT.

17   Q.   AND YOU ALSO REVIEWED THAT PORTION OF THE

18   WELLS FARGO ACCOUNT FOR ASENQUA, DID YOU NOT?

19   A.   YES.

20   Q.   WAS THAT MONEY USED TO PURCHASE SECURITIES?

21   A.   IT WAS NOT.

22   Q.   WHAT HAPPENED AFTER IT HIT THAT BANK ACCOUNT,

23   DID IT STAY THERE, ALL OF IT?

24   A.   I DON'T BELIEVE SO.  I BELIEVE SOME WAS

25   TRANSFERRED TO ALBERT HU'S PERSONAL ACCOUNT.

1    Q.   AND AFTER IT WENT TO THE PERSONAL ACCOUNT,

2    WERE YOU ABLE TO DETERMINE WHAT HAPPENED TO IT

3    AFTER THAT WHEN IT HIT MR. HU'S OTHER ACCOUNT AT

4    WELLS FARGO BANK?

5    A.   YES.

6    Q.   AND REFERRING NOW TO EXHIBIT 237.  AND AGENT

7    FINE, YOU UNDERSTAND THERE WERE ADDITIONAL MONIES

8    TRANSFERRED OUT OF THIS ACCOUNT?

9    A.   YES.

10   Q.   AND I CALL YOUR ATTENTION -- MS. BURNEY IF YOU

11   COULD HIGHLIGHT THE TOP PORTION OF THE PAGE, IN OR

12   AROUND FEBRUARY 28TH.

13         THERE'S AN ENTRY FOR $10,000

14   A.   YES.

15   Q.   WHERE WAS THAT GOING TO, AS YOU UNDERSTAND IT?

16   WAS THAT COMING FROM THE BANK OF AMERICA ACCOUNT WE

17   JUST LOOKED AT?

18   A.   THAT'S RIGHT.  SO THIS WAS THE YELLOW PIE ON

19   THE CHART.  THIS IS THE $10,000 GOING FROM BANK OF

20   AMERICA TO WELLS FARGO.

21   Q.   NOW MS. BURNEY, IF YOU COULD CALL UP THE NEXT

22   EXHIBIT IN ORDER, 238.  FIRST IF WE COULD START ON

23   PAGE 425 OF THAT EXHIBIT.

24         IF YOU COULD NOW, FIRST, FOR THE BENEFIT

25   OF THE JURY AND THE COURT, IF YOU COULD BLOW UP THE

796

1    ENTRY AT THE TOP, THE ADDRESS ON THIS BANK

2    STATEMENT.  AND AGENT FINE, AGAIN, LET ME SHOW YOU

3    A HARD COPY OF THIS DOCUMENT SO YOU CAN READ ALONG

4    WITH THIS MORE EASILY.  SHOWING YOU A PORTION OF

5    EXHIBIT 238, BEGINNING AT PAGE 425 OF THE EXHIBIT.

6    HAVE YOU SEEN THIS DOCUMENT BEFORE, AGENT FINE

7    A.    I HAVE.

8    Q.    WHAT IS IT IN GENERAL TERMS?

9    A.    THIS IS A WELLS FARGO STATEMENT FOR ALBERT

10   KE-JENG AND I DON'T KNOW HOW TO PRONOUNCE IT,

11   H-S-I-A-O-M-E-I, L-I-U.  AND IT'S FOR THE PERIOD

12   FEBRUARY 11TH, 2005, THROUGH MARCH 10TH, 2005.

13   Q.    AND THIS IS AN ADDRESS IN FREMONT, CALIFORNIA?

14   A.    YES.

15   Q.    IF I CAN BOTH CALL YOUR ATTENTION TO THE NEXT

16   PAGE OF THIS EXHIBIT, 426.  AND IF WE CAN NOW

17   HIGHLIGHT THE TOP PORTION OF THE DOCUMENT.

18             AND WHAT'S GOING ON IN THIS TOP PORTION

19   OF THE DOCUMENT, AGENT FINE?

20   A.    THIS IS ALL THE DOCUMENTS INTO THAT ACCOUNT.

21   Q.    OKAY.  NOW IN TERMS OF THE DEPOSITS COMING

22   FROM THE VARIOUS ACCOUNTS, THERE APPEARS TO BE SOME

23   ON LINE TRANSFERS ON 2-28 AND 3-03?

24   A.    YES.

25   Q.    AND WHAT ACCOUNTS ARE THOSE MONEYS COMING

1    FROM?

2    A.   THE ASENQUA WELLS FARGO ACCOUNT.

3    Q.   THE ONE WE HAD A MOMENT AGO?

4    A.   YES.

5    Q.   EXHIBIT 237.  HAVE YOU ALSO BEEN ABLE TO LOOK

6    OVER THIS DOCUMENT IN TERMS OF HOW THE MONEY WAS

7    SPENT IN GENERAL TERMS AFTER THE MOAN HAS ARRIVED

8    FROM THE OTHER WELLS FARGO ACCOUNT FOR ASENQUA?

9    A.   YES.

10   Q.   THERE WERE ANY CASH WITHDRAWALS?

11   A.   YES.

12   Q.   WAS THERE ANY SPENDING ON WHAT APPEARS TO BE

13   TRAVEL?

14   A.   YES.  IN THE ASENQUA ACCOUNT THERE APPEARED TO

15   BE TRAVEL PURCHASES.  IN THE PERSONAL ACCOUNT,

16   ABOUT 4500 WAS TRANSFERRED THAT APPEARED TO BE

17   PERSONAL.

18   Q.   AGENT FINE, GOING ON NOW TO, STILL LOOKING AT

19   EXHIBIT 265, WHAT IS THE ORANGE COLOR INDICATED

20   THERE ON THE TOP OF THE PIE CHART?

21   A.   THAT'S $3,000 OUT OF THE $100,000 WAS

22   WITHDRAWN IN CASH FROM THE BANK OF AMERICA ACCOUNT.

23   Q.   THEN AGENT FINE AT THE VERY BOTTOM OF THE

24   DOCUMENT THERE APPEARS TO BE TWO ASTERISK?

25   A.   YES.

1    Q.   WHAT ARE THOSE IN REFERENCE TO?

2    A.   THEY ARE SIMILAR TO THE ASTERISK ON THE FIRST

3    PIE CHART.  THE FIRST ONE INDICATES THAT PRIOR TO

4    BOB LIN'S $100,000 COMING, THE ACCOUNT BALANCE WAS

5    NEGATIVE AGAIN FOR $207.82.

6         SO SOME OF BOB'S MONEY WAS USED TO

7    REPLENISH THE OVERDRAWN ACCOUNT.  AND THEN THERE

8    $202.00 IN BANK FEES.

9    Q.   AGENT FINE AGAIN, ASKING YOU A SIMILAR

10   QUESTION, BASED ON THE REVIEW OF THE BANK STATEMENT

11   IN SUCCESS BANK ACCOUNT 6581 WHICH WAS THE

12   RECEIVING ACCOUNT FOR MR. LIN'S SECOND WIRE, HOW

13   MUCH OF THAT WOULD YOU DETERMINE WENT TO THE

14   PURCHASE OF SECURITIES?

15   A.   I FOUND NO EVIDENCE THAT ANY OF IT WENT TO THE

16   PURCHASE OF SECURITIES.

17   Q.   AGENT FINE, I NOW CALL YOUR ATTENTION TO

18   GOVERNMENT EXHIBIT 266.

19        WHAT ARE WE NOW LOOKING AT HERE?  WHAT IS

20   THIS EXHIBIT 266 SUMMARIZE?

21   A.   THIS, AGAIN, IS THE DAILY BALANCE IN THE BANK

22   OF AMERICA ACCOUNT, JUST PRIOR TO BOB LIN'S

23   $100,000 WIRE ON FEBRUARY 23RD, 2005, AS WELL AS

24   FOR ABOUT A WEEK AND A HALF AFTER.

25   Q.   HOW MUCH TIME ELAPSED BETWEEN THE TIME THAT

1     THE MONEY HIT THE ACCOUNT ON OR ABOUT FEBRUARY 23RD

2     UNTIL IT WAS EXHAUSTED?

3     A.   ABOUT TEN DAYS.

4     Q.   AND NOW AGENT FINE I WANT TO CALL YOUR

5     ATTENTION TO THE NEXT EXHIBIT IN ORDER, 267?

6     A.   OKAY.

7     Q.   NOW WHAT IS THIS DOCUMENT?

8     A.   THIS IS THE DAILY BALANCE FOR THE ENTIRE MONTH

9     PERIOD OF THE STATEMENT WE HAVE BEEN LOOKING AT.

10    THE TWO SPIKES, WHAT WE SAW PREVIOUSLY IN THE OTHER

11    TWO GRAPHS, THE HUNDRED THOUSAND DOLLAR INVESTMENTS

12    BY BOB LIN.

13    Q.   JUST SO WE ARE CLEAR, THE DOCUMENT INDICATES

14    THIS, THE TWO HIGH SPIKES ARE THE TWO RECEIPTS OF

15    MR. LIN'S $100,000 ON FEBRUARY 8TH THEN AGAIN ON

16    FEBRUARY 23RD?

17    A.   YES.

18    Q.   AND OTHER THAN THE MONEYS COMING IN FROM

19    MR. LIN, OTHER THAN ANY KIND OF CREDITS BACK TO THE

20    ACCOUNT ON CARD PURCHASES, WERE THERE ANY OTHER

21    SOURCES OF MONEY COMING INTO THIS ACCOUNT BETWEEN

22    THE TIME PERIOD OF FEBRUARY 5TH, 2005, UP TO

23    MARCH 4TH, 2005?

24    A.   SNOW.

25    Q.   NOW YOU'VE HAD AN OPPORTUNITY, SPECIAL AGENT

1    FINE TO REVIEW THE STATEMENTS PROVIDED TO MR. LIN

2    AS TO THE FIRST $2,100,000 WIRES?

3    A.   I HAVE.

4    Q.   I WOULD ASK TO PUBLISH TO THE JURY GOVERNMENT

5    EXHIBIT NUMBER 3:  HAVE YOU SEEN THIS DOCUMENT

6    BEFORE, AGENT FINE?

7    A.   YES.

8    Q.   WHAT IS THIS DOCUMENT?

9    A.   IT'S THE ACCOUNT STATEMENT GIVEN TO BOB LIN,

10   I'M SORRY I CAN'T READ THE DATE.

11   Q.   MS. BURNEY, IF YOU COULD ENLARGE THE TOP

12   PORTION OF THE DOCUMENT.

13   A.   IT APPEARS TO BE THE ACCOUNT STATEMENT FOR BOB

14   LIN FOR Q1, 2005.  STATEMENT DATE IS APRIL 17TH,

15   2005.

16   Q.   AND MS. BURNEY, IF YOU COULD ENLARGE THE

17   BOTTOM PORTION OF THE DOCUMENT WHERE IT SAYS TOTAL

18   VALUE.  COULD YOU READ THAT?

19   A.   YES.

20   Q.   WHAT DOES IT SAY AT TOTAL VALUE?

21   A.   $203,842.

22   Q.   AND BASED ON YOUR ANALYSIS OF MR. LIN'S FIRST

23   TWO WIRES, AS THEY CAME INTO THE BANK AMERICA

24   ACCOUNT ENDING IN 6581, WHAT WAS THE BALANCE IN

25   THAT ACCOUNT AS OF EARLY MARCH 2005, ABOUT 4, 5,

1    6 WEEKS EARLIER?

2    A.   NEXT TO NOTHING.

3    Q.   AGENT FINE, IF YOU COULD NOW TURN OUR

4    ATTENTION TO GOVERNMENT EXHIBIT 268 AND ASK THAT BE

5    PUBLISHED NOW FOR THE JURY.

6             WHAT INFORMATION DOES GOVERNMENT 268

7    SUMMARIZE, AGENT FINE?

8    A.   THIS IS THE DISTRIBUTION OF BOB LIN'S FIRST

9    $250,000 WIRE WHICH HE WIRED ON JULY 6TH, 2005.

10   Q.   AND IT APPEARS YOU'VE DONE A SIMILAR BREAK

11   DOWN OF DISTRIBUTION OF THAT MONEY AFTER IT HIT THE

12   ACCOUNT?

13   A.   I HAVE.

14   Q.   AND WAS ANY OF THIS MONEY, BASED ON YOUR

15   REVIEW OF THE ACCOUNT -- THIS IS SKILL BANK ACCOUNT

16   6581?

17   A.   YES.

18   Q.   THE SAME ONE WE WERE LOOKING AT FOR THE FIRST

19   TWO WIRES?

20   A.   YES.

21   Q.   WAS ANY OF THE MONEY USED TO PURCHASE

22   SECURITIES OR STOCKS OR OTHER SECURITIES?

23   A.   NO.

24   Q.   AND THE MONEY WAS ALSO SPENT ON THE CATEGORIES

25   REPRESENTED ON EXHIBIT 268?

1    A.   THAT'S CORRECT.

2    Q.   SO THE FIRST WHAT APPEARS TO BE THE LARGEST

3    CATEGORY IS $150,000; IS THAT CORRECT?

4    A.   THAT'S RIGHT.

5    Q.   WHAT IS THAT A REFERENCE TO?

6    A.   SO MOST OF BOB LIN'S MONEY WAS TRANSFERRED TO

7    A PRIOR INVESTOR, HONG LU FOR SPECIFICALLY

8    $150,000.

9    Q.   AND AGENT FINE, WHAT'S THE NEXT CATEGORY ON

10   THIS FOR, LOOKS LIKE A LITTLE OVER $34,000?

11   A.   YES, SO $34,232.36 SPENT ON CHECK AND CHECK

12   CARD PURCHASES.

13   Q.   AGENT FINE I'M NOW PROVIDING YOU A HARD COPY

14   OF THE NEXT PORTION, 245.  IF YOU COULD DESCRIBE

15   THE DOCUMENT YOU ARE NOW LOOKING AT THAT'S PART OF

16   EXHIBIT 245.

17   A.   THIS IS THE BANK OF AMERICA ACCOUNT STATEMENT

18   FOR THE ACCOUNT ENDING IN 6581 FOR THE TIME PERIOD

19   OF JUNE 10TH, 2005, THROUGH JULY 8TH, 2005.  I ALSO

20   HAVE THE SEQUENTIALLY THE NEXT ACCOUNT STATEMENT

21   FOR THAT TIME FRAME WHICH IS FOR THE PERIOD

22   JULY 9TH, 2005, THROUGH AUGUST 10TH, 2005.

23   Q.   AND FOR THE -- AGAIN, FOR THE BENEFIT OF THE

24   RECORD, THE STATEMENT BEGINNING JULY 9TH, WHAT IS

25   THE NUMBER AT THE VERY BOTTOM IN THE MIDDLE?

1    A.   THE ONE, JULY 9TH IS 8644.  IN THE VERY

2    MIDDLE?  PAGE 40.

3    Q.   PAGE 40.  WHICH IS THE NUMBER OF THE

4    ELECTRONIC VERSION?

5    A.   YES.

6    Q.   JUST AGAIN, IF WE COULD WALK THROUGH THIS

7    PORTION OF EXHIBIT 245.  MS. BURNEY, IF YOU COULD

8    FLASH UP ON THE SCREEN EXHIBIT 245 AT PAGES 38 TO

9    42.  AND IN PARTICULAR, IF YOU COULD CALL YOUR

10   ATTENTION TO THE DOCUMENT WHICH ENDS AT THE BOTTOM,

11   NUMBER 40.

12        SO THIS IS THE STATEMENT YOU WERE

13   REFERRING TO A MOMENT AGO, AGENT FINE?

14   A.   YES.

15   Q.   MS. BURNEY, IF YOU COULD FIRST FLASH UP ON THE

16   SCREEN NOW THE NEXT PAGE IN SEQUENCE, PAGE 41 OF

17   EXHIBIT 245 WHICH IS BATES 8645.

18        AND IF YOU COULD ENLARGE, MS. BURNEY, THE

19   ENTRIES BEGINNING AT JULY 11, 2005.  AND IF YOU

20   COULD FOCUS ON THE ENTRIES BEGINNING 7-11 UP

21   THROUGH 7-14.

22        AGENT FINE, THERE APPEARS TO BE AN ENTRY

23   ON 7-11-2005 WHICH WOULD BE SEVERAL DAYS AFTER

24   MR. LIN'S WIRE HIT THE ACCOUNT.

25   A.   YES.

1    Q.   FOR $35?

2    A.   YES.

3    Q.   YOU SEE THAT ENTRY THERE?

4    A.   YES.

5    Q.   WHAT'S THAT IN REFERENCE TO AS FAR AS THE LINE

6    ITEM?

7    A.   IT'S A PURCHASE AT FISH EAT CAFE IN FREMONT.

8    Q.   GOING DOWN THERE'S AN ENTRY FOR $1,341.59?

9    A.   YES.

10   Q.   WHAT'S THAT LINE ENTRY?

11   A.   PURCHASE WITH EVA AIRWAYS.

12   Q.   AND AGENT FINE GOING ON TO THE BOTTOM OF THE

13   PAGE 714 THERE'S AN ENTRY FOR $3,088.96?

14   A.   YES.

15   Q.   WHAT'S THE LINE AUTOMATIC?

16   A.   FAR EASTERN HOTEL IN TAIPEI.

17   Q.   AND NUMBER OF ENTRIES HERE ON THIS PAGE,

18   MR. FINE, ON 7-18?

19   A.   YES.

20   Q.   I CALL YOUR ATTENTION TO THE ENTRY ABOUT

21   HALFWAY DOWN THE PAGE FOR 7-18, USA PETROLEUM?

22   A.   YES.

23   Q.   HOW MUCH IS THAT ENTRY?

24   A.   $15.14.

25   Q.   AND GOING ON FURTHER IF WE COULD LOOK BAT THE

1    BOTTOM HALF OF THE PAGE FOR THE ENTRIES ON 7-26-05.

2    AGAIN, AGENT FINE I CALL YOUR ATTENTION TO THE

3    ENTRY FOR SHELL OIL ON 7-26-05.  HOW MUCH IS THAT

4    FOR?

5    A.   $49.29.

6    Q.   BASED ON YOUR REVIEW OF AFTER MR. LIN'S WIRE

7    HIT THE 6581 ACCOUNT ON OR ABOUT 7-6-2005 WHICH

8    SHOWED THE STATEMENTS FOR JUNE AND JULY THAT YOU

9    REFERENCED EARLIER ON EXHIBIT 245.  IS THIS WHAT WE

10   ARE SEEING HERE ON THE CHECK AND CHECK CARD

11   PURCHASES, THAT WAS CONSISTENT WITH THE PATTERN YOU

12   OBSERVED?

13   A.   YES.

14   Q.   MS. BURNEY, IF YOU COULD RETURN TO

15   EXHIBIT 268, THE PIE CHART FOR THE THIRD BOB LIN

16   WIRE.

17          THE NEXT AREA IN QUESTION APPEARS TO BE

18   BLACK, $20,000 ON IT.

19   A.   YES.

20   Q.   WHAT'S THAT IN REFERENCE TO?

21   A.   REFERENCE OF $20,000 GOING TO A PERSON BY THE

22   NAME OF J-I-E-Z-H-O-U, LI U.

23   Q.   THAT MONEY WAS TRANSFERRED OUT OF THE 6581

24   BANK OF AMERICA ACCOUNT?

25   A.   YES.

1    Q.   TURNING TO THE NEXT CATEGORY, $8,000, GREEN,

2    WHAT'S THAT A REFERENCE TO?

3    A.   $8,000 TO ASENQUA EMPLOYEES.

4    Q.   AND WHAT ASENQUA EMPLOYEE RECEIVED THAT?

5    A.   STEVE BOND.

6    Q.   AND THAT'S WITH RESPECT TO THE BANK OF AMERICA

7    ACCOUNT IN QUESTION, 6581?

8    A.   YES.

9    Q.   SAYS $37,000 767 AND $0.64 DO YOU SEE THAT ON

10   YOUR CHART?

11   A.   I DO.

12   Q.   THEN ON THE RIGHT SIDE IT SAYS MISCELLANEOUS

13   DIVERSIONS, EXHIBIT 269.  WHAT'S THAT IN REFERENCE

14   TO?

15   A.   THERE'S A NUMBER OF TRANSFERS OR PAYMENTS THAT

16   WERE SMALLER THAN $8,000 WOULD MAKE TINY PIE SLICES

17   THAT KIND OF MOLD TOGETHER IN THAT ONE PIE SPACE.

18   Q.   MS. BURNEY IF YOU COULD TURN TO THE NEXT

19   DOCUMENT IN SEQUENCE, EXHIBIT 216.  THIS IS THE

20   SERIES OF MISCELLANEOUS MATTERS AND DIVERSIONS THAT

21   YOU WERE REFERRING TO JUST A MOMENT AGO, AGENT

22   FINE?

23   A.   YES.

24   Q.   AND WERE ANY OF THESE MONEYS LISTED HERE BASED

25   ON YOUR REVIEW OF THE UNDERLYING DOCUMENTS AND

1    THESE FURTHER ON ENTRIES OF WELLS FARGO, DID ANY OF

2    THOSE GO TOWARDS THE PURCHASE OF SECURITIES?

3    A.   NO.

4    Q.   SO AGAIN SUMMARIZING HERE THE REVIEW OF THE

5    THIRD BOB LIN WIRE DID ANY OF THE $250,000 THAT WAS

6    RECEIVED FROM MR. LIN AND RECEIVED INTO THE BANK OF

7    AMERICA ACCOUNT THAT MR. HU HAD PROVIDED HIM WITH

8    AT BANK OF AMERICA ACCOUNT ENDING IN 6581, WAS ANY

9    OF THAT MOAN USED TO PURCHASE SECURITIES AFTER IT

10   WAS RECEIVED INTO THE ACCOUNT?

11   A.   NO.

12   Q.   IF YOU COULD TURN TO EXHIBIT 270.  SO AGENT

13   FINE, WHAT INFORMATION ARE WE LOOKING AT THAT

14   YOU'VE NOW SUMMARIZED IN EXHIBIT 270?

15   A.   SO THIS IS THE DAILY BALANCE IN THE BANK OF

16   AMERICA ACCOUNT ENDING IN 6581 JUST BEFORE FOR THE

17   PERIOD AFTER BOB LIN'S $250,000 WIRE ON JULY 6,

18   2005.

19   Q.   AND BASED ON YOUR REVIEW -- BEFORE WE GET INTO

20   THAT, IT APPEARS YOU SHOW DATES BETWEEN JULY 6TH,

21   BEGINS JULY 5TH THEN IT SPIKES UP TO A QUARTER

22   MILLION DOLLARS ON JULY 6TH?

23   A.   YES.

24   Q.   IS THAT A REFERENCE TO THE WIRE ARRIVING IN

25   THE ACCOUNT?

1    A.   YES.

2    Q.   AND IT APPEARS TO GO ALL THE WAY UP TO

3    JULY 25TH OR 26TH OF 2005?

4    A.   YES.

5    Q.   HOW MUCH MONEY WAS LEFT AT THE END OF YOUR

6    CHART AT JULY 26, 2005?

7    A.   $159.53.

8    Q.   THAT'S YOUR REFERENCE THERE AT THE BOTTOM OF

9    THE CHART?

10   A.   YES.

11   Q.   IT DIDN'T GO DOWN TO 0 AT THAT POINT?

12   A.   NO, IT DIDN'T START AT EXACTLY 0 THOUGH,

13   EITHER.

14   Q.   THAT'S BECAUSE THERE WAS A BALANCE IN THE

15   ACCOUNT WHEN IT HIT?

16   A.   THERE WAS A SMALL BALANCE IN THE ACCOUNT, YES.

17   Q.   OKAY.  LESS THAN 500 HUNDRED DOLLARS -- AND I

18   CALL YOUR ATTENTION TO EXHIBIT 245, PAGE 38.

19   A.   SO THE BALANCE IN THE ACCOUNT PRIOR TO THE BOB

20   LIN'S $250,000 WIRE WAS $481.82.

21   Q.   AND HOW MUCH TIME ELAPSED FROM THE TIME THE

22   QUARTER MILLION HIT THE BANK OF AMERICA ACCOUNT

23   THAT MR. HU HAD CONTROL OF AND THE MONEY THAT WAS

24   IN THERE AFTER EXHAUSTED?

25   A.   ABOUT THREE WEEKS.

1    Q.   NOW AGAIN, AGENT FINE, HAVE YOU HAD AN

2    OPPORTUNITY TO REVIEW THOSE, YOU TOLD US EARLIER

3    YOU HAVE HAD A CHANCE TO REVIEW THE QUARTERLY

4    STATEMENTS?

5    A.   YES.

6    Q.   I CALL YOUR ATTENTION NOW TO GOVERNMENT

7    EXHIBIT 4.  MS. BURNEY, IF YOU COULD BE SO KIND AS

8    TO PUBLISH THAT.  AND MS. BURNEY FOR THE BENEFIT OF

9    MR. FINE IF YOU COULD ENLARGE THE TOP HALF OF THE

10   DOCUMENT WHERE THE STATEMENT IS LISTED.

11            WHAT IS THE STATEMENT DATE OF THIS

12   DOCUMENT ON THE SCREEN

13   A.   JULY 28TH, 2005.

14   Q.   AND WHO WAS IT BEING DIRECTED TO, BASED ON

15   THIS DOCUMENT?

16   A.   IT SAYS FU-YUAN LIN 1996 TRUST.

17   Q.   IT WAS GOING TO AN ADDRESS IN CUPERTINO?

18   A.   YES.

19   Q.   WHAT WAS THE TOTAL VALUE IN THIS STATEMENT

20   PROVIDED FROM MR. LIN TO YOU?

21   A.   I BELIEVE IT SAYS FOR -- COULD YOU MAKE IT

22   BIGGER?

23   Q.   MS. BURNEY, IF YOU COULD ENLARGE IT FURTHER.

24   THE TOTAL VALUE SECTION.

25   A.   OKAY.

1    Q.    AGENT FINE, LET ME PROVIDE YOU WITH A HARD

2    COPY.

3    A.    SOUNDS GOOD.  THERE, I CAN SEE IT NOW.  THE

4    ACCOUNT BALANCE AT THAT DATE WAS $463,078.70

5    ACCORDING TO THIS ACCOUNT STATEMENT.

6    Q.    JUST SO WE ARE CLEAR BASED ON YOUR ANALYSIS OF

7    THE RELEVANCE BANK ACCOUNT ENDING IN 6581, WHAT WAS

8    THE ACCOUNT BALANCE THAT WAS SHOWING AS OF JULY 26,

9    2005, 2 DAYS EARLIER?

