1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

   UNITED STATES,              )  CR-09-00487-RMW
5                              )
                 PLAINTIFF,    )
6                              )  JUNE 20, 2012
            VS.                )
7                              )  VOLUME 8
   ALBERT KE-JENG HU,          )
8                              )
                 DEFENDANT.    )  PAGES 972-1134
9   _____)

10

11           TRANSCRIPT OF PROCEEDINGS

12     BEFORE THE HONORABLE RONALD M. WHYTE

13          UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE PLAINTIFF:  U.S. ATTORNEY'S OFFICE
                         BY:  JOSEPH FAZIOLI
18                            TIM LUCEY
                         150 S. ALMADEN BLVD, STE 900
19                       SAN JOSE, CA  95113

20

21   FOR THE DEFENDANT:  ATTORNEY AT LAW
                         BY:  JERRY FONG
22                       PO BOX 1040
                         PALO ALTO, CA  94302-1040

23

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185

1

2                        INDEX OF PROCEEDINGS

3

4    CLOSING ARGUMENT BY MR. FAZIOLI          P. 979

5    CLOSING ARGUMENT BY MR. FONG             P. 1051

6    CLOSING ARGUMENT BY MR. LUCEY            P. 1093

7

8    JURY INSTRUCTIONS                        P. 1107

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA          JUNE 20, 2012

2                   P R O C E E D I N G S

3    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT

4    OF THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING, EVERYBODY.

6              WE ARE MISSING ONE JUROR.  IT'S ONE OF

7    THE ALTERNATES.  WE HAVE TRIED TO GET A HOLD OF

8    HER, BUT WE HAVE NOT BEEN ABLE TO.  WE DO NOT HAVE

9    A MESSAGE FROM HER.

10             MY SUGGESTION IS SHE'S AN ALTERNATE,

11   WE'VE STILL GOT ANOTHER ALTERNATE, WE ARE DONE WITH

12   THE CASE, WE GO FORWARD.

13             MR. FONG:  THAT'S FINE WITH THE DEFENSE,

14   YOUR HONOR.

15             MR. FAZIOLI:  THAT'S FINE WITH THE

16   GOVERNMENT, YOUR HONOR.

17             MR. FONG:  YOUR HONOR, WE DO HAVE ONE

18   MATTER THAT I WOULD LIKE TO TAKE UP WITH THE COURT

19   BEFORE WE START.

20             MY UNDERSTANDING FROM CONSULTING WITH THE

21   GOVERNMENT'S COUNSEL IS THAT THE GOVERNMENT INTENDS

22   IN ITS CLOSING ARGUMENT TO DISPLAY THE TRANSCRIPTS

23   OF, EXCERPTS OF TRANSCRIPTS OF WITNESS BOB LIN'S

24   TESTIMONY.  I'M NOT SAYING THAT'S RIGHT OR WRONG, I

25   PERSONALLY HAVE NOT SEEN THAT DONE BEFORE AND I DO

1    KNOW THAT THE JURORS WILL NOT HAVE A COPY OF THE

2    TRANSCRIPT.  THEY CAN CERTAINLY ASK FOR A REREAD OF

3    ANY RELEVANT PORTIONS AND I'M CONCERNED THAT THERE

4    MIGHT BE A PROBLEM WITH THE JURORS SEEING AN

5    EXCERPT OF A TRANSCRIPT UP THERE AND THINKING WELL,

6    THAT TRUMPS EVERYTHING BECAUSE IT'S THE TRANSCRIPT.

7            MR. FAZIOLI:  YOUR HONOR, TO BE CLEAR, WE

8    DO HAVE A POWERPOINT PRESENTATION WE WERE PLANNING

9    IN CLOSING.  IN IT WERE A COUPLE OF SLIDES OF

10   VARIOUS INVESTOR WITNESSES WITH A DESCRIPTION OF A

11   QUESTION AND AN ANSWER.

12           THIS IS A PRACTICE I HAD SEEN DONE IN

13   OTHER INVESTMENT FRAUD TRIALS, PUBLISHING A

14   QUESTION AND AN ANSWER.

15           AND THE GOVERNMENT HAS, THERE WERE

16   REFERENCES TO TRANSCRIPT NUMBERS WHICH WE HAVE

17   REMOVED THAT MAY LESSEN ANY SORT OF IMPRIMATUR THIS

18   IS, IN THAT REGARD.  AND WE ARE ALSO PREPARED TO

19   NOTE BEFORE WE SHOW ANY OF THESE SLIDES THAT THIS

20   IS, THAT THEIR RECOLLECTION OF THE EVIDENCE

21   CONTROLS AND IF THEIR RECOLLECTION OF WHAT

22   WITNESSES SAID IS DIFFERENT THAN WHAT'S ON THE

23   SLIDES, THEN THAT CONTROLS.

24           THE COURT:  I DON'T THINK I SEE A

25   PROBLEM.

1          MR. FONG:  AS LONG AS IT'S MADE CLEAR

2     THAT WHAT THEY ARE SEEING IS NOT MEANT TO BE THE

3     TRANSCRIPT.  BECAUSE I DO THINK UNDERSTANDABLY WILL

4     PUT A LOT MORE FAITH IN A TRANSCRIPT AS OPPOSED TO,

5     THIS IS A POWERPOINT PRESENTATION OF WHAT THE

6     GOVERNMENT IS CONTENDING.

7          MR. FAZIOLI:  WELL, IT IS, JUST TO BE

8     CLEAR, WE ARE NOT GOING TO REPRESENT THAT THIS IS

9     AN OFFICIAL TRANSCRIPT, BUT IT IS IN FACT THE

10    TRANSCRIPT, IT'S NOT A RECREATION --

11         THE COURT:  AS I UNDERSTAND IT YOU ARE

12    GOING TO ARGUE THIS IS A QUESTION THAT WAS ASKED

13    AND THIS IS THE ANSWER THAT WAS GIVEN.

14         MR. FAZIOLI:  YES.

15         THE COURT:  AND NOT THIS IS THE OFFICIAL

16    TRANSCRIPT THAT SHOWS THE QUESTION AND ANSWER.

17         MR. LUCEY:  NOT AT ALL, YOUR HONOR.

18         MR. FONG:  YES, THEY ARE ENTITLED TO SAY

19    THIS QUESTION WAS ASKED THIS ANSWER WAS GIVEN.  I

20    WANT TO MAKE SURE THERE'S NO MENTIONING THAT THIS

21    IS AN OFFICIAL TRANSCRIPT.

22         BUT I HEAR THEY ARE NOT PLANNING TO DO

23    THAT SO I THINK THE MATTER IS TAKEN CARE OF.

24         THANK YOU.

25         THE COURT:  WHAT'S YOUR ANTICIPATED

1    LENGTH OF YOUR CLOSING?

2           MR. FAZIOLI:  I WOULD SAY AN HOUR PERHAPS

3    TO AN HOUR AND 20 MINUTES.  IT WILL DEPEND ON HOW

4    THE SLIDES PROGRESS.

5           MR. FONG:  YOUR HONOR, I WOULD ESTIMATE

6    MINE WILL BE AN HOUR, MAYBE MORE.  I HIGHLY DOUBT

7    THAT IT'S GOING TO BE LESS THAN AN HOUR.

8           THE COURT:  I WILL TELL YOU THAT STUDIES

9    HAVE SHOWN THAT AFTER 20 MINUTES COMPREHENSION GOES

10   DOWN QUITE A BIT, AND AFTER AN HOUR IT'S BASICALLY

11   GONE.  SO JUST BEAR THAT IN MIND.

12          MR. FAZIOLI:  WE WILL BE AS CONCISE AS WE

13   CAN, YOUR HONOR.

14          THE COURT:  IF THERE'S ONE THING I HAVE

15   LEARNED FROM BEING A JUDGE IS THAT CLOSING

16   ARGUMENTS TEND TO BE TOO LONG.  AND I HAVE -- CAN'T

17   TELL YOU HOW MANY TIMES I'VE SAID AND HEARD AN

18   ARGUMENT AND SAID THAT'S THE BEST ARGUMENT I'VE

19   EVER HEARD, AND IT WENT ON AND I HAD FORGOTTEN BY

20   THE END WHY IT WAS ANY GOOD.

21          OKAY.  WE WILL BRING THE JURY IN.

22          MR. FAZIOLI:  AND YOUR HONOR, THE

23   GOVERNMENT INTENDS TO SPLIT -- I'M GOING TO DO THE

24   CLOSING ARGUMENT, MR. LUCEY WILL DO THE REBUTTAL.

25          THE COURT:  THAT'S FINE.  JUST -- THE

977

1    REPLY NEEDS TO BE SHORT.

2              MR. LUCEY: YOUR HONOR, IS YOUR PRACTICE

3    TO GENERALLY TAKE A BREAK BETWEEN THE SECTIONS?

4              THE COURT: MAYBE NOT BETWEEN -- DEPENDS

5    ON HOW LONG.

6              MR. LUCEY: VERY GOOD, YOUR HONOR.

7              (WHEREUPON, THE FOLLOWING PROCEEDINGS

8    WERE HELD IN THE PRESENCE OF THE JURY:)

9              THE COURT: I APOLOGIZE FOR THE LATE

10   START. I DON'T KNOW WHAT HAPPENED TO THE ONE

11   JUROR. SHE IS AN ALTERNATE SO I TALKED TO THE

12   PARTIES AND WE ALL AGREE THAT IT MAKES SENSE TO GO

13   FORWARD BECAUSE SHE PROBABLY WOULDN'T HAVE BEEN

14   NEEDED ANY WAY.

15             BUT I DO APOLOGIZE FOR THE DELAY. BUT WE

16   ARE READY TO PROCEED WITH THE CLOSING ARGUMENTS.

17   LET ME JUST CONFIRM FIRST, BOTH SIDES ARE SATISFIED

18   THAT THEIR EVIDENCE IS IN THAT THEY INTENDED TO

19   OFFER

20             MR. FAZIOLI: YES, YOUR HONOR.

21             MR. FONG: FOR THE DEFENSE, YES, YOUR

22   HONOR.

23             THE COURT: OKAY. THANK YOU.

24             MR. FAZIOLI, ARE YOU DOING THE CLOSING?

25             MR. FAZIOLI: I AM, YOUR HONOR.

1          THE COURT:  LET ME JUST EXPLAIN BRIEFLY.

2          THE GOVERNMENT HAS THE OPPORTUNITY TO GO

3    FIRST IN CLOSING ARGUMENT BECAUSE IT HAS THE BURDEN

4    OF PROOF.  IT ALSO HAS AN OPPORTUNITY TO DO A SHORT

5    REBUTTAL TO THE DEFENSE'S ARGUMENT AFTER THEY MAKE

6    THEIR ARGUMENT.

7          AND THE REASON THEY GET TO GO FIRST AND

8    HAVE ALSO THE CLOSING ARGUMENT IS THAT THEY HAVE

9    THE BURDEN OF PROOF.

10          OKAY.  YOU MAY PROCEED.

11

12          **CLOSING ARGUMENTS BY MR. FAZIOLI**

13

14          MR. FAZIOLI:  THANK YOU, YOUR HONOR.

15          LET ME INTRODUCE MYSELF AGAIN FOR THE

16    LAST TIME.  MY NAME IS ASSISTANT UNITED STATES

17    ATTORNEY JOSEPH FAZIOLI.  I'M PROSECUTING THIS CASE

18    WITH MY COLLEAGUE, ASSISTANT UNITED STATES ATTORNEY

19    TIM LUCEY, WHO AFTER DEFENSE COUNSEL HAS AN

20    OPPORTUNITY TO GIVE A CLOSING STATEMENT, WILL GIVE

21    A BRIEF REBUTTAL.

22          AND WE HAVE A POWERPOINT PRESENTATION

23    THAT WE ARE GOING TO BE PRESENTING TO TRY TO

24    PRESENT A SUMMARY OF SOME OF THE EVIDENCE THAT WAS

25    PRESENTED IN THIS CASE.

1           AND OF COURSE KEEP IN MIND THAT NOTHING

2    THE COUNSEL SAYS IS EVIDENCE.  THE EVIDENCE IS THE

3    INFORMATION THAT YOU'VE HEARD, THE TESTIMONY AND

4    THE DOCUMENTS.

5           AND ALSO, BEFORE I BEGIN THE CLOSING

6    STATEMENT, LET ME SAY THAT TIM AND I THANK YOU FOR

7    YOUR SERVICE IN TERMS OF TAKING THE TIME TO SERVE

8    AS JURORS IN THIS CASE OVER THE LAST COUPLE OF

9    WEEKS AND WE DO GREATLY APPRECIATE IT.

10          MEMBERS OF THE JURY, YOU'VE HEARD

11   EVIDENCE OVER THE LAST FEW WEEKS ABOUT ALBERT HU

12   AND HIS INVESTMENT FUNDS.  THE GOVERNMENT WOULD

13   SUBMIT THAT THIS IS, IN ITS ESSENCE, A VERY

14   STRAIGHTFORWARD CASE.

15          THE EVIDENCE HAS SHOWN THAT ALBERT HU,

16   THE DEFENDANT, LIED TO VARIOUS PEOPLE TO GET THEIR

17   MONEY, THAT BASED ON HIS FALSE STATEMENTS AND

18   REPRESENTATIONS AND PROMISES, AND THERE WERE

19   NUMEROUS REPRESENTATION CUBICLES AND PROMISES THAT

20   WE WILL GO THROUGH, 5 OR 6, THAT BASED UPON THOSE

21   REPRESENTATIONS AND PROMISES, THAT ALBERT HU CAUSED

22   INVESTORS TO WIRE HIM MONEY, MILLIONS OF DOLLARS.

23   HE CAUSED WIRES.

24          AND THAT AFTER HAVING RECEIVED THAT MONEY

25   ON THE BASIS OF THOSE FALSE REPRESENTATIONS, THAT

1    THE DEFENDANT STOLE THAT MONEY.  HE DIDN'T USE IT

2    FOR THE PURPOSES, HE PROMISED AND HE DIDN'T USE IT

3    FOR INVESTMENT PURPOSES.

4              A FAIRLY STRAIGHTFORWARD CASE.  AND THE

5    GOVERNMENT WOULD ALSO SUBMIT THE EVIDENCE THAT THE

6    DEFENDANT, ALBERT HU, COMMITTED WIRE FRAUD, THAT HE

7    MADE FALSE REPRESENTATIONS TO THE INVESTORS, THAT

8    HE CAUSED WIRES THAT HE TOOK THEIR MONEY, THAT

9    THERE WAS A SCHEME TO DEFRAUD, THE GOVERNMENT

10   RESPECTFULLY SUBMITS THAT THE EVIDENCE WAS

11   DEFENDANT'S GUILTY IS OVERWHELMING.

12             THERE'S A MOUNTAIN OF EVIDENCE FROM

13   VARIOUS SOURCES WHICH WE WILL SUMMARIZE THAT WE

14   THINK SUPPORTS A VERDICT OF GUILTY ON ALL CHARGES.

15             DRAWING YOUR ATTENTION TO OUR

16   PRESENTATION.  THE EVIDENCE HAS SHOWN BETWEEN 2002

17   AND 2008 THE DEFENDANT ALBERT HU ENGAGED IN A

18   SCHEME TO DEFRAUD RELATED TO HEDGE FUNDS HE FOUND

19   THAT HE NAMED THE ASENQUA BETA FUND AND THE

20   FIRESIDE LS FUND.

21             YOU MAY HAVE HEARD ABOUT A NUMBER OF

22   DIFFERENT ENTITIES IN THIS CASE THAT ARE ASSOCIATED

23   WITH THE DEFENDANT.  THESE ARE TWO THAT WE HAVE

24   BEEN FOCUSSING ON, THE ASENQUA BETA AND THE

25   FIRESIDE LS FUND.  FUNDS THE DEFENDANT ALBERT HU

1    CREATED AND CONTROLLED.

2            THE EVIDENCE SHOWS ALBERT HU DEFRAUDED

3    VARIOUS PEOPLE OF MILLIONS OF DOLLARS BY MAKING

4    VARIOUS FALSE REPRESENTATIONS.

5            THERE WERE SEVEN CHARGED COUNTS IN THIS

6    CASE, AND WE WILL WALK THROUGH THEM.  THERE'S

7    EVIDENCE OF A SCHEME TO DEFRAUD THEN THERE WERE

8    SEVEN WIRES THAT THE DEFENDANT ALBERT HU CAUSED TO

9    BE MADE AND KNEW WERE CAUSED TO BE MADE.

10           COUNT ONE RELATES TO AN INVESTOR THAT YOU

11   HEARD, THE GOVERNMENT'S FIRST WITNESS, FUYUAN BOB

12   LIN.  COUNT ONE RELATES TO A $100,000 WIRE TRANSFER

13   THAT MR. LIN SENT ON FEBRUARY 8TH, 2005.  AND FBI

14   AGENT WONDERLY, WHO IS PART OF THE TEAM, HAS TAKEN

15   A PICTURE OF MR. LIN, AND YOU MAY RECALL MR. LIN.

16           COUNT TWO IS A WIRE TRANSFER THAT MR. LIN

17   SENT A COUPLE WEEKS LATER ON FEBRUARY 23RD, 2005.

18   WE WILL WALK THROUGH -- YOU MAY RECALL THAT YOU

19   HEARD FINANCIAL SUMMARY TESTIMONY FROM THE CASE

20   AGENT IN THIS CASE, FBI AGENT GREG FINE WHO IS AT

21   THE TABLE.  HE PRESENTED SUMMARY FINANCIAL

22   TESTIMONY ABOUT A NUMBER OF MATTERS.

23           ONE OF THE MATTERS HE TESTIFIED ABOUT WAS

24   WHAT HAPPENED TO BOB LIN'S MONEY, WHAT DID THE

25   DEFENDANT ALBERT HU DO WITH BOB LIN'S MONEY FOR

1   THOSE FIRST TWO WIRES.  THE COUNT ONE WHICH IS THE

2   ONE ON FEBRUARY 8TH AND COUNT TWO, THE ONE ON

3   FEBRUARY 23RD.

4           YOU MAY ALSO RECALL AT THE BEGINNING OF

5   THE GOVERNMENT'S CASE BEFORE MR. LIN TESTIFIED I

6   READ A STIPULATION THAT LAID OUT THE DETAILS OF THE

7   FINANCIAL RECORDS, TRIAL STIPULATION ONE.

8           AND YOU WILL HEAR THE PARTIES HAVE

9   STIPULATIONS THAT THESE ARE THINGS IN WHICH THE

10  PARTIES HAVE AGREED TO PARTICULAR FACTS.  AND THE

11  PARTIES HAVE AGREED TO PARTICULAR FACTS AND YOU MAY

12  ASSUME THEY ARE PROVED.

13          SO PART OF THE PURPOSE BEHIND READING

14  TRIAL STIPULATION NUMBER ONE WAS TO GET INTO

15  EVIDENCE A SERIES OF FINANCIAL RECORDS THAT THE

16  GOVERNMENT HAD OBTAINED THROUGH ITS INVESTIGATION

17  RELATED TO THE DEFENDANT'S CONDUCT.

18          AGENT FINE PROVIDED TESTIMONY WHICH WAS A

19  FINANCIAL SUMMARY OF THE FINANCIAL RECORDS AND WE

20  WILL SEE THAT LATER.

21          SO COUNT TWO IS BOB LIN'S SECOND $100,000

22  WIRE TRANSFER.

23          COUNT THREE IS A WIRE TRANSFER THAT BOB

24  LIN SENT ON JULY 6, 2005.

25          COUNT FOUR RELATES TO ANOTHER INVESTOR,

1     MR. MARK VERDIELL.  HE MADE A $2 MILLION

2     INVESTMENT, AND THAT $2 MILLION INVESTMENT THERE

3     WERE TWO WIRES RELATED TO THAT INVESTMENT.  THE

4     FIRST WIRE WAS A WIRE COMMUNICATION MEANING A

5     COMMUNICATION BY WIRE THAT WAS SENT OUT ON BEHALF

6     OF MR. VERDIELL, ESSENTIALLY DIRECTING THAT THE

7     $2 MILLION TRANSFER TAKE PLACE.

