JERRY Y. FONG, ESQ. (SBN 99673)
THE LAW OFFICE OF JERRY FONG
706 COWPER STREET;   SUITE 203
PALO ALTO, CA  94301
650/322-6123
650/322-6779 fax
jf@jerryfong.com

Attorney for Defendant ALBERT KEJENG HU

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>ALBERT KEJENG HU,<br><br>  Defendant. | CASE NO.   CR 09-00487 RMW<br><br>DEFENDANT ALBERT HU'S <u>***PARTIAL*** SENTENCING MEMO & REQUEST FOR A CONTINUANCE OF THE SENTENCING HEARING & FOR AN EVIDENTIARY HEARING ON SPECIFIC ISSUES.</u><br><br>Date:       November 26, 2012<br>Time:      9:00 a.m.<br>Judge:    Hon. Ronald M. Whyte |

I.

<u>INTRODUCTION</u>

Defendant Albert Hu hereby submits his ***partial*** Sentencing Memorandum and Request for a continuance of the sentencing hearing (from November 26, 2012 to mid-January, 2013) and for an evidentiary hearing for certain sentencing issues.

The request for a continuance is necessary in order for Mr. Hu and his counsel to have sufficient and reasonable time to address or respond to the following sentencing issues:

1.     The receipt on November 14, 2012, of an unexpected jump in the Sentencing Guideline calculations between the Draft PSR and the Final PSR, resulting in a significantly higher prison term recommendation (anywhere from ***84 additional months*** to 105 additional months, if the low end of the sentencing range is used).  While Mr. Hu and his counsel are

1  ready to address some of the issues presented by this radical change, they need more time to
2  fully and fairly respond to these issues.

3       2.    The Government's argument and the Probation Office's recommendation that
4  Mr. Hu should be sentenced to an (from the defense's perspective) unduly harsh and legally
5  unreasonable sentence of 19 and ½ years, only six months fewer than the statutory maximum
6  of 20 years for the crime of wire fraud.  Mr. Hu contends that a body of federal cases has
7  emerged in which certain sentencing judges boldly deconstructed and rejected the "piling-on"
8  mentality of simply adding up guideline enhancement factors to significantly and harshly
9  increase prison sentences for investment fraud cases, and, *instead*, focus on the correlation
10 between the amount of loss and the length of the term of imprisonment imposed.  Mr. Hu and
11 his counsel need more time to research additional cases (including local cases) to support the
12 use of this new model for determining what is a just and reasonable sentence in investment
13 fraud cases.

14      3.    The Government and the Probation Office's improper application of various
15 enhancement factors, adding *another* 12 offense levels to the undisputed 25 levels (base
16 offense level of 7 plus an additional 18 levels for the loss amount).   Many of the material
17 underlying evidence or factual allegations/assumptions used by the PSR and the Government
18 to support the application of these enhancements are disputed, and an evidentiary hearing on
19 these issues is warranted.  Mr. Hu needs more time to prepare and present such arguments
20 and evidence.

21      4.    The receipt of the victim impact statements which (with the exception of Jean
22 Marc Verdiell's, which had been received earlier) yesterday, on November 19, 2012.  From
23 the defense's initial review of these understandably highly emotional statements, it appears
24 that they contain material inaccuracies or omissions.  Due to the fact that this is not
25 mandatory minimum case and the very significant differences between what the PSR and the
26 Government are seeking and what the defense is arguing for, Mr. Hu is entitled to have
27 sufficient time to investigate and respond to these statements.

28      5.    The internal disagreements between Mr. Hu and his counsel as to how to

respond to the Government's argument and the PSR's recommendation and how to present Mr. Hu's perspective and positions properly. Mr. Hu and his counsel have been working non-stop to attempt to resolve their differences, but they need the additional time to complete this process so that there will be unity and consistency in Mr. Hu's representation at sentencing.