10   A.    IN THE BANK OF AMERICA ACCOUNT IT WAS $159.53.

11   Q.    OKAY.  AGENT FINE, CALLING YOUR ATTENTION NOW

12   TO GOVERNMENT EXHIBIT 30, HAVE YOU SEEN THIS

13   DOCUMENT BEFORE, AGENT FINE?

14   A.    YES.

15   Q.    WHAT IS IN DOCUMENT IN GENERAL TERMS?

16   A.    IN GENERAL TERMS THIS WAS THE DOCUMENT

17   MEMORIALIZING BOB LIN'S TRANSFER OF HIS INVESTMENT

18   IN THE ASENQUA BETA FUND TO THE FIRESIDE LS FUND.

19   Q.    AND THERE APPEARS TO BE TWO SIGNATURES ON THIS

20   DOCUMENT?

21   A.    YES.

22   Q.    WHAT SIGNATURE DO YOU UNDERSTAND IS ON THE TOP

23   HALF OF THE DOCUMENT OR THE, JUST BELOW THE ENTRY

24   SAYING $562,332 CUBICLES AND $0.82?

25   A.    FU-YUAN LIN.

1    Q.    AND IMMEDIATELY BELOW MR. LIN?

2    A.    ALBERT HU.

3    Q.    AND THIS WAS IN CONNECTION, WHAT TRANSFER WAS

4    TAKING PLACE HERE AS YOU UNDERSTAND IT?

5    A.    AS I UNDERSTAND IT THE FUND WAS MOVING TO

6    SINGAPORE.  MR. LIN HAD MONEY INVESTED AND THIS WAS

7    TO TRANSFER -- HE HAD MONEY INVESTED IN THE ASENQUA

8    BETA AND THIS WAS TO TRANSFER THE MONEY TO

9    SINGAPORE.

10   Q.    MS. BURNEY, IF YOU COULD PUBLISH GOVERNMENT

11   EXHIBIT NUMBER 6.  IF YOU COULD ENLARGE THE TOP

12   HALF OF THE DOCUMENT.  THANK YOU.

13            YOU'VE SEEN THIS DOCUMENT BEFORE, AGENT

14   FINE?

15   A.    YES.

16   Q.    WHAT IS THE STATEMENT DATE OF THIS DOCUMENT?

17   A.    JANUARY 1ST, 2006.

18   Q.    AND NOW MS. BURNEY IF YOU COULD ENLARGE THE

19   MIDDLE PORTION OF THE DOCUMENT.  IT APPEARS TO SHOW

20   SOMETHING ABOUT A TRANSFER, CORRECT, AGENT FINE?

21   A.    YES.

22   Q.    THE SAME SUM WE LOOKED AT A MOMENT AGO?

23   A.    THAT'S CORRECT.

24   Q.    AND THIS WAS A DOCUMENT THAT MR. HU PROVIDED

25   TO MR. LIN, CORRECT?

1    A.   YES.

2    Q.   AND MS. BURNEY IF YOU COULD ENLARGE THE BOTTOM

3    HALF OF THE DOCUMENT.  IT APPEARS TO HAVE TWO

4    SIGNATURES AGAIN, AGENT FINE?

5    A.   YES.

6    Q.   AFTER MR. POLLACK AND YOU?

7    A.   YES.

8    Q.   NOW YOU REVIEWED THE DOCUMENTS, WE ARE GETTING

9    AHEAD OF OURSELVES A LITTLE BIT.  BUT YOU RUDE THE

10   DOCUMENTS FOR THE CREDIT SWISS ACCOUNTS THAT WERE

11   USED FOR FIRESIDE LS FUND RECEIPT OF WIRES?

12   A.   YES.

13   Q.   THAT RECEIVED WIRES FROM MR. LIN AND

14   MR. VERDIELL, CORRECT?

15   A.   CORRECT.

16   Q.   AND BASED ON YOUR REVIEW OF THOSE CREDIT SWISS

17   DOCUMENTS IN OR AROUND THE TIME OF EXHIBIT 6 AND

18   AGAIN, MS. BURNEY, IF YOU COULD FLASH THAT BACK UP

19   WITH THE ENTIRE DOCUMENT.

20        STATEMENT DATE OF JANUARY 1, 2006, DID

21   YOU SEE ANY INDICATION OF A WIRE IN THE AMOUNT OF

22   OVER $500,000 COMING FROM ANY ACCOUNT INTO THAT

23   CREDIT SWISS ACCOUNT FOR THE BENEFIT OF MR. LIN?

24   A.   NO.

25   Q.   IF WE COULD NOW TURN YOUR ATTENTION AGENT FINE

1    TO EXHIBIT 271?

2    A.   OKAY.

3    Q.   AND THIS IS ANOTHER CHART YOU PREPARED IN

4    CONNECTION WITH YOUR TESTIMONY HERE TODAY?

5    A.   YES.

6    Q.   SO WHAT INFORMATION IS SUMMARIZED IN

7    EXHIBIT 271?

8    A.   SO THIS IS THE DISTRIBUTION OF MARK VERDIELL'S

9    $2 MILLION INVESTMENT WHICH THE WIRE TRANSFER

10   OCCURRED ON APRIL 30TH, 2007.

11   Q.   AND THERE'S A TITLE IMMEDIATELY BELOW THAT,

12   AGENT FINE THAT SAYS DISTRIBUTION AFTER WIRE

13   RECEIVED AS OF 6-19-2007?

14   A.   YES.

15   Q.   WHAT'S THAT A REFERENCE TO, AS OF 6-19-2007?

16   A.   SO THIS IS WHERE THE MONEY WAS DISTRIBUTED TO

17   UP UNTIL OR AS OF THE DATE OF 6-19-2007.

18   Q.   WHY IS THAT DATE OF 6-19-2007 SO SIGNIFICANT

19   AFTER THE WIRE TRANSFER OF APRIL 30TH, 2007?

20   A.   SURE.  IN CASE I WASN'T CLEAR, THIS IS THE

21   CREDIT SWISS ACCOUNT IN SINGAPORE IS WHAT WE ARE

22   LOOKING AT.  IS ON 6-20-2007 IS WHEN BOB LIN WIRED

23   HIS SECOND $250,000 WIRE.

24        SO UP UNTIL 6-19 IT'S ESSENTIALLY ONLY

25   MARK VERDIELL'S MONEY IN THIS ACCOUNT AND YOU CAN

1    DIRECTLY ASSOCIATE HIS MONEY WITH, WE WILL GET INTO

2    THE DETAILS IN THE PIE CHART, WHERE IT GOES.

3              AFTER 6-19 IT'S EITHER MARK VERDIELL'S

4    MONEY OR BOB LIN'S BUT IT'S ONE OF THE TWO.

5    Q.   JUST SO WE ARE CLEAR FOR YOUR TESTIMONY NOW

6    AND I WILL BE ASKING YOU ADDITIONAL QUESTIONS ON,

7    MR. FINE, YOUR TESTIMONY IN REGARD TO THIS CHART,

8    EXHIBIT 271 IS ONLY IN REGARD TO FROM THE TIME THE

9    WIRE HITS MR. VERDIELL'S ACCOUNT INTO THE CREDIT

10   SWISS ACCOUNT HAD BEEN PROVIDED TO HIM BY MR. HU UP

11   UNTIL JUNE 19TH, 2007?

12   A.   CORRECT.

13   Q.   AND DID THE DEFENDANT, MR. HU HAVE CONTROL AND

14   ACCESS TO THIS CREDIT SWISS ACCOUNT?

15   A.   YES.

16   Q.   AND JUST A COUPLE MORE DETAILS.  WE ARE

17   CALLING IT THE CREDIT SWISS ACCOUNT, IT WAS JUST

18   ONE ACCOUNT OR WAS THERE SORT OF ANY KIND OF A

19   SERIES OF ACCOUNTS THAT THEY ARE RELATED TO ONE

20   ANOTHER?

21   A.   THERE'S A SERIES OF ACCOUNTS.

22   Q.   COULD YOU IN GENERAL TERMS, COULD YOU DESCRIBE

23   THOSE, HOW THEY BROKE DOWN?

24   A.   SURE.  WELL, THERE'S A SERIES OF DEPOSITED

25   ACCOUNTS THAT WOULD HOLD CASH.  AND THERE'S LIKE AN

815

1    ACCOUNT FOR SEVERAL DIFFERENT CURRENCIES AROUND THE

2    WORLD, THE U.S. DOLLAR ACCOUNT, THE EURO ACCOUNT,

3    THE YAN ACCOUNT, ET CETERA.  AND YOU HAVE THE

4    ACTUAL PORTFOLIO ACCOUNT WHERE SECURITIES COULD BE.

5    Q.   THOSE ARE BOTH SORTED WITH FIRESIDE UNDER THE

6    CONTROL OF MR. HU?

7    A.   YES.

8    Q.   SO NOW LOOKING AT YOUR CHART, LET'S WALK

9    THROUGH THE CATEGORIES FROM LARGEST TO SMALLEST.

10   WHAT'S THE FIRST CATEGORY ON YOUR CHART IN PURPLE

11   FOR 600,000 PLUS?

12   A.   THE FIRST CATEGORY IS SIX HUNDRED THOUSAND

13   DOLLARS WAS OUT OF MARK VERDIELL'S $2 MILLION WAS

14   SENT TO A PRIOR INVESTOR, ANDY YAN.

15   Q.   AND HOW DID THAT MONEY GET FROM THE CREDIT

16   SWISS ACCOUNT FROM FIRESIDE TO MR. YAN?

17   A.   WIRE TRANSFER.

18   Q.   MS. BURNEY IF WE COULD LOOK AT A SERIES OF

19   DOCUMENTS, GOVERNMENT EXHIBIT 224.  IN PARTICULAR,

20   BATES 2779 AND 2781 WHICH ARE FOR YOUR RECORDS ON

21   THE ELECTRONIC VERSION PAGES 31 AND 33.

22   Q.   HAVE YOU SEEN THIS DOCUMENT BEFORE?

23   A.   I HAVE.

24   Q.   WHAT IS THE FIRST PAGE WE ARE LOOKING AT?

25   A.   THE 600,000 IS ACTUALLY TWO WIRES OF ABOUT

1    $300,000 ANDY YAN AND THIS IS ONE OF THE FIRST TWO

2    WIRES.

3    Q.   THIS HAS A SERIES OF INDICATIONS ON IN AS FAR

4    AS NOTES AND SIGNATURES, AGENT FINE?

5    A.   YES.

6    Q.   WHAT'S YOUR UNDERSTANDING OF WHAT PERSON'S

7    SIGNATURE THERE AS THE AUTHORIZED SIGNATURE?

8    A.   I UNDERSTAND THAT TO BE ALBERT KE-JENG HU'S.

9    Q.   MS. BURNEY IF YOU COULD ENLARGE THE PORTION OF

10   224.

11        COULD YOU PLEASE READ THE PORTION READING

12   AT THE TOP LINE THERE, AGENT FINE, VALIDATION

13   A.   VALIDATION ON CLIENT'S FAX INSTRUCTION.

14   Q.   WHAT DOES IT SAY IMMEDIATELY BELOW THAT?

15   A.   VOICE LOGGED WITH CLIENT, MR. HU.

16   Q.   THEN MS. BURNEY IF YOU COULD NOW RETURN TO THE

17   LARGE PORTION OF THE DOCUMENT, THE BALANCE OF IT.

18        IF YOU COULD FOCUS IN ON THE PORTION

19   READING, PLEASE TAKE -- ALL THE WAY DOWN TO

20   BENEFICIARY ACCOUNT.

21        AND AGENT FINE IS THIS THE INFORMATION

22   YOU WERE JUST CONVEYING REGARDING THE AMOUNT OF THE

23   WIRE?

24   A.   YES.

25   Q.   FOR HOW MUCH?

1    A.   $300,000.

2    Q.   WHO IS THE BENEFICIARY NAME LISTED?

3    A.   ANDY YAN.

4    Q.   MS. BURNEY IF YOU COULD SIMILARLY CALL UP

5    EXHIBIT 224 -- YOUR PAGE 33.  THANK YOU.

6              AND AGAIN, THE DATE OF THIS DOCUMENT,

7    AGENT FINE AT THE VERY TOP

8    A.   I THINK IT SAYS MAY 7TH, 2006.

9    Q.   IF YOU GO DOWN TO THE BOTTOM PORTION, WHERE IT

10   HAS VOICE LOG.  IT INDICATES VOICE LOG BY.

11   A.   MR. HU.

12   Q.   AND IF YOU COULD GO TO THE SIGNATURE ON THE

13   LEFT-HAND SIDE.  AND WHOSE SIGNATURE DO YOU

14   UNDERSTAND THAT TO BE?

15   A.   ALBERT HU'S.

16   Q.   AND THEN MR. FINE IF YOU COULD NOW CALL YOUR

17   ATTENTION TO THE FAX LINES AT THE BOTTOM OF 279

18   AND -- 2779 AND 2781.  AND MS. BURNEY IF YOU COULD

19   CALL YOUR ATTENTION TO THE BOTTOM OF THE DOCUMENT,

20   THE FAX LINES LISTED THERE.

21             WHAT DATE IS LISTED THERE, AGENT FINE ON

22   THE FAX LINES

23   A.   MAY 7, 2007.  AND THE ACCOUNT STATEMENT IS FOR

24   CREDIT SWISS ALSO HAD THIS AS A 2007 TRANSACTION.

25   I BELIEVE THE DATE OF 2006 IS AN ERROR.

1    Q.   THAT'S THE SAME FOR 2779 AND 2781?

2    A.   YES.

3    Q.   THE NEXT CATEGORY APPEARS TO BE A WHITE

4    CATEGORY FOR FIRESIDE USA, AGENT FINE?

5    A.   YES.

6    Q.   WHAT IS THAT A REFERENCE TO?

7    A.   MONEY SENT TO AN ACCOUNT AT U.S. BANK AND

8    FIRESIDE USA.

9    Q.   AND HOW MUCH, APPROXIMATELY, WAS THAT AMOUNT

10   OF THE PORTION OF MR. VERDIELL'S $2 MILLION?

11   A.   $474,9685.

12   A.   WAS THAT ACCOUNT BASED IN THE UNITED STATES.

13   Q.   YES.  EVEN THOUGH THE MONEY HAD BEEN

14   TRANSFERRED FROM THE UNITED STATES TO SINGAPORE?

15   A.   CORRECT.

16   Q.   OF THAT $474,000 PLUS, WHAT HAPPENED TO THE

17   MAJORITY OF MONEY THAT WENT INTO THAT FIRESIDE USA

18   ACCOUNT?

19   A.   MOST OF IT WAS TRANSFERRED TO ANOTHER ACCOUNT

20   IN THE CONTROL OF ALBERT HU.

21   Q.   THAT WAS IN WHAT BANK?

22   A.   I WOULD HAVE TO SEE THE STATEMENTS.

23   Q.   CERTAINLY, WE CAN SHOW THAT.  IF WE COULD SHOW

24   ON THE SCREEN, MS. BURNEY, EXHIBIT 242, AT PAGES 91

25   TO 95 BATES 7776.  IF WE COULD ENLARGE THE TOP

819

1    PORTION OF THE DOCUMENT.  THIS IS THE FIRESIDE USA

2    ACCOUNT YOU WERE TALKING ABOUT A MOMENT AGO.

3    A.   THIS WAS THE ORIGINAL $474,000.

4    Q.   AND THE ACCOUNT GOES ON FURTHER, EXHIBIT 227.

5    SO IF WE COULD LOOK AT THAT DOCUMENT AS WELL,

6    MS. BURNEY.  I'M SORRY, BEGINNING AT PAGE 15.

7    THESE ARE THE CREDIT SUISSE ENTRIES AS WELL?

8    A.   THAT'S CORRECT.

9    Q.   SO BASED ON YOUR REVIEW OF THE ACCOUNT

10   MATERIAL FOR FIRESIDE USA AND THEN THE TRANSFERS

11   INTO THE FURTHER ACCOUNT CONTROLLED BY MR. HU, WAS

12   ANY OF THAT MONEY USED TO PURCHASE SECURITIES?

13   A.   IT WAS NOT.

14   Q.   MS. BURNEY, IF YOU COULD RETURN BACK TO

15   GOVERNMENT EXHIBIT 271.

16           NEXT CATEGORY ON YOUR CHART, AGENT FINE

17   APPEARS TO BE FOR SECURITIES

18   A.   THAT'S CORRECT.

19   Q.   FOR APPROXIMATELY $410,000?

20   A.   YES.  410,717.89 WAS USED TO PURCHASE

21   SECURITIES AS OF JUNE 17, 2007.

22   Q.   AND SO IN FACT THERE WAS A TRADING GOING ON IN

23   SECURITIES FOR AT LEAST A PORTION OF MR. VERDIELL'S

24   MONEY?

25   A.   YES.

1  Q.   HOW MUCH DID THAT AMOUNT TO APPROXIMATELY,

2  PERCENTAGE WIDE?

3  A.   ABOUT 21 PERCENT OF HIS MONEY.

4  Q.   NOW, AGENT FINE ARE YOU FAMILIAR WITH

5  GOVERNMENT EXHIBIT NUMBER 12 THE PPM FOR THE

6  FIRESIDE LS FUND?

7  A.   YES.

8  Q.   DOES IT PROVIDE THAT ONLY 21 PERCENT OF THE

9  INVESTOR'S MONEY WOULD GO TO SECURITIES?

10  A.   NO.

11  Q.   NOW, WE ARE GOING TO FINISH WITH THIS CHART

12  AGENT FINE.  BUT BEFORE I GO ON I WANT TO ASK YOU,

13  OF THAT $410,000, JUST SO WE CAN BE CLEAR, WHAT

14  HAPPENED TO THOSE SECURITIES ULTIMATELY THAT WERE

15  USED, WHAT WAS THE END RESULT OF THOSE SECURITIES?

16  DID ANY OF THOSE MONEYS END UP BEING RETURNED TO

17  MR. VERDIELL?

18  A.   NO.

19  Q.   THOSE SECURITIES WERE TOLD OVER TIME, AS WE

20  ARE GOING TO SEE IN A FEW MOMENTS IN YOUR

21  TESTIMONY?

22  A.   THEY WERE SOLD, YES.

23  Q.   AND DID ANY OF THOSE PROCEEDS, WERE THEY

24  RETURNED TO MR. VERDIELL?

25  A.   NO.

1    Q.   AND THAT'S BASED ON YOUR REVIEW OF THE CREDIT

2    SWISS COULD RECORDS?

3    A.   THAT'S CORRECT.

4    Q.   SO TURNING NOW TO THE NEXT CATEGORY IN YOUR

5    CHART THE FOREST GREEN OF $280,000?

6    A.   YES.  $280,000 WAS TRANSFERRED IN THE NAME OF

7    CAM PRIVILEGE VISION MANAGEMENT, ALSO, CREDIT

8    SWISS.  CREDIT SUISSE.

9    Q.   HOW DO YOU KNOW THAT?  HOW DID YOU DETERMINE

10   IT WAS A CAMBRIDGE VISION MANAGEMENT ACCOUNT.  YOU

11   CAN SEE THE 280,000 ON THE ACCOUNT STATEMENT AND

12   YOU CAN LOOK AT TRANSFER RECORD?

13   Q.   WHERE WAS THIS CAMBRIDGE VISION MANAGEMENT

14   LOCATED?

15   A.   CREDIT SWISS IN SINGAPORE.

16   Q.   SO IT WAS ALSO A CREDIT SUISSE ACCOUNT IN

17   SINGAPORE?

18   A.   YES.

19   Q.   AND DID DEFENDANT ALSO HAVE CONTROL OF THE

20   CAMBRIDGE VISION MANAGEMENT ACCOUNT?

21   A.   YES.

22   Q.   DID YOU HAVE A CHANCE TO REVIEW THE CAMBRIDGE

23   VISION MANAGEMENT ACCOUNT AT CREDIT SUISSE?

24   A.   I DID.

25   Q.   DID ANY OF MR. VERDIELL'S MONEY USED TO

1   PURCHASE SECURITIES?

2   A.   NO.

3   Q.   DID ANY OF THE MONEY THAT WENT TO THE

4   CAMBRIDGE VISION MANAGEMENT ACCOUNT EVER MAKE ITS

5   WAY BACK TO MR. VERDIELL?

6   A.   NO.

7   Q.   WHAT'S THE LIGHT GRAY COLOR THERE AT THE TOP

8   OF YOUR CHART FOR 160,000?

9   A.   YES.   THAT'S $160,000 TO YILI LIU.   THE 30 YOU

10   ALSO SEE ON THE 30TH, ANDY YAN'S TIMES TWO, THOSE

11   ARE ACTUALLY WIRE TRANSFER FEES IT'S NOT BEING

12   TRANSFERRED TO THAT PERSON, HOWEVER THAT FULL

13   AMOUNT IS MARK VERDIELL'S MONEY, SO I INCLUDED THE

14   FULL AMOUNT THERE.

15   Q.   SO THE ODD NUMBERS AT THE END OF THOSE LARGE

16   AMOUNTS ARE SIMPLY THE FEES ASSOCIATED WITH THE

17   TRANSFERS?

18   A.   THAT'S RIGHT.

19   Q.   SO AGAIN YOU DETERMINED THERE WAS ADDITIONAL

20   WIRES TRANSFERRED TO YILI LIU?

21   A.   YES.

22   Q.   WERE YOU ABLE TO VIEW ANY WIRE DOCUMENTS WITH

23   THOSE TRANSFERS?

24   A.   YES.

25   Q.   THEN AGENT FINE IF WE COULD LOOK AT

1    EXHIBIT 224 AT BATES NUMBER 2784.  IF WE COULD

2    ENLARGE THIS DOCUMENT.  WHAT'S THE DATE ON THIS

3    DOCUMENT, AGENT FINE?

4    A.   MAY 16, 2007.

5    Q.   AND HOW MUCH -- COULD YOU ACTUALLY READ AGENT

6    FINE THIS PORTION INTO THE RECORD?

7    A.   PLEASE TAKE THIS LETTER AS MY INSTRUCTION TO

8    REMIT USD, $160,000, USD, 160,000 ONLY, FROM THE

9    SUBJECT A/C TO THE FOLLOWING:

10   Q.   THEN THE BENEFICIARY NAMED DOWN BELOW?

11   A.   YILI LIU.

12   Q.   AND THEN MS. BURNEY, IF YOU COULD ENLARGE THE

13   BOX IN THE MIDDLE PORTION OF THE DOCUMENT, THANK

14   YOU.  AGAIN THERE'S ANOTHER VALIDATION ON CLIENT'S

15   FAX INSTRUCTION?

16   A.   YES.

17   Q.   VOICE LOGGED WITH?

18   A.   YES.

19   Q.   WHOSE NAME IS WRIT THEN THERE WITH THE VOICE

20   LOG ENTRY?

21   A.   MR. HU.

22   Q.   AND AGAIN, IF YOU COULD, MS. BURNEY, ENLARGE

23   THE SIGNATURE PORTION IMMEDIATELY NEXT TO THAT BOX.

24        WHOSE SIGNATURE DO YOU RECOGNIZE THAT TO

25   BE?

1    A.   ALBERT HU.

2    Q.   IF WE COULD NOW RETURN TO AGENT FINE'S CHART

3    AT EXHIBIT 271, MS. BURNEY.   THERE APPEARS TO BE A

4    REFERENCE AT THE VERY BOTTOM, AGENT FINE, WITH AN

5    ASTERISK AND A NUMBER AND A DATE.   WHAT'S THAT A

6    REFERENCE TO?

7    A.   SO AS OF 6-19-2007, NOT ALL OF MARK VERDIELL'S

8    MONEY HAD BEEN SPENT.   IN FACT THERE WAS $74,195.26

9    REMAINING.

10   Q.   AND AGAIN, YOU TOLD US THAT, EARLIER THAT

11   JUNE 19TH DATE IS SIGNIFICANT BECAUSE ADDITIONAL

12   EVENTS OCCURRED ON JUNE 20TH?

13   A.   THAT'S RIGHT.

14   Q.   SO AGAIN WHAT HAPPENED ON JUNE 20TH?

15   A.   BOB LIN WIRES INTO THE SAME ACCOUNT $250,000.

16   Q.   SO DID YOU SEE ANY INDICATION BASED ON YOUR

17   REVIEW OF THE CREDIT SUISSE DOCUMENTS IN QUESTION

18   THAT WERE RELATED TO FIRESIDE, THAT THERE WAS ANY

19   SEPARATION OR DIVISION BETWEEN MR. VERDIELL'S

20   BALANCE OF 74,195.26 AND THE QUARTER MILLION FROM

21   MR. LIN?

22   A.   NO.

23   Q.   JUST SO WE ARE CLEAR, AGAIN, I THINK YOU

24   ALREADY SAID THIS, BUT I WANT TO UNDERSTAND YOUR

25   TESTIMONY AGENT FINE, THE 74,000 PLUS IN THE

1    ACCOUNT, THAT'S SEPARATE FROM THE VALUE OF THE

2    SECURITIES OF 410,000?

3    A.   THAT'S CORRECT.

4    Q.   AND --

5    A.   JUST BECAUSE YOU SAID THE VALUE OF THE

6    SECURITIES IT'S NOT THE VALUE AS OF 6-19, IT'S HOW

7    MUCH YOU WERE PURCHASED.  SO YOU COULD PURCHASE AND

8    IT COULD HAVE CHANGED VALUE.

9    Q.   SO THAT'S HOW MUCH THEY WERE PURCHASED FOR AND

10   REMAINED IN THE SECURITIES FORM AS OF JUNE 19TH?

11   A.   CORRECT.

12   Q.   MS. BURNEY IF WE COULD GO TO EXHIBIT 272.

13        SO THERE APPEAR TO BE TWO BOXES HERE ON

14   YOUR CHART ON EXHIBIT 272, CORRECT, AGENT FINE?

15   A.   YES.

16   Q.   AND JUST SO WE ARE CLEAR YOU HAD THE $74,000

17   PLUS ESSENTIALLY IN CASH, CORRECT?

18   A.   CORRECT.

19   Q.   FROM MR. VERDIELL'S MONEY?

20   A.   CORRECT.

21   Q.   PLUS THE VALUE OF THOSE SECURITIES.  AFTER

22   JUNE 20TH WHEN MR. LIN'S QUARTER MILLION DOLLARS

23   WAS ALSO NOW IN THE CREDIT SUISSE BEING ACCOUNT IN

24   SINGAPORE, THERE AFTER WERE THOSE SECURITIES SOLD

25   OVER TIME?

1    A.    THEY WERE.

2    Q.    AND DID THE PROCEEDS GO BACK INTO THE CREDIT

3    SUISSE ACCOUNT, THE CASH SIDE OF THE ACCOUNT?

4    A.    YES.

5    Q.    AND DID THOSE PROCEEDS THEN GO BACK TO, GO TO

6    MR. VERDIELL OR MR. LIN?

7    A.    NO.

8    Q.    WHAT IN GENERAL TERMS HAPPENED TO THOSE, THE

9    MONEYS THAT WERE NOW MIXED TOGETHER OR COMMINGLED

10   AFTER JUNE 20TH, 2007?

11   A.    IN GENERAL TERMS, THE MONEYS IN THE ACCOUNT TO

12   INCLUDE THE SECURITIES, WERE DEPLETED BY

13   OCTOBER 23RD, 2007.

14   Q.    AND WHAT IS YOUR CHART ON THE TOP HALF, IT

15   SAYS DIVERSIONS OF $100,000 BETWEEN 6-20-07 AND

16   10-1-07?