8              SO THE FIRST WIRE WAS THE COMMUNICATION

9     DIRECTING THE $2 MILLION TRANSFER.  AND THAT TOOK

10    PLACE APRIL 27TH, 2007.

11             THAT WIRE COMMUNICATION DIRECTING THE

12    TRANSFER IS THE BASIS OF COUNT FOUR.

13             COUNT FIVE IS THE $2 MILLION WIRE

14    TRANSFER THAT FOLLOWED A COUPLE OF DAYS LATER AFTER

15    THE WIRE, ESSENTIALLY DIRECTING THAT THE TRANSFER

16    TAKE PLACE.  AND THAT $2 MILLION WIRE TRANSFER,

17    THIS WAS AN INTERNATIONAL TRANSFER THAT WENT FROM

18    THE UNITED STATES TO THE DEFENDANT'S ACCOUNTS IN

19    SINGAPORE, TOOK PLACE ON APRIL 30TH, 2007.

20             COUNT 6 AND 7 RELATE TO BOB LIN.  AND THE

21    SEQUENCING OF WIRES HERE IS SOMEWHAT SIMILAR TO

22    COUNTS 4 AND 5.  IN THAT MR. LIN HAS A WIRE

23    COMMUNICATION DIRECTING A $250,000 WIRE TRANSFER.

24             AND THAT TOOK PLACE ON JUNE 19TH, 2007.

25    LATER THAT DAY THE ACTUAL WIRE TRANSFER OF MONEY

1    GOES INTO EFFECT.  SO THE SEVENTH WIRE TRANSFER OF

2    MONEY, THAT'S COUNT SEVEN, THE DATE ON THAT IS

3    JUNE 19, 2007.

4              SO THESE ARE THE SEVEN WIRES WHICH YOU

5    WILL BE ASKED TO MAKE AN ASSESSMENT ON ABOUT

6    WHETHER THE DEFENDANT IS GUILTY OF WIRE FRAUD.

7              THESE WEREN'T THE ONLY WITNESSES THAT YOU

8    HEARD IN THE CASE THOUGH.  AND THERE WERE OTHER

9    INVESTORS THAT YOU HEARD IN THE CASE.

10             AND ONE OF THE INVESTORS WAS A WOMAN FROM

11   TAIWAN NAMED GRACE DOONG.  YOU HEARD HER TESTIMONY

12   AND HER TESTIMONY ABOUT HOW HERSELF AND HER SISTER

13   YU-MEI DOONG INVESTED MONEY WITH THE DEFENDANT.

14   AND WE'VE TAKEN A PICTURE OF MS. DOONG THERE,

15   MS. GRACE DOONG.  AND YOU WILL HEAR AN INSTRUCTION

16   ABOUT HOW YOU ARE TO CONSIDER MS. DOONG'S

17   TESTIMONY.

18             THE GOVERNMENT DID NOT CHARGE ANY OF THE

19   PARTICULAR WIRES THAT MS. DOONG SENT, HOWEVER, YOU

20   CAN CONSIDER HER EVIDENCE AS ITS PUT FORWARD IN THE

21   INSTRUCTION AS EVIDENCE OF THE DEFENDANT'S -- OF

22   THE SCHEME TO DEFRAUD AND THE INTENT MOTIVE AND

23   PLAN.  AND AGAIN, THE INSTRUCTIONS THAT THE COURT

24   GIVES YOU WILL CONTROL IN TERMS OF ASSESSING THE

25   EVIDENCE.

1    SO THE GOVERNMENT HAS ALL THE BURDENS IN

2    THIS CASE.  IN ORDER TO OBTAIN A CONVICTION ON WIRE

3    FRAUD, WE HAVE TO PROVE VARIOUS ELEMENTS, THE

4    ELEMENTS OF WIRE FRAUD.  AND I WANT TO WALK THROUGH

5    BRIEFLY THESE ELEMENTS.  AND AFTER THE PARTIES GIVE

6    THEIR ARGUMENTS YOU WILL GET AN INSTRUCTION FROM

7    THE JURY -- FROM THE JUDGE, AND THE JUDGE WILL

8    INSTRUCT YOU ON THE ELEMENTS.

9    WE MUST PROVE EACH OF THESE.  FIRST, WE

10   HAVE TO PROVE THAT THE DEFENDANT ALBERT HU DEVISED

11   A SCHEME FOR OBTAINING MONEY BY MEANS OF FALSE OR

12   FRAUDULENT PRETENSES, REPRESENTATIONS OR PROMISES.

13   YOU MUST ALL AGREE ON AT LEAST ONE FALSE OR

14   FRAUDULENT PRETENSE, REPRESENTATIONS OR PROMISES.

15   WE WILL SHORTLY BE GOING THROUGH THE 5 OR

16   6 MAJOR FALSE PROMISES, PRETENSES, REPRESENTATIONS

17   THAT ALBERT HU MADE TO INVESTORS TO GET THEM TO

18   GIVE HIM MONEY.  WE WILL SUBMIT THAT THIS IS

19   EVIDENCE OF HIS INTENT TO DEFRAUD AND THAT THOSE

20   FALSE STATEMENTS CAUSED WIRES.

21   THE FIRST ELEMENT WE HAVE TO PROVE IS HE

22   MADE A FALSE FRAUDULENT PRETENSE, REPRESENTATION OR

23   PROMISE.

24   IN ORDER TO CONVICT YOU MUST ALL AGREE ON

25   AT LEAST ONE FALSE REPRESENTATION, PRETENSE OR

1    PROMISE.  NOT THE ONLY ONE BUT YOU HAVE TO AGREE ON

2    AT LEAST ONE.  AS YOU WILL SEE WE WILL PRESENT

3    EVIDENCE OF 5 OR 6, EACH OF WHICH WE WOULD

4    RESPECTFULLY SUBMIT WOULD BE A BASIS FOR CONVICTION

5    AND THERE'S EVIDENCE TO IT.

6              THE SECOND ELEMENT, THE GOVERNMENT HAS TO

7    PROVE THAT THE DEFENDANT ALBERT HU KNEW THE

8    PRETENSES, REPRESENTATIONS OR PROMISES THAT HE MADE

9    WERE FALSE OR FRAUDULENT.  WE WILL GET TO THAT.

10             THIRD, THE FALSE OR FRAUDULENT PRETENSES

11   REPRESENTATIONS OR PROMISES HAVE TO BE MATERIAL.

12   AND A FALSE OR FRAUDULENT REPRESENTATIONS OR

13   PROMISES WERE MATERIAL IF THEY HAD A NATURAL

14   TENDENCY TO INFLUENCE OR WAS CAPABLE OF INFLUENCING

15   A POTENTIAL INVESTOR TO PART WITH MONEY.  SO THE

16   THIRD ELEMENT IS WE HAVE TO PROVE MATERIALITY.

17             THE FOURTH ELEMENT WE HAVE TO PROVE IS

18   THAT THE DEFENDANT ALBERT HU ACTED WITH AN INTENT

19   TO DEFRAUD.  WHAT DOES THAT MEAN?  WE HAVE TO PROVE

20   THAT HE ACTED WITH AN INTENT TO DECEIVE OR CHEAT.

21   THAT HE INTENDED TO DECEIVE OR CHEAT THE INVESTORS

22   IN THIS CASE.

23             AND LASTLY, WE HAVE TO PROVE THAT THE

24   DEFENDANT ALBERT HU USED OR CAUSED SOMEONE TO USE

25   AND WE SUBMIT IN THIS CASE HE CAUSED BOB LIN AND

987

1     MARK VERDIELL TO USE AN INTERSTATE OR INTERNATIONAL

2     WIRE.

3             SO WE ARE GOING TO WALK THROUGH EACH OF

4     THESE ELEMENTS.  AND THE STANDARD FOR CONVICTION IS

5     PROOF BEYOND A REASONABLE DOUBT.  THAT'S THE

6     GOVERNMENT'S BURDEN IN THIS CASE.  PROOF BEYOND A

7     REASONABLE DOUBT IS PROOF THAT LEAVES YOU FIRMLY

8     CONVINCED THAT THE DEFENDANT IS GUILTY.  FIRMLY

9     CONVINCED.

10             SO IN WALKING THROUGH EACH OF THESE

11     ELEMENTS YOU SHOULD ASK YOURSELF AM I FIRMLY

12     CONVINCED THAT THE GOVERNMENT HAS PROVEN THAT THE

13     DEFENDANT HAD AN INTENT TO DEFRAUD, FOR EXAMPLE.

14             IT IS NOT REQUIRED THAT THE GOVERNMENT

15     PROVE GUILTY BEYOND ALL POSSIBLE DOUBT.  REASONABLE

16     DOUBT IS A STANDARD IN THIS CASE.  YOU SHOULD

17     CONSIDER THE EVIDENCE IN THIS CASE TO IN DECIDING

18     WHETHER OR NOT THE GOVERNMENT HAS MET ITS BURDEN.

19             BUT PROVE BEYOND A REASONABLE DOUBT IS

20     NOT PROOF BEYOND ALL DOUBT.  IT IS A STANDARD

21     THROUGHOUT THE COUNTRY THAT IS MET IN CASES EVERY

22     DAY.  A REASONABLE DOUBT IS DOUBT BASED UPON REASON

23     AND COMMON SENSE AND IS NOT BASED PURELY ON

24     SPECULATION, PARTICULARLY THE EVIDENCE, APPLY YOUR

25     REASON AND COMMON SENSE.

1          AND THIS IS A CASE IN WHICH THE

2     GOVERNMENT WOULD RESPECTFULLY SUBMIT THAT REASON

3     AND COMMON SENSE IS QUITE IMPORTANT IN TAKING A

4     LOOK AT THE EVIDENCE AND THE EVIDENCE OF THE

5     DEFENDANT'S SCHEME TO DEFRAUD.

6          YOU SHOULD CONSIDER EACH ELEMENT OF WIRE

7     FRAUD SEPARATELY.

8          SO LET'S TALK ABOUT THE FIRST ELEMENT WE

9     HAVE TO PROVE WHICH IS THAT THE DEFENDANT USED OR

10    CAUSED TO BE USED AN INTERSTATE OR INTERNATIONAL

11    WIRE.  THE GOVERNMENT WOULD RESPECTFULLY SUBMIT

12    THAT WE HAVE PRESENTED EVIDENCE WHICH SHOULD PROVE

13    BEYOND A REASONABLE DOUBT, SHOULD LEAVE YOU FIRMLY

14    CONVINCED THAT THE DEFENDANT ALBERT HU CAUSED

15    INTERSTATE OR INTERNATIONAL WIRES TO BE SENT.

16         DEFINITION OF A WIRE.  A DEFENDANT USES

17    OR CAUSES SOMEONE TO USE INTERSTATE OR

18    INTERNATIONAL WIRES WHEN HE KNOWS OR REASONABLY

19    FORESEES IN THE ORDINARY COURSE OF BUSINESS THAT

20    ANY WRITING, SIGNAL OR SOUND WILL BE TRANSMITTED BY

21    MEANS OF WIRE, RADIO OR TELEVISION COMMUNICATION

22    FROM ONE STATE OR NATION TO ANOTHER.

23         IT DOES NOT MATTER WHETHER THE MATERIAL

24    WIRE WAS ITSELF FALSE OR DECEPTIVE SO LONG AS THE

25    WIRES WERE USED AS PART OF THE SCHEME NOR THAT DOES

1    IT MATTER WHETHER THE SCHEME OR PLAN SUCCESSFUL OR

2    THAT ANY MONEY OR PROPERTY WAS OBTAINED.  WHAT

3    MATTERS IS HE CAUSED A WIRE OR SENT A WIRE.

4         AND THE GOVERNMENT RESPECTFULLY SUBMITS

5    THAT WE HAVE SUBMITTED EXTREMELY STRONG EVIDENCE

6    THAT THE DEFENDANT ALBERT HU CAUSED INTERSTATE AND

7    INTERNATIONAL WIRES TO BE SENT IN CONNECTION WITH

8    THE SCHEME TO DEFRAUD.

9         JURY INSTRUCTION NUMBER FIVE READS, THE

10   PARTY HAS AGREED TO CERTAIN STIPULATIONS OF FACT

11   THAT HAVE BEEN READ TO YOU.  YOU SHOULD THEREFORE

12   TREAT THE FACTS IN THOSE STIPULATIONS AS HAVING

13   BEEN PROVED.

14        THE PARTIES HAVE STIPULATED TO THE SEVEN

15   WIRES IN THIS CASE.  AND THERE IS A TRIAL

16   STIPULATION THAT THE GOVERNMENT READ AT THE

17   BEGINNING OF THIS CASE.  IT'S TRIAL STIPULATION

18   NUMBER TWO.  IT LAYS OUT IN SOME DETAIL THE FACT

19   THAT THERE WERE WIRES THAT WERE SENT.  THESE ARE

20   THE SEVEN WIRES THAT I TALKED TO YOU ABOUT FOR

21   COUNTS 1 THROUGH 7.  THE PARTIES HAVE AGREED THAT

22   THOSE INTERSTATE AND INTERNATIONAL WIRES TOOK

23   PLACE.  THEY AGREED TO THAT FACT BEYOND A

24   REASONABLE DOUBT.

25        THE GOVERNMENT WOULD SUBMIT THAT THIS IS

1    THE STRONG EVIDENCE THAT WE HAVE MET OUR BURDEN OF

2    PROVING ONE OF THE FIVE ELEMENTS, WHICH IS THAT A

3    WIRE WAS SENT OR CAUSED TO BE SENT.

4           IN ADDITION TO TRIAL STIPULATION NUMBER

5    TWO WHICH TRACKS THE LANGUAGE THAT YOU WILL SEE IN

6    THE INSTRUCTIONS IN THE VERDICT FORM IN TERMS OF

7    DESCRIBING THE WIRES, THERE'S ADDITIONAL EVIDENCE

8    THAT THE GOVERNMENT PRESENTED WHICH SHOWS BEYOND A

9    REASONABLE DOUBT THAT THE DEFENDANT ALBERT HU

10   CAUSED WIRES TO BE SENT IN BOTH INTERSTATE AND

11   INTERNATIONAL COMMERCE.

12          YOU HEARD WITNESS TESTIMONY FROM VARIOUS

13   INVESTORS, MR. LIN, MR. VERDIELL, THEY TESTIFIED

14   THAT THEY WIRED MONEY.  THEY DID SO AT THE

15   DEFENDANT'S DIRECTION.

16          MR. VERDIELL TESTIFIED ABOUT HOW HE

17   CONTACTED HIS BROKERS AS A PROCESS OF STARTING THE

18   BALL ROLLING FOR HIS $2 MILLION INVESTMENT.  IT WAS

19   THAT INITIAL CONTACT WITH THE BROKERS, THAT IS THE

20   INITIAL WIRE COMMUNICATION, THAT SERVES AS COUNT

21   FIVE.

22          THEN IT'S THE SUBSEQUENT WIRE WHERE THE

23   $2 MILLION IS SENT TO SINGAPORE THAT IS -- I'M

24   SORRY.  THE INITIAL MR. VERDIELL CONTACTING HIS

25   BROKER GENERATES THE WIRE COMMUNICATION WHICH IS

1    COUNT FOUR, THAT'S THE ONE ON APRIL 27TH. AND THEN

2    A COUPLE DAYS LATER YOU HAVE THE WIRE COMMUNICATION

3    THAT GOES TO SINGAPORE THE WIRE TRANSFER THAT GOES

4    TO SINGAPORE AND THAT'S COUNT FIVE.

5           SO IN ADDITION TO THE TRIAL STIPULATION

6    WE ALSO HAVE THE WITNESS TESTIMONY FROM MR. LIN AND

7    MR. VERDIELL THAT MR. HU CAUSED WIRES. WE ALSO

8    HAVE DOCUMENTS WE WILL GO THROUGH IN WHICH MR. HU

9    PROVIDES INVESTMENT DOCUMENTS TO THE INVESTORS.

10    THOSE INVESTMENT DOCUMENTS THAT MR. HU SIGNS

11    MEMORIALIZE THE FACT THAT THERE'S CERTAIN WIRES IT

12    SAYS A TRANSFER OR MONEYS WERE WIRED IN OR WORDS TO

13    THAT EFFECT. MR. HU HIMSELF IS ACKNOWLEDGING TO

14    INVESTORS THAT THE WIRES ARE TAKING PLACE.

15           THERE'S ALSO TESTIMONY, YOU HEARD

16    FINANCIAL SUMMARY TESTIMONY FROM AGENT FINE THAT

17    WIRES OF MONEY OCCURRED ON PARTICULAR DATES.

18           SO YOU HAVE THE STIPULATION, TESTIMONY

19    FROM THE INVESTORS, THE DOCUMENT THAT IS MR. HU

20    PROVIDED TO INVESTORS AND YOU HAVE THE FINANCIAL

21    SUMMARY TESTIMONY FROM AGENT FINE. THOSE ARE ALL

22    PART OF THE VERY EXTREMELY STRONG EVIDENCE THAT THE

23    DEFENDANT ALBERT HU CAUSED WIRES TO BE SENT IN

24    INTERSTATE AND INTERNATIONAL COMMERCE.

25           SO WHAT'S THE SECOND ELEMENT OF WIRE

1    FRAUD. THE SECOND ELEMENT OF WIRE FRAUD IS THE

2    GOVERNMENT HAS TO PROVE BEYOND A REASONABLE DOUBT,

3    HAS TO LEAVE YOU FIRMLY CONVINCED THAT THE

4    DEFENDANT MADE A FALSE REPRESENTATION OR PRETENSE

5    OR PROMISE TO INVESTORS.

6            AND THE GOVERNMENT WOULD SUBMIT THAT THE

7    EVIDENCE THAT THE DEFENDANT MADE A FALSE

8    REPRESENTATION OR PROMISE OR PRETENSE TO INVESTORS

9    IS OVERWHELMING AND IT'S OVERWHELMING AS TO SEVERAL

10   DIFFERENT FALSE PROMISES, REPRESENTATIONS OR

11   PRETENSES.

12           FIRST, EVIDENCE SHOWS THAT THE DEFENDANT

13   MADE THE FALSE REPRESENTATION TO THE INVESTORS THAT

14   THE FIRM CASTILLO, LYN, COHEN & VIJAY WAS AN

15   INDEPENDENT AUDITOR FOR DEFENDANT HU'S ASENQUA BETA

16   FUND, AND THE FIRESIDE LS FUND. THAT'S THE FIRST

17   OF SEVERAL FALSE REPRESENTATIONS OR PROMISES THAT

18   THE GOVERNMENT RESPECTFULLY SUBMITS HAS PRESENTED

19   EVIDENCE BEYOND A REASONABLE DOUBT.

20           AND WE WILL WALK THROUGH THE SPECIFIC

21   EVIDENCE FOR EACH OF THESE. THE SECOND FALSE

22   REPRESENTATION THAT THE DEFENDANT MADE TO INVESTORS

23   CAUSED THEM TO WIRE MONEY, WAS THAT AN INDIVIDUAL

24   NAMED TONY POLLACE WAS THE CHIEF FINANCIAL OFFICER

25   OF THE ASENQUA BETA FUND AND THE FIRESIDE LS FUND

1    AND THAT THIS INDIVIDUAL, MR. POLLACE, HAD SIGNED

2    OFF ON QUARTERLY FINANCIAL STATEMENTS.

3             THIS IS FALSE REPRESENTATION NUMBER TWO.

4             FALSE REPRESENTATION NUMBER THREE.  HU

5    TOLD INVESTORS, DOCUMENTS HE SUBMITTED, HE PROVIDED

6    TO INVESTORS, THAT THE LAW FIRM OF PROSKAUER ROSE,

7    LLP WAS ENGAGED IN LEGAL COUNSEL FOR HU'S FIRESIDE

8    LS FUND.

9             FALSE REPRESENTATION NUMBER FOUR, THAT

10   THE GLOBEOP FINANCIAL SERVICES WAS THE FUND

11   ADMINISTRATOR FOR THE FIRESIDE LS FUND.

12            FALSE REPRESENTATION NUMBER FIVE, IS THAT

13   THE MINIMUM AMOUNT INDIVIDUALS WERE INVESTING IN

14   THE FIRESIDE LS FUND WAS A MILLION DOLLARS.

15            AND THE SIXTH FALSE REPRESENTATION THAT

16   THE DEFENDANT MADE TO INVESTORS WHICH CAUSED THEM

17   TO WIRE THE MONEY THAT WAS HE WOULD PAY INVESTORS A

18   20 TO 30 PERCENT ANNUAL RETURN.  AND HE WOULD PAY

19   THIS RETURN BY INVESTING THEIR FUNDS IN TECHNOLOGY

20   RELATED SECURITIES.

21            FALSE REPRESENTATION NUMBER ONE.  THE

22   DEFENDANT TOLD INVESTORS ABOUT A FIRM NAMED

23   CASTILLO, LYN, COHEN & VIJAY.  HE TOLD INVESTORS

24   THAT THE INDEPENDENT AUDITING FIRM OF CASTILLO,

25   LYN, COHEN & VIJAY HAD SIGNED OFF ON THE BOOKS FOR

1    THE ASENQUA BETA AND THE FIRESIDE LS FUND.

2              HE GAVE INVESTORS DOCUMENTS THAT WERE

3    PURPORTEDLY CREATED BY THIS FIRM AND IT'S CPA JUN

4    CASTILLO.

5              AND THIS IS A SLIDE, WE WILL SHOW YOU

6    PORTIONS OF THE DOCUMENTS ADMITTED INTO EVIDENCE.

7    GOVERNMENT EXHIBIT 1.  SEVERAL WITNESSES COMMENTED

8    THAT THEY HAD RECEIVED THIS DOCUMENT IT WAS ONE

9    ALBERT HU PROVIDED THEM THAT IT INFLUENCED THEIR

10   DECISION TO INVEST AND WIRE MONEY TO ALBERT HU.

11             YOU SEE AT THE TOP OF GOVERNMENT

12   EXHIBIT 1, IT'S THE DOCUMENT THAT ALBERT HU

13   PROVIDED INVESTORS.  IT SAYS CASTILLO, LYN, COHEN &

14   VIJAY, REPORT OF THE INDEPENDENT AUDITORS, TO THE

15   LIMITED PARTNERS OF ASENQUA BETA.  "WE HAVE AUDITED

16   THE FINANCIAL STATEMENTS OF ASENQUA BETA FUND, "THE

17   FUND" FOR THE YEAR END DECEMBER 31ST, 2004 WHICH

18   COMPRISE THE BALANCE SHEET STATEMENTS OF ACCOUNT

19   AND RELATED NOTES 1 TO 4.  IT IS OUR RESPONSIBILITY

20   TO FORM AN INDEPENDENT OPINION BASED ON OUR AUDIT

21   OF THOSE FINANCIAL STATEMENTS."

22             BOTTOM OF THIS DOCUMENT THAT THE

23   DEFENDANT PROVIDED TO INVESTORS SAYS, IN OUR

24   OPINION, THE FINANCIAL STATEMENTS REFERRED TO ABOVE

25   PRESENT FAIRLY, IN ALL MATERIAL RESPECTS, THE

1    FINANCIAL POSITION OF THE FUND AS OF DECEMBER 31ST,

2    2004 AND THE RESULT OF ITS OPERATIONS, ITS CASH

3    FLOWS AND THE CHANGES IN ITS EQUITY FOR THE YEAR

4    THAT ENDED IN ACCORDANCE WITH INTERNATIONAL

5    FINANCIAL REPORTING STANDARDS.

6              AND THERE'S A NAME THERE AND A SIGNATURE,

7    JUN CASTILLO CPA, JANUARY 10TH, 2005.  AND YOU WILL

8    HAVE ACCESS TO ALL THE EXHIBITS WHEN YOU ARE

9    DELIBERATING.  IF YOU LOOK, THERE'S AN ADDRESS AT

10   THE BOTTOM FOR THE CASTILLO, LYN, COHEN & VIJAY IT

11   SAYS ONE EMBARCADERO CENTER IN SAN FRANCISCO.

12             THAT DOCUMENT, GOVERNMENT EXHIBIT 1, WAS

13   NOT THE ONLY TIME IN WHICH THE DEFENDANT ALBERT HU

14   PROVIDED DOCUMENTS TO INVESTORS REPRESENTING THAT

15   THE AUDITING FIRM OF CASTILLO, LYN WAS LOOKING

16   AFTER THE BOOKS OF HIS FUNDS.

17             THIS IS GOVERNMENT EXHIBIT 12.  A

18   CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM THAT THE

19   DEFENDANT ALBERT HU PROVIDED TO INVESTOR MARK

20   VERDIELL.

21             WHO DID ALBERT HU LIST AS THE AUDITOR OF

22   THE FIRESIDE LS FUND?  YOU SEE CASTILLO, LYN, COHEN

23   & VIJAY.