For these and other (set forth below) reasons, Mr. Hu respectfully that the Court grant a short continuance (from November 26, 2012 to mid-January, 2013) of the sentencing hearing so that he can reasonably and adequately fight for a significant part of his life.

II.

THE CHANGE BETWEEN THE DRAFT PSR AND THE FINAL PSR

On November 14, 2012, Mr. Hu's counsel received by fax a copy of the Final Presentence Report ("PSR"). A copy of the Final PSR is attached as Exhibit "A" to the Declaration of Jerry Fong (hereinafter "Fong Decl."). The Final PSR contains a significantly different Sentencing Guideline calculation than the Draft PSR's (Exh. "B" to Fong Decl.).

The Draft PSR presented a total offense level of 33, with a Criminal History Category II, yielding an advisory sentence range of 151 months to 188 months. The Draft PSR arrived at the offense level of 33 through the following calculations:

- Base offense level (7).
- Loss amount of more than $7 million (+20 levels).
- Substantial part of scheme was committed from outside the US (+2 levels).
- Organizer, leader, manager, or supervisor in an activity, other than as described at USSG §§3B1.1 (a) and (b)   (+2 levels).
- Abuse of a position of trust (+2 levels).
- **Total offense levels =  33.**

After the disclosure of the Draft PSR, Mr. Hu, through his counsel, submitted two written responses and objections (Exhibits "C" and "D" to Fong Decl) to the Draft PSR, challenging its guideline calculations, particularly the application of the enhancement factors, and requesting to meet-and-confer (among the Probation Office, the Government, and Mr.

Hu's counsel) over the disputed issues. Mr. Hu's counsel also specifically requested that the Probation Office disclose the evidentiary bases upon which the Probation Office relied in arriving at its conclusions or in making its assertions, as contained in the Draft PSR.

The Government also submitted its response (Exhibit "E" to Fong Decl), in which it argued for the application of additional enhancement factors and for the finding of the total offense level at 37. The Government and Mr. Hu did agree on one point: that the loss amount was between $2.5 million and $7 million, so that the loss amount enhancement under USSG §2B1.1 (b)(1) should be +18 levels.

The Government and Mr. Hu's counsel did meet to try to resolve some of the differences, but they were not able to do so. The Probation Office did not participate in the meet-and-confer and did not provide the requested information or evidence, relating to specific recommendations or findings contained in the Draft PSR.

On November 14, 2012, Mr. Hu's counsel received by fax a copy of the Final PSR. The Final PSR appears to have adopted the Government's positions in total. It provides for the following sentencing guideline calculations:

- Base offense level (7)
- Loss amount between $2.5 million and $7 million (+18)(this is 2 levels fewer than the Draft PSR's position).
- Offense involved 10 or more victims (+2)(this was not a part of the Draft PSR).
- Relocating the scheme to another jurisdiction to evade law enforcement (+2)(while the Draft PSR, at ¶ 41, recommended a +2 under USSG §2B1.1 (b)(9)(B), that was based on the assumption that a substantial part of the scheme had been committed from outside the United States).
- Offense involved a violation of securities law and the defendant was, at the time of the offense, an investment adviser (+4)(this was not a part of the Draft PSR, although the PSR did add 2 levels for abusing a position of trust).
- Criminal activity was otherwise extensive and the defendant was an organizer

or leader in an activity involving 5 or more participants (+4)(the Draft PSR, recommended only a 2 level increase under USSG §3B1.1 (c)).

- Final PSR offense total:   Level 37.

✪   The difference in the advisory sentence range between the Draft PSR (151 months to 188 months) and the Final PSR (235 months to 293 months) =   84 months at the low end and 105 months at the high end.

✪   If the Draft PSR had used the parties' agreed-upon loss amount enhancement, the difference would be between Level 31 (121 to 151 months) and Level 37 (235 to 293 months) =   114 months at the low end and 142 months at the high end.