17   A.    CORRECT.

18   Q.    THESE WERE IN YOUR VIEW THE MORE SIGNIFICANT

19   AMOUNTS TRANSFERRED OUT?

20   A.    THEY ARE ALL THE AMOUNTS OF HUNDRED THOUSAND

21   DOLLARS OR GREATER.

22   Q.    SOME OF THE LARGEST ONES IN THAT TIME FRAME?

23   A.    CORRECT.

24   Q.    AND ON JUNE 28TH, 2007, WHAT HAPPENED?

25   A.    THERE WAS A HUNDRED THOUSAND DOLLAR WIRE TO

1    THE FIRESIDE USA ACCOUNT AT U.S. BANK.

2    Q.   AND AGAIN THAT $30 REFERENCE AT THE TAIL END

3    OF THAT TRANSFER?

4    A.   IT'S A WIRE FEE.

5    Q.   THEN TRANSFERS ON 8-30-07 AND 9-5-07?

6    A.   YES.  ON 8-30 THERE WAS A HUNDRED THOUSAND

7    DOLLAR WIRE TO ASENQUA VENTURES MANAGEMENT AT

8    WASHINGTON MUTUAL.  AND THEN ON SEPTEMBER 5TH,

9    2007, A HUNDRED $10,030 AGAIN TO THAT STAPLE SAME

10   ASENQUA ACCOUNT.

11   Q.   AND THAT WASHINGTON MUCH ACCOUNT WAS THAT THE

12   SAME ONE WE TALKED ABOUT THAT RECEIVED IT FROM

13   FIRESIDE USA?

14   A.   YES.

15   Q.   NOW YOUR CHART STOPS AT 10-1-07.  WHY DID YOU

16   BREAK THIS EXHIBIT INTO TWO DIFFERENT CHARTS WHAT

17   HAPPEN IT IS ON OR AROUND THAT DATE?

18   A.   ANOTHER INVESTOR WIRES IN MONEY.

19   Q.   AND WHO IS THAT INVESTOR?

20   A.   DR. WA-FU CHEN.

21   Q.   HOW MUCH THAT WAS FOR?

22   A.   $270,000.

23   Q.   SO IF I'M UNDERSTANDING YOUR TESTIMONY AND

24   FOLLOWING IT, FIRST AS OF JUNE 19TH THERE'S ROUGHLY

25   $74,000 IN CASH, THE REMAINING CASH FROM

1    MR. VERDIELL'S TWO MILLION DOLLAR WIRE.  THEN

2    MR. LIN'S QUARTER MILLION DOLLAR COMES INTO THE

3    ACCOUNT ON JUNE 20TH.  AND YOU ALREADY TOLD US

4    EARLIER THERE WAS NO REAL SEPARATION BETWEEN THOSE

5    TWO POTS OF MONEY, CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    AND NOW, MR. CHEN'S MONEY COMES IN AS WELL?

8    A.    CORRECT.

9    Q.    AND AGAIN NO SEPARATION BETWEEN THESE THREE

10   CLIENT ACCOUNTS?

11   A.    THAT'S RIGHT.

12   Q.    THEN WHAT HAPPENS AFTER THAT BETWEEN

13   OCTOBER 2ND AND THE REST OF OCTOBER OF 2007?

14   A.    BY OCTOBER 23RD ALL OF THE MONEY IS GONE.

15   Q.    AND THERE ARE ADDITIONAL LARGE TRANSFERS OF

16   MONEY OUT OF THE ACCOUNT IN OCTOBER 2007?

17   A.    CORRECT.

18   Q.    SO YOU HAVE AN ENTRY HERE OF OCTOBER 18, 2007?

19   A.    YES.

20   Q.    WHAT'S HAPPENING ON THAT DATE?

21   A.    THERE'S A HUNDRED $10,000 WIRE TO VIEW CHINA

22   ENTERPRISE CORP, CHINA TRUST BANK ACCOUNT.

23   Q.    AND ANOTHER ENTRY ON OCTOBER 23, 2007?

24   A.    YES.  $250,000 WIRE TO PRIOR INVESTOR JOE YE.

25   Q.    NOW AT THE BOTTOM OF YOUR CHART YOU HAVE

1    ANOTHER ASTERISK ABOUT AND A DOLLAR AMOUNT, WHAT'S

2    THAT A REFERENCE TO?

3    A.   SO THE INVESTMENT ACCOUNT HAD A FRACTIONAL

4    SHARE OF ONE OF THE SECURITIES STILL IN IT AND IT

5    ACTUALLY STAYS IN IT FOR A LONG PERIOD OF TIME.  I

6    DON'T KNOW WHY.  BUT THERE WERE A LARGER PORTION, A

7    LARGE NUMBER OF SHARES IN A PARTICULAR SECURITY IT

8    WAS SOLD AND FOR SOME REASON THERE'S A HALF A SHARE

9    LEFT IN THE ACCOUNT.

10           AND AS OF OCTOBER 31ST, 2007, THAT

11   APPROXIMATELY HALF A SHARE IS VALUED AT $2,503.

12   Q.   OTHER THAN THE FRACTIONAL SHARE OF THE

13   INVESTMENT SIDE OF CREDIT SUISSE SINGAPORE FIRESIDE

14   ACCOUNT, YOU INDICATE THE BALANCE WAS OTHERWISE

15   DOWN TO ZERO?

16   A.   RIGHT.  EVERY OTHER SECURITY HAS BEEN SOLD AND

17   BEEN TRANSFERRED BY OCTOBER 23RD, 2007.

18   Q.   YOU ALSO JUST SAID A MOMENT AGO THAT THE

19   $200,503 FRACTIONAL SHARE OF THE INVESTMENT ACCOUNT

20   AT SOME POINT DOLLAR AFTER WAS ALSO CONVERTED TO

21   CASH?

22   A.   IT WAS CONVERTED TO SOMETHING OTHER THAN

23   SECURITY.  IT WAS SOLD FOR CASH --

24   Q.   IT WAS MADE LIQUID?

25   A.   CORRECT.

830

1    Q.   DID THAT SMALL AMOUNT EVER RETURN BACK TO

2    MR. VERDIELL?

3    A.   NO.

4    Q.   OR MR. LIN?

5    A.   NO.

6    Q.   OR MR. CHEN?

7    A.   NO.

8    Q.   AND MR. FINE I WANT TO CALL YOUR ATTENTION TO

9    GOVERNMENT EXHIBIT 16.  AND GOVERNMENT EXHIBIT 11.

10   THESE ARE THE YEAR END STATEMENTS FOR MR. VERDIELL

11   AND MR. LIN THAT WE LOOKED AT EARLIER ALREADY IN

12   EVIDENCE.  DATED DECEMBER 2007.

13        IF YOU COULD NOW ENLARGE THE TOP PORTION

14   OF THE DOCUMENT, MS. BURNEY.  AGENT FINE HAVE SEEN

15   THIS DOCUMENT BEFORE?

16   A.   YES.

17   Q.   WHAT'S THE STATEMENT DATE ON THE DOCUMENT?

18   A.   DECEMBER 31ST, 2007.

19   Q.   WHO WAS BASED ON THE ADDRESS, WHO WAS

20   RECEIVING THIS DOCUMENT?

21   A.   MR. VERDIELL.

22   Q.   AND MS. BURNEY IF YOU COULD NOW ENLARGE THE

23   SOCIETAL VALUE SECTION OF THE DOCUMENT.  BASED ON

24   THE DOCUMENT PROVIDED FROM MR. HU TO MR. VERDIELL,

25   WHAT WAS MR. VERDIELL'S VALUE AS REPORTED TO HIM AT

1    THAT TIME?

2    A.   $2,439,772 FORTY CENTS.

3    Q.   WHAT SIGNATURES ARE ON THE BOTTOM OF THIS

4    DOCUMENT, AGENT FINE?

5    A.   IT SAYS ANTHONY POL AND ALBERT HU PHD.

6    Q.   NOW MS. BURNEY IF YOU COULD TURN SIMILARLY TO

7    GOVERNMENT EXHIBIT 11 ALREADY IN EVIDENCE.  AND

8    BLOWING UP THE TOP PORTION OF THE DOCUMENT.

9           WHAT IS THE STATEMENT DATE OF THIS

10   DOCUMENT

11   A.   DECEMBER 31ST, 2007.

12   Q.   SAME TIME FRAME FOR MR. VERDIELL, APPARENTLY?

13   A.   YES.

14   Q.   WHO WAS THE RECIPIENT FOR THIS DOCUMENT BASED

15   ON THE ADDRESSEE ON THE LEFT-HAND SIDE?

16   A.   FU-YUAN LIN.

17   Q.   ALSO KNOWN AS BOB LIN?

18   A.   CORRECT.

19   Q.   THEN MS. BURNEY IF YOU COULD NOW ENLARGE THE

20   SECTION ON THE NEXT PAGE I BELIEVE.  WHERE IT SAYS

21   TOTAL VALUE.  STILL ON EXHIBIT 11.

22           WHAT DOES THE TOTAL VALUE REFLECTED IN

23   MR. LIN'S YEAR END 2007 STATEMENT

24   A.   CAN YOU MAKE IT A LITTLE BIGGER.  1, 711,

25   567.52.

1    Q.   AND MS. BURNEY IF YOU COULD AGAIN ENLARGE THE

2    BOTTOM OF THE DOCUMENT WITH THE SIGNATURES.

3         WHAT SIGNATURES ARE ON THIS DOCUMENT,

4    EXHIBIT 11, AGENT FINE

5    A.   IT SAYS ANTHONY POL AND ALBERT HU.

6    Q.   IF I'M DOING MY MATH CORRECTLY, AGENT FINE YOU

7    JUST MENTIONED THE TOTAL VALUE REFLECTED IN

8    MR. VERDIELL'S STATEMENT WAS IN EXCESS OF

9    2.4 MILLION?

10   A.   YES.

11   Q.   THE TOTAL VALUE REFLECT INDEED MR. VERDIELL'S

12   YEAR END STATEMENT FOR MR. HU WAS 1.7 MILLION?

13   A.   YES.

14   Q.   AND THAT --

15        THE COURT:  YOU MISSPOKE, I THINK.

16        MR. LUCEY:  I'M SORRY, MR. LIN'S

17   STATEMENT IN EXHIBIT 11 WAS IN EXCESS OF

18   1.7 MILLION?

19        THE WITNESS:  YES.

20   Q.   THAT WOULD ADD TO APPROXIMATELY IN EXCESS OF

21   $4 MILLION?

22   A.   CORRECT.

23   Q.   AND BASED ON YOUR REVIEW OF THE CREDIT SUISSE

24   DOCUMENTS THAT RECEIVED MR. VERDIELL AND MR. LIN'S

25   WIRES IN 2007, WHAT WAS THE AT MOST THE VALUE OF

1    THOSE INVESTMENT ACCOUNTS AND CASH ACCOUNTS IN OR

2    ABOUT OCTOBER 31ST, 2007?

3    A.   AT MOST IT'S $2,503.

4    Q.   AND SO BASED ON YOUR REVIEW OF THE FINANCIAL

5    RECORDS, DO YOU HAVE ANY REASON TO BELIEVE THE

6    FINANCIAL STATEMENTS YOU LOOKED AT, EXHIBIT 11 AND

7    EXHIBIT 17 REFLECT THE TRUE VALUES OF THE HOLDING

8    OF MR. LIN AND MR. VERDIELL OF 2007?

9         MR. FONG:  OBJECTION.  FOUNDATION.

10    SPECULATION.

11         THE COURT:  OVERRULED.

12         THE WITNESS:  I DO NOT THINK THEY

13    ACCURATELY REFLECT THE BALANCE OF MR. VERDIELL AND

14    MR. LIN'S INVESTMENT.

15         MR. LUCEY:  YOUR HONOR, IF I COULD HAVE

16    JUST A MOMENT.

17         NO FURTHER QUESTIONS, YOUR HONOR.

18         THE COURT:  ALL RIGHT.

19         WE WILL TAKE A RECESS FOR 15 MINUTES.

20         (WHEREUPON A RECESS WAS TAKEN.)