24             YOU HEARD TESTIMONY FROM THE INVESTORS

25   THAT THESE STATEMENTS, THESE DOCUMENTS ABOUT

1    CASTILLO, LYN, COHEN & VIJAY, THE STATEMENTS IN

2    THESE DOCUMENTS WAS A REASON THAT LEAD THEM TO

3    INVEST MONEY TO ENTRUST ALBERT HU WITH MILLIONS OF

4    DOLLARS.

5            UNFORTUNATELY, THE REALITY IS THAT

6    CASTILLO, LYN, COHEN & VIJAY WAS NOT INDEPENDENT.

7    IT WAS NOT AN INDEPENDENT AUDITING FIRM.  FIRST OF

8    ALL, IT WASN'T INDEPENDENT.  HOW DO YOU KNOW THIS?

9    THE EVIDENCE SHOWS THAT ALBERT HU PAID FOR THE

10   CASTILLO, LYN OFFICE SPACE WITH HIS OWN CREDIT

11   CARD.

12           AGENT FINE'S FINANCIAL ANALYSIS SHOWS

13   ALBERT HU SENDING MONEY TO PAY FOR THE CASTILLO,

14   LYN OFFICE SPACE.  HE ACTUALLY TAKES MONEY FROM AN

15   INVESTOR WITHOUT THEIR PERMISSION AND HE USES THAT

16   MONEY TO PAY FOR THE CASTILLO, LYN OFFICE SPACE.

17           AND ALSO, YOU WILL SEE THAT TRIAL

18   STIPULATION NUMBER THREE, THE PARTIES HAVE AN

19   AGREEMENT ABOUT THAT THE DEFENDANT ALBERT HU,

20   PARTIES AGREE BEYOND A REASONABLE DOUBT THAT THE

21   DEFENDANT ALBERT HU WAS THE ACCOUNT HOLDER FOR THE

22   PARTICULAR CREDIT CARD NUMBER THAT YOU SEE ON THE

23   CASTILLO LYN OFFICE SPACE RENTAL.

24           THIS IS GOVERNMENT EXHIBIT 19.  THIS IS A

25   DOCUMENT THAT'S INTRODUCED INTO EVIDENCE.  YOU MAY

1    RECALL THERE WAS TESTIMONY FROM A MR. SZTO AND

2    JEANIQUE COOK WHO WERE INDIVIDUALS THAT WORKED AS A

3    COMPANY CALLED REGIS A COMPANY THAT DEALS WITH

4    CREATING VIRTUAL OFFICES.  THIS WAS A DOCUMENT THAT

5    WAS PRESENTED TO THEM.

6             THE COMPANY NAME CASTILLO, LYN, COHEN &

7    VIJAY.  THE ADDRESS, ONE EMBARCADERO CENTER, SUITE

8    500, SAN FRANCISCO.  THE SAME ADDRESS ON GOVERNMENT

9    EXHIBIT 1, THE DOCUMENT THAT'S PURPORTEDLY THE

10   INDEPENDENT ASSESSMENT OF THE RECORDS OF THE

11   ASENQUA BETA FUND.

12            WHOSE NAME IS ON THIS IN TERMS OF WHO IS

13   PAYING FOR THIS SPACE, WHO IS PAYING FOR THE SPACE

14   OF CASTILLO LYN?  ALBERT HU, HIS SIGNATURE IS ON IT

15   AS WELL DATED AUGUST 7, 2006.

16            THERE'S ALSO INVOICES YOU SAW THAT GO

17   BACK BEFORE THEN, SHOW THAT THERE WERE PAYMENTS

18   MADE BEFORE THEN.  WHOSE CREDIT CARD ON THERE?  THE

19   NUMBER LISTED THERE ON GOVERNMENT EXHIBIT 19.

20   COMPARE THAT TO TRIAL STIPULATION NUMBER THREE,

21   IT'S THE SAME CREDIT CARD NUMBER.

22            PARTIES HAVE AGREED BEYOND A REASONABLE

23   DOUBT THAT THAT CREDIT CARD NUMBER, THAT CREDIT

24   CARD NUMBER ON GOVERNMENT EXHIBIT 19 THAT CREDIT

25   CARD NUMBER IS ALBERT HU'S CREDIT CARD NUMBER.  HE

1  PAID FOR THE CASTILLO LYN SPACE, IT WASN'T AN

2  INDEPENDENT AUDITING FIRM.

3          IN ADDITION TO THE CASTILLO LYN FIRM NOT

4  BEING AN INDEPENDENT AUDITING FIRM, THE EVIDENCE

5  HAS SHOWN IT DID NOT EVEN EXIST AS AN AUDITING FIRM

6  AT ALL.

7          HOW DO YOU KNOW THIS?  EVIDENCE AT TRIAL

8  SHOWS THERE'S NO RECORD OF A CASTILLO, LYN, COHEN &

9  VIJAY AUDITING FIRM EVER EXISTING IN CALIFORNIA.

10 THERE'S NO RECORDS OF A CASTILLO, LYN, COHEN &

11 VIJAY AUDITING FIRM OR JUN CASTILLO, CPA.

12         YOU HEARD TESTIMONY FROM TWO WITNESSES.

13 DOMINIC FRANZELLA, HE WAS A WITNESS FROM THE

14 CALIFORNIA BOARD OF ACCOUNTANCY THIS WAS AN ENTITY

15 THAT ONE OF ITS RESPONSIBILITIES IS TO WORK TO

16 PROTECT THE PUBLIC BY SEEKING TO MAKE SURE THAT

17 PEOPLE WHO HAVE LICENSES, LICENSED IF THEY ARE

18 GOING TO BE PRACTICING ACCOUNTING IN THE STATE OF

19 CALIFORNIA.

20         HE PROVIDED TESTIMONY ABOUT THEIR RECORDS

21 ABOUT PEOPLE WHO WERE TO PROVIDE ACCOUNTING OR

22 AUDITING SERVICES WOULD BE REQUIRED TO REGISTER

23 WITH THE CALIFORNIA BOARD OF ACCOUNTANCY.

24 MR. FRANZELLA TESTIFIED HE DID A SEARCH THROUGH THE

25 RECORDS, THERE'S NO INDICATIONS THAT THE CASTILLO,

1    LYN, COHEN & VIJAY EVER EXISTED AS AN AUDITING FIRM

2    IN CALIFORNIA.

3            HE ALSO LOOKED FOR A JUN CASTILLO -- THE

4    PURPOSE OF THE CALIFORNIA BOARD OF ACCOUNTANCY IS

5    TO SERVE AS A LICENSING AND REGISTRATION FUNCTION

6    FOR PEOPLE WHO WANT TO DO ACCOUNTING OR AUDITING

7    SERVICES IN THE STATE OF CALIFORNIA.  IT'S TO

8    PROTECT THE PUBLIC BY MAKING SURE THAT YOU DON'T

9    HAVE A LOT OF UNLICENSED PEOPLE OUT THERE

10   PRACTICING ACCOUNTING.

11           IF YOU HAVE AN INDEPENDENT AUDITING FIRM

12   IN CALIFORNIA AND YOU ARE PLAYING BY THE RULES, YOU

13   REGISTER AND YOU WOULD SHOW UP ON THE RECORDS OF

14   THE CALIFORNIA BOARD OF ACCOUNTANCY.

15           CASTILLO LYN DID NOT.  JUN CASTILLO DID

16   NOT REGISTER.  THE PERSON WHOSE SIGNATURE WAS ON

17   THAT DOCUMENT DOES NOT REGISTER ON THE CALIFORNIA

18   BOARD OF ACCOUNTANCY.

19           WHAT CAN YOU INFER FROM THAT?  WE WOULD

20   SUBMIT YOU COULD INFER THAT CASTILLO, LYN, COHEN &

21   VIJAY NEVER EXISTED, THAT JUN CASTILLO IS NOT A CPA

22   WHO WORKED FOR CASTILLO, LYN, COHEN & VIJAY.  THAT

23   THIS ENTIRE CASTILLO, LYN, COHEN & VIJAY AUDITING

24   FIRM WAS NOT AN INDEPENDENT AUDITING FIRM, THAT IN

25   FACT WAS A FABRICATION THAT THE DEFENDANT ALBERT HU

1    CREATED IN AN ATTEMPT TO LURE INVESTORS TO ENTRUST

2    THEM WITH THEIR MONEY AND TO WIRE THEM MONEY.

3            YOU ALSO HEARD TESTIMONY FROM A WOMAN

4    NAMED LYNETTE DWORKIN, SHE WORKED FOR THE

5    CALIFORNIA EDD.  THIS IS AN ENTITY IF YOU HAVE A

6    BUSINESS AND YOU HAVE PEOPLE WHO ARE EMPLOYEES OF

7    THE BUSINESS AND THEY PAY TAXES, THAT MONEY, SHE

8    TESTIFIED THAT MONEY GOES TO CALIFORNIA EDD.

9            SO IF CASTILLO, LYN, COHEN & VIJAY

10   ACTUALLY EVER EXISTED AS AN INDEPENDENT ACCOUNTING

11   FIRM AS ALBERT HU REPRESENTED TO INVESTORS, THERE

12   WOULD BE SOME SORT OF CALIFORNIA EDD RECORDS

13   RELATED TO A CASTILLO, LYN, COHEN & VIJAY.

14           THERE WEREN'T.  WHY WERE THERE NO SUCH

15   RECORDS?  WE WOULD SUBMIT BECAUSE CASTILLO, LYN,

16   COHEN & VIJAY NEVER EXISTED.  IT'S A FABRICATION, A

17   SHAM THAT THE DEFENDANT CREATED IN AN ATTEMPT TO

18   DEFRAUD PEOPLE TO DECEIVE OR CHEAT PEOPLE TO GIVE

19   HIM MONEY.

20           FALSE REPRESENTATION NUMBER TWO,

21   DEFENDANT ALBERT HU TOLD INVESTORS THAT ANTHONY

22   POLLACE WAS THE CFO OF HIS COMPANIES, THAT HU TOLD

23   INVESTORS THAT ANTHONY POLLACE WAS THE CHIEF

24   FINANCIAL OFFICER OF THE ASENQUA BETA FUND AND THE

25   FIRESIDE LS FUND AND THAT ANTHONY POLLACE HAD

1    SIGNED OFF ON THOSE FINANCIAL STATEMENTS.

2            AND YOU WILL SEE THIS IN A NUMBER OF

3    DIFFERENT CONTEXTS.  THERE'S QUARTERLY STATEMENTS

4    FROM MR. MARK VERDIELL.  ON THIS QUARTERLY

5    STATEMENT, IT'S HARD TO SEE BUT YOU CAN HAVE THIS

6    EXHIBIT GOVERNMENT EXHIBIT 18, YOU WILL SEE MR. HU

7    HIMSELF IS ACKNOWLEDGING ON 4-30-2007 TWO MILLION

8    DOLLARS IS WIRED IN.  THIS IS ADDITIONAL EVIDENCE

9    THAT THE WIRE TOOK PLACE.

10            THIS IS A DOCUMENT THAT MR. VERDIELL

11   TESTIFIED WAS PRESENTED TO HIM BY ALBERT HU.

12   ALBERT HU GAVE HIM THIS DOCUMENT.  WHOSE SIGNATURE

13   IS ON THIS DOCUMENT?  ANTHONY POLLACK.  SUPPOSED TO

14   BE ANTHONY POLLACE AND ALBERT HU PHD.

15            YOU WILL SEE ON THE DOCUMENTS THE POLLACE

16   NAME, THE FIRST NAME IS WRITTEN DOWN AS TONY

17   POLLACE.  YOU SEE THIS SIGNATURE, THIS POLLACE

18   SIGNATURE ON A LOT OF THE OTHER DOCUMENTS,

19   QUARTERLY STATEMENTS TO BOB LIN.  YOU SEE HERE

20   THESE ARE THE TWO MONEY TRANSFERS REFLECTED ON THIS

21   DOCUMENT.

22            THIS IS THE SIGNATURE POLLACK, IT'S

23   SLIGHTLY DIFFERENT.  WE WILL SUBMIT THE FACT THAT

24   THIS NAME CHANGES IS EVIDENCE THAT THE DEFENDANT

25   THAT WAS SUBMITTING DOCUMENTS THAT CONTAINED A

1     FORGED SIGNATURE.

2              BOB LIN EVENTUALLY SUBMITS A WITHDRAWAL

3     FORM TO SEE IF HE CAN GET HIS MONEY BACK.  ALBERT

4     HU PROVIDES HIM A DOCUMENT INDICATING THAT HE'S

5     GOING TO GET HIS MONEY BACK.  WHOSE SIGNATURE IS

6     SUPPOSED TO BE ON THIS DOCUMENT?  ALBERT HU AND

7     SUPPOSEDLY TONY POLLACE, CHIEF FINANCIAL OFFICER.

8              GRACE DOONG, ANOTHER WITNESS, ALSO

9     ANOTHER INVESTMENT IN THE AQC FUND.  ANTHONY

10    POLLACE SIGNATURE, ALBERT HU SIGNATURE ALSO ON THIS

11    DOCUMENT.  WITHDRAWAL DOCUMENTS, QUARTERLY

12    STATEMENTS FROM YU-MEI DOONG.  THIS IS GRACE

13    DOONG'S SISTER, ALBERT HU IS ALSO SUBMITTING

14    DOCUMENTS TO GRACE DOONG'S SISTER STATING ANTHONY

15    POLLACE IS THE CHIEF FINANCIAL OFFICER FROM THE

16    FIRESIDE LS FUND.  DOING THIS AGAIN AND AGAIN AND

17    AGAIN.

18             WITHDRAWAL FORM REPRESENTING THAT --

19    ACTUALLY, LET ME -- AND I SKIPPED SOMETHING HERE.

20    ONE IMPORTANT FACTOR ON THE WITHDRAWAL FORM FOR

21    GRACE DOONG.  YOU MAY RECALL HER TESTIMONY.  IF YOU

22    LOOK AT THE DOCUMENT YOU SEE THERE ARE TWO

23    SIGNATURES ABOVE ALBERT HU.  NOT ONE, BUT TWO,

24    THERE'S ONLY ONE FOR ANTHONY POLLACE.  BUT THERE

25    ARE TWO SIGNATURES FOR ALBERT HU.  AND YOU MAY

1    RECALL THAT MS. DOONG TESTIFIED ABOUT WHY SHE DID

2    THIS.  SHE WAS HAVING CONCERNS ABOUT WHAT WAS GOING

3    ON WITH HER INVESTMENTS THAT SHE WAS TROUBLED BY

4    IT.  AND WHAT DID SHE DO SHE WAS GETTING SOMEWHAT

5    DESPERATE AT THIS POINT AND SHE GOES TO ALBERT HU

6    AND SAYS, I WANT YOU TO SIGN THIS DOCUMENT IN MY

7    PRESENCE.

8              NOW A SECOND SIGNATURE THERE, ESSENTIALLY

9    SHE'S SAYING I WANT TO BE SURE I CAN GET MY MONEY

10   BACK I WANT YOU TO SIGN THIS DOCUMENT IN MY

11   PRESENCE.  HE DOES.  YOU SEE HIS SIGNATURE.

12             AT THE END OF THE DAY UNFORTUNATELY FOR

13   GRACE DOONG, SHE NEVER GETS HER MONEY BACK.  BUT

14   THAT'S ONE OF THE SIGNIFICANCE OF THIS DOCUMENT

15   WITH THE TWO SIGNATURES.  IT'S AN INDICATION OF HOW

16   MR. HU WAS BEHAVING THAT HE WAS ENGAGING WITH AN

17   INTENT TO DEFRAUD AND DECEIVE AND CHEAT.

18             MORE DOCUMENTS THAT SHOW A SIGNATURE FROM

19   MR. POLLACE.

20             SO MR. HU IS REPRESENTING TO INVESTORS

21   THAT ANTHONY POLLACE IS THE CFO OF THE COMPANY AND

22   HE'S SIGNING OFF ON THE DOCUMENTS.

23             ONE OTHER THING ABOUT THE DOCUMENTS.

24   THESE DOCUMENTS ALSO INDICATE THE QUARTERLY

25   STATEMENTS THAT THE FUNDS WILL PROVIDE TAX

1     DOCUMENTS TO PEOPLE.  AND AS YOU SEE LATER IN THE

2     CASE OF MR. VERDIELL THAT TURNED OUT NOT TO BE THE

3     CASE.  THE GOVERNMENT SUBMITS THAT'S FURTHER

4     EVIDENCE THAT THIS ENTIRE THING WAS A FRAUD THAT

5     ALBERT HU WAS NOT ENGAGING IN GOOD FAITH, HE'S NOT

6     RUNNING THE BUSINESS IN GOOD FAITH, THAT WAS AN

7     ATTEMPT TO TAKE MONEY FROM PEOPLE.

8          SO ALBERT HU REPRESENTED TO INVESTORS

9     THAT ANTHONY POLLACE WAS THE CFO, AND BASED ON

10    THOSE MISSTATEMENTS, HE GETS THE INVESTORS TO WIRE

11    MONEY.

12         THE INVESTORS TESTIFIED THIS WAS A FACT

13    THAT'S IMPORTANT TO THEM.  THE REALITY, HOWEVER,

14    UNFORTUNATELY TO THE INVESTORS IS DIFFERENT.

15    ANTHONY POLLACE DID NOT SIGN THOSE DOCUMENTS AND

16    WAS NEVER THE CFO FOR HU'S HEDGE FUNDS.

17         HOW DO YOU KNOW THIS?  MR. POLLACE

18    TESTIFIED, TESTIFIED MONDAY IN THE AFTERNOON,

19    TESTIFIED HE NEVER SIGNED ANY OF THOSE DOCUMENTS.

20    HE WENT THROUGH A LOT OF THEM.  THERE ARE DOZENS OF

21    THOSE DOCUMENTS THAT CONTAIN A SIGNATURE, HE

22    TESTIFIED HE NEVER SIGNED ANY OF THEM.

23         WHAT CAN YOU INFER FROM THIS?  YOU CAN

24    INFER THAT ALBERT HU IS SUBMITTING DOCUMENTS TO

25    INVESTORS THAT CONTAINED HIS SIGNATURE AND

1    CONTAINED A FORGED SIGNATURE OF A CFO.  AND THAT'S

2    VERY STRONG EVIDENCE YOU CAN KEEP IN MIND ABOUT

3    WHETHER THIS ENTIRE EXERCISE WAS A SCHEME TO

4    DEFRAUD.

5         MR. POLLACE TESTIFIED HE WAS NEVER THE

6    CFO FOR THE ASENQUA BETA FUND AND THE FIRESIDE LS

7    FUND.  MR. POLLACE WAS -- DID TESTIFY THAT HE WAS

8    THE CFO FOR A TIME FOR A COMPANY CALLED, I BELIEVE

9    IT WAS APLEX WHICH WAS A SEMICONDUCTOR COMPANY, IT

10   WAS A TECHNICAL COMPANY, IT WASN'T A FINANCIAL

11   COMPANY.  HE WAS CFO FOR A SHORT PERIOD OF TIME.

12   BUT HE WAS NEVER THE CFO FOR ANY OF THE INVESTMENT

13   FUNDS OR FOR ASENQUA.

14        MR. POLLACE TESTIFIED THAT ALBERT HU

15   ASKED HIM TO BE THE CFO FOR ASENQUA AND THAT

16   MR. POLLACE TURNED IT DOWN.

17        THE EVIDENCE SHOWS THAT THAT DIDN'T DETER

18   MR. HU, THAT HE MADE A CONSCIENCE DECISION TO JUST

19   TAKE MR. POLLACE'S NAME AND PUT IT ON DOCUMENTS TO

20   FALSELY REPRESENT TO INVESTORS THAT MR. POLLACE WAS

21   THE CFO OF HIS FUNDS, TO SUBMIT DOCUMENTS TO

22   INVESTORS THAT CONTAINED NOT ONLY MR. HU'S

23   SIGNATURE BUT THE FORGED SIGNATURE OF ANTHONY

24   POLLACE.

25        HOW DO YOU KNOW IT WAS FORGED?  WELL,

1    FIRST OF ALL, YOU KNOW BECAUSE MR. POLLACE

2    INDICATED TO YOU HE DIDN'T SIGN THE DOCUMENTS.  USE

3    YOUR REASON AND COMMON SENSE HERE.  HE ALSO

4    INDICATED THAT DOES NOT HAVE A PRACTICE OF PEOPLE

5    ALLOWING TO SIGN DOCUMENTS WITHOUT HIS KNOWLEDGE

6    AND PERMISSION.  AND WHO WOULD DO SOMETHING LIKE

7    THAT?

8            MR. POLLACE ALSO TESTIFIED HE HAS BEEN A

9    CFO, DOES HAVE BUSINESS RELATIONSHIPS IN SILICON

10   VALLEY.  ALSO YOU HEARD TESTIMONY FROM

11   WENDY ESPINOZA, SHE'S A WITNESS WITH THE DMV AND

12   AUTHORIZED CERTAIN RECORDS.

13           WE INTRODUCED EXHIBIT 260.  THIS IS

14   MR. POLLACE'S SIGNIFICANT.  IN ADDITION TO HIS

15   TESTIMONY, THIS WASN'T A SIGNATURE, THIS SHOWS HIS

16   SIGNATURE OR THE COURSE OF TWO DECADES.  IT'S VERY

17   CONSISTENT HE KEEPS SIGNING HIS NAME A.V. POLLACE.

18   THAT'S THE SIGNATURE HE GAVE TO THE DMV FOR OVER

19   TWO DECADES, AND CORROBORATES HIS TESTIMONY THAT HE

20   DIDN'T SIGN THE DOCUMENTS.  IF YOU LOOK AT ALL THE

21   DOCUMENTS, HIS NAME IS SIGNED TONY POLLACE.  HE

22   INDICATED HE DOESN'T SIGN DOCUMENTS THAT WAY.

23           YOU ALSO HEARD TESTIMONY FROM MR. POLLACE

24   THAT HE WAS IN FACT A CFO AND HE DOES WORK IN

25   SILICON VALLEY AND YOU SEE -- I THINK THE

1    GOVERNMENT RESPECTFULLY SUBMITS THAT YOU MIGHT BE

2    SEEING A PATTERN HERE OF THE DEFENDANT SEEKING TO

3    ASSOCIATE HIS FUNDS WITH REPUTABLE ENTITIES IN

4    ORDER TO SORT OF LEND AN IMPRIMATUR THAT HIS FUNDS

5    WERE A GOOD INVESTMENT.

6         THE PROBLEM IS THAT HE'S DEFRAUDING THESE

7    INVESTORS, HE'S DECEIVING THEM AND CHEATING THEM BY

8    PUTTING ASSOCIATIONS THAT DON'T REALLY EXIST.

9         FALSE REPRESENTATION NUMBER THREE.  THE

10   FIRST IS CASTILLO, LYN, COHEN & VIJAY.  THE SECOND

11   IS TONY POLLACE.  THE THIRD IS THAT THE LAW FIRM OF

12   PROSKAUER ROSE, LLP.

13        THE DEFENDANT TOLD INVESTORS THAT THE

14   PROMINENT GLOBAL LAW FIRM, PROSKAUER ROSE, WAS

15   ENGAGED AS LEGAL COUNSEL FOR THE FIRESIDE LS FUND.

16        HOW DOES HE DO THIS?  GOVERNMENT

17   EXHIBIT 5.  THE DOCUMENT THAT YOU HEARD TESTIMONY

18   ABOUT FROM BOB LIN.  FIRESIDE LS FUND, FUND

19   SUBSCRIPTION BOOKLET FOR NON U.S. INVESTORS AND TAX

20   EXEMPT INVESTORS.

21        THIS IS A DOCUMENT ALBERT HU PROVIDED TO

22   INVESTORS.  THE DOCUMENT INVESTORS RELIED ON IN

23   WIRING HIM MONEY.

24        WHAT DID ALBERT HU PUT IN THIS DOCUMENT?

25   LEGAL REPRESENTATION, WAIVER OF CONFLICTS.  THE

1    INVESTOR UNDERSTANDS THAT PROSKAUER ROSE, PROSKAUER

2    HAS BEEN ENGAGED TO ACT AS LEGAL COUNSEL TO THE

3    FUND, THE INVESTMENT MANAGER, THE ORDINARY

4    SHAREHOLDER AND THE MASTER FUND, COLLECTIVELY, THE

5    FUND AFFILIATED GROUP.

6         PROSKAUER ROSE IS A PROMINENT LAW FIRM.

7    YOU HEARD FROM TWO REPRESENTATIVES OF PROSKAUER

8    ROSE.  DERRICK ARTHUR WHO IS THE PROSKAUER ROSE

9    RECORDS MANAGER, THE INDIVIDUAL WHOSE PICTURE IS ON

10   THE LEFT, THE INDIVIDUAL WHO ACTUALLY HAS ALMOST

11   30 YEARS OF EXPERIENCE IN THE FIELD OF LAW FIRM

12   RECORDKEEPING AND HE TESTIFIED THAT HE WAS

13   CONTACTED BY THE GOVERNMENT AND DID A SEARCH OF

14   PROSKAUER ROSE RECORDS WHICH GO BACK DECADES, I

15   THINK THEY GO BACK TO THE 30'S OR 40'S.  PROSKAUER

16   ROSE, YOU HEARD TESTIMONY THAT PROSKAUER ROSE IS A

17   PROMINENT LAW FIRM OVER A HUNDRED YEARS OLD, HAS A

18   GLOBAL PRACTICE.  IT HAS A BRAND.  SOMETHING THAT

19   COULD POTENTIALLY CAUSE INVESTORS TO WANT TO INVEST

20   IN THE FUND THAT WAS AFFILIATED WITH PROSKAUER

21   ROSE.

22        THE PROBLEM IT TURNS OUT, THE REALITY IS

23   THAT PROSKAUER ROSE WAS NEVER LEGAL COUNSEL FOR HU

24   OR ANY OF HIS FUNDS.  DERRICK ARTHUR SEARCHED THE

25   RECORDS.  THERE'S NO INDICATION WHATSOEVER THAT

1    ALBERT HU WAS EVER, OR ANY OF HIS FUNDS, ASENQUA,

2    FIRESIDE, WAS EVER OR HAD EVER RETAINED PROSKAUER.

3              AND IF WHAT ALBERT HU TOLD INVESTORS WAS

4    TRUE, THAT PROSKAUER ROSE WOULD HAVE BEEN RETAINED

5    IT WOULD HAVE BEEN IN THE RECORDS, IT WASN'T.  SO

6    ANOTHER FALSE REPRESENTATION.

7              LARY RAPPAPORT, THE PROSKAUER EQUITY

8    PARTNER, TOOK ADDITIONAL STEPS THAT PROSKAUER HAD

9    NEVER BEEN RETAINED BY ALBERT HU.  HE SENT THE

10   OFFICE AN E-MAIL ASKING THE ENTIRE FIRM --

11   ESSENTIALLY, HE ASKED THEM ANY INDICATIONS OF

12   ALBERT HU AND ANY OF THESE ENTITIES WERE RETAINED,

13   THE ANSWER WAS NO.  HE SEARCHED THE DOCUMENT

14   MANAGEMENT SOFTWARE WITH PROSKAUER, NO RECORDS

15   INDICATING THAT ALBERT HU OR ASENQUA OR FIRESIDE

16   WERE EVER CLIENTS OF THE FIRM.

17             FALSE REPRESENTATION NUMBER FOUR.  THE

18   HEDGE FUND'S GLOBAL ADMINISTRATOR, GLOBEOP.

19             HU TOLD INVESTORS THAT THE GLOBEOP

20   FINANCIAL SERVICES WAS THE FUND ADMINISTRATOR FOR

21   THE FIRESIDE LS FUND.

22             HOW DID HE DID ON THAT?  THIS IS, AGAIN,

23   GOVERNMENT EXHIBIT 12 THE DOCUMENT PROVIDED THAT HU

24   PREPARED PROVIDED TO INVESTORS.

25             IT SAYS FIRESIDE LS FUND CONFIDENTIAL

1    PRIVATE PLACEMENT MEMORANDUM, ADMINISTRATOR.  THE

2    GLOBEOP FINANCIAL SERVICES LLC THE ADMINISTRATOR

3    HAS BEEN RETAINED BY THE FUND AND THE MASTER FUND

4    TO PERFORM DAY-TO-DAY ADMINISTRATIVE AND

5    BOOKKEEPING SERVICES AND TO SERVE AS REGISTRAR AND

6    TRANSFER AGENT, HAS BEEN RETAINED.

7          WAS THAT A TRUE STATEMENT HE TOLD TO

8    INVESTORS THAT THE GLOBEOP FINANCIAL SERVICES HAS

9    BEEN RETAINED?  NO.  GLOBEOP WAS NEVER THE FUND

10    ADMINISTRATOR FOR HU OR ANY OF HIS FUNDS.

11          HOW DO YOU KNOW THIS?  BECAUSE ANDREA

12    DULBERG CAME IN, SHE'S THE GENERAL COUNSEL FOR

13    GLOBEOP.  SHE FLEW OUT FROM NEW YORK AND PROVIDED

14    TESTIMONY.  SHE TALKED AT LENGTH ABOUT HOW IT'S

15    VERY IMPORTANT FOR GLOBEOP FOR THEIR BUSINESS THAT

16    THEY HAVE TO BE CAREFUL ABOUT THEIR CLIENTS.  THEY

17    INVESTIGATE THEIR CLIENTS.  AND THAT VERY PRESENCE

18    IS IMPORTANT FOR THEM FOR THEIR REPUTATION, THEY

19    HAVE VERY STRICT RECORDS ABOUT THEIR CLIENTS.  THEY

20    SEARCH THE RECORDS.  THERE'S NO INDICATION THAT

21    ALBERT HU OR HIS FUNDS, ASENQUA, FIRESIDE WAS EVER

22    A CLIENT -- THERE'S NO INDICATION THE

23    REPRESENTATION THAT ALBERT HU MADE WAS TRUE.  AND

24    RELATED TO CLIENTS, IT'S RELATES TO THE PRIOR

25    TESTIMONY ABOUT PROSKAUER ROSE.  THERE'S REASONS OR

1    YOU'VE HEARD TESTIMONY THERE ARE VALID BUSINESS

2    REASONS WHY THESE ENTITIES, PROSKAUER ROSE,

3    GLOBEOP, THESE ARE PROMINENT ENTITIES WHY THEY NEED

4    TO HAVE STRICT RECORDS ABOUT THEIR CLIENTS.

5             IN THE LEGAL CONTEXT THERE'S ISSUES ABOUT

6    CONFLICT OF INTEREST, YOU CAN'T REPRESENT PEOPLE ON

7    TWO SIDES OF THE FENCE.  THAT'S WHY YOU NEED TO

8    HAVE STRONG RECORDS BECAUSE THE COMPREHENSIVE

9    RECORDS, AND THERE'S EVIDENCE THAT THE SEARCH OF

10   THOSE RECORDS COMES UP WITH NOTHING FOR HU OR THE

11   FUNDS AS HE REPRESENTED, THAT THEY WERE NEVER

12   ACTUALLY RETAINED.

13            RELATED TO THIS, AND I THINK IT'S FURTHER

14   EVIDENCE THE DEFENDANT HAD AN INTENTION TO DEFRAUD,

15   YOU ALSO HEARD TESTIMONY ABOUT AN ACCOUNTING FIRM

16   NAMED SEILER.

17            AND THAT WAS, THAT'S ALSO IN THE

18   DOCUMENTS.  AND THERE WAS TESTIMONY FROM A WOMAN

19   YOU MAY RECALL LYNN BORN, SHE WAS ONE OF THE

20   INDIVIDUALS WITH THE ACCOUNTING FIRM SEILER.  WHICH

21   SHE PROVIDED TESTIMONY AND INDICATED THAT THAT WAS

22   AN ACCOUNTING FIRM IN THE AREA THAT WORKED WITH

23   HIGH-TECH IN THE HIGH-TECH SECTOR.

24            YOU WILL SEE THESE DOCUMENTS, I WILL NOT

25   SHOW IT NOW BUT THERE ARE DOCUMENTS THAT SHOW THAT

1   SHE REPRESENTED TO INVESTORS THAT SEILER'S WAS THE

2   ACCOUNTING FIRM FOR HIS FUNDS AS WELL.

3            AGAIN, ANOTHER PIECE OF EVIDENCE THAT YOU

4   CAN VIEW LOOKING AT THE EVIDENCE AS A WHOLE USING

5   YOUR REASON AND COMMON SENSE THAT POINTS TO THE

6   FACT THAT THIS ENTIRE THING WAS FOR ALL INTENTS AND

7   PURPOSES A SCHEME.

8            FALSE STATEMENTS NUMBER 5 AND 6, SORT OF

9   PUT THESE TOGETHER.  HIGH RATES OF RETURN AND

10  INVESTING IN TECHNOLOGY STOCKS.

11           DEFENDANT ALBERT HU TOLD INVESTORS THAT

12  HE WOULD PAY RATES OF RETURN AS HIGH AS 20 TO

13  30 PERCENT ANNUAL AND THAT THESE WERE THE HISTORIC

14  RATES OF RETURN FOR HIS HEDGE FUNDS.

15           HE ALSO TOLD INVESTORS HE WOULD OBTAIN

16  THE RATES OF RETURNS FOR INVESTORS PRIMARILY BY

17  INVESTING THEIR FUNDS IN TECHNOLOGY RELATED

18  SECURITIES.

19           AND THIS IS ONE OF THE EXHIBITS THAT WAS

20  INTRODUCED BY THE DEFENSE, THIS IS DEFENDANT'S

21  EXHIBIT 506.  THIS IS A POWERPOINT PRESENTATION

22  THAT WAS PRESENTED.  AND THIS IS A DOCUMENT THAT

23  ALBERT HU PROVIDED TO INVEST OFFERS AND TAKING A

24  LOOK AT THIS IT INDICATES PERFORMANCES.  NET

25  RETURNS AUDITED OF ASENQUA HEDGE FUNDS ACHIEVED A

1013

1    FAVORABLE SHARP RATIO AND LOW CORRELATION WITH THE

2    MARKET.

3              TAKE A LOOK AT THE LEFT-HAND COLUMN OF

4    THE DOCUMENT, IT'S REPRESENTING THAT WHAT ARE THE

5    NET RETURNS OF THE ASENQUA HEDGE FUNDS.  THAT THEY

6    ARE SUBSTANTIAL IN THE YEARS 2001, 2002 AND 2003.

7    THE THREE YEARS BEFORE THIS DOCUMENT, THIS DOCUMENT

8    IS DATED NOVEMBER 2004.

9              ALBERT HU IS REPRESENTING TO INVESTORS

10   THAT HE HAS OBTAINED RETURNS IN THE LAST THREE

11   YEARS OF OVER 30 PERCENT.  HE'S MAKING THIS PITCH

12   TO INVESTORS.  IF YOU INVEST WITH ME YOU WILL DO

13   GREAT.

14             A COUPLE OTHER THINGS THAT ARE

15   SIGNIFICANT ABOUT THIS DOCUMENT.  NOT ONLY IS

16   ALBERT HU REPRESENTING TO INVESTORS THAT HE'S GOT A

17   TERRIFIC TRACK RECORD BETTER THAN S&F, BETTER THAN

18   NASDAQ.

19             TWO OTHER THINGS THAT ARE IMPORTANT.

20   ONE, HE'S REPRESENTING TO INVESTORS THAT HIS

21   RETURNS ARE NOT ONLY EXCEPTIONAL RETURNS BUT THAT

22   THEY ARE AUDITED.  WHY IS THAT SIGNIFICANT?

23   BECAUSE THIS IS EVIDENCE OF ALBERT HU'S STATE OF

24   MIND.  HE'S REPRESENTING TO INVESTORS THAT THOSE

25   RETURNS ARE AUDITED.  ALSO TAKE A LOOK AT THE DATE

1      ON THIS POWERPOINT.  IT'S NOVEMBER 2004.  IF YOU

2      TAKE A LOOK AT THE FIRST DOCUMENT WE SHOWED YOU

3      GOVERNMENT 1, THE CASTILLO, LYN, COHEN & VIJAY

4      DOCUMENT.  THE DOCUMENT THAT THE GOVERNMENT

5      SUBMITS, FRANKLY, WAS IS A SHAM, IT WAS FABRICATED.

6      THIS IS A DOCUMENT THAT'S PURPORTEDLY SAYING THAT

7      AN INDEPENDENT AUDITING FIRM IS CONFIRMING THE

8      RETURNS OF THE ASENQUA BETA FUND.

9              THAT DOCUMENT IS DATED JANUARY 2005.  A

10     COUPLE MONTHS AFTER THIS.  IT'S EVIDENCE OF THE

11     DEFENDANT'S STATE OF MIND.  NOVEMBER 2004 HE'S

12     PREPARING A POWERPOINT PRESENTATION SLIDE TELLING

13     PEOPLE, WE'VE GOT GREAT RETURNS AND NOT ONLY THAT,

14     THOSE RETURNS ARE AUDITED.

15             THE DEFENDANT KNOWS AND UNDERSTANDS THAT

16     IT'S IMPORTANT TO INVESTORS THAT THOSE RETURNS BE

17     AUDITED.  HE'S MAKING THOSE REPRESENTATIONS TO

18     PEOPLE.  HE KNOWS THAT'S IMPORTANT TO INVESTORS AND

19     HE KNOWS AS PART OF HIS SCHEME HE'S GOING TO

20     REPRESENT TO PEOPLE THAT THE RETURNS ARE AUDITED.

21             NOT ONLY DID THE DEFENDANT MAKE

22     REPRESENTATIONS THAT PEOPLE ARE GOING TO DO GREAT

23     THAT THEY ARE GOING TO GET 20 TO 30 PERCENT ANNUAL

24     RUN RETURNS HE ALSO MADE REPRESENTATIONS THAT THE

25     FUNDS WOULD BE INVESTED BUT THEY WOULD ALSO BE

1    INVESTED IN HIGH-TECH STOCKS.

2            HOW DID HE DO THAT?  YOU HEARD TESTIMONY

3    FROM VARIOUS INVESTORS INCLUDING MR. LIN,

4    MR. VERDIELL, MS. DOONG THAT HE TOLD THEM.  HE SAID

5    THERE WERE LONG DISCUSSIONS ABOUT VARIOUS BACK AND

6    FORTH, VARIOUS MEETINGS, YOU ALSO PUT HIS PROMISES

7    IN WRITING.  GOVERNMENT EXHIBIT 12 THE FIRESIDE LS

8    FUND LP CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

9    THE DOCUMENT, AGAIN, ALBERT HU PREPARED AND

10   PRESENTED.

11           INVESTORS SAID THEY RELIED ON THIS

12   DOCUMENT IN WIRING HIM MONEY.  THE FUND IS THE

13   FIRESIDE LS FUND, LP.  THE INVESTMENT OBJECTIVE.

14           THE INVESTMENT OBJECTIVE OF THE FUND,

15   WHICH IS REFERRING HERE TO THE FIRESIDE LS FUND,

16   HAS IMPLEMENTED THROUGH THE MASTER FUND AS DEFINED

17   BELOW WILL BE TO GENERATE HIGH ABSOLUTE RETURNS

18   WHICH ARE UNCORRELATED WITH MAJOR MARKET INDICES

19   AND WHICH EXHIBIT LOW VOLATILITY.  THE FUND WILL

20   SEEK TO ACHIEVE THIS OBJECTIVE BY INVESTING

21   PRINCIPALLY IN THE SECURITIES OF HIGH TECHNOLOGY

22   COMPANIES IN THE DERIVATIVE SUCH AS OPTIONS.

23           THIS IS A DOCUMENT ALBERT HU PRESENTED TO

24   INVESTORS.  HE'S PUTTING THESE COMMENTS INTO

25   WRITING.  IT'S ALSO CONFIRMED WHAT HE TOLD THOSE

1    INVESTORS AND WHAT THOSE INVESTORS TESTIFIED TO.

2    AND AGAIN, YOUR RECOLLECTION OF WHAT THE TESTIMONY

3    IS CONTROLS.

4          ALBERT HU PROMISED THE INVESTORS, YOU

5    GIVE ME YOUR MONEY AND I WILL GENERATE FOR YOU VERY

6    HIGH RETURNS, RETURNS WHICH ARE AUDITED.  AND HOW

7    IS THE DEFENDANT CLAIMING HE'S GOING TO GENERATE

8    THOSE RETURNS?  BY ACTUALLY INVESTING THE MONEY AND

9    INVESTING IN HIGH-TECH STOCKS.  ANOTHER FALSE

10   REPRESENTATION.

11         YOU SEE THE STATEMENT, UNFORTUNATELY AS

12   THE EVIDENCE SHOWS, THIS IS YET ANOTHER FALSE

13   REPRESENTATION OR PROMISE THAT THE DEFENDANT MADE

14   TO INVESTORS TO GET HIM TO WIRE MONEY.  THE

15   DEFENDANT DID NOT INVEST THE MONEY AS HE PROMISED.

16         HOW DO YOU KNOW THIS?  WELL, THE DOCUMENT

17   HERE THIS IS GOVERNMENT EXHIBIT 3 THIS IS A

18   STATEMENT THAT THE DEFENDANT PRESENTED TO BOB LIN.

19   ONE THAT WE WOULD SUBMIT, AGAIN, HAS A FORGED

20   SIGNATURE THERE RELATED TO ANTHONY POLLACE.  THIS

21   DOCUMENT IS DATED APRIL 17, 2005.

22         YOU SEE MR. LIN'S NAME AT THE TOP.  THIS

23   DOCUMENT INDICATES THE TWO MONEY TRANSFERS.  THIS

24   IS THE 2-8-05, 225.  THIS IS THE FIRST AND SECOND

25   ONE, THE FIRST TWO COUNTS.

1          THEN YOU HEARD TESTIMONY FROM AGENT FINE,

2     AGENT FINE REVIEWED THE FINANCIAL ANALYSIS TOOK A

3     LOOK AT RELEVANT PORTIONS OF THE FINANCIAL

4     DOCUMENTS AND PRESENTED HIS FINANCIAL SUMMARY

5     TESTIMONY.

6          WHAT DID AGENT FINE FIND?  TAKE A LOOK AT

7     THIS GOVERNMENT EXHIBIT 267.  THIS IS A

8     DEMONSTRATIVE CHART.  KEEPING IN MIND, JUMPING BACK

9     HERE ON THIS DOCUMENT, THE GOVERNMENT EXHIBIT 3,

10    THIS IS DOCUMENT THAT'S PROVIDED TO -- DEFENDANT

11    PROVIDES TO BOB LIN DATED APRIL 17, 2005.  WHAT IS

12    ALBERT HU TELLING BOB LIN IS THE NET VALUE OF HIS

13    MONEY?  $203,842.  THAT'S WHAT ALBERT HU IS TELLING

14    BOB LIN.

15         WHAT'S THE REALITY?  SHOWN ON GOVERNMENT

16    EXHIBIT 267.  BOB LIN'S MONEY IS GONE.  AND IT'S

17    GONE WAY BEFORE, SIGNIFICANTLY BEFORE APRIL 17TH,

18    2005, WHICH IS THE DATE ON THE STATEMENT THAT

19    ALBERT HU SIGNED AND GAVE TO BOB LIN.

20         GOVERNMENT EXHIBIT 267 IS A CHART.  YOU

21    SEE THAT THERE'S IT POPS UP AND GOES DOWN.  WHAT DO

22    THOSE TWO INCREASES REFLECT?  THEY REFLECT THE

23    WIRES OF BOB LIN.  HE'S WIRES THE MONEY AS PUT

24    FORWARD IN EXHIBIT 27.  HE WIRES A HUNDRED THOUSAND

25    DOLLARS ON 2-8-05.  IT'S A LITTLE LESS THAN A

                                                    1018

1    HUNDRED THOUSAND BECAUSE THE ACCOUNT IS OVERDRAWN.

2            IT GOES TO THAT ACCOUNT FOR THIS TIME

3    PERIOD ON THIS GRAPH, THERE'S NO MONEY COMING IN

4    AND OUT OF THE ACCOUNT.  A HUNDRED THOUSAND DOLLARS

5    COMES IN AND WITHIN TWO WEEKS ALBERT HU, THIS IS

6    THE BANK OF AMERICA ACCOUNT 6581, IT'S AN ACCOUNT

7    HU CONTROLS, SIGNATORY TO, HE HAS ACCESS TO AND HE

8    SPENDS THIS MONEY IN TWO WEEKS.  IT'S ALL GONE.

9            THEN HE GETS ANOTHER HUNDRED THOUSAND

10   DOLLARS.  FEBRUARY 23RD.  WITHIN TWO WEEKS ALBERT

11   HU HAS SPENT THE REST OF THAT MONEY.  WITHIN A

12   PERIOD OF ALMOST A MONTH HE HAS SPENT $200,000 OF

13   BOB LIN'S MONEY.

14           HE THEN MAKES -- THAT'S NOT WHAT IT SAYS

15   ON THE ACCOUNT STATEMENT TO BOB LIN.  HE SAYS BOB

16   LIN HAS AN ACCOUNT VALUE OF $203,000.  IN REALITY

17   THE MONEY IS GONE BECAUSE ALBERT HU SPENT IT.

18           THE QUESTION MIGHT BE WHAT DID HE SPEND

19   THE MONEY ON.  THERE WERE A NUMBER OF THESE CHARTS,

20   WE ARE NOT GOING TO HIGHLIGHT ALL OF THEM, I'M

21   GOING TO HIGHLIGHT A COUPLE OF THEM.

22           AFTER THE FIRST $200,000 WIRES FROM BOB

23   LIN HE SUBSEQUENTLY SUBMITS -- BY THE WAY, THE

24   EVIDENCE SHOWS THAT ALBERT HU DID NOT INVEST THOSE

25   FIRST $200,000 IN HIGH-TECH SECURITIES AS HE

1    PROMISED AS HE SAID ORALLY AND IN WRITING.  THAT HE

2    SPENT THE MONEY.  HE SPENT IT ON THINGS LIKE CHECK

3    CARDS AND OTHER THINGS.

4            IF YOU LOOK OVER THE COURSE OF THE CASE,

5    LARGE AMOUNTS OF MONEY ARE BEING SPENT ON PURCHASES

6    WHICH ARE NOT FOR THE PURPOSES THAT ALBERT HU

7    PROMISED INVESTORS, THEY ARE NOT THE REASONS THEY

8    WIRED HIM HUNDREDS OF THOUSANDS OF DOLLARS AND

9    TRUSTED THEM WITH THEIR MONEY.

10           HE'S SPENDING IT ON CHECK CARD PURCHASES,

11   HE'S SPENDING IT ON CHECKS, HE'S SPENDING IT ON

12   THINGS LIKE COSTCO AND FRY'S AND OTHER STUFF LIKE

13   THAT.  THIS IS NOT INVESTING IN HIGH TECHNOLOGY

14   SECURITIES.  HE'S NOT -- THE DEFENDANT ALBERT HU IS

15   NOT INVESTING THIS MONEY IN HIGH TECHNOLOGY

16   SECURITIES AS HE'S PROMISED.

17           AND THE FACT THAT ALBERT HU IS NOT DOING

18   WITH INVESTORS MONEY AS HE PROMISED -- THAT IS

19   EVIDENCE OF A SCHEME TO DEFRAUD OF HIS INTENT TO

20   DEFRAUD.  THAT THIS ENTIRE THING IS A FRAUD.

21           THERE'S ANOTHER WIRE, A $250,000 WIRE

22   THAT TOOK PLACE ON JULY 6, 2005.  YOU HEARD

23   MR. FINE PROVIDE TESTIMONY ABOUT WHAT HAPPENED TO

24   THIS MONEY.  THIS IS PUT FORWARD ON THIS CHART.

25           AND WHAT DID ALBERT HU DO WITH THE

1    $250,000 THAT BOB LIN SENT HIM AFTER ALBERT HU HAS

2    SQUANDERED THE FIRST $200,000 THAT BOB LIN HAS TOLD

3    HIM.  HE HASN'T TOLD BOB LIN THE MONEY IS GONE.

4    HE'S TELLING HIM IN APRIL THAT THERE'S TWO STILL

5    TWO HUNDRED THOUSAND DOLLARS.

6         WHAT DOES ALBERT HU DO WITH THE $250,000

7    WIRED ON 7/6/2005, HE DOESN'T DO WHAT HE PROMISED

8    TO DO, HE DOESN'T INVEST IT IN HIGH TECH STOCKS, HE

9    TAKES A $150,000 OF BOB LIN'S MONEY, AND WITHOUT

10   BOB LIN'S PERMISSION, HE TAKES THE MONEY AND PAYS A

11   PRIOR INVESTOR, HONG LIU, ANOTHER INVESTOR IN

12   ALBERT HU'S FUND.

13        THE GOVERNMENT WOULD SUBMIT THAT THAT IS

14   EVIDENCE THAT ALBERT HU IS ENGAGED IN A FRAUDULENT

15   SCHEME.  HE'S TAKING MONEY FROM ONE INVESTOR AND

16   WITHOUT THEIR PERMISSION HE'S USE USING IT TO PAY

17   OTHER INVESTORS.  IT'S NOT CONSISTENT WITH WHAT HE

18   REPRESENTED TO BOB LIN.  IT'S NOT CONSISTENT WITH

19   SOMEONE WHO IS RUNNING A LEGITIMATE BUSINESS WHO IS

20   RUNNING A HEDGE FUND.  IT'S CONSISTENT WITH SOMEONE

21   WHO IS RUNNING A FRAUDULENT SCHEME.

22        AND AGAIN, I WON'T GO THROUGH ALL THE

23   DETAILS ON THIS BUT THERE'S ALSO THE SECOND

24   INVESTMENT, HE'S SPENDING $34,000 ON CHECK AND

25   CHECK CARD PURCHASES.

1          MARK VERDIELL'S MARCH 31ST, 2008,

2     STATEMENT.  THIS IS A DOCUMENT AGAIN THAT WAS

3     SUBMITTED, $2 MILLION.

4          WHAT'S SIGNIFICANT ABOUT THIS?  YOU MAY

5     RECALL MR. VERDIELL TESTIFYING ABOUT HOW HE INVESTS

6     HIS MONEY, HIS $2 MILLION, WITH MR. HU AND THEN

7     SUBSEQUENT TO THAT HE'S GETTING THE STATEMENT THAT

8     THINGS ARE GOING GOOD.

9          THEN LATER IN THE YEAR HE STARTS TO HAVE

10    SOME CONCERNS AND HE HAS WHAT HE REFERRED TO AS A

11    PORTFOLIO REVIEW.  HE HAS TO PUSH ALBERT HU TO DO

12    THIS BUT EVENTUALLY HE GETS TO SIT DOWN WITH ALBERT

13    HU AND GO OVER WHAT'S SUPPOSEDLY GOING ON WITH HIS

14    FUNDS.

15         WHAT DOES ALBERT HU TELL HIM?  HE DOESN'T

16    GIVE HIM DOCUMENTS BUT THERE'S -- THE MATERIALS ARE

17    SHOWN TO MR. VERDIELL ON THE SCREEN.  HE'S TOLD

18    THAT, YOU KNOW, THERE'S CERTAIN PUBLIC STOCKS THAT

19    HAVE BEEN PURCHASED.  MR. VERDIELL HAD BEEN CAREFUL

20    WITH TRYING DUE DILIGENCE ON THIS.  THIS HAPPENS IN

21    DECEMBER THAT THERE'S A PORTFOLIO REVIEW.

22         WHAT HAPPENS A COUPLE WEEKS AFTER THE

23    PORTFOLIO REVIEW?  ALBERT HU SUBMITS THIS ACCOUNT

24    STATEMENT TO MR. VERDIELL.  MR. HU KNOWS AT THIS

25    POINT THAT MR. VERDIELL IS HAVING SOME CONCERNS

1    HE'S GOT CONCERNS ABOUT WHAT'S GOING ON WITH HIS

2    INVESTMENT IT'S $2 MILLION.

3            WHAT IS ALBERT HU REPRESENT TO

4    MR. VERDIELL?  HE SUBMITS AND THIS IS -- HE

5    INDICATES AS OF DECEMBER 31ST 2007, THIS IS

6    CONSISTENT, THERE'S ACTUALLY ANOTHER STATEMENT THAT

7    COMES BEFORE THAT WAS SUBMITTED IN THE SAME TIME