Therefore, as of November 14, 2012, Mr. Hu learned that the PSR's recommendation jumped up by, at the least, 84 months, even though the loss amount enhancement had actually decreased by two levels.  When the fact that the loss amount is not in dispute (between $2.5 million and $7 million) is taken into consideration, the differences between the Draft PSR and the Final PSR are magnified significantly.  That is to say, under a total offense level of 31 (Draft PSR with 2 level decrease to adjust for the undisputed, lower loss amount), the low end would have yielded an advisory sentence of 121 months, *almost one half* of the final PSR's recommended sentence of 235 months.

The change from the Draft PSR to the Final PSR was made without, from the defense's standpoint, a meaningful or adequate meet-and-confer session among the probation office, the government, and the defense and without notification to the defense that the Probation Office was contemplating such an increase.

More importantly, for a wire fraud offense, the Government is seeking and the Probation Office is recommending a sentence of 19 and ½ years (and that would be *at the low end of the range*).  At the high end of that range the sentence would be approximately 24 and ½ years.  To place the 19 and ½ year sentencing recommendation in perspective, the statutory maximum prison term is 20 years (for each wire fraud count), only six months more than what the Government is seeking and what the Probation Office is recommending.

While Mr. Hu understands that the final PSR can and should include changes (after consulting with the parties), the fact that the final PSR's recommendation effectively increased by almost 100% from the draft PSR (adjusted for the parties' agreement of the loss amount enhancement) cries out that Mr. Hu needs to have a full opportunity to respond and object properly to the changes, in addition to presenting his other arguments for sentencing under 18 USC §3553 (a).  Given that the final PSR was disclosed on November 14, 2012 (twelve days before the sentencing hearing scheduled on November 26, 2012), Mr. Hu respectfully requests that the Court grant a reasonable continuance to allow his counsel and him to prepare and present their responses and objections properly.

### III.

### EXAMPLES OF IMPROPER APPLICATIONS OF ENHANCEMENTS

As set forth in Mr. Hu's counsel's communications with the Probation Office and the Government, Mr. Hu contends that the enhancements applied by the Probation Office and the Government are not supported by the evidence and/or the applicable law.  However, he and his counsel need more time to respond properly to the allegations.  The following examples are illustrative.

    1.    <u>10 Victims Or More Enhancement</u>

Initially, the draft PSR did not include any enhancement under USSG §2B1.1 (b)(2)(enhancement for mass marketing or multiple victims of 10 or more).  See, ¶ 41 of the Draft PSR.  However, the Final PSR reversed its position and imposed a two level enhancement.  ¶ 41 of the Final PSR provides the following explanation for this reversal:

> There were two victims named in the Indictment, and an additional 10 victims, for a total of 12 victims. Additionally, the named victims' family members could also be considered victims; therefore, the increase is appropriate.

¶ 41 does not identify who the "additional 10 victims" were.  It also does not specify what was the offense or criminal conduct which made these 10 additional individuals "victims" within the meaning of USSG §2B1.1 (b)(2).  Obviously, Mr. Hu cannot be expected to challenge the accuracy of this assertion without knowing the identifies of these

additional "victims".

Furthermore, as a factual matter, from Mr. Hu's perspective, there were fewer than 10 individuals who had lost money investing in the Asenqua or Fireside hedge fund. Other investors had invested in entities which specifically purchased stock in companies such as Konarka. These investments were not part of "the offense", which was limited to the investments made in the Asenqua Beta Fund or the Fireside LS Fund (both hedge funds).

As Mr. Hu's counsel's letter (responding to the Draft PSR) set forth, Mr. Hu could identify (at the most), eight (8) investors who lost money in Asenqua or Fireside hedge funds. That number should also be reduced to seven (7), given that Grace Doong made her investments only in her name and not in her sister's name. Therefore, Mr. Hu could not have known that Grace Doong's investment actually represented two individuals (Grace Doong herself, and her sister, Yu-Mei Doong). A person is considered a "victim" under USSG §2B1.1 (a)(2) only if that person's loss was reasonably foreseeable. There is no evidence that Grace Doong had been acting as the representative for her sister; therefore, it was not foreseeable that her sister could be counted as a "victim".