21         (WHEREUPON, THE FOLLOWING PROCEEDINGS

22    WERE HELD IN THE PRESENCE OF THE JURY:)

23         THE CLERK:  PLEASE BE SEATED AND COME TO

24    ORDER.

25         THE COURT:  MR. FONG, DO YOU HAVE ANY

1    QUESTIONS?

2              MR. FONG:  YES, I DO.

3              THANK YOU, YOUR HONOR.

4

5              **CROSS-EXAMINATION BY MR. FONG**

6

7    BY MR. FONG:

8    Q.   GOOD AFTERNOON, AGENT FINE.  AS YOU KNOW I

9    REPRESENT MR. ALBERT HU.  I HAVE A COUPLE OF

10   QUESTIONS FOR YOU.

11             AGENT FINE, YOU TESTIFIED A LITTLE BIT

12   EARLIER THIS AFTERNOON ABOUT, I BELIEVE GOVERNMENT

13   EXHIBIT 11 AND 18, AMONG OTHERS, BUT DO YOU

14   REMEMBER EXHIBITS 11 AND 18?  THEY ARE THE FIRESIDE

15   STATEMENTS, QUARTERLY STATEMENTS TO, I BELIEVE

16   RESPECTIVELY MR. BOB LIN AND MR. JUAN MARK

17   VERDIELL, DO YOU REMEMBER THOSE DOCUMENTS?

18   A.   I REMEMBER TESTIFYING ABOUT FIRESIDE

19   STATEMENTS I DON'T REMEMBER TESTIFYING ABOUT

20   EXHIBIT NUMBERS.

21   Q.   DO YOU HAVE THE EXHIBITS IN FRONT OF YOU?

22   A.   NOT THOSE EXHIBITS.

23   Q.   IF I MAY PUBLISH.  THIS IS ONE OF THE ONES IN

24   EVIDENCE.

25             LET ME SHOW YOU, FIRST OF ALL, EXHIBIT

835

1    NUMBER 11.  YOU CAN SEE EXHIBIT 11, IT IS THE

2    FIRESIDE SUMMARY OF ACCOUNT FOR DECEMBER 31ST,

3    2007, FOR MR. LIN.  CAN YOU SEE THAT

4    A.   I CAN SEE THE TOP.  AND I DEFINITELY RECOGNIZE

5    IT AS THE FIRESIDE.

6    Q.   YOU KNOW WHAT, LET ME TRY THIS, MAYBE THIS

7    WILL BE EASIER.  I APOLOGIZE.  LET ME JUST SHOW YOU

8    THE ACTUAL DOCUMENTS.

9    A.   THANK YOU.

10   Q.   NOW YOU HAVE IN FRONT OF YOU NOW A COPY OF AN

11   EXHIBIT THAT'S ALREADY BEEN ADMITTED INTO EVIDENCE.

12   I BELIEVE EXHIBIT 11; IS THAT CORRECT?

13   A.   I DO.

14   Q.   AND THAT IS THE QUARTERLY STATEMENT FROM I

15   BELIEVE TOWARD THE ENDS OF 2007 FOR MR. BOB LIN?

16   A.   YES.

17   Q.   OKAY.  AND NOW, THAT PARTICULAR DOCUMENT THE

18   FIRESIDE LS FUND QUARTERLY STATEMENT, THAT DOES NOT

19   CONTAIN ANY PARTICULAR REFERENCE TO ANY BANK OR

20   INSTITUTION, DOES IT?

21   A.   NO, IT DOES NOT.

22   Q.   NOW THE EXHIBIT YOU TESTIFIED TO EARLIER, THE

23   BOTTOM LINE NUMBER IS $1.7 MILLION?

24   A.   THAT'S CORRECT.

25   Q.   IT DOES NOT SAY THAT $1.7 MILLION IS SITTING

1    IN ANY PARTICULAR BASIC ACCOUNT FROM THAT DOCUMENT,

2    DOES IT?

3    A.    NO.

4    Q.    OKAY.  AND LET ME SHOW YOU THE ONE-PAGE

5    DOCUMENT THAT'S ALREADY ADMITTED INTO EVIDENCE AS

6    GOVERNMENT EXHIBIT 18.

7    A.    OKAY.

8    Q.    AND DO YOU SEE THAT IN FRONT OF YOU, SIR?

9    A.    I HAVE IT IN FRONT OF ME.

10   Q.    AND THAT IS A, I BELIEVE THE FIRST QUARTER OF

11   2008 STATEMENT FOR MR. MARK VERDIELL; IS THAT

12   CORRECT?

13   A.    THAT'S CORRECT.

14   Q.    OKAY.  AND I BELIEVE THE BOTTOM LINE NUMBER IS

15   ABOUT $2.4 MILLION?

16   A.    THAT'S CORRECT.

17   Q.    MORE OR LESS.  I'M NOT GIVING YOU AN EXACT

18   NUMBER, BUT IT'S AROUND 2.4, RIGHT?

19   A.    UH-HUH.

20   Q.    NOW THAT DOCUMENT DOES NOT REFERENCE ANY

21   PARTICULAR BANK ACCOUNT, DOES IT?

22   A.    NO.

23   Q.    IT DOES NOT MENTION ANYTHING ABOUT THESE

24   CREDIT SUISSE ACCOUNT OR ANY CREDIT SUISSE

25   ACCOUNTS, RIGHT?

1    A.    NO.

2    Q.    OKAY.  AND FROM THAT DOCUMENT A PERSON LOOKING

3    AT THAT CANNOT TELL WHERE THE MONEY MIGHT BE

4    SITTING; IS THAT CORRECT?

5    A.    FROM LOOKING AT THIS DOCUMENT, NO.

6    Q.    OKAY.  NOW YOU ALSO TESTIFIED TO SOME EARLIER

7    STATEMENTS, I THINK THERE WAS -- WELL, LET ME SHOW

8    YOU THE ASENQUA BETA FUND.  I'M GOING TO SHOW YOU A

9    DOCUMENT THAT'S BEEN ALREADY ADMITTED AS GOVERNMENT

10   EXHIBIT 3 WHICH I BELIEVE YOU TESTIFIED TO A LITTLE

11   BIT EARLIER.  IT'S THE ASENQUA BETA FUND SUMMARY OF

12   ACCOUNT FOR THE FIRST QUARTER OF 2005.  AND IT'S

13   THE STATEMENT FOR MR. LIN -- OR ACTUALLY MR. LIN'S

14   TRUST SHOWING A BALANCE OF ABOUT $203,000.

15         AND -- HAVE YOU HAD A CHANCE TO LOOK AT

16   THAT DOCUMENT, SIR?

17   A.    I HAVE.

18   Q.    NOW, THAT DOCUMENT DOES NOT SAY THAT THE

19   $203,000 IS SITTING, WAS SITTING AT THAT TIME AT

20   THE ASENQUA ACCOUNT THAT YOU TESTIFIED TO A LITTLE

21   BIT EARLIER WITH BANK OF AMERICA, DOES IT?

22   A.    THIS DOCUMENT DOES NOT SAY WHAT BANK ACCOUNT

23   IS BEING USED.

24   Q.    SO LOOKING AT THAT DOCUMENT ALONE, A PERSON

25   CANNOT TELL WHERE THE $203,000 MIGHT BE SITTING; IS

1    THAT CORRECT?

2    A.   THAT'S CORRECT.

3    Q.   AND TO THE BEST OF YOUR RECOLLECTION, WOULD

4    THAT BE TRUE FOR THE OTHER QUARTERLY STATEMENT THAT

5    IS YOU TESTIFIED TO A LITTLE BIT EARLIER, THAT THEY

6    DO NOT REFERENCE OR MENTION ANY SPECIFIC BANK

7    ACCOUNT?

8    A.   I THINK THAT'S TRUE.  I DON'T KNOW IF I CAN

9    TESTIFY TO IT ABSOLUTELY.

10   Q.   BUT CERTAINLY YOU DO NOT RECALL SEEING ON ANY

11   OF THOSE, TO THE BEST OF YOUR RECOLLECTION, ANY OF

12   THE OTHER QUARTERLY STATEMENT THAT IS YOU TESTIFIED

13   TO, YOU DO NOT RECALL SEEING ANY MENTION OF ANY

14   SPECIFIC BANK, RIGHT?

15   A.   NO.

16   Q.   OKAY.  THANK YOU.  NO, YOU DO NOT, RIGHT?

17   A.   NO, I DO NOT.

18   Q.   THANK YOU.

19            NOW, AGENT FINE, WHEN A PERSON, AN

20   INVESTOR INVESTS IN A HEDGE FUND, TYPICALLY WHAT

21   THAT PERSON IS DOING IS THAT HE OR SHE IS ACTUALLY

22   INVESTING IN A LIMITED PARTNERSHIP; IS THAT

23   CORRECT?

24            MR. LUCEY:  OBJECTION, YOUR HONOR.

25   BEYOND THE SCOPE OF THE TESTIMONY.

1          THE COURT:  I THINK IT TECHNICALLY IS,

2     BUT I WILL LET HIM ASK THE QUESTION AND THEN SEE

3     WHERE YOU ARE GOING.

4          THE WITNESS:  THAT'S REALLY VAGUE.  I

5     CAN'T ANSWER YOUR QUESTION IN GENERAL ABOUT ALL

6     HEDGE FUNDS IN THE WORLD.  I CAN ANSWER ABOUT THESE

7     TWO SPECIFIC HEDGE FUNDS.

8     BY MR. FONG:

9     Q.   IN THE COURSE OF YOUR INVESTIGATION OF THIS

10    CASE, YOU DID SOME STUDYING ON HOW HEDGE FUNDS

11    WORK?

12          MR. LUCEY:  OBJECTION.  VAGUE.

13          THE COURT:  CAN YOU MAKE IT A LITTLE MORE

14    SPECIFIC.

15          MR. FONG:  SURE.

16    Q.   IN THE COURSE OF YOUR CASE, YOU HAD STUDIED ON

17    HOW HEDGE FUND ARE STRUCTURED; IS THAT CORRECT?

18    A.   I WAS LOOKING AT THE DOCUMENTS GIVEN TO ME BY

19    THESE INVESTORS.  I WENT THROUGH AND LOOKED AT ALL

20    THE REPRESENTATIONS THAT WERE MADE IN THERE AND

21    THEN I CONDUCTED INVESTIGATION TO SEE IF ANY OF

22    THOSE WERE TRUE.

23    Q.   ALL RIGHT.  SO CAN I TAKE FROM YOUR ANSWER

24    THAT YOU DID NOT INDEPENDENTLY FOR THE PURPOSE OF

25    THIS INVESTIGATION TRY TO STUDY HOW HEDGE FUNDS ARE

1      STRUCTURED OR SET UP; IS THAT CORRECT?

2              THE COURT:  THAT'S AN AWFULLY BROAD

3      QUESTION AS TO ASSUMES THAT ALL HEDGE FUNDS ARE SET

4      UP THE SAME WAY.

5              MR. FONG:  OKAY.

6      Q.   IN LOOKING AT THIS CASE BESIDES THE DOCUMENTS

7      RELATING TO ASENQUA BETA AND FIRESIDE LS FUND, DID

8      YOU DO ANY STUDY OF ANY OTHER HEDGE FUNDS

9      STRUCTURES?

10     A.   WOULD YOU INCLUDE TALKING TO EXPERTS ABOUT

11     THAT?

12     Q.   YES.

13     A.   OKAY.  THEN YES.

14     Q.   OKAY.  IN THE COURSE OF YOUR INVESTIGATION,

15     DID YOU LEARN THAT WHEN AN INVESTOR INVESTS IN A

16     FUND, TYPICALLY WHAT HE OR SHE IS DOING ACQUIRING A

17     FRACTIONAL INTEREST IN A LIMITED PARTNERSHIP?

18     A.   I CAN ONLY SPOKE TO THESE TWO SPECIFIC HEDGE

19     FUNDS.

20     Q.   ALL RIGHT.  IS THAT YOUR UNDERSTANDING OF

21     WHAT -- LET'S TAKE THEM ONE AT A TIME THEN.  FOR

22     THE ASENQUA BETA FUND, THE STRUCTURE WAS SET UP AS

23     A LIMITED PARTNERSHIP; IS THAT CORRECT?

24     A.   SHOW ME THE DOCUMENTS.

25     Q.   I'M SIMPLY ASKING YOU FOR YOUR BEST

1     RECOLLECTION.  IF YOUR BEST RECOLLECTION IS YOU DO

2     NOT KNOW WITHOUT SEEING THE DOCUMENTS, THAT'S FINE?

3     A.   I DO NOT KNOW.

4     Q.   OKAY.  DO YOU HAPPEN TO KNOW IF THE FIRESIDE

5     LS FUND IS SET UP AS A -- EXCUSE ME, I'M LOSING MY

6     THOUGHT HERE.

7          DO YOU HAPPEN TO KNOW IF THE FIRESIDE LS

8     FUND IS SET UP AS A LIMITED PARTNERSHIP INVESTMENT?

9     A.   I WOULD HAVE TO LOOK AT THE DOCUMENT.

10    Q.   OKAY.  NOW, FROM YOUR EXAMINATION OF THE

11    PRIVATE PLACEMENT MEMORANDUM OF THE, LET'S SAY THE

12    ASENQUA BETA FUND, DO YOU RECALL SEEING THAT IT WAS

13    THE -- THE FUND WAS SET UP AS A FEEDER FUND INTO A

14    MASTER FUND?

15    A.   I DON'T RECALL OFF THE TOP OF MY HEAD.  YOU

16    CAN SHOW ME THE DOCUMENT IF YOU WOULD LIKE.

17    Q.   SURE.  AND WE WILL GET TO THAT BUT I JUST WANT

18    TO ASK YOU WHAT IT IS THAT YOU DO REMEMBER.

19         DO YOU RECALL FROM YOUR INVESTIGATION AND

20    EXAMINATION OF DOCUMENTS IF THE FIRESIDE LS FUND

21    WAS SET UP AS A FEEDER FUND INTO A MASTER FUND?

22    A.   FROM MY EXAMINATION OF THE DOCUMENTS AND MY

23    INVESTIGATION, I RECALL THE PPM SAYING THAT THE

24    MONEY WAS GOING TO BE INVESTED.  THAT'S MY

25    EXAMINATION OF THE DOCUMENT.

1          I RECALL FROM THE INVESTIGATION THAT THE

2     MONEY WAS NOT INVESTED.

3          MR. FONG:  I WANT TO MOVE TO STRIKE THAT.

4     LAST ANSWER AS BEING UNRESPONSIVE, YOUR HONOR.

5          THE COURT:  WOULDN'T THAT -- WASN'T THAT

6     ANSWERING -- YOU ARE QUESTIONING HIM -- UNLESS I

7     MISSED SOMETHING, I THOUGHT IT WAS RESPONSIVE.

8          MR. FONG:  THAT'S FINE, YOUR HONOR.

9     Q.   LET ME SHOW YOU A DOCUMENT THAT WAS ADMITTED

10    INTO EVIDENCE WHEN MR. BOB LIN TESTIFIED.  THAT'S

11    DEFENDANT'S EXHIBIT 503.

12         AGENT FINE, DO YOU SEE THAT DOCUMENT IN

13    FRONT OF YOU?

14    A.   I DO.

15    Q.   MAY I DIRECT YOUR ATTENTION TO PAGE EIGHT OF

16    THAT DOCUMENT, EXHIBIT -- DEFENDANT'S EXHIBIT 503

17    WHICH IS IN EVIDENCE.

18    A.   OKAY.

19    Q.   AND YOU ARE ON PAGE EIGHT?

20    A.   I AM.

21    Q.   OKAY NOW, DIRECTING YOUR ATTENTION TO THE VERY

22    LAST PARAGRAPH OF THAT PAGE, IT HAS THE HEADING OF

23    INVESTMENT STRUCTURE.  DO YOU SEE THAT HEADING,

24    SIR?

25    A.   YES.

1    Q.   OKAY.  THEN TO THE RIGHT OF IT, IT SAYS THE

2    FUND WILL INVEST SUBSTANTIALLY ALL OF ITS ASSETS

3    THROUGH A MASTER FUND/FEED FUND STRUCTURE IN THE

4    ASENQUA MASTER FUND LP.  DO YOU SEE THAT?

5    A.   I SEE IT.

6    Q.   OKAY.  NOW DOES THAT REFRESH YOUR RECOLLECTION

7    OF WHETHER OR NOT WHEN YOU WERE INVESTIGATING THIS

8    CASE, DID YOU LEARN ABOUT A MASTER FUND/FEED FUND

9    STRUCTURE INSOFAR AS IT APPLIES TO THE ASENQUA BETA

10   FUND?

11   A.   IT DOES NOT REFRESH MY RECOLLECTION.

12   Q.   ALL RIGHT.  AS YOU SIT HERE TODAY, DO YOU HAVE

13   AN UNDERSTANDING OF HOW A MASTER FUND AND FEEDER

14   FUND ARRANGEMENT WORKS FOR A HEDGE FUND?

15   A.   MAYBE JUST A LAYMAN'S UNDERSTANDING, I'M NOT

16   AN EXPERT.

17   Q.   OF COURSE.  WHAT IS YOUR LAYMAN'S

18   UNDERSTANDING?

19   A.   EXACTLY WHAT IT SAYS HERE:

20        THE FUND WILL INVEST SUBSTANTIALLY ALL OF

21   ITS ASSETS THROUGH A MASTER FUND/FEEDER FUND

22   STRUCTURE IN THE ASENQUA MASTER FUND.  INVESTMENTS

23   NOT INVESTED IN THE MASTER FUND WILL PROVIDE FOR

24   OPERATING EXPENSES OF THE OTHER INVESTMENT FUNDS

25   STRUCTURED TO MEET THE NEEDS OF VARIOUS U.S. TAX

844

1    EXEMPT NON U.S. INVESTORS TOGETHER WITH THE FUND

2    THE INVESTMENT VEHICLES, ALSO INVEST IN THE MASTER

3    FUND AND WILL BEAR A PROPORTIONATE SHARE OF THE

4    MASTER FUND'S EXPENSES.

5    Q.   SO YOUR UNDERSTANDING DERIVES FROM THE

6    PARAGRAPH YOU JUST READ; IS THAT CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   OKAY.  AND WOULD YOUR ANSWER BE THE SAME FOR

9    THE FIRESIDE LS FUND?

10   A.   I BELIEVE SO.  I MEAN, I RELIED ON EXPERTS IN

11   RELATION TO THIS TYPE OF PORTION OF THE PPM.

12   Q.   OKAY.  NOW LET'S TALK ABOUT THE ASENQUA

13   CAPITAL BANK ACCOUNT WITH BANK OF AMERICA RELATING

14   TO, I BELIEVE, GOVERNMENT EXHIBIT 263, THE FIRST --

15   DO YOU HAVE EXHIBIT 263 IN FRONT OF YOU?

16   A.   YES.

17   Q.   OKAY.  AND THAT'S THE PIE CHART, IF YOU WILL,

18   OF MR. BOB LIN'S INVESTMENT DOLLARS, RIGHT?

19   A.   HIS FIRST $100,000 INVESTMENT.

20   Q.   OKAY.  AND THE BANK ACCOUNT -- THAT MONEY THAT

21   MR. LIN WIRED HIS INVESTMENT INTO WAS THE ASENQUA

22   CAPITAL BANK OF AMERICA ACCOUNT; IS THAT CORRECT?

23   A.   THAT'S CORRECT.

24   Q.   OKAY.  AND DID YOU EXAMINE THE CALENDAR YEAR,

25   THE ACTIVITIES WITHIN THAT ACCOUNT FOR THE ENTIRE

1    CALENDAR YEAR OF 2005?

2    A.   PERSONALLY, I DO NOT.

3    Q.   OKAY.  DO YOU KNOW, AS YOU SIT HERE, IF THERE

4    WERE OTHER DEPOSITS INTO THAT ACCOUNT FOR THAT

5    YEAR, 2005?

6    A.   I BELIEVE THERE WERE.

7    Q.   OKAY.  WOULD THE -- DO YOU HAPPEN TO KNOW OR

8    REMEMBER IF THE TOTAL AMOUNT OF DEPOSIT INTO THAT

9    ACCOUNT WAS MORE OR LESS THAN $500,000 FOR THE

10   YEAR?

11   A.   I DON'T KNOW OR REMEMBER.

12   Q.   OKAY.  DO YOU RECALL SEEING DEPOSITS INTO THAT

13   ACCOUNT MADE BY ALBERT HU?

14   A.   I DO NOT.

15   Q.   THEN AS YOU SIT HERE YOU DO NOT KNOW HOW MUCH,

16   IF ANY, MONEY ALBERT HU TRANSFERRED OR DEPOSITED

17   INTO THAT ACCOUNT; IS THAT CORRECT?

18   A.   NOT OFF THE TOP OF MY HEAD, NO.

19   Q.   DO YOU HAVE AN ESTIMATE?

20   A.   I DON'T.

21        MR. FONG:  NOW YOUR HONOR, I THINK MY

22   AGREEMENT WITH THE GOVERNMENT.  I WANT TO ASK AGENT

23   FINE SOME QUESTIONS BEYOND HIS SCOPE OF DIRECT, IF

24   THAT'S OKAY WITH THE COURT.

25        THE COURT:  IT'S ALL RIGHT WITH ME IF YOU

1    CLEARED IT WITH COUNSEL.

2              MR. LUCEY:  YES, YOUR HONOR, HE HAS.

3    BY MR. FONG:

4    Q.   AGENT FINE, YOU WERE HERE PRESENT IN COURT

5    WHEN MR. VERDIELL TESTIFIED; IS THAT CORRECT?

6    A.   YES.

7    Q.   OKAY.  AND YOU, AS THE LEAD CASE AGENT IN THIS

8    CASE, YOU SAT IT ON SEVERAL INTERVIEWS WITH

9    MR. VERDIELL; IS THAT CORRECT?

10   A.   I DID.

11   Q.   OKAY.  AND THE FIRST ONE WAS IN DECEMBER, ON

12   DECEMBER 24TH, 2008, DOES THAT SOUND RIGHT?

13   A.   I REMEMBER THAT BECAUSE IT WAS CHRISTMAS EVE.

14   Q.   OKAY.  AND THERE WERE A COUPLE OF OTHER

15   INTERVIEWS AFTER THAT, RIGHT?

16   A.   YES.

17   Q.   OKAY.  AND THERE WAS ONE ON APRIL 30TH, 2009?

18   A.   I'M NOT GOING TO REMEMBER THE REST OF THE

19   DATES.

20   Q.   SURE.  I'M GOING TO SHOW YOU A DOCUMENT THAT'S

21   BEEN MARKED AS DEFENDANT'S EXHIBIT 541-A, AS IN

22   APPLE.  I WILL JUST GIVE YOU AN OPPORTUNITY TO LOOK

23   AT THAT DOCUMENT.  AND I WILL REPRESENT TO YOU,

24   AGENT FINE THAT THIS IS A COMPILATION OF SEVERAL

25   DIFFERENT FBI 302 REPORTS THAT WERE PREPARED FROM

1    MR. VERDIELL'S INTERVIEWS.

2         FIRST OF ALL, DO YOU RECOGNIZE THE

3    DOCUMENT THAT I PUT IN FRONT OF YOU, DEFENDANT'S

4    EXHIBIT 541-A?

5    A.   YES.

6    Q.   DIRECTING YOUR ATTENTION TO, ABOUT THE SIXTH

7    PAGE, IT HAS A BATES NUMBER OF HU-001556; DO YOU

8    SEE THAT, SIR?

9    A.   YES.

10   Q.   IF YOU COULD LOOK AT THAT FOR JUST A MOMENT?

11   A.   OKAY.

12   Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION OF

13   WHETHER OR NOT YOU AND OTHERS INTERVIEWED

14   MR. VERDIELL ON APRIL 30TH, 2009?

15   A.   YES.  BUT WAS YOUR PRIOR QUESTION ABOUT

16   WHETHER THIS WAS INTERVIEWED IN SEQUENCE -- ARE YOU

17   SAYING THIS IS THE NEXT INTERVIEW?

18   Q.   I BELIEVE IT IS, BUT IF YOU HAVE A DIFFERENT

19   RECOLLECTION, PLEASE SHARE WITH ME?

20   A.   I DO HAVE A DIFFERENT RECOLLECTION.

21   Q.   OKAY.  SO THERE WAS -- WAS THERE AN INTERVIEW

22   BETWEEN THE DECEMBER 24, 2008, WHICH AS YOU POINTED

23   OUT YOU REMEMBERED BECAUSE IT'S CHRISTMAS EVE, AND

24   THE APRIL 30TH, 2009, DATE?

25   A.   I BELIEVE SO.

1    Q.   DO YOU RECALL IF YOU PREPARED AN FBI 302

2    REPORT FROM THAT INTERVIEW.

3    A.   I PREPARED AN AFFIDAVIT.

4    Q.   OKAY.  DO YOU REMEMBER IF THERE WAS AN FBI

5    REPORT?

6    A.   NO, I DID AN AFFIDAVIT, NOT THE 302.

7    Q.   NOW DIRECTING YOUR ATTENTION TO THE NEXT PAGE,

8    IF YOU COULD TAKE A LOOK AT THAT?

9    A.   OKAY.

10   Q.   IF YOU COULD LOOK AT THAT AND SEE -- LET ME

11   ASK A FOUNDATIONAL QUESTION.  DO YOU REMEMBER AFTER

12   THE APRIL 30TH, 2009, INTERVIEW, WAS THERE A

13   SUBSEQUENT INTERVIEW?

14   A.   YES.

15   Q.   OKAY.  AND THAT WAS ON OR ABOUT MAY 30TH,

16   2012?

17   A.   THERE WAS AN INTERVIEW ON THAT DATE.

18   Q.   OKAY.  WAS THAT -- TO THE BEST OF YOUR

19   RECOLLECTION THAT WAS THE NEXT INTERVIEW AFTER THE

20   APRIL 30TH, 2009?

21   A.   I'M NOT SURE.

22   Q.   ALL RIGHT.  BUT YOU'RE SURE, OF COURSE, FROM

23   HAVING JUST REVIEWED THE DOCUMENT IN FRONT OF YOU

24   THAT YES, THERE WAS AN INTERVIEW ON MAY 30, 2012,

25   RIGHT?

1    A.   YES.

2    Q.   AND THEN THE LAST INTERVIEW THAT I AM AWARE OF

3    WAS ON JUNE 12, 2012.  IF YOU COULD TAKE A LOOK AT

4    THE NEXT TWO PAGES.

5    A.   OKAY.

6    Q.   DOES THAT REFRESH YOUR RECOLLECTION OF WHETHER

7    OR NOT THERE WAS A -- THE LAST INTERVIEW WITH

8    MR. VERDIELL THAT YOU HAD WAS ON JUNE 12TH, 2012?

9    A.   I BELIEVE THAT WAS THE LAST INTERVIEW.

10   Q.   OKAY.  AND THAT WAS JUST RIGHT BEFORE HE

11   TESTIFIED; IS THAT CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   OKAY.  NOW, BEFORE JUNE 12, 2012, I COUNTED AT

14   LEAST THREE OR MORE INTERVIEWS THAT YOU HAD WITH

15   MR. VERDIELL; IS THAT CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   OKAY.  NOW, IN THE COURSE OF THOSE INTERVIEWS

18   BEFORE JUNE 12TH, 2012, MR. VERDIELL DID NOT EVER

19   SAY TO YOU THAT HE HAD LOOKED AT THE FIRESIDE

20   PRIVATE PLACEMENT MEMORANDUM AND RELIED ON CERTAIN

21   PROVISIONS IN THERE?

22   A.   I THINK THAT'S INCORRECT.  I THINK HE DID.

23   Q.   LET ME THEN DIRECT YOUR ATTENTION TO THE FIRST

24   FIVE PAGES OF EXHIBIT 541-A.

25   A.   OKAY.

1    Q.   THAT IS THE -- YOUR REPORT FROM THE FIRST

2    INTERVIEW ON DECEMBER 24TH, 2008; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND IT RUNS FROM BATES NUMBER 1770 TO, I

5    BELIEVE, 1774; IS THAT CORRECT?

6    A.   YES.

7    Q.   OKAY.  NOW, IF YOU COULD TAKE A MOMENT AND

8    READ THAT, NOW, NOTHING IN THAT REPORT TALKS ABOUT

9    YOUR RECORDING THE FACT THAT MR. VERDIELL HAD TOLD

10    YOU THAT HE HAD LOOKED AT THE PRIVATE PLACEMENT

11    MEMORANDUM AND RELIED ON CERTAIN PROVISIONS; IS

12    THAT CORRECT?

13    A.   I NEED A SECOND TO READ THIS.

14    Q.   SURE, OF COURSE.  I APOLOGIZE.

15         MR. LUCEY:  YOUR HONOR, WHILE MR. FONG IS

16    REVIEWING THAT DOCUMENT, COULD WE APPROACH?

17         (SIDE-BAR DISCUSSION OFF THE RECORD.)