8    FRAME THE VERY END OF DECEMBER, EARLY JANUARY, HE

9    TELLS MR. VERDIELL THAT IN THE LAST QUARTER OF 2007

10   THAT MR. VERDIELL'S INVESTMENT HAS HAD THE BEST

11   QUARTER TO DATE, THAT IN THE LAST QUARTER, THAT

12   IT'S GONE UP TEN PERCENT IN JUST ONE QUARTER.

13           WHAT CAN YOU INFER FROM THIS?  YOU CAN

14   INFER THAT MR. HU IS TELLING MR. VERDIELL WHAT HE

15   THINKS MR. VERDIELL WANTS TO HEAR.  AND

16   MR. VERDIELL, HAVING RAISED A RED FLAG, EXPRESSED A

17   CONCERN HAVING FORCED MR. HU TO CONDUCT A PORTFOLIO

18   REVIEW IS TELLING HIM THAT THINGS ARE GOING GREAT.

19           AFTER THAT, IN MID MARCH MR. VERDIELL

20   TELLS ALBERT HU, I WANT MY MONEY BACK.  AND NOTICE

21   IN THE NEXT STATEMENT THOSE RETURNS AREN'T SO GOOD

22   ANYMORE.  AT LEAST THESE ARE THE REPRESENTATIONS

23   ALBERT HU IS MAKING TO MR. VERDIELL.  NOW THAT

24   MR. VERDIELL IS ASKING FOR HIS MONEY BACK, THAT

25   LAST NUMBER, SUPPOSEDLY LOST MONEY.

1         YOU HEARD TESTIMONY FROM AGENT FINE ABOUT

2    THAT HAPPENED TO MR. VERDIELL'S $2 MILLION

3    INVESTMENT.  AND WHAT HAPPENED, AS THE EVIDENCE

4    SHOWS, IS THAT ALBERT HU DIDN'T SPEND THAT MONEY AS

5    HE PROMISED HE WOULD.  THAT MONEY GOES TO AN

6    ACCOUNT IN SINGAPORE, AN ACCOUNT THAT ALBERT HU

7    CONTROLS, AGAIN HAS SIGNATORY AUTHORITY ON.

8         WHAT DID ALBERT HU DO WITH MR. VERDIELL'S

9    TWO MILLION DOLLARS?  HE TAKES $600,000 OF THAT

10   MONEY AND HE PAYS, AGAIN, ANOTHER PRIOR INVESTOR

11   ANDY YAN.

12        HE ALSO TAKES A LARGE SUM OF MONEY AND

13   ALMOST A QUARTER OF IT, ALMOST HALF A MILLION

14   DOLLARS AND HAS IT GO TO FIRESIDE USA.  YOUR

15   TESTIMONY FROM AGENT FINE, THAT OF MR. VERDIELL'S

16   TWO MILLION DOLLARS THERE WAS SOME MONEY SPENT ON

17   SECURITIES.

18        HOWEVER, THE EVIDENCE SHOWS THAT THESE

19   WERE NOT HIGH-TECH SECURITIES THAT WERE PURCHASED

20   THAT EVENTUALLY EVER BENEFITTED MR. VERDIELL.  MR.

21   VERDIELL INVESTED $2 MILLION OF ALBERT HU, HE NEVER

22   GOT ANYTHING OUT OF IT.

23        AFTER MR. VERDIELL ASKED FOR HIS MONEY

24   BACK, ALBERT HU SAYS YOU ARE GOING TO GET YOUR

25   MONEY BACK, THERE'S E-MAILS, EXPLANATIONS.  HE

1    NEVER GETS HIS MONEY BACK.

2           SO THE FACT THAT SOME SECURITIES WERE

3    PURCHASED WITH MR. VERDIELL'S MONEY IS NOT EVIDENCE

4    THAT ALBERT HU WAS DOING WHAT HE SAID HE WOULD DO.

5    HE PURCHASED SOME SECURITIES BUT THEY NEVER WENT TO

6    THE BENEFIT OF MR. VERDIELL.

7           SO IN REALITY, JUST ANOTHER WAY OF

8    STEALING MR. VERDIELL'S MONEY.  SOME OF IT WAS

9    STOLEN AND USED ON CHECK CARD PURCHASES, SOME OF IT

10   WAS STOLEN TO USE -- SOME OF IT WAS STOLEN TO PAY

11   FOR FIRESIDE USA.  MONEY WAS USED TO PAY OTHER

12   INVESTORS.  SOME OF IT WAS USED TO PAY SECURITIES

13   WHICH EVENTUALLY DIDN'T GO TO MR. VERDIELL'S

14   BENEFITS.  THE BOTTOM LINE IS HE'S NOT DOING WHAT

15   HE PROMISED TO DO.

16          THE EVIDENCE AT TRIAL SHOWS THAT BY

17   OCTOBER 23RD, 2007 HU HAD ESSENTIALLY SPENT ALL OF

18   MARK VERDIELL AND BOB LIN'S MONEY.

19          AND YOU ARE TO CONSIDER THE EVIDENCE AS A

20   WHOLE.  SO KEEP IN MIND THIS FACT.  ALBERT HU HAD

21   SPENT ALL OF MR. VERDIELL'S AND MR. LIN'S MONEY BY

22   OCTOBER 23RD, 2007.  THAT'S ALMOST TWO MONTHS

23   BEFORE THE PORTFOLIO REVIEW THAT I TALKED ABOUT.

24   THE PORTFOLIO REVIEW IN DECEMBER 2007 WHERE ALBERT

25   HU REQUESTS GOES AND SITS DOWN TALKS TO

1     MR. VERDIELL AND THEY GO TO THE KABUKI DANCE THAT

2     MR. VERDIELL TELLS HIM EVERYTHING IS FINE.  MR. HU

3     DOESN'T TELL MR. VERDIELL HE HAD SPENT ALL HIS

4     MONEY TWO MONTHS EARLIER.

5          WHAT IS THAT EVIDENCE OF?  WE WOULD

6     SUBMIT THAT'S EVIDENCE THAT THIS IS A FRAUD, THIS

7     IS MR. HU'S INTENT TO DECEIVE OR CHEAT.

8          ALL RIGHT.  SO THE FIRST ELEMENT OF WIRE

9     FRAUD IS THAT MR. HU CAUSED WIRES TO BE SENT.  THE

10    SECOND ELEMENT OF WIRE FRAUD IS THAT THERE WAS AT

11    LEAST ONE FALSE REPRESENTATION, PROMISE OR

12    PRETENSE, AND WE HAVE GONE THROUGH 5 OR 6.

13         THE THIRD ELEMENT OF WIRE FRAUD IS

14    MATERIALITY.  A FALSE OR FRAUDULENT PRETENSE,

15    REPRESENTATION OR PROMISE IS MATERIAL IF IT HAD A

16    NATURAL TENDENCY TO INFLUENCE OR WAS CAPABLE OF

17    INFLUENCING A POTENTIAL INVESTOR TO PART WITH

18    MONEY.

19         SO THE GOVERNMENT'S BURDEN HERE IS TO

20    LEAVE YOU FIRMLY CONVINCED THAT THE DEFENDANT MADE

21    AT LEAST ONE FALSE OR FRAUDULENT PRETENSE

22    REPRESENTATION OR PROMISE THAT WAS MATERIAL LEAVING

23    YOU FIRMLY CONVINCED THAT THAT ONE PRETENSE,

24    REPRESENTATION, PROMISE OR MATERIAL HAD A NATURAL

25    TENDENCY TO INFLUENCE OR WAS CAPABLE OF INFLUENCING

1    A POTENTIAL INVESTOR TO PART WITH MONEY.

2              THAT'S THE STANDARD.  DOESN'T MEAN THEY

3    HAVE TO PROVE THEY ACTUALLY DID, JUST MEANS CAPABLE

4    OF.  THAT'S WHAT IS PUT FORWARD HERE IN THIS

5    INSTRUCTION.

6              HOW DO YOU KNOW IF ANY OF ALBERT HU'S

7    FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS OR

8    PROMISES WERE MATERIAL?  TWO WAYS.

9              ONE, YOUR REASON AND COMMON SENSE.

10             SECONDLY, TESTIMONY THAT YOU HEARD AT

11   TRIAL OF ALBERT HU'S INVESTORS.

12             FIRST, LET'S TALK ABOUT YOUR REASON AND

13   COMMON SENSE.

14             THE FAKE ACCOUNTING FIRM WE TALKED ABOUT.

15   THE EVIDENCE SHOWS IT'S EXTREMELY STRONG THAT

16   ALBERT HU EFFECTIVELY MANUFACTURED AN ACCOUNTING

17   FIRM, CASTILLO, LYN, COHEN & VIJAY.  ONE THAT HE

18   WHEN HE'S SUBMITTING DOCUMENTS HE INDICATES THAT

19   THERE WERE HIGH RETURNS THAT WERE AUDITED.

20             SO USING YOUR REASON AND COMMON SENSE YOU

21   SHOULD ASK YOURSELF IF SOMEONE HAD CREATED A FAKE

22   ACCOUNTING FIRM AND FABRICATED DOCUMENTS, AND

23   FORGED THE NAME OF A CPA ON THOSE DOCUMENTS, AND

24   SUBMITTED THEM TO INVESTORS, AND INDICATED TO THEM

25   THAT THE FUNDS WERE -- HAD GREAT RETURNS.  THAT'S

1    THE TYPE OF THING THAT WOULD HAVE A NATURAL

2    TENDENCY TO INFLUENCE OR WOULD BE CAPABLE OF

3    INFLUENCING A POTENTIAL INVESTOR TO INVEST MONEY.

4         THE GOVERNMENT WOULD SUBMIT THAT USING

5    YOUR REASON AND COMMON SENSE, THE ANSWER IS

6    UNQUESTIONABLY YES.  WHAT POTENTIAL INVESTOR WOULD

7    INVEST MONEY WITH SOMEONE WHO HAS CREATED A FAKE

8    ACCOUNTING FIRM?  AND IF THE POTENTIAL INVESTOR

9    KNEW ABOUT THE FACT THAT THE STATEMENTS WEREN'T

10   AUDITED, IT KNEW ABOUT THE FACT THAT SIGNATURES

11   WERE FORCED, THEY NEVER WOULD HAVE GOTTEN CLOSE TO

12   AN INVESTMENT LIKE THIS.  AT THE VERY LEAST IT

13   WOULD HAVE A CAPACITY TO INFLUENCE THEIR DECISION

14   AND THAT'S THE REQUIREMENT FOR IT TO BE MATERIAL.

15        THE NEXT ARGUMENT ON MATERIALITY, REASON

16   AND COMMON SENSE WERE THE FORGED SIGNATURES OF THE

17   CFO.  THIS IS THE QUESTION YOU HAVE TO ASK

18   YOURSELF, ARE YOU FIRMLY CONVINCED THAT A POTENTIAL

19   INVESTOR WOULD HAVE A NATURAL TENDENCY TO INFLUENCE

20   THEM OF PARTING WITH MONEY IF THEY KNEW THAT THE

21   CFO WAS NOT THE CFO OF THE COMPANY OR THAT THERE

22   WERE FORGED DOCUMENTS ON INVESTMENT DOCUMENTS.

23        I WOULD SUBMIT USING YOUR REASON AND

24   COMMON SENSE, THIS IS PRETTY STRAIGHT FORWARD.

25   THAT IS A MATERIAL MISSTATEMENT, ONE THAT WOULD

1    HAVE A CAPACITY TO INFLUENCE PEOPLE TO INVEST

2    MONEY.

3            AGAIN, YOUR REASON AND COMMON SENSE, WE

4    WOULD SUBMIT, WOULD LEAD YOU TO CONCLUDE THE

5    FABRICATED RELATIONSHIPS WITH PROMINENT FIRMS WOULD

6    HAVE HAD A NATURAL TENDENCY TO INFLUENCE OR AT

7    LEAST A CAPACITY CAPABLE OF INFLUENCING A POTENTIAL

8    INVESTOR TO INVEST MONEY.

9            CONSIDERING A POTENTIAL INVESTOR, WOULD

10   IT BE CAPABLE OF INFLUENCING THEM IF THEY KNEW THAT

11   A PROMINENT LAW FIRM WAS AFFILIATED WITH THE FUND?

12   YES.  WOULD IT BE CAPABLE OF INFLUENCING THEM IF

13   THEY KNEW A PROMINENT HEDGE FUND ADMINISTRATOR WAS

14   AFFILIATED WITH THE FUND?  YES, IT WOULD.

15           AND THE GOVERNMENT WOULD SUBMIT THAT

16   ALBERT HU KNEW THAT.  THAT HE KNEW THAT THESE

17   ENTITIES WOULD INFLUENCE INVESTORS AND THAT'S WHY

18   HE INCLUDED THEM IN THESE DOCUMENTS.  HE KNEW THAT

19   THAT WOULD BRING PEOPLE IN.  AGAIN, WE WOULD SUBMIT

20   THIS IS STRAIGHTFORWARD.

21           ALSO USE YOUR REASON AND COMMON SENSE ON

22   THE FRAUDULENT QUARTERLY STATEMENT DOCUMENTS COMING

23   IN THAT ARE FALSE.  THEY ARE PAINTING A PICTURE OF

24   THE STATE OF THE FINANCES OF THE MONEY THAT ALBERT

25   HU GAVE TO INVESTORS AND IT'S NOT IN ACCORDANCE

1029

1    WITH REALITY.  HE'S HAS SPENT THE, MONEY, HE HAS

2    NOT INVESTED IT AS HE PROMISED.  AND BOB LIN HAVING

3    INVESTED A SIGNIFICANT AMOUNTS OF MONEY TO THE

4    DEFENDANT, HE GIVES MORE MONEY TO THE DEFENDANT.

5         AND ANOTHER ONE OF THE FALSE STATEMENTS

6    THAT WERE DISCUSSED IS THE FACT THERE WAS A MINIMUM

7    INVESTMENT OF A MILLION DOLLARS.  YOU HEARD

8    TESTIMONY FROM GRACE DOONG HER SISTER HAD INVESTED

9    A MILLION DOLLARS.  AT THE TIME THAT THE DEFENDANT

10   IS TELLING BOB LIN THAT THERE'S A MINIMUM

11   INVESTMENT OF A MILLION DOLLARS.

12        AND THAT'S ANOTHER FALSE STATEMENT OR

13   REPRESENTATION, YOU HAVE TO INVEST A MILLION

14   DOLLARS.  THAT FALSE PROMISE OR REPRESENTATION IS

15   THE REASON BOB LIN WIRES MORE MONEY.

16        ANOTHER PART OF REASON HE WIRES MORE

17   MONEY THE $250,000, IS THAT HE'S LULLED INTO A

18   SENSE OF COMPLACENCY BY THE FRAUDULENT QUARTERLY

19   STATEMENTS.  THE ONES THAT ARE FALSE, NOT IN

20   ACCORDANCE WITH REALITY.  THEY ARE SIGNED BY ALBERT

21   HU AND THERE'S A FORGED SIGNATURE OF SOMEONE WHO IS

22   NOT THE CFO OF THE FUND.

23        AND AGAIN, FOLLOW THE MONEY.  CONSIDER

24   THE VARIOUS FINANCIAL CIRCUMSTANCES AND THE FALSE

25   STATEMENTS, THE PROMISES OF HIGH RETURNS IS NOT

1    INVESTMENT MONEY.  USE YOUR REASON AND COMMON

2    SENSE.

3            WE WOULD SUBMIT THE EVIDENCE IS EXTREMELY

4    STRONG THAT THESE FALSE STATEMENTS THAT THE

5    ACCOUNTING FIRM, THE SIGNATURES, THE FABRICATED

6    RELATIONSHIPS, FRAUDULENT QUARTERLY STATEMENTS, THE

7    FALSE STATEMENTS ABOUT THE MONEY AND NOT DOING WHAT

8    HE SAID HE WOULD DO WOULD INFLUENCE INVESTORS.

9            I MEAN, ASK YOURSELF, WOULD A POTENTIAL

10   INVESTOR -- COULD IT HAVE BEEN CAPABLE OF

11   INFLUENCING THE FACT THAT THEY WERE TOLD THAT THEY

12   WOULD GET 20 TO 30 PERCENT RETURNS?  IF THE ANSWER

13   IS YES, THEN THE STATEMENT IS MATERIAL.

14           COULD HAVE BEEN CAPABLE OF INFLUENCING

15   THEM THE FACT THAT THEIR MONEY WAS GOING TO BE

16   INVESTED IN HIGH-TECH STOCKS.  WOULD THAT BE

17   CAPABLE OF INFLUENCING A POTENTIAL INVESTOR?  YES,

18   IT WOULD BECAUSE THAT'S WHAT A POTENTIAL INVESTOR

19   WOULD WANT TO BE INVESTING IN HIGH-TECH STOCKS.

20           SO BEING TOLD THEIR MONEY WOULD BE

21   INVESTED IN HIGH-TECH STOCKS WOULD INFLUENCE THEM

22   TO PART WITH MONEY.

23           IN ADDITION TO USING YOUR REASON AND

24   COMMON SENSE ABOUT MATERIALITY, THERE'S ALSO

25   EVIDENCE THAT WAS PRESENTED AT TRIAL.  AND I JUST

1    WANT TO HIGHLIGHT THAT YOUR RECOLLECTION OF THE

2    EVIDENCE IS WHAT IS CONTROLS.

3              YOU HAVE A RECOLLECTION OF THE EVIDENCE

4    THAT'S DIFFERENT THAN WHAT IS PRESENTED UP HERE,

5    YOUR RECOLLECTION IS WHAT CONTROLS.  HOWEVER, WE'VE

6    PREPARED SOME SLIDES THAT IS OUR RECOLLECTION OF A

7    QUESTION THAT WAS ASKED SOME OF THE INVESTORS AND

8    AN ANSWER, AND THAT THIS WAS THE ANSWER THAT WAS

9    GIVEN.

10             AND THE GOVERNMENT WOULD RESPECTFULLY

11   SUBMIT THAT IN ADDITION TO USING YOUR REASON AND

12   COMMON SENSE TO FIND THAT ALL THESE VARIOUS FALSE

13   STATEMENTS WERE MATERIAL, THAT YOU ALSO HAVE THE

14   TESTIMONY OF THE INVESTORS THAT IT WAS MATERIAL

15   BECAUSE IT INFLUENCED THEM.  IT INFLUENCED THEM TO

16   PART WITH LARGE AMOUNTS OF MONEY.

17             THE QUESTION WAS ASKED OF MARK VERDIELL,

18   DID THE PRIVATE PLACEMENT MEMORANDUM FOR THE

19   FIRESIDE LS FUND INFLUENCE YOUR DECISION TO INVEST

20   IN THE FIRESIDE LS FUND?  WHAT WAS THE ANSWER THAT

21   WAS GIVEN?  YES, IT DID.

22             ANOTHER TESTIMONY RELATED TO MATERIALITY.

23   WE ARE GOING TO GO THROUGH A COUPLE OF THESE.

24   THERE WERE MANY DIFFERENT STATEMENTS ABOUT THAT

25   RELATE TO MATERIALITY.  WE ARE GOING TO GO THROUGH

1    A COUPLE.

2            MR. VERDIELL SAID, THE QUESTION WAS

3    ASKED, "WAS IT IMPORTANT TO YOU THAT THE FIRESIDE

4    LS FUND HAD INDEPENDENT AUDITORS?"  THE ANSWER WAS,

5    YES, OF COURSE.

6            YOU MAY RECALL THAT MR. VERDIELL GAVE

7    TESTIMONY ABOUT HOW HE DID EXTRA DUE DILIGENCE IN

8    THE CONTEXT OF THIS INVESTMENT BECAUSE IT WAS A

9    PRIVATE INVESTMENT, IT WASN'T INVESTING IN A PUBLIC

10   COMPANY WHERE YOU HAVE ANALYSTS AND OTHER THINGS

11   THAT ARE LOOKING OUT AFTER IT, THAT HE ATTEMPTED TO

12   DO EXTRA DUE DILIGENCE.  THAT HE HAD SEVERAL

13   MEETINGS WITH THE DEFENDANT BEFORE SHE INVESTED.

14   THAT HE WENT OVER THE DOCUMENTS IN DETAIL WITH HIM

15   BEFORE HE INVESTED HIS MONEY.  THAT HE TALKED ABOUT

16   HOW IT WAS IMPORTANT TO HIM THAT THERE WERE

17   MULTIPLE LEVELS OF PROTECTION THAT THERE WERE

18   INDEPENDENT BOOKKEEPERS THAT LOOKED AT IT,

19   INDEPENDENT ACCOUNTANTS, THE SEILER FIRM WHO LOOKED

20   OVER THE INDEPENDENT BOOKKEEPERS, THAT THERE WERE

21   INDEPENDENT AUDITORS THE CASTILLO, LYN FIRM, THAT

22   THERE WERE CHECKS AND BALANCES.

23            THIS IS ALSO EVIDENCE YOU CAN KEEP IN

24   MIND IN DETERMINING WHETHER THE VARIOUS FALSE

25   STATEMENTS WERE MATERIAL.

1           MR. VERDIELL TESTIFIED HE WOULDN'T HAVE

2    INVESTED IF THE CASTILLO LYN FIRM DIDN'T EXIST IF

3    IT WASN'T INDEPENDENT.

4           ANOTHER TESTIMONY, A QUESTION WAS ASKED

5    OF BOB LIN:  AND MR. LIN, WOULD YOU HAVE KEPT

6    INVESTING IF YOU HAD KNOWN THAT THE QUARTERLY

7    STATEMENTS WE LOOKED AT THIS MORNING FOR ASENQUA

8    BETA AND THEN FOR FIRESIDE LS FUND, IF YOU HAD

9    KNOWN THOSE RETURNS WERE NOT TRUE AND ACCURATE

10   WOULD YOU HAVE KEPT INVESTING MONEY?

11          THAT WAS THE QUESTION THAT WAS ASKED.

12   AND WHAT WAS THE ANSWER THAT WAS GIVEN?  THE ANSWER

13   THAT WAS GIVEN, MR. LIN SAID NO, I WOULD HAVE RUN

14   AS FAST AS I COULD.

15          THE FALSE STATEMENTS WERE MATERIAL.

16   THAT'S WHAT THE GOVERNMENT'S POSITION IS.

17          MR. VERDIELL WAS ASKED, DO YOU EXPECT --

18   DID YOU EXPECT -- WOULD IT HAVE INFLUENCED YOUR

19   DECISION TO INVEST WITH ALBERT HU IF A SIGNIFICANT

20   PORTION OF YOUR FUNDS WAS GOING TO BE USED TO PAY

21   FOR ALBERT HU'S LIVING EXPENSES?  THE ANSWER THAT

22   WAS GIVEN, ABSOLUTELY.  I WOULDN'T HAVE INVESTED.

23          AND AGAIN, WHY NOT?

24          ANSWER, BECAUSE THE MONEY WAS FOR THE

25   PURPOSE OF THE INVESTMENT, IT WAS NOT FOR MR. HU TO

1    PUT IN HIS POCKET.

2              THE FACT THAT -- AND THE GOVERNMENT WOULD

3    SUBMIT THAT THE FACT THAT MR. HU DID NOT MAKE FALSE

4    STATEMENTS, HE'S GOING TO ACTUALLY INVEST THIS

5    MONEY AND THEN DOESN'T, THAT'S MATERIAL.  IT HAD A

6    NATURAL TENDENCY TO INFLUENCE OR WAS CAPABLE OF

7    INFLUENCING INVESTORS IT DID INFLUENCE INVESTORS.

8              GRACE DOONG, ANOTHER INVESTOR WAS ASKED,

9    WHAT DID YOU UNDERSTAND THIS REFERENCE TO PROSKAUER

10   ROSE LLP TO MEAN AT THE TIME?

11             ANSWER:  IT MEANS THE FUND HAS BEEN

12   MONITORED BY PROSKAUER ROSE AS A LEGAL COUNSEL.

13             QUESTION:  AND THAT WAS SIGNIFICANT TO

14   YOU AT THE TIME?

15             ANSWER:  YES.

16             WHY?

17             IT MEANS THE FUND WAS MONITORED.

18             AND WHAT DO YOU MEAN BY MONITORED?

19             IT MEANS IT'S MONITORED TO MAKE SURE IT

20   COMPLIES WITH ALL THE LEGAL OR FINANCIAL REGULATION

21   REQUIREMENTS.

22             MORE TESTIMONY, OR ANOTHER QUESTION THAT

23   WAS ASKED OF GRACE DOONG.

24             QUESTION:  IF YOU HAD KNOWN AT ANY POINT

25   IN THE PROCESS THAT MR. POLLACE HAD NOT IN FACT

```
 1    SIGNED THOSE DOCUMENTS HIMSELF, WOULD THAT HAVE
 2    CAUSED YOU TO ACT DIFFERENTLY?
 3              ANSWER:  OF COURSE.
 4              QUESTION:  WHY?
 5              ANSWER:  EVERY DOCUMENT NEED TO BE TRUE.
 6    AND IF ANYTHING ON THE FUND THAT WASN'T TRUE TO ME
 7    I SHOULDN'T MAKE ANY INVESTMENT IN THOSE FUNDS.
 8              AGAIN, THE QUESTION ASKED OF GRACE DOONG
 9    ABOUT ANOTHER ONE OF THE FALSE STATEMENTS, THE
10    FALSE PROMISES AND REPRESENTATIONS.
11              QUESTION:  MS. DOONG, FOR THE INVESTMENTS
12    THAT YOUR SISTER MADE IN THE ASENQUA BETA FUND THAT
13    BECAME FIRESIDE AND YOUR OWN INVESTMENT IN THE AQC,
14    IF YOU HAD KNOWN AT ANY POINT EITHER PRIOR TO THE
15    START OF THE INVESTING OR THEREAFTER THAT THE MONEY
16    WAS NOT BEING INVESTED AS IT HAD BEEN PROMISED TO
17    YOU BUT WAS ACTUALLY BEING SPENT ON OTHER PURPOSES
18    BY MR. HU, WOULD YOU HAVE INVESTED?
19              ANSWER:  ABSOLUTELY NO.
20              QUESTION:  WHY NOT?
21              ANSWER:  AS I SAID, IF THE INVESTMENT
22    WASN'T DONE AS IT'S SUPPOSED TO BE HANDLED, IT
23    WOULD BE STUPID TO PUT IN ANY OF MY MONEY OR
24    OTHER'S MONEY.
25              AGAIN, THE GOVERNMENT WOULD SUBMIT THAT
```

1    THE FALSE STATEMENTS THE NUMEROUS FALSE PROMISES

2    THE DEFENDANT MADE WERE MATERIAL.

3              BOB LIN WAS ASKED IN THE CONTEXT OF THE

4    FALSE STATEMENTS REGARDING MR. POLLACE.

5              QUESTION:  WAS IT IMPORTANT TO YOU,

6    MR. LIN, THAT THE STATEMENTS AND THE ONES WE ARE

7    GOING TO LOOK AT FOLLOWING HAVE BEEN REVIEWED AND

8    SIGNED OFF BY MR. POLLACE, THE FUND'S REPORTED CFO?

9              ANSWER:  YES, IT WAS PENITENTIARY.

10             QUESTION:  WHY SO?

11             ANSWER:  CFO -- IN ANY FINANCIAL

12   STATEMENT CFO IS KEY.

13             QUESTION:  WHY IS THE CFO IMPORTANT?

14             ANSWER:  HE'S RESPONSIBLE FOR ALL THE

15   FINANCIAL RELATED ISSUES, HE'S RESPONSIBLE TO

16   VERIFY ALL THE FINANCIAL STATEMENTS ARE CORRECT.

17             AND THE GOVERNMENT WOULD SUBMIT THAT

18   MR. LIN'S UNDERSTANDING, THAT IS WHAT A CFO IS FOR

19   IS TO BE RESPONSIBLE TO VERIFY FINANCIAL

20   STATEMENTS.

21             THAT'S WHY IF YOU'RE TAKING -- A

22   POTENTIAL INVESTOR WOULD WANT TO KNOW THAT THERE'S

23   A CFO.  IT WOULD BE MEANINGFUL TO THEM THAT THEY

24   ARE SIGNING OFF, IT'S NOT JUST A ONE-MAN BAND,

25   THERE'S OTHER CHECKS AND BALANCES.

1        IN THIS CASE IT WAS JUST ALBERT HU.  AND

2   HE WAS TAKING PEOPLE'S MONEY AND HE WAS FALSELY

3   CLAIMING OTHER ENTITIES WERE AFFILIATED WITH IT.

4        ALL RIGHT.  SO THERE'S TWO MORE ELEMENTS

5   WE ARE GOING TO GO THROUGH QUICKLY ABOUT ELEMENTS

6   OF WIRE FRAUD.

7        AGAIN, THE FIRST WE TALKED ABOUT IS

8   CAUSING WIRES.  SECOND, THE FALSE STATEMENTS.

9   THIRD IS MATERIALITY.  THE FOURTH IS INTENT TO

10  DEFRAUD.

11       THE GOVERNMENT HAS TO PROVE BEYOND A

12  REASONABLE DOUBT LEAVE YOU FIRMLY CONVINCED THAT

13  THE DEFENDANT ALBERT HU ACTED WITH AN INTENT TO

14  DEFRAUD, THAT IS, THE INTENT TO DECEIVE OR CHEAT.

15       THE INSTRUCTIONS WILL INDICATE THAT IN

16  DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU

17  MAY NOT CONSIDER NOT ONLY THE DEFENDANT'S WORDS AND

18  STATEMENTS BUT ALSO THE CIRCUMSTANCES IN WHICH THEY

19  WERE USED AS A WHOLE.

20       SO THE QUESTION THEN THAT YOU ARE ASKED

21  IS, HOW DO YOU KNOW THAT ALBERT HU ACTED WITH THE

22  INTENT TO DEFRAUD?  HOW DO YOU KNOW HE ACTED WITH

23  AN INTENT TO DECEIVE OR CHEAT INVESTORS?

24       AND AGAIN I WILL REITERATE AT THE ONSET

25  THAT THE GOVERNMENT SUBMITS THAT THIS IS ACTUALLY A

1   FAIRLY STRAIGHTFORWARD CASE.  IT'S FAIRLY

2   STRAIGHTFORWARD BOUT HE WAS ACTING IN AN INTENT TO

3   DECEIVE.  AND WE WOULD RESPECTFULLY SUBMIT THAT THE

4   EVIDENCE THAT HE WAS ACTING WITH AN INTENT TO

5   DEFRAUD IS TRULY OVERWHELMING.

6           CASTILLO, LYN, COHEN & VIJAY.  THE

7   EVIDENCE SHOULD LEAVE YOU FIRMLY CONVINCED THAT

8   WHEN THE DEFENDANT FABRICATED THE EXISTENCE OF AN

9   AUDITING FIRM AND CREATED DOCUMENTS THAT MADE FALSE

10  REPRESENTATIONS ABOUT THOSE FUNDS, THAT HE HAD AN

11  INTENT TO DEFRAUD, THAT HE WAS INTENDING TO DECEIVE

12  OR CHEAT PEOPLE.

13          THIS IS A FAIRLY BRAZEN EXAMPLE OF

14  DECEIVE OR CHEAT PEOPLE.  THE FORGED SIGNATURES OF

15  TONY POLLACE THAT WERE ON THE DOCUMENTS THAT ALBERT

16  HU PROVIDED TO INVESTORS.  WE WOULD RESPECTFULLY

17  SUBMIT THAT WHEN THE DEFENDANT SUBMITTED DOCUMENTS

18  THAT FALSELY CLAIM THAT TONY POLLACE WAS THE CFO

19  FOR HIS FUNDS AND HAD A SIGNATURE ON IT THAT WASN'T

20  TONY POLLACE'S SIGNATURE, ALTHOUGH IT DID HAVE

21  ALBERT HU'S SIGNATURE, THAT ALBERT HU WAS ACTING

22  WITH AN INTENT TO DEFRAUD, THAT HE WAS INTENDING TO

23  DECEIVE OR CHEAT PEOPLE TO DECEIVE THEM INTO

24  THINKING THAT TONY POLLACE WAS THE CFO THAT HE WAS

25  SIGNING OFF ON IT.

1           THE FABRICATED RELATIONSHIPS WITH THE

2     PROMINENT FIRMS.  WE RESPECTFULLY SUBMIT THAT THE

3     EVIDENCE WILL LEAVE YOU FIRMLY CONVINCED THAT WHEN

4     THE DEFENDANT SUBMITTED DOCUMENTS TO INVESTORS THAT

5     FALSELY CLAIM THAT PROSKAUER ROSE WAS THE LAW FIRM

6     TO HIS FUNDS, THAT HE WAS ACTING WITH AN INTENT TO

7     DECEIVE OR CHEAT.

8           HE WAS ACTING WITH AN INTENT TO CHEAT THE

9     PEOPLE OUT OF MONEY, TO DECEIVE THEM TO THINK THAT

10    PROSKAUER ROSE WAS AFFILIATED WITH HIS FUNDS THAT

11    GAVE A SHEEN OF LEGITIMACY TO HIS FUNDS THAT HE WAS

12    INTENDING FOR INVESTORS TO THINK THAT BECAUSE

13    PROSKAUER ROSE, WHICH IS A PROMINENT LAW FIRM

14    BECAUSE THEY WERE ON BOARD, THAT IT'S OKAY FOR THE

15    INVESTORS TO GET ON BOARD THAT THEY COULD BE

16    PROTECTED.

17          AND WE WOULD SUBMIT YOU SHOULD BE FIRMLY

18    CONVINCED WHEN HE MADE THAT FALSE REPRESENTATION HE

19    WAS ACTING WITH THE INTENT TO DECEIVE OR CHEAT.

20          AND ALSO THE GLOBE OP EVIDENCE ABOUT THE

21    HEDGE FUNDS THAT AGAIN WHEN THE DEFENDANT IS

22    SUBMITTING DOCUMENTS FALSELY CLAIMING GLOBE OP HAS

23    BEEN RETAINED HE'S, WE WOULD SUBMIT HE'S ACTING IN

24    A WAY TO DECEIVE OR CHEAT.

25          ALSO THE EVIDENCE ABOUT SEILER, THE

1    DEFENDANT IS MAKING STATEMENTS TO INVESTORS AND

2    WRITING THAT SEILER IS THE ACCOUNTANTS FOR THE

3    FUND.  THEY ARE NOT.  THAT'S EVIDENCE YOU CAN

4    CONSIDER OF HIS INTENT TO DEFRAUD.

5              AND ALSO IT'S IMPORTANT TO KEEP IN MIND

6    THAT YOU NOT ONLY APPLY YOUR REASON AND COMMON

7    SENSE, YOU CONSIDER ALL THE EVIDENCE AS A WHOLE.

8              YOU CONSIDER ALL OF THESE FALSE

9    STATEMENTS TOGETHER IN CONSIDERING WHETHER OR NOT

10   THE DEFENDANT HAS THIS INTENT TO DEFRAUD THAT HE

11   INTENDED TO DECEIVE OR CHEAT PEOPLE.

12             WE SUBMIT THAT FOR EACH OF THE FALSE

13   STATEMENTS WE WALKED THROUGH, FOR EACH OF THEM HE

14   POSSESSED AN INTENT TO DEFRAUD.  FOR EACH OF THE

15   STATEMENTS HE WAS INTENDING TO DECEIVE OR CHEAT

16   THEM.

17             THEN THE ADDITIONAL EVIDENCE ABOUT THE

18   INTENT TO DEFRAUD.  THE VERY EXPLANATIONS, YOU

19   HEARD SEVERAL INVESTORS TESTIFIED THAT THE

20   DEFENDANT GAVE EXPLANATIONS ABOUT WHY HE COULDN'T

21   RETURN THE FUNDS.

22             YOU HEARD MR. VERDIELL TESTIFY, AND I

23   THINK YOU SAW E-MAILS TO THE EFFECT THAT MR. HU

24   REPRESENTED TO INVESTORS THAT HE COULDN'T GET HIS

25   MONEY BACK.  THERE'S AN E-MAIL EVIDENCE THAT TALKS

1    ABOUT THE WIRING DATE, WE ARE TRYING TO FINALIZE

2    THE WIRING DATE, WHICH WAS ITSELF A FALSE

3    STATEMENT.  THE MONEY IS GONE AT THAT POINT.

4           OTHER STATEMENTS MR. HU MAKES AS THIS

5    SCHEME IS KIND OF FALLING A PART IS EVIDENCE THAT

6    YOU CAN CONSIDER ABOUT HIS INTENT TO DEFRAUD.

7           THERE WAS THE DISCUSSION ABOUT THE K1,

8    THIS IS THE TAX DOCUMENT.  IT WAS A DOCUMENT THAT

9    MR. VERDIELL ASKED FOR BECAUSE IT WAS REQUIRED FOR

10   HIS TAXES WHEN HE INVESTED WITH ALBERT HU.

11          AND IF YOU LOOK AT THOSE QUARTERLY

12   STATEMENTS THAT ALBERT HU SIGNED, THE ONES WITH THE

13   FORGED SIGNATURES ON IT FROM MR. POLLACE, THAT YOU

14   WILL SEE THAT ON THOSE DOCUMENTS THERE'S

15   REPRESENTATIONS MADE THAT HU'S FUNDS WILL PROVIDE

16   THE TAX DOCUMENTS, HE'S PROMISING THAT.  HE NEVER

17   PROVIDES THE K1 FORM.

18          THERE'S VARIOUS EXPLANATIONS.  HE SAYS

19   IT'S READY BUT IT NEVER GOES ON THERE, IT NEVER

20   GETS TO MR. VERDIELL.  YOU CAN CONSIDER THOSE VERY

21   EXPLANATIONS AS EVIDENCE THAT THE DEFENDANT IS

22   ACTING WITH AN INTENT TO CHEAT AND TO DECEIVE.

23          OTHER VARYING EXPLANATION THAT

24   MR. VERDIELL TESTIFIED ABOUT.  THERE WAS AN ISSUE

25   WITH THE U.S. GOVERNMENT THAT WAS BLOCKING THE

1    RETURN OF THE FUNDS, THAT THERE WAS AN ISSUE WITH A

2    BROKER THAT SUPPOSEDLY WAS BLOCKING THE RETURN OF

3    THE FUNDS.  THESE ARE ALL ADDITIONAL VARYING

4    CHANGING STORIES THAT MR. HU IS PROVIDING

5    MR. VERDIELL.  APPARENTLY SOME STATEMENT ABOUT

6    MR. HU TELLS MR. VERDIELL THERE'S AN ISSUE ABOUT

7    BOB LIN BEING WELL KNOWN AND THAT THAT SOMEHOW IS A

8    PROBLEM WITH HIM RETURNING MR. VERDIELL'S MONEY.

9            AGAIN, THE EXPLANATIONS CHANGE AND IT'S

10   EVIDENCE THAT THE DEFENDANT HAD AN INTENT TO

11   DEFRAUD.

12           THERE'S ALSO -- YOU HEARD EVIDENCE FROM

13   GRACE DOONG ABOUT A SEPTEMBER 2008 WEBEX CALL.  YOU

14   MAY RECALL THIS.  MS. DOONG TALKED ABOUT THE FACT

15   THAT SHE AND THIS IS LATE IN THE GAME, MS. DOONG

16   ALSO TESTIFIED THAT I MENTIONED SHE HAD -- ALBERT

17   HU CO-SIGNED THE DOCUMENTS IN A DESPERATE ATTEMPT

18   TO GET HIM TO LIVE UP TO THE PROMISES HE MADE,

19   UNSUCCESSFUL AS IT TURNED OUT.  SHE LOST A LOT OF

20   MONEY.

21           THERE'S A SEPTEMBER 2008 WEBEX CALL, A

22   DOCUMENT IN EXHIBIT 63 RELATED TO GRACE DOONG.

23   THERE'S A WEBEX SORT OF AN INTERNET CALL AND SHE'S

24   TRYING DESPERATELY TO GET HER MONEY BACK.  ALBERT

25   HU IS STILL MAKING FALSE STATEMENTS IN

1    SEPTEMBER 2008.  HE'S MAKING FALSE STATEMENTS.

2    THERE'S REPRESENTATIONS HE MAKES TO INVESTORS THAT

3    HIS FUNDS HAVE A VALUE OF OVER $200 MILLION.  A

4    REPRESENTATION HE'S MAKING IN SEPTEMBER 2008.

5              THIS IS A YEAR AFTER THE -- ALMOST A YEAR

6    AFTER THE OCTOBER 2007 TIME FRAME WHERE HE'S BURNED

7    THROUGH ALL OF MR. VERDIELL AND MR. LIN'S MONEY.

8              AND WHAT DID THE TESTIMONY FROM MS. DOONG

9    INDICATE, THAT SHE ACTUALLY -- SHE DIDN'T GET ANY

10   DOCUMENTS OUT OF THIS CALL BUT SHE TAKES A CAMERA

11   AND SHE TAKES A PICTURE OF THE SCREEN FROM THE

12   WEBEX CALL.  AND IT'S NOT A GREAT COPY, IT'S WHAT

13   WE HAVE IN EXHIBIT 63, YOU SEE A PICTURE THAT WAS

14   TAKEN OF THE SCREEN SHOWING THAT THE DOCUMENT THAT

15   MR. HU IS REPRESENTING THAT THE VALUE OF HIS FUNDS

16   ARE WELL OVER $200 MILLION IN OCTOBER 2008.

17             WHAT DOES IT SHOW?  IT SHOWS A PATTERN OF

18   BEHAVIOR A PATTERN OF FALSE STATEMENTS A PATTERN OF

19   MISREPRESENTATIONS AND THAT'S ALL EVIDENCE THAT YOU

20   CAN CONSIDER IN CONSIDERING WHETHER THE DEFENDANT

21   HAD AN INTENT TO DEFRAUD.

22             ALSO IN TERMS OF WHETHER THE DEFENDANT

23   ACTED WITH INTENT TOY DEFRAUD YOU CAN KEEP AN

24   ACCOUNT OF WHAT WAS MENTIONED IN THE FINANCIAL

25   ANALYSIS.  THE DEFENDANT SPENT INVESTOR'S MONEY ON

1    HIMSELF AND FOR OTHER NON INVESTMENT PURPOSES.

2              THE FACT THAT HE DID NOT DO WHAT HE

3    PROMISED TO DO WITH THE MONEY WHAT HE DID IN

4    WRITING AND ORALLY HE DID NOT INVEST THE MONEY IN

5    HIGH-TECH STOCKS AND IN A LIMITED INSTANCE WITH

6    MR. VERDIELL, IT NEVER WENT TO MR. VERDIELL'S

7    BENEFIT, HE WAS INTENDING TO DECEIVE AND CHEAT

8    PEOPLE.

9              OKAY.  THE FINAL ELEMENT OF WIRE FRAUD IS

10   KNOWINGLY.  THE GOVERNMENT HAS TO PROVE BEYOND A

11   REASONABLE DOUBT THAT THE DEFENDANT KNEW THAT THE

12   PRETENSES, REPRESENTATIONS OR PROMISES WERE FALSE

13   OR FRAUDULENT.

14             IT MEANS WE HAVE TO PROVE AT LEAST ONE OF

15   THE VARIOUS FALSE AREAS OF FALSE PROMISES WE'VE

16   GONE THROUGH, AT LEAST ONE OF THEM THE DEFENDANT

17   KNEW THAT THAT PRETENSE, REPRESENTATION OR PROMISE

18   WAS FALSE OR FRAUDULENT.

19             INSTRUCTIONS INDICATE THAT AN ACT IS KNOW

20   DONE KNOWINGLY IF THE DEFENDANT IS AWARE OF THE

21   FACT AND DOES NOT ACT THROUGH IGNORANCE, MISTAKE OR

22   ACCIDENT.  THE GOVERNMENT IS NOT REQUIRED TO PROVE

23   THE DEFENDANT KNEW THESE ACTS OR OMISSIONS WERE

24   UNLAWFUL.  YOU MAY CONSIDER EVIDENCE OF THE WORDS,

25   ACTS OR OMISSIONS ALONG WITH ALL THE OTHER EVIDENCE

1    IN DECIDING WHETHER THE ACTED KNOWINGLY.

2         SO HOW CAN YOU CONCLUDE ALBERT HU KNEW

3    THE REPRESENTATIONS WERE FALSE?  PRETTY

4    STRAIGHTFORWARD, AND THE GOVERNMENT SUSPECTS THE

5    EVIDENCE IS OVERWHELMING.

6         ALBERT HU RAN THE ASENQUA BETA FUND AND

7    THE FIRESIDE LS FUND.  HE WAS THE MAN IN CHARGE.

8    HE'S THE ONE WHOSE NAME IS ON THE DOCUMENT HE'S IS

9    SIGNING THE INVESTMENT DOCUMENTS.

10        THE SUBSCRIPTION BOOKLETS YOU SEE ALBERT

11   HU'S SIGNATURE ON IT.  HE'S SUBMITTING QUARTERLY

12   STATEMENTS TO INVESTORS, STATEMENTS IN WHICH HE IS

13   SIGNING IN WHICH HE'S INDICATING THAT IN SOME

14   INSTANCES IT SAYS THE CHIEF INVESTMENT OFFICER.

15   HE'S THE CHIEF INVESTMENT OFFICER RUNNING THE

16   INVESTMENTS.  ON OTHER DOCUMENTS ALBERT HU IS

17   SAYING HE'S THE PRESIDENT.  HE'S THE MAN IN CHARGE.

18   HE TELLS INVESTORS HERE, THAT'S THE TESTIMONY, THAT

19   HE WAS THE MAN IN CHARGE.

20        I WILL ALSO CONCLUDE THAT ALBERT HU KNEW

21   HIS REPRESENTATIONS WERE FALSE?  HE CONTROLLED THE

22   MONEY.  YOU HEARD TESTIMONY FROM AGENT FINE SUMMARY

23   TESTIMONY SUMMARIZING DOCUMENT IT IS WHICH WERE

24   ADMITTED INTO EVIDENCE.  THOSE DOCUMENTS SHOW HOW

25   ALBERT HU WAS CONTROLLING THE MONEY HE'S A

1     SIGNATORY ON THE ACCOUNTS.

2           THE INVESTORS, THE INVESTORS IN THIS CASE

3     ARE WIRING MONEY AT ALBERT HU'S DIRECTION, HE'S

4     TELLING THEM WIRE MONEY TO THIS ACCOUNT.  TO

5     ACCOUNTS THAT HE CONTROLS.  BOTH IN THE

6     UNITED STATES AND THEN LATER IN THE SCHEME THE

7     MONEY IS BEING WIRED TO SINGAPORE.

8           THE FACT THAT ALBERT HU CONTROLLED THE

9     MONEY, THE FACT THAT THE PATTERN OF BEHAVIOR THAT

10    YOU SEE, MONEY NOT BEING SPENT FOR INVESTMENT

11    PURPOSES, INSTEAD BEING SPENT ON PERSONAL ITEMS

12    CHECK PERSONS CHECK CARDS COSTCO, STARBUCKS, FRY,

13    ET CETERA, HE USED TO PAY PRIOR INVESTORS, PRIOR

14    INVESTORS WITH ALBERT HU, MORE THAN ONE INSTANCE.

15    MORE THAN ONE INVESTOR.

16          ALBERT HU IS CONTROLLING THE MONEY.  IT

17    SHOWS HE KNEW WHAT HE WAS DOING WAS FALSE.  IF

18    ALBERT HU CONTROLS THE MONEY AND HE SPENDS THE

19    MONEY, HE KNOWS WHEN HE TELLS MR. VERDIELL AND

20    MR. LIN THAT THEIR MONEY HAS EARNED HIGH RATES OF

21    RETURN, HE KNOWS THAT THAT'S FALSE.

22          THAT'S JUST REASON AND COMMON SENSE.  HE

23    HAD DIRECT CONTACT WITH THE INVESTORS, AS I

24    MENTIONED THE WITNESS TESTIMONY AND VARIOUS

25    DOCUMENTS SHOW HE'S THE PERSON IN CHARGE, HE'S THE

1    FRONT MAN.

2           HU PROVIDED FRAUDULENT AND FORGED

3    DOCUMENTS TO INVESTORS DOCUMENTS IN HIS NAME

4    DOCUMENTS HE SIGNED.  NUMEROUS DOCUMENTS PRESENTED

5    AT NUMEROUS TIMES.

6           HU LEASED THE SPACE FOR CASTILLO, LYN,

7    COHEN & VIJAY.  THIS IS THE DOCUMENT WE TALKED

8    ABOUT EARLIER.  HIS SIGNATURE IS ON THAT DOCUMENT.

9    HIS CREDIT CARD IS ON THAT DOCUMENT.

10          THE PARTIES HAVE STIPULATED BEYOND A

11   REASONABLE DOUBT THAT THAT CREDIT CARD NUMBER IS

12   ALBERT HU'S CREDIT CARD NUMBER.  IS IT REALISTIC

13   THAT ALBERT HU DID NOT KNOW THAT THEY WERE RENTING

14   THE CASTILLO, LYN, COHEN & VIJAY SPACE?  NO,

15   BECAUSE IT'S REASONABLE FOR YOU TO INFER HE

16   DIRECTED THE WHOLE PROCESS AS PART OF A PLAN TO

17   CREATE A FAKE AUDITING FIRM TO LULL HIS INVESTORS

18   TO GIVE THEM A FALSE SENSE OF SECURITY THAT THEY

19   COULD TRUST HIM WITH LARGE AMOUNTS OF MONEY BECAUSE

20   SOMEONE ELSE WAS, SOMEONE INDEPENDENT THAT WAS

21   WATCHING IT.

22          ALBERT HU ALSO PROMISED TO RETURN

23   INVESTORS EVEN WHEN THE MONEY WAS ESSENTIALLY GONE.

24   SO TAKING A LOOK AT THIS HE RAN THE FUNDS

25   CONTROLLED THE MONEY HAD DIRECT CONTACT WITH

1    INVESTORS PROVIDED THE FRAUDULENT DOCUMENTS, LEASED

2    THE SPACE, PROMISED TO RETURN THE MONEY EVEN WHEN

3    THE MONEY WAS ESSENTIALLY GONE.

4           THE GOVERNMENT WILL RESPECTFUL I SUBMIT

5    THAT ANY ONE OF THE VARIOUS FRAUDULENT PROMISE THAT

6    IS WE SUBMITTED THAT WE HAVE GONE OVER WOULD BE

7    SUFFICIENT PROVIDING YOU FIND THE OTHER ELEMENTS

8    FOR A VERDICT OF GUILTY, EACH OF THEM THE EVIDENCE

9    ON EACH IS SUBSTANTIAL.

10          AND WHEN VIEWED IN WHOLE, TAKE A LOOK AT

11   THE WHOLE PICTURE, THE WHOLE PATTERN AND BEHAVIOR

12   ALL THE VARIOUS FALSE STATEMENTS, THAT THIS IS BOTH

13   A STRAIGHTFORWARD CASE AND ONE IN WHICH THE

14   EVIDENCE OF ALBERT HU'S GUILTY IS TRULY

15   OVERWHELMING.

16          AND AT THE CLOSE OF THIS CASE, WE WILL

17   RESPECTFULLY SUBMIT THAT YOU SHOULD ENTER A VERDICT

18   OF GUILTY ON ALL SEVEN COUNTS OF WIRE FRAUD.

19          THANK YOU.

20          THE COURT:  ALL RIGHT.  WE WILL TAKE

21   MORNING RECESS FOR 15 MINUTES.

22          (WHEREUPON A RECESS WAS TAKEN.)