Finally, ¶ 41's assertion that the named victims' family members could also be considered victims is not based on any facts or law. Mr. Hu cannot find any case law which supports the argument that §2B1.1 (b)(2) was ever intended to count each member of a victim who lost money due to a defendant's fraud can multiply the number of victims simply by counting members of the victims' family. There is no evidence that Mr. Lin or Mr. Verdiell's family members had separately made any investments or loss any money.

Mr. Hu needs more time to separate out each of the possible investors and to produce the relevant documents showing that fewer than 10 of them invested in the Asenqua Beta Fund or the Fireside LS Fund. Mr. Hu also needs the additional time to present the legal argument that the other investments were not relevant conduct as to the Indictment and cannot be considered for the purposes of counting victims.

2. <u>Relocating The Fraud Scheme Outside The United States</u>

In the Draft PSR, the Probation Office applied a two level increase because a

substantial part of the scheme had been committed outside the US.  See, Draft PSR, ¶ 41. It asserted that the "defendant moved his business, and opened a bank account in Singapore. Additionally, he recruited investors from Singapore and Taiwan.  Therefore, the increase is appropriate."

The Final PSR (at ¶ 42) kept the two level increase, but provided a different and more detailed justification:

> The defendant relocated his fraudulent investment funds to Singapore in an effort to evade law enforcement or regulatory officials;  he moved his investment funds to Singapore and asked victims to wire money abroad;  and told victims that he was transferring his funds to Singapore, for among other reasons, to avoid oversight of the SEC and other regulatory authorities.  The defendant also perpetrated his scheme by using numerous bank accounts that he controlled and which were located outside the United States; hide assets and transactions; both created and used fictitious entities;  and used offshore financial accounts.

The problem with this enhancement is that the trial evidence was quite clear that the events which formed the offenses for which Mr. Hu has been convicted had taken place right here in the Bay Area.  Both Mark Verdiell and Bob Lin are residents in the Bay Area. They met Mr. Hu here, and developed their relationship with Mr. Hu here in the Bay Area.  The relevant misrepresentations had been made here, and they sent their money from their Bay Area homes/offices.  At all times, Mr. Hu's maintained his headquarters here in Sunnyvale, CA, and transactions relating to the Asenqua Beta Fund and the Fireside LS Fund had been conducted here as well.  Therefore, the offense took place almost entirely here in the Bay Area.

Furthermore, the fact that Mr. Hu had *other* business interests and transactions (which were not the subject of the Indictment or prosecution in this case) outside the United States is not relevant in determining whether or not the fraudulent scheme at issue had been relocated  to outside the US or had been substantially committed in the US.

Also, even if a foreign bank account had been used for the transfer of some of

1 the funds at issue, that does not change the central fact that the crime had been committed
2 in the Bay Area and the operation of the two hedge funds remained in the Bay Area.

3       Mr. Hu asked for the disclosure of evidence on which this enhancement was
4 based but has not received such information. Mr. Hu wishes to put together the documents
5 which would show that, effectively, the offense had been committed here in the Bay Area
6 and his overseas activities did not alter that fact. Mr. Hu is entitled to more time to provide
7 the necessary documents to disprove the PSR's conclusions.

8       3.    Financial Adviser Enhancement

9       The Draft PSR did not include the four level enhancement based on the
10 allegation that the defendant had been a financial adviser to the investors (under USSG
11 §2B1.1 (b)(18)(A)(iii). Instead, it included a two level enhancement for abuse of a position
12 of trust (USSG §3B1.3). However, the Final PSR (at ¶ 43) changed that to add the four level
13 enhancement by alleging that Mr. Hu had been a financial adviser to the investors. That
14 paragraph alleged that:

15-19
> The defendant promised to invest his clients' monies according to the terms of the relevant investment agreements and private placement memoranda... He often indicated that stocks or other securities were being traded when investors pressed him for more details... the defendant and his companies would retain a percentage of the investments for operational expenses and profits...