18         MR. LUCEY:  SO YOUR HONOR, CERTAINLY

19    MR. FONG CAN GO INTO TALKING ABOUT HIS RECOLLECTION

20    VERSUS WHAT IT WOULD SAY, THE QUESTION IS THERE'S

21    THE ISSUE THAT MR. FINE MADE REFERENCE TO A MOMENT

22    AGO REGARDING PREPARING AN AFFIDAVIT.  THAT

23    AFFIDAVIT WAS IN CONNECTION WITH THE EXTRADITION

24    ISSUE WITH MR. HU IN REGARD TO SOME OF THE TOPICS

25    WITH MR. VERDIELL.

1           MR. FAZIOLI:  IN THAT AFFIDAVIT THERE'S

2    REFERENCE TO AN AFFIDAVIT BY MR. VERDIELL AND

3    MR. LIN WHERE THEY BOTH INDICATE THAT THEY HAD

4    REVIEWED THE PPM AND ALL THESE OTHER VARIOUS

5    DOCUMENTS.  DOCUMENTS -- I'M CONCERNED THE LINE OF

6    QUESTIONING IS -- THIS IS STUFF THAT AGENT FINE

7    NEVER HEARD FROM THE VICTIM INVESTORS UNTIL LATE IN

8    THE GAME AND THAT PERHAPS WAS THE FIRST TIME THEY

9    TESTIFIED TO THAT.  THAT'S NOT CORRECT.  AND I KNOW

10   WE HAVE CONCERNS IN THIS LINE OF QUESTIONING HE'S

11   OPENING THE DOOR TO US ASKING HIM ABOUT, DID

12   MR. VERDIELL COMMUNICATE TO YOU THAT THESE VARIOUS

13   FACTORS WERE IMPORTANT TO HIM.  AND IN THE CONTEXT

14   OF PREPARING AN AFFIDAVIT FOR THE DEFENDANT'S

15   EXTRADITION TO THE UNITED STATES.

16           THE COURT:  WHAT DO YOU HAVE TO SAY IN

17   REFERENCE TO EXTRADITION?  CAN YOU JUST SAY YOU

18   PREPARED THE AFFIDAVIT FOR COURT PROCEEDINGS.

19           MR. FONG:  YOUR HONOR, I THINK, I WILL

20   CUT THIS SHORT IN THAT I DON'T INTEND TO ASK AGENT

21   FINE ANYTHING BEYOND THIS PARTICULAR 302 IN

22   DECEMBER OF 2008 WHICH I BELIEVE PREDATES THE

23   AFFIDAVIT.

24           THE COURT:  IT WOULD ENABLE THEM TO -- I

25   MEAN, THE IMPRESSION THAT LEAVES THEM WITH IS THAT

1    IT WAS NEVER SOMETHING THAT THEY HAD.  SO I THINK

2    YOU ARE ENTITLED TO BRING IT IN.

3               MR. FAZIOLI:  WE CAN SAY WITH REGARD TO

4    LEGAL PROCEEDINGS OR WITH REGARD TO COURT

5    PROCEEDINGS.  WHATEVER PATH OR WORD YOU WANT TO

6    USE.

7               THE COURT:  THAT'S FINE.

8    BY MR. FONG:

9    Q.   AND AGENT FINE, JUST ONLY BECAUSE WE JUST

10   CONCLUDED A SHORT CONFERENCE, WHEN YOU HAVE HAD A

11   CHANCE TO LOOK THROUGH THE FIVE PAGE REPORT, YOU

12   WOULD MIND LETTING ME KNOW.  I DIDN'T MEAN TO

13   INTERRUPT YOU.

14   A.   I'M ON PAGE FOUR.

15   Q.   THANK YOU.

16   A.   OKAY.

17   Q.   YOU HAVE NOW HAD AN OPPORTUNITY TO READ THE

18   FIVE-PAGE REPORT THAT IS THE FIRST FIVE PAGES OF

19   EXHIBIT 541-A; IS THAT CORRECT?

20   A.   I HAVE.

21   Q.   AND THAT'S YOUR FBI 302 REPORT FROM YOUR

22   NOVEMBER 24TH, 2008, INTERVIEW WITH MR. VERDIELL;

23   IS THAT CORRECT?

24   A.   IT IS.

25   Q.   OKAY.  HAVING READ THAT, DOES THAT REFRESH

1  YOUR RECOLLECTION OF WHETHER OR NOT AT THAT

2  PARTICULAR MEETING, DID MR. VERDIELL TELL YOU THAT

3  HE HAD CAREFULLY REVIEWED THE FIRESIDE PLACEMENT

4  MEMORANDUM AND HAD RELIED ON CERTAIN PROVISIONS OF

5  THAT MEMORANDUM?

6  A.   SO IF YOU LOOK AT PAGE FIVE OF THE REPORT IT

7  REFERENCES THE ONE-A AND ITEMS PROVIDED.  COULD I

8  TAKE A LOOK AT THAT TO HELP REFRESH YOUR

9  RECOLLECTION.

10  Q.   I'M SAD TO SAY I DON'T THINK I EVER GOT --

11  A.   YOU HAVE, BUT --

12  Q.   I DON'T HAVE IT IN FRONT OF ME.

13  A.   WELL, MY CONCERN WITH ANSWERING THAT QUESTION

14  IS I'M NOT A HUNDRED PERCENT SURE.  AS I RECALL

15  THIS INTERVIEW IS ON DECEMBER 24TH CHRISTMAS EVE.

16  THERE'S SOME URGE SEE FOR US TO MEET.  WE DID MEET.

17  I THINK, BUT I'M NOT SURE IF THE PPM CAME AT THIS

18  MEETING OR A LATER MEETING BECAUSE HE HAD TO

19  COMPILE IT ALL TOGETHER.

20        SO IT'S POSSIBLE IT WAS NOT TALKED ABOUT.

21  BUT WITHOUT SEEING THAT MY RECOLLECTION IS NOT

22  REFRESHED AND I WOULD NEED TO.

23  Q.   OKAY.  BUT OTHER THAN THE FACT THAT THERE WAS

24  A MENTION OF MR. VERDIELL GIVING YOU CERTAIN

25  DOCUMENTS, IS THERE ANYTHING IN THIS REPORT THAT

1   REFERENCES THE FACT THAT MR. VERDIELL HAD TOLD YOU

2   THAT HE HAD CAREFULLY REVIEWED THE FIRESIDE PRIVATE

3   PLACEMENT MEMORANDUM AND HAD RELIED ON SPECIFIC

4   PROVISIONS OF THAT MEMORANDUM?

5   A.   IT'S NOT WRITTEN IN THE PAGES YOU PROVIDED ME.

6   Q.   NOW YOU, OF COURSE, ARE AN EXPERIENCED FBI

7   AGENT?

8   A.   YES.

9   Q.   AND OF COURSE YOU ARE TRAINED TO PREPARE

10  REPORTS OF INTERVIEWS OF WITNESSES THAT YOUR

11  INVESTIGATION; IS THAT CORRECT?

12  A.   YES.

13  Q.   OKAY.  AND OF COURSE YOU WANT TO BE, YOU'RE IN

14  FACT, YOUR RESPONSIBILITY IS TO MAKE SURE THAT YOU

15  RECORD ANYTHING THAT YOU CONSIDERED TO BE IMPORTANT

16  IN TERMS OF, FROM THE INTERVIEW SO THAT YOU CAN

17  PROPERLY TRANSCRIBE THAT ON TO YOUR REPORT LATER

18  ON; IS THAT CORRECT?

19  A.   SO IT'S IMPORTANT TO LOOK AT THE TIME FRAME

20  HERE BECAUSE, YES, I WOULD DO SOMETHING THAT'S

21  IMPORTANT.

22        IF YOU ARE REFERRING TO REVIEWING THE PPM

23  AND ASKING THE QUESTIONS ABOUT IS IT IMPORTANT

24  THAT -- IF YOU HAD KNOWN THIS WAS FALSE, WOULD YOU

25  HAVE INVESTED, THAT KIND OF QUESTION, THIS IS THE

1    BEGINNING OF THE INVESTIGATION.  I PROBABLY DIDN'T

2    KNOW IS THAT PROSKAUER WASN'T THE ATTORNEY, THAT

3    CASTILLO, LYN DIDN'T EXIST.  I PROBABLY DIDN'T KNOW

4    ALL THESE THINGS AT THIS TIME.  SO IT PROBABLY WAS

5    NOT ASKED OR RECORDED.

6    Q.   MY QUESTION IS BASED ON THIS REPORT, WHICH IS

7    FIVE PAGES, YOU DID NOT SEE ANY REFERENCE IN THERE

8    THAT MR. VERDIELL HAD TOLD YOU IN THAT MEETING AND

9    WHICH YOU REFERRED TO AS THE FIRST MEETING,

10   ANYTHING ABOUT THE FACT THAT HE HAD CAREFULLY READ

11   THE PRIVATE PLACEMENT MEMORANDUM FOR FIRESIDE LS

12   FUND AND HAD RELIED ON CERTAIN KEY PROVISIONS OF

13   THAT MEMORANDUM?

14   A.   THIS IS A LONG QUESTION BUT THERE'S NOTHING

15   SPECIFIC ABOUT THE PPM IN THESE FIVE PAGES.

16   Q.   NOW LET ME DIRECT YOUR -- FIRST OF ALL, DO YOU

17   RECALL HOW LONG THAT INTERVIEW WAS ON

18   DECEMBER 24TH, 2008?

19   A.   NO, I DO NOT.

20   Q.   OKAY.  BUT YOU TOOK ENOUGH NOTES TRANSCRIBE

21   FIVE PAGES WORTH OF THE REPORT, RIGHT?

22   A.   YES.

23   Q.   WOULD THAT GIVE YOU AN ESTIMATE OF HOW LONG

24   WAS THE INTERVIEW ON THE BASIS OF THE FACT THAT YOU

25   HAD TRANSCRIBED FIVE PAGES?

1    A.   I DON'T THINK SO.

2    Q.   ALL RIGHT.  ONE OF THE SUBJECTS YOU DID

3    DISCUSS WITH MR. VERDIELL AT THAT FIRST

4    DECEMBER 24TH INTERVIEW, WAS WHY DID HE MAKE THE

5    INVESTMENT WITH FIRESIDE LS FUND, RIGHT?

6    A.   SO IT IS NOT A RECORDING OF WHAT I ASK HIM.

7    SO I CAN'T SAY FOR SURE THAT I ASKED HIM A SPECIFIC

8    QUESTION.

9    Q.   I GUESS THAT WAS A POOR QUESTION ON MY PART,

10   LET ME TRY AGAIN, PLEASE BEAR WITH ME.

11        DO YOU RECALL AS YOU SIT HERE IF

12   MR. VERDIELL TOLD YOU WHY HE HAD MADE A DECISION TO

13   INVEST WITH FIRESIDE LS FUND?

14   A.   WE MAY HAVE GONE INTO IT BRIEFLY.  I THINK AT

15   A LATER TIME WE WENT INTO THE WHY MORE, GETTING THE

16   GENERAL FACTS DOWN.

17   Q.   LET ME DIRECT YOUR ATTENTION THEN, IF I MAY,

18   TO THE SECOND PAGE OF THE DECEMBER 24TH, 2008, FBI

19   302 REPORT.  IT CARRIES THE BATES STAMP NUMBER OF

20   1771.  IF YOU COULD LOCATE THAT PAGE FOR ME, SIR?