23          (WHEREUPON, THE FOLLOWING PROCEEDINGS

24   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

25          THE COURT:  WHAT'S UP?

1           MR. FAZIOLI:  YOUR HONOR, JUST A QUICK

2      ISSUE.

3           WE APPRECIATE THE DEFENSE GAVE US A LIST

4      OF BULLET POINTS FOR THEIR CLOSING AND I WANT TO

5      HIGHLIGHT ONE ISSUE WHICH IS THAT THERE'S

6      REFERENCES TO THE NOBLE LAW GROUP AND PILLSBURY

7      WINTHROP.  AND AS THE COURT MAY RECALL, THE

8      DOCUMENT, THERE WERE CHECKS THAT WERE ADMITTED INTO

9      EVIDENCE, BUT MY UNDERSTANDING WAS, AND THE COURT

10     CAN CORRECT ME, THAT THOSE WERE ADMITTED FOR A VERY

11     LIMITED PURPOSE AND WE WANT TO AVOID A CIRCUMSTANCE

12     WHERE WE MIGHT HAVE TO OBJECT IN TERMS OF REALLY

13     THERE'S REFERENCES IN THE DOCUMENTS AND THEN THERE

14     ARE JUST CHECKS MADE OUT TO A PARTICULAR ENTITY.

15          AND WE WOULD HAVE SOME CONCERNS ABOUT IN

16     LIGHT OF THE FACT THERE WASN'T WITNESS TESTIMONY,

17     ARGUMENT GOING BEYOND THE FACT THERE WERE CHECK AND

18     REFERENCES IN THE DOCUMENTS.  I WANT TO HIGHLIGHT

19     THAT BEFORE THE CLOSE TO POSSIBLY AVOID AN ISSUE.

20          MR. FONG:  YOUR HONOR, I'M NOT QUITE SURE

21     WHAT THE GOVERNMENT'S CONCERN IS AND CERTAINLY THE

22     GOVERNMENT IS FREE TO OBJECT IF I DO ANYTHING

23     IMPROPER.

24          HOWEVER, MY STATEMENT TO THE COURT IS

25     CLEAR, WHAT THOSE CHECKS, THE CHECKS WERE PROOF

1    THAT PAYMENTS WERE MADE TO THIS LAW FIRM.  NOW,

2    WHATEVER INFERENCE PEOPLE WANT TO DRAW FROM THAT,

3    THAT'S CERTAINLY FREE FOR PEOPLE TO ARGUE.  BUT I'M

4    NOT GOING TO SAY THAT THIS CHECK WAS PAID, THE

5    EVIDENCE SHOWS THAT THIS CHECK WAS PAID FOR THE

6    PREPARATION OF THE PPM, FOR EXAMPLE.

7            I'M GOING TO SAY, I'M JUST GOING TO SAY,

8    IT IS WHAT IT IS.

9            THE COURT:  I THINK THAT'S ALL RIGHT.

10           MR. FAZIOLI:  OKAY.

11           (WHEREUPON, THE FOLLOWING PROCEEDINGS

12   WERE HELD IN THE PRESENCE OF THE JURY:)

13           THE COURT:  ALL RIGHT, MR. FONG, DO YOU

14   WISH TO MAKE A CLOSING ARGUMENT?

15           MR. FONG:  YES, I DO.

16

17           **CLOSING ARGUMENTS BY MR. FONG**

18

19           THANK YOU, YOUR HONOR.  MS. GARCIA,

20   MS. FISHER, MR. FAZIOLI, MS. BURNEY AND SPECIAL

21   AGENT FINE.

22           LADIES AND GENTLEMEN OF THE JURY, NOW IS

23   MY OPPORTUNITY TO PRESENT THE CLOSING ARGUMENT ON

24   BEHALF OF DEFENDANT ALBERT HU LET.

25           THINGS LIKE CRIMES LIKE WIRE FRAUD, CAN

1    BE COMPLICATED BOTH LEGALLY AND FACTUALLY.

2    OBVIOUSLY WHAT THE ATTORNEYS ON BOTH SIDES OF THIS

3    CASE HAVE TRIED TO DO IS TO PRESENT THINGS TO YOU

4    IN A WAY THAT HOPEFULLY WILL MAKE THE MOST SENSE

5    FROM EACH SIDE'S PERSPECTIVE.

6            LET ME, BEFORE I BEGIN TALKING TO YOU

7    ABOUT THIS DOCUMENT, THAT DOCUMENT, THIS WITNESS

8    SAID THIS, THAT WITNESS SAID THAT, LET ME KIND OF

9    IF I MAY, PUT THINGS IN A LITTLE BIT OF A COMMON

10   SENSE PERSPECTIVE.

11           NOW IN MY OPENING STATEMENT I SAID TO YOU

12   THAT HEY, YEAH, THERE PROBABLY WERE FALSE

13   STATEMENTS, FALSE REPRESENTATIONS, BUT THE KEY IS

14   WERE THEY MATERIAL?  WERE THEY MATERIAL?  DID THEY

15   HAVE A NATURAL TENDENCY TO INFLUENCE OR WERE

16   CAPABLE OF INFLUENCING NOT JUST THE AVERAGE PERSON

17   THROUGHOUT THE UNITED STATES, BUT AN INVESTOR TO

18   MAKE THE KIND OF INVESTMENT THAT WE HAVE SEEN IN

19   THIS PARTICULAR CASE.

20           WE'RE NOT EVEN TALKING ABOUT AN INVESTOR

21   WHO OCCASIONALLY SETS ASIDE $25, AND I'LL JUST PUT

22   THIS BY A SHARE ON FACEBOOK OR WHATEVER AND

23   HOPEFULLY IT WILL JUST GO THROUGH THE ROOF.

24           THE INVESTORS WERE TALKING ABOUT IN THIS

25   CASE, YOU HEARD THEM ON THE WITNESS STAND,

1    INVESTORS WHO ARE PEOPLE WHO ARE INCREDIBLY SAVVY,

2    WHO HAVE BEEN INCREDIBLY SUCCESSFUL, WHO ARE VERY

3    HIGH-TECH INDUSTRY ORIENTED AND THEY HAVE HAD TRACK

4    RECORDS OF SUCCESS.  THEY HOLD POWERS AND THEY HAVE

5    POSITIONS OF POWER, AUTHORITY AND RESPONSIBILITY.

6              AND MOST OF ALL WE ARE TALKING ABOUT

7    INVESTORS WHO ARE CAPABLE OF MAKING A DECISION OF

8    WHETHER OR NOT SOMETHING IS GOING TO INFLUENCE ME,

9    THE POTENTIAL INVESTOR, IN NOT JUST INVESTING A

10   HUNDRED DOLLARS OR A THOUSAND DOLLARS, NOT EVEN

11   FIFTY THOUSAND DOLLARS, BUT AT THE VERY, VERY

12   LEAST, HUNDREDS OF THOUSANDS OF DOLLARS.  AND AS WE

13   HAVE SEEN IN MR. VERDIELL'S CASE, TWO MILLION

14   DOLLARS IN A SINGLE WIRE TRANSFER.

15             SO WHEN WE TALK ABOUT MATERIALITY AND

16   WHEN WE LOOK AT THIS CASE, IT MUST BE SEEN IN TERMS

17   OF WELL, WHAT IS -- WHAT WOULD NATURALLY INFLUENCE

18   THE DECISION-MAKING PROCESS OF THIS TYPE OF

19   INVESTOR.

20             LET ME TRY TO PUT THINGS IN A LITTLE BIT

21   OF PERSPECTIVE BY GIVING YOU KIND OF A SIMPLE

22   SCENARIO A HYPOTHETICAL SCENARIO.  YOU AND I BOTH

23   WORK FOR THIS COMPANY IN SILICON VALLEY, NOT THE

24   BIGGEST NOT THE SMALLEST, JUST YOUR AVERAGE

25   COMPANY.  AND THE COMPANY HAS A LITTLE EMPLOYEE

1    WEBSITE, EACH PERSON CAN POST HIS OR HER BIO, I'M

2    JOE, I'M JERRY, I'M MARY, I'M STEPHANIE, THIS IS

3    WHAT I DO, DA DA DA DA, OKAY.  I POST MY BIO

4    SECTION IN THE COMPANY WEBSITE, SAY THAT I'M 6'4.

5    IT TURNS OUT MY ACTUAL HEIGHT I LIKE TO SAY 5'9 BUT

6    IT'S REALLY CLOSER TO 5'8, NOT 6'4.

7           NOW IS MY STATEMENT THAT I'M 6'4 INSTEAD

8    OF I'M GOING TO GIVE MYSELF THE BENEFIT OF THE

9    DOUBT HERE, 5'8, IS THAT MATERIAL?  WELL, IT

10   DEPENDS ON THE TARGET AUDIENCE AND THE REASON

11   BEHIND THE CONNECTION.

12          IF YOU ARE LOOKING AT MY BIO THINKING OF

13   ME AS A POTENTIAL DATE OR A POTENTIAL PERSON TO GET

14   INVOLVED IN A PERSONAL RELATIONSHIP, YEAH.  I WOULD

15   SAY WHETHER I'M 6'4 VERSUS 5'8, PROBABLY WOULD HAVE

16   A NATURAL TENDENCY TO INFLUENCE YOUR DECISION OF

17   WHETHER OR NOT YOU WANT TO GET TOGETHER WITH ME.

18          OR IF YOU'RE SURFING THE COMPANY WEBSITE

19   FOR PEOPLE TO JOIN YOUR BASKETBALL TEAM, WHETHER OR

20   NOT I'M 6'4 VERSUS 5'8, WOULD HAVE A NATURAL

21   TENDENCY TO INFLUENCE YOUR DECISION OF WHETHER OR

22   NOT IT'S EVEN WORTHWHILE TO SEND AN E-MAIL SAYING

23   HEY JERRY, DO YOU WANT TO DO THIS?

24          BUT WHAT IF YOU'RE SURFING THE COMPANY

25   WEBSITE TO FIND A FOURTH PERSON FOR A BRIDGE GAME

1    THAT YOU WANT TO HAVE, YOU NEED A FOURTH BECAUSE

2    THE REGULAR FOURTH PERSON DROPPED OUT.  SO YOU SEE

3    JERRY FONG CAN PLAY BRIDGE, AVERAGE INTELLIGENCE,

4    NOW, THE FACT THAT I TRY TO PASS MYSELF OFF AS 6'4

5    VERSUS MY REAL HEIGHT 5'8, BECAUSE THE PURPOSE YOU

6    ARE LOOKING AT THAT INFORMATION, IT WOULD NOT HAVE

7    NEARLY THE NATURAL TENDENCY TO INFLUENCE YOUR

8    DECISION OF WHETHER OR NOT YOU WANT TO CONTACT ME

9    TO BE YOUR FOURTH IN BRIDGE.

10           ESPECIALLY IF FOR WHATEVER REASON YOU'RE

11   A LITTLE BIT DESPERATE THAT WEEKEND, YOU NEED THE

12   FOURTH, YOU ARE COMPETING IN A TOURNAMENT, YOU

13   REALLY REALLY NEED THE FOURTH, JUST ONE BODY, THEN

14   IN TERMS OF MATERIALITY, THE FACT THAT I MISREAD

15   YOU ABOUT BEING 6'4 WOULD NOT BE NEARLY AS

16   MATERIAL.

17           IT WOULD NOT BE THE KIND OF THING THAT

18   WOULD INFLUENCE YOUR DECISION ON WHETHER OR NOT YOU

19   JUST WANT A WARM BODY BECAUSE YOU NEED THE FOURTH

20   PERSON EACH THOUGH IT TURNS OUT HE'S 5'8.

21           SO KEEP THAT SCENARIO IN MIND AS WE GO

22   THROUGH THE EVIDENCE AND THE LAW IN THIS CASE.

23           NOW, YOU WILL GET THE INSTRUCTIONS FROM

24   THE JUDGE AND OF COURSE YOU HAVE ALREADY SEEN SOME

25   OF THE GOVERNMENT'S PRESENTATION OF WHAT THE

1    INSTRUCTIONS WILL SAY.  AND THE INSTRUCTIONS ARE

2    THE LAW THAT YOU MUST FOLLOW.

3              I DON'T WANT TO REPEAT A LOT OF THINGS I

4    JUST WANT TO EMPHASIZE A COUPLE OF THING IT IS.  MY

5    HIGH-TECH HIGHLIGHTING.

6              NOW, I SHOULD PREFACE THIS BY SAYING,

7    LIKE ANYTHING ELSE, THE JURY INSTRUCTION IN LIGHT

8    OF HOW YOU LOOK AT THIS CASE, HOW YOU EVALUATE THIS

9    CASE, ONLY BY KIND OF LOOKING AT THINGS AS AN

10   INTEGRATED WHOLE AND NOT TRY TO ISOLATE ONE BIT

11   HERE AND THERE.

12             AND WHAT I WANT TO DO IN THE NEXT COUPLE

13   SECONDS IS TO KIND OF BRING TOGETHER TWO IMPORTANT

14   CONCEPTS IN TWO DIFFERENT JURY INSTRUCTIONS.

15             THIS ONE IS THE FIRST ELEMENT FOR A WIRE

16   FRAUD CRIME.  NOW, IT JUST SAYS THAT ALL OF YOU

17   MUST UNANIMOUSLY AGREE ON AT LEAST ONE PARTICULAR

18   FRAUDULENT OR FALSE STATEMENT OR REPRESENTATION

19   THAT MR. HU SUPPOSEDLY MADE.  OKAY.

20             AND GOING BACK TO MATERIALITY, IT ISN'T

21   JUST ANY FALSE STATEMENT OR REPRESENTATION, BUT IT

22   MUST BE MATERIAL.  AND AGAIN, I KNOW YOU'VE SEEN

23   THIS BEFORE, BUT MATERIALITY, WHAT IS MATERIALITY?

24             A FALSE OR FRAUDULENT REPRESENTATION OR

25   PROMISE IS MATERIAL IF IT HAD A NATURAL TENDENCY TO

1    INFLUENCE OR WAS CAPABLE OF INFLUENCING A POTENTIAL

2    INVESTOR TO PART WITH MONEY.

3            WE TALKED ABOUT, JERRY FONG, 6'4, IN

4    REALITY 5'8.  NOT SO GREAT IF YOU ARE THINKING OF

5    DATING ME OR HAVING ME ON YOUR COMPANY BASKETBALL

6    TEAM.  NOT NEARLY IMPORTANT IF YOU ARE DESPERATELY

7    NEEDING A FOURTH PERSON FOR BRIDGE.

8            NOW, WHAT IS IMPORTANT IS TO COMBINE WHAT

9    YOU JUST SAW IN TERMS OF JURY INSTRUCTION 14 WITH

10   THE NEXT ONE WHICH IS JURY INSTRUCTION 15.  AND

11   THIS IS A LIST OF, I BELIEVE SEVEN -- SEVEN FALSE

12   STATEMENTS THAT MR. HU HAS BEEN CHARGED WITH

13   COMMITTING IN THIS PARTICULAR CASE.

14           BUT WHAT IS IMPORTANT ABOUT THESE SEVEN

15   STATEMENTS IS THAT IN ORDER TO CONVICT MR. HU, YOU

16   MUST FIND THAT ONE OF THESE STATEMENTS WAS MADE BY

17   MR. HU AND THAT IT WAS FALSE AND THAT MOST

18   IMPORTANTLY, IT WAS MATERIAL.

19           NOW, WHAT THAT MEANS IS THAT YOU ARE

20   LIMITED IN TERMS OF CONSIDERING WHETHER OR NOT TO

21   CONVICT MR. HU BY THESE SEVEN STATEMENTS, SO THAT

22   LET'S JUST SAY MR. HU SAID, I'M 6'4 -- YOU CANNOT

23   SEE, HE'S SITTING DOWN, BUT I WILL REPRESENT TO YOU

24   HE'S NOT 6'4.

25           EVEN IF YOU FIND THAT TO BE A FALSE

1      STATEMENT BECAUSE IT WAS NOT CHARGED, YOU CANNOT

2      CONVICT MR. HU OF ANY CRIME UNLESS ALL 12 OF YOU

3      FIND UNANIMOUSLY THAT MR. HU MADE ONE OF THESE

4      STATEMENTS THAT IT WAS FALSE AND IT WAS MATERIAL.

5              NOW, I KNOW THAT TO GO DOWN THREE EACH

6      AND EVERY ONE WOULD PROBABLY BE VERY TAXING FOR

7      ANYBODY TO FOLLOW.  BUT LET'S JUST TAKE ONE OF THE

8      PROSKAUER LAW FIRM ALLEGATION THAT IT WAS A

9      MISREPRESENTATION ABOUT THE PROSKAUER ROSE LAW FIRM

10     BEING ENGAGED, HAVING BEEN RETAINED AS LEGAL

11     COUNSEL FOR THE FIRESIDE LS FUND.

12             THE TESTIMONY IS UNCONTRADICTED.  THAT

13     DID NOT HAPPEN.  THAT DID NOT HAPPEN.  HOWEVER, WAS

14     IT MATERIAL?  AND LET ME SHOW YOU A CHART THAT I

15     PREPARED WHICH KIND OF SUMMARIZES WHAT I CALL,

16     ATTORNEYS GONE WILD CHART.  IT SHOWS THAT THERE ARE

17     SO MANY SUBSCRIPTION BOOKLETS AND PPM'S IN THIS

18     CASE FOR THIS FUND, FOR THAT FUND.  SO WHAT I

19     THOUGHT I WOULD DO IS SUMMARIZE THEM ALL ON THAT

20     PAGE FOR YOU.  THERE ARE FIVE OF THEM.  THE

21     SUBSCRIPTION BOOKLET AND THE ASENQUA BETA FUND PPM.

22             NOW THE ASENQUA BETA FUND BOOKLET LISTED

23     HELLER ERHMAN LISTED AS THE FIRM FOR THE FUND.  AND

24     THE ASENQUA BETA PPM LISTED THE NOBLE LAW GROUP AS

25     THE ATTORNEY FOR THE FUND.

1           NOW WHAT'S IMPORTANT ABOUT THESE TWO

2    DOCUMENTS WAS THAT THESE WERE THE DOCUMENT THAT IS

3    BOB LIN SAW AND SUPPOSEDLY READ CAREFULLY AND

4    SUPPOSEDLY RELIED ON WHEN HE MADE HIS FIRST THREE

5    INVESTMENTS.  BECAUSE WHAT HE INVESTED IN FIRST WAS

6    THE ASENQUA BETA FUND.  HE DID NOT INITIALLY INVEST

7    IN THE FIRESIDE, SO OF COURSE HE COULD NOT HAVE

8    BEEN GIVEN OR RELIED ON OR READ THE FIRESIDE

9    DOCUMENTS.

10          SO WHAT WAS REPRESENTED TO MR. BOB LIN

11   WHEN HE MADE THE INITIAL INVESTMENTS, WAS HE WAS

12   LISTED AS THE ATTORNEY FOR THE FUND.  AND THE NOBLE

13   LAW GROUP WAS LISTED AS THE ATTORNEY FOR THE FUND

14   IN THE ASENQUA BETA FUND PPM.  TWO DIFFERENT LAW

15   FIRMS JOCKEYING FOR THE SAME POSITION IN TWO

16   DIFFERENT DOCUMENTS GIVEN BY THE ASENQUA BETA FUND

17   PEOPLE, BY MR. HU.

18          NOW LET'S GO BACK TO OUR SCENARIO.  IF I

19   HAD TOLD YOU ON MY WEBSITE THAT I'M 6'4 BUT ALSO

20   LATER ON IN ANOTHER PART OF THE WEBSITE MY LITTLE

21   BIO SECTION I SAY ACTUALLY I'M 5'8.  NOW, IF YOU

22   CARED HOW IMPORTANT IT WAS TO YOU HOW TALL I REALLY

23   AM, YOU WOULD HAVE PICKED OUT THE DISCREPANCY AND

24   YOU WOULD HAVE ASKED QUESTIONS ABOUT IT.

25          NOW, THERE ACTUALLY IS NO PROOF THAT ONE

1    WAY OR THE OTHER THAT HELLER ERHMAN WAS NOT THE

2    ATTORNEY FOR THE FUND.  NO EVIDENCE WHATSOEVER.

3    AND REMEMBER, THE GOVERNMENT HAS THE BURDEN OF

4    PROOF.

5             THE NOBLE LAW GROUP, WHAT YOU HAVE SEEN

6    AS EVIDENCE IS THAT THERE WERE 3 OR 4 CHECKS MADE

7    PAYABLE TO THE NOBLE LAW GROUP.  NOW, THE CHECKS

8    WERE NOT PAID OUT OF THE ASENQUA BETA FUND ACCOUNT.

9    I WILL BE THE FIRST TO ADMIT THAT.  THEY CAME FROM

10   AN ENTITY BY THE NAME OF ASENQUA VENTURES

11   MANAGEMENT.

12            BUT YOU HAVE SEEN SOME OF THE POWERPOINT

13   PRESENTATIONS.  THERE WAS, AND YOU MIGHT REMEMBER,

14   I WILL SHOW IT TO YOU IN A SECOND, THERE WAS AN

15   ASENQUA ORGANIZATIONAL CHART, A FAMILY TREE, IF YOU

16   WILL, IS CLEAR FROM THE EVIDENCE THAT THE ASENQUA

17   ENTITIES WERE NOT ISOLATED ENTITIES.  EACH ONE WAS

18   COMPARTMENTALIZED AND ONE NEVER MET THE OTHER.

19   THEY WERE ALL PART OF THIS ASENQUA FAMILY, FOR LACK

20   OF A BETTER TERM.

21            WHAT WE DO KNOW, WHAT THE EVIDENCE SHOWS

22   IS THAT THE NOBLE LAW GROUP WAS PAID BY AN ASENQUA

23   ENTITY, THE ASENQUA VENTURES MANAGEMENT.

24            WHAT'S INTERESTING IS THAT MR. LIN WAS ON

25   THE STAND FOR QUITE A WHILE.  HE SAID A LOT OF

1    THINGS.  WHAT'S INTERESTING IS THAT HE NEVER

2    TESTIFIED ABOUT WHAT LAW FIRM HE RELIED ON WHEN HE

3    FIRST MADE HIS INVESTMENT.  BECAUSE OF COURSE THAT

4    WOULD HAVE BEEN THE IMPORTANT POINT THAT -- SO NOT

5    WHAT YOU MIGHT DO AFTER YOU HAVE ALREADY MADE THE

6    INVESTMENT.  MR. LIN DID NOT SAY, WELL, I RELIED ON

7    HELLER ERHMAN, I RELIED ON NOBLE LAW GROUP.

8           AND THERE'S PROBABLY GOOD REASON FOR THAT

9    BECAUSE THERE'S NO EVIDENCE THAT EITHER STATEMENT

10   WOULD BE -- IS FALSE.

11          NOW, COMMON SENSE TELLS YOU, WELL, HOW

12   COULD THERE BE TWO LAW FIRMS?  AGAIN, THAT ONLY

13   GOES TO PROVE THAT MR. LIN DID NOT CARE.  HE DID

14   NOT CONSIDER THIS TO BE AN IMPORTANT FACTOR AT ALL.

15   BECAUSE IF HE WAS CONCERNED, HE WOULD HAVE SAID

16   WAIT A MINUTE, HELLER ERHMAN, NOBLE LAW GROUP, HEY

17   ALBERT HU, WHICH ONE IS IT?

18          BECAUSE IF YOU SAW ON MY WEBSITE THAT I'M

19   6'4 ON ONE PAGE AND 5'8 ON THE OTHER AND YOU WANT

20   ME ON YOUR BASKETBALL TEAM OR YOU WANT ME AS A

21   POTENTIAL LIFETIME PARTNER, YOU WOULD SAY JERRY,

22   WHAT IS GOING ON?  YOU WOULD CARE, IT WOULD BE

23   IMPORTANT TO YOU BECAUSE IT WOULD HAVE A NATURAL

24   TENDENCY TO INFLUENCE YOUR DECISION MAKING.

25          THE REASON WHY MR. LIN DID NOT BOTHER

1    SAYING ANYTHING IS BECAUSE QUITE FRANKLY HE DID NOT

2    CARE.  IT WAS NOT IMPORTANT TO HIM.

3         HOWEVER, HE CONVENIENTLY -- NOW, HE

4    TESTIFIED, AND WHEN I SAY CONVENIENTLY, MR. LIN DID

5    NOT GET HIS INVESTMENT BACK.  IT'S UNDERSTANDABLE

6    THAT MR. LIN WOULD WANT TO DO THINGS IN HIS FAVOR.

7         NOW, MR. LIN TESTIFIED THE PROSKAUER ROSE

8    REPRESENTATION WAS SO IMPORTANT, IN FACT, HE

9    TESTIFIED THAT IT WAS ONE OF THE MOST IMPORTANT

10   THINGS ABOUT HIS SUBSCRIPTION OR HIS TRANSFERRING

11   HIS MONEY FROM ASENQUA BETA FUND TO THE FIRESIDE

12   FUND.

13         WELL, WHAT'S INTERESTING IS THAT, OF

14   COURSE, THIS DID NOT COME UP UNTIL WELL AFTER HE

15   HAD ALREADY PUT HIS MONEY IN THE ASENQUA BETA FUND.

16         NOW, WHY WOULD IT BE THAT SOMEHOW AFTER

17   PUTTING IN $450,000, I BELIEVE, $450,000 INTO A

18   FUND BECAUSE YOU CONSIDERED WHO IS THE ATTORNEY TO

19   BE SO IMPORTANT, WHY IS IT THAT SUDDENLY THIS

20   BECAME IMPORTANT BUT NOT THIS AND NOT THIS BEFORE

21   YOU MADE YOUR DECISION TO INVEST IN THE FIRST

22   PLACE?

23         I SUBMIT THAT THE ANSWER IS MR. LIN WAS

24   SIMPLY NOT CREDIBLE WHEN HE SAID, OH, YES, THE

25   PROSKAUER ROSE LAW FIRM, THAT STATEMENT, THAT DID

1    IT FOR ME.

2            NOW, LET'S LOOK A LITTLE BIT FURTHER,

3    OKAY.  LET'S JUST TAKE THAT ON ITS FACE.  NOW, AT

4    THE SAME TIME THAT MR. LIN WAS READING THIS

5    REPRESENTATION ABOUT THE PROSKAUER ROSE LAW FIRM

6    BEING THE ONE AND ONLY TRUE LAW FIRM FOR THE

7    FIRESIDE FUND, OF COURSE HE WOULD HAVE BEEN GIVEN,

8    HE WOULD HAVE READ THE FIRESIDE LS FUND PPM.

9            NOW, HIS TESTIMONY WAS THAT HE DID NOT

10   SAY THAT HE ACTUALLY READ THAT WITH A FINE TOOTH

11   COMB OR ANYTHING.

12           IN FACT -- HE DID NOT SAY THAT HE

13   REMEMBERS ABOUT THE PPM.  HOWEVER, IF THIS WAS SO

14   IMPORTANT TO MR. LIN, WHY WOULD HE NOT HAVE LOOKED

15   AT THE PRIVATE PLACEMENT MEMORANDUM, WHICH ACTUALLY

16   AS YOU HAVE SEEN, CONTAINS THE SUBSTANTIVE

17   WARNINGS, THE CONDITIONS, THE LAWYER LEGAL EASE

18   ABOUT WARNING THIS, WARNING THAT, THIS IS WHAT YOU

19   ARE GETTING INTO.

20           WHY WOULD HE NOT HAVE NOTICED THAT THE

21   FIRESIDE FUND'S PRIVATE PLACEMENT MEMO, WHICH WAS

22   IN EXISTENCE AT THE SAME TIME AS THE SUBSCRIPTION

23   BOOKLET, HAD PILLSBURY WINTHROP LAW FIRM WAS NAMED

24   AS THE LEGAL COUNSEL FOR THE FIRESIDE FUND.  WHY

25   DID MR. LIN NOT CARE THERE WAS A DISCREPANCY

1    BETWEEN THE TWO AND WHY DID HE TESTIFY THE WAY HE

2    DID?

3            THE EVIDENCE SHOWS THAT THERE WERE THREE

4    CHECKS FROM THE ASENQUA VENTURES MANAGEMENT BANK

5    ACCOUNT PAYABLE TO THE PILLSBURY WINTHROP LAW FIRM.

6    AND THE AMOUNT OF MONEY, I BELIEVE, WAS $25,000.

7    THE CHECKS ARE EXHIBITS AND THEY ARE EVIDENCE SO

8    THAT YOU CAN LOOK AT THEM FOR YOURSELF AND DON'T

9    TAKE MY ADDITION.

10           BUT THE EVIDENCE IS THAT PILLSBURY WAS

11   LISTED AS THE ATTORNEY FOR THE FIRESIDE FUND IN THE

12   PPM FOR ANYBODY WHO CARED.  AND THE EVIDENCE IS

13   THAT ASENQUA ENTITIES, THE ASENQUA MANAGEMENT PAID

14   ABOUT $5,000 TO PILLSBURY.

15           SO THAT SHOULD PUT IN PERSPECTIVE WHAT

16   WAS IMPORTANT TO BOB LIN.

17           NOW, THAT IS SIGNIFICANT INFORMATION;

18   HOWEVER, THERE'S A LOT MORE.  BOB LIN TESTIFIED

19   ABOUT HIS TRUE REASONS FOR GETTING INTO THIS

20   INVESTMENT.  HE SAID, LOOK, I WAS REALLY IMPRESSED

21   BY THE OTHER INVESTORS WHO WERE ON THE ROSTER OF

22   THE ASENQUA BETA FUND.

23           HE SPECIFICALLY MENTIONED ONE GENTLEMAN,

24   LONG LIU OR COULD HAVE BEEN -- LIU.  AND THIS

25   GENTLEMAN WAS IMPRESSIVE BECAUSE HE WAS THE OWNER

1    OR THE CHAIR OR THE PRINCIPAL OF A COMPANY CALLED

2    UPSTARCOM.

3            THAT WAS WHAT IMPRESSED MR. LIN.  HE

4    WANTED TO GET IN ON THE INVESTMENT BECAUSE IT WOULD

5    MAKE HIM PRESTIGIOUS AND IT WOULD ALLOW HIM TO SAY

6    THAT HE WAS NOW AFFILIATED WITH THE ASENQUA FAMILY.

7            WHY DO WE KNOW THAT'S IMPORTANT TO HIM?

8    THIS IS EXHIBIT 16, DEFENDANT'S EXHIBIT 16.

9    MR. LIN AS THE CHAIRPERSON OF THIS ORGANIZATION,

10   MONTE JADE WHICH HE SAID WAS A NETWORKING

11   ASSOCIATION FOR ASIAN AMERICAN HIGH-TECH BUSINESS

12   PEOPLE WHOSE MEMBERS IN THIS AREA NUMBER SEVERAL

13   THOUSANDS, MR. LIN WAS THE CHAIRPERSON OR CHAIRMAN

14   IN 2007 WHEN THEY HAD THEIR CONFERENCE AND MR. LIN

15   GAVE A WELCOMING MESSAGE.  AND MR. LIN, THIS IS IN

16   2007, AT LEAST ONE YEAR AFTER HE HAD MADE HIS

17   INITIAL INVESTMENT IN DECEMBER OF 2005 IN THE

18   ASENQUA BETA FUND.

19           WHAT DOES MR. LIN SAY WHO I AM?  I'M YOUR

20   PRESIDENT.  I'M THE FOUNDER OF MULTI DIMENSIONAL

21   VENTURE PARTNERS, MANAGING PARTNER, ASENQUA

22   VENTURES.  MR. LIN WANTED TO BE ASSOCIATED WITH

23   ASENQUA BECAUSE HE THOUGHT THEY WERE AND ARE A

24   BRAND, AND IT'S IMPORTANT AS A NETWORKING KING TO

25   BE INVOLVED IN THAT KIND OF A BUSINESS VENTURE.

1          AND HE SAID I HAVE A LOT OF EXPERIENCE IN

2     STARTUPS BUT I ALSO LIKE THE FACT THAT I WANT TO

3     GET INTO AN AREA WHERE THE VENTURE CAPITAL, THE

4     STARTUP INVESTMENT AND THE HEDGE FUNDS INVESTMENT

5     WOULD KIND OF ACHIEVE THIS INTEGRATION SYNERGY AND

6     EACH SIDE WOULD BE HELPING EACH OTHER.

7          HE WROTE AN ARTICLE IN CHINESE IN ONE OF

8     TAIWAN'S LEADING ECONOMIC PAPERS ABOUT THE SYNERGY

9     ABOUT HOW IT'S GREAT TO HAVE A VENTURE CAPITAL

10    INVESTMENT PORTFOLIO BUT, MAN, IF YOU DID INTEGRATE

11    THE TWO SO THAT INFORMATION WOULD FLOW FROM THE

12    PUBLIC COMPANY INVESTMENT, THE HEDGE FUND ASPECT TO

13    THE STARTUP COMPANY, THE VENTURE CAPITAL ASPECT AND

14    HAVE INFORMATION FLOW BOTH WAYS, BOY, YOU ARE SO

15    MUCH BETTER.

16         THAT'S WHAT HE WAS SELLING.  MR. LIN WAS

17    SELLING HIS ADVICE.  AND IN ORDER FOR HIM TO OBTAIN

18    GREATER CREDIBILITY, GREATER AUDIENCE, HE WAS PROUD

19    TO ANNOUNCE HIMSELF AS THE MANAGING PARTNER OF

20    ASENQUA VENTURES.

21         AND JUST ONE MORE EXAMPLE OF WHAT WAS

22    REALLY GOING THROUGH BOB LIN'S MIND IN TERMS OF WHY

23    HE INVESTED IN THE ASENQUA BETA FUND TO BEGIN WITH

24    AND WHAT WAS IMPORTANT TO HIM, WHAT WAS IT THAT

25    NATURALLY HAD A TENDENCY TO INFLUENCE HIS DECISION

1    MAKING IN MAKING THE DECISION TO INVEST.

2              MR. LIN WAS ASKED ABOUT HIS FAMILIARITY

3    WITH THE MASTER FUND/FEEDER FUND STRUCTURE THAT IS

4    CONTAINED IN THE ASENQUA BETA FUND PPM AS WELL AS

5    THE FIRESIDE FUND PPM, THE MASTER FUND/FEEDER FUND

6    STRUCTURE.

7              MR. LIN ADMITTED ON THE STAND THAT HE

8    ACTUALLY WAS NOT FAMILIAR WITH THAT AT ALL; AND

9    THAT WHEN HE WAS ASKED TO LOOK AT THE PPM ABOUT

10   THAT SECTION THAT DEALS WITH THE MASTER FUND,

11   FEEDER FUND STRUCTURE, HE SAID HE DID NOT RECALL

12   EVER SEEING THAT.

13             AND WHEN ASKED WHY, HE DID NOT PAY ANY

14   ATTENTION TO THAT.  HE SAID, HE TESTIFIED, HE FELT

15   HONORED TO BE ASKED TO JOIN THE ASENQUA FAMILY TO

16   INVEST HIS MONEY AND TO HAVE THAT CONNECTION AND

17   THAT HE WAS SO ANXIOUS, THAT WAS THE WORD HE USED,

18   ANXIOUS TO GET IN ON THE INVESTMENT THAT IT WASN'T

19   IMPORTANT TO HIM.

20             THAT IN A NUT SHELL IS WHAT THIS CASE IS

21   ABOUT.  IT IS NOT ABOUT THE CASTILLO, LYN, COHEN &

22   VIJAY CPA FIRM THAT DID NOT EXIST.  IT IS NOT ABOUT

23   THE GLOBEOP FUND ADMINISTRATOR.  IT'S NOT ABOUT ANY

24   OF THOSE THINGS THAT ARE CHARGED IN THE

25   GOVERNMENT'S INDICTMENT, BUT RATHER BOB LIN WANTED

1    DESPERATELY TO GET IN ON THE INSIDE BECAUSE THAT

2    WOULD ALLOW HIM TO HAVE MORE ACCESS TO PEOPLE LIKE

3    THIS GENTLEMAN, LONG LIU, WHO WAS THE HEAD OF

4    UTSTARCOM.

5         WHICH BY THE WAY WAS THE SAME REASON

6    MR. VERDIELL TESTIFIED TO AS TO ONE OF THE FACTORS

7    THAT INFLUENCED HIS DECISION TO INVEST IN FIRESIDE.

8    HE SPECIFICALLY MENTIONED THIS GENTLEMAN.  HE

9    DIDN'T KNOW HIS FULL NAME BUT HE DID SAY HE WAS THE

10   PRINCIPAL OR THE OWNER OF THIS COMPANY, UTSTARCOM.

11        SO IT IS THE INSIDER CONNECTION THAT WAS

12   IMPORTANT TO BOB LIN.

13        NOW, BOB LIN, LET'S NOT -- LET'S NOT GO

14   LIGHT ON THIS.  BOB LIN WAS AN INSIDER.  NOT ONLY

15   DID HE PASS HIMSELF OFF AS THE MANAGING PARTNER,

16   NOT JUST A PARTNER BUT THE MANAGING PARTNER OF

17   ASENQUA VENTURES, AS YOU HEARD IN HIS TESTIMONY, HE

18   DID THAT IN SEVERAL DIFFERENT PLACES.

19        HE ALSO TRAVELLED WITH THE ASENQUA AND

20   FIRESIDE FUND MANAGER, STEVEN BOND.  THE GOVERNMENT

21   IN ITS CLOSING ARGUED THAT MR. HU WAS A ONE-PERSON

22   SHOW.  MR. BOND WAS THE PERSON WHO IMPRESSED

23   MR. VERDIELL AND WE WILL GET TO THAT IN A SECOND.

24        AS YOU HAVE SEEN IN THE POWERPOINT

25   PRESENTATIONS, THERE WERE A LOT OF ASENQUA RELATED

1    ENTITY IT IS ALL OVER THE WORLD AND THERE WERE A

2    LOT OF PEOPLE INVOLVED.  IT WAS NOT THE EVIDENCE

3    SHOWS THAT IT WAS NOT A ONE-PERSON SHOW.

4         NOW, BOB LIN TRAVELLED THROUGHOUT ASIA

5    WITH MR. BOND AND ON OCCASION WITH MR. HU.  USE

6    YOUR COMMON SENSE.  IF YOU ARE JUST AN ARM'S LENGTH

7    INVESTOR, DO YOU GO TRAVELLING IN THE FAR EAST OR

8    IN EUROPE OR AFRICA OR IN ANTARCTICA TO PROMOTE AND

9    PITCH THE VIRTUES OF THE VARIOUS ASENQUA ENTITIES

10   OR OTHER ASENQUA PRODUCTS OR SERVICES, IF YOU WILL,

11   THAT'S COVERED BY THE ASENQUA FAMILY TREE.

12        THE COMMON SENSE SHOULD TELL YOU THAT NO,

13   YOU DON'T DO THAT UNLESS YOU ARE TRULY PART OF THE

14   TEAM.  AND BOB LIN BY THE WAY WAS LISTED AS ONE OF

15   THE TEAM MEMBERS OF THE ASENQUA VENTURE MANAGEMENT

16   GROUP.  BOB LIN GOT NOT ONLY REIMBURSED FOR HIS

17   TRAVEL EXPENSES, WHICH OF COURSE IS REASONABLE AND

18   EXPECTED, THE EVIDENCE WILL SHOW THAT ONE OF THE

19   CHECKS AND IT'S ALREADY IN EVIDENCE SO YOU CAN SEE

20   IT AS PART OF, I THINK IT WAS THE LAST CHECK OF

21   DEFENDANT'S EXHIBIT 1, IT'S A SERIES OF CHECKS OF

22   REIMBURSEMENT CHECK THAT IS BOB LIN RECEIVED FROM

23   THE ASENQUA PEOPLE, ONE OF THEM WAS FOR A $3,000

24   MEDICAL COPAYMENT.

25        AGAIN, IF YOU ARE JUST DOING A FRIEND A

1     FAVOR AND YOU DRIVE OUT TO SAN FRANCISCO FOR YOUR

2     FRIEND, HE OR SHE MIGHT REIMBURSE YOU FOR YOUR GAS

3     AND MAYBE BUY YOU A NICE CUP OF COFFEE TO SAY

4     THANKS.  THAT FRIEND WILL NOT PAY $3,000 OF YOUR

5     HEALTH CARE COPAYMENT.  BOB LIN WAS PART OF THE

6     ASENQUA FAMILY.  HE KNEW EXACTLY WHAT WAS GOING ON.

7             AND NOW, HOW DO WE KNOW THAT?  IF WE LOOK

8     AT -- THE VERY NATURAL QUESTION WOULD BE, WHAT

9     ABOUT THE PERFORMANCE OR RETURN RATE ON THESE

10    THINGS IN THE GOVERNMENT HAS ARGUED THESE ARE

11    FALSE, FALSE, FALSE.  BECAUSE IF YOU REALLY LISTEN

12    TO THE GOVERNMENT'S ARGUMENT, WHAT THE GOVERNMENT

13    IS SAYING IS THAT BECAUSE -- THERE ARE TWO REASONS

14    FOR THAT.  THE CASTILLO AUDITED REPORT BECAUSE THE

15    CASTILLO CPA FIRM DID NOT EXIST, THEREFORE THE

16    UNDERLYING NUMBERS IN THIS REPORT WERE FALSE OR

17    FRAUDULENT.

18            THERE IS ACTUALLY NO EVIDENCE OF THAT

19    WHATSOEVER.  AND WE WILL GET TO THE GOVERNMENT'S

20    CHART OF CHASING WHERE THE MONEY WENT IN A SECOND.

21    BUT I WANT YOU TO REMEMBER THAT THERE ACTUALLY IS

22    NO EVIDENCE WHATSOEVER THAT THE NUMBERS ARE FALSE.

23            HOWEVER, HERE'S WHAT WE DO KNOW.

24    EXHIBIT -- DEFENDANT'S EXHIBIT 504 WHICH IS IN

25    EVIDENCE WHICH IS THE SEPTEMBER 2004 POWERPOINT

1  THAT BOB LIN WAS GIVEN BEFORE HE MADE HIS DECISION

2  TO INVEST AND HE SAID HEY, THIS HAD A NATURAL

3  TENDENCY TO INFLUENCE MY DECISION.

4          AND IN FACT THE GOVERNMENT IN ITS CLOSING

5  REFERENCED THIS.  THE ASENQUA CAPITAL MANAGEMENT

6  RETURN RATE SHOWING A REALLY GOOD PERFORMANCE

7  STARTING IN THE YEAR 2000 -- THAT WAS A LOW YEAR

8  BUT IT JUMPED IN 2001 AND HAD SPECTACULAR RETURNS