20       What ¶ 43 described is an arms length relationship between a buyer of a
21 product or service (the investors) and a seller of a product or service (Mr. Hu), the
22 product/service here is the investment in a hedge fund. Mr. Hu pointed to a leading SEC
23 case which held that a manager of a hedge fund does not stand in a financial adviser (or
24 fiduciary) role, relative to the individual investors.  See, Goldstein v. SEC, 451 F.3d 873,
25 877, 879-880 (DC Cir. 2006)

26       Furthermore, the PSR totally ignores the fact that the very documents it pointed
27 to (the placement memoranda and the investment agreements) specifically warned the
28 prospective investors that they should understand that there was inherently a real risk

associated with investing in the hedge fund and that they need to consult with their own independent advisers (e.g., lawyers, accountants, financial advisers, etc.) before making the investment. Exhibit "F" to Fong Decl is made up of the relevant portion of the Fireside LS Fund Placement Memorandum (page 4, 3rd ¶) specifically advising each prospective investor that he or she should rely on his or her own "investment advisers" before making the investment. Page 3, 3rd ¶ of Exhibit "F" warned that the investment is inherently speculative and involve substantial risk of a total loss. The warnings certainly undermine the argument that Mr. Hu stood as the financial adviser to the investors of the hedge funds.

Ultimately, the Probation Office did not respond to Mr. Hu's request to meet and confer over this important issue (as a four level enhancement would increase the sentence by, at the least, 84 months). Mr. Hu is entitled to additional time to flesh out this argument and the supporting evidence.

IV.

VICTIM IMPACT STATEMENTS

On November 19, 2012, Mr. Hu's counsel received from the Government victims impact statements from investors Andy Yan, Bob Lin, Michael Chuang/Grace Doong, and Hwa-Fu Chen. Previously, the Government had sent the victim impact statement from Jean Marc Verdiell. Understandably, the victims tried to make the case that they had endured significant harm, beyond the loss of substantial amounts of money. However, it appears that some of the statements made are at odds with other available sources of evidence.

For example, Hwa-Fu Chen alleged that "some of the $708,044.24, which I invested [sic] Albert HU, came from my home mortgage..." P. 2, the 6th ¶ of Mr. Chen's Statement. The relevant documents, including the monthly statements of his account in the hedge fund and the Government's own calculations, show that Mr. Chen actually invested $570,000, not the $708,044.24 he now claims.

Similarly, Andy Yan claims that: "I had $2.67 million with him [Albert Hu]. This is not a small number, it is a life changing number for me." Yet, the Government's own calculations show that Mr. Yan actually invested a total of $723,133. And, Mr. Yan also

1  received re-payment of $660,000, leaving a difference of $63,133.

2  In addition, these statements should be considered along with the clear
3  warnings contained in the various subscription agreements or placement memoranda, which
4  specifically and repeatedly warned a prospective investor that there were risks inherent in
5  investing in the hedge fund and that each should consult with his/her own independent
6  experts or professionals (including each's own investment adviser) before making the
7  investment. Furthermore, the subscription agreement typically contained each investor's own
8  declaration that he/she was a qualified investor who maintained a high net worth and could
9  afford to deal with the possible loss of the entire investment. Exhibit "G" to Fong Decl is
10 the relevant portion of the Asenqua Beta Fund Subscription Booklet (page 22;  ¶ I of page
11 28).

12 While the victim impact statements do not constitute an enhancement or
13 directly add to the total offense level, it is clear that they could be highly relevant to the
14 Court's determination of the ultimate sentence, given that this is not a mandatory minimum
15 case, and the sentencing guidelines are advisory only. With the significant difference
16 between what the Government is seeking and what the PSR recommends (19 and ½ years)
17 and what Mr. Hu believes is a just and reasonable sentence (4 to 5 years), the accuracy of the
18 victim impact statements is important, and Mr. Hu is entitled to sufficient time to fully assess
19 their accuracy and to respond accordingly.