21   A.   OKAY.

22   Q.   IF YOU COULD DIRECT YOUR ATTENTION TO THE

23   THIRD FULL PARAGRAPH, THE FIRST SENTENCE OF THE

24   THIRD FULL PARAGRAPH.

25        IF YOU COULD READ THAT FIRST SENTENCE TO

1    YOURSELF.

2    A.    OKAY.

3    Q.    HAVING READ THAT SENTENCE, WHICH IS THE FIRST

4    SENTENCE OF THE THIRD FULL PARAGRAPH ON PAGE TWO OF

5    THE DECEMBER 24TH 2008302 REPORT, DOES THAT REFRESH

6    YOUR RECOLLECTION OF WHETHER OR NOT AT THAT FIRST

7    MEETING MR. VERDIELL TOLD YOU WHY HE MADE A

8    DECISION TO INVEST IN THE FIRESIDE LS FUND?

9    A.    THAT'S CONSISTENT WITH WHAT I JUST SAID THAT

10   WE BRIEFLY WENT INTO WHY.

11          I THINK THAT MR. VERDIELL EXPANDED ON

12   THIS IN THE COURSE OF THE JURY TRIAL.  IT'S A VERY

13   SMALL SUBSECTION OF HIS ANSWER.

14   Q.    OKAY.  BUT READING THAT FIRST SENTENCE, DOES

15   THAT REFRESH YOUR RECOLLECTION THAT WHAT

16   MR. VERDIELL TOLD YOU, WHAT HE TOLD YOU AS TO WHY

17   HE MADE THE DECISION TO INVEST IN THE FIRESIDE LS

18   FUND WAS BECAUSE ONE, BASED ON HIS TRUST IN THE

19   OTHER INVESTORS.  AND TWO, HIS CONVERSATIONS WITH

20   MR. HU AND MR. BOND.

21   A.    YES, I THINK THAT'S ENTIRELY CONSISTENT WITH

22   WHAT MR. VERDIELL SAID AT TRIAL.

23   Q.    SO THE ANSWER IS, I GATHER THEN, YOUR BEST

24   RECOLLECTION AS YOU SIT HERE HAVING JUST READ THAT

25   SENTENCE, YOUR RECOLLECTION IS THAT WHAT

1    MR. VERDIELL TOLD YOU AT THAT FIRST MEETING,

2    INTERVIEW, I SHOULD SAY ON DECEMBER 24TH, 2008,

3    THAT HE TOLD YOU THAT THE TWO REASONS THAT HE GAVE

4    YOU FOR INVESTING IN THE FIRESIDE LS FUND WAS ONE,

5    BASED ON HIS TRUST IN THE OTHER INVESTORS AND HIS

6    CONVERSATIONS WITH MR. HU AND MR. BOND; IS THAT

7    CORRECT?

8    A.   YES.  I THINK THAT THE CONVERSATIONS WITH HU

9    AND BOND IS WHAT HE EXPANDED ON.  THE MEETINGS HE

10   HAD.  THIS IS MY UNDERSTANDING OF HIM SO I CAN TELL

11   YOU WHAT I THINK.  BUT WHAT I THINK IS I HEARD THE

12   SAME THING WHEN HE TESTIFIED HERE.

13           MR. FONG:  YOUR HONOR, I WOULD MOVE TO

14   STRIKE THE LAST PART OF HIS ANSWER AS BEING

15   NONRESPONSIVE.

16           THE COURT:  I WILL STRIKE THAT.  PORTION.

17   BY MR. FONG:

18   Q.   AGENT FINE, LET ME ASK YOU A SLIGHTLY

19   DIFFERENT QUESTION.

20           NOW, IN THE COURSE OF THAT FIRST --

21           THE COURT:  LET ME JUST BACK UP.  I

22   ASSUME YOU ARE TALKING ABOUT HIS COMMENT ABOUT

23   HEARING THE SAME THING?

24           MR. FONG:  YES.

25           THE COURT:  HIS STATEMENT THAT HE HEARD

859

1    THE SAME THING AT TRIAL, THAT'S UP TO THE JURY TO

2    DECIDE.

3              MR. FONG:  ALL RIGHT.

4              THANK YOU, YOUR HONOR.

5    Q.   AGENT FINE THEN, LET ME ASK YOU A SLIGHTLY

6    DIFFERENT QUESTION.

7              IN THAT FIRST INTERVIEW WITH

8    MR. VERDIELL, HE TOLD YOU THAT HE HAD -- HE VALUED

9    AND TRUSTED BOB LIN'S OPINION; IS THAT CORRECT?

10   A.   HE SAID -- YES, HE DID.

11   Q.   AND IN THAT FIRST MEETING ON DECEMBER 24TH,

12   2008, YOU AND MR. VERDIELL ALSO HAD A CHANCE TO

13   TALK ABOUT ANOTHER INVESTOR, A MR. ANDY YAN, Y-A-N;

14   IS THAT CORRECT?

15   A.   I THINK I SAW THAT, HOLD ON ONE SECOND.

16   Q.   SURE.  IF I MAY DIRECT YOUR ATTENTION TO THE

17   FOURTH PAGE, BATES NUMBER 1773.  THE SECOND

18   PARAGRAPH FROM THE BOTTOM.

19   A.   I SEE IT.  OKAY.

20   Q.   NOW, HAVING READ THAT PARAGRAPH, DOES THAT

21   REFRESH YOUR RECOLLECTION WHETHER OR NOT

22   MR. VERDIELL HAD TOLD YOU ANYTHING ABOUT HIS

23   CONVERSATIONS WITH ANDY YAN?

24   A.   YES.

25   Q.   OKAY.  AND WHAT MR. VERDIELL TOLD YOU WAS THAT

1    ANDY YAN WAS ANOTHER INVESTOR IN THE FIRESIDE FUND;

2    IS THAT CORRECT?

3    A.   YES.

4    Q.   AND THAT MR. VERDIELL TOLD YOU THAT ANDY YAN

5    HAD TOLD HIM THAT HE, ANDY YAN, HAD KNOWN ALBERT HU

6    AND THAT HE HAD NOT TRUSTED ALBERT HU AND HE HAD

7    KNOWN ALBERT HU TO BE A LIAR, BUT HE STILL, ANDY

8    YAN STILL INVESTED IN THE FIRESIDE FUND; IS THAT

9    CORRECT?

10   A.   SO YOU SKIPPED A WORD WHEN YOU SAID IT.  IT

11   SAYS LATER, AND I THINK THAT'S REFERRING TO THE

12   PARAGRAPH BEFORE.  BUT OTHERWISE YES.

13        SO AFTER MR. VERDIELL IS PROGRESSIVELY

14   HAVING -- HE'S ALREADY COMING TO THE CONCLUSION

15   THAT THIS MIGHT BE A FRAUD, HIS MONEY MIGHT BE IN

16   TROUBLE.  AFTER THAT POINT HE HAD A CONVERSATION

17   WITH MR. YAN WHO TOLD HIM ABOUT MR. HU'S TENDENCY

18   TO LIE.

19   Q.   AND MR. YAN SAID THAT.  BUT IN ADDITION TO

20   THAT, MR. YAN SAID I KNEW THAT MR. HU COULD NOT BE

21   TRUSTED AND I KNEW THAT HE LIED, BUT I STILL, I

22   ANDY YAN, STILL INVESTED WITH HIM THROUGH THE

23   FIRESIDE FUND; IS THAT CORRECT?

24   A.   I'M SORRY, I'M NOT SURE HOW YOU PHRASED THAT.

25   I THINK IT'S DOUBLE HEARSAY.  BUT YES.

1          MR. FONG:  OKAY.  THAT'S ALL I HAVE.

2          THANK YOU FOR YOUR PATIENCE, I APPRECIATE

3     IT.

4          MR. LUCEY:  IF I COULD JUST HAVE A MOMENT

5     TO CONFER WITH MY CO-COUNSEL.

6          THE COURT:  SURE.

7

8          **REDIRECT EXAMINATION BY MR. LUCEY**

9

10    BY MR. LUCEY:

11    Q.   FIRST, MR. FINE, YOU JUST ANSWERED SOME

12    QUESTIONS IN REGARD TO YOUR INTERACTIONS WITH

13    MR. VERDIELL OVER TIME, BEGINNING IN 2008?

14    A.   YES.

15    Q.   AND MR. FONG ASKED YOU A NUMBER OF QUESTIONS

16    REGARDING THOSE INTERACTIONS?

17    A.   YES.

18    Q.   YOU INDICATE INDEED RESPONSE TO ONE OF HIS

19    QUESTIONS IN ADDITION TO THE 30 TWOS THERE ALSO

20    CAME A TIME WHERE YOU WERE INVOLVED IN PREPARING AN

21    AFFIDAVIT FOR THE COURT PROCEEDINGS?

22    A.   YES.

23    Q.   WHEN APPROXIMATELY DID THAT AFFIDAVIT OCCUR?

24    A.   IN EARLY TO MID 2008.

25    Q.   2008 OR 2009?

1    A.   I'M SORRY, 2009.  LATE 2008 WHEN I HAD THE

2    FIRST CONVERSATION.

3    Q.   AND AS PART OF THAT PROCESS DID YOU

4    COMMUNICATE WITH MR. VERDIELL REGARDING WHAT

5    INFLUENCED HIM REGARDING HIS INVESTMENTS IN THE

6    FIRESIDE FUND PRIOR TO INVESTING IN THE FIRESIDE

7    FUND?

8    A.   I DID.

9    Q.   AND DID MR. VERDIELL TELL YOU IN THE COURSE OF

10   PREPARING YOUR AFFIDAVIT THAT HE RELIED ON THE

11   FIRESIDE PPM AS BEING ACCURATE?

12   A.   HE DID.

13   Q.   DID YOU ALSO REVIEW OTHER DOCUMENTS AS WELL

14   WITH MR. VERDIELL?

15   A.   YES.

16   Q.   IN THE COURSE OF COMING TO AN UNDERSTANDING AS

17   TO WHAT HE HAD REVIEWED AND RELIED ON PRIOR TO

18   MAKING AN INVEST?

19   A.   YES.

20   Q.   DID THAT ALSO INCLUDE THE SUBSCRIPTION BOOKLET

21   AS WELL?

22   A.   YES.

23   Q.   ALSO IN REGARD TO THE QUESTION THAT IS

24   MR. FONG HAD JUST ASKED YOU IN REGARD TO MR. YAN, I

25   WANT TO MAKE SURE I UNDERSTAND, I THINK YOU WERE

1    TRYING TO CLARIFY AT LEAST YOUR RECOLLECTION OF

2    THAT PORTION OF THE INTERVIEW WITH MR. VERDIELL.

3            WHAT IS YOUR UNDERSTANDING AS TO WHAT

4    TIME FRAME MR. VERDIELL WAS TALKING ABOUT IN REGARD

5    TO THE STATEMENTS MADE BY MR. YAN?

6    A.   THIS IS AFTER MR. VERDIELL'S CONCERN, HE'S

7    ALREADY INVESTED HE'S GOTTEN SEVERAL STATEMENTS,

8    HE'S CONCERNED ABOUT THE INVESTMENT.

9    Q.   SO TELL ME IF I HAVE THIS RIGHT, AGENT FINE.

10   YOUR RECOLLECTION BASED ON YOUR REVIEW OF THE 302

11   HAS NOW REFRESHED YOUR RECOLLECTION, THE REFERENCE

12   THAT IS MR. VERDIELL MADE WITH HIS CONVERSATIONS

13   WITH MR. YAN AFTER HE INVESTED IN THE FIRESIDE

14   FUND?

15   A.   CORRECT.

16   Q.   AFTER TRYING TO RETRIEVE HIS FUNDS FROM

17   MR. HU?

18   A.   YES.

19   Q.   MR. FINE, YOU WERE ALSO ASKED SOME QUESTIONS

20   IN REGARD TO THE HEDGE FUNDS IN GENERAL.  AND YOU

21   INDICATED THAT YOU WERE FOCUSED HERE ON THESE TWO

22   HEDGE FUNDS IN PARTICULAR, CORRECT?

23   A.   THAT'S CORRECT.

24   Q.   AND IN THE COURSE OF YOUR INVESTIGATION, DID

25   YOU -- I THINK YOU ALSO INDICATED, SORRY.  TAKE A

1    STEP BACK.  YOU ALSO INDICATED YOU HAD A CHANCE TO

2    CONFER WITH PEOPLE MORE KNOWLEDGEABLE ABOUT HEDGE

3    FUNDS AS WELL?

4    A.   I DID.

5    Q.   THAT WAS IN WHAT, IN THE CONTEXT OF TRYING TO

6    UNDERSTAND THESE TWO HEDGE FUNDS IN QUESTION HERE?

7    A.   THAT'S CORRECT.

8    Q.   SO IN THE COURSE OF YOUR INVESTIGATION, DID

9    YOU LEARN THAT THE DEFENDANT, MR. HU, RAN THE TWO

10   HEDGE FUNDS, ASENQUA BETA AND FIRESIDE LS FUND IN A

11   MANNER CONSISTENT WITH A LEGITIMATE HEDGE FUNDS?

12          MR. FONG:  OBJECTION.  SPECULATION.

13   HEARSAY.  FOUNDATION.

14          MR. LUCEY:  YOUR HONOR, THIS GOES TO THE

15   QUESTION RAISED BY MR. FONG ON CROSS-EXAMINATION.

16          THE COURT:  I THINK YOU OPENED THE DOOR

17   ON THIS A LITTLE BIT.  I WILL ALLOW IT.

18          I WILL ALLOW THIS QUESTION BUT I THINK

19   YOU DID SAY THAT HE DID NOT LEARN ABOUT HOW HEDGE

20   FUNDS OPERATE OTHER THAN THESE TWO.

21   BY MR. LUCEY:

22   Q.   BASED ON YOUR EXPERIENCE DEALING WITH PRIOR

23   INVESTMENT FRAUDS AS WELL PRIOR TO COMING TO COURT

24   TODAY AND YOUR WORK ON THIS INVESTIGATION, CAN YOU

25   INDICATE WHETHER OR NOT IT WAS CONSISTENT OR

865

1    INCONSISTENT WITH HOW LEGITIMATE INVESTMENT FUNDS

2    OPERATE?

3         MR. FONG:  SAME OBJECTION.

4         THE COURT:  I WILL SUSTAIN THE OBJECTION.

5    I THINK THE JURY CAN DRAW IT'S CONCLUSIONS.

6    BY MR. LUCEY:

7    Q.   AGENT FINE, YOU WERE ALSO ASKED QUESTIONS

8    REGARDING EXHIBIT 503 THAT WAS THE PPM FOR THE

9    ASENQUA BETA FUND?

10   A.   YES.

11   Q.   SHOWING YOU NOW, AGENT FINE, DEFENDANT'S

12   EXHIBIT 503.  I CALL YOUR ATTENTION IN PARTICULAR

13   TO PAGE EIGHT OF THAT DOCUMENT.

14   A.   OKAY.

15   Q.   AND I CALL YOUR ATTENTION TO THE VERY FIRST

16   SENTENCE OF THAT DOCUMENT?

17   A.   OKAY.

18   Q.   WHERE IT SAYS, ON THE BOTTOM THE SECTION

19   READING INVESTMENT STRUCTURE AT THE BOTTOM OF PAGE

20   EIGHT.  AND THE FIRST SENTENCE OF THAT PARAGRAPH TO

21   THE RIGHT OF THAT TITLE.

22   A.   OKAY.

23   Q.   COULD YOU READ THE FIRST PORTION OF THAT

24   PARAGRAPH BEGINNING WITH THE FUND WILL INVEST.

25   A.   THE FUND WILL INVEST SUBSTANTIALLY ALL OF ITS

1    ASSETS.

2    Q.   AND AGENT FINE, WERE YOU ABLE TO DETERMINE

3    WHETHER OR NOT, AT LEAST AS IT RELATES TO

4    MR. VERDIELL AND MR. LIN'S WIRES WHETHER

5    SUBSTANTIALLY ALL OF THE ASSETS RELATED TO PPM AND

6    FIRESIDE FUND WERE INVESTED?

7              MR. FONG:  OBJECTION.  VAGUE AND

8    AMBIGUOUS.

9              THE COURT:  I WILL LET THAT QUESTION GO.

10             THE WITNESS:  I FOUND TO THE CONTRARY.  I

11   DO NOT THINK THAT SUBSTANTIALLY ALL OF MR. LIN AND

12   MR. VERDIELL'S INVESTMENTS WERE INVESTED.

13   Q.   REGARDING THE QUESTION OF THE MASTER FEEDER

14   FUND ISSUE BY MR. FONG?

15   A.   YES.

16   Q.   WHEN YOU WERE LOOKING AT THE BANK OF AMERICA

17   ACCOUNTS FOR MR. LIN'S FIRST THREE WIRES THEN FOR

18   THE CREDIT SUISSE ACCOUNTS FOR MR. VERDIELL'S ONE

19   WIRE AND MR. LIN'S LAST WIRE.  WE WENT THROUGH

20   EARLIER TODAY IN EXHIBITS 263 TO 272.

21             WERE YOU MAKING ANY DRAWING ANY

22   DISTINCTION OR FOR GOING REVIEWING ANY DOCUMENTS OR

23   BANK ACCOUNTS BECAUSE OF ANY ISSUE REGARDING THE

24   DESTINATION OF THE FUNDS IN QUESTION?

25             MR. FONG:  OBJECTION.  ARGUMENTATIVE.

1        THE WITNESS:  NO.

2        MR. LUCEY:  I WILL REPHRASE YOUR HONOR.

3        THE COURT:  IF YOU DO THAT I WILL STRIKE

4   THE ANSWER.

5   Q.   SO HE WAS ASKING YOU QUESTIONS ABOUT MASTER

6   AND FEEDER FUND, WAS YOUR ATTEMPT TO -- WHAT WAS

7   YOUR GOAL IN TERMS OF LOOKING AT THE BANK OF

8   AMERICA ACCOUNTS AND THE CREDIT SUISSE ACCOUNTS IN

9   QUESTION.  WERE YOU LOOKING AT THE MONEY COMING IN

10  THEN FINDING OUT THERE AFTER ONCE IT HIT THE

11  ACCOUNT?

12        THE WITNESS:  RIGHT.  I WAS TRYING TO SEE

13  WHERE THE MONEY WENT.

14  BY MR. LUCEY:

15  Q.   YOU WERE TRYING TO FOLLOW THE MONEY?

16  A.   CORRECT.

17  Q.   YOU WERE NOT ATTEMPTING TO EXCLUDE ANY BANK

18  ACCOUNT OR ANY DESTINATION BECAUSE IT WAS

19  CHARACTERIZED WITH A PARTICULAR NAME ON IT,

20  CORRECT?

21  A.   NO.

22        MR. LUCEY:  LET ME JUST CONFER WITH MY

23  CO-COUNSEL.

24        NO FURTHER QUESTIONS, YOUR HONOR.

25        MR. FONG:  NOTHING FURTHER.

1          THE COURT:  I JUST HAVE ONE QUESTION.  IF

2     YOU LOOK AT EXHIBIT 263 AND THERE WAS THE

3     DISTRIBUTION OF BOB LIN'S FIRST $100,000

4     INVESTMENT.

5          THE WITNESS:  YES.

6          THE COURT:  THE LARGEST PORTION OF YOUR

7     PIE CHART REFLECTS CHECKS OR CHECK CARD PURCHASES.

8          THE WITNESS:  THAT'S CORRECT.

9          THE COURT:  I WAS NOT SURE I UNDERSTOOD

10    WHAT DID YOU DO, IF ANYTHING, TO DETERMINE WHAT THE

11    CHECKS OR CHECK CARD PURCHASES WERE?

12         THE WITNESS:  SO THERE'S TWO WAYS THAT

13    YOU COULD LOOK AT THE AND HOW I DID LOOK AT THAT.

14    ONE IS YOU SEE THE CHECK CARD PURCHASES ON THE

15    STATEMENT, FRY'S AND COSTCO.  FOR THE CHECKS

16    THERE'S CANCELLED CHECKS THAT WERE ALSO PROVIDED BY

17    THE BANK.

18         AND WE GAVE AT LEAST ONE EXAMPLE MAYBE A

19    COUPLE EXAMPLES OF CHECKS WE RECEIVED

20         THE COURT:  BUT DID YOU GO THROUGH ALL

21    THE CHECKS?

22         THE WITNESS:  SO THERE ARE ACTUALLY SOME

23    CERTAIN CHECKS THAT THE BANK NO LONGER HAS.  SO NO.

24    BUT ALL THE CHECKS I DID HAVE, YES.

25         THE COURT:  ALL RIGHT.  THANK YOU.

1              ANYTHING ELSE?

2              MR. LUCEY:  NO, YOUR HONOR.

3              MR. FONG:  NOTHING FURTHER.

4              THE COURT:  ALL RIGHT.  THANK YOU.

5              MR. FAZIOLI:  WOULD THIS BE A GOOD TIME

6    FOR THE AFTERNOON BREAK?

7              THE COURT:  WE CAN TAKE A BREAK.  WHAT'S

8    YOUR SCHEDULE?

9              MR. FAZIOLI:  I THINK WE ONLY HAVE ONE

10   MORE WITNESS.

11             THE COURT:  ALL RIGHT.  LET'S TAKE OUR

12   SECOND BREAK FOR 15 MINUTES.

13             IF YOU COULD JUST HANG ON FOR A SECOND,

14   TOO.

15             (WHEREUPON, THE FOLLOWING PROCEEDINGS

16   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

17             THE COURT:  MR. FAZIOLI, WHO IS YOUR LAST

18   WITNESS?

19             MR. FAZIOLI:  ANTHONY POLLACE.

20             THE COURT:  HOW LONG DO YOU THINK HE WILL

21   TAKE ON DIRECT?

22             MR. FAZIOLI:  MAYBE HALF AN HOUR,

23   40 MINUTES BUT WE WILL DEFINITELY TRY TO GET HIM IN

24   TODAY?

25             MR. FONG:  I HIGHLY DOUBT MY

                                                      870

1     CROSS-EXAMINATION OF MR. POLLACE WILL BE MORE THAN

2     FIVE MINUTES, IF THAT, YOUR HONOR.

3              THE COURT:  OKAY.  THEN AFTER THAT, WHAT

4     DO YOU HAVE, EITHER SIDE HAVE, ANYTHING?

5              MR. FAZIOLI:  I WOULD HAVE TO CONFER WITH

6     CO-COUNSEL BUT I ANTICIPATE WE WOULD REST AFTER MR.

7     POLLACK TESTIFIES.

8              THE COURT:  MR. FONG, ASSUMING HE DOES

9     THAT?

10             MR. FONG:  I ACTUALLY WAS ANTICIPATING

11    ONE MORE WITNESS, LINDA DANESH, THAT THE GOVERNMENT

12    WAS GOING TO CALL.  IN LIGHT OF THE FACT THAT THE

13    GOVERNMENT IS NOT LIKELY TO CALL HER I HAVE TO

14    RECONFIGURE A COUPLE OF THINGS BUT I SHOULD BE ABLE

15    TO PUT ON A VERY SHORT CASE TOMORROW MORNING, IN

16    TERMS OF, IF MS. DANESH DOES NOT TESTIFY.

17             THE COURT:  MY CONCERN IS THAT I HATE TO

18    HAVE THE JURY COME IN FOR TEN MINUTES OR HALF AN

19    HOUR AND GO HOME.

20             SHOULD WE HAVE THEM COME IN WEDNESDAY

21    MORNING AND JUST FINISH UP THEN?

22             MR. FONG:  I WAS JUST GOING TO SUGGEST

23    THAT, YOUR HONOR.

24             MR. LUCEY:  SO THE IDEA IS YOUR HONOR, WE

25    WOULD COME IN PERHAPS TOMORROW AND DEAL WITH JURY

1      INSTRUCTIONS JUST THE COURT AND COUNSEL.  THEN

2      MR. FONG WOULD PUT ON HIS MATTER THEN WE WOULD GO

3      TO CHARGING AND CLOSING?

4              THE COURT:  RIGHT.

5              MR. FAZIOLI:  I THINK IT WOULD DEPEND ON

6      WHAT THE DEFENSE ANTICIPATES ITS CASE IS GOING TO

7      BE.  IF THE DEFENDANT IS GOING TO START TESTIFYING

8      WEDNESDAY MORNING, IT WOULD EFFECT THE EFFICIENCY

9      OF THE CLOSING.  AND I THINK IT WOULD BE DEPENDENT

10     ON WHO WAS GOING TO TESTIFY WEDNESDAY.  IF HE'S

11     GETTING A COUPLE OF CHECKS INTO EVIDENCE AND

12     THERE'S A FIVE-MINUTE SESSION THEN I THINK WOULDN'T

13     NECESSARILY MATERIALLY AFFECT THE CLOSING THAT

14     MUCH.

15             THE COURT:  I THINK THAT'S A LEGITIMATE

16     CONCERN.

17             MR. FONG:  YOUR HONOR, AS I STAND HERE, I

18     DO NOT ANTICIPATE CALLING MR. HU AS A WITNESS.

19     OBVIOUSLY IT'S HIS CHOICE, BUT AS I STAND HERE I DO

20     NOT ANTICIPATE DOING THAT.

21             I DO NOT ANTICIPATE HAVING ANY LIVE

22     WITNESSES AS OF RIGHT NOW.  I THINK I WILL PUBLISH

23     CERTAIN DOCUMENTS.  BUT AGAIN, LIKE I SAID BEFORE,

24     YOUR HONOR, I NEED TO DO A LITTLE BIT OF RETHINKING

25     IN LIGHT OF THE FACT THAT THE GOVERNMENT IS NOT

1    GOING TO BE PUTTING ON MS. LINDA DANESH AS A

2    WITNESS.

3           OBVIOUSLY THAT'S THE GOVERNMENT'S RIGHT.

4    BUT AS OF LAST WEEK MY UNDERSTANDING WAS THAT

5    MS. DANESH WOULD BE ONE OF THE THREE WITNESSES

6    TODAY.  SO I WOULD BE -- I NEED TO --

7           THE COURT:  WHAT ABOUT -- I KNOW I SAID I

8    WOULDN'T DO THIS BEFORE, BUT WHAT ABOUT DOING

9    CLOSINGS TOMORROW?  COME IN AT, SAY, 8:30 AND WE

10   WILL DO THE INSTRUCTIONS AND THEN FINISH UP

11   WHATEVER YOU NEED TO FINISH UP AND THEN GO TO

12   ARGUMENT.

13          MR. FAZIOLI:  I PROBABLY PREFER TO DO THE

14   CLOSINGS ON WEDNESDAY IF AT ALL POSSIBLE.  BUT IF

15   THE COURT WOULD LIKE US TO DO CLOSINGS TOMORROW, WE

16   CAN.  I HAVE SOME CONCERNS ABOUT CLOSING AFTER THE

17   DEFENSE IS PUTTING ON A CASE, SOMEWHAT.  PLUS I

18   ALSO DON'T KNOW IF -- I GUESS OUR PREFERENCE WOULD

19   TO BE DO IT ON WEDNESDAY.  IF WE HAVE TO DO IT

20   TOMORROW WE CAN GET IT DONE BY TOMORROW.

21          MR. FONG:  MY PREFERENCE TOO WOULD BE TO

22   CLOSE ON WEDNESDAY.

23          THE COURT:  WELL, I THINK JUST IN

24   FAIRNESS TO THE JURY, CAN YOU DECIDE BY THE END OF

25   THE DAY WHETHER YOU ARE GOING TO CALL ANY LIVE

1    WITNESS OR WHETHER YOU ARE JUST GOING TO PUT ON

2    EVIDENCE?

3              MR. FONG:  YOUR HONOR, IF I COULD JUST

4    HAVE TWO MINUTES TO CONFER WITH MY CLIENT.

5              THE COURT:  ABSOLUTELY.

6              MR. LUCEY:  YOUR HONOR, AS MR. FAZIOLI

7    AND MR. FONG WERE TALKING I WAS KIND OF JUST

8    THINKING THROUGH THE LAST, THE COURT'S QUESTIONING

9    OF MR. FINE, I THINK IT MIGHT BE HELPFUL TO PUT HIM

10   BACK ON THE STAND, I HAVE NOT CONFERRED WITH HIM

11   OBVIOUSLY, I THINK IT WOULD BE APPROPRIATE TO HAVE

12   A BRIEF REDIRECT TO MAYBE CLARIFY SOMETHING ABOUT

13   THE COURT'S QUESTIONING ON 263 TO CLARIFY FOR THE

14   RECORD, REALLY CLEAN UP JUST IN TERMS OF THE

15   QUESTIONS YOU POSED TO HIM, IF MR. FONG AGREES.

16             THE COURT:  I WILL LET YOU RECALL HIM.

17             MR. LUCEY:  2 OR 3 QUESTIONS AT THE MOST.

18             MR. FONG:  THAT'S FINE, YOUR HONOR.

19             YOUR HONOR, I CAN REPRESENT TO THE COURT

20   THAT MR. HU WOULD NOT BE TESTIFYING.  I DO NOT

21   INTEND TO PUT ON ANY LIVE WITNESSES.  I SUSPECT

22   THAT MY PART OF THE CASE WILL BE MAYBE -- LESS THAN

23   HALF AN HOUR, YOUR HONOR.  IT'S MAINLY THE

24   PUBLICATION OF CERTAIN DOCUMENTS

25             THE COURT:  MY PUBLICATION OF CERTAIN

1    DOCUMENTS MEANING YOU WANT TO READ FROM --

2              MR. FONG:  TO SHOW ON THE MONITOR.  BUT

3    THEY ARE NOT LENGTHY DOCUMENTS.  THEY ARE NOT THE

4    40-PAGE PPM OR SUBSCRIPTION AGREEMENT.

5              MR. FAZIOLI:  I DON'T KNOW, AGAIN I'M NOT

6    SURE WHICH DOCUMENTS THEY ARE REFERRING TO.  WE DO

7    HAVE -- WE EXPRESSED A GENERALIZED CONCERN ABOUT

8    DOCUMENTS BEING USED WITHOUT A WITNESS AND IF --

9              THE COURT:  I ASSUME THESE ARE DOCUMENTS

10   THAT ARE ALREADY IN.

11             MR. FONG:  RIGHT.  YES.  I'M SORRY

12   YOUR HONOR IF I DIDN'T MAKE THAT CLEAR.

13             THESE ARE -- I MEAN THE PRIMARY DOCUMENTS

14   WOULD BE THE CHECK THAT IS WE TALKED ABOUT EARLIER

15   TODAY.

16             MR. FAZIOLI:  I THINK THE CHECKS COULD

17   BE --

18             MR. LUCEY:  THEY COULD COME INTO

19   EVIDENCE.

20             MR. FAZIOLI:  THAT SORT OF RELATES TO OUR

21   CONCERN ABOUT THE PROBATIVE VALUE OF JUST FREE

22   FLOWING CHECKS ABSENT TESTIMONY WITH THE DEFENDANT

23   OR THE PEOPLE THE CHECKS WERE DIRECTED TO.

24             THE COURT:  I THINK HE COULD SAY THE

25   PARTIES HAVE STIPULATED THAT THESE ARE CHECKS THAT

1   WERE WRITTEN IN THE ORDINARY COURSE OF BUSINESS AND

2   PUT IT UP AND NOT SAY ANYTHING MORE.

3           MR. FAZIOLI:  I GUESS, YES, IF THE COURT

4   IS INCLINED TO DO THAT, THEN YES, HE COULD DO THAT.

5   I SUPPOSE HE COULD DO THAT BEFORE THE CLOSINGS ON

6   WEDNESDAY IF THAT'S WHAT THE COURT DECIDES.

7           THE COURT:  MAYBE WE WILL EVEN HAVE TIME

8   TODAY.  I DON'T KNOW.

9           MR. FONG:  SURE.

10          THE COURT:  OKAY.  WHY DON'T WE COME BACK

11  IN -- WELL, I DON'T KNOW, WE TOOK OUR BREAK.

12          MR. FAZIOLI:  THANK YOU, YOUR HONOR.

13          MR. LUCEY:  THANK YOU.

14          (WHEREUPON A RECESS WAS TAKEN.)