9  IN 2002 AND 2003.

10          THE GOVERNMENT'S ARGUMENT IS WELL, IF

11  THESE -- BECAUSE THESE NUMBERS WERE ASSOCIATED WITH

12  THE CASTILLO AUDIT REPORT, THEY MUST BE FALSE.

13  THEY MUST BE.  AGAIN, THERE'S NO EVIDENCE THAT THE

14  NUMBERS IN THE CASTILLO REPORT IS FALSE.

15          SO THE GOVERNMENT SAYS, WELL, THIS IS

16  FALSE; HOWEVER, IN AUGUST OF 2006 AFTER BOB LIN

17  JOINED THE ASENQUA FAMILY ABOUT THE TIME THAT HE

18  WAS BECOMING MORE INVOLVED, HE ATTENDED MEETINGS --

19  YOU WILL REMEMBER HIS TESTIMONY, HE ATTENDED

20  ASENQUA VENTURES INVESTMENT STRATEGY MEETINGS, HE

21  CAME UP WITH IDEAS, HE MADE RECOMMENDATIONS.

22          BOB LIN TESTIFIED THAT YES, HE GAVE HIS

23  APPROVAL TO BE INCLUDED IN THE ASENQUA CAPITAL

24  GROUP'S POWERPOINT WHICH IS EXHIBIT 505 WHICH IS

25  DATED AUGUST 2006.

1          NOW, THIS IS A DOCUMENT THAT BOB LIN

2     HIMSELF TESTIFIED TO THAT YES, I KNOWINGLY AND

3     VOLUNTARILY ASSOCIATED MYSELF TO THIS POWERPOINT

4     PRESENTATION BECAUSE AMONG OTHER THINGS, BOB LIN IS

5     LISTED AS PART OF THE ASENQUA VENTURES MANAGEMENT

6     TEAM ON PAGE TWO.

7          AND ACTUALLY, I WILL TAKE A MOMENT TO

8     SHOW YOU, THIS IS THE FAMILY TREE I'M TALKING ABOUT

9     LINKING THE VARIOUS ASENQUA ENTITIES TOGETHER

10    INCLUDING, AS YOU WILL SEE IN THE MIDDLE ON THE

11    BOTTOM THERE, ASENQUA VENTURES MANAGEMENT SEAN

12    VERAH, BOB LIN, FRANK FRANZILLA THEY ARE THE

13    ASENQUA MANAGEMENT TEAM.

14         AND AGAIN, BOB LIN SAID, OF COURSE, I

15    APPROVE OF MY NAME APPEARING ON THIS POWERPOINT.

16         NOW, WHAT'S INTERESTING IS THAT IN THIS

17    SAME POWERPOINT A COUPLE PAGES LATER ON PAGE EIGHT,

18    YOU SEE THE SAME PERFORMANCE NUMBERS THAT WERE

19    CONTAINED IN THE 2004, THE SEPTEMBER 2004

20    POWERPOINT PRESENTATION THAT BOB LIN SAID HE HAD

21    SEEN AND HE RELIED ON IT.  THE SAME NUMBERS FROM

22    2000 TO 2003 THE NUMBERS ARE IDENTICAL.  NOW OF

23    COURSE, UNDERSTANDABLY 2004 AND 2005 HAD NOT

24    HAPPENED YET OR AT LEAST THE NUMBERS WEREN'T IN YET

25    AT THE TIME MR. LIN MADE HIS DECISION TO INVEST.

1          BUT MR. LIN HAD ABSOLUTELY NO PROBLEM

2     PUTTING HIS NAME ON A POWERPOINT PRESENTATION WHERE

3     HE WAS NAMED AS A TEAM MEMBER OF THE ASENQUA

4     VENTURES MANAGEMENT TEAM, HAD NO PROBLEM, AND THIS

5     WAS GOING TO BE SEEN BY PERSPECTIVE INVESTORS JUST

6     LIKE MR. LIN HAD BEEN A COUPLE YEARS EARLIER.

7          MR. LIN HAD NO PROBLEM SAYING, THE

8     FIRESIDE FUND IN 2001, AND FIRESIDE OF COURSE WAS

9     THE SUCCESSOR, WHO WAS ORIGINALLY THE ASENQUA BETA

10    FUND AND IT TURNED INTO FIRESIDE.  SO THESE ARE THE

11    ASENQUA BETA FUND 2001, 40 PERCENT, 2002, 30 PLUS

12    PERCENT, 2003, 34 PLUS PERCENT.

13         BOB LIN HAD NO PROBLEM AFTER HE HAD BEEN

14    INVOLVED WITH ASENQUA FOR OVER A YEAR, THAT HE

15    WOULD VALIDATE THESE NUMBERS.

16         NOW, IT'S CERTAINLY COMMON SENSE TO ASK,

17    WELL, HOW DO WE KNOW THAT HE ACTUALLY DID THE DUE

18    DILIGENCE AND INSPECTED THE BOOKS HIMSELF SO THAT

19    HE WAS REALLY VOUCHING FOR SOMETHING THAT HE WAS

20    SURE OF?

21         THE BETTER QUESTION IS, LET'S LOOK AT WHO

22    BOB LIN IS.  HE WAS NOT A 15-YEAR OLD HIGH SCHOOL

23    STUDENT WHO WAS JUST GLAD TO SEE HIS NAME

24    ASSOCIATED WITH SOMETHING THAT WAS KIND OF COOL AT

25    LEAST WITHIN HIS FRAME OF REFERENCE.  BOB LIN IS A

1    VENTURE CAPITAL GURU.  HE GAVE LECTURES THROUGHOUT

2    THE WORLD WITH THE NATIONAL UNIVERSITY OF

3    SINGAPORE, THROUGH THE MONTE JADE NETWORKING GROUP

4    OF SEVERAL THOUSAND HIGH-TECH BUSINESS

5    PROFESSIONALS.

6         BOB LIN WOULD NOT PUT HIS NAME ON

7    SOMETHING WITHOUT HIM BEING VERY CONFIDENT THAT

8    HEY, THIS IS NOT GOING TO TARNISH MY NAME.  AGAIN,

9    THERE ACTUALLY IS NO EVIDENCE THAT THOSE NUMBERS

10   WERE FALSE.

11        AND JUST TO TIE IT ALL TOGETHER, THE --

12   YOU SEE THE NUMBERS FOR THE 2002, 2003, 30-PLUS

13   PERCENT, THESE ARE ACTUALLY THE BOTTOM LINE FIGURES

14   IN THE INFAMOUS CASTILLO AUDITED REPORT.

15        IF YOU LOOK AT PAGE TWO OF THE REPORT,

16   THIS IS THE CASTILLO REPORT, YOU CAN SEE THE COLUMN

17   TO THE RIGHT OF YOUR VIEW, ON THE RIGHT EDGE IS

18   2003, RETURN PERFORMANCE.  AND 2004 IT'S THE COLUMN

19   TOWARD THE MIDDLE.

20        AND YOU WILL SEE THAT THESE NUMBERS ARE

21   VERY SIMILAR, NOT IDENTICAL, BUT SIMILAR TO THE

22   NUMBERS THAT YOU SEE IN THE FIRESIDE LS FUND

23   PERFORMANCE IN EXHIBIT 505, WHICH BOB LIN HAPPILY

24   PUT HIS NAME ON.

25        I FEEL LIKE IT'S ONE OF THOSE

1074

1    COMMERCIALS, BUT WAIT, THERE'S MORE.  HOW DO WE --

2    WHAT EVIDENCE IS THERE THAT THE, THAT THERE

3    ACTUALLY WERE TRADING ACTIVITIES, STOCKS BEING

4    PURCHASED, THAT IT WAS NOT AS THE GOVERNMENT WANTS

5    YOU TO KNOW, MONEY THAT CAME IN OR GOT DISSIPATED

6    OR FOR WHATEVER PERSONAL REASONS OR WHATEVER.

7            MR. VERDIELL TESTIFIED, AND MR. VERDIELL

8    AGAIN, IS A VERY SAVVY SUCCESSFUL BUSINESS PERSON,

9    HIS STARTUP COMPANY, LIGHT LOGIC WAS ACQUIRED BY

10   INTEL AND EVEN A NON TECH PERSON LIKE ME HAS HEARD

11   OF INTEL.  IT WAS ACQUIRED BY INTEL FOR

12   $400 MILLION.  HE'S VERY SUCCESSFUL, HE'S VERY

13   SAVVY, HE KNOWS WHAT HE'S DOING.

14           MR. VERDIELL TESTIFIED THAT SOME TIME

15   LATE IN THE 2007 HE, BECAUSE HE WAS HAVING SOME

16   CONVERSATION WITH BOB LIN, HE BECAME CONCERNED

17   ABOUT THAT VERY QUESTION, WHETHER OR NOT THERE WAS

18   REALLY TRADING ACTIVITIES THERE WAS REALLY AN

19   INVESTMENT FUND, THERE WAS ANY OF THESE THINGS.

20   AND REMEMBER, BOB LIN HAD ASKED TO WITHDRAW HIS

21   MONEY IN NOVEMBER OF 2007.

22           SO NOW, WHAT DID MR. VERDIELL DO?  HE

23   VERY REASONABLY, HE ASKED FOR A SIT DOWN.  HE ASKED

24   FOR KIND OF A SHOW ME THE MONEY MEETING WITH

25   MR. BOND, THE PLAN MANAGER, AND MR. HU.  AND THAT

1    TOOK PLACE IN THE DECEMBER OF 2007.

2            NOW, MR. VERDIELL TESTIFIED, NOT ANYBODY

3    ELSE, MR. VERDIELL TESTIFIED THAT HE WAS SKEPTICAL,

4    HE WAS CONCERNED WHEN HE ATTENDED THIS MEETING.  HE

5    SAT DOWN WITH MR. BOND AND MR. HU ON THIS KIND OF

6    SHOW ME THE MONEY MEETING.

7            NOW, WHAT MR. VERDIELL TESTIFIED TO WAS

8    NOT THAT HE WAS JUST SIMPLY GIVEN SOME MORE

9    LATITUDE OH, YES YOUR INVESTMENT WAS GOING ON, IT'S

10   DOING GREAT.  THAT MIGHT HAVE GONE ON, THAT COULD

11   HAVE BEEN SAID.

12           BUT WHAT MR. VERDIELL TESTIFIED TO WAS

13   THAT HE WAS ACTUALLY SHOWN THE ACTUAL TRADES BY THE

14   FIRESIDE FUND.  HE WAS TALKING ABOUT THERE WERE

15   ABOUT TEN PAIRS THAT LONG, SHORT STRATEGY WHERE THE

16   FUND WOULD INVEST IN TWO COMPANIES IN THE SAME

17   INDUSTRY HOPING ONE OF THEM WOULD HOLD LONG AND ONE

18   OF THEM WOULD SELL SHORT.

19           HE SAID HE SAW ABOUT TEN PAIRS OF THIS

20   KIND OF TRADING AND HE CAME AWAY WITH IN HIS WORDS

21   SATISFIED.  AND HE WAS SUSPICIOUS OR CONCERNED

22   GOING IN.  HE SAID COMING OUT I WAS SATISFIED

23   BECAUSE MR. BOND THE FUND MANAGER AND MR. HU HAD

24   PASSED WITH FLYING COLORS.  THOSE WERE HIS WORDS,

25   PASSED WITH FLYING COLORS.

1        COMMON SENSE WOULD TELL YOU THAT FOR A

2    PERSON AS SAVVY AND AS EXPERIENCED AND AS

3    SOPHISTICATED AS MR. VERDIELL, A POWERPOINT

4    PRESENTATION WITH NOTHING BEHIND IT WOULD NOT HAVE

5    SATISFIED HIM AT THAT POINT.  HE WANTED THE ACTUAL

6    NITTY-GRITTY.  HE WANTED, AS BOB LIN SAID, YOU GOT

7    TO LOOK AT THE BOOKS.  WHICH MR. VERDIELL, AFTER

8    THE SHOW ME THE MONEY MEETING, CAME AWAY WITH BEING

9    SATISFIED AND SAYING THAT THEY PASSED WITH FLYING

10   COLORS.

11        OF COURSE, HE SUBSEQUENTLY BECAME

12   DISSATISFIED.  THE POINT IS, THOUGH, THAT WHAT IS

13   IN EVIDENCE IS THE FACT THAT MR. VERDIELL WAS SHOWN

14   THE ACTUAL TRADING ACTIVITIES OF THE FIRESIDE FUND

15   AND HE CAME AWAY BEING TOTALLY SATISFIED.

16        NOW, THE GOVERNMENT SPENT A LOT OF TIME

17   TRACING THE MONEY, SHOWING THAT SAY, THE HUNDRED

18   THOUSAND DOLLARS THAT MR. LIN HAD FIRST PUT INTO

19   THE ASENQUA BETA FUND WHO ACTUALLY, THAT HE WIRED

20   TO AN ACCOUNT AT MR. HU'S REQUEST, HAD BEEN USED

21   FOR NONTRADING PURPOSES.

22        AND THE GOVERNMENT GOES, SEE, THAT SHOWS

23   THAT THERE WAS NO REAL INVESTMENT FUND, THAT HE WAS

24   ALL A FRAUD.  EXCEPT THE DOCUMENT, THE PPM FOR BOTH

25   THE ASENQUA BETA FUND AND THE FIRESIDE FUND, THEY

1    ACTUALLY DO NOT SAY THAT IF YOU GIVE ME A THOUSAND

2    DOLLARS I, THE FUND MANAGER, WILL ACTUALLY TAKE

3    THAT MONEY AND BUY FIVE SHARES OF STOCK IN THIS

4    COMPANY AND TEN SHARES OF STOCK IN THAT COMPANY AND

5    15 SHARES IN THAT COMPANY.  THAT'S WHAT YOU WOULD

6    DO WITH A PRIVATE BROKER.  THAT'S NOT WHAT A HEDGE

7    FUND IS.

8             THE DOCUMENTS ARE CLEAR.  WHAT THESE TWO

9    HEDGE FUNDS WERE, WERE LIMITED PARTNERSHIPS WHERE

10   INVESTORS WOULD PUT IN A CERTAIN AMOUNT OF MONEY,

11   INVESTORS LIKE MR. VERDIELL, MR. LIN, AND OTHERS

12   INCLUDING THE PERSON THAT THEY BOTH RESPECT SO

13   MUCH, MR. HONG LU, THEY PUT IN THEIR MONEY IN THIS

14   FUND AND IT FORMS A POOL OF MONEY AND THAT POOL OF

15   MONEY ULTIMATELY WILL GET ACTUALLY IN THIS CASE,

16   NOT EVEN NECESSARILY INVESTED AND TRACED AND WHAT

17   NOT.

18             OF COURSE YOU HAVE SEEN IN THE DOCUMENT,

19   AND I WILL SHOW YOU IN A SECOND THAT THE ASENQUA

20   BETA FUND FOR EXAMPLE AND THE FIRESIDE LS FUND,

21   THEY ARE NOT MEANT TO BE AND THE DOCUMENTS DO NOT

22   SAY THAT THESE FUNDS WOULD BE THE FUNDS THAT WOULD

23   ACTUALLY BE CONDUCTING TRADING ACTIVITIES.

24             THAT NO, THE ASENQUA BETA FUND AND THE

25   FIRESIDE LS FUND WOULD EACH BE PART OF A SMALLER

1    PART OF A MASTER FUND.

2              AND MR. LIN ADMITTED ON THE STAND THAT

3    EVEN WITH WHAT HE CLAIMS TO BE LIMITED

4    UNDERSTANDING, THE MASTER FUND WOULD BE BIGGER THAN

5    THE FEEDER FUND.  SO THAT -- THERE'S ABSOLUTELY NO

6    EVIDENCE WHATSOEVER THAT THERE'S NOT A MASTER FUND,

7    THAT IT WAS NOT -- WHERE TRADING WAS TAKING PLACE.

8              THE ONLY THING THE GOVERNMENT'S EVIDENCE

9    SHOWS IS THAT THE MONEY THAT WAS WIRED TO MR. HU

10   GOT SPENT FOR PURPOSES OTHER THAN DIRECTLY MAKE

11   BEING THE INVESTMENT.

12             AND I SUBMIT TO YOU THAT THE WAY HEDGE

13   FUND WAS SET UP IN THIS CASE, THE LIMITED

14   PARTNERSHIP CONTEXT, THAT IT WAS NOT ABOUT IF YOU

15   GIVE ME A THOUSAND DOLLARS, I PUT THAT IN A SHOE

16   BOX, I RUN TO APPLE TO BUY SEVEN SHARES, TO GOOGLE

17   AND BUY SEVEN SHARES, TO PACBELL AND BUY FIVE

18   SHARES.  IT DOESN'T WORK THAT WAY.  THE MONEY GETS

19   PUT INTO A POOL.

20             AND THE DOCUMENTS ARE CLEAR THAT THE FUND

21   MEANING THE ASENQUA BETA FUND AND THE FIRESIDE FUND

22   WOULD INVEST SUBSTANTIALLY MOST OF ITS ASSETS INTO

23   THE MASTER FUND.

24             NOW THERE'S ABSOLUTELY NO EVIDENCE OF

25   WHAT PART, WHAT PERCENTAGE OF THE ASENQUA BETA FUND

1    BOB LIN'S MONEY OR MARK VERDIELL'S MONEY MADE UP.

2    BECAUSE ONE THING WE DO THINK, THERE'S A LOT OF

3    EVIDENCE ABOUT THE FACT THAT THERE WERE A LOT OF

4    OTHER HIGH POWERED INVESTORS, A LOT OF HEAVY

5    HITTERS.  PEOPLE LIKE MR. VERDIELL WHO WOULD THINK

6    OF NOTHING BUT TO TRANSFER $2 MILLION ON ONE DAY

7    JUST LIKE THAT.

8              SO WHAT WE DO KNOW BECAUSE MS. DOONG

9    TESTIFIED TO THIS, IS THAT WE HAVE EVIDENCE THAT

10   ACCORDING TO MR. HU, THAT THERE WAS A FUND OF

11   $200 MILLION OUT THERE.

12             NOW THE GOVERNMENT HAS NOT DISPROVED THAT

13   IN ANY WAY.  THE GOVERNMENT CERTAINLY WANTS YOU TO

14   DRAW INFERENCES, WHICH THE GOVERNMENT IS ALLOWED TO

15   DO.  AND THE GOVERNMENT SAID, WELL, WHY MAKE UP THE

16   CPA FIRM IF THERE WAS REALLY A FUND?

17             AGAIN, THE CASTILLO CPA FIRM IS REALLY A

18   RED HERRING IN THAT THERE'S NO PROOF THAT THE

19   NUMBERS THEMSELVES AND THAT'S WHAT'S IMPORTANT, THE

20   NUMBERS THEMSELVES ARE FALSE.

21             AGAIN, WE SEE THAT MR. VERDIELL SAW THE

22   ACTUAL TRADING AND WAS SATISFIED.  BOB LIN HAD NO

23   PROBLEM PUTTING HIS NAME ON THOSE SAME NUMBERS.

24   BUT IF THE -- GOING BACK TO MATERIALITY, IF THE

25   FACT THAT THIS WAS NOT A TRUE CPA FIRM WAS SO

1    IMPORTANT TO MR. LIN OR MR. VERDIELL, AGAIN, THEY

2    ARE NOT 15-YEAR OLD TEENAGERS, THEY ARE

3    SOPHISTICATED, SAVVY SUCCESSFUL BUSINESS PEOPLE.

4         IF THAT WAS IMPORTANT TO THEM, ALL THEY

5    HAD TO DO WAS TO GO ON THE WEBSITE.  YOU HEARD THE

6    TESTIMONY FROM THE GENTLEMAN FROM THE ACCOUNTANCY

7    BOARD OF THE STATE OF CALIFORNIA, THAT ANYBODY WITH

8    INTERNET ACCESS, ABOUT SEVEN CLICKS, I BELIEVE, 5,

9    7 CLICKS AND TYPING IN THE WORDS CASTILLO, LYN,

10   COHEN & VIJAY OR COMBINATIONS THERE OF, COULD HAVE

11   DISCOVERED THERE WAS NO SUCH CERTIFIED ENTITY IN

12   THE STATE OF CALIFORNIA.

13        THE REASON WHY THAT WAS NOT DONE BY THESE

14   TWO VERY SAVVY PROFESSIONAL BUSINESS PEOPLE IS THAT

15   BECAUSE IT JUST WASN'T THAT IMPORTANT.  WHAT WAS

16   IMPORTANT TO THEM WAS THE FACT THAT IT WAS A HEDGE

17   FUND THAT WAS ASSOCIATED WITH A LOT OF PROMINENT

18   BUSINESS PEOPLE, A LOT OF NAME RECOGNITION.  THEY

19   WANT TO JOIN THE BAND WAGON.

20        AND IN FACT, MR. LIN WHEN HE WAS

21   TESTIFYING ABOUT HIS PHILOSOPHY OF DUE DILIGENCE

22   ABOUT INVESTING IN HIS START UP, HE WAS ASKED WELL,

23   DO YOU CHECK EVERYTHING THAT WAS REPRESENTED TO YOU

24   BEFORE YOU MAKE A DECISION TO INVEST IN A START UP.

25   HE SAID, WELL, YEAH YOU TRY TO, BUT ULTIMATELY

1    THERE ARE REALITIES AT WORK HERE.

2              HE GAVE A PERFECT EXAMPLE.  HE SAID IF

3    THERE'S A PERFECT COMPANY THAT I CONSIDER TO BE

4    REALLY HOT, REALLY HAVE THE POTENTIAL OF BEING

5    SPECTACULAR AND THERE ARE A LOT OF COMPETING PEOPLE

6    WHO WANT TO FUND THAT PARTICULAR START UP, YOU GOT

7    TO GET IN THERE, YOU GOT TO JUST OVER LOOK CERTAIN

8    THINGS, YOU JUST WANT TO GET IN AND BEAT THE

9    COMPETITION BECAUSE YOU COULD BE LEFT OUT IN THE

10   COLD IN TERMS OF NOT BEING ABLE TO INVEST IN THE

11   NEXT GOOGLE, THE NEXT FACEBOOK.

12             AND THAT'S EXACTLY WHAT HAPPENED HERE.

13   MR. LIN WAS AFRAID HE WAS BE ACED OUT.  AND THERE'S

14   PROOF OF THAT BECAUSE THE LAST INVESTMENT THAT HE

15   MADE, THE $250,000 THAT WENT INTO THE FIRESIDE

16   FUND, I BELIEVE IT HAPPENED IN THE MIDDLE OF 2007,

17   THAT WAS NOT DONE FOR ANY REASON OTHER THAN MR. LIN

18   SAID THAT WELL, I WAS THE -- I WAS TOLD BY MR. HU

19   THAT I WAS THE LOWEST, THE SMALLEST INVESTOR IN OUR

20   LITTLE GROUP AND I DID NOT LIKE THAT.  I DID NOT

21   WANT TO DRAG DOWN EVERYBODY ELSE.  I WANT TO BE ON

22   A PAR WITH THE BIG BOYS AND GIRLS.

23             THAT IS AS GOOD OF A STATEMENT OF WHAT

24   WAS IMPORTANT TO MR. LIN, WHAT HAD THE NATURAL

25   TENDENCY TO INFLUENCE HIS DECISION MAKING BECAUSE

1    HE SAID THAT WAS WHY I MADE THIS FINAL $250,000

2    INVESTMENT SO THAT I COULD BRING MY INVESTMENT UP

3    TO A MILLION DOLLARS AND I COULD CLAIM THAT I COULD

4    AT LEAST BE ON THE SAME LEVEL AS SOME OF THE

5    INVESTORS AND NO LONGER THE SMALLEST INVESTOR IN

6    THIS PROMINENT GROUP OF PEOPLE.

7              THE GOVERNMENT ARGUES THAT THAT'S

8    ACTUALLY ONE OF THE FALSE REPRESENTATIONS THAT BY

9    TELLING MR. LIN THAT HE HAD TO INVEST AT LEAST A

10   MILLION DOLLARS, THAT WAS A FALSE STATEMENT.

11             THIS IS THE FIRESIDE PPM AND THE ASENQUA

12   PPM I WILL SHOW YOU AS WELL BUT IT'S IDENTICAL.

13   YOU SEE THAT IN THE SUBSCRIPTION SECTION OF, I

14   BELIEVE THIS IS PAGE EIGHT, IT SAYS THAT INTEREST

15   IN THE FUND WILL BE SOLD AT A MINIMUM SUBSCRIPTION

16   PER INVESTOR AT $1 MILLION, THEN IT FOLLOWS, THE

17   GENERAL PARTNER MAY IN ITS DISCRETION ADJUST THIS

18   MINIMUM.

19             HOW IN THE WORLD IS THAT A FALSE

20   REPRESENTATION THAT EVERYBODY HAS TO, YOU MUST,

21   EVERYBODY HAD TO HAVE INVESTED A MILLION DOLLARS?

22   BECAUSE IT SAYS SO.

23             GENERAL PARTNER MAY, IN ITS DISCRETION,

24   ADJUST THE MINIMUM.  THAT'S WHAT HAPPENED TO

25   MR. LIN IN THE FIRST PLACE.  HE TESTIFIED THAT WHEN

1083

1    HE AND MR. HU WERE TALKING MR. HU TOLD HIM HEY BOB

2    YOU'RE THE EXACTLY THE KIND OF GUY WE WANT.  YOU

3    HAVE THESE BOOKS OUT ON HOW TO BE HAPPY AND HOW TO

4    BE A SUCCESSFUL BUSINESS PERSON.  YOU ARE WELL

5    RESPECTED IN TAIWAN AND IN THE CHINESE-AMERICAN

6    COMMUNICATE.  COME ON IN, I, AS THE GENERAL

7    PARTNER, WILL USE MY DISCRETION SO THAT YOU DON'T

8    HAVE TO INVEST A MILLION DOLLARS.

9            SO IT IS SIMPLY NOT TRUE THAT THIS

10   STATEMENT THAT EVERYBODY HAS TO INVEST A MILLION

11   DOLLARS, THAT IS NOT WHAT'S REQUIRED BY THE

12   DOCUMENT AND THAT'S NOT WHAT HAPPENED.

13           AND MR. LIN WAS SELF CONSCIOUS BECAUSE HE

14   WAS CONCERNED THAT HE DID NOT WANT TO BE THE

15   LOWEST, THE SMALLEST INVESTOR.  WHICH IS

16   UNDERSTANDABLE, BUT THAT IS NOT FRAUD.

17           NOW, ANOTHER ASPECT OF WHY THESE

18   INVESTORS DID NOT GET THEIR MONEY BACK, THE

19   STARTING POINT IS THAT THE INVESTORS EACH

20   TESTIFIED, MR. LIN, MR. VERDIELL, WELL OF COURSE

21   WHEN I SUBMIT MY WRITTEN REQUEST FOR REDEMPTION TO

22   WITHDRAW MY MONEY, MY INVESTMENT, WITHIN 12 MONTHS

23   I SHOULD GET EVERYTHING BACK.

24           AGAIN, THAT'S SIMPLY NOT WHAT THE PPM

25   SAYS.  WHAT THIS WILL SHOW IS THAT UNDERSTANDABLY

1    THOSE TWO GENTLEMAN SAW WHAT THEY WANTED TO SEE.

2    THEY HAD A DEFINITE IDEA THAT THEY WANTED TO BE

3    AFFILIATED WITH THIS SUCCESSFUL FUND AND THEY WANT

4    TO JOIN THE PARTY, THEY DON'T WANT TO BE LEFT OUT.

5    THEY DON'T WANT TO BE ON THE UNINVITED LIST.

6          THIS IS PAGE 17 OF THE PRIVATE PLACEMENT

7    MEMORANDUM OF FIRESIDE.  AND THE ASENQUA PPM HAS

8    THE IDENTICAL LANGUAGE.  AGAIN, YOU HEARD THE

9    TESTIMONY THAT THE REDEMPTION COULD BE SUSPENDED IN

10   THE DISCRETION, IN THE OPINION OF THE INVESTMENT

11   MANAGER UNDER CERTAIN CONDITIONS.

12         AND WE HEARD TESTIMONY THAT AROUND THIS

13   PERIOD OF TIME MR. LIN HIMSELF SAID, I THINK HIS

14   WORDS WERE, THAT HE SPECIFICALLY CITED THE

15   COLLAPSE.  THAT THE PRIME RATE MELT DOWN WITH THE

16   HOUSING MARKET AFFECTING THE GLOBAL ECONOMY.

17         SO THERE WAS TESTIMONY THAT MR. LIN KNEW

18   THAT THERE WERE VERY, VERY TRYING UNUSUAL

19   CATASTROPHIC ECONOMIC CONDITIONS THAT COULD VERY

20   WELL HAVE MADE LIQUIDATED THE INVESTMENT AT THAT

21   POINT TO BE IMPRACTICAL OR PREJUDICIAL.  AGAIN,

22   THERE IS NO EVIDENCE TO THE CONTRARY.

23         HOWEVER, WE DO HAVE EVIDENCE FROM

24   MR. VERDIELL HIMSELF IN AN E-MAIL HE SENT TO BOB

25   LIN WHICH VALIDATES THIS PARTICULAR THEORY.  THIS

1    IS DEFENDANT'S EXHIBIT 560, IT'S IN EVIDENCE.

2              MR. VERDIELL SAID TO BOB LIN, HOW DID IT

3    END UP WITH ASENQUA.  MANY HEDGE FUNDS HAVE

4    STRUGGLED WITH WITHDRAWAL LIQUIDITY THIS QUARTER.

5    I SUPPOSE THEY WERE NOT IMMUNE.

6              AND THIS E-MAIL WAS SENT AROUND THE TIME

7    OF MARCH 5TH, 2008.

8              NOW, THE GOVERNMENT ARGUED AND PRESENTED

9    EVIDENCE TRYING TO SHOW THAT, WELL, WAIT A MINUTE,

10   MR. HU DID NOT COME OUT AND SAY THAT THERE WAS THIS

11   SPECIFIC PROBLEM PREVENTING HIM FROM LIQUIDATING

12   THE ASSETS TO PAY THESE PEOPLE TO PAY BACK

13   MR. VERDIELL, MR. LIN.

14             REMEMBER THE E-MAILS THAT MR. VERDIELL

15   AND MR. HU EXCHANGED.  HE -- AT ONE POINT

16   MR. VERDIELL SAID, WHAT CONDITION?  BECAUSE MR. HU

17   SPECIFICALLY SAID, HEY, I'M WORKING OVER TIME HERE

18   IN ASIA, I'M TRYING TO PUT OUT FIRES LEFT AND

19   RIGHT.  THERE ARE ALL SORTS OF PROBLEMS WITH THE

20   BANKS.

21             SO AGAIN, THERE IS EVIDENCE THAT THERE

22   WAS A REASON WHY THE MONEY HAD NOT BEEN FORTHCOMING

23   WITHIN 12 MONTHS, MR. LIN AND MR. VERDIELL'S MAKING

24   THEIR REQUEST TO WITHDRAW.

25             NOW, I THINK -- WE TALKED A LOT ABOUT

1    MR. LIN, BUT WHAT ABOUT MR. VERDIELL?  MR. VERDIELL

2    WHEN HE MET WITH AGENT FINE ON CHRISTMAS EVE 2008,

3    THEY HAD AN INTERVIEW THAT PRODUCED FIVE PAGES OF

4    FBI NOTES.

5              IN THAT INITIAL MEETING, THERE IS NO

6    RECORD THAT MR. VERDIELL TOLD AGENT FINE OR ANYBODY

7    THAT, WELL, I MADE THIS INVESTMENT BECAUSE I RELIED

8    ON THE CASTILLO AUDITING FIRM, THE PROSKAUER LAW

9    FIRM.  HE NEVER SAID ANY OF THESE THINGS.

10             YES, HE SUBSEQUENTLY ADDED THOSE THINGS

11   BUT THERE'S NO EVIDENCE OF WHAT HAPPENED IN

12   BETWEEN.  BUT WHEN HE MET WITH THE AGENT TO TELL

13   HIS SIDE OF THE STORY, HE DID NOT SAY THAT HE HAD

14   RELIED ON THESE THINGS.

15             BUT THERE'S MORE, THEY DIDN'T -- IT ISN'T

16   AS THOUGH THEY DID NOT TALK ABOUT WHY MR. VERDIELL

17   HAD MADE HIS INVESTMENTS.  MR. VERDIELL SAID HE HAD

18   TOLD AGENT FINE THAT YEAH, I MADE THE INVESTMENT

19   BECAUSE ONE, I KNEW ABOUT THE OTHER INVESTORS AND

20   TRUSTED THEM.

21             AND TWO, MR. BOND AND MR. HU WHEN I WAS

22   TALKING TO THEM, MADE A GOOD PRESENTATION.  I LIKE

23   WHAT THEY HAD TO SAY.  THEY WERE MY KIND OF PEOPLE.

24             NOW, THAT STATEMENT DOES NOT IN ANY WAY

25   INCLUDE ANY REFERENCE TO ANY DOCUMENTS THAT HE

1    LOOKED AT OR THAT HE WAS RELYING ON BECAUSE AGAIN,

2    WHAT WAS MATERIAL TO MR. VERDIELL IS EXACTLY WHAT

3    HE TOLD AGENT FINE, THE PEOPLE INVOLVED AND MR. HU

4    AND MR. BOND MAKING A GOOD IMPRESSION, THAT'S WHY

5    HE INVESTED.

6          AND MR. LIN HIMSELF SAID, I INTRODUCED

7    THE ASENQUA FUND, NOT JUST MR. HU, BUT THE ASENQUA

8    TO MR. VERDIELL.  THAT'S MR. LIN'S TESTIMONY.  I

9    INTRODUCED THE FUND TO MR. VERDIELL.

10          AND MR. LIN ALSO SAID, WELL, OF COURSE,

11   I'VE KNOWN MARK FOR QUITE A WHILE SINCE THE LATE

12   90'S BECAUSE AT THAT TIME MARK HAD A DREAM WITH HIS

13   COMPANY, LIGHT LOGIC AND HE CAME TO ME FOR HELP FOR

14   FINANCING FOR A VENTURE.  AND I, BOB LIN, WAS ONE

15   OF THE FIRST PEOPLE TO SEE THAT DREAM TO HELP HIM

16   MAKE THAT REAL, VERY REAL.  INTEL ACQUISITION OF

17   THE COMPANY FOR $400 MILLION.

18          UNDERSTANDABLY, THERE'S A VERY, VERY

19   STRONG BOND BETWEEN MR. VERDIELL AND MR. LIN.  AND

20   MR. VERDIELL DID TRUST AND VALUE MR. LIN'S OPINION.

21   THAT'S WHY HE INVESTED IN THE FIRESIDE FUND, NOT

22   BECAUSE OF THE PROSKAUER ROSE LAW FIRM OR THE

23   CASTILLO CPA FIRM.

24          AGAIN, MR. VERDIELL TESTIFIED THAT HE DID

25   NOT EVEN RUN THIS INVESTMENT POSSIBILITY BY HIS

1    NORMAL TEAM OF INVESTMENT ADVISORS.  HE TESTIFIED

2    THAT HE, AT THAT TIME HE WORKED WITH PEOPLE WHO

3    WOULD ADVISE HIM ABOUT INVESTMENTS.  HE DIDN'T FEEL

4    THE NEED TO.

5              WHY?  DESPITE ALL THE WARNINGS OF THE

6    PPM, WHY?  ABOUT THE RISK INVOLVED.  BECAUSE IT WAS

7    ALL ABOUT THE PEOPLE INVOLVED AND IN PARTICULAR IT

8    WAS BECAUSE BOB LIN HAD INTRODUCED THE FIRESIDE

9    FUND TO HIM.

10             I THINK -- SO LET ME TRY TO SUM THINGS UP

11   IN TERMS OF WHAT REALLY WAS MATERIAL IN THIS CASE.

12             I THINK ONE OF THE INVESTORS WHO DID NOT

13   TESTIFY, ONE OF THE INVESTORS MR. ANDY YAN SAID IT

14   BEST.  MR. VERDIELL SAID, LOOK, I TALKED TO

15   MR. YAN.  MR. YAN SAID HE HAD KNOWN ABOUT MR. HU,

16   HE HAD KNOWN MR. HU, HE HAD WORKED WITH MR. HU AND

17   THAT HE ACTUALLY HAD NOT TRUSTED MR. HU AND HE HAD

18   KNOWN MR. HU TO BE A LIAR.

19             BUT, AND THIS IS A SIGNIFICANT BUT, BUT

20   MR. YAN STILL INVESTED WITH MR. HU.

21             SO WHAT THIS CASE IS ABOUT IS THE FACT

22   THAT YES, MR. HU WAS VERY PERSUASIVE, HE WAS ABLE

23   TO DRAW CONNECTIONS AND PROBABLY FLATTER A LOT OF

24   PEOPLE LIKE HE DID WITH BOB LIN.  BUT THAT WAS THE

25   REASON WHY MR. LIN AND MR. VERDIELL MADE THEIR

1    INVESTMENT.

2              THAT IS WHAT IS MATERIAL, IT WAS NOT

3    BECAUSE CASTILLO CPA FIRM SUPPOSEDLY SIGNED HIS

4    NAME OR ANTHONY POLLACE HAD SIGNED ON AS THE CFO,

5    BECAUSE OF COURSE THE ANTHONY POLLACE STATEMENTS OR

6    HIS SIGNATURE NEVER APPEARED BEFORE MR. LIN OR

7    MR. VERDIELL MADE THEIR INITIAL INVESTMENT.

8              SO HOW CAN YOU RELY ON SOMETHING THAT HAD

9    NOT BEEN PRESENTED TO YOU BEFORE YOU MADE THE

10   INVESTMENT?  HOW CAN YOU SAY THAT ANTHONY POLLACE'S

11   SIGNATURE WAS IMPORTANT TO ME, IT TERRIBLY

12   INFLUENCED MY DECISION MAKING MY INVESTMENT BEFORE

13   I SAW THE NAME ANTHONY POLLACE.

14             AND BY THE WAY, MR. LIN AND MR. VERDIELL

15   BOTH SAID I NEVER MET MR. POLLACE.  IT'S CERTAINLY

16   COMMON SENSE TO INFER FROM THAT THEY PROBABLY COULD

17   NOT PICK MR. POLLACE OUT OF A LINE UP.  THEY

18   PROBABLY DO NOT KNOW WHO HE WAS OR WHAT HE HAS

19   DONE.

20             AGAIN, IT'S NOT ABOUT ANTHONY POLLACE.

21   IT'S NOT ABOUT THE CASTILLO CPA FIRM BECAUSE ALL

22   THEY HAD TO DO WAS SPEND TWO MINUTES ON THE WEB TO

23   CHECK WHETHER OR NOT CASTILLO WAS AN ACTUAL CPA

24   FIRM IN THE STATE OF CALIFORNIA.

25             AND MORE IMPORTANTLY, THEY COULD HAVE

1    ALSO FOUND OUT THAT ON THE WEBSITE WHETHER OR NOT

2    THIS CPA FIRM HAD A RECORD OF DISCIPLINE PROBLEMS

3    OF BEING, PEOPLE REPORTING DISCIPLINE PROBLEMS WITH

4    INTERACTING WITH THE CPA FIRM.

5            AGAIN, THAT'S BECAUSE THEY DIDN'T CARE.

6    JUST LIKE WHEN I POSTED BY HEIGHT OF 6'4 AND YOU

7    NEVER THE LESS, ON MY PAGE AND ANOTHER PAGE I SAID

8    I'M ACTUALLY ONLY 5'8, YOU DIDN'T CARE.  YOU CAME

9    TO ME ANY WAY BECAUSE YOU NEEDED THAT FOURTH PERSON

10   FOR YOUR BRIDGE GAME AND YOU WANTED A WARM BODY, BE

11   IT 6'4 OR 5'8 OR 5'7.

12           LET ME CLOSE BY TALKING JUST A LITTLE BIT

13   ABOUT REASONABLE DOUBT.  OF COURSE YOU HAVE THE

14   JURY INSTRUCTION ON WHAT IS REASONABLE DOUBT AND

15   EVERYTHING.  AND THAT'S CERTAINLY VERY, VERY

16   HELPFUL.

17           I WOULD KIND OF LIKE TO FRAME REASONABLE

18   DOUBT KIND OF IN MY OWN WAY WHICH IS THAT WHEN YOU

19   GET BACK INTO THE JURY ROOM, DELIBERATION ROOM, YOU

20   WILL HAVE A VERY SPIRITED DISCUSSION ABOUT WHAT YOU

21   HAVE HEARD WHAT YOUR OPINION IS, HOW YOU SEE THE

22   CASE.

23           JUST KEEP THIS IN MIND.  IF ONE OF YOUR

24   COLLEAGUES ON THIS JURY, ONE OF YOUR COLLEAGUES HAS

25   A DOUBT ABOUT ANY PARTICULAR IMPORTANT FACT, HERE'S

1    THE TEST, LISTEN TO THAT PERSON.  YOU DON'T HAVE TO

2    AGREE WITH THAT PERSON, YOU SIMPLY HAVE TO ASK

3    YOURSELF, IS THE DOUBT THAT THIS, MY COLLEAGUE WITH

4    WHOM I HAVE BEEN SITTING IN THIS COURTROOM FOR TWO

5    WEEKS, IS THAT DOUBT REASONABLE OR IS IT JUST SO

6    FAR OUT THERE IT'S JUST TOTALLY INHERENTLY NOT

7    REASONABLE?

8          IF THAT DOUBT THAT'S EXPRESSED TO YOU IS

9    REASONABLE, EVEN THOUGH HAVING HEARD IT YOU STILL

10   WOULD NOT CHANGE, YOU STILL WOULD NOT COME TO A

11   DIFFERENT CONCLUSION, THAT'S REASONABLE DOUBT.

12   THAT'S WHEN YOU MUST FIND THAT EVEN THOUGH YOU

13   YOURSELF MAY NOT AGREE A HUNDRED PERCENT, THAT IF

14   YOU HEAR A DOUBT THAT'S REASONABLE EACH IF YOU

15   DON'T ULTIMATE BUY INTO IT COMPLETELY, THAT'S

16   REASONABLE DOUBT.

17         YOU HAVE BEEN EXTREMELY PATIENT AND I

18   THANK YOU FOR YOUR ATTENTION.

19         THE COURT:  ALL RIGHT.

20         WE WILL TAKE A 15-MINUTE BREAK, COME BACK

21   AND HEAR THE GOVERNMENT'S REBUTTAL AND THEN WE WILL

22   GIVE YOU THE INSTRUCTIONS.

23         (WHEREUPON A RECESS WAS TAKEN.)