20                                    IV.

21 A REALISTIC APPROACH TO THE DETERMINATION OF A JUST &
    REASONABLE SENTENCE IN INVESTMENT FRAUD CASES
22

23 Recently, there has been a developing movement among courts from all corners of the
24 country to work toward finding and formulating a more realistic approach to determine the
25 proper and reasonable sentence to be imposed in a financial fraud case. See, *e.g.*, US v.
26 Parris, 573 F.Supp.2d 744 (E.D.N.Y., 2008). The movement appeared to have started as a
27 negative reaction by the certain district courts to the extraordinarily high and harsh sentences
28 required by a mechanical application of the Sentencing Guidelines, particularly when the

various applicable enhancement factors are added to the base offense level. <u>Id.</u>

One of the leading cases is <u>US v. Adelson</u>, 441 F.Supp.2d 506, 512-514 (S.D.NY 2006). In <u>Adelson</u>, the Defendant was convicted of securities fraud. At sentencing, the District Court was faced with the dilemma that the Sentencing Guideline calculations yielded a sentence of life imprisonment (limited only by the combined statutory maximum of 85 years). Ultimately, the Court sentenced the Defendant to 42 months of imprisonment, with the Government arguing for 15-20 years and the defense arguing for 21 to 27 months. In response to the Second Circuit's requirement for a written statement for the imposition of a non-guideline sentence, the District Court carefully prepared a thoughtful written analysis to explain why the application of the sentencing guideline calculations would have led to a serious injustice and a violation of the goals and policies of 18 USC §3553 (a).

The District Court was clearly troubled by the impact of applying (technically, correctly, under the Sentencing Guidelines) the relevant enhancement adjustments, resulting in the addition of 16 levels to the offense level for a loss of more than $50 million.

> While one might theorize as to why the Sentencing Commission promulgated each of these additions, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weight it has chosen to assign to each identified characteristic." Stith & Cabranes,, *supra*, at 69 [Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)]. Here, their combined effect- an added 20 points under the Government's approach- ill-fits the situation of someone like Adelson. ***It represents, instead, the kind of "piling-on" of points for which the guidelines have frequently been criticized.*** ... (First brackets in original; second brackets added; first italics in original; quotes in original; bold and second italics added).

The District Court acknowledged that the offense was serious in nature, as the accounting fraud at issue extended over several years with an intended loss of more than $50 million. In mitigation, the Court noted that Defendant Adelson was not the originator of the fraud and had joined the conspiracy toward the end and that Adelson had led an otherwise

exemplary life. Weighing the plus and minus, the Court nevertheless concluded that meaningful prison time was necessary to achieve §3553 (a)'s stated goals and policies of retribution and general deterrence. The Court then provided the following observations:

> But as to the latter, there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders. [Citations]. *Cf.* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004)(noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these "white collar" cases, both to ensure proportionate punishment and to achieve deterrence")(emphasis supplied); transcript of sentence, *U. S. v. Saad*, 1/17/06, at 33 (similar remarks of Government prosecutor at time of Dr. Saad's sentence). <u>Id.</u>, at 514 (brackets added; italics, quotes, and parenthesis in original).

The Court also took account the need for the sentence to avoid disparity. Specifically, the Court found that the imposed sentence of 42 months was reasonable (to avoid disparity) in light of the fact that in the case of Bernard Ebbers, in which Mr. Ebbers (as the active leader of the World.Com fraud conspiracy) had been responsible for fraud losses totaling more than $2 billion and, yet, received a sentence of only 25 years. <u>Id.</u>, at 515.

The Court concluded that:

> What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense. <u>Id.</u>, at 512.