15          THE COURT:  MR. LUCEY, YOU INDICATED YOU

16  HAVE A COUPLE OF MORE QUESTIONS.

17          MR. LUCEY:  I DID, YOUR HONOR.  JUST

18  REFLECTING ON THE COURT'S QUESTIONING OF MR. FINE.

19  SO MR. FINE, I DO RECALL AGENT FINE TO THE STAND.

20          THANK YOU, YOUR HONOR.

21

22      **FURTHER REDIRECT EXAMINATION BY MR. LUCEY**

23

24  BY MR. LUCEY:

25  Q.   AGENT FINE YOU UNDERSTAND YOU ARE STILL UNDER

876

1    OATH?

2    A.    YES.

3    Q.    JUST TO FOLLOW UP ON THE COURT'S QUESTIONS TO

4    YOU AT THE VERY END, THE COURT WAS ASKING QUESTIONS

5    REGARDING YOUR ENTRIES ON EXHIBIT 263, THE VERY

6    FIRST CHART REVIEWED REGARDING BOB LIN'S FIRST

7    HUNDRED THOUSAND DOLLAR INVESTMENT AND THE

8    FEBRUARY 8TH, 2005?

9    A.    YES.

10   Q.    THE COURT WAS ASKING QUESTIONS REGARDING THE

11   CHECK CARD PURCHASES THAT WERE REFERENCED THERE?

12   A.    YES.

13   Q.    YOU INDICATED IN YOUR TESTIMONY IN RESPONSE TO

14   THE COURT'S QUESTIONS REGARDING CHECKS YOU REVIEWED

15   ALL CHECKS THAT WERE AVAILABLE FOR THE BANK,

16   CORRECT?

17   A.    THAT'S CORRECT.

18   Q.    JUST SO WE ARE CLEAR FOR THE RECORD, IN REGARD

19   TO THE FIRST WIRE ON FEBRUARY 8TH AND THE SECOND

20   WIRE ON FEBRUARY 23RD, 2005, THOSE ARE THE EXHIBITS

21   THAT ARE REFERENCED FROM 263 THROUGH 267, AGENT

22   FINE?

23   A.    YES.

24   Q.    DID YOU LOOK AT ALL AVAILABLE DOCUMENTS

25   PRODUCED BY THE BANK OF AMERICA IN REGARD TO 6581

1    AS PRODUCED BY THE BANK FOR THAT TIME FRAME?

2    A.   YES.

3    Q.   AND THAT INCLUDED WHAT, ACCOUNT STATEMENTS?

4    A.   YES.

5    Q.   AND IT ALSO INCLUDED CHECKS OVER $10,000?

6    A.   IT DID.

7    Q.   BUT NOT CHECKS SMALLER THAN THAT AMOUNT?

8    A.   THERE MAY BE A COUPLE, BUT GENERALLY, NO.

9    Q.   AND FOR ALL THE CHECKS YOU REVIEWED, AND THAT

10   WERE AVAILABLE TO YOU FROM THE BANK FOR THE ACCOUNT

11   6581 FOR THE PERIOD FOR MARCH IN OR ABOUT

12   FEBRUARY 2005, WHICH WOULD BE INCLUSIVE OF YOUR

13   CHARTS AND DAILY BALANCES THAT WENT ALL THE WAY UP

14   TO MARCH 4TH, 2005, NONE OF THE DOCUMENTS YOU

15   LOOKED AT APPEARED TO SHOW MONEY GOING TOWARDS

16   INVESTMENT OR SECURITIES?

17   A.   THAT'S CORRECT.

18   Q.   NOW JULY 2005, BY CONTRAST, WERE ADDITIONAL

19   DOCUMENTS AVAILABLE TO YOU FOR REVIEW?

20   A.   YES.

21   Q.   THAT INCLUDED A LARGER NUMBER OF CHECKS WERE

22   MADE AVAILABLE?

23   A.   THAT'S CORRECT.

24   Q.   AND IN FACT, AS YOU UNDERSTAND IT THE BANK

25   PRODUCED ALL CHECKS AVAILABLE FOR THAT PERIOD?

1    A.    I THINK IT WAS ALL, IF NOT MAYBE MISSING ONE.

2    Q.    VIRTUALLY ALL?

3    A.    VIRTUALLY ALL.

4    Q.    AND AGAIN, HAVING LOOKED AT ALL THE DOCUMENTS

5    BANK OF AMERICA PRODUCED FOR THE ACCOUNT PERIOD IN

6    OR ABOUT BOB LIN'S THIRD WIRE ON JULY 6TH, 2005,

7    DID YOU SEE ANY INDICATION OF ANY OF THOSE MONEYS

8    AS IT LEFT THE ACCOUNT GOING TOWARDS INVESTMENTS OR

9    SECURITIES?

10    A.    I SAW NO INDICATION.

11            MR. LUCEY:  NO FURTHER, QUESTIONS,

12    YOUR HONOR.

13            THE COURT:  ALL RIGHT.  YOU MAY STEP

14    DOWN.

15            MR. FAZIOLI:  YOUR HONOR, THE

16    UNITED STATES CALLS ANTHONY POLLACE.

17            THE COURT:  ALL RIGHT.

18

19                        **ANTHONY POLLACE,**

20    BEING CALLED AS A WITNESS ON BEHALF OF THE

21    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

22    EXAMINED AND TESTIFIED AS FOLLOWS:

23            THE WITNESS:  YES, I DO.

24            THE CLERK:  PLEASE STATE YOUR FULL NAME

25    FOR THE RECORD AND SPELL YOUR LAST NAME.

1          THE WITNESS:  MY NAME IS ANTHONY VINCENT

2     POLLACE.  IT'S P-O-L-L-A-C-E.

3          THE CLERK:  THANK YOU.

4

5          **DIRECT-EXAMINATION BY MR. FAZIOLI**

6

7     BY MR. FAZIOLI:

8     Q.   MR. POLLACE, GOOD AFTERNOON.  WHERE DO YOU

9     LIVE?

10    A.   I LIVE IN SARATOGA, DO YOU WANT THE ADDRESS?

11    Q.   IT'S NOT NECESSARY.  HOW LONG HAVE YOU LIVED

12    IN CALIFORNIA?

13    A.   ABOUT 60 YEARS.

14    Q.   AND WHAT -- CAN YOU SUMMARIZE FOR THE JURY

15    YOUR EDUCATIONAL BACKGROUND?

16    A.   I HAVE A BACHELOR OF SCIENCE DEGREE IN FINANCE

17    AND ACCOUNTING FROM GOLDEN GATE UNIVERSITY.

18    Q.   WHAT DO YOU DO FOR A LIVING?

19    A.   I AM A CONSULTING CHIEF FINANCIAL OFFICER.

20    Q.   AND WHEN YOU SAY, WHAT DOES IT MEAN TO BE A

21    CONSULTING CHIEF FINANCIAL OFFICER?

22    A.   I TYPICALLY EMPLOY ON A CONSULTING BASIS WITH

23    COMPANIES THAT ARE LOOKING FOR HELP IN FINANCIAL

24    MANAGEMENT.  THERE HAVE BEEN FROM TIME TO TIME I'VE

25    TAKEN ON PERMANENT POSITIONS AS A CFO AS WELL.

1    Q.   GENERALLY PLEASE EXPLAIN FOR THE JURY WHAT

2    DOES A CHIEF FINANCIAL OFFICER DO FOR A COMPANY?

3    A.   THEY HELP MANAGE ADMINISTRATIVELY THE

4    FINANCIAL CONDITION OF A COMPANY, THE ACCOUNTING,

5    THE REPORTING, IF THERE'S AN IPO INVOLVED THEY WORK

6    WITH WALL STREET AND DO PUBLIC OFFERINGS,

7    ET CETERA, VENTURE CAPITAL WORK AS WELL.

8    Q.   DOES A CHIEF FINANCIAL OFFICER OF A COMPANY

9    OFTEN REVIEW THAT COMPANY'S FINANCIAL STATEMENTS?

10   A.   YES.

11   Q.   AND DOES THE CHIEF FINANCIAL OFFICER OF A

12   COMPANY OFTEN MAKE PUBLIC STATEMENTS OR IS THE

13   PUBLIC FACE OF A COMPANY'S FINANCES?

14   A.   SOME CHIEF FINANCIAL OFFICERS DO.  IF THE

15   COMPANY IS PUBLIC, THEY DO.

16   Q.   WHAT TYPES OF COMPANIES HAVE YOU SERVED AS A

17   CHIEF FINANCIAL OFFICER FOR?

18   A.   LET'S SEE, LITTON INDUSTRIES, COMPANIES TIE

19   TECHNOLOGY COMPANIES, PREDOMINANTLY LOCATED IN AND

20   ABOUT SILICON VALLEY.  MEDICAL DEVICE COMPANIES.

21   INTERNET COMPANIES.

22   Q.   AND I THINK YOU MENTIONED YOU HAD BEEN A CFO

23   PART TIMES AND OTHER TIMES FULL TIME; IS THAT

24   CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   CAN YOU EXPLAIN TO THE JURY HOW IT IS YOU CAME

2    TO BE CFO PART TIME, FOR EXAMPLE?

3    A.   FOR WHICH COMPANY.

4    Q.   JUST IN GENERAL.  HOW DID YOU BECOME A CFO

5    EITHER PART TIME OR FULL TIME THROUGH A COMPANY?

6    A.   EITHER THROUGH CONTACTS, BOARD MEMBERS I'VE

7    WORKED WITH IN THE PAST.  I WAS ALSO A PARTNER IN A

8    FIRM CALLED DAVID POWELL INCORPORATED.  THEY WERE

9    UP IN -- 3,000 SAND HILL ROAD WHERE A GREAT MANY

10   VENTURE CAPITALISTS RESIDE.  AND WE WOULD

11   ESSENTIALLY RENT A CFO, IF YOU WILL.  WE WOULD GO

12   INTO COMPANIES AND PERFORM DUTIES AS A CHIEF

13   FINANCIAL OFFICER ON A CONSULTING BASIS ON AN

14   AS-NEEDED BASIS.

15   Q.   DO YOU KNOW SOMEONE NAMED ALBERT HU?

16   A.   YES.

17   Q.   HOW DO YOU KNOW HIM?

18   A.   I ADMIT ALBERT THROUGH DAVID POWELL I WAS A

19   CONSULTING CFO PART TIME AND I MET, ALBERT THROUGH

20   THE RELATIONSHIP AND I WAS THE ACTING CFO.

21   Q.   SO YOU ARE AT DAVID POWELL, CORRECT?

22   A.   YES.

23   Q.   AND AT SOME POINT YOU BECOME A CHIEF FINANCIAL

24   OFFICER FOR ONE OF ALBERT HU'S BUSINESSES; IS THAT

25   CORRECT?

1    A.    THAT'S CORRECT.

2    Q.    AND WHICH ONE OF ALBERT HU'S BUSINESSES DID

3    YOU BECOME THE CFO FOR?

4    A.    THIS WAS APLEX INCORPORATED.

5    Q.    AND WHAT'S THE APPROXIMATE TIME, APPROXIMATE

6    DATE ON WHICH YOU BECAME A CFO FOR APLEX?

7    A.    1998, 1999.

8    Q.    OKAY.  AND WHAT WAS THE PROCESS BY WHICH YOU

9    BECAME A CFO, THE CFO FOR APLEX?  HOW WERE YOU

10   RETAINED?

11   A.    I WAS FIRST RETAINED THROUGH DAVID POWELL IN

12   THIS CONSULTING ARRANGEMENT.  AND MY DUTY WAS TO

13   HELP APLEX, DUTIES RELATED TO THE CFO.

14   Q.    AND WHO WAS THE HEAD OF APLEX?

15   A.    ALBERT HU WAS.

16   Q.    WHAT TYPE OF BUSINESS WAS APLEX?

17   A.    APLEX WAS A RELATIVELY YOUNG COMPANY

18   DEVELOPING A TOOL TO CHEMICAL MECHANICAL

19   PLANARIZATION.  THIS WAS A TOOL USED TO POLISH

20   WAFERS IN THE SEMICONDUCTOR INDUSTRY.

21   Q.    SO APLEX WAS NOT A HEDGE FUNDS?

22   A.    NO IT WAS NOT.

23   Q.    IT WAS NOT A VENTURE CAPITAL FIRM?

24   A.    NO.

25   Q.    WHERE WAS APLEX LOCATED?

1    A.    IN SUNNYVALE, CALIFORNIA.

2    Q.    WERE YOU A PART TIME OR FULL TIME CFO FOR

3    APLEX?

4    A.    I STARTED AS PART TIME, IT BECAME A FULL TIME

5    CFO, PERMANENT.

6    Q.    FOR HOW LONG WERE YOU A CFO AT APLEX?

7    A.    A COUPLE OF YEARS.  1998, 1999.

8    Q.    AND AT SOME POINT DID YOU STOP BECOMING THE

9    CFO FOR APLEX?

10   A.    YES.

11   Q.    AND DO YOU RECALL WHEN YOU STOPPED BECOMING

12   THE CFO FOR APLEX?

13   A.    PROBABLY 1999, SOME TIME.

14   Q.    DO YOU RECALL WHY YOU STOPPED BECOMING THE

15   CHIEF FINANCIAL OFFICER FOR APLEX?

16   A.    THE COMPANY RAN OUT OF FUNDS AND WAS UNABLE TO

17   CONTINUE FINANCIALLY TO DEVELOP ON THE RESEARCH AND

18   DEVELOPMENT, DEVELOP THE PRODUCT.

19   Q.    SO AT THAT POINT YOU STOPPED, YOU WERE NO

20   LONGER THE CFO FOR APLEX?

21   A.    THAT'S CORRECT.

22   Q.    AFTER YOU STOPPED BEING THE CFO FOR APLEX, DID

23   YOU AGREE TO STAY ON AND ASSIST WITH ANY OTHER

24   COMPANY OR FUND OF ALBERT HU?

25   A.    NO.

1    Q.   YOU DIDN'T AGREE TO WORK AS A CONTRACTOR FOR

2    ALBERT HU?

3    A.   NO.

4    Q.   YOU DIDN'T AGREE TO WORK AS A DIRECTOR OR

5    OFFICER FOR ANY ENTITY ASSOCIATED WITH ALBERT HU?

6    A.   NO.

7    Q.   DID YOU HAVE ANY -- AS THE APLEX VENTURE WAS

8    WINDING DOWN, DID YOU HAVE ANY DISCUSSIONS WITH

9    ALBERT HU ABOUT TAKING ON ANY OTHER ROLE IN SAY,

10   ONE OF HIS INVESTMENT FUNDS AFTER YOU LEFT APLEX?

11   A.   THERE WAS DISCUSSION, YES.

12   Q.   WHAT WAS THAT DISCUSSION?

13   A.   ALBERT HAD INVITED ME TO JOIN HIM OR HELP HIM

14   WITH HIS NEW COMPANY ASENQUA.

15   Q.   WHAT WAS THE SUBSTANCE OF THOSE DISCUSSIONS?

16   A.   TO JOIN HIM AS A CFO.

17   Q.   AND WHAT WAS YOUR RESPONSE?

18   A.   I SAID THAT I WAS NOT INTERESTED IN DOING IT.

19   I WAS BUSY WITH OTHER THINGS AND MY RESPONSE WAS

20   NO.

21   Q.   WERE YOU EVER AT ANY POINT A CFO WITH ASENQUA

22   OR A COMPANY WITH THE NAME ASENQUA?

23   A.   NO.

24   Q.   AFTER YOU STOPPED BEING THE CFO OF APLEX, DID

25   YOU HAVE ANY ADDITIONAL COMMUNICATIONS WITH ALBERT

885

1    HU?

2    A.   YES, I DID.

3    Q.   WHAT WERE SOME OF THOSE COMMUNICATIONS?

4    A.   ALBERT HAD, THROUGH HIS COMPANY, ASENQUA, WAS

5    PLACING INVESTMENTS IN VARIOUS COMPANIES.  AT THAT

6    TIME I WAS THE CFO FOR A COMPANY CALLED MANY ONE

7    NETWORKS AND I INVITED ALBERT TO MEET OUR CEO AT

8    MANY ONE NETWORKS AND OFFER AN OPPORTUNITY FOR

9    ASENQUA TO INVEST FUNDS IN MANY ONE, WHICH ALBERT

10   DID.

11   Q.   HOW MUCH DID MR. HU INVEST?

12   A.   $51,000.

13   Q.   AND DO YOU RECALL WHAT TIME FRAME THIS WAS?

14   A.   PROBABLY, 2002.

15   Q.   OKAY.  SO AFTER 2002, SAY 2003 TIME FRAME,

16   WERE YOU RETAINED IN ANY CAPACITY BY ALBERT HU?

17   A.   NO.

18   Q.   HOW ABOUT 2004 TIME FRAME?

19   A.   NO.

20        MR. FAZIOLI:  YOUR HONOR MAY I APPROACH

21   THE WITNESS?

22        THE COURT:  SURE.

23   Q.   THERE'S A NUMBER OF DOCUMENTS ADMITTED INTO

24   EVIDENCE.  THE FIRST DOCUMENT I WANT TO SHOW YOU IS

25   GOVERNMENT EXHIBIT 63.  AND I WOULD LIKE TO DRAW

1    YOUR ATTENTION TO THE BOTTOM OF GOVERNMENT

2    EXHIBIT 63.  THERE ARE LITTLE NUMBERS AT THE

3    BOTTOM.  BATES NUMBERS HU.  DO YOU SEE THAT?

4    A.   YES.

5    Q.   I WOULD LIKE TO DRAW YOUR ATTENTION TO PAGE 34

6    AT THE BOTTOM.  HU1026A.  DO YOU SEE THAT?

7    A.   YES.  LET ME GET TO PAGE 34.  I SEE IT.  I

8    HAVE IT.

9    Q.   MS. BURNEY, CAN YOU PLEASE HIGHLIGHT THE TOP

10   PORTION OF THAT DOCUMENT.

11           SO MR. POLLACE, DO YOU SEE THE PAGE IN

12   EXHIBIT 63, HU1026 A.

13   A.   YES.

14   Q.   IS THERE AN ENTITY AT THE TOP OF THE PAGE?

15   A.   YES.

16   Q.   WHAT'S THE ENTITY LISTED?

17   A.   ASENQUA BETA FUND.

18   Q.   AND IS THERE AN ADDRESS THAT'S LISTED AT THE

19   TOP OF THIS PAGE?

20   A.   YES.

21   Q.   WHAT'S THE ADDRESS THAT'S LISTED?

22   A.   50 CALIFORNIA STREET, SUITE 1500,

23   SAN FRANCISCO, CALIFORNIA, 94111.

24   Q.   AND WHAT IS THE DATE ON THIS STATEMENT HERE?

25   A.   STATEMENT DATE, JULY 2ND, 2004.

1   Q.   AND DO YOU SEE THERE'S AN INDIVIDUAL'S NAME

2   AND AN ADDRESS IN TAIWAN; DO YOU SEE THAT THERE?

3   A.   YES.

4   Q.   DID YOU PLEASE INDICATE WHO IS THE INDIVIDUAL

5   LISTED THERE ABOVE THE TAIWAN EASE ADDRESS?

6   A.   YU-MEI DOONG.

7   Q.   DO YOU SEE THERE'S A REFERENCE THERE TO A

8   WIRED IN, DO YOU SEE THAT?

9   A.   AN ACCOUNT NUMBER, IS THAT WHAT YOU ARE

10  ASKING?

11  Q.   7-2-04, WIRED IN.  DO YOU SEE THAT?

12  A.   ON THE CHECK, OKAY, YES.  7-2-2004.  WIRED IN.

13  YES.

14  Q.   YOU SEE THERE'S AN AMOUNT AFTER THAT?

15  A.   YES.

16  Q.   AND DO YOU SEE -- WHAT DOES IT INDICATE IS THE

17  AMOUNT WIRED IN ON THIS DOCUMENT?

18  A.   $200,000.

19  Q.   NOW YOU SEE THERE ARE TWO NAMES AND SIGNATURES

20  AT THE BOTTOM OF THIS PAGE, CORRECT?

21  A.   YES.

22  Q.   AND WHO IS LISTED AS THE PRESIDENT OF THE

23  ASENQUA BETA FUND ON THIS PAGE?

24  A.   IN PRINTED FORM IT'S ALBERT HU PHD.

25  Q.   THEN WHO IS LISTED AS THE CHIEF FINANCIAL

1    OFFICER OF THE ASENQUA BETA FUND?

2    A.   ANTHONY POLLACE.

3    Q.   AND THERE'S A SIGNATURE ABOVE THAT, CORRECT?

4    A.   THERE'S A SIGNATURE ABOVE IT.

5    Q.   AS OF THE DATE OF THIS STATEMENT, WITHIN

6    GOVERNMENT EXHIBIT 63 WERE YOU THE CHIEF FINANCIAL

7    OFFICER TO THE ASENQUA BETA FUND?

8    A.   NO, I WAS NOT.

9    Q.   HAVE YOU EVER BEEN A CHIEF FINANCIAL OFFICER

10   TO THE ASENQUA BETA FUND?

11   A.   NO.

12   Q.   DID YOU -- IS THAT YOUR SIGNATURE ON THIS

13   PAGE?

14   A.   NO.

15   Q.   DID YOU GIVE PERMISSION -- HOW DO YOU KNOW

16   IT'S NOT YOUR SIGNATURE?

17   A.   IT DOESN'T LOOK LIKE MY SIGNATURE AT ALL AND I

18   DIDN'T SIGN IT.

19   Q.   DID YOU GIVE PERMISSION FOR YOUR NAME TO BE

20   USE INDEED CONNECTION WITH THIS DOCUMENT?

21   A.   NO.

22   Q.   DID YOU GIVE PERMISSION FOR YOUR NAME TO BE

23   USED IN CONNECTION WITH THE ASENQUA BETA FUND?

24   A.   NO.

25   Q.   AT THE TIME YOU WORKED AS -- IN THE TIME

1    YOU'VE WORKED AS A CFO FOR ONE OF ALBERT HU'S

2    COMPANIES DID YOU GIVE HIM PERMISSION TO SIGN YOUR

3    NAME TO DOCUMENTS WITHOUT YOUR KNOWLEDGE OR

4    PERMISSION?

5    A.   NO.

6    Q.   YOU DO YOU HAVE A PRACTICE OF ALLOWING PEOPLE

7    TO SIGN YOUR NAME ON THESE DOCUMENTS WITHOUT YOUR

8    KNOWLEDGE OR PERMISSION?

9    A.   NO.

10   Q.   WHY NOT?

11   A.   GOD, IT'S JUST NOT A GOOD PRACTICE AND I DON'T

12   DELEGATE MY SIGNATURE AUTHORITY EVER TO ANYONE

13   EVER.

14   Q.   ALL RIGHT.

15        TAKING A LOOK AT THE SIGNATURE THAT IS

16   UNDER YOUR NAME ON PAGE, THAT IS ABOVE YOUR NAME ON

17   HU126 A GOVERNMENT EXHIBIT 63.  IS THAT TYPICALLY

18   THE WAY YOU SIGN YOUR NAME?

19   A.   NO.

20   Q.   HOW IS IT DIFFERENT?

21   A.   I TYPICALLY -- I ALWAYS SIGN MY NAME AV

22   POLLACE.

23   Q.   MS. BURNEY COULD YOU PLEASE PUBLISH TO THE

24   JURY WHAT'S BEEN MARKED AS EXHIBIT 260.  DO YOU

25   RECOGNIZE WHAT EXHIBIT 260 IS?

1    A.    YEAH, THAT LOOKS LIKE A COPY OF MY DRIVER'S

2    LICENSE.

3    Q.    IS THAT A COPY OF YOUR SIGNATURE?

4    A.    YES.

5    Q.    HOW DID YOU SIGN YOUR NAME ON THIS DOCUMENT?

6    A.    A.V. POLLACE.

7    Q.    THIS NEXT PAGE IS AN APPLICATION DATE OF

8    APRIL 2006, CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    INFORMATION YOU SUBMITTED TO THE DMV?

11   A.    RIGHT.

12   Q.    AGAIN HOW DID YOU SIGN YOUR NAME ON THIS

13   DOCUMENT?

14   A.    A.V. POLLACE.

15   Q.    MS. BURNEY COULD YOU PLEASE CYCLE THROUGH THE

16   REMAINING PICTURES ON THIS.  THESE NEXT IMAGES HERE

17   THESE ARE ALL SIGNATURES YOU PROVIDED TO THE DMV?

18   A.    YES.

19   Q.    AND THIS IS ACTUALLY GOING BACK TO THE EARLY

20   1990'S, CORRECT?

21   A.    YES.

22   Q.    AND CORRECT ME IF I'M WRONG, BUT YOU ARE

23   SIGNING YOUR NAME AV POLLACE?

24   A.    THAT IS CORRECT.

25   Q.    DO YOU SIGN YOUR NAME TONY POLLACE ON

1    DOCUMENTS?

2    A.   NO.

3    Q.   LET'S GO BACK TO GOVERNMENT EXHIBIT 63.  I'M

4    NOT GOING TO SHOW EVERY INSTANCE BUT I'M GOING TO

5    ASK YOU TO TAKE A LOOK AT, THERE ARE OTHER

6    INSTANCES OF SIGNATURES ABOVE YOUR NAME ON THIS

7    DOCUMENT.  AND I JUST WANT YOU TO STATE FOR THE

8    RECORD WHETHER OR NOT THIS IS YOUR SIGNATURE OR

9    NOT.

10           CAN THE I DRAW YOUR ATTENTION TO THE PAGE

11   AT THE BOTTOM WHICH WOULD BE HU1005A.  PAGE 13.

12   A.   OKAY.  I HAVE PAGE 13.

13   Q.   OKAY.  AND YOU SEE WITHIN GOVERNMENT

14   EXHIBIT 63 THERE'S A SIGNATURE ABOVE THE NAME

15   ANTHONY POLLACE, DO YOU SEE THAT?

16   A.   YES.

17   Q.   IS THAT YOUR SIGNATURE?

18   A.   NO.

19   Q.   DID YOU AUTHORIZE ANYONE TO SIGN YOUR NAME ON

20   THIS DOCUMENT?

21   A.   NO.

22   Q.   AND AGAIN WE DON'T NECESSARILY HAVE TO SHOW

23   EACH OF THESE ON THE SCREEN BUT DRAWING YOUR

24   ATTENTION TO PAGE HU1007A, TWO PAGES AFTERWARDS.

25   A.   I'M LOOKING AT IT.

1    Q.   AND LET ME, MS. BURNEY IF YOU DON'T MIND

2    HIGHLIGHTING THIS PAGE, THIS IS THE 14TH PAGE OF

3    THIS DOCUMENT.  CAN YOU HIGHLIGHT WHAT IT SAYS AT

4    THE TOP OF THIS DOCUMENT, WITHIN EXHIBIT 63.

5         AND YOU SEE THERE'S NOW A DIFFERENT FUND

6    NAME ON THE TOP OF THIS DOCUMENT HERE ON

7    EXHIBIT 63.  DO YOU SEE THAT?

8    A.   THERE'S NOT A --

9    Q.   DO YOU SEE AT THE TOP, WHAT'S THE NAME THAT'S

10   AT THE TOP?

11   A.   FIRESIDE.

12   Q.   DO YOU SEE THERE'S A NAME OF A FUND THERE?

13   A.   FIRESIDE LS FUND.

14   Q.   SO AGAIN, NOW ASKING YOU ABOUT THIS DOCUMENT,

15   IT SAYS FIRESIDE LS FUND.  THEN I'M DRAWING YOUR

16   ATTENTION TO THE NEXT PAGE OF THE DOCUMENT, THE

17   SECOND PAGE OF THE ACCOUNT STATEMENT YOU SEE THE

18   STATEMENT DATE DECEMBER 31ST, 2007, DO YOU SEE

19   THAT?

20   A.   THE NEXT PAGE OF THE DOCUMENT WHICH WOULD BE

21   PAGE 15?

22   Q.   YES.  THAT WOULD BE HU1007A.

23   A.   OKAY.  I'M LOOKING AT IT.

24   Q.   OKAY.  CAN YOU PLEASE BLOW UP AT THE BOTTOM.

25   AND WHO IS LISTED AS THE CHIEF INVESTMENT OFFICER

1    HERE?

2    A.   ALBERT HU PHD.

3    Q.   WHO IS LISTED AS THE CHIEF FINANCIAL OFFICER

4    FOR THE FIRESIDE LS FUND?

5    A.   ANTHONY POLLACE.

6    Q.   WERE YOU AT THAT POINT IN TIME THE CHIEF

7    FINANCIAL OFFICER FOR THE FIRESIDE LS FUND?

8    A.   NO.

9    Q.   HAVE YOU EVER BEEN THE CHIEF FINANCIAL OFFICER

10   FOR THE FIRESIDE LS FUND?

11   A.   NO.

12   Q.   DID YOU EVER GIVE PERMISSION FOR YOUR NAME TO

13   ANYONE, DID YOU EVER GIVE PERMISSION TO ANYONE FOR

14   YOUR NAME TO BE USED IN CONNECTION WITH THE

15   FIRESIDE LS FUND?

16   A.   NO.

17   Q.   SO YOU DIDN'T GIVE ALBERT HU TO SIGN YOUR NAME

18   ON THIS DOCUMENT, CORRECT?

19   A.   NO.

20   Q.   SO CONTINUING ON AND WE WON'T BLOW EACH OF

21   THESE UP.  DO YOU SEE THE NEXT PAGE IT SAYS 16 AT

22   THE BOTTOM HU1008A?

23   A.   YES I'M LOOKING AT IT.

24   Q.   AND WHO IS LISTED AS THE CHIEF FINANCIAL

25   OFFICER HERE?

894

1    A.    ANTHONY POLLACE.

2    Q.    IS THAT YOUR SIGNATURE ON THAT DOCUMENT?

3    A.    NO.

4    Q.    AGAIN MOVING ON TWO MORE PAGES TO PAGE 18

5    MARKED HU1010A, DO YOU SEE WHO IS LISTED THERE AS

6    THE CHIEF FINANCIAL OFFICER FOR THE FIRESIDE LS

7    FUND?

8    A.    ANTHONY POLLACE.

9    Q.    DID YOU SIGN THAT DOCUMENT?

10   A.    NO.

11   Q.    AGAIN, NEXT TWO PAGES HU1012A, DO YOU SEE

12   THAT?

13   A.    YES.

14   Q.    WHO IS LISTED THERE AS THE CHIEF FINANCIAL

15   OFFICER FOR THE FIRESIDE LS FUND FOR Q4, 2006?

16   A.    ANTHONY POLLACE.

17   Q.    DID YOU SIGN THAT DOCUMENT?

18   A.    NO.

19   Q.    SAME QUESTION AS TO HU1014A.  THIS IS A

20   FIRESIDE LS FUND STATEMENT DATE SEPTEMBER 30TH,

21   2006.  WHO IS LISTED AS THE CHIEF FINANCIAL OFFICER

22   FOR THE FIRESIDE LS FUND?

23   A.    ANTHONY POLLACE.

24   Q.    DID YOU SIGN THIS DOCUMENT?

25   A.    NO.

1    Q.   DID YOU SIGN ABOVE YOUR NAME ON PAGE 24 WHICH

2    IS HU1016 ADO YOU SEE THAT?

3    A.   I SEE IT.

4    Q.   DID YOU SIGN YOUR NAME ON THAT DOCUMENT?

5    A.   NO.

6    Q.   MOVING ON TO HU1018A, THIS IS A STATEMENT OF

7    ACCOUNT Q1, 2006 TO YU-MEI DOONG AND ABOVE THE

8    DEFENDANT'S NAME YOU SEE THERE'S AN INDIVIDUAL

9    LISTED AS THE CHIEF FINANCIAL OFFICER OF THE

10    FIRESIDE LS FUND.  WHO IS LISTED AS THE CHIEF

11    FINANCIAL OFFICER?

12    A.   ANTHONY POLLACE.

13    Q.   DID YOU SIGN THIS DOCUMENT?

14    A.   NO.

15    Q.   DID YOU EVER HAVE ACCESS TO THE FINANCIAL

16    RECORDS OF THE FIRESIDE LS FUND?

17    A.   NO.

18    Q.   MOVING ON TO HU1020A.  DID YOU?

19    A.   OKAY.

20    Q.   WHO IS LISTED ON THIS DOCUMENT AS THE CHIEF

21    FINANCIAL OFFICER OF THE FIRESIDE LS FUND?

22    A.   ANTHONY POLLACE.

23    Q.   DID YOU SIGN THIS DOCUMENT?

24    A.   NO.

25    Q.   SAME QUESTION AS TO HU1022 A.  WHO IS LISTED

1    AS THE CHIEF FINANCIAL OFFICER FOR THE ASENQUA BETA

2    FUND STATEMENT DATE JUNE 30TH, 2005?

3    A.   ANTHONY POLLACE.

4    Q.   DID YOU SIGN THIS DOCUMENT?

5    A.   NO.

6    Q.   SAME QUESTION AS TO HU1023 A.  THIS IS THE

7    ASENQUA BETA FUND STATEMENT DATE MARCH 31ST, 2005.

8    WHO IS LISTED HERE AS THE PRESIDENT OF THE ASENQUA

9    BETA FUND?

10   A.   ALBERT HU PHD.

11   Q.   THERE'S A SIGNATURE ABOVE THAT NAME, CORRECT?

12   A.   CORRECT.

13   Q.   WHO IS LISTED AS THE CHEF FINANCIAL OFFICER

14   FOR THE ASENQUA BETA FUND?

15   A.   ANTHONY POL.

16   Q.   IS THAT YOUR SIGNATURE ON THIS DOCUMENT?

17   A.   NO.

18   Q.   AGAIN THE NEXT PAGE HU1024 A IS A STATEMENT

19   DATE DECEMBER 31ST, 2004.  THIS IS TO YU-MEI DOONG

20   IN TAIWAN, WHO IS LISTED ON THIS DOCUMENT AS THE

21   CHIEF FINANCIAL OFFICER OF THE ASENQUA BETA FUND?

22   A.   ANTHONY POLLACE.

23   Q.   DID YOU SIGN THIS DOCUMENT?

24   A.   NO.

25   Q.   DRAWING YOUR ATTENTION TO THE NEXT DOCUMENT

1    HU1025 A.  WHO IS LISTED ON THIS DOCUMENT AS THE

2    CHIEF FINANCIAL OFFICER OF THE ASENQUA BETA FUND?

3    A.   ANTHONY POLLACE.

4    Q.   DID YOU SIGN THIS DOCUMENT?

5    A.   NO.

6    Q.   AND ON THE NEXT PAGE HU1026 A.  STATEMENT DATE

7    JULY 2ND, 2004.  WHO IS LISTED AS THE CHIEF

8    FINANCIAL OFFICER FOR THE ASENQUA BETA FUND?

9    A.   ANTHONY POLLACE.

10   Q.   DID YOU SIGN THAT DOCUMENT?

11   A.   NO.

12   Q.   MS. BURNEY COULD YOU PLEASE PUBLISH WITHIN

13   EXHIBIT 63, WE'VE GONE THROUGH A NUMBER OF ACCOUNT

14   STATEMENTS.  THIS APPEARS TO BE A SLIGHTLY

15   DIFFERENT DOCUMENT. HU001027A.  DO YOU SEE THAT.

16   COULD YOU PLEASE HIGHLIGHT THE TOP HALF OF THAT

17   DOCUMENT THROUGH THE SIGNATURES, PLEASE.

18          AND WHAT'S THE NAME OF THE ENTITY THAT'S

19   LISTED AT THE TOP OF THIS PAGE 1027-A

20   A.   ASENQUA.

21   Q.   THAT'S THE ENTITY ALBERT HU ASKED YOU TO BE

22   THE CFO OF?

23   A.   YES.

24   Q.   AND YOU TOLD HIM NO?

25   A.   YES.

1    Q.   CAN YOU SEE WHAT THE DATE IS ON THIS RECEIPT?

2    A.   YES.

3    Q.   WHAT IS THE DATE ON THIS RECEIPT?

4    A.   JULY 2ND, 2004.

5    Q.   WHAT DOES IT SAY AFTER THE WORD RECEIPT?

6    A.   THIS IS TO CONFIRM THE RECEIPT OF $200,000 USD

7    FROM MISS YU-MEI DOONG FOR THE ASENQUA BETA FUND ON

8    JULY 2ND, 2004.

9    Q.   WHO IS LISTED AS THE PRESIDENT OF THE ASENQUA

10   BETA FUND?

11   A.   ALBERT K. HU, PHD.

12   Q.   WHO IS LISTED AS THE CHIEF FINANCIAL OFFICER?

13   A.   ANTHONY POLLACE.

14   Q.   IS THAT YOUR SIGNATURE ON THIS DOCUMENT?

15   A.   NO.

16   Q.   DID YOU EVER GIVE MR. HU PERMISSION TO SIGN

17   YOUR NAME ON THIS DOCUMENT?

18   A.   NO.

19   Q.   DID YOU EVER HAVE AN OPPORTUNITY TO CONFIRM

20   THE RECEIPT OF $200,000 FROM MISS YU-MEI DOONG FOR

21   THE INVESTMENT IN THE ASENQUA BETA FUND ON

22   JULY 2ND, 2004?

23   A.   NO.

24   Q.   COULD YOU PLEASE BRING UP THE NEXT PAGE IN

25   THIS DOCUMENT.  WHAT'S THE BATES NUMBER AT THE

1    BOTTOM OF THAT PAGE?

2    A.    1028 A.

3    Q.    NOW, MS. BURNEY CAN YOU PLEASE -- WHAT'S THE

4    NAME OF THIS FUND -- THE NAME LISTED AT THE TOP OF

5    THIS DOCUMENT FOR A FUND?

6    A.    AQC FUND.

7    Q.    WERE YOU EVER THE CFO FOR THE AQC FUND?

8    A.    NO.

9    Q.    DRAWING YOUR ATTENTION TO THE NEXT DOCUMENT?

10          THE COURT:   I THINK WE ESTABLISHED PRETTY

11   CLEARLY THAT THE TESTIMONY IS THAT HE NEVER SIGNED

12   ANYTHING ON BEHALF OF ASENQUA.

13          MR. FAZIOLI:   OKAY.   OR THE AQC.   OKAY.

14

15   Q.    DO YOU EVER HAVE ACCESS TO THE RECORDS OF THE

16   AQC FUND?

17   A.    NO.

18   Q.    DID YOU EVER GIVE PERMISSION TO HAVE YOUR NAME

19   USED IN CONNECTION WITH THE AQC FUND?

20   A.    NO.

21   Q.    LET ME SHOW YOU WHAT'S BEEN MARKED AS

22   GOVERNMENT EXHIBIT 3.

23   A.    OKAY.   I GOT IT.

24   Q.    DO YOU SEE WHAT ENTITY IS LISTED AT THE TOP OF

25   GOVERNMENT EXHIBIT 3?

1    A.   ASENQUA BETA FUND.

2    Q.   CAN YOU -- MS. BURNEY CAN YOU PLEASE GO TO THE

3    SECOND PAGE OF GOVERNMENT EXHIBIT 3.

4         DO YOU SEE THERE ARE TWO SIGNATURES THERE

5    FOR THE CHIEF FINANCIAL OFFICER AND THE PRESIDENT

6    OF THE ASENQUA BETA FUND; DO YOU SEE THAT?

7    A.   YES.

8    Q.   WHO IS LISTED AS THE PRESIDENT OF THE ASENQUA

9    BETA FUND?

10   A.   ALBERT HU PHD.

11   Q.   DO YOU SEE HOW ON THE FIRST PAGE OF GOVERNMENT

12   EXHIBIT 3 THERE'S AN ADDRESS THERE AND IT'S TO THE

13   FU-YUAN LIN 1996 TRUST DO YOU SEE THAT?

14   A.   YES.

15   Q.   SO THAT'S THE INDIVIDUAL THE DOCUMENT IS

16   ADDRESSED TO:  ON THE SECOND PAGE OF IS THIS

17   DOCUMENT GOVERNMENT EXHIBIT 3 MR. HU IS LISTED AS

18   THE PRESIDENT, WHO IS LISTED AS THE CHIEF FINANCIAL

19   OFFICER FOR THE ASENQUA BETA FUND.  WHAT'S THE

20   NAME?

21   A.   IT'S ANTHONY POLLACK.  P-O-L-L-A-C-K.

22   Q.   IS THAT A CORRECT SPELLING OF YOUR NAME?

23   A.   NO.

24   Q.   BUT THERE'S A SIGNATURE ABOVE THE NAME ANTHONY

25   POLLACK DO YOU SEE THAT?

901

1    A.   YES.

2    Q.   IS THAT YOUR SIGNATURE?

3    A.   NO.

4    Q.   DO YOU HAVE A PRACTICE OF SIGNING FINANCIAL

5    DOCUMENTS ON WHICH YOUR NAME IS MISSPELLED?

6    A.   NO.

7    Q.   AGAIN QUICKLY GOING THROUGH THERE'S A SERIES

8    OF DOCUMENTS IN FRONT OF YOU GOVERNMENT EXHIBITS

9    34, 5 -- SORRY, 3, 4, 6, 7, 8, 9, 10.