24         THE COURT:  ALL RIGHT.

25         MR. LUCEY, YOU WANT TO MAKE THE

1    GOVERNMENT'S FINAL CLOSE?

2              MR. LUCEY:  THANK YOU, YOUR HONOR.

3

4              **CLOSING ARGUMENTS BY MR. LUCEY**

5

6              MR. LUCEY:  GOOD AFTERNOON.  MAY IT

7    PLEASE THE COURT, COUNSEL.

8              MEMBERS OF THE JURY, GOOD AFTERNOON.  MY

9    NAME IS TIM LUCEY.  I'M CO-COUNSEL WITH MR. FAZIOLI

10   IN THE MATTER OF UNITED STATES V. ALBERT HU.

11             AS MR. FAZIOLI AND MR. FONG AND THE COURT

12   HAVE ALREADY TOLD YOU, I ALSO JOIN IN THANKING YOU

13   FOR YOUR SERVICE AS JURORS IN THIS MATTER AND YOUR

14   ATTENTION THROUGHOUT THE PROCESS.

15             I WANT TO ADDRESS A COUPLE OF MATTERS AND

16   ISSUES THAT MR. FONG RAISED DURING HIS CLOSING

17   ARGUMENT.

18             FIRST OF ALL, I WANT TO ADDRESS THE ISSUE

19   OF CERTAIN OF THE JURY INSTRUCTIONS THAT MR. FONG

20   REVIEWED WITH YOU.  AND IN PARTICULAR I WANT TO

21   ADDRESS THE ISSUE OF MATERIALITY AND THE JURY

22   INSTRUCTION THAT APPLIES HERE.

23             THE GOVERNMENT SUBMITS THAT MR. FONG

24   MISSTATED THE INSTRUCTION THE COURT HAS GIVEN TO

25   YOU THAT APPLIES TO WIRE FRAUD AND MATERIALITY.

1          AS MR. FAZIOLI REVIEWED WITH YOU EARLIER

2     TODAY THE JURY INSTRUCTION THAT APPLIES AS TO

3     MATERIALITY AS ONE OF THE ELEMENTS OF WIRE FRAUD

4     THAT MUST ARE PROVEN BY THE GOVERNMENT IS THAT A

5     FALSE OR FRAUDULENT PRETENSE, REPRESENTATION OR

6     PROMISE IS MATERIAL IF IT HAD A NATURAL TENDENCY TO

7     INFLUENCE OR WAS CAPABLE OF INFLUENCING A POTENTIAL

8     INVESTOR TO PART WITH MONEY.

9          THE STANDARD IS NOT, AS MR. FONG

10    INDICATED, THAT OF A SAVVY INVESTOR OR A PARTICULAR

11    INVESTOR.  IT IS -- HAD A NATURAL TENDENCY TO

12    INFLUENCE OR WAS CAPABLE OF INFLUENCING A POTENTIAL

13    INVESTOR AND PART WITH HIS MONEY, HIS OR HER MONEY.

14         NOW, LADIES AND GENTLEMEN, DID MR. HU'S

15    NUMEROUS FALSE REPRESENTATIONS, FALSE PROMISES,

16    FALSE PRETENSES HAVE A NATURAL TENDENCY TO

17    INFLUENCE OR WERE CAPABLE OF INFLUENCING A

18    POTENTIAL INVESTOR TO PART WITH MONEY?  THE

19    GOVERNMENT SUBMITS THE EVIDENCE IS OVERWHELMING.

20         YOU HAVE HEARD THE EVIDENCE, LADIES AND

21    GENTLEMEN, DURING THE COURSE OF THIS TRIAL OF A

22    SYSTEMATIC SERIAL, BRAZEN ATTEMPT AND CONDUCT BY

23    MR. HU TO MAKE FALSE STATEMENTS, FALSE

24    REPRESENTATIONS AND PRETENSES ON MATTERS THAT

25    WERE -- THAT HAD A NATURAL TENDENCY AND WERE

1    CAPABLE OF -- AND/OR WERE CAPABLE OF INFLUENCING A

2    POTENTIAL INVESTOR TO PART WITH MONEY.

3            AS MR. FAZIOLI ADVISED YOU EARLIER TODAY

4    AND AS THE COURT WILL ADVISE YOU WHEN IT REVIEWS

5    THE JURY INSTRUCTIONS FORMALLY IN JUST A MOMENT, AS

6    PART OF YOUR DELIBERATIONS YOU USE YOUR REASON AND

7    COMMON SENSE.

8            THE FALSE STATEMENTS HERE, THE FALSE

9    PROMISES HERE, THE FALSE PRETENSES HERE ARE BRAZEN

10   AND BREATHTAKING.

11           AS MR. FAZIOLI ALSO ADVISED YOU EARLIER

12   TODAY IN REVIEWING THE JURY INSTRUCTIONS, YOU AS

13   PART OF YOUR DELIBERATIONS WILL BE LOOKING AT THE

14   WHOLE PICTURE AND THE CIRCUMSTANCES AS A WHOLE IN

15   REVIEWING THE EVIDENCE AS TO EACH ELEMENT.

16           THE GOVERNMENT WOULD SUBMIT TO YOU THERE

17   IS LIE, UPON LIE, UPON LIE, UPON LIE, IN THIS

18   MATTER.  LIE THAT IS WENT ON FOR YEARS LIES THAT

19   WERE AT THE BEGINNING THAT WENT ON THROUGHOUT THE

20   SCHEME OF THIS FRAUD.  THAT MR. HU PROVIDED

21   DOCUMENTS OR STATEMENTS THAT WERE CAPABLE OF

22   INFLUENCING INVESTORS TO PART WITH MONEY.

23           THERE WERE LIE, UPON LIE AFTER MR. HU HAD

24   RECEIVED MONEY FROM INVESTORS IN REGARD TO

25   QUARTERLY STATEMENTS, IN REGARD TO HOW THEIR MONEY

1    WAS BEING INVESTED, IN REGARD TO WHO WAS ACTUALLY

2    SIGNING DOCUMENTS.

3            AND AS A SCHEME TO DEFRAUD CONTINUED AND

4    UNRAVELED, MR. HU CONTINUED TO PROVIDE LIE, UPON

5    LIE, UPON LIE TO INVESTORS.

6            NOW, MR. FONG SPENT TIME TALKING TO YOU

7    EARLIER TODAY ABOUT BOB LIN, ONE OF THE INVESTORS

8    IN THE ASENQUA BETA FUND AND THE FIRESIDE FUND.

9    AND TALKING ABOUT MR. LIN'S INVOLVEMENT IN THE

10   ASENQUA VENTURES PARTNERS.

11           THE GOVERNMENT SUBMITS THAT USING YOUR

12   REASON AND COMMON SENSE, THE GOVERNMENT SUBMITS THE

13   EVIDENCE SHOWS THAT MR. LIN BECAME INVOLVED WITH

14   THE ASENQUA VENTURE PARTNERS BECAUSE MR. HU HAD

15   LIED TO HIM, HAD LIED TO HIM REPEATEDLY, BRINGING

16   HIM INTO THE INVESTMENTS WITH THE ASENQUA BETA

17   FUND, PROVIDING HIM WITH QUARTERLY STATEMENTS THAT

18   CONTAINED MR. POLLACE'S FORGED SIGNATURE, PROVIDING

19   HIM WITH QUARTERLY STATEMENTS REGARDING THE STATUS

20   OF HIS INVESTMENTS WITH THE ASENQUA BETA FUND THAT

21   DID NOT COMPORT WITH THE REALITY OF HOW THE MONEY

22   HAD BEEN SPENT BY MR. HU, THAT HAD NOT IN FACT BEEN

23   INVESTED IN HIGH TECHNOLOGY STOCKS AS MR. HU HAD

24   PROMISED TO DO WITH MR. LIN'S MONEY.

25           INDEED AS MR. LIN TOLD YOU, AGAIN, YOUR

1       MEMORY CONTROLS HERE, BUT THE GOVERNMENT SUBMITS

2       THE EVIDENCE IS MR. LIN INDICATED HE TRUSTED MR. HU

3       AND HE WAS SATISFIED WITH THE RETURNS HE WAS SEEING

4       ON THOSE QUARTERLY STATEMENTS.

5               REASON AND COMMON SENSE INDICATES THAT IT

6       WOULD BE NATURAL FOR MR. LIN TO HAVE BECOME

7       INVOLVED WITH THE ASENQUA VENTURE PARTNERS.  AND

8       THE LIES THAT HAD BEEN TOLD TO HIM HAD HAD A

9       NATURAL TENDENCY TO INFLUENCE HIM.

10              MR. FONG ALSO DISCUSSED MR. VERDIELL.

11      AND MR. VERDIELL'S STATEMENTS REGARDING THE

12      DECEMBER 2007 PORTFOLIO REVIEW.  MR. FONG HAD TOLD

13      YOU THAT MR. VERDIELL TESTIFIED THAT IN

14      MR. VERDIELL'S VIEW, MR. HU AND MR. BOND HAD PASSED

15      THAT TEST WITH FLYING COLORS.

16              THE GOVERNMENT SUBMITS THE IMPORTANT PART

17      OF THAT MEETING USING YOUR REASON AND COMMON SENSE

18      IN REVIEWING THE EVIDENCE, IS THAT THIS MEETING

19      SHOWS IN FACT THAT MR. HU WAS STILL LYING TO

20      MR. VERDIELL EVEN AS MR. VERDIELL WAS DOING HIS

21      LEVEL BEST TO TRY TO DETERMINE THE STATUS OF HIS

22      INVESTMENTS TO, AS MR. VERDIELL SAID DURING HIS

23      TESTIMONY, TRYING TO FIND A LITTLE MORE INFORMATION

24      AS THE QUARTERLY STATEMENTS DIDN'T PROVIDE A LITTLE

25      MORE LEVEL OF DETAIL.

1       HE TOOK THE TIME TO AND YOUR MEMORY

2    CONTROLS HERE BUT THE GOVERNMENT SUBMIT THAT IS HE

3    TOOK THE TIME TO SIT DOWN AND MEET WITH MR. HU

4    ALONG WITH MR. BOND AND REVIEW THE STATUS OF HIS

5    INVESTMENTS IN THE FIRESIDE FUND.  NOT KNOWING, NOT

6    KNOWING THAT TWO MONTHS EARLIER HIS MONEY HAD

7    ALREADY ALL ESSENTIALLY BEEN SPENT.

8       THE $2 MILLION HE PROVIDED IN APRIL 2007

9    TO THE CREDIT SUISSE ACCOUNT HAD ALREADY BEEN AS

10   AGENT FINE TESTIFIED IN HIS SUMMARY TESTIMONY,

11   ESSENTIALLY EXHAUSTED AS OF OCTOBER 23RD, 2007,

12   MONTHS BEFORE THIS DETAILED PORTFOLIO REVIEW FOR

13   WHICH HE NEVER RECEIVED ANY DOCUMENTS OR ANY

14   MATERIALS OTHER THAN THE SCREEN VIEWS THAT MR. HU

15   AND MR. BOND SHOWED HIM ON THEIR COMPUTERS.

16      AGAIN, LADIES AND GENTLEMEN, THE

17   GOVERNMENT WOULD SUBMIT THAT THE EVIDENCE IS

18   OVERWHELMING THAT THE FALSE STATEMENTS WERE CAPABLE

19   OF INFLUENCING A POTENTIAL INVESTOR TO PART WITH

20   MONEY.  BEYOND LOOKING AT YOUR REASON AND COMMON

21   SENSE OF THE VARIOUS FACTS OF THIS MATTER OF THE

22   DOCUMENTS AND OF THE CIRCUMSTANCES, YOU ALSO HEARD

23   FROM THE INVESTORS THAT THEY WERE INFLUENCED.  AND

24   YOU CAN ASSESS THEIR CREDIBILITY.

25      BUT LADIES AND GENTLEMEN OF THE JURY, YOU

1    CAN ALSO INFER THAT THOSE FALSE STATEMENTS WERE

2    MATERIAL BY THE FACT THAT THE DEFENDANT CHOSE TO

3    INCLUDE THE FALSE STATEMENTS TO LURE INVESTORS IN,

4    TO KEEP THEM IN THE FUNDS, AND THEN TO DISTRACT

5    THEM FROM THE FACT THAT THEY CANNOT RECEIVE THEIR

6    MONEY BACK, TO BRIBE THEM WITH REASON AFTER REASON,

7    WHICH WAS LIE, AFTER LIE ABOUT WHAT IN FACT HAD

8    HAPPENED TO THEIR MONEY.

9            MR. FONG SPENT SOME TIME TALKING ABOUT

10   THE MASTER FEEDER FUND IN REGARD TO THE ASENQUA

11   FUND AND FIRESIDE FUND AND TALKING ABOUT HOW IN HIS

12   VIEW IT INDICATES THE MONEY SOMEHOW HAD BEEN

13   POOLED.

14           AGAIN, THE GOVERNMENT SUBMITS THAT YOU,

15   LADIES AND GENTLEMEN, NEED TO USE YOUR REASON AND

16   COMMON SENSE.  THE GOVERNMENT SUBMITS THAT AGENT

17   FINE TESTIFIED THAT HIS ATTEMPT IN LOOKING AT THE

18   FIVE WIRES OF MONEY, THE FIVE TRANSFERS OF ACTUAL

19   MONEY THAT WERE DONE BY MR. LIN AND MR. VERDIELL,

20   THAT HE ATTEMPTED TO LOOK AT ALL THE INDICATIONS AS

21   TO TRACING THE MONEY, FOLLOWING THE MONEY, THAT WAS

22   HIS GOAL LOOKING AT THOSE FUNDS FOR EACH OF THOSE

23   FIVE WIRE TRANSFERS.

24           HE INDICATED IN HIS TESTIMONY THAT HE NOT

25   MAKE ANY DISTINGUISHING CHARACTERISTICS BETWEEN

1    BANK ACCOUNTS, HE WAS TRYING TO FOLLOW THE MONEY.

2              AND LADIES AND GENTLEMEN, AS YOU HEARD IN

3    HIS TESTIMONY, LADIES AND GENTLEMEN, HE DID NOT SEE

4    ANY INDICATION OF ANY TRADING ACTIVITY OTHER THAN

5    THE SMALL AMOUNT OF MONEY OF MR. VERDIELL'S WIRE

6    THAT WERE TRADED IN SECURITIES BUT WHICH AS AGENT

7    FINE TESTIFIED EACH AFTER IT WAS SOLD, WAS NOT

8    RETURNED TO MR. VERDIELL.  OR AFTER THE MONEY THAT

9    WAS MERGED WITH MR. LIN, RETURNED TO MR. LIN

10   EITHER.

11             IF IN FACT, AS MR. FONG PURPORTS THE

12   MONEY WAS POOLED IN SOME OTHER ACCOUNT, IT'S CLEAR

13   THAT THAT POOL WAS ULTIMATELY DRAINED.  DRAINED BY

14   ALBERT HU FOR HIS BENEFIT.

15             THERE WAS ALSO A DISCUSSION DURING

16   MR. FONG'S CLOSING ARGUMENT ABOUT REASONABLE DOUBT.

17   AND I THINK IT'S IMPORTANT FOR US TO REVIEW THAT

18   DISCUSSION AS WELL, LADIES AND GENTLEMEN.

19             MR. FONG MADE REFERENCE TO LOOKING FOR

20   ANY DOUBT THAT MAY BE OUT STANDING FOR ANY ONE

21   JUROR.  THE GOVERNMENT SUBMITS THAT MISSTATES THE

22   STANDARD FOR CONVICTION HERE.  AND THE STANDARD OF

23   REASONABLE DOUBT.

24             AS MR. FAZIOLI REVIEWED WITH YOU EARLIER

25   TODAY AND JUDGE WHYTE WILL REVIEW WITH YOU WITH ALL

1    THE JURY INSTRUCTIONS IN A MOMENT, PROOF BEYOND A

2    REASONABLE DOUBT IS PROOF THAT LEAVES YOU FIRMLY

3    CONVINCED THAT THE DEFENDANT IS GUILTY.  IT IS NOT

4    REQUIRED THAT THE GOVERNMENT PROVE GUILTY ALL

5    POSSIBLE DOUBT.

6              A REASONABLE DOUBT IS A DOUBT BASED UPON

7    REASON AND COMMON SENSE.  AND IT IS NOT BASED

8    PURELY ON SPECULATION.

9              THE GOVERNMENT SUBMITS THAT WILL BE

10   IMPORTANT IN UNDERSTANDING THE STANDARD FOR

11   EVALUATING THE EVIDENCE AS YOU MEET LATER ON TODAY

12   TO BEGIN DELIBERATING ON THE EVIDENCE IN THIS CASE.

13             THERE WAS ALSO A DISCUSSION, LADIES AND

14   GENTLEMEN ABOUT MR. POLLACE.  AND MR. FONG

15   INDICATING IN HIS VIEW IN HIS ARGUMENT THAT THERE

16   WAS NO NEED FOR YOU AS A JURY TO CONSIDER THE

17   QUARTERLY STATEMENTS OR MR. POLLACE'S SIGNATURE ON

18   THOSE STATEMENTS.

19             THE GOVERNMENT SUBMITS THAT MR. POLLACE'S

20   SIGNATURE ON THOSE DOCUMENTS IS MATERIAL, THAT A

21   POTENTIAL INVESTOR WAS CAPABLE OF BEING INFLUENCED

22   BY THE SIGNATURE OF THE PURPORTED CFO OF THE

23   ASENQUA BETA FUND AND THE FIRESIDE FUND.

24             THE GOVERNMENT ALSO SUBMITS THAT AS

25   MR. LIN TESTIFIED AFTER RECEIVING HIS FIRST FEW

1    QUARTERLY STATEMENTS AND SEEING THE RETURNS, HE

2    MADE FURTHER INVESTMENTS.  AND THE GOVERNMENT

3    SUBMITS THAT MR. LIN TESTIFIED THAT HE HAD SEEN THE

4    SIGNATURES OF MR. HU AND MR. POLLACE ON THOSE

5    QUARTERLY STATEMENTS.

6            AND THOSE SIGNATURES CONTINUED THEREAFTER

7    AND THEREAFTER CAUSED HIM ALONG WITH THE OTHER

8    FALSE STATEMENTS HE HAD RECEIVED AND QUARTERLY

9    STATEMENTS AND DOCUMENTS, TO MAKE INVESTMENTS THERE

10   AFTER IN THE FIRESIDE FUND AS WELL.

11           LADIES AND GENTLEMEN, THERE'S ALSO A

12   DISCUSSION BY MR. FONG ABOUT THE CASTILLO LYN

13   STATEMENTS, EXHIBIT 1.  AND MR. FONG DISCUSSING

14   ABOUT THE VALUATIONS IN THAT EXHIBIT 1 DOCUMENT AND

15   THE TRUTH OR EVIDENCE CALCULATING IN THERE.

16           AND IN MR. FONG'S VIEW THAT WAS THE MOST

17   IMPORTANT PART OF THE DOCUMENT.  THE GOVERNMENT

18   SUBMITS THAT THE DOCUMENTS THEMSELVES, AND IN

19   PARTICULAR THE PAGE THAT MR. FAZIOLI REVIEWED WITH

20   YOU, THE SIGNATURE PAGE SIGNED BY MR. CASTILLO,

21   INDICATING THAT IT WAS A REPORT OF INDEPENDENT

22   AUDITORS THAT THE BOOKS AND RECORDS OF THE ASENQUA

23   BETA FUND HAD BEEN EXAMINED BY THE CASTILLO LYN

24   FIRM AS OF DECEMBER 31ST, 2004, HAD A NATURAL

25   TENDENCY OR WAS CAPABLE OF INFLUENCING A POTENTIAL

1    INVESTOR TO PART WITH MONEY.

2         AND IN FACT THE GOVERNMENT SUBMITS YOU

3    HEARD TESTIMONY FROM MR. LIN ABOUT THOSE AUDITED

4    STATEMENTS ABOUT THAT LANGUAGE IN PARTICULAR ON THE

5    SIGNATURE PAGE SIGNED BY MR. CASTILLO.

6         THERE WAS ALSO TESTIMONY BY GRACE DOONG

7    TO THAT SAME EFFECT.  AND THE REFERENCE TO CASTILLO

8    LYN WERE IN THE DOCUMENTS PRIOR TO MR. CASTILLO

9    MAKING HIS INVESTMENT.

10        AND MR. FONG HAD A DISCUSSION ABOUT THE

11   IN EXCESS OF $200 MILLION OF ASSET VALUE THAT

12   MR. HU HAD REPRESENTED DURING THAT 2008 WEBEX CALL

13   WITH GRACE DOONG AMONG OTHERS INDICATING THAT

14   THERE'S NO EVIDENCE THAT THAT NUMBER IS NOT IN FACT

15   ACCURATE.

16        THE GOVERNMENT SUBMITS IT IS HERE, AGAIN,

17   IMPORTANT FOR YOU TO USE YOUR REASON AND COMMON

18   SENSE.  BOB LIN, MARK VERDIELL, GRACE DOONG, NONE

19   OF THEM EVER GOT ANY OF THEIR INVESTMENT BACK.

20        THE GOVERNMENT SUBMITS THAT IN FACT THAT

21   VALUATION PROVIDED BY MR. HU TO MS. DOONG AND

22   OTHERS DURING THAT 2008 WEBEX CALL WAS JUST ONE

23   MORE LIE IN MR. HU'S SCHEME TO DEFRAUD THAT HAD GUN

24   YEARS EARLIER.  AND THAT IT WAS PART OF THE SAME

25   PATTERN OF BRAZEN, SYSTEMATIC SERIAL LIES THAT

1    MR. HU HAD ENGAGED IN, KNOWINGLY AND INTENTIONALLY

2    TO STEAL MONEY FROM INVESTORS, TO TAKE THEIR MONEY

3    AND NOT INVEST IT IN HIGH TECHNOLOGY STOCKS,

4    ESSENTIALLY ALL THEIR ASSETS AS THE INVESTMENT

5    DOCUMENTS PROVIDED.

6         YOU HEARD THE TESTIMONY OF SPECIAL AGENT

7    FINE TRACING THE MONEY FOR EACH OF THE FIVE WIRE

8    TRANSFERS FROM BOB LIN AND MARK VERDIELL, SHOWING

9    THAT WITH THE EXCEPTION OF MR. VERDIELL'S

10   $2 MILLION THERE WAS NO INDICATION OF TRADING.  AND

11   EVEN WHEN A SMALL PORTION OF MR. VERDIELL'S MONEY

12   WAS USED TO PURCHASE SECURITIES, THOSE PROCEEDS

13   NEVER WENT BACK AFTER THOSE STOCKS WERE SOLD TO THE

14   BENEFIT OF MR. VERDIELL.

15        MR. FONG ALSO MADE REFERENCE TO PROBLEMS

16   THAT MR. HU INDICATED HE WAS HAVING IN 2008

17   RETURNING THE MONEY AND MR. FONG ALSO MADE

18   REFERENCE TO VARIOUS FINANCIAL DIFFICULTIES THAT

19   WERE OCCURRING IN THE MARKET IN 2008.

20        THE GOVERNMENT SUBMITS THERE IS NO REASON

21   TO BELIEVE THAT MR. HU'S FUNDS FAILED BECAUSE OF

22   ANY PROBLEMS IN CONNECTION WITH THE INDICATIONS AND

23   DISCUSSIONS THAT WERE IN MR. HU'S E-MAILS TO THE

24   INVESTORS.

25        AS MR. FINE HAD TESTIFIED, THE MONEY WAS

1    GONE, ESSENTIALLY GONE, AS OF OCTOBER 23RD, 2007.

2    AND THAT MR. LIN ASKED FOR HIS MONEY BACK IN 2007.

3    THAT MS. DOONG EXECUTED HER WITHDRAWAL FORM ALONG

4    WITH HER SISTER IN MR. HU'S PRESENCE IN WHICH SHE

5    ASKED HIM TO SIGN A SECOND TIME IN HER PRESENCE IN

6    2007.  AND THAT MR. VERDIELL FORMALIZED HIS REQUEST

7    FOR HIS MONEY IN EARLY 2008.

8            NONE OF THEM RECEIVED THEIR FUNDS BACK.

9    THEIR MONEY WAS NOT INVESTED AS THEY HAD BEEN

10   PROMISED BY MR. HU.

11           IN CLOSING, LADIES AND GENTLEMEN, THE

12   GOVERNMENT SUBMITS THAT THE EVIDENCE IS

13   OVERWHELMING THAT ALBERT HU ACTED KNOWINGLY AND

14   INTENTIONALLY TO MAKE MATERIALLY FALSE STATEMENT

15   THAT IS HE KNEW WERE FALSE, HE RAN THE ASENQUA BETA

16   AND FIRESIDE FUNDS, HE CONTROLLED THE MONEY, MR. HU

17   HAD DIRECT CONTACT WITH THE INVESTORS, MR. HU

18   PROVIDED THE INVESTMENT DOCUMENTS, MR. HU PROVIDED

19   THE DOCUMENTS CONTAINING FORGED SIGNATURES OF

20   ANTHONY POLLACE, MR. HU LEASED THE SPACE FOR

21   CASTILLO, LYN, COHEN & VIJAY AUDITING FIRM, MR. HU

22   PROVIDED THE AUDITED STATEMENTS FROM THE CASTILLO,

23   LYN, COHEN & VIJAY FIRM TO THE INVESTORS, MR. HU

24   PROMISED TO INVEST THEIR MONEY IN HIGH TECHNOLOGY

25   STOCKS, HE DID NOT DO SO.

1          MR. HU PROMISED TO RETURN THE INVESTOR'S

2     MONEY EVEN WHEN HE KNEW THE MONEY WAS ALREADY GONE.

3          THE GOVERNMENT SUBMITS THE EVIDENCE IS

4     OVERWHELMING IN THIS CASE AS TO EACH COUNT, EACH OF

5     THE SEVEN COUNTS OF WIRE FRAUD.

6          THE GOVERNMENT ASKS THAT YOU RETURN A

7     GUILTY VERDICT ON ALL COUNTS AGAINST THE DEFENDANT,

8     ALBERT HU.

9          THE COURT:  ALL RIGHT.  THANK YOU.

10          MS. GARCIA, WOULD YOU PASS OUT THE

11     INSTRUCTIONS, AND THE VERDICT FORMS.

12          THE COURT:  BEFORE I READ THESE

13     INSTRUCTIONS LET ME MAKE A COUPLE OF COMMENTS.

14          ONE IS THE JURY INSTRUCTIONS ARE FOR YOU

15     TO USE AS YOU SEE FIT.  IF YOU FIND IT HELPFUL TO

16     FOLLOW ALONG AS I READ THEM, THAT'S FINE.  IF IT'S

17     EASIER FOR YOU TO JUST LISTEN TO WHAT I'M SAYING

18     AND SAVE THOSE FOR LATER REFERENCE, THAT'S FINE

19     TOO.  IT'S YOUR COPY TO USE IN WHATEVER WAY WILL

20     HELP YOU MAKE NOTES ON IT IF YOU WANT OR NOT.

21          THE VERDICT FORM WILL BE SIGNED ONLY BY

22     THE PRESIDING OR FOREPERSON OF THE JURY.  I'VE

23     GIVEN YOU EACH A COPY SO THAT WHEN YOU'RE

24     DELIBERATING YOU CAN SEE THE FORM THAT NEEDS TO BE

25     FILLED OUT BUT THE ACTUAL VERDICT FORM SHOULD BE

1106

1    FILLED OUT AND SIGNED BY WHOEVER IS THE PRESIDING

2    OR FOREPERSON OF THE JURY.

3            SO LET ME NOW READ THE INSTRUCTIONS TO

4    YOU.

5                    **JURY INSTRUCTIONS**

6

7            MEMBERS OF THE JURY, NOW THAT YOU HAVE

8    HEARD ALL THE EVIDENCE, IT IS MY DUTY TO INSTRUCT

9    YOU ON THE LAW WHICH APPLIES TO THIS CASE.  A COPY

10   OF THESE INSTRUCTIONS HAS BEEN GIVEN TO YOU FOR YOU

11                   TO CONSULT.

12           IT IS YOUR DUTY TO FIND THE FACTS FROM

13   ALL THE EVIDENCE IN THE CASE.  TO THOSE FACTS YOU

14   WILL APPLY THE LAW AS I GIVE IT TO YOU.  YOU MUST

15   FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER OR NOT

16   YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE

17   INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES,

18   OPINIONS, PREJUDICES, OR SYMPATHY.

19           THAT MEANS THAT YOU MUST DECIDE THE CASE

20   SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL

21   THAT YOU TOOK AN OATH PROMISING TO DO SO AT THE

22   BEGINNING OF THE CASE.

23           IN FOLLOWING MY INSTRUCTIONS, YOU MUST

24   FOLLOW ALL OF THEM AND NOT SINGLE OUT SOME AND

25   IGNORE OTHERS.  THEY ARE ALL EQUALLY IMPORTANT.

1    YOU MUST NOT READ INTO THESE INSTRUCTIONS OR INTO

2    ANYTHING THE COURT MAY HAVE SAID OR DONE ANY

3    SUGGESTION AS TO WHAT VERDICT YOU SHOULD RETURN,

4    THAT IS A MATTER ENTIRELY UP TO YOU.

5         THE INDICTMENT IS NOT EVIDENCE.  MR. HU

6    HAS PLEADED NOT GUILTY TO THE CHARGES.  HE'S

7    PRESUMED TO BE INNOCENT AND UNLESS AND UNTIL THE

8    GOVERNMENT PROVES HIM GUILTY BEYOND A REASONABLE

9    DOUBT.  IN ADDITION, THE DEFENDANT DOES NOT HAVE TO

10   TESTIFY OR PRESENT ANY EVIDENCE TO PROVE INNOCENCE.

11        THE GOVERNMENT HAS THE BURDEN OF PROVING

12   EVERY ELEMENT OF THE COUNT BEYOND A REASONABLE

13   DOUBT BEFORE THE DEFENDANT CAN BE FOUND GUILTY OF

14   THAT COUNT.

15        A DEFENDANT IN A CRIMINAL CASE HAS A

16   CONSTITUTIONAL RIGHT NOT TO TESTIFY.  YOU MAY NOT

17   DRAW ANY INFERENCE OF ANY KIND FROM THE FACT THAT

18   MR. HU DID NOT TESTIFY.

19        PROOF BEYOND A REASONABLE DOUBT IS PROOF

20   THAT LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT

21   IS GUILTY.  IT IS NOT REQUIRED THAT THE GOVERNMENT

22   PROVE GUILTY BEYOND ALL POSSIBLE DOUBT.

23        A REASONABLE DOUBT IS A DOUBT BASED UPON

24   REASON AND COMMON SENSE AND IS NOT BASED PURELY ON

25   SPECULATION.  IF MAY ARISE FROM A CAREFUL AND

1    IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE OR FROM

2    LACK OF EVIDENCE.

3           IF AFTER A CAREFUL AND IMPARTIAL

4    CONSIDERATION OF ALL THE EVIDENCE YOU ARE NOT

5    CONVINCED BEYOND A REASONABLE DOUBT THAT MR. HU IS

6    GUILTY, IT IS YOUR DUTY TO FIND HIM NOT GUILTY.

7           ON THE OTHER HAND IF AFTER A CAREFUL AND

8    IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE YOU ARE

9    CONVINCED BEYOND A REASONABLE DOUBT THAT MR. HU IS

10   GUILTY, IT IS YOUR DUTY TO FIND HIM GUILTY.

11          THE EVIDENCE FROM WHICH YOU ARE TO DECIDE

12   WHAT THE FACTS ARE CONSISTS OF ONE, THE SWORN

13   TESTIMONY OF ANY WITNESS.

14          TWO, THE EXHIBITS WHICH HAVE BEEN

15   RECEIVED INTO EVIDENCE.

16          AND THREE, ANY FACTS TO WHICH THE PARTIES

17   HAVE AGREED.

18          THE PARTIES HAVE AGREED TO CERTAIN

19   STIPULATIONS OF FACT THAT HAVE BEEN READ TO YOU.

20   YOU SHOULD THEREFORE TREAT THE FACTS IN THOSE

21   STIPULATIONS AS HAVING BEEN PROVED.

22          IN REACHING YOUR VERDICT YOU MAY CONSIDER

23   ONLY THE TESTIMONY AND EXHIBITS RECEIVED IN

24   EVIDENCE.  THE FOLLOWING THINGS ARE NOT IN EVIDENCE

25   AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE

1    FACTS ARE.

2              QUESTIONS AND STATEMENTS, OBJECTIONS AND

3    ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE.  THE

4    LAWYERS ARE NOT WITNESSES.  ALTHOUGH YOU MUST

5    CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND THE

6    ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE

7    NOT EVIDENCE.

8              SIMILARLY, WHAT THE LAWYERS HAVE SAID IN

9    THEIR OPENING STATEMENTS, CLOSING ARGUMENTS AND AT

10   OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE

11   EVIDENCE, BUT IT IS NOT EVIDENCE.

12             IF THE FACTS AS YOU REMEMBER THEM DIFFER

13   FROM THE WAY THE LAWYERS STATED THEM, YOUR MEMORY

14   OF THEM CONTROLS.

15             ANY TESTIMONY THAT I HAVE EXCLUDED,

16   STRICKEN OR INSTRUCTED YOU TO DISREGARD IS NOT

17   EVIDENCE.  IN ADDITION, SOME EVIDENCE WAS RECEIVED

18   FOR A LIMITED PURPOSE.  WHEN I INSTRUCTED YOU TO

19   CONSIDER EVIDENCE, CERTAIN EVIDENCE IN A LIMITED

20   WAY, YOU MUST DO SO.

21             ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN

22   THE COURT IS NOT IN SESSION IS NOT EVIDENCE.  YOU

23   ARE TO DECIDE THE CASE SALLY ON IT IS EVIDENCE

24   RECEIVED AT THE TRIAL.

25             EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

                                              1110

1     DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS

2     TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS

3     PERSONALLY SAW OR HEARD OR DID.

4              CIRCUMSTANTIAL EVIDENCE IS INDIRECT

5     EVIDENCE.  THAT IS THE PROOF OF ONE OR MORE FACTS

6     FROM WHICH YOU CAN FIND ANOTHER FACT.

7              YOU ARE TO CONSIDER BOTH

8     CIRCUMSTANTIAL -- YOU ARE TO CONSIDER BOTH DIRECT

9     AND CIRCUMSTANTIAL EVIDENCE, THERE SHOULD BE AN

10    EVIDENCE AT THE END OF THAT SENTENCE.

11             EITHER CAN BE USED TO PROVE ANY FACT.

12    THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO

13    BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

14    EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT

15    TO GIVE TO ANY EVIDENCE.

16             IN DECIDING THE FACTS IN THIS CASE, YOU

17    MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND

18    WHICH TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE

19    EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE OF

20    IT.

21             IN CONSIDERING THE TESTIMONY OF ANY

22    WITNESS YOU MAY TAKE INTO ACCOUNT THE WITNESS'S

23    OPPORTUNITY AND ABILITY TO SEE OR HEAR OR KNOW THE

24    THINGS TESTIFIED TO.

25             THE WITNESS'S MEMORY, THE WITNESS'S

1   MANNER WHILE TESTIFYING, THE WITNESS'S INTEREST IN

2   THE OUTCOME IN THE CASE, IF ANY, THE WITNESS'S BIAS

3   OR PREJUDICE, IF ANY, WHETHER OTHER EVIDENCE

4   CONTRADICTED THE WITNESS'S TESTIMONY, THE

5   REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

6   OF ALL THE EVIDENCE, AND ANY OTHER FACTORS THAT

7   BEAR ON BELIEVABILITY.

8           THE WEIGHT OF THE EVIDENCE AS TO A FACT

9   DOES NOT NECESSARILY DEPEND ON THE NUMBER OF

10  WITNESSES WHO TESTIFY.  WHAT IS IMPORTANT IS HOW

11  BELIEVABLE THE WITNESSES WERE, AND HOW MUCH WEIGHT

12  YOU THINK THEIR TESTIMONY DESERVES.

13          YOU ARE HERE ONLY TO DETERMINE WHETHER

14  MR. HU IS GUILTY OR NOT GUILTY OF THE CHARGES IN

15  THE INDICTMENT.  MR. HU IS NOT ON TRIAL FOR ANY

16  CONDUCT OR OFFENSE NOT CHARGED IN THE INDICTMENT.

17          YOU HAVE HEARD EVIDENCE RELATING TO

18  INVESTMENT FUNDS THAT MR. HU OBTAINED FROM

19  GRACE DOONG AND HER SISTER.  MR. HU IS NOT CHARGED

20  IN THIS CASE WITH WIRE FRAUD WITH RESPECT TO WIRE

21  TRANSFERS OF MONEY MADE BY MS. DOONG AND HER

22  SISTER.  YOU MAY CONSIDER THE TESTIMONY OF

23  MS. DOONG REGARDING THE REPRESENTATIONS MADE TO HER

24  ONLY ON THE LIGHT IT SHEDS, IF ANY, ON THE QUESTION

25  OF WHETHER MR. HU WAS ENGAGED IN A FRAUDULENT

1    SCHEME AND ON HIS INTENT MOTIVE OR PLAN AT THE TIME

2    HE OBTAINED THE MONEY HE IS CHARGED WITH HAVING

3    OBTAINED FROM BOB LIN AND MARK VERDIELL.

4         A SEPARATE CRIME IS CHARGED AGAINST

5    MR. HU IN EACH COUNT.  YOU MUST DECIDE EACH COUNT

6    SEPARATELY.  YOUR VERDICT ON ONE COUNT SHOULD NOT

7    CONTROL YOUR VERDICT ON ANY OTHER COUNT.

8         CERTAIN CHARTS AND SUMMARIES HAVE BEEN

9    ADMITTED IN EVIDENCE.  CHARTS AND SUMMARIES ARE

10   ONLY AS GOOD AS THE UNDERLYING SUPPORTING MATERIAL.

11   YOU SHOULD, THEREFORE, GIVE THEM ONLY SUCH WEIGHT

12   AS YOU THINK THE UNDERLYING MATERIAL DESERVES.

13        MR. HU IS CHARGED WITH SEVEN COUNTS OF

14   WIRE FRAUD.  THE GOVERNMENT CHARGES THAT ON THE

15   DATES LISTED BELOW ALBERT HU, HAVING KNOWINGLY AND

16   INTENTIONALLY DEVISED A SCREAM TO DEFRAUD AND TO

17   OBTAIN MONEY BY MEANS OF MATERIAL FALSE AND

18   FRAUDULENT PRETENSES, REPRESENTATION CUBICLES AND

19   PROMISES, DID FOR THE PURPOSE OF EXECUTING THE

20   SCHEME, KNOWINGLY CAUSE TO BE TRANSMITTED IN

21   INTERSTATE OR FOREIGN COMMERCE, THE FOLLOWING WIRES

22   OR WIRE COMMUNICATIONS.

23        COUNT ONE, THE TRANSFER DATE OF

24   FEBRUARY 8TH, 2005, AN INTERSTATE WIRE TRANSFER OF

25   $100,000 SENT BY OR ON BEHALF OF MR. LIN TO A BANK

1113

1    OF AMERICA ACCOUNT ENDING IN 6581.

2              COUNT TWO, DATE OF FEBRUARY 23RD, 2005,

3    AN INTERSTATE WIRE TRANSFER OF $100,000 SENT BY OR

4    ON BEHALF OF MR. LIN TO BANK OF AMERICA ACCOUNT

5    ENDING IN 6581.

6              COUNT 3, JULY 6, 2005, INTERSTATE WIRE

7    TRANSFER OF $250,000 SENT BY OR ON BEHALF OF

8    MR. LIN TO A BANK OF AMERICA ACCOUNT ENDING IN

9    6581.