In <u>US v. Jackson</u>, 346 F.3d 22 (2d Cir. 2003), the defendant was convicted of credit card fraud, mail fraud, and bank fraud. The Second Circuit upheld the District Court's imposition of two enhancement factors (sophisticated means **and** leadership of an extensive criminal activity) which were similar in nature, rejecting the argument that adding two similar enhancement factors constituted impermissible "double counting". <u>Id.</u>, at 26-27. However, the Court then remanded the case to the district court for consideration of a possible downward departure, due to the injustice of following the literal application of the

guidelines when two overlapping enhancements were properly added (on a technical level) to the base offense. The Court explained that:

> Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. ***Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.*** (Italics and bold added).

The Court further noted that while each enhancement might seemingly add a modest number of levels to the overall offense level calculation (e.g., the sophisticated means enhancement added only 2 levels), such added levels tend to have a greater effect (in terms of harshness) on increasing the number of months of imprisonment, due to the fact that as the offense levels increase, each additional level would impose a higher number of months than that same level if added to a lower offense level.

> Moreover, a phenomenon of the Guidelines, graphically illustrated by this case, is that any one enhancement increases the sentencing range by a far greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement had been imposed. [Citation].... we think that these enhancements combine to have a cumulative effect that is present "to a degree" not adequately considered by the Commission, *see* 18 U.S.C. § 3553 (b), and therefore make available, in the discretion of the District Court, a downward departure... *Id.*, at 26 (brackets added).

In Jackson, the enhancements which aroused the Court's concerns were fairly modest, in comparison to the enhancements at issue in this case: 10 levels for the sum of money lost; 2 levels for carefully planned criminal activity; 2 levels for sophisticated means; and 4 levels for an extensive criminal scheme. *Id.*

In a laudable display of diligence, the District Court in US v. Parris, 573 F.Supp.2d 744 (E.D.N.Y. 2008), actively solicited the presentation of an overview of the pattern of sentencing in investment fraud cases throughout the federal court system. In Parris, two brothers were convicted of conspiracy to commit securities fraud, conspiracy to commit witness tampering, and witness tampering. Faced with the advisory guidelines range

1  of 360 months to life, the Court instead imposed a sentence of 60 months for each of the
2  defendants, citing with approval <u>Adelson</u>'s observation that the case was yet another example
3  where the guidelines in a securities fraud prosecution have so run amok that they are patently
4  absurd on their face, due to the kind of piling-on points for which the guidelines have
5  frequently been criticized.  <u>Id.</u>, at 745.
6      The Court observed that:

> ... the nature of their crimes- while clearly deserving of the punishment which I have meted out [60 months, instead of the guidelines' advisory range of 360 months to life]- is simply not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations and, in particular, on their companies' employees and stockholders, many of whom lost their pensions and were financially ruined.  Yet the sentences entailed in those cases, such as Enron, WorldCom and Computer Associates, were each less, and in some cases markedly less, than the lowest end of the guidelines range in this case.  <u>Id.</u>, at 746 (brackets added).

The Court acknowledged that the applicable guidelines calculations were:

| | | |
|---|---|---|
| 1. | Base offense level: | 7; |
| 2. | Loss of more than $2.5 million: | +18; |
| 3. | More than 250 victims: | + 6; |
| 4. | Sophisticated means: | + 2; |
| 5. | Defendants as officers or directors of public companies: | + 4; |
| 6. | Defendants as managers or supervisors of criminal activity involving 5 or more participants: | + 3; |
| 7. | Obstruction of justice by witness tampering and giving false testimony and documents to the SEC: | + 2 |
| 8. | <u>Total offense level:</u> | <u>42</u> |

The guidelines calculation in <u>Parris</u> is eerily similar to that proposed by the Government and the PSR in Mr. Hu's case.