10            SO 3, 4, 6, 7, 8, 9, AND 10.  DO YOU SEE

11   THAT?

12   A.   YES.

13   Q.   AND THERE'S A SIGNATURE ABOVE THE NAME ANTHONY

14   POLLACK ON EACH OF THESE DOCUMENTS, CORRECT?

15   A.   NUMBER THREE, YES.  EXHIBIT 4, YES.

16   EXHIBIT 6, YES.  EXHIBITS SEVEN, YES, AND

17   EXHIBIT 8, YES.

18   Q.   EXHIBIT 9 AS WELL, CORRECT?

19   A.   YES.

20   Q.   EXHIBIT 10 AS WELL?

21            THE COURT:  HE'S TESTIFIED THAT HE DIDN'T

22   SIGN ANYTHING AFTER A CERTAIN -- YOU DON'T NEED TO

23   GO THROUGH EVERY SINGLE ONE.

24   BY MR. FAZIOLI:

25   Q.   THAT'S NOT YOUR ACTUAL SIGNATURE ON ANY OF

902

1    THOSE DOCUMENTS, CORRECT?

2    A.   NO.

3    Q.   ALSO NOT YOUR SIGNATURE ON EXHIBITS 27, 31 AND

4    36?

5    A.   27, NO.  31, NO.  36, NO.

6    Q.   OKAY.  DRAWING YOUR ATTENTION TO GOVERNMENT

7    EXHIBITS 14 THROUGH 18; DO YOU SEE THAT?

8    A.   I DON'T FIND -- WOULD IT BE IN THIS STACK?

9    Q.   I WILL APPROACH.

10   Q.   DO YOU SEE GOVERNMENT EXHIBIT 14?

11   A.   YES.

12   Q.   THE STATEMENT DATE ON GOVERNMENT EXHIBIT 14?

13   A.   MAY 2ND, 2007.

14   Q.   WHO IS LISTED AS THE RECIPIENT UP AT THE TOP?

15   A.   VERDIELL FAMILY TRUST.

16   Q.   WHO IS LISTED AS THE CHIEF FINANCIAL OFFICER?

17   A.   ANTHONY POLLACK.

18   Q.   AGAIN JUST FOR THE RECORD YOU NEVER SIGNED

19   THIS DOCUMENT, CORRECT?

20   A.   CORRECT.

21   Q.   YOU DIDN'T SIGN EXHIBIT 15?

22   A.   CORRECT.

23   Q.   NOR 16, 17 AND 18, CORRECT?

24   A.   CORRECT.

25   Q.   I THINK YOU PREVIOUSLY INDICATED THAT YOU DID

1    NOT HAVE A PRACTICE OF ALLOWING OTHER PEOPLE TO

2    SIGN YOUR NAME ON FINANCIAL DOCUMENTS WITHOUT YOUR

3    KNOWLEDGE OR PERMISSION, CORRECT?

4    A.   CORRECT.

5    Q.   DURING THIS, THE TIME PERIOD OF THE LAST TEN

6    YEARS, WAS IT IMPORTANT TO YOU HOW YOUR NAME WAS

7    BEING USED IN THE LOCAL BUSINESS COMMUNITY?

8    A.   SAY AGAIN?

9    Q.   IS IT IMPORTANT TO YOU HOW YOUR NAME IS USED

10   IN THE LOCAL BUSINESS COMMUNITY?

11             THE WITNESS:  YES.

12             MR. FONG:  OBJECTION.  RELEVANCE.

13             THE COURT:  I THINK WE ARE GETTING A

14   LITTLE BIT FAR AFIELD.  HE'S TESTIFIED HE DIDN'T

15   WORK FOR THE COMPANY, DIDN'T SIGN ANY OF THESE.

16             MR. FAZIOLI:  NO FURTHER QUESTIONS.

17             THE COURT:  MR. FONG, ANY QUESTIONS?

18             MR. FONG:  JUST A COUPLE, YOUR HONOR.

19

20             **CROSS-EXAMINATION BY MR. FONG**

21

22   BY MR. FONG:

23   Q.   GOOD AFTERNOON, MR. POLLACE, MY NAME IS JERRY

24   FONG AND I REPRESENT ALBERT HU.  I JUST HAVE A

25   COUPLE QUESTIONS FOR YOU.

1             WHEN YOU WORKED WITH MR. HU, I BELIEVE

2     THE COMPANY IS CALLED APLEX, RIGHT?

3     A.   YES.

4     Q.   IN THE COURSE OF, I GUESS TWO YEARS YOU WORKED

5     FOR HIM?

6     A.   APPROXIMATELY, YES.

7     Q.   IN THE COURSE OF THE TWO YEARS YOU WORKED WITH

8     MR. HU, THERE WERE MANY OCCASIONS WHICH YOU SIGNED

9     DOCUMENTS THAT YOU GAVE TO MR. HU, RIGHT?

10    A.   I'M GUESSING YES.  AS A CFO OR CHIEF FINANCIAL

11    OFFICER I WOULD GUESS YES.

12    Q.   OKAY.  AND AS YOU SIT HERE YOU'RE PRETTY SURE

13    THAT MR. HU WOULD BE FAMILIAR WITH YOUR SIGNATURE;

14    IS THAT CORRECT?

15    A.   AGAIN, I'M ASSUMING YES.

16    Q.   NOW, IN THE PART OF THE WORK THAT YOU DID WITH

17    MR. HU AT APLEX, THAT INVOLVED ALSO RAISING VENTURE

18    CAPITAL; IS THAT CORRECT?

19    A.   THAT IS CORRECT.

20    Q.   OKAY.  AND YOU'RE AWARE IN THE PERIOD OF TIME

21    THAT YOU WERE THERE APLEX, THROUGH MR. HU WAS ABLE

22    TO RAISE ABOUT $10 MILLION IN VENTURE CAPITAL; IS

23    THAT CORRECT?

24    A.   I'M NOT SURE ABOUT THE AMOUNT, BUT YES.  THERE

25    WAS MONEY RAISED, YES.

1    Q.    AND WAS IT IN THE RANGE OF ABOUT $10 MILLION?

2    A.    I THINK SO.

3    Q.    OKAY.  AND AS PART OF YOUR WORK WITH MR. HU,

4    YOU ALSO WORKED WITH LAW FIRMS WHO DID LEGAL WORK

5    FOR APLEX; IS THAT CORRECT?

6    A.    YES.

7    Q.    OKAY.  AND THEY WERE SOME OF THE FAIRLY WELL

8    KNOWN LAW FIRMS IN THE AREA; IS THAT CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    OKAY.  AND NOW, AND MR. HU IN ABOUT 2007 OR

11   EXCUSE ME, 2002, HE INVESTED ABOUT $50,000 IN A

12   COMPANY CALLED MANY ONE?

13   A.    MANY ONE NETWORKS.

14            MR. FONG:  THANK YOU.  THAT'S ALL I HAVE.

15            MR. FAZIOLI:  NO FURTHER REDIRECT,

16   YOUR HONOR.

17            THE COURT:  ALL RIGHT.  YOU MAY BE

18   EXCUSED.  THANK YOU.

19            THE WITNESS:  THANK YOU.  LEAVE THESE

20   DOCUMENTS UP HERE?

21            THE COURT:  PLEASE.

22            MR. FAZIOLI:  THE UNITED STATES RESTS,

23   YOUR HONOR.

24            MR. FONG:  YOUR HONOR, MAY WE APPROACH

25   FOR ONE SECOND.

1              THE COURT:  OKAY.

2              MR. FONG:  LIKE I SAID BEFORE, IF I COULD

3      PUT ON MY CASE WEDNESDAY MORNING AND I REPRESENT TO

4      THE COURT THAT IT WOULD NOT TAKE MORE THAN HALF AN

5      HOUR IT SHOULD BE ACTUALLY LESS THAN THAT BUT I

6      WOULD PREFER TO GO OVER MY NOTES AND MAKE SURE I

7      DON'T MISS ANY PARTICULAR DOCUMENTS.

8              THE COURT:  ARE YOU REPRESENTING THAT YOU

9      ARE NOT GOING TO GO --

10             MR. FONG:  I'M REPRESENTING I'M NOT GOING

11     TO BE CALLING ANY LIVE WITNESSES.

12             AND I WANT TO MAKE SURE I GET ALL THE

13     DOCUMENTS THAT I WANT IN.

14             THE COURT:  OKAY.  I WILL LET YOU PROPOSE

15     THE DOCUMENTS.  BUT I CAN TELL THE JURY THAT THIS

16     CONCLUDES THE LIVE WITNESSES AND THAT WEDNESDAY

17     MORNING THERE MAY BE SOME DOCUMENTS.

18             MR. FONG:  THAT'S FINE, YOUR HONOR.  THAT

19     WOULD BE GREAT.

20             THE COURT:  IS IT DOCUMENTS OR YOU WANT

21     TO PUBLISH THE DOCUMENTS.

22             MR. FONG:  PUBLISH THE DOCUMENTS.

23             YOUR HONOR, I COULD DO IT NOW BUT I WANT

24     TO MAKE SURE I HAVE ALL THE DOCUMENTS

25             THE COURT:  HOW ABOUT I DO IT NOW WITH

907

1    THE UNDERSTANDING THAT --

2              MR. FONG:  OKAY.  THAT'S FINE.

3              MR. LUCEY:  YOUR HONOR, SHOULD WE HAVE

4    THE JURY RETURN OR LEAVE, THERE'S DEMONSTRATIVE

5    COPIES WE GAVE THEM OF THE EXHIBITS THEY NEED TO

6    RETURN THOSE BACK TO US OR --

7              THE COURT:  IT'S UP TO YOU.  THEY CAN

8    KEEP THOSE.

9              MR. LUCEY:  IF THEY TOOK NOTES THAT'S

10   FINE.  THAT'S FINE.  OKAY.

11             THE COURT:  ALL RIGHT.  MR. FONG.

12             MR. FONG:  THANK YOU, YOUR HONOR.

13             LADIES AND GENTLEMEN OF THE JURY, NOW IS

14   THE DEFENSE'S PART OF THE CASE AND I'M HAPPY TO

15   REPORT TO YOU THAT IT SHOULD BE RELATIVELY SHORT.

16   I WOULD SIMPLY LIKE TO PUBLISH FOR YOU TO LOOK AT,

17   CERTAIN DOCUMENTS THAT HAVE ALREADY BEEN ADMITTED

18   INTO EVIDENCE.

19             LET ME START WITH -- THIS IS EXHIBIT 503

20   WHICH IS THE ASENQUA BETA FUND CONFIDENTIAL PRIVATE

21   PLACEMENT MEMORANDUM.  ON PAGE 13 OF THAT EXHIBIT

22   THERE'S A HEADING AT THE BOTTOM OF -- I WILL SIMPLY

23   READ IT INTO THE RECORD.

24             IT READS THE HEADING.  COUNSEL.  NOBLE

25   LAW GROUP LP HAS BEEN RETAINED AS COUNSEL FOR THE

1    FUND, THE MASTER FUND AND THE INVESTMENT MANAGER.

2    MAPLES AND CALDER HAS BEEN RETAINED AS CAYMAN

3    ISLANDS COUNSEL TO THE MASTER FUND.

4           AND IF YOU WILL BEAR WITH ME THEN.  ON

5    PAGE 40, OF THE ASENQUA BETA FUND PRIVATE PLACEMENT

6    MEMORANDUM, IT HAS ON PAGE 40 LEGAL ADVISORS, THE

7    NOBLE LAW GROUP.

8           NOW I WOULD LIKE TO PUBLISH FOR YOU TO

9    REVIEW CERTAIN DOCUMENTS THAT THE GOVERNMENT AND

10   THE DEFENSE HAVE STIPULATED MAY COME INTO EVIDENCE

11   AND THE COURT HAS ALREADY RULED THEY ARE ADMISSIBLE

12   AS EVIDENCE.

13          THE FIRST DOCUMENT IS ACTUALLY A -- IT'S

14   PART OF A LARGER DOCUMENT, A BATCH OF DOCUMENTS THE

15   GOVERNMENT ALREADY ADMITTED INTO EVIDENCE ON ITS

16   OWN BUT I HAVE SEPARATED THIS OUT AS EXHIBIT 602,

17   DEFENDANT'S EXHIBIT 602 FOR YOU TO LOOK AT.

18          AND EXHIBIT 602 IS A CHECK FROM THE

19   ASENQUA ACORN LLC DATED FEBRUARY 25, 2005, MADE

20   PAYABLE TO THE ORDER OF NOBLE LAW GROUP FOR

21   $12,187.50.

22          AND IT'S SIGNED BY AN EMPLOYEE OF THE

23   ASENQUA GROUP.  SO CHECK 298, FEBRUARY 25TH, 2005,

24   12,187.50 TO THE NOBLE LAW GROUP.

25          EXHIBIT 603 IS A CHECK, 1002 OUT OF THE

1    WASHINGTON MUTUAL ACCOUNT OF ASENQUA VENTURES

2    MANAGEMENT, LLC, DATED, I BELIEVE THAT IS

3    JULY 25TH, 2006.  I'M NOT QUITE SURE IF THAT'S JULY

4    OR SEPTEMBER.  IT MIGHT BE -- YEAH.

5                ANY WAY, IT'S MADE PAYABLE TO THE NOBLE

6    LAW GROUP FOR $512.50.

7                AGAIN, THE CHECK FROM ASENQUA VENTURES

8    MANAGEMENT, CHECK 1002 FOR $512.50 MADE PAYABLE TO

9    THE NOBLE LAW FIRM.

10               EXHIBIT 604 WHICH IS ALSO IN EVIDENCE IS

11   CHECK 1003 FOR $1,900 OUT OF THE ASENQUA VENTURES

12   MANAGEMENT WASHINGTON MUTUAL ACCOUNT PAYABLE TO THE

13   NOBLE LAW FIRM.  SO -- THE CHECK IS 1003 IT'S IN --

14   LOOKS LIKE IT'S SEPTEMBER 25TH, 2006, $1,900 FROM

15   THE NOBLE LAW FIRM TO ASENQUA VENTURES MANAGEMENT.

16   THAT'S EXHIBIT 604.

17               EXHIBIT 604-A, AS IN APPLE, IS A CHECK,

18   ANOTHER CHECK FROM ASENQUA VENTURES MANAGEMENT LLC.

19   THE CHECK NUMBER IS 1011 AND IT'S DATED

20   DECEMBER 4TH, 2006, AND IT'S FOR $2,500 MADE

21   PAYABLE TO NOBLE LAW GROUP.

22               NOW I WANT TO PUBLISH FOR YOU THE TWO

23   PAGES, ONLY TWO PAGES OF THE FIRESIDE LS FUND

24   PRIVATE PLACEMENT MEMORANDUM.

25               ON PAGE -- THIS IS THE FIRESIDE LS FUND

910

1    CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THIS

2    HAS ALREADY COME INTO EVIDENCE AS PLAINTIFF'S

3    EXHIBIT 12.

4           ON PAGE 13 OF EXHIBIT 12 THE BOTTOM OF

5    THE PAGE, THE LAST PARAGRAPH READS THE HEADING,

6    COUNSEL.  TO THE RIGHT IT READS, PILLS BURY WIN 31

7    HAS BEEN RETAINED AS COUNSEL FOR THE FUND, THE

8    MASTER FUND AND THE INVESTMENT MANAGER.  MAPLES AND

9    CALDER HAS BEEN RETAINED AS CAYMAN ISLAND COUNSEL

10   TO THE MASTER FUND.

11          SO COUNSEL PILSBURY WINTHROP.  AND THIS

12   IS FOR THE FIRESIDE PRIVATE PLACEMENT MEMO.

13          THEN ON PAGE 40, THE LAST PAGE OF

14   EXHIBIT 12, THE PRIVATE PLACEMENT MEMO, THE LAST

15   ENTRY READS LEGAL ADVISORS.  PILSBURY WINTHROP

16   SHAW, PITTMAN LLP, WITH THE SAN FRANCISCO ADDRESS.

17          NOW KEEP THAT IN MIND.  THE NEXT DOCUMENT

18   I'M GOING TO PUBLISH FOR YOU IS DEFENDANTS 605.

19   AND YOU WILL OF COURSE BE ABLE TO LOOK AT THESE

20   EXHIBITS AFTER CLOSING ARGUMENTS.

21          EXHIBIT 605 IS A CHECK DATED AUGUST 10TH

22   2006, CHECK 1038 FROM ASENQUA VENTURES MANAGEMENT

23   LLC FROM THIS WASHINGTON MUTUAL BANK ACCOUNT MADE

24   PAYABLE TO PILSBURY WINTHROP, I CAN'T READ THE

25   LAST -- PITMAN, $8,000.

1        THE NEXT DOCUMENT I SHOULD SAY IS

2    DEFENDANT'S EXHIBIT 606.  DEFENDANT'S EXHIBIT 606

3    IS ANOTHER CHECK PAYABLE FROM ASENQUA VENTURES

4    MANAGEMENT OUT OF ITS WASHINGTON MUTUAL BANK

5    ACCOUNT TO THE LAW FIRM OF PILSBURY WINTHROP FOR

6    $6,000 DATED AUGUST 14, 2006.  CHECK 1087 -- 37 OR

7    87 -- 37.  FOR $6,000 FROM ASENQUA VENTURES

8    MANAGEMENT TO PILSBURY LAW FIRM.

9        AND THEN THE LAST CHECK OR LAST DOCUMENT

10   IS DEFENDANT'S EXHIBIT 607.  DEFENDANT'S

11   EXHIBIT 607.  IT IS A CHECK NUMBER 1042.  IT'S FROM

12   ASENQUA MANAGEMENT LLC OUT OF THE WASHINGTON MUTUAL

13   ACCOUNT DATED OCTOBER 15, 2006.  FOR $15,000.

14   $15,000 EVEN THOUGH THE NUMERAL IS HARD TO READ YOU

15   CAN SEE $15,000 FROM ASENQUA VENTURES MANAGEMENT

16   LLC OUT OF ITS WASHINGTON MUTUAL ACCOUNT, PAY TO

17   THE ORDER OF PILSBURY WINTHROP SHAW AND PIT MAN, A

18   CHECK FOR $15,000 CHECK NUMBER 1042.

19        YOUR HONOR THAT'S ALL THE DOCUMENTS I

20   WISH TO PUBLISH AT THIS POINT.  THANK YOU.

21        THE COURT:  SO BOTH SIDES REST SUBJECT TO

22   YOUR REVIEW OF THE DOCUMENTS.

23        MR. FONG:  YES, YOUR HONOR.

24        MR. FAZIOLI:  YES, YOUR HONOR.

25        THE COURT:  ALL RIGHT.

1    SO THAT WILL CONCLUDE THE EVIDENCE IN THE

2    CASE.

3    WHAT WE ARE GOING TO DO IS I HAVE TO GO

4    OVER WITH THE ATTORNEYS THE LEGAL INSTRUCTIONS,

5    ONCE THE CASE HAS BEEN COMPLETED IT'S MY OBLIGATION

6    TO GO OVER WITH THEM THE INSTRUCTIONS I INTEND TO

7    GIVE YOU.  SO TO AVOID YOUR HAVING TO POSSIBLY WAIT

8    TOMORROW WHILE WE DID SOME OF THAT, I'M GOING TO

9    HAVE YOU COME IN WEDNESDAY AND WE WILL HAVE CLOSING

10   ARGUMENTS AND INSTRUCTIONS ON WEDNESDAY AND THE

11   CASE WILL BE YOURS AND YOU CAN DELIBERATE STARTING

12   WEDNESDAY.

13   AND YOU WILL NOT NEED TO BE HERE

14   TOMORROW.  SO WITH THAT YOU ARE EXCUSED AND WE WILL

15   SEE YOU WEDNESDAY MORNING AT 8:30.

16   (WHEREUPON, THE FOLLOWING PROCEEDINGS

17   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

18   THE COURT:  WHAT'S YOUR PLEASURE IN

19   MEETING TOMORROW?  I CAN DO IT ANY TIME, OBVIOUSLY

20   BECAUSE WE HAVE THE TIME SET ASIDE.  SO IF YOU WANT

21   TO COME AT 8:30 THAT'S FINE.  IF YOU WANT TO COME

22   AT NINE, THAT'S FINE.

23   MR. LUCEY:  YOUR HONOR, IF I COULD MAKE A

24   SUGGESTION.  PERHAPS IT MIGHT SERVE THE COURT IF

25   COUNSEL CAN MEET PRIOR TO COMING TO COURT AND SEE,

913

1   I DON'T THINK WE HAVE ACTUALLY GONE THROUGH AND

2   HASHED OUT WHERE WE AGREE OR DISAGREE.  SO PERHAPS

3   WE COULD DO THAT FIRST.

4          THE COURT:  WELL, I HAVE THE INSTRUCTIONS

5   ESSENTIALLY DONE.  I NEED TO CLEAN UP A COUPLE OF

6   THINGS.  I COULD E-MAIL THEM TO YOU OR YOU COULD

7   JUST PICK THEM UP TOMORROW MORNING AND GO OVER

8   THEM.  I DO THINK IT MAKES SENSE FOR YOU TO MEET.

9          MR. FAZIOLI:  I THINK YOU COULD E-MAIL

10  THEM.  OR YOU COULD GIVE IT TO US IN THE MORNING.

11         THE COURT:  I WILL E-MAIL THEM.

12         MR. FONG:  I APPRECIATE THAT YOUR HONOR.

13         THE COURT:  GIVE YOUR E-MAILS TO MISS

14  GARCIA, WHAT TIME DO YOU WANT TO MEET?

15         MR. FONG:  MAY I SUGGEST YOUR HONOR THAT

16  PERHAPS COUNSEL AND I CAN MEET AT 9:00 THEN WE CAN

17  CONVENE IN THE COURT AT 10:00.

18         THE COURT:  SOUNDS FINE TO ME.

19         MR. LUCEY:  THANK YOU, YOUR HONOR.

20         MR. FAZIOLI:  AND A VERDICT FORM,

21  YOUR HONOR?

22         THE COURT:  I WILL DO ONE OF THOSE TOO.

23         MR. FAZIOLI:  OKAY.

24         MR. LUCEY:  YOUR HONOR, ONE OTHER CLEAN

25  UP THING OUT OF AN ABUNDANCE OF CAUTION IN TERMS OF

914

1    THE ISSUES WITH THE RECORD.

2           SO WE -- YOUR HONOR, LET ME CHECK WITH

3    MR. FONG FIRST THEN WE WILL ADDRESS THE COURT

4           (OFF-THE-RECORD DISCUSSION.)

5           MR. LUCEY: OKAY. YOUR HONOR, JUST

6    MAKING CLEAR FOR THE RECORD WE CONFERRED WITH

7    MR. FONG, THIS GOES BACK TO ONE OF OUR EARLIER

8    MATTERS. MR. FONG HAS NO OBJECTION TO AT THIS

9    POINT THE JURY HAS RETAINED EACH OF THEM THE

10    EXHIBITS 263 TO 272 PRIOR TO THEIR DELIBERATIONS

11    BEGINNING. THE COURT THAT WAS MY UNDERSTANDING

12    THEY STILL HAVE THEM.

13           MR. LUCEY: FAIR ENOUGH. MAKE SURE IT'S

14    CLEAR FOR THE RECORD THAT THERE'S NO OBJECTION.

15           MR. FONG: THAT'S FINE.

16           MR. FAZIOLI: YOUR HONOR, ONE LAST THING.

17    I DON'T KNOW IF THE COURT WOULD CONSIDER IT

18    CONSTRUCTIVE FOR, TO ASK THE DEFENDANT IF HE'S

19    AWARE HE HAS A RIGHT TO TESTIFY AND HE'S CHOOSING

20    NOT TO, JUST TO CLARIFY FOR THE RECORD.

21           THE COURT: I ASSUMED THAT MR. HU KNOWS

22    HE'S GOT A RIGHT TO TESTIFY AND HAS CHOSEN NOT TO

23    DO SO.

24           MR. FONG: IS THAT YOUR UNDERSTANDING

25    MR. HU.

1          THE DEFENDANT:  THANKS FOR ALL THE

2     ATTENTION, BUT NO.

3          MR. FAZIOLI:  THE DEFENDANT UNDERSTANDS

4     HE HAS A RIGHT TO TESTIMONY AND HE'S CHOOSING NOT

5     TO TESTIFY.  THANK YOU.

6          THE COURT:  PLEASE ALSO MAKE SURE YOU GO

7     OVER EXHIBITS THAT HAVE BEEN ADMITTED AND HAVE

8     AGREEMENT ON THAT AND THAT THEY ARE SEPARATED OUT

9     FOR BEING TAKEN TO THE JURY.

10          (WHEREUPON, THE PROCEEDINGS IN THIS

11     MATTER WERE CONCLUDED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4 **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9 REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10 THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11 FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12 CERTIFY:

13          THAT THE FOREGOING TRANSCRIPT,

14 CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15 CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16 SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17 HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18 TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22 _____

23 SUMMER A. FISHER, CSR, CRR
   CERTIFICATE NUMBER 13185          DATED: 6/19/2012

24

25