10             COUNT 4, APRIL 27, 2007, INTERSTATE WIRE

11   COMMUNICATION DIRECTING A $2 MILLION WIRE TRANSFER

12   BE SENT BY OR ON BEHALF OF MR. VERDIELL TO A CREDIT

13   SUISSE ACCOUNT ENDING IN 1780.

14             COUNT FIVE, AN INTERSTATE WIRE DATED

15   APRIL 30TH, 2007, INTERNATIONAL WIRE TRANSFER OF

16   $2 MILLION SENT BY OR ON BEHALF OF MR. VERDIELL TO

17   A CREDIT SUISSE ACCOUNT ENDING IN 1780.

18             COUNT 6, JUNE 19, 2007, AN INTERSTATE

19   WIRE COMMUNICATION DIRECTING THAT A $250,000 WIRE

20   TRANSFER BE SENT BY OR ON BEHALF OF MR. LIN TO A

21   CREDIT SUISSE ACCOUNT ENDING IN 1780.

22             AND COUNT SEVEN, A JUNE 19, 2007,

23   INTERNATIONAL WIRE TRANSFER OF $250,000 SENT BY OR

24   ON BEHALF OF MR. LIN TO A CREDIT SUISSE ACCOUNT

25   ENDING IN 1780.

1     IN ORDER FOR MR. HU TO BE FOUND GUILTY OF

2     ANY COUNT OF THE CHARGED OFFENSES OF WIRE FRAUD,

3     THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

4     ELEMENTS BEYOND A REASONABLE DOUBT WITH RESPECT TO

5     THAT COUNT.

6     FIRST, THE DEFENDANT KNOWINGLY DEVISED A

7     SCHEME OR PLAN TO DEFRAUD, OR A SCREAM OR PLAN FOR

8     OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR

9     FRAUDULENT PRETENSES OR REPRESENTATIONS OR

10    PROMISES, WITH ALL OF YOU AGREEING ON AT LEAST ONE

11    PARTICULAR FALSE OR FRAUDULENT PRETENSE,

12    REPRESENTATION OR PROMISE THAT WAS MADE.

13    SECOND, THE DEFENDANT KNEW THAT THE

14    PRETENSES, REPRESENTATIONS OR PROMISES WERE FALSE

15    OR FRAUDULENT.

16    THIRD, THE FALSE OR FRAUDULENT PRETENSES

17    REPRESENTATIONS OR PROMISES THAT WERE MADE AS PART

18    OF THE SCHEME OR PLAN WERE MATERIAL.

19    FOURTH, THE DEFENDANT ACTED WITH THE

20    INTENT TO DEFRAUD, THAT IS THE INTEND TO DECEIVE OR

21    CHEAT.

22    AND FIFTH, THE DEFENDANT USED OR CAUSED

23    TO BE USED INTERSTATE OR INTERNATIONAL WIRES TO

24    CARRY OUT AN ESSENTIAL PART OF THE SCHEME.

25    IN DETERMINING WHETHER A SCHEME TO

1    DEFRAUD EXISTS YOU MAY CONSIDER NOT ONLY THE

2    DEFENDANT'S WORDS OR STATEMENTS BUT ALSO THE

3    CIRCUMSTANCES IN WHICH THEY WERE USED AS A WHOLE.

4            A FALSE OR FRAUDULENT PRETENSE,

5    REPRESENTATION OR PROMISE IS MATERIAL IF IT HAD A

6    NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF

7    INFLUENCING A POTENTIAL INVESTOR TO PART WITH

8    MONEY.

9            A DEFENDANT USES OR CAUSES SOMEONE TO USE

10   INTERSTATE WIRES WHEN HE KNOWS OR REASONABLY

11   FORESEES IN THE ORDINARY COURSE OF BUSINESS THAT

12   ANY WRITING SIGNAL OR SOUND WILL BE TRANSMITTED BY

13   MEANS OF WIRE, RADIO, TELEVISION, COMMUNICATION

14   FROM ONE STATE TO ANOTHER.

15           SIMILARLY, A DEFENDANT USES OR CAUSES

16   SOMEONE TO USE INTERNATIONAL WIRES WHEN HE KNOWS,

17   OR REASONABLY FORESEES IN THE ORDINARY COURSE OF

18   BUSINESS THAT ANY WRITING, SIGNAL OR SOUND WILL BE

19   TRANSMITTED BY MEANS OF WIRE, RADIO OR TELEVISION

20   COMMUNICATION FROM ONE COUNTRY TO ANOTHER.

21           IT DOES NOT MATTER WHETHER THE MATERIAL

22   WIRED WAS ITSELF FALSE OR DECEPTIVE SO AS LONG AS

23   THE WIRES WERE USED AS A PART OF THE SCHEME, NOR

24   DOES IT MATTER WHETHER THE SCHEME OR PLAN WAS

25   SUCCESSFUL OR THAT ANY MONEY OR PROPERTY WAS

1    OBTAINED.

2              THE GOVERNMENT CHARGES THAT MR. HU MADE

3    THE FOLLOWING FRAUDULENT STATEMENTS,

4    REPRESENTATIONS OR PROMISES.

5              A, THAT GLOBEOP FINANCIAL SERVICES WAS

6    THE FUND ADMINISTRATOR FOR DEFENDANT HU'S FIRESIDE

7    LS FUND.

8              B, THE LAW FIRM PROSKAUER ROSE WAS

9    ENGAGED AS LEGAL COUNSEL FOR DEFENDANT HU'S

10   FIRESIDE LS FUND.

11             C, THE FIRM OF CASTILLO, LYN, COHEN &

12   VIJAY WAS AN INDEPENDENT AUDITOR FOR DEFENDANT

13   ASENQUA BETA FUND AND FIRESIDE LS FUND.

14             D, THAT AN INDIVIDUAL NAMED TONY POLLACE

15   WAS THE CHIEF FINANCIAL OFFICER OF THE ASENQUA BETA

16   FUND AND THE FIRESIDE LS FUND AND THAT POLLACE HAD

17   SIGNED OFF ON QUARTERLY FINANCIAL STATEMENTS OF

18   THOSE HEDGE FUNDS WHICH DEFENDANT HU PROVIDED TO

19   INVESTORS.

20             E, THAT AS OF MAY 2007 THE MINIMUM AMOUNT

21   INDIVIDUALS WERE INVESTING IN THE FIRESIDE LS FUND

22   TO DATE WAS $1 MILLION.

23             F, THAT DEFENDANT HU WOULD PAY INVESTORS

24   RATES OF RETURN AS HIGH AS 20 TO 30 PERCENT

25   ANNUALLY AND THAT THESE WERE HISTORIC RATES OF

1    RETURN FOR HIS HEDGE FUND.

2              AND G, THAT DEFENDANT HU WOULD OBTAIN

3    THESE HIGH RATE RETURNS FOR INVESTORS PRIMARILY BY

4    INVESTING THEIR FUNDS IN TECHNOLOGY-RELATED

5    SECURITIES.

6              AN ACT IS DONE KNOWINGLY IF THE DEFENDANT

7    IS AWARE OF THE ACT AND DOES NOT ACT THROUGH

8    IGNORANCE, MISTAKE OR ACCIDENT.

9              THE GOVERNMENT IS NOT REQUIRED TO PROVE

10   THAT THE DEFENDANT KNEW HIS ACTS OR OMISSIONS WERE

11   UNLAWFUL.  YOU MAY CONSIDER EVIDENCE OF THE

12   DEFENDANT'S WORDS, ACTS OR OMISSIONS ALONG WITH ALL

13   THE OTHER EVIDENCE IN DECIDING WHETHER THE

14   DEFENDANT ACTED KNOWINGLY.

15             WHEN YOU BEGIN YOUR DELIBERATIONS YOU

16   SHOULD ELECT ONE MEMBER OF THE JURY AS YOUR

17   PRESIDING JUROR WHO WILL PRESIDE OVER THE

18   DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

19             YOU WILL THEN DISCUSS THE CASE WITH YOUR

20   FELLOW JURORS TO REACH AGREEMENT IF YOU CAN DO SO.

21   YOUR VERDICT, WHETHER GUILTY OR NOT GUILTY MUST BE

22   UNANIMOUS.

23             EACH OF YOU MUST DECIDE THE CASE FOR

24   YOURSELF, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE

25   CONSIDERED ALL THE EVIDENCE, DISCUSSED IT FULLY

1    WITH THE OTHER JURORS, AND LISTENED TO THE VIEWS OF

2    YOUR FELLOW JURORS.

3            DO NOT BE AFRAID TO CHANGE YOUR OPINION

4    IF THE DISCUSSION PERSUADES YOU THAT YOU SHOULD.

5    BUT DO NOT COME TO A DECISION SIMPLY BECAUSE THE

6    OTHER JURORS THINK IT IS RIGHT.

7            IT IS IMPORTANT THAT YOU ATTEMPT TO REACH

8    A UNANIMOUS VERDICT, BUT OF COURSE ONLY IF EVEN OF

9    YOU CAN DO SO AFTER HAVING MADE YOUR OWN

10   CONSCIENTIOUS DECISION.  DO NOT CHANGE AN HONEST

11   BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

12   SIMPLY TO REACH A VERDICT.

13           BECAUSE YOU MUST BASE YOUR VERDICT ON THE

14   EVIDENCE RECEIVED IN THE CASE, AND ON THESE

15   INSTRUCTIONS, I REMIND YOU THAT YOU MUST NOT BE

16   EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR

17   TO THE ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING

18   THE CASE WITH YOUR FELLOW JURORS DURING YOUR

19   DELIBERATIONS.

20           DO NOT COMMUNICATE WITH ANYONE IN ANY WAY

21   AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN

22   ANY WAY ABOUT THE MERITS OF THE CASE OR ANYTHING TO

23   DO WITH IT.  THIS INCLUDES DISCUSSING THE CASE IN

24   PERSON OR WRITING, BY PHONE OR ELECTRONIC MEANS VIA

25   E-MAIL, TEXT MESSAGES OR ANY INTERNET CHAT ROOM,

1119

1     BLOG, WEBSITE OR OTHER FEATURE.

2              THIS APPLIES TO COMMUNICATING WITH YOUR

3     FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS

4     AND THE PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE

5     ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

6     SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST THAT

7     YOU HAVE BEEN ORDERED WANT TO DISCUSS THE MATTER

8     AND TO REPORT THE CONTACT TO THE COURT.

9              DID NOT READ, WATCH OR LISTEN TO ANY NEWS

10    OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR

11    ANYTHING TO DO WITH IT.  DO NOT DO ANY RESEARCH,

12    CONSULTING DICTIONARIES, SEARCHING THE INTERNET OR

13    USING OTHER REFERENCE MATERIALS.  AND DO NOT MAKE

14    ANY INVESTIGATION OR ANY OTHER WAY TO TRY TO LEARN

15    ABOUT THE CASE ON YOUR OWN.

16             THE LAW REQUIRES THESE RESTRICTIONS TO

17    ENSURE THE PARTIES HAVE A FAIR TRIAL BASED ON THE

18    SAME EVIDENCE THAT EACH PARTY HAS HAD AN

19    OPPORTUNITY TO ADDRESS.

20             A JUROR WHO VIOLATES THESE RESTRICTIONS

21    JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS.  IF

22    ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION,

23    PLEASE NOTIFY THE COURT IMMEDIATELY.  SOME OF YOU

24    HAVE TAKEN NOTES DURING THE TRIAL.

25             WHETHER OR NOT YOU TOOK NOTES YOU SHOULD

1120

1    RELY ON YOUR OWN MEMORY OF WHAT WAS SAID, NOTES ARE

2    ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD NOT BE

3    OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR

4    FELLOW JURORS.

5            THE PUNISHMENT PROVIDED BY LAW FOR THE

6    CRIMES INVOLVED IS FOR THE COURT TO DECIDE IF THERE

7    IS A FINDING OF GOVERNMENT.  YOU MAY NOT CONSIDER

8    PUNISHMENT IN DECIDING WHETHER OR NOT THE

9    GOVERNMENT HAS PROVED ITS CASE AGAINST MR. HU

10   BEYOND A REASONABLE DOUBT.

11           A VERDICT FORM HAS BEEN PREPARED FOR YOU

12   AFTER YOU'VE REACHED UNANIMOUS AGREEMENT ON YOUR

13   VERDICT YOUR PRESIDING JUROR SHOULD COMPLETE THE

14   VERDICT FORM ACCORDING TO YOUR DELIBERATIONS SIGN

15   AND DATE IT, AND ADVISE THE COURT OFFICER THAT YOU

16   ARE READY TO RETURN TO THE COURTROOM.

17           IF IT BECOMES NECESSARY DURING YOUR

18   DELIBERATIONS TO COMMUNICATE WITH ME, YOU MAY SEND

19   A NOTE THROUGH THE COURT OFFICER, SIGNED BY ANY ONE

20   OR MORE OF YOU.

21           NO MEMBER OF THE JURY SHOULD EVER ATTEMPT

22   TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING

23   AND I WILL RESPOND TO THE JURY CONCERNING THE CASE

24   ONLY IN WRITING OR HERE IN OPEN COURT.

25           IF YOU SEND OUT A QUESTION I WILL CONSULT

1    WITH THE LAWYERS BEFORE CONSIDERING IT, WHICH IT

2    MAY TAKE SOME TIME.  YOU MAY CONTINUE YOUR

3    DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

4    QUESTION.

5                REMEMBER THAT YOU ARE NOT TO TELL ANYONE

6    INCLUDING ME, HOW THE JURY STANDS NUMERICALLY OR

7    OTHERWISE ON ANY QUESTION SUBMITTED TO YOU

8    INCLUDING THE QUESTION OF THE GUILTY OF MR. HU

9    UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR

10   HAVE BEEN DISCHARGED.

11               ALL RIGHT.  YOU ARE FREE TO DELIBERATE

12   THIS AFTERNOON IF YOU WISH.  WHAT I WOULD ASK IS IF

13   YOU DECIDE -- WHEN YOU DECIDE WHAT YOUR SCHEDULE

14   WILL BE FOR DELIBERATIONS, PLEASE GIVE ME A NOTE

15   AND GIVE US A SCHEDULE.

16               I REQUIRE THE LAWYERS TO BE WITHIN TEN

17   MINUTES OF THE COURTROOM.  SO IF YOU HAVE A

18   QUESTION OR HAVE A VERDICT, THEY CAN GET HERE

19   PROMPTLY.

20               SO IF YOU'RE OUT TAKING A LUNCH BREAK OR

21   WHATEVER, AND YOU ARE GOING TO WORK UNTIL ONLY A

22   CERTAIN TIME IN THE AFTERNOON, WE WOULD LIKE TO

23   KNOW THAT SO THAT WE CAN ADJUST OUR SCHEDULES

24   ACCORDINGLY.

25               AS I MENTIONED TO YOU, THE VERDICT FORM

1    SHOULD BE FILLED OUT ONLY BY WHOEVER IS THE

2    FOREPERSON.  WHEN I SAY FOREPERSON, YEARS AGO AS

3    YOU CAN PROBABLY IMAGINE, THAT VERDICT FORM WOULD

4    SAY FOREMAN.  AND THEN THEY GOT A LITTLE MORE TUNED

5    INTO WHAT WAS POLITICALLY CORRECT AND THEY CHANGED

6    IT TO FOREPERSON.  AND NOW MORE OFTEN THAN NOT YOU

7    SEE PRESIDING JUROR.

8              WHEN THE ORIGINAL SWITCH WAS BEING MADE

9    TO FOREPERSON, FROM FOREMAN TO FOREPERSON, ONE OF

10   THE JUDGES ACTUALLY IN STATE COURT GOT A VERDICT

11   FORM SIGNED BY FOREPERSONS.

12             WE ONLY WANT IT SIGNED BY THE PRESIDING

13   JUROR OR FOREPERSON.

14             ALSO, YOU ARE FREE TO OBVIOUSLY TAKE

15   BREAKS DURING YOUR DELIBERATIONS TO STRETCH OR

16   WHATEVER, BUT PLEASE REMEMBER YOU SHOULD ONLY TALK

17   ABOUT THE CASE WHEN ALL 12 OF YOU ARE TOGETHER.

18   YOU SHOULD NOT TALK ABOUT IT SEPARATELY, ONLY WHEN

19   ALL 12 ARE TOGETHER.

20             AND MR. VALDEZ, I THINK YOU ARE THE

21   ALTERNATE AND IF YOU WOULD HANG ON AFTER I SEND THE

22   OTHER JURORS ON THEIR WAY I WOULD LIKE TO TALK TO

23   YOU ABOUT WHAT YOU NEED TO DO.

24             AND WITH THAT I WILL HAVE MS. GARCIA -- I

25   GUESS THE SECURITY OFFICER NEEDS TO BE SWORN.

1123

1          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

2          (WHEREUPON THE SECURITY OFFICER WAS GIVEN

3     THE OATH.)

4          COURT SECURITY OFFICER:  I DO.

5          THE COURT:  SO WHAT I WOULD LIKE YOU TO

6     DO FIRST IS TO TAKE CARE OF ELECTING YOUR

7     FOREPERSON THEN GIVE US A SCHEDULE SO WE KNOW WHAT

8     WE ARE GOING TO DO AND THEN START YOUR

9     DELIBERATIONS.

10          (WHEREUPON, THE FOLLOWING PROCEEDINGS

11     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

12          THE COURT:  MR. VALDEZ, IT CERTAINLY

13     APPEARS AT THIS POINT WE ARE NOT GOING TO NEED YOU,

14     BUT I WOULD ASK YOU TO GIVE YOUR TELEPHONE NUMBER,

15     IF SHE DOESN'T HAVE IT, TO MS. GARCIA SO SHE HAS

16     IT.  IT'S ALWAYS POSSIBLE SOMETHING SHOULD OCCUR

17     WITH THE JURY WHICH WOULD REQUIRE OUR NEED TO GET

18     IN CONTACT WITH YOU.

19          I WOULD ALSO ASK YOU NOT TO TALK ABOUT

20     YOUR EXPERIENCE OR JURY SEVERANCE UNTIL YOU'VE

21     LEARNED THE JURY HAS IN FACT REACHED A VERDICT.  AT

22     THAT POINT IN TIME YOU ARE FREE TO TALK ABOUT THE

23     CASE WITH OTHERS IF YOU WISH.  ON THE OTHER HAND

24     YOU HAVE ABSOLUTELY NO OBLIGATION TO DO SO.

25          IN CASE WE DON'T SEE YOU AGAIN I WOULD

1    LIKE TO THANK YOU FOR YOUR COOPERATION AND

2    ATTENDANCE AND THE TENTATIVENESS THROUGHOUT THE

3    TRIAL AND DON'T RESPOND TO THIS, BUT I DON'T KNOW

4    WHETHER YOU HAVE MIXED EMOTIONS ABOUT SITTING

5    THROUGH IT ALL AND NOT PARTICIPATING IN THE

6    DECISION OR WHETHER YOU'RE HAPPY THAT YOU DON'T

7    HAVE TO PARTICIPATE IN THE DECISION, BUT IN ANY

8    EVENT WE THANK YOU FOR YOUR SERVICE.

9              IF YOU HAVE ANY PERSONAL BELONGINGS IN

10   THE JURY ROOM, YOU ARE FREE TO GO GET THEM.  AND

11   ALSO MS. GARCIA WILL NEED TO COLLECT YOUR BADGE

12   FROM YOU, AND I DON'T KNOW IF SHE'S GOT A PARKING

13   VALIDATION SHE NEEDS TO GIVE YOU OR WHATEVER, BUT

14   CHECK WITH HER BEFORE YOU LEAVE.

15             AND WITH THAT, THANKS AND YOU MAY GO GET

16   YOUR STUFF.

17             LET ME CONFIRM WITH THE PARTIES I READ

18   THE INSTRUCTIONS AS YOU EXPECTED I WOULD?

19             MR. FONG:  YES, YOUR HONOR, ON BEHALF OF

20   THE DEFENSE.

21             MR. FAZIOLI:  YES, YOUR HONOR.

22             MR. LUCEY:  SURE.

23             THE COURT:  YOU HAD A SMILE BETWEEN YOU

24   TWO, DID I MISS SOMETHING?

25             MR. LUCEY:  WELL, I GUESS THERE'S TWO

1    POINTS, YOUR HONOR.

2              ONE, OBVIOUSLY EVERYONE MISSED THAT ONE

3    OMISSION OF EVIDENCE IN THE DIRECT, CIRCUMSTANTIAL

4    MATTER.  YOU READ IT INTO THE RECORD, OBVIOUSLY.

5              WOULD THE PLAN BE TO PROVIDE A CORRECTED

6    VERSION TO THE JURY OR --

7              THE COURT:  I THINK IT'S STATED, IT'S

8    OBVIOUS.

9              MR. FAZIOLI:  YOUR HONOR, I MAY HAVE

10   MISHEARD THIS, BUT IN THE INSTRUCTION OF REASONABLE

11   DOUBT THERE'S A SENTENCE THAT SAYS, IT IS NOT

12   REQUIRED THE GOVERNMENT PROVE GUILT BEYOND A

13   REASONABLE DOUBT -- IT SAYS, THE SENTENCE IN THE

14   WRITTEN INSTRUCTION SAYS, IT IS NOT REQUIRED THAT

15   THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE

16   DOUBT.

17             AND I RECALL THAT THE COURT MAY HAVE

18   READ, IT IS NOT NECESSARY THAT THE GOVERNMENT PROVE

19   GUILT BEYOND ALL POSSIBLE DOUBT.

20             I DON'T THINK IT'S A BIG ISSUE FROM OR

21   PERSPECTIVE.  SUBSTANTIVELY, IT'S QUITE SIMILAR.

22             THE COURT:  WHAT ARE YOU SAYING I DID?

23             MR. FAZIOLI:  I THINK ON THE SECOND

24   SENTENCE SAYING, IT DOES NOT REQUIRE THE GOVERNMENT

25   PROVE GUILT BEYOND ALL POSSIBLE DOUBT.  IT MAY HAVE

1    BEEN READ, IT IS NOT NECESSARY THAT THE GOVERNMENT

2    PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

3              THE COURT:  I DON'T SEE WHERE IT MAKES

4    ANY DIFFERENCE, IF THAT'S WHAT I SAID.

5              MR. FAZIOLI:  I DON'T REALLY THINK IT

6    MAKES A BIG DIFFERENCE EITHER, JUST NOTING IT FOR

7    THE RECORD.

8              THE COURT:  I DO NOT RECALL DOING THAT

9    BUT IT'S ENTIRELY POSSIBLE.

10             MR. FAZIOLI:  AND I ASSUME THE DEFENSE

11   DOESN'T HAVE AN ISSUE.

12             MR. FONG:  I HAVE NO OBJECTION, NO

13   COMMENT.

14             MR. FAZIOLI:  THANK YOU, YOUR HONOR.

15             THE COURT:  ANYTHING ELSE?

16             MR. FAZIOLI:  NO.

17             MR. LUCEY:  NO, YOUR HONOR.

18             THE COURT:  I WOULD ASK YOU TO HANG

19   AROUND UNTIL WE FIND OUT WHAT THEIR SCHEDULE IS

20   AND WE CAN ACT ACCORDINGLY.

21             (WHEREUPON, A RECESS WAS TAKEN.)

22             (WHEREUPON, THE FOLLOWING PROCEEDINGS

23   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

24             THE COURT:  UNLESS THIS IS MORE

25   COMPLICATED THAN I THINK, I WON'T BOTHER PUTTING ON

1    MY ROBE, BUT I THINK THE ANSWER IS YES.

2              MR. FONG:  WE AGREE, YOUR HONOR.

3              MR. FAZIOLI:  YES.  IT IS YES.

4              THE COURT:  SO LET ME JUST HAVE YOU LOOK

5    AT THIS.

6              MR. FAZIOLI:  IT'S COUNT SEVEN, I BELIEVE

7    THEY WERE ASKING ABOUT.

8              THAT'S CORRECT.

9              MR. LUCEY:  SO YOUR HONOR, JUST FOR THE

10   RECORD, WE ARE REPLACING --

11             THE COURT:  FOR THE RECORD, WE ARE

12   CORRECTING THE VERDICT FORM TO READ MR. LIN IN

13   COUNT SEVEN, RATHER THAN MR. VERDIELL.  AND I'M

14   GIVING THE JURY THE CORRECTED VERDICT FORM.

15             MR. LUCEY:  AND IT'S OTHERWISE UNCHANGED.

16             MR. FAZIOLI:  THANK YOU, YOUR HONOR.

17             MR. LUCEY:  THANK YOU, YOUR HONOR.

18             MR. FONG:  THANK YOU.

19             THE COURT:  I HOPE SO.  I MIGHT JUST

20   DOUBLE CHECK.  I THINK I PICKED THE MOST RECENT

21   COPY.

22             MR. LUCEY:  WE WILL DOUBLE CHECK TO MAKE

23   SURE.

24             (OFF-THE-RECORD DISCUSSION.)

25             MR. FAZIOLI:  I THINK THE SUBSTANCE IS

1    THE SAME.  IT'S SLIGHTLY DIFFERENT.  THE VERSION

2    THAT WAS JUST DISTRIBUTED HAS A SLIGHTLY DIFFERENT

3    FORMATTING.

4              MR. LUCEY:  JUST THE SPACING OF THE LINES

5    IS DIFFERENT ON THIS ONE.

6              MR. FAZIOLI:  SO THIS WAS THE ONE THAT

7    WAS DISTRIBUTED, AND THIS ONE HAS IT ON THE SIDE.

8              THE COURT:  OKAY.  I WILL GET THE

9    CORRECT, SAME ONE.

10             MR. LUCEY:  THANK YOU, YOUR HONOR.

11             MR. FAZIOLI:  THANK YOU.

12             ACTUALLY, THIS VERSION HAS, IT'S E-N-G.

13             (WHEREUPON, THE FOLLOWING PROCEEDINGS

14   WERE HELD IN THE PRESENCE OF THE JURY:)

15             THE COURT:  ALL RIGHT.

16             WHO IS THE FOREPERSON?

17             JUROR:  I AM.

18             THE COURT:  HAS THE JURY REACHED A

19   VERDICT?

20             JUROR:  YES, WE HAVE.

21             THE COURT:  WOULD YOU HAND IT TO

22   MS. GARCIA, PLEASE.

23             ALL RIGHT.  WOULD YOU PUBLISH THE

24   VERDICT, PLEASE.

25             THE CLERK:  YES.

1129

1     LADIES AND GENTLEMEN OF THE JURY, HARKEN

2   TO YOUR VERDICT, FOR IT WILL STAND RECORDED IN THE

3   NORTHERN DISTRICT OF CALIFORNIA FOR THE MATTER OF

4   CR-09-487, USA VERSUS ALBERT HU.

5     WE, THE MEMBERS OF THE JURY, IN THE ABOVE

6   ENTITLED ACTION FIND THE DEFENDANT ALBERT KE-JENG

7   HU AS TO COUNT ONE, GUILTY OF THE CHARGE OF WIRE

8   FRAUD WITH RESPECT TO AN INTERSTATE WIRE TRANSFER

9   OF A HUNDRED THOUSAND, SENT BY OR ON THE BEHALF OF

10  MR. LIN ON OR ABOUT FEBRUARY 8TH, 2005, AS

11  DESCRIBED IN INSTRUCTION 13.

12    COUNT TWO, GUILTY OF THE CHARGE OF WIRE

13  FRAUD WITH RESPECT TO AN INTERSTATE WIRE TRANSFER

14  OF A HUNDRED THOUSAND SENT BY OR ON BEHALF OF

15  MR. LIN ON OR ABOUT FEBRUARY 23RD, 2005, AS

16  DESCRIBED IN INSTRUCTION 13.

17    COUNT THREE, GUILTY OF THE CHARGE OF WIRE

18  FRAUD WITH RESPECT TO AN INTERSTATE WIRE TRANSFER

19  OF 250,000 SENT BY OR ON BEHALF OF MR. LIN ON OR

20  ABOUT JULY 6, 2005, AS DESCRIBED IN INSTRUCTION 13.

21    COUNT FOUR, GUILTY OF THE CHARGE OF WIRE

22  FRAUD WITH RESPECT TO AN INTERSTATE WIRE

23  COMMUNICATION DIRECTING 2 MILLION WIRE TRANSFER BE

24  SENT BY OR ON BEHALF OF MR. VERDIELL ON OR ABOUT

25  APRIL 27, 2007, AS DESCRIBED IN INSTRUCTION 13.

1          COUNT FIVE, GUILTY OF THE CHARGE OF WIRE

2     FRAUD WITH RESPECT TO AN INTERNATIONAL WIRE

3     TRANSFER OF 2 MILLION SENT BY OR ON BEHALF OF

4     MR. VERDIELL ON OR ABOUT APRIL 30TH, 2007, AS

5     DESCRIBED IN INSTRUCTION 13.

6          COUNT SIX, GUILTY OF THE CHARGE OF WIRE

7     FRAUD WITH RESPECT TO AN INTERSTATE WIRE

8     COMMUNICATION DIRECTING THAT A 250,000 WIRE

9     TRANSFER BE SENT BY OR ON BEHALF OF MR. LIN ON OR

10    ABOUT JUNE 19, 2007, AS DESCRIBED IN INSTRUCTION

11    13.

12         COUNT SEVEN, GUILTY OF THE CHARGE OF WIRE

13    FRAUD WITH RESPECT TO AN INTERNATIONAL WIRE

14    TRANSFER OF 250,000 SENT BY OR ON BEHALF OF MR. LIN

15    ON OR ABOUT JUNE 19TH, 2007, AS DESCRIBED IN

16    INSTRUCTION 13.

17         DATED JUNE 20TH, 2012, JURY FOREPERSON

18    PAUL KEMPEN.

19         THE COURT:  MR. KEMPEN, DID THE CLERK

20    CORRECTLY READ THE VERDICT?

21         JUROR:  YES.

22         THE COURT:  DOES EITHER SIDE WISH TO HAVE

23    THE JURY POLLED.

24         MR. FAZIOLI:  NO, YOUR HONOR.

25         MR. FONG:  NO, YOUR HONOR.

1        THE COURT:  ALL RIGHT, LADIES AND

2   GENTLEMEN, THAT CONCLUDES YOUR SERVICE.  I WANT TO

3   THANK YOU VERY MUCH FOR YOUR COOPERATION AND

4   ATTENDANCE THROUGHOUT THIS MATTER.

5        AS I TOLD YOU AT THE BEGINNING AND I

6   THINK A COUPLE TIMES DURING THE TRIAL, UP ARE NOW

7   FREE TO TALK ABOUT THE CASE TO ANYONE IF YOU WISH

8   TO.  ON THE OTHER HAND YOU HAVE ABSOLUTELY NO

9   OBLIGATION TO DO SO.

10       SO IF THE ATTORNEYS WANT TO TALK TO YOU

11  ABOUT THE CASE, YOU CAN TALK TO THEM IF YOU WANT

12  TO, BUT YOU DON'T HAVE TO.  SIMILARLY WITH FAMILY,

13  EMPLOYERS OR FRIENDS, IT'S TOTALLY UP TO YOU.

14       SOMETIMES ATTORNEYS IN PARTICULAR LIKE TO

15  TALK TO JURORS TO FIND OUT WHAT THEIR THINKING WAS

16  AND GET CRITIQUES OF THEIR OWN PERFORMANCES, BUT

17  AGAIN IT'S TOTALLY UP TO YOU WHETHER YOU TALK TO

18  THEM OR NOT.

19       YOU HAVE BEEN A GREAT JURY, YOU HAVE BEEN

20  TIMELY AND ATTENTIVE AND I REALLY APPRECIATE IT,

21  AND WITH THAT YOU ARE EXCUSED.

22       THE COURT:  AND I WILL BE BACK WITH

23  COUNSEL IN ABOUT FIVE MINUTES.

24       (WHEREUPON, THE FOLLOWING PROCEEDINGS

25  WERE HELD OUT OF THE PRESENCE OF THE JURY:)

1              THE COURT:  DO YOU WANT TO SET A

2     SENTENCING DATE?

3              THE CLERK:  YES.  HOW ABOUT SEPTEMBER 4TH

4     FOR SENTENCING?

5              MR. FAZIOLI:  WOULD IT BE POSSIBLE -- I

6     MAY BE IN A TRIAL THAT WEEK ON THAT DATE.  I DON'T

7     KNOW IF WE COULD DO IT A WEEK LATER, IF POSSIBLE.

8     IF THE DEFENSE OBJECTS TO IT I CAN WORK AROUND IT.

9              MR. FONG:  THERE'S NO OBJECTION,

10    YOUR HONOR.

11             THE CLERK:  OKAY.  SEPTEMBER 10TH.

12             THE COURT:  ALL RIGHT.  ANYTHING ELSE?

13             MR. FONG:  NO, YOUR HONOR.

14             MR. FAZIOLI:  NO, NOTHING FURTHER.

15             THE COURT:  THANK YOU FOR YOUR

16    COOPERATION AND COURTESY THROUGHOUT THE CASE, AND

17    IT'S VERY APPRECIATED BY ME.

18             THANKS.

19             MR. FAZIOLI:  THANK YOU, YOUR HONOR.

20             MR. LUCEY:  THANK YOU, YOUR HONOR.

21             MR. FONG:  GOOD EVENING.

22             (WHEREUPON, THE PROCEEDINGS IN THIS

23    MATTER WERE CONCLUDED.)

24

25

1

2                      **<u>CERTIFICATE OF REPORTER</u>**

3

4

5

6            I, THE UNDERSIGNED OFFICIAL COURT

7    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

8    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

9    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT,

12   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

13   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

14   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

15   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16   TRANSCRIPTION TO THE BEST OF MY ABILITY.

17

18

19

20

21

22

23   /S/

24   _____
     SUMMER A. FISHER, CSR, CRR
25   CERTIFICATE NUMBER 13185          DATED: 6/26/12

                                                    1134