Troubled by the fact that under the guidelines' advisory range of 360 months, the Court undertook the chore of researching (with the cooperation of the Government and the defense) sentences imposed in significant fraud cases throughout the federal court system, for the purpose of comparing the sentences imposed in the other cases to the situation involving Defendant Parris, in attempting to arrive at a just and reasonable sentence for Parris, particularly to meet the mandate of 18 USC §3553 (a)(6) of avoiding unwarranted sentence disparities among defendants with similar records who have been found guilty of similar crimes. The results of the Court and counsel's searches are summarized in tables or columns set forth within the opinion:   at pages:   753;   756-763.

From the accumulated data and information, the Court drew certain general conclusions:

1.  That there was a significant correlation between the amount of losses and the period of incarceration imposed in sentencing.

2.  Those defendants who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years).

3.  Those defendants who were responsible for losses of less than $100 million were generally sentenced to single-digit prison terms. *Id.*, at 753.

These conclusions further led the Court to acknowledge that:

> To be sure, there were undoubtedly a host of factors that entered into these sentences, and there were others that seem on the surface to defy this pattern,  for example, *Surgent* FN9-  but I simply could not dismiss, in assessing the nature and seriousness of the Parrises' crimes under §3553 (a)(1), the overall relationship of the amount of losses in those cases to the sentence imposed; fairness in sentencing required that I recognize that, although the Parrises' criminal conduct was reprehensible, they were simply not in the same league as the likes of Enron, WorldCom and Computer Associates defendants.  (Italics in original).

Ultimately, to ensure that the sentence imposed would be sufficient ***but not greater than necessary*** to satisfy the purpose of sentencing (as identified in 18 USC §3553 (a)), the Court concluded that the 60 month sentence the Court intended to impose on the defendants was fair and reasonable, instead of the guidelines advisory range of 360 months:

> While it may well be that the 25-year sentence for someone like Ebbers- who, as CEO of a major multinational corporation with 2.9 billion shares of outstanding stock, was responsible for $2.2 billion loss to hundreds of thousands of investors- was "harsh but not unreasonable," *Ebbers*, 458 F.3d at 130, any comparable sentence meted out to the Parrises, would, in contrast, be unreasonable as a matter of law. (Italics in original).

On the local front, a recent, similar investment fraud case in the Northern District of California provides support for the imposition of a sentence well below the guideline calculations. That case is US v. James Stanley Ward, et. al., Northern District of California Case No. CR-11-0393 TEH. The Ward case involved an investment fraud scheme based on misrepresentations concerning the existence and validity of security for investors in construction loan mortgages. The Government calculated the losses in that case to be more than $9 million, with over 200 victims. Defendant Jim Ward was the undisputed leader of the group of four defendants. The relevant guideline sentence range was between 97 to 121 months. The Court imposed a sentence of 5 years.

Having just received the Government's Sentencing Memorandum, Mr. Hu's counsel noticed that on page 9, the Government listed seven Northern District cases which the Government contends are "analogous" to Mr. Hu's case. Mr. Hu's counsel has not had an opportunity to investigate the underlying facts or factors at play in these cases. However, Mr. Hu does agree that a meaningful study and comparison of all relevant cases is important to provide the Court with additional information to arrive at a just and reasonable sentence. Accordingly, Mr. Hu respectfully requests that the Court grant a short continuance to allow Mr. Hu and his counsel to do present a more complete and meaningful argument based on the concept of parity.

V.

UNRESOLVED DIFFERENCES BETWEEN MR. HU & HIS COUNSEL

As set forth in Mr. Hu's declaration and Attorney Jerry Fong's declaration, Mr. Hu and his counsel need additional time to resolve a significant difference of opinion between them as to whether or not certain specific arguments should be made (and, if so, how they should be made) relating to sentencing. Given the high stake at issue (19 and ½ years of imprisonment), Mr. Hu respectfully requests that the Court permit him and his counsel the additional time to resolve their differences so that Mr. Hu can present a unified vision of his arguments at the sentencing hearing.

DATED: November 20, 2012                    Respectfully submitted,


                                            _____/S/_____
                                            by JERRY Y. FONG, Attorney for
                                            Defendant ALBERT KEJENG HU